No. 20-35827

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

DANIEL MITCHELL, ROBIN BALL, LUKE RETTMER, NATHANIEL
CASEY, MATTHEW WALD, SECOND AMENDMENT FOUNDATION, and
NATIONAL RIFLE ASSOCIATION,

*Plaintiffs — Appellees*,

v.

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County,
Washington, CRAIG MEIDL, in his official capacity as the Chief of Police of
Spokane, Washington, and TERESA BERNTSEN, in her official capacity as the
Director of the Washington State Department of Licensing,

*Defendants — Appellants*,

and

SAFE SCHOOLS SAFE COMMUNITIES,

*Defendant — Intervenor — Appellant*.

Appeal from the United States District Court for the
Western District of Washington; No. 3:19-cv-05106-JCC

## APPELLANTS' OPENING BRIEF

Ard Law Group PLLC                  Albrecht Law PLLC

Joel Ard                            David K. DeWolf
joel@ard.law                        david@albrechtlawfirm.com
P.O. Box 11633                      421 W. Riverside Ave., Ste. 614
Bainbridge Island, Washington 98110 Spokane, WA 99201
(206) 701-9243                      (509) 495-1246

November 25, 2020

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellants National Rifle Association ("NRA") and Second Amendment Foundation ("SAF") make the following Corporate Disclosure Statements:

The National Rifle Association is a not-for-profit membership association incorporated in the State of New York. NRA is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

The Second Amendment Foundation is a not-for-profit corporation incorporated in the State of Washington. SAF is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF ISSUES .............................................................. 1

STATEMENT OF THE CASE ......................................................... 1

   I.  I-1639 restricted purchase and sale of an entire class of firearms. ............ 2

   II.  Semi-automatic rifles are protected by the second amendment................ 3

      A.  Semi-automatic rifles are in common use. ...................................... 4

      B.  Semi-automatic rifles are used by law abiding citizens for lawful purposes. .................................................................... 8

      C.  Semi-automatic rifles are used for self-defense in the home. .......... 9

   III. RCW 9.41.124 bans interstate FFL-to-FFL sales.................................... 9

SUMMARY OF ARGUMENT...................................................... 12

STANDARD OF REVIEW ............................................................ 13

ARGUMENT ................................................................................ 14

   I.  The analytical framework for evaluating regulations challenged under the second amendment.................................................... 14

   II.  The first step: young adult purchase of semi-automatic rifles is protected by the second amendment. ....................................................15

      A.  Young adults have rights protected by the Second Amendment.................................................................. 16

      B.  *Heller* only excludes from Second Amendment protection restrictions characterized by long historical standing. ................. 19

      C.  The rights protected by the Second Amendment are not limited to self-defense in the home. .............................................. 21

   III. The second step: The under-21 semi-automatic rifle purchase ban can satisfy no "tiered" scrutiny............................................................ 23

      A.  The young adult purchase ban is per se unconstitutional. ............ 24

      B.  The young adult purchase ban impermissibly burdens Second Amendment rights. ......................................................26

C.  The young adult purchase ban fails intermediate scrutiny, even if that lower level applies. ..................................................... 28

IV. RCW 9.41.124 bans interstate sales in violation of the commerce clause. ........................................................................................ 31

A.  The framework for analyzing challenges under the interstate commerce clause. ........................................................................ 31

B.  The blanket ban on interstate commerce is unconstitutional. ....... 32

C.  The *Pike* test, even if it applied, could not be satisfied. ................ 35

Conclusion ............................................................................................ 36

Certifications ....................................................................................... 38

# TABLE OF AUTHORITIES

## CASES

*Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074 (9th Cir. 2020) ...................... 13

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) ............................................ 27

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573 (1986) ............................................................................................ 33

*Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016) ........................................... 4

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997) .................................................................................... 31, 32, 33

*City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) ............................... 34

*Department of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ....................... 35

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................... passim

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020)........................................ 6

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............................... 21

*Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1 (1928) ......................... 34

*General Motors v. Tracy*, 519 U.S. 278 (1997)....................................... 33, 34

*Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011)........................................... 14

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016)............................................. 8

*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014) .................... 20

*Mahoney v. Sessions*, 871 F.3d 873 (9th Cir. 2017)............................... 20, 27

*Mance v. Sessions*, 896 F.3d 390 (5th Cir. 2018)....................................... 14

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................... 4, 25, 28

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ............................................... 20

*Nationwide Biweekly Administration, Inc. v. Owen*, 873 F.3d 716 (9th Cir. 2017) .................................................................................... 35

*Natl. Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 714 F.3d 334 (5th Cir. 2013)............................................... 17

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) .............. 34

*New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .................................................................................... 7

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Or.*, 511 U.S. 93 (1994) ............................................... 32

*Packingham v. North Carolina*, 137 S.Ct. 1730 (2017) ......................... 28

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .................................... 35

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ........................... passim

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ......................... 21

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ................. 20, 27

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) .......................... 21

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) ............................. 21

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ...................................... 7

## STATUTES

10 U.S.C. § 246 ........................................................................................ 18

18 U.S.C. § 922(b)(3) ............................................................................... 11

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

50 U.S.C. § 3802 ...................................................................................... 18

RCW 9.41.010 ....................................................................................... 2, 10

RCW 9.41.080 .......................................................................................... 12

RCW 9.41.090 .......................................................................................... 12

RCW 9.41.092 .......................................................................................... 12

RCW 9.41.124 ..................................................................................... passim

RCW 9.41.240 ..................................................................................... passim

UNITED STATES STATUTES AT LARGE, 2 Cong. Ch. 33, May 8, 1792, 1 Stat. 271 ..................................................................................... 18

## Other Authorities

1 Proceedings And Acts Of The General Assembly Of
  Maryland January 1637/8 — September 1664, at 347
  (William Hand Browne ed., 1883)......................................................17

Bureau of Alcohol, Tobacco, Firearms, and Explosives Form 4473.......................30

Cramer, Clayton Colonial Firearm Regulation, 16 J. J. On
  Firearms & Pub. Pol'y 1 (2004) ........................................................17

https://www.marines.com/becoming-a-marine/enlisted.html..............................18

Kopel, David B. and Greenlee, Joseph, The Second
  Amendment Rights of Young Adults (January 16,
  2019). 43 Southern Illinois Law Journal (2019); U Denver Legal
  Studies Research Paper No. 18-28 .....................................................17

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. § 1331 (constitutional challenge). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

The district court's final judgment disposed of all parties' claims and was entered on August 31, 2020. ER 3. The Plaintiffs timely filed a notice of appeal on September 21, 2020. ER 4-6; *see also* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

1. Does Washington's ban on sales of semi-automatic rifles to adults ages 18-20, RCW 9.41.240, infringe the rights protected by the Second Amendment to the United States Constitution?

2. Does Washington's ban on interstate sales of semi-automatic rifles, RCW 9.41.124, violate the Commerce Clause of the United States Constitution?

