Nos. 20-35827

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

DANIEL MITCHELL, ROBIN BALL, LUKE RETTMER, NATHANIEL
CASEY, MATTHEW WALD, SECOND AMENDMENT FOUNDATION, and
NATIONAL RIFLE ASSOCIATION,

*Plaintiffs — Appellees,*

v.

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County,
Washington, CRAIG MEIDL, in his official capacity as the Chief of Police of
Spokane, Washington, and TERESA BERNTSEN, in her official capacity as the
Director of the Washington State Department of Licensing,

*Defendants — Appellants,*

and

SAFE SCHOOLS SAFE COMMUNITIES,

*Defendant — Intervenor — Appellant.*

Appeal from the United States District Court for the
Western District of Washington; No. No. 3:19-cv-05106-JCC

**EXCERPTS OF THE RECORD VOL. I**

Ard Law Group PLLC                     Albrecht Law PLLC

Joel Ard                               David K. DeWolf
joel@ard.law                           david@albrechtlawfirm.com
P.O. Box 11633                         421 W. Riverside Ave., Ste. 614
Bainbridge Island, Washington 98110    Spokane, WA 99201
(206) 701-9243                         (509) 495-1246

November 25, 2020

RECORD EXCERPTS

TABLE OF CONTENTS

| DOCUMENT | USDC DOCKET NO. | PAGE NUMBERS |
|---|---|---|
| Judgment By Court | 125 | 3 |
| Notice Of Appeal | 127 | 4-6 |
| Order denying Plaintiffs' Motion for Summary Judgment; granting Defendants' and Intervenor's Cross Motion for Summary Judgment | 124 | 7-25 |
| Plaintiffs' Motion for Summary Judgment and attachments | 76 | 26-120 |
| Trial Court Docket | n/a | 121-129 |
| Certificate of Service | n/a | 130 |

November 25, 2020.

Ard Law Group PLLC

By: _____

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Attorneys for Plaintiffs-Appellants

Albrecht Law PLLC

By: _____

David K. DeWolf, WSBA #10875
421 W. Riverside Ave., Ste. 614
Spokane, WA 99201
(509) 495-1246
Attorneys for Plaintiffs-Appellants

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 16, Page 3 of 130
Case 3:19-cv-05106-3CC   Document 125   Filed 08/31/20   Page 1 of 1

ER p. 3 of 130

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

| | |
|---|---|
| DANIEL MITCHELL, et al, <br><br>            Plaintiffs, <br><br>    v. <br><br> CHARLES ATKINS, et al., <br><br>            Defendants. <br><br> SAFE SCHOOLS SAFE COMMUNITIES, <br><br>          Intervenor-Defendant. | **JUDGMENT IN A CIVIL CASE** <br><br><br> CASE NUMBER: C19-5106RBL |

☐    **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

XX    **Decision by Court**. This action came to consideration before the Court. The issues have been considered and a decision has been rendered.

     THE COURT HAS ORDERED THAT

     Plaintiffs' Motion for Summary Judgment [76] is DENIED, and the Defendants' and Intervenor's Cross Motion for Summary Judgment [84] is GRANTED.  The Plaintiffs' Commplaint is DISMISSED WITH PREJUDICE.  Each side shall bear their own litigation costs.

DATED:  August 31, 2020

                             William M. McCool
                             Clerk

                             Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DANIEL MITCHELL, ROBIN BALL, LUKE RETTMER, NATHANIEL CASEY, MATTHEW WALD, SECOND AMENDMENT FOUNDATION, and NATIONAL RIFLE ASSOCIATION, | The Honorable John C. Coughenour |
| *Plaintiffs*, | No. 3:19-cv-05106-JCC |
| v. | PLAINTIFFS' NOTICE OF APPEAL |
| CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, CRAIG MEIDL, in his official capacity as the Chief of Police of Spokane, Washington, and TERESA BERNTSEN, in her official capacity as the Director of the Washington State Department of Licensing, | |
| *Defendants*, | |
| and | |
| SAFE SCHOOLS SAFE COMMUNITIES, | |
| *Defendant-Intervenor.* | |

## PLAINTIFFS' NOTICE OF APPEAL

Plaintiffs Daniel Mitchell, Robin Ball, Luke Rettmer, Nathaniel Casey, Matthew Wald, Second Amendment Foundation, and National Rifle Association appeal to the United States Court of Appeals for the Ninth Circuit from the "Judgment in a Civil Case" entered as Document 125 on August 31, 2020.

///

September 21, 2020.

Ard Law Group PLLC

By: _____
Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Attorneys for Plaintiffs

Albrecht Law PLLC

By: _____
David K. DeWolf, WSBA #10875
Matthew C. Albrecht, WSBA #36801
421 W. Riverside Ave., Ste. 614
Spokane, WA 99201
(509) 495-1246
Attorneys for Plaintiffs

## Certificate Of Service

I certify under penalty of perjury under the laws of the United States of America that on September 21, 2020, I filed the foregoing Notice of Appeal together with its attached Plaintiffs' Representation Statement, in *Mitchell et al. v. Atkins et al.*, No. 3:19-cv-05106-JCC, with the Court's CM/ECF system, which will give notice to all parties and counsel of record.

Ard Law Group PLLC

By

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Joel@Ard.law

Attorneys for Plaintiffs

Case 3:20-35803 11/25/2020 ID: 11906099 DktEntry: 6 Page 7 of 130
Case 3:19-cv-05106-RBL Document 124 Filed 08/31/20 Page 1 of 19

ER p. 7 of 130

HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DANIEL MITCHELL, et al,

                Plaintiffs,

    v.

CHARLES ATKINS, et al,

                Defendants.

SAFE SCHOOLS SAFE
COMMUNITIES,

            Intervenor-Defendant.

CASE NO. C19-5106-RBL

ORDER

## I. INTRODUCTION

THIS MATTER is before the Court on Plaintiffs' Motion for Summary Judgment [Dkt. #76] and Defendants' and Intervenor-Defendant's Cross-Motion for Summary Judgment [Dkt. #84]. The parties dispute the constitutionality of I-1639, a Washington initiative regulating the sale and possession of semiautomatic assault rifles ("SARs"). The Court has reviewed the materials filed for and against said Motions, including materials filed by Certain Amici. The Court has conducted oral argument. For the reasons given below, the Court **GRANTS** the

1  Defendants and Intervenor's Motion for Summary Judgment and **DENIES** the Plaintiffs' Motion

2  for Summary Judgment.

3  ## II. FACTS

4  In 2018, the people of Washington passed Initiative Measure No. 1639 to expand

5  background checks for purchase of guns in this state, to prohibit those under age 21 from

6  purchasing an SAR, and to prohibit in-person sales of such rifles to out-of-state purchasers.

7  Plaintiffs ask this Court to override this initiative and declare the age and out-of-state purchaser

8  limitations unconstitutional.

9  I-1639 extends three longstanding statutory restrictions on handguns to the weapon often

10  favored by mass shooters: SARs. I-1639 mirrors existing federal and state restrictions on

11  handguns by (1) prohibiting individuals under 21 from purchasing SARs (the "Age Provision");

12  (2) requiring an enhanced background check—a comprehensive records search conducted by

13  local law enforcement—for SAR purchases (the "Background Check Provision"); and (3)

14  prohibiting in-person sales of SARs to non-Washington residents (the "Nonresident Sales

15  Provision").

16  **A.      The Age Provision**

17  First, I-1639's Age Provision extends longstanding federal and state restrictions on the

18  sale and possession of handguns to persons under 21 to SARs. The Gun Control Act of 1968,

19  Pub. L. 90-618, 82 Stat. 1213 (codified as amended at 18 U.S.C. §§ 921 et seq.) (the "GCA"),

20  comprehensively regulates interstate and foreign commerce in firearms, imposing strict licensing

21  requirements.  The GCA prohibits a federal firearms licensee ("FFL") from selling a handgun to

22  anyone under the age of 21. *Id.* § 102, 82 Stat. at 1218 (codified as amended at 18 U.S.C.

23  § 922(b)(1)). Since 1994, Washington State law has prohibited 18- to 20-year-olds from

24

1    possessing pistols, except in their home or in a variety of other enumerated situations. 1994

2    Wash. 1st Spec. Sess. Laws, ch. 7, § 423 (codified as amended at RCW 9.41.240).

3         Under I-1639's Age Provision, the minimum age requirements for purchase of SARs and

4    pistols are identical: a person under 21 "may not purchase a pistol or semiautomatic assault

5    rifle." RCW 9.41.240(1). Likewise, I-1639 limits possession of SARs by 18- to 20-year-olds in

6    parallel circumstances to those long in place for pistols. RCW 9.41.240(3). The Age Provision

7    does not preclude 18- to 20-year-olds from accessing SARs. Its exceptions permit 18- to 20-year-

8    olds to possess SARs in a variety of situations, including: (1) in their home or business; (2) on

9    real property they control; (3) at competitions or shooting ranges; (4) hunting; (5) anywhere

10   shooting is legal; (6) while on duty in the armed forces; or (7) traveling to or from a place they

11   may legally possess such weapons. RCW 9.41.240(2), 9.41.042, 9.41.060. Further, 18- to 20-

12   year-olds may still legally buy shotguns and non-semiautomatic rifles for any and all legal

13   purposes. *See* RCW 9.41.010(27); 18 U.S.C. § 922(b)(1).

14   **B.      The Background Check Provision**

15        Second, I-1639's Background Check Provision requires local law enforcement agencies

16   to conduct the same enhanced background checks on prospective purchasers of SARs that they

17   long have performed for pistols. RCW 9.41.090(2)(b).

18        Basic background check requirements apply to most firearm sales. Federal law requires

19   FFLs to conduct background checks on potential firearm purchasers. 18 U.S.C. § 922(s). It also

20   requires the FBI to maintain the National Instant Criminal Background Check System ("NICS"),

21   a centralized catalog of records comprising three separate national databases. 18 U.S.C. § 922.

22   States' participation in NICS is voluntary, and Defendants argue that the quantity and quality of

23   records shared with NICS varies widely across states.  By one count, "at least 25% of felony

24   convictions" in the United States "are not available" in NICS.

By default, an FFL will contact the FBI's NICS Section when performing a potential firearm transaction. 18 U.S.C. § 922(t). States may also designate a law enforcement agency "point of contact" to initiate the NICS check and to search any other state and local databases required under state law. *See* 28 C.F.R. §§ 25.1–.2, 25.6(d).

Washington is a "partial" point-of-contact state. Before I-1639, FFLs contacted the FBI for NICS checks on sales of all firearms except pistols. For pistols, Washington law enforcement agencies conduct "enhanced background checks." In such a check, law enforcement queries not only the NICS databases to determine a purchaser's eligibility, but also various state and local databases, including: (1) the Washington Crime Information Center (which may disclose state arrest warrants not in the NICS databases); (2) the DOL Firearms System (which reflects whether the purchaser has a concealed pistol license and whether it has been revoked); (3) Washington court databases; (4) the Department of Corrections database; (5) local records management systems; and (6) the Washington Health Care Authority's mental health records. It is undisputed that the enhanced background check is more comprehensive than a NICS check alone. This helps prevent ineligible purchasers from falling through the cracks. I-1639 now requires local law enforcement to conduct enhanced background checks for SARs as well.

## C.    The Nonresident Sales Provision

Third, federal law has long prohibited in-person handgun sales to nonresidents of a state. I-1639 mirrors that requirement for SARs. Under the GCA, it is unlawful for anyone to sell a handgun in person to a nonresident. 18 U.S.C. § 922(a)(5)(A), (b)(3). All interstate transfers of firearms must take place through an FFL, *id.* § 922(a)(1)–(5), and only FFLs may "engage in the business of . . . dealing in firearms" (interstate or otherwise), *id.* § 922(a)(1)(A); *see United States v. Redus*, 469 F.2d 185, 187 (9th Cir. 1972). To buy a handgun from an out-of-state FFL, a nonresident may arrange for its delivery to an in-state FFL, from whom the buyer may retrieve

Case 3:20-35827, 11/25/2020, ID: 11906299, DktEntry: 17-2, Page 11 of 130
Case 3:19-cv-05106-RBL Document 124 Filed 08/31/20 Page 5 of 30

ER p. 11 of 130

1    the gun. 18 U.S.C. § 922(b). This process is known as "FFL-to-FFL transfer." To purchase a rifle

2    or shotgun from an out-of-state FFL, the buyer may do so in person—provided that the sale

3    "compl[ies] with the legal conditions of sale in both such States." *Id.* § 922(b)(3).

4       Shortly after the GCA's enactment, Washington legalized the in-person sale of rifles and

5    shotguns to nonresidents. 1970 Wash. Sess. Laws, ch. 74, § 2 (originally codified at RCW

6    19.70.020, codified as amended at RCW 9.41.124). In I-1639, Washington narrowed the scope of

7    that permission by removing SARs from the category of "rifles and shotguns" that legally may

8    be purchased in person by nonresidents. RCW 9.41.124. The effect of this provision is that SARs

9    are treated the same as handguns: they may not be purchased by nonresidents in person. But just

10   as for handguns, a nonresident may still purchase an SAR through an FFL-to-FFL transfer.

11       The Nonresident Sales Provision is a corollary to the Background Check Provision.

12   Because enhanced background checks query an array of state and local databases, it is difficult if

13   not impossible for law enforcement agencies to effectively conduct such checks on nonresidents.

14   **D.**      **Plaintiffs' Legal Challenge**

15       Plaintiffs challenge only two provisions of I-1639. First, all Plaintiffs allege that the Age

16   Provision violates the Second Amendment. Dkt. 17 ¶¶ 117–19. Second, Mitchell alleges that the

17   Nonresident Sales Provision violates the Dormant Commerce Clause. Id. ¶ 120.

18                  **III. DISCUSSION**

19   **A.**      **Standard of Review**

20       Summary judgment is appropriate when no genuine issues of material fact exist and the

21   moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Once the moving

22   party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the

23   opposing party must then set forth specific facts showing a genuine issue for trial in order to

24   defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the nonmoving

Case: 20-35827, 11/25/2020, ID: 11906299, DktEntry: 17-2, Page 12 of 130
Case 3:19-cv-05106-RBL  Document 124  Filed 08/31/20  Page 6 of 19

ER p. 12 of 130

1  party fails to make this showing, "Rule 56(c) mandates the entry of summary judgment." *Id.* at

2  322.

3  **B.    Constitutionality of the Age Provision under the Second Amendment**

4         In *District of Columbia v. Heller*, 554 U.S. 570, 573–74 (2008), the Supreme Court

5  struck down a city's "total ban" on the "possession of usable handguns in the home" under the

6  Second Amendment. In the wake of *Heller*, nearly every circuit (including the Ninth) has

7  adopted a two-part test for Second Amendment claims. *See N.Y. State Rifle & Pistol Ass'n, Inc.*

8  *v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015); *see, e.g., Fyock v. Sunnyvale*, 779 F.3d 991, 996

9  (9th. Cir. 2015). The court first "asks whether the challenged law burdens conduct protected by

10  the Second Amendment." *Fyock*, 779 F.3d at 996 (quoting *United States v. Chovan*, 735 F.3d

11  1127, 1136 (9th Cir. 2013)). If the law does not burden protected conduct, "the inquiry is

12  complete" and the law "passes constitutional muster" without further analysis. *Teixeira v. Cty. of*

13  *Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc) (internal quotation marks and citations

14  omitted). If there is a burden, the court proceeds to step two, asking "what level of scrutiny

15  should be applied" and evaluating the law in question. *Fyock*, 779 F.3d at 996.

16  *1.     Burden on Constitutionally Protected Conduct*

17         Not every firearm regulation burdens protected conduct. The Supreme Court has set forth

18  a non-"exhaustive" list of "presumptively lawful [firearm] regulatory measures," *Heller*, 554

19  U.S. at 627 & n.26, that "are outside the ambit of the [Second] [A]mendment," *United States v.*

20  *Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010). Those exceptions include "laws imposing

21  conditions and qualifications on the commercial sale of arms" and certain "longstanding

22  prohibitions on the possession of firearms." *Heller*, 554 U.S. at 626–27 & n.26. The Supreme

23  Court later "repeat[ed] those assurances" and reiterated that *Heller* had invalidated a broad ban

24

on handgun possession in the home while simultaneously "recogniz[ing] that the right to keep

and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner

whatsoever and for whatever purpose.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)

(quoting *Heller*, 554 U.S. at 626). To determine whether a law is so historically rooted as to fall

outside the scope of the Second Amendment, courts assess "a variety of legal and other sources

to determine the public understanding of [the] legal text in the period after its enactment or

ratification." *Heller*, 554 U.S. at 600.

U.S. law has long recognized that age can be decisive in determining rights and

obligations. For most of our country's history, 18- to 20-year-olds were considered minors or

"infants" without the full legal rights of adulthood. At common law and at the time of the

adoption of the Constitution, the age of majority was 21 years. *See, e.g.*, 1 William Blackstone,

Commentaries *463 ("So that full age in male or female, is twenty one years . . . , who till that

time is an infant, and so styled in law."); Infant, Black's Law Dictionary 847 (9th ed. 2009) ("An

infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . .

he or she is said to attain majority . . . .") (quoting John Indermaur, *Principles of the Common

Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878)). In fact, before ratification of the 26th

Amendment in 1971, states rarely permitted individuals under 21 to vote. *See, e.g., Oregon v.

Mitchell*, 400 U.S. 112, 130–31 (1970) (lead opinion of Black, J.) (upholding provision of Voting

Rights Act Amendments of 1970 lowering voting age to 18 in federal elections but invalidating

provision doing same for state and local elections); *id.* at 213 n.90 (Harlan, J., concurring in part

and dissenting in part) (noting that at the time only four states set the voting age below 21). It

was not until the 1970s that states lowered the age of majority to 18. *Nat'l Rifle Ass'n of Am.,

Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 201 (5th Cir. 2012)

Case 3:20-cv-05837-RBL Document 122 Filed 08/31/20 Page 8 of 19
Case 3:19-cv-05106-RBL Document 124-9 Filed 08/31/20 Page 14 of 130

ER p. 14 of 130

1  ("*NRA*"); Larry D. Barnett, *The Roots of Law,* 15 AM. U.J. GENDER SOC. POL'Y & L. 613, 681–

2  86 app. (2007).

3         Against this historical backdrop, it is unsurprising that laws prohibiting those under 21

4  from purchasing firearms are longstanding. In the 19th century, 19 states and the District of

5  Columbia enacted laws expressly restricting the ability of individuals under 21 to purchase or use

6  particular firearms in jurisdictions where the age of majority was set at 21. *See, e.g.*, *NRA*, 700

7  F.3d at 202. By the early twentieth century, three more states had restricted the purchase or use

8  of particular firearms by persons under 21. *Id.* Thus by 1923, over half the states then in the

9  union had set 21 as the minimum age for purchase or use of particular firearms. *Id.*

10         This long-held tradition of restricting certain firearm rights of 18- to 20-year-olds

11  continues today. Since 1968, federal law has prohibited FFLs from selling handguns to persons

12  under 21. 18 U.S.C. § 922(b)(1). Currently, 17 states and the District of Columbia have parallel

13  or more exacting laws prohibiting those under 21 from purchasing or possessing handguns. And

14  five states also prohibit the sale of *all* long guns—not just SARs—to individuals under 21. *Id.*

15  Prohibiting SAR sales to 18- to 20-year-olds comports with these longstanding laws.

16         Based on this historical evidence, several courts have concluded that firearms age

17  restrictions, particularly those for people under 21, fall outside the Second Amendment's ambit.

18  In *NRA*, 700 F.3d at 211, the Fifth Circuit rejected a Second Amendment challenge to the federal

19  prohibition on the sale of handguns by FFLs to those under 21, 18 U.S.C. § 922(b)(1). The Fifth

20  Circuit concluded that the federal age restriction was "consistent with a longstanding, historical

21  tradition, which suggests that the conduct at issue falls outside the Second Amendment's

22  protection." *Id.* at 203. A year later the same court upheld a Texas law prohibiting persons under

23  21 from receiving a license to carry concealed pistols, concluding that the age restriction "likely

24

Case 3:20-cv-35837-1b/25/2020 ID: 11906299 DktEntry: 172 Page 15 of 130
Case 3:19-cv-05106-RBL Document 224 Filed 08/31/20 Page 9 of 19

ER p. 15 of 130

'falls outside the Second Amendment's protection.'" *NRA v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (quoting *NRA*, 700 F.3d at 203). In both cases, although the Fifth Circuit was "inclined to uphold the challenged federal laws at step one of our analytical framework, in an abundance of caution" it "proceed[ed] to step two" and upheld the minimum age restriction under intermediate scrutiny. *NRA*, 700 F.3d at 204; *McCraw*, 719 F.3d at 347.

At least three other courts have held that firearms restrictions applicable to persons under 21 fall outside the scope of the Second Amendment. *See, e.g.*, *Hirschfeld*, 417 F. Supp. 3d at 755–56 (rejecting challenge to federal prohibition on sale by FFLs of handguns and ammunition to those under 21 because law "reflect[s] 'longstanding' prohibitions on the use or possession of handguns by those under a given age" that "have been in place and upheld by courts since the nineteenth century" and thus "do not implicate Second Amendment rights"); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387–88 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015) (state law prohibiting those under 21 from receiving concealed carry licenses "comports with the Second Amendment" because such "[a]ge-based restrictions . . . are among those lawful," "access-limiting conditions" and "impose[] no burden on the rights of eighteen- to twenty-year-olds to keep and bear arms"); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (state convictions for aggravated unlawful use of a weapon by defendant under 21 did not regulate conduct within scope of Second Amendment); *see also United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (upholding the federal age restriction on possession of handguns because "the right to keep arms in the founding period did not extend to juveniles").

These authorities demonstrate that reasonable age restrictions on the sale, possession, or use of firearms have an established history in this country. The extension of Washington's age restrictions to SARs is ultimately a distinction without a difference. Like handgun age

Case 3:20-35827, 04/25/2020, ID: 11996099, DktEntry: 3, Page 16 of 130
Case 3:19-cv-03106-RBL   Document 124   Filed 03/31/20   Page 10 of 19

ER p. 16 of 130

1  restrictions, the Age Provision here is "consistent with a longstanding tradition of targeting select

2  groups' ability to access and to use arms for the sake of public safety." *NRA*, 700 F.3d at 203.

3  While states may vary in terms of the specific guns or activities they regulate, restrictions on

4  potentially dangerous firearm conduct by those under the age of 21 is the common refrain. There

5  is no reason why a restriction on sale and possession of SARs—powerful weapons that can be

6  wielded against the public—constitutes a break from this pattern. The Age Provision does not

7  burden Second Amendment rights. Plaintiffs' challenge to it thus fails at the first step of the

8  inquiry.

9  ### 2.    *Level of Scrutiny*

10          Although the Age Provision does not burden constitutional rights, the Court will

11  nonetheless perform the full constitutional analysis out of an "abundance of caution." *Id*. at 204.

12  If a law burdens protected conduct, the court next determines whether to apply intermediate or

13  strict scrutiny. The level of scrutiny depends on two factors: "(1) how close the law comes to the

14  core of the Second Amendment right, and (2) the severity of the law's burden on the right."

15  *Chovan*, 735 F.3d at 1138 (internal quotation marks omitted). Strict scrutiny applies only to a

16  law that (1) "implicates the core of the Second Amendment right" (namely, the right to defend

17  one's home), and (2) "severely burdens that right." *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir.

18  2018) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)).

19          Intermediate scrutiny applies if the law either does not implicate the core Second

20  Amendment right *or* does not place a severe burden on that right. *Id*. (quoting *Fyock*, 779 F.3d at

21  998–99). Where a law carves out exceptions to its regulation of the core Second Amendment

22  right, it may alleviate the impact so as to render any burden insubstantial. *Chovan*, 735 F.3d at

23  1138. There "has been 'near unanimity in the post-*Heller* case law that, when considering

24

Case 3:20-35827, 04/25/2020, ID: 11906099, DktEntry: 2, Page 17 of 130
Case 3:19-cv-05106-RBL   Document 124   Filed 08/31/20   Page 19 of 19

ER p. 17 of 130

1   regulations that fall within the scope of the Second Amendment, intermediate scrutiny is

2   appropriate.'" *United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) (quoting *Silvester*,

3   843 F.3d at 823).

4          Unsurprisingly, intermediate scrutiny is appropriate here. The Age Provision does not

5   implicate the core Second Amendment right to defend one's home because it does not restrict the

6   ability of 18- to 20-year-olds to purchase long guns that are not semiautomatic. The Age

7   Provision also contains multiple exceptions, allowing 18- to 20-year-olds to possess SARs in

8   several places and situations, including in their homes for self-defense. *See* RCW 9.41.240(3)(a),

9   9.41.042(8); Knezovich Rep. at 6 (noting that I-1639 contains "broad exceptions under RCW

10  9.41.240, permitting the possession of the same firearms by 18- to 20-year-olds in a wide variety

11  of circumstances"). Finally, 18- to 20-year-olds have historically not been considered

12  "responsible" and thus have not had the same panoply of constitutional or other legal rights as

13  adults, such as to vote, serve on juries, consume alcohol, gamble, or own firearms. *See, e.g.,*

14  *NRA*, 700 F.3d at 206 ("restricting the presumptive Second Amendment rights of 18-to-20-year-

15  olds does not violate the central concern of the Second Amendment" which protects

16  "responsible" citizens because "Congress found that persons under 21 tend to be relatively

17  irresponsible and can be prone to violent crime").

18         To the extent the Age Provision does have an impact on the core home defense right, it is

19  not severe. A severe burden is one that "substantially prevent[s] law-abiding citizens from using

20  firearms to defend themselves in the home." *Jackson*, 746 F.3d at 964. As already discussed, the

21  Age Provision leaves 18- to 20-year-olds with ample alternative to defend their home. *See Pena*,

22  898 F.3d at 978 ("[B]eing unable to purchase a subset of semiautomatic weapons, without more,

23  does not significantly burden the right to self-defense in the home."). I-1639's limited scope and

24

Case 3:20-35827 04/25/2020 ID: 11000099 DktEntry: 20 Page 18 of 130
Case 3:19-cv-05106-RBL Document 124 Filed 08/31/20 Page 12 of 19

ER p. 18 of 130

1  exceptions ensure that its impact on home defense is minimal. Intermediate scrutiny is therefore

2  appropriate.

3  ### 3.  *Intermediate Scrutiny*

4  A law meets intermediate scrutiny if (1) the state's objective is significant, substantial, or

5  important; and (2) there is a reasonable fit between the challenged regulation and the objective.

6  *Jackson*, 746 F.3d at 965. The regulation must "promote[] a 'substantial government interest that

7  would be achieved less effectively absent the regulation,'" but need not be the "least restrictive

8  means" of achieving the government's interest. *Fyock*, 779 F.3d at 1000 (quoting *Colacurcio v.*

9  *City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998) (internal quotation marks omitted)).

10  Courts considering a state's interest "do not impose an 'unnecessarily rigid burden of

11  proof,'" and the state is allowed to "rely on any material 'reasonably believed to be relevant' to

12  substantiate its interests in gun safety and crime prevention." *Pena*, 898 F.3d at 979 (quoting

13  *Mahoney v. Sessions*, 871 F.3d 873, 881 (9th Cir. 2017)). When analyzing whether there is a

14  "reasonable fit between the government's stated objective and the regulation," courts consider

15  "the legislative history of the enactment as well as studies in the record or cited in pertinent case

16  law." *Id.* (quoting *Fyock*, 779 F.3d at 1000) (internal citations omitted).

17  The objectives of I-1639—promoting public safety and preventing violent crime—are

18  indisputably substantial government interests. *See e.g., Pena*, 898 F.3d at 981–82 (noting that

19  "countless cases support" the principle that "public safety and crime prevention are substantial

20  government interests"); *NRA*, 700 F.3d at 209 ("[C]urbing violent crime perpetrated by young

21  persons under 21—by preventing such persons from acquiring handguns from FFLs—constitutes

22  an important government objective."); *Cuomo*, 804 F.3d at 261 ("[S]tates have substantial,

23

24

Case 3:20-35827, 04/25/2020, ID: 11996099, DktEntry: 9, Page 19 of 130
Case 3:19-cv-03106-RBL Document 124 Filed 03/31/20 Page 19 of 19

ER p. 19 of 130

1  indeed compelling, governmental interests in public safety and crime prevention.") (internal

2  citation omitted).

3      The Age Provision reasonably fits with Washington's interest in promoting public safety

4  and reducing gun violence. Scientific research, crime data, and legislative findings all support

5  "the commonsense notion that 18- to 20-year-olds tend to be more impulsive" and likelier to

6  resort to violent crime than older adults. *NRA*, 700 F.3d at 210 n.21. Indeed, the prevalence of

7  18- to 20-year-olds as mass shooters is sufficient justification itself. Age-based access to SARs is

8  "reasonably suited to achieve" the state's interests. *Silvester*, 843 F.3d at 827.

9      Research shows that 18- to 20-year-olds are developmentally immature compared with

10  older adults, increasing their risk to the community. Canvassing the leading research in

11  neuroscience and developmental psychology, Defendants' two unrebutted scientific experts have

12  found clear "consensus" that various regions of the human brain that govern impulsivity and

13  sensation-seeking do not fully mature until the twenties. Courts have reached the same

14  conclusion. *See e.g., Horsley*, 808 F.3d at 1133 ("The evidence now is strong that the brain does

15  not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment,

16  planning for the future, foresight of consequences, and other characteristics that make people

17  morally culpable.") (quoting scientific expert declaration); *Graham v. Florida*, 560 U.S. 48, 68

18  (2010) ("[D]evelopments in psychology and brain science continue to show fundamental

19  differences between juvenile and adult minds. For example, parts of the brain involved in

20  behavior control continue to mature through late adolescence."). These well-established

21  neuroscientific findings logically support the decision of Washington voters to limit sales of

22  SARs, a firearm with the potential to inflict significant harm, to those 21 and older.

23

24

Case 3:20-35837, 04/25/2020, ID: 11666099, DktEntry: 6, Page 20 of 130
Case 3:19-cv-03016-RBL   Document 124   Filed 08/31/20   Page 14 of 19

ER p. 20 of 130

1        Given this higher degree of impulsiveness and emotional immaturity, it is unsurprising

2   that 18- to 20-year-olds also commit a disproportionate share of crimes, including violent crimes.

3   Though this group comprises only 4.4% of the population, it accounts for approximately one-

4   quarter of firearm homicides committed where an offender was identified. *See, e.g.*, 145 Cong.

5   Rec. 18119 (1999) ("Studies show that one in four gun murders are committed by people aged

6   18 to 20.") (statement of Rep. Grace Napolitano). In addition, 18- to 20-year-olds account for

7   8/7% of all violent crime arrests, including: 15.5% of murder and non-negligent manslaughter,

8   17.1% of robbery, 11.1% of rape, and 11.5% of weapons offense arrests. Simpson Decl.,

9   Dkt. # 94, Ex. L, at tbl. 38. Overall, older adolescents aged 18, 19, and 20 accounted for the first,

10  second, and third highest percentages of arrests, respectively, for any age up to age 24. *Id*. Arrest

11  rates for murder, robbery, and other violent crimes peak around ages 17 to 20, and arrest rates for

12  weapons crimes are nearly 50% higher among 18- to 20-year-olds than among younger

13  adolescents. S. Johnson Decl., Dkt. # 88, Ex. A, at 10.

14       Laws raising the minimum legal age to engage in certain behaviors to 21 have effectively

15  addressed other public health and safety concerns. For example, raising the minimum age to

16  drink alcohol to 21 reduced alcohol-related traffic crashes. William DeJong et al., *Case Closed:*

17  *Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking*

18  *Age in the United States*, 75 J. STUD. ON ALCOHOL & DRUGS 108, 113 (2014). Raising the age to

19  purchase tobacco to 21 is expected by the Institute of Medicine to "eventually . . . result in

20  249,000 fewer premature deaths . . . for people born between 2000 and 2019. It also would result

21  in about 286,000 fewer pre-term births and 438,000 fewer babies born with low birth weights"

22  by reducing smoking among older adolescents. Tripp Mickle, *Study Supports Raising Tobacco-*

23  *Purchase Age to 21*, Wall St. J., Mar. 12, 2015; *Public Health Implications of Raising the*

24

Case 3:20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 21 of 130
Case 3:19-cv-05106-RBL   Document 124   Filed 08/31/20   Page 19 of 19

ER p. 21 of 130

*Minimum Age of Legal Access to Tobacco Products*, Inst. of Medicine of the Nat'l Academies (Richard J. Bonnie, et al., eds. 2015). Washington recently enacted exactly such a measure. *See* RCW 26.28.080.

In sum, 18- to 20-year-olds are developmentally immature, commit a disproportionate share of violent crimes, and have been successful subjects of public health and safety regulation in the past. This, combined with the dangers posed by SARs, makes it reasonable for Washingtonians to anticipate that minimum age requirements for purchase and possession of SARs would also yield public health benefits. The Age Provision passes intermediate scrutiny.

## C. Constitutionality of the Nonresident Sales Provision under the Dormant Commerce Clause

The Commerce Clause provides that Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among several states, and with the Indian Tribes." U.S. Const. Art. 1, § 8, cl. 3. In addition to this express grant of power to Congress, the Commerce Clause has an implicit negative aspect—known as the Dormant Commerce Clause—that "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirit Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). The Dormant Commerce Clause serves as a bulwark against state programs of "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015) (internal citations and quotations omitted).

To determine whether a law violates the Dormant Commerce Clause, courts "first ask whether it discriminates on its face against interstate commerce." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007). If so, the law is

Case 3:20-35837 04/25/2020 ID: 11996099 DktEntry: 60 Page 22 of 130
Case 3:19-cv-05106-RBL Document 124 Filed 08/31/20 Page 16 of 19

ER p. 22 of 130

1  invalid unless the state "has no other means to advance a legitimate local purpose." *Id.* (citing

2  *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). If the law is non-discriminatory, however, it violates

3  the Dormant Commerce Clause only if the burden on interstate commerce is "clearly excessive

4  in relation to the putative local benefits." *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir.

5  2011) (quotation marks omitted) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

6  This *Pike* balancing test requires "sensitive consideration of the weight and nature of the state

7  regulatory concern in light of the extent of the burden imposed on the course of interstate

8  commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 441 (1978). That there "be a

9  substantial burden on interstate commerce" is a "critical requirement" of a Dormant Commerce

10 Clause violation. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th

11 Cir. 2012) (citing *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)).

12 *1.    Discrimination against Interstate Commerce*

13        The threshold question under the Dormant Commerce Clause is whether the law is

14 discriminatory. The term "discrimination" has a specific meaning in the Dormant Commerce

15 Clause context: "economic protectionism, or discrimination, 'simply means differential treatment

16 of in-state and out-of-state economic interests that benefits the former and burdens the latter.'"

17 *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Or. Waste*

18 *Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)).

19        Mere differential treatment of in-state and out-of-state interests is insufficient to establish

20 discrimination. Rather, there must be some economic benefit to in-state interests or some

21 economic burden on out-of-state interests. *See, e.g., City of Phila. v. New Jersey*, 437 U.S. 617,

22 624 (1978) ("The crucial inquiry . . . [is] whether [the law] is basically a protectionist measure,

23 or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects

24

Case 3:20-35807 04/25/2020 ID: 11006099 DktEntry: 6 Page 23 of 130
Case 3:19-cv-03105-RBL Document 124 Filed 08/31/20 Page 17 of 19

ER p. 23 of 130

1  upon interstate commerce that are only incidental."). This makes sense, as "[t]he central rationale

2  for the rule against discrimination is to prohibit state or municipal laws whose object is local

3  economic protectionism, laws that would excite those jealousies and retaliatory measures the

4  Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S.

5  383, 390 (1994) (emphasis added).

6       The Nonresident Sales Provision does not trigger this protectionism concern because it

7  neither benefits in-state economic interests nor burdens out-of-state economic interests. Plaintiff

8  Mitchell—the only Plaintiff who now asserts a Commerce Clause claim, Dkt. # 76 at 16—bears

9  the burden of establishing that the provision discriminates. *Int'l Franchise Ass'n*, 803 F.3d at

10 400. (Plaintiff Ball had originally alleged a Dormant Commerce Clause claim too, but Plaintiffs'

11 abandoned her claim after Ball revealed in discovery that, after I-1639 went into effect, her

12 firearm sales revenue increased.) But Mitchell fails to adduce facts creating a genuine dispute on

13 this threshold issue. Mitchell alleges that the provision has diminished his sales of SARs to

14 potential out-of-state purchasers. But Mitchell concedes that no actual evidence supports his bare

15 allegation of diminished sales because he did not consult any financial records or sales data in

16 arriving at his "ballpark" estimate.

