NO. 20-35827

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DANIEL MITCHELL, et al.,

Appellants,

v.

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, et al.,

Defendants-Appellees

and

SAFE SCHOOLS SAFE COMMUNITIES,

Intervenor-Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
No. 3:20-cv-05106-JCC
The Honorable Judge John C. Coughenour, United States District Court

## APPELLEES' JOINT ANSWERING BRIEF

ROBERT W. FERGUSON
  *Attorney General*
NOAH G. PURCELL
  *Solicitor General*

Zachary Pekelis Jones, WSBA 44557
R. July Simpson, WSBA 45869
  *Assistant Attorneys General*
Jeffrey T. Even, WSBA 20367
  *Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104
(206) 464-7744
*Counsel for Appellee Teresa Berntsen*

Salvatore J. Faggiano WSBA 15696
  *Assistant City Attorney*
Office of the City Attorney
808 W. Spokane Falls Blvd.
Spokane, WA 99201-3326
(509) 625-6818
*Counsel for Defendant Craig Meidl*

Paul J. Lawrence, WSBA 13557
Gregory J. Wong, WSBA 39329
Nicholas W. Brown, WSBA 33586
Kai A. Smith, WSBA 54749
PACIFICA LAW GROUP LLP
1191 Second Avenue, Suite 2000
Seattle, WA 98101-3404
Telephone: 206-240-1700
Facsimile: 206-240-1750
*Counsel for Appellee Safe Schools Safe Communities*

Leslie A. Lopez, WSBA 46118
Deputy Prosecuting Attorney
Clark County Prosecutor's Office
PO Box 5000
Vancouver, WA 98666-5000
(564) 397-2478
*Counsel for Defendant Chuck Atkins*

# TABLE OF CONTENTS

I.     INTRODUCTION ..............................................................1

II.    JURISDICTIONAL STATEMENT ....................................2

III.   STATEMENT OF ISSUES PRESENTED FOR REVIEW ..............2

IV.  STATEMENT OF THE CASE ..........................................3

      A.  Gun Violence and Mass Shootings ..............................3

      B.  I-1639 .......................................................5

      C.  Procedural History...............................................8

      D.  The District Court's Decision .....................................9

      E.  Undisputed or Unrebutted Facts.................................11

V.    STANDARD OF REVIEW ...............................................13

VI.  SUMMARY OF THE ARGUMENT .............................13

VII. ARGUMENT ...................................................15

      A.  The Age Provision Comports With the Second Amendment ....15

          1.  Second Amendment Framework .........................15

          2.  The Age Provision Burdens No Second Amendment Rights .................................................16

              a.  "Presumptively lawful" firearm regulations fall outside the Second Amendment ....................17

              b.  The Age Provision is a presumptively lawful condition on commercial sale of arms...........................18

c. Firearm minimum age laws are historically longstanding ................................................. 19

    (1) The age of majority was 21 until the 1970s ........ 19

    (2) State laws have restricted firearm sales to people under 21 since the 1800s ......................... 20

    (3) Clear judicial consensus is that age restrictions fall outside the Second Amendment ................... 22

    (4) Militia laws do not undercut the historical analysis ............................................................... 25

3. The Age Provision withstands intermediate scrutiny ......... 28

    a. This Court's approach to the level of scrutiny ............. 28

    b. The Age Provision does not "severely" burden the "core" right of "responsible individuals" to self-defense at home ..................................................... 29

    c. The Age Provision satisfies intermediate scrutiny ........ 33

        (1) I-1639 addresses significant government interests ............................................................... 34

        (2) The Age Provision has a "reasonable fit" with reducing gun violence and increasing public safety ................................................................. 35

            (a) Impulsivity control and judgment do not fully mature until the twenties ..................... 36

            (b) 18- to 20-year-olds disproportionately commit violent crimes ................................. 37

            (c) Minimum age laws are effective in addressing health and safety concerns .......... 38

(d) SARs are more dangerous and used by mass shooters more than other firearms .......38

(e) NRA's arguments are without merit.............39

4. Even if strict scrutiny applied, the Age Provision would meet it........................................................41

5. NRA's proposed common use test contravenes binding law ..................................................................42

B. Mitchell's Challenge to the Nonresident Sales Provision Fails ..........................................................................45

1. Dormant Commerce Clause framework ..............................45

2. Mitchell lacks standing .......................................................46

3. I-1639 does not directly regulate interstate commerce because it does not prohibit FFL-to-FFL transfer of SARs ...................................................................49

a. The text supports the District Court's reading ..............51

b. I-1639's purpose confirms its text................................53

c. I-1639 is consistent with federal law............................53

d. Interpretive canons support the District Court's reading .........................................................................55

4. I-1639 does not discriminate against interstate commerce ..............................................................................56

5. The Nonresident Sales Provision is constitutional under *Pike* .........................................................................62

6. The Nonresident Sales Provision would meet strict scrutiny..................................................................................65

7.  Congress has authorized the Nonresident Sales
    Provision ............................................................. 67

C.  Some Claims Are Not Justiciable ............................................. 72

VIII. CONCLUSION ..................................................................... 72

# TABLE OF AUTHORITIES

## Cases

*Am. Petroleum Inst. v. Cooper,*
  718 F.3d 347 (4th Cir. 2013) ........................................................ 54

*Amalgam. Transit Union Local 587 v. State,*
  11 P.3d 762 (Wash. 2000),
  *corrected*, 27 P.3d 608 (2001) ................................................. 52, 53

*Animal Legal Def. Fund v. FDA,*
  836 F.3d 987 (9th Cir. 2016) (en banc) (per curiam) .................................. 13

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris,*
  729 F.3d 937 (9th Cir.2013) .................................................. 50, 63

*Bauer v. Becerra,*
  858 F.3d 1216 (9th Cir. 2017) ....................................................... 40

*Bias v. Moynihan,*
  508 F.3d 1212 (9th Cir. 2007) ....................................................... 36

*Brownback v. King,*
  --- U.S. ----, No. 19-546, 2021 WL 726222 (U.S. Feb. 25, 2021) ............... 15

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
  476 U.S. 573 (1986) ........................................................ 45, 60, 61

*Burlington N. & Santa Fe Ry. Co. v. White,*
  548 U.S. 53 (2006) .................................................................... 53

*C & A Carbone, Inc. v. Town of Clarkstown,*
  511 U.S. 383 (1994) ........................................................ 55, 65, 66

*Caetano v. Massachusetts,*
  136 S. Ct. 1027 (2016) (per curiam) ............................................... 43

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
  520 U.S. 564 (1997) ........................................................................ 59

*City of Philadelphia v. New Jersey*,
  437 U.S. 617 (1978) ................................................................... 56, 57

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398, (2013) ................................................................. 47, 48

*Coleman v. State*,
  32 Ala. 581 (1858)........................................................................ 20

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018)......................................................... 50

*Direct Mktg. Ass'n v. Brohl*,
  814 F.3d 1129 (10th Cir. 2016)...................................................... 58

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ............................................................... passim

*Duncan v. Becerra*,
  970 F.3d 1133 (9th Cir. 2020),
  *vacated on reh'g en banc*,
  No. 19-55376, --- F.3d ----, 2021 WL 728825 (Feb. 25, 2021) ............. 32, 43

*Fisher v. Kealoha*,
  855 F.3d 1067 (9th Cir. 2017)....................................................... 33

*Fortson v. L. A. City Att'y's Office*,
  852 F.3d 1190 (9th Cir. 2017)....................................................... 33

*Foster-Fountain Packing Co. v. Haydel*,
  278 U.S. 1 (1928) ......................................................................... 59

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015)......................................................... 40

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th. Cir. 2015)................................................................ passim

*Gen. Motors Corp. v. Tracy*,
    519 U.S. 278 (1997) ................................................................ 61, 62

*Gould v. Morgan*,
    907 F.3d 659 (1st Cir. 2018) ........................................ 15, 18, 35

*Graham v. Florida*,
    560 U.S. 48 (2010) ........................................................ 36

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) .................................... 16

*Hirschfeld v. ATF*,
    417 F. Supp. 3d 747 (W.D. Va. 2019),
    *appeal docketed*, No. 19-2250 (9th Cir. 2019)........................... 18, 23, 25, 44

*Hirst v. Skywest, Inc.*,
    910 F.3d 961 (7th Cir. 2018)........................................ 71

*Horsley v. Trame*,
    808 F.3d 1126 (7th Cir. 2015)...................................... 37

*Humane Soc'y of the United States v. Perdue*,
    935 F.3d 598 (D.C. Cir. 2019) .................................... 48

*In re Williams*,
    853 P.2d 444 (Wash. 1993) ........................................ 55

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
    803 F.3d 389 (9th Cir. 2015)...................................... 45

*Jackson v. City & County of San Francisco*,
    746 F.3d 953 (9th Cir. 2014)................................................................ passim

*Jones v. Becerra*,
   No. 19-CV-1226-L-AHG,
   2020 WL 6449198 (S.D. Cal. Nov. 3, 2020),
   *appeal docketed*, No. 20-56174 (9th Cir. 2020) ............................... 23, 24, 27

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) (en banc) ....................................................... 16

*Lopez v. Candaele*,
   630 F.3d 775 (9th Cir. 2010) ......................................................................... 49

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ....................................................................................... 46

*Mai v. United States*,
   952 F.3d 1106, 1116–17 (9th Cir. 2020) ..................................... 31, 32, 38, 40

*Maine v. Taylor*,
   477 U.S. 131 (1986) ....................................................................................... 66

*Mance v. Sessions*,
   896 F.3d 699 (5th Cir. 2018) (per curiam) ......................................... 8, 40, 67

*McDonald v. City of Chicago*,
   561 U.S. 742  (2010) ...................................................................................... 43

*Moy v. Cowen*,
   958 F.2d 168 (7th Cir. 1992) (per curiam) .................................................... 55

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) .......................................................................... 43

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
   567 F.3d 521 (9th Cir. 2009) ................................................................... 62, 63

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
   682 F.3d 1144 (9th Cir. 2012) ................................................................. 46, 65

*Nat'l Rifle Ass'n v. ATF*,
  700 F.3d 185 (5th Cir. 2012) ................................................................ passim

*Nat'l Treasury Emps. Union v. Von Raab*,
  489 U.S. 656, (1989) ........................................................................... 66

*Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
  472 U.S. 159 (1985). ............................................................................ 46

*New Energy Co. of Indiana v. Limbach*,
  486 U.S. 269 (1988) ............................................................................. 66

*New England Power Co. v. New Hampshire*,
  455 U.S. 331 (1982) ............................................................................. 59

*NRA v. McCraw*,
  719 F.3d 338 (5th Cir. 2013) ......................................................... 22, 31, 72

*Oregon v. Mitchell*,
  400 U.S. 112 (1970) ............................................................................. 19

*Pac. Nw. Venison Producers v. Smitch*,
  20 F.3d 1008 (9th Cir. 1994) ............................................................. 63, 64

*Padgett v. Wright*,
  587 F.3d 983 (9th Cir. 2009) ................................................................. 50

*Pena v. Lindley*,
  898 F.3d 969 (9th Cir. 2018) .............................................................. passim

*People v. Aguilar*,
  2 N.E.3d 321 (Ill. 2013) ........................................................................ 25

*People v. Jordan G.*,
  33 N.E.3d 162 (Ill. 2015) ...................................................................... 25

*People v. Mosley*,
  33 N.E.3d 137 (Ill. 2015) ...................................................................... 23

*Peruta v. County of San Diego*,
  824 F.3d 919 (9th Cir. 2016) (en banc) .......................................................... 18

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) ............................................................................ passim

*Powell v. Tompkins*,
  926 F. Supp. 2d 367 (D. Mass. 2013),
  *aff'd*, 783 F.3d 332 (1st Cir. 2015) .................................................. 23, 25, 27

*Raymond Motor Transp., Inc. v. Rice*,
  434 U.S. 429 (1978) ............................................................................... 65

*Rocky Mtn. Farmers Union v. Corey*,
  730 F.3d 1070 (9th Cir. 2013) ........................................................ 56, 57, 62

*Rosenblatt v. City of Santa Monica*,
  940 F.3d 439 (9th Cir. 2019) ............................................................... passim

*S.D. Myers, Inc. v. City & County of San Francisco*,
  253 F.3d 461 (9th Cir. 2001) .................................................................... 63

*Schall v. Martin*,
  467 U.S. 253 (1984) ............................................................................... 41

*Silvester v. Harris*,
  843 F.3d 816 (9th Cir. 2016) ........................................................ 18, 36, 64

*State v. Callicutt*,
  69 Tenn. 714 (1878) ............................................................................... 20

*State v. Quail*,
  92 A. 859 (Del. Gen. Sess. 1914) .............................................................. 24

*State v. Watson*,
  154 P.3d 909 (Wash. 2007) ...................................................................... 55

*Stiles v. Blunt*,
  912 F.2d 260 (8th Cir. 1990) .................................................................... 33

*Sullivan v. Finkelstein*,
496 U.S. 617 (1990) ..................................................................... 54

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ..................................................................... 72

*Swanson Group Mfg. LLC v. Jewell*,
790 F.3d 235 (D.C. Cir. 2015) .................................................... 48

*Teixeira v. County of Alameda*,
873 F.3d 670 (9th Cir. 2017) (en banc)........................................ 16

*Thomas v. Anchorage Equal Rights Comm'n*,
220 F.3d 1134 (9th Cir. 2000) (en banc)..................................... 49

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007) ............................................................... 45, 58

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011) .................................................... 13

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013).................................... 15, 28, 29, 41

*United States v. Henry*,
688 F.3d 637 (9th Cir. 2012)....................................................... 42

*United States v. Lanier*,
520 U.S. 259 (1997) ..................................................................... 55

*United States v. Nordbrock*,
38 F.3d 440 (9th Cir. 1994)......................................................... 51

*United States v. Rene E.*,
583 F.3d 8 (1st Cir. 2009) ........................................................... 23

*United States v. Salerno*,
481 U.S. 739 (1987) ..................................................................... 18

*United States v. Torres*,
  911 F.3d 1253 (9th Cir. 2019) .......................................................... 17, 28, 29

*W. Lynn Creamery, Inc. v. Healy*,
  512 U.S. 186 (1994) ...................................................................... 58

