NO. 20-35827

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DANIEL MITCHELL, et al.,

Appellants,

v.

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, et al.,

Defendants-Appellees

and

SAFE SCHOOLS SAFE COMMUNITIES,

Intervenor-Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
No. 3:20-cv-05106-JCC
The Honorable Judge John C. Coughenour, United States District Court

## APPELLEES' JOINT SUPPLEMENTAL EXCERPTS OF RECORD VOLUME 1 OF 4

ROBERT W. FERGUSON
  *Attorney General*
NOAH G. PURCELL
  *Solicitor General*
Zachary Pekelis Jones, WSBA 44557
R. July Simpson, WSBA 45869
  *Assistant Attorneys General*
Jeffrey T. Even, WSBA 20367
  *Deputy Solicitor General*
Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104
(206) 464-7744
*Counsel for Appellee Teresa Berntsen*

Salvatore J. Faggiano WSBA 15696
  *Assistant City Attorney*
Office of the City Attorney
808 W. Spokane Falls Blvd.
Spokane, WA 99201-3326
(509) 625-6818
*Counsel for Defendant Craig Meidl*

Paul J. Lawrence, WSBA 13557
Gregory J. Wong, WSBA 39329
Nicholas W. Brown, WSBA 33586
Kai A. Smith, WSBA 54749
PACIFICA LAW GROUP LLP
1191 Second Avenue, Suite 2000
Seattle, WA 98101-3404
Telephone: 206-240-1700
Facsimile: 206-240-1750800
*Counsel for Appellee Safe Schools Safe Communities*

Leslie A. Lopez, WSBA 46118
Deputy Prosecuting Attorney
Clark County Prosecutor's Office
PO Box 5000
Vancouver, WA 98666-5000
(564) 397-2478
*Counsel for Defendant Chuck Atkins*

THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DANIEL MITCHELL, et al., | No. 3:19-cv-5106 |
| Plaintiffs, | EVERYTOWN FOR GUN SAFETY SUPPORT FUND'S AMICUS BRIEF IN SUPPORT OF DEFENDANTS' AND INTERVENOR-DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CHARLES ATKINS, et al., | |
| Defendants, | |
| and | NOTED ON MOTION CALENDAR: August 18, 2020 |
| SAFE SCHOOLS SAFE COMMUNITIES, | |
| Intervenor-Defendant. | |

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

### TABLE OF CONTENTS

2

Page

3  INTEREST OF AMICUS CURIAE ........................................................................ 1

4  INTRODUCTION ................................................................................................... 2

   ARGUMENT ........................................................................................................... 3
5
       I.   Longstanding Restrictions on the Sale of Firearms to Persons Under 21
6            Establish That I-1639's Age Limitation Regulates Conduct Outside the
             Second Amendment's Scope ................................................................... 3
7
            A.   The relevant time period for the historical analysis begins when the
8                 Fourteenth Amendment was ratified. ......................................... 5

9           B.   For most of the history of the United States, persons under 21 were
                  considered minors. ...................................................................... 6

10          C.   Restrictions on the sale or transfer of firearms to minors have
                  existed for more than 150 years. ................................................ 7
11
            D.   Courts have accepted the historical pedigree of age-based
                  restrictions and upheld those restrictions. ................................ 9
12
       II.  Washington Has a Compelling Interest in the Public-Safety Value of
13           Enhanced Background Checks, Given its Limited Access to Criminal,
             Mental Health, and Domestic Violence Information About Nonresidents.......... 10
14
            A.   Inconsistencies in the record reporting processes of several states
15                demonstrate the importance of Washington's enhanced background
                  check system. ............................................................................ 12
16
                 1.   Criminal history records ................................................. 14

                 2.   Protective orders ............................................................. 16
17
                 3.   Mental-health records ..................................................... 17
18
            B.   Oregon, Idaho, and Montana Share Many of the Same Record
                  Reporting Flaws as Other States. .............................................. 17
19
   CONCLUSION ....................................................................................................... 18

20

21

22

23

24

25

26

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – i

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-3**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
   910 F.3d 106 (3d Cir. 2018)....................................................................1

*Biffer v. City of Chicago*,
   116 N.E. 182 (Ill. 1917)..........................................................................9

*Coleman v. State*,
   32 Ala. 581 (1858)..................................................................................8

*Colo. Outfitters Ass'n v. Hickenlooper*,
   Nos. 14-1290, 14-1292 (10th Cir.)..........................................................1

*Culp v. Raoul*,
   921 F.3d 646 (7th Cir. 2019), *petition for cert. filed*, No. 19-487
   (Oct. 10, 2019)......................................................................................11

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)........................................................................ *passim*

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011)..................................................................5

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015)..................................................................6

*Fyock v. City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015)...............................................................4, 6

*Gould v. Morgan*,
   907 F.3d 659 (1st Cir. 2018), *petition for cert. filed*, No. 18-1272 (Apr. 1,
   2019)......................................................................................................5

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
   417 F. Supp. 3d 747 (W.D. Va. 2019), *app. docketed*, No. 19-2250 (4th Cir.
   Nov. 7, 2019).........................................................................................9

*Horsley v. Trame*,
   808 F.3d 1126 (7th Cir. 2015).........................................................7, 10

*In re Jordan G.*,
   33 N.E.3d 162 (Ill. 2015).....................................................................10

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – ii

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-4**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Int'l Franchise Ass'n v. City of Seattle*,
  97 F. Supp. 3d 1256 (W.D. Wash. 2015), *aff'd* 803 F.3d 389 (9th Cir. 2015) ......................11

*Mance v. Sessions*,
  896 F.3d 699 (5th Cir. 2018), *petition for cert. filed*, 18-663 (Nov. 19, 2018) ......................11

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
  719 F.3d 338 (5th Cir. 2013) ................................................................................10

*Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
  700 F.3d 185 (5th Cir. 2012) ................................................................ *passim*

*Nat'l Rifle Ass'n v. Swearingen*,
  No. 4:18-cv-00137 (N.D. Fla.) ................................................................1

*Parman v. Lemmon*,
  244 P. 227 (Kan. 1925) ........................................................................9

*People v. Aguilar*,
  2 N.E.3d 321 (Ill. 2013) ..................................................................4, 10

*People v. Mosley*,
  33 N.E.3d 137 (Ill. 2015) ......................................................................10

*Peruta v. Cty. of San Diego*,
  824 F.3d 919 (9th Cir. 2016) (en banc) ..............................................4, 5

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) ...................................................................11, 12, 18

*Powell v. Tompkins*,
  926 F. Supp. 2d 367 (D. Mass. 2013), *aff'd on other grounds*, 783 F.3d 332
  (1st Cir. 2015) ......................................................................................10

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) ........................................................................1

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019), *app. docketed*, No. 19-56004 (9th Cir.
  Aug. 28, 2019) ......................................................................................1

*Silvester v. Harris*,
  843 F.3d 816 (9th Cir. 2016) ................................................................4

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – iii

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-5**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Silvester v. Harris*,
   No. 14-16840 (9th Cir.) ...........................................................................1

*State in Interest of J.M.*,
   144 So. 3d 853 (La. 2014) .....................................................................10

*State v. Allen*,
   94 Ind. 441 (1884) ...................................................................................8

*State v. Callicutt*,
   69 Tenn. 714 (1878)..................................................................................8

*State v. Quail*,
   92 A. 859 (Del. Gen. Sess. 1914) ............................................................9

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) .................................................................4

*United States v. Rene E.*,
   583 F.3d 8 (1st Cir. 2009).................................................................4, 10

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc) ..................................................3

*United States v. Torres*,
   911 F.3d 1253 (9th Cir. 2019) .................................................................4

*Walker v. Walker*,
   17 Ala. 396 (1850) ...................................................................................8

*Washington v. U.S. Dep't of State*,
   No. 2:18-cv-01115 (W.D. Wash.)............................................................1

*Whitt v. Whitt*,
   490 S.W.2d 159 (Tenn. 1973).................................................................8

*Young v. Hawaii*,
   896 F.3d 1044, 1059 (9th Cir. 2018), *reh'g en banc granted*, 915 F.3d 681
   (9th Cir. 2019) ........................................................................................6

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – iv

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-6**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**STATUTES**

18 U.S.C. 922(g)(4) ..................................................................................................17

Consolidated Appropriations Act, 2018, Fix NICS Act of 2018, Pub. L. 115–141,
§§ 601–605 (2018) ...........................................................................................18

RCW § 9.41.010(26) ................................................................................................2

RCW § 9.41.240 ......................................................................................................2

RCW § 9.41.040(2)(a)(iv) .......................................................................................17

RCW § 9.41.047 ......................................................................................................17

RCW § 71.05.182 ....................................................................................................17

**REGULATIONS**

28 CFR 20.3(m) .......................................................................................................15

**OTHER AUTHORITIES**

Active Records in the NICS Indices by State ...........................................................17

Bureau of Justice Statistics, *Survey of State Criminal History Information Systems
2016* (Feb. 2018) ...................................................................................... *passim*

D. Hemenway & M. Miller, *Association of rates of household handgun
ownership, lifetime major depression, and serious suicidal thoughts with rates
of suicide across US census regions*, 8 Injury Prevention 313 (2002) ...................17

Infant, *Black's Law Dictionary* (1st ed. 1891) ........................................................7

James Kent, 2 *Commentaries on American Law* (1827) .........................................7

Larry D. Barnett, *The Roots of Law* Am. U. J. Gender, Soc. Pol'y & L. 613 (2007) ......................7

National Consortium for Justice Information and Statistics (SEARCH), *Improving
the National Instant Background Screening System for Firearm Purchases* 19
(2013) .............................................................................................................14

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – v

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-7**

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

SEARCH, State Progress in Record Reporting for Firearm-Related Background

4

Checks: Misdemeanor Crimes of Domestic Violence (2016) ...................................14

5

SEARCH, State Progress in Record Reporting for Firearm-Related Background

Checks: Protection Order Submissions (2016) ........................................................16

6

T.E. James, *The Age of Majority*, 4 Am. J. Legal Hist. 22 (1960)...................................7

7

Thomas M. Cooley, *A Treatise on Constitutional Limitations* (5th ed. 1883) ..............9

8

Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55 (2016) ...........7

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – vi

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-8**

### INTEREST OF AMICUS CURIAE

*Amicus curiae* Everytown for Gun Safety Support Fund ("Everytown") is the education, research, and litigation arm of Everytown for Gun Safety, the nation's largest gun-violence-prevention organization, with nearly six million supporters across all fifty states. Everytown for Gun Safety was founded in 2014 as the combined efforts of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in an elementary school in Newtown, Conn. by a 20-year-old using a Bushmaster XM-15 semiautomatic rifle. The mayors of nine cities in the State of Washington are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws.

Everytown's mission includes defending gun laws through the filing of amicus briefs providing historical context, social science and public policy research, and doctrinal analysis that might otherwise be overlooked. Everytown has filed such briefs in numerous Second Amendment cases, including cases, like this one, involving challenges to minimum-age restrictions and restrictions on the purchase and sale of firearms, *see, e.g. Colo. Outfitters Ass'n v. Hickenlooper*, Nos. 14-1290, 14-1292 (10th Cir.); *Silvester v. Harris*, No. 14-16840 (9th Cir.); *Nat'l Rifle Ass'n v. Swearingen*, No. 4:18-cv-00137 (N.D. Fla.) (Dkt. 83), and in a case in this District, *Washington v. U.S. Dep't of State*, No. 2:18-cv-01115 (W.D. Wash.) (Dkt 47, Dkt. 95 at 2 n.2). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other gun cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991–92 & n.11 (C.D. Cal. 2019), *app. docketed*, No. 19-56004 (9th Cir. Aug. 28, 2019); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210–11 nn.4 & 7 (2019) (Alito, J., dissenting).

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-9**

**INTRODUCTION**

This case is about the right of the people of Washington to be free from gun violence and the state's power to pass laws to protect that freedom. By adopting Initiative Measure No. 1639 ("I-1639"), Washingtonians chose to expand background checks, to prohibit those under age 21 from purchasing a semiautomatic assault rifle (the "Age Provision"),[1] and to prohibit in-person sales of such rifles to out-of-state purchasers (the "Nonresident Sales Provision"). Plaintiffs ask this Court to override these choices and declare the age and out-of-state purchaser limitations unconstitutional.

Plaintiffs challenge the Age Provision under the Second Amendment. They assert that I-1639 is "the broadest, most expansive firearms ban in the nation." Pls. Mot. For Summ. J., Dkt. 76 at p. 1. But this is not so. It is comparable to minimum-age laws on the purchase and sale of firearms that have been enacted and upheld by federal and state courts throughout the country. Indeed, plaintiffs' portrayal largely disregards the age-related aspects of I-1639 and seeks to paint it as an outright *ban* on semiautomatic assault rifles. But their rhetoric cannot mask the fact that I-1639 is not as restrictive as (and certainly not more restrictive than) laws generally prohibiting and restricting the purchase and possession of assault weapons to persons of any age—laws that, like minimum-age laws, have been upheld by federal and state appellate courts against Second Amendment challenges. And considered, as it must be, only as an age-based restriction, this limitation in I-1639 falls outside the protection of the Second Amendment. Regulating access to firearms for those under 21 has clear historical pedigree extending from the founding era through the modern era.

Plaintiffs also challenge the Nonresident Sales Provision under the dormant Commerce Clause. Despite their contention, this restriction is not a "ban on interstate sales." Dkt. 76 at p. 1,

---

[1] "Semiautomatic assault rifle" is defined to include "any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" and to exclude "antique firearms" and those that have been made permanently inoperable. RCW § 9.41.010(26). Washington law, like federal law, also prohibits the purchase of pistols by those under 21, RCW § 9.41.240, but plaintiffs have not challenged that provision in this litigation.

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

16. As the Attorney General has explained, "nothing in the Initiative prohibits an FFL [in Washington] from transferring a semiautomatic assault rifle to an FFL in a different state consistent with federal law—a practice long utilized for interstate sales of pistols and other types of firearms"—for sale to a non-Washington resident.[2] I-1639 does not discriminate against out-of-state commercial interests and it does not excessively burden commerce relative to Washington's substantial interest in promoting public safety through enhanced background checks.

Everytown files this amicus brief in support of the defendants' and intervenor-defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, and, in particular, to provide additional background for the Court on two issues. First, restrictions on the transfer of firearms to persons under 21 comport with historical understandings of the Second Amendment—and thus regulate conduct outside its scope. Second, the government's interest in enhanced background checks, which cannot be conducted adequately on nonresidents of Washington, is substantial (indeed, compelling) for purposes of the dormant Commerce Clause analysis.

## ARGUMENT

**I.    Longstanding Restrictions on the Sale of Firearms to Persons Under 21 Establish That I-1639's Age Limitation Regulates Conduct Outside the Second Amendment's Scope**

The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), held that the Second Amendment protects an individual right to bear arms. Its opinion emphasized, however, that the right "is not unlimited," and that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms." *Id.* at 626. Those longstanding prohibitions include "laws imposing conditions and qualifications on the commercial sale of arms," which are "presumptively lawful regulatory measures." *Id.* at 626–27 n. 26. These "exclusions need not mirror limits that were on the books in 1791." *United States v. Skoien*, 614

---

[2] https://www.atg.wa.gov/initiative-1639.

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

F.3d 638, 641 (7th Cir. 2010) (en banc) (upholding federal law prohibiting the possession of firearms for persons convicted of misdemeanor domestic violence crimes); *see Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).

The Ninth Circuit applies a two-step framework to assess whether a law violates the Second Amendment. The first step is to ask "whether the challenged law burdens conduct protected by the Second Amendment." *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). Courts examine "whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). Where such evidence exists, the law should be upheld because it falls outside the Second Amendment's scope; there is no need to proceed to the step-two scrutiny analysis. *Id.* at 829–30.

That is precisely the situation here. Restrictions on the sale or transfer of firearms to persons under the age of 21 are a "longstanding" form of firearms regulation that "historically has fallen outside the scope of the Second Amendment." *United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019). Plaintiffs' claim thus fails at step one of the Second Amendment analysis, and the Court need not reach the second step. *See Peruta v. Cty. of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) (en banc) (holding, based on historical analysis alone, that law prohibiting persons from carrying concealed weapons, subject to a license-based exception, did not violate the Second Amendment); *United States v. Rene E.*, 583 F.3d 8, 12, 16 (1st Cir. 2009) (holding, based on historical analysis alone, that law regulating possession of handguns by juveniles did not violate the Second Amendment); *People v. Aguilar*, 2 N.E.3d 321, 329 (Ill. 2013) (historical evidence set forth in other decisions supports "the obvious and undeniable conclusion that the possession of handguns by minors is conduct that falls outside the scope of the second amendment's protection"); *cf. Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 204 (5th Cir. 2012) ("*NRA*") ("Although we are inclined to uphold the

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  challenged federal laws [prohibiting selling handguns to individuals under 21] at step one of our

2  analytical framework, in an abundance of caution, we proceed to step two.").

3       Inexplicably, plaintiffs contest the restriction on sales to persons under 21 with virtually

4  no reference to that age limitation or its historical pedigree. Instead, they argue as though I-1639

5  banned *all* sales of semiautomatic assault rifles *to anyone*, calling it "immense and

6  unprecedented" in scope and "akin to the blanket handgun ban at issue in *Heller*." Dkt. 76 at p. 9.

7  But that is not the case, and thus, as defendants explain, the question is not whether

8  semiautomatic rifles fall within the Second Amendment's protection, but whether sales of those

9  firearms to 18- to 20-year-olds do so. Defs. and Intervenor-Def. Cross Mot. for Summ. J. and

10  Opp. to Pls. Mot. for Summ. J., Dkt. 84 at p. 12. Because plaintiffs omitted the relevant

11  framework for historical analysis from their brief, we provide that framework to assist the Court.

### A. The relevant time period for the historical analysis begins when the Fourteenth Amendment was ratified.

14       Because plaintiffs are challenging a state law under the Second and Fourteenth

15  Amendments, the historical analysis should begin in 1868, when ratification of the Fourteenth

16  Amendment made the Second Amendment applicable to the states. *See Gould v. Morgan*, 907

17  F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent

18  point in time would be 1868 (when the Fourteenth Amendment was ratified)."), *petition for cert.

19  filed*, No. 18-1272 (Apr. 1, 2019); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011)

20  ("If the claim concerns a state or local law, the 'scope' question asks how the right was publicly

21  understood when the Fourteenth Amendment was proposed and ratified.") (citing *McDonald v.

22  City of Chicago*, 561 U.S. 742, 770–85 (2010) and *Heller*, 554 U.S. at 625–28); *cf. Peruta*, 824

23  F.3d at 933 (evaluating historical materials bearing on the adoption of both the Second and

24  Fourteenth Amendment in considering Second Amendment challenge to county's interpretation

25  of the statutory good cause requirement under California law).

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    The Court's historical inquiry should not end in 1868, however. *Heller* instructs that

2    "examination of a variety of legal and other sources to determine the *public understanding* of a

3    legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional

4    interpretation." *Heller*, 554 U.S. at 605 (second emphasis added); *see also, e.g.*, *Friedman v. City*

5    *of Highland Park,* 784 F.3d 406, 408 (7th Cir. 2015) (noting that "*Heller* deemed a ban on

6    private possession of machine guns to be obviously valid" despite the fact that "states didn't

7    begin to regulate private use of machine guns until 1927," and that "regulating machine guns at

8    the federal level" did not begin until 1934); *NRA*, 700 F.3d at 196 ("*Heller* demonstrates that a

9    regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era

10   analogue."). Indeed, the Ninth Circuit has looked to regulations from the early twentieth century,

11   commenting that "these early twentieth century regulations might nevertheless demonstrate a

12   history of longstanding regulation if their historical prevalence and significance is properly

13   developed in the record." *Fyock*, 779 F.3d at 997 (declining to preliminarily enjoin city

14   ordinance banning possession of large-capacity magazines).[3]

15   In this case, it does not matter whether the Court looks to the timeframe most relevant for

16   the Fourteenth Amendment, or to the time of the Second Amendment's ratification, or even to

17   much more recent history. As the sections that follow explain, the historical record from the

18   founding era through the modern era supports restrictions on the sale and transfer of firearms to

19   18- to-20-year-olds.

20   **B.    For most of the history of the United States, persons under 21 were
       considered minors.**

22   In 1791 when the Second Amendment was ratified, in 1868 when the Fourteenth

23   Amendment was ratified and made the Second Amendment applicable to the States, and for most

24   of the history of the United States, persons under the age of 21 were considered minors. At

---

[3] A panel of the Ninth Circuit recognized the relevance of post-Civil War history in *Young v. Hawaii* but ascribed lesser importance to this later history even though the case involved a challenge to a state law. *See* 896 F.3d 1044, 1059 (9th Cir. 2018), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019). The *Young* panel decision, however, is no longer precedential in light of the grant of en banc review. *See* 915 F.3d at 682.

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-14**

1    common law, the age of majority was 21, and the term "minor" or "infant" applied to anyone

2    under 21. *See NRA*, 700 F.3d at 201; *Horsley v. Trame*, 808 F.3d 1126, 1130 (7th Cir. 2015)

3    ("During the founding era, persons under 21 were considered minors or 'infants.'").[4] Indeed,

4    until 1969, the age of majority for unmarried men was 21 in every state. Declaration of Carolyn

5    Gilbert ("Gilbert Decl."), Ex. 6, Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender, Soc.

6    Pol'y & L. 613, 681–86 (2007); *NRA*, 700 F.3d at 201 ("[I]t was not until the 1970s that States

7    enacted legislation to lower the age of majority to 18."); *Horsley*, 808 F.3d at 1130 ("The age of

8    majority was 21 until the 1970s."). Thus, historically, laws restricting the rights of minors

9    applied to persons under the age of 21.

10       **C.    Restrictions on the sale or transfer of firearms to minors have existed for
             more than 150 years.**

11

12       As defendants explain, statutes restricting the purchase and transfer of firearms by those

13   under the age of 21 are "longstanding," *Heller*, 554 U.S. at 626, having existed for over 150

14   years. *See* Dkt. 84 at pp. 13–14. The following historical context confirms and expands on

15   defendants' analysis.

16       Numerous nineteenth century state laws restricted the purchase of firearms by, and

17   transfer of firearms to, minors, including laws for the states of Alabama, Delaware, Georgia,

18   Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada,

19   North Carolina, Tennessee, Texas, West Virginia, Wisconsin, Wyoming, and the District of

---

20   [4] *See also* Gilbert Decl., Ex. 1, Blackstone, 1 Commentaries On the Laws of England 451 (1st ed. 1765) ("So that

21   full age in male or female is twenty one years, … who till that time is an infant, and so styled in law."); Gilbert
     Decl., Ex. 2, Infant, *Black's Law Dictionary* (1st ed. 1891) (defining "infant" as "[a] person within age, not of age,

22   or not of full age; a person under the age of twenty-one years; a minor"); Gilbert Decl., Ex. 3, Vivian E. Hamilton,
     *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016) ("The immediate historical origins of the U.S. age of

23   majority lie in the English common law tradition. The American colonies, then the United States, adopted age
     twenty-one as the near universal age of majority. The U.S. age of majority remained unchanged from the country's

24   founding well into the twentieth century."); Gilbert Decl., Ex. 4, T.E. James, *The Age of Majority*, 4 Am. J. Legal
     Hist. 22, 30 (1960) ("[i]n the eyes of the common law, all persons were esteemed infants until they attained [21

25   years of age]"); *id.* at 26 (noting that at the time of the Magna Carta, the age of majority was 21 years); Gilbert
     Decl., Ex. 5, James Kent, 2 *Commentaries on American Law* 191 (1827), Lecture 31 of Infants ("The necessity of

26   guardians results from the inability of infants to take care of themselves; and this inability continues, in
     contemplation of law, until the infant has attained the age of twenty-one years.").

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-15**

Columbia. *See, e.g.*, Gilbert Decl., Ex. 7 (chart compiling the earliest nineteenth century state laws restricting the purchase of firearms by, and transfer of firearms to, minors); *see also NRA*, 700 F.3d at 202. Moreover, laws analogous to the Second Amendment existed in twelve of the states and the District of Columbia at the time those laws restricting the ability of minors to purchase or use particular firearms were enacted. *See* Gilbert Decl., Ex. 8 (chart compiling nineteenth century state analogues to the Second Amendment).

Courts and leading scholars of the era considered these laws to be constitutional. For example, in 1878, the Supreme Court of Tennessee rejected a challenge to a law prohibiting the sale (and even gifting) of pistols to minors (defined as those under age 21),[5] holding that "we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *State v. Callicutt*, 69 Tenn. 714, 716–17 (1878). The court rejected the defendant's argument that "every citizen who is subject to military duty has the right 'to keep and bear arms,' and that this right necessarily implies the right to buy or otherwise acquire, and the right in others to give, sell, or loan to him." *Id.* at 716. The court explained that the challenged laws were "passed with a view to 'prevent crime'" and do not "affect" or "abridge" the constitutional right of the "'citizens of the State to keep and bear arms for their common defense.'" *Id.* Similarly, in 1858, the Supreme Court of Alabama upheld a conviction for violating a state law that made it a misdemeanor to "sell, or give, or lend" a pistol "to any male minor."[6] *Coleman v. State*, 32 Ala. 581, 582 (1858); *see also, e.g.*, *State v. Allen*, 94 Ind. 441, 443 (1884) (reversing dismissal of indictment where defendant was charged with "'unlawfully barter[ing] and trad[ing] to … a minor under the age of twenty-one years, a certain deadly and dangerous weapon, to wit: a pistol, commonly called a revolver'").

---

[5] *See Whitt v. Whitt*, 490 S.W.2d 159, 160 (Tenn. 1973) (noting that Chapter 162 of the Public Acts of 1971 reduced the age of majority from 21 to 18 years of age).

[6] At that time, the age of majority in Alabama was 21. *See Walker v. Walker*, 17 Ala. 396, 399–400 (1850).

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1        Thomas Cooley, the "most famous" nineteenth century constitutional law scholar who

2   wrote "a massively popular" constitutional law treatise, *Heller*, 554 U.S. at 616, acknowledged

3   that "the State may prohibit the sale of arms to minors." Gilbert Decl., Ex. 9, Thomas M. Cooley,

4   *A Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883). Cooley recognized the validity

5   of age restrictions and concurrently noted that the "federal and State constitutions therefore

6   provide that the right of the people to bear arms shall not be infringed," *id.* at 429—observing no

7   conflict between these principles.

8        Early twentieth-century court decisions also recognize the constitutionality of age-based

9   firearms regulations. *See Parman v. Lemmon*, 244 P. 227, 229 (Kan. 1925) (rejecting

10   constitutional challenge to a law that prohibited the sale or possession of "dangerous weapons,"

11   including pistols and revolvers, to minors); *Biffer v. City of Chicago*, 116 N.E. 182, 184–85 (Ill.

12   1917) (upholding city ordinance that denied minors permits to carry concealed weapons); *cf.*

13   *State v. Quail*, 92 A. 859, 859 (Del. Gen. Sess. 1914) (denying defendant's request to dismiss

14   indictment based on statute criminalizing "knowingly sell[ing] a deadly weapon to a minor other

15   than an ordinary pocket knife").

### D.   Courts have accepted the historical pedigree of age-based restrictions and upheld those restrictions.

17        As defendants explain, there is a clear consensus that, in light of the historical record,

18   restrictions on firearm purchases by those under 21 fall outside the protection of the Second

19   Amendment. Dkt. 84 at pp. 14–15. Plaintiffs engage with none of this case law—not even *NRA*,

20   the seminal 2012 decision in which the Fifth Circuit upheld federal prohibitions on selling

21   handguns or handgun ammunition to individuals under 21.[7] Nor do plaintiffs engage with federal

---

[7] The Fifth Circuit concluded that the federal age restrictions were "consistent with a longstanding, historical tradition, which suggests that the conduct at issue falls outside the Second Amendment's protection" and thus was "inclined to uphold the challenged federal laws at step one of our analytical framework." *NRA*, 700 F.3d at 203–04. "[I]n an abundance of caution," the court proceeded to step two and held that the challenged laws "pass constitutional muster *even if* they implicate the Second Amendment guarantee." *Id.* (emphasis added); *see also Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 417 F. Supp. 3d 747, 756 (W.D. Va. 2019), *app. docketed*, No. 19-2250 (4th Cir. Nov. 7, 2019) (concluding that the same federal age restrictions do not

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-17**

1   and state case law upholding similar regulations affecting the ability of young people to obtain

2   firearms.[8] The unavoidable conclusion is that plaintiffs have no tenable response to the

3   consensus of state and federal courts across the country: the historical record establishes that age-

4   based firearms restrictions are "longstanding," and thus permissible under the Second

5   Amendment.[9]

6   **II.    Washington Has a Compelling Interest in the Public-Safety Value of Enhanced**
        **Background Checks, Given its Limited Access to Criminal, Mental Health, and**
7       **Domestic Violence Information About Nonresidents**

8          Plaintiffs also challenge I-1639 under the dormant Commerce Clause. The new law

9   excludes semiautomatic assault rifles from the categories of firearms that Washington dealers

10  may sell directly, in person, to non-state purchasers—placing semiautomatic assault rifles in the

11  same category as handguns. *See* Dkt. 84 at 9. As defendants explain, this exclusion does not

12  violate the dormant Commerce Clause, including because it does not discriminate against

13

14  _____
    implicate Second Amendment rights, relying on the "historical record of legislation, court decisions, and
    scholarship" as well as the reasoning in *NRA*).

15  [8] *See United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (upholding federal ban on juvenile possession of
16  firearms after "evaluat[ing] evidence that the founding generation would have regarded such laws as consistent with
    the right to keep and bear arms"); *Horsley v. Trame*, 808 F.3d 1126, 1134 (7th Cir. 2015) (upholding state law
17  restricting the ability of persons under the age of 21 from acquiring a firearm license without parental consent);
    *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387 (D. Mass. 2013), *aff'd on other grounds*, 783 F.3d 332 (1st Cir. 2015)
18  (holding that Massachusetts's limiting public carry licenses to those 21 and older "comports with the Second
    Amendment and imposes no burden on the rights of eighteen- to twenty-year-olds to keep and bear arms"); *State in*
19  *Interest of J.M.*, 144 So. 3d 853, 862 (La. 2014) (holding that the "prohibition on the juvenile possession of a
    handgun is the type of long-standing limitation" that survives constitutional scrutiny, given age restrictions in
20  Louisiana dating from as early as 1890); *People v. Aguilar*, 2 N.E.3d 321, 329 (Ill. 2013) ("[a]lthough many
    colonies *permitted* or even *required* minors to own and possess firearms for purposes of militia service, nothing like
21  a *right* for minors to own and possess firearms has existed at any time in this nation's history") (emphasis in
    original); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (holding that possession of handguns by minors is
22  conduct that falls outside the scope of the Second Amendment); *In re Jordan G.*, 33 N.E.3d 162, 168 (Ill. 2015)
    (holding that age-based restrictions on the right to keep and bear arms are historically rooted and apply "equally to
23  those persons under 21 years of age"); *see also Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir.
24  2013) (upholding state law requirement that applicants for concealed-carry permits be at least 21; noting that "the
    conduct burdened by the Texas scheme likely 'falls outside the Second Amendment's protection'").

25  [9] For the reasons set out in defendants' brief, even if the Court were to proceed to step two of the constitutional
    analysis, it should apply intermediate scrutiny and conclude that I-1639's age provision does not violate the Second
26  Amendment. The provision does not severely burden a core right (*see* Dkt. 84 at 16–19) and it has, at the very least,
    a "reasonable fit" with Washington's substantial interest in promoting public safety and reducing gun violence (*see*
    Dkt. 84 at 20–26).

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    interstate commerce (*see id.* at 27–31) and, even if it indirectly burdens interstate commerce, it

2    easily passes muster under the applicable balancing test (*see id.* at 31–32).

3    The case establishing that balancing test is *Pike v. Bruce Church, Inc.*, 397 U.S. 137

4    (1970). Under *Pike*, a non-discriminatory measure that indirectly burdens interstate commerce is

5    constitutional unless the burden is "clearly excessive in relation to the putative local benefits."

6    397 U.S. at 142; *see also, e.g.*, *Int'l Franchise Ass'n v. City of Seattle*, 97 F. Supp. 3d 1256, 1277

7    (W.D. Wash. 2015), *aff'd* 803 F.3d 389 (9th Cir. 2015). As defendants explain, the "local

8    benefits" of limiting in-person sales of semiautomatic assault rifles to residents of the state arise

9    from Washington's substantial interest in ensuring the proper processing of its enhanced

10   background checks, which cannot adequately be run on nonresidents.

11   Compelling public-policy considerations support that interest. The federal background

12   check system performs an indispensable function in reducing the chances that individuals not

13   permitted to possess firearms will nevertheless be able to acquire them. Queries to the National

14   Instant Criminal Background Check System ("NICS") yield information from three databases,

15   containing (1) information about fugitives from justice, terrorists, and those subject to domestic

16   violence protection orders; (2) state and national fingerprint records of people charged with

17   felonies or misdemeanors; and (3) other prohibitor information not contained in (1) or (2).[10]

18   Nevertheless, the system is not perfect: "states voluntarily provide records for use in the

19   databases accessed by NICS. … [F]or various reasons, some records are not timely provided, or

20   are not provided at all." *Mance v. Sessions*, 896 F.3d 699, 707 (5th Cir. 2018) (denying Second

21   Amendment and equal-protection challenges to federal prohibition on in-person sales of

22   handguns to nonresidents), *petition for cert. filed*, 18-663 (Nov. 19, 2018); *see also Culp v.*

23   *Raoul*, 921 F.3d 646, 648 (7th Cir. 2019), (rejecting Second Amendment and Article IV cl. 2

24   challenges to Illinois law limiting concealed carry permits to in-state residents and residents of

25

26   [10] *See* Candee Decl. ¶ 7. In addition, ICE databases may be queried through NICS for records on non-U.S. citizens
     attempting to receive firearms. *See id.*

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 11

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

states with licensing standards substantially similar to Illinois's, in light of "Illinois's inability to obtain complete and timely information about nonresidents—for example, about a recent arrest for domestic violence or a voluntary commitment for inpatient mental health treatment[—given that] Illinois cannot compel this information from other states, nor at this time do national databases otherwise contain the information"), *petition for cert. filed,* No. 19-487 (Oct. 10, 2019).

Washington's enhanced background checks are critical to supplement the federal system for those firearms that Washingtonians have determined merit additional safeguards—*i.e.*, handguns and semiautomatic assault rifles. When only NICS checks are available, as is the case for most nonresident purchasers, the limitations in coverage reduce Washington's ability to ensure that applicants are actually law-abiding and responsible. Washington, therefore, has a compelling interest in permitting in-person sales of semiautomatic assault rifles only to those for whom an enhanced background check is feasible—*i.e.*, Washington residents. That policy has substantial "local benefits" and any purported burden on interstate commerce does not outweigh—let alone "clearly exce[ed]"—those benefits.[11]

> **A.    Inconsistencies in the record reporting processes of several states demonstrate the importance of Washington's enhanced background check system.**

As defendants explain, I-1639's background check provision provides for an "enhanced" background check for semiautomatic assault rifles, the same process Washington currently has in place for handguns. Local law enforcement performs these checks, and they involve querying not only NICS but also multiple additional databases and agency sources. *See* Dkt. 84 at 8.

Kateri Candee, Washington State Patrol's Assistant Division Administrator for ACCESS, the system that enables state agencies to query law enforcement data, explains in a declaration

---

[11] *See Pike*, 397 U.S. at 142. Although strict scrutiny is not the applicable standard, *see* Dkt. 84 at 27–31, these compelling state interests would guide the analysis even if it did apply. *See id.* at 32–35 (explaining that nonresident sales provision would also survive strict scrutiny). In other words, the explanation set out in this section for why Washington has a compelling interest in enhanced background checks that cannot adequately be run on nonresidents applies under either standard.

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-20**

that Washington's enhanced background checks are "far more thorough than a NICS check alon[e]." Candee Decl. ¶ 18. As Candee explains, "participation by the states in NICS is voluntary. This means that the type and volume of records available in NICS databases varies widely from state to state." *Id.* ¶ 8. In addition, Washington's enhanced checks can identify several categories of information not available via NICS. *See id.* 15–17. Furthermore, "because the bulk of state and local databases queried in an enhanced background check contain exclusively Washington records, conducting an effective enhanced background check on a resident of a state other than Washington would be extremely difficult, if not impossible." *Id.* ¶ 18. Such a check would "require contacting … jurisdictions outside the state—which may or may not be cooperative and responsive to the agency's request." *Id.*

Brandi Belcher, a Records Specialist at the Spokane Police Department, likewise explains that "it is virtually impossible to run a thorough and comprehensive background check on a non-Washington resident. The kind of information I can uncover in a local check is often not available to me for non-residents." Belcher Decl. ¶ 8. Belcher explains, for example, that there are, in Belcher's experience, disqualifying mental-health records that are not available in the databases accessed via NICS but are available in Washington's state records, and that a NICS search would likewise not reveal "a non-Washington conviction for which [an applicant was] never finger printed." *Id.* ¶¶ 6–8. And Belcher also emphasizes that NICS's coverage is limited by the fact that submission of information is voluntary and sometimes by errors in data transfer. *Id.* ¶ 6. Belcher illustrates these issues with a tragic example: an individual received a Washington concealed pistol license despite a mental health disqualifier known to Hawaii, because Hawaii had not submitted the disqualifier to NICS and Washington and Hawaii do not exchange mental health information, and the individual obtained a firearm and used it to shoot and kill another person. *Id.* ¶ 9.

As the following subsections explain, substantial information from federal and state entities that examine and report on the NICS system supports Candee's and Belcher's

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-21**

1   observations. Together, they compel the conclusion that Washington has a robust interest in

2   permitting sales of semiautomatic assault rifles only to those for whom an enhanced background

3   check is feasible—Washington residents.

### 1.   Criminal history records

5   Most importantly, there are significant state-level disparities in reporting criminal records

6   to the national system, with some reporting nearly all records and others failing to report a

7   significant portion of criminal convictions. The failures of certain states to do a thorough

8   reporting job results in a substantial number of criminal records being excluded from the federal

9   system. A 2013 report (cited in and attached to Candee's declaration) found that nationwide,

10  states fail to make available to the federal criminal-background-check system records of twenty-

11  five percent of felony convictions, totaling more than seven million missing records. National

12  Consortium for Justice Information and Statistics (SEARCH), *Improving the National Instant*

13  *Background Screening System for Firearm Purchases* 19 (2013), *available at*

14  http://bit.ly/2oat4Ha ("SEARCH REPORT"); *see also* Candee Decl. ¶ 8 & Exh. B.[12] The most

15  recent available statistics show that the criminal records of as many as 18.7 million individuals

16  contained in state repositories may not be available through III. Bureau of Justice Statistics,

17  *Survey of State Criminal History Information Systems* 2016 ("BJS Report"), Tables 1, 20 (Feb.

18  2018), *available at* www.ncjrs.gov/pdffiles1/bjs/grants/251516.pdf.

19  Relatedly, backlogs in certain states' record reporting mean that there are a significant

20  number of records that have never been entered into the state databases that populate III. Twenty

21  states have a backlog of 1,000 or more records, ranging from 1,000 to over 520,000. BJS Report

---

22  [12] Most states hold criminal records in their state criminal record databases, which are also made available through

23  an entry in the Interstate Identification Index ("III"), the national database for records of arrests, indictments, and
    dispositions for all 50 states (and which in turn is one of the three databases that compose NICS). *See* SEARCH

24  Report at p. 6; Candee Decl. ¶ 7. Among other reasons, some records maintained at the state level are unavailable in
    a national check because some law enforcement agencies do not collect the fingerprints of offenders—and III will

25  not accept the submission of records that do not contain fingerprints. SEARCH, State Progress in Record Reporting
    for Firearm-Related Background Checks: Misdemeanor Crimes of Domestic Violence, 6 (2016), *available at*
    https://bit.ly/2pMnDQd. When a criminal record lacks a fingerprint, the record is unavailable beyond the local or

26  state level. As a result, many records of misdemeanor crimes of domestic violence are not available through III. *Id.*

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-22**

at Table 13.[13] While many states do an effective job of reporting criminal records, these failures of other states to report such records or report them timely would undermine Washington's ability to conduct its background checks on nonresidents.

Moreover, certain states make criminal records available through III only after significant delays. This flaw has two elements: (1) a delay between a felony adjudication and the receipt of a conviction record by the state record repository, and (2) a delay between the records being received by a repository and records being entered into a state database, which feeds into the national database.[14] Nine states take at least thirty days for felony records to be received by the state repository and an additional thirteen states take between eight and thirty days for their state repositories to receive records. BJS Report at Table 8b.[15] Once records are received, nine states take at least thirty days to then enter that felony adjudication into the state repository, and five states take between eight and thirty days to do so. BJS Report at Table 8b.[16] Together, in low-performing states, these reporting delays can lead to long gaps between a felony conviction and the entry of records into a database accessible through the federal system—over two years in Kansas, over a year in Indiana and Mississippi, at least 212 days in New Mexico, 189 days West

---

[13] Arizona (520,009 records); Connecticut (331,200); Pennsylvania (225,500); Virginia (172,700); Hawaii (148,000); Kansas (140,800); New Jersey (133,700); Idaho (129,800); Nevada (119,000); Alabama (100,000); Utah (73,500); Missouri (65,600); Oregon (55,000); West Virginia (50,200); Indiana (10,000); New Mexico (6,800); Montana (4,000); Ohio (4,000); North Dakota (2,400); Alaska (1,000).

[14] III, which supplies criminal history records for the federal background check system, relies on state criminal records databases to populate the system. When a state agency queries III, state databases with responsive records are identified which can then be searched. This means failure of states to enter records in their own databases also deprives the federal system of the records. *See* 28 CFR 20.3(m); BJS Report at glossary v–vi.

[15] Indiana, Kansas, and Mississippi (more than one year); North Dakota (91–180 days); Arizona, Nevada, New Mexico, North Carolina, and Ohio (31–90 days); Arkansas, California, Florida, Georgia, Hawaii, Missouri, Montana, Oklahoma, South Dakota, Texas, Vermont, Virginia, and West Virginia (8–30 days). BJS Report at Table 8b.

[16] Kansas (more than one year); New Mexico and West Virginia (181–365 days); Arizona, California, Montana, Nevada, North Dakota, and Ohio (31–90); Georgia, Oklahoma, South Dakota, Vermont, and Virginia (8–30 days). BJS Report at Table 8b.

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-23**

Virginia, 122 days in North Dakota and 62 days in Arizona, Nevada and Ohio—posing serious public safety threats. BJS Report at Table 8b.[17]

### 2.    Protective orders

There are also significant failures in certain states to report protective orders into the national database. A number of states only report a fraction of the protective orders indexed in their state databases into the national system. BJS Report at Tables 4, 4a.[18] Nationally, there is a disparity of approximately 164,000 protective orders between state databases and the federal background-check system. *Id.* Some of the disparity may be due to the regular entry and expiration of short-term orders, but the size of the disparity is concerning.[19] Additionally, some states cannot reliably report protective orders to the National Crime Information Center ("NCIC") file (which is one of the databases that NICS comprises) because (1) courts cannot meet NCIC technical requirements, (2) some courts and law enforcement agencies lack adequate staff, and (3) some protective orders lack all of the data elements required for entry into NCIC.[20] Whatever the reason for this disparity, it denies important information to the state of Washington.

---

[17] Kansas (over two years); Indiana, Mississippi (over one year); New Mexico (212–455 days); West Virginia (189–395 days); North Dakota (122–270 days); Arizona, Nevada, Ohio (62–180 days); California and Montana (39–120 days); North Carolina (32–91 days); Georgia, Oklahoma, South Dakota, Vermont, and Virginia (16–60 days); Arkansas (10–37 days); Florida, Hawaii, Missouri, and Texas (9–31 days). BJS Report at Table 8b.

[18] Alabama (4,721 of 13,542); Colorado (112,156 of 230,678); Florida (194,803 of 319,218); Hawaii (5,272 of 13,747); Iowa (25,462 of 50,180); Massachusetts (19,785 of 35,605); Michigan (16,076 of 30,421); Mississippi (826 of 17,441); Nebraska (2,094 of 5,027); Nevada (110 of 2,380); North Dakota (1,297 of 2,683); Rhode Island (15,567 of 50,980); South Dakota (3,010 of 4,371); Texas (17,743 of 44,610); Utah (10,446 of 38,450); Vermont (2,119 of 3,873). BJS Report at Tables 4, 4a.

[19] SEARCH, State Progress in Record Reporting for Firearm-Related Background Checks: Protection Order Submissions, 5 (2016), *available at* https://bit.ly/2GklRwa.

[20] *Id.*

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

### 3. Mental health records

There are also failures in certain states in reporting prohibiting mental health records.[21] Two nearby states—Montana and Wyoming—and the U.S. territories functionally fail to report prohibiting mental health records. Active Records in the NICS Indices by State, *available at* https://bit.ly/2JISsPk.[22] In states that do report records, a number do so at a per-capita rate that is aberrantly low compared to other states, indicating either underreporting or differences in state law leading to the failure to include seriously ill individuals.[23] The median state, Mississippi, reports prohibiting mental health records at a rate of 711 per 100,000 (a total of 21,150 records for a state of 2,976,149 people). Sixteen states report prohibiting records at less than half the median rate, and nine states report a rate at or below one-fourth of the median.[24] Again, some of these disparities can likely be explained by policy differences, rather than reporting failures. Some states may provide less access to treatment to the severely mentally ill, or otherwise employ commitment procedures that do not require reporting committed individuals to NICS. But these differences in policy do not mitigate the need of Washington to identify people prohibited by mental illness when selling semiautomatic assault rifles.

### B. Oregon, Idaho, and Montana Share Many of the Same Record Reporting Flaws as Other States.

Plaintiff Daniel Mitchell's store is located in Vancouver, Washington, *see* Mitchell Decl. ¶ 1, which lies on the state border next to Portland, Oregon. According to his declaration, his out-

---

[21] Federal law prohibits the possession of firearms by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution." 18 U.S.C. 922(g)(4); *see also* RCW §§ 9.41.040(2)(a)(iv), 9.41.047, 71.05.182.

[22] Wyoming (13 Records); Montana (36 Records).

[23] States do not meaningfully differ in their underlying rates of mental illness. *See* D. Hemenway & M. Miller, *Association of rates of household handgun ownership, lifetime major depression, and serious suicidal thoughts with rates of suicide across US census regions*, 8 Injury Prevention 313, 314 (2002), *available at* https://bit.ly/2V9Pxoe.

[24] Wyoming (2 per 100,000); Montana (3); New Hampshire (44); Alaska (92); Rhode Island (135); Georgia (136); Oklahoma (144); Arkansas (155); South Dakota (170); Louisiana (191); Indiana (193); Alabama (214); Kansas (263); Maryland (281); Nevada (303); Vermont (336). Washington's own reporting rate is more than twice the median rate, at 1,898 per 100,000.

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-25**

of-state purchasers are primarily from Oregon. *See id.* ¶ 16 ("The majority of my sales are to Washington and Oregon residents."). Similarly, stores in eastern Washington presumably are likely to serve customers from Idaho and Montana. Many of the state-level reporting problems just discussed are also present in these three states. As noted above, Montana functionally fails to report any prohibiting mental-health records. *See supra.* And in 2016, Oregon and Idaho each had enormous backlogs of unprocessed and partially processed dispositions not yet properly entered into their respective state criminal record repositories: Idaho had a backlog of 129,800 records, and Oregon had a backlog of 55,000 records. *See* BJS Report at Table 13. Similarly, after a felony adjudication, Montana takes between 8 and 30 days to forward the record to the state repository and then between 31 and 90 days to enter the adjudication into the repository, making it one of the slow states on record entry. *See* BJS Report at Table 8b.

Each of these shortcomings would undermine Washington's ability to ensure that purchasers of semiautomatic assault rifles are qualified and responsible, if the state were limited to NICS checks.[25] And given that enhanced background checks are virtually impossible to run on nonresidents, *see* Belcher Decl. ¶ 8; Candee Decl. ¶ 18, these shortcomings further establish Washington's compelling interest in limiting such sales to Washington residents. Accordingly, the nonresident sales limitation is clearly constitutional under *Pike*. *See* Dkt. 84 at 31–32 (plaintiffs have not adequately established any burden on interstate commerce and, in any event, the "local benefit" of enabling enhanced background checks "outweighs any alleged burden").

## CONCLUSION

The court should grant Defendants' and Intervenor-Defendant's Cross Motion for Summary Judgment and should deny Plaintiffs' Motion for Summary Judgment.

---

[25] Recently enacted federal legislation will (1) require states to form a plan to improve their record reporting, (2) incentivize states to comply with their improvement plans, and (3) provide funding to states to improve their record reporting systems. *See* Consolidated Appropriations Act, 2018, Fix NICS Act of 2018, Pub. L. 115–141, §§ 601–605 (2018). But the results of this increased funding and attention are yet to be realized.

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DATED:  July 2, 2020

By:  *s/ Mica D. Klein*
By:  *s/ Carolyn S. Gilbert*
Mica D. Klein, WSBA No. 46596
MicaKlein@perkinscoie.com
Carolyn S. Gilbert, WSBA No. 51285
CarolynGilbert@perkinscoie.com
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

*Attorneys for Amicus Curiae Everytown for Gun Safety Support Fund*

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND'S AMICUS BRIEF
(No. 3:19-cv-5106) – 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**CERTIFICATE OF SERVICE**

The undersigned certifies that on July 2, 2020, I caused to be served via the CM/ECF system a true and correct copy of the foregoing document and that service of this document was accomplished on all parties in the case by the CM/ECF system.

*s/ Mica D. Klein*
Mica D. Klein, WSBA No. 46596
MicaKlein@perkinscoie.com

CERTIFICATE OF SERVICE
(No. 3:19-cv-5106) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**SER-28**

1

2

3

4

5

6                                                                        The Honorable Ronald B. Leighton

7

8                           UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
9                                     AT TACOMA

10   DANIEL MITCHELL, ROBIN BALL, LUKE            NO. 3:19-CV-05106-RBL
     RETTMER, NATHANIEL CASEY,
11   MATTHEW WALD, SECOND AMENDMENT              **DECLARATION OF
     FOUNDATION, and NATIONAL RIFLE             BONNIE E. MACNAUGHTON
12   ASSOCIATION,                                IN SUPPORT OF BRIEF OF
                                                 *AMICI CURIAE* GIFFORDS
13                              *Plaintiffs*,     LAW CENTER TO PREVENT
                                                 GUN VIOLENCE AND BRADY
14          v.                                   IN SUPPORT OF
                                                 DEFENDANTS AND
15   CHUCK ATKINS, in his official capacity as   INTERVENOR-DEFENDANT'S
     the Sheriff of Clark County, Washington,    CROSS-MOTION FOR
16   CRAIG MEIDL, in his official capacity as    SUMMARY JUDGMENT AND
     the Chief of Police of Spokane, Washington, OPPOSITION TO
17   and TERESA BERNTSEN, in her official        PLAINTIFFS' MOTION FOR
     capacity as the director of the Washington  SUMMARY JUDGMENT**
18   State Department of Licensing,

19                              *Defendants*,

20          and

21   SAFE SCHOOLS SAFE COMMUNITIES,

22                      *Intervenor-Defendant*.

23

24          I, Bonnie E. MacNaughton, declare:

25          1.      I am a member of the bars of the State of Washington and this Court, and am a

26   partner in the firm of Davis Wright Tremaine LLP, attorney for *amici curiae* Giffords Law Center

27

DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 1

                                                        Davis Wright Tremaine LLP
                                                              LAW OFFICES
                                                         920 Fifth Avenue, Suite 3300
                                                           Seattle, WA 98104-1610
                                                    206.622.3150 main · 206.757.7700 fax

to Prevent Gun Violence ("Giffords Law Center") and Brady.  I submit this Declaration in support of Giffords Law Center and Brady's *amicus* Brief in Support of Defendants and Intervenor-Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I would testify competently thereto.

2.      Attached as **Exhibit 1** is a true and correct copy of Joseph O'Sullivan, *Washington state voters approved new gun regulations in I-1639. Here's what the law will do*, Seattle Times, Nov.  8,  2018,  https://www.seattletimes.com/seattle-news/politics/washington-state-voters-approved-new-gun-regulations-in-i-1639-heres-what-the-law-will-do/.

3.      Attached as **Exhibit 2** is a true and correct copy of *Washington party shooting suspect read AR-15 gun manual right before attack*, The Guardian, Aug. 1, 2016, https://www.theguardian.com/us-news/2016/aug/01/washington-shooting-suspect-allen-ivanov-ar-15-gun-manual.

4.      Attached as **Exhibit 3** is a true and correct copy of excerpts of RAND Corporation, *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* (2018).

5.      Attached as **Exhibit 4** is a true and correct copy of Tomáš Paus et al., *Why do many psychiatric disorders emerge during adolescence?*, 9 Nature Reviews Neuroscience 947 (2008).

6.      Attached as **Exhibit 5** is a true and correct copy of *Mental Health Disorder Statistics*, Johns Hopkins Medicine (2020), https://www.hopkinsmedicine.org/health/wellness-and-prevention/mental-health-disorder-statistics.

7.      Attached as **Exhibit 6** is a true and correct copy of Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 Archives of General Psychiatry 1058 (2011).

8.      Attached as **Exhibit 7** is a true and correct copy of American Public Health Association, *Reducing Suicides by Firearms* (2018), https://www.apha.org/policies-and-

DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 2

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

advocacy/public-health-policy-statements/policy-database/2019/01/28/reducing-suicides-by-firearms.

9.      Attached as **Exhibit 8** is a true and correct copy of J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 Am. J. of Psychiatry 1094 (2016).

10.     Attached as **Exhibit 9** is a true and correct copy of Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. Times, Nov. 7, 2016, https://www.nytimes.com/2016/11/08/well/live/after-a-suicide-attempt-the-risk-of-another-try.html.

11.     Attached as **Exhibit 10** is a true and correct copy of Thomas J. Hanlon et al., *Type of Firearm Used in Suicides: Findings from 13 States in the National Violent Death Reporting System, 2005–2015*, 65 J. Adolescent Health 366 (2019).

12.     Attached as **Exhibit 11** is a true and correct copy of Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004).

13.     Attached as **Exhibit 12** is a true and correct copy of Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 No. 2 Pediatrics (2019).

14.     Attached as **Exhibit 13** is a true and correct copy of Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. Am. College Surgeons 150 (2019).

15.     Attached as **Exhibit 14** is a true and correct copy of excerpts of Jillian K. Peterson & James Densley, *Database of Mass Shootings in the United States*, The Violence Project (Nov. 2019),     https://www.theviolenceproject.org/wp-content/uploads/2019/11/TVP-Mass-Shooter-Database-Report-Final-compressed.pdf.

16.     Attached as **Exhibit 15** is a true and correct copy of Jillian Peterson & James Densley, *School shooters usually show these signs of distress long before they open fire, our database shows*, The Conversation, Feb. 8, 2019, https://theconversation.com/school-shooters-usually-show-these-signs-of-distress-long-before-they-open-fire-our-database-shows-111242.

DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

17.     Attached as **Exhibit 16** is a true and correct copy of *Active Shooter: Shooter's Age*, K-12 School Shooting Database, Center for Homeland Defense and Security, https://www.chds.us/ssdb/active-shooter-shooters-age/.

18.     Attached as **Exhibit 17** is a true and correct copy of excerpts of Adam Lankford & James Silver, *Why Have Public Mass Shootings Become More Deadly? Assessing how Perpetrators' Motives and Methods Have Changed Over Time*, 19 Criminology & Public Policy 37 (2020).

19.     Attached as **Exhibit 18** is a true and correct copy of *Percentage of the population 3 to 34 years old enrolled in school, by age group: selected years, 1940 through 2018*, National Center for Education Statistics, *available at* https://nces.ed.gov/programs/digest/d19/tables/dt19_103.20.asp?current=yes.

20.     Attached as **Exhibit 19** is a true and correct copy of excerpts of Eboni Morris, *Youth Violence: Implications for Posttraumatic Stress Disorder in Urban Youth*, National Urban League Policy Institute (2009).

21.     Attached as **Exhibit 20** is a true and correct copy of excerpts of U.S. Census Bureau, *Current Population Reports*, *Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 to 2050* (1996), *available at* https://www.census.gov/library/publications/ 1996/demo/p25-1130.html.

22.     Attached as **Exhibit 21** is a true and correct copy of Glenn D. Braunstein, *Violent Events Have Long-Term Effects on Children*, Huffington Post, Sept. 24, 2012, https://www.huffingtonpost.com/glenn-d-braunstein-md/childrenptsd_b_1901651.html.

23.     Attached as **Exhibit 22** is a true and correct copy of Jared Keller, *The Psychological Aftermath of Surviving School Shootings*, Pacific Standard, Mar. 25, 2019, https://psmag.com/education/the-psychological-aftermath-of-surviving-school-shootings.

24.     Attached as **Exhibit 23** is a true and correct copy of Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents with and Without Semiautomatic Rifles in the United States*,

DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 4

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

320 JAMA 1034 (2018).

25.     Attached as **Exhibit 24** is a true and correct copy of Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic, Feb. 22, 2018, https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victimsfrom-parkland-should-change-the-debate-on-guns/553937/.

26.     Attached as **Exhibit 25** is a true and correct copy of Melvin D. Livingston et. al, *A Descriptive Analysis of School and School Shooter Characteristics and the Severity of School Shootings in the United States*, *1999–2018*, 64 J. of Adolescent Health 797 (2019).

27.     Attached as **Exhibit 26** is a true and correct copy of Joshua D. Brown & Amie J. Goodin, *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982–2018*, 108 Am. J. Pub. Health 1385 (2018).

28.     Attached as **Exhibit 27** is a true and correct copy of Jeremy White, *When Lawmakers Try to Ban Assault Weapons, Gunmakers Adapt*, N.Y. Times, July 31, 2019, https://www.nytimes.com/interactive/2019/07/31/us/assault-weapons-ban.html.

29.     Attached as **Exhibit 28** is a true and correct copy of Zusha Elinson & Cameron McWhirter, *Gun Makers Adjust Rifles to Skirt Bans*, Wall St. J., June 21, 2019, https://www.wsj.com/articles/gun-makers-adjust-rifles-to-skirt-bans-11561109521.

30.     Attached as **Exhibit 29** is a true and correct copy of *Initiative Measure No. 1639*, November 6, 2018 General Election Results, Secretary of State (Nov. 27, 2018), *available at* https://results.vote.wa.gov/results/20181106/State-Measures-Initiative-Measure-No-1639-Initiative-Measure-No-1639-concerns-firearms_ByCounty.html.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 1st day of July 2020, at Seattle, Washington.


                                    *s/ Bonnie E. MacNaughton*
                                    Bonnie E. MacNaughton, WSBA #36110

DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 5

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

<u>CERTIFICATE OF SERVICE</u>

2

3

I hereby certify that on July 1, 2020, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to those

4

attorneys of record registered on the CM/ECF system.  All other parties (if any) shall be served

5

6

in accordance with the Federal Rules of Civil Procedure.

7

*s/ Bonnie E. MacNaughton*

8

Bonnie E. MacNaughton, WSBA #36110

9

Davis Wright Tremaine LLP

10

920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610

11

Ph:  (206) 622-3150
Fax:  (206) 757-7700

12

E-mail:  BonnieMacNaughton@dwt.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# Exhibit 11

■ ORIGINAL CONTRIBUTION

# Association Between Youth-Focused Firearm Laws and Youth Suicides

Daniel W. Webster, ScD, MPH

Jon S. Vernick, JD, MPH

April M. Zeoli, MPH

Jennifer A. Manganello, PhD, MPH

SUICIDE IS THE THIRD LEADING cause of death among youth aged 10 to 19 years in the United States, accounting for 1883 deaths in 2001.[1] Firearms were used in approximately half of suicides within this age group in 2001; however, as recently as 1994, 7 of every 10 suicides among teenagers involved firearms.[1]

Firearms are one of the most lethal methods of self-harm.[2] Case-control studies using community and clinical samples have consistently found that the presence of firearms in the home substantially increased the risk of adolescent suicide.[3-7] In addition, a recent state-level study, using the ratio of firearm suicides to total suicides as a proxy for the prevalence of gun ownership, found that suicide rates among teenagers and adults are significantly higher in states with higher rates of gun ownership.[8]

Several firearm policies are intended to limit the access that underage youth have to firearms. Since 1968, federal law has required licensed firearms dealers to prohibit handgun sales to purchasers younger than 21 years. In 1994, a federal law established 18 years as the minimum legal age for possessing or purchasing handguns, including sales by gun owners who are not licensed dealers. Many states have also adopted laws establishing a minimum legal age for being able to purchase or possess a firearm. Another type

of law intended to keep firearms from youth are gun safe storage laws, often referred to as child access prevention (CAP) laws. As of 2001, 18 states had some form of CAP law that makes it a crime to store firearms in a manner that allows them to be easily accessed by children and adolescents. Most require gun owners to lock up their guns.

**Context**  Firearms are used in approximately half of all youth suicides. Many state and federal laws include age-specific restrictions on the purchase, possession, or storage of firearms; however, the association between these laws and suicides among youth has not been carefully examined.

**Objective**  To evaluate the association between youth-focused firearm laws and suicides among youth.

**Design, Setting, and Participants**  Quasi-experimental design with annual state-level data on suicide rates among US youth aged 14 through 20 years, for the period 1976-2001. Negative binomial regression models were used to estimate the association between state and federal youth-focused firearm laws mandating a minimum age for the purchase or possession of handguns and state child access prevention (CAP) laws requiring safe storage of firearms on suicide rates among youth.

**Main Outcome Measures**  Association between youth-focused state and federal firearm laws and rates of firearm, nonfirearm, and total suicides among US youth aged 14 to 17 and 18 through 20 years.

**Results**  There were 63954 suicides among youth aged 14 through 20 years during the 1976-2001 study period, 39655 (62%) of which were committed with firearms. Minimum purchase-age and possession-age laws were not associated with statistically significant reductions in suicide rates among youth aged 14 through 20 years. State CAP laws were associated with an 8.3% decrease (rate ratio [RR], 0.92; 95% confidence interval [CI], 0.86-0.98) in suicide rates among 14- to 17-year-olds. The annual rate of suicide in this age group in states with CAP laws was 5.97 per 100000 population rather than the projected 6.51. This association was also statistically significant for firearm suicides (RR, 0.89; 95% CI, 0.83-0.96) but not for nonfirearm suicides (RR, 1.00; 95% CI, 0.91-1.10). CAP laws were also associated with a significant reduction in suicides among youth aged 18 through 20 years (RR, 0.89; 95% CI, 0.85-0.93); however, the association was similar for firearm suicides (RR, 0.87; 95% CI, 0.82-0.92) and nonfirearm suicides (RR, 0.91; 95% CI, 0.85-0.98).

**Conclusions**  There is evidence that CAP laws are associated with a modest reduction in suicide rates among youth aged 14 to 17 years. As currently implemented, minimum age restrictions for the purchase and possession of firearms do not appear to reduce overall rates of suicide among youth.

*JAMA. 2004;292:594-601*                                                    www.jama.com

**Author Affiliations:** Center for the Prevention of Youth Violence (Dr Webster and Mr Vernick and Ms Zeoli) and Center for Gun Policy and Research (Dr Webster and Mr Vernick), Johns Hopkins Bloomberg School of Public Health, Baltimore, Md; Annenberg Public Policy Center, University of Pennsylvania, Philadelphia (Dr Manganello).
**Corresponding Author:** Daniel W. Webster, ScD, MPH, Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, 624 N Broadway, Room 593, Baltimore, MD 21205 (dwebster @jhsph.edu).

©2004 American Medical Association. All rights reserved.

**DECL. OF BONNIE E. MACNAUGHTON**
**(3:19-CV-05106-RBL) - 95**

There has been little empirical research on the association between these youth-focused laws and rates of suicide among youth. Marvel[9] examined laws banning the possession of firearms by juveniles and found no evidence that these laws reduced youth suicides. However, in that study the outcome examined was suicides among youth aged 15 to 19 years, over half of which involve suicides among 18- and 19-year-olds, an age group not covered by most of the laws. We are not aware of any other study that has examined the association between minimum age restrictions for firearm purchases and firearm suicides among youth. In a study of the association between the first 12 CAP laws and mortality among youth through 1994, Cummings et al[10] reported that state CAP laws were associated with a 19% decline in suicides among youth aged 10 to 14 years. This estimate was not emphasized by the authors, presumably because the upper bound of the 95% confidence interval for the rate ratio was 1.01. Lott and Whitley[11] reported no statistically significant association between CAP laws and suicides among children younger than 15 years or among youth aged 15 to 19 years. However, their use of Tobit regression to estimate the laws' effects is vulnerable to bias when data are highly skewed and heteroskedastic, as is the case for state-level data on youth suicides.[12]

The study herein seeks to address the gap in research on the effects of firearm laws specifically designed to reduce the access that children and youth have to firearms. We examine the association between these laws and suicides among youth aged 14 through 20 years, an age group at much greater risk of firearm suicide than the younger groups examined in prior research.

## METHODS
### Study Design

To estimate the association between youth-focused firearm policies and suicide, we used a quasi-experimental design and regression analyses (described below) to contrast changes in rates of suicide among youth in states that adopted laws to restrict youth access to firearms with rate changes in states that did not make such changes in their laws, while controlling for potential confounders. State-level data sets were constructed that included the number of suicides among youth within each state for the years 1976 through 2001 for the 2 age groups potentially affected by the laws. Youth aged 14 to 17 years were the target group for laws establishing 18 years or younger as a minimum age for handgun purchase or possession, and for most CAP laws. Youth aged 18 through 20 years were legally affected by laws that increased the minimum age for handgun purchase or possession from 18 to 21 years.

### Outcome Variables

The outcome variables were the number of total, firearm, and nonfirearm suicides in each age group targeted by the laws. Death certificate data from the National Center for Health Statistics were used to identify suicide as a cause of death (*International Classification of Diseases, Ninth Revision* external cause of death codes E950-E959[13] and *International Classification of Diseases, 10th Revision* codes X60-X84, Y87.0, and U03[14]).

### Firearm Laws

We conducted legal research and consulted existing compilations of state laws[15] to obtain information about the youth-focused firearm laws of interest: minimum purchase age, minimum possession age, and CAP laws. When states had minimum-age cutoffs for purchase or possession of handguns that were different from those for purchase or possession of long guns, we used the cutoffs for handguns. We also collected information about other firearm laws, such as handgun licensing requirements (also known as permit-to-purchase laws), which might affect our outcomes of interest. For each law, we then determined the date it took effect, and whether there had been any changes to the law itself during the study period.

Dummy variables were created, set equal to 1 when the law was in effect for the whole year and equal to 0 when no law was in effect. For laws that were in effect for only part of a specific year, we set the law variable equal to 1 in a state-year if the law was in place for at least half of the year and equal to 0 otherwise. For the few laws that affected only one part of our age groups (eg, age 17 years as the minimum age for firearm purchase), we set the law variable equal to 1 if the law applied to the majority of youth committing suicide in the age group and equal to 0 otherwise. The federal law establishing a minimum legal age for handgun purchase and possession was assumed to affect only states that, prior to the federal law, either had no minimum-age law of this type or had a law that established a minimum legal age younger than 18 years.

### Statistical Analysis

To derive estimates of the association between the laws and youth suicide, we used negative binomial regression models and generalized estimating equations to estimate regression parameters. Negative binomial regression is appropriate for estimating models for count data that are overdispersed (ie, the variance is greater than the mean),[16] as is the case with state-level youth suicide data. Likelihood ratio tests rejected the null hypothesis that the distributions were Poisson. Generalized estimating equations take into account that the data are correlated, in this case by state and year, and make appropriate adjustments to standard errors for accurate hypothesis testing.[17] Correlation matrices of model residuals were examined to identify any clear pattern of autocorrelation; however, no pattern was evident. Therefore, the models were specified with unstructured autocorrelation, as is recommended for studies of this type,[18] using the PROCGEN program in SAS version 8.2 (SAS Institute Inc, Cary, NC). Each model included the natural logarithm of the population as an offset variable with the coefficient constrained to equal 1. Model coefficients

©2004 American Medical Association. All rights reserved.

DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 96

SER-37

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES

were converted to rate ratios (RRs) so that effects could be expressed in terms of percentage changes in suicide rates. We used 2-tailed tests of significance and $\alpha \le .05$ for rejecting the null hypothesis of no effect.

When statistically significant associations were identified, we assessed whether an association not attributable to change in the covariates could be attributable to differential prelaw trends in states that passed the law vs those that did not pass the law. This was assessed by estimating the effects for a set of dummy variables representing each of the 5 years just prior to the passage of the law and each of the first 5 years the law was in place. We assessed the plausibility that significant changes in suicide rates for an age group were caused by the law by examining whether statistically significant associations were specific to suicides using firearms and were not associated with changes in suicide rates among young persons aged 22 to 24 years, a group not legally affected by the laws. We also estimated a model that included only those states that had enacted their laws prior to 1996, providing at least 6 years of follow-up data. Model fit was assessed by comparing deviance statistics with their asymptotic $\chi^2$ distribution[19] and the Akaike information criterion statistic.[20]

**Other Explanatory Variables**

In addition to the firearm law variables, the models included indicator variables for each state, suicides for a within-state comparison group (individuals aged 22 to 24 years), per capita beer consumption, percentage of the population living in rural areas, real income per capita, unemployment rates, percentage of the adult population with a bachelors degree, percentage of the population of black race, the ratio of adult firearm suicides to total suicides as a proxy for the prevalence of gun ownership, and percentage of the population affiliated with specific religious denominations. The dummy variables for each state control for baseline differences in youth suicide levels across the 50 states

(the District of Columbia was not included in our study). Because the state firearm policies of interest target a particular age group, we used within-state suicide rates among young persons aged 22 to 24 years who were not targeted by the law to control for difficult-to-measure social factors (eg, social norms regarding suicide) that influence suicide rates among young persons in a particular state and year. We used year dummy variables to control for national trends in suicides among youth but also estimated alternative models with linear trend parameters when such patterns were clearly evident.

Data on state population of youth aged 14 through 20 years[21-23] and the percentage of residents living in rural areas were obtained from the US Census.[24] Annual per capita beer consumption data based on beer sales were obtained from the Alcohol Epidemiologic Data System of the National Institute of Alcoholism and Alcohol Abuse.[25] Data on personal income, unemployment, educational attainment, and religious affiliation were provided by Markowitz et al,[26] who obtained the data from government and private sources.[27-29]

**RESULTS**

**Youth-Focused Firearm Laws**

As of 2001, federal law and the laws of 46 states have mandated a minimum age for the purchase of a handgun, with the age ranging from 14 to 21 years. Of these, 21 states enacted or changed their law during the study period. Federal law and the laws of 39 states mandated a minimum possession age, ranging from 15 to 21 years, with 29 states enacting or changing their law during the study period. Nearly all of these changes established 18 years as the minimum age for firearm possession. Only 3 states increased their minimum legal age for handgun possession to 21 years during the study period. Eighteen states had CAP laws as of 2001. The maximum age of youth covered by these CAP laws ranged from 13 to 17 years (TABLE 1). Only 3 states adopted permit-to-purchase firearms licensing systems during the study period.

Most law changes restricting the access of youth to firearms went into effect between 1990 and 1995. The federal law establishing 18 years as the minimum age for handgun purchase and possession went into effect in 1994. After Florida implemented the nation's first CAP law in late 1989, 14 more states followed suit before the end of 1995.

**Suicide Trends Among Youth**

There were 63 954 suicides among youth aged 14 through 20 years during the 1976-2001 study period, 39 655 (62%) of which were committed with firearms. Firearm suicide rates among youth aged 14 to 17 years increased steadily from 2.6 (per 100 000 population) in 1976 to 5.7 in 1994, and then declined rapidly to 2.5 in 2001 (FIGURE). There were less-dramatic changes in firearm suicide rates among youth aged 18 through 20 years, except for a steep decrease from 9.6 in 1994 to 5.9 in 2001. There were no noteworthy trends in rates of nonfirearm suicides within the 2 age groups.

**Association Between Firearm Laws and Suicides Among Youth Aged 14 to 17 Years**

Our regression models for suicides among youth aged 14 to 17 years reveal no statistically significant association between suicide rates and laws setting minimum ages for firearm purchase or possession enacted at the state or federal level (TABLE 2). State CAP laws were associated with an 8.3% reduction in suicide rates (RR, 0.92; 95% confidence interval [CI], 0.86-0.98). In states with CAP laws, the annual suicide rate for youth aged 14 to 17 years was 5.97 per 100 000 during the period in which these laws were in effect. Our model estimates that in the absence of these laws the expected rate would have been 6.51.

The reduction associated with CAP laws was observed for firearm suicides, which decreased an estimated 10.8% in response to the introduction of CAP laws (RR, 0.89; 95% CI, 0.83-0.96). There was no statistically significant association between CAP

©2004 American Medical Association. All rights reserved.

**DECL. OF BONNIE E. MACNAUGHTON**
**(3:19-CV-05106-RBL) - 97**

SER-38

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES

**Table 1.** State Firearm Laws Focused on Youth, 1976-2001

| State | Minimum Purchase/Sale Age | | Minimum Possession Age | | CAP Law (Effective Date) |
| --- | --- | --- | --- | --- | --- |
| | Age, y | Change During Study Period (Effective Date) | Age, y | Change During Study Period (Effective Date) | |
| Federal law | 18 | No law to age 18 (09/19/94) | 18 | No law to age 18 (09/19/94) | NA |
| Alabama | 18 | NA | | NA | NA |
| Alaska | 16 | No law to age 16 (09/14/92) | 16 | No law to age 16 (01/80) | NA |
| Arizona | 18 | NA | 18 | No law to age 18 (07/18/93) | NA |
| Arkansas | 18 | No law to age 18 (01/01/76) | 18 | No law to age 18 (03/17/89) | NA |
| California | 18 | NA | 18 | No law to age 18 (09/19/94) | Up to age 17 (01/01/92) |
| Colorado | 18 | No law to age 18 (09/13/93) | 18 | No law to age 18 (09/13/93) | NA |
| Connecticut | 21 | Age 18 to age 21 (10/01/95) | | NA | Up to age 15 (10/01/90) |
| Delaware | 21 | Age 16 to age 21 (07/16/87) | 18 | No law to age 18 (07/15/94) | Up to age 17 (07/12/94) |
| Florida | 18 | NA | 18 | No law to age 18 (01/01/94) | Up to age 15 (10/01/89) |
| Georgia | 18 | Age 21 to age 18 (07/01/94) | 18 | No law to age 18 (07/01/94) | NA |
| Hawaii | 21 | Age 18 to age 21 (07/01/94) | | NA | Up to age 15 (06/29/92) |
| Idaho | 18 | Age 16 to age 18 (07/01/94) | 18 | No law to age 18 (07/01/94) | NA |
| Illinois | 21 | NA | 21 | NA | Up to age 14 (01/01/00) |
| Indiana | 18 | Age 21 to age 18 (07/01/77) | 18 | No law to age 18 (07/01/94) | NA |
| Iowa | 21 | Age 18 to age 21 (01/01/79) | | NA | Up to age 13 (04/05/90) |
| Kansas | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Kentucky | 18 | No law to age 18 (07/15/94) | 18 | No law to age 18 (07/15/94) | NA |
| Louisiana | 18 | NA | 17 | No law to age 17 (09/07/99) | NA |
| Maine | 16 | NA | | NA | NA |
| Maryland | 21 | NA | 21 | No law to age 21 (10/01/96) | Up to age 15 (10/01/92) |
| Massachusetts | 21 | Age 18 to age 21 (10/21/98) | 21 | Age 18 to age 21 (10/21/98) | Up to age 17 (10/21/98) |
| Michigan | 18 | NA | 18 | No law to age 18 (03/28/91) | NA |
| Minnesota | 18 | NA | 18 | NA | Up to age 13 (08/01/93) |
| Mississippi | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Missouri | 21 | Age 18 to age 21 (09/28/81) | | NA | NA |
| Montana | | NA | | NA | NA |
| Nebraska | 21 | Age 18 to age 21 (06/07/91) | 18 | NA | NA |
| Nevada | 18 | NA | 18 | Age 14 to age 18 (07/01/95) | Up to age 17 (10/01/91) |
| New Hampshire | 18 | NA | | NA | Up to age 16 (01/01/01) |
| New Jersey | 21 | Age 18 to age 21 (01/01/01) | 21 | Age 18 to age 21 (01/01/01) | Up to age 15 (01/17/92) |
| New Mexico | | NA | 19 | No law to age 19 (07/01/94) | NA |
| New York | 21 | No law to age 21 (11/01/00) | 16 | NA | NA |
| North Carolina | 18 | NA | 18 | No law to age 18 (09/01/93) | Up to age 17 (12/01/93) |
| North Dakota | 18 | Age 17 to age 18 (07/01/85) | 18 | Age 17 to age 18 (07/01/85) | NA |
| Ohio | 21 | Age 17 to age 21 (11/09/95) | | NA | NA |
| Oklahoma | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Oregon | 18 | NA | 18 | No law to age 18 (01/01/90) | NA |
| Pennsylvania | 18 | NA | 18 | No law to age 18 (09/11/95) | NA |
| Rhode Island | 21 | NA | 15 | NA | Up to age 15 (06/19/95) |
| South Carolina | 21 | NA | 21 | NA | NA |
| South Dakota | | NA | 18 | No law to age 18 (07/01/94) | NA |
| Tennessee | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Texas | 18 | NA | | NA | Up to age 16 (09/01/95) |
| Utah | 18 | No law to age 18 (10/21/93) | 18 | NA | NA |
| Vermont | 16 | NA | 16 | NA | NA |
| Virginia | 18 | NA | 18 | No law to age 18 (07/01/93) | Up to age 13 (07/01/92) |
| Washington | 18 | Age 21 to age 18 (07/01/94) | 18 | No law to age 18 (07/01/94) | NA |
| West Virginia | 18 | No law to age 18 (07/08/89) | 18 | No law to age 18 (07/08/89) | NA |
| Wisconsin | 18 | NA | 18 | NA | Up to age 13 (04/16/92) |
| Wyoming | | NA | | NA | NA |

Abbreviations: CAP, child access prevention; NA, not applicable/no change.     Minimum age not established.

©2004 American Medical Association. All rights reserved.

**DECL. OF BONNIE E. MACNAUGHTON**
**(3:19-CV-05106-RBL) - 98**

**SER-39**

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES

**Figure.** Youth Suicide Rates by Method and Age Group, United States, 1976-2001



laws and nonfirearm suicides among youth aged 14 to 17 years (RR, 1.00; 95% CI, 0.91-1.10). Estimates of the association between CAP laws and suicides among 14- to 17-year-olds were dependent on how national suicide trends were modeled. The estimates from the primary model noted above included separate linear-trend parameters for the 1976-1994 period of increasing suicide rates and for the 1995-2001 period of a downturn in rates. The trend parameters in this model were highly significant and, based on Akaike information criterion statistics, this model fit the data better than did a model that included year indicator variables. Models that assumed no overall pattern in youth suicide trends but that controlled for year-to-year fluctuations nationally with year indicator variables found no statistically significant association between CAP laws and suicide rates in the group aged 14 to 17 years. CAP law estimates did not vary substantially by whether violators could be charged with felony crimes or by the maximum age of youth targeted by the laws (data not shown).

The models used to estimate differences in suicide rates among youth aged 14 to 17 years in each of the 5 years before and after the adoption of a CAP law revealed no pattern of unmodeled differences between states with and those without CAP laws just prior to the adoption of these laws. When we examined the relationship between the length of time a CAP law was in place and the effects of the laws, there was also no clear pattern in successive postlaw year effects on total suicide rates, but the association between CAP laws and firearm suicides for this group was most pronounced for the first year the law was in effect (RR, 0.89; 95% CI, 0.77-1.02).

There was no statistically significant association between permit-to-purchase licensing laws and suicide rates among youth aged 14 to 17 years (RR, 1.06; 95% CI, 0.92-1.23). Association between the laws and suicide rates among youth aged 14 to 17 years were not substantially altered when the suicide rate among 22- to 24-year-olds and other covariates were removed from the model.

**Association Between Firearm Laws and Suicides Among Youth Aged 18 Through 20 Years**
The model for total suicides among youth aged 18 through 20 years estimated that state laws that increased the legal age for handgun possession to 21 years during the study period were associated with a 12.9% increase in sui-

cide rates (RR, 1.13; 95% CI, 1.01-1.27) (Table 2). This effect was not statistically significant, however, either for firearm suicides (RR, 1.14; 95% CI, 0.98-1.34) or nonfirearm suicides (RR, 1.07; 95% CI, 0.90-1.27). State laws raising the minimum legal purchase age to 21 years were associated with a 9.0% decline in rates of firearm suicides among youth aged 18 through 20 years (RR, 0.91; 95% CI, 0.83-1.00); however, there was no statistically significant association for overall suicide rates (RR, 0.97; 95% CI, 0.91-1.05).

State CAP laws were associated with an 11.1% decline in suicide rates among youth aged 18 through 20 years (RR, 0.89; 95% CI, 0.85-0.93). In this group, suicide reductions associated with CAP laws were similar for firearm suicides (−12.9%; RR, 0.87; 95% CI, 0.82-0.92) and nonfirearm suicides (−8.8%; RR, 0.91; 95% CI, 0.85-0.98). The 3 permit-to-purchase licensing laws were associated with a 17.7% increase in suicide rates (RR, 1.18; 95% CI, 1.04-1.34).

**COMMENT**
After steadily increasing between 1976 and 1994, rates of firearm suicides among youth have decreased sharply. Although many laws enacted during the early 1990s were intended to decrease access to firearms by children and youth, this study found no evidence that minimum-age restrictions for firearm purchase and possession have reduced suicide rates among the age groups targeted by the laws.

Our models estimate that 3 state laws that increased the minimum legal age for handgun possession to 21 years were associated with a 12.9% increase in total suicide risks among youth ages 18 through 20 years. There are several reasons, however, to doubt the validity of this estimate, including: (1) firearm and nonfirearm suicide rates were affected equally; (2) there was no increase in suicides among 14- to 17-year-olds associated with minimum possession age laws; (3) it is based on only 3 states, 2 of which adopted the change in the final 2 years of the study; and (4) the ab-

©2004 American Medical Association. All rights reserved.

**DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 99**

**SER-40**

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES

sence of a theory for how an intervention designed to reduced access to means of suicide could lead to a substantial increase in suicide rates. Similarly, our findings for permit-to-purchase licensing laws should be regarded with skepticism since they are based on just 3 changes in state law occurring during the study period, none of which involved a very restrictive licensing scheme.

We did find convincing evidence that the 18 CAP laws adopted during the study period led to an 8.3% reduction in suicide rates among youth aged 14 to 17 years. As would be expected if these reductions were attributable to reduced access to firearms, the reductions were specific to suicides committed with firearms and to the age group principally targeted by CAP laws. We found no association between CAP laws and suicide rates among young persons aged 22 to 24 years. Our estimate of the association between CAP laws and firearm suicides (−10.8%; 95% CI, −18.4% to −3.7%) among youth aged 14

**Table 2.** Association Between Youth-Focused Firearm Laws and Suicides Among Youth Aged 14 to 17 Years and 18 Through 20 Years

| | Aged 14 to 17 Years | | Aged 18 Through 20 Years | |
|---|---|---|---|---|
| | RR (95% CI) | Value | RR (95% CI) | Value |
| **Total Suicides** | | | | |
| Firearm laws | | | | |
| Federal law | | | | |
|   Minimum purchase age | 1.02 (0.91-1.14) | .72 | NA | NA |
|   Minimum possession age | 0.98 (0.90-1.08) | .75 | NA | NA |
| State laws | | | | |
|   Minimum purchase age | 1.04 (0.90-1.21) | .58 | 0.97 (0.91-1.05) | .47 |
|   Minimum possession age | 0.97 (0.90-1.05) | .44 | 1.13 (1.01-1.27) | .04 |
|   Child access prevention laws | 0.92 (0.86-0.98) | .005 | 0.89 (0.85-0.93) | <.001 |
|   Permit to purchase laws | 1.06 (0.92-1.23) | .43 | 1.18 (1.04-1.34) | .01 |
| Other covariates | | | | |
| Linear time trend, 1976-1994 | 1.10 (1.07-1.12) | <.001 | NA | NA |
| Linear time trend, 1995-2001 | 0.95 (0.93-0.98) | <.001 | NA | NA |
| Per capita beer consumption | 0.99 (0.99-1.00) | .10 | 1.00 (0.99-1.01) | .27 |
| Population living in rural areas | 0.99 (0.98-1.01) | .37 | 1.00 (0.99-1.01) | .50 |
| Unemployment | 1.00 (0.99-1.00) | .48 | 1.01 (1.00-1.02) | .12 |
| Real per capita income | 1.00 (1.00-1.00) | .22 | 1.00 (1.00-1.00) | .85 |
| Adult population with bachelors degree | 0.99 (0.98-1.00) | .08 | 1.00 (0.99-1.01) | .78 |
| Religious affiliation | | | | |
|   Southern Baptist | 1.04 (1.00-1.07) | .01 | 1.01 (0.98-1.03) | .57 |
|   Other Protestant | 1.01 (0.99-1.02) | .37 | 0.99 (0.98-1.00) | .16 |
|   Mormon | 1.12 (1.05-1.18) | <.001 | 1.04 (0.98-1.09) | .17 |
|   Catholic | 0.98 (0.97-1.00) | .006 | 0.98 (0.98-0.99) | .002 |
| Proxy for adult firearm prevalence | 0.41 (0.26-0.64) | <.001 | 0.46 (0.32-0.65) | <.001 |
| Suicide rates among ages 22-24 y | 1.01 (1.00-1.01) | .002 | 1.01 (1.00-1.01) | .002 |
| **Firearm Suicides** | | | | |
| Federal law | | | | |
|   Minimum purchase age | 1.00 (0.87-1.16) | .96 | NA | NA |
|   Minimum possession age | 0.99 (0.89-1.09) | .80 | NA | NA |
| State laws | | | | |
|   Minimum purchase age | 1.04 (0.87-1.16) | .66 | 0.91 (0.83-1.00) | .05 |
|   Minimum possession age | 1.02 (0.92-1.12) | .77 | 1.14 (0.98-1.34) | .10 |
|   Child access prevention laws | 0.89 (0.83-0.96) | .003 | 0.87 (0.82-0.92) | <.001 |
|   Permit to purchase laws | 0.92 (0.76-1.10) | .33 | 1.22 (1.04-1.43) | .02 |
| **Nonfirearm Suicides** | | | | |
| Federal law | | | | |
|   Minimum purchase age | 1.08 (0.91-1.28) | .40 | NA | NA |
|   Minimum possession age | 1.12 (0.99-1.26) | .08 | NA | NA |
| State laws | | | | |
|   Minimum purchase age | 1.05 (0.85-1.31) | .64 | 1.05 (0.94-1.17) | .37 |
|   Minimum possession age | 0.93 (0.82-1.05) | .24 | 1.07 (0.90-1.27) | .44 |
|   Child access prevention laws | 1.00 (0.91-1.10) | .95 | 0.91 (0.85-0.98) | .02 |
|   Permit to purchase laws | 1.27 (1.00-1.61) | .047 | 1.14 (0.93-1.39) | .21 |

Abbreviations: CI, confidence interval; NA, not applicable; RR, rate ratio.

©2004 American Medical Association. All rights reserved.

**DECL. OF BONNIE E. MACNAUGHTON**
**(3:19-CV-05106-RBL) - 100**

**SER-41**

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES

to 17 years is consistent with, though smaller in magnitude than, the estimate of Cummings et al[10] of the association between CAP laws and firearm suicides among adolescents younger than 15 years (−19.0%; 95% CI, −34.0% to +1.0%). CAP laws were also associated with statistically significant declines in suicide rates among those in the group aged 18 through 20 years. However, the statistically significant negative association between CAP laws and rates of suicide using means other than firearms casts doubt on any causal connection between the laws and lower suicide rates in this group of older youth.

Some may question whether the reductions in youth suicides that were associated with CAP laws in this study might be spurious, since many in the group aged 14 to 17 years were older than the maximum age required for safe firearm storage. However, many older youth have younger siblings, relatives, or friends that may prompt their parents to comply with CAP law requirements. In addition, CAP laws may encourage gun owners with children young enough to be covered by the law to adopt safe storage practices that endure even after their children are beyond the age required for safe firearms storage under the law. Finally, gun owners simply may not respond to very specific aspects of a CAP law in order to be in compliance. Instead, CAP laws may increase awareness and change social norms to encourage gun owners to secure firearms from underage youth. These interpretations are consistent with our finding that the ages covered by the CAP law were unrelated to the association between CAP laws and suicides among youth.

There are several reasons that CAP laws might be more effective than minimum-age restrictions for firearm purchases and possession in reducing suicides among youth. First, a large majority of youth who commit or attempt suicide with a firearm use guns owned by their parents or relatives.[30,31] Second, the adopted restrictions on minimum purchase age did not affect the handgun sales practices re-

quired of licensed firearm dealers. Since 1968, federal law has prohibited licensed dealers from selling handguns to individuals younger than 21 years. In addition, there is little evidence that laws governing sales by those who are not dealers are vigorously enforced in most states[32] (Frattaroli S, unpublished doctoral dissertation, 1999; on file with the authors).

Thus, it is important to recognize that our study is not a test of the relationship between firearm availability and risk of suicide among youth. Our results for minimum purchase-age and possession-age laws suggest that these laws have not substantially reduced the availability of firearms to youth at risk for suicide. Therefore, our results are not necessarily inconsistent with prior research, such as findings from Wintemute et al[33] that adult handgun purchasers were at higher risk for suicide, even 6 years after purchase. If a youth's risk of suicide were greatest several years after he or she had acquired a firearm, we may have underestimated the full effect of these laws. But when we limited the analysis to state laws enacted through 1995—providing at least 6 years of follow-up data for the remaining 45 states—we still identified no significant effects for these laws.

As with prior studies of CAP laws, we were unable to directly measure whether these laws resulted in actual changes in firearm storage practices. Nevertheless, our weapon-specific estimates of the effects of CAP laws suggest that these laws did limit the access that youth have to firearms.

This study does not examine the full range of potential effects of CAP laws. Lott and Whitley[11] report that CAP laws were associated with increases in rapes (9%) and robberies (10%), presumably because firearms kept in locked storage are potentially less available for self-defense. Their findings are questionable because the vast majority of these crimes take place outside the home[34] and firearms are very rarely used for self-defense.[35]

Our study also does not consider the potential role that laws restricting the

access of youth to firearms might have in reducing unintentional shootings or homicides. Two prior studies of the association between CAP laws and deaths among children younger than 15 years from unintentional shootings, with similar methods but over different time periods, produced similar estimates of aggregate effect (−23% and −17%).[10,36] However, one of these studies[36] found that the aggregate benefits were largely driven by a single state law (Florida). Marvel[9] found no evidence that laws prohibiting possession of firearms by juveniles were associated with youth being killed by guns or with their use of guns to commit homicide.

The reductions in suicides associated with CAP laws are relatively modest in terms of percentage change. However, because the laws target an important risk factor, a high-risk group, and a leading cause of death, the public health significance of the laws is meaningful. Assuming that the observed association is causal, we estimate that the 18 CAP laws implemented prior to 2002 have prevented 333 suicides among youth aged 14 to 17 years from the time that Florida implemented the nation's first CAP law (October 1989) through 2001. In 2001 alone, we estimate that there were 35 fewer suicides among this group in the 18 states with CAP laws than would have been expected without the laws. These benefits have been obtained with very modest levels of publicity and enforcement. Increased efforts to encourage compliance with CAP laws have the potential to enhance their effectiveness in preventing deaths and injuries resulting from unsupervised access of youth to firearms.

Further research is needed to ascertain what factors have contributed to the recent decline in firearm suicides among youth in the United States. The timing of the decline is coincident with the adoption of several laws designed to reduce youth access to firearms, yet the only evidence we found that these laws are responsible for reductions in suicides among youth was a modest reduction associated with CAP laws. The

©2004 American Medical Association. All rights reserved.

**DECL. OF BONNIE E. MACNAUGHTON**
**(3:19-CV-05106-RBL) - 101**

**SER-42**

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES

passage of many youth-focused firearm restrictions during the early 1990s may have been associated with broader changes in those social norms that involve allowing youth access to firearms—norms that affect states both with and without recent changes to their firearm laws. If the passage of laws restricting youth access to firearms influenced norms and practices both within and outside the states that adopted the laws, our estimates would understate the effect of these laws on suicide rates among youth.

**Author Contributions:** Dr Webster, as principal investigator of this study, had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analyses.
*Study concept and design; drafting of the manuscript; obtained funding:* Webster, Vernick.
*Acquisition of data; critical revision of the manuscript for important intellectual content; administrative, technical, or material support:* Vernick, Manganello, Zeoli.
*Analysis and interpretation of data:* Webster, Vernick, Manganello, Zeoli.

*Statistical analysis; study supervision:* Webster.
**Funding/Support:** This study was funded by grant R49/CCR318627-04 from the Centers for Disease Control and Prevention, National Center for Injury Prevention and Control to the Johns Hopkins Center for the Prevention of Youth Violence.
**Role of the Sponsor:** The Centers for Disease Control and Prevention had no role in the design and conduct of the study; in the collection, analysis, or interpretation of the data; in the preparation of the data; or in the preparation, review, or approval of the manuscript.
**Acknowledgment:** We thank Lisa Hepburn and Sara Markowitz for assistance in obtaining the data for this study, Maria Bulzacchelli for assistance with data management, and Elizabeth Johnson for statistical advice.

**REFERENCES**

**1.** Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics and Query Reporting System. Available at: http://www.cdc.gov/ncipc/wisqars. Accessed December 17, 2003.
**2.** Shenassa ED, Catlin SN, Buka SL. Lethality of firearms relative to other suicide methods: a population based study. *J Epidemiol Community Health.* 2003; 57:120-124.
**3.** Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide: a community case-control study. *AJDC.* 1993;147:1066-1071.
**4.** Brent DA, Perper J, Moritz G, et al. Suicide in adolescents with no apparent psychopathology. *J Am Acad Child Adolesc Psychiatry.* 1993;32:494-500.
**5.** Kellermann AL, Rivara FP, Rushforth NB, et al. Suicide in the home in relationship to gun ownership. *N Engl J Med.* 1992;327:467-472.
**6.** Brent DA, Perper JA, Allman CJ, et al. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. *JAMA.* 1991; 266:2989-2995.
**7.** Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. *Arch Gen Psychiatry.* 1988;45:581-588.
**8.** Miller M, Azrael D, Hemenway D. Household firearm ownership and suicide in the United States. *Epidemiology.* 2002;13:517-524.
**9.** Marvel TB. The impact of banning juvenile gun possession. *J Law Econ.* 2001;44:691-713.
**10.** Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *JAMA.* 1997;278:1084-1086.
**11.** Lott JR Jr, Whitley JE. Safe storage gun laws: accidental deaths, suicides, and crime. *J Law Econ.* 2001; 44:6596-6689.
**12.** Greene WH. *Econometric Analyses.* 5th ed. Upper Saddle River, NJ: Prentice Hall; 2003:768-771.
**13.** World Health Organization (WHO). *Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death.* Geneva, Switzerland: WHO; 1977.
**14.** World Health Organization (WHO). *Interna-

tional Statistical Classification of Diseases and Related Health Problems.* Geneva, Switzerland: WHO; 1992.
**15.** Bureau of Alcohol, Tobacco and Firearms. *State Laws and Published Ordinances—Firearms.* Washington, DC: US Dept of the Treasury; 1988, 1994, 1998, 2000.
**16.** Lawless JE. Negative binomial and mixed Poisson regression. *Can J Stat.* 1987;15:209-225.
**17.** Liang KY, Zeger SL. Longitudinal data analysis using generalized linear models. *Biometrika.* 1986;73: 13-22.
**18.** Bertrand M, Duflo E, Mullainathan S. How much should we trust differences-in-differences estimates? *Q J Econ.* 2004:249-275.
**19.** Williams DA. Generalized linear model diagnostics using the deviance and single case deletions. *Appl Stat.* 1987;36:181-191.
**20.** Akaike H. A new look at the statistical model identification. *IEEE Trans Automatic Control.* 1974;19: 716-723.
**21.** US Census Bureau. Intercensal Estimates of the Resident Populations of States 1970 to 1980. US Dept of Commerce, 2002. Available at: http://eire.census.gov/popest/archives/pre1980/e7080sta.txt. Accessed October 1, 2003.
**22.** US Census Bureau. Historical Annual Time Series of State Population Estimates and Demographic Components of Change 1980 to 1990, by Single Year of Age and Sex. US Dept of Commerce, 2002. Available at: http://eire.census.gov/popest/archives/state/st_stig.php. Accessed October 1, 2003.
**23.** US Census Bureau. Population Estimates: 1990 to 1999 Annual Time Series of State Population Estimates, by Single Year of Age and Sex. US Dept of Commerce, 2002. Available at: http://eire.census.gov/popest/archives/state/st-99-10.php. Accessed October 1, 2003.
**24.** US Census Bureau. *Statistical Abstract of the United States.* Washington, DC: US Dept of Commerce; 1977-2002.
**25.** Nephew TM, Williams GD, Yi H, Hoy AK, Stinson FS, Dufour MC. *Apparent Per Capita Alcohol Consumption: National, State, and Regional Trends, 1977-2000.* Bethesda, Md: National Institute on Alcohol Abuse and Alcoholism, Division of Biometry and Epi-

demiology, Alcohol Epidemiologic Data System; August 2003.
**26.** Markowitz S, Chatterji P, Kaestner R. Estimating the impact of alcohol policies on youth suicides. *J Ment Health Policy Econ.* 2003;6:37-46.
**27.** Bureau of Economic Analysis. *State Personal Income, 1929-2002* [database on CD-ROM]. Washington, DC: US Dept of Commerce; 2004.
**28.** Bureau of Labor Statistics. Historical data from the Current Population Survey. Washington, DC: US Department of Labor, 2003. Available at: http://www.bls.gov/lau/staadoc.htm. Accessed June 29, 2004.
**29.** Jones DE, Doty S, Horsch JE, et al. *Religious Congregations and Membership in the United States, 2000: An Enumeration by Region, State, and County Based on Data Reported by 149 Religious Bodies.* Nashville, Tenn: Glenmary Research Center; 2002.
**30.** Shah S, Hoffman RE, Wake L, Marine WM. Adolescent suicide and household access to firearms in Colorado: results of a case-control study. *J Adolesc Health.* 2000;26:157-163.
**31.** Grossman DC, Reay DT, Baker SA. Self-inflicted and unintentional firearm injuries among children and adolescents: the source of the firearm. *Arch Pediatr Adolesc Med.* 1999;153:875-878.
**32.** Vernick JS, Hepburn LM. State and federal gun laws: trends for 1970-99. In: Ludwig J, Cook PJ. eds. *Evaluating Gun Policy.* Washington, DC: Brookings Institution Press; 2003.
**33.** Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. *N Engl J Med.* 1999;341:1583-1589.
**34.** Bureau of Justice Statistics. *Criminal Victimization in the United States, 2002: Statistical Tables.* Washington, DC: US Department of Justice; December 2003. Bureau of Justice Statistics Special Report NCJ 200561.
**35.** Perkins C. *Weapon Use and Violent Crime: National Crime Victimization Survey 1993-2001.* Washington, DC: US Dept of Justice; September 2003. Bureau of Justice Statistics Special Report NCJ 194820.
**36.** Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional firearm deaths of children. *Pediatrics.* 2000;106:1466-1469.

©2004 American Medical Association. All rights reserved.

**DECL. OF BONNIE E. MACNAUGHTON**
**(3:19-CV-05106-RBL) - 102**

**SER-43**

LETTERS

dividuals already infected with HIV should thus continue vigilant personal protection through safe-sex practices or clean needle use for injection drugs, even if their risk exposures are with other HIV-infected people.

Davey M. Smith, MD
d13smith@ucsd.edu
Department of Medicine
University of California, San Diego
La Jolla
Joseph K. Wong, MD
George K. Hightower, BA
Caroline C. Ignacio, BS
Kersten K. Koelsch, MD
Department of Medicine
University of California, San Diego
Eric S. Daar, MD
Division of HIV Medicine, Harbor-UCLA Research and Education Institute and the David Geffen School of Medicine at UCLA
Los Angeles, Calif
Douglas D. Richman, MD
Departments of Medicine and Pathology
University of California, San Diego
San Diego Veterans Affairs Healthcare Systems
Susan J. Little, MD
Department of Medicine
University of California, San Diego

**Access to Data:** Dr Smith had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analyses.
**Funding/Support:** This work was supported by National Institutes of Health grants 5K23AI055276, AI27670, AI38858, AI43638, AI43752, UCSD Centers for AIDS Research (AI36214), AI29164, and M01-RR00425, and the Research Center for AIDS and HIV Infection of the San Diego Veterans Affairs Healthcare System.

**Role of the Sponsors:** The organizations funding this study had no role in the design and conduct of the study; the collection, analysis, and interpretation of the data; or the preparation, review, or approval of the manuscript.

**1.** Allen T, Altfeld M. HIV superinfection. *J Allergy Clin Immunol.* 2003;112:829-835.
**2.** Koelsch KK, Smith DM, Little SJ, et al. Clade B HIV-1 superinfection with wild-type virus after infection with drug resistant clade B virus. *AIDS.* 2003;17:F11-F16.
**3.** Smith DM, Wong JK, Hightower GK, et al. The clinical consequences of HIV superinfection. Presented at: XV International AIDS Conference; July 11-16, 2004; Bangkok, Thailand.
**4.** Gonzales MJ, Delwart E, Rhee SY, et al. Lack of detectable human immunodeficiency virus type 1 superinfection during 1072 person-years of observation. *J Infect Dis.* 2003;188:397-405.
**5.** Watanabe ME. Skeptical scientists skewer VaxGen statistics. *Nat Med.* 2003; 9:376.
**6.** Lyles RH, Munoz A, Yamashita TE, et al, Multicenter AIDS Cohort Study. Natural history of human immunodeficiency virus type 1 viremia after seroconversion and proximal to AIDS in a large cohort of homosexual men. *J Infect Dis.* 2000; 181:872-880.

# CORRECTIONS

**Incorrect Dosages:** In the Original Contribution entitled "Safety and Efficacy of Enoxaparin vs Unfractionated Heparin in Patients With Non–ST-Segment Elevation Acute Coronary Syndromes Who Receive Tirofiban and Aspirin: A Randomized Controlled Trial" published in the July 7, 2004, issue of *JAMA* (2004;292:55-64), there were 2 incorrect dosages on page 56. At the bottom of column 2, the sentence should read, "The dosing regimen for tirofiban in the A to Z trial was a hybrid between the previously proven ACS and percutaneous coronary intervention dosing regimens: a bolus of 10 μg/kg over 3 minutes, followed by a maintenance infusion of 0.1 μg/kg per minute for a suggested minimum of 48 hours (or a minimum of 12 hours after intervention) and a maximum of 120 hours.[9,13]"

**Funding Source Omitted:** In the Original Contribution entitled "Association Between Youth-Focused Firearm Laws and Youth Suicides" published in the August 4, 2004, issue of *JAMA* (2004;292;594-601), a funding source was omitted. In addition to the sources cited, the study also received support from the David and Lucile Packard Foundation.

©2004 American Medical Association. All rights reserved.

**DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 103**

**SER-44**

# Exhibit 16

## ACTIVE SHOOTER: SHOOTER'S AGE
*Based on publicly available data on incidents from 1970-present*



# Exhibit 20

CURRENT POPULATION REPORTS

# Population Projections of the United States by Age, Sex, Race, and Hispanic Origin:  1995 to 2050

P25-1130



U.S. Department of Commerce
Economics and Statistics Administration
BUREAU OF THE CENSUS

CURRENT POPULATION REPORTS

# Population Projections of the United States by Age, Sex, Race, and Hispanic Origin:  1995 to 2050

P25-1130

Issued February 1996





**U.S. Department of Commerce**
**Ronald H. Brown,** Secretary
**David J. Barram,** Deputy Secretary

**Economics and Statistics Administration**
**Everett M. Ehrlich,** Under Secretary
for Economic Affairs

**BUREAU OF THE CENSUS**
**Martha Farnsworth Riche,** Director

# Acknowledgments

This report was prepared under the general direction of **Gregory Spencer,** Chief of the Population Projections Branch. Statistical assistance was provided by **Mary Jane Slagle. Rosalyn M. Green** assisted with computer programming of the detailed tables. **John F. Long**, Assistant Division Chief for Population Estimates and Projections provided overall direction. Professional consultation was provided by **Gregory Spencer, Frederick W. Hollmann, Paul R. Campbell, Signe I. Wetrogan, Kevin E. Deardorff, Larry Sink,** and **Martin O'Connell.** The preparation of the final report was the responsibility of a team headed by **Kevin E. Deardorff.** Its other principal members were **Patricia Montgomery** and **Gregory Spencer.**

The staff of Administrative and Customer Services Division, **Walter C. Odom,** Chief, provided publication planning, design, composition, editorial review, and printing planning and procurement. **Cynthia G. Brooks** provided publication coordination and editing.



ECONOMICS
AND STATISTICS
ADMINISTRATION



**Economics and Statistics
Administration**
**Everett M. Ehrlich**, Under Secretary
for Economic Affairs

**BUREAU OF THE CENSUS**
**Martha Farnsworth Riche**, Director
**Bryant Benton**, Deputy Director

**Paula J. Schneider**, Principal Associate
Director for Programs
**Nancy M. Gordon**, Associate Director
for Demographic Programs

**POPULATION DIVISION**
**Arthur J. Norton**, Chief

---

**SUGGESTED CITATION**

Day, Jennifer Cheeseman, *Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 to 2050,* U.S. Bureau of the Census, Current Population Reports, P25-1130, U.S. Government Printing Office, Washington, DC, 1996

---

For sale by Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402.

**Table 2.  Projections of the Population by Age, Sex, Race, and Hispanic Origin for the United**

[Numbers in thousands. Resident population]

| Date and age | Total | | | Race | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | White | | | Black | | | American Indian, Eskimo, and Aleut | | | Asian and Pacific Islander | | |
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| **JULY 1, 2020** | | | | | | | | | | | | | | | |
| All ages | 322 742 | 158 021 | 164 721 | 254 887 | 125 855 | 129 032 | 45 075 | 21 312 | 23 763 | 3 129 | 1 536 | 1 593 | 19 651 | 9 318 | 10 333 |
| Under 5 years | 21 979 | 11 259 | 10 719 | 16 419 | 8 424 | 7 994 | 3 818 | 1 951 | 1 867 | 266 | 134 | 132 | 1 476 | 750 | 726 |
| Under 1 year | 4 454 | 2 280 | 2 174 | 3 313 | 1 699 | 1 613 | 781 | 399 | 382 | 54 | 27 | 27 | 306 | 155 | 151 |
| 1 year | 4 388 | 2 248 | 2 141 | 3 280 | 1 682 | 1 598 | 763 | 390 | 373 | 52 | 26 | 26 | 293 | 149 | 144 |
| 2 years | 4 377 | 2 244 | 2 133 | 3 273 | 1 680 | 1 593 | 758 | 388 | 370 | 53 | 27 | 26 | 293 | 149 | 144 |
| 3 years | 4 359 | 2 233 | 2 126 | 3 263 | 1 675 | 1 589 | 750 | 383 | 367 | 53 | 27 | 26 | 292 | 149 | 143 |
| 4 years | 4 401 | 2 255 | 2 146 | 3 289 | 1 688 | 1 602 | 766 | 391 | 375 | 53 | 27 | 27 | 292 | 149 | 143 |
| 5 to 9 years | 21 548 | 11 045 | 10 503 | 16 273 | 8 273 | 7 849 | 3 717 | 1 901 | 1 816 | 269 | 136 | 133 | 1 440 | 735 | 705 |
| 5 years | 4 375 | 2 243 | 2 132 | 3 272 | 1 680 | 1 593 | 756 | 387 | 370 | 54 | 27 | 27 | 292 | 149 | 143 |
| 6 years | 4 339 | 2 223 | 2 116 | 3 257 | 1 670 | 1 586 | 743 | 380 | 362 | 53 | 27 | 26 | 287 | 146 | 141 |
| 7 years | 4 318 | 2 212 | 2 106 | 3 235 | 1 659 | 1 576 | 743 | 379 | 364 | 53 | 27 | 26 | 286 | 146 | 140 |
| 8 years | 4 126 | 2 114 | 2 012 | 3 088 | 1 584 | 1 504 | 708 | 362 | 346 | 52 | 26 | 26 | 278 | 142 | 136 |
| 9 years | 4 390 | 2 253 | 2 137 | 3 271 | 1 680 | 1 591 | 766 | 393 | 374 | 56 | 28 | 28 | 297 | 152 | 145 |
| 10 to 14 years | 21 334 | 10 933 | 10 401 | 15 848 | 8 133 | 7 715 | 3 677 | 1 881 | 1 797 | 285 | 144 | 141 | 1 524 | 776 | 748 |
| 10 years | 4 372 | 2 245 | 2 127 | 3 257 | 1 674 | 1 583 | 756 | 387 | 369 | 57 | 29 | 28 | 302 | 154 | 147 |
| 11 years | 4 272 | 2 190 | 2 082 | 3 185 | 1 635 | 1 550 | 734 | 375 | 359 | 56 | 28 | 28 | 297 | 152 | 145 |
| 12 years | 4 235 | 2 168 | 2 067 | 3 146 | 1 615 | 1 528 | 736 | 376 | 360 | 57 | 29 | 29 | 305 | 155 | 151 |
| 13 years | 4 233 | 2 167 | 2 067 | 3 141 | 1 610 | 1 531 | 724 | 370 | 354 | 58 | 29 | 29 | 310 | 157 | 153 |
| 14 years | 4 222 | 2 165 | 2 057 | 3 128 | 1 606 | 1 522 | 727 | 373 | 354 | 57 | 29 | 28 | 310 | 158 | 152 |
| 15 to 19 years | 21 364 | 10 952 | 10 412 | 15 858 | 8 199 | 7 759 | 3 639 | 1 861 | 1 778 | 265 | 133 | 132 | 1 502 | 759 | 743 |
| 15 years | 4 230 | 2 170 | 2 060 | 3 130 | 1 608 | 1 522 | 733 | 376 | 357 | 57 | 28 | 28 | 310 | 157 | 153 |
| 16 years | 4 220 | 2 171 | 2 049 | 3 143 | 1 619 | 1 525 | 721 | 371 | 349 | 54 | 27 | 27 | 301 | 154 | 148 |
| 17 years | 4 292 | 2 212 | 2 081 | 3 203 | 1 653 | 1 550 | 728 | 375 | 353 | 54 | 27 | 27 | 307 | 156 | 150 |
| 18 years | 4 197 | 2 147 | 2 051 | 3 153 | 1 617 | 1 536 | 712 | 362 | 349 | 49 | 25 | 25 | 283 | 143 | 141 |
| 19 years | 4 424 | 2 252 | 2 172 | 3 228 | 1 702 | 1 626 | 745 | 376 | 369 | 51 | 25 | 26 | 300 | 149 | 151 |
| 20 to 24 years | 21 298 | 10 803 | 10 495 | 16 186 | 8 265 | 7 921 | 3 399 | 1 691 | 1 708 | 240 | 119 | 121 | 1 473 | 728 | 745 |
| 20 years | 4 387 | 2 235 | 2 152 | 3 317 | 1 698 | 1 619 | 726 | 366 | 360 | 49 | 24 | 25 | 296 | 147 | 148 |
| 21 years | 4 300 | 2 191 | 2 110 | 3 252 | 1 665 | 1 588 | 702 | 353 | 349 | 49 | 24 | 24 | 297 | 148 | 149 |
| 22 years | 4 189 | 2 127 | 2 061 | 3 188 | 1 630 | 1 558 | 662 | 330 | 333 | 47 | 24 | 24 | 291 | 144 | 147 |
| 23 years | 4 160 | 2 103 | 2 057 | 3 169 | 1 615 | 1 554 | 654 | 322 | 332 | 47 | 23 | 23 | 290 | 143 | 147 |
| 24 years | 4 262 | 2 146 | 2 116 | 3 259 | 1 656 | 1 602 | 656 | 320 | 336 | 48 | 24 | 24 | 299 | 146 | 153 |
| 25 to 29 years | 21 569 | 10 760 | 10 809 | 16 576 | 8 353 | 8 223 | 3 242 | 1 563 | 1 679 | 236 | 117 | 119 | 1 515 | 727 | 788 |
| 25 years | 4 241 | 2 128 | 2 113 | 3 247 | 1 645 | 1 602 | 647 | 314 | 333 | 47 | 24 | 24 | 299 | 145 | 154 |
| 26 years | 4 240 | 2 117 | 2 123 | 3 254 | 1 640 | 1 614 | 639 | 309 | 330 | 47 | 24 | 24 | 300 | 144 | 156 |
| 27 years | 4 314 | 2 154 | 2 160 | 3 315 | 1 672 | 1 643 | 647 | 313 | 335 | 48 | 24 | 24 | 304 | 146 | 158 |
| 28 years | 4 155 | 2 064 | 2 091 | 3 216 | 1 614 | 1 602 | 609 | 293 | 317 | 44 | 22 | 22 | 286 | 136 | 150 |
| 29 years | 4 619 | 2 297 | 2 322 | 3 544 | 1 783 | 1 762 | 699 | 334 | 365 | 50 | 25 | 25 | 326 | 155 | 171 |
| 30 to 34 years | 21 365 | 10 559 | 10 806 | 16 542 | 8 284 | 8 258 | 3 126 | 1 473 | 1 653 | 246 | 122 | 124 | 1 452 | 681 | 771 |
| 30 years | 4 499 | 2 228 | 2 271 | 3 483 | 1 747 | 1 737 | 668 | 316 | 352 | 52 | 26 | 26 | 296 | 140 | 156 |
| 31 years | 4 262 | 2 107 | 2 155 | 3 282 | 1 644 | 1 638 | 641 | 303 | 337 | 51 | 25 | 26 | 289 | 135 | 153 |
| 32 years | 4 196 | 2 071 | 2 125 | 3 243 | 1 622 | 1 621 | 614 | 289 | 325 | 49 | 24 | 25 | 291 | 136 | 154 |
| 33 years | 4 133 | 2 033 | 2 098 | 3 214 | 1 603 | 1 611 | 603 | 287 | 315 | 46 | 23 | 23 | 280 | 130 | 150 |
| 34 years | 4 276 | 2 120 | 2 156 | 3 320 | 1 668 | 1 652 | 611 | 288 | 323 | 48 | 24 | 24 | 297 | 139 | 157 |
| 35 to 39 years | 20 534 | 10 121 | 10 413 | 16 016 | 8 002 | 8 013 | 2 879 | 1 350 | 1 529 | 221 | 110 | 112 | 1 417 | 659 | 759 |
| 35 years | 4 225 | 2 087 | 2 138 | 3 291 | 1 647 | 1 644 | 595 | 280 | 314 | 47 | 23 | 24 | 292 | 137 | 156 |
| 36 years | 4 021 | 1 981 | 2 040 | 3 141 | 1 569 | 1 572 | 558 | 261 | 297 | 44 | 22 | 22 | 279 | 129 | 149 |
| 37 years | 4 139 | 2 038 | 2 101 | 3 224 | 1 610 | 1 615 | 572 | 269 | 308 | 46 | 23 | 23 | 288 | 134 | 154 |
| 38 years | 3 896 | 1 915 | 1 982 | 3 051 | 1 520 | 1 531 | 542 | 253 | 289 | 40 | 20 | 20 | 263 | 122 | 142 |
| 39 years | 4 253 | 2 101 | 2 152 | 3 309 | 1 656 | 1 652 | 605 | 285 | 320 | 45 | 22 | 23 | 294 | 137 | 157 |
| 40 to 44 years | 19 078 | 9 345 | 9 733 | 14 921 | 7 418 | 7 503 | 2 673 | 1 240 | 1 433 | 186 | 93 | 93 | 1 298 | 594 | 704 |
| 40 years | 4 127 | 2 027 | 2 100 | 3 217 | 1 607 | 1 610 | 588 | 274 | 314 | 42 | 21 | 21 | 279 | 128 | 150 |
| 41 years | 3 861 | 1 891 | 1 970 | 3 013 | 1 498 | 1 515 | 543 | 251 | 292 | 39 | 19 | 20 | 266 | 122 | 144 |
| 42 years | 3 746 | 1 834 | 1 912 | 2 939 | 1 460 | 1 479 | 518 | 240 | 279 | 36 | 18 | 18 | 253 | 116 | 137 |
| 43 years | 3 668 | 1 796 | 1 891 | 2 872 | 1 421 | 1 451 | 517 | 238 | 279 | 36 | 18 | 18 | 261 | 118 | 143 |
| 44 years | 3 658 | 1 798 | 1 860 | 2 881 | 1 436 | 1 444 | 507 | 237 | 270 | 32 | 16 | 16 | 239 | 109 | 130 |
| 45 to 49 years | 18 376 | 8 947 | 9 430 | 14 479 | 7 156 | 7 322 | 2 493 | 1 134 | 1 359 | 166 | 85 | 82 | 1 238 | 572 | 666 |
| 45 years | 3 624 | 1 772 | 1 852 | 2 854 | 1 417 | 1 437 | 493 | 227 | 266 | 33 | 16 | 16 | 244 | 111 | 133 |
| 46 years | 3 443 | 1 677 | 1 766 | 2 714 | 1 343 | 1 370 | 463 | 211 | 252 | 31 | 16 | 16 | 235 | 107 | 127 |
| 47 years | 3 565 | 1 731 | 1 834 | 2 775 | 1 369 | 1 405 | 502 | 227 | 275 | 34 | 17 | 17 | 254 | 117 | 137 |
| 48 years | 3 559 | 1 727 | 1 832 | 2 828 | 1 393 | 1 435 | 466 | 210 | 256 | 31 | 16 | 15 | 233 | 107 | 126 |
| 49 years | 4 186 | 2 041 | 2 146 | 3 308 | 1 634 | 1 674 | 569 | 259 | 310 | 37 | 19 | 18 | 272 | 128 | 144 |
| 50 to 54 years | 19 363 | 9 400 | 9 963 | 15 591 | 7 685 | 7 907 | 2 466 | 1 103 | 1 364 | 152 | 78 | 74 | 1 153 | 535 | 618 |
| 50 years | 4 056 | 1 973 | 2 083 | 3 253 | 1 604 | 1 649 | 515 | 232 | 283 | 34 | 18 | 16 | 254 | 120 | 135 |
| 51 years | 3 799 | 1 847 | 1 952 | 3 064 | 1 512 | 1 552 | 471 | 211 | 259 | 30 | 16 | 15 | 234 | 108 | 126 |
| 52 years | 3 720 | 1 806 | 1 914 | 2 995 | 1 477 | 1 518 | 473 | 211 | 262 | 29 | 15 | 14 | 223 | 103 | 120 |
| 53 years | 3 817 | 1 850 | 1 967 | 3 087 | 1 520 | 1 568 | 485 | 216 | 270 | 29 | 15 | 14 | 215 | 100 | 116 |
| 54 years | 3 971 | 1 924 | 2 047 | 3 192 | 1 572 | 1 620 | 522 | 233 | 289 | 30 | 15 | 15 | 226 | 105 | 122 |
| 55 to 59 years | 21 165 | 10 244 | 10 921 | 17 411 | 8 563 | 8 848 | 2 461 | 1 090 | 1 371 | 146 | 72 | 74 | 1 043 | 485 | 559 |
| 55 years | 4 072 | 1 968 | 2 103 | 3 284 | 1 612 | 1 673 | 537 | 239 | 298 | 30 | 15 | 15 | 221 | 102 | 118 |
| 56 years | 4 252 | 2 059 | 2 200 | 3 499 | 1 721 | 1 778 | 522 | 236 | 296 | 29 | 15 | 15 | 210 | 98 | 112 |
| 57 years | 4 348 | 2 104 | 2 244 | 3 570 | 1 755 | 1 816 | 532 | 234 | 298 | 30 | 15 | 15 | 216 | 100 | 115 |
| 58 years | 4 114 | 1 992 | 2 122 | 3 434 | 1 689 | 1 745 | 467 | 204 | 263 | 27 | 13 | 13 | 186 | 86 | 100 |
| 59 years | 4 372 | 2 121 | 2 251 | 3 624 | 1 787 | 1 837 | 502 | 221 | 286 | 30 | 14 | 15 | 211 | 98 | 113 |
| 60 to 64 years | 20 549 | 9 876 | 10 674 | 17 107 | 8 364 | 8 743 | 2 399 | 1 035 | 1 364 | 131 | 63 | 68 | 911 | 415 | 498 |
| 60 years | 4 270 | 2 047 | 2 223 | 3 539 | 1 724 | 1 815 | 509 | 219 | 290 | 27 | 13 | 14 | 196 | 90 | 106 |
| 61 years | 4 095 | 1 980 | 2 129 | 3 425 | 1 680 | 1 745 | 475 | 204 | 271 | 26 | 13 | 14 | 183 | 84 | 100 |
| 62 years | 4 098 | 1 968 | 2 127 | 3 404 | 1 669 | 1 740 | 481 | 208 | 273 | 26 | 12 | 13 | 172 | 78 | 94 |
| 63 years | 4 082 | 1 973 | 2 110 | 3 423 | 1 677 | 1 747 | 469 | 200 | 263 | 26 | 12 | 13 | 172 | 79 | 94 |
| 64 years | 3 993 | 1 908 | 2 085 | 3 316 | 1 613 | 1 703 | 464 | 204 | 259 | 25 | 12 | 13 | 187 | 79 | 99 |
| 65 to 69 years | 17 530 | 8 296 | 9 234 | 14 711 | 7 079 | 7 632 | 1 966 | 845 | 1 121 | 104 | 47 | 57 | 748 | 325 | 423 |
| 70 to 74 years | 13 855 | 6 495 | 7 361 | 11 906 | 5 678 | 6 228 | 1 420 | 597 | 824 | 78 | 35 | 43 | 451 | 186 | 266 |
| 75 to 79 years | 9 435 | 4 309 | 5 126 | 8 200 | 3 814 | 4 395 | 788 | 314 | 474 | 46 | 20 | 26 | 388 | 155 | 233 |
| 80 to 84 years | 6 316 | 2 749 | 3 567 | 5 585 | 2 433 | 3 152 | 523 | 203 | 320 | 31 | 13 | 18 | 177 | 100 | 77 |
| 85 to 89 years | 3 494 | 1 308 | 2 186 | 3 103 | 1 149 | 1 954 | 271 | 94 | 177 | 18 | 7 | 11 | 101 | 58 | 43 |
| 90 to 94 years | 1 973 | 610 | 1 363 | 1 742 | 544 | 1 199 | 157 | 41 | 101 | 14 | 4 | 10 | 59 | 21 | 53 |
| 95 to 99 years | 589 | 148 | 441 | 520 | 132 | 388 | 44 | 11 | 34 | 4 | 1 | 3 | 18 | 5 | 16 |
| 100 years and over | 71 | 14 | 57 | 62 | 12 | 50 | 7 | 1 | 6 | 1 | 0 | 1 | 2 | 0 | 2 |
| 16 years and over | 253 651 | 122 613 | 131 038 | 203 368 | 99 416 | 103 952 | 33 129 | 15 203 | 17 926 | 2 253 | 1 094 | 1 159 | 14 901 | 6 899 | 8 001 |
| 18 years and over | 245 138 | 118 230 | 126 908 | 197 031 | 96 541 | 100 491 | 31 679 | 14 456 | 17 223 | 2 145 | 1 040 | 1 105 | 14 292 | 6 590 | 7 703 |
| 15 years and over | 257 041 | 124 395 | 132 646 | 207 697 | 101 467 | 106 228 | 33 589 | 15 456 | 18 152 | 2 356 | 1 146 | 1 210 | 15 398 | 7 134 | 8 264 |
| 65 years and over | 53 263 | 23 929 | 29 334 | 45 829 | 20 842 | 24 987 | 5 176 | 2 106 | 3 070 | 296 | 127 | 169 | 1 962 | 850 | 1 112 |
| Median age | 37.6 | 36.3 | 39.0 | 39.3 | 38.1 | 40.5 | 31.2 | 29.4 | 30.7 | 33.1 | 31.3 | 34.6 | 34.3 | 33.1 | 35.4 |
| Mean age | 39.0 | 37.9 | 40.0 | 40.2 | 39.1 | 41.2 | 34.4 | 32.6 | 35.0 | 33.1 | 32.2 | 34.0 | 35.8 | 34.8 | 36.4 |

¹Persons of Hispanic origin may be of any race. These data do not include the population of Puerto Rico.

TSIPSII [UPF]  ROZ1255  POP 34480186  02/21/96  8:28 AM  MACHINE:D  DATA:NONE  TAPE:NONE  FRAME: 35
TSF:POP'92  02/21/96  08:24:07  UTF:POP'93  02/21/96  08:24:07  META:POP'96  02/21/96  08:27:01

# Exhibit 23

# Letters

RESEARCH LETTER

## Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States

Semiautomatic rifles have been used in some of the largest active shooter incidents in US history.[1] The weapons were banned in 1994 under the federal assault weapons ban but were reintroduced to the public marketplace in 2004.[2] Currently, there are no comprehensive assessments of injuries from different types of firearms. We compared the number of persons wounded, killed, and either wounded or killed during active shooter incidents with and without semiautomatic rifles.

**Methods** | An active shooter incident is defined by the Federal Bureau of Investigation (FBI) as a situation in which an individual is actively engaged in killing or attempting to kill people in a confined or populated area.[3] The FBI has tracked all active shooter incidents since 2000 and has the most comprehensive data set available.[3] We retrieved active shooter incident characteristics from the publicly accessible FBI database through 2017 (accessed May 18, 2018).[3] For each incident, we extracted shooter age, name, year, location (city and state), number of people wounded, killed, and wounded or killed, place of shooting (commerce, education, government, open space, residences, health care, and house of worship), and type of firearms present (rifle, shotgun, handgun).

The FBI reports do not distinguish whether a rifle was semiautomatic; therefore, for each incident in which the FBI reported that a rifle was present, a media content analysis was performed to identify semiautomatic rifle presence. An a priori search hierarchy was established in which the primary data sources were court and police documents or statements (44.9%; 35 of 78), and secondary data sources were news articles. At least 3 news articles from different media outlets were required to triangulate data. No discrepancies among sources were found. All incidents with the presence of a semiautomatic rifle were classified as semiautomatic rifle incidents regardless of other firearm presence. The Las Vegas, Nevada, shooting, which represented a statistical outlier, and the San Bernardino, California, shooting, which had more than 1 shooter present, were excluded. Negative binomial regression was used to estimate the association between presence of a semiautomatic rifle and the total numbers nonfatally wounded, killed, and either wounded or killed, and the percentage of persons who died if wounded at the incident, controlling for the place and year of shooting and the presence of other firearms. Significance was set at P < .05 (2-sided). Stata version 15.1 was used for analysis.

**Results** | Of the 248 active shooter incidents, 76 involved a rifle, and we identified the type in all instances. A semiautomatic rifle was involved in 24.6% (n = 61) of incidents, and 75.4% (n = 187) involved handguns (n = 154), shotguns (n = 38), and non-semiautomatic rifles (n = 15). Multiple firearm types were involved in 60.7% (n = 37 of 61) of semiautomatic rifle incidents and 25.1% (n = 47) of non-semiautomatic rifle incidents.

There were 898 persons wounded and 718 killed. Active shooter incidents with vs without the presence of a semiautomatic rifle were associated with a higher incidence of persons wounded (unadjusted mean, 5.48 vs 3.02; incidence rate ratio [IRR], 1.81 [95% CI, 1.30-2.53]), killed (mean, 4.25 vs 2.49; IRR, 1.97 [95% CI, 1.38-2.80]), and wounded or killed (mean, 9.72 vs 5.47; IRR, 1.91 [95% CI, 1.46-2.50]) (Figure). The percentage of persons who died if wounded in incidents with a semiautomatic rifle (43.7% [n = 259 of 593]) was similar to the percentage who died in incidents without a semiautomatic rifle (44.9% [n = 459 of 1023]) (IRR, 0.99 [95% CI, 0.60-1.61]).

**Discussion** | Although 44% of persons wounded in active shooter incidents died of their injuries, irrespective of the type of firearm used, more people were wounded and killed in incidents in which semiautomatic rifles were used compared with incidents involving other firearms. Semiautomatic rifles are designed for easy use, can accept large magazines, and fire high-velocity bullets, enabling active shooters to wound and kill more people per incident.[4]

Limitations of this study include the lack of data on specific injuries, demographics, and other details of the incidents. Incidents involving semiautomatic rifles may differ from other incidents in ways that may partially explain the association but could not be controlled (ie, intentionality of the shooter). This lack of data highlights the need for a national centralized database to inform the debate on an assault weapons ban.

**Figure. Unadjusted Mean Number of Victims Injured and Killed per Active Shooter Incident With and Without Semiautomatic Rifles**



The error bars indicate 95% CIs.

© 2018 American Medical Association. All rights reserved.

DECL. OF BONNIE E. MACNAUGHTON
(3:19-CV-05106-RBL) - 179
Downloaded From: https://www.jamanetwork.com/ on 04/02/2020

SER-54

Letters

Elzerie de Jager, MBBS(Hons)
Eric Goralnick, MD, MS
Justin C. McCarty, DO
Zain G. Hashmi, MBBS
Molly P. Jarman, PhD, MPH
Adil H. Haider, MD, MPH

**Author Affiliations:** Center for Surgery and Public Health (CSPH), Brigham and Women's Hospital, Boston, Massachusetts (de Jager, McCarty, Hashmi, Jarman, Haider); Department of Emergency Medicine, Brigham and Women's Hospital, Boston, Massachusetts (Goralnick).

**Accepted for Publication:** July 11, 2018.

**Corresponding Author:** Adil H. Haider, MD, MPH, Center for Surgery and Public Health, Brigham and Women's Hospital, 75 Francis St, Boston, MA 02115 (ahhaider@bwh.harvard.edu).

**Author Contributions:** Dr Haider had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Concept and design:* De Jager, Goralnick, McCarty, Hashmi, Haider.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* De Jager, McCarty, Haider.
*Critical revision of the manuscript for important intellectual content:* De Jager, Goralnick, McCarty, Hashmi, Jarman, Haider.
*Statistical analysis:* Goralnick, McCarty, Hashmi, Jarman, Haider.
*Administrative, technical, or material support:* De Jager, Goralnick, McCarty, Haider.
*Supervision:* Goralnick, Haider.

**Conflict of Interest Disclosures:** All authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest. Dr Haider reports stock holdings and being cofounder of Patient Doctor Technologies. No other disclosures were reported.

**1.** Cummings W, Jansen B. Why the AR-15 keeps appearing at America's deadliest mass shootings. *USA Today.* February 14, 2018. https://www.usatoday.com/story/news/nation/2018/02/14/ar-15-mass-shootings/339519002/. Accessed February 23, 2018.

**2.** Koper CS, Roth JA. The impact of the 1994 federal assault weapons ban on gun markets: an assessment of short-term primary and secondary market effects. *J Quant Criminol.* 2002;18(3):239-266. doi:10.1023/A:1016055919939

**3.** Federal Bureau of Investigation. Active shooter resources, Advanced Law Enforcement Rapid Response Training (ALERRT) Center at Texas State University, FBI resources. 2018. https://www.fbi.gov/about/partnerships/office-of-partner-engagement/active-shooter-resources Accessed May 18, 2018.

**4.** Coble YD, Eisenberg AB, Estes EH, et al; Council on Scientific Affairs, American Medical Association. Assault weapons as a public health hazard in the United States. *JAMA.* 1992;267(22):3067-3070. doi:10.1001/jama.1992.03480220085033

**COMMENT & RESPONSE**

### Antiplatelet Therapy After Coronary Artery Bypass Grafting

**To the Editor** Dr Zhao and colleagues concluded that among patients undergoing elective coronary artery bypass graft (CABG) surgery with saphenous vein grafting, ticagrelor plus aspirin significantly increased graft patency after 1 year vs aspirin alone.[1] However, based on current best evidence and standards of care, the aspirin dosage (100 mg/d) used in this study for the aspirin-alone group may have been suboptimal.[2]

The largest placebo-controlled trial to date in this field was the Veterans Administration Cooperative Study.[3] The aspirin dosage in this trial was 325 mg/d. The 1-year graft occlusion rate in the aspirin-alone group was lower than that noted by Zhao and colleagues (15.8% vs 23.5%). Similarly, a previous meta-analysis of 5 randomized clinical trials suggested that a medium dosage of aspirin (300-325 mg/d) more successfully reduced graft occlusion within the first year of CABG than low-dosage regimes (50-100 mg/d).[4] In addition, pharmacokinetic studies have shown that an aspirin dose of 100 mg is sufficient to suppress thromboxane synthesis in healthy controls but ineffective at suppressing platelet thromboxane formation in the majority of post-CABG patients.[2,5] This observation reflects the phenomenon of platelet resistance during the post-CABG period, which is believed to be due to the effects of cardiopulmonary bypass and surgical trauma.[2,5] Therefore, current scientific guidelines prefer a higher aspirin dosage (>100 mg/d) early after CABG to improve graft patency.[2]

In the study by Zhao and colleagues, the dosage of aspirin administered in the aspirin alone group may have been suboptimal, which could have confounded their findings by favoring the ticagrelor plus aspirin group. Furthermore, any new therapy must be compared with the currently best available therapy, which was not done in this study.[2] Therefore, the generalizability of these findings is of potential concern.

Rahman Shah, MD
Kirstin Hesterberg, DO

**Author Affiliations:** Division of Cardiology, University of Tennessee School of Medicine, Memphis.

**Corresponding Author:** Rahman Shah, MD, Section of Cardiovascular Medicine, University of Tennessee School of Medicine, 1030 Jefferson Ave, Memphis, TN 38104 (shahcardiology@yahoo.com).

**Conflict of Interest Disclosures:** The authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest and none were reported.

**1.** Zhao Q, Zhu Y, Xu Z, et al. Effect of ticagrelor plus aspirin, ticagrelor alone, or aspirin alone on saphenous vein graft patency 1 year after coronary artery bypass grafting: a randomized clinical trial. *JAMA.* 2018;319(16):1677-1686. doi:10.1001/jama.2018.3197

**2.** Kulik A, Ruel M, Jneid H, et al. Secondary prevention after coronary artery bypass graft surgery: a scientific statement from the American Heart Association. *Circulation.* 2015;131(10):927-964. doi:10.1161/CIR.0000000000000182

**3.** Goldman S, Copeland J, Moritz T, et al. Improvement in early saphenous vein graft patency after coronary artery bypass surgery with antiplatelet therapy: results of a Veterans Administration Cooperative Study. *Circulation.* 1988;77(6):1324-1332. doi:10.1161/01.CIR.77.6.1324

**4.** Lim E, Ali Z, Ali A, et al. Indirect comparison meta-analysis of aspirin therapy after coronary surgery. *BMJ.* 2003;327(7427):1309. doi:10.1136/bmj.327.7427.1309

**5.** Zimmermann N, Kienzle P, Weber AA, et al. Aspirin resistance after coronary artery bypass grafting. *J Thorac Cardiovasc Surg.* 2001;121(5):982-984. doi:10.1067/mtc.2001.111416

**To the Editor** The Different Antiplatelet Therapy Strategy After Coronary Artery Bypass Graft Surgery (DACAB) trial provides needed insight into the utility of dual antiplatelet therapy (DAPT) with ticagrelor as the second agent in patients undergoing CABG.[1] The current American Heart Association and American College of Cardiology (AHA/ACC) guideline is based on limited evidence and restricted to resumption of DAPT in patients who present with acute coronary syndrome. Consequently, intersurgeon variability in DAPT use is high with a relatively low rate of DAPT use.[2]

Several trial characteristics deserve attention in evaluating the clinical applicability of the findings.

© 2018 American Medical Association. All rights reserved.

**DECL. OF BONNIE E. MACNAUGHTON**
**(3:19-CV-05106-RBL) - 180**
Downloaded From: https://jamanetwork.com/ on 04/02/2020

**SER-55**

The Honorable Ronald B. Leighton

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9  DANIEL MITCHELL, ROBIN BALL, LUKE
10  RETTMER, NATHANIEL CASEY,
   MATTHEW WALD, SECOND AMENDMENT
11  FOUNDATION, AND NATIONAL RIFLE
   ASSOCIATION,

12                              *Plaintiffs*,

13     v.

14  CHUCK ATKINS, in his official capacity as
15  the Sheriff of Clark County, Washington,
   CRAIG MEIDL, in his official capacity as
16  the Chief of Police of Spokane, Washington,
   and TERESA BERNTSEN, in her official
17  capacity as the director of the Washington
   State Department of Licensing,
18

19                              *Defendants*,

20     and

21  SAFE SCHOOLS SAFE COMMUNITIES,

22
   *Defendant-Intervenor.*
23

NO. 3:19-CV-05106-RBL

**BRIEF OF *AMICI CURIAE*
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
AND BRADY IN SUPPORT OF
DEFENDANTS AND
INTERVENOR-DEFENDANT'S
CROSS-MOTION FOR
SUMMARY JUDGMENT AND
OPPOSITION TO
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

**NOTED ON MOTION
CALENDAR: August 18, 2020**

24

25

26

27

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

## **CORPORATE DISCLOSURE**

2

3       Giffords Law Center to Prevent Gun Violence and Brady have no parent corporations.

4   They have no stock and hence no publicly held company owns 10% or more of their stock.  None

5   of their members or owners is in a joint venture or limited liability corporation (LLC), they have

6   no partners in a partnership or limited liability partnership (LLP), and they have no corporate

    member.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF CONTENTS

Page

INTEREST OF *AMICUS CURIAE* ............................................................. 1

INTRODUCTION ........................................................................................ 2

ARGUMENT ............................................................................................... 3

    I.     Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately
         High Rates, and Access to Firearms, Especially Long Guns, Increases the
         Likelihood and Lethality of Those Suicide Attempts. .......................................... 5

    II.    Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Carry
         Out Mass Shootings at Schools................................................................ 7

    III.   The Initiative Defines "Semiautomatic Assault Rifles" to Encompass an
         Exceptionally Lethal Subset of Long Guns. .......................................... 9

CONCLUSION ........................................................................................... 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - i

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**SER-58**

1

## TABLE OF AUTHORITIES

2

3                                                                     **Page(s)**

4    **Cases**

5    *Ass'n of N.J. Rifle & Pistol Clubs v. Attorney Gen. N.J.,*
         910 F.3d 106 (3d Cir. 2018)......................................................................1
6

7    *Coal. for Econ. Equity v. Wilson,*
         122 F.3d 692 (9th Cir. 1997) ...................................................................11

8    *District of Columbia v. Heller,*
9        554 U.S. 570 (2008)..................................................................................1

10   *Fyock v. City of Sunnyvale,*
         779 F.3d 991 (9th Cir. 2015) .................................................................1, 4
11

12   *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
         417 F. Supp. 3d 747 (W.D. Va. 2019) .....................................................1

13   *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
14       No. 19-2250 (4th Cir. 2020) .....................................................................2

15   *Kasler v. Lockyer,*
         23 Cal. 4th 472 (2000) .............................................................................9

16   *McDonald v. City of Chicago,*
17       561 U.S. 742 (2010)..................................................................................1

18   *Md. Shall Issue v. Hogan,*
         353 F. Supp. 3d 400 (D. Md. 2018) ..........................................................1
19

20   *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
         700 F.3d 185 (5th Cir. 2012) .................................................................2, 7
21

22   *People v. Fields,*
         24 N.E.3d 326 (Ill. App. Ct. 2014) ..........................................................4

23   *Peruta v. County of San Diego,*
24       824 F.3d 919 (9th Cir. 2016) ....................................................................1

25   *Silvester v. Harris,*
         843 F.3d 816 (9th Cir. 2016) ....................................................................4

26

27

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - ii

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**SER-59**

*Stimmel v. Sessions*,
    879 F.3d 198 (6th Cir. 2018) .........................................................................1

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017) .........................................................................1

*United States v. Chovan*,
    735 F.3d 1127 (9th Cir. 2013) ....................................................................3, 4

*United States v. Hayes*,
    555 U.S. 415 (2009)........................................................................................1

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) .......................................................................11

*United States v. Torres*,
    911 F.3d 1253 (9th Cir. 2019) .......................................................................3

*Washington v. State Department*,
    No. 2:20-cv-00111-RAJ (W.D. Wash. 2020) ...............................................1

**Other Authorities**

*Active Shooter: Shooter's Age*, K-12 School Shooting Database, Center for
    Homeland Defense and Security......................................................................8

Adam Lankford & James Silver, *Why Have Public Mass Shootings Become More
    Deadly? Assessing how Perpetrators' Motives and Methods Have Changed
    Over Time*, 19 Criminology & Public Policy 37 (2020)..................................8

American Public Health Association, *Reducing Suicides by Firearms* (2018) .............5

Centers for Disease Control and Prevention, Web-based Injury Statistics Query
    and Reporting System (WISQARS), *Leading Cause of Death Reports* ...................5

Centers for Disease Control and Prevention, Wide-ranging Online Data for
    Epidemiologic Research (WONDER) ..............................................................6

Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and
    Youth Suicides*, 292 JAMA 594 (2004) .........................................................6

Eboni Morris, *Youth Violence: Implications for Posttraumatic Stress Disorder in
    Urban Youth*, National Urban League Policy Institute (2009) ..................................9

Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents with and
    Without Semiautomatic Rifles in the United States*, 320 JAMA 1034 (2018)...................9, 10

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - iii

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**SER-60**

Glenn D. Braunstein, *Violent Events Have Long-Term Effects on Children*,
     Huffington Post, Sept. 24, 2012 ................................................................. 9

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the
     Debate on Guns*, The Atlantic, Feb. 22, 2018 .......................................... 9

Initiative Measure No. 1639 ............................................................... *passim*

*Initiative Measure No. 1639*, November 6, 2018 General Election Results,
     Secretary of State (Nov. 27, 2018) ........................................................ 11

J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide:
     Even More Lethal Than We Knew*, 173 Am. J. of Psychiatry 1094 (2016) ............. 5

Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. Times,
     Nov. 7, 2016 ............................................................................ 6

Jared Keller, *The Psychological Aftermath of Surviving School Shootings*, Pacific
     Standard, Mar. 25, 2019 ................................................................. 9

Jeremy White, *When Lawmakers Try to Ban Assault Weapons, Gunmakers Adapt*,
     N.Y. Times, July 31, 2019 .............................................................. 10

Jillian K. Peterson & James A. Densley, *Database of Mass Shootings in the
     United States*, The Violence Project (Nov. 2019) ....................................... 7

Jillian Peterson & James Densley, *School shooters usually show these signs of
     distress long before they open fire, our database shows*, The Conversation,
     Feb. 8, 2019 ............................................................................ 8

Joseph O'Sullivan, *Washington state voters approved new gun regulations in I-
     1639. Here's what the law will do*, Seattle Times, Nov. 8, 2018 .......................... 2

Joshua D. Brown & Amie J. Goodin, *Mass Casualty Shooting Venues, Types of
     Firearms, and Age of Perpetrators in the United States*, *1982–2018*, 108 Am.
     J. Pub. Health 1385 (2018) ............................................................. 10

Melvin D. Livingston et al., *A Descriptive Analysis of School and School Shooter
     Characteristics and the Severity of School Shootings in the United States,
     1999–2018*, 64 J. of Adolescent Health 797 (2019) ..................................... 10

*Mental Health Disorder Statistics*, Johns Hopkins Medicine (2020) ......................... 5

Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in
     Mental Disorder*, 68 Archives of General Psychiatry 1058 (2011) ......................... 5

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - iv

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

**SER-61**

Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 Pediatrics No. 2 (2019) ...................................................................7

*Percentage of the population 3 to 34 years old enrolled in school, by age group: selected years, 1940 through 2018*, National Center for Education Statistics.........................8

RAND Corporation, *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* (2018) .......................................4

Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. Am. College Surgeons 150 (2019)...................................................................................................................7

Thomas J. Hanlon et al., *Type of Firearm Used in Suicides: Findings from 13 States in the National Violent Death Reporting System, 2005–2015*, 65 J. Adolescent Health 366 (2019)...................................................................................6

Tomáš Paus et al., *Why do many psychiatric disorders emerge during adolescence?*, 9 Nature Reviews Neuroscience 947 (2008)...................................................5

U.S. Census Bureau, *Current Population Reports*, Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 to 2050 (1996) .........................8

*Washington party shooting suspect read AR-15 gun manual right before attack*, The Guardian, Aug. 1, 2016.................................................................................2

Zusha Elinson & Cameron McWhirter, *Gun Makers Adjust Rifles to Skirt Bans*, Wall St. J., June 21, 2019.................................................................................11

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - v

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

### INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center")[1] is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to effectively reduce gun violence.  The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords.  Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to improve the safety of their communities.  Giffords Law Center has provided informed analysis as an *amicus* in many firearm-related cases, including in *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417  F. Supp. 3d 747 (W.D. Va. 2019), *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), and *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (*en banc*).[2]

*Amicus curiae* Brady (formerly the Brady Center to Prevent Gun Violence) is a non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Brady has a substantial interest in ensuring that the Constitution and state laws are properly interpreted to allow *strong* government action to prevent gun violence.  Through its Legal Action Project, Brady has filed numerous briefs in support of government regulation of firearms, including in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *United States v. Hayes*, 555 U.S. 415 (2009), *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Washington v. State Department*, No. 2:20-cv-00111-RAJ (W.D. Wash. 2020).  Further, Brady filed *amicus* briefs

---

[1] Giffords Law Center was previously named Law Center to Prevent Gun Violence, and Legal Community Against Violence.

[2] Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings.  *E.g.*, *Hirschfeld*, 417 F. Supp. 3d. at 754, 759; *Ass'n of N.J. Rifle & Pistol Clubs v. Attorney Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (*en banc*) (Graber, J., concurring).

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

supporting federal minimum age laws in *National Rifle Association of America., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) and *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, No. 19-2250 (4th Cir. 2020).

### INTRODUCTION[3]

On November 6, 2018, the people of Washington went to the polls and voted to reduce gun violence in their communities, and among young people in particular. They did so by passing a referendum—Initiative 1639 (the "Initiative")[4]—to prohibit 18-to-20-year-olds from purchasing *semiautomatic* assault rifles.[5] The Initiative passed by a strong majority, garnering more than 59% of the vote.[6]

The grassroots movement to pass the Initiative began two years earlier, after three teenagers were murdered at a house party in Mukilteo, Washington, by a former high school classmate. The 19-year-old attacker in that tragedy used an AR-15 semiautomatic assault rifle that he purchased *legally* the previous week.[7] The massacre animated Washington voters to devise measures to reduce the gun violence that was all too prevalent in their state, particularly shootings involving semiautomatic assault rifles, which they recognized "heavily" "impact[] . . . children and teenagers."[8]

---

[3] No counsel for a party authored this brief in whole or in part. No person other than *amici* or their counsel contributed money to fund this brief's preparation or submission.

[4] Initiative Measure No. 1639, approved Nov. 6, 2018, https://www.sos.wa.gov/_assets/ elections/initiatives/finaltext_1531.pdf.

[5] Plaintiffs' Amended Complaint challenges only the Initiative's restrictions on *purchase* (not possession) of semiautomatic assault rifles. *See* Dkt. 17. However, Plaintiffs' Motion for Summary Judgment challenges restrictions on purchase and possession. *See* Pls.' Mot. for Summ. J., Dkt. 76 ("Pls.' MSJ"). Although the Court need only resolve the challenge brought in the Complaint, both the purchase and possession restrictions in the Initiative easily pass constitutional muster.

[6] MacNaughton Decl., Ex. 1, Joseph O'Sullivan, *Washington state voters approved new gun regulations in I-1639. Here's what the law will do*, Seattle Times, Nov. 8, 2018, https://www.seattletimes.com/seattle-news/politics/washington-state-voters-approved-new-gun-regulations-in-i-1639-heres-what-the-law-will-do/.

[7] MacNaughton Decl., Ex. 2, *Washington party shooting suspect read AR-15 gun manual right before attack*, The Guardian, Aug. 1, 2016, https://www.theguardian.com/us-news/2016/aug/01/washington-shooting-suspect-allen-ivanov-ar-15-gun-manual.

[8] Initiative 1639 § 1.

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - 2

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1   Plaintiffs contend that the Initiative prevents them from exercising rights conferred by the

2   Second Amendment.  Dkt. 17 ¶ 3.  This ignores well-established Second Amendment law, which

3   has long permitted sensible firearm regulations like the Initiative that reasonably fit the state's

4   interest in promoting public safety.

5   Social science data cited in Defendants' cross-motion for summary judgment confirms

6   the more than reasonable fit between the Initiative's restrictions and Washington's compelling

7   interest in protecting the safety of its citizens. This *amicus* brief presents three additional

8   arguments, rooted in social science research, that further justify the Initiative under the applicable

9   legal standard:  (i) young people aged 18 to 20 are at higher risk of using firearms to attempt

10  suicide, (ii) this group is disproportionately likely to carry out mass shootings at schools using

11  semiautomatic assault rifles, and (iii) the Initiative's definition of semiautomatic assault rifles,

12  which focuses on these rifles' mechanics, ensures that the most lethal types of rifles are regulated.

13  The Initiative easily passes constitutional muster.

14  **ARGUMENT**

15  Courts in the Ninth Circuit apply a "two-step inquiry to analyze claims that a law violates

16  the Second Amendment." *United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019).  This

17  test "(1) asks whether the challenged law burdens conduct protected by the Second Amendment

18  and (2) if so, directs courts to apply an appropriate level of scrutiny." *Id.* (quoting *United States*

19  *v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)).  Here, the Initiative's minimum age requirement

20  passes at both steps.  As Defendants explained, history and tradition show that state and federal

21  governments have regulated 18-to-20-year-olds' access to firearms since the founding of this

22  nation. *See* Defs.' & Intervenor-Defs.' Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ.

23  J., Dkt. 84 ("Defs.' MSJ") at 12-15.  The Initiative's minimum age requirement is therefore

24  constitutional at the threshold inquiry. *Id.*

25

26

27

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

But even if this Court proceeds to step two, the Initiative's minimum age requirement easily survives intermediate scrutiny.[9]  Intermediate scrutiny requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139.  Courts may look to legislative history as well as scientific or other studies to determine whether intermediate scrutiny is satisfied.  *Fyock*, 779 F.3d at 1000 (considering "studies in the record or cited in pertinent case law") (citation & internal quotation marks omitted).

The Initiative satisfies both criteria of intermediate scrutiny.  *First*, it is beyond question that the Initiative's stated public safety goals are "substantial"; the Initiative raises the minimum age to purchase semiautomatic rifles because "[s]emiautomatic assault rifles are specifically designed to kill quickly and efficiently and have been used in some of the country's deadliest mass shootings."[10]  These weapons are also disproportionately used by young people in suicide attempts.  The Ninth Circuit found it "self-evident" that the government's interests in addressing these grave public safety concerns are "substantial and important." *Fyock*, 779 F.3d at 1000.

*Second*, empirical research overwhelmingly supports the voters' judgment: 18-to-20-year-olds are disproportionately likely to attempt suicide and commit mass shootings at schools.[11]  In part, this is because young people's brains are still developing, causing them to act impulsively and making them more likely to use guns irresponsibly.  *See* Defs.' MSJ at 21-23.  Research confirms that age-based firearm restrictions reduce firearm-related injuries and deaths.  *Infra* Section I.  Data also show that suicide attempts and mass shootings are far deadlier when carried

---

[9] As Defendants explain in their Motion for Summary Judgment, intermediate scrutiny is the appropriate level of scrutiny because the Initiative neither "implicates the core of the Second Amendment right" nor "severely burdens that right." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016); *see* Defs.' MSJ at 16-19.

[10] Initiative 1639 § 1.

[11] As Defendants note, 18-to-20-year-olds are also disproportionately likely to commit violent crime, *see* Defs.' MSJ at 22-23, but there's more:  This cohort is also disproportionately the *victim* of gun violence.  *See* MacNaughton Decl., Ex. 3, RAND Corporation, *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States*, 145 (2018); *see also People v. Fields*, 24 N.E.3d 326, 344 (Ill. App. Ct. 2014) ("We also note that the 18-to-20-year-old age group is more likely to be directly interacting with and, thus, endangering juveniles under 18 years of age.").

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - 4

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

SER-66

1   out using semiautomatic assault rifles.  Accordingly, there is more than a "reasonable fit" between

2   the voters' public safety objectives and the data-driven reforms advanced by the Initiative.

3   **I.      Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates,
           and Access to Firearms, Especially Long Guns, Increases the Likelihood and
4          Lethality of Those Suicide Attempts.**

5           Eighteen-to-twenty-year-olds are disproportionately at risk of attempting suicide, and

6   firearm access exacerbates this risk.  Many major psychiatric conditions first develop in

7   adolescence,[12] and suicide risk "increase[s] steeply during the first few years after" an

8   individual's first contact with psychiatric services.[13]  Data from the Centers for Disease Control

9   and Prevention show that suicide accounts for a higher percentage of deaths for 15-to-24-year-

10  olds than for any other age group.[14]  Indeed, suicide is the second-most common cause of death

11  among 18-to-20-year-olds.[15]

12          "Access to firearms is a key risk factor for suicide."[16]  Firearm suicide is also the suicide

13  method with the highest fatality rate—the odds of completing a suicide attempt are 140 times

14  greater when a gun is used than for any other commonly used method.[17]  Moreover, less than 3%

15  of people who survive one suicide attempt later die by suicide.[18]  As scholars have noted,

16  "[s]uicide attempters often have second thoughts, but when a method like a gun works so

17

18          [12] See MacNaughton Decl., Ex. 4, Tomáš Paus et al., *Why do many psychiatric disorders emerge during
19  adolescence?*, 9 Nature Reviews Neuroscience 947, 952 (2008) ("Anxiety disorders, bipolar disorder, depression,
    eating disorder, psychosis including schizophrenia and substance abuse all most commonly emerge during
20  adolescence."); MacNaughton Decl., Ex. 5, *Mental Health Disorder Statistics*, Johns Hopkins Medicine,
    https://www.hopkinsmedicine.org/health/wellness-and-prevention/mental-health-disorder-statistics (last visited Apr.
21  6, 2020) (explaining that schizophrenia typically "first appears in men during their late teens or early 20s").

            [13] MacNaughton Decl., Ex. 6, Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in
22  Mental Disorder*, 68 Archives of General Psychiatry 1058, 1061 (2011).
            [14] Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System
23  (WISQARS), *Leading Cause of Death Reports*, https://webappa.cdc.gov/sasweb/ncipc/leadcause.html.
            [15] *Id.*
24          [16] MacNaughton Decl., Ex. 7, American Public Health Association, *Reducing Suicides by Firearms* (2018),
    https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2019/01/28/reducing-
25  suicides-by-firearms.
            [17] MacNaughton Decl., Ex. 8, J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed
26  Suicide: Even More Lethal Than We Knew*, 173 Am. J. of Psychiatry 1094, 1097 (2016).
            [18] *Id.* at 1098.
27
    *AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
    CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
    MOT FOR SUMMARY JUDGMENT                                                            Davis Wright Tremaine LLP
    NO. 3:19-CV-05106-RBL - 5                                                                LAW OFFICES
                                                                                        920 Fifth Avenue, Suite 3300
                                                                                          Seattle, WA  98104-1610
                                                                                   206.622.3150 main · 206.757.7700 fax

1   effectively, there's no opportunity to reconsider."[19]   Therefore, a minor's access to firearms

2   during a suicide attempt often determines whether they die or recover.

3           Eighteen-to-twenty-year-olds are particularly at risk for suicides involving long guns, a

4   category of firearm that includes semiautomatic assault rifles.  Of suicides where the firearm type

5   is known, adults are nearly three times as likely to die by handgun suicide as they are by long

6   gun suicide.[20]  But 18-to-20-year-olds are much more likely to die by *long gun* suicides than other

7   groups, likely at least in part because, prior to the enactment of laws like the Initiative, they have

8   had far easier access to long guns compared to handguns.  In fact, 18- and 19-year-olds are the

9   only groups more likely to die by long gun suicide than handgun suicide.[21]  A recent study found

10  that, while handguns are the most common weapon utilized in suicides, long gun use is relatively

11  higher among adolescents compared with adults.[22]  Long guns therefore pose a unique risk to the

12  18-to-20-year-old age group.

13          Moreover, studies have repeatedly found a connection between age restrictions such as

14  the Initiative and a decline in firearm-related adolescent deaths, especially suicides.  For instance,

15  an August 2004 study found that state laws raising the minimum legal age to purchase a handgun

16  to 21 were associated with a 9% decline in firearm suicide rates among 18-to-20-year-olds.[23]

17          State gun safety laws more generally have also proven effective in reducing gun deaths

18  among young people, including in the 18-to-20-year-old range.  A 2019 study examined the

19  21,241 firearm-related deaths among U.S. children from 2011 to 2015.  Eighteen-to-21-year-olds

20  made up more than two-thirds of these deaths (68.7%).  But state laws make a difference:  The

21

22          [19] MacNaughton Decl., Ex. 9, Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. Times, Nov. 7, 2016, https://www.nytimes.com/2016/11/08/well/live/after-a-suicide-attempt-the-risk-of-another-try.html.

23          [20] MacNaughton Decl., Ex. 10, Thomas J. Hanlon et al., *Type of Firearm Used in Suicides: Findings from 13 States in the National Violent Death Reporting System, 2005–2015*, 65 J. Adolescent Health 366, 367 (2019).

24          [21] Centers for Disease Control and Prevention, Wide-ranging Online Data for Epidemiologic Research (WONDER), https://wonder.cdc.gov/.  The supporting Wonder database query is on file with the author and will be supplied upon request.

25          [22] MacNaughton Decl., Ex. 10, *supra* n.20, at 366-67.

26          [23] MacNaughton Decl., Ex. 11, Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

27  *AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
    CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
    MOT FOR SUMMARY JUDGMENT
    NO. 3:19-CV-05106-RBL - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

study found that every 10-point increase in a score measuring the strictness of a state's gun control laws "decreases the firearm-related mortality rate in children by 4%" in its fully adjusted model.[24]   Another 2019 study using the same gun-law scores found that the quartile of states with the strictest laws "have an annual pediatric firearm mortality rate of 2.563 per 100,000 [children aged 0-to-19-years-old] compared with states in the lowest quartile [with the least strict laws], where the mortality rate is almost twice as high at 5.005 per 100,000."[25]   These studies show that minimum age laws save lives and thereby also confirm a "reasonable fit" between Washington's public safety objective and the Initiative's restrictions.

## II.   Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Carry Out Mass Shootings at Schools.

Eighteen-to-twenty-year-olds are also especially prone to take risks and deprioritize long-term outcomes. *See Nat'l Rifle Assoc. of Am.*, 700 F.3d at 210 n.21 ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive" because key brain functions such as "response inhibition, emotional regulation, planning and organization . . . continue to develop between adolescence and young adulthood.") (alteration in original) (quoting, in part, American Medical Association submission).   These qualities—impulsiveness and emotional volatility—make easy gun access a disproportionate public health risk for young people.

Nowhere is this clearer than in the epidemic of deadly mass shootings committed by young people in schools or targeting peers from school settings.   Mass shooters tend to target people or institutions against which they have a grievance,[26] which is why most school shooters—

---

[24] MacNaughton Decl., Ex. 12, Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 Pediatrics No. 2 at 3 & tbl. 2 (2019).

[25] MacNaughton Decl., Ex. 13, Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. Am. College Surgeons 150, 152 (2019).

[26] A comprehensive analysis of mass shootings shows that 70% of mass shooters knew at least some of their victims, and school shooters "in particular were 'insiders.'"   MacNaughton Decl., Ex. 14, Jillian K. Peterson & James A. Densley, *Database of Mass Shootings in the United States*, The Violence Project, at 19 (Nov. 2019), https://www.theviolenceproject.org/wp-content/uploads/2019/11/TVP-Mass-Shooter-Database-Report-Final-compressed.pdf.

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - 7

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**SER-69**

1  as high as 91% in one recent study—were current or former students of the school at which the

2  attack occurred.[27]  As a result, the median age of school shooters is high-school-aged or slightly

3  older.  According to data on active shooter incidents in schools collected by the Center for

4  Homeland Defense and Security, nearly three-quarters of known active school shooters were

5  under 21 at the time of their attack.  Roughly 14% were between 18 and 21, despite this age group

6  accounting for less than 5% of the population.[28]  Scholars have also noted that the age of

7  perpetrators of high-fatality mass shootings has continually decreased over the past decade.[29]

8  This data shows that the Initiative's age restriction is tailored to encompass the cohort that poses

9  the greatest risk to Washington's students.

10      As the Initiative recognized in its statement of intent, "[t]he impacts of gun violence by

11 assault weapons fall heavily on children and teenagers.  According to one analysis, more than

12 two hundred eight thousand students attending at least two hundred twelve schools have

13 experienced a shooting on campus since the Columbine mass shooting in 1999."[30]  Data from the

14 National Center for Education Statistics show that in 2018, 18.6% of 18- and 19-year-olds in the

15 United States were enrolled in secondary education.[31]  Extrapolating that percentage to

16 Washington, there are likely almost 50,000 18- and 19-year-olds in Washington enrolled in

17

18      [27] MacNaughton Decl., Ex. 15, Jillian Peterson & James Densley, *School shooters usually show these signs of

19 distress long before they open fire, our database shows*, The Conversation, Feb. 8, 2019,
   https://theconversation.com/school-shooters-usually-show-these-signs-of-distress-long-before-they-open-fire-our-

20 database-shows-111242.

      [28] Based on data from 1970 to present.  MacNaughton Decl., Ex. 16, *Active Shooter: Shooter's Age*, K-12

21 School Shooting Database, Center for Homeland Defense and Security, https://www.chds.us/ssdb/active-shooter-
   shooters-age/ (last visited Apr. 6, 2020); MacNaughton Decl., Ex. 20 at 76, U.S. Census Bureau, *Current Population

22 Reports, Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 to 2050* (1996),
   *available at* https://www.census.gov/library/publications/1996/demo/p25-1130.html.

23      [29] MacNaughton Decl., Ex. 17 at 43, Adam Lankford & James Silver, *Why Have Public Mass Shootings
   Become More Deadly? Assessing how Perpetrators' Motives and Methods Have Changed Over Time*, 19

24 Criminology & Public Policy 37, 43 (2020).

      [30] Initiative 1639 § 1.

25
      [31] MacNaughton Decl., Ex. 18, *Percentage of the population 3 to 34 years old enrolled in school, by age group:

26 selected years, 1940 through 2018*, National Center for Education Statistics, *available at*
   https://nces.ed.gov/programs/digest/d19/tables/dt19_103.20.asp?current=yes (last visited Apr. 6, 2020).

27 *AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
   CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
   MOT FOR SUMMARY JUDGMENT                                              Davis Wright Tremaine LLP
   NO. 3:19-CV-05106-RBL - 8                                            LAW OFFICES
                                                                        920 Fifth Avenue, Suite 3300
                                                                        Seattle, WA  98104-1610
                                                                        206.622.3150 main · 206.757.7700 fax

1  secondary schools.  The Initiative's sensible age restrictions are designed to protect precisely

2  these students, who are the same age as the victims of the Mukilteo house party shooting.

3  But even after a shooting ends, gun violence disproportionately harms young people.

4  Young people exposed to gun violence are at a greater risk of developing PTSD[32] and harming

5  themselves.[33]  For instance, after the Columbine massacre, one student survivor suffering from

6  PTSD died from suicide after losing two friends and watching his basketball coach die in the

7  mass shooting.[34]  Similarly, two teenage survivors of the 2018 mass shooting in Parkland, Florida

8  later died by suicide.[35]  By seeking to prevent mass school shootings and other gun violence, the

9  Initiative's age restrictions squarely fit the state's objective of protecting the mental health and

10  safety of young adults.

11  **III.    The Initiative Defines "Semiautomatic Assault Rifles" to Encompass an Exceptionally Lethal Subset of Long Guns.**

12  Semiautomatic assault rifles are exceptionally lethal.[36]  *See* Defs.' MSJ at 24-25.  These

13  weapons fire bullets at a higher velocity than other types of firearms (such as semiautomatic

14  handguns), which medical evidence shows results in more grievous injuries.[37]  School shootings

15  in the United States involving rifles have a 9.73 times higher causality rate and a 14.74 times

16

17

18  [32] One study found that nearly 40% of children exposed to a shooting will develop PTSD.  *See* MacNaughton Decl., Ex. 19 at 7, Eboni Morris, *Youth Violence: Implications for Posttraumatic Stress Disorder in Urban Youth*, National Urban League Policy Institute, at 7 (2009).

19  [33] MacNaughton Decl., Ex. 21, Glenn D. Braunstein, *Violent Events Have Long-Term Effects on Children*, Huffington Post, Sept. 24, 2012, https://www.huffingtonpost.com/glenn-d-braunstein-

20  md/childrenptsd_b_1901651.html.

21  [34] *Id.*

22  [35] MacNaughton Decl., Ex. 22, Jared Keller, *The Psychological Aftermath of Surviving School Shootings*, Pacific Standard, Mar. 25, 2019, https://psmag.com/education/the-psychological-aftermath-of-surviving-school-shootings.

23  [36] *See* MacNaughton Decl., Ex. 23 at 1034, Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents with and Without Semiautomatic Rifles in the United States*, 320 JAMA 1034, 1034 (2018).

24  [37] *See, e.g.*, MacNaughton Decl., Ex. 24, Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic, Feb. 22, 2018, https://www.theatlantic.com/politics/

25  archive/2018/02/what-i-saw-treating-the-victimsfrom-parkland-should-change-the-debate-on-guns/553937/ (explaining difference between injuries inflicted by semiautomatic rifles vs. handguns); *Kasler v. Lockyer*, 23 Cal.

26  4th 472, 484 (2000) (citing medical evidence on "special wounding characteristics" of the high-velocity ammunition like that used in semiautomatic rifles).

27

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - 9

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    higher fatality rate compared to shootings involving handguns.[38]  A recent study estimated that

2    one-fourth of school shooting deaths nationwide could have been prevented if 18-to-20-year-olds

3    were barred from buying long guns.[39]

4        Despite this data, Plaintiffs contend the Initiative's "scope" is too broad because the

5    Initiative defines semiautomatic assault rifles in terms of their fundamental mechanics rather than

6    by particular features.  Pls.' MSJ" at 8-10.  Specifically, the Initiative defines semiautomatic

7    assault rifles as "any rifle which utilizes a portion of the energy of a firing cartridge to extract the

8    fired cartridge case and chamber the next round, and which requires a separate pull of the trigger

9    to fire each cartridge."[40]  This definition differs from some other states' assault weapons bans,

10    which restrict specific features, "such as pistol grips or bayonet lugs or muzzle brakes."  Pls.'

11    MSJ at 10.

12        The Initiative's approach is entirely reasonable, especially given that its goal is much

13    narrower than an assault weapons ban.  The Initiative does not ban any weapons, but restricts

14    minors' access to otherwise-available firearms capable of causing exceptionally serious harm if

15    misused.  Research on the enhanced lethality of semiautomatic rifles, defined as in the Initiative,

16    amply justifies the Initiative's holistic definition.[41]  Moreover, gun manufacturers have a well-

17    documented history of circumventing regulations that prohibit specific features on semiautomatic

18    rifles by engineering slight modifications so that a rifle complies with the regulation but remains

19    similarly lethal in operation.[42]  Washington sought to avoid this pitfall in the Initiative by defining

---

[38] MacNaughton Decl., Ex. 25 at 798, Melvin D. Livingston et. al, *A Descriptive Analysis of School and School Shooter Characteristics and the Severity of School Shootings in the United States, 1999–2018*, 64 J. of Adolescent Health 797, 798 (2019).

[39] MacNaughton Decl., Ex. 26  at 1386, Joshua D. Brown  & Amie J. Goodin, *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982–2018*, 108 Am. J. Pub. Health 1385, 1386 (2018).

[40] Initiative 1639 § 16.

[41] *See* MacNaughton Decl., Ex. 23, *supra* n.36 at 1034 (finding that active shootings involving a semiautomatic rifle, defined similarly to the Initiative's definition, were associated on average with more injuries and deaths than if a different kind of gun was used).

[42] *See* MacNaughton Decl., Ex. 27, Jeremy White, *When Lawmakers Try to Ban Assault Weapons, Gunmakers Adapt*, N.Y. Times, July 31, 2019, https://www.nytimes.com/interactive/2019/07/31/us/assault-weapons-ban.html;

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - 10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   semiautomatic assault rifles by their fundamental mechanical traits that enable their lethality.  In

2   doing so, the Initiative ensures that the limited restriction it places on 18-to-20-year-olds' ability

3   to purchase the most lethal type of rifles promotes public safety (by, among other things, reducing

4   fatalities from mass shootings and suicide attempts) rather than incentivizing gun manufacturers

5   to design around the law.

6                                        **CONCLUSION**

7       The Initiative's minimum-age restrictions reflect the judgment of nearly two million

8   Washington voters[43] who voted to address the grave danger of gun violence.[44]  Nothing in the

9   Second Amendment requires this Court to strip the people of their power to protect their children

10  and communities.  Indeed, "[a] system which permits one judge to block with the stroke of a pen

11  what [nearly two million] state residents voted to enact as law tests the integrity of our

12  constitutional democracy." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 699 (9th Cir. 1997).

13  As Judge Wilkinson, speaking for the Fourth Circuit, said: "This is serious business.  We do not

14  wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the

15  peace of our judicial chambers we miscalculated as to Second Amendment rights." *United States*

16  *v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

17                              *     *     *

18      The Initiative is a commonsense, calibrated, and data-driven solution with enormous

19  potential to save lives that does not substantially burden Second Amendment rights.

20

21

22

23  ─────────────────
    MacNaughton Decl., Ex. 28, Zusha Elinson & Cameron McWhirter, *Gun Makers Adjust Rifles to Skirt Bans*, Wall
24  St. J., June 21, 2019, https://www.wsj.com/articles/gun-makers-adjust-rifles-to-skirt-bans-11561109521.

25      [43] MacNaughton Decl., Ex. 29, *Initiative Measure No. 1639*, November 6, 2018 General Election Results,
    Secretary of State (Nov. 27, 2018), *available at* https://results.vote.wa.gov/results/20181106/State-Measures-
26  Initiative-Measure-No-1639-Initiative-Measure-No-1639-concerns-firearms_ByCounty.html.

        [44] Initiative 1639 § 1.

27  *AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
    CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
    MOT FOR SUMMARY JUDGMENT                                        Davis Wright Tremaine LLP
    NO. 3:19-CV-05106-RBL - 11                                      LAW OFFICES
                                                                    920 Fifth Avenue, Suite 3300
                                                                    Seattle, WA  98104-1610
                                                                    206.622.3150 main · 206.757.7700 fax

Dated:  July 1, 2020

*Of Counsel for Amicus Curiae Giffords Law
Center to Prevent Gun Violence:*

J. Adam Skaggs
Hannah Shearer
Hannah Friedman
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA 94104
Tel:  (415) 433-2062

Robert A. Sacks
Leonid Traps
Angela N. Ellis
Jackson Froliklong
Rachel VanGelder
Stephanie M. Kelly
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-4000

*Of Counsel for Amicus Curiae Brady*:

Jonathan Lowy
Kelly Sampson
BRADY
840 First Street, NE, Suite 400
Washington, DC 20002
Tel:  (202) 289-7319

DAVIS WRIGHT TREMAINE LLP
*Attorney for Amici Curiae Giffords Law
Center to Prevent Gun Violence and
Brady*

s/ *Bonnie E. MacNaughton*
Bonnie E. MacNaughton (#36110)
920 Fifth Ave., Suite 3300
Seattle, WA 98104
Tel:  (206) 622-3150
Fax:  (206) 757-7700
Email: BonnieMacNaughton@dwt.com

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - 12

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on July 1, 2020, I electronically filed the foregoing with the Clerk of

3

the Court using the CM/ECF system, which will send notification of such filing to those

4

attorneys of record registered on the CM/ECF system.  All other parties (if any) shall be served

5

in accordance with the Federal Rules of Civil Procedure.

6

7

8

*s/ Bonnie E. MacNaughton*
Bonnie E. MacNaughton, WSBA #36110

9

Davis Wright Tremaine LLP

10

920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610

11

Ph:  (206) 622-3150
Fax:  (206) 757-7700

12

E-mail:  BonnieMacNaughton@dwt.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*AMICI-CURIAE* GIFFORDS LAW CENTER AND BRADY ISO DEFS.'
CROSS-MOT FOR SUMMARY JUDGMENT AND OPP. TO PLFS.'
MOT FOR SUMMARY JUDGMENT
NO. 3:19-CV-05106-RBL - 13

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**SER-75**

The Honorable Ronald B. Leighton

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

| | |
|---|---|
| DANIEL MITCHELL, *et al.*, | NO. 3:19-cv-5106 |
| Plaintiffs, | DEFENDANTS AND INTERVENOR-DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CHARLES ATKINS, *et al.*, | |
| Defendants, | **RE-NOTE ON MOTION CALENDAR: MAY 24, 2020 ORAL ARGUMENT REQUESTED** |
| and | |
| SAFE SCHOOLS SAFE COMMUNITIES, | |
| Intervenor-Defendant. | |

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-76**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................ 1

II.   ARGUMENT IN REPLY ........................................................................... 1

   A.   Defendants' Material Evidence is Undisputed or Unrebutted ................... 1

   B.   The Age Provision Does Not Offend the Second Amendment ................. 2

      1.   The Ninth Circuit's Second Amendment framework governs this case ........... 2

      2.   The Age Provision is constitutional ................................................. 4

   C.   The Nonresident Sales Provision Does Not Violate the Dormant Commerce Clause ......................................................................................... 8

      1.   The Nonresident Sales Provision does not bar sales across state lines ............. 8

      2.   The Nonresident Sales Provision is nondiscriminatory .................................... 12

      3.   The Nonresident Sales Provision is constitutional as a matter of law ............ 13

   D.   Plaintiffs Fail to Provide Sufficient Evidence Establishing Justiciability ............... 14

III.   CONCLUSION ......................................................................................... 14

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# TABLE OF AUTHORITIES

**Federal Cases**                                                                              Page(s)

*Bias v. Moynihan,*
   508 F.3d 1212 (9th Cir. 2007) ............................................................................. 2

*Burlington N. & Santa Fe Ry. Co. v. White,*
   548 U.S. 53 (2006) ............................................................................................ 10

*C & A Carbone, Inc. v. Town of Clarkstown,*
   511 U.S. 383 (1994) .......................................................................................... 10

*Caetano v. Massachusetts,*
   136 S. Ct. 1027 (2016) ........................................................................................ 3

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
   520 U.S. 564 (1997) .......................................................................................... 12

*Chinatown Neighborhood Ass'n v. Harris,*
   794 F.3d 1136 (9th Cir. 2015) ........................................................................... 13

*City of Phila. v. New Jersey,*
   437 U.S. 617 (1978).......................................................................................... 12

*Craig v. Boren,*
   429 U.S. 190 (1976).......................................................................................... 14

*District of Columbia v. Heller,*
   554 U.S. 570 (2008)...................................................................................... passim

*Fyock v. Sunnyvale,*
   779 F.3d 991 (9th. Cir. 2015) ..................................................................... 2, 3, 7

*General Motors Corp. v. Tracy,*
   519 U.S. 278 (1997).......................................................................................... 13

*Gould v. Morgan,*
   907 F.3d 659 (1st Cir. 2018)............................................................................... 5

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011) ......................................................................... 3

DEFENDANTS' REPLY IN SUPPORT OF                    ii              ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                                          Complex Litigation Division
NO. 3:19-cv-5106                                                     800 Fifth Avenue, Suite 2000
                                                                     Seattle, WA 98104-3188
                                                                     (206) 464-7744

**SER-78**

*Jackson v. City & Cty. of San Francisco,*
   746 F.3d 953 (9th Cir. 2014) ........................................................... 8

*Kachalsky v. Cty. of Westchester,*
   701 F.3d 81 (2d Cir. 2012) .............................................................. 7

*Kolbe v. Hogan,*
   849 F.3d 114 (4th Cir. 2017) ........................................................... 2

*Mai v. United States,*
   952 F.3d 1106 (9th Cir. 2020) ...................................................... 6, 7

*Mance v. Sessions,*
   896 F.3d 390 (5th Cir. 2018) (per curiam) ...................................... 3

*McBurney v. Young,*
   569 U.S. 221 (2013) ...................................................................... 12

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ........................................................................ 3

*Moy v. Cowen,*
   958 F.2d 168 (7th Cir. 1992) (per curiam) .................................... 11

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown,*
   567 F.3d 521 (9th Cir. 2009) ......................................................... 13

*Nat'l Rifle Ass'n v. Bur. of Alcohol, Tobacco, Firearms & Explosives,*
   700 F.3d 185 (5th Cir. 2012) .............................................. 4, 5, 6, 7

*New Energy Co. of Ind. v. Limbach,*
   486 U.S. 269) (1988) ..................................................................... 12

*Pena v. Lindley,*
   898 F.3d 969 (9th Cir. 2018) ........................................................... 6

*Pike v. Bruce Church, Inc.,*
   397 U.S. 137 (1970) ................................................................. 13, 14

*Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.,*
   763 F.3d 1232 (9th Cir. 2014) ....................................................... 11

*Rhode v. Becerra,*
   No. 18-cv-802-BEN, 2020 WL 1955363 (S.D. Cal. Apr. 23, 2020) ...................... 3

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

iii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-79**

*Rhode v. Becerra,*
    No. 20-55437, 2020 WL 2049091 (9th Cir. Apr. 24, 2020) .................................... 3

*Rosenblatt v. City of Santa Monica,*
    940 F.3d 439 (9th Cir. 2019) ............................................................... 8, 10, 12, 13

*Shaver v. United States,*
    174 F.2d 618 (9th Cir. 1949) .......................................................................... 10

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ....................................................................................... 14

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 1999) (en banc) ........................................................ 14

*United States v. Chovan,*
    735 F.3d 1127 (9th Cir. 2013) .......................................................................... 2

*United States v. Henry,*
    688 F.3d 637 (9th Cir. 2012) ............................................................................ 2

*United States v. Nordbrock,*
    38 F.3d 440 (9th Cir. 1994) ............................................................................ 11

*Worman v. Healey,*
    922 F.3d 26 (1st Cir. 2019) ........................................................................... 2, 4


**Washington State Cases**

*In re Williams,*
    121 Wn.2d 655 (1993) .................................................................................... 10

*League of Educ. Voters v. State,*
    176 Wn.2d 808 (2013) .................................................................................... 14

*State v. Tvedt,*
    153 Wn.2d 705 (2005) .................................................................................... 10

*Transit Union Local 587 v. State,*
    142 Wn.2d 183 (2000) .................................................................................... 10

DEFENDANTS' REPLY IN SUPPORT OF                  iv          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                                          Complex Litigation Division
NO. 3:19-cv-5106                                                    800 Fifth Avenue, Suite 2000
                                                                     Seattle, WA 98104-3188
                                                                         (206) 464-7744

**SER-80**

**Other State Cases**

*People v. Aguilar,*
   2 N.E.3d 321 (Ill. 2013) ............................................................................ 5

*People v. Jordan G.,*
   33 N.E.3d 162 (Ill. 2015) .......................................................................... 5


**Federal Statutes**

10 U.S.C. § 246 ............................................................................................. 5

18 U.S.C. § 922 ................................................................................. 9, 10, 11


**Washington State Statutes**

RCW 2.60.020 ............................................................................................. 11

RCW 82.32.730 ............................................................................................. 9

RCW 9.41.122 ............................................................................................... 9

RCW 9.41.124 ......................................................................................... 9, 11

RCW 9.41.010 ............................................................................................. 11


**Other State Statutes**

Mass. Gen. Laws ch. 140, § 131E ............................................................. 10


**Federal Regulations**

27 C.F.R. § 478.124 ................................................................................... 11


**State Regulations**

WAC 458-20-193 ........................................................................................... 9

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

v

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-81**

**Other Authorities**

Senate Report No. 90-1501 (1968) ............................................................................................. 9

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

vi

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-82**

# I.    INTRODUCTION

If one thing is clear from Plaintiffs' briefing, it is that neither the facts nor the law are on their side. Instead of providing evidence to counter the comprehensive record Defendants have assembled, Plaintiffs offer only unsupported conclusions and rhetoric. Rather than apply the Ninth Circuit's established two-part Second Amendment framework, Plaintiffs ask this Court to adopt a test they personally consider truer to *District of Columbia v. Heller*, 554 U.S. 570 (2008)—a test no court has ever accepted. Binding precedent forecloses Plaintiffs' approach.

Mitchell's Dormant Commerce Clause claim is no more colorable. As with handguns, I-1639 permits interstate sales of SARs via FFL-to-FFL transfer. Mitchell expansively interprets the Nonresident Sales Provision to the contrary—a reading at odds with its text, purpose, and context. His linguistic gymnastics over sales, purchases, and delivery are distinctions without a difference. Under the proper legal framework, the Nonresident Sales Provision is constitutional. It does not discriminate by advancing "economic protectionism," but rather promotes public safety by ensuring an enhanced background check precedes any in-state SAR purchase. The law survives any standard of scrutiny and further is authorized by Congress. Even if Plaintiffs' claims were justiciable (and many are not), summary judgment for Defendants is warranted.

# II.    ARGUMENT IN REPLY

## A.    Defendants' Material Evidence is Undisputed or Unrebutted

Plaintiffs fail to create a genuine question of fact as to any material issue. The following facts are undisputed and, when applied under the binding frameworks, demonstrate that I-1639 is constitutional: (1) Reducing gun violence and increasing public safety—the actual purposes behind I-1639—are important government purposes; (2) I-1639 extended current laws applicable to handguns to one other subset of firearms—SARs; (3) SARs are easier to use and more lethal than other types of firearms; (4) Mass shooters often favor SARs; (5) The regions of the brain that govern impulsivity and judgment do not fully mature until the twenties; (6) 18- to 20-year-olds disproportionately commit violent crimes; (7) Numerous mass shootings, including those

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  in Newtown, CT, Parkland, FL, Burlington, WA, and Mukilteo, WA, have been carried out by

2  18- to 20-year-olds using SARs; (8) Minimum age laws have proven effective in addressing

3  health and safety concerns; and (9) Enhanced background checks are more effective than NICS-

4  only checks, and difficult if not impossible to conduct on nonresident firearm purchasers.

5       Plaintiffs mostly ignore these contentions or respond with unsupported or conclusory

6  statements. For example, while Plaintiffs assert—without support—that the testimony of

7  Defendants' expert witnesses, who are well-respected leaders in their fields, is nothing more than

8  "claptrap," Dkt. 103 at 21 n.23, they did not move to exclude any of those experts' testimony or

9  offer rebuttal expert testimony in response. Likewise, Plaintiffs do not cite any legislative facts

10 or declarations in rebuttal.[1] Because Plaintiffs fail to meaningfully dispute these issues with

11 "significant probative evidence," *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007), the

12 Court should accept them as true and grant Defendants summary judgment.

13 **B.     The Age Provision Does Not Offend the Second Amendment**

14      **1.     The Ninth Circuit's Second Amendment framework governs this case**

15      Plaintiffs pretend that *Heller* is a blank slate, ignoring that the Ninth Circuit, along with

16 every other circuit to address the issue, has adopted a two-part Second Amendment framework

17 derived from *Heller*. *See Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th. Cir. 2015).[2] In place of

18 that framework, Plaintiffs would have this Court create a new test—one unrecognized by any

19 court—under which any condition on the sale of firearms in "common use" is unconstitutional.

20 Dkt. 103 at 8. Plaintiffs' requested approach to leapfrog "circuit precedent" that "remains

21 binding" is not available to this Court. *United States v. Henry*, 688 F.3d 637, 642 (9th Cir. 2012).

22

23      [1] Plaintiffs state that some people believe that "guns are actually part of the solution," Dkt. 103 at 2, but this unsupported statement of preferred policy does not rebut any of the specific evidence listed above.

24      [2] *See also Worman v. Healey*, 922 F.3d 26, 33 (1st Cir. 2019); *Kolbe v. Hogan*, 849 F.3d 114, 132–33 (4th Cir. 2017). This makes sense as the *Heller* Court noted that the Second Amendment's doctrinal structure "is no

25 different" from the First Amendment's. 554 U.S. at 635. Application of facts to the appropriate level of scrutiny is well-recognized under the First Amendment. *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir.

26 2013). Accordingly, Plaintiffs' ideological arguments regarding treating the Second Amendment as a "right" versus a "privilege" are not based in law and their characterization of the two-part test as "interest balancing" is incorrect.

DEFENDANTS' REPLY IN SUPPORT OF                    2                    ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                                                  Complex Litigation Division
NO. 3:19-cv-5106                                                               800 Fifth Avenue, Suite 2000
                                                                              Seattle, WA 98104-3188
                                                                                 (206) 464-7744

1   It also misreads *Heller*. *Heller* did not hold that firearms in "common use" are free from

2   regulation. Rather, *Heller* invalidated a total ban on handgun possession because it infringed on

3   the "core" right of "responsible citizens to use arms in defense of hearth and home." 554 U.S. at

4   630, 635. "[N]othing in our opinion," the *Heller* Court cautioned, "should be taken to cast doubt

5   on longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . .

6   laws imposing conditions and qualifications on the commercial sale of arms," or other such

7   "presumptively lawful regulatory measures." *Id.* at 626–27 & n.26. In *McDonald v. City of*

8   *Chicago*, the Court reiterated that *Heller* "recognized that the right to keep and bear arms is not

9   'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

10  purpose.'" 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626).[3]

11  In fact, whether a firearm is in "common use" is relevant only as a threshold question at

12  the first step of the framework—to determine whether a firearm may be "dangerous and unusual"

13  such that it falls outside the Second Amendment altogether. *Fyock*, 779 F.3d at 997–1001 (though

14  large-capacity magazines were sufficiently in "common use" to fall within Second Amendment's

15  scope, law banning such magazines triggered only intermediate scrutiny, which it met).

16  Plaintiffs' theory overlooks the limited relevance of "common use" in the binding test.[4]

17  _____

18  [3] Plaintiffs do not cite a single case that supports their novel "common use" theory. For example, *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), does not remotely prescribe a "common use" test. Rather, in *Caetano* the

19  Court vacated and remanded a state court decision because the court had erroneously held that the Second Amendment does not apply to arms not in existence in the late 1700s. *Id.* at 1028. *Rhode v. Becerra*, No. 18-cv-

20  802-BEN, 2020 WL 1955363, (S.D. Cal. Apr. 23, 2020), is also unavailing. First, the Ninth Circuit immediately stayed the district court's preliminary injunction against California's background check requirement for ammunition purchases. *Rhode v. Becerra*, No. 20-55437, 2020 WL 2049091, at *1 (9th Cir. Apr. 24, 2020) and Dkt. 13-1

21  (May 14, 2020). Second, the district court applied the two-part test that Plaintiffs now ask this Court to ignore. *Becerra*, 2020 WL 1955363, at *16–17. Third, the background check requirement in *Rhode* applied to purchase of

22  any ammunition by anyone. *Id.* The Age Provision is limited to purchases of one type of firearm by a subset of the population. It is less burdensome than restrictions that bar firearm possession completely. *See* Dkt. 103 at 18.

23  [4] Further, the common use test expressly has been rejected in the courts. *See Heller v. District of Columbia*,

24  670 F.3d 1244, 1264-69 (D.C. Cir. 2011); *see also Mance v. Sessions*, 896 F.3d 390, 391-93 (5th Cir. 2018) (Higginson, J., concurring in denial of rehearing en banc) (the Supreme Court has "never suggested that courts should abandon the familiar tiers-of-scrutiny architecture built around analogous provisions like the Equal

25  Protection Clause, Due Process Clauses, and First Amendment"). A common use test also would create a perverse incentive whereby firearm manufacturers could insulate highly lethal firearms from regulation simply by

26  manufacturing and marketing them before a government could assess them and decide on a regulatory response.

DEFENDANTS' REPLY IN SUPPORT OF           3           ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                            Complex Litigation Division
NO. 3:19-cv-5106                                      800 Fifth Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                           (206) 464-7744

Regardless, none of Defendants' arguments rest on whether SARs are in common use. The Age Provision is outside the Second Amendment's protection not because SARs are "dangerous and unusual" (an issue this Court need not resolve), but for the separate reason that age restrictions for individuals under 21 are historically longstanding. *See* Dkt. 84 at 11–15.[5]

The Court should decline Plaintiffs' invitation to ignore circuit precedent in favor of their own idiosyncratic rewrite of *Heller*.

**2.      The Age Provision is constitutional**

Plaintiffs fail to cite a single decision striking down a minimum age law or restriction on SARs (or similar weapons) under any standard. The dearth of authority is not surprising. Courts consistently have upheld minimum age laws and restrictions on SARs—including assault weapons bans. Dkt. 84 at 14–15, 25; *see also, e.g.*, *Worman*, 922 F.3d at 40 (upholding Massachusetts assault weapons ban). The Age Provision in I-1639 is no different.

**a.      The Age Provision falls outside the Second Amendment**

As noted above, historical firearm laws demonstrate that age restrictions are "longstanding" and thus outside the Second Amendment's ambit. *Heller*, 554 U.S. at 626–27. Defendants have established, and courts have concluded, that firearms age restrictions on 18- to 20-year-olds meet this test. Dkt. 84 at 13–15. Plaintiffs unsuccessfully try to distract from this undisputed historical record. For example, their suggestion that a firearm restriction is constitutional only if it has an analogue "as long-standing as the Second Amendment," Dkt. 103 at 13, is contrary to *Heller*, which deemed firearms restrictions from as late as the early 20th century to be "longstanding." 554 U.S. at 626–27; *Nat'l Rifle Ass'n v. Bur. of Alcohol, Tobacco, Firearms & Explosives* (*NRA*), 700 F.3d 185, 196 (5th Cir. 2012) (identifying "longstanding"

---

[5] Moreover, Plaintiffs have failed to establish that SARs are in common use for lawful purposes, let alone among 18- to 20-year-olds. Though they claim the record is "replete" with such evidence, Plaintiffs cite only one source: a declaration by Mitchell, Dkt. 103 at 4 n.5, who previously conceded that he had not consulted any sales data in arriving at his "ballpark" estimate of out-of-state SAR sales and provides no information about 18- to 20-year-olds. Dkt. 84 at 28.

DEFENDANTS' REPLY IN SUPPORT OF                    4              ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                                          Complex Litigation Division
NO. 3:19-cv-5106                                                        800 Fifth Avenue, Suite 2000
                                                                          Seattle, WA 98104-3188
                                                                              (206) 464-7744

1    regulations that arose in the "20th-century"); Dkt. 84 at 13–14.[6] Moreover, as "the challenge

2    here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth

3    Amendment was ratified)," not 1791. *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018).

4        Plaintiffs further state—again, without authority—that historical statutory restrictions on

5    handguns have no bearing on I-1639's regulation of long guns. Dkt. 103 at 12. Plaintiffs miss

6    the point. These laws demonstrate that age restrictions on firearms are longstanding. Plaintiffs

7    make no attempt to explain how prohibiting sales of SARs to 18- to 20-year-olds could be

8    unconstitutional when the parallel federal age prohibition on sales of handguns—"the

9    quintessential self-defense weapon," *Heller*, 554 U.S. at 629—has uniformly withstood Second

10   Amendment challenges. *See NRA*, 700 F.3d at 188; Dkt. 84 at 12 n.47.[7]

11       Finally, Plaintiffs argue that requiring 18- to 20-year-olds to serve in the militia and

12   possess a firearm somehow vests those persons with an individual right to ownership of firearms.

13   Dkt. 103 at 9–12. But in *Heller*, the Court decoupled the right to bear arms from the duty to serve

14   in the militia. *Heller*, 554 U.S. at 589–94. Thus, when Plaintiff NRA raised this same militia

15   argument in another case, the Fifth Circuit rejected it, explaining that *Heller* held that "the right

16   to arms is not co-extensive with the duty to serve in the militia." *NRA*, 700 F.3d at 204 n.17.[8]

17   This distinction is made clearer by the federal prohibition on possession of handguns by 18- to

18   20-year-olds despite their ability to use those same firearms for military purposes. *Id.* at 211.[9]

19

20   ──────────────

     [6] Contrary to Plaintiffs' contention, no court has held that firearms restrictions are permissible only for
21   persons who have "forfeited their rights or ha[ve] been legally subjected to state control." Dkt. 103 at 9. To the
     contrary, *Heller* explains that presumptively lawful restrictions include "conditions and qualifications on the
22   commercial sale of arms"—the exact type of restriction at issue here. 554 U.S. at 626-27.
         [7] Plaintiffs also ignore both that many courts have held that 18- to 20-year-olds are not "responsible"
23   persons and that the "responsible" standard comes from *Heller* itself. *See, e.g.*, *NRA*, 700 F.3d at 206.
         [8] *See also People v. Aguilar*, 2 N.E.3d 321, 329 (Ill. 2013) ("[A]lthough many colonies *permitted* or even
24   *required* minors to own and possess firearms for purposes of militia service, nothing like a *right* for minors to
     own and possess firearms has existed at any time in this nation's history"); *People v. Jordan G.*, 33 N.E.3d 162,
25   168 (Ill. 2015) ("[W]e find our conclusion in *Aguilar*, that age based restrictions on the right to keep and bear
     arms are historically rooted, applies equally to those persons under 21 years of age").
         [9] Plaintiffs' citation of 10 U.S.C. § 246, which limits members of the militia to 17- to 44-year-olds, is also
26   of no import. Such age requirements cannot define the scope of the Second Amendment right, unless Plaintiffs
     seriously contend that 17-year-olds enjoy its full protections while persons age 45 and over do not.

DEFENDANTS' REPLY IN SUPPORT OF               5          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                                    Complex Litigation Division
NO. 3:19-cv-5106                                                800 Fifth Avenue, Suite 2000
                                                                 Seattle, WA 98104-3188
                                                                    (206) 464-7744

### b.   Plaintiffs' arguments against intermediate scrutiny fail

Even if the Age Provision burdened conduct protected by the Second Amendment, it would be constitutional under intermediate scrutiny, which applies because the Age Provision does not "severely burden[]" the "core Second Amendment right of self-defense of the home." *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (quotation marks and citation omitted).

Plaintiffs do not even attempt to establish how the Age Provision "severely burdens" their core right to self-defense, or even why SARs are necessary for self-defense. Rather, Plaintiffs again simply ignore binding case law cabining the scope of the *core* right.[10] Moreover, the purchase portion of the Age Provision is a commercial regulation—a type of restriction *Heller* recognized as presumptively valid. 554 U.S. at 626–27. And the "temporary nature of this burden" is "far less onerous" than a lifetime ban. *NRA*, 700 F.3d at 207; *cf. Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020) (intermediate scrutiny applies even to a lifetime ban).[11]

Plaintiffs do not deny that other firearms remain available for self-defense or any other lawful activity. Instead they argue that such viable alternatives are irrelevant under *Heller*. But this argument ignores *Heller*'s pivotal conclusion that handguns are the "quintessential" firearm for self-defense. 554 U.S. at 629. Plaintiffs provided no evidence that SARs hold a similar position, that SARs are the primary firearm 18- to 20-year-olds use for self-defense, or that alternatives are inadequate. Moreover, the broad ban on handgun possession in *Heller* is nothing like the Age Provision, which permits 18- to 20-year-olds to possess multiple firearms, including SARs, in the home for self-defense and many other lawful purposes. Dkt. 84 at 7.[12]

The Age Provision triggers at most intermediate scrutiny, which it easily satisfies. I-

---

[10] Defendants have never maintained that the Second Amendment is limited to the right of self-defense in the home, *cf.* Dkt. 103 at 14, but simply have pointed out that such purpose is the "core" Second Amendment right as described in *Heller* and as relevant to the two-step test, Dkt. 84 at 16.

[11] Plaintiffs do not apply any Ninth Circuit precedent to their arguments, including failing to state the standard for when strict scrutiny applies, what it requires, or how it would apply to these facts.

[12] Plaintiffs' claim that the Age Provision prohibits using SARs for self-defense, marksmanship, and hunting is false. Dkt. 84 at 7 (listing exceptions for a variety of lawful purposes).

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1639's purposes are to "increase public safety and reduce gun violence." Dkt. 84 at 20. Plaintiffs do not dispute that these objectives are important public purposes.[13]

Limiting SAR purchases by 18- to 20-year-olds, the same as for handguns, has a "reasonable fit" with those purposes. *See Fyock*, 779 F.3d at 1000. Tellingly, Plaintiffs don't even mention the most directly analogous case that applied this analysis: *NRA*, 700 F.3d at 207–11, which upheld the federal minimum age requirement for handgun purchases. Instead, Plaintiffs cite a First Amendment case that applies a completely different standard. Dkt. 103 at 19. Intermediate scrutiny requires only that a measure have a "reasonable fit" with an "important" state objective. *Fyock*, 779 F.3d at 1000; *see also Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) ("Unlike strict scrutiny review, we are not required [under intermediate scrutiny] to ensure that the [law] is 'narrowly tailored' . . . .").

As explained above, Plaintiffs do not dispute—or fail to rebut—most of the material facts Defendants presented to support the Age Provision, including that key regions of the brain do not fully mature until the twenties; 18- to 20-year-olds disproportionately commit violent crimes; SARs are more lethal and used more frequently in mass shootings than other firearms; and 18- to 20-year-olds have committed gun violence, including mass shootings, in Washington and nationally. Even "categorical bans on groups of persons . . . pos[ing] an increased risk of violence" meet intermediate scrutiny, *Mai*, 952 F.3d 1116, so the Age Provision does, too.[14]

---

[13] Plaintiffs attempt to artificially narrow I-1639's purpose to reducing mass shootings only. Dkt. 103 at 20. This is not correct, as the Initiative makes clear. Dkt. 94-1, Ex. A (stating the I-1639's purpose was to "increase public safety and reduce gun violence"). Plaintiffs' misstatements may stem from their decision to challenge only the Age and Nonresident Sales Provisions. But I-1639 was more than these two provisions. Consistent with its overall goal to reduce gun violence, the Initiative contains multiple related requirements, including mandating firearms safety training and an enhanced background check and waiting period prior to purchasing a SAR, and providing criminal penalties in certain circumstances if a firearm is stored unsafely. Dkt. 84 at 6 n.30.

[14] Plaintiffs' footnote 23, which distorts defense experts' testimony, is at most subjective criticism and fails to introduce any contrary facts that dispute the experts' unrebutted opinions. *See, e.g.*, Dkt. 104, Ex. F (Rivara Dep. 41:1–42:1, 50:1–51:7, 52:3–53:8) (explaining that difference between public health "problem" and "crisis" such as firearm suicides is whether it is being addressed; separately answering that he takes steps as a physician to prevent deaths due to medical errors); *id.*, Ex. G (Aylward Dep. 7:2–12:24, 30:2–32:23) (defining risky behavior and explaining common-sense point that public norms inform whether behavior is risky; explaining that responsible firearm use would entail following laws and having sufficient neurodevelopmental maturation); *id.* Ex. H (Johnson

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Plaintiffs' argument to the contrary rests on the observation that background checks will

2   not be conducted on 18- to 20-year-olds who obtain SARs *unlawfully*. Dkt. 103 at 3. This is a

3   non-sequitur. That a law does not entirely eliminate a risk does not mean that it is ineffective at

4   reducing risk. Prohibiting 18- to 20-year-olds from purchasing SARs will limit their

5   opportunities to use them for harm. For example, the Age Provision could have prevented the

6   mass shooting in Mukilteo, where the 19-year-old perpetrator legally purchased an AR-15-style

7   SAR before killing multiple people. Dkt. 84 at 23. While it is true that every mass shooting

8   averted is "theoretical," Dkt. 103 at 3, that is precisely the point of prevention—to ensure that

9   more potential shootings remain unrealized. Defendants have presented evidence that shows 18-

10  to 20-year-olds' access to firearms like SARs poses increased risks to public health and safety.

11  The State is entitled to deference in its choice of means to address that risk. *See Jackson v. City*

12  *& Cty. of San Francisco*, 746 F.3d 953, 966 (9th Cir. 2014). The Age Provision is constitutional.

13  **C.    The Nonresident Sales Provision Does Not Violate the Dormant Commerce Clause**

14  Mitchell fails to carry his "initial burden of showing discrimination" under the Dormant

15  Commerce Clause. *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 448 (9th Cir. 2019).

16  **1.    The Nonresident Sales Provision does not bar sales across state lines**

17  Perhaps the oddest feature of Plaintiffs' brief is Mitchell's argument that the Nonresident

18  Sales Provision is far broader than either what its plain meaning suggests or how the State of

19  Washington itself construes it. To transform I-1639 into an interstate sales ban, Mitchell claims

20  the Nonresident Sales Provision not only precludes SAR sales to nonresidents in Washington,

21  but also "forbids the purchase of a [SAR]" by a nonresident in all circumstances, including by

22  FFL-to-FFL transfer. Dkt. 103 at 21. This expansive reading of the law is irreconcilable with

23  every standard tool of statutory construction, including I-1639's text, context, and purpose.

24  _____

25  Dep. 7:14–12:6, 16:20–19:8) (explaining that adolescents are more prone to emotionally hot situations and answering irrelevant question of whether she is familiar with firearm purchase process; explaining efficacy of

26  firearm restriction in reducing injuries could be measured); *id.* Ex. I (Jones Dep. 11:19–12:2, 52) (giving opposite answer claimed by Plaintiffs by providing specific examples of firearms regulations that he supports).

DEFENDANTS' REPLY IN SUPPORT OF          8          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                         Complex Litigation Division
NO. 3:19-cv-5106                                    800 Fifth Avenue, Suite 2000
                                                    Seattle, WA 98104-3188
                                                    (206) 464-7744

First, under the plain language, the Nonresident Sales Provision applies only to a nonresident SAR "purchase" that occurs "in Washington." RCW 9.41.124. Mitchell concedes that the law applies to "*in-state* purchases by non-residents," Dkt. 103 at 21 (emphasis added), but argues that a FFL-to-FFL transfer to a customer located at all relevant times in another state somehow constitutes a purchase "in Washington." This argument is wrong. To say that a Texas buyer purchases a SAR "in Washington" when the buyer receives it directly from a Texas FFL, subject to Texas background check laws, and without leaving Texas, defies common sense and plain meaning. The Texas purchaser is not physically "in Washington." The Texas purchaser does not pay Washington sales tax or use tax.[15] While the Texan may have procured the gun *from* Washington, it would defy ordinary parlance to say he purchased it "in" Washington.

Second, reading I-1639 to allow FFL-to-FFL transfers harmonizes with the federal Gun Control Act (GCA). The GCA prohibits an FFL in one state from selling firearms to a resident of another unless (1) the firearm is a rifle or shotgun; (2) the sale takes place "in person"; and (3) the laws of "both such States" permit it. 18 U.S.C. § 922(b)(3). In turn, the Nonresident Sales Provision expressly permits nonresident purchases of "rifles and shotguns . . . in Washington," "except [SARs]." RCW 9.41.124. Thus, a Washington FFL may not sell a SAR to a nonresident "in Washington," RCW 9.41.124, because it would not "fully comply" with Washington's "legal conditions of sale," 18 U.S.C. § 922(b)(3). But neither the Nonresident Sales Provision nor § 922(b)(3) restricts *interstate* long gun sales made through FFLs, where the buyer goes "in person" to their local in-state FFL rather than physically purchasing the SAR in Washington.[16]

---

[15] *See* RCW 82.32.730(1)(b); WAC 458-20-193(2), (203)(a)–(b); Wash. Dep't of Rev., *Sales and transfers of firearms by licensed dealers* (last visited May 20, 2020), https://dor.wa.gov/get-form-or-publication/publications-subject/tax-topics/sales-and-transfers-firearms-license-dealers.

[16] Washington non-resident purchase provisions are *in pari materia* with the GCA, as 18 U.S.C § 922(b)(3) expressly authorizes states to determine whether (1) their residents may purchase rifles and shotguns in other states and (2) nonresidents may purchase long guns within their borders. When the GCA was enacted, Congress required states to "enact enabling legislation permitting such sales" to their residents in other states. S. Rep. No. 90-1501, at 11, 21 (1968). Numerous states did so, while also enacting parallel statutes expressly permitting nonresidents to purchase long guns within their borders—making clear that nonresident purchases "fully comply" with state law under § 922(b)(3). *See, e.g.,* RCW 9.41.122., 124 (allowing residents to purchase long guns out-of-state and

---

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Third, Mitchell's reading cannot be squared with I-1639's expressed intent to regulate

2    SARs in the same ways as handguns. Under federal law, nonresidents may purchase handguns

3    (as well as other types of firearms) through FFL-to-FFL transfer but may not make an in-person

4    purchase of a handgun in a state where they do not reside. It is undisputed that I-1639 intended

5    the same for SARs. Dkt. 84 at 6–9. This intent was expressly conveyed to voters.[17] An "average

6    informed voter" would understand the law to restrict in-person SAR sales only, not the FFL-to-

7    FFL transfer process. *See Amalgam. Transit Union Local 587 v. State*, 142 Wn.2d 183, 205

8    (2000). Accordingly, I-1639's "purpose reinforces what the language already indicates,"

9    *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006): the Nonresident Sales

10   Provision applies to direct, in-person transactions and not to interstate FFL-to-FFL transfers.

11   Fourth, even if there were ambiguity—and there is not—canons of construction forbid

12   Mitchell's expansive reading. Under the rule of lenity, the Nonresident Sales Provision should

13   be cabined to its text to reach only SAR sales "in Washington." *See State v. Tvedt*, 153 Wn.2d

14   705, 710–11 (2005).[18] And the avoidance canon instructs that statutes are construed to avoid

15   constitutional difficulties when such construction is "consistent with the purposes of the statute."

16   *In re Williams*, 121 Wn.2d 655, 665 (1993). This doctrine, too, favors construing I-1639 to allow

17   nonresidents to buy SARs from Washington dealers through FFL-to-FFL transfer.[19]

18

19   nonresidents to purchase long guns in state, respectively). *But see, e.g.*, Mass. Gen. Laws ch. 140, § 131E (permitting

20   only residents to purchase long guns from licensed dealers). Thus, § 922(b)(3) expressly allows states to decide
     whether to allow *in-person* nonresident long guns purchases, *see* Dkt. 84 at 35–37—a conclusion Mitchell does not
     appear to dispute. *See* Dkt. 103 at 25–26. Instead, he argues that § 922(b)(3) does not permit states to ban long gun
     sales via FFL-to-FFL transfer. For the reasons explained herein, I-1639 does not have that interstate sweep.

21      [17] I-1639's preamble notes that it would "implement[] an enhanced background check system for [SARs]
     that is as strong as the one required to purchase a handgun." Dkt. 94-1, Ex. A at 2 (I-1639 § 1); *see also id.*, Dkt.

22   94-2, Ex. Q at 23, 26 (2018 General Election Voters' Pamphlet, Wash. Sec'y of State).

        [18] The rule of lenity is particularly appropriate here because the Nonresident Sales Provision is framed in

23   permissive (rather than prohibitory) terms. *See, e.g.*, *Shaver v. United States*, 174 F.2d 618, 619 (9th Cir. 1949)
     ("The coverage of criminal statutes cannot be supplied by implications.").

24      [19] The Nonresident Sales Provision would be constitutional even if it did prohibit interstate SAR sales
     through FFL-to-FFL transfer (which it does not) or under strict scrutiny, because it is "demonstrably justified by a

25   valid factor unrelated to economic protectionism." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 402
     (1994); *see* Dkt. 84 at 32–35. If the Court disagrees, however, it should not strike down the provision on that basis.

26   It would be "highly problematic" for a federal court to "[c]onstru[e] a state law so as to create a constitutional

DEFENDANTS' REPLY IN SUPPORT OF          10
MOTION FOR SUMMARY JUDGMENT                        Complex Litigation Division
NO. 3:19-cv-5106                                   800 Fifth Avenue, Suite 2000
                                                   Seattle, WA 98104-3188
                                                   (206) 464-7744

Finally, Mitchell's tangled digression into the various meanings of "sale," "purchase," and "delivery," *see* Dkt. 103 at 22–23, is difficult to unravel—and ultimately unavailing. If his point is merely that when a nonresident purchases a firearm from a Washington dealer through the FFL-to-FFL transfer process, it is not a "sale" under Washington or federal law, *id.* at 22, Defendants agree.[20] But if his position is that "it is possible to have a firearms ***purchase*** without a firearms ***sale***" under Washington law, *id.* at 23, it has no basis in the statutory text or logic. Neither RCW ch. 9.41 nor the GCA defines "purchase," so in the absence of any contrary intent it should be construed consistent with the parallel term, "sale." *See, e.g.*, *United States v. Nordbrock*, 38 F.3d 440, 444 (9th Cir. 1994) ("[S]imilar terms appearing in different sections of a statute should receive the same interpretation.").[21] Defining those terms differently would mean that when a nonresident acquires a SAR from a Washington dealer through FFL-to-FFL transfer, the buyer would violate RCW 9.41.124 because that transaction is a "purchase" but, because it is neither a "sale" nor a "delivery," the dealer would be in compliance with § 922(b)(3).[22] That absurd result is easily avoided by following the text of I-1639, which bans neither interstate sales nor purchases of SARs via FFL-to-FFL transfer.

---

problem, and then hold[] the statute unconstitutional." *Moy v. Cowen*, 958 F.2d 168, 170 (7th Cir. 1992) (per curiam). If the Court disagrees with the Washington Attorney General's interpretation of this state law, it should certify the question to the Washington Supreme Court. *See* RCW 2.60.020; *Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 763 F.3d 1232, 1235 (9th Cir. 2014).

[20] That is why a dealer may lawfully use FFL-to-FFL transfer to ship a handgun across state lines for a nonresident end purchaser, despite the federal ban on direct interstate handgun sales to non-licensees. Under federal law, an FFL-to-FFL transfer (even if the end purchaser is a nonresident) is not a sale to a non-licensee. *See* 27 C.F.R. § 478.124. Instead, ATF instructs FFLs to record the transaction to "reflect the transfer to the out-of-State FFL and not to the end purchaser." Dkt. 94-2, Ex. PP at 6. An FFL-to-FFL transfer is neither a purchase nor a sale.

[21] The terms "sale" and "sell" mean "the actual approval of the delivery of a firearm in consideration of payment or promise of payment." RCW 9.41.010. In the FFL-to-FFL transfer process, the nonresident buyer may provide payment or promise of payment to the Washington FFL, but the "actual approval of the delivery of a firearm" to the buyer does not occur until after the FFL in the buyer's state completes the background check process. Dkt. 94-3, Ex. X at 6. Because the "sale" to the nonresident is not complete until the out-of-state FFL "approv[es] of the delivery," the transaction between the nonresident and the Washington FFL does not constitute a "purchase . . . in Washington" under RCW 9.41.010. Construing "purchase" as parallel to "sale" in this way is consistent with how "purchase" is used in common parlance to mean "procure, acquire, or obtain" through payment. *See* "Purchase," *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1569 (1996).

[22] This would have been true for the past 50 years. Mitchell incorrectly suggests that I-1639 added the word "purchase" to RCW 9.41.124, Dkt. 103 at 23, when it in fact comes from the 1970 session law that first gave nonresidents the ability to purchase long guns in Washington. *See* 1970 Wash. Sess. Laws 668, § 2.

---

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

### 2.    The Nonresident Sales Provision is nondiscriminatory

Mitchell generally ignores Dormant Commerce Clause jurisprudence, which is "driven by a concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *McBurney v. Young*, 569 U.S. 221, 235 (2013) (quoting *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273–74) (1988)). "The crucial inquiry" is "whether [the law] is "a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Phila. v. New Jersey,* 437 U.S. 617, 624 (1978).

Mitchell cites *City of Philadelphia* for an unsupported proposition: that "*protectionism of any kind*" "*is per se unconstitutional.*" Dkt. 103 at 24. Such wordplay overlooks the ordinary meaning of the word "protectionism," as well as the doctrine's fundamental purpose to root out discrimination against interstate *commerce*.[23] Mitchell misreads *City of Philadelphia*, which held that "whatever New Jersey's ultimate purpose," its "means" were "protectionist" because it "impose[d] on out-of-state commercial interests the full burden of conserving the State's remaining landfill space" when concededly "there [was] no basis to distinguish out-of-state waste from domestic waste." 437 U.S. at 626–29.[24] Regardless, Mitchell does not even identify what he alleges Washington is "protecting." It certainly is not in-state economic interests, as Washington dealers like him are allegedly *harmed* while out-of-state dealers benefit.[25]

Moreover, Washington has an undisputedly valid and non-economic reason for treating nonresidents differently with respect to a SAR sale: to ensure it occurs only after an enhanced

---

[23] *See, e.g.*, "Protectionism," *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1553 (1996) ("*Econ.* The theory, practice, or system of fostering or developing domestic industries by protecting them from foreign competition . . . .").

[24] In *City of Philadelphia*, "[i]t made no difference whether the state's intent was environmental conservation or economic protectionism because the state provided no reason, 'apart from their origin, to treat them differently.'" *Rosenblatt*, 940 F.3d at 449 (quoting *City of Phila.*, 437 U.S. at 627). By contrast, Washington has a reason unrelated to commerce to bar in-state nonresident SAR purchases.

[25] Nor is this the case of protectionism of natural resources or some other "special service" unique to the state. *Cf. Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 577 (1997). I-1639 has no effect on prices of SARs in other states, nor does Mitchell allege that Washington has unique access to SARs.

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106                                    12                    ATTORNEY GENERAL OF WASHINGTON
                                                                          Complex Litigation Division
                                                                          800 Fifth Avenue, Suite 2000
                                                                          Seattle, WA 98104-3188
                                                                          (206) 464-7744

**SER-94**

background check confirms the purchaser's eligibility. Mitchell does not deny that background checks are important for public safety, that enhanced background checks are more comprehensive than NICS-only checks, or that it is nearly impossible to conduct enhanced background checks on nonresidents. Washington is owed significant deference on this issue of public health and safety. *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 526 (9th Cir. 2009). For those reasons, which are unrelated to commerce, residents and nonresidents are not "substantially similar." *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997). Mere participation in "the same market is not sufficient to conclude that entities are similarly situated." *LensCrafters*, 567 F.3d at 527. I-1639 does not discriminate.

### 3.    The Nonresident Sales Provision is constitutional as a matter of law

Absent discrimination "in favor of in-state commerce," Mitchell must demonstrate the law imposes a "significant burden on interstate commerce." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1146 (9th Cir. 2015). Non-discriminatory laws generally are upheld unless they regulate "an activity that is inherently national" or "require a uniform system of regulation." *Id.* at 1147. Without a proper showing, "[c]ourts may not assess the benefits of a state law or the wisdom in adopting it." *Rosenblatt*, 940 F.3d at 452. Here, in-state firearms sales are not inherently national and do not require a uniform system of regulation. And Mitchell does not otherwise establish any significant burden on interstate commerce. *See* Dkt. 84 at 31–32. His erroneous argument regarding FFL-to-FFL transfer and conclusory allegations of harm are insufficient to preclude summary judgment. This Court should uphold the law without review of the putative local benefits under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).

Even if the Court were to engage in *Pike* balancing, the Nonresident Sales Provision passes constitutional muster. The law's benefits are substantial and largely undisputed. *See* Dkt. 84 at 32. Mitchell does not contest that enhanced background checks are more comprehensive than NICS-only checks, or that they increase public safety. Dkt. 76 at 3; Dkt. 103 at 20. The Nonresident Sales Provision ensures that SARs sold "in Washington" are subject to such checks

DEFENDANTS' REPLY IN SUPPORT OF          13          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                              Complex Litigation Division
NO. 3:19-cv-5106                                        800 Fifth Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                        (206) 464-7744

and does not affect the police powers of other states. *Contra* Dkt. 103 at 29–30. Any incidental burden on interstate commerce would not be "clearly excessive" in relation to the law's undisputed safety benefits. *Pike*, 397 U.S. at 142.[26]

### D.    Plaintiffs Fail to Provide Sufficient Evidence Establishing Justiciability

*Matthew Wald.* Plaintiffs argue that Wald still has an interest in "acquir[ing] and then possess[ing] a [SAR] at his parents' home." Dkt. 103 at 26. But as the owner of multiple SARs, his interest has already been fulfilled. Dkt. 84 at 38. Wald therefore lacks standing.

*Organizations.* Neither SAF nor NRA submitted a declaration alleging they have at least one member that meets the standing requirements. Thus, each fails to support its claim. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).[27]

*Mitchell.* Mitchell lacks standing to challenge the Nonresident Sales Provision, as he has repeatedly failed to provide any evidence of his alleged lost sales.[28] Further, lost sales based on his incorrect reading of I-1639 before its enforcement is insufficient to establish standing. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 1999) (en banc).

*Casey and Rettmer.* Finally, Casey's and Rettmer's claims are moot because they have turned 21 and their claims should be dismissed. *Craig v. Boren*, 429 U.S. 190, 192 (1976). No Plaintiff in this case has made a claim for damages, nominal or otherwise, *see* Dkt. 17 ¶¶ 124–27, nor have Plaintiffs sought leave to amend.

### III.    CONCLUSION

For the reasons stated above and in Defendants' Cross-Motion for Summary Judgment, they respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment and enter summary judgment in Defendants' favor.

---

[26] If any portion of I-1639 is ruled unconstitutional, the remainder should be upheld. Dkt. 84 at 40 n.113; *League of Educ. Voters v. State,* 176 Wn.2d 808, 827 (2013). Plaintiffs make no argument against severance.
[27] While Mitchell alleges he is a member of the NRA, Dkt. 104 at 189 of 339, the NRA is a wholly separate party in this action and Mitchell does not claim to speak on its behalf (and he says nothing about SAF).
[28] Dkt. 84 at 39 nn.110, 111 (citing Dkt. 94-4, Ex. KK and Dkt. 94-2, Ex. R).

DEFENDANTS' REPLY IN SUPPORT OF          14          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                             Complex Litigation Division
NO. 3:19-cv-5106                                        800 Fifth Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                        (206) 464-7744

1    DATED this 22nd day of May, 2020.

2

3                                 ROBERT W. FERGUSON
                                  *Attorney General*
4
                                  NOAH G. PURCELL, WSBA No. 43492
5                                 *Solicitor General*

6                                 *s/ Jeffrey T. Even*
7                                 JEFFREY T. EVEN, WSBA No. 20367
                                  Deputy Solicitor General
8                                 jeffrey.even@atg.wa.gov
                                  ZACHARY PEKELIS JONES, WSBA No. 44557
9                                 R. JULY SIMPSON, WSBA No. 45869
                                  BRENDAN SELBY, WSBA No. 55325
10                                Assistant Attorneys General
11                                Complex Litigation Division
                                  zach.jones@atg.wa.gov
12                                july.simpson@atg.wa.gov
                                  brendan.selby@atg.wa.gov
13                                DIONNE PADILLA-HUDDLESTON, WSBA No. 38356
14                                Assistant Attorney General
                                  Licensing and Administrative Law Division
15                                dionnep@atg.wa.gov
                                  lalseaef@atg.wa.gov
16                                800 Fifth Avenue, Suite 2000
                                  Seattle, WA 98104-3188
17
18                                *Attorneys for Defendant Teresa Berntsen*

19
                                  PACIFICA LAW GROUP LLP
20
21                                *s/ Gregory J. Wong*
                                  Paul J. Lawrence, WSBA NO. 3557
22                                Gregory J. Wong, WSBA NO. 39329
                                  Nicholas W. Brown, WSBA NO. 33586
23                                Kai A. Smith, WSBA NO. 54749

24                                *Attorneys for Intervenor-Defendant*
                                  *Safe Schools Safe Communities*
25

26

DEFENDANTS' REPLY IN SUPPORT OF           15          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                               Complex Litigation Division
NO. 3:19-cv-5106                                         800 Fifth Avenue, Suite 2000
                                                          Seattle, WA 98104-3188
                                                              (206) 464-7744

1

2
                  *s/ Leslie A. Lopez*
                  Leslie A. Lopez, WSBA No. 46118

3
                  Deputy Prosecuting Attorney
                  Clark County Prosecutor's Office – Civil Division

4
                  PO Box 5000
                  Vancouver WA 98666-5000

5
                  Tele: (564) 397-2478
                  leslie.lopez@clark.wa.gov

6
                  *Attorney for Defendant Chuck Atkins*

7

8
                  *s/ Salvatore J. Faggiano*

9
                  Salvatore J. Faggiano, WSBA No. 15696
                  Assistant City Attorney

10
                  Office of the City Attorney
                  808 W. Spokane Falls Blvd.

11
                  Spokane, WA 99201-3326
                  Telephone: (509) 625-6818

12
                  Fax: (509) 625-6277
                  sfaggiano@spokanecity.org

13

14
                  *Attorney for Defendant Craig Meidl*

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
NO. 3:19-cv-5106

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1
## CERTIFICATE OF SERVICE

2        I hereby certify that on this 22nd day of May, 2020, I electronically filed the foregoing

3  document with the United States District Court ECF system, which will send notification of such

4  filing to all counsel of record.

5        Dated this 22nd day of May, 2020.

6                                                                    *s/ Thien Tran*

7                                              Thien Duc Tran, Paralegal/Legal Assistant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' REPLY IN SUPPORT OF          17          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR SUMMARY JUDGMENT                            Complex Litigation Division
NO. 3:19-cv-5106                                      800 Fifth Avenue, Suite 2000
                                                      Seattle, WA 98104-3188
                                                      (206) 464-7744

The Honorable Ronald B. Leighton

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

DANIEL MITCHELL, et al.,

        Plaintiffs,

  v.

CHARLES ATKINS, et al.,

        Defendants,

  and

SAFE SCHOOLS SAFE COMMUNITIES,

        Intervenor-Defendant.

NO. 3:19-cv-5106

DECLARATION BY
TERRI JOHNSON IN
SUPPORT OF DEFENDANTS'
MOTION FOR
SUMMARY JUDGMENT

I, Terri Johnson, declare as follows:

1.    I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.    I am employed by the King County Sheriff's Office (KCSO) as a Lead Records Management Specialist. I have been employed by the KCSO for 19 years, I started my career in the Records Department in 2000. I have worked in almost every work group in the department including: Data Entry, Warrants, Court Orders, Processing (report distribution), Concealed Pistol License Processing, NCIC validations, public disclosure requests, and Firearms Transfers.

3.    As a local law enforcement agency, the KCSO is statutorily required to run the background checks for pistol and semi-automatic assault rifles. Concealed Pistol License

DECLARATION BY TERRI JOHNSON
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-100

1   applications, Firearm Dealer License applications, and Alien Firearm License applications.

2   KCSO's Property Management Unit (PMU) firearm returns also runs background checks prior

3   to returning a firearm to an owner. It has always been our practice to evaluate eligibility to

4   possess firearms under both state and federal law and so what is sometimes referred to as

5   "enhanced" background checks has long been the standard at KCSO. In 2018, the FBI informed

6   us that local law enforcement agencies would be required to run background checks for transfers

7   of receivers and frames and certain firearm parts starting July 1, 2019, and later extended that

8   deadline to July 1, 2020. Local background checks are not conducted for sales and transfers of

9   shotguns and non-semiautomatic rifles at this time.

10          4.      The KCSO Records Unit is comprised of 13 full-time employees, five of which

11  are assigned to the work group that processes Firearms Transfers and Concealed Pistol Licenses,

12  Alien Firearm Licenses, Firearm Dealer Licenses, and PMU firearm returns. At any given time

13  there are 2 people actively working on Firearm Transfers. The office handles approximately 200

14  background checks a day. The length of time to handle a check varies depending on whether

15  there are any "flags" that require further investigation. A "flag" is any indication that a potential

16  prohibiting record could exist. With the exception of the pending State Health Care Authority

17  (HCA) mental health query, a check with no flags typically takes approximately 5-10 minutes to

18  complete. However, a check with flags could take 2 to 3 weeks. By statute, we must respond to

19  the requester within 1 0 business days or the firearm can be transferred without an eligibility

20  determination. In some circumstances, we advise the requester of the need for additional time

21  and have up to 30 days to complete the background check unless there is a court order to extend

22  the hold to 60 days.

23          5.      Each background check is unique, and I will follow different leads depending on

24  what flags arise during my investigation. However, when running a check I will, at a minimum,

25  take the following steps:

26

DECLARATION BY TERRI JOHNSON                    2           ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF DEFENDANTS'                                          800 Fifth Avenue, Suite 2000
MOTION FOR SUMMARY JUDGMENT                                          Seattle, WA  98104-3188
CAUSE NO. 3:19-cv-5106                                                      (206) 464-7744

SER-101

a.  Send the name, date of birth, and sometimes the social security number, to the Washington State Health Care Authority which checks to see whether the individual is disqualified from possessing a firearm due to a mental health event in Washington.

b.  Run a check through the FBI National Instant Criminal Background Check System (NICS), which is a computerized database designed to determine whether a person is disqualified from receiving or possessing a firearm by conducting a search of available records. The NIC S indices contains information provided by local, state, tribal, and federal agencies on persons prohibited from receiving firearms under state and federal law. The databases searched in the NICS check include the National Crime Information Center (NCIC), which stores "hot files" on wanted persons, protection orders, and the like; the Interstate Identification Index (III), which accesses criminal history records; and the NICS Indices, which includes records on individuals who have been determined to be prohibited from possessing or receiving a firearm based on information that may not be available through the other two NICS databases.

c.  Check the Washington Crime Information Center (WACIC), which stores Washington State's "hot files" (e.g., misdemeanor warrants, protections orders, and stolen vehicles);

d.  Check Washington State Identification Section (WASIS), which stores Washington State criminal histories and may include DOC records;

e.  Check the International Justice and Public Safety Information Sharing Network (Nlets), which links to Interpol;

f.  The Canadian Police Information Centre (CPIC) has to be queried directly if we have reason to suspect there may be a record (Place of Birth, Citizenship, etc.);

DECLARATION BY TERRI JOHNSON
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

3

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

g.    Check Court records, in the Administration of Courts (AOC) and Judicial Access Browser System (JABS);

h.    Check Department of Licensing (DOL) records, which include, for example, drivers' license records, vehicle registration and concealed pistol license records; and

i.    Juvenile Information Management System (JIMS) database, which includes district, municipal, superior, and juvenile court records.

6.    Local background checks are important to public safety and keeping firearms out of the hands of people who are prohibited from possessing them. Only running a NICS check could easily miss a lot of disqualifiers that I would find during a local background check. This is because NICS has a lot of shortcomings:

a.    NICS is only as good as the information submitted to it. Submission of information into NICS by the states is voluntary and not all states input the same information or the same quality of information.

b.    NICS is only as good as the technology that feeds information into the system. For example, in theory there is a regular "data dump" of mental health information into NICS. However, sometimes that data dump is not successful due to issues with systems "talking" to one another and no one will know that the data was not uploaded into NICS. As an example, I have encountered situations where I ran a NICS check, had the person come back as clear, but HCA returned a disqualifying mental health record.

c.    Interstate Identification Index (III) only maintains fingerprint based records. This means that if no fingerprinting was done there will be no record. For example, if the person was only issued a summons and was not"booked"then the record of their conviction will not be in NICS.

DECLARATION BY TERRI JOHNSON
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

4

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

d.     Many juvenile records are not in III. At least half of King County Juvenile arrests are not entered into the Washington State Criminal History database. The KCSO searches for juvenile records in the AOC database, JABS, and JIMS. I have run checks on individuals whose disqualifying juvenile record was not reflected in III, but that record was found in the AOC, JABS, or JIMS databases.

e.     NICS only checks the national files, it will always miss any information that is only maintained in a state record, Washington or elsewhere, unless a local agency has made the effort to enter it into the NIC S Indices.

7.     Additionally, only running NICS check does not allow for the kind of investigation that is necessary to uncover all disqualifiers. For example, a WACIC check may uncover a DOC number, meaning the person was recently incarcerated or under supervision. When this happens I will often look up their parole officer and inquire whether the person has failed a drug test in the last 12 months. Because WACIC is an internal Washington State Reporting System, the DOC record may not be reflected in the NICS response. In addition, NICS only returns information that is added to their database or that is associated with an FBI Number. An FBI Number is assigned to an individual by the FBI when the individual's fingerprints and/or criminal record has been submitted to their database. Based on my experience there are many instances where the information contained in both NICS and National Crime information Center (NCIC) is incomplete and fails to include disqualifiers that I am able to discover in my own research.

8.     KCSO conducts background checks on non-residents only in very limited circumstances. Non-residents are ineligible to purchase pistols or semiautomatic assault rifles in Washington. However, there are times when our Property Management Unit will transfer a firearm to an eligible, non-resident after a background check has been conducted. Based on my experience, conducting complete background checks on nonresidents is very difficult, if not impossible. That is because the state and local databases referenced above do not contain

DECLARATION BY TERRI JOHNSON
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

5

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-2, Page 105 of 233

1  records from non-Washington jurisdictions. At best, those databases would only display

2  whether he or she has a criminal history and/or other disqualifiers *in Washington*. Unless any

3  criminal or prohibitive records were entered into the NICS system involving his or her state of

4  residence, the NICS response would not provide information from his or her state of residence.

5  For that reason, a background check conducted on a nonresident provides much less

6  information than one conducted on a Washington resident.

7      9.      I declare under penalty of perjury under the laws of the State of Washington

8  that the foregoing is true and correct.

9      SIGNED this 27th day of March 2020, at Seattle, Washington.

10

11                                        TERRI JOHNSON

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION BY TERRI JOHNSON                    6                ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF DEFENDANTS'                                              800 5th Avenue, Suite 2000
MOTION FOR SUMMARY JUDGMENT                                             Seattle, WA 98104-3188
CAUSE NO. 3:19-cv-5106                                                      (206) 474-7744

**SER-105**

1
2
3
4
5
6

The Honorable Ronald B. Leighton

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

8

9 | DANIEL MITCHELL, et al.,

NO. 3:19-cv-5106

10 | Plaintiffs,

DECLARATION OF
R. JULY SIMPSON IN

11 | v.

SUPPORT OF DEFENDANTS
AND INTERVENOR-

12 | CHARLES ATKINS, et al.,

DEFENDANT'S CROSS-
MOTION FOR SUMMARY

13 | Defendants,

JUDGMENT AND
OPPOSITION TO

14 | and

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

15 | SAFE SCHOOLS SAFE COMMUNITIES,

16 | Intervenor-Defendant.

17

18      I, R. JULY SIMPSON, declare as follows:

19      1.      I am over the age of 18, competent to testify as to the matters herein and make

20 this declaration based on my personal knowledge.

21      2.      I am an Assistant Attorney General in the Complex Litigation Division of the

22 Washington Attorney General's Office. In that capacity, I am one of the attorneys representing

23 Defendant Teresa Berntsen, Director of the Washington Department of Licensing, in this

24 matter.

25

26

DECL. OF JULY SIMPSON ISO DEFS.'          1          ATTORNEY GENERAL OF WASHINGTON
CROSS-MSJ AND OPP. TO PLFS.' MSJ                            800 Fifth Avenue, Suite 2000
NO. 3:19-cv-5106                                              Seattle, WA 98104-3188
                                                                (206) 464-7744

3.      Attached hereto as Exhibit A is a true and correct copy of the text of Initiative Measure No. 1639 (I-1639), bearing bates numbers DOL00000001–DOL00000030, as produced in the Director's initial disclosures.

4.      Attached hereto as Exhibit B is a true and correct copy of scholarly article: Peter Rhee, et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma & Acute Care Surgery 853 (2016).

5.      Attached hereto as Exhibit C is a true and correct copy of excerpts of an internet resource: German Lopez and Kavya Sukumar, *After Sandy Hook, we said never again. And then we let 2,408 mass shootings happen*, Vox (updated Mar. 27, 2020), available in its entirety at https://www.vox.com/a/mass-shootings-america-sandy-hook-gun-violence.

6.      Attached hereto as Exhibit D is a table entitled Mass Killings Table generated by Attorney General's Office professional staff. Exhibit D compiles data on mass shootings (*i.e.*, shootings where three or more people were killed in a single incident) in the United States from 2010 to 2019 that involved either a shooter under age 21 or a semiautomatic rifle. The data is derived from four sources: Mark Follman et al., *US Mass Shootings, 1982-2020*, Mother Jones (updated Feb. 26, 2020), https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ ("Mother Jones"); *Ten Years of Mass Shooting in the United States*, Everytown for Gun Safety (updated Mar. 24, 2020), https://everytownresearch.org/massshootingsreports/mass-shootings-in-america-2009-2019/ ("Everytown"); Jillian Peterson & James Densley, *The Mass Shooter Database*, The Violence Project, https://www.theviolenceproject.org/mass-shooter-database/ ("Violence Project"); and the Gun Violence Archive, (updated Mar. 29, 2020,), https://www.gunviolencearchive.org/ ("Gun Violence Archive").

7.      Attached hereto as Exhibit E is a true and correct copy of a news article: Samantha Green, *Shooting Suspect Jealous Over Ex, Brought Rifle a Week Ago, Police Say*, Seattle Times (Aug. 2, 2016), available at https://www.seattletimes.com/seattle-

DECL. OF JULY SIMPSON ISO DEFS.'
CROSS-MSJ AND OPP. TO PLFS.' MSJ
NO. 3:19-cv-5106

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

SER-107

1  news/crime/document-mukilteo-shooting-suspect-was-jealous-over-ex-purchased-rifle-a-

2  week-ago/.

3       8.    Attached hereto as Exhibit F is a true and correct copy of a news article: Rick

4  Anderson, *Stroke of luck and gun laws kept Washington state mall shooting from being much*

5  *worse, police say*, the Los Angeles Times (Dec. 15, 2016), available at

6  https://www.latimes.com/nation/la-na-washington-mall-shooting-2016-story.html.

7       9.    Attached hereto as Exhibit G is a true and correct copy of a government report:

8  *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy*

9  *Hook Elementary School and 36 Yoganda Street, Newtown, Connecticut on December 14, 2012*

10 (Nov.        25,        2013),        available        at        https://portal.ct.gov/-

11 /media/DCJ/SandyHookFinalReportpdf.pdf?la=en.

12      10.    Attached hereto as Exhibit H is a true and correct copy of excerpts of a

13 government report: *Marjory Stoneman Douglas High School Public Safety Commission Initial*

14 *Report* (Jan. 2, 2019), available in its entirety at

15 http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf.

16      11.    Attached hereto as Exhibit I is a true and correct copy of scholarly article:

17 Christopher S. Koper, et al., *Criminal Use of Assault Weapons and High-Capacity*

18 *Semiautomatic Firearms: an Updated Examination of Local and National Sources*, J. Urb.

19 Health 313 (Oct. 2017).

20      12.    Attached hereto as Exhibit J is a true and correct copy of the excerpted transcript

21 of the deposition of Plaintiff Nathaniel Casey, taken February 20, 2020.

22      13.    Attached hereto as Exhibit K is a true and correct copy of the excerpted transcript

23 of the deposition of Plaintiff Robin Ball, taken January 31, 2020.

24

25

26

DECL. OF JULY SIMPSON ISO DEFS.'          3          ATTORNEY GENERAL OF WASHINGTON
CROSS-MSJ AND OPP. TO PLFS.' MSJ                              800 Fifth Avenue, Suite 2000
NO. 3:19-cv-5106                                              Seattle, WA 98104-3188
                                                             (206) 464-7744

SER-108

1      14.      Attached hereto as Exhibit L is a true and correct copy of a federal government

2  data table: United States Department of Justice, *Crime in the United States Arrests, by Age*,

3  Table 38, (2018) available at https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-

4  2018/topic-pages/tables/table-38.

5      15.      Attached hereto as Exhibit M is a true and correct copy of a federal government

6  data table: U.S. Census Bureau, *Annual Estimates of the Resident Population by Sex, Single*

7  *Year of Age, Race, and Hispanic Origin for the United States: April 1, 2010 to July 1, 2018*,

8  available       at         https://www2.census.gov/programs-surveys/popest/tables/2010-

9  2018/national/asrh/PEPALL6N.pdf.

10     16.      Attached hereto as Exhibit N is a true and correct copy of a scholarly article:

11  Adam Ortiz, *Adolescence, Brain Development and Legal Culpability*, Am. Bar. Ass'n, Juvenile

12  Justice Ctr., at 2 (Jan. 2004).

13     17.      Attached hereto as Exhibit O is a true and correct copy of the November 6, 2018

14  General Election Results for Initiative Measure No. 1639 (last updated Nov. 27, 2018),

15  available    on     the     website    of    the    Washington    Secretary    of    State    at

16  https://results.vote.wa.gov/results/20181106/State-Measures-Initiative-Measure-No-1639-

17  Initiative-Measure-No-1639-concerns-firearms.html.

18     18.      Attached hereto as Exhibit P is a true and correct copy of a news article: Jeremy

19  White, *When Lawmakers Try to Ban Assault Weapons, Gunmakers Adapt*, the New York

20  Times       (July        31,        2019),        available        at

21  https://www.nytimes.com/interactive/2019/07/31/us/assault-weapons-

22  ban.html?action=click&module=Top%20Stories&pgtype=Homepage.

23     19.      Attached hereto as Exhibit Q is a true and correct copy of excerpts of the 2018

24  Voter's Pamphlet for I-1639, bearing bates numbers DOL00000031–DOL00000134, as

25  produced in the Director's initial disclosures.

26

DECL. OF JULY SIMPSON ISO DEFS.'                        4          ATTORNEY GENERAL OF WASHINGTON
CROSS-MSJ AND OPP. TO PLFS.' MSJ                                      800 Fifth Avenue, Suite 2000
NO. 3:19-cv-5106                                                         Seattle, WA  98104-3188
                                                                           (206) 464-7744

SER-109

20.     Attached hereto as Exhibit R is a true and correct copy of the excerpted transcript of the deposition of Plaintiff Daniel Mitchell, taken January 30, 2020.

21.     Attached hereto as Exhibit S is a true and correct copy of Exhibit 95 to the deposition of Plaintiff Nathaniel Casey taken February 20, 2020.

22.     Attached hereto as Exhibit T is a true and correct copy of the excerpted transcript of the deposition of Plaintiff Matthew Wald, taken February 18, 2020.

23.     Attached hereto as Exhibit U is a federal government website: FBI, *About NICS* available at https://www.fbi.gov/services/cjis/nics/about-nics.

24.     Attached hereto as Exhibit V is a true and correct copy of the excerpted transcript of the deposition of Plaintiffs' expert Sheriff Ozzie Knezovich, taken February 4, 2020.

25.     Attached hereto as Exhibit W is a true and correct copy of excerpts of a federal government report: *ATF Federal Firearms Regulations Reference Guide* (2014), U.S. Dep't of Justice, available in its entirety at https://www.atf.gov/firearms/docs/guide/federal-firearms-regulations-reference-guide-2014-edition-atf-p-53004/download.

26.     Attached hereto as Exhibit X is a true and correct copy of a Washington State government internet resource: Washington State Office of Attorney General's *Initiative 1639: Frequently Asked Questions*, available at https://www.atg.wa.gov/initiative-1639.

27.     Attached hereto as Exhibit Y is a true and correct copy of the excerpted transcript of the deposition of Plaintiff Luke Rettmer, taken February 15, 2020.

28.     Attached hereto as Exhibit Z is a true and correct copy of excerpts of the Complaint for Declaratory and Injunctive Relief filed in this Court under cause no. 3:18-cv-05931-RBL on November 15, 2018.

29.     Attached hereto as Exhibit AA is a true and correct copy of Exhibit 8 to the deposition of Plaintiff Daniel Mitchell taken January 30, 2020.

30.     Attached hereto as Exhibit BB is a table compiling the text of various nineteenth century statutes restricting minors' access to firearms.

DECL. OF JULY SIMPSON ISO DEFS.'
CROSS-MSJ AND OPP. TO PLFS.' MSJ
NO. 3:19-cv-5106

5

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**SER-110**

31.    Attached hereto as Exhibit CC is a true and correct copy of the excerpted transcript of the deposition of Hugh Foskey, taken February 3, 2020.

32.    Attached hereto as Exhibit DD is a true and correct copy of the government report: U.S. Dep't of the Treasury & U.S. Dep't of Justice, *Gun Crime in the Age Group 18–20* (June 1999).

33.    Attached hereto as Exhibit EE is a true and correct copy of the government report: Fed. Bur. of Investigation, *A Study of Active Shooter Incidents in the United States Between 2000 and 2013* (Sep. 16, 2013), available at https://www.fbi.gov/file-repository/active-shooter-study-2000-2013-1.pdf/view.

34.    Attached hereto as Exhibit FF is a true and correct copy of excerpts from the internet resource: K-12 School Shooting Database, Active Shooter: Shooter Age and Active Shooter: Incidents by Caliber of Firearm graphs, available at https://www.chds.us/ssdb/.

35.    Attached hereto as Exhibit GG is a true and correct copy of the study: *Analysis of the Involvement of 18-20 Year Olds in Firearm Violence and the Special Problem of Semi-Automatic Weapons*, Firearm Injury and Policy Research Program (June 2019).

36.    Attached hereto as Exhibit HH is a true and correct copy of the scholarly article: William DeJong and Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States,* 75 J. Stud. on Alcohol & Drugs 108 (2014).

37.    Attached hereto as Exhibit II is a true and correct copy of the news article: Tripp Mickle, *Study Supports Raising Tobacco-Purchase Age to 21*, the Wall Street Journal (Mar. 12, 2015), available at https://www.wsj.com/articles/study-supports-raising-tobacco-purchase-age-to-21-1426172582.

DECL. OF JULY SIMPSON ISO DEFS.'
CROSS-MSJ AND OPP. TO PLFS.' MSJ
NO. 3:19-cv-5106

6

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

SER-111

38.    Attached as Exhibit JJ is a true and correct copy of excerpts of the publication: *Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products*, Inst. of Medicine of the Nat'l Academies (Richard J. Bonnie, et al., eds. 2015), available at https://www.ncbi.nlm.nih.gov/books/NBK310412/pdf/Bookshelf_NBK310412.pdf

39.    Attached hereto as Exhibit KK is a true and correct copy of excerpts of Plaintiff Daniel Mitchell's Objections and Responses to Director Berntsen's First Set of Interrogatories and Request for Production.

40.    Attached hereto as Exhibit LL is a true and correct copy of the news article: Lauren Hepler, Amy Harmon and Richard A. Oppel Jr., *Gilroy Shooting: Two Children Among the Dead at California* Festival, N.Y. Times (Jul. 29, 2019), available at https://www.nytimes.com/2019/07/29/us/gilroy-festival-shooting.html.

41.    Attached hereto as Exhibit MM is a true and correct copy of the news article: Michael S. Schmidt, *State Law Prevented Sale of Assault Rifle to Suspect Last Week, Officials Say*, New York Times (Sept. 13, 2013), available at https://www.nytimes.com/2013/09/18/us/state-law-stopped-gunman-from-buying-rifle-officials-say.html?hp&_r=1&).

42.    Attached hereto as Exhibit NN is a true and correct copy of Exhibit 85 to the deposition of Plaintiff Matthew Wald taken February 18, 2020.

43.    Attached hereto as Exhibit OO is a true and correct copy of Exhibit 89 to the deposition of Plaintiff Nathaniel Casey taken February 20, 2020.

44.    Attached hereto as Exhibit PP is a true and correct copy of the government report: *ATF Federal Firearms Licensee Quick Reference and Best Practices Guide*, U.S. Dep't of Justice (2010).

DECL. OF JULY SIMPSON ISO DEFS.'
CROSS-MSJ AND OPP. TO PLFS.' MSJ
NO. 3:19-cv-5106

7

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

SER-112

1       I declare under penalty of perjury under the laws of the State of Washington and the

2   United States that the foregoing is true and correct.

3       DATED this 31st day of March 2020, at Tacoma, Washington.

*s/ R. July Simpson*
R. JULY SIMPSON

DECL. OF JULY SIMPSON ISO DEFS.'      8      ATTORNEY GENERAL OF WASHINGTON
CROSS-MSJ AND OPP. TO PLFS.' MSJ             800 Fifth Avenue, Suite 2000
NO. 3:19-cv-5106                        Seattle, WA  98104-3188
                                      (206) 464-7744

SER-113

Case 3:19-cv-05106-RBL   Document 94-1   Filed 03/31/20   Page 1 of 193

# Exhibit A

# Initiative Measure No. 1639, filed May 2, 2018

AN ACT Relating to increasing public safety by implementing firearm safety measures, including requiring enhanced background checks, waiting periods, and increased age requirements for semiautomatic assault rifles and secure gun storage for all firearms; amending RCW 9.41.090, 9.41.092, 9.41.094, 9.41.097, 9.41.0975, 9.41.110, 9.41.113, 9.41.124, 9.41.240, 9.41.129, and 9.41.010; adding new sections to chapter 9.41 RCW; creating new sections; prescribing penalties; and providing effective dates.

BE IT ENACTED BY THE PEOPLE OF THE STATE OF WASHINGTON:

NEW SECTION.  **Sec. 1.**  INTENT.  Gun violence is far too common in Washington and the United States. In particular, shootings involving the use of semiautomatic assault rifles have resulted in hundreds of lives lost, devastating injuries, and lasting psychological impacts on survivors, their families, and communities. Semiautomatic assault rifles are specifically designed to kill quickly and efficiently and have been used in some of the country's deadliest mass shootings, including in Newtown, Connecticut; Las

1

DOL00000001

DOL00000001

Vegas, Nevada; and Parkland and Orlando, Florida, among others. Semiautomatic assault rifles have also been used in deadly shootings in Washington, including in Mukilteo and Tacoma.

The impacts of gun violence by assault weapons fall heavily on children and teenagers. According to one analysis, more than two hundred eight thousand students attending at least two hundred twelve schools have experienced a shooting on campus since the Columbine mass shooting in 1999. Active shooter drills are normal for a generation of American schoolchildren, instilling at a young age the sad and unnecessary realization that a mass shooting can happen in any community, in any school, at any time.

Enough is enough. The people find and declare that it is crucial and urgent to pass laws to increase public safety and reduce gun violence.

Implementing an enhanced background check system for semiautomatic assault rifles that is as strong as the one required to purchase a handgun and requiring safety training and a waiting period will help ensure that we keep these weapons out of dangerous hands. Further, federal law prohibits the sale of pistols to individuals under the age of twenty-one and at least a dozen states further restrict the ownership or possession of firearms by individuals under the age of twenty-one. This makes sense, as studies show that eighteen to twenty year olds commit a disproportionate number of firearm homicides in the United States and research indicates that the brain does not fully mature until a later age. Raising the minimum age to purchase semiautomatic assault rifles to twenty-one is a commonsense step the people wish to take to increase public safety.

Finally, firearms taken from the home by children or other persons prohibited from possessing firearms have been at the heart of several tragic gun violence incidents. One study shows that over eighty-five percent of school shooters obtained the firearm at their home or from a friend or relative. Another study found that more than seventy-five percent of firearms used in youth suicide attempts

2

DOL00000002
DOL00000002

and unintentional injuries were stored in the residence of the
victim, a relative, or a friend. Secure gun storage requirements for
all firearms will increase public safety by helping ensure that
children and other prohibited persons do not inappropriately gain
access to firearms, and notice requirements will make the potential
dangers of firearms clear to purchasers.

Therefore, to increase public safety for all Washingtonians, in
particular our children, this measure would, among other things:
Create an enhanced background check system applicable to
semiautomatic assault rifles similar to what is required for
handguns, require that individuals complete a firearm safety
training course and be at least twenty-one years of age to purchase
or possess such weapons, enact a waiting period for the purchase of
such weapons, and establish standards for the responsible storage of
all firearms.

NEW SECTION.  **Sec. 2.**  SHORT TITLE.  This act may be known and
cited as the public safety and semiautomatic assault rifle act.

**Sec. 3.**  ENHANCED BACKGROUND CHECKS.  RCW 9.41.090 and 2018 c
201 s 6003 are each amended to read as follows:

(1) In addition to the other requirements of this chapter, no
dealer may deliver a pistol to the purchaser thereof until:

(a) The purchaser produces a valid concealed pistol license and
the dealer has recorded the purchaser's name, license number, and
issuing agency, such record to be made in triplicate and processed
as provided in subsection (((5))) (6) of this section. For purposes
of this subsection (1)(a), a "valid concealed pistol license" does
not include a temporary emergency license, and does not include any
license issued before July 1, 1996, unless the issuing agency
conducted a records search for disqualifying crimes under RCW
9.41.070 at the time of issuance;

(b) The dealer is notified in writing by (i) the chief of police
or the sheriff of the jurisdiction in which the purchaser resides

3

DOL00000003
DOL00000003

**SER-117**

that the purchaser is eligible to possess a pistol under RCW
9.41.040 and that the application to purchase is approved by the
chief of police or sheriff; or (ii) the state that the purchaser is
eligible to possess a firearm under RCW 9.41.040, as provided in
subsection (3)(b) of this section; or

(c) The requirements or time periods in RCW 9.41.092 have been
satisfied.

(2) In addition to the other requirements of this chapter, no
dealer may deliver a semiautomatic assault rifle to the purchaser
thereof until:

(a) The purchaser provides proof that he or she has completed a
recognized firearm safety training program within the last five
years that, at a minimum, includes instruction on:

(i) Basic firearms safety rules;

(ii) Firearms and children, including secure gun storage and
talking to children about gun safety;

(iii) Firearms and suicide prevention;

(iv) Secure gun storage to prevent unauthorized access and use;

(v) Safe handling of firearms; and

(vi) State and federal firearms laws, including prohibited
firearms transfers.

The training must be sponsored by a federal, state, county, or
municipal law enforcement agency, a college or university, a
nationally recognized organization that customarily offers firearms
training, or a firearms training school with instructors certified
by a nationally recognized organization that customarily offers
firearms training. The proof of training shall be in the form of a
certification that states under the penalty of perjury the training
included the minimum requirements; and

(b) The dealer is notified in writing by (i) the chief of police
or the sheriff of the jurisdiction in which the purchaser resides
that the purchaser is eligible to possess a firearm under
RCW 9.41.040 and that the application to purchase is approved by the
chief of police or sheriff; or (ii) the state that the purchaser is

4

DOL00000004
DOL00000004

eligible to possess a firearm under RCW 9.41.040, as provided in subsection (3)(b) of this section; or

(c) The requirements or time periods in RCW 9.41.092 have been satisfied.

(3)(a) Except as provided in (b) of this subsection, in determining whether the purchaser meets the requirements of RCW 9.41.040, the chief of police or sheriff, or the designee of either, shall check with the national crime information center, including the national instant criminal background check system, provided for by the Brady Handgun Violence Prevention Act (18 U.S.C. Sec. 921 et seq.), the Washington state patrol electronic database, the health care authority electronic database, and with other agencies or resources as appropriate, to determine whether the applicant is ineligible under RCW 9.41.040 to possess a firearm.

(b) The state, through the legislature or initiative process, may enact a statewide firearms background check system equivalent to, or more comprehensive than, the check required by (a) of this subsection to determine that a purchaser is eligible to possess a firearm under RCW 9.41.040. Once ((the)) a state system is established, a dealer shall use the state system and national instant criminal background check system, provided for by the Brady Handgun Violence Prevention Act (18 U.S.C. Sec. 921 et seq.), to make criminal background checks of applicants to purchase firearms. ((However, a chief of police or sheriff, or a designee of either, shall continue to check the health care authority's electronic database and with other agencies or resources as appropriate, to determine whether applicants are ineligible under RCW 9.41.040 to possess a firearm.))

(((3))) (4) In any case under this section where the applicant has an outstanding warrant for his or her arrest from any court of competent jurisdiction for a felony or misdemeanor, the dealer shall hold the delivery of the pistol or semiautomatic assault rifle until the warrant for arrest is served and satisfied by appropriate court appearance. The local jurisdiction for purposes of the sale, or the

5

DOL00000005
DOL00000005

state pursuant to subsection (3)(b) of this section, shall confirm the existence of outstanding warrants within seventy-two hours after notification of the application to purchase a pistol or semiautomatic assault rifle is received. The local jurisdiction shall also immediately confirm the satisfaction of the warrant on request of the dealer so that the hold may be released if the warrant was for an offense other than an offense making a person ineligible under RCW 9.41.040 to possess a ((pistol)) firearm.

(((4))) (5) In any case where the chief or sheriff of the local jurisdiction, or the state pursuant to subsection (3)(b) of this section, has reasonable grounds based on the following circumstances: (a) Open criminal charges, (b) pending criminal proceedings, (c) pending commitment proceedings, (d) an outstanding warrant for an offense making a person ineligible under RCW 9.41.040 to possess a ((pistol)) firearm, or (e) an arrest for an offense making a person ineligible under RCW 9.41.040 to possess a ((pistol)) firearm, if the records of disposition have not yet been reported or entered sufficiently to determine eligibility to purchase a ((pistol)) firearm, the local jurisdiction or the state may hold the sale and delivery of the pistol or semiautomatic assault rifle up to thirty days in order to confirm existing records in this state or elsewhere. After thirty days, the hold will be lifted unless an extension of the thirty days is approved by a local district court, superior court, or municipal court for good cause shown. A dealer shall be notified of each hold placed on the sale by local law enforcement or the state and of any application to the court for additional hold period to confirm records or confirm the identity of the applicant.

(((5))) (6)(a) At the time of applying for the purchase of a pistol or semiautomatic assault rifle, the purchaser shall sign in triplicate and deliver to the dealer an application containing:

(i) His or her full name, residential address, date and place of birth, race, and gender;

(ii) The date and hour of the application;

6

DOL00000006
DOL00000006

(iii) The applicant's driver's license number or state identification card number;

(iv) A description of the pistol or semiautomatic assault rifle including the make, model, caliber and manufacturer's number if available at the time of applying for the purchase of a pistol or semiautomatic assault rifle. If the manufacturer's number is not available at the time of applying for the purchase of a pistol or semiautomatic assault rifle, the application may be processed, but delivery of the pistol or semiautomatic assault rifle to the purchaser may not occur unless the manufacturer's number is recorded on the application by the dealer and transmitted to the chief of police of the municipality or the sheriff of the county in which the purchaser resides, or the state pursuant to subsection (3)(b) of this section; ((and))

(v) A statement that the purchaser is eligible to purchase and possess a ((pistol)) firearm under ((RCW 9.41.040)) state and federal law; and

(vi) If purchasing a semiautomatic assault rifle, a statement by the applicant under penalty of perjury that the applicant has completed a recognized firearm safety training program within the last five years, as required by subsection (2) of this section.

(b) The application shall contain ((a)) two warnings substantially stated as follows:

(i) CAUTION: Although state and local laws do not differ, federal law and state law on the possession of firearms differ. If you are prohibited by federal law from possessing a firearm, you may be prosecuted in federal court. State permission to purchase a firearm is not a defense to a federal prosecution; and

(ii) CAUTION: The presence of a firearm in the home has been associated with an increased risk of death to self and others, including an increased risk of suicide, death during domestic violence incidents, and unintentional deaths to children and others.

7

DOL00000007
DOL00000007

The purchaser shall be given a copy of the department of fish and wildlife pamphlet on the legal limits of the use of firearms((,)) and firearms safety((, and the fact that local laws and ordinances on firearms are preempted by state law and must be consistent with state law)).

(c) The dealer shall, by the end of the business day, sign and attach his or her address and deliver a copy of the application and such other documentation as required under subsections (1) and (2) of this section to the chief of police of the municipality or the sheriff of the county of which the purchaser is a resident, or the state pursuant to subsection (3)(b) of this section. The triplicate shall be retained by the dealer for six years. The dealer shall deliver the pistol or semiautomatic assault rifle to the purchaser following the period of time specified in this chapter unless the dealer is notified of an investigative hold under subsection ((4)) (5) of this section in writing by the chief of police of the municipality ((or)), the sheriff of the county, or the state, whichever is applicable, ((denying)) or of the denial of the purchaser's application to purchase and the grounds thereof. The application shall not be denied unless the purchaser is not eligible to purchase or possess ((a pistol)) the firearm under ((RCW 9.41.040)) state or ((9.41.045, or)) federal law.

(d) The chief of police of the municipality or the sheriff of the county, or the state pursuant to subsection (3)(b) of this section, shall retain or destroy applications to purchase a pistol or semiautomatic assault rifle in accordance with the requirements of 18 U.S.C. Sec. 922.

((6)) (7)(a) To help offset the administrative costs of implementing this section as it relates to new requirements for semiautomatic assault rifles, the department of licensing may require the dealer to charge each semiautomatic assault rifle purchaser or transferee a fee not to exceed twenty-five dollars, except that the fee may be adjusted at the beginning of each biennium to levels not to exceed the percentage increase in the

8

DOL00000008
DOL00000008

consumer price index for all urban consumers, CPI-W, or a successor
index, for the previous biennium as calculated by the United States
department of labor.

(b) The fee under (a) of this subsection shall be no more than
is necessary to fund the following:

(i) The state for the cost of meeting its obligations under this
section;

(ii) The health care authority, mental health institutions, and
other health care facilities for state-mandated costs resulting from
the reporting requirements imposed by RCW 9.41.097(1); and

(iii) Local law enforcement agencies for state-mandated local
costs resulting from the requirements set forth under RCW 9.41.090
and this section.

(8) A person who knowingly makes a false statement regarding
identity or eligibility requirements on the application to purchase
a ((pistol)) firearm is guilty of false swearing under RCW
9A.72.040.

((<del>(7)</del>)) (9) This section does not apply to sales to licensed
dealers for resale or to the sale of antique firearms.

**Sec. 4.**   WAITING PERIOD. RCW 9.41.092 and 2018 c 145 s 4 are
each amended to read as follows:

(1) Except as otherwise provided in this chapter and except for
semiautomatic assault rifles under subsection (2) of this section, a
licensed dealer may not deliver any firearm to a purchaser or
transferee until the earlier of:

((<del>(1)</del>)) (a) The results of all required background checks are
known and the purchaser or transferee ((<del>(a)</del>)) (i) is not prohibited
from owning or possessing a firearm under federal or state law and
((<del>(b)</del>)) (ii) does not have a voluntary waiver of firearm rights
currently in effect; or

((<del>(2)</del>)) (b) Ten business days have elapsed from the date the
licensed dealer requested the background check. However, for sales
and transfers of pistols if the purchaser or transferee does not

9

have a valid permanent Washington driver's license or state
identification card or has not been a resident of the state for the
previous consecutive ninety days, then the time period in this
subsection shall be extended from ten business days to sixty days.

(2) Except as otherwise provided in this chapter, a licensed
dealer may not deliver a semiautomatic assault rifle to a purchaser
or transferee until ten business days have elapsed from the date of
the purchase application or, in the case of a transfer, ten business
days have elapsed from the date a background check is initiated.

NEW SECTION.  **Sec. 5.**  SECURE GUN STORAGE. A new section is
added to chapter 9.41 RCW to read as follows:

(1) A person who stores or leaves a firearm in a location where
the person knows, or reasonably should know, that a prohibited
person may gain access to the firearm:

(a) Is guilty of community endangerment due to unsafe storage of
a firearm in the first degree if a prohibited person obtains access
and possession of the firearm and causes personal injury or death
with the firearm; or

(b) Is guilty of community endangerment due to unsafe storage of
a firearm in the second degree if a prohibited person obtains access
and possession of the firearm and:

(i) Causes the firearm to discharge;

(ii) Carries, exhibits, or displays the firearm in a public
place in a manner that either manifests an intent to intimidate
another or that warrants alarm for the safety of other persons; or

(iii) Uses the firearm in the commission of a crime.

(2)(a) Community endangerment due to unsafe storage of a firearm
in the first degree is a class C felony punishable according to
chapter 9A.20 RCW.

(b) Community endangerment due to unsafe storage of a firearm in
the second degree is a gross misdemeanor punishable according to
chapter 9A.20 RCW.

(3) Subsection (1) of this section does not apply if:

10

DOL00000010
DOL00000010

(a) The firearm was in secure gun storage, or secured with a trigger lock or similar device that is designed to prevent the unauthorized use or discharge of the firearm;

(b) In the case of a person who is a prohibited person on the basis of the person's age, access to the firearm is with the lawful permission of the prohibited person's parent or guardian and supervised by an adult, or is in accordance with RCW 9.41.042;

(c) The prohibited person obtains, or obtains and discharges, the firearm in a lawful act of self-defense; or

(d) The prohibited person's access to the firearm was obtained as a result of an unlawful entry, provided that the unauthorized access or theft of the firearm is reported to a local law enforcement agency in the jurisdiction in which the unauthorized access or theft occurred within five days of the time the victim of the unlawful entry knew or reasonably should have known that the firearm had been taken.

(4) If a death or serious injury occurs as a result of an alleged violation of subsection (1)(a) of this section, the prosecuting attorney may decline to prosecute, even though technically sufficient evidence to prosecute exists, in situations where prosecution would serve no public purpose or would defeat the purpose of the law in question.

(5) For the purposes of this section, "prohibited person" means a person who is prohibited from possessing a firearm under state or federal law.

(6) Nothing in this section mandates how or where a firearm must be stored.

NEW SECTION.  **Sec. 6.**  AVAILABILITY OF SECURE GUN STORAGE.  A new section is added to chapter 9.41 RCW to read as follows:

(1) When selling or transferring any firearm, every dealer shall offer to sell or give the purchaser or transferee a secure gun storage device, or a trigger lock or similar device that is designed to prevent the unauthorized use or discharge of the firearm.

11

(2) Every store, shop, or sales outlet where firearms are sold, that is registered as a dealer in firearms with the department of licensing, shall conspicuously post, in a prominent location so that all patrons may take notice, the following warning sign, to be provided by the department of licensing, in block letters at least one inch in height:

WARNING: YOU MAY FACE CRIMINAL PROSECUTION IF YOU STORE OR LEAVE AN UNSECURED FIREARM WHERE A PERSON WHO IS PROHIBITED FROM POSSESSING FIREARMS CAN AND DOES OBTAIN POSSESSION.

(3) Every store, shop, or sales outlet where firearms are sold that is registered as a dealer in firearms with the department of licensing, upon the sale or transfer of a firearm, shall deliver a written warning to the purchaser or transferee that states, in block letters not less than one-fourth inch in height:

WARNING: YOU MAY FACE CRIMINAL PROSECUTION IF YOU STORE OR LEAVE AN UNSECURED FIREARM WHERE A PERSON WHO IS PROHIBITED FROM POSSESSING FIREARMS CAN AND DOES OBTAIN POSSESSION.

(4) Every person who violates this section is guilty of a class 1 civil infraction under chapter 7.80 RCW and may be fined up to two hundred fifty dollars. However, no such fines may be levied until thirty days have expired from the time warning signs required under subsection (2) of this section are distributed by the department of licensing.

**Sec. 7.**  RCW 9.41.094 and 2018 c 201 s 6004 are each amended to read as follows:

A signed application to purchase a pistol _or semiautomatic assault rifle_ shall constitute a waiver of confidentiality and written request that the health care authority, mental health institutions, and other health care facilities release, to an inquiring court or law enforcement agency, information relevant to the applicant's eligibility to purchase a pistol _or semiautomatic assault rifle_ to an inquiring court or law enforcement agency.

12

DOL00000012
DOL00000012

**Sec. 8.**  RCW 9.41.097 and 2018 c 201 s 6005 are each amended to read as follows:

(1) The health care authority, mental health institutions, and other health care facilities shall, upon request of a court, ((or)) law enforcement agency, or the state, supply such relevant information as is necessary to determine the eligibility of a person to possess a ((pistol)) firearm or to be issued a concealed pistol license under RCW 9.41.070 or to purchase a pistol or semiautomatic assault rifle under RCW 9.41.090.

(2) Mental health information received by: (a) The department of licensing pursuant to RCW 9.41.047 or 9.41.173; (b) an issuing authority pursuant to RCW 9.41.047 or 9.41.070; (c) a chief of police or sheriff pursuant to RCW 9.41.090 or 9.41.173; (d) a court or law enforcement agency pursuant to subsection (1) of this section; or (e) the state pursuant to RCW 9.41.090, shall not be disclosed except as provided in RCW 42.56.240(4).

**Sec. 9.**  RCW 9.41.0975 and 2009 c 216 s 7 are each amended to read as follows:

(1) The state, local governmental entities, any public or private agency, and the employees of any state or local governmental entity or public or private agency, acting in good faith, are immune from liability:

(a) For failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful;

(b) For preventing the sale or transfer of a firearm to a person who may lawfully receive or possess a firearm;

(c) For issuing a concealed pistol license or alien firearm license to a person ineligible for such a license;

(d) For failing to issue a concealed pistol license or alien firearm license to a person eligible for such a license;

(e) For revoking or failing to revoke an issued concealed pistol license or alien firearm license;

13

DOL00000013
DOL00000013

(f) For errors in preparing or transmitting information as part of determining a person's eligibility to receive or possess a firearm, or eligibility for a concealed pistol license or alien firearm license;

(g) For issuing a dealer's license to a person ineligible for such a license; or

(h) For failing to issue a dealer's license to a person eligible for such a license.

(2) An application may be made to a court of competent jurisdiction for a writ of mandamus:

(a) Directing an issuing agency to issue a concealed pistol license or alien firearm license wrongfully refused;

(b) Directing a law enforcement agency to approve an application to purchase a pistol or semiautomatic assault rifle wrongfully denied;

(c) Directing that erroneous information resulting either in the wrongful refusal to issue a concealed pistol license or alien firearm license or in the wrongful denial of a purchase application for a pistol or semiautomatic assault rifle be corrected; or

(d) Directing a law enforcement agency to approve a dealer's license wrongfully denied.

The application for the writ may be made in the county in which the application for a concealed pistol license or alien firearm license or to purchase a pistol or semiautomatic assault rifle was made, or in Thurston county, at the discretion of the petitioner. A court shall provide an expedited hearing for an application brought under this subsection (2) for a writ of mandamus. A person granted a writ of mandamus under this subsection (2) shall be awarded reasonable attorneys' fees and costs.

**Sec. 10.** RCW 9.41.110 and 2009 c 479 s 10 are each amended to read as follows:

(1) No dealer may sell or otherwise transfer, or expose for sale or transfer, or have in his or her possession with intent to sell,

DOL00000014
DOL00000014

or otherwise transfer, any pistol without being licensed as provided in this section.

(2) No dealer may sell or otherwise transfer, or expose for sale or transfer, or have in his or her possession with intent to sell, or otherwise transfer, any firearm other than a pistol without being licensed as provided in this section.

(3) No dealer may sell or otherwise transfer, or expose for sale or transfer, or have in his or her possession with intent to sell, or otherwise transfer, any ammunition without being licensed as provided in this section.

(4) The duly constituted licensing authorities of any city, town, or political subdivision of this state shall grant licenses in forms prescribed by the director of licensing effective for not more than one year from the date of issue permitting the licensee to sell firearms within this state subject to the following conditions, for breach of any of which the license shall be forfeited and the licensee subject to punishment as provided in RCW 9.41.010 through 9.41.810. A licensing authority shall forward a copy of each license granted to the department of licensing. The department of licensing shall notify the department of revenue of the name and address of each dealer licensed under this section.

(5)(a) A licensing authority shall, within thirty days after the filing of an application of any person for a dealer's license, determine whether to grant the license. However, if the applicant does not have a valid permanent Washington driver's license or Washington state identification card, or has not been a resident of the state for the previous consecutive ninety days, the licensing authority shall have up to sixty days to determine whether to issue a license. No person shall qualify for a license under this section without first receiving a federal firearms license and undergoing fingerprinting and a background check. In addition, no person ineligible to possess a firearm under RCW 9.41.040 or ineligible for a concealed pistol license under RCW 9.41.070 shall qualify for a dealer's license.

15

DOL00000015
DOL00000015

(b) A dealer shall require every employee who may sell a firearm in the course of his or her employment to undergo fingerprinting and a background check. An employee must be eligible to possess a firearm, and must not have been convicted of a crime that would make the person ineligible for a concealed pistol license, before being permitted to sell a firearm. Every employee shall comply with requirements concerning purchase applications and restrictions on delivery of pistols <u>or semiautomatic assault rifles</u> that are applicable to dealers.

(6)(a) Except as otherwise provided in (b) of this subsection, the business shall be carried on only in the building designated in the license. For the purpose of this section, advertising firearms for sale shall not be considered the carrying on of business.

(b) A dealer may conduct business temporarily at a location other than the building designated in the license, if the temporary location is within Washington state and is the location of a gun show sponsored by a national, state, or local organization, or an affiliate of any such organization, devoted to the collection, competitive use, or other sporting use of firearms in the community. Nothing in this subsection (6)(b) authorizes a dealer to conduct business in or from a motorized or towed vehicle.

In conducting business temporarily at a location other than the building designated in the license, the dealer shall comply with all other requirements imposed on dealers by RCW 9.41.090, 9.41.100, and ((~~9.41.110~~)) <u>this section</u>. The license of a dealer who fails to comply with the requirements of RCW 9.41.080 and 9.41.090 and subsection (8) of this section while conducting business at a temporary location shall be revoked, and the dealer shall be permanently ineligible for a dealer's license.

(7) The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises in the area where firearms are sold, or at the temporary location, where it can easily be read.

16

DOL00000016
DOL00000016

(8)(a) No pistol or semiautomatic assault rifle may be sold: (i) In violation of any provisions of RCW 9.41.010 through 9.41.810; nor (ii) may a pistol or semiautomatic assault rifle be sold under any circumstances unless the purchaser is personally known to the dealer or shall present clear evidence of his or her identity.

(b) A dealer who sells or delivers any firearm in violation of RCW 9.41.080 is guilty of a class C felony. In addition to any other penalty provided for by law, the dealer is subject to mandatory permanent revocation of his or her dealer's license and permanent ineligibility for a dealer's license.

(c) The license fee for pistols shall be one hundred twenty-five dollars. The license fee for firearms other than pistols shall be one hundred twenty-five dollars. The license fee for ammunition shall be one hundred twenty-five dollars. Any dealer who obtains any license under subsection (1), (2), or (3) of this section may also obtain the remaining licenses without payment of any fee. The fees received under this section shall be deposited in the state general fund.

(9)(a) A true record in triplicate shall be made of every pistol or semiautomatic assault rifle sold, in a book kept for the purpose, the form of which may be prescribed by the director of licensing and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other, and shall contain the date of sale, the caliber, make, model and manufacturer's number of the weapon, the name, address, occupation, and place of birth of the purchaser, and a statement signed by the purchaser that he or she is not ineligible under ((RCW 9.41.040)) state or federal law to possess a firearm.

(b) One copy shall within six hours be sent by certified mail to the chief of police of the municipality or the sheriff of the county of which the purchaser is a resident, or the state pursuant to RCW 9.41.090; the duplicate the dealer shall within seven days send to the director of licensing; the triplicate the dealer shall retain for six years.

17

DOL00000017
DOL00000017

(10) Subsections (2) through (9) of this section shall not apply to sales at wholesale.

(11) The dealer's licenses authorized to be issued by this section are general licenses covering all sales by the licensee within the effective period of the licenses. The department shall provide a single application form for dealer's licenses and a single license form which shall indicate the type or types of licenses granted.

(12) Except as provided in RCW 9.41.090, every city, town, and political subdivision of this state is prohibited from requiring the purchaser to secure a permit to purchase or from requiring the dealer to secure an individual permit for each sale.

**Sec. 11.** RCW 9.41.113 and 2017 c 264 s 2 are each amended to read as follows:

(1) All firearm sales or transfers, in whole or part in this state including without limitation a sale or transfer where either the purchaser or seller or transferee or transferor is in Washington, shall be subject to background checks unless specifically exempted by state or federal law. The background check requirement applies to all sales or transfers including, but not limited to, sales and transfers through a licensed dealer, at gun shows, online, and between unlicensed persons.

(2) No person shall sell or transfer a firearm unless:

(a) The person is a licensed dealer;

(b) The purchaser or transferee is a licensed dealer; or

(c) The requirements of subsection (3) of this section are met.

(3) Where neither party to a prospective firearms transaction is a licensed dealer, the parties to the transaction shall complete the sale or transfer through a licensed dealer as follows:

(a) The seller or transferor shall deliver the firearm to a licensed dealer to process the sale or transfer as if it is selling or transferring the firearm from its inventory to the purchaser or transferee, except that the unlicensed seller or transferor may

18

DOL00000018
DOL00000018

remove the firearm from the business premises of the licensed dealer
while the background check is being conducted. If the seller or
transferor removes the firearm from the business premises of the
licensed dealer while the background check is being conducted, the
purchaser or transferee and the seller or transferor shall return to
the business premises of the licensed dealer and the seller or
transferor shall again deliver the firearm to the licensed dealer
prior to completing the sale or transfer.

(b) Except as provided in (a) of this subsection, the licensed
dealer shall comply with all requirements of federal and state law
that would apply if the licensed dealer were selling or transferring
the firearm from its inventory to the purchaser or transferee,
including but not limited to conducting a background check on the
prospective purchaser or transferee in accordance with federal and
state law requirements ((and)), fulfilling all federal and state
recordkeeping requirements, and complying with the specific
requirements and restrictions on semiautomatic assault rifles in
this act.

(c) The purchaser or transferee must complete, sign, and submit
all federal, state, and local forms necessary to process the
required background check to the licensed dealer conducting the
background check.

(d) If the results of the background check indicate that the
purchaser or transferee is ineligible to possess a firearm, then the
licensed dealer shall return the firearm to the seller or
transferor.

(e) The licensed dealer may charge a fee that reflects the fair
market value of the administrative costs and efforts incurred by the
licensed dealer for facilitating the sale or transfer of the
firearm.

(4) This section does not apply to:

(a) A transfer between immediate family members, which for this
subsection shall be limited to spouses, domestic partners, parents,
parents-in-law, children, siblings, siblings-in-law, grandparents,

19

DOL00000019
DOL00000019

grandchildren, nieces, nephews, first cousins, aunts, and uncles, that is a bona fide gift or loan;

(b) The sale or transfer of an antique firearm;

(c) A temporary transfer of possession of a firearm if such transfer is necessary to prevent imminent death or great bodily harm to the person to whom the firearm is transferred if:

(i) The temporary transfer only lasts as long as immediately necessary to prevent such imminent death or great bodily harm; and

(ii) The person to whom the firearm is transferred is not prohibited from possessing firearms under state or federal law;

(d) A temporary transfer of possession of a firearm if: (i) The transfer is intended to prevent suicide or self-inflicted great bodily harm; (ii) the transfer lasts only as long as reasonably necessary to prevent death or great bodily harm; and (iii) the firearm is not utilized by the transferee for any purpose for the duration of the temporary transfer;

(e) Any law enforcement or corrections agency and, to the extent the person is acting within the course and scope of his or her employment or official duties, any law enforcement or corrections officer, United States marshal, member of the armed forces of the United States or the national guard, or federal official;

(f) A federally licensed gunsmith who receives a firearm solely for the purposes of service or repair, or the return of the firearm to its owner by the federally licensed gunsmith;

(g) The temporary transfer of a firearm (i) between spouses or domestic partners; (ii) if the temporary transfer occurs, and the firearm is kept at all times, at an established shooting range authorized by the governing body of the jurisdiction in which such range is located; (iii) if the temporary transfer occurs and the transferee's possession of the firearm is exclusively at a lawful organized competition involving the use of a firearm, or while participating in or practicing for a performance by an organized group that uses firearms as a part of the performance; (iv) to a person who is under eighteen years of age for lawful hunting,

20

sporting, or educational purposes while under the direct supervision and control of a responsible adult who is not prohibited from possessing firearms; (v) under circumstances in which the transferee and the firearm remain in the presence of the transferor; or (vi) while hunting if the hunting is legal in all places where the person to whom the firearm is transferred possesses the firearm and the person to whom the firearm is transferred has completed all training and holds all licenses or permits required for such hunting, provided that any temporary transfer allowed by this subsection is permitted only if the person to whom the firearm is transferred is not prohibited from possessing firearms under state or federal law;

(h) A person who (i) acquired a firearm other than a pistol by operation of law upon the death of the former owner of the firearm or (ii) acquired a pistol by operation of law upon the death of the former owner of the pistol within the preceding sixty days. At the end of the sixty-day period, the person must either have lawfully transferred the pistol or must have contacted the department of licensing to notify the department that he or she has possession of the pistol and intends to retain possession of the pistol, in compliance with all federal and state laws; or

(i) A sale or transfer when the purchaser or transferee is a licensed collector and the firearm being sold or transferred is a curio or relic.

**Sec. 12.**  RCW 9.41.124 and 2015 c 1 s 7 are each amended to read as follows:

Residents of a state other than Washington may purchase rifles and shotguns, except those firearms defined as semiautomatic assault rifles, in Washington: PROVIDED, That such residents conform to the applicable provisions of the federal Gun Control Act of 1968, Title IV, Pub. L. 90-351 as administered by the United States secretary of the treasury: AND PROVIDED FURTHER, That such residents are eligible to purchase or possess such weapons in Washington and in the state in which such persons reside: AND PROVIDED FURTHER, That such

21

DOL00000021
DOL00000021

residents are subject to the procedures and background checks required by this chapter.

**Sec. 13.**  RCW 9.41.240 and 1994 sp.s. c 7 s 423 are each amended to read as follows:

(1) A person under twenty-one years of age may not purchase a pistol or semiautomatic assault rifle, and except as otherwise provided in this chapter, no person may sell or transfer a semiautomatic assault rifle to a person under twenty-one years of age.

(2) Unless an exception under RCW 9.41.042, 9.41.050, or 9.41.060 applies, a person at least eighteen years of age, but less than twenty-one years of age, may possess a pistol only:

((<del>(1)</del>)) (a) In the person's place of abode;

((<del>(2)</del>)) (b) At the person's fixed place of business; or

((<del>(3)</del>)) (c) On real property under his or her control.

(3) Except in the places and situations identified in RCW 9.41.042 (1) through (9) and 9.41.060 (1) through (10), a person at least eighteen years of age, but less than twenty-one years of age, may possess a semiautomatic assault rifle only:

(a) In the person's place of abode;

(b) At the person's fixed place of business;

(c) On real property under his or her control; or

(d) For the specific purpose of (i) moving to a new place of abode; (ii) traveling between the person's place of abode and real property under his or her control; or (iii) selling or transferring the firearm in accordance with the requirements of this chapter; provided that in all of these situations the semiautomatic assault rifle is unloaded and either in secure gun storage or secured with a trigger lock or similar device that is designed to prevent the unauthorized use or discharge of the firearm.

**Sec. 14.**  RCW 9.41.129 and 2005 c 274 s 203 are each amended to read as follows:

22

The department of licensing ((may)) shall keep copies or records of applications for concealed pistol licenses provided for in RCW 9.41.070, copies or records of applications for alien firearm licenses, copies or records of applications to purchase pistols or semiautomatic assault rifles provided for in RCW 9.41.090, and copies or records of pistol or semiautomatic assault rifle transfers provided for in RCW 9.41.110. The copies and records shall not be disclosed except as provided in RCW 42.56.240(4).

NEW SECTION.  **Sec. 15.**  A new section is added to chapter 9.41 RCW to read as follows:

(1) Within twelve months of the effective date of this section, the department of licensing shall, in conjunction with the Washington state patrol and other state and local law enforcement agencies as necessary, develop a cost-effective and efficient process to:

(a) Verify, on an annual or more frequent basis, that persons who acquired pistols or semiautomatic assault rifles pursuant to this chapter remain eligible to possess a firearm under state and federal law; and

(b) If such persons are determined to be ineligible for any reason, (i) notify and provide the relevant information to the chief of police or the sheriff of the jurisdiction in which the purchaser resides and (ii) take steps to ensure such persons are not illegally in possession of firearms.

(2) The department of licensing, where appropriate, may consult with individuals from the public and private sector or ask the individuals to establish a temporary advisory committee to accomplish the purposes in subsection (1) of this section. Members of such an advisory committee are not entitled to expense reimbursement.

**Sec. 16.**  RCW 9.41.010 and 2018 c 7 s 1 are each amended to read as follows:

23

Unless the context clearly requires otherwise, the definitions in this section apply throughout this chapter.

(1) "Antique firearm" means a firearm or replica of a firearm not designed or redesigned for using rim fire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898, including any matchlock, flintlock, percussion cap, or similar type of ignition system and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

(2) "Barrel length" means the distance from the bolt face of a closed action down the length of the axis of the bore to the crown of the muzzle, or in the case of a barrel with attachments to the end of any legal device permanently attached to the end of the muzzle.

(3) "Bump-fire stock" means a butt stock designed to be attached to a semiautomatic firearm with the effect of increasing the rate of fire achievable with the semiautomatic firearm to that of a fully automatic firearm by using the energy from the recoil of the firearm to generate reciprocating action that facilitates repeated activation of the trigger.

(4) "Crime of violence" means:

(a) Any of the following felonies, as now existing or hereafter amended: Any felony defined under any law as a class A felony or an attempt to commit a class A felony, criminal solicitation of or criminal conspiracy to commit a class A felony, manslaughter in the first degree, manslaughter in the second degree, indecent liberties if committed by forcible compulsion, kidnapping in the second degree, arson in the second degree, assault in the second degree, assault of a child in the second degree, extortion in the first degree, burglary in the second degree, residential burglary, and robbery in the second degree;

DOL00000024
DOL00000024

(b) Any conviction for a felony offense in effect at any time prior to June 6, 1996, which is comparable to a felony classified as a crime of violence in (a) of this subsection; and

(c) Any federal or out-of-state conviction for an offense comparable to a felony classified as a crime of violence under (a) or (b) of this subsection.

(5) "Curio or relic" has the same meaning as provided in 27 C.F.R. Sec. 478.11.

(6) "Dealer" means a person engaged in the business of selling firearms at wholesale or retail who has, or is required to have, a federal firearms license under 18 U.S.C. Sec. 923(a). A person who does not have, and is not required to have, a federal firearms license under 18 U.S.C. Sec. 923(a), is not a dealer if that person makes only occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or sells all or part of his or her personal collection of firearms.

(7) "Family or household member" means "family" or "household member" as used in RCW 10.99.020.

(8) "Felony" means any felony offense under the laws of this state or any federal or out-of-state offense comparable to a felony offense under the laws of this state.

(9) "Felony firearm offender" means a person who has previously been convicted or found not guilty by reason of insanity in this state of any felony firearm offense. A person is not a felony firearm offender under this chapter if any and all qualifying offenses have been the subject of an expungement, pardon, annulment, certificate, or rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted or a pardon, annulment, or other equivalent procedure based on a finding of innocence.

(10) "Felony firearm offense" means:

(a) Any felony offense that is a violation of this chapter;

(b) A violation of RCW 9A.36.045;

(c) A violation of RCW 9A.56.300;

DOL00000025
DOL00000025

(d) A violation of RCW 9A.56.310;

(e) Any felony offense if the offender was armed with a firearm in the commission of the offense.

(11) "Firearm" means a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder. "Firearm" does not include a flare gun or other pyrotechnic visual distress signaling device, or a powder-actuated tool or other device designed solely to be used for construction purposes.

(12) "Gun" has the same meaning as firearm.

(13) "Law enforcement officer" includes a general authority Washington peace officer as defined in RCW 10.93.020, or a specially commissioned Washington peace officer as defined in RCW 10.93.020. "Law enforcement officer" also includes a limited authority Washington peace officer as defined in RCW 10.93.020 if such officer is duly authorized by his or her employer to carry a concealed pistol.

(14) "Lawful permanent resident" has the same meaning afforded a person "lawfully admitted for permanent residence" in 8 U.S.C. Sec. 1101(a)(20).

(15) "Licensed collector" means a person who is federally licensed under 18 U.S.C. Sec. 923(b).

(16) "Licensed dealer" means a person who is federally licensed under 18 U.S.C. Sec. 923(a).

(17) "Loaded" means:

(a) There is a cartridge in the chamber of the firearm;

(b) Cartridges are in a clip that is locked in place in the firearm;

(c) There is a cartridge in the cylinder of the firearm, if the firearm is a revolver;

(d) There is a cartridge in the tube or magazine that is inserted in the action; or

(e) There is a ball in the barrel and the firearm is capped or primed if the firearm is a muzzle loader.

26

(18) "Machine gun" means any firearm known as a machine gun, mechanical rifle, submachine gun, or any other mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into the firearm, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

(19) "Nonimmigrant alien" means a person defined as such in 8 U.S.C. Sec. 1101(a)(15).

(20) "Person" means any individual, corporation, company, association, firm, partnership, club, organization, society, joint stock company, or other legal entity.

(21) "Pistol" means any firearm with a barrel less than sixteen inches in length, or is designed to be held and fired by the use of a single hand.

(22) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned, made or remade, and intended to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(23) "Sale" and "sell" mean the actual approval of the delivery of a firearm in consideration of payment or promise of payment.

(24) "Secure gun storage" means:

(a) A locked box, gun safe, or other secure locked storage space that is designed to prevent unauthorized use or discharge of a firearm; and

(b) The act of keeping an unloaded firearm stored by such means.

(25) "Semiautomatic assault rifle" means any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

"Semiautomatic assault rifle" does not include antique firearms, any firearm that has been made permanently inoperable, or any

27

DOL00000027
DOL00000027

firearm that is manually operated by bolt, pump, lever, or slide action.

(26) "Serious offense" means any of the following felonies or a felony attempt to commit any of the following felonies, as now existing or hereafter amended:

(a) Any crime of violence;

(b) Any felony violation of the uniform controlled substances act, chapter 69.50 RCW, that is classified as a class B felony or that has a maximum term of imprisonment of at least ten years;

(c) Child molestation in the second degree;

(d) Incest when committed against a child under age fourteen;

(e) Indecent liberties;

(f) Leading organized crime;

(g) Promoting prostitution in the first degree;

(h) Rape in the third degree;

(i) Drive-by shooting;

(j) Sexual exploitation;

(k) Vehicular assault, when caused by the operation or driving of a vehicle by a person while under the influence of intoxicating liquor or any drug or by the operation or driving of a vehicle in a reckless manner;

(l) Vehicular homicide, when proximately caused by the driving of any vehicle by any person while under the influence of intoxicating liquor or any drug as defined by RCW 46.61.502, or by the operation of any vehicle in a reckless manner;

(m) Any other class B felony offense with a finding of sexual motivation, as "sexual motivation" is defined under RCW 9.94A.030;

(n) Any other felony with a deadly weapon verdict under RCW 9.94A.825;

(o) Any felony offense in effect at any time prior to June 6, 1996, that is comparable to a serious offense, or any federal or out-of-state conviction for an offense that under the laws of this state would be a felony classified as a serious offense; or

(p) Any felony conviction under RCW 9.41.115.

28

DOL00000028
DOL00000028

(($(25)$)) (27) "Short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle by any means of modification if such modified weapon has an overall length of less than twenty-six inches.

(($(26)$)) (28) "Short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun by any means of modification if such modified weapon has an overall length of less than twenty-six inches.

(($(27)$)) (29) "Shotgun" means a weapon with one or more barrels, designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned, made or remade, and intended to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(($(28)$)) (30) "Transfer" means the intended delivery of a firearm to another person without consideration of payment or promise of payment including, but not limited to, gifts and loans. "Transfer" does not include the delivery of a firearm owned or leased by an entity licensed or qualified to do business in the state of Washington to, or return of such a firearm by, any of that entity's employees or agents, defined to include volunteers participating in an honor guard, for lawful purposes in the ordinary course of business.

(($(29)$)) (31) "Unlicensed person" means any person who is not a licensed dealer under this chapter.

NEW SECTION.  **Sec. 17.**  This act takes effect July 1, 2019, except for section 13 of this act which takes effect January 1, 2019.

NEW SECTION.  **Sec. 18.**  The director of the department of licensing may take the necessary steps to ensure that this act is implemented on its effective date.

29

NEW SECTION.  **Sec. 19.**  If any provision of this act or its application to any person or circumstance is held invalid or preempted by federal law, the remainder of the act or the application of the provision to other persons or circumstances is not affected.

**--- END ---**

30

# Exhibit B

REVIEW ARTICLE

# Gunshot wounds: A review of ballistics, bullets, weapons, and myths

**Peter M. Rhee, MD, MPH, Ernest E. Moore, MD, Bellal Joseph, MD, Andrew Tang, MD, Viraj Pandit, MD, and Gary Vercruysse, MD,** Tucson, Arizona

In the United States, someone experiences a gunshot wound every 4 minutes 44 seconds, and a person dies as a result each 16 minutes. Annually, this means that approximately 111,000 Americans are shot and 33,800 die as a result of these injuries, which equates to 93 deaths caused by firearms every day.[1,2] In contrast, the war in Iraq and Afghanistan has resulted in less than 200 deaths per year from gunshot wounds during the height of the conflict (Table 1). Gunshot wound injuries are a preventable epidemic in the United States. This silent epidemic is largely deaf to the American public because we are so accustomed to these injuries that they rarely make the news. Gun violence leading to homicide may get some attention, but an even greater toll is placed on the survivors who must live with the loss of loved ones or are burdened by the costs associated with the temporary or permanent disability caused by these wounds. Gunshot wounds not only hurt the body and mind of the victim but also burden the family of the victim and the society, both mentally and from a financial perspective. It is not unusual to have survivors accumulate hospital costs of more than $1 million per year, and some have total hospital and recovery costs of more than $10 million. Since most do not have the money to afford these enormous costs, the burden then falls on the society and ultimately the taxpayers. Additional societal costs that are harder to quantify are the costs associated with the permanent disabling and unemployment seen not infrequently in the victims of gunshot wounds. Whether these injuries are intentional or unintentional, the patients are in our health care system. These costs have been estimated to range from $100 to $174 billion annually.[3]

Furthermore, there has been an alarming escalation in the numbers of mass shootings throughout the United States (which leads the world in mass shootings), with 265 individuals killed and 269 wounded in the past 16 years[4] (Table 2).[5] Recent terrorist-related mass shootings have reignited vigorous and volatile public debate over access to weapons designed for inflicting mass casualties.[6] The predictable reflex response to these mass shootings has been in several forms, of which one is in the call for reviving and funding research on gun violence and inadequate recognition and treatment of mental illness that warrants federal and state tax support.[7,8] As health care providers for trauma care, we have witnessed the ravages of gun-related violence and, thus, should become proactive in the ongoing national debate as it is our duty.

The numbers of gunshot wounds are increasing in the United States, although the gun-related homicide rates remain relatively stable.[9] Guns are ubiquitous in the United States, and it is known that where there are guns, there will be gunshot wounds.[10,11] In other countries, it has been shown that gun law reforms were associated with a decrease in the numbers of mass shootings and firearm deaths.[12–14] Canada, with their strict handgun control, has one-third fewer gunshot wounds than the United States. Australia and the United Kingdom have less than half of the deaths from gunshot wounds seen in Canada.[10] The United States, which constitutes approximately 5% of the world's population, owns between 35% and 50% of its guns. Legislation regarding firearms differs within the United States, but what is certain is that gunshot wounds are a daily part of our society and will remain a part of it for a very long time. While any topic relating to firearms remains volatile in our country, the fact is that where there are guns, people will be shot. The real tragedy is that with as many gunshot wounds occurring daily in the United States, even collection of the basic data, scientific inquiry, policy formation and analysis, and rigorous evaluation are limited. Firearm research is difficult because of politically motivated constraints. A blue ribbon commission appointed by the National Academy of Sciences concluded that very little is currently known about effective ways to reduce gun violence and injury within the United States because it is rarely studied.[15] While mortality rates from every major cause of death have declined dramatically during the past half century,[16] the homicide and gunshot wound rates in America are the same as those in 1950. Without challenging the Second Amendment of the Constitution, we can still work toward some semblance of regulation and control. The costs of inaction are more gunshot wounds to both intended and unintended victims. The cost of total freedom to bear arms is measured not only in terms of the financial burden to the society but also in terms of lives and lives ruined. The cost to life and the society is too enormous to ignore. The costs are generally to the taxpayers because it is costly to the court system, police system, and health care system. By promoting discussions on this topic and synergy of collaboration, we can at least attempt to make effectual progress.

Despite gunshot wounds being an epidemic, many health care providers' understanding of ballistics, bullets, and guns

Submitted: January 14, 2016, Revised: February 8, 2016, Accepted: March 10, 2016, Published online: March 15, 2016.

From the Division of Trauma, Critical Care, Burns and Emergency Surgery (P.M.R., B.J., A.T., V.P., G.V.), Department of Surgery, University of Arizona, Tucson, Arizona; and Department of Surgery (E.E.M.), University of Colorado, Denver, Denver, Colorado.

Address for reprints: Peter M. Rhee, MD, MPH, Division of Trauma, Critical Care, Burns and Emergency Surgery, University of Arizona, Department of Surgery, 1501 N Campbell Ave, Room 5411, PO Box 245063 Tucson, AZ 85724; email: prhee@surgery.arizona.edu.

DOI: 10.1097/TA.0000000000001037

J Trauma Acute Care Surg
Volume 80, Number 6

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 80, Number 6

*Rhee et al.*

**TABLE 5.** Caliber of Bullets in English and Metric

| Caliber in inches | Conversion to Millimeter | Similar Metric Round | Type of Firearm |
|---|---|---|---|
| .22 | 5.59 | | Handgun and rifle |
| .223 | 5.66 | 5.56 | Rifle |
| .30 | 7.62 | 7.62 | Rifle and machine gun |
| .357 | 9.07 | 9 | Handgun |
| .38 special | 9.65 | | Handgun |
| .380 ACP | 9.65 | | Handgun |
| .40 | 10.16 | 10 | Handgun |
| .44 mag | 11.18 | 11 | Handgun |
| .45 ACP | 11.43 | | Handgun |
| .45 colt | 11.43 | | Handgun |
| 0.50 | 12.7 | | Rifle and machine gun |

ACP, Automatic Colt Pistol.

to the victim. The goal of transferring all of the kinetic energy is in hopes of knocking down the person or "dropping" the person. This is known as "stopping power." Some hollow point bullets are so well designed that the expansion is precise and reproducible such as the "black talon" bullet. This type of modification to enhance wounding capacity is not modern. One of the earliest reports was in 1897 when the British scored the bullets externally to promote fragmentation to stop fanatical Indian Tribesman. The "dum-dum" bullet was developed by the British by removing the jacket at the nose of the bullet to expand (mushroom) on impact to limit penetration and produce a larger-diameter wound for increased incapacitation. At the British military facility, Captain Neville Bertie-Clay developed the Mark IV cartridge, the so-called *dum-dum bullet* (Dum Dum is a city in West Bengal, India). These were the types of bullets that have been banned in warfare by the Hague Convention. During World War I, the Germans also similarly altered their ammunition. A more recent modification highlighted by the shooting of President Regan is the explosive bullet, designed to detonate after the bullet was imbedded in the victim's tissues.[27] The earliest report is attributed to the British in 1822, who designed the bullet with delayed ignition of powder magazines, and these bullets were used in the Civil War. The modern version of this concept is referred to as "Devastator" brand cartridges, which contained small aluminum and lead azide explosive charges designed to explode on contact, and this was used by John Hinckley when he tried to assassinate President Regan in 1981.[28] Hinckley used a Rohm RG-14 0.22 long rifle blue steel revolver and fired six rounds in 1.7 seconds.

### Caliber

The outer diameter of the bullet is the caliber. It can be confusing because nomenclature is large. The system is somewhat cumbersome because English or metric systems are used. The English system measures bullets in hundredths of an inch, and the metric system uses millimeters. A .22LR, L, or S caliber bullet is 22/100th of an inch in diameter. The abbreviations after the diameter stand for long rifle, long, or short, respectively, and denote the power charge and size of the casing

behind the bullet. The .22lr caliber handgun round (the most popular of the .22 caliber cartridges) can be shot in revolvers or semiautomatic handguns or rifles and is a very low-energy round with a very small bullet. In contrast, the typical round used in military assault rifles are the .223 round (metric system, 5.56 mm). The rifle rounds are either 22.3/100th of an inch or 5.56 mm in diameter (Table 5). Although the caliber of the .223 assault rifle round is similar to the .22 handgun round in diameter, the bullet mass and length are larger and contain much more propellant or smokeless gunpowder. The result is that the assault rifle round has more than four times the muzzle velocity compared with the handgun round and more mass and thus significantly more kinetic energy, even though the calibers are similar (Tables 3 and 4). Similarly, the 9-mm bullets from the most common handgun are 9 mm in diameter. The .380 and .357 bullets (using English dimensions) are similar in caliber to the 9-mm bullet (Fig. 6). Table 1 shows various sizes of the bullets in inches with comparable metric equivalent.

The common English nomenclature handgun rounds are the .22, .38, .357, .40, .44, and .45. Grain is an older standard measure of mass and can refer to the amount of propellant behind the bullet and also denotes the weight of the bullet. One grain is equal to 64.79891 mg. Although the .38 special is a common round used in revolvers by the police in the 1960s and 1970s, this round is vastly different from the .357 magnum because of the amount of propellant, even though the diameter of the bullet is similar. President Lincoln was assassinated with a .44 caliber Derringer revolver, President Garfield was assassinated with a .44 caliber Webley Bulldog revolver, and President McKinley was assassinated with a .32 caliber Iver Johnson "Safety Automatic" revolver that was purchased for $4.50.

The .380 is a round used in a semiautomatic handgun that is most well-known for its use by James Bond in the 007 movies. The .380 bullet is similar in diameter to the 9-mm semiautomatic handgun used by law enforcement and the military. Although the diameter may be similar among various bullets, the length and weight of the bullet and the amount of propellant are not normally distinguished in the nomenclature. Ultimately, this equates to the muzzle kinetic energy being different between the .380 and the 9-mm round (Fig. 5).



**Figure 6.** Handgun ammunition is considered low velocity and designed for short-range targets. The bullets vary widely in design; the left is a 50 cal magnum; the right, a 22 cal short.

© *2016 Wolters Kluwer Health, Inc. All rights reserved.*

**859**

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

# Exhibit C



# After Sandy Hook, we said never again.
## And then we let 2,408 mass shootings happen.

By German Lopez and Kavya Sukumar

Updated: March 26, 2020 3:30 PM

Scroll down



15 of 15



The map shows that almost no state is immune to mass gun violence, even as crime and murder rates have generally declined in the past couple of decades.

# Exhibit D

**Partial List of Mass Killings in the United States (2010-2019)**
*Shooter < 21 years old or used semiautomatic rifle*

| Location | Date | Victims Killed | Victims Injured | Age of Shooter | Weapon Type | Weapon Details | Killed/Injured Data Source(s) |
|---|---|---|---|---|---|---|---|
| Dayton, Ohio | 8/4/2019 | 9 | 27 | 24 | semiautomatic rifle | AR-15-style rifle w/100-round capacity ammunition drum | Mark Follman et al., *US Mass Shootings, 1982-2020*, Mother Jones (updated Feb. 26, 2020), https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ ("Mother Jones") |
| El Paso, Tex. | 8/3/2019 | 22 | 26 | 21 | semiautomatic rifle | AK-47-style rifle per authorities | Mother Jones; *Ten Years of Mass Shooting in the United States*, Everytown for Gun Safety (updated Mar. 24, 2020), https://everytownresearch.org/massshootingsreports/mass-shootings-in-america-2009-2019/ ("Everytown"); Jillian Peterson & James Densley, *The Mass Shooter Database*, The Violence Project, https://www.theviolenceproject.org/mass-shooter-database/ ("Violence Project") |

\* Consistent with the definition of "mass killing" under federal law—that is, "3 or more killings in a single incident"—this table contains a non-exhaustive list of mass killings in which the assailant was under 21 years old or used a semiautomatic rifle. The table does not contain the entire universe of incidents that would meet those parameters, due to limitations of—and differences between—the various source material. For example, Everytown and the Violence Project collect data only for shootings that result in four or more deaths, excluding the shooter. The Mother Jones database does not include "more conventionally motivated" crimes, such as "gang activity," "armed robbery," and "mass killings that took place in private homes (often stemming from domestic violence)". And the Violence Project database omits "murders . . . attributable to any other underlying criminal activity or commonplace circumstance."

1 of 6

**Partial List of Mass Killings in the United States (2010-2019)**

*Shooter < 21 years old or used semiautomatic rifle*

| Location | Date | Victims Killed | Victims Injured | Age of Shooter | Weapon Type | Weapon Details | Killed/Injured Data Source(s) |
|---|---|---|---|---|---|---|---|
| Gilroy, Cal. | 7/28/2019 | 3 | 12 | 19 | semiautomatic rifle | AK-47-style rifle per authorities | Mother Jones |
| Pittsburgh, Pa. | 10/27/2018 | 11 | 6 | 46 | semiautomatic rifle, semiautomatic handguns | AR-15; Glock .357 (3) | Mother Jones Everytown Violence Project |
| Santa Fe, Tex. | 5/18/2018 | 10 | 13 | 17 | shotgun, .38 revolver | | Mother Jones Everytown Violence Project |
| Nashville, Tenn. | 4/22/2018 | 4 | 4 | 29 | semiautomatic rifle | AR-15 | Mother Jones Violence Project |
| Yountville, Cal. | 3/9/2018 | 3 | 0 | 36 | semiautomatic rifle, shotgun | | Mother Jones |
| Parkland, Fla. | 2/14/2018 | 17 | 17 | 19 | semiautomatic rifle | AR-15 | Mother Jones Everytown Violence Project |
| Melcroft, Pa. | 1/28/2018 | 4 | 1 | 28 | semiautomatic rifle, semiautomatic handgun | | Mother Jones Violence Project |
| Sutherland Springs, Tex. | 11/5/2017 | 26 | 20 | 26 | semiautomatic rifle | Ruger AR-556; also possessed semiautomatic handguns | Mother Jones |

**SER-153**

**Partial List of Mass Killings in the United States (2010-2019)**

*Shooter < 21 years old or used semiautomatic rifle*

| Location | Date | Victims Killed | Victims Injured | Age of Shooter | Weapon Type | Weapon Details | Killed/Injured Data Source(s) |
|---|---|---|---|---|---|---|---|
| Las Vegas, Nev. | 10/1/2017 | 58 | 546 | 64 | 23 firearms, mostly rifles, including two modified with "bump stocks" | AR-15-style and AK-47-style rifles; "large cache of ammunition"; 4 Daniel Defense DDM4 rifles, 3 FN-15s and other rifles made by Sig Sauer | Mother Jones |
| Burlington, Wash. | 9/23/2016 | 5 | 0 | 20 | semiautomatic rifle | Ruger 10/22 semiautomatic rifle | Mother Jones Everytown Violence Project |
| Mukilteo, Wash. | 7/30/2016 | 3 | 1 | 19 | semiautomatic rifle | AR-15 semiautomatic rifle | Gun Violence Archive, updated Mar. 29, 2020, https://www.gunviolencearchive.org/ |
| Dallas, Tex. | 7/7/2016 | 5 | 7 | 25 | semiautomatic rifle, two semiautomatic handguns | Izhmash-Saiga 5.45mm (AK-style) semiautomatic rifle with large capacity magazines; Glock 9mm handgun, .25-caliber semiautomatic handgun | Everytown Violence Project |

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-2, Page 154 of 233

**Partial List of Mass Killings in the United States (2010-2019)**

*Shooter < 21 years old or used semiautomatic rifle*

| Location | Date | Victims Killed | Victims Injured | Age of Shooter | Weapon Type | Weapon Details | Killed/Injured Data Source(s) |
|---|---|---|---|---|---|---|---|
| Orlando, Fla. | 6/12/2016 | 49 | 53 | 29 | semiautomatic rifle, semiautomatic handgun | Sig Sauer MCX rifle, Glock 17 9mm; high-capacity magazines (30 rounds) | Mother Jones Everytown Violence Project |
| Hesston, Kan. | 2/25/2016 | 3 | 14 | 38 | semiautomatic rifle, semiautomatic handgun | Zastava Serbia AK-47-style rifle, Glock Model 22 .40-caliber handgun; high-capacity magazines (30 rounds) | Mother Jones |
| San Bernardino, Cal. | 12/2/2015 | 14 | 22 | 28 | two semiautomatic rifles, two semi-automatic pistols | two semiautomatic AR-15-style rifles (DPMS A-15, Smith & Wesson M&P15, both with .223 caliber ammunition); two 9mm semiautomatic handguns; high capacity magazines | Everytown Violence Project |
| Colorado Springs, Colo. | 11/27/2015 | 3 | 9 | 57 | semiautomatic rifle | Reportedly an AK-47 style semiautomatic rifle and others | Mother Jones |
| Colorado Springs, Colo. | 10/31/2015 | 3 | 0 | 33 | semiautomatic rifle, two handguns | AR-15 rifle, a 9 mm pistol, and a .357 revolver | Mother Jones |

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-2, Page 155 of 233

**Partial List of Mass Killings in the United States (2010-2019)**

*Shooter < 21 years old or used semiautomatic rifle*

| Location | Date | Victims Killed | Victims Injured | Age of Shooter | Weapon Type | Weapon Details | Killed/Injured Data Source(s) |
|---|---|---|---|---|---|---|---|
| Roseburg, Or. | 10/1/2015 | 9 | 9 | 26 | semiautomatic rifle, five handguns | 9 mm Glock pistol, .40 caliber Smith & Wesson, .40 caliber Taurus pistol, .556 caliber Del-Ton; (ammo details unclear) | Mother Jones Everytown |
| Chattanooga, Tenn. | 7/16/2015 | 5 | 2 | 24 | two semiautomatic rifles, semiautomatic handgun | AK-47, AR-15, and 30-round magazines; 9mm handgun | Mother Jones Everytown Violence Project |
| Marysville, Wash. | 10/24/2014 | 4 | 1 | 15 | handgun | Beretta .40-caliber handgun | Everytown Violence Project |
| Santa Monica, Cal. | 6/7/2013 | 5 | 3 | 23 | semiautomatic rifle, handgun | .223-caliber semi-automatic assault rifle, about 40 high capacity magazines, "black powder" handgun (likely antique) | Violence Project |

**Partial List of Mass Killings in the United States (2010-2019)**

*Shooter < 21 years old or used semiautomatic rifle*

| Location | Date | Victims Killed | Victims Injured | Age of Shooter | Weapon Type | Weapon Details | Killed/Injured Data Source(s) |
|---|---|---|---|---|---|---|---|
| Newtown, Conn. | 12/14/2012 | 27 | 2 | 20 | semiautomatic rifle, two semiautomatic handguns, one semiautomatic shotgun | 10mm Glock, 9mm SIG Sauer P226 semiautomatic handguns; .223 Bushmaster XM15-E2S semiautomatic rifle; Izhmash Saiga-12 12-gauge semiautomatic shotgun | Mother Jones Everytown |
| Aurora, Colo. | 7/20/2012 | 12 | 70 | 24 | two semiautomatic handguns, one rifle (assault), one shotgun | Two .40-caliber Glock semiautomatic handguns; .223-caliber Smith & Wesson M&P15 semiautomatic rifle; 12-gauge Remington 870 pump-action shotgun | Mother Jones Everytown Violence Project |
| Carson City, Nev. | 9/6/2011 | 4 | 7 | 32 | two semiautomatic rifles, one handgun | AK-47 Norinco Arms variant, AK-47 Romarm Cugir variant rifles; .38-caliber Colt revolver | Everytown Violence Project |

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-2, Page 157 of 233

# Exhibit E

*The Seattle Times*

**Crime**

# Mukilteo shooting suspect jealous over ex, bought rifle a week ago, police say

Originally published August 1, 2016 at 10:36 am | *Updated August 2, 2016 at 2:32 pm*



 1 of 5 | Allen Christopher Ivanov, left, suspected of killing three people at a Mukilteo house party early Saturday, makes his first court... (Mike Siegel/The Seattle Times) **More** ⌄

**Allen Christopher Ivanov told detectives he viewed the AR-15 "as a symbol of power," according to an affidavit of probable cause.**

By **Sara Jean Green** 🐦
*Seattle Times staff reporter*

EVERETT — After spotting his ex-girlfriend with another guy through the window of a Mukilteo house where a party was under way, Allen Christopher Ivanov returned to his

car Friday night to study the owner's manual for his new AR-15 semi-automatic rifle, police wrote in court documents.

Two hours apparently passed before Ivanov walked back to the home around 12:07 a.m., Saturday, opened fire and killed three young people, including his ex, and wounded a fourth, according to the affidavit of probable cause outlining the police case against the 19-year-old.

Like Ivanov, all of the victims were recent graduates of Kamiak High School.

On Monday, Snohomish County District Court Judge Anthony Howard affirmed a finding of probable cause to hold Ivanov on investigation of one count of aggravated first-degree-murder domestic violence, two counts of first-degree murder and one count of attempted first-degree murder. On Sunday, a court commissioner had also found probable cause to hold Ivanov on the same allegations.

Howard ordered Ivanov — who appeared via video feed from the Snohomish County Jail — to be held without bail.

Prosecutors are expected to formally charge Ivanov on Tuesday or Wednesday, Deputy Prosecutor Adam Cornell said.



## Mukilteo shooting

Allen Ivanov pleads guilty to 3 slayings at Mukilteo house party

Report: Allen Ivanov wrote rap lyrics in jail about Mukilteo mass shooting

Mukilteo suspect held without bail in shooting of 'dream girl' ex, other partygoers

'My friends just got shot': 911 calls from Mukilteo shooting released

UW Bothell student killed in Mukilteo shooting remembered as 'bright light'

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-2, Page 161 of 233

3/25/2020    Case 3:19-cv-05106-RBL    Document 94    Filed 03/31/20    Page 73 of 193
Mukilteo shooting suspect was jealous over ex-bought rifle a week ago | Police Fray | The Seattle Times

'Chill' gathering turns deadly for longtime Mukilteo friends

800 gather to pray, weep at vigil to honor Mukilteo victims

Parents of Mukilteo shooting suspect: 'We raised our son with love'

Release of accused Mukilteo gunman's letter riles defense

WSP releases video of arrest of Mukilteo-slaying suspect

Messages indicate Mukilteo killings planned

Killed were Ivanov's ex-girlfriend, Anna Bui, Jake Long and Jordan Ebner, all 19. Will Kramer, 18, was wounded and was in serious condition Monday in the intensive-care unit at Harborview Medical Center, a hospital spokesman said.

Also Monday, a vigil was held for Bui at the University of Washington's Bothell campus, where she and Ivanov were students. Recently returned from a monthlong trip to Europe, Bui was remembered as a "bright light" who was considering a career in medicine.

The mass shooting has rocked a tight-knit group of friends who attended Mukilteo's Kamiak High School.

Sultan Akbar, 18, had classes with Ivanov and the victims. He wasn't at the party where the shootings happened, but showed up at court with three friends Monday to express support for the victims' families.

"I just feel shook up," Akbar said. "I'm shocked … those guys aren't here anymore."

He was friends with Ivanov, who he said seemed to have an explosive temper, once threatening to get Akbar kicked out of school after Akbar reported to a teacher that Ivanov had copied his work.

"He was always wanting to be in control of the situation" and at times displayed "illogical anger," Akbar said.

Seattle defense attorneys Tim Leary and Zach Wagnild were retained by Ivanov's parents over the weekend and said the couple are devastated for the victims' families as well as their own. Ivanov's mother told them Bui "was essentially like a daughter to them," Wagnild said.

SER-161

Leary said he was troubled that Ivanov was able to buy an assault-style rifle but was too young to buy a six-pack of beer. He underscored the police contention that Ivanov read the weapon's instruction manual just before the shooting.

"I think it speaks volumes to his youth and inexperience and highlights the lethality of the weapon involved," Leary said.

Mukilteo police say Ivanov told detectives he broke up with Bui two months ago but then decided he wanted her back, according to the affidavit. He told police he began spending time with Bui last week.

After his arrest, "Ivanov stated that everything that went on tonight was about a girl," police wrote in the affidavit.

Ivanov became jealous after he said he saw photos of Bui on Snapchat with other young men — evidence "she was getting on with her life without him," the document says. He told police he realized she was his "dream girl," "and wanted to get back together," the affidavit says.

Ivanov said he became angry when he heard from others that Bui "was seeing other guys while the two of them were talking and that made him angry," police wrote.

The affidavit says Ivanov claimed he purchased the Ruger AR-15 rifle about a week ago, intent on using it for target practice. He signed up for a firearms-safety class, which was to begin early this month.

He told police he viewed "the rifle as a symbol of power," the affidavit said.

On Friday night, Ivanov left work early because he "wasn't feeling well," then went to the Cabela's store in Marysville to buy a second magazine for the rifle because he had been told he would need it for the firearms class, the affidavit says.

Ivanov told police he arrived at the party in the 10000 block of 64th Place West at 10 p.m. Friday but parked across the street and watched the house, the affidavit says. He crept up toward the house, looked inside and saw Bui "with another male and got angry," it says.

Ivanov then returned to his car, where he read the owner's manual for the rifle, loaded the magazine and inserted it into the AR-15, the affidavit says.

Around midnight, he crept to the back of the house, hiding "along the west wall near the living room windows," it says. He was discovered by a male partygoer, who said, "No, no, no," before Ivanov opened fire, shooting the male, according to the affidavit.

Ivanov told police "it was too late to turn back, and once he had pulled the trigger, his adrenaline kicked in." He entered the house through a side door, found Bui and shot her twice, it says. He continued through the house, then shot another male "running toward the house," police wrote.

Ivanov went upstairs and onto the balcony off the master bedroom and fired at two more males in the driveway, police wrote. "He then went up on the roof and realized his magazine was empty," so returned to his car and drove away. He was arrested about 90 minutes later on Interstate 5 near Chehalis.

As part of the investigation into the killings, a detective spoke by phone with a person described as a "witness from Kentucky," who said that two or three days earlier, Ivanov had sent him text messages "regarding committing a mass shooting," the affidavit says.

Detectives say Ivanov's recent social-media posts suggest he "was considering the murders ... he later committed."

Vicki Bratvold, whose teenage son hosted the house party where the shootings occurred, texted a Seattle Times reporter Monday, writing "there are no words to express our sorrow."

"We have always tried to make our house a loving, safe, happy place that the kids could always come. Our hearts are broken for the parents of Jake, Anna, and Jordan. We are praying for Will's recovery," she wrote.

*Sara Jean Green: 206-515-5654 or [sgreen@seattletimes.com](mailto:sgreen@seattletimes.com)Seattle Times staff reporters Lynn Thompson, Mike Baker and Mike Carter and news researcher Miyoko Wolf contributed to this story.*

The Seattle Times occasionally closes comments on particularly sensitive stories. If you would like to share your thoughts or experiences in relation to this story, please email the reporter or submit a letter to be considered for publication in our Opinion section. You can read more about our community policies here.

**SER-163**

# Exhibit F

3/30/2020　　　　Stroke of luck and gun laws kept Washington state mall shooting from being much worse, police say - Los Angeles Times



*Los Angeles Times*

LOG IN

ADVERTISEMENT

WORLD & NATION

# Stroke of luck and gun laws kept Washington state mall shooting from being much worse, police say



Arcan Cetin, accused of fatally shooting five people at the Cascade Mall in Burlington, Wash., appears in court in September. (Brandy Shreve / Associated Press)

By RICK ANDERSON

DEC. 15, 2016
3 PM



Reporting from Seattle —  As bad as it was, the violence unleashed by a gunman this fall at a mall in Washington state could have been substantially worse, police say, if fate and

3/30/2020    Strokes of luck and bungled plans: Washington state mall shooting from start to finish. two were police-savvy - Los Angeles Times

gun laws had not intervened.

More than 30 moviegoers watching "The Magnificent Seven" in a Burlington mall theater could have been sitting targets had the suspect, a troubled, 20-year-old fast-food worker named Arcan Cetin, been able to buy other firearms that day and enter though a theater exit door he had propped open with his cellphone in what police say was an ambush plan, newly released records show.

The phone's placement brings to mind the bloodshed at a movie theater in Aurora, Colo., in 2012 that left 12 dead and 70 wounded. Gunman James E. Holmes had propped open an exit door in order to retrieve firearms from his car.

"I suspect," said Burlington Police Det. Adrian Kuschnereit, "that this theater room and the people inside of it may have been a planned target for a shooting."

---

But because of Cetin's strange behavior and reluctance to go through a background check, a gun store clerk refused to sell him a .45-caliber handgun hours before the suspect went to the mall. And Cetin's cellphone, wedged in the theater exit door, was spotted by a moviegoer and removed.

Cetin was able to kill five people at the mall, shooting them at close range inside a Macy's store before he ran out of ammunition.

3/30/2020     Stroke of luck and a lost phone: Washington state mall shooting suspect easily bought two weapons, police say - Los Angeles Times

In interviews and hundreds of pages of police investigative documents obtained by the Los Angeles Times through a Public Records Act request, Cetin is portrayed as volatile, obsessed with guns and the product of an unstable childhood. He expressed no remorse.

After his cellphone was discovered at the theater, a nervous Cetin, who had earlier bought a ticket to another movie, "Snowden," showed up in the lobby claiming he'd lost his phone, according to court records. It was returned and he left.



Rachel Marsh, right, and Selena Orozco, both 15, attend a prayer service after the mass shooting that left five dead at a mall in Burlington, Wash. (Ted S. Warren / Associated Press )

A half hour later, just before 7 p.m. on Friday, Sept. 23, security video showed Cetin entering another door at the Cascade Mall, carrying a semi-automatic Ruger .22 rifle

3/30/2020    Struck by luck and a gun: How Robert William Cetin carried out a deadly mass shooting | Washington state mall shooting from 2016 took a turn for the worse: police say - Los Angeles Times

Case 3:19-cv-05106-RBL    Document 94    Filed 03/31/20    Page 8 of 193

that he had stolen from his stepfather's closet, according to authorities. . Unlike
Holmes, who carried out his rampage in Aurora swathed in black body armor, Cetin
wore a T-shirt and shorts.

Investigators say he moved swiftly around the Macy's cosmetics area, shooting and
killing five victims at close range. In some cases, he stalked them as they crawled away
and tried to hide behind clothes racks and sales counters. Then he shot them point-
blank, police say.

After the ammunition in his magazine-equipped rifle gave out, he casually set his empty
weapon on a counter and joined others hurrying out of the mall, the documents say**.**

Four victims were shoppers: Sarai Lara, a 16-year-old cancer survivor;  Belinda Sue
Galde, 64, a probation officer; Wilton "Chuck" Eagan, 61, a longtime Boeing worker;
and 95-year-old Beatrice Dotson. Also killed was Shayla Kathleen Martin, 52, a Macy's
employee.

The Turkish-born Cetin, whose social media web pages show him posed with assault-
style weapons and feature photos of serial killer Ted Bundy, is being held on $2-million
bail while prosecutors weigh whether to seek the death penalty. (Washington Gov. Jay
Inslee has suspended executions during the time he's in office, citing "too many flaws"
in the judicial system.)

According to a transcript of an interview with detectives, Cetin was asked what,
theoretically, he would call someone who went into a store and killed five people.

"A murderer," he answered.

ADVERTISEMENT

"OK, so what are you?" a detective asked.

Case 3:19-cv-05406-RBL   Document 94-1   Filed 03/31/20   Page 81 of 193

"A murderer."

"Are you sorry at all?"

"I don't want to answer that," Cetin said.

"Cold. Ice cold," said the detective.

After the mall killings, Cetin drove his used Chevrolet Cavalier an hour south to Seattle, had a salmon dinner and spent the night in his car. When he woke up, he read about himself on his cellphone and saw his picture on Fox News. He drove back to his home in Oak Harbor, where he was arrested.



Authorities say a surveillance video shows an armed Arcan Cetin at the Cascade Mall in Burlington, Wash.. (Washington State Patrol )

Documents reveal that just hours before the rampage at the mall, Cetin played his favorite video game, "Call to Duty: Black Ops III," which allows the gamer to assume the role of a futuristic cyborg soldier slaughtering his enemies.

3/30/2020       Stroke of luck and 40 uneasy hours: Inside Washington state mall shooting from hell to two weeks later - Los Angeles Times

Case 3:19-cv-05406-RBL    Document 94    Filed 03/31/20    Page 82 of 193

ADVERTISEMENT

"I asked him," an investigator wrote, "if killing these people [in Macy's] was similar to a video game…. Cetin did not provide a response."

Cetin's former girlfriend, who had earlier left the Burlington area, told investigators he was often angry and that she came to fear him.  He had assaulted his stepfather several times and once punched his mother in the face, according to court records.

"The only person he talked to was me," the former girlfriend told investigators, adding Cetin would become jealous if she spent time with others. He failed to take his prescription to combat Attention Deficit Hyperactivity Disorder, she told the investigators, and aggravated his mood swings with excessive use of alcohol and marijuana.

After she broke up with him following repeated bouts of rough sex, she moved near Tacoma. "He messaged me on Facebook," she recalled, "and said he was going to come down here and rape me."

The former girlfriend, who worked at a Macy's near Tacoma, never worked at the Burlington store but had told him it was her favorite Macy's. Witnesses told police that the shooter shouted a woman's name as he killed his victims, but the name has not been disclosed.

Cetin, brought to the U.S. from Turkey by his mother and stepfather when he was 8, described himself to investigators as a devout Sunni Muslim who prayed five times a day, read the Koran and went by the nickname the Turk. On his social media sites, police discovered, Cetin had posted photos of Islamic State leader Abu Bakr Baghdadi and Iranian Supreme Leader Ayatollah Khamenei.

"He was asked if any of his Turkish relatives had ties to terrorists groups and he said no," a police interview summary states. He admitted to watching beheadings by Islamic

State on the Internet and reading articles about the terror group.

"He was asked if what terrorists were doing was wrong and he said yes," investigators wrote. "He was asked if he was to be labeled a Muslim terrorist for these shootings would this be okay for him and he said, 'I can't answer that.' He was asked if terrorist groups such as ISIS inspired him to commit these murders and he again said, 'I can't answer that.'"

Cetin described a difficult childhood in Turkey, saying that his uncles hit him — one uncle was in prison for murder — and that his father and uncles also beat his mother. He was 6 when a bus ran over him, breaking his pelvis. He was diagnosed with post-traumatic stress disorder.

His mother, in a police interview, said she had gotten pregnant in high school and rejected her boyfriend's demand she get an abortion. She married a U.S. sailor she met in Turkey who was transferred to Whidbey Island, Wash., about 12 years ago.

They raised her son on Whidbey and he graduated from Oak Harbor High in 2015, she said. But he couldn't attend commencement, having gotten kicked out of school two weeks earlier after being accused of sexually harassing two girls.

***Anderson is a special correspondent.***

**ALSO**

**Jurors find Dylann Roof guilty in hate-crime shootings in South Carolina church**

**New York Muslim woman fabricated report of Trump supporters threatening her on the subway, police say**

**SER-171**

# Exhibit G



# Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012

## OFFICE OF THE STATE'S ATTORNEY
## JUDICIAL DISTRICT OF DANBURY
### Stephen J. Sedensky III, State's Attorney

**November 25, 2013**

TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................................1

INTRODUCTION  ...................................................................................................................5

PURPOSE AND SCOPE OF REPORT .......................................................................................6

SANDY HOOK ELEMENTARY SCHOOL - INCIDENT AND RESPONSE ............................9

SANDY HOOK ELEMENTARY SCHOOL – SCENE INVESTIGATION ..............................16

SANDY HOOK ELEMENTARY SCHOOL - AUTOPSY INFORMATION ............................23

36 YOGANANDA STREET, NEWTOWN, CT – INCIDENT AND RESPONSE ....................24

36 YOGANANDA STREET, NEWTOWN, CT – SCENE INVESTIGATION .........................24

36 YOGANANDA STREET, NEWTOWN, CT – AUTOPSY INFORMATION ......................27

SHOOTER – AUTOPSY INFORMATION.................................................................................27

INVESTIGATION TO DETERMINE ACCESSORIES AND/OR CO-CONSPIRATORS ........27

EVENTS AND BACKGROUND INFORMATION LEADING UP TO DEC. 14, 2012 ............28

EVIDENCE EXAMINATION ...................................................................................................35

MISCELLANEOUS INVESTIGATIVE LEADS ......................................................................38

DETERMINATIONS OF CRIMES COMMITTED ..................................................................40

CONCLUSION...........................................................................................................................43

ACKNOWLEDGEMENTS........................................................................................................44

APPENDIX[1]

Search Warrants

Honda Civic – 12/14/2012 ....................................................................................A1

36 Yogananda Street - 12/14/2012 at 5:29 p.m ...............................................A10

36 Yogananda Street - 12/14/2012 at 7:25 p.m ...............................................A21

36 Yogananda Street - 12/15/2012 at 3:03 p.m ...............................................A31

36 Yogananda Street - 12/16/2012 at 4:31 p.m ...............................................A38

ATT telephone – 4/10/2013 at 10:43 a.m. .......................................................A47

ATT telephone – 4/10/2013 at 10:47 a.m. .......................................................A54

Verizon telephone – 4/10/2013 at 10:51 a.m....................................................A61

Combat Arms – Nexon – 08/27/2013 at 9:46 a.m. ...........................................A68

World of Warcraft – Blizzard - 8/27/2013 at 9:50 a.m...................................  A76

Time Line.........................................................................................................A84

SHES Floor Plan ............................................................................................A116

SHES and Parking Lot Map...........................................................................A117

SHES Ballistics Diagram...............................................................................A118

SHES Exterior Description.............................................................................A119

SHES Lobby, Hallway, Room 9 and Ballistics Description...........................A125

SHES Classroom 8 Ballistics Description .....................................................A134

SHES Classroom 10 Ballistics and Shooter Description................................A136

SHES Weight – Guns and Ammunition .........................................................A141

---

[1] Because of its volume, the Appendix to this report is published as a separate document.  Some of the search warrants and reports contained in the Appendix have been redacted to meet court orders, exceptions to the Freedom of Information Act, protect the identity of witnesses, protect records of child abuse or personal identification information.

SHES Newtown Emergency Response Plan.............................................................A144

SHES Photographs................................................................................................A165

Yogananda Scene Description ...............................................................................A180

Yogananda Digital Image Report ..........................................................................A188

Yogananda Photographs .......................................................................................A193

Yogananda Review of Electronic Evidence ...........................................................A211

Yogananda - Book of Granny .................................................................................A220

Yogananda GPS Routes.........................................................................................A223

Lanza, Adam – Toxicology....................................................................................A231

## EXECUTIVE SUMMARY

The purpose of this report is to identify the person or persons criminally responsible for the twenty-seven homicides that occurred in Newtown, Connecticut, on the morning of December 14, 2012, to determine what crimes were committed, and to indicate if there will be any state prosecutions as a result of the incident.

The State's Attorney for the Judicial District of Danbury is charged, pursuant to Article IV, Section 27 of the Constitution of the State of Connecticut and Connecticut General Statutes (C.G.S.) Sec. 51-276 *et seq.*, with the investigation and prosecution of all criminal offenses occurring within the Judicial District of Danbury. The Connecticut State Police have the responsibility to prevent and detect violations of the law and this State's Attorney has worked with and relied upon the Connecticut State Police since the incident occurred.

Since December 14, 2012, the Connecticut State Police and the State's Attorney's Office have worked with the federal authorities sharing responsibilities for various aspects of this investigation. Numerous other municipal, state and federal agencies assisted in the investigation. The investigation materials reflect thousands of law enforcement and prosecutor hours. Apart from physical evidence, the materials consist of more than seven-hundred individual files that include reports, statements, interviews, videos, laboratory tests and results, photographs, diagrams, search warrants and returns, as well as evaluations of those items.

In the course of the investigation, both state and federal law enforcement personnel received a large number of contacts purporting to provide information on the shootings and the shooter. Although many times these "leads" would go nowhere, each one was evaluated and often required substantial law enforcement time to pursue. An abundance of caution was used during the investigation to ensure that all leads were looked into, despite the fact that more than 40 such "leads" proved, after investigation, to be unsubstantiated. Information that was substantiated and relevant was made part of the investigation.

It is not the intent of this report to convey every piece of information contained in the voluminous investigation materials developed by the Connecticut State Police and other law enforcement agencies, but to provide information relevant to the purposes of this report. While no report is statutorily required of the State's Attorney once an investigation is complete, it has been the practice of State's Attorneys to issue reports on criminal investigations where there is no arrest and prosecution if the State's Attorney determines that some type of public statement is necessary. Given the gravity of the crimes committed on December 14, 2012, a report is in order.

On the morning of December 14, 2012, the shooter, age 20, heavily armed, went to Sandy Hook Elementary School (SHES) in Newtown, where he shot his way into the locked school building with a Bushmaster Model XM15-E2S rifle. He then shot and killed the principal and school psychologist as they were in the north hallway of the school responding to the noise of the shooter coming into the school. The shooter also shot and injured two other staff members who were also in the hallway.

# Exhibit H

# MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY COMMISSION



Initial Report
Submitted to the Governor,
Speaker of the House of Representatives
and Senate President

## January 2, 2019



## In memory of:

**Alyssa Alhadeff     Scott Beigel     Martin Duque     Nicholas Dworet**

**Aaron Feis     Jaime Guttenberg     Chris Hixon     Luke Hoyer**

**Cara Loughran     Gina Montalto     Joaquin Oliver     Alaina Petty**

**Meadow Pollack     Helena Ramsay     Alex Schachter**

**Carmen Schentrup     Peter Wang**

### But for a Small Moment

**Tragedy falls, and takes what cannot be replaced:
Time, moments, milestones,
Togetherness.**

**Darkest clouds of trouble, a peace destroyed.
Suddenly, senselessly,
Publicly.**

**Yet night briefly yields, and rays
of love uncommon shine.
Broken hearts together,
United.**

**Not to supplant, but to illuminate
a journey blessed by grace.
Deeply etched, always
Remembered.**

**Our truest promise, vitally renewed in her:
To live and love and strive.
Until joyfully reunited, a family
Forever.**

**Written for Alaina Petty by anonymous.  Dedicated to each of the 17 families.**



Alyssa Alhadeff

It was only a week prior to February 14, 2018 that our daughter, Alyssa Alhadeff, had selected her course load for the upcoming academic Sophomore year. Honors English, Pre-Calc, Chemistry and Spanish 4 topped her list…had such a bright future ahead of her! Hard to imagine, though, that I now must write about our beautiful 14 year old in the past tense.

Not only an academic talent, Alyssa shone brightly athletically as well. Having begun to play soccer at the age of 3, she held the position as attacking mid-fielder wearing the number 8 with pride. Her unbelievable passing skills, coupled with her ability to communicate as a leader on the field, were paving her way to athletic prowess.

The light of all of our lives was dimmed forever on February 14, 2018. We will spend the rest of our lives trying to:

#LiveforAlyssa

#PlayforAlyssa

#ShineforAlyssa



Scott J. Beigel

Scott J. Beigel was 35 years old. Scott was a teacher, a coach, a camp counselor, a son, a grandson, a brother, an uncle, a nephew, a cousin, a friend and a hero. Scott was a very humble young man who never knew how much of an impact he had on others, especially children. Scott loved working with children. Teaching afforded him the ability to continue with one of his life's passions, working at sleep away camp. Scott's ultimately wanted to have a positive impact on every child, no matter how young or old, no matter what the issues. Scott did volunteer work in South Africa with under privileged children. It is for this reason that we have combined his two life passions; his love of summer camp and his desire to teach and mentor children, that we started the Scott J. Beigel Memorial Fund. The Scott J. Beigel Memorial Fund is a 501(c)(3) not for profit whose mission statement and purpose is to help send under privileged children to summer camp. We would very much like Scott's legacy to live on.



Martin Duque
Anguiano

Martin Duque Anguiano, Jr. was a smart and driven young man who was taking honors classes and looked forward to taking AP classes and dual enrollment college classes. As committed as he was to his studies, Martin was equally devout in his faith - he prayed every day and regularly attended church. loved soccer, the FC Barcelona team and anything related to 'Star Wars.' He was a JROTC Cadet Corporal who'd received numerous honors. Martin was kind, compassionate, fun-loving, studious and generous with friends and strangers alike. He is greatly missed by his parents Daisy and Martin, Sr., his brothers Miguel, Alex, Andres and Santiago and everyone who knew him.



Nicholas Dworet

Nicholas Dworet was Captain of the MSD swim team; he also loved to play water polo. He was a district, regional and state champion. He had a college scholarship in hand with the University of Indianapolis, and with aspirations to swim in the Tokyo 2020 summer Olympics. Nick was selected by faculty as one of twenty, First Class graduating Seniors who excelled in academic achievement, character, community service, and athletic achievement.

We honor Nick for his love of life, his true love Daria, his positive attitude and his respect for what he cherished most…his family and friends. Always on our mind, forever in our hearts, we miss you Nick.



Aaron Louis Feis

Aaron Louis Feis was a loving husband, devoted father, coach and mentor on and off the field, confidante, and lifelong friend. Aaron always put his family first. Whether it was working an extra job, helping with homework, or cooking with his daughter. Aaron treasured the simple moments. His heart was full of kindness, love and humor. Aaron's greatest joy was to see others reach their potential and achieve their goals. He was a loyal and genuine friend. Aaron's unwavering selflessness was a steady constant. His demeanor put others at ease. Aaron's enveloping presence provided a sense of safeguard that allowed others to be themselves. He will always be remembered as a hero but to those who knew him, he was a hero each and every day.



Jaime Guttenberg

Jaime Guttenberg was a beautiful, smart, energetic, compassionate and funny 14 year old girl when her life was tragically cut short in the MSD shooting. She should have turned 15 on July 13th and she should be living her life now as a competitive dancer, volunteer to children with special needs, amazing daughter, sister and friend.  We should be teaching Jaime to drive, not driving to a cemetery to visit Jaime.  We miss our beautiful daughter.  We miss her laughter, her voice, her beauty and the energy that she always brought into every room that she entered.   And we will love her forever.



Christopher Brent Hixon

Christopher Brent Hixon was a caring, passionate, adventurous and responsible man. He was a wonderful son and brother, incredible father to his two sons and a devoted husband.  He was a sailor in the US Navy; both active duty and Reserves, where he served as a Machinist Mate and Military Police officer for 27 years. He was passionate about sports and became an athletic director for the BCPS where he was able to share that passion with his athletes. He was a great leader to his coaches and a true role model for the athletes. He always put others before himself and he had a way of making you feel like you were family.  He lived his life helping others and trying to make the world a better and safer place.  He will be forever remembered as a hero because he exemplified the motto "If not me, then who?" through his actions every single day.



Luke Hoyer

Luke Hoyer was a quiet soul with a big heart. His friendly face, sweet smile, laid back personality and low-key humor brought happiness to all those around him. He was known as "Lukey Bear" to his family, a nickname his Mom gave him at an early age. Luke loved his family, his friends, his dogs, basketball, Clemson Football, family trips to South Carolina, family trips to the Jersey Shore, Miami Heat, Dwayne Wade and Chicken Nuggets. He could often be found playing basketball at his neighborhood court with friends. He played for many years in the Parkland Basketball League and was a member of several travel basketball teams.  He also played football in middle school and was looking forward to trying out for the MSD football team in the fall. Luke led a simple and beautiful life. He didn't need to say much, just having him around made the room feel warm and welcoming. Luke's contagious smile and good nature well be greatly missed by those that knew and loved him. He touched many lives and will be felt in many hearts forever. Luke's parents, his older sister Abby and older brother Jake love and miss him so much everyday! He will always be our Lukey Bear!



Cara Loughran

Cara Loughran was diligent, determined and to those she loved and cared about, she was fiercely loyal. Her presence combined with her smile and laugh could change the atmosphere in any room. A beautiful soul.



Gina Rose Montalto

Gina Rose Montalto, age 14, was a special girl who melted the heart of everyone she met. Her infectious smile was there from the start and brightened any room she entered. This was a quality she retained throughout her amazing life. Gina was instant friends with everyone she met. A caring and loving soul, she was often the first to reach out to the new kids in class and welcome them into the neighborhood. She also had a great sense of humor and a penchant for being silly - even goofy at times.

Always trying to make things better for others, Gina loved to do volunteer work, especially if it involved helping kids. She was a Girl Scout and active in a local church. Gina was known to all as an avid reader and a talented artist who illustrated for a local magazine. Once she told her mother that she loved books so much she wanted to live in a library.

She loved to cook with her Father and her Grandmother, especially during the holiday season.

She enjoyed shopping days with her Mom, and NY Jets games with her Dad. In the local recreational leagues Gina played soccer and flag football. Gina was also a bit of a daredevil riding all the extreme roller coasters at the Orlando theme parks with her Mother. Gina loved to surf, snorkel and ski. She loved to do these activities with her best buddy; her brother Anthony. They got along well, and loved each other very much.

Gina joined the MSD Color Guard last winter. She competed through the spring and was a part of the Eagle Regiment as they won the FL state championship in the fall of 2017. She always earned the highest grades in school and had a bright future ahead of her. Gina will be missed not only by her family, but by everyone whose life she touched.



Joaquin Oliver

Joaquin Oliver was the most vibrant personality in every room. He was always the life of the party and he loved to love. Even now, I hear how his presence impacted so many people. He always did his best to be there for everyone and be the best friend and best boyfriend he could be. He was persistent, opinionated, and always stood up for what's right and what's fair. Everywhere he went he touched someone's heart and had a special bond with each and every one of them. Joaquin had a strong passion for writing and looking at everything he wrote now, the meaning behind his writings goes so much deeper than expected. As a son he was very kind, warm, spoiled and persistent in what he wanted to get and accomplish. He was always making fun of little things, making jokes and looking for company when he wanted to eat or watch a game. As a brother he adored his sister and he always looked after her. We miss him each and every day; everything we do is for him.



Alaina Petty

It is impossible to sum up in words all that Alaina was and all she meant to her family, friends & community. Alaina was a vibrant, determined & accomplished young woman, loved by all who knew her. She sought after the beauty in the world and others. Alaina was happiest while spending time with her family and friends, her dogs, working hard and making a difference. To make a difference, Alaina found opportunities to serve others. She served her community through her participation in the Marjory Stoneman Douglas JROTC program and by giving of her time as a volunteer for the "Helping Hands" program of The Church of Jesus Christ of Latter-day Saints. As a first-year Cadet, Alaina achieved the highest rank possible for a Freshman. She was awarded 'Cadet of the Month' in only her second month, a rare honor for a 1st-year cadet.

While we will not have the opportunity to watch her grow to become the amazing woman we know she would be, we choose to take an eternal perspective. We are grateful for the knowledge that Alaina is a part of our eternal family and that we will be reunited with her. This knowledge and abiding faith in our Heavenly Father's plan gives us the strength to endure this most difficult trial.

"Live every day as though it's your last" was her advice to friends and so she lived her life in faith, not fear. Alaina was a light to all who encountered her. Alaina's light lives on.

Ryan, Kelly, Ian, Meghan & Patrick Petty



Meadow Jade
Pollack

Meadow Jade Pollack is forever loved and missed by her family and friends.  As the youngest in a family with 10 grandchildren all growing up together in Parkland she was the princess of the family.  While Meadow was small in stature, she had such strength and determination. She was a beautiful girl that loved everything pink and girly but also could get dirty outdoors.  She aspired to be an attorney and have a family of her own.  We will never see her vision of life come true. She will always be our beautiful princess.



Helena Ramsay

Helena Ramsay was a bright and beautiful young lady who had friends of all cultures and creeds. She was very shy and private until you got to know her wonderful sense of humor and wicked wit. Helena was very aware of the challenges facing communities across the globe such as inequality and discrimination, as well as being passionate about environmental issues. Helena's dreams would have led her on an adventure around the world, traveling to Europe with the possibility of study, listening to the K-Pop bands in South Korea, and an expedition to find the exquisite Pink Dolphins of the Amazon Forest. On the day of the tragedy Helena like so many others who lost their lives acted selflessly and put her classmates first ultimately costing her, her life.



Alex Schachter

Alex Schachter was a special little boy. He was happy and always smiling. He loved sports. Whether it was playing basketball and football or watching his favorite teams the New England Patriots, Boston Red Sox and Boston Celtics he was always ready to talk smack with his friends. His tenacious defense led to several championships on the basketball court. He worshipped his big brother Ryan. He used to let his little sister Avery play with his hair and give him massages so she could hang out with him and his friends. He used to bond with his older sister Morgan over their love of Japanese TV shows. Alex's love of music was constant throughout middle and high school. He followed in his grandfather's footsteps and played the trombone in middle and high school. His hard work and dedication paid off when his band, the Marjory Stoneman Douglas Eagle Regiment Marching Band became state champions several months before his passing. His family founded SafeSchoolsForAlex. org in his honor to protect all children and teachers. Alex is loved and missed every day.



Carmen Schentrup

Carmen was a beautiful, talented, caring, smart, and witty 16 year old Senior, just a week away from her 17th birthday. Carmen enjoyed spending time with her family and friends, reading, and making others laugh. While Carmen had a silly disposition by nature, she knew how to apply herself, excelling in school and music. Carmen was also involved in a number of clubs and was president of the a cappella club and her church youth group. Like many teenagers, she enjoyed watching TV and going to movies; watching a favorite new show wasn't uncommon. Always looking to explore the world, Carmen liked to travel, visit national parks, explore museums, and go to concerts. As a National Merit Scholar, with multiple scholarships, she was excited about graduating from Stoneman Douglas and was debating attending either the University of Florida or the University of Washington. We will never know which one Carmen would have picked. Her dream to become a medical researcher and cure ALS cut short before it began. For all of us that knew Carmen, we were sure she was going to change the world. We miss her more than you can know.



Peter Wang

Peter Wang was a much beloved and good son, and the adored older brother of Jason and Alex. He was kind, generous and smart and could always be counted on for a smile, a joke or to make others laugh. He was never sad. He embodied the values espoused in his JROTC- honor, duty, respect, loyalty, selfless service and courage- and on that horrific day, Peter held the door so his classmates and peers could safely escape. Peter had his sights set on attending West Point and becoming a pilot. West Point posthumously admitted him to the class of 2025 and granted him the Medal of Heroism. He was a hero and is greatly missed by all who knew and loved him.

## Where I'm From

I am from the sketchpad
filled with drawings
From Crayola and Macy's
I am from the house
with the basketball hoop in front
and the green paint, brown door,
with a pool and a lake in the back
It feels cozy and cool I am
from palm trees, the gardenias
big beautiful white and green
flowers that the smells so good
I'm from the family vacations
and the barbecues with the neighbors,
from Tony, Jen, and Anthony
I'm from the Ginabug and Pickelhead
From I am so brave, strong, and
beautiful and you can be anything
I'm from Christmas trees,
with shining light with glittering
and dangling ornament
I'm from Italy and Ireland,
spaghetti and corned beef.
From the knitting with Grandma
and little purple needles
and soft wool, the brave firefighter,
I am from sunny, warm, rainy,
humid, colorful, tropical.
southern, and flavorful Florida

By Gina Rose Montalto

# Life is like a roller coaster

It has some ups and downs
Sometimes you can take it slow
Or very fast
It may be hard to breathe at times
But you just have to push yourself
And keep going
Your bar is your safety
It's like your family and friends
You hold on tight and don't let go
But sometimes you might
throw your hands up
Because your friends and
family will always be with you
Just like that bar keeping you
safe at all times
It may be too much
for you at times
The twists,
The turns,
The upside downs,
But you get back up
And keep chugging along
Eventually it all comes to a stop
You won't know when
Or how
But you will know that it will be
time to get off
And start anew.
Life is like a roller coaster.

By Alex Schachter

## COMMISSION APPOINTEES

**Commission Chair: Sheriff Bob Gualtieri** is the Sheriff of Pinellas County and has served with the Pinellas County Sheriff's Office for 35 years. Sheriff Gualtieri also serves on the board of directors for the Florida Sheriff's Association (FSA), the Major County Sheriff's Association (MCSA) and the Boys and Girls Clubs of the Suncoast.

**Vice Chair: Chief Kevin Lystad**, of Miami Shores, is the Chief of the Miami Shores Police Department. He is the President of the Florida Police Chiefs Association. Chief Lystad serves as Vice Chair of the Commission.

**Sheriff Larry Ashley**, of Okaloosa, is the Okaloosa County Sheriff.  Sheriff Ashley has nearly 30 years of law enforcement experience and has earned numerous awards and commendations during his career. He participated in the Governor's emergency meetings to help develop the Marjory Stoneman Douglas High School Public Safety Act.

**Chief Asst. State Attorney Bruce Bartlett** – Serving in the State Attorney's Office for more than 39 years, he has prosecuted or taken part in the prosecutions of some of Pinellas's most notorious criminals.  He has practiced since 1979 and is a graduate of Stetson University's College of Law.

**Desmond Blackburn,** Ph.D., of Broward County, is the CEO of the New Teacher Center, a national nonprofit that improves public education by training and mentoring new teachers. Dr. Blackburn served as the Superintendent of Brevard Public Schools when appointed to the Commission. He previously worked as a teacher, principal, district trainer, director of school improvement, an area superintendent and as the chief school performance and accountability officer for the Broward County School District. Dr. Blackburn participated in the Governor's emergency meetings to help develop the Marjory Stoneman Douglas High School Public Safety Act.

**State Senator Lauren Book,** M.S. Ed, is an internationally respected and renowned child advocate, former classroom teacher and best-selling author. In 2016, she was elected to represent State Senate District 32, which includes portions of Broward County.

**Mike Carroll** of Pinellas County joined Lutheran Services of Florida in 2018 after retiring as the Secretary of the Florida Department of Children and Families ending a state career that spanned more than 25 years within the department. As the longest serving Secretary in the department's history, Mike led the development of a first-of-its-kind website to allow public review of abuse-related child deaths, giving communities the ability to identify and bridge gaps in local services.

**Douglas Dodd** is a member of the Citrus County School Board. He served in the Citrus County Sheriff's Office for more than 26 years, retiring as a captain. During his career in law enforcement, Mr. Dodd served as a school resource officer for 10 years.

**COMMISSION APPOINTEES**

**James Harpring** is the undersheriff for Indian River County and serves as general counsel to the Sheriff's Department. He also works as an adjunct professor at Indian River State College and as an instructor at the Treasure Coast Law Enforcement Academy.

**Sheriff Grady Judd** is the Sheriff of Polk County. Prior to becoming Sheriff in 2004, Sheriff Judd graduated from the FBI National Academy, as well as several other prestigious law enforcement academies, and taught for 23 years at both the University of South Florida and Florida Southern College.

**Melissa Larkin-Skinner**, MA, LMHC, is the Chief Executive Officer at Centerstone Florida. As a Licensed Mental Health Counselor, she has nearly 25 years of experience in mental health and addictions treatment programs, including hospital, outpatient, crisis, community-based, forensic and child welfare services.

**Chris Nelson** currently serves as the Executive Director at the State Attorney's Office for the 10th Circuit. He was former Chief of Police for the City of Auburndale. A graduate of Bartow High School, he started his law enforcement career as a patrol officer with the Bartow Police Department.

**Ryan Petty**, of Parkland, is the father of Alaina Petty, who was murdered at Marjory Stoneman Douglas High School. He played an integral role in ensuring the Marjory Stoneman Douglas High School Public Safety Act moved through the Florida Legislature.

**Marsha Powers** is a member of the Martin County School Board. She was elected to the School Board in 2012 and re-elected subsequently.

**Max Schachter** is the father of Alex Schachter, who was murdered at Marjory Stoneman Douglas High School. Following the shooting at Marjory Stoneman Douglas High School, Schachter advocated for school safety improvements and urged members of the Florida Legislature to enact effective legislation.

In addition, **Florida Department of Law Enforcement Commissioner Rick Swearingen** serves as a member of the commission, and the following individuals serve as ex officio members:

- **Florida Department of Education Commissioner Pam Stewart**
- **Florida Department of Children and Families Interim Secretary Rebecca Kapusta**
- **Florida Department of Juvenile Justice Interim Secretary Timothy Niermann**
- **Florida Agency for Health Care Administration Secretary Justin Senior**

TABLE OF CONTENTS

PREFACE ................................................................................................................ 1

COMMISSION BACKGROUND AND SCOPE ............................................................ 7

INCIDENT SUMMARY ................................................................................................................. 7
MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY COMMISSION ................................... 7
COMMISSION RESPONSIBILITIES AND SCOPE OF REPORT ................................................................. 8
METHODOLOGY AND INFORMATION SOURCES ............................................................................. 10

CHAPTER 1      REVIEW OF K-12 ACTIVE ASSAILANT INCIDENTS ....................................... 13

CHAPTER 2      INCIDENT TIMELINE .................................................................... 23

CHAPTER 3      MARJORY STONEMAN DOUGLAS HIGH SCHOOL OVERVIEW, SECURITY AND
               STAFF RESPONSE TO THE SHOOTING ........................................... 39

3.1 PHYSICAL SECURITY ........................................................................................................... 40
    Findings Campus Physical Security ............................................................................. 42
    Findings Building 12 Physical Security and Warning Systems ..................................... 47
3.2 BROWARD COUNTY PUBLIC SCHOOL AND MARJORY STONEMAN DOUGLAS HIGH SCHOOL ACTIVE ASSAILANT RESPONSE POLICIES AND TRAINING .... 49
    Findings ...................................................................................................................... 51
3.3 SCHOOL ADMINISTRATION AND SECURITY STAFF RESPONSE ON FEBRUARY 14, 2018 ...................... 52
    Findings ...................................................................................................................... 82
RECOMMENDATIONS ............................................................................................................... 83

CHAPTER 4      ON-CAMPUS SCHOOL RESOURCE OFFICER RESPONSE TO THE SHOOTING ........ 87

4.1 DEPUTY SCOT PETERSON'S ACTIONS ON FEBRUARY 14, 2018 .................................................... 87
    Findings ...................................................................................................................... 96
4.2. DEPUTY PETERSON'S TRAINING ............................................................................................ 97
    Findings ...................................................................................................................... 98
4.3 BROWARD COUNTY SRO STRUCTURE AND STAFFING LEVELS ....................................................... 99
    Findings .................................................................................................................... 100
RECOMMENDATIONS ............................................................................................................. 101

CHAPTER 5      OFF-CAMPUS LAW ENFORCEMENT RESPONSE TO THE SHOOTING ................. 107

5.1 OFF-CAMPUS LAW ENFORCEMENT OFFICE RESPONSE ON FEBRUARY 14, 2018 ............................. 108
    Findings .................................................................................................................... 167
5.2 INCIDENT COMMAND AND CONTROL .................................................................................... 169
    Findings .................................................................................................................... 198
5.3 ACTIVE ASSAILANT RESPONSE POLICIES AND TRAINING BROWARD COUNTY SHERIFF'S OFFICE AND CORAL SPRINGS POLICE DEPARTMENT ... 199
    Findings .................................................................................................................... 201
RECOMMENDATIONS ............................................................................................................. 202

CHAPTER 6      FIRE DEPARTMENT / EMS RESPONSE AND VICTIMS' EMERGENCY MEDICAL
               TREATMENT ........................................................................ 205

6.1 SWAT AND TACTICAL MEDICS ............................................................................................ 206
6.2 RESCUE TASKFORCES ......................................................................................................... 208
6.3 MEDICAL RESPONSE TIMELINE WITHIN BUILDING 12 ............................................................... 209
    Findings .................................................................................................................... 212
RECOMMENDATIONS ............................................................................................................. 213

CHAPTER 7      INCIDENT COMMUNICATIONS, INTEROPERABILITY AND 911, RADIO, AND
               COMPUTER-AIDED DISPATCH (CAD) SYSTEMS ........................... 215

TABLE OF CONTENTS

7.1 COMMUNICATION TIMELINE AND RESPONSE TO THE SHOOTING ......................................... 215
7.2 911 SYSTEM ................................................................................................................... 219
    *Findings* ...................................................................................................................... 222
7.3 LAW ENFORCEMENT COMPUTER-AIDED DISPATCH SYSTEMS (CAD) ......................... 224
    *Findings* ...................................................................................................................... 225
7.4 LAW ENFORCEMENT RADIO SYSTEMS ........................................................................... 226
    *Findings* ...................................................................................................................... 228
RECOMMENDATIONS ............................................................................................................. 230

**CHAPTER 8    SUMMARY OF CRUZ'S LIFE AND CONTACTS PRIOR TO FEBRUARY 14, 2018   231**

8.1 PRE-INCIDENT- CRUZ'S BIRTH THROUGH FEBRUARY 13, 2018 ..................................... 231
8.2 CRUZ'S LAW ENFORCEMENT, PROVIDER AND OTHER CONTACTS .............................. 234
8.3 CRUZ'S SCHOOL DISCIPLINE RECORDS ......................................................................... 243
8.4 PRIOR INFORMATION RECEIVED BY THE FBI .............................................................. 244
8.5 CRUZ'S SOCIAL MEDIA POSTS ...................................................................................... 245
8.6 CRUZ'S INTERNET SEARCHES AND DIGITAL IMAGES .................................................... 246
8.7 CRUZ'S GUN PURCHASES ............................................................................................... 262
*Findings* ............................................................................................................................. 264
RECOMMENDATIONS ............................................................................................................. 265

**CHAPTER 9    CRUZ'S SERVICES BY MENTAL HEALTH PROVIDERS ............................. 267**

9.1 CRUZ'S SERVICES BY MENTAL HEALTH PROVIDERS ..................................................... 267
    *Findings* ...................................................................................................................... 268
9.2 BAKER ACT ................................................................................................................... 268
    *Findings* ...................................................................................................................... 271
RECOMMENDATIONS ............................................................................................................. 272

**CHAPTER 10 CRUZ'S SCHOOL DISCIPLINE AND JUVENILE DIVERSION ...................... 275**

10.1 BROWARD COUNTY SCHOOL DISCIPLINE SYSTEM ...................................................... 275
10.2 OVERVIEW OF FLORIDA JUVENILE DIVERSION .......................................................... 275
10.3 PROMISE PROGRAM ................................................................................................... 276
*Findings* ............................................................................................................................. 278
RECOMMENDATIONS ............................................................................................................. 279

**CHAPTER 11   CRUZ'S BEHAVIORAL THREAT ASSESSMENT ................................... 281**

*Findings* ............................................................................................................................. 285
RECOMMENDATIONS ............................................................................................................. 285

**CHAPTER 12   CRUZ'S EDUCATIONAL SERVICES ................................................... 289**

12.1 REQUIREMENT OF FREE AND APPROPRIATE PUBLIC EDUCATION (FAPE) .................. 289
12.2 ESE/IEP ...................................................................................................................... 290
    *Findings* ...................................................................................................................... 291
RECOMMENDATIONS ............................................................................................................. 293

**CHAPTER 13   FLORIDA SAFE SCHOOLS ASSESSMENT TOOL ................................. 295**

*Findings* ............................................................................................................................. 295
RECOMMENDATIONS ............................................................................................................. 296

**CHAPTER 14   INFORMATION SHARING ................................................................. 299**

14.1 FEDERAL AND STATE PRIVACY LAWS AFFECTING INFORMATION SHARING—SCHOOL, MEDICAL AND MENTAL HEALTH RECORDS (FLORIDA
    EDUCATIONAL PRIVACY REQUIREMENTS, FERPA, AND HIPAA) ..................................... 299
    *Findings* ...................................................................................................................... 306
14.2 SCHOOL INCIDENT REPORTING TO FDOE AND CRIME REPORTING TO LAW ENFORCEMENT ............... 306
14.3 SCHOOL INCIDENT REPORTING TO FDOE -SESIR ..................................................... 307

TABLE OF CONTENTS

*Findings*............................................................................................................*313*

RECOMMENDATIONS ..............................................................................................313

**CHAPTER 15   MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT** ............. **315**

**GLOSSARY OF TERMS** ........................................................................... **325**

**ADDITIONAL INFORMATION AND RESOURCES** ................................................ **333**

*APPENDICES*

APPENDIX A   LIST OF PEOPLE REFERENCED IN THE REPORT ..............................................................307

APPENDIX B   TARGET HARDENING CATEGORIES ..............................................................................345

APPENDIX C   BROWARD COUNTY SHERIFF'S OFFICE IA INVESTIGATION ........................................351

APPENDIX D   FBI LETTER ................................................................................................................421

APPENDIX E   MEETING AGENDAS ...................................................................................................423

APPENDIX F   **CONFIDENTIAL** CRUZ BACKGROUND INFORMATION ..............................................440

APPENDIX G   **CONFIDENTIAL** CRUZ THREAT ASSESSMENT .........................................................480

CHAPTER 8.   SUMMARY OF CRUZ'S LIFE AND CONTACTS PRIOR TO FEBRUARY 14, 2018

8.1  Pre-Incident- Cruz's Birth through February 13, 2018

The following timeline represents key dates and periods during Nikolas Cruz's life prior to February 14, 2018.

| | |
|---|---|
| September 24, 1998: | Nikolas Cruz was born to his biological mother in Plantation, FL. |
| February 18, 1999: | Nikolas Cruz was adopted by Roger Cruz (born in New York on June 14, 1937) and Lynda Kumbatovich (born in New York on September 25, 1949). (Roger and Lynda married in 2002.) |
| | They resided at 6166 NW 80th Terrace, Parkland, FL, from Cruz's adoption until August 27, 2010. |
| | Cruz's younger biological half-brother, Zachary, was also adopted by Roger and Lynda Cruz on or about February 21, 2000. |
| 1999 – 2001: | Cruz was enrolled at Young Minds Learning Center, 6530 State Road 7, Coconut Creek, FL. |
| 2002: | Nikolas Cruz was enrolled at Tutor Time in Boca Raton, FL. |
| July 1, 2002: | Roger Paul Cruz and Lynda Marie Cruz were married Broward County. |

CHAPTER 8.   SUMMARY OF CRUZ'S LIFE AND CONTACTS PRIOR TO FEBRUARY 14, 2018

| | |
|---|---|
| 2:16:54 – 3:45:52 pm | Cell phone activity during this timeframe was serviced by a tower immediately southeast of MSDHS.<br><br>During this timeframe, at 2:19 pm, Cruz arrived at MSDHS. Cruz's phone had 23 text messages and 10 missed calls when it was recovered, but most of this activity occurred after Cruz left his phone behind at the scene and was the result of inbound calls/texts.<br><br>Cruz sent two texts to his ex-girlfriend saying "I love you". The last outgoing texts were to JT Snead; the meaning of these texts is not understood.  At 2:18:46 Cruz sent "Yo", and at 2:18:57 he sent "Tell". |

8.7 Cruz's Gun Purchases

On September 30, 2016, Nikolas Cruz was issued a Florida identification card that he needed to purchase firearms. Cruz used a single firearm during the shooting, and it was the only firearm he had in his possession on February 14, 2018.  The firearm was a Smith and Wesson, model MP-15 semi-automatic firearm.  A sling and bi-pod were attached to the rifle.  The firearm was lawfully purchased on February 11, 2017, at Sunrise Tactical Supply in Coral Springs, Florida.  Eight 30- and 40-round capacity magazines were recovered from the scene.

CHAPTER 8.   SUMMARY OF CRUZ'S LIFE AND CONTACTS PRIOR TO FEBRUARY 14, 2018









# Exhibit I

J Urban Health (2018) 95:313–321
DOI 10.1007/s11524-017-0205-7



# Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources

Christopher S. Koper · William D. Johnson ·
Jordan L. Nichols · Ambrozine Ayers · Natalie Mullins

Published online: 2 October 2017
© The New York Academy of Medicine 2017

**Abstract** Policies restricting semiautomatic assault weapons and large-capacity ammunition magazines are intended to reduce gunshot victimizations by limiting the stock of semiautomatic firearms with large ammunition capacities and other military-style features conducive to criminal use. The federal government banned such weaponry from 1994 to 2004, and a few states currently impose similar restrictions. Recent debates concerning these weapons have highlighted their use in mass shootings, but there has been little examination of their use in gun crime more generally since the expiration of the federal ban. This study investigates current levels of criminal activity with assault weapons and other high-capacity semiautomatics in the USA using several local and national data sources including the following: (1) guns recovered by police in ten large cities, (2) guns reported by police to federal authorities for investigative tracing, (3) guns used in murders of police, and (4) guns used in mass murders. Results suggest assault weapons (primarily assault-type rifles) account for 2–12% of guns used in crime in general (most estimates suggest less than 7%) and 13–16% of guns used in murders of police. Assault weapons and other high-capacity semiautomatics together generally account for 22 to 36% of crime guns, with some estimates upwards of 40% for cases involving serious violence including murders of police. Assault weapons and other high-capacity semiautomatics appear to be used in a higher share of firearm mass murders (up to 57% in total), though data on this issue are very limited. Trend analyses also indicate that high-capacity semiautomatics have grown from 33 to 112% as a share of crime guns since the expiration of the federal ban—a trend that has coincided with recent growth in shootings nationwide. Further research seems warranted on how these weapons affect injuries and deaths from gun violence and how their regulation may impact public health.

**Keywords** Firearms · Assault weapons · Violence

## Introduction

Firearm violence imposes a significant burden on public health in the USA. From 2010 through 2012, the nation experienced an annual average of 11,256 firearm homicides and 48,534 non-fatal assault-related gunshot victimizations that cost society nearly $22 billion a year in lifetime medical and work-related costs [1]. One type of policy response to reduce gun violence involves restricting or mandating design changes in particular types of firearms that are considered to be especially dangerous and/or attractive for criminal use.

Restrictions on assault weapons (AWs) represent one particularly controversial and highly contested form of such legislation that has featured prominently in gun policy debates in recent decades. In general, AW laws

C. S. Koper (✉) · W. D. Johnson · J. L. Nichols ·
A. Ayers · N. Mullins
Center for Evidence-Based Crime Policy, Department of
Criminology, Law and Society, George Mason University, Fairfax,
VA, USA
e-mail: ckoper2@gmu.edu

Springer

restrict manufacturing, sales, and ownership of semiautomatic firearms with large ammunition capacities and other military-style features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense [2]. Examples of such features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and barrel shrouds on pistols. AW laws also commonly include restrictions on large-capacity magazines (LCMs), which are typically defined as ammunition feeding devices holding more than ten rounds of ammunition (some laws have higher limits). LCM restrictions are arguably the most important components of AW laws in that they also apply to the larger class of high-capacity semiautomatic firearms without military-style features. In the broadest sense, AW-LCM laws are thus intended to reduce gunshot victimizations by limiting the stock of semiautomatic firearms with large ammunition capacities and other features conducive to criminal use. The federal government enacted a national ban on AWs and LCMs in 1994 but allowed it to expire in 2004. Currently, eight states and the District of Columbia have AW and/or LCM restrictions, as do some additional localities [3].

Recent discussion and debates concerning these weapons have largely focused on their use in mass shootings. However, there has been little examination of the use of AWs and LCMs in gun crime more generally since the expiration of the federal ban. Studies conducted around the time of the federal ban found that AWs accounted for up to 8% of guns used in crime (generally between 1 and 6% and averaging around 2%) and that the broader class of firearms equipped with LCMs (including AWs and other semiautomatic firearms equipped with LCMs) accounted for up to a quarter [2, 4–12]. Criminal use of such weaponry declined during the years of the federal ban [2, 13, 14], but trends since then have only been examined in the state of Virginia, where LCM use rose following the ban's expiration [14]. Semiautomatic weapons with LCMs and/or other military-style features are common among models produced in the contemporary gun market [15, 16], but precise estimates of their production and ownership are unavailable. Growth in the use of such weapons could have important implications for public health as these weapons tend to produce more lethal and injurious outcomes when used in gun violence [2, 17]. This study provides an updated examination of the AW issue by investigating current levels of criminal activity with AWs and other LCM firearms as measured in a variety of national and local data sources.

## Data and Methods

There is no national data source that can be used to count the numbers of homicides, non-fatal shootings, or other crimes committed with AWs and other LCM firearms. Therefore, criminal use of these weapons was approximated by examining and triangulating across several local and national data sources on guns used in different types of crimes.

Local Data Sources

The local-level analyses are based on guns recovered by police over multiple years (defined below) in a convenience sample of ten cities including Hartford (CT), Rochester (NY), Syracuse (NY), Baltimore (MD), Richmond (VA), Minneapolis (MN), Milwaukee (WI), Kansas City (MO), Seattle (WA), and Sacramento (CA). Large cities were selected for the analysis (these cities range in size from roughly 124,000 to 684,500) due to the concentration of gun violence in urban areas [18, 19]. Patterns and trends in these particular cities may not be indicative of those elsewhere; further, some (Baltimore, Hartford, Rochester, Syracuse, and Sacramento) are covered by state AW and LCM restrictions that were in effect during all or portions of the study period (this study does not attempt to evaluate the implementation and effects of these laws or variations therein). Nonetheless, these cities constitute a geographically diverse set of ban and non-ban locations, thus strengthening generalizations. The data were obtained from law enforcement authorities in these jurisdictions except where otherwise noted. Information available in most of the police databases included the type, make, model, and caliber of each confiscated firearm; the date when it was recovered; and the type of crime with which it was associated.

Guns recovered by police (often referred to as "crime guns") are the only readily available data with which to study patterns and trends in the types of guns used in crime across jurisdictions, and they are commonly used in research on gun markets, gun violence, and gun policy [2, 9, 20–37]. Guns confiscated by police include guns recovered in violent crime investigations as well as those recovered in connection with weapon offenses

**SER-202**

(illegal possession, carrying, and discharges), drug violations, property crimes, and other incidents. These samples thus represent guns known to have been used in violence as well as guns possessed and/or carried by criminal and otherwise high-risk persons. As others have noted, they represent a sample from the population of guns that are at greatest risk of misuse [24] and thereby provide a probable sample of guns used to commit crimes [21]. As caveats, nonetheless, it should be noted that police do not recover all guns used and possessed illegally, and it is possible that the types of guns they confiscate differ from those of unrecovered guns linked to illegal possessors and users. The analyses highlighted below are based on all confiscated firearms in the study jurisdictions. Additional analyses conducted with just those guns clearly connected to a violent offense, which represented at least 13 to 19% of guns across the cities, produced very similar results except where noted (separate offense-type analyses could not be conducted with the Syracuse and Rochester gun data or the Richmond LCM data).

National Data Sources

National-level analyses were conducted using three data sources and compilations. The first consists of information on firearms recovered by law enforcement agencies throughout the nation and reported to the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) for investigative tracing of their sale histories. Guns reported to ATF provide a national sample of crime guns numbering in the hundreds of thousands annually (predominantly from urban jurisdictions), but they do not constitute a statistically representative sample for the nation given that gun tracing is voluntary (agencies trace guns as needed for specific investigations and/or analysis of illegal gun markets) and varies between agencies and over time [24, 27, 38–40]. Further, publicly available data on traced guns are limited to aggregate figures on basic types and calibers of the weapons, thus limiting the analyses that could be conducted as described below. The other national data sources included information on guns used in murders of police officers and mass murder incidents. Prior research has shown that AWs and LCM firearms are used in a higher share of these crimes, due presumably to their lethality and attractiveness to the types of offenders who commit these offenses [2, 4], and this has been a prominent issue in the AW debate. Information on firearms used in murders of police,

including the type, make, model, and caliber of each weapon, was obtained from the Federal Bureau of Investigation (FBI), which compiles these data from reports by police agencies throughout the country. Information on firearms used in mass murder shooting incidents was collected from lists and reports compiled by several organizations since there is no single official data source that regularly provides detailed and comprehensive information on mass murders and the guns used in these incidents [41–50]. Consistent with many prior studies of this issue, firearm mass murders were defined as incidents in which four or more people were murdered with a firearm, not including the death of the shooter if applicable and irrespective of the number of additional victims shot but not killed. This increased the number of sources that could be used to gather information. As described below, however, detailed weapon information could not be found in public sources for many of the cases.

**Methods**

There is no universal definition of an AW that applies across current and past AW laws. For example, the expired federal ban and some current state laws define AWs as having two military-style features, whereas other state bans and a recent (2013) proposal for a new federal ban use a one feature criterion [2, 51]. For this study, AWs were defined based on the weapons that have most commonly been identified as such based on the old federal ban, current state laws, and the recently proposed federal ban. This list included more than 200 make-model combinations covered by either of the federal lists (2004 and 2013) or at least two of the state laws. Based on preliminary analyses showing that most recovered AWs are assault rifles (as opposed to assault pistols or assault shotguns), an additional ceiling estimate of AW use was calculated based on the prevalence of semiautomatic rifles. This was also done to compensate for imprecision in the AW estimates (due, for example, to missing or partial gun model data, lack of information about the specific features or configurations of the weapons that could affect their AW status, and possible omissions from the operational AW list).

Use of guns with LCMs could only be measured precisely for the Syracuse, Baltimore, and Richmond analyses, which are based on data sources having an indicator for magazine capacity (which is typically

missing from police gun databases), and some of the mass murder incidents. For most analyses, use of LCM firearms was approximated based on recoveries of semi-automatics that are commonly manufactured and sold with LCMs, referred to below as LCM-compatible firearms. Identification of these models was based on gun catalogs (such as the *Blue Book of Gun Values* and *Gun Digest*) and examination of gun manufacturers' websites. This method likely overstates LCM use to some degree since many LCM compatible firearms can also be equipped with smaller magazines. As a rough guide, inspection of all recoveries of a small number of LCM-compatible handgun models in the Baltimore data revealed that approximately four of five were equipped with LCMs. Conversely, LCM use can also be undercounted for guns that were missing complete model information or equipped with aftermarket LCMs, which are available for some guns not sold with LCMs at retail. LCM use was not estimated for Rochester and Sacramento since New York and California have had longstanding restrictions on magazines with more than ten rounds (hence, it seems less likely that LCM-compatible guns recovered in those jurisdictions were actually equipped with LCMs).

Data were collected from 2014 through 2016. Current estimates of AW and LCM use were developed using the most recent 2–3 years of data from the local police databases and ATF data. Data spanning the most recent 5–6 years were used to generate contemporary estimates of AW and LCM use in murders of police and mass murders due to the rarity of these events. As described below, some data sources were also used to estimate trends in the use of semiautomatic rifles and LCM firearms since the expiration of the federal ban. Reported figures highlight AWs and LCM firearms as a share of crime guns in order to control for differences in the volume of gun crime and overall gun recoveries between places and over time. Other noteworthy aspects of the data and analyses are discussed below.

## Results

### Local Analyses

Results of the local analyses are presented in Table 1. For each site, estimates are based on data spanning different portions of the 2011–2014 period. The number of guns

analyzed ranged from 281 in Syracuse to 4994 in Kansas City and totaled 21,551 across all data sources.

Estimates of the prevalence of AWs among crime guns ranged from a low of 2.4% in Baltimore to a high of 8.5% in Syracuse. Assault rifles (e.g., variations of the AR-15 or AK-47) accounted for the majority of AWs in all sites and more than three-quarters in all but one (Richmond). The remaining AWs consisted entirely (or nearly so) of assault pistols (e.g., the TEC-9 or TEC-22). The share of crime guns consisting of semiautomatic rifles of any sort is also displayed in Table 1 for localities that had gun databases with gun-type designations (i.e., handgun/rifle/shotgun, semiautomatic/non-semiautomatic). These estimates ranged from a low of 4.1% in Hartford to 12.4% in Rochester but were less than 9% for most cities. (The Milwaukee estimate is based on the percentage of crime guns that were rifles of any sort as semiautomatic/non-semiautomatic designations were unavailable.) As noted, the semiautomatic rifle estimates, which include both AW-type and non-AW-type rifles, provide a likely ceiling for estimates of AW prevalence.

The percentage of crime guns clearly equipped with an LCM (including AWs and other high-capacity semi-automatics, most of which are pistols) was 16.5% in Baltimore during the 2012–2014 period, but this figure rose to 21.5% for guns that were connected to a violent crime. These findings are similar to those from a recent news report (involving a separate and independent analysis of Baltimore data) indicating that 18.4% of guns recovered in Baltimore had LCMs for the period of 2010 through 2016 [52]. In Richmond, 22% of crime guns were equipped with LCMs during 2008 and 2009 based on data collected by the Virginia State Police and initially reported by *The Washington Post* [14] (the *Post's* reported figures have been reanalyzed here to focus on the most recent available years and to assess trends). Crime guns were least likely to be equipped with LCMs in Syracuse (14.6%), where New York State LCM restrictions have been in effect since the early 2000s.

For the other sites, the prevalence of LCM-compatible guns ranged from 22.2% in Hartford to 36.2% in both Kansas City and Seattle, with the majority of the estimates (3 of 5) higher than one-third. In most of these cities, the prevalence of LCM guns was similar whether focusing on all guns or those connected to a violent crime. In Hartford, however, 30% of violent crime guns were LCM compatible in contrast to 22.2% for all guns. Further, a supplemental analysis of guns linked to assault-

**SER-204**

Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms                                   317

**Table 1**  Prevalence of assault weapons, semiautomatic rifles, and semiautomatics with large-capacity magazines among guns recovered by police: estimates for selected cities and years

| Location and sample | Assault weapons as % of guns | Semiautomatic rifles as % of guns | Semiautomatics with large-capacity magazines as % of guns |
|---|---|---|---|
| Hartford, CT (2011–2012, $N = 854$) | 2.6% | 4.1% | 22.2% overall, 30% for guns linked to violent crime |
| Rochester, NY (2012–July 2014, $N = 1687$) | 4.9% | 12.4% | Not estimated |
| Syracuse, NY (2012–May 2014, $N = 281$) | 8.5% | 12.1% | 14.6% |
| Baltimore, MD (2012–Sep. 2014, $N = 4680$) | 2.4% | 5.4% | 16.5% overall, 21.5% for guns linked to violent crime |
| Richmond, VA (AW analysis: 2012–2013, $N = 1180$) (LCM analysis: 2008–2009, $N = 1960$) | 2.7% | Not estimated | 22.0% |
| Minneapolis, MN (2012–Aug. 2014, $N = 2178$) | 3.4% | 6.4% | 25.1% overall, 46.3% for guns linked to shootings |
| Milwaukee, WI (Jul. 2013–Jun. 2014, $N = 1868$) | 4.6% | < 9.4% | 35.5% |
| Kansas City, MO (2012–Aug. 2014, $N = 4994$) | 6.1% | 6.3% | 36.2% |
| Seattle, WA (2012–July 2014, $N = 596$ guns linked to violent crimes or weapons violations) | 6.4% | 7.9% | 36.2% |
| Sacramento, CA (Aug. 2013–Jul. 2014, $N = 1273$) | 6.0% | Not estimated | Not estimated |

Estimates are based on general gun recovery samples except where noted. Estimates were similar for guns known to have been connected to violent crimes except where noted. Large-capacity magazine (LCM) estimates for Syracuse, Baltimore, and Richmond are based on known LCM recoveries (the Richmond estimates are based on Virginia State Police data initially reported by *The Washington Post*). Other LCM estimates are based on recoveries of LCM compatible firearm models. The Milwaukee semiautomatic rifle estimate is based on the prevalence of all rifles

related shootings in Minneapolis (using gunshot victimization data provided by Minneapolis police) revealed that 46.3% were LCM compatible, though this was based on a small sample ($n = 80$ guns).

National Analyses

Results of the national analyses are presented in Table 2. AW prevalence was approximated in the national ATF tracing data for 2012 and 2013 ($n = 481,632$) based on traces of guns in calibers .223, 5.56, and 7.62 mm. These are common calibers for AW-type semiautomatic rifles, though not all firearms in these calibers are AWs, and not all AWs fall into these calibers. This method nonetheless yielded an estimate of 5%, which is within the range of estimates provided by the local analyses. Further estimates of semiautomatic rifles and LCM firearms were not possible given the limitations of published tracing data.

Guns used in murders of police were analyzed for the years 2009 through 2013 ($n = 219$, excluding cases involving the officers' own weapons, which are often LCM firearms). AWs accounted for an estimated 13.2% of the firearms used in these crimes overall and varied

between 8 and 18% from year to year. Virtually all of the AWs (97%) were assault rifles. Semiautomatic rifles overall accounted for 15.5% of the firearms used in these cases and ranged from 5 to 23% annually. LCM-compatible firearms more generally constituted 40.6% of the murder weapons, ranging from 35 to 48% annually.

AW and LCM use in firearm mass murders was examined for a sample of 145 incidents that occurred from 2009 through 2015 but could only be estimated within broad ranges due to high levels of missing weapons data in public accounts. AWs were used in at least 10.3% of these incidents. However, only 42 incidents had sufficiently detailed weapon information to make a definitive determination regarding AW use; among these cases, 35.7% involved AW use. All but one AW case involved an assault rifle. (A separate estimate for semiautomatic rifle use is not presented because only two additional cases clearly involved a semiautomatic rifle with an unclear or non-AW designation.) LCM firearms overall were involved in at least 18.6% of the incidents based on cases that involved clear possession of LCMs, AWs, or other LCM-compatible models. Although many additional cases involved semiautomatic firearms, an LCM coding could

318                                                                    C. Koper et al.

**Table 2**  Prevalence of assault weapons, semiautomatic rifles, and semiautomatics with large-capacity magazines among national samples of guns recovered by police, guns used in murders of police, and guns used in mass murders

| Data source and sample | Assault weapons as % of guns | Semiautomatic rifles as % of guns | Semiautomatics with large-capacity magazines as % of guns |
|---|---|---|---|
| Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF): guns recovered by police and reported to ATF for investigative tracing (2012–2013, $N = 481{,}632$) | 5% | Not estimated | Not estimated |
| Federal Bureau of Investigation: guns used in murders of police (2009–2013, $N = 219$) | 13.2% | 15.5% | 40.6% |
| Public reports of firearm mass murders (4+ killed) (2009–2015, $N = 145$) | 10.3–35.7% | Not estimated | 18.6–57.4% |

Assault weapon estimate for ATF data is based on reported firearms in calibers .223, 5.56, and 7.62 mm. LCM estimates are based on recoveries of LCM compatible firearm models in the FBI data and recoveries of both LCMs and LCM compatible firearms in the mass murder data

only be made for 47 cases, 57.4% of which involved an LCM firearm. The identified AW and LCM cases typically occurred in public locations (80%) and resulted in more than twice as many people shot on average as did other incidents (13.7 victims on average for AW-LCM cases versus 5.2 for other cases; $t$ test $p$ level < 0.01).

Trend Analyses

Trends in the use of AWs and LCM firearms since the end of the federal AW ban or the early post-ban years were also estimated using selected data sources that had sufficiently detailed weapon information and spanned the period of interest. First, trends in recoveries of semiautomatic rifles were used to approximate trends in crime with AWs using the FBI national data on police murders (2003–2013) and data from the following cities and time periods: Baltimore (2004–2014), Rochester (2004–2014), Syracuse (2004–2014), Milwaukee (2006–2014, based on all rifles), Seattle (2008–2014), Minneapolis (2006–2014), and Kansas City (2008–2014). In summary, these analyses (not shown) revealed little evidence of upward trends in the use of semiautomatic rifles across sites.

Second, trends in crimes with LCM firearms were estimated based on guns used in murders of police (2003–2013) as well as guns recovered in Baltimore (2004–2014), Richmond (2003–2009), and Minneapolis (2006–2014). Table 3 shows changes over time in the percentage of guns that were LCM firearms using the earliest and latest years of each data source. In relative terms, the prevalence of LCM firearms increased from 33 to 49% in the Baltimore, Minneapolis, and national (FBI) data (note that Maryland restricted LCMs with more than 20 rounds throughout this period and extended these restrictions to LCMs with more than 10 rounds in late 2013). The largest increase occurred in Richmond, where LCM firearms increased 111.5%, rising from 10.4% of recovered guns in 2003–2004 (the final years of the federal AW ban) to 22% in 2008–2009. Similar trends have also been reported for the state of Virginia overall [14]. All of these changes were statistically significant ($p < 0.05$) based on chi-square tests of the equality of proportions.

**Discussion**

Subject to caveats noted above, this examination of several national and local data sources suggests that AWs are used in between 2 and 9% of gun crimes in general with most estimates being less than 7%. Upper bound estimates of AW use based on semiautomatic rifles range from 4 to 12% in most data sources and are typically less than 9%. These estimates are broadly similar to those generated in the early 1990s prior to the federal AW ban [2], though they are perhaps somewhat higher on average. However, comparisons of these estimates with others should be made cautiously, as operational definitions of an AW have varied across studies and estimates presented here are based on the most contemporary definitions of AWs. One clearly notable

🌋 Springer

**SER-206**

**Table 3** Changes in prevalence of semiautomatics with LCMs: estimates for selected local and national data sources and time frames, 2003–2014

| Data source/location | LCM firearm prevalence: early time period | LCM firearm prevalence: late time period | Change in LCM firearm prevalence |
|---|---|---|---|
| Baltimore crime guns | 11.1% (2004, 2006, $N = 5369$ total firearms) | 16.5% (2012–Sep. 2014, $N = 4381$ total firearms) | + 48.6%** |
| Richmond, VA crime guns | 10.4% (2003–2004, $N = 2413$ total firearms) | 22.0% (2008–2009, $N = 1960$ total firearms) | + 111.5%** |
| Minneapolis crime guns | 16.8% (2006–2007, $N = 2564$ total firearms) | 25.1% (2012–Aug. 2014, $N = 2178$ total firearms) | + 49.4%** |
| National (FBI): guns used in murders of police | 30.4% (2003–2007, $N = 224$ total firearms) | 40.6% (2009–2013, $N = 219$ total firearms) | + 33.6%* |

Change in proportions statistically significant at $p < 0.05$ (*) or $p < 0.01$ (**)

Estimates are based on general gun recovery samples except where noted. LCM estimates for Baltimore and Richmond are based on known LCM recoveries (the Richmond estimates are based on Virginia State Police data initially reported by *The Washington Post*). The early period estimate for Baltimore excludes the year 2005 due to an unusually large number of guns appearing that year within the buyback/turn-in/safekeeping category. Other LCM estimates are based on recoveries of LCM compatible firearm models

recent change is that assault rifles, rather than assault pistols, now account for a substantial majority of AWs used in crime in contrast to prior estimates [2]. This implies an increase over time in the average lethality of AWs used in violence.

LCM firearms, which include AWs as well as other high-capacity semiautomatics, appear to account for 22 to 36% of crime guns in most places, with some estimates upwards of 40% for cases involving serious violence. These estimates are comparable to or higher than earlier estimates of LCM use. However, the higher-end estimates may overstate LCM use somewhat as most are based on measurement of LCM-compatible guns that may not all have been equipped with LCMs.

Consistent with prior research, this study also finds that AWs and LCM firearms are more heavily represented among guns used in murders of police and mass murders. AWs account for 13–16% of guns used in murders of police, while LCM weapons overall account for about 41% of these weapons. Estimates for firearm mass murders are very imprecise due to lack of data on the guns and magazines used in these cases, but available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of such incidents. Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts.

Importantly, trend analyses suggest that LCM firearms have grown substantially as a share of crime guns since the expiration of the federal ban on AWs and LCMs. This implies possible increases in the level of

gunfire and injury per gun attack during this time. Consistent with this inference, national statistics from the Centers for Disease Control and Prevention (CDC) and the FBI show that the ratio of gun homicides and assaultive non-fatal shootings to overall reported violent gun crimes (homicides, assaults, and robberies) rose from an average of 0.163 for 2003–2005 to an average of 0.21 for 2010–2012 (calculated from CDC [53] and FBI [54] data). This change was driven by non-fatal shootings, which have been trending upward since the early 2000s and recently reached their highest levels since 1995 [1]. The findings presented in this study suggest the possibility that greater use of high-capacity semiautomatics has contributed to this upward trend in shootings.

Further study would seem warranted on LCM use trends with additional jurisdictions and data sources. Research on this issue could be facilitated by more systematic efforts to collect detailed information on crime guns and magazines in local police databases as well as through national data collection systems like the Supplemental Homicide Reports and the National Violent Death Reporting System. Study of these weapons is also hampered by lack of public data on production of LCMs and LCM-compatible firearms. The need for better data on this issue may become more pressing if there continue to be significant changes in the lethality of commercially available firearms.

Additional research is also needed to quantify the effects that LCM use has on injuries and deaths from gun attacks—and by extension on the costs to society

Ⓢ Springer

from gun violence. Research suggests that gunfire attacks involving semiautomatics produce more lethal and injurious outcomes [2, 10, 17, 55] and that 4–5% of assault-related gunshot victims are wounded in attacks involving more than ten shots fired [2]. However, such evidence is extremely limited at present. Studies of this issue, combined with evaluation research on the effects of current state and local LCM laws, could provide additional insights into the efficacy of expanding LCM restrictions at the local, state, and/or national levels. Research illuminating the public health and safety benefits of AW-LCM restrictions could also inform the courts as they continue to adjudicate recent challenges to the constitutionality of these statutes. Although this study does not directly evaluate any AW-LCM law, it provides further evidence that the federal ban curbed the spread of high-capacity semiautomatic weapons when it was in place and, in so doing, may have had preventive effects on gunshot victimizations.

**Acknowledgments**   The authors thank the police agencies that provided data for this study: the Hartford (CT) Police Department, the New York State Police, the Baltimore Police Department, the Richmond (VA) Police Department, the Minneapolis Police Department, the Milwaukee Police Department, the Kansas City (MO) Police Department, the Sacramento Police Department, the Seattle Police Department, and the Federal Bureau of Investigation. The authors also thank Grace Beya, Mark Ecleo, and Thomas Prifti for additional research assistance. The opinions expressed in this manuscript are those of the authors and should not be attributed to any of the aforementioned organizations or individuals.

# References

1. Fowler KA, Dahlberg LL, Haileyesus T, Annest JL. Firearm injuries in the United States. *Prev Med.* 2015;79:5–14.
2. Koper CS. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003.* Report to the National Institute of Justice, U.S. Department of Justice. Philadelphia, PA: Jerry Lee Center of Criminology, University of Pennsylvania; 2004.
3. Law center to prevent gun violence. http://smartgunlaws.org. Accessed May 2016.
4. Adler WC, Bielke FM, Doi DJ, Kennedy JF. *Cops under fire: law enforcement officers killed with assault weapons or guns with high capacity magazines.* Washington, DC: Handgun Control, Inc.; 1995.
5. Beck A, Gilliard, D, Greenfeld L, et al. *Survey of state prison inmates,* 1991. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice. 1993.
6. Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman E. Characteristics of firearms involved in fatalities. *JAMA.* 1996;275:42–5.
7. Hutson HR, Anglin D, Pratts MJ Jr. Adolescents and children injured or killed in drive-by shootings in Los Angeles. *N Engl J Med.* 1994;330:324–7.
8. Hutson HR, Anglin D, Kyriacou DN, Hart J, Spears K. The epidemic of gang-related homicides in Los Angeles county from 1979 through 1994. *JAMA.* 1995;274:1031–6.
9. Kleck G. *Targeting guns: firearms and their control.* New York: NY; Aldine de Gruyter; 1997.
10. McGonigal MD, Cole J, Schwab CW, Kauder DR, Rotondo MF, Angood PB. Urban firearm deaths: a five-year perspective. *J Trauma.* 1993;35:532–7.
11. New York State Division of Criminal Justice Services. *Assault weapons and homicide in New York City.* Albany, NY: Author; 1994.
12. Zawitz MW. *Guns used in crime.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 1995.
13. Koper CS. America's experience with the federal assault weapons ban, 1994–2004: key findings and implications. In: Webster DW, Vernick JS, editors. *Reducing gun violence in America: informing policy with evidence and analysis,* vol. 2013. Baltimore MD: Johns Hopkins University Press; 2013. p. 157–71.
14. Fallis D VA. Data show drop in criminal firepower during assault gun ban. *The Washington Post,* 2011; January 23.
15. Lee J, editor. *Gun digest 2015.* Iola, WI: Krause Publications; 2014.
16. Violence Policy Center. *The militarization of the U.S. civilian firearms market.* Washington, DC: Author; 2011.
17. Reedy DC, Koper CS. Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers. *Injury Prevention.* 2003;9:151–5.
18. Planty M, Truman JL. *Firearm violence, 1993–2011.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 2013.
19. Smith EL, Cooper A. *Homicides in the U.S. known to law enforcement, 2011.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 2013.
20. Bureau of Alcohol, Tobacco, and Firearms. Crime gun trace reports. In: *National report.* Washington, DC: United States Department of the Treasury; 2000. p. 2002.
21. Brill S. *Firearm abuse: a research and policy report.* Washington, DC: Police Foundation; 1977.
22. Braga AA, Wintemute GJ, Pierce GL, Cook PJ, Ridgeway G. Interpreting the empirical evidence on illegal gun market dynamics. *J Urban Health: Bull New York Acad Med.* 2012;89:779–93.
23. Braga AA, Pierce GL. Disrupting illegal firearms markets in Boston: the effects of operation ceasefire on the supply of new handguns to criminals. *Criminol Public Policy.* 2005;4(4):717–48.
24. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Arizona Law Review.* 2001;43:277–309.
25. Koper CS. Federal legislation and gun markets: how much have recent reforms of the federal firearms licensing system reduced criminal gun suppliers? *Criminol Public Policy.* 2002;1:151–78.
26. Koper CS. Crime gun risk factors: buyer, seller, firearm, and transaction characteristics associated with gun trafficking and criminal gun use. *J Quant Criminol.* 2014;30:285–315.

27. Pierce GL, Braga AA, Hyatt RR Jr, Koper CS. Characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy. *Justice Q.* 2004;21:391–422.

28. Vernick JS, Webster DW, Hepburn LM. Effects of Maryland's law banning saturday night special handguns on crime guns. *Injury Prev.* 1999;5:259–63.

29. Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning saturday night special handguns on homicides. *Am J Epidemiol.* 2002;155:406–12.

30. Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings of gun dealers on the supply of new guns to criminals. *Injury Prev.* 2006;12:255–30.

31. Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *J Urban Health: Bull New York Acad Med.* 2006;83:778–87.

32. Webster DW, Vernick JS, Hepburn LM. Relationship between licensing, registration, and other gun sales laws and the source state of crime guns. *Injury Prev.* 2006;7:184–9.

33. Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *J Urban Health: Bull New York Acad Med.* 2009;86: 525–37.

34. Wintemute GJ. *Ring of fire: the handgun makers of southern California.* Davis, CA: Violence Prevention Research Program, University of California, Davis; 1994.

35. Wintemute GJ, Romero MP, Wright MA, Grassel KM. The life cycle of crime guns: a description based on guns recovered from young people in California. *Ann Emerg Med.* 2004;43:733–42.

36. Wintemute GJ, Cook PJ, Wright MA. Risk factors among retail handgun dealers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Injury Prev.* 2005;11:357–63.

37. Wright MA, Wintemute GJ, Webster DW. Factors affecting a recently purchased handgun's risk for use in crime under circumstances that suggest gun trafficking. *J Urban Health: Bull New York Acad Med.* 2010;87:352–64.

38. Koper CS. Purchase of multiple firearms as a risk factor for criminal gun use: implications for gun policy and enforcement. *Criminol Public Policy.* 2005;4:749–78.

39. Kleck GBATF. Gun trace data and the role of organized gun trafficking in supplying guns to criminals. *Saint Louis Univ Public Law Rev.* 1999;18:23–45.

40. National Research Council. *Firearms and violence*: a critical review. Washington, DC: The national academies press; 2005.

41. Citizens Crime Commission of New York City. *Mass shooting incidents in America* (1984–2012). http://www.nycrimecommission.org/mass-shooting-incidents-america.php. Accessed March 2015.

42. Everytown for Gun Safety. *Analysis of recent mass shootings.* New York: NY; Author; 2014.

43. Everytown for Gun Safety. *Mass shootings in the United States:* 2009-2016. New York: Author; 2017.

44. Mass shooting tracker, gun violence archive. http://www.shootingtracker.com/. Accessed Aug. 2016.

45. Federal Bureau of Investigation. *A study of active shooter incidents in the United States between 2000 and 2013.* Washington, DC: U.S. Department of Justice.

46. Kaminski Leduc JL. *Weapons used in mass shootings.* Report 2013-R-0057. Hartford: Connecticut; Office of Legislative Research, Connecticut General Assembly; 2013.

47. Aronsen G, Follman M, Pan D. A guide to mass shootings in America. *Mother Jones.* http://www.motherjones.com/politics/2012/07/mass-shootings-map. Accessed Feb. 2015, Jul. 2016.

48. New York City Police Department. *Active shooter: recommendations and analysis for risk mitigation. New York: counterterrorism bureau,* New York City Police Department; New York, NY; 2012.

49. Violence Policy Center. *Mass shootings in the United States involving high-capacity ammunition magazines.* http://www.vpc.org/fact_sht/VPCshootinglist.pdf. Accessed June 18, 2017.

50. Berkowitz B, Gamio L, Lu D, Uhrmacher K, and Lindeman T. The math of mass shootings. *The Washington Post* https://www.washingtonpost.com/graphics/national/mass-shootings-in-america/. Accessed Aug. 2016.

51. Assault Weapons Act of 2013. OLL13047, 113th Cong. (2013).

52. Freskos B. Baltimore police are recovering more guns loaded with high-capacity magazines, despite ban on sales. *The trace.* 2017; Apr. 1. https://www.thetrace.org/2017/03/high-capacity-magazine-ban-baltimore-police/ Accessed Apr. 1, 2017.

53. Centers for Disease Control and Prevention. Injury Center. https://www.cdc.gov/injury/wisqars/. Accessed March 2015.

54. Federal Bureau of Investigation. Uniform crime reporting. https://ucr.fbi.gov/ucr. Accessed March 2015.

55. Richmond TS, Branas CC, Cheney RA, Schwab CW. The case for enhanced data collection of gun type. *J Trauma.* 2004;57:1356–60.



# Exhibit J

**In The Matter Of:**

**Mitchell, et al.**

**vs**

**Atkins, et al.**

**Deposition of**

**Nathaniel Casey**

**February 20, 2020**



**Central Court Reporting**

800.442.DEPO

Support@centralcourtreporting.com

www.centralcourtreporting.com

```
 1                UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF WASHINGTON

 3                        AT TACOMA

 4

 5   DANIEL MITCHELL, et al.,     )

 6           Plaintiffs,          )

 7      v.                        ) Case No. 3:19-cv-5106

 8   CHARLES ATKINS, et al.,      )

 9           Defendants,          )

10       and                      )

11   SAFE SCHOOLS SAFE            )

12   COMMUNITIES,                 )

13         Intervenor-Defendant. )

14   _____)

15

16

17

18              DEPOSITION OF NATHANIEL CASEY

19                  FEBRUARY 20, 2020

20

21

22              CERTIFIED COPY

23

24   REPORTED BY:
     EMILY L. NORD, CSR No. 695, RPR
25   Notary Public
```

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
 1            THE DEPOSITION OF NATHANIEL CASEY was taken

 2   on behalf of the Defendant State of Washington at the

 3   Idaho Office of the Attorney General, Consumer

 4   Protection Division, 954 W. Jefferson, Boise, Idaho,

 5   commencing at 11:14 a.m. on Thursday, February 20, 2020,

 6   before Emily L. Nord, Certified Shorthand Reporter and

 7   Notary Public within and for the State of Idaho, in the

 8   above-entitled matter.

 9

10                  A P P E A R A N C E S

11   For the Plaintiffs:

12        Albrecht Law, PLLC

13        BY MR. MATTHEW C. ALBRECHT

14        421 W. Riverside Ave., Suite 614

15        Spokane, WA 99201

16        matt@albrechtlawfirm.com

17   For the Defendant State of Washington:

18        Attorney General State of Washington

19        BY MR. ZACHARY P. JONES, Assistant Atty. General

20        (and R. JULY SIMPSON, attending via telephone

21        for last portion of deposition)

22        800 Fifth Avenue, Suite 2000

23        Seattle, Washington 98104-3188

24        zach.jones@atg.wa.gov

25                       (Appearances continued . . . )
```

Central Court Reporting   800.442.3376

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
 1              A P P E A R A N C E S (Continued)

 2

 3    For Intervenor Defendant Safe Schools, Safe

 4         Communities (Campaign):

 5         Pacifica Law Group, LLP

 6         BY MR. KAI A. SMITH (via telephone)

 7         1191 Second Ave., Suite 2000

 8         Seattle, WA 98101-3404

 9         kai.smith@pacificalawgroup.com

10    For Defendant Meidl, City of Spokane:

11         Office of the City Attorney

12         BY MR. SALVATORE J. FAGGIANO, Assistant City Atty.

13         808 W. Spokane Falls Blvd.

14         Spokane, WA 99201-3326

15         sfaggiano@spokanecity.org

16                        ---------

17

18

19

20

21

22

23

24

25
```

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
 1                         I N D E X

 2

 3    TESTIMONY OF NATHANIEL CASEY                    PAGE

 4    Examination by Mr. Jones                           6

 5    Examination by Mr. Albrecht                       94

 6    Further Examination by Mr. Jones                  97

 7

 8

 9                      E X H I B I T S

10

11    NO.      DESCRIPTION                         MARKED

12    Exh 88   Third Amended Notice of Deposition       9

13             Upon Oral Examination of Nathaniel Casey

14    Exh 89   University Policy No. 12080             29

15    Exh 90   Complaint for Declaratory and           30

16             Injunctive Relief

17    Exh 91   Initiative Measure No. 1639,            42

18             pages 1 through 30

19    Exh 92   First Amended Complaint for Declatory   60

20             and Injunctive Relief

21    Exh 93   Information from Ruger Website,          65

22             pages 1 through 9

23    Exh 94   NRA article, "Everything You Need to    70

24             Know About Bolt-Action Rifle Triggers"

25                          (Exhibits continued . . . )
```



                                                      Page 4
              Central Court Reporting    800.442.3376

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
 1              E X H I B I T S (Continued)

 2

 3   NO.    DESCRIPTION                                PAGE

 4   Exh 95  NRA article, "9 Best Budget               79

 5           Home-Defense Shotguns"

 6   Exh 96  Excerpt, District of Columbia Et Al.      82

 7           v. Heller, p. 570-573, 628, and 629

 8   Exh 97  RCW 9.41.042, Children - Permissible      88

 9           firearm possession

10   Exh 98  RCW 9.41.060, Exceptions to               91

11           restrictions on carrying firearms

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Central Court Reporting    800.442.3376

**SER-216**

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
1          A.  No.

2          Q.  Do you know if your dad knew Ms. Ball?

3          A.  Maybe.

4          Q.  What kind of law does your dad practice?

5          A.  He practices insurance.

6          Q.  Is his practice in Spokane?

7          A.  Yes.

8          Q.  Do you know Spokane County Sheriff Ozzie

9     Knezovich?

10         A.  No.

11         Q.  Okay.  So you mentioned that you owned a

12    firearm for practicing drill.  Is that right?

13         A.  Yes.

14         Q.  What is that firearm?

15         A.  It is an AR-15.

16         Q.  And when did that AR-15 come into your

17    possession?

18         A.  2018, in April.

19         Q.  How did that occur?

20         A.  I purchased it from one of my military

21    buddies.

22         Q.  And did you go through a dealer to make that

23    transaction?

24         A.  Yes.

25         Q.  Which dealer?  Do you remember?
```



Central Court Reporting   800.442.3376

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

1          A.  I don't.

2          Q.  And do you still own that AR-15?

3          A.  Yes, I do.

4          Q.  Where do you store it?

5          A.  I store it in a safe in my house.

6          Q.  In Boise or in Spokane?

7          A.  In Boise.

8          Q.  What did you do with that AR-15 during the

9     year that you lived in the Boise State dorm?

10          A.  I had it at my parents' house during that

11    time.

12          Q.  Why is that?

13          A.  Boise State does not allow firearms in the

14    dorm rooms.

15          (Exhibit 89 marked.)

16          Q.  (BY MR. JONES)  The court reporter just handed

17    you Exhibit 89.  Do you recognize this document?

18          A.  Yes.

19          Q.  And is this Boise State University Policy No.

20    12080 regarding possession of firearms or weapons on

21    university-owned or controlled premises?

22          A.  Yes.

23          Q.  Is this the policy that you were referring to

24    that prohibits firearms on campus or university-owned

25    buildings?



Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
 1        A.  Yes.

 2        Q.  And if you direct your attention to the second

 3   page, section 4.1, where it says:

 4            "The possession, wearing, carrying,

 5   transporting, or use of a Weapon is strictly forbidden

 6   on University-owned or controlled premises, including

 7   vehicles parked on such premises."

 8            Do you see that?

 9        A.  Yes.

10        Q.  Is that the prohibition you were referring to?

11        A.  Yes.

12        Q.  And you see "Weapon," in section 3.1, is

13   defined to include "firearms, knives of any length,

14   conducted energy devices such as stun guns, incendiary

15   devices and explosives."

16            Do you see that?

17        A.  Yes.

18        Q.  Do you own any other firearms besides the

19   AR-15 we were talking about?

20        A.  No.

21        Q.  Have you ever owned any other firearms?

22        A.  No.

23        Q.  You haven't owned a 223 Colt M4?

24        A.  No.

25            (Exhibit 90 marked.)
```

Central Court Reporting   800.442.3376

**SER-219**

Mitchell, et al. vs Atkins, et al.                Nathaniel Casey 02/20/2020

```
 1    time more.
 2           Q.  How many times would you say you've used a
 3    bolt-action rifle?
 4           A.  A good bit.  A good bit.
 5           Q.  Could you put a number on it?  Even if it's
 6    just an estimate?
 7           A.  A hundred times.
 8           Q.  How long would you say it takes you between
 9    shots with a bolt-action rifle?
10           A.  If I'm going for accuracy, probably about five
11    seconds.
12           Q.  And what if you're going for speed?
13           A.  If I'm going for speed, probably about three.
14           Q.  Okay.  And with a semiautomatic rifle, how
15    much time would you say it takes between shots if you're
16    going for accuracy?
17           A.  Accuracy, probably about three or four.
18           Q.  And if you're going for speed?
19           A.  About two.
20           Q.  Two seconds between shots?
21           A.  Yeah.  If I'm going for speed, I'm not -- I
22    don't want to just shoot randomly.  The shots still have
23    to be placed.  So if I'm still going for speed and not
24    just firing off randomly, about two seconds.
25           Q.  But you acknowledge if you were firing as
```



                                                       Page 37

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

1    quickly as possible with a semiautomatic, you could fire

2    multiple shots in less than a second?

3          A.   I believe it depends on the rifle being used.

4          Q.   So with, say, a Ruger 10/22?

5          A.   It's probably a shot a second.

6          Q.   At the fastest?

7          A.   At the fastest.

8          Q.   How about an AR-15?

9          A.   Probably two shots a second.  It's just

10   difference of the blowback.

11         Q.   Understood.

12              Okay.  Besides practicing aiming as recently

13   as 2017, when else have you used a bolt-action rifle?

14         A.   Earlier, I want to say last year, in

15   September.

16         Q.   What were you doing in September?

17         A.   I was shooting my Mosin-Nagant, just

18   practicing the motions.

19         Q.   So the Mosin-Nagant is a bolt action?

20         A.   Correct.

21         Q.   And you said "my Mosin-Nagant," but you don't

22   own it, do you?

23         A.   No, I do not.

24         Q.   Who owns that?

25         A.   My father.



Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

1    of rounds that they require us to.

2          Q.   Why is that?

3          A.   They require us to shoot twice within about

4    five seconds, and to be accurate on that.  And with the

5    bolt action, if I'm trying to be accurate, I won't be

6    able to practice actually fulfilling that.

7          Q.   But with a semiautomatic rifle you can fire

8    more rounds faster and accurately?

9          A.   Yeah.  I could probably do two in, like, five

10   to six seconds if I was -- when I'm being accurate and

11   faster.

12         Q.   So you're turning twenty-one next week?

13         A.   Correct.

14         Q.   Do you intend to purchase any of the rifles

15   we've talked about or any others?

16         A.   I do.

17         Q.   What do you intend to purchase?

18         A.   I intend to purchase a -- the Ruger 10/22.

19         Q.   Where do you intend to purchase it?

20         A.   I was going to intend to purchase it at Sharp

21   Shooters.

22         Q.   Which one?

23         A.   The one in Spokane.  Since the one in Boise, I

24   don't know if they'll sell it to me with the Washington

25   license.



Central Court Reporting   800.442.3376

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

 1    dangerous?

 2              MR. ALBRECHT:  Objection.  Requires

 3    speculation.

 4              THE WITNESS:  I don't know.

 5         Q.  (BY MR. JONES)  Well, let's say that you're

 6    not the person with the rifle.  Let's say you're one of

 7    the people, a potential victim.  Which situation would

 8    you rather be in?  A situation where he has a

 9    bolt-action rifle, or a situation where he has a

10    semiautomatic rifle?  And I'll remind you, you're under

11    oath.

12              MR. ALBRECHT:  I have to object for the

13    compound nature of the question and the ambiguousness of

14    it.  I can't tell if you're asking him if he is the one

15    who is going to have the rifle --

16              MR. JONES:  No.

17              MR. ALBRECHT:  -- defending himself?

18         Q.  (BY MR. JONES)  I'll rephrase it.  You are at

19    school, in a classroom, and somebody comes in, intending

20    to do harm to you and your classmates.  Every other

21    variable is the same, except the action of the rifle

22    he's carrying.

23              Situation A, it's a bolt action.  Situation B,

24    it's semiautomatic.  Which situation would you rather be

25    in?



Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

1         A.  Probably the bolt action.

2         Q.  Why?

3         A.  Just because in that amount of close quarter.

4    I mean, it really depends on the caliber, again.

5         Q.  Again, everything else is the same.

6         A.  Yeah, I mean, but if he's using a 22, a 22

7    doesn't have very much recoil.  Whereas if he's using a

8    308, it has a lot of recoil.

9              So if you're using a 308, it wouldn't really

10   matter if it's a bolt action or a semiautomatic because

11   the recoil is a great deal more bigger.  So it's --

12   you're not going to hit as many shots.

13        Q.  Even with the semiautomatic?

14        A.  Even with the semiautomatic, yeah.

15        Q.  So --

16        A.  Because the recoil, it jerks the gun a lot

17   with the 308.  And so --

18        Q.  But the recoil would be the same with a

19   semiautomatic and a bolt action.  Right?

20        A.  It would.  But if you're going into, say, a

21   classroom, like the situation, you're in a small area

22   already.  So when you're at a distance, shooting targets

23   at a distance with a higher recoil, it doesn't affect

24   how accurate you are to that point.  But if you're in a

25   small area, the bigger the recoil, your shots could go



Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
 1        A.  A bolt action -- so a bolt action, it's not
 2   more complicated.
 3             Semiautomatic rifles are more prone to jamming
 4   as well.  And if it jams -- especially if you're firing
 5   it as fast as possible, the odds of it jamming are,
 6   like, 50 percent.  Whereas --
 7        Q.  What is that based on?
 8        A.  Personal experience and experiences I've heard
 9   from other people.  I've had that happen plenty of times
10   in the military and on my personal firearm.  It's just
11   due to the blowback of the weapon.
12             Whereas a bolt action, it doesn't jam.  The
13   worst -- I think the only thing that it comes close to
14   is sometimes the bolt doesn't catch the cartridge.
15        Q.  Okay.  Is it fair to say that, in general,
16   semiautomatic rifles are capable of firing more shots,
17   in the same amount of time, than bolt-action rifles?
18        A.  Yes.
19        Q.  And for that reason, in general, isn't it fair
20   to say that, in a mass shooting situation, a
21   semiautomatic rifle has the potential to kill or injure
22   more people in a short period of time than a bolt-action
23   rifle?
24             MR. ALBRECHT:  Objection.  Requires
25   speculation.
```



**SER-225**

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

1            THE WITNESS:  I guess it would be fair to say

2    it has the potential.

3        Q.  (BY MR. JONES)  You mentioned that you've

4    fired a 12-gauge shotgun, I think you said, like,

5    twenty-five times before?  On twenty-five instances?

6        A.  Yeah, about.

7        Q.  Do you have a view on whether shotguns are

8    optimal for home-defense situations?

9        A.  Shotguns, I personally think they are not a

10   great home-defense weapon.

11       Q.  And why not?

12       A.  They -- they have a spread, and so it's a lot

13   more likely that if someone is intruding into your

14   house, that you're going to fatally wound them.  And in

15   a home-defense situation, the last thing that you want

16   to do is try and fatally wound them.

17           You also, with a shotgun, have a lot more

18   stopping power than some other home-defense weapons that

19   you can have.  It's a lot more likely . . .

20       Q.  For example, a 10/22.  Right?

21       A.  Like a 10/22, correct.  And you have a lot

22   more chance that you could have the pellets go through

23   the wall and hit someone else in another room.  Because

24   I have roommates.  And so if someone was in the house

25   and I was using a shotgun, there's a chance it could hit

Central Court Reporting   800.442.3376

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

1   well-versed in shooting and be able to aim accurately.

2        Q.  Last part of this sentence:  The handgun "can

3   be pointed at a burglar with one hand while the other

4   hand dials the police."

5            Do you agree with that?

6        A.  Yes.

7        Q.  Okay.  I think we're done with Heller.

8            MR. ALBRECHT:  Oh, you're not done with Heller

9   yet.  Maybe for this deposition.

10           MR. JONES:  For the purposes of this

11   deposition.  Exactly.      ____

12        Q.  (BY MR. JONES)  Turning back to Exhibit -- I

13   believe it's ninety?  No.  Ninety-one.  And this is

14   Initiative I-1639.

15           And before I call your attention to a specific

16   provision here, I guess I want to ask you, do you

17   understand that I-1639 allows individuals under

18   twenty-one to possess semiautomatic assault rifles in

19   certain situations?

20        A.  Yes.

21        Q.  Okay.  So turning to subsection 13, which is

22   on page 22, and you'll see, in paragraph 3 on page 22 --

23   do you see that?  Paragraph 3 under section 13?

24        A.  Yes.

25        Q.  It says, "Except in the places and situations



Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

 1    identified in RCW 9.41.042, (1) through (9), and

 2    9.41060, (1) through (10), a person at least eighteen

 3    years of age, but less than twenty-one years of age, may

 4    possess a semiautomatic assault rifle only:

 5              "(a) In the person's fixed place of abode;

 6              "(b) At the person's fixed place of business;

 7              "(c) On real property under his or her

 8               control; or,

 9              "(d)" -- and I'm going to leave out (d) for

10    the time being, because I want to ask you a question

11    just about that.

12         A.  Gotcha.

13         Q.  So do you understand that I-1639 permits you,

14    as a twenty-year-old -- for the next few days, at least

15    -- to possess a SAR, a semiautomatic assault rifle, in

16    your home?

17         A.  I do understand that it allows me to possess a

18    semiautomatic assault rifle.

19         Q.  In your home?

20         A.  In my home, yes.

21         Q.  And you store an AR-15 in your home?

22         A.  Correct.

23         Q.  So it references two other sections of the

24    revised code of Washington.  I want to turn to those now

25    as well.

Central Court Reporting   800.442.3376

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
 1              (Exhibit 97 marked.)

 2          Q.  (BY MR. JONES)  So could you just go ahead and

 3    read this section of RCW.  It's 9.41.042, and it's

 4    Exhibit No. 97.  Would you just read that to yourself,

 5    and let me know when you're finished.

 6          A.  [Reviewing document.]  Okay.

 7          Q.  Okay.  Have you read Exhibit 97?

 8          A.  Yes.

 9          Q.  So do you understand that I-1639 permits you

10    to possess a SAR while attending a hunter's safety

11    course or a firearm safety course?

12          A.  Yes.

13          Q.  Okay.  And do you understand that I-1639

14    permits you to possess a SAR while firearm or target

15    shooting?

16          A.  Yes.

17          Q.  And I wanted to talk more about that exception

18    2 there, because I think earlier you testified that you

19    believed 1639 prevented you from target shooting near

20    Spokane.  I forget the name of the place you went to.

21          A.  Fishtrap.

22          Q.  Fishtrap.  Was that your testimony?  Did I

23    understand that correctly?

24          A.  Yes.

25          Q.  And in reading Exhibit 97, do you still have
```



Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
 1    that view?

 2         A.  Yes.

 3         Q.  Why?

 4         A.  According to subsection 2, it says, "Engaging

 5    in practice in the use of a firearm or target shooting

 6    at an established range authorized by the governing

 7    body."

 8              That area is not authorized.  Technically it's

 9    private land.

10         Q.  It's not an established range?

11         A.  Yes.

12         Q.  Did you see the last part of that paragraph 2,

13    though, where it says "or any other area where the

14    discharge of a firearm is not prohibited"?

15         A.  Okay.  I did not.

16         Q.  So does reading that change your view as to

17    whether it is permissible for you to use a SAR at age

18    twenty at the Fishtrap area?

19         A.  It does allow me to do that, yes.

20         Q.  Okay.  And if you look at paragraph 3, 1639

21    also permits you to possess a SAR in an organized

22    competition?

23         A.  Yes.

24         Q.  If you should choose to return to your Boy

25    Scout days.
```



Central Court Reporting   800.442.3376

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

```
 1              And paragraph 4, 1639 permits you to possess a

 2   SAR while hunting or trapping with a valid license.  Is

 3   that right?

 4        A.  Am I reading this correctly, that this is

 5   specifically for semiautomatic rifles?

 6        Q.  So we were talking about Exhibit 91, which is

 7   the initiative itself.

 8        A.  Yes.

 9        Q.  And then in section 13, it referenced this

10   part of Washington's Code as exceptions.  Does that make

11   sense to you?

12        A.  Yes.  Okay.  Yes.  For paragraph 4, I do

13   understand.

14        Q.  That you are allowed to use a SAR while

15   hunting or trapping with a valid license?

16        A.  Yes.

17        Q.  And paragraph 6 allows you to possess a SAR

18   when you're traveling to and from any of the activities

19   listed above?

20        A.  Yes.

21        Q.  It also permits you to use a SAR while on your

22   parents' property?

23        A.  Yes.

24        Q.  And it also -- and this is particularly apt

25   for you.  It allows you to use a SAR while on active
```

Central Court Reporting   800.442.3376

Mitchell, et al. vs Atkins, et al.                    Nathaniel Casey 02/20/2020

 1    duty in the Reserves?

 2          A.  Yes.

 3          Q.  And subsection 8, it allows you to use a SAR

 4    at your home for the purpose of self defense?

 5          A.  Yes.

 6              MR. JONES:  I think my last exhibit that I

 7    want to use . . .

 8              (Exhibit 98 marked.)

 9          Q.  (BY MR. JONES)  So Exhibit 98 is also

10    cross-referenced by section 13 of I-1639.  And I don't

11    need you to read all of it.  Some of them are actually

12    duplicative.  But I do want you to look at subsection 8,

13    which starts, "Any person engaging" . . .

14              Just, when you read that, let me know.

15          A.  [Reviewing document.]  Okay.

16          Q.  So do you recognize that 1639 also allows you

17    to possess a SAR while participating in or traveling to

18    lawful outdoor activities such as hunting, fishing,

19    camping, hiking, or horseback riding?

20          A.  Yes.

21          Q.  Okay.  I think you can put 98 aside.

22              Do you own or rent any property in Washington

23    state?

24          A.  No.

25          Q.  Do you own property here in Idaho or anywhere

Central Court Reporting   800.442.3376

```
 1                    REPORTER'S CERTIFICATE

 2          I, EMILY L. NORD, CSR NO. 695, Certified

 3     Shorthand Reporter, Certify:

 4          That the foregoing proceedings were taken before

 5     me at the time and place therein set forth, at which

 6     time the witness was put under oath by me;

 7          That the testimony and all objections made were

 8     recorded stenographically by me and were thereafter

 9     transcribed by me, or under my direction;

10          That the foregoing is a true and correct record

11     of all testimony given, to the best of my ability;

12          I further certify that I am not a relative or

13     employee of any attorney or party, nor am I financially

14     interested in the action.

15          IN WITNESS WHEREOF, I set my hand and seal this

16     3rd day of March          , 2020 .

17

18

19

20          _____

21     EMILY L. NORD, CSR, RPR

22     Notary Public

23     P.O. Box 2636

24     Boise, Idaho 83701-2636

25     My Commission Expires November 5, 2023
```