## STATEMENT OF THE CASE

By approval of a ballot proposition, Initiative No. 1639 ("I-1639") in 2018, Washington added certain new definitions and restrictions to the firearms code, and thereby banned all persons aged 18 to 20 years old ("young adults") from purchasing semi-automatic rifles, by far the most common rifles purchased anywhere in the United States. I-1639 also banned non-residents from purchasing semi-automatic rifles from federally licensed firearms dealers ("FFLs") in Washington state. I-1639 banned in-person sales to non-residents, including active duty military personnel stationed in Washington, or non-residents who travel to Washington, and seek to

purchase a semi-automatic rifle in person. It also banned sales by Washington FFLs where delivery takes place in the purchaser's state. Prior to I-1639, a Washington FFL could sell a semi-automatic rifle to a non-resident by transferring the rifle to an FFL in the purchaser's home state, so that any background checks, waiting periods, or other requirements of the purchaser's state law would be fulfilled by the local FFL. I-1639 bans these "FFL-to-FFL" sales. The young adult purchase ban infringes the rights protected by the Second Amendment and enjoyed by law-abiding adults of all ages. The interstate sales ban violates the Interstate Commerce Clause.

## I. I-1639 RESTRICTED PURCHASE AND SALE OF AN ENTIRE CLASS OF FIREARMS.

I-1639 banned the sale of so-called "semiautomatic assault rifles" to young adults, and prohibited the sale of these firearms to anyone who does not reside in Washington state.[1] The novel phrase "semiautomatic assault rifle" was defined as follows:

> 'Semiautomatic assault rifle' means any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

RCW 9.41.010. Every "rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic rifle. ER 114-115. The word "assault" does nothing to further describe the operation or characteristics of a semi-automatic rifle. Just like rifles, a shotgun "which utilizes a

---

[1] RCW 9.41.240 (young adults); RCW 9.41.124 (out of state residents).

portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic shotgun, a common firearm. ER 114-115. A handgun "which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic pistol, and perhaps the most common firearm of any sort. ER 114-115. Thus, this new statutory definition covers every semi-automatic rifle model, with or without any particular feature or set of features. Any rifle that operates by using cartridge energy to load a new cartridge fits this definition, meaning that a separate trigger pull is required to fire each round, but no additional action (such as pulling back the bolt to chamber a new round) is required. All semi-automatic rifles are banned from purchase by young adults.

## II. SEMI-AUTOMATIC RIFLES ARE PROTECTED BY THE SECOND AMENDMENT.

The scope of the Second Amendment's protection is plain: Washington may not infringe the right of its people to keep and bear firearms that are in common use and are "typically possessed by law-abiding citizens for lawful purposes," *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008)—unless there is a history or tradition of bans on those firearms. In fact, "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. Rifles, including semi-automatic rifles, are "bearable arms." The right of Washington residents to keep and bear these arms is incorporated by the Fourteenth Amendment against state infringement, just as it is against the federal infringement.

*McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). The rights protected by the Second Amendment are "among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778. As a result, Washington state may not simply "enact any gun control law that [it] deem[s] to be reasonable." *Id.* at 783 (plurality opinion).

Semi-automatic rifles are in common use, and thus are protected by the Second Amendment, just as "handguns" (*Heller*) and "stun guns" (*Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016)) were found to be in common use. Semi-automatic rifles are the most popular long gun sold in the United States, and are owned by millions of Americans, including thousands of Washington residents. ER 41. Therefore, the state has banned arms protected by the Second Amendment. Quite literally millions of semi-automatic rifles are owned by private citizens in the United States, and they are commonly sold in Washington, with untold thousands at least in circulation. Rifles of every sort are so rarely involved in crime that the likelihood of a semi-automatic rifle being used ***other*** than for a lawful purpose by a law-abiding person is effectively zero.

###### A.    Semi-automatic rifles are in common use.

The Supreme Court has set a numerical lower bound for determining whether a category of weapon is "in common use." In *Caetano*, 136 S.Ct. 1027, Justice Alito's concurrence made clear that stun guns were in common use in the United States based on an undisputed record showing that approximately 200,000 civilians owned them. *Id.* at 1033. In light of this, and by any definition, semi-automatic rifles are in common use in the United States and in Washington. Indeed, every court to consider the question has reached this conclusion. Even courts that have upheld bans on

subcategories of semi-automatic rifles have conceded that semi-automatic rifles are overwhelmingly common in the United States.

The exact number of semi-automatic rifles in use in the United States is difficult to calculate. While statistics for sales of rifles of all types are available from the Bureau of Alcohol, Tobacco and Firearms ("BATF"), no entity tracks rifle sales by action type, e.g., semi-automatic, bolt, lever, pump, or break action. ER 33. Combining multiple data sources, however, it is abundantly clear that semi-automatic rifles are in common use.

In 2017, 2,504,092 rifles were manufactured in the United States. ER 56. 158,871 of those were exported, ER 33, while another 572,309 were imported. ER 33. This tallies to a net domestic increase of 2,917,530 rifles in 2017 alone. Prior years show similar increases: 2016 (increased by 4,821,743); 2015 (increased by 4,347,909); 2014 (increased by 3,963,507); and 2013 (increased by 5,355,628). ER 33.

The proportion of semi-automatic rifles reflected in those rifle totals can be derived from other data. The closest available estimate comes from the National Shooting Sports Foundation, which estimates the number of modern sporting rifles[2] manufactured in America each year. This subset of semi-automatic rifles represents over half of all rifles manufactured in the United States in 2017. ER 33. Given that 52% of all rifles manufactured for U.S. sales in 2017 were one specific type of semi-automatic rifle, the fraction of all rifles in use that are semi-automatic must be higher.

---

[2] Modern Sporting Rifle is the industry's name for AR style semi-automatic rifles, used to distinguish this specific type of semi-automatic rifle from other rifles, including other semi-automatic rifles. ER 33, citing https://www.nssf.org/msr/.

Even if modern sporting rifles constituted the only semi-automatic rifles available in the United States, in 2017 alone, Americans purchased over one and a half million of those semi-automatic rifles.

This preference for semi-automatic rifles is longstanding. For example, the Civilian Marksmanship Program ("CMP")[3] has for years sold U.S. military surplus M1 Garand rifles to civilians. The M1 Garand is a semi-automatic rifle (and thus banned for purchase by young adults in Washington state), which has been sold to the public by the federal government through FFLs for decades. They remain available today, and an interested person can begin the purchase process on the website of the CMP at https://thecmp.org/sales-and-service/m1-garand/.

Following *Caetano*'s use of national total ownership as the measure of "common use," there can be no doubt that semi-automatic rifles are in common use: in just the past decade, multiple millions of semi-automatic rifles have entered private ownership, far beyond the threshold of *Caetano*.