17      Even if Mitchell's allegations were true, they would not establish discrimination under

18 the Dormant Commerce Clause because they connote a burden to Washington economic

19 interests—the very opposite of economic protectionism. Conversely, the likely economic

20 beneficiaries of the Nonresident Sales Provision are out-of-state gun dealers who would, if

21 anything, see a corresponding increase in sales at the expense of Washington gun dealers. *See*

22 *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1997) ("[A]ny notion of discrimination

23 assumes comparison of substantially similar entities.") (footnote omitted). Thus, the central

24

1    concern of the Dormant Commerce Clause is not triggered and the Nonresident Sales Provision

2    is nondiscriminatory. *See, e.g., Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d

3    Cir. 2007) (law nondiscriminatory where "it does not confer a competitive advantage upon local

4    business vis-a-vis out-of-state competitors" and "even local businesses operating within the

5    Town itself challenge [its] validity"); *Cohen v. R.I. Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439,

6    447 (D.R.I. 2011) ("[W]hen a law does not implicate the kind of 'local economic protectionism'

7    that the Commerce Clause aims to eradicate, the rationale for equating differentiation and

8    discrimination disappears . . . . Plaintiff has failed to identify a specific in-state commercial

9    interest that is favored by the [law] at the expense of particular out-of-state competitors, so it

10   cannot demonstrate that the discount discriminates against interstate commerce.").

11   **2.    The *Pike* Balancing Test**

12            Without discrimination, a law need only meet the lenient *Pike* balancing test, under

13   which courts "will uphold the law 'unless the burden imposed on [interstate] commerce is clearly

14   excessive in relation to the putative local benefits.'" *Corey*, 730 F.3d at 1087–88 (quoting *Pike*,

15   397 U.S. at 142). Mitchell "bears the burden of proof in establishing the excessive burden in

16   relation to the local benefits." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v.*

17   *Brown*, 567 F.3d 521, 528 (9th Cir. 2009). Courts will not look beyond a law's putative benefits

18   absent proof of an excessive burden. *Harris*, 682 F.3d at 1155.

19            I-1639's benefits, however, are substantial. Thus, even if Mitchell had shown that the law

20   substantially burdens interstate commerce, it would still pass constitutional muster because it

21   advances a bona fide state interest in public safety that far outweighs any perceived burden on

22   interstate commerce. I-1639 was adopted to "increase public safety and reduce gun violence," an

23   unquestionably legitimate government interest. To advance this interest, the people of

24

Case 3:20-35837, 04/25/2020, ID: 11996099, DktEntry: 5-2, Page 25 of 130
Case 3:19-cv-05106-RBL   Document 124   Filed 08/31/20   Page 19 of 19

ER p. 25 of 130

1  Washington extended an existing safeguard on handgun sales to SAR sales: the requirement to

2  undergo an enhanced background check, in which law enforcement searches additional state and

3  local databases to ensure that the buyer is not prohibited by law from buying the firearm.

4        It is undisputed that enhanced background checks are more comprehensive than an NICS

5  check alone. As the Fifth Circuit has noted, "The states voluntarily provide records for use in the

6  databases accessed by NICS," and, "for various reasons, some records are not timely provided,

7  or are not provided at all." *Mance*, 896 F.3d at 707. This enhanced background check cannot be

8  conducted on nonresidents because Washington State cannot request—much less require—out-

9  of-state law enforcement agencies to assist with running Washington's background checks. Thus,

10  the Nonresident Sales Provision is necessary to ensure an enhanced background check is

11  conducted before an SAR is sold in Washington. This local benefit far outweighs any alleged

12  burden. The Nonresident Sales Provision is constitutional under *Pike* balancing.

13                           **IV. CONCLUSION**

14        For the reasons stated above, the Plaintiffs' Motion for Summary Judgment [Dkt. #76] is

15  **DENIED**, and the Defendants' and Intervenor's Cross Motion for Summary Judgment [Dkt.

16  #84] is **GRANTED**. The Court's earlier Minute Entry **DENIED** Defendants' Motion to Exclude

17  Expert Testimony of Sheriff Ozzie Krezovich [Dkt. #77]. The Plaintiffs' Complaint is

18  **DISMISSED WITH PREJUDICE**. Each side shall bear their own costs of this litigation.

19        IT IS SO ORDERED.

20        Dated this 31st day of August, 2020.

21

22

23  Ronald B. Leighton
United States District Judge

24

Case 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 26 of 130
Case 3:19-cv-05106-RBL Document 76 Filed 03/10/20 Page 1 of 29

ER p. 26 of 130

1

2

3

4

5

6

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7  DANIEL MITCHELL, ROBIN BALL, LUKE
   RETTMER, NATHANIEL CASEY,
8  MATTHEW WALD, SECOND AMENDMENT
   FOUNDATION, and NATIONAL RIFLE
9  ASSOCIATION,

10              *Plaintiffs*,

11         v.

12
   CHUCK ATKINS, in his official capacity as the
13 Sheriff of Clark County, Washington, CRAIG
   MEIDL, in his official capacity as the Chief of
14 Police of Spokane, Washington, and TERESA
   BERNTSEN, in her official capacity as the
15 Director of the Washington State Department
   of Licensing,
16
                *Defendants*,
17
          and
18
   SAFE SCHOOLS SAFE COMMUNITIES,
19
                *Defendant-Intervenor.*
20

The Honorable Ronald B. Leighton

No. 3:19-cv-05106-RBL

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

NOTING DATE: APRIL 24, 2020

ORAL ARGUMENT REQUESTED

21

22

23

24

25

26

27

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 20, Page 27 of 130
Case 3:19-cv-05106-RBL  Document 76  Filed 03/10/20  Page 2 of 20

ER p. 27 of 130

<div align="center">TABLE OF CONTENTS</div>

I. INTRODUCTION ......................................................................................... 1

II. FACTUAL BACKGROUND ....................................................................... 2

    A. The Banned Firearms ....................................................................... 2

    B. Semi-automatic Rifle Sales Are Governed By Extensive Safety Regulation. ................ 2

    C. The Banned Firearms Are In Common, Lawful Use In America And Washington State ....... 4

III. ARGUMENT ............................................................................................. 6

    A. Each Plaintiff Has Established Standing ............................................ 6

        1. The Under-21 Plaintiffs Have Standing ..................................... 6

            a) Each Plaintiff Has Suffered an Injury In Fact ..................... 6

            b) The Injury Is "Fairly Traceable" To I-1639 ....................... 6

            c) The Remedy Sought Will Remove the Obstacle ................. 7

        2. The Dealer Plaintiffs Have Standing .......................................... 7

        3. The Organizational Plaintiffs Have Standing ............................. 7

    B. The Under-21 Sales Ban Infringes Second Amendment Rights. ............ 7

        1. The Scope Of This Ban Renders It Unconstitutional Under Any Level Of Scrutiny, Without Any Means-Ends Or Balancing Test ........................... 8

        2. The State Bans Arms Which Are Protected By The Second Amendment. ............... 10

            a) The Restricted Arms Are In Common Use. ....................... 11

            b) The Restricted Arms Are Used By Law Abiding Citizens For Lawful Purposes. ............. 13

            c) The Restricted Arms Are Used For Self-Defense In The Home ....... 13

        3. The Purchase Restriction Is Categorically Unconstitutional. ......... 14

        4. The Restriction Impermissibly Burdens Second Amendment Rights. .......... 15

    C. The Interstate Sales Ban Violates The Commerce Clause. ....................... 16

    D. The Plaintiffs Are Entitled to an Award of Attorney's Fees ....................... 18

IV. CONCLUSION ......................................................................................... 18

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - ii
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 20, Page 28 of 130
Case 3:19-cv-05106-RBL Document 76 Filed 03/10/20 Page 3 of 20

ER p. 28 of 130

# TABLE OF AUTHORITIES

## CASES

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) ........................................................ 15

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573 (1986) ................... 16

*Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016) .......................................................... 11

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997) ................... 16, 17

*Department of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) .............................................. 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................ passim

*Ex Parte Young*, 209 U.S. 123 (1908) ......................................................................... 18

*Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1 (1928) ................................................ 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ..................... 7

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ............................................................... 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................................... 6

*Mahoney v. Sessions*, 871 F.3d 873 (9th Cir. 2017) .......................................................... 15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................ 8, 9, 15

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) ................................... 18

*Nationwide Biweekly Administration, Inc. v. Owen*, 873 F.3d 716 (9th Cir. 2017) ......................... 18

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) ......................................... 17

*New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ...................... 12

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Or.*,
    511 U.S. 93 (1994) ...................................................................................... 16

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ................................................... passim

*State v. Trump*, 2020 WL 949934 (W.D. Wash. 2020) ...................................................... 6

*U.S. v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) .............................................................. 14

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ............................................................. 12

## STATUTES

18 U.S.C. § 922(b)(1) ........................................................................................ 14

42 U.S.C. § 1983 ............................................................................................. 18

H.R. 3355, Pub.L. 103–322 ................................................................................. 10

RCW 9.21.124 ................................................................................................. 2

RCW 9.41.010 ................................................................................................. 2

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - iii
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 20, Page 29 of 130
Case 3:19-cv-05106-RBL Document 76 Filed 03/10/20 Page 4 of 23

ER p. 29 of 130

RCW 9.41.240......................................................................................................... 2, 14

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Am. 2. ....................................................................................................1, 7

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## I.  INTRODUCTION

The Second Amendment provides that "the right of the people to keep and bear Arms . . . shall not be infringed." U.S. Const. Am. 2. Infringing that right, Washington state forbids 18 to 20 year old adults from purchasing semi-automatic rifles. Today, Washington residents aged 18 to 20—otherwise treated as adults—cannot legally purchase the most commonly owned long rifles. This is the broadest, most expansive firearms ban anywhere in the nation. In Washington, a 19 year old woman can only exercise her fundamental, enumerated, Constitutional right to keep and bear common, lawful arms if she happens to have an older relative willing to give her the firearm as a gift. The Constitution does not require any adult to secure her parent's permission as the condition of exercising her Constitutional rights. Washington's ban on purchases of the most commonly owned type of rifle in the country—rifles which are "typically possessed for lawful purposes" of all protected types—infringes the Second Amendment. *See, i.a.*, *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008).

In *Heller*, the Court made clear that the state cannot ban entire classes of common arms. Such a ban is unconstitutional *per se*, making it irrelevant whether the state can proffer appealing policy reasons for enacting such a ban, such as by citing isolated examples of crimes committed with firearms of the same class, or can reassure this Court that there remain other means by which a citizen can protect himself or herself—just as a ban on adults from using Twitter could not be justified by pointing to other avenues by which they could express themselves. No attempt at justification can survive the constitutional prohibition against banning an entire class of rifles which millions of Americans, and Washingtonians, have safely and lawfully owned and used for decades.

An additional constitutional infirmity is the state's ban on interstate sales of these same long guns, a textbook violation of the interstate commerce clause. The interstate sales ban serves no purpose at all, and cannot survive the exacting scrutiny required, no matter what *post hoc* justifications the state proffers in defense.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 1
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## II.  FACTUAL BACKGROUND

### A.  The Banned Firearms

Initiative No. 1639 added a definition to Washington law:

'Semiautomatic assault rifle' means any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

RCW 9.41.010. The Initiative banned sales of so-called "semiautomatic assault rifles" to persons age 18, 19, or 20, *see* RCW 9.41.240, and to anyone who does not reside in Washington state. *See* RCW 9.21.124.

Every "rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic rifle. Mitchell Decl. ¶ 5. The statutory definition that adds the word "assault" to the commonly known and previously understood definition which describes the mode of operation of any semi-automatic action adds nothing informative. Just like rifles, a shotgun "which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic shotgun, a common firearm. Mitchell Decl. ¶ 9. A handgun "which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic pistol, and perhaps the most common firearm of any sort. Mitchell Decl. ¶ 10. Thus, this new statutory definition covers every semi-automatic rifle model, of every visual appearance, with or without any particular feature or set of features. Each such rifle operates by using cartridge energy to load a new cartridge. Every rifle that fits this definition is semi-automatic, meaning, it requires a separate trigger pull to fire each round.

### B.  Semi-automatic Rifle Sales Are Governed By Extensive Safety Regulation.

Dan Mitchell and Robin Ball are licensed by both the federal government and the state to sell firearms. Mitchell Decl. ¶ 2; Ball Decl. ¶ 2. Before selling any firearm, Mitchell and Ball require the purchaser to pass the legally mandated background check process. The process begins by

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 2
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 7-2, Page 32 of 130
Case 3:19-cv-05106-RBL   Document 76   Filed 03/10/20   Page 7 of 29
ER p. 32 of 130

1   running the purchaser's name, date of birth, government issued ID number, and other information

2   through the federally-maintained National Instant Check System, or NICS. Mitchell Decl. ¶ 19;

3   Ball Decl. ¶ 10. The NICS system checks various databases to determine if the prospective

4   purchaser is forbidden to own or possess a firearm. Mitchell Decl. ¶ 20. Neither Mitchell nor Ball

5   ever complete a firearm sale unless and until the NICS check confirms that there is no reason to

6   believe the person is forbidden to purchase or possess the firearm. Mitchell Decl. ¶ 22; Ball Decl.

7   ¶ 11.

8       After the passage of I-1639, the background check became more involved. While the

9   prospective customer uses the same BATF form today as prior to passage, the application to

10   purchase a semi-automatic rifle is sent to the local law enforcement agency in the jurisdiction of

11   the buyer's residence. That agency then runs the NICS check, and also checks with Washington

12   Department of Social and Health Services for involuntary commitments (although those are

13   supposed to already be reported to the NICS system by the state), and checks for open restraining

14   orders or pending criminal charges in local court. The rifle is tagged for mandatory 10 business day

15   storage. Upon receiving an "approved" SAR application, the customer is contacted to pick up

16   their rifle. To pick up the rifle, the customer reviews and reaffirms that nothing on the BATF form

17   has changed since its original date of signature. At that point, the rifle is delivered. Mitchell Decl.

18   ¶¶ 29-36.

19       Prior to the passage of I-1639, Mitchell routinely sold semi-automatic rifles to purchasers

20   in other states. Mitchell Decl. ¶ 17. Such sales were only made by Michell after performing a NICS

21   check or through a person holding a FFL in the purchaser's state. Mitchell Decl. ¶¶ 37-38. Any

22   person who found a semi-automatic rifle in Mitchell's stock that she wanted to purchase could do

23   so either in person after a successful NICS check, or by having Mitchell ship the firearm to a

24   designated FFL in the purchaser's state. Mitchell Decl. ¶ 38. The receiving FFL would process

25   the necessary background check, consistent with federal and any applicable state law Mitchell

26   Decl. ¶ 38. Thus, all interstate firearms sales by Mitchell were subject to background checks. Prior

27   to the passage of I-1639, Mitchell estimates that as much as 30% of his sales were of semi-automatic

Plaintiffs' Motion for Summary Judgment - 3
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 20, Page 33 of 130
Case 3:19-cv-05106-RBL   Document 76   Filed 03/10/20   Page 8 of 29

ER p. 33 of 130

rifles to purchasers in other states. Mitchell Decl. ¶ 17. He has lost significant business due to the interstate sales ban. Mitchell Decl. ¶ 17. He still receives occasional inquiries for interstate sales of semi-automatic rifles, and must always turn them down. Mitchell Decl. ¶¶ 18-21.

### C.  The Banned Firearms Are In Common, Lawful Use In America And Washington State

Semi-automatic rifles are, by any estimate and any definition, in common and lawful use. The most recent data from the Bureau of Alcohol, Tobacco, and Firearms shows that 2,504,092 rifles were manufactured in the United States in 2017. Ard Decl. Exh. A at 1. 158,871 of those were exported, *id.* at 3, while another 572,309 were imported. *Id.* at 5. This tallies to a net domestic increase of 2,917,530 rifles in 2017 alone. Prior years show similar increases, numbering in the millions each year. American ownership of rifles increased by 4,821,743 in 2016; by 4,347,909 in 2015, by 3,963,507 in 2014, and by 5,355,628 in 2013. All told, in the 20 years from 1998 to 2017, Americans imported and manufactured for domestic purchase over ***55 million rifles***.

No entity tracks rifles by action type, making it impossible to procure a similarly exact number for the percentage of those fifty five million rifles that have a semi-automatic action, as opposed to bolt, lever, pump, or break action. The closest available estimate comes from the National Shooting Sports Foundation, which estimates the number of modern sporting rifles[1] manufactured in America each year. This subset of all semi-automatic rifles nonetheless represents over half of all rifles manufactured in the United States in 2017. Ard Decl. Exh. B. Given that 52% of all rifles manufactured for U.S sales in 2017 were one specific type of semi-automatic rifle, the fraction of all rifles that are semi-automatic in operation must be higher. Even if modern sporting rifles constituted the only semi-automatic rifles available in the United States, in 2017 alone, Americans purchased over one and a half million of those semi-automatic rifles.

---

[1] Modern Sporting Rifle is the industry's name for AR style semi-automatic rifles, used to distinguish this specific type of semi-automatic rifle from other rifles. *See, e.g.*, https://www.nssf.org/msr/.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 20, Page 34 of 120
Case 3:19-cv-05106-RBL Document 76 Filed 03/10/20 Page 9 of 29

ER p. 34 of 130

This preference for semi-automatic rifles is long standing. For example, the Civilian Marksmanship Program[2] has for years sold U.S. military surplus M1 Garand rifles to civilians. The M1 Garand is a semi-automatic rifle, newly banned in Washington state, despite that the federal government has sold them to the public through FFLs for decades. They remain available today, and an interested person can begin the purchase process on the website of the CMP at https://thecmp.org/sales-and-service/m1-garand/.

Washington state is representative of the country as a whole. As both Mitchell and Ball testify, they routinely sell many, many semi-automatic rifles. Mitchell Decl. ¶ 14; Ball Decl. ¶ 7. Semi-automatic rifles constitute a majority of the rifles they sell to Washington residents. Mitchell Decl. ¶ 15; Ball Decl. ¶ 8. By any standard that has been employed by a federal court in assessing firearms regulations, all rifles, and even the subset of semi-automatic rifles are in common use.

Furthermore, the overwhelming use of these common firearms is lawful. No one can draw any other conclusion from their prevalence compared to the miniscule amount of crime committed with rifles of all sorts. In every year from 2014 to 2018, for example, homicides with rifles numbered fewer than homicides committed with blunt weapons or with hands and feet. Ard Decl. Exh. C. Regardless of how many individual tragedies the state identifies, it is literally impossible to show that any statistically significant fraction of all rifles, or even semi-automatic rifles, are used in any kind of crime. Even if every rifle used in a homicide in 2017 was also sold in 2017, that would constitute only 390/2,917,530 or 0.013% of rifles used to commit murder. The state cannot cobble together any crime statistic that rebuts the truth: the vast majority—well over 99.9%—of all semi-automatic rifle owners in the United States are law-abiding citizens who use their lawfully possessed semi-automatic rifles in lawful ways.

---

[2] The CMP first existed within the Department of War, then the Department of the Army, and now is a federally chartered 501(c)(3). *See* https://thecmp.org/about/.

Plaintiffs' Motion for Summary Judgment - 5
No. 3:19-cv-05106-RBL

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# III.  ARGUMENT

## A.  Each Plaintiff Has Established Standing

In order to establish standing, a plaintiff must allege: (1) plaintiff has suffered a distinct and palpable injury as a result of the defendant's conduct; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed if the requested relief is granted. *State v. Trump,* 2020 WL 949934 (W.D. Wash. 2020); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The record in this case demonstrates that each group of plaintiffs, and each plaintiff within each group, has satisfied the threshold requirements for standing.

### 1.  The Under-21 Plaintiffs Have Standing

#### a)  Each Plaintiff Has Suffered an Injury In Fact

Each of the plaintiffs who was denied the right to purchase a firearm due to I-1639 has been deposed, and during their depositions each described the injury suffered as a result of the challenged law:

*Matthew Wald* testified that he intended to purchase a semi-automatic rifle, and when he sought out a dealer from whom to purchase the rifle, he was refused. Ard Decl. Exh. E. *Luke Rettmer* and *Nathaniel Casey* faced the same bar. Ard Decl. Exh. F and G. Unlike cases in which the plaintiff fears some future harm, and the court rejected that injury as merely speculative, the plaintiffs who were denied purchases in this case have already suffered an injury in fact.

#### b)  The Injury Is "Fairly Traceable" To I-1639

It is similarly undisputed in this case that the refusal of gun dealers to sell a semi-automatic rifle to these plaintiffs is the reason that they were unable to purchase them. As with the injury-in-fact requirement this case differs from cases in which courts have denied standing based upon the failure to establish a causal relationship between the injury suffered and the actions taken by the defendants. The testimony of the gun dealers themselves establishes that they refrained from making an otherwise profitable sale of semi-automatic rifles because of I-1639. Mitchell Decl. ¶ 22.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 6
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case 3:20-35827-106/25/2020 ID: 11906099 DktEntry/20 Page 36 of 130
Case 3:19-cv-05106-RBL Document 78 Filed 03/10/20 Page 1 of 23

ER p. 36 of 130

### c) The Remedy Sought Will Remove the Obstacle

The last element of the standing test is also clear: if this Court declares that I-1639 violates the Second Amendment, the plaintiffs' rights will be restored and they will be able to purchase the firearms that they have chosen from Ball and Mitchell. Mitchell will be able to resume interstate sales of those same firearms, subject to background checks as required.

### 2. The Dealer Plaintiffs Have Standing

This court has already determined that the dealer plaintiffs have standing: "It is difficult to see how the Dealers could sustain a more concrete form of injury without actually violating the law, which they are not required to do. The standing and ripeness requirements have therefore been satisfied." Dkt 044 Order on Motions to Dismiss, 7:15-18.

### 3. The Organizational Plaintiffs Have Standing

It is well established that an organization representing the interests of individual plaintiffs who themselves have standing may sue to protect the interests of the individuals whom they represent. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). In this case the individual plaintiffs also have standing, the interests at stake are germane to the organizations' purposes, and the participation of individual plaintiffs is not required to award the requested relief.

### B. The Under-21 Sales Ban Infringes Second Amendment Rights.

The Second Amendment provides that "the right of the people to keep and bear Arms . . . shall not be infringed." U.S. Const. Am. 2. This protects the right of people to own and bear those types of firearms that are in common use by law abiding citizens for lawful purposes. *See generally*, *Heller*, 554 U.S. 570. This right includes the "individual right to possess and carry weapons" for lawful purposes, including self-defense. *Id.* at 592. In *Heller*, the Court invalidated a broad ban on an entire category of firearms, finding that it could not survive under "any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628 and n.27. In other words, this categorical ban fails to satisfy the applicable standard, which must face at least intermediate scrutiny, but should face a much more stringent test.

Plaintiffs' Motion for Summary Judgment - 7
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 7, Page 37 of 133
Case 3:19-cv-05106-RBL Document 76 Filed 03/10/20 Page 12 of 23

ER p. 37 of 130

1    The Court subsequently held in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) that the
2    right to keep and bear arms is protected against infringement by the states, just as against the
3    federal government. *Id.* at 750. The Court described it as "among those fundamental rights
4    necessary to our system of ordered liberty." *Id.* at 778. Washington state may not simply "enact
5    any gun control law that [it] deem[s] to be reasonable." *Id.* at 783 (plurality opinion).

6    The Ninth Circuit reviews firearms regulation by finding certain regulations
7    "unconstitutional under any level of scrutiny" and adopting tiers of scrutiny for others:

8    A law that imposes such a severe restriction on the fundamental right of self defense of the
     home that it amounts to a destruction of the Second Amendment right is unconstitutional
9    under any level of scrutiny. . . A law that implicates the core of the Second Amendment
     right and severely burdens that right warrants strict scrutiny. . . Otherwise, intermediate
10   scrutiny is appropriate. If a challenged law does not implicate a core Second Amendment
     right, or does not place a substantial burden on the Second Amendment right, the court
11   may apply intermediate scrutiny.

12   *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) (internal citations and alterations omitted).
13   Here, quite plainly the ban is unconstitutional under any level of scrutiny. Unlike bans which have
14   received strict or intermediate scrutiny, this ban amounts to a destruction of the Second
15   Amendment right for the adults it affects. However reasonable Washington considers its ban—
16   forbidding the purchase of the most common type of rifle that has been made, used, and sold in the
17   United States in enormous numbers for many decades—it may not simply make the exercise of
18   this fundamental right contingent on the permission of an adult's older relative.

19          **1.   The Scope Of This Ban Renders It Unconstitutional Under Any Level Of**
20                 **Scrutiny, Without Any Means-Ends Or Balancing Test**

21   *Heller* and *McDonald* establish a presumption that ownership and use of firearms protected
22   by the Second Amendment "shall not be infringed," and that the government bears the burden of
23   proving a sufficiently robust justification for restrictions. To satisfy its high burden, the state must
24   show the restriction falls within the text of the Amendment, as informed by the history and
25   tradition of firearms ownership, use, and restrictions in the United States. *See Heller*, 554 U.S. at
26   634-36. The *Heller* Court specifically rejected the invitation to apply "intermediate scrutiny" and
27   rejected the interest balancing test proposed by the dissent. 554 U.S. at 634-35. The *McDonald*

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Court reiterated this standard, again rejecting a role for "judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 561 U.S. at 790–91. Thus, this Court's review should determine whether Washington's law restricts the right to keep and bear arms as it was understood by the drafters and enactors of both the Second and Fourteenth Amendments. *Heller*, 554 U.S. at 626-34. It will find that the law "imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right [and] is unconstitutional under any level of scrutiny." *Silvester*, 843 F.3d at 281. The law bars 18, 19, and 20 year old adults from purchasing any model of semi-automatic rifle, akin to the blanket handgun ban at issue in *Heller*, a ban which the Supreme Court agreed failed any degree of scrutiny.

The state's decision to call all these common rifles "assault" rifles has no basis in the classification of firearms. It was adopted to make the passage of I-1639 more likely, and to obfuscate the immense and unprecedented scope of the ban. This plain fact was conceded by the Violence Policy Center:[3]

> Defining an assault weapon—in legal terms—is not easy. It's not merely a matter of going after guns that are 'black and wicked looking.' Although those involved in the debate know the weapons being discussed, it's extremely difficult to develop a legal definition that restricts the availability of assault weapons without affecting legitimate semi-automatic guns.[4]

*See* http://www.vpc.org/studies/awaconc.htm. Thus, rather than clarify the scope of the law's restriction, the phrase "semiautomatic assault rifle" serves the purpose of confusing the public about the scope of the law's restriction:

> Assault weapons—just like armor-piercing bullets, machine guns, and plastic firearms—are a new topic. The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons—anything that looks like a machine gun is assumed to be a machine gun—can only increase the chance of public support for restrictions on these weapons.

---

[3] The Violence Policy Center claims that it "works to stop gun death and injury through research, education, advocacy, and collaboration." *See* http://vpc.org/about-the-vpc/.

[4] All semi-automatic guns are legitimate, whatever the Violence Policy Center thinks.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

*Id.* In other words, the state selected this additional word for the definition to make the banned rifles sound politically unpalatable. "Semiautomatic assault rifle" has all the constitutional significance of "dark money" in the First Amendment context. Adding the pejorative label 'assault' onto the existing understood definition of a semi-automatic rifle signifies nothing more than "these are rifles the state does not like." In that, the definition does have constitutional significance, inasmuch as it shows that the purpose of the Second Amendment was to preclude such a law:

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*Heller*, 554 U.S. at 634–35.

As this Court is well aware, the federal government and several states have at various times banned or restricted "assault rifles," and I-1639 purported to piggy-back on those bans. Perhaps the State will even attempt to convince the court that this ban is like those bans. That is false. The ban at issue in this case is broader than any rifle ban ever attempted by any jurisdiction in the United States. Other "assault weapons" bans restricted a small subset of semi-automatic rifles, often listing specific models or requiring them to have a combination of certain militaristic features such as pistol grips or bayonet lugs or muzzle brakes. *See, e.g.*, H.R. 3355, Pub.L. 103–322. Prior to this ban, no American jurisdiction has ever attempted to simply ban the purchase of all semi-automatic rifles. Adding the word "assault" to the known definition in no way mitigates the breadth of this ban. The ban certainly covers the iconic and wildly popular AR-15 style rifle, but also covers the most popular hunting rifles that decline to include military-looking cues, and even bans purchase of the .22 caliber rifles that might be found at a Boy Scout rifle merit badge clinic.

### 2. The State Bans Arms Which Are Protected By The Second Amendment.

The scope of the protections of the Second Amendment is plain: Washington may not infringe the right of its people to keep and bear firearms that are in common use and are "typically

Plaintiffs' Motion for Summary Judgment - 10
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 624-25, where there is no history or tradition of bans on those firearms. In fact, "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. Rifles., including semi-automatic rifles, constitute "bearable arms."

Rifles—the subject of this ban, just as "handguns" were the subject of *Heller* and "stun guns" the subject of *Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016)—are in common use, with over 55 million sold in the U.S. in the past twenty years. As such, the state has banned arms protected by the Second Amendment. Even if the state can narrow the relevant category from rifles to semi-automatic rifles, then attempt to ban the subset of these common arms, the narrower category of semi-automatic rifles still fits both these tests perfectly. Quite literally millions of semi-automatic rifles are owned by private citizens in the United States, and they are commonly sold in Washington, with untold thousands at least in circulation. Rifles of every sort are so rarely involved in crime that the likelihood of a semi-automatic rifle being used ***other*** than for a lawful purpose by a law-abiding person is effectively zero.

### a) The Restricted Arms Are In Common Use.

By any definition, semi-automatic rifles are in common use in the United States and in Washington. Indeed, every court to consider the question has found this result. Even courts which have upheld bans on subcategories of semi-automatic rifles have conceded that this category of rifles is overwhelmingly common in the United States.

The Supreme Court has set a lower bound for determining whether a category of weapon is "in common use." In *Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016), Justice Alito's concurrence made clear that stun guns were in common use in the United States where the undisputed record showed that approximately 200,000 civilians owned stun guns, which were legal in 45 states. *Id.* at 1033. Here, there can be no dispute that semi-automatic rifles are in common use, where the available data show that nearly 10 times as many semi-automatic rifles were sold to private owners in the United States in just 2017. *See* Ard Decl. Exhs. A and B. Following *Caetano*'s use of total ownership as the measure of "common use," the commonality of semi-automatic rifles

Plaintiffs' Motion for Summary Judgment - 11
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1  is plain: in just the past decade, multiple millions of semi-automatic rifles have entered private
2  ownership, far beyond the threshold of *Caetano.*

3       Nor can there be any reasonable dispute that semi-automatic rifles are in common use
4  within Washington. The state itself has no idea how many semi-automatic rifles are in private
5  hands in the state. There is no reason to doubt that national trends are equally applicable here. The
6  dealer plaintiffs testified to how routinely they sell semi-automatic rifles. Mitchell Decl. ¶ 17; Ball
7  Decl. ¶ 7-8.

8       Next, when other courts have reviewed bans on much narrower subsets of semi-automatic
9  rifles—for example, those with particular features like pistol grips or removable magazines—they
10 have uniformly found that even defined subsets of semiautomatic rifles constitute rifles in common
11 use. For example, in *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir.
12 2015), the court reviewed a challenge to a state law that banned ownership of a "semiautomatic
13 firearm that contained at least two listed military-style features, including a telescoping stock, a
14 conspicuously protruding pistol grip, a bayonet mount, a flash suppressor, and a grenade
15 launcher." *Id.* at 248. (This ban, obviously, is broader, covering any semi-automatic rifle,
16 regardless of features.) The court had no trouble concluding that the narrow subset of semi-
17 automatic rifles at issue were nonetheless in common use. *Id.* at 255. Similarly, in *Worman v.*
18 *Healey*, 922 F.3d 26 (1st Cir. 2019), the Court concluded that where "nearly 5,000,000 people
19 owned at least one" of the defined subset of semi-automatic firearms (again, rifles with certain
20 proscribed features), that subset of rifles was in common use. Here, of course, there are vastly more
21 total semi-automatic rifles in private ownership than any defined subset, and must necessarily be
22 in common use.

23      Other courts have concluded that categories of arms are in common use where very few
24 jurisdictions ban them—a test that also incorporates the Second Amendment's limit on creating
25 new, ahistorical bans. The concurrence in *Caetano* looked to this fact in striking down the stun gun
26 ban, and the Fifth Circuit considered the long-standing and widespread bans on fully automatic
27 machine guns relevant to finding them ***not*** in common use in *Hollis v. Lynch*, 827 F.3d 436 (5th Cir.

Plaintiffs' Motion for Summary Judgment - 12
No: 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

2016). Under this test, too, the ban fails. No U.S. jurisdiction—none, anywhere, ever—has attempted to impose a categorical ban on private purchase of all semi-automatic rifles.

      **b)    The Restricted Arms Are Used By Law Abiding Citizens For Lawful Purposes.**

      The sheer number of semi-automatic rifles owned by private citizens in the United States demonstrates that this category of firearms is not only in common use, but that they are used by law-abiding citizens for lawful purposes.[5] The amount of crime committed with rifles of all types— a broader category than semi-automatic rifles—is miniscule. For homicide, as an example, killings with rifles are dwarfed by killings with fists and blunt objects. *See* Ard Decl. Exh. C. The overwhelming majority of semi-automatic rifles are quite plainly used only by law-abiding citizens for lawful purposes. Indeed, in any given year for the past decades, it is obvious that the number of semi-automatic rifles purchased exceeds the total number of rifles used for crime by a multiple of thousands. Any comparison of the BATF rifle sales data and FBI crime data compels only one conclusion: the overwhelmingly vast majority, far over 99.9%, of all rifles are used lawfully. This is no new trend, and shows no sign of reversing. Rifles last for years, even for decades. During the useful life of the tens of millions of rifles sold over the last twenty years, the rate of all manner of violent crime has declined, a decline that thankfully continues even today. *See* Ard Decl. Exh. D. In light of the ever-increasing number of semi-automatic rifles in private hands, simple math compels the conclusion that the miniscule percentage of rifles used for any unlawful purposes declines each and every year.

      **c)    The Restricted Arms Are Used For Self-Defense In The Home**

      The state's ban amounts to no less than "such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right." *Silvester*, 843 F.3d at 821. First, the banned firearms are used for self-defense in the home. By all

---

[5] Any attempt to limit the scope of the right exclusively to home self-defense misstates the Supreme Court's interpretation of the right in *Heller*. Lawful use of firearms goes far beyond merely home defense. The point is moot here, however, where these firearms are the best home defense tools available to the plaintiffs denied the right to purchase them.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case 20-35827, 11/25/2020, ID: 11906099, DktEntry: 7, Page 43 of 133
Case 3:19-cv-05106-RBL Document 76 Filed 03/10/20 Page 18 of 23

ER p. 43 of 130

accounts, they represent the second most popular choice for in-home self defense. Second, because the state already bans 18, 19, and 20 year old adults from purchasing handguns (the most popular home self-defense weapon), this second ban does, in fact, destroy the Second Amendment right of adults to engage in home self-defense.

### 3. The Purchase Restriction Is Categorically Unconstitutional.

The restriction overwhelmingly burdens an adult's Second Amendment rights. Even under the narrowest understanding of the scope of the Second Amendment—limiting it to self defense of the home—this ban forbids 18, 19, and 20 year old adults in Washington from purchasing the most popular firearms available to them for that purpose. Already restricted by the state from purchasing handguns, *see* RCW 9.41.240,[6] this new restriction "amounts to a destruction of the Second Amendment right [and] is unconstitutional under any level of scrutiny." *Silvester*, 843 F.3d at 821. As the Ninth Circuit noted, "laws which regulate only the manner in which persons may exercise their Second Amendment rights are less burdensome than those which bar firearm possession completely." *Silvester*, 843 F.3d at 827.

This blanket ban is too strict to face intermediate scrutiny, as seen by the kinds of regulations for which the Ninth Circuit has applied that tier of scrutiny. In *Silvester*, the law at issue did not ban purchases, but imposed a 10 day waiting period, and therefore faced intermediate scrutiny. *Silvester*, 843 F.3d at 818. The Ninth Circuit also applied intermediate scrutiny to a ban on people already found not to be law-abiding, namely, domestic violence misdemeanants. It applied only intermediate scrutiny in part because the challenged law had sufficient exceptions that it did not amount to a complete ban, where an affected person could get his rights restored and lawfully possess firearms. *See U.S. v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013). No such exception applies here, where the law is a complete ban on law-abiding adults purchasing semi-automatic rifles.

---

[6] The federal government barred FFLs from selling handguns to those under 21. *See* 18 U.S.C. § 922(b)(1).

Plaintiffs' Motion for Summary Judgment - 14
No: 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1  The court also applied intermediate scrutiny to a police use-of-force policy governing use

2  of issued firearms during work for the Seattle Police Department. *See Mahoney v. Sessions*, 871 F.3d

3  873, 881 (9th Cir. 2017). Plainly, the police officers already had firearms to which the use-of-force

4  policy applied; the regulation did not ban them from possessing firearms or using them in self-

5  defense. Here, these adult plaintiffs cannot purchase firearms. And in *Bauer v. Becerra*, 858 F.3d

6  1216 (9th Cir. 2017), the court concluded that "intermediate scrutiny is the appropriate standard

7  for analyzing the fee scheme" at issue, which added a challenged $5 fee to purchases. This ban on

8  purchases merits higher scrutiny, the level at which it automatically fails.