*W. Min. Council v. Watt*,
  643 F.2d 618 (9th Cir. 1981) .......................................................... 49

*White v. Mass. Council of Const. Employers, Inc.*,
  460 U.S. 204 (1983) ...................................................................... 67

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) .................................................................. 46, 47

*Wilson v. Cook County*,
  937 F.3d 1028 (7th Cir. 2019) (per curium) ................................... 16

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019) ............................................................ 16

*Wyoming v. U.S. Dep't of Interior*,
  674 F.3d 1220 (10th Cir. 2012) ...................................................... 47

## Constitutional Provisions

Kan. Const. art. 8, § 1 (1859) .......................................................... 27

N.C. Const. art. XII, § 1 (1868) ...................................................... 27

U.S. Const. amend. II .............................................................. passim

U.S. Const. art I, § 8, cl. 3 ....................................................... passim

## Statutes

10 U.S.C. § 246 ............................................................................ 27

10 U.S.C. § 505(a) ........................................................................ 26

18 U.S.C. § 921 ................................................................. 52

18 U.S.C. § 921(a)(21) ..................................................... 52

18 U.S.C. § 921(a)(29)(A) ................................................. 6

18 U.S.C. § 922(a)(2) ........................................................ 54

18 U.S.C. § 922(a)(3) ........................................................ 7

18 U.S.C. § 922(b)(1) .................................... 6, 21, 22, 26

18 U.S.C. § 922(b)(3) ................................................ passim

18 U.S.C. § 922(b)(3) (1970) .................................... 69, 70

18 U.S.C. § 922(g)(5) ...................................................... 32

18 U.S.C. § 927 ............................................................... 71

16 Del. Laws 716, § 1 (1881) ......................................... 24

1883 Mo. Laws 76, § 1274 ............................................. 24

1895 Neb. Laws 237-38, Art. XXVI, §§ 2, 5 ................. 24

1970 Wash. Sess. Laws 668, ch. 74, § 1 ......................... 70

1970 Wash. Sess. Laws 668, ch. 74, § 2 ......................... 70

2019 Wash. Sess. Laws 7 .......................................... passim

2020 Wash. Sess. Laws 506 ............................................. 7

43.430 Ill. Comp. Stat. 65/2(a)(1) ................................. 21

43.430 Ill. Comp. Stat. 65/4 ........................................... 21

430 Ill. Comp. Stat. 65/3a .............................................. 21

430 Ill. Comp. Stat. 65/4 ................................................................... 21

430 Ill. Comp. Stat. 65/4(a)(2)(i-5) ................................................. 21

52 Cong. ch. 159 § 5, 27 Stat. 116 (1892) ...................................... 24

An Act for raising levies and recruits to serve in the present expedition
    against the French, on the Ohio, ch. II, §§ I–III (1754),
    6 William Waller Henning, *The Statutes at Large: Being a
    Collection of All the Laws of Virginia* 438 (1823) ...................... 27

An Act for the Organization, Discipline, and Regulation of the Militia of
    the Commonwealth of Pennsylvania, No. 211, § 1,
    1864 Pa. Laws 221 ...................................................................... 27

An Act to establish an Uniform Militia throughout this State,
    ch. XLIX, §§ 1–2, 4,
    4 M. Bradford & R. Porter, eds., *Laws of the State of Delaware* 123
    (1816) ......................................................................................... 27

An Act to exempt minors from Militia Duty in time of peace (1829),
    Josiah Harrison, ed., *A Compilation of the Public Laws of the State of
    new Jersey Passed Since the Revision in the Year 1820* (1833) .... 27

An Act to regulate the Militia, § 2,
    1843 Ohio Acts 53 ....................................................................... 27

Cal. Penal Code § 27505(a) ............................................................. 21

Cal. Penal Code § 27510(a)–(c) ...................................................... 21

Conn. Gen. Stat. § 29-34(b) ............................................................ 21

D.C. Code § 22-4507 ....................................................................... 21

Del. Code Ann. tit. 24, § 903 ......................................................... 21

Fla. Stat. § 790.065(13) .................................................................. 21

Gun Control Act of 1968,
   Pub. L. No. 90-618, 82 Stat. 1213 (1968)
   (codified as amended at 18 U.S.C. § 922(b)(1)) .................................. passim

Haw. Rev. Stat. § 134-2(a) ................................................................. 21

Haw. Rev. Stat. § 134-2(d) ................................................................. 21

Haw. Rev. Stat. Ann. § 134-2(a).......................................................... 21

Haw. Rev. Stat. Ann. § 134-2(d) ......................................................... 21

Iowa Code § 724.22(2) ....................................................................... 21

Ky. Rev. Stat. § 237.020(1) ................................................................ 70

Ky. Rev. Stat. § 237.020(2) ................................................................ 70

Mass. Gen. Laws ch. 140, § 130......................................................... 21

Mass. Gen. Laws ch. 140, § 131E ....................................................... 70

Mass. Gen. Laws ch. 140, § 131E(a) ................................................... 21

Md. Code Ann., Pub. Safety § 5-134(d) ............................................... 21

Mich. Comp. Laws. § 28.422(3)(b) ..................................................... 21

Militia Act of 1792, 2 Cong. ch. 33, 1 Stat. 271 (May 8, 1792) ...................... 26

Mo. Rev. Stat. § 571.080 .................................................................... 21

N.J. Stat. Ann. § 2C:58-3.3c .............................................................. 21

N.J. Stat. Ann. § 2C:58-3c(4) ............................................................. 21

N.J. Stat. Ann. § 2C:58-6.1(a) ............................................................ 21

N.Y. Penal Law § 400.00(1)(a)............................................................ 21

N.Y. Penal Law § 400.00(12) ............................................................... 21

Neb. Rev. Stat. § 69-2403 .................................................................... 21

Neb. Rev. Stat. § 69-2404 .................................................................... 21

Ohio Rev. Code Ann. § 2923.21(B) ................................................... 21

R. H. Clark et al., eds., *The Code of the State of Georgia*,
  pt. 1, tit. 11, ch. 2, §§ 981, 1026 (1861) ........................................ 27

R.I. Gen. Laws § 11-47-37 ................................................................. 21

R.I. Gen. Laws §§ 11-47-35(a)(1) ...................................................... 21

RCW 2.60.020 ..................................................................................... 55

RCW 43.43.580 ..................................................................................... 7

RCW 9.41.010(23) ................................................................................. 6

RCW 9.41.010(25) ............................................................................... 51

RCW 9.41.010(26) ............................................................................... 30

RCW 9.41.010(27) ................................................................................. 5

RCW 9.41.042 ....................................................................................... 6

RCW 9.41.042(8) ................................................................................. 29

RCW 9.41.060 ....................................................................................... 6

RCW 9.41.090(2)(b) ............................................................................. 7

RCW 9.41.124 .................................................................. 51, 54, 68, 71

RCW 9.41.240 ..................................................................................... 21

RCW 9.41.240(1) ................................................................................... 6

RCW 9.41.240(3) ................................................................................ 6

RCW 9.41.240(3)(a) .......................................................................... 29

Vt. Stat. Ann. tit. 13, § 4020 ............................................................ 21

Wyo. Stat. Ann. § 6-8-404(d)(i)(A) .................................................. 21

## <u>Regulations</u>

27 C.F.R. § 478.99 ............................................................................ 67

27 C.F.R. § 478.99(a) .......................................................................... 7

## <u>Other Authorities</u>

1 William Blackstone, *Commentaries* ............................................. 19

Black's Law Dictionary (9th ed. 2009) ............................................ 19

Deborah Azrael et al,
  *The Stock and Flow of U.S. Firearms: Results from the 2015 National
  Firearms Survey*  (Oct. 2017),
  https://www.jstor.org/stable/10.7758/
  rsf.2017.3.5.02#metadata_info_tab_contents ............................... 44

Eugene Volokh*, State Constitutional Rights to Keep and Bear Arms*,
  11 Texas Rev. L. & Politics 191 (2006) ........................................ 20

German Lopez & Kavya Sukumar; *After Sandy Hook, we said never
  again. And then we let 2,654 mass shootings happen*, Vox,
  https://www.vox.com/a/mass-shootings-america-sandy-hook-gun-
  violence (updated July 21, 2020) ..................................................... 3

Grace Hauck, *'They're Not Forgotten': America's Other Epidemic Killed
  41,000 People This Year*, USA Today, Dec. 18, 2020,
  https://www.usatoday.com/story/news/nation/2020/12/18/gun-violence-
  deaths-americans-2020/3906428001/ ............................................ 3

Gun Violence Archive, *Past Summary Ledgers*, *available at*
  https://www.gunviolencearchive.org/past-tolls (last accessed
  Feb. 22, 2021) ................................................................................. 3

H.R. Rep. No. 90-1577 (1968),
  *reprinted in* 1968 U.S.C.C.A.N. 4410 .................................... 68, 69

Hearings Before the Subcomm. on Crime, Comm. of the Judiciary,
  99th Cong. (1st and 2d Sess.) Pt. 1, Serial No. 131 (1985–86) ................... 71

Larry D. Barnett, *The Roots of Law*,
  15 Am. U. J. Gender Soc. Pol'y & L. 613 (2007) ........................................ 20

S. Rep. No. 89-1866 (1966) ............................................................ 69

S. Rep. No. 90-1097 (1968),
  *reprinted in* 1968 U.S.C.C.A.N. 2112 ........................................... 69

S. Rep. No. 90-1501 (1968) .......................................................... 69, 70

S. Rep. No. 98-583 (1984) ............................................................. 70

*Webster's Encyclopedic Unabridged Dictionary of the English
  Language* (1996) ...................................................................... 51

## I. INTRODUCTION

The devastating impact of gun violence is undeniable, with some horrific events forever scarred in our memories. Newtown, Connecticut: 20 children and 6 adults killed at Sandy Hook Elementary School. Parkland, Florida: 17 killed and 17 injured at Marjory Stoneman Douglas High School. And locally, Burlington, Washington: 5 killed as they shopped in the Cascade Mall. These tragic mass shootings all share a common feature: each gunman was between 18 and 20 years old and used a semiautomatic assault rifle (SAR) to carry out his attack.

In 2018, the people of Washington took action against gun violence by adopting Initiative Measure No. 1639 (I-1639 or Initiative). I-1639 takes the simple and commonsense approach of extending three longstanding statutory restrictions on handguns to the weapon often favored by mass shooters: SARs. I-1639 mirrors existing federal and state handgun laws by: (1) prohibiting individuals under 21 from purchasing SARs (Age Provision); (2) requiring an enhanced background check—a comprehensive records search conducted by local law enforcement—for SAR purchases (Background Check Provision); and (3) prohibiting in-person sales of SARs to non-Washington residents (Nonresident Sales Provision).

The District Court granted summary judgment to Appellees (collectively, the State), rejecting Appellants' (collectively, NRA's) facial challenges to the Age Provision under the Second Amendment and the Nonresident Sales Provision under the dormant Commerce Clause. Parallel regulations on handguns have been in place for decades and consistently upheld, and nothing in the Constitution prohibits Washington voters from extending these same restrictions to SARs. On appeal, NRA expresses its general disagreement with the District Court's holdings, but barely addresses its detailed and comprehensive analysis, let alone identifies any reversible error. This Court should affirm.

## II.    JURISDICTIONAL STATEMENT

The State agrees with NRA's statement of jurisdiction.

## III.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    May Washington impose a minimum age requirement of 21 to purchase SARs, consistent with the Second Amendment?

2.    Where law enforcement must run enhanced background checks on all SAR purchasers but cannot effectively conduct such checks on other states' residents, does the dormant Commerce Clause permit Washington to prohibit direct, in-person SAR sales to nonresidents?

## IV.    STATEMENT OF THE CASE

### A.    Gun Violence and Mass Shootings

In 2020, more than 41,000 people in the United States died of gun violence—the most in at least four decades.[1] The same year, this country set a record for mass shootings.[2] While unprecedented, neither statistic was an aberration: on average, firearms kill 33,800 Americans and injure 111,000 others every year. 1-SER-146. Since the 2012 Sandy Hook attack, more than 2,900 Americans have died and over 11,000 have been injured in mass shootings alone. 1-SER-149.[3]

Mass shootings often share two common features: the perpetrator (1) is between 18 and 20 years of age and (2) uses a SAR. Examples include Sandy Hook (age 20, AR-15 rifle), Parkland (age 19, AR-15 rifle), and the 2019 Gilroy Garlic Festival (age 19, AK-47 rifle). 1-SER-153, 157, 177, 198; 3-SER-531.

---

[1] Grace Hauck, *'They're Not Forgotten': America's Other Epidemic Killed 41,000 People This Year*, USA Today, Dec. 18, 2020, https://www.usatoday.com/story/news/nation/2020/12/18/gun-violence-deaths-americans-2020/3906428001/.

[2] Gun Violence Archive, *Past Summary Ledgers*, *available at* https://www.gunviolencearchive.org/past-tolls (last accessed Feb. 22, 2021).

[3] German Lopez & Kavya Sukumar; *After Sandy Hook, we said never again. And then we let 2,654 mass shootings happen*, Vox, https://www.vox.com/a/mass-shootings-america-sandy-hook-gun-violence (updated July 21, 2020).

Recent mass shootings in Washington fit this paradigm. In Mukilteo, for example, a 19-year-old used an AR-15 SAR to kill multiple teenagers in 2016. 1-SER-160; 3-SER-593, 595. The same year in Burlington, a 20-year-old used a Ruger 10/22 SAR to kill five people at a mall. 1-SER-154, 166–68.

It is no mystery why mass shooters often favor SARs. They generally are easy to use and fire faster than handguns and non-semiautomatic firearms (often at approximately four times the muzzle velocity). 1-SER-54, 71–72 147, 204, 225; 2-SER-244, 251–53; 3-SER-568, 613. As explained by the State's law enforcement expert, "mass shootings . . . are demonstrably more lethal when the assailant uses a [SAR] than when other firearms are used." 3-SER-612–13. Unsurprisingly, in the five deadliest mass shootings in the United States between 2009 and 2018, the assailant used a SAR. 3-SER-613.