Further, when courts have reviewed bans on much narrower subsets of semi-automatic rifles—for example, those with particular features like pistol grips or removable magazines—they have uniformly found that even defined subsets of semiautomatic rifles constitute rifles in common use. This court recently noted the commonality of semi-automatic rifles with greater than 10-round capacity magazines. *See Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020). Where the Court found that a subset of all semi-automatic rifles, namely, two specific types of

---

[3] The CMP first existed within the Department of War, then the Department of the Army, and now is a federally chartered 501(c)(3). *See* https://thecmp.org/about/.

semi-automatic rifles with specific magazine capacity, are in common use, it logically follows that the greater set of *all* semi-automatic rifles is also in common use.

Other courts have followed suit. For example, in *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), the court reviewed a challenge to a state law that banned ownership of a "semiautomatic firearm that contained at least two listed military-style features, including a telescoping stock, a conspicuously protruding pistol grip, a bayonet mount, a flash suppressor, and a grenade launcher." *Id.* at 248. The Second Circuit had no trouble concluding that the narrow subset of semi-automatic rifles at issue was nonetheless in common use. *Id.* at 255. Similarly, in *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), the Court concluded that because "nearly 5,000,000 people owned at least one" of the defined subset of semi-automatic rifles (again, rifles with certain proscribed features), that defined subset of rifles was in common use. Of course, there are vastly more total semi-automatic rifles in private ownership than any defined subset. With many defined subsets "in common use," the larger, complete set must necessarily also be in common use.

With respect to whether semi-automatic rifles are in common use, Washington state is representative of the country as a whole. As both Mitchell and Ball testified, they routinely sell many, many semi-automatic rifles. ER 115; ER 120. Semi-automatic rifles constitute a majority of the rifles they sell to Washington residents. ER 115; ER 120. By any standard that has been employed by a federal court in assessing firearms regulations, semi-automatic rifles are in common use. The state itself has no idea how many semi-automatic rifles are in private hands in the state,

but all record evidence confirms that national trends are equally applicable in Washington.

Finally, other courts have concluded that categories of arms are in common use where very few jurisdictions ban them—a test that also incorporates the Second Amendment's limit on creating new, ahistorical bans. The concurrence in *Caetano* looked to this fact in striking down the stun gun ban, and the Fifth Circuit considered the longstanding and widespread bans on fully automatic machine guns relevant to finding them ***not*** in common use in *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016). Under this test, too, semi-automatic rifles are in common use. No prior U.S. jurisdiction has attempted to impose a categorical ban on the ability of any group of law-abiding adults to purchase all semi-automatic rifles.

### B. Semi-automatic rifles are used by law abiding citizens for lawful purposes.

The sheer number of semi-automatic rifles owned by private citizens in the United States demonstrates that this category of firearms is not only in common use, but that they are used by law-abiding citizens for lawful purposes. The amount of crime committed with rifles of all types—a broader category than semi-automatic rifles—is minuscule. For example, homicides committed with rifles are dwarfed by homicides from fists and blunt objects. ER 97. The overwhelming majority of semi-automatic rifles are quite plainly used only by law-abiding citizens for lawful purposes. Indeed, in any given year for the past decades, it is obvious that the number of semi-automatic rifles purchased exceeds the total number of rifles used for crime by a multiple of thousands. Any comparison of the BATF rifle sales data and FBI

crime data compels only one conclusion: over 99.9%, of all rifles are used lawfully. This is not a new trend, and shows no sign of reversing. Rifles can be used for years, even for decades. During the useful life of the tens of millions of rifles sold over the last twenty years, the rate of all manner of violent crime has declined, a decline that thankfully continues. ER 100-101. In light of the ever-increasing number of semi-automatic rifles in private hands, simple math compels the conclusion that the minuscule percentage of rifles used for any unlawful purpose declines every year.

### C. Semi-automatic rifles are used for self-defense in the home.

As more fully elaborated below, the Second Amendment rights identified in *Heller* extend beyond self-defense in the home. However, even if defense of one's home were the only right protected by the Second Amendment, a ban on any adult purchasing semi-automatic rifles would still be unconstitutional, and particularly so for young adults. By all accounts, semi-automatic rifles are the second most popular choice for in-home self defense, and are the best home defense firearms available to young adults. RCW 9.41.240 denies young adults the right to purchase them.

### III. RCW 9.41.124 BANS INTERSTATE FFL-TO-FFL SALES.

RCW 9.41.124 states that "[r]esidents of a state other than Washington may *purchase* rifles and shotguns, *except those firearms defined as semiautomatic assault rifles*, in Washington . . ." (emphasis added). This bars not only in-state *sales* and in-state *deliveries*, to non-Washington residents, but also sales where the firearm is transferred by a Washington FFL to an FFL in another state for delivery to a non-Washington resident in his or her home state.

In firearms law, a transaction in which a licensed dealer exchanges a firearm for money can constitute a "purchase" without an accompanying "sale," or can be a "sale" without a "purchase." Because these terms have firearms-specific federal definitions designed to ensure compliance with relevant federal law, and are not governed by general contract law, the new state ban on "purchase" of semiautomatic rifles by non-Washington residents does not have *merely* in-state effect and does not *merely* serve the State's asserted background check interest. It instead directly bans interstate commerce in which the State has no interest and which it has no right to regulate.

Prior to I-1639, a Georgia resident could give a Washington FFL money to purchase a semi-automatic firearm without entering Washington state. The Washington FFL would transfer the firearm to a Georgia FFL. The Georgia FFL would then comply with Georgia law before delivering the firearm to the Georgia resident, in Georgia. Under these circumstances, the Georgia resident *purchased* the firearm in Washington from the Washington FFL, even though the Washington FFL did not *sell* or *deliver* that firearm according to Washington law. This follows because Washington law defines the terms "sale" and "sell" with respect to firearms in a manner different from the use of those terms in other contexts:

> 'Sale' and 'sell' mean the actual approval of the delivery of a firearm in consideration of payment or promise of payment.

RCW 9.41.010. Federal law bans any licensed dealer from selling handguns to non-residents by forbidding the *sale or delivery* to a person who is not a resident of the

state in which the dealer operates. *See* 18 U.S.C. § 922(b)(3).[4] Following that pattern and respectful of the distinction between purchase on the one hand, and sale or delivery on the other, Washington law has no ban on "purchase" of handguns akin to the new interstate ban challenged here. Instead, tracking federal law, an out-of-state resident may purchase a handgun from a Washington FFL. The Washington FFL cannot ***deliver*** it to the non-Washington resident, nor approve that delivery. 18 U.S.C. § 922(b)(3). Instead, the Washington FFL sends it to a licensed dealer in the purchaser's state of residence, for that FFL to run required background checks and deliver the firearm to the purchaser. Thus, while a Washington FFL takes money in exchange for the firearm, he does not "sell" the firearm as that term is defined under law.