9  The only greater degree of firearms regulation possible in the state would be a complete

10  ban on these adult's ability to purchase all firearms. If a ban this broad does not fail the

11  constitutional test of *Heller*, the Ninth's Circuit's tiered approach demands only intermediate

12  scrutiny for any imaginable regulation of firearms. Such an outcome contradicts not only *Silvester*,

13  but also ignores the Supreme Court's caution in *McDonald* that courts should **not** attempt "to

14  assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments

15  in an area in which they lack expertise." *McDonald*, 561 U.S. at 790–91.

16  **4. The Restriction Impermissibly Burdens Second Amendment Rights.**

17  If the Court does not immediately conclude that the law fails under the *Heller / Silvester*

18  test as "such a severe restriction . . . that it amounts to a destruction of the Second Amendment

19  right," *Silvester*, 843 F.3d at 821, then this law—the most restrictive rifle ban ever imposed in the

20  nation, on the broadest category of firearms, covering 100% of the most popular rifles sold and

21  owned—must face strict scrutiny as a "law that implicates the core of the Second Amendment

22  right and severely burdens that right . . ." *Id*. A ban that deprives 18 to 20 year old adults of the

23  right to purchase virtually any firearm cannot be justified merely as a "reasonable regulation" of

24  the manner of their exercise of rights protected by the Second Amendment.

25  Here, the state can proffer no reasonable justification for the law in any event. The banned

26  firearms are overwhelmingly common and popular, and are so rarely used in any form of crime that

27  use of one in crime is a statistical anomaly. No one can identify any specific reduction in any crime

Plaintiffs' Motion for Summary Judgment - 15
No: 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    or other negative behavior that will result from the ban. It has no effective relationship to the

2    supposed purpose put forward by the state: generic public safety. Nor will the State be able to show,

3    as it must, that there are no less restrictive means to meet the purpose of public safety it suggests

4    is the reason for the law.

5        **C.  The Interstate Sales Ban Violates The Commerce Clause.**

6        Plaintiff Dan Mitchell challenges the ban on interstate sales of semi-automatic rifles. This

7    challenged statute forbids all sales by Mitchell or any other FFL of the subject firearms to any

8    resident of another sate, whether that resident is present in Washington or located in his home

9    state. This law forbids Mitchell from transferring a self-loading rifle from his business to the

10   business of an out-of-state FFL for delivery to a customer in that state. It also forbids any locally

11   stationed member of the U.S. military whose state of residence is outside Washington from buying

12   a semi-automatic rifle. It eliminated up to 30% of his sales of semi-automatic rifles. This blanket

13   ban discriminates against interstate commerce. "State laws discriminating against interstate

14   commerce on their face are virtually per se invalid." *Camps Newfound/Owatonna, Inc. v. Town of*

15   *Harrison, Me.*, 520 U.S. 564, 575 (1997) (internal citation omitted). As the Supreme Court has

16   instructed:

17       [T]he first step in analyzing any law subject to judicial scrutiny under the negative
         Commerce Clause is to determine whether it regulates evenhandedly with only incidental
18       effects on interstate commerce, or discriminates against interstate commerce. . . As we use
         the term here, "discrimination" simply means differential treatment of in-state and out-of-
19       state economic interests that benefits the former and burdens the latter. If a restriction on
         commerce is discriminatory, it is virtually per se invalid.
20

21   *Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Or.*, 511 U.S. 93, 99

22   (1994) (internal citations and alterations omitted).    Furthermore, this kind of forbidden

23   "[e]conomic protectionism is not limited to attempts to convey advantages on local merchants; it

24   may include attempts to give local consumers an advantage over consumers in other States."

25   *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986). This ban

26   plainly satisfies the test, because it does not matter whether the state describes the ban as imposing

27   harmful burdens on its own citizens, the in-state FFLs who can no longer make profitable sales. By

Plaintiffs' Motion for Summary Judgment - 16
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

banning interstate commerce, the state has engaged in economic Balkanization that is forbidden by the interstate commerce clause, just like the law in *Brown-Forman* and just like the law challenged in *Town of Harrison*. There, the law taxed in-state businesses more heavily if they catered to out-of-state residents, harming in-state businesses and benefitting in-state consumers. The Supreme Court struck down the law. "By encouraging economic isolationism, prohibitions on out-of-state access to in-state resources serve the very evil that the dormant Commerce Clause was designed to prevent." *Town of Harrison*, 520 U.S. at 578.

The interstate sales ban cannot survive scrutiny under this long-standing rule. "A state is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the state." *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 10 (1928). Whatever reason the state may eventually produce for why it has banned residents of other states and locally stationed military members from buying semi-automatic rifles from a Washington merchant, it has enacted a ban on "privately owned articles of trade from being shipped and sold in interstate commerce," a ban the state lacks the power to create. *See also New England Power Co. v. New Hampshire*, 455 U.S. 331, 338 (1982) ("Our cases consistently have held that the Commerce Clause of the Constitution, Art. I, § 8, cl. 3, precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom"). Because "[a] discriminatory law is virtually per se invalid . . . [it] will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives . . ." *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008).

"In all but the narrowest circumstances, state laws violate the Dormant Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. . . State laws that directly discriminate against out-of-state entities can survive only if the state demonstrates both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means."

Plaintiffs' Motion for Summary Judgment - 17
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 7, Page 47 of 130
Case 3:19-cv-05106-RBL Document 76 Filed 03/10/20 Page 22 of 23

ER p. 47 of 130

1 *Nationwide Biweekly Administration, Inc. v. Owen*, 873 F.3d 716, 736 (9th Cir. 2017) (internal

2 citations and alterations omitted). Plaintiffs have shown that the law is facially discriminatory and

3 per se invalid. It falls to the state to invent a justification.

4 **D. The Plaintiffs Are Entitled to an Award of Attorney's Fees**

5 This Court recognized in its Order on Motions to Dismiss, Dkt 044, that in an action under

6 *Ex Parte Young*, 209 U.S. 123, 156 (1908) against defendants acting in their official capacity, the

7 remedies under 42 U.S.C. § 1983 are available even if the Plaintiff(s) neither seek nor are entitled

8 to damages under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). Order, at

9 13 n.4: "Fortunately for Plaintiffs, [failure to qualify for damages under *Monell*] does not actually

10 eliminate any of the remedies available to them. Plaintiffs only ask for declaratory and injunctive

11 relief, which is already available in an *Ex Parte Young* action."

12 Plaintiff will present a supplemental motion for an award of attorney's fees when this Court

13 determines that Plaintiffs have established a violation of their civil rights pursuant to 42 U.S.C.

14 § 1983.

15 **IV. CONCLUSION**

16 I-1639 prohibits Washington citizens from purchasing a firearm that is in common use by

17 law-abiding persons for law-abiding purposes. It also discriminates between in-state and out-of-

18 state purchasers in violation of the interstate commerce clause. I-1639 is not a reasonable regulation

19 narrowly tailored to promote the public safety while respecting the most basic and fundamental

20 right to self-defense. Instead, it subjects a category of particularly useful and popular firearms to

21 flat prohibition, and discriminates against out-of-state purchasers in clear violation of the interstate

22 commerce clause. Declaratory and injunctive relief should issue.

23 ///

24 ///

25 ///

26 ///

27 ///

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 9, Page 48 of 133
Case 3:19-cv-05106-RBL Document 76 Filed 03/10/20 Page 23 of 23

ER p. 48 of 130

1 | March 10, 2020.

2 | ARD LAW GROUP PLLC

3 | By: _____

4 | Joel B. Ard, WSBA # 40104

5 | P.O. Box 11633

6 | Bainbridge Island, WA 98110
   | (206) 701-9243

7 | Attorneys for Plaintiffs

8 | ALBRECHT LAW PLLC

9 |

10 | By: _____
    | Matthew C. Albrecht, WSBA #36801

11 | David K. DeWolf, WSBA #10875

12 | 421 W. Riverside Ave., Ste. 614
    | Spokane, WA 99201

13 | (509) 495-1246

14 | Attorneys for Plaintiffs

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 19
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906699, DktEntry: 6-2, Page 49 of 130
Case 3:19-cv-05106-RBL   Document 76-1   Filed 03/16/20   Page 1 of 3

ER p. 49 of 130

1

2

3

4

5                    UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF WASHINGTON
6                              AT TACOMA

7  DANIEL MITCHELL, ROBIN BALL, LUKE          The Honorable Ronald B. Leighton
   RETTMER, NATHANIEL CASEY,
8  MATTHEW WALD, SECOND AMENDMENT
   FOUNDATION, and NATIONAL RIFLE
9  ASSOCIATION,                               No. 3:19-cv-05106-RBL

10                Plaintiffs,                  [PROPOSED] ORDER RE SUMMARY
                                              JUDGMENT
11       v.

12
   CHUCK ATKINS, in his official capacity as the
13 Sheriff of Clark County, Washington, CRAIG
   MEIDL, in his official capacity as the Chief of
14 Police of Spokane, Washington, and TERESA
   BERNTSEN, in her official capacity as the
15 Director of the Washington State Department
   of Licensing,
16
                  Defendants,
17
        and
18
   SAFE SCHOOLS SAFE COMMUNITIES,
19
                  Defendant-Intervenor.
20

21

22       This matter came before the Court on cross-motions for Summary Judgment.  The matter

23 was heard on April 24, 2020.  The Court considered the papers and pleadings filed in this matter,

24 including:

25

26       1.   The Parties' Motions for Summary Judgment;

27

Case: 20-35827, 11/25/2020, ID: 11906699, DktEntry: 16-2, Page 50 of 130
Case 3:19-cv-05106-RBL   Document 76-1   Filed 03/16/20   Page 2 of 3

ER p. 50 of 130

2. The Declarations Submitted in Support of the respective Motions

3. The briefs in opposition to the Motions for Summary Judgment;

4. The Reply Briefs submitted by the parties

5. _____

6. _____

7. _____

Having considered the papers submitted by the parties, and having heard oral argument, the Court finds that Initiative 1639, approved by Washington State voters on November 6, 2018, and codified in the Revised Code of Washington as Chapter 9.41 RCW, impairs the Second Amendment rights of Washington adults aged 18 to 20; that it impairs the rights of federally licensed firearms dealers in the State of Washington, and that it violates the interstate commerce clause of the U.S. Constitution.

IT IS THEREFORE ORDERED THAT:

1. Plaintiffs' Motion for Summary Judgment is GRANTED;

2. Defendants' Motion for Summary Judgment is DENIED WITH PREJUDICE;

3. Defendants are enjoined from enforcing Initiative 1639;

4. Plaintiffs are entitled to recover their attorney's fees and costs upon presentation of a statement of such fees and costs and review thereof by this Court.

IT IS SO ORDERED.

Dated: _____, 2020

By: _____

HON. RONALD B. LEIGHTON

UNITED STATES DISTRICT JUDGE

///

///

///

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT - 2
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906699, DktEntry: 16, Page 51 of 130
Case 3:19-cv-05106-RBL Document 76-1 Filed 03/10/20 Page 3 of 3

ER p. 51 of 130

1    Present this March 10, 2020 by:

2                                 ARD LAW GROUP PLLC

3

4                                  By: _____

                                 Joel B. Ard, WSBA # 40104

5                                  P.O. Box 11633

                                 Bainbridge Island, WA 98110

6                                  (206) 701-9243

7                                  Attorneys for Plaintiffs

8                                  ALBRECHT LAW PLLC

9

10                                 By: _____

                                 Matthew C. Albrecht, WSBA #36801

11                                  David K. DeWolf, WSBA #10875

12                                  421 W. Riverside Ave., Ste. 614

                                 Spokane, WA 99201

13                                  (509) 495-1246

14                                  Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT - 3
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906699, DktEntry: 6-2, Page 52 of 130
Case 3:19-cv-05106-RBL Document 76-2 Filed 03/16/20 Page 1 of 2

ER p. 52 of 130

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

Daniel Mitchell, Robin Ball, Luke Rettmer, Nathaniel Casey, Matthew Wald, Second Amendment Foundation, and National Rifle Association,

The Honorable Ronald B. Leighton

*Plaintiffs*,

No. 3:19-cv-05106-RBL

v.

Declaration of Joel Ard In Support Of Plaintiffs' Motion For Summary Judgment

Chuck Atkins, in his official capacity as the Sheriff of Clark County, Washington, Craig Meidl, in his official capacity as the Chief of Police of Spokane, Washington, and Teresa Berntsen, in her official capacity as the Director of the Washington State Department of Licensing,

*Defendants*,

and

Safe Schools Safe Communities,

*Defendant-Intervenor*.

I, Joel Ard, declare as follows under penalty of perjury of the laws of the United States:

1. I am an attorney with Ard Law Group PLLC. I have personal knowledge of the facts stated in this Declaration and am competent to testify to them.

1.     Attached hereto as Exhibit A is a true and correct copy of the Bureau of Alcohol, Tobacco, and Firearms 2019 Annual Statistical Update, "Firearms Commerce In The United

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906699, DktEntry: 16, Page 53 of 189
Case 3:19-cv-05106-RBL Document 76-2 Filed 03/10/20 Page 2 of 2

ER p. 53 of 130

States," available at https://www.atf.gov/firearms/docs/report/2019-firearms-commerce-report/download.

2. Attached hereto as Exhibit B is a true and correct copy of the National Shooting Sports Foundation's "Industry Intelligence Report" titled "Firearms Production In The United States," available at https://www.nssf.org/wp-content/uploads/2019/12/IIR_2019_Firearms_Production.pdf.

3. Attached hereto as Exhibit C is a true and correct copy of "Expanded Homicide Data Table 8" of the FBI's "2018 Crime In The United States" report, available at https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/expanded-homicide-data-table-8.xls.

4. Attached hereto as Exhibit D is a true and correct copy of "Crime in the United States by Volume and Rate per 100,000 Inhabitants, 1999–2018," Table One of the FBI's "2018 Crime In The United States" report, available at https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/tables/table-1.

5. Attached hereto as Exhibit E is a true and correct copy of excerpts of the transcript of the deposition of Matthew Wald taken in this matter.

6. Attached hereto as Exhibit F is a true and correct copy of excerpts of the transcript of the deposition of Daniel Mitchell taken in this matter.

7. Attached hereto as Exhibit G is a true and correct copy of excerpts of the transcript of the deposition of Nathaniel Casey taken in this matter.

Signed March 10, 2020 at Bainbridge Island, Washington.

By: _____
Joel B. Ard

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 54 of 130
Case 3:19-cv-05106-RBL Document 76-3 Filed 05/10/20 Page 2 of 59
ER p. 54 of 130

# Ex.

# A

# Firearms Commerce

# in the

# United States

## Annual Statistical Update

## 2019

**United States Department of Justice**

**Bureau of Alcohol, Tobacco, Firearms**

**and Explosives**

Case 3:19-cv-05106-RBL   Document 76-3   Filed 05/01/20   Page 9 of 130
Case 3:20-35807, 04/25/2020, ID: 11669099, DktEntry: 62, Page 56 of 130
ER p. 56 of 130

# Exhibit 1.  Firearms Manufactured (1986-2017)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 662,973 | 761,414 | 970,507 | 641,482 | 4,558 | 3,040,934 |
| 1987 | 964,561 | 722,512 | 1,007,661 | 857,949 | 6,980 | 3,559,663 |
| 1988 | 1,101,011 | 754,744 | 1,144,707 | 928,070 | 35,345 | 3,963,877 |
| 1989 | 1,404,753 | 628,573 | 1,407,400 | 935,541 | 42,126 | 4,418,393 |
| 1990 | 1,371,427 | 470,495 | 1,211,664 | 848,948 | 57,434 | 3,959,968 |
| 1991 | 1,378,252 | 456,966 | 883,482 | 828,426 | 15,980 | 3,563,106 |
| 1992 | 1,669,537 | 469,413 | 1,001,833 | 1,018,204 | 16,849 | 4,175,836 |
| 1993 | 2,093,362 | 562,292 | 1,173,694 | 1,144,940 | 81,349 | 5,055,637 |
| 1994 | 2,004,298 | 586,450 | 1,316,607 | 1,254,926 | 10,936 | 5,173,217 |
| 1995 | 1,195,284 | 527,664 | 1,411,120 | 1,173,645 | 8,629 | 4,316,342 |
| 1996 | 987,528 | 498,944 | 1,424,315 | 925,732 | 17,920 | 3,854,439 |
| 1997 | 1,036,077 | 370,428 | 1,251,341 | 915,978 | 19,680 | 3,593,504 |
| 1998 | 960,365 | 324,390 | 1,535,690 | 868,639 | 24,506 | 3,713,590 |
| 1999 | 995,446 | 335,784 | 1,569,685 | 1,106,995 | 39,837 | 4,047,747 |
| 2000 | 962,901 | 318,960 | 1,583,042 | 898,442 | 30,196 | 3,793,541 |
| 2001 | 626,836 | 320,143 | 1,284,554 | 679,813 | 21,309 | 2,932,655 |
| 2002 | 741,514 | 347,070 | 1,515,286 | 741,325 | 21,700 | 3,366,895 |
| 2003 | 811,660 | 309,364 | 1,430,324 | 726,078 | 30,978 | 3,308,404 |
| 2004 | 728,511 | 294,099 | 1,325,138 | 731,769 | 19,508 | 3,099,025 |
| 2005 | 803,425 | 274,205 | 1,431,372 | 709,313 | 23,179 | 3,241,494 |
| 2006 | 1,021,260 | 385,069 | 1,496,505 | 714,618 | 35,872 | 3,653,324 |
| 2007 | 1,219,664 | 391,334 | 1,610,923 | 645,231 | 55,461 | 3,922,613 |
| 2008 | 1,609,381 | 431,753 | 1,734,536 | 630,710 | 92,564 | 4,498,944 |
| 2009 | 1,868,258 | 547,195 | 2,248,851 | 752,699 | 138,815 | 5,555,818 |
| 2010 | 2,258,450 | 558,927 | 1,830,556 | 743,378 | 67,929 | 5,459,240 |
| 2011 | 2,598,133 | 572,857 | 2,318,088 | 862,401 | 190,407 | 6,541,886 |
| 2012 | 3,487,883 | 667,357 | 3,168,206 | 949,010 | 306,154 | 8,578,610 |
| 2013 | 4,441,726 | 725,282 | 3,979,570 | 1,203,072 | 495,142 | 10,844,792 |
| 2014 | 3,633,454 | 744,047 | 3,379,549 | 935,411 | 358,165 | 9,050,626 |
| 2015 | 3,557,199 | 885,259 | 3,691,799 | 777,273 | 447,131 | 9,358,661 |
| 2016 | 4,720,075 | 856,291 | 4,239,335 | 848,617 | 833,123 | 11,497,441 |
| 2017 | 3,691,010 | 720,917 | 2,504,092 | 653,139 | 758,634 | 8,327,792 |

Source: ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1]Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.  The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act.  For example, calendar year 2012 data was due to ATF by April 1, 2013, but not published until January 2014.



Exhibit 1a. Firearms Manufactured (1986-2017)

# Exhibit 2.  Firearms Manufacturers' Exports (1986 - 2017)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 16,511 | 104,571 | 37,224 | 58,943 | 199 | 217,448 |
| 1987 | 24,941 | 134,611 | 42,161 | 76,337 | 9,995 | 288,045 |
| 1988 | 32,570 | 99,289 | 53,896 | 68,699 | 2,728 | 257,182 |
| 1989 | 41,970 | 76,494 | 73,247 | 67,559 | 2,012 | 261,282 |
| 1990 | 73,398 | 106,820 | 71,834 | 104,250 | 5,323 | 361,625 |
| 1991 | 79,275 | 110,058 | 91,067 | 117,801 | 2,964 | 401,165 |
| 1992 | 76,824 | 113,178 | 90,015 | 119,127 | 4,647 | 403,791 |
| 1993 | 59,234 | 91,460 | 94,272 | 171,475 | 14,763 | 431,204 |
| 1994 | 93,959 | 78,935 | 81,835 | 146,524 | 3,220 | 404,473 |
| 1995 | 97,969 | 131,634 | 90,834 | 101,301 | 2,483 | 424,221 |
| 1996 | 64,126 | 90,068 | 74,557 | 97,191 | 6,055 | 331,997 |
| 1997 | 44,182 | 63,656 | 76,626 | 86,263 | 4,354 | 275,081 |
| 1998 | 29,537 | 15,788 | 65,807 | 89,699 | 2,513 | 203,344 |
| 1999 | 34,663 | 48,616 | 65,669 | 67,342 | 4,028 | 220,318 |
| 2000 | 28,636 | 48,130 | 49,642 | 35,087 | 11,132 | 172,627 |
| 2001 | 32,151 | 32,662 | 50,685 | 46,174 | 10,939 | 172,611 |
| 2002 | 22,555 | 34,187 | 60,644 | 31,897 | 1,473 | 150,756 |
| 2003 | 16,340 | 26,524 | 62,522 | 29,537 | 6,989 | 141,912 |
| 2004 | 14,959 | 24,122 | 62,403 | 31,025 | 7,411 | 139,920 |
| 2005 | 19,196 | 29,271 | 92,098 | 46,129 | 7,988 | 194,682 |
| 2006 | 144,779 | 28,120 | 102,829 | 57,771 | 34,022 | 367,521 |
| 2007 | 45,053 | 34,662 | 80,594 | 26,949 | 17,524 | 204,782 |
| 2008 | 54,030 | 28,205 | 104,544 | 41,186 | 523 | 228,488 |
| 2009 | 56,402 | 32,377 | 61,072 | 36,455 | 8,438 | 194,744 |
| 2010 | 80,041 | 25,286 | 76,518 | 43,361 | 16,771 | 241,977 |
| 2011 | 121,035 | 23,221 | 79,256 | 54,878 | 18,498 | 296,888 |
| 2012 | 128,313 | 19,643 | 81,355 | 42,858 | 15,385 | 287,554 |
| 2013 | 167,653 | 21,236 | 131,718 | 49,766 | 22,748 | 393,121 |
| 2014 | 126,316 | 25,521 | 207,934 | 60,377 | 784 | 420,932 |
| 2015 | 140,787 | 22,666 | 159,707 | 18,797 | 1,499 | 343,456 |
| 2016 | 172,408 | 24,587 | 147,044 | 24,668 | 8,111 | 376,818 |
| 2017 | 275,424 | 21,676 | 158,871 | 29,997 | 2,332 | 488,300 |

Source:  ATF Annual Firearms Manufacturing and Exportation Report (AFMER).

[1]Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.

This exhibit does not include statistics related to the National Firearms Act (NFA).

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 59 of 130
Case 3:19-cv-05106-RBL   Document 76-3   Filed 05/10/20   Page 6 of 59

ER p. 59 of 130



Case 3:20-35887 04/23/2020 ID: 11908099 DktEntry: 6-2 Page 60 of 130
Case 3:19-cv-05106-RBL   Document 76-39   Filed 03/16/20   Page 7 of 59
ER p. 60 of 130

## Exhibit 3.  Firearms Imports (1986 - 2018)

| Calendar Year | Shotguns | Rifles | Handguns | Total |
|---|---|---|---|---|
| 1986 | 201,000 | 269,000 | 231,000 | 701,000 |
| 1987 | 307,620 | 413,780 | 342,113 | 1,063,513 |
| 1988 | 372,008 | 282,640 | 621,620 | 1,276,268 |
| 1989 | 274,497 | 293,152 | 440,132 | 1,007,781 |
| 1990 | 191,787 | 203,505 | 448,517 | 843,809 |
| 1991 | 116,141 | 311,285 | 293,231 | 720,657 |
| 1992 | 441,933 | 1,423,189 | 981,588 | 2,846,710 |
| 1993 | 246,114 | 1,592,522 | 1,204,685 | 3,043,321 |
| 1994 | 117,866 | 847,868 | 915,168 | 1,880,902 |
| 1995 | 136,126 | 261,185 | 706,093 | 1,103,404 |
| 1996 | 128,456 | 262,568 | 490,554 | 881,578 |
| 1997 | 106,296 | 358,937 | 474,182 | 939,415 |
| 1998 | 219,387 | 248,742 | 531,681 | 999,810 |
| 1999 | 385,556 | 198,191 | 308,052 | 891,799 |
| 2000 | 331,985 | 298,894 | 465,903 | 1,096,782 |
| 2001 | 428,330 | 227,608 | 710,958 | 1,366,896 |
| 2002 | 379,755 | 507,637 | 741,845 | 1,629,237 |
| 2003 | 407,402 | 428,837 | 630,263 | 1,466,502 |
| 2004 | 507,050 | 564,953 | 838,856 | 1,910,859 |
| 2005 | 546,403 | 682,100 | 878,172 | 2,106,675 |
| 2006 | 606,820 | 659,393 | 1,166,309 | 2,432,522 |
| 2007 | 725,752 | 631,781 | 1,386,460 | 2,743,993 |
| 2008 | 535,960 | 602,364 | 1,468,062 | 2,606,386 |
| 2009 | 558,679 | 864,010 | 2,184,417 | 3,607,106 |
| 2010 | 509,913 | 547,449 | 1,782,585 | 2,839,947 |
| 2011 | 529,056 | 998,072 | 1,725,276 | 3,252,404 |
| 2012 | 973,465 | 1,243,924 | 2,627,201 | 4,844,590 |
| 2013 | 936,235 | 1,507,776 | 3,095,528 | 5,539,539 |
| 2014 | 648,339 | 791,892 | 2,185,037 | 3,625,268 |
| 2015 | 644,293 | 815,817 | 2,470,101 | 3,930,211 |
| 2016 | 736,482 | 729,452 | 3,671,837 | 5,137,771 |
| 2017 | 632,105 | 572,309 | 3,287,842 | 4,492,256 |
| 2018 | 713,931 | 652,031 | 2,939,889 | 4,305,851 |

Source: ATF and United States International Trade Commission.

Statistics prior to 1992 are for fiscal years; 1992 is a transition year with five quarters.

Case 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 61 of 130
Case 3:19-cv-05106-RBL  Document 76-3  Filed 05/10/20  Page 8 of 59

ER p. 61 of 130



Exhibit 3a. Firearms Imports (1986 - 2018)

## Exhibit 4.  Importation Applications (1986 - 2018)

| Fiscal Year | Licensed Importer | Military* | Other | Total |
|---|---|---|---|---|
| 1986 | 7,728 | 9,434 | 2,631 | 19,793 |
| 1987 | 7,833 | 8,059 | 2,130 | 18,022 |
| 1988 | 7,711 | 7,680 | 2,122 | 17,513 |
| 1989 | 7,950 | 8,293 | 2,194 | 18,437 |
| 1990 | 8,292 | 8,696 | 2,260 | 19,248 |
| 1991 | 8,098 | 10,973 | 2,412 | 21,483 |
| 1992 | 7,960 | 9,222 | 2,623 | 19,805 |
| 1993 | 7,591 | 6,282 | 2,585 | 16,458 |
| 1994 | 6,704 | 4,570 | 3,024 | 14,298 |
| 1995 | 5,267 | 2,834 | 2,548 | 10,649 |
| 1996 | 6,340 | 2,792 | 2,395 | 11,527 |
| 1997 | 8,288 | 2,069 | 1,395 | 11,752 |
| 1998 | 8,767 | 2,715 | 1,536 | 13,019 |
| 1999 | 9,505 | 2,235 | 1,036 | 12,776 |
| 2000 | 7,834 | 2,885 | 1,416 | 12,135 |
| 2001 | 9,639 | 3,984 | 1,569 | 15,192 |
| 2002 | 9,646 | 6,321 | 3,199 | 19,166 |
| 2003 | 8,160 | 2,264 | 2,081 | 12,505 |
| 2004 | 7,539 | 1,392 | 1,819 | 10,750 |
| 2005 | 7,539 | 1,320 | 1,746 | 10,605 |
| 2006 | 8,537 | 1,180 | 1,505 | 11,222 |
| 2007 | 8,004 | 1,081 | 1,236 | 10,321 |
| 2008 | 7,610 | 718 | 980 | 9,308 |
| 2009 | 7,967 | 504 | 970 | 9,441 |
| 2010 | 7,367 | 823 | 1,088 | 9,278 |
| 2011 | 7,647 | 641 | 959 | 9,247 |
| 2012 | 8,408 | 420 | 895 | 9,723 |
| 2013 | 9,964 | 319 | 597 | 10,880 |
| 2014 | 8,529 | 255 | 429 | 9,213 |
| 2015 | 6,078 | 318 | 897 | 7,293 |
| 2016 | 6,154 | 220 | 814 | 7,188 |
| 2017 | 5,859 | 309 | 685 | 6,853 |
| 2018 | 6,631 | 289 | 670 | 7,590 |

Source: ATF Firearms and Explosives Import System (FEIS)

Import data excludes temporary permits issued to nonimmigrant aliens.

*Depicts ATF Form 6A Part 2 (5330.3C)

Effective April 8, 2014 Import permits are valid for two years.

Case 20-35827, 01/25/2020, ID: 11996099, DktEntry: 6-2, Page 63 of 180
Case 3:19-cv-05106-RBL   Document 76-3   Filed 03/10/20   Page 10 of 59

ER p. 63 of 130



Exhibit 4a. Importation Applications
(1986 - 2018)

Case 3:20-35837-cl 1/25/2020 ID: 11096099 DktEntry: 62 Page 64 of 189
Case 3:19-cv-05106-RBL  Document 76-3  Filed 03/10/20  Page 11 of 59

ER p. 64 of 130

## Exhibit 5.  Firearms Imported into the United States
## by Country 2018

| | Handguns | Rifles | Shotguns | Total Firearms |
|---|---|---|---|---|
| Austria | 927,524 | 4,786 | 1,264 | 933,574 |
| Brazil | 664,698 | 138,931 | 61,257 | 864,886 |
| Turkey | 78,026 | 2,037 | 343,392 | 423,455 |
| Italy | 167,011 | 18,565 | 168,455 | 354,031 |
| Germany | 329,692 | 18,521 | 3,589 | 351,802 |
| Croatia | 295,107 | 0 | 0 | 295,107 |
| Czech Republic | 195,637 | 28,156 | 43 | 223,836 |
| Canada | 6,447 | 197,609 | 5,760 | 209,816 |
| Philippines | 123,618 | 7,430 | 8,050 | 139,098 |
| China | 0 | 0 | 111,696 | 111,696 |
| Spain | 21,026 | 56,377 | 1,554 | 78,957 |
| Japan | 0 | 67,840 | 931 | 68,771 |
| Belgium | 25,411 | 29,651 | 3,768 | 58,830 |
| Argentina | 39,969 | 0 | 0 | 39,969 |
| Finland | 130 | 34,788 | 0 | 34,918 |
| Romania | 23,562 | 9,885 | 0 | 33,447 |
| Israel | 11,979 | 3,679 | 0 | 15,658 |
| Switzerland | 10,663 | 2,884 | 0 | 13,547 |
| United Kingdom | 326 | 5,773 | 3,870 | 9,969 |
| Serbia | 5,575 | 2,688 | 49 | 8,312 |
| Poland | 5431 | 2,617 | 0 | 8,048 |
| Russia | 0 | 7,046 | 14 | 7,060 |
| Portugal | 0 | 5,483 | 33 | 5,516 |
| Bulgaria | 1,293 | 3,000 | 47 | 4,340 |
| Slovenia | 3,232 | 0 | 0 | 3,232 |
| Ukraine | 0 | 2,100 | 0 | 2,100 |
| Slovak Republic | 1,996 | 0 | 0 | 1,996 |
| France | 496 | 879 | 79 | 1,454 |
| Other[2] | 1,040 | 1,306 | 80 | 2,426 |
| Total | 2,939,889 | 652,031 | 713,931 | 4,305,851 |

[1]On May 26, 1994, the United States instituted a firearms imports embargo against China. Sporting shotguns, however, are exempt from the embargo.

[2]Imports of fewer than 1,000 per country.

Imports from Afghanistan, Belarus, Burma, China, Cuba, Democratic Republic of Congo, Haiti, Iran, Iraq, Libya, Mongolia, North Korea, Rwanda, Somalia Sudan, Syria, Unita (Angola), Vietnam, may include surplus military curio and relic firearms that were manufactured in these countries prior to becoming proscribed or embargoed and had been outside those proscribed countries for the preceding five years prior to import. Imports may also include those that obtained a waiver from the U.S. State Department.

Imports from Georgia, Kazakstan, Kyrgyzstan, Moldova, Russian Federation, Turkmenistan, Ukraine, and Uzbekistan are limited to firearms enumerated on the Voluntary Restraint Agreement (VRA).



# Exhibit 6.  National Firearms Act Tax Revenues and Related Activities
## (1984 - 2018)

| Fiscal Year[1] | Occupational Tax Paid[2] | Transfer and Making Tax Paid | Enforcement Support[3] | |
| | | | Certifications | Records Checks |
|---|---|---|---|---|
| 1984 | $596,000 | $666,000 | 1,196 | 2,771 |
| 1985 | $606,000 | $594,000 | 921 | 3,682 |
| 1986 | $667,000 | $1,372,000 | 690 | 3,376 |
| 1987 | $869,000 | $1,576,000 | 575 | 4,135 |
| 1988 | $2,095,000 | $1,481,000 | 701 | 3,738 |
| 1989 | $1,560,000 | $1,527,000 | 1,196 | 6,128 |
| 1990 | $1,442,000 | $1,308,000 | 666 | 7,981 |
| 1991 | $1,556,000 | $1,210,000 | 764 | 7,857 |
| 1992 | $1,499,000 | $1,237,000 | 1,257 | 8,582 |
| 1993 | $1,493,000 | $1,264,000 | 1,024 | 7,230 |
| 1994 | $1,444,000 | $1,596,000 | 586 | 6,283 |
| 1995 | $1,007,000 | $1,311,000 | 882 | 5,677 |
| 1996 | $1,143,000 | $1,402,000 | 529 | 5,215 |
| 1997 | $1,284,000 | $1,630,000 | 488 | 4,395 |
| 1998 | $1,299,000 | $1,969,000 | 353 | 3,824 |
| 1999 | $1,330,000 | $2,422,000 | 345 | 3,994 |
| 2000 | $1,399,000 | $2,301,000 | 144 | 2,159 |
| 2001 | $1,456,000 | $2,800,000 | 402 | 5,156 |
| 2002 | $1,492,000 | $1,510,000 | 441 | 6,381 |
| 2003 | $1,758,000 | $2,699,000 | 401 | 6,597 |
| 2004 | $1,640,000 | $3,052,000 | 435 | 6,191 |
| 2005 | $1,659,000 | $2,810,000 | 447 | 6,218 |
| 2006 | $1,709,000 | $3,951,000 | 327 | 6,331 |
| 2007 | $1,815,000 | $4,890,000 | 530 | 7,468 |
| 2008 | $1,950,000 | $5,742,000 | 375 | 5,872 |
| 2009 | $2,125,000 | $7,971,000 | 418 | 5,736 |
| 2010 | $2,530,000 | $7,184,000 | 267 | 5,883 |
| 2011 | $2,952,000 | $9,576,000 | 287 | 6,313 |
| 2012 | $3,628,000 | $12,814,000 | 390 | 7,103 |
| 2013 | $4,294,000 | $18,182,000 | 501 | 7,138 |
| 2014 | $4,837,000 | $22,678,000 | 367 | 6,172 |
| 2015 | $5,417,000 | $32,462,000 | 338 | 5,650 |
| 2016 | $6,018,000 | $62,596,000 | 397 | 6,547 |
| 2017 | $6,371,000 | $22.972,000 | 469 | 6,749 |
| 2018 | $6,753,000 | $33,371,000 | 537 | 6,130 |

Source:  ATF's National Firearms Registration and Transfer Record (NFRTR).

[1]Data from 1997 - 2000 were based on calendar year data.

[2]Special occupational tax revenues for FY 1990 - 1996 include collections made during the fiscal year for prior tax years. Importers, manufacturers, or dealers in NFA firearms are subject to a yearly occupational tax.

[3]ATF searches the NFRTR in support of criminal investigations and regulatory inspections in order to determine whether persons are legally in possession of NFA weapons and whether transfers are made lawfully.

Data from 2000-2010 for Certifications and Records Checks was corrected in the 2012 update.