Equally predictable are the young ages of many mass shooters. Decades of scientific research shows that "older adolescents" (those between 18 and 21) tend to lack older adults' capacity to "govern impulsivity, judgment, planning for the future, [and] foresight of consequences." 1-SER-116; 2-SER-266; 4-SER-666. As the State's unrebutted neuroscience expert explained, "brain development . . . lasts well into adulthood, and the regions that are the last to mature are those associated with executive control." 4-SER-768. The State's

4

unrebutted psychology expert agreed, describing older adolescence as a period of "developmental vulnerability" when individuals are still "maturing in important ways." 3-SER-674.

It is little wonder that older adolescents are disproportionately responsible for mass shootings and other violent crime. Arrests for violent crimes peak from ages 17 to 20. 2-SER-261; 3-SER-672. And while people age 18 to 20 make up only 4.4% of the population, they account for 24% of firearm homicides. 2-SER-263, 455.

**B.    I-1639**

In 2018, the people of Washington overwhelmingly adopted I-1639 to "increase public safety and reduce gun violence." 1-SER-116; 2-SER-270. Although I-1639 includes a number of provisions that apply to all firearms, at issue here are provisions regulating SARs, the weapon "used in some of the country's deadliest mass shootings." 1-SER-115.[4] I-1639 employs a modest, straightforward approach to regulating SARs by simply "requir[ing] the same

---

[4] The Initiative defines a SAR in part as "any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge." 1-SER-141 (codified at RCW 9.41.010(27)).

5

standards for purchasing [SARs] that are already required for handguns." 2-SER-307.[5]

As the District Court noted, the Initiative aligns restrictions on SARs and handguns in three main respects. First, I-1639's Age Provision, RCW 9.41.240(1), extends to SARs longstanding restrictions on the sale and possession of handguns to persons under 21. ER-8–9; *see* Gun Control Act of 1968, Pub. L. No. 90-618, § 922(b)(1), 82 Stat. 1213, 1218 (1968) (codified as amended at 18 U.S.C. § 922(b)(1)) (GCA). The Age Provision does not bar 18- to 20-year-olds from possessing SARs in a variety of situations, *e.g.*, in their homes, while hunting, or at shooting ranges. RCW 9.41.240(3), 9.41.042, 9.41.060. Nor does it prohibit them from buying other types of long guns, such as shotguns or non-semiautomatic rifles, which NRA concedes are suitable for self-defense. 2-SER-329, 334, 341, 360.

Second, I-1639's Background Check Provision requires the same "enhanced background checks" for SAR purchases that Washington has long

---

[5] Although pistols are commonly considered a subset of handguns, Washington law defines "pistol" broadly as "any firearm with a barrel less than sixteen inches in length, or is designed to be held and fired by the use of a single hand." RCW 9.41.010(23). *Cf.* 18 U.S.C. § 921(a)(29)(A) (defining "handgun" in relevant part as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand"). The term "handgun" is used herein unless referencing Washington law specifically.

mandated for handgun purchases. RCW 9.41.090(2)(b). Enhanced background checks are conducted by local law enforcement agencies, which, in addition to querying the FBI's National Instant Criminal Background Check System (NICS), also search at least six Washington-specific criminal history and other databases.[6] ER-10; 2-SER-370; 3-SER-707–09. It is undisputed that an enhanced background check is more comprehensive than a NICS check alone. ER-10.

Third, because enhanced background checks cannot be performed effectively on nonresidents, I-1639's Nonresident Sales Provision applies to SARs the 53-year-old federal prohibition on the direct sale of handguns to other states' residents. ER-10; *see* 18 U.S.C. § 922(a)(3), (b)(3); 27 C.F.R. § 478.99(a). Federal law allows a federal firearms licensee (FFL) to *indirectly* sell handguns to nonresidents through delivery to FFLs in their home states, a process known as "FFL-to-FFL transfer." ER-11; 18 U.S.C. § 922(a)(2);

---

[6] Last year, the Washington Legislature enacted a law establishing, when implemented, a statewide "automated firearms background check system" system. 2020 Wash. Sess. Laws 506–08 (ch. 28, § 1) (codified at RCW 43.43.580). The system is expected to be operational in January 2024. Washington State Patrol, *Centralized Firearms Background Check Program Implementation Plan*, at 1 (Dec. 1, 2020), https://app.leg.wa.gov/ ReportsToTheLegislature/Home/GetPDF?fileName=Centralized%20Firearms %20Background%20Check%20Program%20Implementation%20Report_2020 _97a77c5f-684c-4059-9578-d69399f0ea6b.pdf.

27 C.F.R. § 478.99(a); *Mance v. Sessions*, 896 F.3d 699, 709 (5th Cir. 2018) (per curiam); 2-SER-397; 3-SER-551. The in-state FFL must record the transfer as going to the out-of-state FFL, "not to the end purchaser," and the out-of-state FFL is responsible for the required background check. 3-SER-551.

The Washington Attorney General has advised the public that while the Nonresident Sales Provision prohibits direct, in-person SAR sales to nonresidents, it allows out-of-state SAR sales through FFL-to-FFL transfer. 2-SER-406. The District Court agreed with that construction because—consistent with I-1639's purpose—it means that "SARs are treated the same as handguns: they may not be purchased by nonresidents in person," but "a nonresident may still purchase a SAR through an FFL-to-FFL transfer." ER-11.

## C.   Procedural History

Appellants consist of the National Rifle Association and Second Amendment Foundation (SAF), two gun rights groups that organized and funded this lawsuit; Daniel Mitchell and Robin Ball, Washington FFLs who opposed I-1639; and Nathaniel Casey, Luke Rettmer, and Matthew Wald, who were between 18 and 20 years old when I-1639 was enacted, but have since turned 21. 1-SER-222; 2-SER-307, 332–33, 352, 414–17, 431. Their pre-enforcement challenge concerns two provisions of I-1639. First, all claim that the Age

Provision violates the Second Amendment. 4-SER-882. Second, Appellant Mitchell alone claims that the Nonresident Sales Provision violates the dormant Commerce Clause. *Id.* (Appellant Ball abandoned her dormant Commerce Clause claim after discovery revealed that her firearm sales revenue actually increased after I-1639's enactment. ER-45; 2-SER-249–50, 4-SER-882.) Agreeing that no genuine dispute of material fact exists, the parties cross-moved for summary judgment.

**D.     The District Court's Decision**

The District Court entered summary judgment for the State. ER-7. In upholding the Age Provision, the District Court applied this Court's two-step Second Amendment framework. ER-12. Finding that "reasonable age restrictions on the sale, possession, or use of firearms have an established history in this country," the District Court held that the "Age Provision does not burden Second Amendment rights" and NRA's "challenge to it thus fails at the first step of the inquiry." ER-15-16.

The District Court went further and also upheld the Age Provision under the second step. Applying intermediate scrutiny because the "Age Provision does not implicate the core Second Amendment right to defend one's home," the District Court concluded that the "Age Provision reasonably fits with"

Washington's "substantial government interests" in "public safety" and "preventing violent crime." ER-17–19. The District Court credited (1) the opinions of the State's "two unrebutted scientific experts" that "18- to 20-year-olds are developmentally immature compared with older adults, increasing their risk to the community"; (2) judicial decisions "reach[ing] the same conclusion"; and (3) crime data showing that "18- to 20-year-olds also commit a disproportionate share of crimes." ER-19–20.

The District Court then upheld the Nonresident Sales Provision under the dormant Commerce Clause, concluding it is nondiscriminatory "because it neither benefits in-state economic interests nor burdens out-of-state economic interests." ER-23. Although Mitchell claims to have lost sales of SARs to potential out-of-state purchasers, the District Court ruled that he "fail[ed] to adduce facts creating a genuine dispute on this threshold issue." *Id.* Moreover, "[e]ven if Mitchell's allegations were true, they would . . . connote a burden to *Washington* economic interests—the very opposite of economic protectionism." *Id.* (emphasis added). Applying "the lenient *Pike* balancing test," the District Court ruled that Mitchell failed to meet his burden of establishing an "excessive burden" to interstate commerce. ER-24. The District Court also concluded that "I-1639's benefits . . . are substantial" and "far outweigh[ ] any alleged burden"

because "the Nonresident Sales Provision is necessary to ensure an enhanced background check is conducted before a[] SAR is sold in Washington," helping "prevent ineligible purchasers from falling through the cracks." ER-24–25, 10.

### E.  Undisputed or Unrebutted Facts

As the District Court noted, many of the key facts supporting its decision were either undisputed or unrebutted by NRA. Those facts include:

1.  The expressed intent of I-1639 was to extend current laws applicable to handguns to SARs. 1-SER-116; 2-SER-304, 307.

2.  SARs are easier to use and more lethal than other types of firearms. 1-SER-54, 71–72, 147, 204, 225; 2-SER-244, 251–53; 3-SER-568, 613; 4-SER-835–36.

3.  Mass shooters often favor SARs. 1-SER-152–57, 205; 3-SER-613; 4-SER-835–36.

4.  Other types of firearms such as shotguns and non-semiautomatic rifles, which 18- to 20-year-olds and nonresidents may purchase in Washington, are suitable (or even "ideal") for self-defense. 2-SER-329, 334, 341, 360, 383, 448; 3-SER-652; 4-SER-828, 859.

5.  Psychologically and neurobiologically, young adults do not fully mature until age 21 or older, and are more prone to sensation-seeking, risk-

taking, and poor impulse control than older adults. ER-19, 3-SER-664–75; 4-SER-760–76, 815–16, 832–33.

6. Eighteen- to twenty-year-olds disproportionately commit violent crimes and attempt suicide. ER-19, 1-SER-66–71; 2-SER-261, 455; 3-SER-672; 4-SER-833–34.

7. Multiple mass shootings have been carried out in recent years by 18- to 20-year-olds using SARs, including at least two in Washington. 1-SER-152–57, 166-68; 3-SER-593–95.

8. The Nonresident Sales Provision was not enacted with the purpose of advancing economic protectionism. 1-SER-116; 2-SER-304, 307.

9. The Nonresident Sales Provision does not adversely affect the economic interests of firearms dealers outside Washington. ER-23; 2-SER-327–28; 4-SER-840.

10. Enhanced background checks are more effective than NICS-only checks. ER-10; 1-SER-103–04; 2-SER-330–31, 384–85; 3-SER-709; 4-SER-751–52.

11. It is generally impossible to conduct effective enhanced background checks on nonresident firearm purchasers. 1-SER-104–05; 3-SER-709–10; 4-SER-752–54.

## V.    STANDARD OF REVIEW

This Court reviews *de novo* grants of summary judgment, "employ[ing] the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)." *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 988 (9th Cir. 2016) (en banc) (per curiam). The Court "view[s] the evidence in the light most favorable to the nonmoving party, determine[s] whether there are any genuine issues of material fact, and decide[s] whether the district court correctly applied the relevant substantive law." *Id.* at 989. To establish a genuine dispute of material fact, "a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).

## VI.    SUMMARY OF THE ARGUMENT

The District Court correctly granted the State summary judgment on NRA's Second Amendment claim. First, the Age Provision falls outside the scope of the Second Amendment as a condition or qualification on the commercial sale of firearms and because of longstanding and historical firearm minimum age restrictions. Second, even if the Age Provision were within the Second Amendment's scope, it would trigger only intermediate scrutiny because it does not severely burden the core right of home self-defense. The Age

Provision is a narrow restriction that applies only to sales of one type of firearm to 18- to 20-year-olds, who may still possess SARs for a variety of lawful purposes and buy many other types of firearms. Third, the Age Provision satisfies intermediate scrutiny because it reasonably fits with Washington's substantial interests in reducing violence and promoting public safety. Fourth, even if strict scrutiny did apply, the Age Provision would meet it because the law is narrowly tailored to undisputedly compelling state interests and leaves 18- to 20-year-olds with adequate self-defense alternatives.

The District Court also correctly granted the State summary judgment on Mitchell's dormant Commerce Clause claim. First, Mitchell lacks standing because he presented no evidence of any injury fairly traceable to the Nonresident Sales Provision. Second, Mitchell forfeited his theory that I-1639 directly regulates interstate commerce because he did not raise it in the District Court. The theory also is meritless because I-1639 prevents only in-person SAR purchases by nonresidents, not FFL-to-FFL transfers. Third, the Nonresident Sales Provision does not discriminate against interstate commerce because there is no evidence it benefits in-state economic interests or burdens out-of-state economic interests. If anything, it does the opposite. Fourth, the Nonresident Sales Provision satisfies *Pike* balancing because the record contains no evidence

14

of any burden to interstate commerce, and the law advances substantial public safety benefits. Fifth, the law would meet even strict scrutiny because it is justified by a valid factor unrelated to economic protectionism: it ensures all SAR purchasers pass enhanced background checks. Sixth, Congress has expressly authorized states to bar sales of rifles to nonresidents.

## VII.   ARGUMENT

**A.    The Age Provision Comports With the Second Amendment**

**1.    Second Amendment Framework**

After *District of Columbia v. Heller*, 554 U.S. 570, 573–74 (2008), the Ninth Circuit—and every other circuit to address the issue—adopted a two-part test for analyzing Second Amendment claims. *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *see, e.g.*, *Gould v. Morgan*, 907 F.3d 659, 668–69 (1st Cir. 2018) (collecting cases). The Court first "asks whether the challenged law burdens conduct protected by the Second Amendment." *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th. Cir. 2015) (cleaned up).[7] If the law does not burden protected conduct, the "inquiry is complete" and the law "passes constitutional muster" without further analysis. *Teixeira v. County of Alameda*, 873 F.3d 670,

---

[7] The parenthetical "cleaned up" indicates omission of internal quotation marks, alterations, or citations from a quotation. *See, e.g.*, *Brownback v. King*, --- U.S. ----, No. 19-546, 2021 WL 726222, at *4 (Feb. 25, 2021).

682 (9th Cir. 2017) (en banc). If there is such a burden, at step two the Court asks "what level of scrutiny should be applied" and evaluates the law. *Fyock*, 779 F.3d at 996. This framework derives directly from "*Heller*'s method of analysis." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 959 (9th Cir. 2014).