Furthermore, if the non-Washington FFL, in the purchaser's home state, performs the background check and delivers the firearm (after approval) as a professional courtesy to the Washington FFL, without charging the Washington FFL or firearm recipient, this means that neither the Washington FFL nor the out-of-state FFL "sold" the firearm for purposes of Chapter 9.41 RCW. The Washington FFL did not make "actual approval of the delivery" because the out-of-state FFL did. But that local FFL made delivery without payment or promise of payment. Thus, however counterintuitive it may appear, it is possible to have a firearms ***purchase*** without a firearms ***sale***.

---

[4] Read in conjunction with Washington's definition, this means federal law bans both sale, meaning "actual approval of the delivery of a [handgun] in consideration of payment or promise of payment," and delivery performed *without* payment or promise of payment.

Similarly, much of federal and state firearms law regulate *delivery*.[5] Following the structure and format of federal law, other Washington statutes (those drafted and passed by the legislature, instead of through citizen initiative) also regulate "delivery" of firearms. *See, e.g.*, RCW 9.41.080 ("No person may *deliver* a firearm to any person" the deliverer believes ineligible to receive it); RCW 9.41.090 ("no dealer may *deliver* a pistol to the purchaser thereof until" various conditions are met); RCW 9.41.092 ("a licensed dealer may not *deliver* any firearm to a purchaser or transferee until" background check requirements are met) (all emphases added).

Because RCW 9.41.124 bans certain *purchases*, not *sales* or *deliveries*, and because a purchase can take place without a sale, when Washington state barred *purchase* instead of banning *sale* or *delivery*, it banned an out-of-state purchaser from paying a Washington FFL for a firearm to be transferred to an FFL in another state, who in turn delivers the firearm in that other state.

## SUMMARY OF ARGUMENT

RCW 9.41.240's ban on purchase of semi-automatic rifles by young adults violates the Second Amendment. Young adults cannot be excluded from the protections of any enumerated right, including the Second Amendment. While certain persons (after individual adjudication) and certain classes of firearms have historically been considered outside the scope of Second Amendment protection, there is no historical precedent for depriving young adults of the ability to purchase

---

[5] Perhaps Congress thought if it regulated only "sales" or "purchases," FFLs could evade the law by giving away firearms. For whatever reason it made this distinction, it matters for understanding the ban.

semi-automatic rifles. Even if RCW 9.41.240 qualified for application of a tier of scrutiny, it could not survive either strict or intermediate scrutiny.

The ban in RCW 9.41.124 on purchases of semi-automatic rifles by non-residents is likewise unconstitutional under the Commerce Clause. Rather than track the restrictions on the delivery of handguns to non-residents, RCW 9.41.124 bans all semi-automatic rifle purchases by non-residents. Facial interstate commerce bans are per se invalid; even if a balancing test were applied, RCW 9.41.124 cannot be justified by any legitimate state interest.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision to grant a motion for summary judgment. *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1077 (9th Cir. 2020). The evidence must be viewed in a light most favorable to the non-moving party. Thus, contested factual claims asserted by the State (for example, testimony that young adults have immature brains, or that other firearms are adequate substitutes for purposes of self-defense) cannot be the basis of summary judgment. With respect to Plaintiffs' Motion for Summary Judgment, by contrast, there is no genuine issue as to the fact that, for example, semi-automatic rifles are in common and lawful use, permitting this Court to remand for summary judgment in Plaintiffs' favor.

**ARGUMENT**

## I. THE ANALYTICAL FRAMEWORK FOR EVALUATING REGULATIONS CHALLENGED UNDER THE SECOND AMENDMENT.

In reviewing the constitutionality of firearms regulations challenged under the Second Amendment, this court follows a two-step analysis: "first, the court asks whether the challenged law burdens conduct protected by the Second Amendment; and if so, the court must then apply the appropriate level of scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016).[6] To determine whether the regulated conduct is protected by the Second Amendment, the Court compares the challenged law to "a historical understanding of the scope of the right... Laws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis." *Silvester*, 843 F.3d at 821. If the challenged law has the kind of centuries-long historical pedigree demonstrating that the same conduct was proscribed when the Second Amendment was adopted, the court concludes that the conduct falls outside the scope of the individual right codified in the Second Amendment. Additionally, at the first step, the court asks whether the challenged regulation is among the

---

[6] While the Court remains bound to follow the circuit precedent of *Silvester*, the appropriate test is based on the Second Amendment's text, history, and tradition. *See Heller v. D.C.*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J. dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."); *Mance v. Sessions*, 896 F.3d 390, 394 (5th Cir. 2018) (Elrod, J. dissenting from denial of rehearing *en banc*) (joined by six other judges) ("[U]nless the Supreme Court instructs us otherwise, we should apply a test rooted in the Second Amendment's text and history—as required under *Heller* and *McDonald*—rather than a balancing test like strict or intermediate scrutiny.").

"presumptively lawful regulations" such as "prohibitions on the possession of firearms by felons and the mentally ill . . ." *Silvester*, 843 F.3d at 820. These regulations are presumptively lawful. All others are subject to scrutiny.

Thus, where at the first step the court finds that "the regulation is neither outside the historical scope of the Second Amendment, nor presumptively lawful . . . the court must proceed to the second step; it must consider: (1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right" in order to determine the level of scrutiny to apply. *Silvester*, 843 F.3d at 821. This second step involves determining the extent to which the challenged law imposes burdens on core protected conduct, determining the scope of review, and comparing the burdens of the law to the purported benefits proffered by the state.

## II. THE FIRST STEP: YOUNG ADULT PURCHASE OF SEMI-AUTOMATIC RIFLES IS PROTECTED BY THE SECOND AMENDMENT.

I-1639 burdens conduct that is demonstrably within the historical understanding of rights protected by the Second Amendment. First, every law-abiding young adult who has not been individually adjudicated as a felon or mentally ill is one of the "members of the political community," *Heller*, 554 U.S. at 580, for whom the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. Second, there is no historical evidence showing longstanding restrictions on the conduct regulated by I-1639—a blanket ban on young adult purchase of the most commonly used long guns.

### A.    Young adults have rights protected by the Second Amendment.

At the first step, the court must conclude that RCW 9.41.240 regulates conduct protected by the Second Amendment. There are no historical examples of blanket bans on young adults purchasing long guns in common use. The historical record shows exactly the opposite: young adults have been permitted—and indeed, sometimes required—to procure and maintain rifles. Examining the text and history of the Second Amendment, and particularly the much longer history of the militia in the colonies and United States, demonstrates beyond any doubt that the Amendment protects the rights of young adults to keep and bear long guns.[7] First, they are members of the citizens' militia, the protection of whose existence is codified in the Second Amendment:

> [T]he Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right . . .

*Heller*, 554 U.S. at 599. As the *Heller* majority made clear, "'the Militia comprised all males physically capable of acting in concert for the common defense.'" *Id.* at 595 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Thus, "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Heller*, 554 U.S. at 627. In short, the *Heller*

---

[7] The question presented in this case is whether restrictions on adult purchases of handguns pass constitutional muster, taking into account the extent to which these new restrictions, when added to existing existing restrictions (such as the ban on purchase of handguns), further disarm law-abiding adults.

decision makes explicit that all citizens capable of military service are members of the "citizens' militia" who have the right to keep and bear arms codified in, and protected by, the Second Amendment.