Case: 20-35827, 01/25/2020, ID: 11096099, DktEntry: 67-4, Page 14 of 130
Case 3:19-cv-05106-RBL Document 76-3 Filed 03/10/20 Page 14 of 59

ER p. 67 of 130

# Exhibit 7. National Firearms Act Firearms Processed by Form Type (1990 - 2018)

| Calendar Year[1] | Application to Make NFA Firearms (ATF Form 1) | Manufactured and Imported (ATF Form 2) | Application for Tax Exempt Transfer Between Licensees (ATF Form 3) | Application for Taxpaid Transfer (ATF Form 4) | Application for Tax-Exempt Transfer[2] (ATF Form 5) | Exported (ATF Form 9) | Total[3] |
|---|---|---|---|---|---|---|---|
| 1990 | 399 | 66,084 | 23,149 | 7,024 | 54,959 | 21,725 | 173,340 |
| 1991 | 524 | 80,619 | 19,507 | 5,395 | 44,146 | 40,387 | 190,578 |
| 1992 | 351 | 107,313 | 26,352 | 6,541 | 45,390 | 22,120 | 208,067 |
| 1993 | 310 | 70,342 | 22,071 | 7,388 | 60,193 | 24,041 | 184,345 |
| 1994 | 1,076 | 97,665 | 27,950 | 7,600 | 67,580 | 34,242 | 236,113 |
| 1995 | 1,226 | 95,061 | 18,593 | 8,263 | 60,055 | 31,258 | 214,456 |
| 1996 | 1,174 | 103,511 | 16,931 | 6,418 | 72,395 | 40,439 | 240,868 |
| 1997 | 855 | 110,423 | 18,371 | 7,873 | 70,690 | 36,284 | 244,496 |
| 1998 | 1,093 | 141,101 | 27,921 | 10,181 | 93,135 | 40,221 | 313,652 |
| 1999 | 1,071 | 137,373 | 28,288 | 11,768 | 95,554 | 28,128 | 302,182 |
| 2000 | 1,334 | 141,763 | 23,335 | 11,246 | 96,234 | 28,672 | 302,584 |
| 2001 | 2,522 | 145,112 | 25,745 | 10,799 | 101,955 | 25,759 | 311,892 |
| 2002 | 1,173 | 162,321 | 25,042 | 10,686 | 92,986 | 47,597 | 339,805 |
| 2003 | 1,003 | 156,620 | 21,936 | 13,501 | 107,108 | 43,668 | 343,836 |
| 2004 | 980 | 83,483 | 20,026 | 14,635 | 54,675 | 19,425 | 193,224 |
| 2005 | 1,902 | 65,865 | 26,603 | 14,606 | 26,210 | 20,951 | 156,137 |
| 2006 | 2,610 | 188,134 | 51,290 | 20,534 | 100,458 | 42,175 | 405,201 |
| 2007 | 3,553 | 296,267 | 51,217 | 22,260 | 194,794 | 76,467 | 644,558 |
| 2008 | 4,583 | 424,743 | 71,404 | 26,917 | 183,271 | 206,411 | 917,329 |
| 2009 | 5,345 | 371,920 | 56,947 | 31,551 | 201,267 | 163,951 | 830,981 |
| 2010 | 5,169 | 296,375 | 58,875 | 33,059 | 189,449 | 136,335 | 719,262 |
| 2011 | 5,477 | 530,953 | 107,066 | 33,816 | 147,341 | 311,214 | 1,135,867 |
| 2012 | 7,886 | 484,928 | 149,762 | 52,490 | 170,561 | 219,700 | 1,085,327 |
| 2013 | 9,347 | 477,567 | 206,389 | 57,294 | 110,637 | 224,515 | 1,085,749 |
| 2014 | 22,380 | 591,388 | 262,342 | 107,921 | 138,204 | 248,109 | 1,370,344 |
| 2015 | 32,558 | 583,499 | 365,791 | 130,017 | 127,945 | 306,037 | 1,545,847 |
| 2016 | 49,985 | 1,066,812 | 571,840 | 133,911 | 152,264 | 555,397 | 2,530,209 |
| 2017 | 40,444 | 497,329 | 344,197 | 184,312 | 180,850 | 224,389 | 1,471,521 |
| 2018 | 21,580 | 545,700 | 355,114 | 128,324 | 169,258 | 318,387 | 1,538,363 |

Source: ATF's National Firearms Registration and Transfer Record (NFRTR).

[1] Data from 1990 - 1996 represent fiscal year.

[2] Firearms may be transferred to the U.S., State or local governments without the payment of a transfer tax. Further transfers of NFA firearms between licensees registered as importers, manufacturers, or dealers who have paid the special occupational tax are likewise exempt from transfer tax.

[3] Totals do not include ATF Form 5320.20 or ATF Form 10 because these do not relate to commercial transactions.

Exhibit 7a. National Firearms Act Firearms Processed by Form Type (1990-2018)
1,200,000
1,000,000
800,000
600,000
400,000
200,000
1990
1991
1992
1993
1994
1995
1996
1997
1998
1999
2000
2001
2002
2003
2004
2005
2006
2007
2008
2009
2010
2011
2012
2013
2014
2015
2016
2017
2018
Application to Make NFA Firearms (ATF Form 1)
Manufactured and Imported (ATF Form 2)
Application for Tax Exempt Transfer Between Licensees (ATF Form 3)
Application for Taxpaid Transfer (ATF Form 4)
Application for Tax-Exempt Transfer (ATF Form 5)
Exported (ATF Form 9)





# Exhibit 8. National Firearms Act Registered Weapons by State (May 2019)

| State | Any Other Weapon[1] | Destructive Device[2] | Machinegun[3] | Silencer[4] | Short Barreled Rifle[5] | Short Barreled Shotgun[6] | Total |
|---|---|---|---|---|---|---|---|
| Alabama | 1,228 | 80,726 | 29,757 | 46,902 | 7,214 | 2,438 | 168,265 |
| Alaska | 332 | 5,346 | 1,674 | 9,250 | 2,503 | 1,415 | 20,520 |
| Arkansas | 651 | 70,179 | 5,657 | 26,804 | 4,279 | 1,231 | 108,801 |
| Arizona | 1,365 | 108,692 | 17,841 | 55,099 | 19,124 | 2,696 | 204,817 |
| California | 4,113 | 299,766 | 30,173 | 15,131 | 13,354 | 14,129 | 376,666 |
| Colorado | 1,045 | 50,349 | 7,377 | 41,983 | 10,008 | 1,929 | 112,691 |
| Connecticut | 973 | 13,647 | 41,920 | 13,731 | 3,567 | 1,039 | 74,877 |
| District of Columbia | 69 | 51,297 | 5,689 | 551 | 1,119 | 1,107 | 59,832 |
| Delaware | 35 | 3,324 | 542 | 388 | 357 | 635 | 5,281 |
| Florida | 3,881 | 216,851 | 45,893 | 118,097 | 38,216 | 9,643 | 432,581 |
| Georgia | 2,113 | 80,158 | 33,743 | 82,003 | 16,238 | 11,738 | 225,993 |
| Hawaii | 34 | 7,794 | 435 | 259 | 70 | 73 | 8,665 |
| Iowa | 898 | 17,203 | 3,697 | 12,074 | 1,576 | 1,092 | 36,540 |
| Idaho | 648 | 21,792 | 4,899 | 26,773 | 4,136 | 549 | 58,797 |
| Illinois | 1,033 | 107,116 | 30,893 | 2,729 | 4,204 | 1,723 | 147,698 |
| Indiana | 1,703 | 45,691 | 20,185 | 47,950 | 8,827 | 9,238 | 133,594 |
| Kansas | 733 | 24,573 | 3,691 | 19,677 | 4,584 | 1,151 | 54,409 |
| Kentucky | 1,140 | 33,595 | 17,818 | 33,903 | 5,278 | 1,985 | 93,719 |
| Louisiana | 586 | 56,603 | 7,294 | 42,611 | 7,401 | 1,903 | 116,398 |
| Massachusetts | 859 | 17,682 | 6,876 | 9,210 | 4,263 | 996 | 39,886 |
| Maryland | 1,074 | 55,663 | 34,026 | 27,421 | 6,184 | 3,921 | 128,289 |
| Maine | 589 | 3,611 | 5,141 | 5,014 | 2,540 | 515 | 17,410 |
| Michigan | 1,216 | 28,265 | 16,650 | 29,220 | 6,501 | 1,503 | 83,355 |
| Minnesota | 2,695 | 50,767 | 8,556 | 29,485 | 5,939 | 1,143 | 98,585 |
| Missouri | 1,488 | 34,637 | 10,051 | 31,121 | 8,176 | 2,797 | 88,270 |
| Mississippi | 468 | 17,499 | 4,588 | 24,925 | 3,864 | 1,002 | 52,346 |
| Montana | 454 | 4,423 | 2,416 | 13,635 | 1,994 | 554 | 23,476 |
| North Carolina | 995 | 98,302 | 15,549 | 49,977 | 13,080 | 3,306 | 181,209 |
| North Dakota | 202 | 3,404 | 1,630 | 12,712 | 1,473 | 299 | 19,720 |
| Nebraska | 779 | 7,608 | 2,303 | 15,414 | 2,785 | 864 | 29,753 |
| New Hampshire | 462 | 5,225 | 17,545 | 29,866 | 5,676 | 567 | 59,341 |
| New Jersey | 433 | 45,241 | 36,756 | 2,526 | 2,666 | 2,595 | 90,217 |
| New Mexico | 319 | 84,787 | 4,086 | 12,218 | 3,644 | 782 | 105,836 |
| Nevada | 1,017 | 41,134 | 15,313 | 26,140 | 10,247 | 2,971 | 96,822 |
| New York | 1,769 | 48,178 | 13,384 | 4,707 | 7,076 | 7,803 | 82,917 |
| Ohio | 1,991 | 87,146 | 21,431 | 46,939 | 11,984 | 6,328 | 175,819 |
| Oklahoma | 1,213 | 17,846 | 9,510 | 45,710 | 6,941 | 1,892 | 83,112 |
| Oregon | 1,603 | 24,670 | 6,597 | 32,843 | 7,433 | 1,576 | 74,722 |
| Pennsylvania | 2,385 | 161,645 | 20,997 | 57,200 | 15,660 | 13,540 | 271,427 |
| Rhode Island | 41 | 3,516 | 644 | 91 | 254 | 109 | 4,655 |
| South Carolina | 708 | 40,330 | 10,934 | 35,945 | 7,223 | 4,143 | 99,283 |
| South Dakota | 376 | 4,245 | 1,990 | 23,132 | 1,163 | 228 | 31,134 |
| Tennessee | 1,756 | 48,750 | 14,328 | 39,935 | 10,149 | 6,222 | 121,140 |
| Texas | 7,410 | 275,529 | 39,903 | 330,806 | 62,504 | 9,216 | 725,368 |
| Utah | 504 | 18,154 | 7,572 | 58,448 | 7,190 | 1,572 | 93,440 |
| Virginia | 2,983 | 224,550 | 38,532 | 60,811 | 21,420 | 8,667 | 356,963 |
| Vermont | 232 | 3,067 | 1,421 | 2,177 | 655 | 164 | 7,716 |
| Washington | 1,965 | 52,180 | 4,525 | 48,010 | 12,109 | 1,040 | 119,829 |
| Wisconsin | 797 | 33,621 | 8,138 | 29,333 | 6,400 | 1,350 | 79,639 |
| West Virginia | 471 | 20,948 | 7,084 | 9,627 | 2,379 | 1,142 | 41,651 |
| Wyoming | 322 | 119,982 | 1,915 | 9,902 | 1,528 | 401 | 134,050 |
| Other US Territories | 6 | 323 | 408 | 18 | 12 | 99 | 866 |
| Total | 62,162 | 2,977,630 | 699,977 | 1,750,433 | 413,167 | 155,021 | 6,058,390 |

Source: ATF National Firearms Registration and Transfer Record (NFRTR).

15

[1] The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

[2] Destructive device generally is defined as (a) Any explosive, incendiary, or poison gas (1) bomb, (2) grenade, (3) rocket having a propellant charge of more than 4 ounces, (4) missile having an explosive or incendiary charge of more than one-quarter ounce, (5) mine, or (6) device similar to any of the devices described in the preceding paragraphs of this definition; (b) any type of weapon (other than a shotgun or a shotgun shell which the Director finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and (c) any combination of parts either designed or intended for use in converting any device into any destructive device described in paragraph (a) or (b) of this section and from which a destructive device may be readily assembled. The term shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10, United States Code; or any other device which the Director finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational, or cultural purposes.

[3] Machinegun is defined as any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

[4] Silencer is defined as any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for the use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

[5] Short-barreled rifle is defined as a rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

[6] Short-barreled shotgun is defined as a shotgun having one or more barrels less than 18 inches in length, and any weapon made from a shotgun, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than 26 inches.

**Exhibit 9. National Firearms Act Special Occupational Taxpayers by State Tax Year 2018**

| State | Importers | Manufacturers | Dealers | Total |
|-------|-----------|---------------|---------|-------|
| Alabama | 24 | 107 | 127 | 258 |
| Alaska | 0 | 29 | 57 | 86 |
| Arizona | 36 | 356 | 238 | 630 |
| Arkansas | 14 | 111 | 113 | 238 |
| California | 14 | 115 | 103 | 232 |
| Colorado | 6 | 137 | 183 | 326 |
| Connecticut | 6 | 82 | 53 | 141 |
| Delaware | 0 | 2 | 4 | 6 |
| District of Columbia | 0 | 0 | 1 | 1 |
| Florida | 55 | 441 | 447 | 943 |
| Georgia | 11 | 168 | 247 | 426 |
| Hawaii | 0 | 0 | 1 | 1 |
| Idaho | 1 | 103 | 96 | 200 |
| Illinois | 9 | 90 | 51 | 150 |
| Indiana | 3 | 99 | 178 | 280 |
| Iowa | 1 | 49 | 91 | 141 |
| Kansas | 3 | 55 | 128 | 186 |
| Kentucky | 14 | 71 | 128 | 213 |
| Louisiana | 2 | 63 | 150 | 215 |
| Maine | 4 | 39 | 43 | 86 |
| Maryland | 8 | 68 | 76 | 152 |
| Massachusetts | 3 | 101 | 27 | 131 |
| Michigan | 6 | 93 | 170 | 269 |
| Minnesota | 12 | 102 | 115 | 229 |
| Mississippi | 7 | 67 | 97 | 171 |
| Missouri | 14 | 127 | 197 | 338 |
| Montana | 3 | 58 | 102 | 163 |
| Nebraska | 0 | 36 | 85 | 121 |
| Nevada | 15 | 156 | 75 | 246 |
| New Hampshire | 5 | 84 | 55 | 144 |
| New Jersey | 2 | 5 | 18 | 25 |
| New Mexico | 9 | 57 | 65 | 131 |
| New York | 2 | 56 | 27 | 85 |
| North Carolina | 2 | 185 | 254 | 441 |
| North Dakota | 0 | 12 | 58 | 70 |
| Ohio | 4 | 188 | 234 | 426 |
| Oklahoma | 1 | 114 | 148 | 263 |
| Oregon | 2 | 108 | 137 | 247 |
| Pennsylvania | 21 | 184 | 285 | 490 |
| Rhode Island | 1 | 0 | 2 | 3 |
| South Carolina | 9 | 93 | 102 | 204 |
| South Dakota | 0 | 27 | 75 | 102 |
| Tennessee | 6 | 117 | 192 | 315 |
| Texas | 40 | 647 | 896 | 1583 |
| Utah | 3 | 118 | 100 | 221 |
| Vermont | 4 | 21 | 14 | 39 |
| Virginia | 41 | 171 | 233 | 445 |
| Washington | 0 | 0 | 1 | 1 |
| West Virginia | 5 | 114 | 110 | 229 |
| Wisconsin | 7 | 40 | 61 | 108 |
| Wyoming | 2 | 99 | 109 | 210 |
| Total | 438 | 5,402 | 6,620 | 12,460 |

Source: ATF's National Firearms Act Special Occupational Tax Database (NSOT)

Numbers represent qualified premises locations.

# Exhibit 10: Federal Firearms Licensees Total (1975-2018)

| Fiscal Year | Dealer | Pawn-broker | Collector | Manufacturer of | | Importer | Destructive Device | | | Total |
| | | | | Ammunition | Firearms | | Dealer | Manufacturer | Importer | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1975 | 146,429 | 2,813 | 5,211 | 6,668 | 364 | 403 | 9 | 23 | 7 | 161,927 |
| 1976 | 150,767 | 2,882 | 4,036 | 7,181 | 397 | 403 | 4 | 19 | 8 | 165,697 |
| 1977 | 157,463 | 2,943 | 4,446 | 7,761 | 408 | 419 | 6 | 28 | 10 | 173,484 |
| 1978 | 152,681 | 3,113 | 4,629 | 7,735 | 422 | 417 | 6 | 35 | 14 | 169,052 |
| 1979 | 153,861 | 3,388 | 4,975 | 8,055 | 459 | 426 | 7 | 33 | 12 | 171,216 |
| 1980 | 155,690 | 3,608 | 5,481 | 8,856 | 496 | 430 | 7 | 40 | 11 | 174,619 |
| 1981 | 168,301 | 4,308 | 6,490 | 10,067 | 540 | 519 | 7 | 44 | 20 | 190,296 |
| 1982 | 184,840 | 5,002 | 8,602 | 12,033 | 675 | 676 | 12 | 54 | 24 | 211,918 |
| 1983 | 200,342 | 5,388 | 9,859 | 13,318 | 788 | 795 | 16 | 71 | 36 | 230,613 |
| 1984 | 195,847 | 5,140 | 8,643 | 11,270 | 710 | 704 | 15 | 74 | 40 | 222,443 |
| 1985 | 219,366 | 6,207 | 9,599 | 11,818 | 778 | 881 | 15 | 85 | 45 | 248,794 |
| 1986 | 235,393 | 6,998 | 10,639 | 12,095 | 843 | 1,035 | 16 | 95 | 52 | 267,166 |
| 1987 | 230,888 | 7,316 | 11,094 | 10,613 | 852 | 1,084 | 16 | 101 | 58 | 262,022 |
| 1988 | 239,637 | 8,261 | 12,638 | 10,169 | 926 | 1,123 | 18 | 112 | 69 | 272,953 |
| 1989 | 231,442 | 8,626 | 13,536 | 8,345 | 922 | 989 | 21 | 110 | 72 | 264,063 |
| 1990 | 235,684 | 9,029 | 14,287 | 7,945 | 978 | 946 | 20 | 117 | 73 | 269,079 |
| 1991 | 241,706 | 9,625 | 15,143 | 7,470 | 1,059 | 901 | 17 | 120 | 75 | 276,116 |
| 1992 | 248,155 | 10,452 | 15,820 | 7,412 | 1,165 | 894 | 15 | 127 | 77 | 284,117 |
| 1993 | 246,984 | 10,958 | 16,635 | 6,947 | 1,256 | 924 | 15 | 128 | 78 | 283,925 |
| 1994 | 213,734 | 10,872 | 17,690 | 6,068 | 1,302 | 963 | 12 | 122 | 70 | 250,833 |
| 1995 | 158,240 | 10,155 | 16,354 | 4,459 | 1,242 | 842 | 14 | 118 | 71 | 191,495 |
| 1996 | 105,398 | 9,974 | 14,966 | 3,144 | 1,327 | 786 | 12 | 117 | 70 | 135,794 |
| 1997 | 79,285 | 9,956 | 13,512 | 2,451 | 1,414 | 733 | 13 | 118 | 72 | 107,554 |
| 1998 | 75,619 | 10,176 | 14,875 | 2,374 | 1,546 | 741 | 12 | 125 | 68 | 105,536 |
| 1999 | 71,290 | 10,035 | 17,763 | 2,247 | 1,639 | 755 | 11 | 127 | 75 | 103,942 |
| 2000 | 67,479 | 9,737 | 21,100 | 2,112 | 1,773 | 748 | 12 | 125 | 71 | 103,157 |
| 2001 | 63,845 | 9,199 | 25,145 | 1,950 | 1,841 | 730 | 14 | 117 | 72 | 102,913 |
| 2002 | 59,829 | 8,770 | 30,157 | 1,763 | 1,941 | 735 | 16 | 126 | 74 | 103,411 |
| 2003 | 57,492 | 8,521 | 33,406 | 1,693 | 2,046 | 719 | 16 | 130 | 82 | 104,105 |
| 2004 | 56,103 | 8,180 | 37,206 | 1,625 | 2,144 | 720 | 16 | 136 | 84 | 106,214 |
| 2005 | 53,833 | 7,809 | 40,073 | 1,502 | 2,272 | 696 | 15 | 145 | 87 | 106,432 |
| 2006 | 51,462 | 7,386 | 43,650 | 1,431 | 2,411 | 690 | 17 | 170 | 99 | 107,316 |
| 2007 | 49,221 | 6,966 | 47,690 | 1,399 | 2,668 | 686 | 23 | 174 | 106 | 108,933 |
| 2008 | 48,261 | 6,687 | 52,597 | 1,420 | 2,959 | 688 | 29 | 189 | 113 | 112,943 |
| 2009 | 47,509 | 6,675 | 55,046 | 1,511 | 3,543 | 735 | 34 | 215 | 127 | 115,395 |
| 2010 | 47,664 | 6,895 | 56,680 | 1,759 | 4,293 | 768 | 40 | 243 | 145 | 118,487 |
| 2011 | 48,676 | 7,075 | 59,227 | 1,895 | 5,441 | 811 | 42 | 259 | 161 | 123,587 |
| 2012 | 50,848 | 7,426 | 61,885 | 2,044 | 7,423 | 848 | 52 | 261 | 169 | 130,956 |
| 2013 | 54,026 | 7,810 | 64,449 | 2,353 | 9,094 | 998 | 57 | 273 | 184 | 139,244 |
| 2014 | 55,431 | 8,132 | 63,301 | 2,596 | 9,970 | 1,133 | 66 | 287 | 200 | 141,116 |
| 2015 | 56,181 | 8,152 | 60,652 | 2,603 | 10,498 | 1,152 | 66 | 315 | 221 | 139,840 |
| 2016 | 56,754 | 8,076 | 57,345 | 2,481 | 11,083 | 1,105 | 71 | 332 | 217 | 137,464 |
| 2017 | 56,638 | 7,871 | 55,588 | 2,259 | 11,946 | 1,110 | 78 | 357 | 234 | 136,081 |
| 2018 | 55,891 | 7,639 | 54,136 | 2,119 | 12,564 | 1,127 | 98 | 378 | 239 | 134,191 |

Source: ATF Federal Firearms Licensing Center, Federal Licensing System (FLS). Data is based on active firearms licenses and related statistics as of the end of each fiscal year.

# Exhibit 11. Federal Firearms Licensees by State 2018

| State | FFL Population |
|---|---|
| Alabama | 2,275 |
| Alaska | 891 |
| Arizona | 3,256 |
| Arkansas | 1,949 |
| California | 7,925 |
| Colorado | 3,005 |
| Connecticut | 1,798 |
| Delaware | 305 |
| District of Columbia | 28 |
| Florida | 7,170 |
| Georgia | 3,526 |
| Hawaii | 245 |
| Idaho | 1,466 |
| Illinois | 5,326 |
| Indiana | 2,816 |
| Iowa | 2,058 |
| Kansas | 1,845 |
| Kentucky | 2,321 |
| Louisiana | 2,065 |
| Maine | 934 |
| Maryland | 3,096 |
| Massachusetts | 4,109 |
| Michigan | 4,032 |
| Minnesota | 2,502 |
| Mississippi | 1,504 |
| Missouri | 4,588 |
| Montana | 1,524 |
| Nebraska | 1,138 |
| Nevada | 1,331 |
| New Hampshire | 1,206 |
| New Jersey | 497 |
| New Mexico | 1,070 |
| New York | 3,887 |
| North Carolina | 4,589 |
| North Dakota | 685 |
| Ohio | 4,646 |
| Oklahoma | 2,402 |
| Oregon | 2,255 |
| Pennsylvania | 6,250 |
| Rhode Island | 637 |
| South Carolina | 2,121 |
| South Dakota | 776 |
| Tennessee | 3,191 |
| Texas | 10,733 |
| Utah | 1,451 |
| Vermont | 535 |
| Virginia | 4,030 |
| Washington | 2,910 |
| West Virginia | 1,376 |
| Wisconsin | 2,938 |
| Wyoming | 861 |
| Other Territories | 117 |
| Total | 134,191 |

Source: ATF, Federal Firearms Licensing Center, Firearms Licensing System. Data is based on active firearms licenses and related statistics as of the end of the fiscal year.

Case: 20-35827, 01/25/2020, ID: 11096099, DktEntry: 62, Page 75 of 189
Case 3:19-cv-05106-RBL   Document 76-3   Filed 03/10/20   Page 22 of 59
ER p. 75 of 130

# Exhibit 12.  Actions on Federal Firearms License Applications
## (1975 - 2018)

| Fiscal Year | Original Application | | | |
| --- | --- | --- | --- | --- |
| | Processed | Denied | Withdrawn[1] | Abandoned[2] |
| 1975 | 29,183 | 150 | 1,651 | … |
| 1976 | 29,511 | 209 | 2,077 | ... |
| 1977 | 32,560 | 216 | 1,645 | ... |
| 1978 | 29,531 | 151 | 1,015 | 414 |
| 1979 | 32,678 | 124 | 432 | 433 |
| 1980 | 36,052 | 96 | 601 | 661 |
| 1981 | 41,798 | 85 | 742 | 329 |
| 1982 | 44,745 | 52 | 580 | 370 |
| 1983 | 49,669 | 151 | 916 | 649 |
| 1984 | 39,321 | 98 | 706 | 833 |
| 1985 | 37,385 | 103 | 666 | 598 |
| 1986 | 42,842 | 299 | 698 | 452 |
| 1987 | 36,835 | 121 | 874 | 458 |
| 1988 | 32,724 | 30 | 506 | 315 |
| 1989 | 34,318 | 34 | 561 | 360 |
| 1990 | 34,336 | 46 | 893 | 404 |
| 1991 | 34,567 | 37 | 1,059 | 685 |
| 1992 | 37,085 | 57 | 1,337 | 611 |
| 1993 | 41,545 | 343 | 6,030 | 1,844 |
| 1994 | 25,393 | 136 | 4,480 | 3,917 |
| 1995 | 7,777 | 49 | 1,046 | 1,180 |
| 1996 | 8,461 | 58 | 1,061 | 629 |
| 1997 | 7,039 | 24 | 692 | 366 |
| 1998 | 7,090 | 19 | 621 | 352 |
| 1999 | 8,581 | 23 | 48 | 298 |
| 2000 | 10,698 | 6 | 447 | 91 |
| 2001 | 11,161 | 3 | 403 | 114 |
| 2002 | 16,100 | 13 | 468 | 175 |
| 2003 | 13,884 | 30 | 729 | 289 |
| 2004 | 12,953 | 18 | 572 | 235 |
| 2005 | 13,326 | 33 | 943 | 300 |
| 2006 | 13,757 | 35 | 898 | 234 |
| 2007 | 14,123 | 32 | 953 | 402 |
| 2008 | 15,434 | 21 | 1,030 | 291 |
| 2009 | 16,105 | 20 | 1,415 | 724 |
| 2010 | 16,930 | 32 | 1,467 | 380 |
| 2011 | 19,923 | 22 | 1,744 | 369 |
| 2012 | 20,977 | 28 | 2,252 | 358 |
| 2013 | 23,242 | 30 | 2,901 | 385 |
| 2014 | 17,816 | 27 | 2,192 | 444 |
| 2015 | 15,219 | 34 | 1,953 | 387 |
| 2016 | 15,853 | 16 | 2,165 | 307 |
| 2017 | 14,546 | 17 | 2,038 | 366 |
| 2018 | 14,054 | 17 | 1,913 | 377 |

Source:  ATF

[1]   An application can be withdrawn by an applicant at any time prior to the issuance of a license.

[2]   If ATF cannot locate an applicant during an attempted application inspection or cannot obtain needed verification data, then the application will be abandoned.

# Exhibit 13. Federal Firearms Licensees and Compliance Inspections
## (FY 1975-2018)

| Fiscal Year | Inspections | Total Licensees | Percent Inspected | Licensed Business Entities[1] | Percent Inspected |
|---|---|---|---|---|---|
| 1975 | 10,944 | 161,927 | 6.7% | 156,716 | 7.0% |
| 1976 | 15,171 | 165,697 | 9.1% | 161,661 | 9.4% |
| 1977 | 19,741 | 173,484 | 11.3% | 169,038 | 11.7% |
| 1978 | 22,130 | 169,052 | 13.1% | 164,423 | 13.5% |
| 1979 | 14,744 | 171,216 | 8.6% | 166,241 | 8.9% |
| 1980 | 11,515 | 174,619 | 6.5% | 169,138 | 6.8% |
| 1981 | 11,035 | 190,296 | 5.7% | 183,806 | 6.0% |
| 1982 | 1,829 | 211,918 | 0.8% | 203,316 | 0.9% |
| 1983 | 2,662 | 230,613 | 1.1% | 220,754 | 1.2% |
| 1984 | 8,861 | 222,443 | 3.9% | 213,800 | 4.1% |
| 1985 | 9,527 | 248,794 | 3.8% | 239,195 | 4.0% |
| 1986 | 8,605 | 267,166 | 3.2% | 256,527 | 3.4% |
| 1987 | 8,049 | 262,022 | 3.1% | 250,928 | 3.2% |
| 1988 | 9,283 | 272,953 | 3.4% | 260,315 | 3.6% |
| 1989 | 7,142 | 264,063 | 2.7% | 250,527 | 2.9% |
| 1990 | 8,471 | 269,079 | 3.1% | 254,792 | 3.3% |
| 1991 | 8,258 | 276,116 | 3.0% | 260,973 | 3.2% |
| 1992 | 16,328 | 284,117 | 5.7% | 268,297 | 6.1% |
| 1993 | 22,330 | 283,925 | 7.9% | 267,290 | 8.4% |
| 1994 | 20,067 | 250,833 | 8.0% | 233,143 | 8.6% |
| 1995 | 13,141 | 191,495 | 7.0% | 171,577 | 7.7% |
| 1996 | 10,051 | 135,794 | 7.4% | 120,828 | 8.3% |
| 1997 | 5,925 | 107,554 | 5.5% | 94,042 | 6.3% |
| 1998 | 5,043 | 105,536 | 4.8% | 90,661 | 5.6% |
| 1999 | 9,004 | 103,942 | 8.7% | 86,179 | 10.4% |
| 2000 | 3,640 | 103,157 | 3.5% | 82,558 | 4.4% |
| 2001 | 3,677 | 102,913 | 3.6% | 77,768 | 4.7% |
| 2002 | 5,467 | 103,411 | 5.2% | 73,254 | 7.5% |
| 2003 | 5,170 | 104,105 | 4.9% | 70,699 | 7.3% |
| 2004 | 4,509 | 106,214 | 4.2% | 69,008 | 6.5% |
| 2005 | 5,189 | 106,432 | 4.9% | 66,359 | 7.8% |
| 2006 | 7,294 | 107,316 | 6.8% | 63,666 | 11.5% |
| 2007 | 10,141 | 108,933 | 9.3% | 61,243 | 16.6% |
| 2008 | 11,100 | 112,943 | 9.8% | 60,346 | 18.4% |
| 2009 | 11,375 | 115,395 | 9.9% | 60,349 | 18.8% |
| 2010 | 10,538 | 118,487 | 8.9% | 61,807 | 17.0% |
| 2011 | 13,159 | 123,587 | 10.6% | 64,360 | 20.4% |
| 2012 | 11,420 | 130,956 | 8.7% | 69,071 | 16.5% |
| 2013 | 10,516 | 139,244 | 7.6% | 74,795 | 14.1% |
| 2014 | 10,437 | 141,116 | 7.4% | 77,815 | 13.4% |
| 2015 | 8,696 | 139,840 | 6.3% | 79,188 | 11.0% |
| 2016 | 9,790 | 137,464 | 7.1% | 80,119 | 12.2% |
| 2017 | 11,009 | 136,081 | 8.1% | 80,493 | 13.7% |
| 2018 | 10,323 | 134,191 | 7.7% | 80,055 | 12.9% |

Source: ATF

[1] Does not include Collector of Curio and Relics (Type 03)

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 77 of 180
Case 3:19-cv-05106-RBL  Document 76-3  Filed 03/10/20  Page 24 of 59
ER p. 77 of 130

# Ex.

# B

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 62, Page 78 of 189
Case 3:19-cv-05106-RBL Document 76-3 Filed 03/10/20 Page 25 of 59
ER p. 78 of 130



# INDUSTRY INTELLIGENCE REPORTS
## Helping Our Members Make Informed Decisions

# FIREARMS PRODUCTION
## IN THE UNITED STATES
### WITH FIREARMS IMPORT AND EXPORT DATA

**P**roviding a comprehensive overview of firearms production trends spanning a period of 25 years, this report is based primarily on the data sourced from the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF's) Annual Firearms Manufacturing and Export Reports (AFMER). Every effort has been made to provide accurate and updated information so the reader may keep this edition as a reliable resource for trend information. Production data is a leading indicator of industry performance; this is especially true when combined with other valuable sources of information.

This edition includes manufacturing trends for ammunition as sourced from Census Bureau's Economic Census, which is conducted once every five years. The Annual Survey of Manufacturers (ASM) is used for all years that fall between those fifth-year economic census reports. Import and export statistics for firearms compiled from the U.S. International Trade Commission (USITC) are presented in conjunction with the AFMER numbers to provide a more accurate picture of the historical production that has been made available to the U.S. market. These data sources, when used collectively, help to provide an overview of the firearms and ammunition manufacturing industries.

Information on production, imports, exports and other manufacturing variables are only a piece of a more complex puzzle of the firearms industry. Other factors outside of the manufacturing sector, such as the retail sector, the economy and frequently the political climate, must all be taken into consideration.  The limitation of the AFMER data is that it reflects historic trends; however, using the data in combination with other reports does provide a more complete picture of the industry. Firearms and ammunition production provide a very significant contribution to the national economy in terms of jobs, wages, and benefits. In addition, capital expenditures on materials (energy, equipment, fuels) help boost local economies.

## KEY FINDINGS

- The average annual production of firearms in the U.S. was 5,278,368 for the last quarter century.

- Total firearm production reported in the 2017 AFMER was 7,901,218 – a decrease of 25.5% over 2016 reported figures.

- Long guns totaled 3,489,295 and accounted for 44.2% of total U.S. firearms production. Of that, rifles totaled 2,821,945 (80.9% of long gun production) and shotguns totaled 667,350 (19.1%).

**\* See back for all Key Findings**



**THE FIREARMS INDUSTRY TRADE ASSOCIATION    |    NSSF.ORG    |**        

# U.S. Firearms Production (1993 - 2017)

| Year | Pistols | Revolvers | Total Handguns | Rifles | Shotguns | Total Long Guns | Production Total (a) | % Change in Total Production Year over Year |
|------|---------|-----------|----------------|--------|----------|-----------------|----------------------|---------------------------------------------|
| 1993 | 2,093,186 | 562,292 | 2,655,478 | 1,171,872 | 1,148,939 | 2,320,811 | 4,976,289 | 23.5% |
| 1994 | 1,995,511 | 586,450 | 2,581,961 | 1,349,116 | 1,254,926 | 2,604,042 | 5,186,003 | 4.2% |
| 1995 | 1,195,266 | 527,664 | 1,722,930 | 1,331,780 | 1,173,645 | 2,505,425 | 4,228,355 | -18.5% |
| 1996 | 985,533 | 498,944 | 1,484,477 | 1,424,319 | 925,732 | 2,350,051 | 3,834,528 | -9.3% |
| 1997 | 1,036,077 | 370,428 | 1,406,505 | 1,251,341 | 915,978 | 2,167,319 | 3,573,824 | -6.8% |
| 1998 | 960,365 | 324,390 | 1,284,755 | 1,345,899 | 1,036,520 | 2,382,419 | 3,667,174 | 2.6% |
| 1999 | 995,446 | 335,784 | 1,331,230 | 1,569,685 | 1,106,995 | 2,676,680 | 4,007,910 | 9.3% |
| 2000 | 962,901 | 318,960 | 1,281,861 | 1,583,042 | 898,442 | 2,481,484 | 3,763,345 | -6.1% |
| 2001 | 626,836 | 320,143 | 946,979 | 1,284,554 | 679,813 | 1,964,367 | 2,911,346 | -22.6% |
| 2002 | 741,514 | 347,070 | 1,088,584 | 1,515,286 | 741,325 | 2,256,611 | 3,345,195 | 14.9% |
| 2003 | 811,660 | 309,364 | 1,121,024 | 1,430,324 | 726,078 | 2,156,402 | 3,277,426 | -2.0% |
| 2004 | 728,511 | 294,099 | 1,022,610 | 1,325,138 | 731,769 | 2,056,907 | 3,079,517 | -6.0% |
| 2005 | 803,425 | 274,205 | 1,077,630 | 1,431,372 | 709,313 | 2,140,685 | 3,218,315 | 4.5% |
| 2006 | 1,021,260 | 382,069 | 1,403,329 | 1,496,505 | 714,618 | 2,211,123 | 3,614,452 | 12.3% |
| 2007 | 1,219,664 | 391,334 | 1,610,998 | 1,610,923 | 645,231 | 2,256,154 | 3,867,152 | 7.0% |
| 2008 | 1,387,271 | 431,753 | 1,819,024 | 1,746,139 | 630,710 | 2,376,849 | 4,195,873 | 8.5% |
| 2009 | 1,868,268 | 547,547 | 2,415,815 | 2,253,103 | 752,699 | 3,005,802 | 5,421,617 | 29.2% |
| 2010 | 2,087,577 | 558,927 | 2,646,504 | 1,830,556 | 743,378 | 2,573,934 | 5,220,438 | -3.7% |
| 2011 | 2,464,255 | 572,857 | 3,037,112 | 2,305,854 | 862,401 | 3,168,255 | 6,205,367 | 18.9% |
| 2012 | 3,311,081 | 667,357 | 3,978,438 | 3,109,940 | 949,010 | 4,058,950 | 8,037,388 | 29.5% |
| 2013 | 4,314,550 | 725,282 | 5,039,832 | 3,996,673 | 1,203,072 | 5,199,745 | 10,239,577 | 27.4% |
| 2014 | 3,602,577 | 744,047 | 4,346,624 | 3,379,009 | 935,411 | 4,314,420 | 8,661,044 | -15.4% |
| 2015 | 3,553,026 | 884,578 | 4,437,604 | 3,701,443 | 777,273 | 4,478,716 | 8,916,320 | 2.9% |
| 2016 | 4,705,930 | 856,288 | 5,562,218 | 4,198,693 | 848,615 | 5,047,308 | 10,609,526 | 19.0% |
| 2017 | 3,691,006 | 720,917 | 4,411,923 | 2,821,945 | 667,350 | 3,489,295 | 7,901,218 | -25.5% |

(a): Does not include AFMER MISC firearms category which includes items such as: pen guns and starter guns. Also adjusted to exclude/include, as noted:

* 2011, 2012, 2013 figures from the following manufacturers were excluded:  contact NSSF research for more information

* 2014 figures from the following manufacturers:

    -- pistol parts and components manufacturers were not included in this report:  Hi Tech Plastics Inc.12,005; Engineering & Cycle Co., Inc  2,583; EPP Team Inc. 14,387; and Tanury Industries, Inc. 1,894.