Applying this standard, courts have repeatedly upheld minimum age laws and restrictions on SARs—including outright prohibitions on assault weapons. *See, e.g.*, *Nat'l Rifle Ass'n v. ATF*, 700 F.3d 185, 211 (5th Cir. 2012) (*NRA*) (rejecting challenge to federal prohibition on the sale of handguns by FFLs to those under 21); *Worman v. Healey*, 922 F.3d 26, 40 (1st Cir. 2019) (upholding state assault weapons ban); *Wilson v. Cook County*, 937 F.3d 1028, 1036–37 (7th Cir. 2019) (per curiam) (same); *Kolbe v. Hogan*, 849 F.3d 114, 137–38 (4th Cir. 2017) (en banc) (same); *Heller v. District of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011) (same).

## 2. The Age Provision Burdens No Second Amendment Rights

The Age Provision is constitutional under step one of the framework because the law does not burden conduct protected by the Second Amendment.

16

### a. "Presumptively lawful" firearm regulations fall outside the Second Amendment

*Heller* set forth a non-"exhaustive" list of "presumptively lawful [firearm] regulatory measures," 554 U.S. at 627 & n.26, that are "traditionally understood to be outside the scope of the Second Amendment," *Fyock*, 779 F.3d at 996. These include "laws imposing conditions and qualifications on the commercial sale of arms" and "longstanding prohibitions on the possession of firearms." *Heller*, 554 U.S. at 626–27. "These measures comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms." *United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019) (cleaned up).

To determine whether a law falls outside the Second Amendment, courts ask (1) "whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*," or (2) "whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Jackson*, 746 F.3d at 960 (cleaned up). Courts consult "a variety of legal and other sources to determine the public understanding of [the] legal text in the period after its enactment or ratification." *Heller*, 554 U.S. at 605 (emphasis omitted). Because "the challenge here is directed at a state law, the pertinent point in time would

17

be 1868 (when the Fourteenth Amendment was ratified)," not 1791. *Gould*, 907 F.3d at 669; *accord Peruta v. County of San Diego*, 824 F.3d 919, 936 (9th Cir. 2016) (en banc). Under both assessments, the Age Provision does not burden Second Amendment conduct.

> **b.** **The Age Provision is a presumptively lawful condition on commercial sale of arms**

NRA entirely fails to address that the Age Provision primarily "impos[es] conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27; *see also Hirschfeld v. ATF*, 417 F. Supp. 3d 747, 756 (W.D. Va. 2019), *appeal docketed*, No. 19-2250 (9th Cir. 2019) (federal age restriction for handguns is "among the . . . 'conditions and qualifications on the commercial sale of arms,' which . . . *Heller* did not 'cast doubt' on") (quoting *Heller*, 554 U.S. at 626–27); *Silvester v. Harris*, 843 F.3d 816, 832 (9th Cir. 2016) (Thomas, C.J., concurring) (waiting period presumptively lawful as condition or qualification on commercial sale of arms). NRA's facial challenge to the Age Provision should be rejected on this basis alone. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial challenge must establish that "no set of circumstances exists under which [the law] would be valid").

### c. Firearm minimum age laws are historically longstanding

The Age Provision also falls outside the Second Amendment because firearm minimum age laws are historically longstanding. The appropriate inquiry here is not whether the Second Amendment protects a particular type of firearm (SARs), but whether the specific prohibition—sales to 18- to 20-year-olds—falls within the amendment's scope. It does not. Laws restricting sales of firearms to this age group have been widespread since at least the 19th century and remain so today.

### (1) The age of majority was 21 until the 1970s

For most of our history, 18- to 20-year-olds were considered minors or "infants" without the full legal rights of adulthood. At common law and at the time of the adoption of the Constitution, the age of majority was 21 years. *See* 1 William Blackstone, *Commentaries* \*463; *Infant*, Black's Law Dictionary 847 (9th ed. 2009). In fact, before ratification of the 26th Amendment in 1971, few states permitted individuals under 21 to vote. *See Oregon v. Mitchell*, 400 U.S. 112, 213 n.90 (1970) (Harlan, J., concurring in part and dissenting in part) (only four states then set the voting age below 21). It was not until the 1970s that 49 states lowered the general age of majority to 18. *NRA*, 700 F.3d at 201; Larry D.

19

Barnett, *The Roots of Law*, 15 Am. U. J. Gender Soc. Pol'y & L. 613, 681–86 app. (2007).

### (2)    State laws have restricted firearm sales to people under 21 since the 1800s

In the 19th century, 19 states and the District of Columbia enacted laws restricting the ability of individuals under 21 to purchase or use firearms. *See, e.g.*, *NRA*, 700 F.3d at 202; 2-SER-438–40. By the early twentieth century, three more states restricted the purchase or use of firearms by persons under 21. *NRA*, 700 F.3d at 202. By 1923, over half of the states had set 21 as the minimum age for purchase or use of various firearms. *Id*. Such age restrictions were deemed constitutional under Second Amendment analogues in state constitutions[8] by "19th-century cases" and "legal scholar[s]." *Heller*, 554 U.S. at 610, 616; *see, e.g.*, *State v. Callicutt*, 69 Tenn. 714, 716–17 (1878) ("[W]e regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions."); *Coleman v. State*, 32 Ala. 581, 582 (1858). Those decisions cohere with the views of Judge Thomas Cooley—whose authority

---

[8] *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Texas Rev. L. & Politics 191, 193–204 (2006) (compiling state Second Amendment analogues).

*Heller* recognized, *see* 554 U.S. at 616–17—who wrote "that 'the State may prohibit the sale of arms to minors' pursuant to the State's police power." *NRA*, 700 F.3d at 203 (quoting Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883)).

This long tradition of firearm minimum age laws continues today. Since 1968, federal law has prohibited FFLs from selling handguns to persons under 21. 18 U.S.C. § 922(b)(1). At least 19 states and the District of Columbia currently restrict purchase or possession of handguns by persons under 21. 18 U.S.C. § 922(b)(1).[9] Contrary to NRA's claim, *see* Appellants' Opening Brief (Br.) at 26, five states also restrict the sale of *all* long guns or all firearms, not just SARs, to individuals under 21.[10] Thus, minimum age restrictions on firearm

---

[9] Cal. Penal Code § 27505(a); Conn. Gen. Stat. § 29-34(b); Del. Code Ann. tit. 24, § 903; D.C. Code § 22-4507; Fla. Stat. § 790.065(13); Haw. Rev. Stat. § 134-2(a), (d); 430 Ill. Comp. Stat. 65/3a, 65/4(a)(2)(i-5); Iowa Code § 724.22(2); Md. Code Ann., Pub. Safety § 5-134(d); Mass. Gen. Laws ch. 140, §§ 130, 131E(a); Mich. Comp. Laws. § 28.422(3)(b); Mo. Rev. Stat. § 571.080; Neb. Rev. Stat. §§ 69-2403, 69-2404; N.J. Stat. Ann. §§ 2C:58-3.3c, 2C:58-6.1(a), 2C:58-3c(4); N.Y. Penal Law §§ 400.00(1)(a), (12); Ohio Rev. Code Ann. § 2923.21(B); R.I. Gen. Laws §§ 11-47-35(a)(1), 11-47-37; Vt. Stat. Ann. tit. 13, § 4020; RCW 9.41.240; Wyo. Stat. Ann. § 6-8-404(d)(i)(A).

[10] Cal. Penal Code § 27510(a)–(c) (21 to purchase long guns with some exceptions); Fla. Stat. § 790.065(13) (21 to purchase any firearm); Haw. Rev. Stat. Ann. § 134-2(a), (d) (21 to purchase long guns); 430 Ill. Comp. Stat. 65/3a, 65/4 (21 to purchase any firearm) and 43.430 Ill. Comp. Stat. 65/2(a)(1), 65/4 (21 to possess any firearm); Vt. Stat. Ann. tit. 13, § 4020 (21 to purchase any firearm unless in possession of hunter safety certificate).

sales not only sweep more broadly than I-1639's Age Provision, but have deep historical roots.

### (3) Clear judicial consensus is that age restrictions fall outside the Second Amendment

Multiple courts have held that firearms age restrictions, particularly those for people under 21, fall outside the Second Amendment. In *NRA*, the Fifth Circuit rejected a Second Amendment challenge to the federal prohibition on handgun sales by FFLs to those under 21, 18 U.S.C. § 922(b)(1). 700 F.3d at 211. The court concluded that the age restriction was "consistent with a longstanding, historical tradition, which suggests that the conduct at issue falls outside the Second Amendment's protection." *Id*. at 203. A year later, the same court upheld a Texas law prohibiting persons under 21 from receiving concealed pistol licenses, concluding that the law "likely 'falls outside the Second Amendment's protection.'" *NRA v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (quoting *NRA*, 700 F.3d at 203). Nevertheless, both courts, "in an abundance of caution . . . proceed[ed] to step two" and upheld the minimum age restriction under intermediate scrutiny. *NRA*, 700 F.3d at 204; *McCraw*, 719 F.3d at 347.

Several other courts also have held that age-based firearms restrictions fall outside the Second Amendment. *See, e.g.*, *Jones v. Becerra*, No. 19-CV-1226-L-AHG, 2020 WL 6449198, at *5 (S.D. Cal. Nov. 3, 2020), *appeal docketed*,

No. 20-56174 (9th Cir. 2020) ("age-based restrictions like the one in [Cal. Penal Code] section 27510[,]" which prohibits 18- to 20-year-olds from purchasing a handgun or a semiautomatic centerfire rifle, are "longstanding, and presumptively Constitutional"); *Hirschfeld*, 417 F. Supp. 3d at 755–56 (upholding at step one federal minimum age requirement for handguns); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387–88 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015) (upholding at step one state law prohibiting persons under 21 from receiving concealed carry licenses); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (law restricting firearm possession by those under 21 was "historically rooted and not a core conduct subject to second amendment protection"); *see also United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (upholding federal age restriction on possession of handguns because "the right to keep arms in the founding period did not extend to juveniles"). The State is aware of no case invalidating an age-based restriction under the Second Amendment.

Rather than address these holdings, NRA argues that they do not apply because the "historical record" purportedly "lacks any evidence of laws restricting the right of young adults to purchase rifles." Br. at 19. NRA's argument misses the mark. First, historical state laws *did* apply to long guns (*i.e.*, rifles and shotguns), as well as to weapons like daggers. 2-SER-438–40; *see,*

*e.g.*, 16 Del. Laws 716, § 1 (1881); 1895 Neb. Laws 237-38, Art. XXVI, §§ 2, 5; 1883 Mo. Laws 76, § 1274; *State v. Quail*, 92 A. 859, 859 (Del. Gen. Sess. 1914); *see also* 52 Cong. ch. 159 § 5, 27 Stat. 116, 117 (1892) (prohibiting sale of "any deadly or dangerous weapons" in District of Columbia to "any minor under the age of twenty-one").

Second, minimum age laws on handgun purchases demonstrate that age restrictions *on firearms* are longstanding and constitutional. In cases upholding those laws, the determinative issue was age, not firearm type. *See, e.g.*, *NRA*, 700 F.3d at 202–04 ("age-based restrictions on the purchase of *firearms* . . . comport[] with the Second Amendment guarantee") (emphasis added); *Jones*, 2020 WL 6449198, at *5 ("Although the regulations in question in *NRA* . . . involve the prohibition of different weapons, the historical backdrop of age-based restrictions is the same."). NRA cites no authority for the proposition that SARs somehow receive greater Second Amendment protection than firearms in general, nor explains how prohibiting SAR sales to 18- to 20-year-olds could be unconstitutional when the parallel federal age restriction for handguns—"the quintessential self-defense weapon," *Heller*, 554 U.S. at 629—has uniformly withstood Second Amendment challenges. *See NRA*, 700 F.3d at 188;

24

*Hirschfeld*, 417 F. Supp. 3d at 755. The Age Provision falls outside the historical scope of the Second Amendment.

### (4)    Militia laws do not undercut the historical analysis

Ignoring this authority, NRA argues that founding-era laws requiring 18- to 20-year-olds to serve in the militia vests those persons with an individual right to own and purchase firearms. Br. at 16–18. But *Heller* specifically described the Second Amendment as a "right unconnected with militia service." 554 U.S. at 605. And the Fifth Circuit soundly rejected this argument when NRA previously raised it: "[T]he right to arms is not co-extensive with the duty to serve in the militia. . . . And this is all not to mention the anachronism at play: we no longer have a founding-era-style militia." *NRA*, 700 F.3d at 204 n.17; *accord Powell*, 926 F. Supp. 2d at 387 n.18; *People v. Jordan G.*, 33 N.E.3d 162, 168 (Ill. 2015). Neither the Ninth Circuit nor any other court of which the State is aware has interpreted *Heller* to apply a "militia" standard when evaluating aged-based firearms regulations. *See, e.g.*, *People v. Aguilar*, 2 N.E.3d 321, 329 (Ill. 2013) ("although many colonies *permitted* or even *required* minors to own and possess firearms for purposes of militia service, nothing like a *right* for minors to own and possess firearms has existed at any time in this nation's history").

A close reading of militia laws further undermines NRA's position. The Militia Act of 1792 did much more than define who may serve in a militia. Militia Act of 1792, 2 Cong. ch. 33, 1 Stat. 271. Congress mandated that every person suitable for the "National Defence" be "enrolled in the militia." *Id.* at 271. As to who qualified, the law was clear: "every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years, and under the age of forty-five years . . . ." *Id.* Thus, the militia did not include women, non-whites, disabled persons, or anyone over 44. NRA selectively focuses on 18-year-olds' eligibility, while overlooking the remaining qualifications. The purpose of the law was not to define Second Amendment rights, but to create an organized "national defence." 1 Stat. at 271. Federal law has long distinguished between who may qualify for military service and who may purchase certain firearms. Eighteen-year-olds may serve in the military and use handguns in their service, as may 17-year-olds with parental consent. 10 U.S.C. § 505(a). But federal law also bars FFL sales of handguns to 18-year-olds, and of any firearms to 17-year-olds. 18 U.S.C. § 922(b)(1). The statutes are consistent because they serve different purposes.