Historical evidence beginning long prior to and continuing through the Founding Era demonstrates that young adults were considered part of the militia. Definitions of the militia have always included young adults, reaching back hundreds of years to the earliest codifications of militias in America. For example, as early as 1654, Maryland required "that all persons from 16 yeares of age to Sixty shall be provided with Serviceable Armes & Sufficient Amunition of Powder and Shott ready upon all occasions."[8] Other colonies had similar definitions of the militia, and similar mandates on members.[9] In pre-revolutionary America, young adult males were members of the militia, and as often as not were required to own long guns (muskets and rifles) and ammunition.[10]

The federally defined militia since ratification of the Constitution has always included young adults, starting with the first militia act, passed in 1792. That Act

---

[8] Kopel, David B. and Greenlee, Joseph, THE SECOND AMENDMENT RIGHTS OF YOUNG ADULTS (January 16, 2019, 43 SOUTHERN ILLINOIS LAW JOURNAL (2019); U. Denver Legal Studies Research Paper No. 18-28, available at https://ssrn.com/abstract=3205664, citing 1 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8— SEPTEMBER 1664, at 347 (William Hand Browne ed., 1883).

[9] Cramer, Clayton, COLONIAL FIREARM REGULATION, 16 J. On Firearms & Pub. Pol'y 1, 2-10 (2004); see also Natl. Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 714 F.3d 334, 341 and n.8 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc and collecting founding-era minimum militia age laws, all 18).

[10] Cramer, COLONIAL FIREARM REGULATION, 16 J. J. On Firearms & Pub. Pol'y 1, 2-10 (2004).

provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia . . ." UNITED STATES STATUTES AT LARGE, 2 Cong. Ch. 33, May 8, 1792, 1 Stat. 271.[11] Each militia member, subject to enrollment, was required to "provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges . . ." *Id.* . Not only were young adults considered members of the militia, with rights protected by the Second Amendment, federal law ***required*** them to purchase and own long guns, together with ammunition for the firearm they personally provided for themselves. It is simply impossible to conclude that a young adult who faced a federal mandate to "provide himself with" a long gun nonetheless had no right protected by the Second Amendment to purchase that very firearm.

Today, young adults still fall within the federal definition of the militia, *see* 10 U.S.C. § 246, are required to register for the draft if male, *see* 50 U.S.C. § 3802, and are admitted to the ranks of the United States armed forces every day, where the federal government treats them as the responsible individuals they are, training them in the use of firearms. *See, e.g.*, https://www.marines.com/becoming-a-marine/enlisted.html ("Becoming an Enlisted Marine requires the ability to meet

---

[11] Of course, the modern militia does not and cannot countenance race-based exclusions. But neither can the State of Washington invent a new, age-based exclusion that has no historical or legal foundation.

the highest standards of moral, mental and physical strength. . . INITIAL REQUIREMENTS: Must be at least 17 years old at time of enlistment").

**B.** *Heller* **only excludes from Second Amendment protection restrictions characterized by long historical standing.**

While the historical record shows centuries of legal permission for young adults' ownership and possession of rifles, it lacks any evidence of laws restricting the right of young adults to purchase rifles of any sort. Without substantial and longstanding evidence showing that this particular restriction (or restrictions of similar kind and scope) have a suitable historical pedigree, the young adult purchase ban fails the *Heller* test.

This Court and all its sister circuits have exclusively used a comparison of apples to apples when searching for any historical justification for a challenged restriction. In *Silvester*, this Court described the analysis as follows:

> Whether the challenged law falls outside the scope of the Amendment involves examining whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood. Laws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis.

*Silvester*, 843 F.3d at 821 (citation omitted). In conducting a historical analysis of the ten-day waiting period for firearms purchase that was being challenged, the *Silvester* court reviewed the history of laws imposing waiting periods on firearms purchase. The Court recently followed this same approach in analyzing a ban on large-capacity magazines, stating that "[i]n our circuit, we have looked for evidence showing whether the challenged law traces its lineage to founding-era or Reconstruction-era

regulations." *Duncan v. Becerra*, 970 F.3d 1133, 1150 (9th Cir. 2020). It followed by examining the historical lineage of large capacity magazine bans to determine the historical justification for the challenged law. This method of historical review has been followed consistently in the Ninth Circuit. *See, e.g.*, *Mahoney v. Sessions*, 871 F.3d 873, 879 (9th Cir. 2017) (in a Second Amendment challenge to a policy regarding police use of force, the court reviewed the record for historical examples of police use of force policies); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014) (evaluating the history of ammunition storage laws to find a historical pedigree for a challenged ammunition storage law); *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013) (examining the history of "firearm restrictions regarding violent offenders" in a challenge to a firearm restriction on domestic violence misdemeanants).

Other circuits follow the same analysis. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) is perhaps the most instructive, even though (in Plaintiffs' view) the Fifth Circuit erred in upholding the challenged the federal ban on sales of handguns by licensed FFLs to young adults. In upholding the ban as within the scope of presumptively lawful historical regulation, the court reviewed historical limitations on young adults purchasing, possessing, and carrying ***handguns***. In other words, it measured the historical justification for the law by looking at historical regulation of the same

conduct. It did not examine completely unrelated regulation of non-firearm conduct, or even historical regulation of other firearm possession.[12]

### C. The rights protected by the Second Amendment are not limited to self-defense in the home.

RCW 9.41.240's ban on the purchase of semi-automatic rifles by young adults cannot be justified by limiting the Second Amendment to self-defense in the home; nor is it the place of the legislature or a court to prescribe which types of firearms are best suited to that role. First, semi-automatic rifles are the second most popular choice for home self-defense firearms. Even if the Second Amendment protects only the right to home self-defense, the purchase, possession, and ownership of semi-automatic rifles nonetheless falls within that right.[13]

But *Heller* recognized that the Second Amendment codified a right that extends beyond home self-defense. As *Heller* held, "the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right," namely, the "individual right to possess and carry weapons in case of confrontation." *Heller*, 554

---

[12] *Accord, United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) (analyzing a ban on possession of handguns by persons under age 18 by looking to the history of bans on those under 18 possessing handguns); *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) (examining historical basis for firearms sentence enhancement by looking to historical restrictions on criminals' possession of firearms); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) (reviewing historical evidence of excluding felons from the Second Amendment to analyze a domestic violence bar to firearms possession); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (in a challenge to firing ranges within the city of Chicago, reviewing "founding-era, antebellum, and Reconstruction state and local laws that limited the discharge of firearms in urban environments").

[13] As noted above, this is especially true for young adults in Washington who are forbidden by federal and state law from owning handguns, the most popular selection for home self-defense.