    -- rifle parts manufacturers were not included in this report:  Engineering & Cycle Co., Inc. 985; and John W Heaton 13,528. The parts are included in the final, finished product and are reported by the final firearm manufacturer. Rifle total adjusted to include an average percentage of total manufactured product for Aero Precision. Revised count from 1,118 to 18,000 on 9/21/2017.

* 2015 figures from the following manufacturers:

    -- pistol parts and components manufacturers were not included in this report:  Hi Tech Plastics Inc.1,798 and Tanury Industries, Inc. 3,057.

    -- rifle parts manufacturers were not included in this report: John W Heaton 7,643 and Tanury Industries, Inc. 2. The parts are included in the final, finished product and are reported by the final firearm manufacturer. Rifle total adjusted to include an average percentage of total manufactured product for Aero Precision. Revised count from 5 to 14,000 on 9/21/2017.

* 2016 figures from the following manufacturers:

    -- pistol parts and components manufacturers were not included in this report:  Hi Tech Plastics Inc. 4,520; Pauway Corp. 5,774; and Tanury Industries, Inc. 1,257.

    -- rifle parts manufacturers were not included in this report: Pauway Corp. 6,723; RP Abrasives & Machine Inc. 51,242; Tanury Industries, Inc. 299. The parts are included in the final, finished product and are reported by the final firearm manufacturer. Rifle total adjusted to include an average percentage of total manufactured product for Aero Precision. Revised count from 4,931 to 30,000 on 9/21/2018.

* 2017 figures from the following manufacturers:

    -- rifle parts manufacturers were not included in this report: RP Abrasives & Machine Inc. 28,982. The parts are included in the final, finished product and are reported by the final firearm manufacturer. Rifle total was adjusted to include an average percentage of total manufactured product for Aero Precision. Revised count from 1,490 to 27,500 on 7/31/2019.

    -- rifles ADDED: Savage Arms manufactured 320,825.

    -- shotguns ADDED: Savage Arms manufactured 14,211.



# U.S. Firearms Production (1993 - 2017)

2018 interim data prepared July 22, 2019. The interim report indicates preliminary data for which the following number of units were reported as manufactured by the manufacturer. This "production" report represents firearms (including separate frames or receivers, actions or barreled actions) manufactured and disposed of in commerce during the calendar year.

| Year | Pistols | Revolvers | Total Handguns | Rifles | Shotguns | Total Long-Guns |
|------|---------|-----------|----------------|--------|----------|-----------------|
| MANUFACTURED | | | | | | |
| 2018 Interim | 3,679,268 | 598,703 | **4,277,971** | 2,846,757 | 535,994 | **3,382,751** |

The full 2018 report is expected to be available approximately February 2020. Look for it at www.atf.gov.

## ANNUAL AVERAGES

| Years | Pistols | Revolvers | Total Handguns | Rifles | Shotguns | Total Long Guns | Production Total |
|-------|---------|-----------|----------------|--------|----------|-----------------|------------------|
| 25 YR (1993 to 2017) | 1,886,508 | 502,110 | **2,388,618** | 2,018,580 | 871,170 | **2,889,750** | **5,278,368** |
| 15 YR (2003 to 2017) | 2,371,337 | 557,375 | **2,928,712** | 2,442,508 | 793,129 | **3,235,636** | **6,164,349** |
| 10 YR (2008 to 2017) | 3,098,554 | 670,955 | **3,769,509** | 2,934,336 | 836,992 | **3,771,327** | **7,540,837** |
| 5 YR (2013 to 2017) | 3,973,418 | 786,222 | **4,759,640** | 3,619,553 | 886,344 | **4,505,897** | **9,265,537** |

Source: Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Annual Firearms Manufacturing and Export Report (AFMER). Data is in total units and represents the number of firearms "manufactured and disposed of in commerce during the calendar year." Totals include firearms sold for export and law enforcement, but not military sales.



# U.S. Firearms Production (1993 - 2017)

## Handguns



## Total Production



## Long Guns



### 2017 Production At A Glance



| Pistols by Caliber | | |
|---|---|---|
| To .22 | 408,705 | 11.1% |
| To .25 | 11,135 | 0.3% |
| To .32 | 8,152 | 0.2% |
| To .380 | 848,425 | 23.0% |
| To 9mm | 1,756,618 | 47.6% |
| To .50 | 657,971 | 17.8% |
| | 3,691,006 | 100.0% |

| Revolver by Caliber | | |
|---|---|---|
| To .22 | 319,364 | 44.3% |
| To .32 | 1,715 | 0.2% |
| To .357 M | 134,053 | 18.6% |
| To .38 Sp | 177,956 | 24.7% |
| To .44 M | 42,062 | 5.8% |
| To .50 | 45,767 | 6.3% |
| | 720,917 | 100% |

NOTE: Caliber designations as reported in ATF reports are preceded by the word "to." This represents a range of calibers in a category. For example, the pistol "To .50" category includes .40- and .45-caliber models among others that are larger than 9mm.



Source: AFMER

Case 3:19-cv-05106-RBL Document 76-3 Filed 08/10/20 Page 29 of 59
Case 20-35827, 11/25/2020, ID: 11896999, DktEntry: 6, Page 82 of 130
ER p. 82 of 130

**INDUSTRY INTELLIGENCE REPORTS**

# U.S. Pistol Production by Caliber (1993 - 2017)



Pistols



| Year | To .22 | To .25 | To .32 | To .380 | To 9mm | To .50 | Total |
|------|--------|--------|--------|---------|--------|--------|-------|
| 1993 | 452,509 | 277,306 | 52,268 | 508,469 | 586,039 | 216,595 | 2,093,186 |
| 1994 | 449,237 | 110,732 | 25,972 | 313,915 | 750,698 | 344,957 | 1,995,511 |
| 1995 | 260,059 | 51,025 | 19,220 | 182,802 | 398,467 | 283,693 | 1,195,266 |
| 1996 | 204,819 | 41,156 | 20,709 | 165,789 | 319,696 | 233,364 | 985,533 |
| 1997 | 250,983 | 43,103 | 43,623 | 154,046 | 303,212 | 241,110 | 1,036,077 |
| 1998 | 184,836 | 50,936 | 62,338 | 98,266 | 284,374 | 279,615 | 960,365 |
| 1999 | 229,852 | 24,393 | 52,632 | 81,881 | 270,298 | 336,390 | 995,446 |
| 2000 | 184,577 | 23,198 | 60,527 | 108,523 | 277,176 | 308,900 | 962,901 |
| 2001 | 123,374 | 5,697 | 57,823 | 41,634 | 213,378 | 181,164 | 623,070 |
| 2002 | 144,722 | 10,009 | 53,999 | 59,476 | 205,197 | 268,111 | 741,514 |
| 2003 | 189,785 | 10,987 | 43,471 | 79,788 | 219,668 | 267,961 | 811,660 |
| 2004 | 211,473 | 10,140 | 32,435 | 68,291 | 182,493 | 223,679 | 728,511 |
| 2005 | 139,178 | 10,455 | 29,024 | 107,386 | 299,681 | 217,701 | 803,425 |
| 2006 | 141,651 | 9,625 | 39,197 | 126,939 | 352,383 | 351,465 | 1,021,260 |
| 2007 | 180,419 | 11,361 | 43,914 | 138,484 | 391,312 | 454,174 | 1,219,664 |
| 2008 | 195,633 | 14,586 | 40,485 | 278,945 | 421,746 | 435,876 | 1,387,271 |
| 2009 | 320,697 | 15,053 | 47,396 | 390,897 | 586,364 | 507,861 | 1,868,268 |
| 2010 | 320,237 | 21,722 | 39,792 | 615,630 | 591,876 | 498,320 | 2,087,577 |
| 2011 | 357,884 | 19,182 | 13,890 | 537,063 | 838,957 | 697,279 | 2,464,255 |
| 2012 | 586,625 | 9,853 | 11,248 | 582,645 | 1,175,564 | 945,146 | 3,311,081 |
| 2013 | 554,431 | 18,578 | 6,591 | 852,663 | 1,653,900 | 1,228,387 | 4,314,550 |
| 2014 | 410,747 | 19,097 | 10,494 | 873,087 | 1,254,582 | 1,034,570 | 3,602,577 |
| 2015 | 410,041 | 11,567 | 14,763 | 819,094 | 1,531,033 | 766,528 | 3,553,026 |
| 2016 | 439,628 | 13,174 | 10,269 | 1,129,761 | 2,275,660 | 837,438 | 4,705,930 |
| 2017 | 408,705 | 11,135 | 8,152 | 848,425 | 1,756,618 | 657,971 | 3,691,006 |
| TOTAL | 7,352,102 | 844,070 | 840,232 | 9,163,899 | 17,140,372 | 11,818,255 | 47,158,930 |

## Percentage of Pistols produced in the U.S. by caliber



**25 YEARS (1993-2017)**
To .22: 15.6%, To .25: 1.8%, To .32: 1.8%, To .380: 19.4%, To 9mm: 36.3%, To .50: 25.1%

**20 YEARS (1998-2017)**
To .22: 14.4%, To .25: 0.8%, To .32: 1.7%, To .380: 19.7%, To 9mm: 37.1%, To .50: 26.3%

**15 YEARS (2003-2017)**
To .22: 13.7%, To .25: 0.6%, To .32: 1.1%, To .380: 20.9%, To 9mm: 38.0%, To .50: 25.7%

**10 YEARS (2008-2017)**
To .22: 12.9%, To .25: 0.5%, To .32: 0.7%, To .380: 22.4%, To 9mm: 39.0%, To .50: 24.6%

**5 YEARS (2013-2017)**
To .22: 11.2%, To .25: 0.4%, To .32: 0.3%, To .380: 22.8%, To 9mm: 42.6%, To .50: 22.8%

NOTE: Caliber designations as reported in ATF reports are preceded by the word "to." This represents a range of calibers in a category. For example, the pistol "To .50" category includes .40- and .45- caliber models among others that are larger than 9mm.

Source: AFMER

**INDUSTRY INTELLIGENCE REPORTS**

# U.S. Revolver Production by Caliber (1993 - 2017)





| Year | To .22 | To .32 | To .357 MAG | To .38 SPEC | To .44 MAG | To .50 | Total |
|------|--------|--------|-------------|-------------|------------|--------|-------|
| 1993 | 122,614 | 10,421 | 183,328 | 146,767 | 70,381 | 28,781 | 562,292 |
| 1994 | 133,990 | 9,160 | 170,856 | 146,630 | 89,713 | 36,101 | 586,450 |
| 1995 | 99,578 | 4,381 | 210,379 | 92,913 | 90,144 | 30,269 | 527,664 |
| 1996 | 127,119 | 3,083 | 134,910 | 115,432 | 80,456 | 37,944 | 498,944 |
| 1997 | 109,296 | 3,876 | 70,792 | 85,935 | 61,324 | 39,205 | 370,428 |
| 1998 | 68,108 | 2,602 | 73,905 | 77,289 | 64,236 | 38,250 | 324,390 |
| 1999 | 80,140 | 5,844 | 68,174 | 86,356 | 55,957 | 39,313 | 335,784 |
| 2000 | 79,472 | 1,598 | 81,017 | 59,339 | 46,931 | 50,603 | 318,960 |
| 2001 | 77,433 | 5,003 | 50,120 | 85,628 | 39,515 | 62,444 | 320,143 |
| 2002 | 86,806 | 17,599 | 95,570 | 51,472 | 46,080 | 49,543 | 347,070 |
| 2003 | 108,518 | 3,928 | 59,591 | 57,078 | 46,533 | 33,716 | 309,364 |
| 2004 | 88,570 | 3,446 | 62,640 | 54,842 | 35,097 | 49,504 | 294,099 |
| 2005 | 63,333 | 2,297 | 68,476 | 68,785 | 25,802 | 45,512 | 274,205 |
| 2006 | 84,452 | 2,242 | 99,562 | 85,321 | 54,308 | 56,184 | 382,069 |
| 2007 | 91,963 | 3,509 | 93,320 | 104,498 | 46,719 | 51,325 | 391,334 |
| 2008 | 115,511 | 6,681 | 105,944 | 133,621 | 31,135 | 38,861 | 431,753 |
| 2009 | 141,840 | 7,590 | 107,834 | 232,339 | 29,967 | 27,977 | 547,547 |
| 2010 | 131,543 | 8,605 | 126,525 | 210,762 | 45,361 | 36,131 | 558,927 |
| 2011 | 153,749 | 5,182 | 125,237 | 206,191 | 35,791 | 46,707 | 572,857 |
| 2012 | 234,164 | 1,717 | 126,594 | 203,005 | 36,116 | 65,761 | 667,357 |
| 2013 | 226,749 | 1,914 | 149,730 | 238,384 | 46,466 | 62,039 | 725,282 |
| 2014 | 200,739 | 5,260 | 151,635 | 283,990 | 41,640 | 60,783 | 744,047 |
| 2015 | 278,784 | 9,413 | 185,976 | 225,782 | 48,170 | 136,453 | 884,578 |
| 2016 | 320,773 | 7,851 | 182,564 | 248,143 | 51,451 | 45,506 | 856,288 |
| 2017 | 319,364 | 1,715 | 134,053 | 177,956 | 42,062 | 45,767 | 720,917 |
| TOTAL | 3,544,608 | 134,917 | 2,918,732 | 3,478,458 | 1,261,355 | 1,214,679 | 12,552,749 |

## Percentage of Revolvers produced in the U.S. by caliber



Source: AFMER

Case: 20-35827, 11/25/2020, ID: 11896099, DktEntry: 6, Page 84 of 130
Case 3:19-cv-06106-RBL Document 76-3 Filed 08/10/20 Page 31 of 59
ER p. 84 of 130

**INDUSTRY INTELLIGENCE REPORTS**

# Modern Sporting Rifle Production Plus Imports Less Exports (1990 - 2017)

(estimated)

| Year | US Production less exports of MSRs | US Imports less exports of MSRs | TOTAL |
|------|------|------|------|
| 1990 | 43,000 | 31,000 | 74,000 |
| 1991 | 46,000 | 69,000 | 115,000 |
| 1992 | 33,000 | 72,000 | 105,000 |
| 1993 | 62,000 | 226,000 | 288,000 |
| 1994 | 103,000 | 171,000 | 274,000 |
| 1995 | 54,000 | 77,000 | 131,000 |
| 1996 | 27,000 | 43,000 | 70,000 |
| 1997 | 44,000 | 81,000 | 125,000 |
| 1998 | 70,000 | 75,000 | 145,000 |
| 1999 | 113,000 | 119,000 | 232,000 |
| 2000 | 86,000 | 130,000 | 216,000 |
| 2001 | 60,000 | 119,000 | 179,000 |
| 2002 | 97,000 | 145,000 | 242,000 |
| 2003 | 118,000 | 262,000 | 380,000 |
| 2004 | 107,000 | 207,000 | 314,000 |
| 2005 | 141,000 | 170,000 | 311,000 |
| 2006 | 196,000 | 202,000 | 398,000 |
| 2007 | 269,000 | 229,000 | 498,000 |
| 2008 | 444,000 | 189,000 | 633,000 |
| 2009 | 692,000 | 314,000 | 1,006,000 |
| 2010 | 444,000 | 140,000 | 584,000 |
| 2011 | 653,000 | 163,000 | 816,000 |
| 2012 | 1,308,000 | 322,000 | 1,630,000 |
| 2013 | 1,882,000 | 393,000 | 2,275,000 |
| 2014 | 950,000 | 237,000 | 1,187,000 |
| 2015 | 1,360,000 | 244,000 | 1,604,000 |
| 2016 | 2,142,000 | 230,000 | 2,372,000 |
| 2017 | 1,378,000 | 158,000 | 1,536,000 |
| TOTALS | 12,922,000 | 4,818,000 | 17,740,000 |

Source: ATF AFMER, US ITC, Industry estimates



Case: 19-35837, 11/25/2020, ID: 11906099, DktEntry: 6, Page 85 of 130
Case 3:19-cv-05106-RBL Document 76-3 Filed 03/10/20 Page 32 of 59
ER p. 85 of 130

**INDUSTRY INTELLIGENCE REPORTS**

# U.S. Production by Manufacturer (2017)

| LICENSE NAME  HANDGUN | PISTOLS | REVOLVERS | TOTAL |
|---|---|---|---|
| SMITH & WESSON CORP | 1,032,450 | 207,384 | 1,239,834 |
| STURM, RUGER & COMPANY, INC | 781,623 | 172,104 | 953,727 |
| SIG SAUER INC | 536,774 | 0 | 536,774 |
| HERITAGE MANUFACTURING INC | 0 | 226,065 | 226,065 |
| KIMBER MFG INC | 183,858 | 21,349 | 205,207 |
| GLOCK INC | 175,696 | 0 | 175,696 |
| SCCY INDUSTRIES LLC | 150,647 | 0 | 150,647 |
| SPRINGFIELD INC | 81,377 | 0 | 81,377 |
| TAURUS INTERNATIONAL MANUFACTURING INC | 69,123 | 0 | 69,123 |
| FN AMERICA, LLC | 61,510 | 0 | 61,510 |
| REMINGTON ARMS COMPANY LLC | 59,581 | 0 | 59,581 |
| KEL TEC CNC INDUSTRIES INC | 58,982 | 0 | 58,982 |
| BERETTA USA CORP | 57,411 | 0 | 57,411 |
| BROWNING ARMS COMPANY | 50,331 | 0 | 50,331 |
| NORTH AMERICAN ARMS INC | 809 | 46,138 | 46,947 |
| STRASSELLS MACHINE INC | 46,015 | 0 | 46,015 |
| PALMETTO STATE ARMORY, LLC | 43,248 | 0 | 43,248 |
| COLTS MANUFACTURING COMPANY LLC | 31,987 | 7,342 | 39,329 |
| COBRA ENTERPRISES OF UTAH, INC | 27,905 | 0 | 27,905 |
| JIMENEZ ARMS INC | 26,499 | 0 | 26,499 |
| CHARCO 2000 INC | 0 | 24,310 | 24,310 |
| DIAMONDBACK FIREARMS LLC | 24,270 | 0 | 24,270 |
| SAEILO, INC | 23,646 | 0 | 23,646 |
| PHOENIX ARMS | 20,650 | 0 | 20,650 |
| BOND ARMS, INC | 13,333 | 0 | 13,333 |
| HASKELL MANUFACTURING INC | 10,900 | 0 | 10,900 |
| MAGNUM RESEARCH INC | 8,367 | 959 | 9,326 |
| CENTURY ARMS INC | 9,321 | 0 | 9,321 |
| CZ-USA INC | 8,261 | 600 | 8,861 |
| VALLEY STEEL STAMP INC | 0 | 7,890 | 7,890 |
| IBERIA FIREARMS INC | 7,800 | 0 | 7,800 |
| FMK FIREARMS INCORPORATED | 7,000 | 0 | 7,000 |
| STI FIREARMS LLC | 6,416 | 0 | 6,416 |
| FRANK ROTH CO INC | 0 | 5,742 | 5,742 |
| WILSONS GUN SHOP INC | 5,203 | 0 | 5,203 |
| AMERICAN TACTICAL INC | 5,005 | 0 | 5,005 |
| SILENCERCO, LLC | 4,850 | 0 | 4,850 |
| ALPHATECH INC | 3,450 | 0 | 3,450 |
| KRISS USA, INC | 3,254 | 0 | 3,254 |
| PALMETTO STATE ARMORY, LLC | 3,123 | 0 | 3,123 |
| VLH INC | 3,037 | 0 | 3,037 |
| RADICAL FIREARMS LLC | 2,775 | 0 | 2,775 |
| TRAILBLAZER FIREARMS LLC | 2,723 | 0 | 2,723 |
| FREEDOM ORDNANCE MANUFACTURING INC | 2,552 | 0 | 2,552 |
| MASTERPIECE ARMS HOLDING COMPANY | 2,336 | 0 | 2,336 |
| HONOR DEFENSE LLC | 2,327 | 0 | 2,327 |
| NIGHTHAWK CUSTOM LLC | 2,299 | 0 | 2,299 |
| OUTDOOR COLORS LLC | 1,712 | 0 | 1,712 |
| WHALLEY PRECISION INC | 1,706 | 0 | 1,706 |
| V CUSTOM INC | 1,474 | 0 | 1,474 |
| WM C ANDERSON INC | 1,448 | 0 | 1,448 |
| LES BAER CUSTOM INC | 1,382 | 0 | 1,382 |
| COONAN INC | 1,345 | 0 | 1,345 |
| COBRAY FIREARMS OF TENNESSEE LLC | 987 | 0 | 987 |
| EXTAR LLC | 950 | 0 | 950 |
| CMMG INC | 844 | 0 | 844 |
| ED BROWN PRODUCTS, INC | 827 | 0 | 827 |
| HUDSON MFG LLC | 770 | 0 | 770 |
| TOTAL | 3,691,006 | 720,917 | 4,411,923 |

Manufacturers producing less than 700 handguns in 2017 are not displayed above, but all units are included in the total..

| LICENSE NAME  LONG GUNS | RIFLES | SHOTGUNS | TOTAL |
|---|---|---|---|
| REMINGTON ARMS COMPANY LLC | 448,513 | 269,391 | 717,904 |
| STURM, RUGER & COMPANY, INC | 661,155 | 16 | 661,171 |
| MAVERICK ARMS, INC | 80,275 | 302,830 | 383,105 |
| SAVAGE ARMS | 320,825 | 14,211 | 335,036 |
| SMITH & WESSON CORP | 265,356 | 21 | 265,377 |
| HENRY RAC HOLDING CORP | 235,037 | 0 | 235,037 |
| KEL TEC CNC INDUSTRIES INC | 66,235 | 25,413 | 91,648 |
| RADICAL FIREARMS LLC | 88,430 | 0 | 88,430 |
| SPRINGFIELD INC | 69,352 | 0 | 69,352 |
| STRASSELLS MACHINE INC | 40,511 | 0 | 40,511 |
| HENRY WISCONSIN LLC | 32,177 | 6,146 | 38,323 |
| SIG SAUER INC | 35,920 | 0 | 35,920 |
| DANIEL DEFENSE INC | 34,098 | 0 | 34,098 |
| OUTDOOR COLORS LLC | 11,946 | 19,776 | 31,722 |
| AERO PRECISION LLC | 27,500 * | 0 | 27,500 |
| DIAMONDBACK FIREARMS LLC | 26,960 | 0 | 26,960 |
| PALMETTO STATE ARMORY, LLC | 25,221 | 0 | 25,221 |
| DEL-TON, INC | 24,829 | 0 | 24,829 |
| AMERICAN TACTICAL INC | 20,898 | 1,432 | 22,330 |
| CENTURY ARMS INC | 19,888 | 0 | 19,888 |
| BERETTA USA CORP | 2,778 | 17,025 | 19,803 |
| FN AMERICA, LLC | 15,614 | 0 | 15,614 |
| IWI US INC | 14,133 | 0 | 14,133 |
| COLTS MANUFACTURING COMPANY LLC | 13,942 | 0 | 13,942 |
| LWRC INTERNATIONAL | 12,413 | 3 | 12,416 |
| KIMBER MFG INC | 11,378 | 0 | 11,378 |
| STAG ARMS LLC | 10,932 | 0 | 10,932 |
| WINDHAM WEAPONRY INC | 9,484 | 0 | 9,484 |
| TDJ INC | 8,992 | 0 | 8,992 |
| SAEILO, INC | 8,615 | 0 | 8,615 |
| STRATEGIC ARMORY CORPS LLC | 8,581 | 0 | 8,581 |
| O F MOSSBERG & SONS INC | 8,296 | 0 | 8,296 |
| I O INC | 7,460 | 0 | 7,460 |
| ROCK RIVER ARMS INC | 6,667 | 0 | 6,667 |
| BRAVO COMPANY MFG INC | 6,467 | 0 | 6,467 |
| PATRIOT ORDNANCE FACTORY INC | 5,079 | 0 | 5,079 |
| BARRETT FIREARMS MFG INC | 4,749 | 293 | 5,042 |
| WEATHERBY INC | 3,937 | 0 | 3,937 |
| KRISS USA, INC | 3,660 | 0 | 3,660 |
| AREOTEK INDUSTRIES LLC | 3,587 | 0 | 3,587 |
| STANDARD MANUFACTURING CO LLC | 160 | 3,131 | 3,291 |
| TACTICAL SOLUTIONS INC | 3,247 | 0 | 3,247 |
| BEAR CREEK ARSENAL LLC | 3,023 | 0 | 3,023 |
| FIME GROUP LLC | 2,190 | 579 | 2,769 |
| TROY INDUSTRIES INC | 2,688 | 0 | 2,688 |
| FREEDOM ORDNANCE MANUFACTURING INC | 2,498 | 0 | 2,498 |
| JUST RIGHT CARBINES LLC | 2,444 | 0 | 2,444 |
| CMMG INC | 2,369 | 0 | 2,369 |
| UTAS-USA LTD | 0 | 2,358 | 2,358 |
| WILSONS GUN SHOP INC | 2,095 | 253 | 2,348 |
| PALMETTO STATE ARMORY, LLC | 2,343 | 0 | 2,343 |
| ADAMS ARMS LLC | 2,342 | 0 | 2,342 |
| FMK FIREARMS INCORPORATED | 2,316 | 0 | 2,316 |
| WM C ANDERSON INC | 2,295 | 0 | 2,295 |
| BLACK RAIN ORDNANCE INC | 2,291 | 0 | 2,291 |
| ALEX PRO FIREARMS LLC | 2,232 | 0 | 2,232 |
| SEEKINS PRECISION LLC | 2,227 | 0 | 2,227 |
| JAMES RIVER ARMORY | 2,149 | 0 | 2,149 |
| TOTAL | 2,821,945 | 667,350 | 3,489,295 |

Manufacturers producing less than 2,000 long guns in 2017 are not displayed above, but all units are included in the total.

# Top 25 Manufacturers of Firearms Manufactured in the U.S.

(Based on Total U.S. Production in 2017)

| LICENSE NAME | PISTOLS | REVOLVERS | TOTAL HANDGUNS | RIFLES | SHOTGUNS | TOTAL LONG GUNS | TOTAL FIREARMS MANUFACTURED | % OF TOTAL 2017 U.S. HANDGUN & LONG GUN PRODUCTION |
|---|---|---|---|---|---|---|---|---|
| STURM, RUGER & COMPANY, INC | 781,623 | 172,104 | 953,727 | 661,155 | 16 | 661,171 | 1,614,898 | 20.4% |
| SMITH & WESSON CORP | 1,032,450 | 207,384 | 1,239,834 | 265,356 | 21 | 265,377 | 1,505,211 | 19.1% |
| REMINGTON ARMS COMPANY LLC | 59,581 | 0 | 59,581 | 448,513 | 269,391 | 717,904 | 777,485 | 9.8% |
| SIG SAUER INC | 536,774 | 0 | 536,774 | 35,920 | 0 | 35,920 | 572,694 | 7.2% |
| MAVERICK ARMS, INC | 0 | 0 | 0 | 80,275 | 302,830 | 383,105 | 383,105 | 4.8% |
| SAVAGE ARMS | 0 | 0 | 0 | 320,825 | 14,211 | 335,036 | 335,036 | 4.2% |
| HENRY RAC HOLDING CORP | 0 | 0 | 0 | 235,037 | 0 | 235,037 | 235,037 | 3.0% |
| HERITAGE MANUFACTURING INC | 0 | 226,065 | 226,065 | 0 | 0 | 0 | 226,065 | 2.9% |
| KIMBER MFG INC | 183,858 | 21,349 | 205,207 | 11,378 | 0 | 11,378 | 216,585 | 2.7% |
| GLOCK INC | 175,696 | 0 | 175,696 | 0 | 0 | 0 | 175,696 | 2.2% |
| SPRINGFIELD INC | 81,377 | 0 | 81,377 | 69,352 | 0 | 69,352 | 150,729 | 1.9% |
| SCCY INDUSTRIES LLC | 150,647 | 0 | 150,647 | 0 | 0 | 0 | 150,647 | 1.9% |
| KEL TEC CNC INDUSTRIES INC | 58,982 | 0 | 58,982 | 66,235 | 25,413 | 91,648 | 150,630 | 1.9% |
| RADICAL FIREARMS LLC | 2,775 | 0 | 2,775 | 88,430 | 0 | 88,430 | 91,205 | 1.2% |
| STRASSELLS MACHINE INC | 46,015 | 0 | 46,015 | 40,511 | 0 | 40,511 | 86,526 | 1.1% |
| BERETTA USA CORP | 57,411 | 0 | 57,411 | 2,778 | 17,025 | 19,803 | 77,214 | 1.0% |
| FN AMERICA, LLC | 61,510 | 0 | 61,510 | 15,614 | 0 | 15,614 | 77,124 | 1.0% |
| TAURUS INTERNATIONAL MANUFACTURING INC | 69,123 | 0 | 69,123 | 103 | 0 | 103 | 69,226 | 0.9% |
| COLT'S MANUFACTURING COMPANY LLC | 31,987 | 7,342 | 39,329 | 13,942 | 0 | 13,942 | 53,271 | 0.7% |
| DIAMONDBACK FIREARMS LLC | 24,270 | 0 | 24,270 | 26,960 | 0 | 26,960 | 51,230 | 0.6% |
| BROWNING ARMS COMPANY | 50,331 | 0 | 50,331 | 668 | 0 | 668 | 50,999 | 0.6% |
| NORTH AMERICAN ARMS INC | 809 | 46,138 | 46,947 | 0 | 0 | 0 | 46,947 | 0.6% |
| WALTHER MANUFACTURING INC | 43,248 | 0 | 43,248 | 1 | 0 | 1 | 43,249 | 0.5% |
| HENRY WISCONSIN LLC | 0 | 0 | 0 | 32,177 | 6,146 | 38,323 | 38,323 | 0.5% |
| DANIEL DEFENSE INC | 513 | 0 | 513 | 34,098 | 0 | 34,098 | 34,611 | 0.4% |
| Total Produced in 2017 by Top 25 Manufacturers | 3,448,980 | 680,382 | 4,129,362 | 2,449,328 | 635,053 | 3,084,381 | 7,213,743 | 91.3% |
|  | 93.4% | 94.4% | 93.6% | 86.8% | 95.2% | 88.4% | 91.3% |  |

Source:AFMER

# INDUSTRY INTELLIGENCE REPORTS

# U.S. Manufacturers Direct Exports at a Glance (2017)

| PISTOL MANUFACTURER | EXPORTS |
|---|---|
| SIG SAUER INC | 177,414 |
| GLOCK INC | 47,861 |
| SMITH & WESSON CORP | 22,440 |
| STURM, RUGER & COMPANY, INC | 10,534 |
| BERETTA USA CORP | 4,750 |
| REMINGTON ARMS COMPANY LLC | 3,022 |
| KIMBER MFG INC | 2,605 |
| COLT'S MANUFACTURING COMPANY LLC | 1,870 |
| MAGNUM RESEARCH INC | 1,002 |
| FN AMERICA, LLC | 636 |
| LES BAER CUSTOM INC | 492 |
| KEL TEC CNC INDUSTRIES INC | 351 |
| TAURUS INTERNATIONAL MANUFACTURING INC | 275 |
| SAEILO, INC | 271 |
| SCCY INDUSTRIES LLC | 270 |
| FMK FIREARMS INCORPORATED | 214 |
| RAINIER ARMS LLC | 166 |
| NIGHTHAWK CUSTOM LLC | 162 |
| STRAYER VOIGT INC | 159 |
| SPRINGFIELD INC | 152 |
| KRISS USA, INC | 119 |
| WILSONS GUN SHOP INC | 111 |
| ANGSTADT ARMS LLC | 111 |
| BIXLER, CHRISTOPHER A | 95 |
| JV INDUSTRIES LLC | 63 |
| NORTH AMERICAN ARMS INC | 58 |
| ENGAGE ARMAMENT LLC | 50 |
| PISTOL TOTAL | 275,424 |

| REVOLVER MANUFACTURER | EXPORTS |
|---|---|
| SMITH & WESSON CORP | 16,230 |
| STURM, RUGER & COMPANY, INC | 3,992 |
| NORTH AMERICAN ARMS INC | 705 |
| KIMBER MFG INC | 334 |
| COLT'S MANUFACTURING COMPANY LLC | 158 |
| CHARCO 2000 INC | 122 |
| MAGNUM RESEARCH INC | 112 |
| REVOLVER TOTAL | 21,676 |

| SHOTGUN MANUFACTURER | EXPORTS |
|---|---|
| REMINGTON ARMS COMPANY LLC | 18,238 |
| MAVERICK ARMS, INC | 10,559 |
| BERETTA USA CORP | 667 |
| KEL TEC CNC INDUSTRIES INC | 514 |
| SHOTGUN TOTAL | 29,997 |

| RIFLE MANUFACTURERS | EXPORTS |
|---|---|
| REMINGTON ARMS COMPANY LLC | 62,345 |
| STURM, RUGER & COMPANY, INC | 39,551 |
| SMITH & WESSON CORP | 11,835 |
| MAVERICK ARMS, INC | 11,180 |
| HENRY RAC HOLDING CORP | 10,533 |
| BEAR CREEK ARSENAL LLC | 2,999 |
| KEL TEC CNC INDUSTRIES INC | 2,659 |
| COLT'S MANUFACTURING COMPANY LLC | 2,097 |
| STI FIREARMS LLC | 1,959 |
| SIG SAUER INC | 1,758 |
| TROY INDUSTRIES INC | 1,411 |
| KRISS USA, INC | 1,077 |
| JUST RIGHT CARBINES LLC | 990 |
| DANIEL DEFENSE INC | 918 |
| KIMBER MFG INC | 859 |
| BARRETT FIREARMS MFG INC | 696 |
| TNW FIREARMS INC | 613 |
| WEATHERBY INC | 568 |
| DESERT TECH LLC | 420 |
| STRATEGIC ARMORY CORPS LLC | 344 |
| TDJ INC | 331 |
| PATRIOT ORDNANCE FACTORY INC | 331 |
| STAG ARMS LLC | 324 |
| FN AMERICA, LLC | 261 |
| SPRINGFIELD INC | 243 |
| RAINIER ARMS LLC | 207 |
| WINDHAM WEAPONRY INC | 174 |
| WM C ANDERSON INC | 167 |
| PNEU DART INC | 167 |
| KELBLY'S RIFLE RANGE INC | 155 |
| V CUSTOM INC | 118 |
| FIERCE FIREARMS LLC | 105 |
| LEWIS MACHINE & TOOL CO | 102 |
| RIVERMAN, LLC | 101 |
| WILSON PRECISION ARMS INC | 96 |
| TIPPMANN ARMS COMPANY LLC | 90 |
| MAGNUM RESEARCH INC | 84 |
| MEGGITT TRAINING SYSTEMS INC | 56 |
| LANCER SYSTEMS LP | 53 |
| SARCO INC | 50 |
| RIFLE TOTAL | 158,897 |

Note: A manufacturer that reported exporting less than fifty units does not appear
in the tables above. The totals include all units manufactured and exported.



Source: AFMER

# Industry Statistics (current Snapshot)

The data listed on this page are sourced from the most current Census Bureau report. At this time it is the Economic Census (conducted every five years). NAICS (North American Industry classification System) code 332992 represents "Small-Arms Ammunition," and NAICS code 332 represents "Fabricated-Metal-Product Manufacturing."

## DEFINITION OF TERMS

**Employees:** includes all full-time and part-time employees on the payroll of operating manufacturing establishments.

**Production workers:** includes workers (up through the line-supervisor level) actively engaged in the manufacturing process.

**Payroll:** includes the gross earnings of all employees paid in a calendar year.

**Value added:** measure of manufacturing activity derived by subtracting the cost of materials and supplies from the value of shipments (finished products and services rendered).

**Capital expenditures:** represents the total new and used expenditures reported by establishments in operation and any known plants under construction.

**Inventories:** includes products and materials held outside of the establishment, such as in warehouses (private or public).