NRA further ignores that under the 1792 Militia Act, states had discretion to impose age qualifications on service, *see* 1 Stat. at 272, the "minimum age"

threshold "varied wildly across the colonies and early states," *Powell*, 926 F. Supp. 2d at 387 n.18, and at least seven states chose to enroll only those age 21 or over.[11] NRA's reliance on more recent militia laws, including 10 U.S.C. § 246, fares no better. That law, which limits members of the National Guard (the modern "militia") to 17- to 44-year-olds, cannot define the Second Amendment's scope, unless NRA's position is that 17-year-olds enjoy its full protections while persons older than 44 do not. Nor does NRA acknowledge that government militias, like the armed forces, have "strict rules" requiring significant firearms training and safety precautions. *Jones*, 2020 WL 6449198, at \*5. In sum, as every court to have considered the question has ruled, militia laws are not relevant to the scope of the Second Amendment.

---

[11] *See* An Act to establish an Uniform Militia throughout this State, ch. XLIX, §§ 1–2, 4, *in* 4 M. Bradford & R. Porter, eds., *Laws of the State of Delaware* 123, 123–24, 125–26 (1816); R. H. Clark et al., eds., *The Code of the State of Georgia*, pt. 1, tit. 11, ch. 2, §§ 981, 1026, at 189, 199 (1861); Kan. Const. of 1859, art. 8, § 1; An Act to exempt minors from Militia Duty in time of peace (1829), in Josiah Harrison, ed., *A Compilation of the Public Laws of the State of new Jersey Passed Since the Revision in the Year 1820*, at 266 (1833); N.C. Const. of 1868, art. XII, § 1; An Act to regulate the Militia, § 2, in 1843 Ohio Acts 53, 53; An Act for the Organization, Discipline, and Regulation of the Militia of the Commonwealth of Pennsylvania, No. 211, § 1, *in* 1864 Pa. Laws 221, 221–22; *see also* An Act for raising levies and recruits to serve in the present expedition against the French, on the Ohio, ch. II, §§ I–III (1754), *in* 6 William Waller Henning, *The Statutes at Large: Being a Collection of All the Laws of Virginia* 438–39 (1823).

This Court should affirm the District Court's conclusion that, based on the historical record, the Age Provision does not implicate the Second Amendment.

### 3. The Age Provision withstands intermediate scrutiny

Should this Court, like the District Court, proceed to step two "out of an 'abundance of caution,'" ER-16 (quoting *NRA*, 700 F.3d at 204), it should affirm and hold that the Age Provision withstands intermediate scrutiny.

### a. This Court's approach to the level of scrutiny

At step two, the level of scrutiny depends on two factors: "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Chovan*, 735 F.3d at 1138 (cleaned up). Strict scrutiny applies only to a law that (1) "implicates the core of the Second Amendment right" (namely, the right to defend one's home), *and* (2) "severely burdens that right." *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (cleaned up). Where a law carves out exceptions, it may alleviate the impact so as to render any burden on the core right non-severe. *Chovan*, 735 F.3d at 1138. There "has been near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *Torres*, 911 F.3d at 1262 (cleaned up).

28

> **b.**    **The Age Provision does not "severely" burden the "core" right of "responsible individuals" to self-defense at home**

The "core right" of the Second Amendment is that of "responsible" individuals to possess firearms for self-defense in the home. *Heller*, 554 U.S. at 630. NRA acknowledges as much, Br. at 22, but notes that Second Amendment protection is not *limited* to self-defense in the home, Br. at 21. Nevertheless, "in considering the first question to determine the appropriate level of scrutiny," this Court examines only "the proximity of the challenged law to the core of the Second Amendment right." *Torres*, 911 F.3d at 1262 (cleaned up). And "*Heller* tells us that the core of the Second Amendment is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Chovan*, 735 F.3d at 1138 (quoting *Heller*, 554 U.S. at 635). A "severe" burden, in turn, is one that "substantially prevent[s] law-abiding citizens from using firearms to defend themselves in the home." *Jackson*, 746 F.3d at 964. For at least four reasons, the Age Provision does not burden this core right at all, let alone "severely."

First, notwithstanding NRA's mischaracterization of I-1639 as a "blanket ban," 18- to 20-year-olds may legally possess SARs, including for self-defense in the home. Br. at 15; *see* RCW 9.41.240(3)(a), 9.41.042(8); 4-SER-862. In fact, all three adolescent Appellants legally owned SARs *before* turning 21.

1-SER-217; 2-SER-354, 415. Laws that restrict the sale of arms but preserve individuals' ability to possess them in the home do not impose severe burdens on the Second Amendment's core right. *See, e.g.*, *Jackson*, 746 F.3d at 970 (no severe burden because law "affects only the *sale* of hollow-point ammunition, [so] San Franciscans are free to use and possess hollow-point bullets within city limits"); *Pena*, 898 F.3d at 977 (no severe burden because "statute does not restrict *possession* of handguns in the home or elsewhere"); *NRA*, 700 F.3d at 207 (handgun minimum age law did not strike at Second Amendment's core because "18-to-20-year-olds may possess and use handguns for self-defense, hunting, or any other lawful purpose" and "they may acquire handguns from responsible parents or guardians").

Second, the Age Provision does not restrict the ability of 18- to 20-year-olds to purchase long guns other than SARs—including shotguns and non-semiautomatic rifles. ER-9; *see* RCW 9.41.010(26). It is undisputed that such firearms are good—even "ideal"—self-defense options. *Supra* at 11. Because the Age Provision leaves adequate "alternative channels for self-defense," it does not "place a severe burden on the [core] Second Amendment right." *Jackson*, 746 F.3d at 961, 968 (prohibition on sale of hollow-point bullets not severe burden where "[t]here is no evidence in the record indicating that ordinary

bullets are ineffective for self-defense"). NRA does not allege that the "hundreds of firearms available for purchase" by 18- to 20-year-olds "are inadequate for self-defense," so their "being unable to purchase a subset of semiautomatic weapons, without more, does not significantly burden the right to self-defense in the home." *Pena*, 898 F.3d at 978–79.

Third, 18- to 20-year-olds have historically not been considered "responsible." Accordingly, they traditionally have not received the same panoply of rights as adults, including the rights to vote, serve on juries, consume alcohol, gamble, or own firearms. *See supra* at 19; *see, e.g.*, *NRA*, 700 F.3d at 206 ("[R]estricting the presumptive Second Amendment rights of 18-to-20-year-olds does not violate the central concern of the Second Amendment" which protects "responsible" citizens because "Congress found that persons under 21 tend to be relatively irresponsible and can be prone to violent crime").

Courts have consistently upheld under intermediate scrutiny laws that restrict access to firearms by discrete groups of individuals, including 18- to 20-year-olds. *See, e.g.*, *NRA*, 700 F.3d at 211 (upholding minimum age requirement for handguns); *McCraw*, 719 F.3d at 349 (upholding law restricting rights of 18- to 20-year-olds to carry handguns in public). Likewise, in *Mai v. United States*, this Court upheld under intermediate scrutiny the lifetime federal ban on

possession of a firearm by anyone ever involuntarily committed to a mental institution, 18 U.S.C. § 922(g)(5), noting that the "Second Amendment allows categorical bans on groups of persons who presently pose an increased risk of violence." 952 F.3d 1106, 1116–17 (9th Cir. 2020); *see also* 4-SER-829.

The now-vacated panel decision in *Duncan v. Becerra* does not undermine this precedent and is inapposite. 970 F.3d 1133 (9th Cir. 2020), *vacated on reh'g en banc*, No. 19-55376, --- F.3d ----, 2021 WL 728825 (Feb. 25, 2021) (mem.). California's "wholesale ban on the possession"—not just sale—of large-caliber magazines in *Duncan* applied to "almost everyone, everywhere, and to nearly every weapon that can be reasonably expected for use in self-defense." *Id.* at 1141. In contrast, the Age Provision is limited to sales to 18- to 20-year-olds and includes several "meaningful exceptions for law-abiding citizens" to possess and own SARs, including for self-defense. *Id.*; *see supra* at 29–30. Moreover, 18- to 20- year olds do not forfeit their previously owned SARs under I-1639. *Cf. Duncan*, 970 F.3d at 1156.

Fourth, any burden is alleviated by the Age Provision's inherently temporary nature. Firearm minimum age requirements "demand only an 'intermediate' level of scrutiny because they regulate commercial sales through an age qualification with temporary effect. Any 18-to-20-year-old subject to the

ban will soon grow up and out of its reach." *NRA*, 700 F.3d at 207. This Court has upheld under intermediate scrutiny various firearms restrictions due, in part, to their temporary effects. *See, e.g.*, *Fortson v. L. A. City Att'y's Office*, 852 F.3d 1190, 1194 (9th Cir. 2017) (upholding ban on domestic violence misdemeanants' possession of firearms where "it only [applies] . . . for ten years, rather than for life."); *Fisher v. Kealoha*, 855 F.3d 1067, 1071 n.2 (9th Cir. 2017) (upholding temporary ban on firearm possession while an alien's presence in the United States is unlawful); *see generally Stiles v. Blunt*, 912 F.2d 260, 265 (8th Cir. 1990) (minimum age laws receive "deferential standard of review" because they "do not result in an absolute prohibition but merely postpone the opportunity to engage in the conduct at issue."). As in *NRA*, the "temporary nature" of the Age Provision "reduces its severity." 700 F.3d at 207. At most, intermediate scrutiny applies.

### c. The Age Provision satisfies intermediate scrutiny

A law satisfies intermediate scrutiny when (1) the state's objective is "significant, substantial, or important"; and (2) there is a "reasonable fit" between the challenged regulation and the objective. *Jackson*, 746 F.3d at 965 (cleaned up). The regulation must "promote[ ] a 'substantial government interest that would be achieved less effectively absent the regulation,'" but need not be

the "least restrictive means" of achieving the interest. *Fyock*, 779 F.3d at 1000 (cleaned up). Courts "do not impose an unnecessarily rigid burden of proof," and allow the state to "rely on any material reasonably believed to be relevant to substantiate its interests in gun safety and crime prevention," including "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." *Pena*, 898 F.3d at 979 (cleaned up). Owing deference to a state's "considered judgment," *id.* at 983, courts give it "a reasonable opportunity to experiment with solutions to admittedly serious problems," *Jackson*, 746 F.3d at 966 (cleaned up).

### (1)    I-1639 addresses significant government interests

NRA attempts to artificially narrow I-1639's purpose to reducing mass shootings only, Br. at 29, ignoring the broader purpose set forth in I-1639's text: "to increase public safety and reduce gun violence." 1-SER-116. Certainly, preventing mass shootings is an important part of public safety and reducing gun violence. But the measure is not so limited. "[C]ountless cases support" the principle that "public safety and crime prevention are substantial government interests." *Pena*, 898 F.3d at 981–82. Washington undisputedly has a significant interest in reducing the risk and severity of gun violence.

### (2)    The Age Provision has a "reasonable fit" with reducing gun violence and increasing public safety

NRA erroneously argues that a law must be "narrowly tailored" to satisfy intermediate scrutiny. Br. at 28. But intermediate scrutiny requires only that a measure "reasonabl[y] fit" an "important" state objective. *Fyock*, 779 F.3d at 1000. "Intermediate scrutiny does not require that [the law] be the *least* restrictive means of reducing handgun-related deaths." *Jackson*, 746 F.3d at 966; *Gould*, 907 at 674 ("[A] legislature's chosen means need not be narrowly tailored to achieve its ends.").

The Age Provision satisfies intermediate scrutiny because it reasonably fits Washington's interest in promoting public safety and reducing gun violence. Extensive and unrebutted evidence—including scientific research, crime data, and legislative findings—demonstrates that: key regions of the brain do not fully mature until the twenties; 18- to 20-year-olds disproportionately commit violent crimes and attempt suicide; SARs are more lethal and used more frequently in mass shootings than other firearms; 18- to 20-year-olds have committed gun violence in Washington and nationally; and that minimum age restrictions have yielded public health and safety benefits in other areas. ER-21; 4-SER-832–37.

This evidence confirms that age-based limitations on SARs are "reasonably suited to achieve" Washington's interests. *Silvester*, 843 F.3d at 827.

NRA failed to rebut these facts with "significant probative evidence." *See Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007); 1-SER-83–84. Its conclusory claim on appeal that this evidence is "contested" is belied by the dearth of record citations. Br. at 13; ER-19, 44–45. NRA put forth no contrary expert witnesses, did not challenge the qualifications of the State's experts nor address their contentions in summary judgment briefing, and did not claim it needed further discovery. NRA failed to create any genuine dispute of material fact.

### (a) Impulsivity control and judgment do not fully mature until the twenties

Scientific evidence logically supports the decision of Washington voters to limit sales of SARs to adults 21 and older. The State's unrebutted neuroscience and developmental psychology experts established clear scientific consensus that the capacity to govern impulsivity, regulate emotions, avoid risk, plan for the future, and exercise responsible judgment do not fully mature until after age 20. 3-SER-664–75; 4-SER-760–76. Courts consistently have reached the same conclusion. *See e.g.*, *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("[P]arts of the brain involved in behavior control continue to mature through

late adolescence."); *Horsley v. Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015) ("The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences . . . .") (quoting scientific expert); *NRA*, 700 F.3d at 210 n.21 ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over.").

### (b) 18- to 20-year-olds disproportionately commit violent crimes

Individuals aged 18 to 20 disproportionately commit crimes, including violent crimes involving firearms. Although this age group comprises only 4.4% of the population, it accounts for approximately one-quarter of firearm homicides committed where an offender was identified. *NRA*, F.3d at 209; 2-SER-263, 455. This age group also disproportionately accounts for violent crime arrests, including 15.5% of murder and non-negligent manslaughter, 17.1% of robbery, 11.1% of rape, and 11.5% of weapons offense arrests. 2-SER-261.

The statistics are even starker when analyzing school shootings. "[M]ore than [208,000] students attending at least [212] schools have experienced a shooting on campus since the Columbine mass shooting in 1999." 1-SER-116. When I-1639 was enacted, five of the previous six school shooters had used a

37

SAR. 2-SER-307. And of all "active shooters" since 1970, more than 80% were under 21. 3-SER-468. Of all active shooters in schools, nearly 75% were under 21 and 14% were between 18 and 21, despite the group comprising less than 5% of the population. 1-SER-46, 52. Such evidence provides a reasonable fit between the Age Provision and the State's public safety interests. *See Mai*, 952 F.3d at 1116.