U.S. at 592. While *Heller* concluded that the Second Amendment ***includes*** the right of personal self-defense in the home, it never limited the protected right in such a way. Far from it: *Heller* explicitly recognized that narrowing proposals offered by the government are the antithesis of the protected right. For example, *Heller* rejected assertions that the Second Amendment protected only the right to participate in the organized militia, because such a limited right "does not assure the existence of a 'citizens' militia' as a safeguard against tyranny." *Heller*, 554 U.S. at 600.

*Heller* repeated this throughout the majority opinion: "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. Further, contrary to the petitioners' argument (and that of the *Heller* dissent), the militia identified in the prefatory clause was not "the state- and congressionally-regulated military forces described in the Militia Clauses . . ." but comprised "all able bodied men." *Id.* at 596. The "militia" comprised far more than those called by the government into actual service because "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Id.* at 598. In addition to the right to purchase and possess a firearm in common use by law-abiding citizens for the purpose of defending hearth and home, the Second Amendment codified the pre-existing right of all people—the unorganized militia—to keep and bear arms for self-defense, for hunting, and to preserve the existence of a "citizens' militia as a safeguard against tyranny." *Id.* at 600.

Even though the core holding of *Heller* concerned severe restrictions on possession of a firearm used for home self-defense, nothing in that case rejected or

even cast doubt on the description of the Second Amendment—repeated numerous times in that opinion—as having codified a much broader right. Indeed, as the *Heller* court held, the primary reason for its codification—not its *exercise* but its *codification*—was to preserve the existence of the armed citizenry as a bulwark against tyranny. Finally, the majority explicitly left open—to the dismay of the dissent—the outcome of future cases asserting the protection of other activities by the Second Amendment. *Id.* at 635. If the Second Amendment protected only home self-defense, there would have been nothing to leave open, and the *Heller* court would not have referred to home self-defense as the "core" of codified rights, but instead as the totality of its substance. The Second Amendment codifies an individual right that extends beyond only self-defense in the home, and the young adult purchase ban infringes those rights.

## III. The second step: The under-21 semi-automatic rifle purchase ban can satisfy no "tiered" scrutiny.

Because the young adult purchase ban falls within the coverage of the Second Amendment, the Court proceeds to the second step of the analysis: "In ascertaining the proper level of scrutiny, the court must consider: (1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right." *Silvester*, 843 F.3d at 821. Here, the appropriate level of scrutiny is set by *Heller*. If the challenged law or regulation prohibits an entire class of arms that are commonly used for lawful purposes, there is no need for a balancing test or a tier of scrutiny; the constitution forbids its enforcement. *Id.* Even if RCW 9.41.240 is analyzed under a tier of scrutiny, the severity of the restrictions it imposes

require strict scrutiny. And even if only intermediate scrutiny were applied, RCW 9.41.240 would still be unconstitutional, because the purported justifications are not advanced, but instead are actually undermined, by the law itself.

### A.    The young adult purchase ban is per se unconstitutional.

Just as *Heller* gave no tier of scrutiny or degree of balancing to a law banning ownership and possession of all handguns, this Court should not balance, or weigh, or defer to a law that bans all purchase of semi-automatic rifles. In *Heller*, the Supreme Court disposed of a handgun ban of similar scope in short order:

> The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster.

*Heller*, 554 U.S. at 628–29 (internal citations omitted). By substituting "semi-automatic rifle" for "handgun," the same analysis applies, and the same conclusion follows. Semi-automatic rifles are an entire class of arms. ER 114-115. They are overwhelmingly chosen by American society for lawful purposes, including home self defense. The prohibition on young adult purchase precludes young adults from possessing them for home self defense. "[B]anning from the home the [second] most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." *Id.* The Court rejected a state ban of similarly broad scope on *McDonald*, without attempting to balance the infringement against asserted state interests. In doing so, the *McDonald* Court again rejected a role

for "judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 561 U.S. at 790–91. Here, too, the State's ban on young adult purchase of an entire category of firearms in common use in the United States cannot be reconciled with *Heller*, *McDonald*, and *Caetano*, as applied by this Court in *Silvester* and *Duncan*.

*Silvester*, of course, employs this same analysis, and when applied to this case requires a similar result. Because RCW 9.41.240 "imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right [it] is unconstitutional under any level of scrutiny." *Silvester*, 843 F.3d at 821. The law bars young adults from purchasing any model of semi-automatic rifle, just like the blanket handgun ban at issue in *Heller*. This ban does not fall into the category of "laws which regulate only the manner in which persons may exercise their Second Amendment rights [and which] are less burdensome than those which bar firearm possession completely." *Silvester*, 843 F.3d at 827. In order to exercise one's fundamental right to keep and bear arms, one must first *acquire* arms, typically by purchase. The State bans that protected conduct as to the largest category of rifles, millions of which are sold in the United States each year. It is true that RCW 9.41.240 permits *possession* of a semi-automatic rifle by a young adult when the rifle is given to the young adult by a parent. But conditioning a fundamental, enumerated right on the availability of an adult who will make a gift of the firearm goes far beyond regulation of the manner of exercise. If such a condition were applied to any other enumerated Constitutional right, it would never be classified as "mere regulation of the manner of exercise."

Even under the narrowest understanding of the scope of the Second Amendment—limiting it to self defense of the home—this ban forbids young adults in Washington from purchasing the most popular firearms available to them for that purpose. Already restricted by the state from purchasing handguns, this additional restriction "amounts to a destruction of the Second Amendment right [and] is unconstitutional under any level of scrutiny." *Silvester*, 843 F.3d at 821.

In view of the history of how young adults have been expected to "keep and bear arms" similar to the rifles that are the subject of this litigation, RCW 9.41.240 impermissibly prevents the exercise of the Plaintiffs' Second Amendment rights. No level of scrutiny is applied where a ban of such breadth is imposed.

## B. The young adult purchase ban impermissibly burdens Second Amendment rights.

Even if RCW 9.41.240 is not per se unconstitutional, it fails any level of scrutiny that has been applied to Second Amendment claims. RCW 9.41.240's ban on the purchase of semi-automatic rifles by young adults is "such a severe restriction . . . that it amounts to a destruction of the Second Amendment right," *Silvester*, 843 F.3d at 821. I-1639 is the most restrictive rifle ban ever imposed in the nation, on the broadest category of firearms, covering 100% of the most popular rifles sold and owned. It therefore is subject to strict scrutiny as a "law that implicates the core of the Second Amendment right and severely burdens that right . . ." *Id.* A ban that deprives young adults of the right to purchase virtually any firearm cannot be justified merely as a "reasonable regulation" of the manner of their exercise of rights protected by the Second Amendment.