**NOTE: The fabricated metal product manufacturing (NAICS code 332) subsector consists of all of these industry groups. Forging and Stamping: NAICS 3321; Cutlery and Handtool Manufacturing: NAICS 3322; Architectural and Structural Metals Manufacturing: NAICS 3323; Boiler, Tank, and Shipping Container Manufacturing: NAICS 3324; Hardware Manufacturing: NAICS 3325; Spring and Wire Product Manufacturing: NAICS 3326; Machine Shops; Turned Product; and Screw, Nut, and Bolt Manufacturing: NAICS 3327; Coating, Engraving, Heat Treating, and Allied Activities: NAICS 3328; Other Fabricated Metal Product Manufacturing: NAICS 3329.

| INDUSTRY STATISTIC | (332) Fabricated Metal Product Manufacturing (2017) | (332992) Ammunition Manufacturing (2017) | Ammunition Manufacturing as Percent of Total Fabricated Metal Product Manufacturing |
|---|---|---|---|
| **Employment & Labor Costs** | | | |
| Total number of employees | 1,370,635 | 11,958 | 0.9% |
| Number of production workers | 1,043,064 | 9,894 | 0.9% |
| Production workers hours worked | 2,024,352,000 | 20,769,000 | 1.0% |
| Production workers wages | $47,579,535,000 | $528,602,000 | 1.1% |
| Total annual payroll | $73,949,468,000 | $667,204,000 | 0.9% |
| Total fringe benefits | not avail. Nov. 2020 | not avail. Nov. 2020 | not available |
| **Total annual compensation** | **$73,949,468,000** | **$667,204,000** | **0.9%** |
| **Purchased Fuels and Electric Energy Used for Heat and Power** | | | |
| Electric energy purchased (kWh) | 40,054,937,000 | 382,533,000 | 1.0% |
| Cost of electric energy | $3,416,269,000 | $29,420,000 | 0.9% |
| Cost of purchased fuels | $1,208,867,000 | D* | not available |
| **Total cost of fuels and electric energy** | **$4,625,136,000** | **$29,420,000** | **0.6%** |
| **Capital Expenditures for Plant and Equipment** | | | |
| Capital expenditures for buildings and other structures | avail. Nov. 2020 | avail. Nov. 2020 | not available |
| Rental or lease payments (buildings and equipment) | $4,592,021,000 | $25,455,000 | 0.6% |
| Capital expenditures for machinery and equipment | avail. Nov. 2020 | avail. Nov. 2020 | not available |
| All other operating expenses | $28,028,180,000 | $338,060,000 | 1.2% |
| **Total capital expenditures for plant and equipment** | **$32,620,201,000** | **$363,515,000** | **1.1%** |
| **Value of Manufacturers' Inventories by Stage of Fabrication** | | | |
| **Beginning of Year** | | | |
| Finished Products | $17,056,680,000 | $387,087,000 | 2.3% |
| Work-in-process | $12,008,011,000 | $183,083,000 | 1.5% |
| Materials and supplies inventories | $17,482,151,000 | $216,500,000 | 1.2% |
| **Total** | **$46,546,842,000** | **$786,670,000** | **1.7%** |
| **End of Year** | | | |
| Finished products | $18,034,932,000 | $352,413,000 | 2.0% |
| Work-in-process | $12,664,585,000 | $231,675,000 | 1.4% |
| Materials and supplies inventories | $18,649,336,000 | $203,925,000 | 1.2% |
| **Total** | **$49,348,853,000** | **$788,013,000** | **1.6%** |
| **Manufacturing Activity** | | | |
| **Total value of shipments** | **$344,742,838,000** | **$4,117,447,000** | **1.2%** |
| **Total cost of materials** | **$156,195,391,000** | **$1,651,559,000** | **1.1%** |
| **Value added** | **$190,182,273,000** | **$2,479,806,000** | **1.3%** |

* D: Withheld to avoid disclosing data for individual companies

Source: 2017 Economic Census (data available as of Oct 14. 2019).

Note: The last implimented update to NAICS codes went into effect in 2012. NAICS code 332994 was revised at that time and changed from reporting Small Arms/Firearms Manufacturing and now includes a list of military applications/products in addition to those manufactured for sporting use. As such, code 332994 is no longer included in this report.

Case: 20-35827, 11/25/2020, ID: 11896090, DktEntry: 6, Page 88 of 130
Case 3:19-cv-05106-RBL Document 76-3 Filed 03/10/20 Page 38 of 59
ER p. 88 of 130

**INDUSTRY INTELLIGENCE REPORTS**

# Manufacturing Trends

Small Arms Ammunition (NAICS 332992)

## ALL EMPLOYEES (NUMBER)

### 10-Year Average

Small Arms Ammunition: **10,674**



| Year | Value |
|------|-------|
| 2008 | 9,668 |
| 2009 | 10,283 |
| 2010 | 10,730 |
| 2011 | 10,346 |
| 2012 | 10,413 |
| 2013 | 10,505 |
| 2014 | 10,660 |
| 2015 | 10,387 |
| 2016 | 11,809 |
| 2017 | 11,958 |

## PAYROLL ($ IN MILLIONS)

### 10-Year Average

Small Arms Ammunition: **$773M**



| Year | Value |
|------|-------|
| 2008 | 630 |
| 2009 | 696 |
| 2010 | 741 |
| 2011 | 748 |
| 2012 | 793 |
| 2013 | 842 |
| 2014 | 828 |
| 2015 | 876 |
| 2016 | 912 |
| 2017 | 667 |

## VALUE ADDED ($ IN MILLIONS)

### 10-Year Average

Small Arms Ammunition: **$2,078M**



| Year | Value |
|------|-------|
| 2008 | 1,299 |
| 2009 | 1,788 |
| 2010 | 1,783 |
| 2011 | 1,592 |
| 2012 | 2,291 |
| 2013 | 2,579 |
| 2014 | 2,440 |
| 2015 | 2,135 |
| 2016 | 2,480 |
| 2017 | 2,480 |

## COST OF MATERIALS ($ IN MILLIONS)

### 10-Year Average

Small Arms Ammunition: **$1,608M**



| Year | Value |
|------|-------|
| 2008 | 1,355 |
| 2009 | 1,288 |
| 2010 | 1,703 |
| 2011 | 1,830 |
| 2012 | 1,348 |
| 2013 | 1,653 |
| 2014 | 1,671 |
| 2015 | 1,872 |
| 2016 | 1,711 |
| 2017 | 1,652 |

Source: U.S. Census Bureau, Annual Survey of Manufacturers (ASM) and Economic Census reports

## US Ammunition Consumer Market Unit Estimate

| Category | 2012 | 2015 | 2018 |
|----------|------|------|------|
| Shotshell | 1.4 billion | 1.4 billion | 1.0 billion |
| Rimfire | 4.5 billion | 5.4 billion | 4.1 billion |
| Centerfire | 3.6 billion | 3.7 billion | 3.6 billion |
| **TOTAL** | **9.5 billion** | **10.5 billion** | **8.7 billion** |

Source: USITC and NSSF Estimates









**INDUSTRY INTELLIGENCE REPORTS**

# Firearm Imports By Country (2008 - 2017) (in actual units of quantity)

**Pistols:** HTS 9302000040 [PISTOLS, SEMIAUTOMATIC EXCEPT OF HEADING 9303 OR 9304] --or-- HTS 9302000090 [PISTOLS, EXCEPT OF HEADING 9303 OR 9304, NESOI (not elsewhere specified or included)]

| COUNTRY | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | 65,915 | 63,872 | 74,245 | 71,838 | 75,984 | 82,635 | 43,710 | 42,304 | 75,834 | 33,676 |
| Austria | 371,910 | 602,146 | 431,118 | 515,396 | 821,522 | 932,117 | 794,540 | 923,986 | 1,318,204 | 1,198,740 |
| Belgium | 12,179 | 33,195 | 18,874 | 9,769 | 10,754 | 14,493 | 18,221 | 18,679 | 25,299 | 21,691 |
| Brazil | 181,808 | 285,075 | 206,207 | 161,597 | 215,470 | 215,895 | 113,976 | 273,792 | 455,368 | 465,652 |
| Bulgaria | 1,347 | 2,881 | 3,325 | 1,450 | 4,586 | 8,397 | 270 | 6,267 | 3,290 | 1,174 |
| Croatia | 191,876 | 272,204 | 239,021 | 211,001 | 389,014 | 451,657 | 441,337 | 338,535 | 574,486 | 326,653 |
| Czech Republic | 19,583 | 49,408 | 19,531 | 18,588 | 38,540 | 37,467 | 47,104 | 71,889 | 107,600 | 140,653 |
| Denmark | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75 |
| France | 0 | 0 | 0 | 10 | 465 | 15 | 0 | 13 | 34 | 25 |
| Germany | 250,422 | 282,075 | 221,446 | 254,574 | 402,566 | 502,117 | 282,018 | 225,052 | 416,961 | 325,829 |
| Hungary | 2,446 | 7,950 | 349 | 311 | 695 | 777 | 898 | 1,521 | 852 | 488 |
| Israel | 18,388 | 10,238 | 2,645 | 9,995 | 20,017 | 23,979 | 13,189 | 15,618 | 22,342 | 15,174 |
| Italy | 54,280 | 81,811 | 86,867 | 63,540 | 154,999 | 171,221 | 106,462 | 48,909 | 129,456 | 124,490 |
| Pakistan | 0 | 0 | 0 | 0 | 0 | 161 | 250 | 575 | 175 | 400 |
| Philippines | 18,277 | 27,294 | 38,572 | 48,908 | 73,430 | 131,898 | 62,823 | 66,408 | 78,314 | 68,754 |
| Poland | 1,645 | 10,234 | 3,922 | 20,895 | 9,806 | 8,406 | 12,094 | 10,276 | 11 | 45 |
| Portugal | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 432 | 230 |
| Romania | 8,935 | 10,571 | 16,945 | 13,775 | 3,579 | 3,655 | 5,800 | 9,460 | 5,272 | 10,311 |
| Russia | 0 | 90 | 1,050 | 5,400 | 61 | 772 | 0 | 0 | 60 | 17 |
| Serbia | 0 | 3,038 | 12,455 | 720 | 29,204 | 48,786 | 10,180 | 18,066 | 12,823 | 16,470 |
| Slovakia | 0 | 0 | 0 | 0 | 801 | 1,204 | 417 | 1,075 | 1,223 | 2,196 |
| Slovenia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,058 | 7,083 | 6,014 |
| South Korea | 0 | 20 | 29 | 0 | 1,021 | 3,879 | 62 | 0 | 47 | 0 |
| Spain | 176 | 410 | 989 | 322 | 376 | 262 | 10,485 | 83 | 622 | 22,793 |
| Switzerland | 821 | 2,207 | 735 | 979 | 3,110 | 5,508 | 2,222 | 3,953 | 2,289 | 6,982 |
| Taiwan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 90 | 0 | 750 |
| Turkey | 7,345 | 17,984 | 15,825 | 15,408 | 25,798 | 92,321 | 17,446 | 61,948 | 87,999 | 81,330 |
| United Arab Em | 0 | 0 | 0 | 0 | 3,814 | 909 | 47 | 0 | 110 | 300 |
| United Kingdom | 13 | 0 | 0 | 1 | 4,355 | 1 | 63 | 149 | 59 | 66 |
| TOTALS | 1,230,592 | 1,774,261 | 1,394,178 | 1,448,435 | 2,286,720 | 2,738,747 | 1,983,945 | 2,139,744 | 3,326,334 | 2,871,027 |

Countries with limited activity over this 10-year period are not shown; however, the totals include the units from all countries.
Source: Data from the U.S. Department of Commerce and the U.S. International Trade Commission.

## Revolvers: HTS 9302000020 [REVOLVERS, EXCEPT OF HEADING 9303 OR 9304]

| COUNTRY | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | 967 | 303 | 0 | 0 | 200 | 0 | 100 | 0 | 0 | 0 |
| Brazil | 203,803 | 368,128 | 319,804 | 198,249 | 228,876 | 236,270 | 98,480 | 211,847 | 201,544 | 238,101 |
| Czech Republic | 7 | 6,287 | 9 | 83 | 38 | 0 | 0 | 0 | 115 | 42 |
| France | 0 | 0 | 0 | 0 | 2 | 350 | 163 | 8 | 420 | 497 |
| Germany | 4,025 | 9,367 | 8,431 | 9,423 | 11,416 | 11,747 | 11,906 | 12,010 | 15,383 | 15,724 |
| Italy | 24,926 | 16,929 | 18,536 | 27,847 | 40,238 | 53,152 | 48,617 | 45,843 | 50,665 | 49,889 |
| Philippines | 2,960 | 6,127 | 6,054 | 5,339 | 6,666 | 8,915 | 8,198 | 13,049 | 18,852 | 19,034 |
| Poland | 0 | 0 | 0 | 0 | 0 | 0 | 79 | 507 | 0 | 0 |
| Russia | 0 | 0 | 0 | 11,500 | 11,486 | 0 | 0 | 0 | 0 | 0 |
| Serbia | 0 | 0 | 0 | 0 | 0 | 1,872 | 0 | 0 | 0 | 0 |
| Slovakia | 400 | 1,503 | 260 | 640 | 480 | 0 | 0 | 0 | 0 | 0 |
| Spain | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 156 | 586 | 0 |
| Switzerland | 0 | 23 | 3 | 12 | 0 | 268 | 0 | 18 | 5 | 28 |
| Turkey | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 125 | 250 |
| Ukraine | 0 | 1,000 | 0 | 5,500 | 0 | 4,000 | 0 | 0 | 0 | 0 |
| United Arab Em | 0 | 0 | 0 | 285 | 4,995 | 0 | 0 | 0 | 0 | 0 |
| United Kingdom | 0 | 489 | 360 | 0 | 0 | 1 | 83 | 0 | 20 | 5 |
| TOTALS | 237,470 | 410,156 | 353,457 | 258,878 | 304,397 | 316,582 | 167,646 | 283,438 | 287,723 | 323,572 |

Countries with limited activity over this 10-year period are not shown; however, the totals include the units from all countries.
Source: Data from the U.S. Department of Commerce and the U.S. International Trade Commission.





More detail on import and export data is available through the U.S. International Trade Commission (USITC), https://dataweb.usitc.gov . To obtain the highest level of product definition, use the HTS (Harmonized Tariff Schedule) 10-digit codes whenever possible.

Refer to the most current Harmonized Tariff Schedule for IMPORT codes and Schedule B for EXPORT codes. Note that import and export codes do not always match.

Beginning in July, 2014, corrections to import and export data are updated annually in USITC Data Web with the latest official revisions from the Census Bureau. Revisions are current through 2017.

For posted corrections pertaining to years prior to 2010, go to:

census.gov/foreign-trade/statistics/corrections/index.html

**INDUSTRY INTELLIGENCE REPORTS**

# Firearm Imports By Country (2008 - 2017) (in actual units of quantity)

## Shotguns: HTS 930320 [SPORTING, HUNTING OR TARGET-SHOOTING SHOTGUNS, INCLUDING COMBINATION SHOTGUN-RIFLES, EXCEPT MUZZLELOADING FIREARMS]

| Country | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Austria | 9 | 245 | 497 | 1,507 | 783 | 618 | 34 | 716 | 65 | 19 |
| Belgium | 787 | 25 | 48 | 114 | 157 | 9 | 1,377 | 715 | 546 | 120 |
| Brazil | 119,556 | 172,369 | 169,136 | 105,676 | 125,891 | 119,090 | 58,729 | 38,225 | 39,225 | 36,947 |
| Canada | 2 | 13 | 0 | 13 | 26 | 5 | 0 | 192 | 148 | 0 |
| China | 41,170 | 53,336 | 61,956 | 90,952 | 154,446 | 234,486 | 112,095 | 164,818 | 149,091 | 140,171 |
| Czech Republic | 172 | 1,738 | 34 | 6 | 0 | 142 | 50 | 109 | 22 | 15 |
| France | 48 | 20 | 20 | 10 | 6,284 | 10 | 9 | 23 | 84 | 116 |
| Germany | 3,265 | 1,254 | 2,364 | 2,204 | 3,467 | 1,370 | 1,224 | 1,547 | 2,371 | 2,284 |
| Ireland | 0 | 26 | 0 | 1 | 58 | 2 | 0 | 0 | 19 | 0 |
| Italy | 182,396 | 140,500 | 139,182 | 137,767 | 170,460 | 212,557 | 206,773 | 199,231 | 182,368 | 138,323 |
| Japan | 2,526 | 1,148 | 344 | 1,834 | 2,875 | 1,525 | 652 | 907 | 766 | 733 |
| Pakistan | 0 | 5 | 4 | 0 | 0 | 19 | 0 | 335 | 0 | 250 |
| Philippines | 100 | 560 | 1,139 | 950 | 5,500 | 9,800 | 6,496 | 6,400 | 7,100 | 3,100 |
| Portugal | 1,858 | 5 | 704 | 2,115 | 2,384 | 6,415 | 3,465 | 4,175 | 78 | 10 |
| Russia | 65,090 | 60,937 | 3,708 | 50,837 | 47,360 | 34,904 | 21,830 | 5,150 | 12,420 | 7,410 |
| Spain | 2,519 | 4,628 | 1,722 | 1,328 | 1,692 | 1,620 | 1,746 | 839 | 2,637 | 4,191 |
| Sweden | 718 | 133 | 42 | 0 | 238 | 143 | 228 | 2 | 183 | 91 |
| Turkey | 107,350 | 113,618 | 122,721 | 122,682 | 174,212 | 306,312 | 233,371 | 220,310 | 335,190 | 295,362 |
| United Kingdom | 8,155 | 8,046 | 6,099 | 8,251 | 8,836 | 8,922 | 490 | 578 | 4,042 | 2,847 |
| **TOTAL** | **535,960** | **558,679** | **509,792** | **530,564** | **704,828** | **937,952** | **648,592** | **644,274** | **736,443** | **631,998** |

Countries with limited activity over this 10-year period are not shown. Totals include all countries.
Source: Data from the U.S. Department of Commerce and the U.S. International Trade Commission.



## Rifles: HTS 930330 [SPORTING, HUNTING OR TARGET-SHOOTING RIFLES, EXCEPT MUZZLELOADING FIREARMS AND COMBINATION SHOTGUN-RIFLES] (Adjusted to EXCLUDE HTS codes 9303304010 & 9303308005 - Telescopic Sights Imported with Rifles)

| Country | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Australia | 0 | 2 | 5 | 23 | 1 | 1 | 0 | 0 | 61 | 0 |
| Austria | 1,623 | 2,593 | 2,756 | 6,192 | 6,319 | 8,966 | 2,988 | 1,109 | 3,387 | 3,113 |
| Belgium | 17,696 | 21,819 | 16,017 | 16,317 | 20,634 | 29,920 | 34,067 | 54,497 | 58,129 | 40,268 |
| Brazil | 118,007 | 94,858 | 46,243 | 156,847 | 316,577 | 404,234 | 56,411 | 78,585 | 31,204 | 19,317 |
| Bulgaria | 5,791 | 5,142 | 0 | 0 | 10,790 | 31,087 | 12,900 | 5,100 | 290 | 1,816 |
| Canada | 112,676 | 161,552 | 134,519 | 156,860 | 267,993 | 292,404 | 258,803 | 276,821 | 225,108 | 202,119 |
| China | 0 | 0 | 0 | 0 | 0 | 1,500 | 4,049 | 0 | 0 | 0 |
| Czech Republic | 20,453 | 16,774 | 15,072 | 20,236 | 23,264 | 25,507 | 25,412 | 28,125 | 31,385 | 27,080 |
| Denmark | 0 | 157 | 179 | 169 | 0 | 0 | 0 | 0 | 0 | 81 |
| Finland | 31,800 | 32,623 | 26,464 | 23,417 | 33,536 | 43,858 | 40,183 | 50,492 | 56,614 | 35,285 |
| France | 81 | 60 | 42 | 64 | 64 | 47 | 50 | 482 | 307 | 739 |
| Germany | 32,406 | 101,939 | 32,476 | 42,116 | 96,013 | 134,305 | 39,376 | 16,008 | 30,229 | 9,976 |
| Hungary | 1,500 | 18,050 | 0 | 354 | 0 | 0 | 0 | 0 | 0 | 0 |
| Israel | 0 | 0 | 0 | 0 | 1 | 18,502 | 27,771 | 4,302 | 24,965 | 6,615 |
| Italy | 15,026 | 21,829 | 16,393 | 12,222 | 20,705 | 53,115 | 27,943 | 26,981 | 18,873 | 14,526 |
| Japan | 75,282 | 83,329 | 49,946 | 59,471 | 71,538 | 76,399 | 89,657 | 87,012 | 98,324 | 76,676 |
| Mexico | 1,000 | 1,770 | 0 | 0 | 0 | 200 | 800 | 0 | 0 | 0 |
| Netherlands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| New Zealand | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 3 | 0 | 1 |
| Norway | 0 | 10 | 0 | 25 | 22 | 0 | 36 | 0 | 0 | 0 |
| Peru | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Philippines | 400 | 4,092 | 2,050 | 1,430 | 2,437 | 5,909 | 7,435 | 5,603 | 4,847 | 3,725 |
| Poland | 0 | 1,313 | 0 | 1,081 | 2,170 | 510 | 1,454 | 527 | 5 | 778 |
| Portugal | 5,240 | 14,173 | 4,740 | 0 | 250 | 4 | 1,298 | 2,117 | 1,842 | 8,037 |
| Romania | 57,567 | 82,312 | 33,855 | 37,648 | 46,533 | 44,734 | 14,039 | 17,870 | 8,220 | 5,735 |
| Russia | 26,540 | 22,933 | 50,547 | 87,681 | 74,512 | 71,230 | 29,864 | 4,404 | 28,832 | 8,430 |
| Serbia | 0 | 1,224 | 13,468 | 7,562 | 20,320 | 44,672 | 12,720 | 17,357 | 18,139 | 8,394 |
| South Africa | 7 | 0 | 4 | 14 | 0 | 0 | 0 | 4 | 18 | 2 |
| Spain | 1,936 | 1,532 | 6,898 | 10,015 | 18,989 | 17,403 | 9,411 | 25,393 | 26,679 | 39,632 |
| Sweden | 1,456 | 55 | 0 | 138 | 114 | 375 | 758 | 113 | 552 | 298 |
| Switzerland | 936 | 2,275 | 1,260 | 441 | 163 | 3,607 | 3,889 | 510 | 526 | 674 |
| Turkey | 149 | 200 | 400 | 1,153 | 475 | 0 | 15 | 339 | 2,428 | 1,330 |
| Ukraine | 0 | 0 | 6,800 | 10,600 | 0 | 0 | 0 | 0 | 0 | 0 |
| United Kingdom | 6,482 | 5,183 | 6,665 | 3,979 | 3,575 | 4,243 | 5,028 | 4,683 | 6,019 | 4,748 |
| **TOTAL** | **538,283** | **697,800** | **466,799** | **656,256** | **1,039,716** | **1,313,678** | **706,362** | **708,436** | **676,987** | **519,400** |

Countries with limited activity over this 10-year period are not shown. Totals include all countries.
Note: Units posted under Russia in 2009 were revised per posted corrections, Census Bureau.
Source: Data from the U.S. Department of Commerce and the U.S. International Trade Commission.

## Muzzleloaders: HTS=930310 [MUZZLELOADING]

| Country | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| China | 0 | 56 | 0 | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 |
| France | 3 | 0 | 0 | 0 | 0 | 2,300 | 0 | 2 | 0 | 0 |
| Germany | 5,025 | 30 | 5 | 4,183 | 0 | 0 | 0 | 401 | 0 | 0 |
| India | 0 | 27 | 87 | 21 | 90 | 135 | 26 | 28 | 0 | 0 |
| Italy | 30,387 | 37,595 | 26,171 | 32,613 | 40,559 | 44,007 | 51,730 | 42,077 | 37,499 | 38,472 |
| Japan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 400 |
| Spain | 134,670 | 103,468 | 129,472 | 128,778 | 124,509 | 133,189 | 122,861 | 111,834 | 112,951 | 107,112 |
| Taiwan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 65 | 0 |
| United Kingdom | 13 | 0 | 83 | 0 | 0 | 0 | 0 | 498 | 1 | 1 |
| **TOTAL** | **170,998** | **141,656** | **155,818** | **167,095** | **165,158** | **179,631** | **174,919** | **154,848** | **150,518** | **145,989** |

Countries with limited activity over this 10-year period are not shown. Totals include all countries.
Source: Data from the U.S. Department of Commerce and the U.S. International Trade Commission.

**INDUSTRY INTELLIGENCE REPORTS**

## U.S. Imports for Consumption (1993 - 2017)

**IMPORTS**

| Year | Revolvers & Pistols (930200) | Rifles (930330) | Shotguns (930320) | Muzzleloaders (930310) | TOTAL FIREARMS |
|---|---|---|---|---|---|
| 1993 | 1,169,123 | 749,433 | 132,502 | 197,899 | 2,248,957 |
| 1994 | 1,383,279 | 733,277 | 142,590 | 259,975 | 2,519,121 |
| 1995 | 825,127 | 286,579 | 136,733 | 331,168 | 1,579,607 |
| 1996 | 663,801 | 236,917 | 145,676 | 221,585 | 1,267,979 |
| 1997 | 1,316,931 | 267,294 | 142,067 | 185,145 | 1,911,437 |
| 1998 | 590,661 | 229,242 | 163,663 | 186,514 | 1,170,080 |
| 1999 | 677,757 | 314,622 | 335,489 | 155,764 | 1,483,632 |
| 2000 | 712,661 | 321,316 | 332,704 | 259,315 | 1,625,996 |
| 2001 | 710,958 | 322,201 | 428,308 | 345,534 | 1,807,001 |
| 2002 | 971,135 | 458,684 | 498,535 | 380,499 | 2,308,853 |
| 2003 | 762,764 | 517,509 | 498,677 | 353,673 | 2,132,623 |
| 2004 | 838,856 | 491,932 | 507,050 | 379,883 | 2,217,721 |
| 2005 | 878,172 | 448,862 | 546,261 | 244,564 | 2,117,859 |
| 2006 | 1,164,973 | 516,127 | 607,894 | 208,279 | 2,497,273 |
| 2007 | 1,387,428 | 612,837 | 725,635 | 222,404 | 2,948,304 |
| 2008 | 1,468,062 | 538,283 | 535,960 | 170,998 | 2,713,303 |
| 2009 | 2,184,417 | 697,800 | 558,679 | 141,656 | 3,582,552 |
| 2010 | 1,747,635 | 466,799 | 509,792 | 155,818 | 2,880,044 |
| 2011 | 1,707,313 | 656,256 | 530,564 | 167,095 | 3,061,228 |
| 2012 | 2,591,117 | 1,039,716 | 704,828 | 165,158 | 4,500,819 |
| 2013 | 3,055,329 | 1,313,678 | 937,952 | 179,631 | 5,486,590 |
| 2014 | 2,151,591 | 706,362 | 648,592 | 174,919 | 3,681,464 |
| 2015 | 2,423,182 | 708,436 | 644,274 | 154,848 | 3,930,740 |
| 2016 | 3,614,057 | 676,987 | 736,443 | 150,518 | 5,178,005 |
| 2017 | 3,194,599 | 519,400 | 631,998 | 145,989 | 4,491,986 |
| **AVERAGE** | | | | | |
| 5-year (2013-2017) | 2,887,752 | 784,973 | 719,852 | 161,181 | 4,553,757 |
| 10-year (2008-2017) | 2,413,730 | 732,372 | 643,908 | 160,663 | 3,950,673 |
| 15-year (2003-2017) | 1,944,633 | 660,732 | 621,640 | 201,029 | 3,428,034 |
| 20-year (1998-2017) | 1,641,633 | 577,852 | 554,165 | 217,153 | 2,990,804 |
| 25-year (1993-2017) | 1,527,637 | 553,222 | 471,315 | 221,553 | 2,773,727 |

## Total U.S. Exports (1993 - 2017)

**EXPORTS**

| Year | Revolvers & Pistols (930200) | Rifles (930330) | Shotguns (930320) | Muzzleloaders (930310) | TOTAL FIREARMS |
|---|---|---|---|---|---|
| 1993 | 170,378 | 125,694 | 175,563 | 29,930 | 501,565 |
| 1994 | 195,031 | 131,034 | 163,031 | 31,872 | 520,968 |
| 1995 | 218,826 | 106,504 | 125,387 | 4,589 | 455,306 |
| 1996 | 193,647 | 101,961 | 115,555 | 15,908 | 427,071 |
| 1997 | 146,846 | 106,838 | 105,814 | 30,785 | 390,283 |
| 1998 | 124,295 | 85,755 | 136,652 | 11,248 | 357,950 |
| 1999 | 116,467 | 69,389 | 82,046 | 7,680 | 275,582 |
| 2000 | 80,249 | 67,188 | 95,782 | 6,063 | 249,282 |
| 2001 | 86,041 | 83,671 | 123,430 | 19,361 | 312,503 |
| 2002 | 82,338 | 102,588 | 133,559 | 8,290 | 326,775 |
| 2003 | 73,337 | 102,429 | 95,299 | 7,294 | 278,359 |
| 2004 | 69,316 | 236,525 | 94,854 | 10,035 | 410,730 |
| 2005 | 80,882 | 142,252 | 115,083 | 12,587 | 350,804 |
| 2006 | 90,944 | 150,493 | 130,310 | 9,536 | 381,283 |
| 2007 | 133,774 | 220,593 | 157,536 | 13,439 | 525,342 |
| 2008 | 151,290 | 264,114 | 171,360 | 11,849 | 598,613 |
| 2009 | 162,951 | 199,417 | 123,209 | 11,185 | 496,762 |
| 2010 | 201,231 | 205,950 | 150,956 | 12,842 | 570,979 |
| 2011 | 247,738 | 263,223 | 172,770 | 8,786 | 692,517 |
| 2012 | 220,923 | 315,783 | 180,634 | 9,841 | 727,181 |
| 2013 | 268,024 | 363,950 | 146,624 | 5,664 | 784,262 |
| 2014 | 234,329 | 431,890 | 158,471 | 9,180 | 833,870 |
| 2015 | 201,390 | 328,395 | 101,656 | 5,693 | 637,134 |
| 2016 | 240,642 | 266,589 | 81,689 | 10,603 | 599,523 |
| 2017 | 278,082 | 347,374 | 79,854 | 5,159 | 710,469 |
| **AVERAGE** | | | | | |
| 5-year (2013-2017) | 244,493 | 347,640 | 113,659 | 7,260 | 713,052 |
| 10-year (2008-2017) | 220,660 | 298,669 | 136,722 | 9,080 | 665,131 |
| 15-year (2003-2017) | 176,990 | 255,932 | 130,687 | 9,580 | 573,189 |
| 20-year (1998-2017) | 157,212 | 212,378 | 126,589 | 9,817 | 505,996 |
| 25-year (1993-2017) | 162,759 | 192,784 | 128,685 | 12,377 | 496,605 |

Source: U.S. International Trade Commission (USITC)

# U.S. Firearms Total Exports (1993 - 2017) (Manufacturers & Other Exporters)

Source: U.S. International Trade Commission (USITC)



**INDUSTRY INTELLIGENCE REPORTS**

# Total Firearm Units Produced for the United States Market Annually

| Year | Handguns Produced in U.S. | | Handguns Imported into U.S. | | Handguns Exported out of U.S. | | Total Handguns | Year | Rifles & Shotguns Produced in U.S. | | Rifles & Shotguns Imported in U.S. | | Rifles & Shotguns Exported out of U.S. | | Total Rifles & Shotguns | TOTAL HANDGUNS, RIFLES & SHOTGUNS | % Change Yoy | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1991 | 1,838,266 | + | 692,282 | - | 223,248 | = | 2,307,300 | 1991 | 1,711,908 | + | 447,410 | - | 318,221 | = | 1,841,097 | 4,148,397 | - | 1991 |
| 1992 | 2,010,033 | + | 876,314 | - | 210,358 | = | 2,675,989 | 1992 | 2,019,912 | + | 732,988 | - | 309,171 | = | 2,443,729 | 5,119,718 | 23.4% | 1992 |
| 1993 | 2,655,478 | + | 1,169,123 | - | 170,378 | = | 3,654,223 | 1993 | 2,320,811 | + | 881,935 | - | 301,257 | = | 2,901,489 | 6,555,712 | 28.0% | 1993 |
| 1994 | 2,581,961 | + | 1,383,279 | - | 195,031 | = | 3,770,209 | 1994 | 2,604,042 | + | 875,867 | - | 294,065 | = | 3,185,844 | 6,956,050 | 6.1% | 1994 |
| 1995 | 1,722,930 | + | 825,127 | - | 218,826 | = | 2,329,231 | 1995 | 2,505,425 | + | 422,951 | - | 231,891 | = | 2,696,485 | 5,025,716 | -27.8% | 1995 |
| 1996 | 1,484,477 | + | 663,801 | - | 193,647 | = | 1,954,631 | 1996 | 2,350,051 | + | 380,607 | - | 217,516 | = | 2,513,142 | 4,467,773 | -11.1% | 1996 |
| 1997 | 1,406,505 | + | 1,316,931 | - | 146,846 | = | 2,576,590 | 1997 | 2,167,319 | + | 408,936 | - | 212,652 | = | 2,363,603 | 4,940,193 | 10.6% | 1997 |
| 1998 | 1,284,755 | + | 590,661 | - | 124,295 | = | 1,751,121 | 1998 | 2,382,419 | + | 392,714 | - | 222,407 | = | 2,552,726 | 4,303,847 | -12.9% | 1998 |
| 1999 | 1,331,230 | + | 677,757 | - | 116,467 | = | 1,892,520 | 1999 | 2,676,680 | + | 649,469 | - | 151,435 | = | 3,174,714 | 5,067,234 | 17.7% | 1999 |
| 2000 | 1,281,861 | + | 712,661 | - | 80,249 | = | 1,914,273 | 2000 | 2,481,484 | + | 654,020 | - | 162,970 | = | 2,972,534 | 4,886,807 | -3.6% | 2000 |
| 2001 | 946,979 | + | 710,958 | - | 86,041 | = | 1,571,896 | 2001 | 1,964,367 | + | 750,509 | - | 207,101 | = | 2,507,775 | 4,079,671 | -16.5% | 2001 |
| 2002 | 1,088,584 | + | 971,135 | - | 82,338 | = | 1,977,381 | 2002 | 2,256,611 | + | 957,219 | - | 236,147 | = | 2,977,683 | 4,955,064 | 21.5% | 2002 |
| 2003 | 1,121,024 | + | 762,764 | - | 73,337 | = | 1,810,451 | 2003 | 2,156,402 | + | 1,016,186 | - | 197,728 | = | 2,974,860 | 4,785,311 | -3.4% | 2003 |
| 2004 | 1,022,610 | + | 838,856 | - | 69,316 | = | 1,792,150 | 2004 | 2,056,907 | + | 998,982 | - | 331,379 | = | 2,724,510 | 4,516,660 | -5.6% | 2004 |
| 2005 | 1,077,630 | + | 878,172 | - | 80,882 | = | 1,874,920 | 2005 | 2,140,685 | + | 995,123 | - | 257,335 | = | 2,878,473 | 4,753,393 | 5.2% | 2005 |
| 2006 | 1,403,329 | + | 1,164,973 | - | 90,944 | = | 2,477,358 | 2006 | 2,211,123 | + | 1,124,021 | - | 280,803 | = | 3,054,341 | 5,531,699 | 16.4% | 2006 |
| 2007 | 1,610,998 | + | 1,387,428 | - | 133,774 | = | 2,864,652 | 2007 | 2,256,154 | + | 1,338,472 | - | 378,129 | = | 3,216,497 | 6,081,149 | 9.9% | 2007 |
| 2008 | 1,819,024 | + | 1,468,062 | - | 151,290 | = | 3,135,796 | 2008 | 2,376,849 | + | 1,074,243 | - | 435,474 | = | 3,015,618 | 6,151,414 | 1.2% | 2008 |
| 2009 | 2,415,815 | + | 2,184,417 | - | 162,951 | = | 4,437,281 | 2009 | 3,005,802 | + | 1,256,479 | - | 322,626 | = | 3,939,655 | 8,376,936 | 36.2% | 2009 |
| 2010 | 2,646,504 | + | 1,747,635 | - | 201,231 | = | 4,192,908 | 2010 | 2,573,934 | + | 976,591 | - | 356,906 | = | 3,193,619 | 7,386,527 | -11.8% | 2010 |
| 2011 | 3,037,112 | + | 1,707,313 | - | 247,738 | = | 4,496,687 | 2011 | 3,168,255 | + | 1,186,820 | - | 435,993 | = | 3,919,082 | 8,415,769 | 13.9% | 2011 |
| 2012 | 3,978,438 | + | 2,591,117 | - | 220,923 | = | 6,348,632 | 2012 | 4,058,950 | + | 1,744,544 | - | 496,417 | = | 5,307,077 | 11,655,709 | 38.5% | 2012 |
| 2013 | 5,039,832 | + | 3,055,329 | - | 268,024 | = | 7,827,137 | 2013 | 5,199,745 | + | 2,251,630 | - | 510,574 | = | 6,940,801 | 14,767,938 | 26.7% | 2013 |
| 2014 | 4,346,624 | + | 2,151,591 | - | 234,329 | = | 6,263,886 | 2014 | 4,314,420 | + | 1,354,954 | - | 590,361 | = | 5,079,013 | 11,342,899 | -22.5% | 2014 |
| 2015 | 4,437,604 | + | 2,423,182 | - | 201,390 | = | 6,659,396 | 2015 | 4,478,716 | + | 1,352,710 | - | 430,051 | = | 5,401,375 | 12,060,771 | 6.3% | 2015 |
| 2016 | 5,562,218 | + | 3,614,057 | - | 240,642 | = | 8,935,633 | 2016 | 5,047,308 | + | 1,413,430 | - | 348,278 | = | 6,112,460 | 15,048,093 | 24.8% | 2016 |
| 2017 | 4,411,923 | + | 3,194,599 | - | 278,082 | = | 7,328,440 | 2017 | 3,489,295 | + | 1,551,398 | - | 426,790 | = | 4,613,903 | 11,542,343 | -23.3% | 2017 |
| 2018 Int. | 4,277,971 | + | 2,879,781 | - | 400,196 | = | 6,757,556 | 2018 Int. | 3,382,751 | + | 1,313,160 | - | 379,093 | = | 4,316,818 | 11,074,374 | -4.1% | 2018 Int. |
| TOTAL | 67,841,715 | + | 42,639,305 | - | 4,902,773 | = | 105,578,247 | TOTAL | 79,358,325 | + | 28,103,368 | - | 9,042,770 | = | 98,418,923 | 203,997,170 | | |

Sources: U.S. firearm production figures from AFMER, Import and Export figures from USITC.
In order to obtain an estimate for the number of total firearms available in the United States in a given year, NSSF combined U.S. firearm production with firearms exported.