### (c) Minimum age laws are effective in addressing health and safety concerns

As the District Court found, "[l]aws raising the minimum legal age to engage in certain behaviors to 21 have effectively addressed other public health and safety concerns." ER-20. Raising the minimum age to drink alcohol to 21 reduced alcohol-related auto crashes. *Id.*; 3-SER-485. And raising the age to purchase tobacco to 21 is expected to prevent an estimated 249,000 deaths among people born in the past 20 years. ER-20; 3-SER-490, 510–14. It was reasonable for Washington's voters to anticipate that minimum age requirements for firearms would also yield public health benefits.

### (d) SARs are more dangerous and used by mass shooters more than other firearms

As the State's experts explained, SARs "are demonstrably more lethal" when used in mass shootings, 3-SER-612, particularly because of "the number

38

of bullets that can be shot in a very short period of time," 3-SER-568. Semiautomatic firearms result in higher mortality rates than non-semiautomatic, and require on average 4.12 more days of hospitalization. 3-SER-475. Many SARs shoot bullets at higher speeds and have more lethal impacts compared to semiautomatic handguns. *See supra* at 11. As a result, U.S. school shootings involving rifles have casualty rates nearly 10 times higher and fatality rates nearly 15 times higher than those involving handguns. 1-SER-71–72. Active shooter incidents involving SARs also are associated with more injuries and deaths. 1-SER-54. NRA contested none of these facts.

In fact, as NRA admits, SARs are easy for inexperienced shooters to operate. 1-SER-54; 2-SER-244, 251–53. This aspect is particularly relevant in Washington: in 2016, a 19-year-old in Mukilteo studied the manual for his newly purchased AR-15-style SAR before walking into a party and opening fire, killing three people. 1-SER-160; 3-SER-593, 595. Given these factors, it is not surprising that several states and localities have enacted total prohibitions on assault weapons, which federal courts have upheld. *See supra* at 16.

### (e)    NRA's arguments are without merit

Ignoring this evidence, NRA raises two unavailing arguments. It first argues that I-1639 would not necessarily prevent every bad actor from obtaining

a SAR. Br. at 29. But a firearms law need not entirely "eliminate gun violence" where it reduces the risk (or even the "perceived risk") of a "mass shooting." *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015). Prohibiting 18- to 20-year-olds from purchasing SARs will limit the opportunities of a "presumptively risky" group to access a categorically more dangerous weapon. *See Mai*, 952 F.3d at 1116; *Bauer v. Becerra*, 858 F.3d 1216, 1223 (9th Cir. 2017). That is all intermediate scrutiny requires.[12]

Second, NRA's speculative theory that the Age Provision "actually subverts" public safety objectives baselessly presumes that background checks would disqualify adolescent SAR purchasers bent on using them for violence. Br. at 29. It also assumes—again without evidence—that the Age Provision stimulates demand for black market purchases. Without any reason to suppose such unintended consequences are likely, voters were entitled to weigh their theoretical risk against the Age Provision's tangible benefits in reducing older adolescents' legal access to SARs. *See Pena*, 898 F.3d at 980 ("The legislative

---

[12] Even under strict scrutiny, NRA's claim of "underinclusivity is not itself fatal." *Mance*, 896 F.3d at 393 (citing *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) ("A State need not address all aspects of a problem in one fell swoop . . . .")).

judgment that preventing cases of accidental discharge outweighs the need for discharging a gun without the magazine in place is reasonable.").

In sum, the people's decision to limit the often deadly mix of 18- to 20-year-olds and SARs reasonably fits with Washington's substantial interests in increasing public safety and reducing gun violence.

### 4. Even if strict scrutiny applied, the Age Provision would meet it

Even if strict scrutiny applied, the Age Provision would still pass constitutional muster. Washington's interests in reducing gun violence and promoting public safety are compelling. *See Schall v. Martin*, 467 U.S. 253, 264 (1984). Its prohibition on purchases, by a discrete, high-risk group, of one dangerous type of weapon used disproportionately in mass shootings, is "narrowly tailored" to advance those interests.[13] And the law leaves ample alternative channels for exercise of Second Amendment rights. *Supra* at 29–30; *see, e.g.*, *Chovan*, 735 F.3d at 1152 (Bea, J., concurring) (law prohibiting

---

[13] NRA faults I-1639 for defining SAR to include all semiautomatic rifles, *e.g.*, Br. at 3, but offers no alternative and itself has criticized the assault weapon "features test." *See* 4-SER-836. That test has been circumvented by firearms manufacturers and criminals through minor modifications that leave "overall functionality undiminished." 2-SER-285, 386–88; 3-SER-617. I-1639 avoids that result by defining SAR by its firing action.

convicted domestic violence misdemeanants from possessing firearms passes strict scrutiny).

### 5. NRA's proposed common use test contravenes binding law

Finally, although NRA recites the governing two-step Second Amendment framework, it misapplies it and instead suggests a different standard that no court has adopted: a challenged firearm law is *per se* unconstitutional if it regulates firearms in "common use." Br. at 4–5, 24–25. Having reaffirmed the two-step Second Amendment framework in at least fifteen decisions, this Court should reject NRA's attempt to leapfrog "circuit precedent" that "remains binding." *United States v. Henry*, 688 F.3d 637, 642 (9th Cir. 2012).

*Heller* did not hold that laws prohibiting the sale of firearms in "common use" are *per se* unconstitutional. Br. at 24. Far from it. *Heller* invalidated a total ban on handgun possession because it infringed the core right of "responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. "[N]othing in our opinion," the *Heller* Court cautioned, "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . laws imposing conditions and qualifications on the commercial sale of arms," or other such "presumptively lawful regulatory measures." *Id*. at 626–27 & n.26. In *McDonald v. City of Chicago*, the Court reiterated that "the

right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626).

NRA's other cited decisions also do not prescribe a common use test. They instead analyze firearm "common use" only as a threshold matter under step one of the framework: whether a firearm may be "dangerous and unusual" such that it falls outside the Second Amendment altogether. *See Fyock*, 779 F.3d at 997; *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015); *see also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1028 (2016) (per curiam) (state court erred in "equating 'unusual' with "in common use *at the time of the Second Amendment's enactment*") (emphasis added). Moreover, the *Duncan* panel expressly rejected such a test. 970 F.3d at 1143 n.6 (the "'simple *Heller* test' conflicts with our court's two-step inquiry").

Even if SARs' popularity were relevant, NRA failed to put forth any evidence of 18- to 20-year-olds' ownership or purchases of SARs. NRA's only source—ATF data as interpreted by a gun industry lobbying group—compiles *manufacturing* and *import* data rather than sales data. *See* Br. at 5. The data does not differentiate between SARs and other types of rifles, nor is it a reliable proxy for private ownership since it includes firearms manufactured or imported for

law enforcement or the military. *See* ER-56, 60, 62. Further undercutting any assumption about SARs' popularity is the fact that half of all U.S. firearms are owned by just 3% of the population. *See* Deborah Azrael, *et al.*, *The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey* 43 (Oct. 2017), https://www.jstor.org/stable/10.7758/rsf.2017.3.5.02# metadata_info_tab_contents. Rifle ownership is likely even more concentrated than handgun ownership. *Id.* at 44. NRA's industry-supplied estimates do not prove that SARs are commonly owned, let alone by 18- to 20-year-olds. To the contrary, the only direct record evidence of SARs' popularity indicates that Washingtonians purchase just one-tenth as many SARs as pistols. *See* 3-SER-591.

Even if it were true that SARs are "the second most popular choice" of firearm, Br. at 9, NRA never explains how prohibiting sales of SARs to 18- to 20-year-olds could violate the Second Amendment when courts have consistently rejected constitutional challenges to the parallel federal age restriction for handguns—the *most* common firearm, as NRA concedes, and "the quintessential self-defense weapon." *Heller*, 554 U.S. at 629; *see NRA*, 700 F.3d at 188; *Hirschfeld*, 417 F. Supp. 3d at 755–56. The Age Provision is constitutional, too.

**B.** **Mitchell's Challenge to the Nonresident Sales Provision Fails**

**1.** **Dormant Commerce Clause framework**

The dormant Commerce Clause protects against state programs of "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015) (cleaned up). In reviewing dormant Commerce Clause challenges, courts "follow a two-tiered approach." *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 444 (9th Cir. 2019). The first question is whether a "state statute directly regulates or discriminates against interstate commerce." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.* (*Brown-Forman*), 476 U.S. 573, 579 (1986). If so, the law is invalid unless the state "has no other means to advance a legitimate local purpose." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007).

If not, the law is constitutional if it "effectuate[s] a legitimate local public interest" and the "the burden imposed on [interstate] commerce is [not] clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). A "*substantial* burden on *interstate commerce*" is a "critical requirement" of a dormant Commerce Clause violation. *Nat'l Ass'n of*

*Optometrists & Opticians v. Harris* (*Optometrists II*), 682 F.3d 1144, 1148 (9th Cir. 2012). Indeed, "[c]ourts may not assess the benefits of a state law" that is nondiscriminatory "unless [it] . . . imposes a significant burden on interstate commerce." *Rosenblatt*, 940 F.3d at 452 (cleaned up).

Finally, "state actions which [Congress] plainly authorizes are invulnerable to constitutional attack under the Commerce Clause." *Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985).

### 2.    Mitchell lacks standing

As a threshold matter, Mitchell lacks standing. To establish standing, Mitchell "first must clearly demonstrate that he has suffered an injury in fact . . . that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). He must also "satisfy the 'causation' and 'redressability' prongs . . . by showing that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Id.* (cleaned up). Mitchell "bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At "the summary judgment stage, [Mitchell] can no longer rest on . . . mere allegations, but must set forth by

affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (cleaned up).

Mitchell has failed to meet this burden. He alleges that, "prior to the passage of I-1639, approximately 30% of my sales of semi-automatic rifles were to residents of other states," and that "I have lost significant sales to prospective out-of-state purchasers" since its adoption. ER-115; *accord* 4-SER-881. As the District Court found, however, "no actual evidence supports [Mitchell's] bare allegation of diminished sales"—not even of a single lost sale. ER-23. Mitchell's purported economic injury is thus entirely "speculative," and insufficient to establish standing. *Whitmore*, 495 U.S. at 155; *see, e.g.*, *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1232 (10th Cir. 2012) (county lacked standing where official's "conclusory" affidavit "attests the county is harmed by a reduction in sales revenue," but "provides no underlying evidence").

Mitchell's claim of unspecified lost sales is especially inadequate in light of his refusals to disclose details of his alleged injury. When asked to provide documents evidencing his lost sales, Mitchell objected and declined. 3-SER-519–27. When asked during his deposition about his claim that 30% of his pre-Initiative SAR sales were to nonresidents, Mitchell conceded having consulted no records or data in arriving at that "ballpark estimate." 2-SER-338. Thus,

47

Mitchell's claim of injury is based entirely on his own say-so. That is insufficient because "on summary judgment, a party cannot establish standing with 'conclusory allegations of an affidavit.'" *Humane Soc'y of the United States v. Perdue*, 935 F.3d 598, 603 (D.C. Cir. 2019) (quoting *Lujan*, 497 U.S. at 888); *see also Swanson Group Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015) (declaration asserting "economic loss and hardship," which "told nothing about the nature" of the loss, insufficient to establish standing).

Mitchell also cannot establish causation because he may still sell SARs to nonresidents through FFL-to-FFL transfer. As explained in more detail in the next subsection, I-1639 prohibits only direct, in-person sales of SARs to nonresidents, leaving Mitchell free to sell SARs indirectly to nonresidents via an out-of-state FFL. *Infra* at 49–55. According to Mitchell, FFL-to-FFL transfer appears to be the primary method by which nonresidents seek to acquire SARs from him. ER-115. Because I-1639 allows indirect nonresident purchases, whatever such sales Mitchell has foregone are not "fairly . . . traceable" to the Initiative. *Clapper*, 568 U.S. at 418.

Mitchell disagrees that I-1639 permits SAR sales to nonresidents through FFL-to-FFL transfer. Br. at 9–12. But even if his atextual reading were plausible, he would still lack standing to challenge the law on that basis pre-enforcement.

The Washington Attorney General, the Washington Department of Licensing Director, and Sheriff Chuck Atkins—who has criminal jurisdiction over Mitchell's business, *see* 4-SER-874—have publicly confirmed that the Nonresident Sales Provision allows FFL-to-FFL transfer of SARs to nonresidents. 2-SER-406. Mitchell thus cannot "demonstrate the necessary injury in fact where the enforcing authority [has] expressly interpreted the challenged law as not applying to [his] activities." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010). Mitchell "cannot . . . create a justiciable case or controversy simply by misreading statutes and claiming as injury fears born of [his] own error." *W. Min. Council v. Watt*, 643 F.2d 618, 626 (9th Cir. 1981). The State's reading of the Nonresident Sales Provision is not only the correct one, but it precludes Mitchell from establishing a "genuine threat of imminent prosecution" and forecloses his dormant Commerce Clause claim as a matter of subject matter jurisdiction. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (cleaned up).

### 3. I-1639 does not directly regulate interstate commerce because it does not prohibit FFL-to-FFL transfer of SARs

Mitchell asserts that the Nonresident Sales Provision "directly bans interstate commerce in which the State has no interest" by purportedly prohibiting "interstate FFL-to-FFL sales." Br. at 9–10 (capitalization omitted).

Mitchell appears to contend for the first time on appeal that I-1639 triggers strict scrutiny because it "directly regulates"—as opposed to "discriminates against"—interstate commerce.[14] Because Mitchell did not make that argument in the District Court, having relied solely on a "discrimination" theory, ER-45–47, it is forfeited. *See Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009).

Regardless, Mitchell's new direct regulation theory falls flat. It depends on the false premise that I-1639 prohibits SAR sales to nonresidents via FFL-to-FFL transfer. Mitchell takes the absurd position that he is prohibited from selling SARs to out-of-state residents through FFL-to-FFL transfer, despite being told by all relevant authorities that he, in fact, may do so. As the District Court correctly held, "just as for handguns, a nonresident may still purchase a[] SAR through an FFL-to-FFL transfer." ER-11.