This blanket ban is too severe to face intermediate scrutiny, as seen by the kinds of regulations for which the Ninth Circuit has applied that tier of scrutiny. In *Silvester*, the law at issue did not ban purchases, but imposed a 10 day waiting period, and therefore faced intermediate scrutiny. *Silvester*, 843 F.3d at 818. The Ninth Circuit also applied intermediate scrutiny to a ban on people already found not to be law-abiding, namely, domestic violence misdemeanants. It applied only intermediate scrutiny in part because the challenged law had sufficient exceptions that it did not amount to a complete ban, where an affected person could get his rights restored and lawfully possess firearms. *See Chovan*, 735 F.3d at 1138. No such exception applies here, where the law is a complete ban on law-abiding young adults purchasing semi-automatic rifles.

The court also applied intermediate scrutiny to a police use-of-force policy governing use of issued firearms during work for the Seattle Police Department. *See Mahoney*, 871 F.3d at 881. Plainly, the police officers already had firearms to which the use-of-force policy applied; the regulation did not ban them from possessing firearms or using them in self-defense. Here, these adult plaintiffs cannot purchase semi-automatic rifles. And in *Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017), the court concluded that "intermediate scrutiny is the appropriate standard for analyzing the fee scheme" at issue, which added a challenged $5 fee to purchases. This ban on purchases merits higher scrutiny, a level at which it automatically fails.

The only greater degree of firearms regulation possible in the state would be a complete ban on these adult's ability to purchase all firearms, instead of banning both handguns and semi-automatic rifle purchases. If a ban this broad only faces

intermediate scrutiny, the Ninth's Circuit's tiered approach provides intermediate scrutiny for any imaginable regulation of firearms short of a complete ban on all firearms. This outcome would contradict not only *Silvester*, but also ignore the Supreme Court's caution in *McDonald* that courts should ***not*** attempt "to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 561 U.S. at 790–91.

Here, the state can proffer no reasonable justification for the law in any event. The banned firearms are overwhelmingly common and popular, and are so rarely used in any form of crime that use of one in crime is a statistical anomaly. No one can identify any specific reduction in any crime or other negative behavior that will result from the ban. It has no effective relationship to the supposed purpose put forward by the state: generic public safety. Nor can the state show, as it must, that there are no less restrictive means to meet the purpose of public safety proffered as the reason for the law.

## C. The young adult purchase ban fails intermediate scrutiny, even if that lower level applies.

RCW 9.41.240 fails intermediate scrutiny unless the State can affirmatively demonstrate that the law is "narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1736 (2017) (internal quotation marks omitted). As an alternative holding to the finding urged above, this Court should find that RCW 9.41.240 fails intermediate scrutiny because of the lack of any conceivable "fit" between the governmental interest and the statutory scheme.

The specific harm sought to be avoided by RCW 9.41.240 is the prevention of mass shootings by young adults. However horrific these cases are, they are also extremely rare. Because the State only asserts that the law promotes its interest in preventing mass shootings by young adults, it must demonstrate, not hypothesize, that RCW 9.41.240 is narrowly tailored to serve that specific interest. Given its asserted interest, it also does not matter whether there are additional harms that could be avoided, such as suicide or accidental firearms injuries.

The government bears the burden of proving that the chosen imposition on a constitutional right serves the identified governmental interest. Even crediting the interest, and claims of the applicability of intermediate scrutiny, RCW 9.41.240 does not prevent adults from accessing semiautomatic rifles. Not only does RCW 9.41.240 permit supposedly irresponsible young adults to acquire semiautomatic rifles legally, but there is no showing that the law presents a significant obstacle to a prospective mass murderer. Unless the law has a measurable effect on advancing the State's purported interest, it cannot be said to justify the undeniable harm (such as preventing young adults from obtaining a means of home self defense) that the law entails.

But far worse than simply being ineffectual, RCW 9.41.240 combined with other state and federal firearms transfer requirements actually subverts the identified governmental interest of preventing the use of semiautomatic rifles in mass shootings. Absent the purchase ban of RCW 9.41.240, a young adult who wished to acquire a semiautomatic rifle—typically by purchase—would undergo the same background check that is applied to any other purchaser; with the ban, he cannot. A

commercial-sale background check serves a legitimate governmental interest in preventing felons, the mentally ill, and other legally adjudicated "irresponsible" persons from obtaining firearms. But as a result of RCW 9.41.240, the only way a young adult can access a semiautomatic rifle—access that state law not only contemplates but specifically permits—is to obtain a semi-automatic rifle *without* a background check. It is not simply that background checks are not *required* when obtained other than by purchase; they are ***legally forbidden***.[14] Sympathetic adults who might otherwise insist that a young adult obtain a semiautomatic rifle by purchasing one may very well be persuaded that the lawful possession and use of a semiautomatic rifle—which state law still explicitly permits—should be made possible by giving or loaning a semi-automatic rifle to an adult who cannot purchase it.

If "intermediate scrutiny" is to mean anything, it requires not only that the Court must consider the strength of the governmental interest asserted, but also whether it is "narrowly tailored"—so that it does not inflict substantial damage to other legitimate interests, especially enumerated constitutional rights. While RCW 9.41.240 undeniably prevents adults from exercising their constitutional right to keep and bear arms—for self-defense, for marksmanship, for hunting, and for other lawful purposes—it does little to achieve the goal of preventing mass shootings, and

---

[14] *See* Bureau of Alcohol, Tobacco, Firearms, and Explosives Form 4473 Q 21.a and comments (a purchaser who intends to give a firearm as a lawful gift must complete the background check, not the intended recipient) (available at https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download).

may very well have a negative impact by evading the background check requirement that would otherwise apply.

## IV. RCW 9.41.124 BANS INTERSTATE SALES IN VIOLATION OF THE COMMERCE CLAUSE.

### A. The framework for analyzing challenges under the interstate commerce clause.

In reviewing the interstate sales ban, the court begins with the admonition that "[s]tate laws discriminating against interstate commerce on their face are virtually per se invalid." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 575 (1997) (internal citation omitted). Because RCW 9.41.124 discriminates against interstate commerce by forbidding FFL-to-FFL transfers, it is per se invalid.

As detailed above, RCW 9.41.124 bans FFL-to-FFL transfers because it regulates ***purchase*** instead of ***sale*** or ***delivery***. In this, it bans interstate commerce in which the State has no legitimate interest. And further, the State cannot justify banning in-person in-state sales of semi-automatic rifles in order to promote its claimed interest in enhanced background checks of purchasers because it addresses a truly non-existent problem. The State proffered no example of a non-resident coming to Washington, purchasing a semi-automatic rifle, and subsequently using it to commit a crime in Washington state or elsewhere. A comparison of the restriction to the harm it proposes to ameliorate is straightforward: because there is no harm to address, any harm produced by the restriction is too great.

The state claims an interest in ensuring that every in-state purchaser of a semi-automatic rifle undergoes a comprehensive background check, including investigation by the local law enforcement officials of the person's residence.

31

Because some other states do not engage in that kind of background check, Washington asserts it can only satisfy that interest by banning non-resident purchases. But the state's interest in running commercial-sale background checks is to prevent unauthorized persons from purchasing firearms and committing crimes with them. If the state cannot identify a single instance of a non-resident committing a crime with a semi-automatic rifle purchased in Washington, it cannot sustain its burden. Even if it has a legitimate interest in crime prevention, the law will not reduce the relevant crime level because it is currently non-existent. Therefore, the ban on purchases by non-residents cannot survive scrutiny.