## Total Firearm Units Produced for the United States Market Annually



Source: AFMER and U.S. International Trade Commission (USITC)

# Firearms to U.S. Market (1991 - 2018 Interim)



MILLION

**CUMULATIVE ANNUAL FIREARM PRODUCTION PLUS (+) IMPORTS LESS (-) EXPORTS**

Source:  AFMER and U.S. International Trade Commission (USITC)

**FACT**

From 1991 to 2018, nearly
204 million firearms have been
produced for the U.S. market.



During the 25-year period covered in
this report (1993 – 2017)

**the violent crime
rate has
decreased by** ➤  **48.6** ▼
percent

**and unintentional
firearm-related
fatalities
have declined by** ➤  **68.0** ▼
percent

Sources: 2018 FBI Uniform Crime Reports and National
Safety Council Injury Facts (online, for 2017 data)

# INDUSTRY INTELLIGENCE REPORTS

## KEY FINDINGS

- The latest figures show that more than 65.4% of U.S. pistol production fell into either the "up to" 9mm calibers (47.6%) or the "up to" .50 calibers (17.8%).

- The 2017 top-25 manufacturers of firearms manufactured in the U.S. accounted for 91.3% of the U.S. production total for the year.

- Sturm, Ruger & Company, Inc. topped the list in 2017 accounting for 20.4% of total firearm production in the U.S. reported, followed by Smith & Wesson Corporation, 19.1%; Remington Arms Company LLC, 9.8%; Sig Sauer Inc, 7.2%; Maverick Arms, Inc, 4.8%; and Savage Arms, Inc., 4.2%.

- Firearms-ammunition manufacturing accounted for nearly 12,000 employees producing over $4.1 billion in goods shipped in 2017.

- In 2017, the greatest number of imported pistols came from Austria (1,198,740) representing 41.8% of all imported pistols. Austria was followed by Brazil with 465,652 or 16.2%, Croatia at 11.4% with 326,653 units, and 11.3% were imported from Germany (325,829).

- Brazil was the source of the greatest number of revolvers imported in 2017 (238,101), following by Italy with 49,889; Philippines 19,034; and 15,724 imported from Germany.

- The greatest number of shotguns imported in 2017 came from Turkey (295,362), China (140,171), and Italy (138,323); and for rifles, Canada (202,119), Japan (76,676), and Belgium (40,268). Spain (104,701) was the source of the highest of number of muzzleloaders imported, followed by Italy (31,060).

- According to USITC data, the U.S. exported 710,408 total firearms in 2017 as compared to 599,513 in 2016 - an increase of 18.5 percent.

- More than half (54%) of all rifles produced in 2017 were modern sporting rifles.

- According to data reported in the ATF's Firearms Commerce Report in the United States 2019 report and including the preliminary 2018 Annual Firearms Manufacturing and Exportation Report (AFMER) figures, the estimated total number of firearms in civilian possession from 1986 - 2018 is 422.9 million.

## SOURCES

| | |
|---|---|
| **Total Production** | Detail data source: The 2017 Annual Firearms Manufacturing and Export Report (AFMER). This annual report is prepared by the office of Firearms and Explosives Services Division (FESD), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Washington D.C. (Historical analysis conducted by NSSF.) For purposes of this report only, "Production" is defined as firearms, including separate frames, receivers, actions or barreled actions, manufactured and disposed of in commerce during each calendar year. The ATF's latest full AFMER is for calendar year 2017, since the agency embargoes the data for a period of one year. Production totals data source: The AFMER 2017 as reported through January 30, 2019 -- reviewed/adjusted by NSSF (adjustments are noted on page 2). **For more information visit** atf.gov/content/about/statistics |
| **Manufacturing Trends** | U.S. Census Bureau: Economic Census, Manufacturing: Summary Statistics for the U.S., States, and Selected Geographies: 2017.   (Historical analysis conducted by NSSF.) The 2017 data is available through the U.S. Census Bureau web site: census.gov/data/tables/2017/econ/economic-census/naics-sector-31-33.html |
| **Firearms Imports for Consumption / Total Exports** | U.S. Department of Commerce and the U.S. International Trade Commission (USITC) - Interactive Tariff and Trade DataWeb: dataweb.usitc.gov U.S. Census Bureau for corrections to import/export data prior to year 2010 may be found at census.gov/foreign-trade/statistics/corrections/index.html |
| **Manufacturers Export** | The 2017 Annual Firearms Manufacturing and Export Report (AFMER)  atf.gov/content/about/statistics |



Report provided by NSSF. For additional research materials, please visit nssf.org/research

© 2019 National Shooting Sports Foundation, Inc. All Rights Reserved

Item #30336-19  10/19

Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 62, Page 96 of 130
Case 3:19-cv-05106-RBL   Document 76-3   Filed 03/10/20   Page 43 of 59
ER p. 96 of 130

# Ex.

# C

Home (https://ucr.fbi.gov) • Crime in the U.S. (https://ucr.fbi.gov/crime-in-the-u.s) • 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018) • Crime in the U.S. 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018) • Tables (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables) • Expanded Homicide Data Table 8



**Criminal Justice Information Services Division (https://www.fbi.gov/services/cjis)**
Feedback (https://forms.fbi.gov/cius-feedback-2018) | Contact Us (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/contact-us) | Data Quality Guidelines (https://ucr.fbi.gov/data-quality-guidelines-new) | UCR Home (https://ucr.fbi.gov/)

**Home (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/home)**

**Offenses Known to Law Enforcement (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/offenses-known-to-law-enforcement)**

**Violent Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/violent-crime)**   **Expanded Homicide Data Table 8**

**Property Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/property-crime)**   **Murder Victims**
by Weapon, 2014–2018

**Clearances (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/clearances)**

**Persons Arrested (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/persons-arrested)**

**Police Employee Data (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/police-employee-data)**

Download Excel (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/expanded-homicide-data-table-8.xls/output.xls)

| Weapons | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Total** | **12,278** | **13,780** | **15,318** | **15,195** | **14,123** |
| Total firearms: | 7,803 | 9,103 | 10,372 | 11,006 | 10,265 |
|    Handguns | 5,342 | 6,176 | 6,762 | 7,051 | 6,603 |
|    Rifles | 235 | 215 | 300 | 390 | 297 |
|    Shotguns | 238 | 247 | 247 | 264 | 235 |
|    Other guns | 88 | 151 | 172 | 180 | 167 |
|    Firearms, type not stated | 1,900 | 2,314 | 2,891 | 3,121 | 2,963 |
| Knives or cutting instruments | 1,545 | 1,525 | 1,558 | 1,609 | 1,515 |
| Blunt objects (clubs, hammers, etc.) | 431 | 436 | 464 | 472 | 443 |
| Personal weapons (hands, fists, feet, etc.)[1] | 668 | 647 | 664 | 710 | 672 |
| Poison | 9 | 8 | 12 | 15 | 5 |
| Explosives | 6 | 1 | 1 | 0 | 4 |
| Fire | 55 | 63 | 78 | 96 | 72 |
| Narcotics | 70 | 69 | 118 | 110 | 78 |
| Drowning | 12 | 12 | 9 | 8 | 9 |
| Strangulation | 84 | 96 | 97 | 89 | 70 |
| Asphyxiation | 93 | 105 | 92 | 111 | 90 |

Case 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 98 of 185
Case 3:19-cv-05106-RBL   Document 76-3   Filed 03/10/20   Page 45 of 59
ER p. 98 of 130

| Weapons | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Other weapons or weapons not stated | 1,502 | 1,715 | 1,853 | 969 | 900 |

- [1] Pushed is included in personal weapons.
- NOTE: The Uniform Crime Reporting Technical Refresh enables updating of prior years' crime data; therefore, data presented in this table may not match previously published data.

Case 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 99 of 130
Case 3:19-cv-05106-RBL   Document 76-3   Filed 03/10/20   Page 46 of 59
ER p. 99 of 130

# Ex.

# D

FBI — Table 1                                    https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-...

Case 2:20-35827-11/25/2020, ID: 11906099, DktEntry: 67-3, Page 100 of 130
Case 3:19-cv-05106-RBL    Document 76-3    Filed 05/10/20    Page 47 of 59

ER p. 100 of 130

Home (https://ucr.fbi.gov) • Crime in the U.S. (https://ucr.fbi.gov/crime-in-the-u.s) • 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018) • Crime in the U.S. 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018) • Tables (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables) • Table 1



Criminal Justice Information Services Division (https://www.fbi.gov/services/cjis)
Feedback (https://forms.fbi.gov/cius-feedback-2018) | Contact Us (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/contact-us) | Data Quality Guidelines (https://ucr.fbi.gov/crime-in-the-u.s/data-quality-guidelines-new) | UCR Home (https://ucr.fbi.gov/)

**Home (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/home)**

**Offenses Known to Law Enforcement (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/offenses-known-to-law-enforcement)**

**Violent Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/violent-crime)**

**Property Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/property-crime)**

**Clearances (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/clearances)**

**Persons Arrested (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/persons-arrested)**

**Police Employee Data (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/police-employee-data)**

**Table 1**

**Crime in the United States**
by Volume and Rate per 100,000 Inhabitants, 1999–2018

Overview

Data Declaration (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-1/table-1-data-declaration)

Download Excel (Table 1) (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-1/table-1.xls/output.xls)

Download Excel (Table 1A) (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-1/table-1a/output.xls)

## Table 1

| Year | Population[1] | Violent crime[2] | Violent crime rate | Murder and nonnegligent manslaughter | Murder and nonnegligent manslaughter rate | Rape (revised definition)[3] | Rape (revised definition) rate[3] | Rape (legacy definition)[4] | Rape (legacy definition) rate[4] | Robbery | Robbery rate | Aggravated assault |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1999 | 272,690,813 | 1,426,044 | 523.0 | 15,522 | 5.7 | | | 89,411 | 32.8 | 409,371 | 150.1 | 911,7 |
| 2000 | 281,421,906 | 1,425,486 | 506.5 | 15,586 | 5.5 | | | 90,178 | 32.0 | 408,016 | 145.0 | 911,7 |
| 2001[5] | 285,317,559 | 1,439,480 | 504.5 | 16,037 | 5.6 | | | 90,863 | 31.8 | 423,557 | 148.5 | 909,0 |
| 2002 | 287,973,924 | 1,423,677 | 494.4 | 16,229 | 5.6 | | | 95,235 | 33.1 | 420,806 | 146.1 | 891,4 |
| 2003 | 290,788,976 | 1,383,676 | 475.8 | 16,528 | 5.7 | | | 93,883 | 32.3 | 414,235 | 142.5 | 859,0 |
| 2004 | 293,656,842 | 1,360,088 | 463.2 | 16,148 | 5.5 | | | 95,089 | 32.4 | 401,470 | 136.7 | 847,3 |
| 2005 | 296,507,061 | 1,390,745 | 469.0 | 16,740 | 5.6 | | | 94,347 | 31.8 | 417,438 | 140.8 | 862,2 |
| 2006 | 299,398,484 | 1,435,123 | 479.3 | 17,309 | 5.8 | | | 94,472 | 31.6 | 449,246 | 150.0 | 874,0 |
| 2007 | 301,621,157 | 1,422,970 | 471.8 | 17,128 | 5.7 | | | 92,160 | 30.6 | 447,324 | 148.3 | 866,358 |
| 2008 | 304,059,724 | 1,394,461 | 458.6 | 16,465 | 5.4 | | | 90,750 | 29.8 | 443,563 | 145.9 | 843,683 |
| 2009 | 307,006,550 | 1,325,896 | 431.9 | 15,399 | 5.0 | | | 89,241 | 29.1 | 408,742 | 133.1 | 812,514 |
| 2010 | 309,330,219 | 1,251,248 | 404.5 | 14,722 | 4.8 | | | 85,593 | 27.7 | 369,089 | 119.3 | 781,844 |
| 2011 | 311,587,816 | 1,206,005 | 387.1 | 14,661 | 4.7 | | | 84,175 | 27.0 | 354,746 | 113.9 | 752,423 |

| Year | Population[1] | Violent crime[2] | Violent crime rate | Murder and nonnegligent manslaughter | Murder and nonnegligent manslaughter rate | Rape (revised definition)[3] | Rape (revised definition) rate[3] | Rape (legacy definition)[4] | Rape (legacy definition) rate[4] | Robbery | Robbery rate | Aggravated assault |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | 313,873,685 | 1,217,057 | 387.8 | 14,856 | 4.7 | | | 85,141 | 27.1 | 355,051 | 113.1 | 762,009 |
| 2013 | 316,497,531 | 1,168,298 | 369.1 | 14,319 | 4.5 | 113,695 | 35.9 | 82,109 | 25.9 | 345,093 | 109.0 | 726,777 |
| 2014 | 318,907,401 | 1,153,022 | 361.6 | 14,164 | 4.4 | 118,027 | 37.0 | 84,864 | 26.6 | 322,905 | 101.3 | 731,089 |
| 2015 | 320,896,618 | 1,199,310 | 373.7 | 15,883 | 4.9 | 126,134 | 39.3 | 91,261 | 28.4 | 328,109 | 102.2 | 764,057 |
| 2016 | 323,405,935 | 1,250,162 | 386.6 | 17,413 | 5.4 | 132,414 | 40.9 | 96,970 | 30.0 | 332,797 | 102.9 | 802,982 |
| 2017[6] | 325,147,121 | 1,247,917 | 383.8 | 17,294 | 5.3 | 135,666 | 41.7 | 99,708 | 30.7 | 320,596 | 98.6 | 810,319 |
| 2018 | 327,167,434 | 1,206,836 | 368.9 | 16,214 | 5.0 | 139,380 | 42.6 | 101,151 | 30.9 | 282,061 | 86.2 | 807,410 |

- [1] Populations are U.S. Census Bureau provisional estimates as of July 1 for each year except 2000 and 2010, which are decennial census counts.
- [2] The violent crime figures include the offenses of murder, rape (legacy definition), robbery, and aggravated assault.
- [3] The figures shown in this column for the offense of rape were estimated using the revised Uniform Crime Reporting (UCR) definition of rape. See data declaration for further explanation.
- [4] The figures shown in this column for the offense of rape were estimated using the legacy UCR definition of rape. See data declaration for further explanation.
- [5] The murder and nonnegligent homicides that occurred as a result of the events of September 11, 2001, are not included in this table.
- [6] The crime figures have been adjusted.
- NOTE: Although arson data are included in the trend and clearance tables, sufficient data are not available to estimate totals for this offense. Therefore, no arson data are published in this table.

## Table 1A

| Years | Violent crime[1] | Violent crime rate | Murder and nonnegligent manslaughter | Murder and nonnegligent manslaughter rate | Rape (revised definition)[2] | Rape (revised definition) rate[2] | Rape (legacy definition)[3] | Rape (legacy definition) rate[3] | Robbery | Robbery rate | Aggravated assault | Aggravated assault rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018/2017 | -3.3 | -3.9 | -6.2 | -6.8 | +2.7 | +2.1 | +1.4 | +0.8 | -12.0 | -12.6 | -0.4 | -1. |
| 2018/2014 | +4.7 | +2.0 | +14.5 | +11.6 | +18.1 | +15.1 | +19.2 | +16.2 | -12.6 | -14.9 | +10.4 | +7. |
| 2018/2009 | -9.0 | -14.6 | +5.3 | -1.2 | | | +13.3 | +6.4 | -31.0 | -35.2 | -0.6 | -6. |

- [1] The violent crime figures include the offenses of murder, rape (legacy definition), robbery, and aggravated assault.
- [2] The figures shown in this column for the offense of rape were estimated using the revised UCR definition of rape. See data declaration for further explanation.
- [3] The figures shown in this column for the offense of rape were estimated using the legacy UCR definition of rape. See data declaration for further explanation.

## Data Declaration (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables /table-1/table-1-data-declaration)

Provides the methodology used in constructing this table and other pertinent information about this table.

## Overview

Download Printable Document
(https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-1/table-1-overview.pdf)

**Table 1—Crime in the United States, by Volume and Rate per 100,000 Inhabitants, 1999–2018**

**Table 1A—Crime in the United States, Percent Change in Volume and Rate per 100,000 Inhabitants for 2 years, 5 years, and 10 years**

- In 2018, the estimated number of violent crime offenses was 1,206,836, a decrease of 3.3 percent from the 2017 estimate.
- The violent crime of murder and nonnegligent manslaughter decreased 6.2 percent in 2018 when compared with the 2017 estimate. Rape offenses (legacy definition) increased 1.4 percent, and aggravated assault offenses decreased 0.4 percent. The violent crime of robbery decreased by 12.0 percent when compared with the 2017 estimate.
- The 2018 violent crime rate was 368.9 per 100,000 inhabitants, down 3.9 percent when compared with the 2017 violent crime rate.
- The murder rate was 5.0 per 100,000 inhabitants in 2018, a 6.8 percent decrease when compared with the estimated rate

ER p. 102 of 130

for the previous year.

- The estimated number of property crimes in 2018 was 7,196,045, a 6.3 percent decrease from the 2017 estimate.

- Of the property crimes, the estimated number of burglary offenses decreased 11.9 percent, and larceny-theft offenses declined 5.4 percent. The estimated number of motor vehicle thefts decreased 3.1 percent.

- The 2018 property crime rate was 2,199.5 per 100,000, a 6.9 percent decrease when compared with the 2017 rate.

Case 3:19-cv-05106-RBL Document 76-3 Filed 03/10/20 Page 50 of 59
Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 103 of 130
ER p. 103 of 130

# Ex.

# E

Case 3:19-cv-05106-RBL   Document 70-3   Filed 03/16/20   Page 51 of 59
Case 20-35827, 11/25/2020, ID: 11906089, DktEntry: 6, Page 104 of 130

ER p. 104 of 130

# Deposition of Matthew Wald

# Mitchell, et al. v. Atkins, et al.

# February 18, 2020



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**
www.buellrealtime.com

Olympia | **360.534.9066**   Spokane | **509.624.3261**   National | **800.846.6989**

email: info@buellrealtime.com



Case 3:20-35837, 11/25/2020, ID: 11906099, DktEntry: 62, Page 105 of 130
Case 3:19-cv-05106-RBL Document 76-3 Filed 03/10/20 Page 52 of 59
Matthew Wald                                                            2/18/2020
ER p. 105 of 130

1    rifle.  It was a phone conversation, to my recollection.

2        Q.   And the date seems right to you?

3        A.   Yes, based on my previous estimate of what I

4    thought the date was, February 4th sounds correct.

5        Q.   Was it your understanding that you were having

6    that conversation with Mr. Mitchell as a potential

7    plaintiff in this case?

8        A.   To my knowledge, the timeline would have already

9    made me a plaintiff in the case.

10       Q.   What was -- do you remember specifically what

11   you said and what Mr. Mitchell said during the

12   conversation?

13       A.   No.

14       Q.   Do you remember -- you do remember asking about

15   whether you could purchase a Ruger 10/22?

16       A.   Yes, I remember very few specifics of words

17   spoken, but I recall the general conversation going in,

18   inquiring about the purchase of a Ruger 22 self-loading

19   rifle, informing Mitchell of my age, and then saying

20   that it would be disallowed due to my age.

21       Q.   If you had been able to purchase that 10/22

22   rifle, what would you have done with it?

23       A.   I would have predominantly -- you are speaking

24   hypothetically?

25       Q.   I am.  What was your intention had you been able

# Ex.

# F

# Deposition of Daniel Mitchell

# Mitchell, et al. v. Atkins, et al.

# January 30, 2020



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**
www.buellrealtime.com

Olympia l **360.534.9066**    Spokane l **509.624.3261**    National l **800.846.6989**

email:  info@buellrealtime.com



Case 3:19-cv-05106-RBL   Document 76-3   Filed 03/10/20   Page 59 of 59
Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 108 of 130
ER p. 108 of 136

Daniel Mitchell                                         1/30/2020

1    Q.  Okay.  Would you turn to paragraph 58 of the

2    complaint, which appears on page 7.

3         And why don't you go ahead and just familiarize

4    yourself with paragraphs 58 through 96.  You'll find

5    that there's some repetition in there.

6         But just read that portion and let me know once

7    you've read it, and I would like to ask you just a few

8    questions about it.

9    A.  Okay.

10   Q.  So paragraph 60 reads:  "On February 4, 2019,

11   Rettmer contacted Mitchell and inquired about the

12   purchase of a Ruger 10/22 self-loading rifle."

13        Do you see that?

14   A.  Yes.

15   Q.  Is that true?

16   A.  I believe that is correct.

17   Q.  So how did Mr. Rettmer contact you?

18   A.  I believe it would have been about telephone.

19   Q.  What can you remember about that conversation?

20   A.  Specifically, I can't remember verbatim by any

21   stretch of the imagination.  But it was an inquire

22   whether he -- we had a product in stock and whether he

23   was able to purchase it.

24        And we informed him that it is a regular stock

25   item.  We sell them routinely.  It is a highly common

Case 3:20-35827-11/25/2020-ID: 11906089-DktEntry: 67-2 Page 109 of 130
Case 3:19-cv-05106-RBL Document 76-3 Filed 03/10/20 Page 56 of 59
ER p. 109 of 136
1/30/2020

Daniel Mitchell

1    ==rifle that is used across the board.  You know, large==

2    ==spectrum of new shooters and experienced shooters.  It's==

3    ==still one of my favorite rifles to shoot.==

4    ==      When he informed us of what his age was, as we==

5    ==would with anybody that we found was a prohibited party,==

6    ==we said that we would not be able to make that==

7    ==particular sale.==

8        Q.   Do you know why Mr. Rettmer contacted Sporting

9    Systems specifically?

10       A.   I do not.

11       Q.   Do you know why he sought to purchase a

12   Ruger 10/22 specifically?

13       A.   That I do not know.

14       Q.   It says, in paragraph 61, "Mitchell routinely

15   stocks the Ruger 10/22 and offers it for sale for $299."

16          Do you see that?

17       A.   Yes, sir.

18       Q.   Is that accurate?

19       A.   It's accurate, the sale price can very widely

20   depending on how it's configured.

21       Q.   Okay.  And if you turn back to Exhibit 7, which

22   is the inventory list.

23       A.   Okay.

24       Q.   You'll see that it looks like the sixth firearm

25   listed is Ruger 10/22.

Case 3:19-cv-05106-RBL   Document 76-3   Filed 05/10/20   Page 57 of 59
Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6-2, Page 110 of 130

ER p. 110 of 130

# Ex.

# G

In The Matter Of:

**Mitchell, et al.**

vs

**Atkins, et al.**


**Deposition of**

**Nathaniel Casey**

**February 20, 2020**



**Central Court Reporting**
800.442.DEPO
Support@centralcourtreporting.com
www.centralcourtreporting.com

Case: 20-35807, 11/25/2020, ID: 11906099, DktEntry: 67, Page 112 of 130
Case 3:19-cv-05106-RBL   Document 76-3   Filed 03/10/20   Page 59 of 59
Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020
ER p. 112 of 130

```
 1    near future.
 2         Q.  Okay.  Did you ever purchase a 22 long rifle?
 3         A.  No.
 4         Q.  Why not?
 5         A.  I tried to purchase one, but the gun owner --
 6    or, the store said that, because of the law, I was not
 7    allowed to.
 8         Q.  Because of 1639?
 9         A.  Yes.
10         Q.  So you'll see the date of this Complaint is
11    November 15th, 2018.
12         A.  Correct.
13         Q.  So the date -- I-1639's effective date was
14    later.  It was January 1st, 2019.  So why didn't you
15    purchase the 22 prior to the effective date of 1639?
16         A.  At the time, when I was brought on, it was --
17    it was too expensive for me at the time.  I was just
18    going into my first semester at Boise State.  And so I
19    was starting to pay that off a little bit.
20              So it was too expensive for me at the time,
21    but I had planned to buy one once I had started working
22    and gotten a few more paychecks.
23         Q.  So when were you able to afford the 22 long
24    rifle?
25         A.  About middle of January.  Middle of January,
```



Case: 20-35827, 11/25/2020, ID: 11906099, DktEntry: 6, Page 113 of 130
Case 3:19-cv-05106-RBL Document 76-4 Filed 03/10/20 Page 1 of 8

ER p. 113 of 130

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DANIEL MITCHELL, ROBIN BALL, LUKE RETTMER, NATHANIEL CASEY, MATTHEW WALD, SECOND AMENDMENT FOUNDATION, and NATIONAL RIFLE ASSOCIATION,

Plaintiffs,

v.

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, CRAIG MEIDL, in his official capacity as the Chief of Police of Spokane, Washington, and TERESA BERNTSEN, in her official capacity as the Director of the Washington State Department of Licensing,

Defendants,

and

SAFE SCHOOLS SAFE COMMUNITIES,

Defendant-Intervenor.

No. 3:19-cv-05106

DECLARATION OF DANIEL MITCHELL

IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Daniel Mitchell, make the following declaration under penalty of perjury:

1.     I own and operate Sporting Systems Vancouver in Vancouver, WA, a store which sells high end custom rifles and pistols.

2.     I have a Federal Firearms License, or FFL. Only bearers of FFLs are permitted to engage in the business of dealing in firearms.

3.     I have operated Sporting Systems Vancouver for 4 years.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 12/25/2020, ID: 11906892, DktEntry: 6, Page 114 of 130
Case 3:19-cv-05106-RBL Document 76-4 Filed 03/10/20 Page 2 of 30

ER p. 114 of 130

4.      I-1639 includes the following definition, now found in Washington statute at RCW 9.41.010(26):

> "Semiautomatic assault rifle" means any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge. "Semiautomatic assault rifle" does not include antique firearms, any firearm that has been made permanently inoperable, or any firearm that is manually operated by bolt, pump, lever, or slide action.

5.      Rifles that utilize a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which require a separate pull of the trigger to fire each cartridge are described in the firearms industry as "semi-automatic rifles."

6.      The second sentence in RCW 9.41.101(26) is entirely superfluous, because "antique firearms," as defined in RCW 9.41.101(1) are, by falling within the scope of that definition, incapable of utilizing a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round.

7.      Similarly, an inoperable firearm cannot utilize a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round.

8.      Further, a firearm that is manually operated by bolt, pump, lever, or slide action does not utilize a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round. Instead it uses the energy of the user manually operating the bolt, pump, lever, or slide action to extract the fired cartridge case and chamber the next round.

9.      A shotgun "which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic shotgun.

10.      A handgun "which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic handgun, commonly called simply a pistol.

11.      To the best of my knowledge, pistols are the most common firearm of any type.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

12. To the best of my knowledge, the phrase "semiautomatic assault rifle" is uniquely found in Washington law as modified by I-1639. It is not a term used in the firearms industry to describe any class or category of firearm.

13. Thus, the category of firearms that fit the definition of RCW 9.41.101(26) are best and most commonly known as "semi-automatic rifles."

14. In the past 4 years, I have sold approximately 5562 semi-automatic rifles.

15. Semi-automatic rifles are the majority of all rifles I sell.

16. The majority of my sales are to Washington and Oregon residents.

17. Prior to the passage of I-1639, approximately 30% of my sales of semi-automatic rifles were to residents of other states.

18. Since the passage of I-1639, I have lost significant sales to prospective out-of-state purchasers.

19. Although I have updated my website to inform people that I can no longer sell semi-automatic rifles out of state, I continue to get calls on a regular basis from people outside Washington who want me to send rifles to their local FFL.

20. I also receive inquires in person, including from military personnel stationed in Washington to whom I cannot sell semi-automatic rifles.

21. I must decline all these sales, and do decline them.

22. I have also forgone sales to adults under age 21. Because it is illegal for me to run a NICS check on a person who is obviously not qualified to purchase the selected firearm, I cannot say with certainty that every person who I rejected for purchase of a semi-automatic rifle due to the purchaser's age would have qualified to purchase. However, to the best of my knowledge, and based on my years of experience, I have lost sales I otherwise would have made due to the under-21 ban.

23. For each and every semi-automatic rifles I have sold directly to a purchaser, I have run a background check on the purchaser.

Declaration of Daniel Mitchell iso MSJ - 3
3:19-cv-05106

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

24. This involves running the purchaser's relevant information (name, date of birth, ID number, etc.) through the National Instant Check System, known by its acronym, NICS.

25. The NICS checks various databases to determine of the prospective purchaser is forbidden to own or possess a firearm.

26. I only complete a sale if the NICS check comes back clear, *i.e.*, confirms that there is no reason to believe the person is forbidden to purchase or possess the firearm.

27. I have never sold a firearm of any sort, including a semi-automatic rifles, unless and until the NICS background check clears the purchaser.

28. After the passage of I-1639, the background check process became more complex.

29. The application to purchase a semi-automatic rifle is sent to the local law enforcement agency in the jurisdiction of the buyer's residence.

30. That agency then runs the NICS check.

31. It also checks with Washington Department of Health Services for involuntary commitments (although those are supposed to already be reported to the NICS system by the state).

32. It checks for open restraining orders or pending criminal charges in local court.

33. During this process, I tag the rifle for mandatory 10 business day storage.

34. Upon my receipt of an approved SAR application, I contact the customer to pick up their rifle.

35. At that time, to pick up the rifle, the customer must review the BATF form, and affirm that nothing on the form has changed since its original date of signature.

36. Only then is the rifle delivered.

37. Prior to the passage of I-1639, an out-of-state purchaser could buy a semi-automatic rifle from me after completion of a NICS check as described above.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

38.    Alternatively, a purchaser could buy a semi-automatic rifle by having me deliver the rifle to a FFL in the buyer's home state. That FFL would be required to perform the NICS check as well as any additional background check required by state law of the purchaser's state, just as I would do for a purchaser appearing in my own store.

39.    My suppliers make available to me approximately 3,000 different models of semiautomatic rifles that I can offer for sale in Washington.

40.    While Washington residents can purchase suppressors, the process is extremely involved, and far more difficult than purchasing a pistol or semi-automatic rifle.

41.    A prospective suppressor purchaser must complete an ATF Form 4.

42.    Two copies of ATF Form 4 are submitted to ATF-National Firearms Act division

43.    That submission must include two completed FBI Form 258 fingerprints cards and two 2"x2" passport photos.

44.    The prospective purchaser must submit one copy of ATF Form 4 to the chief law enforcement officer of the purchaser's city or county of residence.

45.    The prospective purchaser must also complete a Responsible Party Affidavit.

46.    One copy of the Responsible Party Affidavit is submitted to the ATF National Firearms Act division.

47.    One copy of the Responsible Party Affidavit is submitted to the chief law enforcement officer of the purchaser's city or county of residence.

48.    Finally, the purchaser must pay a non-refundable $200 for an ATF tax stamp for the application.

49.    The purchaser must also pass the standard NICS background check prior to ATF considering the application.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Case: 20-35827, 11/25/2020, ID: 11906092, DktEntry: 6, Page 118 of 130
Case 3:19-cv-05106-RBL Document 76-4 Filed 03/10/20 Page 6 of 6

ER p. 118 of 130

1     50.    Based on my observation of average return dates of approved ATF forms, the

2     application to purchase a suppressor currently takes between 12-14 months for ATF

3     processing.

4     51.    If a Washington resident is approved to purchase a suppressor, he must agree to

5     allow ATF access to his licensed addressed at anytime without notice to verify possession of

6     the suppressor.

7     52.    The owner of a suppressor must file an ATF Form 5300.20 with the ATF if he

8     intends to take the suppressor out his state of residence at any time for any reason.

9     Signed March 10, 2020, at Vancouver, Washington.

10

11    By: _____
      Daniel Mitchell

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1

2

3

4

5

6

## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

7  DANIEL MITCHELL, ROBIN BALL, LUKE
   RETTMER, ARMEN TOOLOEE,
8  NATHANIEL CASEY, MATTHEW WALD,
   SECOND AMENDMENT FOUNDATION,
9  and NATIONAL RIFLE ASSOCIATION,

10               Plaintiffs,

11        v.

12  CHUCK ATKINS, in his official capacity as
    the Sheriff of Clark County, Washington,
13  CRAIG MEIDL, in his official capacity as the
    Chief of Police of Spokane, Washington, and
14  TERESA BERNTSEN, in her official capacity
    as the Director of the Washington State
15  Department of Licensing,

16               Defendants.

No. 3:19-cv-05106

Declaration Of Robin Ball i/s/o Summary
Judgment

17

18  I, Robin Ball, make the following declaration under penalty of perjury:

19        1.      I own and operate Sharp Shooting Indoor Range & Gun Shop in Spokane, WA.

20        2.      I have a Federal Firearms License, or FFL. Only bearers of FFLs are permitted to

21  engage in the business of dealing in firearms.

22        3.      I have operated Sharp Shooting for 24 years.

23        4.      I am familiar with I-1639, which applies to "semiautomatic assault rifles."

24        5.      To the best of my knowledge, the phrase "semiautomatic assault rifle" is not a term

25  used in the firearms industry to describe any class or category of firearm.

26

Declaration of Robin Ball - 1
3:19-cv-05106

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

6.      Consequently, in this declaration I will refer to the firearms described in RCW 9.41.101(26) "semi-automatic rifles."

7.      In the past 4 years, I have sold approximately 1,000 semi-automatic rifles.

8.      Semi-automatic rifles are the majority of all rifles I sell.

9.      The majority of my sales are to Washington residents.

10.     Before selling a semi-automatic rifle, I run a background check on the prospective purchaser including obtaining an NICS report.

11.     I only complete a sale if the NICS check comes back clear, *i.e.*, confirms that there is no reason to believe the person is forbidden to purchase or possess the firearm.

12.     I have never sold a firearm of any sort, including a semi-automatic rifle, unless and until the NICS background check clears the purchaser.

13.     I have also forgone sales to adults under age 21. Because it is illegal for me to run a NICS check on a person who is obviously not qualified to purchase the selected firearm, I cannot say with certainty that every person who I rejected for purchase of a semi-automatic rifle due to the purchaser's age would have qualified to purchase. However, to the best of my knowledge, and based on my years of experience, I have lost sales I otherwise would have made due to the under-21 ban.

Signed March 10, 2020, at Kona, Hawaii.