---

[14] A state law "directly regulates" interstate commerce when it "directly affects transactions that take place across state lines or entirely outside of the state's borders." *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 614 (9th Cir. 2018). A law "discriminates" against interstate commerce by "providing benefits to in-state economic interests while burdening out-of-state competitors." *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013) (cleaned up).

### a.  The text supports the District Court's reading

Under its plain language, the Nonresident Sales Provision applies only to a nonresident's SAR "purchase" that occurs "in Washington." RCW 9.41.124. "Purchase" means "procure, acquire, or obtain." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1569 (1996). In an FFL-to-FFL transfer, the buyer makes payment or a promise of payment (without paying Washington tax[15]), but does not *obtain* the firearm from the Washington FFL. Rather, as Mitchell acknowledges, the buyer procures the firearm from an FFL in another state only after it runs a background check pursuant to that state's laws. Br. at 11; 3-SER-551. As a textual matter, then, the Nonresident Sales Provision permits such a transaction because it is simply not a "purchase . . . in Washington." RCW 9.41.124.

This interpretation is consistent with the statutory definition of "sale," which means "the actual approval of the delivery of a firearm in consideration of payment or promise of payment." RCW 9.41.010(25). The statute does not define "purchase," but it is a "maxim of statutory construction that similar terms appearing in different sections of a statute should receive the same interpretation." *United States v. Nordbrock*, 38 F.3d 440, 444 (9th Cir. 1994).

---

[15] RCW 82.32.730(1)(b); WAC 458-20-193(2), (203)(a)–(b); 1-SER-91.

Here, it is reasonable to presume that an "average informed voter" read the parallel terms "purchase" and "sale" to have parallel meanings. *See Amalgam. Transit Union Local 587 v. State*, 11 P.3d 762, 780 (Wash. 2000), *corrected*, 27 P.3d 608 (2001).

Mitchell's argument would require the Court to assume just the opposite—that voters understood "sale" to mean something different from "purchase"—while providing no reason to take that illogical leap. *See* Br. at 12 (arguing that the Nonresident Sales Provision "bans certain ***purchases***, not ***sales***" and "a purchase can take place without a sale"). Contending that "these terms have firearms-specific federal definitions," *id.* at 10, Mitchell overlooks that the GCA defines neither "purchase" nor "sale." 18 U.S.C. § 921.[16] Washington firearms law defines "sale" only, and Mitchell admits that a Washington FFL who transfers a SAR to an out-of-state FFL "does not 'sell' the firearm as that term is defined under [state] law." Br. at 11. Mitchell insists that it is "possible to have a firearms ***purchase*** without a firearms ***sale***," but fails to give a textual basis for his "counterintuitive" construction. Br. at 11. The Court

---

[16] Although it does not define "purchase" or "sale," the GCA's definitions section uses those terms in parallel ways, suggesting they should be understood to have similar meanings. *See, e.g.*, 18 U.S.C. § 921(a)(21).

should reject it as inconsistent with the statute's plain language and common sense.

### b.    I-1639's purpose confirms its text

Mitchell's view also cannot be squared with I-1639's expressed intent to regulate SARs in the same ways as handguns. Under federal law, nonresidents may purchase handguns through FFL-to-FFL transfer but not in person. 18 U.S.C. § 922(b)(3). As the Voters' Pamphlet explained, I-1639 would "require[] the same standards for purchasing [SARs] that are already required for handguns." 2-SER-307; *see also* 2-SER-304. An "average informed voter" would understand the Nonresident Sales Provision to preclude in-person SAR sales only, not the FFL-to-FFL transfer process. *See Amalgam. Transit Union*, 11 P.3d at 780. Accordingly, I-1639's "purpose reinforces what language already indicates": the Nonresident Sales Provision does not apply to indirect FFL-to-FFL transfers. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006).

### c.    I-1639 is consistent with federal law

The District Court's reading also harmonizes I-1639 with federal law. The GCA prohibits an FFL in one state from selling firearms to a resident of another unless (1) the firearm is a rifle or shotgun; (2) the sale takes place "in person";

and (3) the laws of "both such States" permit it. 18 U.S.C. § 922(b)(3). In turn, I-1639 expressly allows residents of other states to purchase "rifles and shotguns . . . in Washington," "except [SARs]." RCW 9.41.124. Thus, an FFL may not ship a SAR *directly* to a non-FFL buyer in another state, because that transaction would violate § 922(b)(3)'s requirement that sales to nonresidents be "in person." Nor may a Washington FFL sell a SAR directly to a nonresident "in Washington," RCW 9.41.124, because it would not "fully comply" with Washington's "legal conditions of sale," 18 U.S.C. § 922(b)(3). But federal law allows an FFL to sell a rifle *indirectly* to a nonresident through an out-of-state FFL, because that is not considered a sale by the original FFL to the nonresident end-purchaser. 18 U.S.C. § 922(a)(2); 3-SER-551. The Nonresident Sales Provision, which expressly incorporates the "applicable provisions of the [GCA]," RCW 9.41.124, should be construed the same way. *See Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring in part) ("statutes *in pari materia* should be interpreted harmoniously"); *Am. Petroleum Inst. v. Cooper*, 718 F.3d 347, 354 (4th Cir. 2013) ("[W]hen determining the interplay of the federal and state statutes at issue, we are obliged to attempt to harmonize those statutes if reasonably possible.").

### d. Interpretive canons support the District Court's reading

Two canons of construction also forbid Mitchell's expansive interpretation. First, under the rule of lenity, the Nonresident Sales Provision should be cabined to its text to prohibit only direct SAR sales to nonresidents while they are "in Washington." *See United States v. Lanier*, 520 U.S. 259, 266 (1997); *State v. Watson*, 154 P.3d 909, 916 (Wash. 2007). Second, the avoidance canon instructs that courts should construe laws to avoid constitutional difficulties when "consistent with the purposes of the statute." *In re Williams*, 853 P.2d 444, 448 (Wash. 1993). This doctrine also weighs against reading I-1639 to prohibit interstate FFL-to-FFL transfers of SARs, which would push the law closer to the constitutional line.[17]

The District Court's interpretation of the Nonresident Sales Provision was correct, and I-1639 does not directly regulate interstate commerce.

---

[17] But not over the line. The Nonresident Sales Provision would still be constitutional even if it did prohibit interstate SAR sales through FFL-to-FFL transfer because it is "demonstrably justified by a valid factor unrelated to economic protectionism." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 402 (1994); *see infra* at 65–67. If the Court disagrees, however, it should not strike down the provision on that basis but instead certify the question to the Washington Supreme Court. *See* RCW 2.60.020; *Moy v. Cowen*, 958 F.2d 168, 170 (7th Cir. 1992) (per curiam).

### 4. I-1639 does not discriminate against interstate commerce

Properly understood to bar only direct, in-person SAR sales to nonresidents, the Initiative plainly does not "discriminate" against interstate commerce—a point Mitchell appears to concede. *See* Br. 35. The term "discrimination" has a specific meaning in the dormant Commerce Clause context: "economic protectionism, or discrimination, 'simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994)). "The crucial inquiry . . . [is] whether [the law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).[18]

---

[18] Misreading *City of Philadelphia*, Mitchell denies the dormant Commerce Clause's central anti-protectionist purpose, asserting that "it is *protectionism of any kind* that is *per se* unconstitutional, not just economic protectionism." Br. at 34. This ignores not only the inherently economic meaning of the word "protectionism," but also the dormant Commerce Clause's essential focus on *commerce*. *City of Philadelphia* held that a ban on out-of-state waste was "protectionist" because it "impose[d] on out-of-state *commercial interests* the full burden of conserving the State's remaining landfill space," without providing "*some reason*, apart from their origin, to treat them differently." 437 U.S. at 627 (emphasis added). By contrast, Washington bars in-state SAR

Mitchell "bears the burden of establishing that [I-1639] has a discriminatory purpose or effect." *Corey*, 730 F.3d at 1097. As the District Court correctly held, he failed to do so. First, although Mitchell alleged that the Initiative has caused him to lose SAR sales to nonresidents, "no actual evidence support[ed]" his claimed injury. ER-23. Mitchell thus "fail[ed] to adduce facts creating a genuine dispute on this threshold issue." *Id*. He does not address the District Court's conclusion or point to any evidence in the record to undercut it.

Second, the District Court held that "[e]ven if Mitchell's allegations were true, they would not establish discrimination under the Dormant Commerce Clause because they connote a burden to Washington economic interests," which is "the very opposite of economic protectionism." ER-23. Observing that "the likely economic beneficiaries of the Nonresident Sales Provision are *out-of-state* gun dealers," the District Court concluded that "the central concern of the Dormant Commerce Clause is not triggered and the Nonresident Sales Provision is nondiscriminatory." *Id.* at 23–24 (emphasis added) (citing inter alia *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d Cir. 2007)).

---

purchases by nonresidents not to "discriminate against interstate commerce as such," but because it cannot rely on enhanced background checks to determine whether nonresidents are prohibited purchasers. *Id.* at 629.

A "cardinal" principle of the Supreme Court's dormant Commerce Clause jurisprudence is that laws are discriminatory only when they "benefit in-state economic interests by burdening out-of-state competitors." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 199 (1994) (cleaned up). By definition, "differential treatment that benefits or does not affect out-of-state interests is not a violation of the dormant Commerce Clause." *Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1142 (10th Cir. 2016); *see also id.* at 1147 (10th Cir. 2016) (Gorsuch, J., concurring) ("I agree with everything the court has said").

For example, in *United Haulers*, the Supreme Court upheld an ordinance requiring trash haulers to deliver solid waste to a New York-owned processing plant. 550 U.S. at 342. The Court held that the law was nondiscriminatory in part because "the most palpable harm imposed by the ordinances—more expensive trash removal—is likely to fall upon" New Yorkers, including the "businesses of the Counties [that must] bear the costs of the ordinances." *Id.* at 345. The same is true of the Nonresident Sales Provision. Even if it did diminish Washington dealers' revenue due to lost in-person SAR sales to nonresidents, the Commerce Clause provides "no reason to step in and hand local businesses a victory they could not obtain through the political process." *Id.*

Mitchell's reliance on state-resource-hoarding cases is misplaced. Br. at 32–33. For example, *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, involved a quintessential law "burden[ing] out-of-state access" to a "natural resource" and "related services" unique to the state. 520 U.S. 564, 577 (1997). The Court struck down a Maine tax exemption unavailable to summer camps serving primarily out-of-state campers because, in purpose and effect, the law restricted nonresidents' access to "the natural beauty of Maine itself" and "the special services that the camp provides." *Id.*; *see also New England Power Co. v. New Hampshire*, 455 U.S. 331, 332, 339 (1982) (invalidating prohibition on selling hydroelectric energy outside the state as "simple economic protectionism" designed to gain an "economic advantage for New Hampshire citizens at the expense of [out-of-state] customers"); *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 9 (1928) (invalidating Louisiana law prohibiting export of unshelled shrimp outside the state).

The Nonresident Sales Provision is not of this ilk. Nothing in the record suggests that Washington somehow has a unique supply of SARs that are unavailable in other states. Mitchell has adduced no evidence, for example, that Oregon residents who might otherwise have purchased SARs from Mitchell would have any difficulty buying the same guns in their home state at the same

prices. In fact, Mitchell acknowledged that *Washington* residents often prefer to purchase firearms *in Oregon* to avoid paying sales tax or transfer fees. 2-SER-327–28. This is not a state-resource-hoarding case because, quite simply, SARs are not a product to which Washington has any special access. And even if it did, nonresidents remain able to purchase SARs from Washington firearms dealers through FFL-to-FFL transfer. *See supra* at 49–55.

Struggling to force the Nonresident Sales Provision into the ill-fitting mold of discrimination, Mitchell claims that the law "can . . . be described as 'benefitting' the 'economic interest' of in-state purchasers . . . at the expense of . . . out-of-state purchasers." Br. at 33. But Mitchell fails to explain—let alone support with specific facts—how the Nonresident Sales Provision would economically "benefit[ ] . . . in-state purchasers." Br. at 33.

Nor does the record contain any evidence of harms to prospective out-of-state SAR buyers. For that reason, among others, this case is not at all like *Brown-Forman*, in which a New York law designed to assure its residents "the lowest possible prices" of liquor required distillers to sell their products to wholesalers for no more than the lowest price offered in any other state. 476 U.S. at 579. The law violated the dormant Commerce Clause *per se* because, by "project[ing] its legislation into [other States] by regulating the price to be paid

for liquor in those States," New York was effectively "regulat[ing] out-of-state transactions." *Id.* at 582–83 (cleaned up). Not only does I-1639 not directly regulate sales in other states, *see supra* at 49–55, there is no evidence it has even an indirect impact on the prices of SARs (or any other commercial effects) in other states.

Finally, even if there were any evidence of economic harm to nonresident consumers, it would be insufficient to establish discrimination because they are not "similarly situated" to Washington residents. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1997) ("[A]ny notion of discrimination assumes a comparison of substantially similar entities."). *Tracy* upheld an Ohio law providing preferential tax treatment to in-state public utilities because they were not "similarly situated" to out-of-state fuel distributors. *Id.* at 298. Not only did they apparently "serve different markets," *id.* at 299, but "[s]tate regulation of natural gas . . . serves important interest in health and safety"—the "pursuit of" which the Court has "consistently recognized . . . as compatible with the Commerce Clause." *Id.* at 306.

Just so here. Out-of-state SAR buyers are not "similarly situated" to Washington purchasers because enhanced background checks cannot be effectively conducted on nonresidents, so their differential treatment serves

"important interests in health and safety." *Id.*; *see also Rosenblatt*, 940 F.3d at 451 (ordinance prohibiting home rentals unless primary resident remained on site did not discriminate against "non-resident property owners" because "they are not similarly situated to" local owners); *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown* (*Optometrists I*), 567 F.3d 521, 526 (9th Cir. 2009) (in determining whether in- and out-of-state economic actors are similarly situated, courts owe "deference to states' decisions regarding health and safety").

The District Court correctly held that Mitchell failed to carry his burden to show that I-1639 discriminates against interstate commerce.