### B.    The blanket ban on interstate commerce is unconstitutional.

The dormant Interstate Commerce Clause is not limited to preventing discrimination in the form of economic protectionism. Instead, "State laws discriminating against interstate commerce on their face are virtually per se invalid." *Town of Harrison*, 520 U.S. at 575 (internal citation omitted). As the Supreme Court has instructed:

> [T]he first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce. . . As we use the term here, "discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. If a restriction on commerce is discriminatory, it is virtually per se invalid.

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Or.*, 511 U.S. 93, 99 (1994) (internal citations and alterations omitted). Furthermore, this kind of discrimination is forbidden. "Economic protectionism is not limited to

attempts to convey advantages on local merchants; it may include attempts to give local consumers an advantage over consumers in other States." *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986). This ban plainly satisfies the test. Following long-established Supreme Court jurisprudence, it does not matter whether the state describes the ban as imposing harmful burdens on its own citizens (the in-state FFLs who can no longer make profitable sales). Obviously, by limiting the ability of in-state FFLs to sell semi-automatic rifles to residents of other states, the ban can just as easily be described as "benefitting" the "economic interest" of in-state purchasers. Reducing out-of-state demand benefits the economic actors who are in-state purchasers, at the expense of the in-state sellers and out-of-state purchasers. By banning interstate commerce, the state has engaged in economic Balkanization that is forbidden by the interstate commerce clause, just as it forbade the law in *Brown-Forman* or the law challenged in *Town of Harrison*. In *Town of Harrison*, the law taxed in-state businesses more heavily if they catered to out-of-state residents, harming in-state businesses and benefitting in-state consumers. The Supreme Court struck down the law. "By encouraging economic isolationism, prohibitions on out-of-state access to in-state resources serve the very evil that the dormant Commerce Clause was designed to prevent." *Town of Harrison*, 520 U.S. at 578.

This ban is not the kind of neutral law upheld in, for example, *General Motors v. Tracy*, 519 U.S. 278 (1997). There, the Court allowed the challenged regulation because the statute was facially non-discriminatory: "The State of Ohio imposes its general sales and use taxes on natural gas purchases from all sellers, whether in-state

or out-of-state, except regulated public utilities that meet Ohio's statutory definition of a 'natural gas company.'" *GM v. Tracy*, 519 U.S. at 281-282. By contrast, in *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), the Supreme Court struck down a New Jersey law forbidding the importation of solid or liquid waste originating outside New Jersey, despite the asserted environmental protection justification. Thus, it is *protectionism of any kind* that is *per se* unconstitutional, not just economic protectionism. Just as the desire to protect New Jersey residents from environmental degradation could not save a statute that discriminated against out-of-state sales, RCW 9.41.124 cannot be saved by claiming that it is protecting the health and safety of Washington residents (without favoring them economically).

The interstate sales ban cannot survive scrutiny under this longstanding rule. "A state is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the state." *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 10 (1928). The State has enacted a ban on "privately owned articles of trade from being shipped and sold in interstate commerce," a ban the state lacks the power to create. *See also New England Power Co. v. New Hampshire*, 455 U.S. 331, 338 (1982) ("Our cases consistently have held that the Commerce Clause of the Constitution, Art. I, § 8, cl. 3, precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom"). Because "[a] discriminatory law is virtually *per se* invalid . . . [it] will survive only if it advances a legitimate local purpose that cannot be

adequately served by reasonable nondiscriminatory alternatives . . ." *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). "In all but the narrowest circumstances, state laws violate the Dormant Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. . . State laws that directly discriminate against out-of-state entities can survive only if the state demonstrates both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means." *Nationwide Biweekly Administration, Inc. v. Owen*, 873 F.3d 716, 736 (9th Cir. 2017) (internal citations and alterations omitted)

### C. The *Pike* test, even if it applied, could not be satisfied.

As shown above, the complete ban on FFL to FFL transfers means that the ban is unconstitutional. Even if the law were assumed to function in a way other than the one that the law specifies, so that it would permit FFL-to-FFL transfers but only banned in-person in-state sales to non-residents, the ban fails scrutiny under the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).

The state's asserted interest in promoting background checks through the mechanism of banning in-person purchases by visitors to the state (including active duty military personnel who are not Washington residents) does not satisfy any balancing test found in interstate commerce clause jurisprudence. Because the state pointed to no existing problem of crime that could possibly be solved by banning in-state non-residents from purchasing semi-automatic rifles, its purported interest is too weak to survive being balanced against the limits on commerce it has created.

In support of this supposed lesser ban, the State proffered its interest in all purchasers facing the new comprehensive background checks, which include investigation by local law enforcement from the jurisdiction where the purchaser lives. Even if the State's asserted interest were valid, the statute fails scrutiny. The State's legitimate interest in public safety does not allow it to impede interstate commerce to "solve" a non-existent problem. The State proffered no evidence that any non-resident, after purchasing a semiautomatic rifle in Washington, subsequently used that firearm in Washington in a crime of violence. Thus, the State's asserted interest in background checks is a pure *post hoc* rationalization. With no imaginable connection between the background checks and increased public safety, the State's interest is non-existent.

## CONCLUSION

Plaintiffs demonstrated that the banned firearms are in common use by law-abiding citizens for lawful purposes. Neither the State nor the District Court disputed that fact. *Heller* and subsequent cases make it clear that possession—and purchase—of these commonly used firearms are both protected by the Second Amendment, a protection that extends to young adults in Washington and the United States. In addition, by imposing a complete ban on the sale of the banned firearms to non-resident purchasers, RCW 9.41.124 violated the constitutional protection of interstate commerce. For these reasons, the District Court's judgment should be reversed, and this case should be remanded for entry of judgment in Plaintiffs' favor.

///

November 25, 2020

Respectfully submitted,

ARD LAW GROUP PLLC

By: _____

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
206.701.9243
Joel@Ard.law
Attorneys For Plaintiffs-Appellants


ALBRECHT LAW PLLC


By: _____

David K. DeWolf, WSBA #10875
421 W. Riverside Ave., Ste. 614
Spokane, WA 99201
(509) 495-1246
david@albrechtlawfirm.com
Attorneys For Plaintiffs-Appellants

## CERTIFICATIONS

This filing complies with the type-volume requirements of Federal Rule of Appellate Procedure 32 and Ninth Circuit Rule 32-1 because it contains fewer than 13,000 not-exempted words.

This filing complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32 because it uses a proportionally spaced typeface, Equity Text A 14 point.

This filing was served on all parties' counsel at the time of filing by delivering it through the Court's electronic docketing system.

November 25, 2020

ARD LAW GROUP PLLC

By _____

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Joel@Ard.law
Attorneys for Plaintiffs-Appellants