By: _Robin Ball_
Robin Ball

Declaration of Robin Ball - 2
3:19-cv-05106

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

APPEAL,CLOSED,PROTO

## U.S. District Court
## United States District Court for the Western District of Washington (Tacoma)
### CIVIL DOCKET FOR CASE #: 3:19-cv-05106-JCC

Mitchell et al v. Atkins et al
Assigned to: U.S. District Judge John C Coughenour
Case in other court: 9th Circuit Court of Appeals, 20-35827
Cause: 28:1331 Fed. Question: Constitutionality of State Statutes

Date Filed: 02/08/2019
Date Terminated: 08/31/2020
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 02/08/2019 | 1 | COMPLAINT against All Defendants (Receipt # 0981-5645269) Attorney Joel B. Ard added to party Robin Ball(pty:pla), Attorney Joel B. Ard added to party Nathaniel Casey(pty:pla), Attorney Joel B. Ard added to party Daniel Mitchell(pty:pla), Attorney Joel B. Ard added to party National Rifle Association(pty:pla), Attorney Joel B. Ard added to party Luke Rettmer(pty:pla), Attorney Joel B. Ard added to party Second Amendment Foundation(pty:pla), Attorney Joel B. Ard added to party Armen Tooloee(pty:pla), Attorney Joel B. Ard added to party Matthew Ward(pty:pla), filed by Matthew Ward, Luke Rettmer, Second Amendment Foundation, Robin Ball, National Rifle Association, Daniel Mitchell, Armen Tooloee, Nathaniel Casey. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Charles Atkins, # 3 Summons to Craig Meidl, # 4 Summons to Teresa Berntsen)(Ard, Joel) (Entered: 02/08/2019) |
| 02/08/2019 | 2 | NOTICE of Related Case(s): 3:18-cv-05931, by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Ward. (Ard, Joel) (Entered: 02/08/2019) |
| 02/08/2019 | 3 | CORPORATE DISCLOSURE STATEMENT indicating no Corporate Parents and/or Affiliates. Filed pursuant to Fed.R.Civ.P 7.1. Filed by Second Amendment Foundation (Ard, Joel) (Entered: 02/08/2019) |
| 02/08/2019 | 4 | CORPORATE DISCLOSURE STATEMENT indicating no Corporate Parents and/or Affiliates. Filed pursuant to Fed.R.Civ.P 7.1. Filed by National Rifle Association (Ard, Joel) (Entered: 02/08/2019) |
| 02/11/2019 | 5 | NOTICE of Appearance by attorney Matthew C Albrecht on behalf of Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Ward. (Albrecht, Matthew) (Entered: 02/11/2019) |
| 02/11/2019 | 6 | NOTICE of Appearance by attorney David K DeWolf on behalf of Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Ward. (DeWolf, David) (Entered: 02/11/2019) |
| 02/13/2019 | | Judge David W. Christel added. (SP) (Entered: 02/13/2019) |
| 02/13/2019 | 7 | Summons(es) Electronically Issued as to defendant(s) Charles Atkins, Teresa Berntsen and Craig Meidl. (Attachments: # 1 Summons, # 2 Summons)(SP) (Entered: 02/13/2019) |
| 02/14/2019 | | Case Reassigned to Judge Ronald B. Leighton as related to 3:18-cv-5931-RBL. (GMR) (Entered: 02/14/2019) |
| 02/19/2019 | 8 | ORDER REGARDING DISCOVERY AND DEPOSITIONS by Judge Ronald B. Leighton. (DN) (Entered: 02/19/2019) |
| 02/19/2019 | 9 | ORDER REGARDING INITIAL DISCLOSURES AND JOINT STATUS REPORT Joint Status Report due by 5/20/2019, FRCP 26f Conference Deadline is 5/6/2019, Initial Disclosure Deadline is 5/13/2019, by Judge Ronald B. Leighton. (DN) (Entered: 02/19/2019) |

| | | |
|---|---|---|
| 02/25/2019 | 10 | NOTICE of Appearance by attorney Noah Guzzo Purcell on behalf of Defendant Teresa Berntsen (Purcell, Noah) (Entered: 02/25/2019) |
| 02/25/2019 | 11 | NOTICE of Appearance by attorney Jeffrey T Even on behalf of Defendant Teresa Berntsen. (Even, Jeffrey) (Entered: 02/25/2019) |
| 02/25/2019 | 12 | NOTICE of Appearance by attorney Megan Lin on behalf of Defendant Teresa Berntsen. (Lin, Megan) (Entered: 02/25/2019) |
| 02/26/2019 | 13 | NOTICE of Appearance by attorney Dionne Padilla-Huddleston on behalf of Defendant Teresa Berntsen. (Padilla-Huddleston, Dionne) (Entered: 02/26/2019) |
| 02/26/2019 | 14 | NOTICE of Appearance by attorney R July Simpson on behalf of Defendant Teresa Berntsen. (Simpson, R) (Entered: 02/26/2019) |
| 02/26/2019 | 15 | NOTICE of Appearance by attorney Zachary P Jones on behalf of Defendant Teresa Berntsen. (Jones, Zachary) (Entered: 02/26/2019) |
| 02/28/2019 | 16 | NOTICE of Appearance by attorney Salvatore J Faggiano on behalf of Defendant Craig Meidl. (Faggiano, Salvatore) (Entered: 02/28/2019) |
| 03/04/2019 | 17 | AMENDED COMPLAINT against All Defendants., filed by Matthew Wald, Luke Rettmer, Second Amendment Foundation, Robin Ball, National Rifle Association, Daniel Mitchell, Armen Tooloee, Nathaniel Casey. (Attachments: # 1 Summons on Chuck Atkins, # 2 Summons on Craig Meidl)(Ard, Joel) (Entered: 03/04/2019) |
| 03/04/2019 | 18 | Summons(es) Electronically Issued as to defendant(s) Chuck Atkins, Craig Meidl. (Attachments: # 1 Summons)(GMR) (Entered: 03/04/2019) |
| 03/07/2019 | 19 | NOTICE of Appearance by attorney Leslie Anne Lopez on behalf of Defendant Chuck Atkins. (Lopez, Leslie) (Entered: 03/07/2019) |
| 03/07/2019 | 20 | NOTICE of Unavailability of counsel Leslie Anne Lopez for Defendant Chuck Atkins from April 30-May 3; July 3-9; Sept 30-Oct 4; and Oct 7-11, 2019. (Lopez, Leslie) (Entered: 03/07/2019) |
| 03/14/2019 | 21 | Stipulated MOTION for Extension of Time to File Answer to Plaintiffs' First Amended Complaint, filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl. Noting Date 3/22/2019, (Lopez, Leslie) (Entered: 03/14/2019) |
| 03/14/2019 | 22 | MOTION to Intervene as a Defendant, filed by Intervenor Defendant Plaintiff Safe Schools Safe Communities. (Attachments: # 1 Answer, # 2 Proposed Order Proposed Order) Noting Date 3/29/2019, (Wong, Gregory) Modified on 3/14/2019 (PS). (Entered: 03/14/2019) |
| 03/14/2019 | 23 | DECLARATION of Gregory Wong filed by Intervenor Defendant Plaintiff Safe Schools Safe Communities re 22 MOTION to Intervene as a Defendant (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Wong, Gregory) Modified on 3/14/2019 (PS). (Entered: 03/14/2019) |
| 03/14/2019 | | NOTICE of Docket Text Modification re 22 MOTION to Intervene as a Defendant, 23 Declaration, : Amended party role type to Intervenor Defendant, due to scrivener's error. (Per counsel request) (PS) (Entered: 03/14/2019) |
| 03/14/2019 | 24 | DECLARATION of Renee Hopkins filed by Intervenor Defendant Safe Schools Safe Communities re 22 MOTION to Intervene as a Defendant (Attachments: # 1 Exhibit A)(Wong, Gregory) (Entered: 03/14/2019) |
| 03/14/2019 | 25 | CORPORATE DISCLOSURE STATEMENT indicating no Corporate Parents and/or Affiliates. Filed pursuant to Fed.R.Civ.P 7.1. Filed by Safe Schools Safe Communities (Wong, Gregory) (Entered: 03/14/2019) |
| 03/18/2019 | 26 | ANSWER to 17 Amended Complaint, and Affirmative Defenses by Teresa Berntsen.(Padilla-Huddleston, Dionne) (Entered: 03/18/2019) |
| 03/19/2019 | 27 | ORDER granting 21 Motion for Extension of Time to Answer; Chuck Atkin's, Teresa Berntsen's, and Craig Meidl's answers are due 4/1/2019; signed by Judge Ronald B. Leighton. (DN) (Entered: 03/19/2019) |

| | | |
|---|---|---|
| 03/25/2019 | 28 | RESPONSE, by Defendant Teresa Berntsen, to 22 MOTION to Intervene *as a Defendant*. (Even, Jeffrey) (Entered: 03/25/2019) |
| 03/25/2019 | 29 | RESPONSE, by Defendant Craig Meidl, to 22 MOTION to Intervene *as a Defendant*. (Faggiano, Salvatore) (Entered: 03/25/2019) |
| 03/25/2019 | 30 | RESPONSE, by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Wald, to 22 MOTION to Intervene *as a Defendant*. Oral Argument Requested. (Ard, Joel) (Entered: 03/25/2019) |
| 03/29/2019 | 31 | REPLY, filed by Intervenor Defendant Safe Schools Safe Communities, TO RESPONSE to 22 MOTION to Intervene *as a Defendant* (Wong, Gregory) (Entered: 03/29/2019) |
| 04/01/2019 | 32 | MOTION to Dismiss *Plaintiffs' First Amended Complaint (Dkt. 17)*, filed by Defendant Chuck Atkins. (Attachments: # 1 Proposed Order) Noting Date 4/26/2019, (Lopez, Leslie) (Entered: 04/01/2019) |
| 04/01/2019 | 33 | PRAECIPE re 32 MOTION to Dismiss *Plaintiffs' First Amended Complaint (Dkt. 17) to Correct Certificates of Service* by Defendant Chuck Atkins (Lopez, Leslie) (Entered: 04/01/2019) |
| 04/01/2019 | 34 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , filed by Defendant Craig Meidl. (Attachments: # 1 Proposed Order) Noting Date 4/26/2019, (Faggiano, Salvatore) (Entered: 04/01/2019) |
| 04/02/2019 | 35 | ORDER granting 22 Safe Schools Safe Communities' Motion to Intervene; signed by Judge Ronald B. Leighton.(DN) (Entered: 04/02/2019) |
| 04/09/2019 | 36 | MOTION for Extension of Time *to Extend the Initial Scheduling Deadlines*, filed by Defendants Chuck Atkins, Craig Meidl. (Attachments: # 1 Proposed Order) Noting Date 4/19/2019, (Lopez, Leslie) (Entered: 04/09/2019) |
| 04/09/2019 | 37 | DECLARATION of Leslie A. Lopez filed by Defendants Chuck Atkins, Craig Meidl re 36 MOTION for Extension of Time *to Extend the Initial Scheduling Deadlines* (Lopez, Leslie) (Entered: 04/09/2019) |
| 04/09/2019 | 38 | RESPONSE, by Defendant Teresa Berntsen, Intervenor Defendant Safe Schools Safe Communities, to 36 MOTION for Extension of Time *to Extend the Initial Scheduling Deadlines*. (Even, Jeffrey) (Entered: 04/09/2019) |
| 04/17/2019 | 39 | RESPONSE, by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Wald, to 36 MOTION for Extension of Time *to Extend the Initial Scheduling Deadlines*. (Attachments: # 1 Exhibit)(Ard, Joel) (Entered: 04/17/2019) |
| 04/19/2019 | 40 | REPLY, filed by Defendants Chuck Atkins, Craig Meidl, TO RESPONSE to 36 MOTION for Extension of Time *to Extend the Initial Scheduling Deadlines* (Faggiano, Salvatore) (Entered: 04/19/2019) |
| 04/19/2019 | 41 | ORDER granting 36 Defendants Atkins and Meidl's Motion for Extension of Time; Initial Scheduling Deadlines are terminated and will be reset after Court's decision on Motions to Dismiss, if needed; signed by Judge Ronald B. Leighton.(DN) (Entered: 04/19/2019) |
| 04/22/2019 | 42 | RESPONSE, by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Wald, to 34 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 32 MOTION to Dismiss *Plaintiffs' First Amended Complaint (Dkt. 17)*. Oral Argument Requested. (Ard, Joel) (Entered: 04/22/2019) |
| 04/26/2019 | 43 | REPLY, filed by Defendant Chuck Atkins, TO RESPONSE to 34 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 32 MOTION to Dismiss *Plaintiffs' First Amended Complaint (Dkt. 17)* (Lopez, Leslie) (Entered: 04/26/2019) |
| 05/20/2019 | 44 | ORDER granting in part and denying in part 32 Defendant Atkins' Motion to Dismiss; granting in part and denying in part 34 Defendant Meidl's Motion to Dismiss for Failure to State a Claim; granted with respect to Plaintiffs' 1983 claim and denied on all other matters; signed by Judge Ronald B. Leighton.(DN) (Entered: 05/20/2019) |

| | | |
|---|---|---|
| 05/22/2019 | 45 | NOTICE OF WITHDRAWAL OF COUNSEL: Attorney Megan Lin for Defendant Teresa Berntsen. (Even, Jeffrey) (Entered: 05/22/2019) |
| 05/23/2019 | | Reset Deadlines: In light of the Order on motions to dismiss, the Joint Status Report is now due by 6/21/2019, (DN) (Entered: 05/23/2019) |
| 06/06/2019 | 46 | ANSWER to 17 Amended Complaint, by Chuck Atkins.(Lopez, Leslie) (Entered: 06/06/2019) |
| 06/06/2019 | 47 | ANSWER to 17 Amended Complaint, by Craig Meidl.(Faggiano, Salvatore) (Entered: 06/06/2019) |
| 06/12/2019 | 48 | NOTICE of Appearance by attorney Kai A Smith on behalf of Intervenor Defendant Safe Schools Safe Communities. (Smith, Kai) (Entered: 06/12/2019) |
| 06/20/2019 | 49 | JOINT STATUS REPORT signed by all parties estimated Trial Days: 5. Filed by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Wald. (Attachments: # 1 Proposed Order and Model ESI Agreement)(Ard, Joel) (Entered: 06/20/2019) |
| 06/27/2019 | 50 | MINUTE ORDER SETTING TRIAL AND PRETRIAL DATES ; Length of Trial: *FIVE DAYS*. Bench Trial is set for 6/8/2020 at 09:30 AM in Courtroom B before Judge Ronald B. Leighton. Joinder of Parties due by 6/28/2019, Expert Witness Disclosure/Reports under FRCP 26(a)(2) due by 12/11/2019, Motions due by 1/21/2020, Discovery completed by 2/10/2020, Dispositive motions due by 3/10/2020, Pretrial Order due by 5/22/2020, Trial briefs to be submitted by 5/27/2020, Proposed Findings of Fact and Conclusions of Law to be submitted by 5/27/2020. Entered as directed by Judge Ronald B. Leighton. (DK) (Entered: 06/27/2019) |
| 06/27/2019 | 51 | AGREED ORDER RE ELECTRONICALLY STORED INFORMATION, signed by Judge Ronald B. Leighton. (DK) (Entered: 06/27/2019) |
| 10/23/2019 | 52 | NOTICE of Appearance by attorney Brendan C Selby on behalf of Defendant Teresa Berntsen. (Selby, Brendan) (Entered: 10/23/2019) |
| 10/24/2019 | 53 | MOTION for Protective Order , filed by Defendant Teresa Berntsen. (Attachments: # 1 Proposed Order) Noting Date 11/1/2019, (Jones, Zachary) (Entered: 10/24/2019) |
| 10/24/2019 | 54 | DECLARATION of Zachary P. Jones filed by Defendant Teresa Berntsen re 53 MOTION for Protective Order (Jones, Zachary) (Entered: 10/24/2019) |
| 10/24/2019 | 55 | DECLARATION of Teresa Berntsen filed by Defendant Teresa Berntsen re 53 MOTION for Protective Order (Jones, Zachary) (Entered: 10/24/2019) |
| 10/25/2019 | 56 | RESPONSE, by Intervenor Defendant Safe Schools Safe Communities, to 53 MOTION for Protective Order . (Wong, Gregory) (Entered: 10/25/2019) |
| 10/25/2019 | 57 | DECLARATION of Gregory Wong filed by Intervenor Defendant Safe Schools Safe Communities re 53 MOTION for Protective Order (Wong, Gregory) (Entered: 10/25/2019) |
| 10/30/2019 | 58 | RESPONSE, by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Wald, to 53 MOTION for Protective Order . Oral Argument Requested. (Attachments: # 1 Exhibit Ard Declaration and Exhibits A-C)(Ard, Joel) (Entered: 10/30/2019) |
| 11/01/2019 | 59 | REPLY, filed by Defendant Teresa Berntsen, TO RESPONSE to 53 MOTION for Protective Order (Jones, Zachary) (Entered: 11/01/2019) |
| 11/01/2019 | 60 | Second DECLARATION of Zachary P. Jones filed by Defendant Teresa Berntsen re 53 MOTION for Protective Order (Jones, Zachary) (Entered: 11/01/2019) |
| 11/22/2019 | 61 | ORDER granting 53 Defendant Berntsen's Motion for Protective Order; signed by Judge Ronald B. Leighton.(DN) (Entered: 11/22/2019) |

| 12/11/2019 | 62 | Stipulated MOTION *to Extend Deadline for Disclosure of Expert Testimony*, filed by Defendant Teresa Berntsen. Noting Date 12/11/2019, (Even, Jeffrey) (Entered: 12/11/2019) |
|---|---|---|
| 12/13/2019 | 63 | ORDER granting 62 Stipulated Motion; Expert Witness Disclosure/Reports under FRCP 26(a)(2) due by 12/18/2019; signed by Judge Ronald B. Leighton.(DN) (Entered: 12/13/2019) |
| 01/10/2020 | 64 | MOTION for Protective Order *Quashing Deposition Notices*, filed by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Wald. Oral Argument Requested. (Attachments: # 1 Exhibit, # 2 Proposed Order) Noting Date 1/24/2020, (Ard, Joel) (Entered: 01/10/2020) |
| 01/22/2020 | 65 | RESPONSE, by Defendant Teresa Berntsen, to 64 MOTION for Protective Order *Quashing Deposition Notices*. (Jones, Zachary) (Entered: 01/22/2020) |
| 01/22/2020 | 66 | DECLARATION of Jeffrey T. Even filed by Defendant Teresa Berntsen re 64 MOTION for Protective Order *Quashing Deposition Notices* (Attachments: # 1 Exhibit A)(Jones, Zachary) (Entered: 01/22/2020) |
| 01/22/2020 | 67 | DECLARATION of Zach Jones filed by Defendant Teresa Berntsen re 64 MOTION for Protective Order *Quashing Deposition Notices* (Attachments: # 1 Exhibit A-I)(Jones, Zachary) (Entered: 01/22/2020) |
| 01/24/2020 | 68 | ORDER denying 64 Plaintiffs Motion for Protective Order Quashing Notices of Depositions of Rettmer, Tooloee, Casey and Wald; signed by Judge Ronald B. Leighton.(DN) (Entered: 01/24/2020) |
| 02/07/2020 | 69 | Stipulated MOTION *to Extend Deadline to Take Depositions*, filed by Defendant Teresa Berntsen. (Attachments: # 1 Proposed Order) Noting Date 2/7/2020, (Jones, Zachary) (Entered: 02/07/2020) |
| 02/10/2020 | 70 | ORDER granting 69 Stipulated Motion extending the deadline for depositions to 2/21/2020; signed by Judge Ronald B. Leighton.(DN) (Entered: 02/10/2020) |
| 02/12/2020 | 71 | MOTION to Dismiss Party *Armen Tooloee*, filed by Plaintiff Armen Tooloee. Noting Date 2/12/2020, (Ard, Joel) (Entered: 02/12/2020) |
| 02/12/2020 | 72 | PROPOSED ORDER (Unsigned) re 71 MOTION to Dismiss Party *Armen Tooloee* (Ard, Joel) (Entered: 02/12/2020) |
| 02/12/2020 | 73 | Stipulated MOTION *and [Proposed] Order Setting Briefing Schedule and Striking Trial Date and Deadlines*, filed by Intervenor Defendant Safe Schools Safe Communities. Noting Date 2/12/2020, (Wong, Gregory) (Entered: 02/12/2020) |
| 02/13/2020 | 74 | ORDER granting 73 Stipulated Motion Setting Briefing Schedule and Striking Trial Date and Deadlines; signed by Judge Ronald B. Leighton.(DN) (Entered: 02/13/2020) |
| 02/14/2020 | 75 | ORDER granting 71 Motion to Dismiss Party Armen Tooloee, signed by Judge Ronald B. Leighton.(DK) (Entered: 02/14/2020) |
| 03/10/2020 | 76 | MOTION for Summary Judgment , filed by Plaintiff Daniel Mitchell. Oral Argument Requested. (Attachments: # 1 Proposed Order, # 2 Declaration, # 3 Exhibit Exhibits to J. Ard Declaration, # 4 Declaration, # 5 Declaration) Noting Date 3/10/2020, (Albrecht, Matthew) (Entered: 03/10/2020) |
| 03/10/2020 | 77 | MOTION to Exclude *EXPERT TESTIMONY OF SHERIFF OZZIE KNEZOVICH*, filed by Defendant Teresa Berntsen. (Attachments: # 1 Proposed Order) Noting Date 3/20/2020, (Jones, Zachary) (Entered: 03/10/2020) |
| 03/10/2020 | 78 | DECLARATION of ZACHARY PEKELIS JONES filed by Defendant Teresa Berntsen re 77 MOTION to Exclude *EXPERT TESTIMONY OF SHERIFF OZZIE KNEZOVICH* (Attachments: # 1 Exhibit, # 2 Exhibit)(Jones, Zachary) (Entered: 03/10/2020) |
| 03/11/2020 | 79 | NOTICE that the following is RE-NOTED: 77 MOTION to Exclude *EXPERT TESTIMONY OF SHERIFF OZZIE KNEZOVICH*. Filed by Defendant Teresa Berntsen. Noting Date 3/27/2020, (Jones, Zachary) (Entered: 03/11/2020) |
| 03/23/2020 | 80 | RESPONSE, by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Matthew Wald, to 77 MOTION to Exclude *EXPERT TESTIMONY OF SHERIFF OZZIE KNEZOVICH*. (Ard, |

| | | Joel) (Entered: 03/23/2020) |
|---|---|---|
| 03/23/2020 | 81 | DECLARATION of Matthew Albrecht filed by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Matthew Wald re 77 MOTION to Exclude *EXPERT TESTIMONY OF SHERIFF OZZIE KNEZOVICH* (Attachments: # 1 Exhibit A)(Ard, Joel) (Entered: 03/23/2020) |
| 03/27/2020 | 82 | REPLY, filed by Defendant Teresa Berntsen, TO RESPONSE to 77 MOTION to Exclude *EXPERT TESTIMONY OF SHERIFF OZZIE KNEZOVICH* (Selby, Brendan) (Entered: 03/27/2020) |
| 03/27/2020 | 83 | DECLARATION of Brendan Selby filed by Defendant Teresa Berntsen re 77 MOTION to Exclude *EXPERT TESTIMONY OF SHERIFF OZZIE KNEZOVICH* (Selby, Brendan) (Entered: 03/27/2020) |
| 03/31/2020 | 84 | CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment ., filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities. Oral Argument Requested. (Attachments: # 1 Proposed Order) Noting Date 4/24/2020, (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 85 | DECLARATION of Elizabeth H. Aylward, Ph.D. filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 86 | DECLARATION of Brandi Belcher filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 87 | DECLARATION of Kateri Candee filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 88 | DECLARATION of Sara B. Johnson, Ph.D. MPH filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 89 | DECLARATION of Mark D. Jones filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 90 | DECLARATION of Paul Kramer filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 91 | DECLARATION of Jennifer Richards filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 92 | DECLARATION of Frederick P. Rivara, MD, MPH filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 93 | DECLARATION of April Schentrup filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 03/31/2020 | 94 | DECLARATION of R. July Simpson filed by Defendant Teresa Berntsen re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Attachments: # 1 Exhibit Exhibits A-J, # 2 Exhibit Exhibits K-T, # 3 Exhibit Exhibits U-DD, # 4 Exhibit Exhibits EE-PP)(Simpson, R) (Entered: 03/31/2020) |

| 03/31/2020 | 95 | DECLARATION of Terri Johnson filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities re 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment . (Jones, Zachary) (Entered: 03/31/2020) |
| 04/06/2020 | 96 | Unopposed MOTION for Extension of Time *to Complete Summary Judgment Briefing*, filed by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Matthew Wald. (Attachments: # 1 Proposed Order) Noting Date 4/6/2020, (Ard, Joel) (Entered: 04/06/2020) |
| 04/07/2020 | 97 | ORDER granting 96 Motion for Extension of Time signed by Judge Ronald B. Leighton.(DK) (Entered: 04/07/2020) |
| 04/07/2020 | 98 | NOTICE of Appearance by attorney Mica D Klein on behalf of Amicus Everytown for Gun Safety Support Fund. (Klein, Mica) (Entered: 04/07/2020) |
| 04/07/2020 | 99 | ~~MOTION for Leave to File , filed by Intervenor Defendant Safe Schools Safe Communities. (Attachments: # 1 Exhibit Amicus Brief, # 2 Exhibit Declaration of Bonnie MacNaughton, # 3 Exhibit 1-7 to Declaration, # 4 Exhibit 8-18 to Declaration, # 5 Exhibit 19-24 to Declaration, # 6 Exhibit 25-29 to Declaration, # 7 Proposed Order) Noting Date 4/24/2020, (MacNaughton, Bonnie)~~ Modified on 4/8/2020 (SP). (Entered: 04/07/2020) |
| 04/07/2020 | 100 | MOTION for Leave to File *Amicus Brief*, filed by Amicus Everytown for Gun Safety Support Fund. (Attachments: # 1 Proposed Amicus Brief & Declaration, # 2 Proposed Order) Noting Date 4/24/2020, (Klein, Mica) (Entered: 04/07/2020) |
| 04/07/2020 | 101 | NOTICE of Appearance by attorney Bonnie Elizabeth MacNaughton on behalf of Amicus Parties Giffords Law Center to Prevent Gun Violence, Brady. (MacNaughton, Bonnie) (Entered: 04/07/2020) |
| 04/07/2020 | 102 | MOTION for Leave to File *Amicus Brief in Support of Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment*, filed by Amicus Parties Brady, Giffords Law Center to Prevent Gun Violence. (Attachments: # 1 Proposed Brief of Amicus Curiae, # 2 Declaration of Bonnie E. MacNaughton, # 3 Exhibit 1-7, # 4 Exhibit 8-18, # 5 Exhibit 19-24, # 6 Exhibit 25-29, # 7 Proposed Order) Noting Date 4/24/2020, (MacNaughton, Bonnie) (Entered: 04/07/2020) |
| 04/08/2020 | | NOTICE of Docket Text Modification re 99 MOTION for Leave to File : Stricken as entered in error per phone call from counsel. (SP) (Entered: 04/08/2020) |
| 04/28/2020 | 103 | RESPONSE, by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Matthew Wald, to 84 CROSS-MOTION AND RESPONSE re 76 MOTION for Summary Judgment ., 76 MOTION for Summary Judgment . Oral Argument Requested. (Ard, Joel) (Entered: 04/28/2020) |
| 04/28/2020 | 104 | DECLARATION of Joel Ard iso Opposition to MSJ filed by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Matthew Wald re 76 MOTION for Summary Judgment (Ard, Joel) (Entered: 04/28/2020) |
| 05/22/2020 | 105 | REPLY, filed by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities, TO RESPONSE to 76 MOTION for Summary Judgment (Wong, Gregory) (Entered: 05/22/2020) |
| 06/22/2020 | 106 | NOTICE of Hearing on Motion re 76 Motion for Summary Judgment, 84 Cross-Motion and Response re 76 MOTION for Summary Judgment: MOTION HEARING set for 8/18/2020 at 01:30 PM in Courtroom B before Judge Ronald B. Leighton.(DK) (Entered: 06/22/2020) |
| 06/24/2020 | 107 | NOTICE of Supplemental Authority by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities (Wong, Gregory) (Entered: 06/24/2020) |
| 06/24/2020 | 108 | NOTICE of Supplemental Authority by Defendants Chuck Atkins, Teresa Berntsen, Craig Meidl, Intervenor Defendant Safe Schools Safe Communities (Attachments: # 1 Supplement Authority)(Wong, Gregory) (Entered: 06/24/2020) |
| 06/30/2020 | 109 | ORDER granting 100 Everytown's Motion for Leave to File Amicus Brief; signed by Judge Ronald B. Leighton.(DN) (Entered: 06/30/2020) |

| | | |
|---|---|---|
| 06/30/2020 | 110 | ORDER GRANTING 102 GIFFORDS LAW CENTER AND BRADY'S MOTION FOR LEAVE TO FILE AMICUS BRIEF, SIGNED BY JUDGE RONALD B. LEIGHTON.(DN) (ENTERED: 06/30/2020) |
| 07/01/2020 | 111 | RESPONSE, BY AMICUS GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, TO 84 CROSS-MOTION AND RESPONSE RE 76 MOTION FOR SUMMARY JUDGMENT .. (MACNAUGHTON, BONNIE) (ENTERED: 07/01/2020) |
| 07/01/2020 | 112 | DECLARATION OF BONNIE E. MACNAUGHTON FILED BY AMICUS GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE RE 84 CROSS-MOTION AND RESPONSE RE 76 MOTION FOR SUMMARY JUDGMENT . (ATTACHMENTS: # 1 EXHIBIT 1-7, # 2 EXHIBIT 8-18, # 3 EXHIBIT 19-24, # 4 EXHIBIT 25-29)(MACNAUGHTON, BONNIE) (ENTERED: 07/01/2020) |
| 07/02/2020 | 113 | RESPONSE, BY AMICUS EVERYTOWN FOR GUN SAFETY SUPPORT FUND, TO 84 CROSS-MOTION AND RESPONSE RE 76 MOTION FOR SUMMARY JUDGMENT .. (KLEIN, MICA) (ENTERED: 07/02/2020) |
| 07/02/2020 | 114 | DECLARATION OF CAROLYN S. GILBERT FILED BY AMICUS EVERYTOWN FOR GUN SAFETY SUPPORT FUND RE 84 CROSS-MOTION AND RESPONSE RE 76 MOTION FOR SUMMARY JUDGMENT . (ATTACHMENTS: # 1 EXHIBIT 1-9)(KLEIN, MICA) (ENTERED: 07/02/2020) |
| 07/24/2020 | 115 | APPLICATION OF ATTORNEY DAVID D. JENSEN FOR LEAVE TO APPEAR PRO HAC VICE FOR AMICUS PARTIES FIREARMS POLICY FOUNDATION, CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS (FEE PAID) RECEIPT NO. AWAWDC-6486960 (STAHLFELD, ERIC) (ENTERED: 07/24/2020) |
| 07/24/2020 | 116 | MOTION FOR LEAVE TO FILE *AMICUS BRIEF*, FILED BY AMICUS PARTIES CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS, FIREARMS POLICY FOUNDATION. (ATTACHMENTS: # 1 PROPOSED AMICUS BRIEF) NOTING DATE 8/14/2020, (STAHLFELD, ERIC) (ENTERED: 07/24/2020) |
| 07/29/2020 | 117 | NOTICE OF APPEARANCE BY ATTORNEY ERIC R STAHLFELD ON BEHALF OF AMICUS PARTIES CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS, FIREARMS POLICY FOUNDATION. (STAHLFELD, ERIC) (ENTERED: 07/29/2020) |
| 08/10/2020 | 118 | RESPONSE, BY DEFENDANTS CHUCK ATKINS, TERESA BERNTSEN, CRAIG MEIDL, INTERVENOR DEFENDANT SAFE SCHOOLS SAFE COMMUNITIES, TO 116 MOTION FOR LEAVE TO FILE *AMICUS BRIEF*. (SIMPSON, R) (ENTERED: 08/10/2020) |
| 08/11/2020 | 119 | MINUTE ORDER RE 106 NOTICE OF HEARING ON MOTION. DUE TO THE CONTINUED CLOSURE OF THE COURTHOUSE, AS REFERENCED IN GENERAL ORDER 11-20, THIS MOTION HEARING WILL BE CONDUCTED TELEPHONICALLY. THE CLERK WILL PROVIDE THE PARTIES WITH THE NECESSARY INFORMATION TO PARTICIPATE IN THE CALL. ENTERED AS DIRECTED BY JUDGE RONALD B. LEIGHTON (DK) (ENTERED: 08/11/2020) |
| 08/13/2020 | 120 | MINUTE ORDER: THE COURT HAS REVIEWED CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS' MOTION FOR LEAVE TO FILE AN AMICUS BRIEF, DEFENDANTS' AND INTERVENOR'S OPPOSITION, AND THE PROPOSED BRIEF ITSELF. THE MOTION DKT. 116 IS DENIED. THE AUGUST 18 TELEPHONIC ORAL ARGUMENT WILL BE LIMITED TO ONE HOUR, DIVIDED AMONG THE PARTIES. AMICI WILL NOT BE HEARD. IT IS SO ORDERED. ENTERED AS DIRECTED BY JUDGE RONALD B. LEIGHTON. (DK) (ENTERED: 08/13/2020) |
| 08/17/2020 | 121 | NOTICE OF SUPPLEMENTAL AUTHORITY RE 76 MOTION FOR SUMMARY JUDGMENT BY PLAINTIFFS ROBIN BALL, NATHANIEL CASEY, DANIEL MITCHELL, NATIONAL RIFLE ASSOCIATION, LUKE RETTMER, SECOND AMENDMENT FOUNDATION, MATTHEW WALD (ARD, JOEL) (ENTERED: 08/17/2020) |
| 08/18/2020 | 122 | ORDER RE 115 APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE. THE COURT ADMITS ATTORNEY DAVID D. JENSEN FOR AMICUS PARTIES CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS AND FIREARMS POLICY FOUNDATION, BY CLERK WILLIAM M MCCOOL. NO DOCUMENT ASSOCIATED WITH THIS DOCKET ENTRY, TEXT ONLY.<br><br>*NOTE TO COUNSEL: LOCAL COUNSEL AGREES TO SIGN ALL FILINGS AND TO BE PREPARED TO HANDLE THE MATTER, INCLUDING THE TRIAL THEREOF, IN THE EVENT THE APPLICANT IS UNABLE TO BE PRESENT ON ANY DATE SCHEDULED BY THE COURT, PURSUANT TO LCR 83.1(D).*(CDA) (ENTERED: 08/18/2020) |
| 08/18/2020 | 123 | MINUTE ENTRY FOR PROCEEDINGS HELD BEFORE JUDGE RONALD B. LEIGHTON- DEP CLERK: *DARA KALEEI*; PLA COUNSEL: *JOEL ARD*; DEF COUNSEL: *ZACHARY JONES*; CR: *BARRY FANNING*; MOTION HEARING HELD ON 8/18/2020 76 PLTF'S MOTION FOR SUMMARY JUDGMENT , AND 84 CROSS-MOTION AND RESPONSE FILED BY SAFE SCHOOLS SAFE COMMUNITIES, CHUCK ATKINS, TERESA BERNTSEN, CRAIG MEIDL. 77 MOTION TO EXCLUDE *EXPERT TESTIMONY OF SHERIFF OZZIE KNEZOVICH*, AND 116 MOTION FOR LEAVE TO FILE |

| | | |
|---|---|---|
| | | *Amicus Brief* filed by Firearms Policy Foundation, Citizens' Committee for the Right to Keep and Bear Arms, are DENIED. Counsel present argument. Court to issue a written opinion on or before 8/31/2020.(DK) (Entered: 08/18/2020) |
| 08/31/2020 | [124](#) | ORDER denying [76](#) Plaintiffs' Motion for Summary Judgment; granting [84](#) Defendants' and Intervenor's Cross Motion for Summary Judgment; Plaintiffs' Complaint is DISMISSED WITH PREJUDICE; signed by Judge Ronald B. Leighton.(DN) (Entered: 08/31/2020) |
| 08/31/2020 | [125](#) | JUDGMENT BY COURT (DK) (Entered: 08/31/2020) |
| 09/09/2020 | 126 | MINUTE ORDER REASSIGNING CASE. Case reassigned to U.S. District Judge John C Coughenour for all further proceedings. Judge Ronald B. Leighton retired from the federal bench. (DK) (Entered: 09/09/2020) |
| 09/21/2020 | [127](#) | NOTICE OF APPEAL to Ninth Circuit (20-35827) re [125](#) Judgment by Court by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Armen Tooloee, Matthew Wald. $505, receipt number AWAWDC-6610238 (cc: USCA) (Ard, Joel) Modified on 9/23/2020 to add CCA#. (RE) (Entered: 09/21/2020) |
| 09/21/2020 | [128](#) | REPRESENTATION STATEMENT, by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Matthew Wald, (re: [127](#) Notice of Appeal,.) (Ard, Joel) (Entered: 09/21/2020) |
| 09/22/2020 | [129](#) | TIME SCHEDULE ORDER ( #20-35827) as to [127](#) Notice of Appeal, filed by Robin Ball, Nathaniel Casey, Armen Tooloee, Daniel Mitchell, Luke Rettmer, Second Amendment Foundation, Matthew Wald, National Rifle Association. (RE) (Entered: 09/23/2020) |
| 10/01/2020 | [130](#) | TRANSCRIPT REQUEST by Plaintiffs Robin Ball, Nathaniel Casey, Daniel Mitchell, National Rifle Association, Luke Rettmer, Second Amendment Foundation, Matthew Wald for proceedings held on 8/18/2020, Requesting Attorney: Joel B Ard. (Ard, Joel) (Entered: 10/01/2020) |
| 10/26/2020 | 131 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motions Hearing held on 8/18/2020 before Judge Ronald B. Leighton. Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov. To purchase a copy of the transcript, contact court reporter Barry Fanning, barry_fanning@wawd.uscourts.gov, 253-882-3833. Release of Transcript Restriction set for 1/25/2021, (BF) (Entered: 10/26/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 11/20/2020 10:59:04 | | | |
| PACER Login: | jbard7041 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 3:19-cv-05106-JCC |
| Billable Pages: | 9 | Cost: | 0.90 |

## CERTIFICATE OF SERVICE

This filing was served on all parties' counsel at the time of filing by delivering it through the Court's electronic docketing system.

November 25, 2020

ARD LAW GROUP PLLC

By _____

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Joel@Ard.law
Attorneys for Plaintiffs-Appellants