### 5. The Nonresident Sales Provision is constitutional under *Pike*

Absent discrimination or direct regulation, a law need only meet the lenient *Pike* balancing test, under which courts "will uphold the law 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Corey*, 730 F.3d at 1087–88 (quoting *Pike*, 397 U.S. at 142). This Court has recognized that "[o]nly a small number of . . . cases invalidating laws under the dormant Commerce Clause have involved laws that were genuinely nondiscriminatory but still imposed a clearly excessive burden on interstate commerce." *Rosenblatt*, 940 F.3d at 452 (cleaned up). Those rare

cases all "address state regulation of activities that are inherently national or require a uniform system of regulation—most typically, interstate transportation." *Id.* (cleaned up). This case fits none of those categories.

Mitchell "bears the burden of proof in establishing the excessive burden in relation to the local benefits." *Optometrists I*, 567 F.3d at 528. His lack of evidence of any burden to interstate commerce compels affirmance under *Pike*, even without consideration of the "putative local benefits." 397 U.S. at 142; *see Ass'n des Éleveurs*, 729 F.3d at 951–52 (before court engages in *Pike* balancing, "plaintiff must first show that the statute imposes a substantial burden"). Here, "the record lacks any indication of the *extent* of the commercial activities that have been foreclosed," so balancing is unnecessary. *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1015 (9th Cir. 1994); *see also S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 471 (9th Cir. 2001) (ordinance met *Pike* where plaintiff "has relied solely on conclusory statements about the burden the Ordinance has on interstate commerce" rather than "specific details" of its "economic impact").

Even if Mitchell had proven a significant burden, the District Court rightly held that I-1639's "benefits are substantial," and "it would still pass [*Pike* balancing] . . . because it advances a bona fide state interest in public safety that

far outweighs any perceived burden on interstate commerce." ER-24. Just as for handguns, I-1639 requires SAR purchases to undergo enhanced background checks, which Mitchell concedes are more thorough than a NICS check alone. ER-25; 2-SER-330–31. Because it is undisputed that enhanced background checks cannot effectively be conducted on nonresidents, the District Court correctly held that I-1639's "local benefit far outweighs any alleged burden." ER-25.

Mitchell argues that the benefits are "non-existent" because there is "no imaginable connection between the background checks and increased public safety." Br. at 36. This argument overlooks that (1) states have "important interests in thorough background checks to make sure that firearms stay out of the hands of prohibited individuals," *Silvester*, 843 F.3d at 826; (2) both NRA's law enforcement expert and Appellant Ball—also a Washington FFL—*support* enhanced background checks, 2-SER-245–46; 4-SER-861–62; and (3) under *Pike*, courts "presume the law serves the [state's] legitimate interests," *Rosenblatt*, 940 F.3d at 452, and do not "second-guess the empirical judgments of lawmakers concerning the utility of legislation,'" *Pac. Nw. Venison Producers*, 20 F.3d at 1017 (quoting *CTS Corp. v. Dynamics Corp.*, 481 U.S. 69,

92 (1987)), especially not in the field of public safety, *see Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443 (1978).

Mitchell ignores this deferential standard and suggests that Washington must identify a specific nonresident who, "after purchasing a semiautomatic rifle in Washington, subsequently used that firearm in Washington in a crime of violence." Br. at 36. Although the record actually does document two mass shooters who purchased (or attempted to purchase) a SAR in states where they did not reside, such specific evidence is unnecessary. 3-SER-531, 536. *Pike* considers only "whether the burden on interstate commerce is 'clearly excessive in relation to the *putative* local benefits'" and "does not mention actual benefits as part of the test," let alone demand the extreme specificity Mitchell seeks. *Optometrists II*, 682 F.3d at 1155 (quoting *Pike,* 397 U.S. at 142).

The District Court correctly held that the Nonresident Sales Provision is constitutional under *Pike*.

### 6.     The Nonresident Sales Provision would meet strict scrutiny

Even if strict scrutiny applied, the Nonresident Sales Provision would meet it. To pass strict scrutiny, a law must be "demonstrably justified by a valid factor unrelated to economic protectionism." *Carbone*, 511 U.S. at 402. That is, the law must "serve[] a legitimate local purpose, and that this purpose could not

be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 138 (1986). This is "just another way of saying that what may appear to be a 'discriminatory' provision in the constitutionally prohibited sense—that is, a protectionist enactment—may on closer analysis not be so." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988) (cleaned up). I-1639 meets this test.

First, it is undisputed that the purpose of the Nonresident Sales Provision is unrelated to economic protectionism. Rather, it advances the state's compelling interest in promoting public safety and reducing gun violence by mandating enhanced background checks. *See, e.g.*, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 670–71, 677 (1989).

Second, I-1639 is the least restrictive means to advance that interest. *Carbone*, 511 U.S. at 392. It is undisputed that enhanced background checks are more comprehensive than checks using NICS alone, because the latter suffers significant gaps, including millions of unreported state criminal history and protective order records, years-long delays in entry of felony convictions, and a failure by many states to report mental health records at all. 1-SER-20–26; 3-SER-706, 732; 4-SER-753–54. It is also undisputed that enhanced background checks cannot effectively be performed on nonresidents. *Supra* at 12. Thus, the

District Court correctly found that the "Nonresident Sales Provision is necessary to ensure an enhanced background check is conducted before a[] SAR is sold in Washington." ER-25.

Finally, nonresidents have adequate alternative channels to purchase SARs: through FFL-to-FFL transfer, in their own states, or in other states that allow in-person nonresident SAR purchases.

For all those reasons, the Nonresident Sales Provision would meet strict scrutiny if it were to apply. *See Mance*, 896 F.3d at 706 (federal prohibition on in-person sales of handguns to nonresidents, 18 U.S.C. § 922(a)(3), is "justified by a compelling government interest and is narrowly tailored to serve that interest").

### 7.    Congress has authorized the Nonresident Sales Provision

Finally, the Nonresident Sales Provision cannot violate the dormant Commerce Clause claim because Congress has "specifically authorized" states to prohibit the sale of rifles to nonresidents. *See White v. Mass. Council of Const. Employers, Inc.*, 460 U.S. 204, 213 (1983). The GCA permits sales of rifles and shotguns to nonresidents only if they "fully comply with the legal conditions of sale in both such States." 18 U.S.C. § 922(b)(3); 27 C.F.R. § 478.99. The plain meaning of § 922(b)(3), reinforced by the statutory context and legislative

history, allows Washington to bar nonresidents from purchasing a subset of rifles when "in Washington." RCW 9.41.124.

The entire thrust of § 922(b)(3) is to prohibit nonresident firearm purchases except to the extent the States authorize. It accomplishes this by imposing a general prohibition against an FFL's sale of "any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the [FFL's] place of business is located." 18 U.S.C. § 922(b)(3). It then permits an exception if three conditions are met: (1) the firearm is a "rifle or shotgun," (2) "the transferee meets in person with the transferor to accomplish the transfer," and (3) the "sale, delivery, and receipt fully comply with the legal conditions of sale" in both states. *Id.* Because the statute authorizes states to prohibit sales of *all* rifles and shotguns to nonresidents, it *a fortiori* permits Washington to restrict one category of rifles (semiautomatic) in the same way.

The history of § 922(b)(3) confirms that plain meaning. Congress enacted the provision as part of the GCA "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, at 6 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4411; *see also* S. Rep. No. 89-1866, at 19

(1966) (noting the "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State"). Having found that "the sale . . . of firearms" (including "[r]ifles") "to nonresidents . . . has tended to make ineffective the laws, regulations, and ordinances in the several States," S. Rep. No. 90-1501, at 28 (1968), Congress made it unlawful for FFLs to sell or deliver "any firearm" to a nonresident, 18 U.S.C. § 922(b)(3) (1970). At the time of the GCA's enactment, at least 16 states had laws restricting acquisition or possession of one or more types of firearms by nonresidents. 4-SER-847.

Congress did not intend to displace those state residency restrictions. Quite the opposite: By making the default rule that nonresidents may *not* purchase firearms—subject to an exception only if both states permit it— Congress sought to "[a]ssist and encourage States and local communities to adopt and enforce *stricter* gun control laws." H.R. Rep. No. 90-1577, at 8, 1968 U.S.C.C.A.N. at 4413 (emphasis added); *see also* S. Rep. No. 90-1097, at 50 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2166 (residency provisions "will enable the States to more effectively control this traffic within their own jurisdictions").

As originally enacted, the GCA allowed nonresidents to purchase rifles or shotguns only if their home states "enact[ed] enabling legislation permitting such sales." S. Rep. No. 90-1501, at 21 (1968); *see* 18 U.S.C. § 922(b)(3) (1970). Many (though not all) states did so, while simultaneously enacting parallel statutes expressly permitting nonresidents to purchase long guns—making clear that such nonresident purchases "fully comply" with state law under § 922(b)(3). *Compare* Ky. Rev. Stat. § 237.020(1)–(2) (allowing residents to purchase long guns in other states and nonresidents to purchase them in Kentucky), *with* Mass. Gen. Laws ch. 140, § 131E (permitting only residents to purchase long guns). That is the approach Washington took in 1970, allowing both residents to buy long guns in other states and qualified nonresidents to purchase them in Washington. 1970 Wash. Sess. Laws 668, ch. 74, § 1 (originally codified at RCW 19.70.010, recodified as amended at RCW 9.41.122), § 2 (originally codified at RCW 19.70.020, recodified as amended at RCW 9.41.124).

Nothing in the GCA required Washington to make this allowance for nonresident long gun purchases. Congress's goal was always to "prevent the use of interstate sales to defeat state and local gun restrictions," S. Rep. No. 98-583, at 10 (1984), and to "[l]et the States make those decisions," Hearings Before the

70

Subcomm. on Crime, Comm. of the Judiciary, 99th Cong. (1st and 2d Sess.) Pt. 1, Serial No. 131, at 785 (1985–86).[19]

As the District Court noted, all the Nonresident Sales Provision did was "narrow[] the scope" of Washington's original allowance for nonresident purchases of rifles. ER-11. By adding four words to RCW 9.41.124—"except . . . semiautomatic assault rifles"—I-1639 removed SARs from the class of rifles that nonresidents may purchase "in person" under § 922(b)(3). Washington's decision to cabin its own law is squarely within its congressionally delegated authority, defeating Mitchell's dormant Commerce Clause claim at its threshold. *See, e.g.*, *Hirst v. Skywest, Inc.*, 910 F.3d 961, 967 (7th Cir. 2018) (state minimum wage laws were authorized by federal statute providing that "[n]o provision of this chapter . . . shall excuse noncompliance with any . . . State law . . . establishing a minimum wage higher than the minimum wage established under this chapter").

---

[19] That Congress understood § 922(b)(3) to authorize state restrictions on the sale of firearms to nonresidents is reinforced by its specification that "[n]o provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates *to the exclusion of the law of any State on the same subject matter*, unless there is a direct and positive conflict." 18 U.S.C. § 927 (emphasis added).

### C. Some Claims Are Not Justiciable

Finally, this Court lacks subject matter jurisdiction over certain other claims. SAF lacks standing because there is no evidence that "at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). And the claims of Casey, Rettmer, and Wald are moot because they "are now 21." *McCraw*, 719 F.3d at 344 & n.3.

## VIII. CONCLUSION

This Court should affirm the District Court's decision.

RESPECTFULLY SUBMITTED this 26th day of February, 2021.

ROBERT W. FERGUSON
*Attorney General*

NOAH G. PURCELL
*Solicitor General*

*s/Zachary Pekelis Jones*
ZACHARY PEKELIS JONES, WSBA 44557
R. JULY SIMPSON, WSBA 45869
*Assistant Attorneys General*
*Complex Litigation Division*
zach.jones@atg.wa.gov
july.simpson@atg.wa.gov

JEFFREY T. EVEN, WSBA 20367
*Deputy Solicitor General*
jeffrey.even@atg.wa.gov
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104
(206) 464-7744

*Attorneys for Defendant-Appellee Teresa Berntsen*

PAUL J. LAWRENCE, WSBA 13557
GREGORY J. WONG, WSBA 39329
NICHOLAS W. BROWN, WSBA 33586
KAI A. SMITH, WSBA 54749
PACIFICA LAW GROUP LLP
1191 Second Avenue, Suite 2000
Seattle, WA 98101-3404
Telephone: 206-240-1700
Facsimile: 206-240-1750800

*Counsel for Intervenor-Defendant-Appellee Safe Schools Safe Communities*

LESLIE A. LOPEZ, WSBA 46118
Deputy Prosecuting Attorney
Clark County Prosecutor's Office
PO Box 5000
Vancouver, WA 98666-5000
(564) 397-2478

*Counsel for Defendant-Appellee Chuck Atkins*

SALVATORE J. FAGGIANO WSBA 15696
Assistant City Attorney
Office of the City Attorney
808 W. Spokane Falls Blvd.
Spokane, WA 99201-3326
(509) 625-6818

*Counsel for Defendant-Appellee Craig Meidl*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6(b), Appellees hereby state that they are aware of one case pending in this Court that may be related to this case because it "raise[s] the same or closely related issues." The case, *Jones v. Becerra*, No. 20-56174, involves an appeal from the district court's denial of a preliminary injunction in a Second Amendment challenge to a California law prohibiting the sale of "semi-automatic centerfire rifles" by FFLs to individuals under age 21, except active duty or reserve law enforcement officers or active duty members of the Armed Forces. Cal. Penal Code. § 27510(3); *Jones v. Becerra*, No. 19-CV-1226-L-AHG, 2020 WL 6449198, at *2 (S.D. Cal. Nov. 3, 2020).

<div style="margin-left:40%">

*s/Zachary Pekelis Jones*
ZACHARY PEKELIS JONES
  *Assistant Attorney General*

*Counsel for Defendant-Appellee Teresa Berntsen*

</div>

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 20-35827

I am the attorney or self-represented party.

**This brief contains** | 15,292 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ◉ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Zachary Pekelis Jones    **Date** | Feb. 26, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, that I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/Zachary Pekelis Jones*
ZACHARY PEKELIS JONES
  *Assistant Attorney General*

*Counsel for Defendant-Appellee Teresa Berntsen*