NO. 20-35827

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DANIEL MITCHELL, et al.,

Appellants,

v.

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, et al.,

Defendants-Appellees

and

SAFE SCHOOLS SAFE COMMUNITIES,

Intervenor-Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
No. 3:20-cv-05106-JCC
The Honorable Judge John C. Coughenour, United States District Court

## APPELLEES' JOINT SUPPLEMENTAL EXCERPTS OF RECORD VOLUME 2 OF 4

ROBERT W. FERGUSON
  *Attorney General*
NOAH G. PURCELL
  *Solicitor General*
Zachary Pekelis Jones, WSBA 44557
R. July Simpson, WSBA 45869
  *Assistant Attorneys General*
Jeffrey T. Even, WSBA 20367
  *Deputy Solicitor General*
Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104
(206) 464-7744
*Counsel for Appellee Teresa Berntsen*

Salvatore J. Faggiano WSBA 15696
  *Assistant City Attorney*
Office of the City Attorney
808 W. Spokane Falls Blvd.
Spokane, WA 99201-3326
(509) 625-6818
*Counsel for Defendant Craig Meidl*

Paul J. Lawrence, WSBA 13557
Gregory J. Wong, WSBA 39329
Nicholas W. Brown, WSBA 33586
Kai A. Smith, WSBA 54749
PACIFICA LAW GROUP LLP
1191 Second Avenue, Suite 2000
Seattle, WA 98101-3404
Telephone: 206-240-1700
Facsimile: 206-240-1750800
*Counsel for Appellee Safe Schools Safe Communities*

Leslie A. Lopez, WSBA 46118
Deputy Prosecuting Attorney
Clark County Prosecutor's Office
PO Box 5000
Vancouver, WA 98666-5000
(564) 397-2478
*Counsel for Defendant Chuck Atkins*

# Exhibit K

# Deposition of Robin Ball

# Mitchell, et al. v. Atkins, et al.

# January 31, 2020



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

www.buellrealtime.com

Olympia | **360.534.9066**   Spokane | **509.624.3261**   National | **800.846.6989**

email: info@buellrealtime.com



1           UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON

3                   AT TACOMA

4

5    DANIEL MITCHELL, et al.,        ) No. 3:19-cv-5106
                                     )
6            Plaintiffs,        )
                                     )
7    vs.                        )
                                     )
8    CHARLES ATKINS, et al.,         )
                                     )
9            Defendants.        )
                                     )
10        and                   )
                                     )
11   SAFE SCHOOLS SAFE COMMUNITIES,        )
                                     )
12        Intervenor-Defendant.        )
     _____)

13

14

15

16      DEPOSITION UPON ORAL EXAMINATION OF ROBIN BALL

17

18            Friday, January 31, 2020
              9:05 a.m. - 1:51 p.m.
             1116 West Riverside Avenue
19            Spokane, Washington

20

      TAKEN AT THE INSTANCE OF THE DEFENDANTS
21

22

23

24

     REPORTED BY:
25   RACHAEL L. HALL, CCR NO. 3265

Robin Ball                                                                1/31/2020

1    APPEARANCES:

2    FOR THE PLAINTIFFS:

3         MR. MATTHEW C. ALBRECHT
          Albrecht Law PLLC
4         421 West Riverside Avenue, Suite 614
          Spokane, Washington 99201
5         matt@albrechtlawfirm.com

6    FOR THE INTERVENOR-DEFENDANT SAFE SCHOOLS SAFE
     COMMUNITIES (CAMPAIGN):
7
          MR. KAI SMITH
8         MR. GREGORY J. WONG
          Pacifica Law Group LLP
9         1191 Second Avenue, Suite 2000
          Seattle, Washington 98101-3404
10        kai.smith@pacificalawgroup.com
          greg.wong@pacificalawgroup.com
11

12   FOR THE DEFENDANT MEIDL, CITY OF SPOKANE:

13        MR. SALVATORE J. FAGGIANO
          Assistant City Attorney
14        Office of the City Attorney
          808 West Spokane Falls Boulevard
15        Spokane, Washington 99201-3326
          sfaggiano@spokanecity.org
16

17   FOR THE DEFENDANT TERESA BERNTSEN:

18        MR. ZACHARY JONES (telephonically)
          MS. JULY SIMPSON (telephonically)
19        Assistant Attorneys General
          Attorney General of Washington
20        Licensing and Administrative Law Division
          Complex Litigation Division
21        800 Fifth Avenue, Suite 2000
          Seattle, Washington 98104-3188
22        zach.jones@atg.wa.gov
          july.simpson@atg.wa.gov
23

24        MS. DIONNE PADILLA-HUDDLESTON
          Assistant Attorney General
25        Licensing and Administrative Law Divsion


          dionnep@atg.wa.gov

Robin Ball                                                          1/31/2020

1    APPEARANCES (Continued):

2    FOR THE DEFENDANT ATKINS, CLARK COUNTY:

3       MR. CURTIS BURNS
       (Appearing telephonically)
4       Clark County Prosecutor's Office
       Civil Division
5       P.O. Box 5000
       Vancouver, Washington 98666-5000
6       curtis.burns@clark.wa.gov

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Robin Ball                                                          1/31/2020

1                        I N D E X

2       MITCHELL, et al. v. ATKINS, et al.
        NO. 3:19-cv-5106
3       January 31, 2020

4

5

6

7

8

9                     T E S T I M O N Y

10                                         PAGE
        ROBIN BALL
11

12         Examination by Mr. Smith              6, 131

13         Examination by Mr. Albrecht              127

14

15

16

17                     E X H I B I T S

18      NO.         DESCRIPTION                PAGE

19      19     Initiative Measure No. 1639 (double-sided);
               30 pgs.                        13
20
        20     First Amended Complaint for Declaratory
21             and Injunctive Relief (double-sided); 13 pgs.   27

22      21      Sharp Shooting Indoor Range & Gun Shop
               website, class protection descriptions
23             (double-sided); 3 pgs.         83

24      22      Sharp Shooting Indoor Range & Gun Shop
               website, radical firearms article
25             (double-sided); 2 pgs.         98

Robin Ball                                                          1/31/2020

1  EXHIBITS (Continued):

2  NO.         DESCRIPTION                    PAGE

3  23     Sharp Shooting Indoor Range & Gun Shop
          website, gun inventory (double-sided); 2 pgs.   103
4
   24     Director Berntsen's First Set of
5         Interrogatories & Requests for Production
          to Plaintiff Robin Ball and Plaintiff
6         Robin Ball's Objections and Response
          (double-sided); 16 pgs.                   105
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Robin Ball                                                          1/31/2020

1     so.

2     **Q.  On behalf of the Sharp Shooting, who maintains Sharp**

3        **Shooting's presence?**

4     A.  My son.

5     **Q.  Does he do that 100 percent?**

6     A.  Yes.

7     **Q.  So is it fair to say that any post by Sharp Shooting on**

8        **any of those social media platforms would be authored by**

9        **your son?**

10    A.  Yes.  I have responded to customers who have commented

11       on our range Facebook page, but I don't do anything

12       else, and that's even rare.

13    **Q.  For your responses, are those through your Sharp**

14       **Shooting account or through your personal --**

15    A.  Sharp Shooting.

16    **Q.  With respect to firearms, specifically, what firearms**

17       **does Sharp Shooting sell at a broad level?**

18    A.  Handguns, long guns, shotguns.

19    **Q.  Do you sell non-semiautomatic rifles?**

20    A.  Bolt and level, mm-hmm.

21    **Q.  On any given day for those four categories of firearms,**

22       **how many would you say you have in stock at**

23       **Sharp Shooting?**

24          **Well, let's take it one at a time.  How about**

25       **pistols?**

Robin Ball                                                              1/31/2020

1   A.  A thousand.

2   Q.  And shotguns?

3   A.  Maybe 20.

4   Q.  And non-semiautomatic rifles?

5   A.  Probably 50.

6   Q.  And semiautomatic rifles?

7   A.  Two hundred.

8   Q.  Were those numbers similar before 1639 was passed,

9       before 1639 went into effect July of this year, 2019?

10  A.  Yes.

11  Q.  Okay.

12  A.  Yes.  That hasn't changed very much.

13  Q.  So, on average, is your testimony that there are

14      roughly -- it looks like maybe 1,300 firearms available

15      in your inventory any given day?

16  A.  Yeah.

17  Q.  Do your sales roughly match that ratio?

18  A.  Yes.

19  Q.  Is it fair to say you are primarily a pistol dealer?

20  A.  We are.

21  Q.  In addition to selling firearms, is there a shooting

22      range at Sharp Shooting?

23  A.  There is.

24  Q.  Is it open to the public?

25  A.  Yes.

Robin Ball                                                          1/31/2020

1   A.  Correct.

2   Q.  Does that ratio also match up with the recommendations

3       you provide consumers on what type of handgun to

4       purchase for self-defense -- I'm sorry -- what type of

5       firearm to purchase?

6   A.  We probably recommend a handgun because we do kind of

7       cater to that concealed carry market, but again, it just

8       depends on what the customer is wanting to do.  And if

9       it's a first gun, or if they intend to buy more guns,

10      that would come into play as well.

11  Q.  How would whether it's someone's first gun factor into

12      your recommendation?

13  A.  Because then what they want to do with it is going to

14      apply even more where they don't have other options.

15      And most often, a first gun for an individual adult

16      buyer frequently is a handgun.

17  Q.  Why is that?

18  A.  Sometimes I think it's just because the size of it is

19      less intimidating if they are a newer shooter.

20  Q.  Do you agree with that assessment?

21  A.  Yes.  I believe they believe that.  I don't believe that

22      that's the case knowing what I know now.  Smaller guns

23      are harder to shoot.  Bigger guns are easier to shoot,

24      but it's a little bit counterintuitive for new people to

25      the industry.

Robin Ball                                                          1/31/2020

1          MR. ALBRECHT:  I understand.  But I don't see how

2     you can separate appropriateness as a test from whether

3     or not you believe it is or is not lawful.  If you're

4     talking about someone's lawful obligations, I don't know

5     how you separate those two.  That's why I'm asking to

6     leave it as a standing objection.  We can resolve it

7     later.  I don't mind if she tries to answer.

8          MR. SMITH:  That would be fine.

9          THE WITNESS:  I've forgotten the question.

10         (The record was read as follows:

11         "Q.  If the local jurisdictions were checking

12         Department of Corrections records or databases, is

13         that something you think would be appropriate?")

14         THE WITNESS:  I'm not opposed to background checks,

15    and that's already part of the process.

16    BY MR. SMITH:

17    **Q.  But it sounds like you don't have a view one way or**

18    **another on whether those background checks should**

19    **include, for example, state mental health records?**

20    A.  I don't know if they're effective, if they're

21    appropriate.  I know what we have to do by law.

22    Q.  So when you say you support background checks, it sounds

23    like you don't support checking state mental health

24    records?

25    A.  I support the background check they're doing currently.

**BUELL REALTIME REPORTING, LLC**                          **Page: 71**
**206.287.9066 | 800.846.6989**

**SER-245**

Robin Ball                                                                    1/31/2020

1        That is included.

2    Q.  Under the enhanced background check process?

3    A.  Sure.

4    Q.  So, say, a consumer goes through this process, they go

5        through the background check process, you get the

6        go-ahead, I assume, from the local law enforcement

7        agency or from the federal government; is that

8        correct?

9    A.  Depending if it's a direct mix, it's from the federal

10       side.  If it's local jurisdiction, it's from whoever we

11       sent the fax to.

12   Q.  So for the federal side, who would give you the answer

13       once you submit the form?

14   A.  The NICS process for us is electronic.  So we submit to

15       the NICS database, 99 percent of the time, we get a

16       proceed back quickly with that system.  Sometimes the

17       little wheel on the computer spins for a very long time

18       while it's thinking about it and sometimes it will say

19       "Further review."

20   Q.  How long typically does the NICS system take to

21       respond?

22   A.  With an approval on a really busy day, it could be five

23       minutes.

24   Q.  At the longest it could take for an approval?

25   A.  If we get a delay, it can be three or four days.

Robin Ball                                                           1/31/2020

1  **Q.  Did you provide any advice or guidance on what should be**

2     **included in the report?**

3  A.  No.

4  **Q.  Have you had any e-mail communication with Mr. Knezovich**

5     **about this case?**

6  A.  No.

7  **Q.  Have you texted with him about this case?**

8  A.  No.  I did ask him when his deposition was.

9  **Q.  Did you ask --**

10  A.  We were talking about something completely separate, but

11     I knew that was coming up.  I didn't know when he was

12     scheduled.

13  **Q.  It sounds like you talked with him about that in**

14     **person?**

15  A.  No.  On the phone.

16  **Q.  On the phone?**

17  A.  Yeah.

18  **Q.  And then earlier we had talked about the M107, and you**

19     **had mentioned that M107 was not an appropriate firearm**

20     **for self-defense.  Are there any other type of firearm**

21     **that Sharp Shooting sells that are not appropriate for**

22     **self-defense?**

23        MR. ALBRECHT:  Excuse me, I'm going to object.

24     That misstates the prior testimony.

25  //

**BUELL REALTIME REPORTING, LLC**                          **Page: 119**
**206.287.9066 | 800.846.6989**

**SER-247**

Robin Ball                                                                    1/31/2020

1   BY MR. SMITH:

2   **Q.  You can answer.**

3   A.  I guess you would have to consider -- if it's

4       self-defense, you would want something that you could

5       physically move.  And really there are some

6       long-distance precision rifles a lot of our competition

7       shooters use that are really heavy.  You're not going to

8       use something like that.

9   **Q.  Other than those types of firearms and the M107, are**

10      **there any other types of firearms that Sharp Shooting**

11      **sells that would not be appropriate for self-defense?**

12  A.  I can't think of anything in the store that falls in

13      that category.

14  **Q.  We had touched a little bit on the records that**

15      **Sharp Shooting maintains, specifically the inventory**

16      **record that sounds like it can be used a little bit to**

17      **indicate what sales have been made.  I wanted to ask**

18      **specifically about revenue and whether or not you track**

19      **revenue for Sharp Shooting.**

20  A.  Yes.

21  **Q.  How do you track your revenue?**

22  A.  By department, and in some cases, division of categories

23      in specific departments.

24  **Q.  And what department?**

25  A.  For example, I have category for range sales, which is

Robin Ball                                                          1/31/2020

1    **Q.  Sure.  In addition to tracking revenue by types of**

2        **firearm, are you able to track revenue by the state of**

3        **residency of the purchaser?**

4    A.  No.

5    **Q.  I think that's all the questions I have.**

6            MR. SMITH:  I'd like to take a short break just to

7    review my notes and confer with co-counsel and make sure

8    there's nothing else.

9            MR. ALBRECHT:  All right.

10           (Brief recess.)

11   BY MR. SMITH:

12   **Q.  And we are back on the record again.  I just have a**

13       **couple of follow-up questions.**

14           **At the end of the last segment before we took a**

15       **break, we were talking about revenue, and one of the**

16       **questions we talked about is sort of measuring revenue**

17       **by year, and I wanted to revisit that.**

18           **For 2017 as an example, would you know off the top**

19       **of your head how revenue was for that year for**

20       **Sharp Shooting?**

21   A.  I don't know the answer to that.

22   **Q.  Do you know if it was a good, bad or medium year?**

23   A.  We -- I would say it was a good year only because I know

24       we've had some growth every year.

25   **Q.  So every year over the last few years, you have had**

Robin Ball                                                                1/31/2020

1    **increased revenue.  Is that an accurate statement?**

2    A.  That would be true every year since we opened in '95.

3    **Q.  Is that true specifically with respect to the retail**

4    **department you had mentioned?**

5    A.  It would be true of all departments.

6    **Q.  Do you know how 2019 was in relation to 2018?  You**

7    **said -- I believe your testimony is it was a better year**

8    **revenue-wise.  Do you know exactly how much?**

9    A.  2019?

10   **Q.  Yeah.**

11   A.  No.  2019 was not a better revenue year.  We still

12   showed some growth, but based on growth 2018 was a

13   better year.

14   **Q.  So you had a higher revenue in 2019 than 2018, but the**

15   **growth rate was not as good?**

16   A.  Right, exactly.  And only marginally over 2018 in

17   revenue.

18   **Q.  Do you have a sense of how 2020 is going to go?**

19   A.  Not a clue.

20        MR. ALBRECHT:  Objection.  Speculative.

21        MR. SMITH:  At this time, I don't have any further

22   comments.  I do want to mention, though, on the record

23   that it seems that Ms. Ball has referenced the presence

24   of a number of records and documents including the

25   inventory and sales records that appear to be responsive

Robin Ball                                                                    1/31/2020

1    **Q.  What medical records would you think would be**

2        **appropriate to check as part of a background check?**

3    A.  Criminal information based on mental health that the

4        state has.

5    **Q.  Do you think state mental health records should be**

6        **included in a background check?**

7    A.  Only -- only in that category.

8    **Q.  What categories?**

9    A.  So if a court has deemed someone mentally adjudicated,

10       that should be information that's available to law

11       enforcement who is doing the background check.

12   **Q.  You also had mentioned shooter-induced malfunctions.**

13   A.  Yes.

14   **Q.  I think your testimony is that handguns are -- might be**

15       **more common for someone to have a shooter-induced**

16       **malfunction operating a handgun versus semiautomatic**

17       **assault rifle; is that accurate?**

18   A.  Potentially, mm-hmm.  You're less likely to have a

19       shooter-induced malfunction with a rifle.

20   **Q.  Are you less likely to have a shooter-induced**

21       **malfunction if you're using a shotgun?**

22   A.  Yeah, I would say so.

23   **Q.  Would it be on par with a semiautomatic assault rifle?**

24   A.  I've actually seen it more often with a shotgun than

25       with a semiautomatic rifle.

Robin Ball                                                              1/31/2020

1    **Q.  You've seen more operator-induced malfunctions?**

2    A.  Yes, with shotgun.

3    **Q.  Why do you think that is?**

4    A.  Strength, technique more than anything.

5    **Q.  In that the shotgun requires more strength to operate**

6    **effectively?**

7    A.  It doesn't need more strength.  It just needs a little

8    more muzzle depending on the type of shotgun, but a

9    pump-action shotgun, I've seen people short stroke those

10   and cause a malfunction.

11   **Q.  Does a handgun require less strength than a**

12   **semiautomatic assault rifle or shotgun to operate?**

13   A.  A handgun requires different manipulation.  Some of it

14   is strength but some of it is technique, and they're

15   more prone to malfunctions because of those items.

16   **Q.  Does a handgun require less strength to operate**

17   **effectively than a semiautomatic assault rifle?**

18   A.  No.

19   **Q.  Does it require less strength to operate than --**

20   A.  It requires more strength and better technique --

21   **Q.  Your testimony --**

22   A.  -- than a handgun.

23   **Q.  Your testimony is that a handgun requires more strength**

24   **to operate effectively than a semiautomatic assault**

25   **rifle?**

Robin Ball                                                                      1/31/2020

1    A.  Yes.

2    Q.  And it's your testimony that a shotgun requires more

3        strength to operate effectively than a semiautomatic

4        assault rifle?

5    A.  Neither of them are necessarily more strength.  It's a

6        combination of the physical ability, people developing

7        arthritis in their hands don't necessarily have the grip

8        they need, so it's more technique.  Along with strength,

9        the two go hand in hand.  One is not more important than

10       the other in either of those platforms.

11   Q.  So your testimony is that if someone has trouble with

12       grip strength due to arthritis, a semiautomatic assault

13       rifle could be a better firearm than a handgun?

14   A.  Definitely.  Because the controls are easier to grab

15       ahold of.

16   Q.  How do you mean that they are easier to grab ahold of?

17   A.  They are a little bit larger.  They protrude a little

18       bit more.

19           MR. SMITH:  I don't think I have any further

20       questions.  Okay.  I think we're finished, then.

21           MR. ALBRECHT:  Thank you.  We'll reserve signature

22       and order.

23           MR. SMITH:  We request a copy.

24           (DEPOSITION WAS CONCLUDED AT 1:51 P.M.)

25           (SIGNATURE RESERVED.)

Robin Ball - 1/31/2020

135

C E R T I F I C A T E

STATE OF WASHINGTON   )
                      ) s.s.
COUNTY OF SPOKANE     )

        This is to certify that I, Rachael L. Hall,

certified Court Reporter in and for the State of

Washington, residing at Spokane, reported the within

and foregoing deposition; said deposition being taken

before me on the date herein set forth; that pursuant

to RCW 5.28.010 the witness was first by me duly

sworn; that said examination was taken by me in

shorthand and thereafter under my supervision

transcribed, and that same is a full, true and correct

record of the testimony of said witness, including all

questions, answers and objections, if any, of counsel.

        I further certify that I am not a relative or

employee or attorney or counsel of any of the parties,

nor am I financially interested in the outcome of the

cause.

        IN WITNESS WHEREOF I have set my hand this 5th

day of February, 2020.

_____
RACHAEL L. HALL
CSR, CRR NO. 3265

**BUELL** REALTIME REPORTING   COURT REPORTING AND LEGAL VIDEO   206.287.9066   buellrealtime.com   1325 Fourth Avenue, Suite 1840   Seattle, Washington 98101



# DECLARATION

**CASE NAME:**   Mitchell, et al. v. Atkins, et al.

**DATE TAKEN:** 01/31/2020

**WITNESS:**   Robin Ball

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

*Robin Ball*
Robin Ball

Signed on the ___25___ day of __February__, 2020.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com



# ERRATA

**CASE NAME:** Mitchell, et al. v. Atkins, et al.

**DATE TAKEN:** 01/31/2020

**WITNESS:** Robin Ball

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| 22 | 20 | votes for Oregon | votes for Washington |
| 40 | 25 | a ban outlay | a Bayonet lug |
| 43 | 24 | that pulls lifetime inventory | that pulls livetime inventory |
| 61 | 3+4 | we then check the federal form off... | we then create the state form off... |
| 67 | 7 | DIRECTLY to the next check | DIRECTLY to the NICS check |
| 75 | 14 | logged out with | logged with |

_Robin Ball_
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com

# Exhibit L

MORE ≡    **FBI: UCR**    🔍 Search FBI

Home • Crime in the U.S. • 2018 • Crime in the U.S. 2018 • Tables • Table 38

# 2018 CRIME in the UNITED STATES

U.S. DEPARTMENT OF JUSTICE • FEDERAL BUREAU OF INVESTIGATION • CRIMINAL JUSTICE INFORMATION SERVICES DIVISION

Criminal Justice Information Services Division    Feedback | Contact Us | Data Quality Guidelines | UCR Home

| Home | Offenses Known to Law Enforcement | Violent Crime | Property Crime | Clearances | Persons Arrested | Police Employee Data |

## Table 38

### Arrests
by Age, 2018
[12,212 agencies; 2018 estimated population 247,752,415]

Overview   Data Declaration   Download Excel

| Offense charged | Total all ages | Ages under 15 | Ages under 18 | Ages 18 and over | Under 10 | 10-12 | 13-14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 7,811,085 | 165,342 | 553,620 | 7,257,465 | 3,501 | 38,304 | 123,537 | 104,148 | 129,078 | 155,052 | 215,132 | 231,089 | 233,876 | 239,463 | 24 |
| Total percent distribution[1] | 100.0 | 2.1 | 7.1 | 92.9 | * | 0.5 | 1.6 | 1.3 | 1.7 | 2.0 | 2.8 | 3.0 | 3.0 | 3.1 | 3.1 |
| Murder and nonnegligent manslaughter | 9,049 | 67 | 694 | 8,355 | 0 | 4 | 63 | 100 | 197 | 330 | 474 | 479 | 449 | 394 | 37 |
| Rape[2] | 19,093 | 1,324 | 3,144 | 15,949 | 22 | 412 | 890 | 552 | 613 | 655 | 764 | 694 | 653 | 648 | 55 |
| Robbery | 67,397 | 2,615 | 13,220 | 54,177 | 11 | 283 | 2,321 | 2,781 | 3,704 | 4,120 | 4,641 | 3,764 | 3,113 | 2,682 | 2,5 |
| Aggravated assault | 300,726 | 7,415 | 21,225 | 279,501 | 145 | 2,056 | 5,214 | 3,781 | 4,709 | 5,320 | 6,653 | 7,192 | 7,962 | 9,054 | 9,2 |
| Burglary | 135,918 | 5,136 | 16,933 | 118,985 | 160 | 1,096 | 3,880 | 3,498 | 3,941 | 4,358 | 5,231 | 4,581 | 4,237 | 3,949 | 4,1 |
| Larceny-theft | 682,517 | 20,058 | 71,222 | 611,295 | 289 | 4,338 | 15,431 | 13,767 | 17,134 | 20,263 | 24,642 | 22,883 | 20,523 | 18,928 | 18 |
| Motor vehicle theft | 69,502 | 2,766 | 11,202 | 58,300 | 15 | 322 | 2,429 | 2,704 | 2,922 | 2,810 | 2,582 | 2,320 | 2,068 | 2,077 | 2,1 |
| Arson | 7,050 | 803 | 1,386 | 5,664 | 56 | 281 | 466 | 220 | 191 | 172 | 189 | 133 | 161 | 148 | 15 |
| Violent crime[3] | 396,265 | 11,421 | 38,283 | 357,982 | 178 | 2,755 | 8,488 | 7,214 | 9,223 | 10,425 | 12,532 | 12,129 | 12,177 | 12,778 | 12 |
| Violent crime percent distribution[1] | 100.0 | 2.9 | 9.7 | 90.3 | * | 0.7 | 2.1 | 1.8 | 2.3 | 2.6 | 3.2 | 3.1 | 3.1 | 3.2 | 3.2 |
| Property crime[3] | 894,987 | 28,763 | 100,743 | 794,244 | 520 | 6,037 | 22,206 | 20,189 | 24,188 | 27,603 | 32,644 | 29,917 | 26,989 | 25,102 | 24 |
| Property crime percent distribution[1] | 100.0 | 3.2 | 11.3 | 88.7 | 0.1 | 0.7 | 2.5 | 2.3 | 2.7 | 3.1 | 3.6 | 3.3 | 3.0 | 2.8 | 2.8 |
| Other assaults | 809,050 | 39,334 | 95,116 | 713,934 | 900 | 11,032 | 27,402 | 18,250 | 19,177 | 18,355 | 18,517 | 18,226 | 19,608 | 22,292 | 23 |
| Forgery and counterfeiting | 38,128 | 157 | 792 | 37,336 | 5 | 33 | 119 | 96 | 186 | 353 | 991 | 1,471 | 1,694 | 1,066 | 1,1 |
| Fraud | 90,886 | 840 | 3,567 | 87,319 | 9 | 146 | 685 | 685 | 834 | 1,208 | 1,843 | 2,231 | 2,632 | 2,462 | 2,6 |
| Embezzlement | 11,278 | 20 | 443 | 10,835 | 1 | 2 | 17 | 32 | 127 | 264 | 524 | 561 | 545 | 482 | 42 |
| Stolen property, buying, receiving, possessing | 70,996 | 1,524 | 7,100 | 63,896 | 14 | 172 | 1,338 | 1,474 | 1,939 | 2,163 | 2,734 | 2,703 | 2,433 | 2,177 | 2,2 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vandalism | 137,108 | 8,939 | 23,329 | 113,779 | 362 | 2,572 | 6,005 | 4,490 | 4,972 | 4,928 | 4,971 | 4,472 | 4,179 | 4,798 | 4,5 |
| Weapons; carrying, possessing, etc. | 127,588 | 3,744 | 13,011 | 114,577 | 155 | 1,030 | 2,559 | 2,366 | 2,973 | 3,928 | 4,827 | 5,059 | 4,725 | 5,164 | 5,2 |
| Prostitution and commercialized vice | 23,699 | 41 | 199 | 23,500 | 1 | 7 | 33 | 27 | 43 | 88 | 707 | 763 | 883 | 1,026 | 1,0 |
| Sex offenses (except rape and prostitution) | 35,549 | 2,698 | 5,719 | 29,830 | 88 | 708 | 1,902 | 1,052 | 966 | 1,003 | 1,028 | 947 | 820 | 814 | 78 |
| Drug abuse violations | 1,251,852 | 11,758 | 68,612 | 1,183,240 | 84 | 1,818 | 9,856 | 10,754 | 17,201 | 28,899 | 51,840 | 53,810 | 50,975 | 47,929 | 47 |
| Gambling | 2,475 | 23 | 134 | 2,341 | 1 | 2 | 19 | 19 | 33 | 59 | 73 | 88 | 78 | 80 | 89 |
| Offenses against the family and children | 64,872 | 893 | 2,477 | 62,395 | 35 | 215 | 643 | 524 | 529 | 531 | 778 | 818 | 930 | 1,138 | 1,2 |
| Driving under the influence | 746,575 | 102 | 4,064 | 742,511 | 8 | 12 | 82 | 173 | 931 | 2,858 | 8,738 | 12,302 | 15,201 | 24,707 | 27 |
| Liquor laws | 130,921 | 2,767 | 19,922 | 110,999 | 18 | 280 | 2,469 | 3,186 | 5,341 | 8,628 | 17,504 | 19,138 | 15,935 | 3,108 | 2,2 |
| Drunkenness | 252,727 | 378 | 2,512 | 250,215 | 7 | 32 | 339 | 390 | 597 | 1,147 | 3,405 | 4,315 | 4,679 | 7,593 | 7,2 |
| Disorderly conduct | 251,182 | 17,784 | 44,074 | 207,108 | 340 | 4,692 | 12,752 | 8,803 | 9,286 | 8,201 | 7,186 | 6,636 | 6,554 | 8,119 | 7,4 |
| Vagrancy | 18,121 | 145 | 527 | 17,594 | 3 | 18 | 124 | 126 | 137 | 119 | 300 | 253 | 281 | 276 | 27 |
| All other offenses (except traffic) | 2,439,500 | 28,812 | 106,060 | 2,333,440 | 669 | 5,697 | 22,446 | 20,521 | 25,871 | 30,856 | 43,979 | 55,238 | 62,544 | 68,340 | 71 |
| Suspicion | 427 | 14 | 37 | 390 | 0 | 3 | 11 | 3 | 7 | 13 | 11 | 12 | 14 | 12 | 14 |
| Curfew and loitering law violations | 16,899 | 5,185 | 16,899 | - | 103 | 1,040 | 4,042 | 3,774 | 4,517 | 3,423 | - | - | - | - | |

- [1] Because of rounding, the percentages may not add to 100.0.
- [2] The rape figures in this table are aggregate totals of the data submitted based on both the legacy and revised Uniform Crime Reporting definitions.
- [3] Violent crimes are offenses of murder and nonnegligent manslaughter, rape, robbery, and aggravated assault. Property crimes are offenses of burglary, larceny-theft, motor vehicle theft, and arson.
- * Less than one-tenth of 1 percent.

**Data Declaration**

Provides the methodology used in constructing this table and other pertinent information about this table.

**Overview**

▸ Download Printable Document

**Arrests, by Age, 2018**

- In 2018, 92.9 percent of all individuals arrested were adults (18 years of age and over). Adults comprised 90.3 percent of all persons arrested for violent crimes and 88.7 percent of persons arrested for property crimes.
- Adults accounted for 94.5 percent of persons arrested for drug abuse violations.
- In 2018, 19.7 percent of persons arrested for arson were juveniles. More than half of those juveniles (57.9 percent) were under the age of 15.
- Persons between the ages of 25 and 29 accounted for 17.2 percent of all arrestees in 2018.



| Publications | General Resources | Data Collections | Documentation | More |
|---|---|---|---|---|
| Crime in the United States | A Word About UCR Data | National Incident-Based Reporting System (NIBRS) | Technical Specifications | Overview |
| Law Enforcement Officers Killed and Assaulted (LEOKA) | UCR Statistics, Their Proper Use (pdf) | Summary Reporting System (SRS) | User Manuals | NIBRS Overview |

| | | |
|---|---|---|
| Hate Crime Statistics | Data Quality Guidelines | Law Enforcement Officers Killed and Assaulted (LEOKA) |
| National Incident-Based Reporting System (NIBRS) | UCR Program—Summary of Authorities | Hate Crime Statistics |
| Cargo Theft 2014 (pdf) | UCR Program Quarterly | Cargo Theft |
| Cargo Theft 2013 (pdf) | State Program Bulletins and Newsletters | |
| Human Trafficking (pdf) | UCR Program Contacts | |
| | State UCR Program Contacts | |
| | UCR Quality Assurance Review | |
| | Related Sites | |

Accessibility | eRulemaking | Freedom of Information/Privacy Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House | No FEAR Act

FBI.gov is an official site of the U.S. government, U.S. Department of Justice

3 of 4

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-3, Page 28 of 223

**Table 38**

**Arrests**

by Age, 2018

[12,212 agencies; 2018 estimated population 247,752,415]

| Offense charged | Total all ages | Ages under 15 | Ages under 18 | Ages 18 and over | Under 10 | 10-12 | 13-14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60-64 | 65 and over |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL** | 7,811,085 | 165,342 | 553,620 | 7,257,465 | 3,501 | 38,304 | 123,537 | 104,148 | 129,078 | 155,052 | 215,132 | 231,089 | 233,876 | 239,463 | 243,844 | 249,783 | 281,034 | 1,346,362 | 1,142,905 | 945,178 | 636,963 | 517,234 | 413,491 | 302,942 | 154,935 | 103,234 |
| **Total percent distribution[1]** | 100.0 | 2.1 | 7.1 | 92.9 | * | 0.5 | 1.6 | 1.3 | 1.7 | 2.0 | 2.8 | 3.0 | 3.0 | 3.1 | 3.1 | 3.2 | 3.6 | 17.2 | 14.6 | 12.1 | 8.2 | 6.6 | 5.3 | 3.9 | 2.0 | 1.3 |
| Murder and nonnegligent manslaughter | 9,049 | 67 | 694 | 8,355 | 0 | 1 | 63 | 100 | 197 | 330 | 474 | 479 | 449 | 394 | 371 | 377 | 499 | 1,637 | 1,138 | 872 | 503 | 363 | 302 | 235 | 121 | 141 |
| Rape[2] | 19,093 | 1,324 | 3,144 | 15,949 | 22 | 412 | 890 | 552 | 615 | 653 | 648 | 556 | 481 | 551 | | | | 2,357 | 2,282 | 1,997 | 1,443 | 1,116 | 888 | 707 | 385 | 427 |
| Robbery | 67,397 | 2,615 | 13,220 | 54,177 | 11 | 283 | 2,321 | 2,781 | 3,704 | 4,120 | 4,641 | 3,764 | 3,113 | 2,682 | 2,500 | 2,413 | 3,274 | 10,618 | 7,454 | 5,115 | 3,016 | 2,186 | 1,759 | 1,115 | 371 | 156 |
| Aggravated assault | 300,726 | 7,415 | 21,225 | 279,501 | 145 | 2,056 | 5,214 | 3,781 | 4,709 | 5,320 | 6,653 | 7,192 | 7,962 | 9,054 | 9,287 | 9,589 | 10,858 | 53,458 | 45,383 | 36,630 | 24,934 | 19,657 | 16,221 | 11,889 | 6,162 | 4,572 |
| Burglary | 135,918 | 5,136 | 16,933 | 118,985 | 160 | 1,096 | 3,880 | 3,498 | 3,941 | 4,358 | 5,231 | 4,581 | 4,237 | 3,949 | 4,119 | 4,029 | 4,547 | 23,255 | 20,176 | 16,164 | 9,670 | 7,690 | 5,652 | 3,500 | 1,424 | 761 |
| Larceny-theft | 682,517 | 20,058 | 71,222 | 611,295 | 289 | 4,338 | 15,431 | 13,767 | 17,134 | 20,263 | 24,642 | 22,883 | 20,523 | 18,928 | 18,482 | 18,955 | 21,845 | 108,977 | 97,128 | 79,907 | 53,493 | 44,675 | 36,003 | 24,975 | 12,077 | 7,802 |
| Motor vehicle theft | 69,502 | 2,766 | 11,202 | 58,300 | 15 | 322 | 2,429 | 2,704 | 2,922 | 2,810 | 2,582 | 2,320 | 2,068 | 2,077 | 2,139 | 2,128 | 3,910 | 12,311 | 10,030 | 7,639 | 4,415 | 3,113 | 1,923 | 1,071 | 398 | 176 |
| Arson | 7,050 | 803 | 1,386 | 5,664 | 56 | 281 | 466 | 220 | 191 | 172 | 189 | 133 | 161 | 148 | 156 | 139 | 159 | 937 | 834 | 793 | 503 | 490 | 406 | 274 | 209 | 133 |
| Violent crime[3] | 396,265 | 11,421 | 38,283 | 357,982 | 178 | 2,755 | 8,488 | 7,214 | 9,223 | 10,425 | 12,532 | 12,129 | 12,177 | 12,778 | 12,714 | 12,860 | 15,182 | 68,000 | 56,257 | 44,614 | 29,896 | 23,322 | 19,170 | 13,946 | 7,039 | 5,296 |
| Violent crime percent distribution[1] | 100.0 | 2.9 | 9.7 | 90.3 | * | 0.7 | 2.1 | 1.8 | 2.3 | 2.6 | 3.2 | 3.1 | 3.1 | 3.2 | 3.2 | 3.2 | 3.8 | 17.2 | 14.2 | 11.3 | 7.5 | 5.9 | 4.8 | 3.5 | 1.8 | 1.3 |
| Property crime[3] | 894,987 | 28,763 | 100,743 | 794,244 | 520 | 6,037 | 22,206 | 20,189 | 24,188 | 27,603 | 32,644 | 29,917 | 26,989 | 25,102 | 24,896 | 25,251 | 30,461 | 145,480 | 128,168 | 104,503 | 68,081 | 55,968 | 43,984 | 29,820 | 14,108 | 8,872 |
| Property crime percent distribution[1] | 100.0 | 3.2 | 11.3 | 88.7 | 0.1 | 0.7 | 2.5 | 2.3 | 2.7 | 3.1 | 3.6 | 3.3 | 3.0 | 2.8 | 2.8 | 2.8 | 3.4 | 16.3 | 14.3 | 11.7 | 7.6 | 6.3 | 4.9 | 3.3 | 1.6 | 1.0 |
| Other assaults | 809,050 | 39,334 | 95,116 | 713,934 | 900 | 11,032 | 27,402 | 18,250 | 19,017 | 18,515 | 18,517 | 18,226 | 19,608 | 22,292 | 23,546 | 24,206 | 29,191 | 132,791 | 113,155 | 94,961 | 65,287 | 53,147 | 41,771 | 29,874 | 15,517 | 11,849 |
| Forgery and counterfeiting | 38,128 | 157 | 792 | 37,336 | 5 | 33 | 119 | 96 | 186 | 353 | 991 | 1,471 | 1,694 | 1,066 | 1,171 | 1,193 | 1,298 | 6,767 | 6,411 | 5,495 | 3,434 | 2,507 | 1,831 | 1,163 | 550 | 304 |
| Fraud | 90,886 | 840 | 3,567 | 87,319 | 9 | 146 | 685 | 685 | 834 | 1,208 | 1,843 | 2,231 | 2,632 | 2,462 | 2,624 | 2,823 | 2,954 | 16,089 | 15,146 | 12,546 | 8,531 | 6,553 | 4,905 | 3,361 | 1,643 | 1,176 |
| Embezzlement | 11,278 | 20 | 443 | 10,835 | 1 | 2 | 17 | 32 | 127 | 264 | 524 | 561 | 545 | 482 | 423 | 455 | 401 | 1,962 | 1,557 | 1,218 | 955 | 704 | 484 | 304 | 150 | 113 |
| Stolen property; buying, receiving, possessing | 70,996 | 1,524 | 7,100 | 63,896 | 14 | 172 | 1,338 | 1,474 | 1,939 | 2,163 | 2,734 | 2,703 | 2,433 | 2,177 | 2,220 | 2,318 | 2,543 | 13,070 | 11,056 | 8,931 | 5,217 | 3,695 | 2,484 | 1,458 | 600 | 257 |
| Vandalism | 137,108 | 8,939 | 23,329 | 113,779 | 362 | 2,572 | 6,005 | 4,490 | 4,972 | 4,928 | 4,971 | 4,472 | 4,179 | 4,798 | 4,549 | 4,575 | 5,321 | 23,092 | 17,703 | 13,580 | 8,469 | 6,487 | 5,022 | 3,532 | 1,744 | 1,285 |
| Weapons; carrying, possessing, etc. | 127,588 | 3,744 | 13,011 | 114,577 | 155 | 1,030 | 2,559 | 2,366 | 2,973 | 3,928 | 4,827 | 5,059 | 4,725 | 5,164 | 5,256 | 5,108 | 7,469 | 23,818 | 17,055 | 12,885 | 7,853 | 5,537 | 4,178 | 2,917 | 1,563 | 1,163 |
| Prostitution and commercialized vice | 23,699 | 41 | 199 | 23,500 | 1 | 7 | 33 | 27 | 43 | 88 | 707 | 763 | 883 | 1,026 | 1,046 | 1,043 | 1,024 | 4,678 | 3,345 | 2,647 | 1,912 | 1,624 | 1,221 | 745 | 441 | 395 |
| Sex offenses (except rape and prostitution) | 35,549 | 2,698 | 5,719 | 29,830 | 88 | 708 | 1,902 | 1,052 | 966 | 1,003 | 1,028 | 947 | 820 | 814 | 788 | 785 | 784 | 3,962 | 3,825 | 3,684 | 2,737 | 2,576 | 2,307 | 2,003 | 1,228 | 1,542 |
| Drug abuse violations | 1,251,852 | 11,758 | 68,612 | 1,183,240 | 84 | 1,818 | 9,856 | 10,754 | 17,201 | 28,899 | 51,840 | 53,810 | 50,975 | 47,929 | 47,147 | 51,871 | | 232,737 | 184,653 | 145,439 | 91,452 | 69,736 | 51,784 | 34,958 | 15,250 | 6,505 |
| Gambling | 2,475 | 23 | 134 | 2,341 | 1 | 3 | 19 | 19 | 33 | 59 | 73 | 88 | 78 | 80 | 89 | 95 | 337 | 366 | 256 | 222 | 171 | 122 | 107 | 112 | 79 | 66 |
| Offenses against the family and children | 64,872 | 893 | 2,477 | 62,395 | 35 | 215 | 643 | 524 | 529 | 531 | 778 | 818 | 930 | 1,138 | 1,273 | 1,437 | 1,822 | 11,381 | 12,312 | 11,381 | 7,429 | 5,360 | 3,360 | 1,853 | 881 | 533 |
| Driving under the influence | 746,575 | 102 | 4,064 | 742,511 | 8 | 12 | 82 | 173 | 931 | 2,858 | 8,738 | 12,302 | 15,201 | 24,707 | 27,098 | 28,130 | 29,216 | 138,434 | 109,648 | 89,300 | 66,707 | 58,840 | 49,594 | 41,037 | 24,388 | 19,151 |
| Liquor laws | 130,921 | 2,767 | 19,922 | 110,999 | 18 | 280 | 2,469 | 3,186 | 5,341 | 8,628 | 17,504 | 19,138 | 15,935 | 3,108 | 2,218 | 1,816 | 1,806 | 8,098 | 6,877 | 6,796 | 5,682 | 5,686 | 5,951 | 5,593 | 3,066 | 1,725 |
| Drunkenness | 252,727 | 378 | 2,512 | 250,215 | 7 | 32 | 339 | 390 | 597 | 1,147 | 3,405 | 4,315 | 4,679 | 7,593 | 7,295 | 7,435 | 7,587 | 38,573 | 34,957 | 31,492 | 24,357 | 23,086 | 21,961 | 18,688 | 9,613 | 5,179 |
| Disorderly conduct | 251,182 | 17,784 | 44,074 | 207,108 | 340 | 4,692 | 12,752 | 8,803 | 9,286 | 8,201 | 7,186 | 6,636 | 6,554 | 8,119 | 7,425 | 7,183 | 8,335 | 35,323 | 29,704 | 25,033 | 17,405 | 15,066 | 13,110 | 10,791 | 5,533 | 4,205 |
| Vagrancy | 18,121 | 145 | 527 | 17,594 | 3 | 18 | 124 | 126 | 137 | 119 | 300 | 253 | 281 | 276 | 278 | 364 | 381 | 2,279 | 2,206 | 2,357 | 1,774 | 1,927 | 1,890 | 1,613 | 922 | 493 |
| All other offenses (except traffic) | 2,439,500 | 28,812 | 106,060 | 2,333,440 | 669 | 5,697 | 22,446 | 20,521 | 25,871 | 30,856 | 43,979 | 55,238 | 62,544 | 68,340 | 71,767 | 75,546 | 83,024 | 439,323 | 388,545 | 328,046 | 219,589 | 175,552 | 138,351 | 99,859 | 50,612 | 33,125 |
| Suspicion | 427 | 14 | 37 | 390 | 0 | 3 | 11 | 3 | 7 | 13 | 40 | 42 | 14 | 12 | 14 | 12 | 14 | 69 | 48 | 25 | 30 | 28 | 15 | 8 | - | - |
| Curfew and loitering law violations | 16,899 | 5,169 | 16,899 | - | 103 | 1,040 | 4,042 | 3,774 | 4,517 | 3,423 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

[1] Because of rounding, the percentages may not add to 100.0.

[2] The rape figures in this table are aggregate totals of the data submitted based on both the legacy and revised Uniform Crime Reporting definitions.

[3] Violent crimes are offenses of murder and nonnegligent manslaughter, rape, robbery, and aggravated assault. Property crimes are offenses of burglary, larceny-theft, motor vehicle theft, and arson.

* Less than one-tenth of 1 percent.

# Exhibit M



| PEPALL6N | Annual Estimates of the Resident Population by Sex, Single Year of Age, Race, and Hispanic Origin for the United States: April 1, 2010 to July 1, 2018 |
| | 2018 Population Estimates |

**Geography: United States**
**Year: April 1, 2010 Census**
**Hispanic Origin: Total**

| Sex | Age | Total | Race Alone | | | |
|-----|-----|-------|------------|---|---|---|
| | | | White | Black or African American | American Indian and Alaska Native | Asian |
| Both Sexes | Total | 308,745,538 | 241,937,061 | 40,250,635 | 3,739,506 | 15,159,516 |
| Both Sexes | 0 | 3,944,153 | 2,853,019 | 598,707 | 64,475 | 182,025 |
| Both Sexes | 1 | 3,978,070 | 2,882,697 | 607,395 | 64,577 | 184,388 |
| Both Sexes | 2 | 4,096,929 | 2,972,028 | 623,053 | 67,005 | 195,492 |
| Both Sexes | 3 | 4,119,040 | 3,003,160 | 622,008 | 67,936 | 193,399 |
| Both Sexes | 4 | 4,063,170 | 2,979,603 | 604,101 | 66,146 | 192,239 |
| Both Sexes | 5 | 4,056,858 | 2,983,760 | 595,581 | 65,509 | 198,428 |
| Both Sexes | 6 | 4,066,381 | 3,007,014 | 592,066 | 63,960 | 197,001 |
| Both Sexes | 7 | 4,030,579 | 2,983,903 | 592,088 | 63,648 | 194,569 |
| Both Sexes | 8 | 4,046,486 | 2,999,712 | 605,344 | 63,219 | 186,111 |
| Both Sexes | 9 | 4,148,353 | 3,069,401 | 627,622 | 64,428 | 195,981 |
| Both Sexes | 10 | 4,172,541 | 3,095,140 | 638,023 | 65,063 | 186,077 |
| Both Sexes | 11 | 4,114,415 | 3,064,410 | 625,174 | 63,637 | 179,516 |
| Both Sexes | 12 | 4,106,243 | 3,054,818 | 628,331 | 63,181 | 184,031 |
| Both Sexes | 13 | 4,118,013 | 3,072,702 | 625,663 | 63,137 | 185,766 |
| Both Sexes | 14 | 4,165,982 | 3,111,902 | 637,255 | 62,865 | 187,097 |
| Both Sexes | 15 | 4,242,820 | 3,156,170 | 670,521 | 64,600 | 187,157 |
| Both Sexes | 16 | 4,316,139 | 3,199,345 | 701,429 | 66,649 | 188,623 |
| Both Sexes | 17 | 4,395,295 | 3,256,234 | 722,407 | 68,433 | 192,994 |
| Both Sexes | 18 | 4,500,855 | 3,334,065 | 735,755 | 70,655 | 206,643 |
| Both Sexes | 19 | 4,585,234 | 3,400,441 | 742,806 | 69,392 | 223,310 |
| Both Sexes | 20 | 4,519,129 | 3,361,045 | 722,209 | 67,979 | 227,482 |
| Both Sexes | 21 | 4,354,294 | 3,253,300 | 672,463 | 64,463 | 233,021 |
| Both Sexes | 22 | 4,264,642 | 3,216,266 | 633,825 | 63,065 | 226,565 |
| Both Sexes | 23 | 4,198,571 | 3,183,516 | 608,273 | 61,545 | 225,874 |
| Both Sexes | 24 | 4,249,363 | 3,231,552 | 603,019 | 61,655 | 236,245 |
| Both Sexes | 25 | 4,262,350 | 3,244,668 | 594,557 | 61,045 | 247,806 |
| Both Sexes | 26 | 4,152,305 | 3,158,473 | 572,662 | 59,639 | 250,948 |
| Both Sexes | 27 | 4,248,869 | 3,233,210 | 583,488 | 61,025 | 259,774 |
| Both Sexes | 28 | 4,215,249 | 3,209,469 | 576,376 | 58,766 | 262,540 |
| Both Sexes | 29 | 4,223,076 | 3,214,683 | 584,328 | 59,395 | 257,585 |
| Both Sexes | 30 | 4,285,668 | 3,251,700 | 600,613 | 59,494 | 267,830 |
| Both Sexes | 31 | 3,970,218 | 3,016,017 | 551,463 | 54,725 | 251,238 |
| Both Sexes | 32 | 3,986,847 | 3,040,408 | 545,058 | 55,114 | 250,959 |
| Both Sexes | 33 | 3,880,150 | 2,955,516 | 526,643 | 53,373 | 253,843 |
| Both Sexes | 34 | 3,839,216 | 2,920,389 | 519,322 | 52,518 | 260,058 |
| Both Sexes | 35 | 3,956,434 | 3,019,717 | 529,852 | 53,189 | 269,845 |
| Both Sexes | 36 | 3,802,087 | 2,897,071 | 511,218 | 50,895 | 263,224 |
| Both Sexes | 37 | 3,934,445 | 2,997,268 | 535,916 | 51,679 | 269,476 |
| Both Sexes | 38 | 4,121,880 | 3,172,607 | 550,946 | 51,962 | 266,481 |

10/08/2019

# Exhibit N

# Juvenile Justice Center

**American Bar Association** 

740 15th Street, NW  Washington, DC 20005 • 202.662.1506 • juvjus@abanet.org • www.abanet.org/crimjust/juvjus

January 2004

### *Cruel and Unusual Punishment: The Juvenile Death Penalty*

# Adolescence, Brain Development and Legal Culpability

*"[They] frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others…. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability."*

Atkins v. Virginia, *536 U.S. 304, 318, 122 S.Ct. 2242, 2250 (2002)*

In 2002, the U.S. Supreme Court banned the execution of mentally retarded persons. This decision, *Atkins v. Virginia*, cited the underdeveloped mental capacities of those with mental retardation as a major factor behind the Justices' decision.

Adolescence is a transitional period during which a child is becoming, but is not yet, an adult. An adolescent is at a crossroads of changes where emotions, hormones, judgment, identity and the physical body are so in flux that parents and even experts struggle to fully understand.

As a society, we recognize the limitations of adolescents and, therefore, restrict their privileges to vote, serve on a jury, consume alcohol, marry, enter into contracts, and even watch movies with mature content. Each year, the United States spends billions of dollars to promote drug use prevention and sex education to protect youth at this vulnerable stage of life. When it comes to the death penalty, however, we treat them as fully functioning adults.

## The Basics of the Human Brain

The human brain has been called the most complex three-pound mass in the known universe. This is a well deserved reputation, for this organ contains billions of connections among its parts and governs countless actions, involuntary and voluntary, physical, mental and emotional.

The largest part of the brain is the *frontal lobe*. A small area of the frontal lobe located behind the forehead, called the *prefrontal cortex*, controls the brain's most advanced functions. This

part, often referred to as the "CEO" of the body, provides humans with advanced cognition. It allows us to prioritize thoughts, imagine, think in the abstract, anticipate consequences, plan, and control impulses.

Along with everything else in the body, the brain changes significantly during adolescence. In the last five years, scientists, using new technologies, have discovered that adolescent brains are far less developed than previously believed.

## New Technology, New Discoveries

Scientists are now utilizing advances in magnetic resonance imaging (MRI) to create and study three-dimensional images of the brain without the use of radiation (as in an x-ray). This breakthrough allows scientists to safely scan children over many years, tracking the development of their brains.[1]

Researchers at Harvard Medical School, the National Institute of Mental Health, UCLA, and others, are collaborating to "map" the development of the brain from childhood to adulthood and examine its implications.



A three dimensional "map" showing portions of gray matter "pruned" from the brain between adolescence and adulthood.  The dark portions in the two boxes indicate sections that will be discarded from the **frontal lobe**. The box on the far right indicates the **prefrontal cortex**, a subsection of the frontal lobe that controls judgment.

Image adapted from *Nature Neuroscience*.

Lobes of the Brain:

Parietal lobe

Occipital lobe

Frontal lobe

Temporal lobe

(pre-frontal cortex)

©2002 Hybrid Medical Animation

The scientists, to their surprise, discovered that the teenage brain undergoes an intense overproduction of *gray matter* (the brain tissue that does the "thinking"). Then a period of "pruning" takes over, during which the brain discards gray matter at a rapid rate.[2] This process is similar to pruning a tree: cutting back branches stimulates health and growth.

In the brain, pruning is accompanied by *myelination*, a process in which *white matter* develops. White matter is fatty tissue that serves as insulation for the brain's circuitry, making the brain's operation more precise and efficient.[3]

Researchers have carefully scrutinized the pace and severity of these changes and have learned that they continue into a person's early 20s. Dr. Elizabeth Sowell, a member of the UCLA brain research team, has led studies of brain development from adolescence to adulthood. She and her colleagues found that the frontal lobe undergoes far more change during adolescence than at any other stage of life.[4] It is also the last part of the brain to develop, which means that even as they become fully capable in other areas, adolescents cannot reason as well as adults: "[m]aturation, particularly in the frontal lobes, has been shown to correlate with measures of cognitive functioning."[5]

### Biology and Behavior

Jay Giedd, a researcher at the National Institute of Mental Health, explains that during adolescence the "part of the brain that is helping organization, planning and strategizing is not done being built yet…. It's sort of unfair to expect [adolescents] to have adult levels of organizational skills or decision making before their brain is finished being built."[6]

Dr. Deborah Yurgelun-Todd of Harvard Medical School has studied the relation between these new findings and teen behavior and concluded that adolescents often rely on emotional parts of the brain, rather than the frontal lobe. She explains, "one of the things that teenagers seem to do is to respond more strongly with gut response than they do with evaluating the consequences of what they're doing."[7]

Also, appearances may be deceiving: "Just because they're physically mature, they may not appreciate the consequences or weigh information the same way as adults do. So we may be mistaken if we think that [although] somebody looks physically mature, their brain may in fact not be mature."[8]

This discovery gives us a new understanding into juvenile delinquency. The frontal lobe is "involved in behavioral facets germane to many aspects of criminal culpability,"[9] explains Dr. Ruben C. Gur, neuropsychologist and Director of the Brain Behavior Laboratory at the University of Pennsylvania. "Perhaps most relevant is the involvement of these brain regions in the control of aggression and other impulses…. If the neural substrates of these behaviors have not reached maturity before adulthood, it is unreasonable to expect the behaviors themselves to reflect mature thought processes.

"The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable…. Indeed, age 21 or 22 would be closer to the 'biological' age of maturity."[10]

### Other Changes in the Body

In addition to the profound physical changes of the brain, adolescents also undergo dramatic hormonal and emotional changes. One of the hormones which has the most dramatic effect on the body is testosterone. Testosterone, which is closely associated with aggression, increases tenfold in adolescent boys.[11]

> "Just because they're physically mature, they may not appreciate the consequences or weigh information the same way as adults do. So, [although] somebody looks physically mature, their brain may in fact not be mature."
>
> Deborah Yurgelun-Todd, PhD
> Brain Imaging Laboratory,
> McClean Hospital
> Harvard University Medical School

Emotionally, an adolescent "is really both part child and part adult,"[12] explains Melvin Lewis, an expert in child psychiatry and pediatrics at Yale University School of Medicine. Normal development at this time includes self-searching, during which the adolescent tries to grow out of his or her childlike self. This change is complicated by the conflict between an adolescent's new sense of adult identity and remaining juvenile insecurities.

The behaviors associated with this process include self-absorption, a need for privacy, mood swings, unique dress, and escapism, such as video games, music, and talking on the phone, as well as riskier behaviors, such as drug use or sexual activity.[13]

### Childhood Abuse and Violence

In addition to this context of change and volatility, research shows that abusive childhood experiences can trigger violent behavior. The American Academy of Pediatrics has identified several risk factors that can spark violence in adolescents, including being witness to domestic violence or substance abuse within the family, being poorly or inappropriately supervised, and being the victim of physical or sexual assault.[14]

Researcher Phyllis L. Crocker of Cleveland-Marshall College of Law has written that "the nexus between poverty, childhood abuse and neglect, social and emotional dysfunction, alcohol and drug abuse and crime is so tight in the lives of many capital defendants as to form a kind of social historical profile."[15]

> "The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable...."
>
> Ruben Gur,  MD, PhD
> Director, University of
> Pennsylvania Medical Center

Dr. Chris Mallett, Public Policy Director at Bellefaire Jewish Children's Bureau in Ohio, recently completed the most comprehensive study of traumatic experiences in the lives of death row juvenile offenders to date.[16] He found that:

- 74% experienced family dysfunction[17]
- 60% were victims of abuse and/or neglect[18]
- 43% had a diagnosed psychiatric disorder[19]
- 38% suffered from substance addictions[20]
- 38% lived in poverty[21]

More than 30% of death row juvenile offenders had experienced six or more distinct areas of childhood trauma with an overall average of four such experiences per offender. Most children and adolescents do not face even one of these defined areas of difficulty.[22] Mallett also found that such mitigating evidence was presented to juries in fewer than half of the offenders' trials.[23]

Mallett's research confirmed findings in previous studies. In 1992, researchers found that two-thirds of all juveniles sentenced to death had backgrounds of abuse, psychological disorders, low IQ, indigence, and/or substance abuse.[24]



Dr. Jay Giedd of the National Institute of Mental Health. Image courtesy of PBS Frontline report *Inside the Teenage Brain*.

In 1987, an investigation into 14 juveniles on death row[25] (40% of the total at the time) revealed that nine had major neuropsychological disorders[26] and seven had psychotic disorders since early childhood.[27] All but two had IQ scores under 90.[28] Only three had average reading abilities, and another three had learned to read only after arriving on death row.[29] Twelve reported having been physically or sexually abused, including five who were sodomized by relatives.[30]

### Delinquency Link

The turmoil often associated with adolescence can result in poor decisions and desperate behaviors. For example, studies have found that 20 to 30% of high school students consider suicide. Suicide is the third-leading cause of death among teenagers, occurring once every two hours, or over 4,000 times a year, according to the U.S. Surgeon General.[31] Approximately 30% of youths reported using an illicit drug at least once during their lifetime, and 22.2% reported using an illicit drug within the past year.[32]

### Conclusion

New discoveries provide scientific confirmation that the teen years are a time of significant transition. They shed light on the mysteries of adolescence and demonstrate that adolescents have significant neurological deficiencies that result in stark limitations of judgment. Research suggests that when compounded with risk factors (neglect, abuse, poverty, etc.), these limitations can set the psychological stage for violence.

These discoveries support the assertion that adolescents are less morally culpable for their actions than competent adults and are more capable of change and rehabilitation. The ultimate punishment for minors is contrary to the idea of fairness in our justice system, which accords the greatest punishments to the most blameworthy.

This fresh understanding of adolescence does not excuse juvenile offenders from punishment for violent crime, but it clearly lessens their culpability. This concept is not new; it is why we refer to those under 18 as "minors" and "juveniles"— because, in so many respects, they are *less than adult*.

# American Bar Association Juvenile Justice Center

## Notes

1 For an excellent overview, see Elkhonon Goldberg, *The Executive Brain: Frontal Lobes and the Civilized Mind,* Oxford University Press (2001).

2 Sowell, Elizabeth R, Paul M. Thompson, Colin J. Holems, Terry L. Jernigan and Arthur W. Toga. *In vivo evidence for post-adolescent brain maturation in frontal and striatal regions.* 2 Nature Neuroscience 10 (1999), also Paus, Tomas, Jay Giedd, et. al. *Structural maturation of neural pathways in children and adolescents: in vivo study.* Science, 283 (1999).

3 Id.

4 Id.

5 Sowell, Elizabeth R, Paul M. Thompson, Kevin D. Tessner and Arthur W. Toga. *Mapping continued brain growth and gray matter density reduction in dorsal frontal cortex: inverse relationships during postadolescent brain maturation,* 21 Journal of Neuroscience 22 (2001), at 8819, also Reiss, A.L., et. al., *Brain development, gender and IQ in children, a volumetric imaging study.* Brain, 119 (1996).

6 PBS Frontline, *Inside the Teen Brain.* See *Interview with Jay Giedd,* online at www.pbs.org/wgbh/pages/frontline/shows/teenbrain/.

7 Id, at *Interview with Deborah Yurgelun-Todd.*

8 Id.

9 Gur, Ruben C. Declaration of Ruben C. Gur., PhD, *Patterson v. Texas.* Petition for Writ of Certiorari to US Supreme Court, J. Gary Hart, Counsel. (Online at: www.abanet.org/crimjust/juvjus/patterson.html)

10 Id.

11 See Adams, Gerald R., Raymond Montemayor, and Thomas P. Gullota, eds. *Psychosocial Development during Adolescence.* Thousand Oaks, CA, Sage Publications (1996).

12 Lewis, Melvin. *Child and Adolescent Psychiatry: A comprehensive textbook,* Lippincott Williams and Wilkins (2002).

13 See id, and Cobb, Nancy J. *Adolescence: Continuity, Change and Diversity.* Mayfield Publishing, CA (1998).

14 American Society of Pediatrics, *Policy Statement,* 1 Pediatrics, 103 (1999).

15 Phyllis L. Crocker. *Childhood Abuse and Adult Murder: Implications for the Death Penalty,* 77 NC L. Rev. 1143 (1999).

16 Mallett, Chris. *Socio-Historical Analysis of Juvenile Offenders on Death Row,* 3 Juv. Corr. Mental Health Report 65 (2003).

17 Id., at 77.

18 Id., at 78.

19 Id., at 77.

20 Id., at 78.

21 Id.

22 Id.

23 Id.

24 Robinson, DA and Stephens, OH; *Patterns of mitigating factors in juvenile death penalty cases,* 3 Criminal Law Bulletin 28 (1992).

25 Lewis, DO, Pincus, Bard, Richardson, Prichep, Feldman, Yeager. *Neuropsychiatric, psychoeducational, and family characteristics of 14 juveniles condemned to death in the United States,* 5 Am. J. of Psychiatry 145 (1988).

26 Id.

27 Id.

28 Id.

29 Id.

30 Id.

31 Office of the U.S. Surgeon General, *At a Glance, Suicide Among the Young:* Online at www.surgeongeneral.gov/library/calltoaction/fact3.htm

32 White House Office of National Drug Control Policy, Juveniles and Drugs, at www.whitehousedrugpolicy.gov/drugfact/juveniles/index.html

*This publication was supported in part by a grant from the Soros Justice Fellowship of the Open Society Institute. By Adam Ortiz.*



**Defending Liberty
Pursuing Justice**

(202)662-1506 (phone) ■ (202)662-1507 (fax) ■ www.abanet.org/crimjust/juvjus ■ juvjus@abanet.org

# Exhibit O



# Exhibit P

# When Lawmakers Try to Ban Assault Weapons, Gunmakers Adapt

By Jeremy White

July 31, 2019



As the United States witnesses dozens of mass shootings each year, one proposal to limit the carnage turns up again and again: an assault weapons ban.

SER-272

Even though military-style weapons are used in few shootings, they have proven to be the deadliest, and the most visible targets for legislation.



But the nature of today's most popular rifles — and the determination of gunmakers, firearms hobbyists and Second Amendment enthusiasts — means weapons bans have worked better in theory than in practice.

**SER-273**

Gunmakers and owners can modify guns in ways that keep the weapons **legal** but nearly indistinguishable from **illegal** assault weapons.

**SER-274**

Modern sporting rifles, patterned after the Colt AR-15, are versatile platforms for accessories. Their **tactical attachments** help make them popular.



**SER-275**

California was the first state to define and ban assault weapons, after an elementary school shooting in 1989. As in seven other states, it is **illegal** to sell or import **high-capacity magazines** for rifles that can hold more than 10 rounds.

**SER-276**



California has also tried regulating guns with lower-capacity **detachable magazines** that make reloading faster — and potentially deadlier in a mass shooting scenario.

**SER-277**

It is **illegal** for a rifle with a **detachable magazine** to have certain other features that lawmakers say belong on the **battlefield**.



Gun owners say those features are largely **cosmetic** and don't necessarily make the weapon more dangerous. The proof, they say, is that the same features remain **legal** for rifles with a **fixed**, or attached, magazine.

**SER-278**



**SER-279**

Gun owners who wanted these features still valued the quick-change performance of a rifle with a detachable magazine. So gunmakers engineered a solution.



**SER-280**

They added a **magazine release** that required a tool as simple as a **bullet** and made reloading easier.



**SER-281**

In 2016, after the San Bernardino shooting, California lawmakers tried again. They **banned bullet buttons** and introduced a new definition for **fixed magazines**.

**SER-282**



**SER-283**

To replace the magazine, the gun must be "**disassembled**" and the firearm action opened. In theory, this requirement would slow reloading times.

SER-284



It did not take long for gunmakers and third-party manufacturers to find a way to comply with the law while still offering consumers a similar product with all the same accessories.



Inexpensive **modification kits** on the market now make it quick and simple to "disassemble" the rifle.

**SER-286**

These allow the firearm action to **open slightly** with the press of a button. The magazine can then be removed with a traditional release. The banned features become **legal again**.



As a result, the latest AR-15 patterned rifles are not that different from the assault weapons California banned in 1989.

Federal restrictions have seen a similar response from gunmakers.

SER-289

After the 2018 Las Vegas shooting — the deadliest mass shooting in modern U.S. history — the Justice Department **banned bump stocks**, which the shooter used to fire more than 1,100 rounds in 11 minutes.





But a recent trigger adaptation, called a **binary trigger**, increases firing speed much like a bump stock and is **legal** in many states. It allows the firearm to shoot one bullet when the trigger is **pulled** …

**SER-291**



… and one when it is **released**.

**SER-292**



**SER-293**



A 30-round magazine can be emptied in about **three seconds**.

**SER-294**



A federal judge recently upheld California's assault weapons ban, ruling that semiautomatic assault rifles were "**essentially indistinguishable**" from machine guns. Similar bills were introduced in the United States House and Senate this year.

**SER-295**

Yet the modifications remain legal, and gunmakers will most likely respond to future restrictions with fresh adaptations.



Michael Schwartz, executive director of the San Diego County Gun Owners, an advocacy group, said flexibility is the AR-15's advantage: "After 60-plus years, it's still an **extremely good design**."



SER-297

# Exhibit Q

# VOTERS' PAMPHLET

## WASHINGTON STATE ELECTIONS

### GENERAL ELECTION
### NOVEMBER 6



## 2018

YOUR BALLOT WILL BE MAILED BY **OCTOBER 19**

(800) 448-4881 | vote.wa.gov

OFFICIAL PUBLICATION



Secretary of State

DOL00000031

**2**

## A message from Secretary of State Kim Wyman

Welcome to your 2018 General Election Voters' Pamphlet!

This important election will decide local, state, and national races and issues. All 10 of Washington's congressional seats and a statewide race for the U.S. Senate are on the ballot in this election, as are all 98 seats in the state House of Representatives and 25 of 49 seats in the state Senate. City and county elections will select judges, council members, and other officials who administer day-to-day government functions locally.

Several statewide initiatives are on the ballot this year as well, with the potential to significantly affect public policy and Washingtonians' lives. For more than a century, citizens have used petitions to place issues directly before the state's voters, and the Voters' Pamphlet has provided valuable information about what each proposal would do. Inside this edition of the Pamphlet, you'll find explanations of each initiative, the impact each would have on state government finances, and arguments for and against.

To participate in this election, you must be registered to vote in Washington. You may check your registration status anytime online at MyVote.wa.gov. If you are not yet registered to vote in this year's General Election, you have until October 29th to register at your county's elections office.

This year, you and voters throughout the state will be able to return ballots by mail without using a stamp. This new convenience provides greater access to elections. Whether you use a mailbox or drop box, you can cast your vote postage-free.

Voting is your opportunity to make your voice heard at the ballot box and make a difference in your community. Please take time to read through this Voters' Pamphlet to learn about the important issues and political offices being decided this year, and then fill out your ballot and return it by November 6th by mail or in one of your county's drop boxes.

Thank you for your time and your participation in the political process. Make an impact in your community and our state by voting this fall!



Kim Wyman
Secretary of State

 @secstatewa

 /WASecretaryofState
/WashingtonStateElections

DOL00000032

**3**

November 6, 2018 General Election

# Table of contents

Voting in Washington State . . . . . . . 4
Accessible Pamphlets . . . . . . . . 5
Language Assistance . . . . . . . . 6

**Measures**
Initiative Measure No. 1631. . . . . . . 8
Initiative Measure No. 1634. . . . . . 18
Initiative Measure No. 1639. . . . . . 21
Initiative Measure No. 940 . . . . . . 27
Advisory Votes. . . . . . . . . . 32

**Candidates**
U.S. Senate . . . . . . . . . 37
U.S. House of Representatives . . . . 40
State Legislative Offices. . . . . . . 48
State Judicial Offices. . . . . . . . 69

**More information**
Complete Text of Measures . . . . . 76
Contact Your County . . . . . . . 102



### Local Candidates and Measures

This pamphlet contains information for state candidates and measures.

You will receive a Local Voters' Pamphlet from your county elections department with information on local candidates and issues.

If you do not receive a Local Voters' Pamphlet by the time you receive your ballot, please call the Pierce County Elections Department at (253) 798-VOTE (8683).

You can also visit MyVote.wa.gov to view your online voters' guide.



### Political parties

**Washington State Democrats**

PO Box 4027
Seattle, WA 98194
(206) 583-0664
info@wa-democrats.org
www.wa-democrats.org

**Washington State Republican Party**

11811 NE 1st St, Ste A306
Bellevue, WA 98005
(425) 460-0570
caleb@wsrp.org
www.wsrp.org



### Who donates to campaigns?

View financial contributors for candidates and measures:

**Public Disclosure Commission**

www.pdc.wa.gov
Toll Free (877) 601-2828

DOL00000033

| Initiative Measure No. **1639** | **21** |
| --- | --- |

Initiative Measure No.

# 1639

Initiative Measure No. 1639 concerns firearms.

This measure would require increased background checks, training, age limitations, and waiting periods for sales or delivery of semiautomatic assault rifles; criminalize noncompliant storage upon unauthorized use; allow fees; and enact other provisions.

Should this measure be enacted into law?

[  ] Yes
[  ] No

**Explanatory Statement**   .   .   .   .   .   .   . 22
**Fiscal Impact Statement**   .   .   .   .   .   .   . 24
**Arguments For and Against**   .   .   .   .   .   . 26

 The Secretary of State is not responsible for the content of statements or arguments (WAC 434-381-180).

DOL00000051

**SER-302**

22          Initiative Measure No. **1639**

# Explanatory Statement

Written by the Office of the Attorney General

## The Law as it Presently Exists

Washington law requires background checks for the sale or transfer of firearms, with exceptions. This background check requirement applies to sales and transfers of firearms through firearms dealers, at gun shows, online, and between unlicensed private individuals. This requirement applies to most sales of firearms, as well as gifts or loans of firearms. The background check includes checking with federal and state agencies for criminal convictions, pending criminal charges or warrants, and certain mental health records.

A sale or transfer of a firearm cannot take place if the background check shows that the buyer or recipient is legally ineligible to possess it. The sale or transfer of a firearm may be completed if the result of a background check is not received within 10 business days. That 10 day period is extended to 60 days if the buyer or recipient does not have a valid permanent Washington driver's license or state identification card, or has not lived in Washington for at least 90 days. It is a felony to deliver a firearm to any person reasonably believed to be prohibited from owning or possessing a firearm.

The delivery of a pistol may be restricted based on an outstanding warrant for a buyer's arrest or certain other charges or proceedings that might be pending against the buyer. Certain recordkeeping requirements apply to the sale of a pistol that do not apply to other types of firearms. A licensed firearm dealer must report to the state the buyer's name, address, and other information. The state maintains records of the sales of pistols. The state does not maintain records of other transfers or a registry of firearms. State law requires that an application for the purchase of a pistol contain a warning about the possibility of criminal prosecution for the illegal possession of firearms, and that state and federal laws regarding possession of firearms differ.

State law makes it illegal to possess some kinds of firearms. These include machine guns, short-barreled shotguns, and short-barreled rifles. Machine guns include firearms that do not require a separate trigger pull for each shot, and can store ammunition in a separable device such as a clip that can fire at the rate of five or more shots per second. There are exceptions to this prohibition.

State law prohibits certain people from possessing firearms. A person convicted of certain crimes or found not guilty by reason of insanity is ineligible to possess a firearm. The entry of a civil commitment order based on mental health also makes a person ineligible to possess a firearm.

The entry of restraining orders for harassing, stalking, or threatening an intimate partner or child may make a person ineligible to possess a firearm under some circumstances. Firearm rights can be restored under some circumstances.

People between the ages of 18 and 21 are generally allowed to possess a pistol only in their residence, their place of business, or property under their control. A person under age 18 is generally prohibited from possessing a firearm. State law allows a person under age 18 to possess a firearm only under limited circumstances. These exceptions include, among others: while attending a firearms safety course, while practicing or target shooting at an approved range, while competing in an organized competition, while hunting with a valid hunting license, or in certain instances with parental permission.

Residents of other states may purchase rifles and shotguns in Washington if they are eligible to possess such weapons under federal law and the laws of both Washington and the state in which they reside. Nonresidents are subject to the same background check requirements that apply to Washington residents.

State law does not currently require firearms safety training to possess a firearm. Hunter safety training may be required to obtain a hunting license. State law does not specifically regulate firearms storage.

## The Effect of the Proposed Measure if Approved

This measure would change state laws regarding firearms. Some of these changes would relate only to semiautomatic assault rifles, as defined. Other changes would apply to other types of firearms as well.

> The initiative defines a "semiautomatic assault rifle" to mean:
>
> any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

The initiative defines semiautomatic assault rifles not to include antique firearms, permanently inoperable firearms, or any firearm that is manually operated by bolt, pump, lever, or slide action.

This initiative would add new requirements for the purchase of a semiautomatic assault rifle. Buyers would be required to provide proof that they have completed a recognized firearm safety training program within the past five years. That training program must include instruction on:

- Basic firearms safety rules;
- Firearms and children, including secure gun storage and talking to children about gun safety;

| Initiative Measure No. **1639** | **23** |
| --- | --- |

- Firearms and suicide prevention;
- Secure gun storage to prevent unauthorized access and use;
- Safe handling of firearms; and
- State and federal firearms laws, including prohibited firearms transfers.

This initiative would make it illegal for a person under 21 years of age to buy a pistol or semiautomatic assault rifle. It would make it illegal for any person to sell or transfer a semiautomatic assault rifle to a person under age 21. The initiative would prohibit a person between the ages of 18 and 21 from possessing a semiautomatic assault rifle except in the person's residence, fixed place of business, on real property under his or her control, or for other specified purposes.

The initiative would require a dealer to wait at least 10 days before delivering a semiautomatic assault rifle to a buyer. It would also prohibit anyone who is not a resident of Washington from buying a semiautomatic assault rifle in Washington.

The initiative would change some laws that currently apply only to pistols and apply them to both pistols and semiautomatic assault rifles. These include restrictions on delivery when a buyer has an outstanding warrant for his or her arrest. This would also be true for situations in which certain charges or proceedings are pending. Background check and record keeping requirements that currently apply only to the purchase of pistols would also apply to the purchase of semiautomatic assault rifles. The same requirements for collecting and maintaining information on purchases of pistols would apply to purchases of semiautomatic assault rifles.

The initiative would require a new warning on application forms for the purchase of a pistol or semiautomatic assault rifle. This new warning would read:

> CAUTION: The presence of a firearm in the home has been associated with an increased risk of suicide, death during domestic violence incidents, and unintentional deaths to children and others.

The initiative would allow the state to impose a fee of up to $25 on each purchaser of a semiautomatic assault rifle. This fee would be used to offset certain costs of implementing the initiative. The fee would be adjusted for inflation.

The initiative would create new criminal offenses for the unsafe storage of a firearm if a person who cannot legally possess a firearm gets it and uses it in specified ways. These crimes would apply to a person who stores or leaves a firearm in a place where the person knows, or reasonably should know, that a prohibited person may gain access to

the firearm. Failure to securely store a firearm would only be a crime if certain other events happen. A person who fails to securely store a firearm would be guilty of a felony if a person who is legally ineligible to possess a firearm uses it to cause personal injury or death. A person who fails to securely store a firearm would be guilty of a gross misdemeanor if a person who is legally ineligible to possess a firearm discharges it, uses it in a way that shows intent to intimidate someone or that warrants alarm for the safety of others, or uses the firearm in the commission of a crime.

The initiative would not mandate how or where a firearm must be stored. But it would provide that the crimes regarding unsecure storage would sometimes not apply. Those crimes would not apply if the firearm was in secure gun storage, meaning a locked box, gun safe, or other locked storage space that is designed to prevent unauthorized use or discharge of a firearm. The crimes also would not apply if the firearm was secured with a trigger lock or similar device that is designed to prevent the unauthorized use or discharge of the firearm. The crimes would not apply if the person who gets the firearm is ineligible to possess it because of age but the access is with parental permission and under adult supervision. The crimes would not apply in cases of self-defense. Finally, the crimes would not apply if the person who is ineligible to possess a firearm obtains it through unlawful entry, if the unauthorized access or theft is reported to law enforcement within five days of the time the victim knew or should have known that the firearm had been taken.

The initiative would require every firearm dealer to offer to sell or give the purchaser or transferee of any firearm a secure gun storage device or trigger lock. It would also require every store, shop, or sales outlet where firearms are sold to post a warning sign advising buyers that they may face criminal prosecution if they store or leave an unsecured firearm where a person prohibited from possessing the firearm can get it. A similar written warning must be delivered to firearm buyers and transferees. Violation of these requirements would be a civil infraction.

Finally, the initiative would require the development of a cost-effective and efficient process to verify that people who have acquired pistols or semiautomatic assault rifles remain eligible to possess a firearm under state and federal law. This process would provide for notice to local chiefs of police and sheriffs to take steps to ensure that persons legally ineligible to possess firearms are not illegally in possession of firearms.

DOL00000053

**24** Initiative Measure No. **1639**

# Fiscal Impact Statement

Written by the Office of Financial Management
For more information visit www.ofm.wa.gov/ballot

## FISCAL IMPACT SUMMARY

Initiative 1639 changes state laws regarding firearms. It allows the state to collect a fee up to $25 for certain rifle sales and transfers; however, the number of these rifle sales and transfers isn't available. The initiative creates new criminal offenses for unsafe storage of a firearm. The state and local costs related to these criminal offenses cannot be determined as there is no data to estimate the number of cases filed or persons convicted each year. The cost for the annual verification cannot be determined as the process has not been developed. Therefore, the fiscal impacts cannot be determined.

## General Assumptions

- The effective date of the initiative is July 1, 2019, except Section 13, which takes effect Jan. 1, 2019.
- The provisions of the initiative apply prospectively, not retroactively.
- No data is available on the number of semiautomatic rifles bought or transferred each year in Washington. Federal law prohibits the tracking of gun purchases (U.S.C. Title 18, Part 1, Chapter 44, Sec. 926).
- Fiscal estimates use the state's fiscal year of July 1 through June 30. Fiscal year 2019 is July 1, 2018, to June 30, 2019.

## REVENUE

### State Revenue

The Department of Licensing (DOL) would be authorized to charge a fee of up to $25 for each semiautomatic assault rifle (SAR) sale or transfer. (The initiative includes a new definition for SAR.) The fee would be adjusted for inflation. The initiative specifies the distribution of this revenue to state agencies and local law enforcement agencies for record keeping and other related costs they incur. Because data is not available to provide an estimate on the number of SARs purchased, no estimate of state revenue is available. However, the state does have data on the number of background checks conducted for concealed pistol licenses (CPLs) and sales of handguns and long guns (which would include SARs and other long guns). An average of 560,000 such background checks were conducted each year between 2013 and 2017.

Washington state law also requires mental health background checks for all CPLs and handgun sales, but not long gun sales. An average of 300,000 mental health

background checks were conducted each year between 2013 and 2017.

Subtracting the number of mental health background checks for CPLs and handguns from the number of criminal checks for CPLs, hand guns and long guns yields an average estimate of 260,000 long gun criminal checks per year. The state does not have data to determine what percentage of the total long gun checks would meet the definition of SAR under the initiative.

## EXPENDITURES

### State Government Expenditures

### Annual verification of eligibility to possess a firearm

The initiative would allow, but would not require, DOL, Washington State Patrol and other state and local law enforcement agencies to form a temporary group to advise on how to set up an efficient, cost-effective process for annual verification of eligibility to possess a firearm. Whether such a group is formed, and what expenses it may incur, are unknown and indeterminate. However, DOL has conducted similar work group activities that cost $15,000.

The initiative does not define the verification process, and DOL has not yet identified a likely option or set of options for annual verifications. Therefore potential costs to state and local governments are indeterminate.

### Mental health background checks

The initiative would require mental health background checks for someone to purchase a SAR. Although data is not available to estimate the number of additional mental health background checks that would need to be performed, more work is likely for the Health Care Authority. One or more additional background check specialists could be hired at an annual cost of $83,000 each.

### Unsafe storage of a firearm crime

The initiative would create a new class C felony of Community Endangerment Due to Unsafe Storage of a Firearm in the First Degree. It would be punishable by 0–12 months in county jail (see local expenditure impacts). The number of potential prosecutions and convictions of this new crime is unknown.

If an aggravated exceptional sentence were imposed, a sentence exceeding 12 months would result and be served at a state prison. The average cost of a state prison bed is $101 per day.

There would be an indeterminate fiscal impact due to additional filings or trial court proceedings to the Administrative Office of the Courts as a result of any new misdemeanor and/or felony charges.

Dealers registered with DOL would be required to post

DOL00000054

| Initiative Measure No. **1639** | **25** |
| --- | --- |

warning signs and provide a written warning to a purchaser about secure gun storage. DOL would incur minimal costs to print and mail the warning signs to dealers.

### Record keeping

The initiative would require the Department of Licensing to keep records of CPL and SAR applications and transfers. The department already tracks CPL applications and transfers. The addition of SARs to record keeping, as required by the initiative, would increase the data input workload to its firearms database. (While online submission is available, DOL receives 60 percent of applications by mail, in paper form, from dealers and private gun sales.) The department would also incur costs to update forms and upgrade computer systems to add SAR records to its firearms database. DOL would experience rule-making, information services and administrative costs to implement this initiative. One-time costs would be at least $1.1 million and $500,000 annually thereafter. Additional staffing costs could be incurred, depending on the number of SAR records the agency processes.

### *Local Government Expenditures*

### Annual verification of eligibility to possess a firearm

If a person is found ineligible to possess a pistol or SAR, the Department of Licensing is required to notify a chief of police or sheriff, who then takes steps to ensure that the person does not illegally possess one. Associated costs are indeterminate.

### Unsafe storage of a firearm crime

The initiative would create a new class C felony (Community Endangerment Due to Unsafe Storage of a Firearm in the First Degree). As an unranked Class C felony offense, it is punishable by a standard range term of confinement of 0–12 months in jail.

It also would create a new gross misdemeanor (Community Endangerment Due to Unsafe Storage of a Firearm in the Second Degree). As a gross misdemeanor offense, it is punishable by a standard range term of confinement of 0–364 days in jail.

Average costs to prosecute and defend a comparable felony are $2,260 and, for a comparable misdemeanor, approximately $1,700.

Sentences of less than one year in length are typically served in county jails. The average cost of a county jail bed is $106 per day.

According to local governments, it is unknown how many people may be charged, tried or convicted. Costs are indeterminate for city and county law enforcement agencies, prosecutors, indigent defense attorneys and county jails.



**view ballot status**

myvote.wa.gov

MyVote

DOL00000055

**26**                          Initiative Measure No. **1639**

# Argument for

***Yes* on I-1639: For Safer Schools and Communities**
Five of the last six school shooters used an assault weapon; 80% of school shooters obtained guns from their own home or that of a relative or friend. Over 187,000 students have experienced school gun violence since 1999. Deadly shootings, including Parkland, Las Vegas, Orlando, and even Mukilteo, involved assault weapons. Enough is enough. We need to get serious about keeping firearms, especially assault weapons, out of the wrong hands.

**Assault Weapons are Made to Kill**
Assault weapons are not designed for hunting or protecting families from danger; they are military-grade weapons designed to kill large numbers of people. These weapons belong in the hands of trained experts, not people who might harm others.

**Commonsense Reforms**
In the U.S. military, soldiers are not allowed to handle firearms without training. Yet, anyone in Washington can buy military-grade weapons without training or additional screening. This measure prevents anyone under the age of 21 from purchasing a semi-automatic assault rifle. It requires additional background checks and mandatory training so people who buy these weapons use them safely. I-1639 requires securing these and other deadly weapons, reducing how easily kids and prohibited users can access them.

**We Must Act to Reduce Gun Violence**
No law will stop every person intent on committing violence, but we must do something. Reducing access to assault weapons and ensuring those who do own assault weapons have safety training is a commonsense reform we urgently need.

**Rebuttal of argument against**
The gun lobby has a long track record of trying to convince Washingtonians there's nothing we can do to stop the plague of gun violence. They are wrong. This common sense measure requires the same standards for purchasing semi-automatic assault rifles that are already required for handguns. It will not affect law-abiding, responsible gun owners, rather, it will establish common sense safeguards to help prevent dangerous, unlawful access to firearms.

**Written by**
**Paul Kramer**, Survivor, Mukilteo shooting; **Ola Jackson**, Student, Rainier Beach High School; **Chris Reykdal**, Washington Superintendent of Public Instruction; **Regina Malveaux**, Member, Washington State Women's Commission, CEO YWCA Spokane; **Mitzi Johanknecht**, King County Sheriff; **Matt Vadnal**, Mill Creek resident, Colonel United States Army Reserve

**Contact:** (206) 718-3529; info@yeson1639.org; yeson1639.org

# Argument against

**I-1639 Removes Rights from Law-Abiding Adults**
Washington's law-abiding adults aged 18-20 are responsible enough to vote, purchase a home, and serve in our military. Yet I-1639's proponents want you to believe these same adults cannot be trusted to defend themselves or their families and are attempting to use the crimes of a few as a justification to curtail the rights of hundreds of thousands of Washingtonians.

**I-1639 Makes Firearms Unavailable for Self-Defense**
I-1639 would require gun owners to lock up their firearms or face criminal charges. This strict mandate renders firearms useless in self-defense situations by requiring them to be locked up. The United States Supreme Court invalidated a similar law as a violation of the Second Amendment, but I-1639's proponents are nonetheless seeking to create this unconstitutional requirement in Washington.

**I-1639's Misguided Approach Will Not Impact Crime**
Handguns- not rifles- are used in the majority of crimes committed with a firearm in Washington. Targeting rifle ownership will only restrict law-abiding adults from accessing them for self-defense, home protection, and hunting.

**I-1639 is Another Extreme Seattle Agenda that Fails to Improve Safety**
I-1639 is bankrolled by a handful of Seattle billionaires that are more concerned with pushing failed California-style gun control than finding real solutions to make our schools and communities safe. This 33-page initiative requires firearm registration, waiting periods, mandatory government training, firearm storage requirements, purchase tax, and more- none of which will stop criminals or protect our Washington schools.

**Rebuttal of argument for**
I-1639 is not about "assault weapons". I-1639 targets *all* semi-automatic rifles, *including hunting rifles and target shooting rifles*. These are not fully automatic military grade weapons- these are commonly owned rifles used for self-defense, home protection and hunting. I-1639 places Washingtonians at risk by restricting access to firearms for lawful self-defense, while doing *nothing* to increase security in schools or target violent criminals. Don't let I-1639 leave Washingtonians defenseless. Vote No.

**Written by**
**Brad Klippert**, Deputy Sheriff, State Representative, Public Safety Committee; **Jane Milhans**, Home Invasion Survivor, Women's Self-Defense Trainer; **Keely Hopkins**, State Director, National Rifle Association; **Alan Gottlieb**, Founder, Second Amendment Foundation; **Robin Ball**, "Refuse to Be a Victim" Instructor, Spokane Region; **Brian Blake**, State Representative, Democrat, 19th Legislative District

**Contact:** www.VoteNo1639.org

DOL00000056

# Complete Text

## Initiative Measure No. 1639

AN ACT Relating to increasing public safety by implementing firearm safety measures, including requiring enhanced background checks, waiting periods, and increased age requirements for semiautomatic assault rifles and secure gun storage for all firearms; amending RCW 9.41.090, 9.41.092, 9.41.094, 9.41.097, 9.41.0975, 9.41.110, 9.41.113, 9.41.124, 9.41.240, 9.41.129, and 9.41.010; adding new sections to chapter 9.41 RCW; creating new sections; prescribing penalties; and providing effective dates.

BE IT ENACTED BY THE PEOPLE OF THE STATE OF WASHINGTON:

NEW SECTION. **Sec. 1.** INTENT. Gun violence is far too common in Washington and the United States. In particular, shootings involving the use of semiautomatic assault rifles have resulted in hundreds of lives lost, devastating injuries, and lasting psychological impacts on survivors, their families, and communities. Semiautomatic assault rifles are specifically designed to kill quickly and efficiently and have been used in some of the country's deadliest mass shootings, including in Newtown, Connecticut; Las Vegas, Nevada; and Parkland and Orlando, Florida, among others. Semiautomatic assault rifles have also been used in deadly shootings in Washington, including in Mukilteo and Tacoma.

The impacts of gun violence by assault weapons fall heavily on children and teenagers. According to one analysis, more than two hundred eight thousand students attending at least two hundred twelve schools have experienced a shooting on campus since the Columbine mass shooting in 1999. Active shooter drills are normal for a generation of American schoolchildren, instilling at a young age the sad and unnecessary realization that a mass shooting can happen in any community, in any school, at any time.

Enough is enough. The people find and declare that it is crucial and urgent to pass laws to increase public safety and reduce gun violence.

Implementing an enhanced background check system for semiautomatic assault rifles that is as strong as the one required to purchase a handgun and requiring safety training and a waiting period will help ensure that we keep these weapons out of dangerous hands. Further, federal law prohibits the sale of pistols to individuals under the age of twenty-one and at least a dozen states further restrict the ownership or possession of firearms by individuals under the age of twenty-one. This makes sense, as studies show that eighteen to twenty year olds commit a disproportionate number of firearm homicides in the United States and research indicates that the brain does not fully mature until a later age. Raising the minimum age to purchase semiautomatic assault rifles to twenty-one is a commonsense step the people wish to take to increase public safety.

Finally, firearms taken from the home by children or other persons prohibited from possessing firearms have been at the heart of several tragic gun violence incidents. One study shows that over eighty-five percent of school shooters obtained the firearm at their home or from a friend or relative. Another study found that more than seventy-five percent of firearms used in youth suicide attempts and unintentional injuries were stored in the residence of the victim, a relative, or a friend. Secure gun storage requirements for all firearms will increase public safety by helping ensure that children and other prohibited persons do not inappropriately gain access to firearms, and notice requirements will make the potential dangers of firearms clear to purchasers.

Therefore, to increase public safety for all Washingtonians, in particular our children, this measure would, among other things: Create an enhanced background check system applicable to semiautomatic assault rifles similar to what is required for handguns, require that individuals complete a firearm safety training course and be at least twenty-one years of age to purchase or possess such weapons, enact a waiting period for the purchase of such weapons, and establish standards for the responsible storage of all firearms.

NEW SECTION. **Sec. 2.** SHORT TITLE. This act may be known and cited as the public safety and semiautomatic assault rifle act.

**Sec. 3.** ENHANCED BACKGROUND CHECKS. RCW 9.41.090 and 2018 c 201 s 6003 are each amended to read as follows:

(1) In addition to the other requirements of this chapter, no dealer may deliver a pistol to the purchaser thereof until:

(a) The purchaser produces a valid concealed pistol license and the dealer has recorded the purchaser's name, license number, and issuing agency, such record to be made in triplicate and processed as provided in subsection ((~~5~~)) 6 of this section. For purposes of this subsection (1)(a), a "valid concealed pistol license" does not include a temporary emergency license, and does not include any license issued before July 1, 1996, unless the issuing agency conducted a records search for disqualifying crimes under RCW 9.41.070 at the time of issuance;

(b) The dealer is notified in writing by (i) the chief of police or the sheriff of the jurisdiction in which the purchaser resides that the purchaser is eligible to possess a pistol under RCW 9.41.040 and that the application to purchase is approved by the chief of police or sheriff; or (ii) the state that the purchaser is eligible to possess a firearm under RCW 9.41.040, as provided in subsection (3)(b) of this section; or

(c) The requirements or time periods in RCW 9.41.092 have been satisfied.

(2) In addition to the other requirements of this chapter, no dealer may deliver a semiautomatic assault rifle to the purchaser thereof until:

(a) The purchaser provides proof that he or she has com-

pleted a recognized firearm safety training program within the last five years that, at a minimum, includes instruction on:

(i) Basic firearms safety rules;

(ii) Firearms and children, including secure gun storage and talking to children about gun safety;

(iii) Firearms and suicide prevention;

(iv) Secure gun storage to prevent unauthorized access and use;

(v) Safe handling of firearms; and

(vi) State and federal firearms laws, including prohibited firearms transfers.

The training must be sponsored by a federal, state, county, or municipal law enforcement agency, a college or university, a nationally recognized organization that customarily offers firearms training, or a firearms training school with instructors certified by a nationally recognized organization that customarily offers firearms training. The proof of training shall be in the form of a certification that states under the penalty of perjury the training included the minimum requirements; and

(b) The dealer is notified in writing by (i) the chief of police or the sheriff of the jurisdiction in which the purchaser resides that the purchaser is eligible to possess a firearm under RCW 9.41.040 and that the application to purchase is approved by the chief of police or sheriff; or (ii) the state that the purchaser is eligible to possess a firearm under RCW 9.41.040, as provided in subsection (3)(b) of this section; or

(c) The requirements or time periods in RCW 9.41.092 have been satisfied.

(3)(a) Except as provided in (b) of this subsection, in determining whether the purchaser meets the requirements of RCW 9.41.040, the chief of police or sheriff, or the designee of either, shall check with the national crime information center, including the national instant criminal background check system, provided for by the Brady Handgun Violence Prevention Act (18 U.S.C. Sec. 921 et seq.), the Washington state patrol electronic database, the health care authority electronic database, and with other agencies or resources as appropriate, to determine whether the applicant is ineligible under RCW 9.41.040 to possess a firearm.

(b) The state, through the legislature or initiative process, may enact a statewide firearms background check system equivalent to, or more comprehensive than, the check required by (a) of this subsection to determine that a purchaser is eligible to possess a firearm under RCW 9.41.040. Once ((~~the~~)) a state system is established, a dealer shall use the state system and national instant criminal background check system, provided for by the Brady Handgun Violence Prevention Act (18 U.S.C. Sec. 921 et seq.), to make criminal background checks of applicants to purchase firearms. ((~~However, a chief of police or sheriff, or a designee of either, shall continue to check the health care authority's electronic database and with other agencies or resources as appropriate, to determine whether applicants are ineligible under RCW 9.41.040 to possess a firearm.~~))

((~~(3)~~)) (4) In any case under this section where the applicant has an outstanding warrant for his or her arrest from any court of competent jurisdiction for a felony or misdemeanor, the dealer shall hold the delivery of the pistol or semiautomatic assault rifle until the warrant for arrest is served and satisfied by appropriate court appearance. The local jurisdiction for purposes of the sale, or the state pursuant to subsection (3)(b) of this section, shall confirm the existence of outstanding warrants within seventy-two hours after notification of the application to purchase a pistol or semiautomatic assault rifle is received. The local jurisdiction shall also immediately confirm the satisfaction of the warrant on request of the dealer so that the hold may be released if the warrant was for an offense other than an offense making a person ineligible under RCW 9.41.040 to possess a ((~~pistol~~)) firearm.

((~~(4)~~)) (5) In any case where the chief or sheriff of the local jurisdiction, or the state pursuant to subsection (3)(b) of this section, has reasonable grounds based on the following circumstances: (a) Open criminal charges, (b) pending criminal proceedings, (c) pending commitment proceedings, (d) an outstanding warrant for an offense making a person ineligible under RCW 9.41.040 to possess a ((~~pistol~~)) firearm, or (e) an arrest for an offense making a person ineligible under RCW 9.41.040 to possess a ((~~pistol~~)) firearm, if the records of disposition have not yet been reported or entered sufficiently to determine eligibility to purchase a ((~~pistol~~)) firearm, the local jurisdiction or the state may hold the sale and delivery of the pistol or semiautomatic assault rifle up to thirty days in order to confirm existing records in this state or elsewhere. After thirty days, the hold will be lifted unless an extension of the thirty days is approved by a local district court, superior court, or municipal court for good cause shown. A dealer shall be notified of each hold placed on the sale by local law enforcement or the state and of any application to the court for additional hold period to confirm records or confirm the identity of the applicant.

((~~(5)~~)) (6)(a) At the time of applying for the purchase of a pistol or semiautomatic assault rifle, the purchaser shall sign in triplicate and deliver to the dealer an application containing:

(i) His or her full name, residential address, date and place of birth, race, and gender;

(ii) The date and hour of the application;

(iii) The applicant's driver's license number or state identification card number;

(iv) A description of the pistol or semiautomatic assault rifle including the make, model, caliber and manufacturer's number if available at the time of applying for the purchase of a pistol or semiautomatic assault rifle. If the manufacturer's number is not available at the time of applying for the purchase of a pistol or semiautomatic assault rifle, the

**92** Initiative Measure No. **1639**

application may be processed, but delivery of the pistol or semiautomatic assault rifle to the purchaser may not occur unless the manufacturer's number is recorded on the application by the dealer and transmitted to the chief of police of the municipality or the sheriff of the county in which the purchaser resides, or the state pursuant to subsection (3) (b) of this section; ((and))

(v) A statement that the purchaser is eligible to purchase and possess a ((pistol)) firearm under ((RCW 9.41.040)) state and federal law; and

(vi) If purchasing a semiautomatic assault rifle, a statement by the applicant under penalty of perjury that the applicant has completed a recognized firearm safety training program within the last five years, as required by subsection (2) of this section.

(b) The application shall contain ((a)) two warnings substantially stated as follows:

(i) CAUTION: Although state and local laws do not differ, federal law and state law on the possession of firearms differ. If you are prohibited by federal law from possessing a firearm, you may be prosecuted in federal court. State permission to purchase a firearm is not a defense to a federal prosecution; and

(ii) CAUTION: The presence of a firearm in the home has been associated with an increased risk of death to self and others, including an increased risk of suicide, death during domestic violence incidents, and unintentional deaths to children and others.

The purchaser shall be given a copy of the department of fish and wildlife pamphlet on the legal limits of the use of firearms((;,)) and firearms safety((, and the fact that local laws and ordinances on firearms are preempted by state law and must be consistent with state law)).

(c) The dealer shall, by the end of the business day, sign and attach his or her address and deliver a copy of the application and such other documentation as required under subsections (1) and (2) of this section to the chief of police of the municipality or the sheriff of the county of which the purchaser is a resident, or the state pursuant to subsection (3)(b) of this section. The triplicate shall be retained by the dealer for six years. The dealer shall deliver the pistol or semiautomatic assault rifle to the purchaser following the period of time specified in this chapter unless the dealer is notified of an investigative hold under subsection (((4))) (5) of this section in writing by the chief of police of the municipality ((or)), the sheriff of the county, or the state, whichever is applicable, ((denying)) or of the denial of the purchaser's application to purchase and the grounds thereof. The application shall not be denied unless the purchaser is not eligible to purchase or possess ((a pistol)) the firearm under ((RCW 9.41.040)) state or ((9.41.045, or)) federal law.

(d) The chief of police of the municipality or the sheriff of the county, or the state pursuant to subsection (3)(b) of this section, shall retain or destroy applications to purchase a pistol or semiautomatic assault rifle in accordance with the

requirements of 18 U.S.C. Sec. 922.

(((6))) (7)(a) To help offset the administrative costs of implementing this section as it relates to new requirements for semiautomatic assault rifles, the department of licensing may require the dealer to charge each semiautomatic assault rifle purchaser or transferee a fee not to exceed twenty-five dollars, except that the fee may be adjusted at the beginning of each biennium to levels not to exceed the percentage increase in the consumer price index for all urban consumers, CPI-W, or a successor index, for the previous biennium as calculated by the United States department of labor.

(b) The fee under (a) of this subsection shall be no more than is necessary to fund the following:

(i) The state for the cost of meeting its obligations under this section;

(ii) The health care authority, mental health institutions, and other health care facilities for state-mandated costs resulting from the reporting requirements imposed by RCW 9.41.097(1); and

(iii) Local law enforcement agencies for state-mandated local costs resulting from the requirements set forth under RCW 9.41.090 and this section.

(8) A person who knowingly makes a false statement regarding identity or eligibility requirements on the application to purchase a ((pistol)) firearm is guilty of false swearing under RCW 9A.72.040.

(((7))) (9) This section does not apply to sales to licensed dealers for resale or to the sale of antique firearms.

**Sec. 4.** WAITING PERIOD. RCW 9.41.092 and 2018 c 145 s 4 are each amended to read as follows:

(1) Except as otherwise provided in this chapter and except for semiautomatic assault rifles under subsection (2) of this section, a licensed dealer may not deliver any firearm to a purchaser or transferee until the earlier of:

(((1))) (a) The results of all required background checks are known and the purchaser or transferee ((a)) (i) is not prohibited from owning or possessing a firearm under federal or state law and ((b)) (ii) does not have a voluntary waiver of firearm rights currently in effect; or

(((2))) (b) Ten days have elapsed from the date the licensed dealer requested the background check. However, for sales and transfers of pistols if the purchaser or transferee does not have a valid permanent Washington driver's license or state identification card or has not been a resident of the state for the previous consecutive ninety days, then the time period in this subsection shall be extended from ten business days to sixty days.

(2) Except as otherwise provided in this chapter, a licensed dealer may not deliver a semiautomatic assault rifle to a purchaser or transferee until ten business days have elapsed from the date of the purchase application or, in the case of a transfer, ten business days have elapsed from the date a background check is initiated.

NEW SECTION. **Sec. 5.** SECURE GUN STORAGE. A new

DOL00000122

Initiative Measure No. **1639**                                    **93**

section is added to chapter 9.41 RCW to read as follows:

(1) A person who stores or leaves a firearm in a location where the person knows, or reasonably should know, that a prohibited person may gain access to the firearm:

(a) Is guilty of community endangerment due to unsafe storage of a firearm in the first degree if a prohibited person obtains access and possession of the firearm and causes personal injury or death with the firearm; or

(b) Is guilty of community endangerment due to unsafe storage of a firearm in the second degree if a prohibited person obtains access and possession of the firearm and:

(i) Causes the firearm to discharge;

(ii) Carries, exhibits, or displays the firearm in a public place in a manner that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons; or

(iii) Uses the firearm in the commission of a crime.

(2)(a) Community endangerment due to unsafe storage of a firearm in the first degree is a class C felony punishable according to chapter 9A.20 RCW.

(b) Community endangerment due to unsafe storage of a firearm in the second degree is a gross misdemeanor punishable according to chapter 9A.20 RCW.

(3) Subsection (1) of this section does not apply if:

(a) The firearm was in secure gun storage, or secured with a trigger lock or similar device that is designed to prevent the unauthorized use or discharge of the firearm;

(b) In the case of a person who is a prohibited person on the basis of the person's age, access to the firearm is with the lawful permission of the prohibited person's parent or guardian and supervised by an adult, or is in accordance with RCW 9.41.042;

(c) The prohibited person obtains, or obtains and discharges, the firearm in a lawful act of self-defense; or

(d) The prohibited person's access to the firearm was obtained as a result of an unlawful entry, provided that the unauthorized access or theft of the firearm is reported to a local law enforcement agency in the jurisdiction in which the unauthorized access or theft occurred within five days of the time the victim of the unlawful entry knew or reasonably should have known that the firearm had been taken.

(4) If a death or serious injury occurs as a result of an alleged violation of subsection (1)(a) of this section, the prosecuting attorney may decline to prosecute, even though technically sufficient evidence to prosecute exists, in situations where prosecution would serve no public purpose or would defeat the purpose of the law in question.

(5) For the purposes of this section, "prohibited person" means a person who is prohibited from possessing a firearm under state or federal law.

(6) Nothing in this section mandates how or where a firearm must be stored.

<u>NEW SECTION.</u> **Sec. 6.** AVAILABILITY OF SECURE GUN STORAGE. A new section is added to chapter 9.41 RCW to read as follows:

(1) When selling or transferring any firearm, every dealer shall offer to sell or give the purchaser or transferee a secure gun storage device, or a trigger lock or similar device that is designed to prevent the unauthorized use or discharge of the firearm.

(2) Every store, shop, or sales outlet where firearms are sold, that is registered as a dealer in firearms with the department of licensing, shall conspicuously post, in a prominent location so that all patrons may take notice, the following warning sign, to be provided by the department of licensing, in block letters at least one inch in height:

WARNING: YOU MAY FACE CRIMINAL PROSECUTION IF YOU STORE OR LEAVE AN UNSECURED FIREARM WHERE A PERSON WHO IS PROHIBITED FROM POSSESSING FIREARMS CAN AND DOES OBTAIN POSSESSION.

(3) Every store, shop, or sales outlet where firearms are sold that is registered as a dealer in firearms with the department of licensing, upon the sale or transfer of a firearm, shall deliver a written warning to the purchaser or transferee that states, in block letters not less than one-fourth inch in height:

WARNING: YOU MAY FACE CRIMINAL PROSECUTION IF YOU STORE OR LEAVE AN UNSECURED FIREARM WHERE A PERSON WHO IS PROHIBITED FROM POSSESSING FIREARMS CAN AND DOES OBTAIN POSSESSION.

(4) Every person who violates this section is guilty of a class 1 civil infraction under chapter 7.80 RCW and may be fined up to two hundred fifty dollars. However, no such fines may be levied until thirty days have expired from the time warning signs required under subsection (2) of this section are distributed by the department of licensing.

**Sec. 7.** RCW 9.41.094 and 2018 c 201 s 6004 are each amended to read as follows:

A signed application to purchase a pistol <u>or semiautomatic assault rifle</u> shall constitute a waiver of confidentiality and written request that the health care authority, mental health institutions, and other health care facilities release, to an inquiring court or law enforcement agency, information relevant to the applicant's eligibility to purchase a pistol <u>or semiautomatic assault rifle</u> to an inquiring court or law enforcement agency.

**Sec. 8.** RCW 9.41.097 and 2018 c 201 s 6005 are each amended to read as follows:

(1) The health care authority, mental health institutions, and other health care facilities shall, upon request of a court, ((or)) law enforcement agency, <u>or the state,</u> supply such relevant information as is necessary to determine the eligibility of a person to possess a ((pistol)) <u>firearm</u> or to be issued a concealed pistol license under RCW 9.41.070 or to purchase a pistol <u>or semiautomatic assault rifle</u> under RCW 9.41.090.

(2) Mental health information received by: (a) The department of licensing pursuant to RCW 9.41.047 or 9.41.173; (b)

| 94 | Initiative Measure No. **1639** |

an issuing authority pursuant to RCW 9.41.047 or 9.41.070; (c) a chief of police or sheriff pursuant to RCW 9.41.090 or 9.41.173; (d) a court or law enforcement agency pursuant to subsection (1) of this section; or (e) the state pursuant to RCW 9.41.090, shall not be disclosed except as provided in RCW 42.56.240(4).

**Sec. 9.** RCW 9.41.0975 and 2009 c 216 s 7 are each amended to read as follows:

(1) The state, local governmental entities, any public or private agency, and the employees of any state or local governmental entity or public or private agency, acting in good faith, are immune from liability:

(a) For failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful;

(b) For preventing the sale or transfer of a firearm to a person who may lawfully receive or possess a firearm;

(c) For issuing a concealed pistol license or alien firearm license to a person ineligible for such a license;

(d) For failing to issue a concealed pistol license or alien firearm license to a person eligible for such a license;

(e) For revoking or failing to revoke an issued concealed pistol license or alien firearm license;

(f) For errors in preparing or transmitting information as part of determining a person's eligibility to receive or possess a firearm, or eligibility for a concealed pistol license or alien firearm license;

(g) For issuing a dealer's license to a person ineligible for such a license; or

(h) For failing to issue a dealer's license to a person eligible for such a license.

(2) An application may be made to a court of competent jurisdiction for a writ of mandamus:

(a) Directing an issuing agency to issue a concealed pistol license or alien firearm license wrongfully refused;

(b) Directing a law enforcement agency to approve an application to purchase a pistol or semiautomatic assault rifle wrongfully denied;

(c) Directing that erroneous information resulting either in the wrongful refusal to issue a concealed pistol license or alien firearm license or in the wrongful denial of a purchase application for a pistol or semiautomatic assault rifle be corrected; or

(d) Directing a law enforcement agency to approve a dealer's license wrongfully denied.

The application for the writ may be made in the county in which the application for a concealed pistol license or alien firearm license or to purchase a pistol or semiautomatic assault rifle was made, or in Thurston county, at the discretion of the petitioner. A court shall provide an expedited hearing for an application brought under this subsection (2) for a writ of mandamus. A person granted a writ of mandamus under this subsection (2) shall be awarded reasonable attorneys' fees and costs.

**Sec. 10.** RCW 9.41.110 and 2009 c 479 s 10 are each

amended to read as follows:

(1) No dealer may sell or otherwise transfer, or expose for sale or transfer, or have in his or her possession with intent to sell, or otherwise transfer, any pistol without being licensed as provided in this section.

(2) No dealer may sell or otherwise transfer, or expose for sale or transfer, or have in his or her possession with intent to sell, or otherwise transfer, any firearm other than a pistol without being licensed as provided in this section.

(3) No dealer may sell or otherwise transfer, or expose for sale or transfer, or have in his or her possession with intent to sell, or otherwise transfer, any ammunition without being licensed as provided in this section.

(4) The duly constituted licensing authorities of any city, town, or political subdivision of this state shall grant licenses in forms prescribed by the director of licensing effective for not more than one year from the date of issue permitting the licensee to sell firearms within this state subject to the following conditions, for breach of any of which the license shall be forfeited and the licensee subject to punishment as provided in RCW 9.41.010 through 9.41.810. A licensing authority shall forward a copy of each license granted to the department of licensing. The department of licensing shall notify the department of revenue of the name and address of each dealer licensed under this section.

(5)(a) A licensing authority shall, within thirty days after the filing of an application of any person for a dealer's license, determine whether to grant the license. However, if the applicant does not have a valid permanent Washington driver's license or Washington state identification card, or has not been a resident of the state for the previous ninety days, the licensing authority shall have up to sixty days to determine whether to issue a license. No person shall qualify for a license under this section without first receiving a federal firearms license and undergoing fingerprinting and a background check. In addition, no person ineligible to possess a firearm under RCW 9.41.040 or ineligible for a concealed pistol license under RCW 9.41.070 shall qualify for a dealer's license.

(b) A dealer shall require every employee who may sell a firearm in the course of his or her employment to undergo fingerprinting and a background check. An employee must be eligible to possess a firearm, and must not have been convicted of a crime that would make the person ineligible for a concealed pistol license, before being permitted to sell a firearm. Every employee shall comply with requirements concerning purchase applications and restrictions on delivery of pistols or semiautomatic assault rifles that are applicable to dealers.

(6)(a) Except as otherwise provided in (b) of this subsection, the business shall be carried on only in the building designated in the license. For the purpose of this section, advertising firearms for sale shall not be considered the carrying on of business.

(b) A dealer may conduct business temporarily at a lo-

DOL00000124

Initiative Measure No. **1639**                                                                                           **95**

cation other than the building designated in the license, if the temporary location is within Washington state and is the location of a gun show sponsored by a national, state, or local organization, or an affiliate of any such organization, devoted to the collection, competitive use, or other sporting use of firearms in the community. Nothing in this subsection (6)(b) authorizes a dealer to conduct business in or from a motorized or towed vehicle.

In conducting business temporarily at a location other than the building designated in the license, the dealer shall comply with all other requirements imposed on dealers by RCW 9.41.090, 9.41.100, and ((9.41.110)) this section. The license of a dealer who fails to comply with the requirements of RCW 9.41.080 and 9.41.090 and subsection (8) of this section while conducting business at a temporary location shall be revoked, and the dealer shall be permanently ineligible for a dealer's license.

(7) The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises in the area where firearms are sold, or at the temporary location, where it can easily be read.

(8)(a) No pistol or semiautomatic assault rifle may be sold: (i) In violation of any provisions of RCW 9.41.010 through 9.41.810; nor (ii) may a pistol or semiautomatic assault rifle be sold under any circumstances unless the purchaser is personally known to the dealer or shall present clear evidence of his or her identity.

(b) A dealer who sells or delivers any firearm in violation of RCW 9.41.080 is guilty of a class C felony. In addition to any other penalty provided for by law, the dealer is subject to mandatory permanent revocation of his or her dealer's license and permanent ineligibility for a dealer's license.

(c) The license fee for pistols shall be one hundred twenty-five dollars. The license fee for firearms other than pistols shall be one hundred twenty-five dollars. The license fee for ammunition shall be one hundred twenty-five dollars. Any dealer who obtains any license under subsection (1), (2), or (3) of this section may also obtain the remaining licenses without payment of any fee. The fees received under this section shall be deposited in the state general fund.

(9)(a) A true record in triplicate shall be made of every pistol or semiautomatic assault rifle sold, in a book kept for the purpose, the form of which may be prescribed by the director of licensing and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other, and shall contain the date of sale, the caliber, make, model and manufacturer's number of the weapon, the name, address, occupation, and place of birth of the purchaser, and a statement signed by the purchaser that he or she is not ineligible under ((RCW 9.41.040)) state or federal law to possess a firearm.

(b) One copy shall within six hours be sent by certified mail to the chief of police of the municipality or the sheriff of the county of which the purchaser is a resident, or the state pursuant to RCW 9.41.090; the duplicate the dealer shall within seven days send to the director of licensing; the

triplicate the dealer shall retain for six years.

(10) Subsections (2) through (9) of this section shall not apply to sales at wholesale.

(11) The dealer's licenses authorized to be issued by this section are general licenses covering all sales by the licensee within the effective period of the licenses. The department shall provide a single application form for dealer's licenses and a single license form which shall indicate the type or types of licenses granted.

(12) Except as provided in RCW 9.41.090, every city, town, and political subdivision of this state is prohibited from requiring the purchaser to secure a permit to purchase or from requiring the dealer to secure an individual permit for each sale.

**Sec. 11.** RCW 9.41.113 and 2017 c 264 s 2 are each amended to read as follows:

(1) All firearm sales or transfers, in whole or part in this state including without limitation a sale or transfer where either the purchaser or seller or transferee or transferor is in Washington, shall be subject to background checks unless specifically exempted by state or federal law. The background check requirement applies to all sales or transfers including, but not limited to, sales and transfers through a licensed dealer, at gun shows, online, and between unlicensed persons.

(2) No person shall sell or transfer a firearm unless:

(a) The person is a licensed dealer;

(b) The purchaser or transferee is a licensed dealer; or

(c) The requirements of subsection (3) of this section are met.

(3) Where neither party to a prospective firearms transaction is a licensed dealer, the parties to the transaction shall complete the sale or transfer through a licensed dealer as follows:

(a) The seller or transferor shall deliver the firearm to a licensed dealer to process the sale or transfer as if it is selling or transferring the firearm from its inventory to the purchaser or transferee, except that the unlicensed seller or transferor may remove the firearm from the business premises of the licensed dealer while the background check is being conducted. If the seller or transferor removes the firearm from the business premises of the licensed dealer while the background check is being conducted, the purchaser or transferee and the seller or transferor shall return to the business premises of the licensed dealer and the seller or transferor shall again deliver the firearm to the licensed dealer prior to completing the sale or transfer.

(b) Except as provided in (a) of this subsection, the licensed dealer shall comply with all requirements of federal and state law that would apply if the licensed dealer were selling or transferring the firearm from its inventory to the purchaser or transferee, including but not limited to conducting a background check on the prospective purchaser or transferee in accordance with federal and state law requirements ((and)), fulfilling all federal and state record-keeping requirements, and complying with the specific re-

DOL00000125

**SER-313**

**96**                           Initiative Measure No. **1639**

quirements and restrictions on semiautomatic assault rifles in this act.

(c) The purchaser or transferee must complete, sign, and submit all federal, state, and local forms necessary to pro-cess the required background check to the licensed dealer conducting the background check.

(d) If the results of the background check indicate that the purchaser or transferee is ineligible to possess a firearm, then the licensed dealer shall return the firearm to the seller or transferor.

(e) The licensed dealer may charge a fee that reflects the fair market value of the administrative costs and efforts incurred by the licensed dealer for facilitating the sale or transfer of the firearm.

(4) This section does not apply to:

(a) A transfer between immediate family members, which for this subsection shall be limited to spouses, domestic partners, parents, parents-in-law, children, siblings, sib-lings-in-law, grandparents, grandchildren, nieces, neph-ews, first cousins, aunts, and uncles, that is a bona fide gift or loan;

(b) The sale or transfer of an antique firearm;

(c) A temporary transfer of possession of a firearm if such transfer is necessary to prevent imminent death or great bodily harm to the person to whom the firearm is trans-ferred if:

(i) The temporary transfer only lasts as long as immedi-ately necessary to prevent such imminent death or great bodily harm; and

(ii) The person to whom the firearm is transferred is not prohibited from possessing firearms under state or federal law;

(d) A temporary transfer of possession of a firearm if: (i) The transfer is intended to prevent suicide or self-inflicted great bodily harm; (ii) the transfer lasts only as long as rea-sonably necessary to prevent death or great bodily harm; and (iii) the firearm is not utilized by the transferee for any purpose for the duration of the temporary transfer;

(e) Any law enforcement or corrections agency and, to the extent the person is acting within the course and scope of his or her employment or official duties, any law enforce-ment or corrections officer, United States marshal, member of the armed forces of the United States or the national guard, or federal official;

(f) A federally licensed gunsmith who receives a firearm solely for the purposes of service or repair, or the return of the firearm to its owner by the federally licensed gunsmith;

(g) The temporary transfer of a firearm (i) between spous-es or domestic partners; (ii) if the temporary transfer oc-curs, and the firearm is kept at all times, at an established shooting range authorized by the governing body of the jurisdiction in which such range is located; (iii) if the tempo-rary transfer occurs and the transferee's possession of the firearm is exclusively at a lawful organized competition in-volving the use of a firearm, or while participating in or prac-ticing for a performance by an organized group that uses

firearms as a part of the performance; (iv) to a person who is under eighteen years of age for lawful hunting, sporting, or educational purposes while under the direct supervision and control of a responsible adult who is not prohibited from possessing firearms; (v) under circumstances in which the transferee and the firearm remain in the presence of the transferor; or (vi) while hunting if the hunting is legal in all places where the person to whom the firearm is transferred possesses the firearm and the person to whom the firearm is transferred has completed all training and holds all li-censes or permits required for such hunting, provided that any temporary transfer allowed by this subsection is per-mitted only if the person to whom the firearm is transferred is not prohibited from possessing firearms under state or federal law;

(h) A person who (i) acquired a firearm other than a pistol by operation of law upon the death of the former owner of the firearm or (ii) acquired a pistol by operation of law upon the death of the former owner of the pistol within the pre-ceding sixty days. At the end of the sixty-day period, the person must either have lawfully transferred the pistol or must have contacted the department of licensing to notify the department that he or she has possession of the pistol and intends to retain possession of the pistol, in compli-ance with all federal and state laws; or

(i) A sale or transfer when the purchaser or transferee is a licensed collector and the firearm being sold or transferred is a curio or relic.

**Sec. 12.** RCW 9.41.124 and 2015 c 1 s 7 are each amend-ed to read as follows:

Residents of a state other than Washington may pur-chase rifles and shotguns, except those firearms defined as semiautomatic assault rifles, in Washington: PROVIDED, That such residents conform to the applicable provisions of the federal Gun Control Act of 1968, Title IV, Pub. L. 90-351 as administered by the United States secretary of the treasury: AND PROVIDED FURTHER, That such residents are eligible to purchase or possess such weapons in Wash-ington and in the state in which such persons reside: AND PROVIDED FURTHER, That such residents are subject to the procedures and background checks required by this chapter.

**Sec. 13.** RCW 9.41.240 and 1994 sp.s. c 7 s 423 are each amended to read as follows:

(1) A person under twenty-one years of age may not pur-chase a pistol or semiautomatic assault rifle, and except as otherwise provided in this chapter, no person may sell or transfer a semiautomatic assault rifle to a person under twenty-one years of age.

(2) Unless an exception under RCW 9.41.042, 9.41.050, or 9.41.060 applies, a person at least eighteen years of age, but less than twenty-one years of age, may possess a pistol only:

(((1))) (a) In the person's place of abode;

(((2))) (b) At the person's fixed place of business; or

Initiative Measure No. **1639**    **97**

(((3))) (c) On real property under his or her control.

(3) Except in the places and situations identified in RCW 9.41.042 (1) through (9) and 9.41.060 (1) through (10), a person at least eighteen years of age, but less than twenty-one years of age, may possess a semiautomatic assault rifle only:

(a) In the person's place of abode;

(b) At the person's fixed place of business;

(c) On real property under his or her control; or

(d) For the specific purpose of (i) moving to a new place of abode; (ii) traveling between the person's place of abode and real property under his or her control; or (iii) selling or transferring the firearm in accordance with the requirements of this chapter; provided that in all of these situations the semiautomatic assault rifle is unloaded and either in secure gun storage or secured with a trigger lock or similar device that is designed to prevent the unauthorized use or discharge of the firearm.

**Sec. 14.** RCW 9.41.129 and 2005 c 274 s 203 are each amended to read as follows:

The department of licensing ((may)) shall keep copies or records of applications for concealed pistol licenses provided for in RCW 9.41.070, copies or records of applications for alien firearm licenses, copies or records of applications to purchase pistols or semiautomatic assault rifles provided for in RCW 9.41.090, and copies or records of pistol or semiautomatic assault rifle transfers provided for in RCW 9.41.110. The copies and records shall not be disclosed except as provided in RCW 42.56.240(4).

NEW SECTION. **Sec. 15.** A new section is added to chapter 9.41 RCW to read as follows:

(1) Within twelve months of the effective date of this section, the department of licensing shall, in conjunction with the Washington state patrol and other state and local law enforcement agencies as necessary, develop a cost-effective and efficient process to:

(a) Verify, on an annual or more frequent basis, that persons who acquired pistols or semiautomatic assault rifles pursuant to this chapter remain eligible to possess a firearm under state and federal law; and

(b) If such persons are determined to be ineligible for any reason, (i) notify and provide the relevant information to the chief of police or the sheriff of the jurisdiction in which the purchaser resides and (ii) take steps to ensure such persons are not illegally in possession of firearms.

(2) The department of licensing, where appropriate, may consult with individuals from the public and private sector or ask the individuals to establish a temporary advisory committee to accomplish the purposes in subsection (1) of this section. Members of such an advisory committee are not entitled to expense reimbursement.

**Sec. 16.** RCW 9.41.010 and 2018 c 7 s 1 are each amended to read as follows:

Unless the context clearly requires otherwise, the defini-

tions in this section apply throughout this chapter.

(1) "Antique firearm" means a firearm or replica of a firearm not designed or redesigned for using rim fire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898, including any matchlock, flintlock, percussion cap, or similar type of ignition system and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

(2) "Barrel length" means the distance from the bolt face of a closed action down the length of the axis of the bore to the crown of the muzzle, or in the case of a barrel with attachments to the end of any legal device permanently attached to the end of the muzzle.

(3) "Bump-fire stock" means a butt stock designed to be attached to a semiautomatic firearm with the effect of increasing the rate of fire achievable with the semiautomatic firearm to that of a fully automatic firearm by using the energy from the recoil of the firearm to generate reciprocating action that facilitates repeated activation of the trigger.

(4) "Crime of violence" means:

(a) Any of the following felonies, as now existing or hereafter amended: Any felony defined under any law as a class A felony or an attempt to commit a class A felony, criminal solicitation of or criminal conspiracy to commit a class A felony, manslaughter in the first degree, manslaughter in the second degree, indecent liberties if committed by forcible compulsion, kidnapping in the second degree, arson in the second degree, assault in the second degree, assault of a child in the second degree, extortion in the first degree, burglary in the second degree, residential burglary, and robbery in the second degree;

(b) Any conviction for a felony offense in effect at any time prior to June 6, 1996, which is comparable to a felony classified as a crime of violence in (a) of this subsection; and

(c) Any federal or out-of-state conviction for an offense comparable to a felony classified as a crime of violence under (a) or (b) of this subsection.

(5) "Curio or relic" has the same meaning as provided in 27 C.F.R. Sec. 478.11.

(6) "Dealer" means a person engaged in the business of selling firearms at wholesale or retail who has, or is required to have, a federal firearms license under 18 U.S.C. Sec. 923(a). A person who does not have, and is not required to have, a federal firearms license under 18 U.S.C. Sec. 923(a), is not a dealer if that person makes only occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or sells all or part of his or her personal collection of firearms.

(7) "Family or household member" means "family" or "household member" as used in RCW 10.99.020.

(8) "Felony" means any felony offense under the laws of this state or any federal or out-of-state offense comparable to a felony offense under the laws of this state.

DOL00000127

**98**          Initiative Measure No. **1639**

(9) "Felony firearm offender" means a person who has previously been convicted or found not guilty by reason of insanity in this state of any felony firearm offense. A person is not a felony firearm offender under this chapter if any and all qualifying offenses have been the subject of an expungement, pardon, annulment, certificate, or rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted or a pardon, annulment, or other equivalent procedure based on a finding of innocence.

(10) "Felony firearm offense" means:

(a) Any felony offense that is a violation of this chapter;

(b) A violation of RCW 9A.36.045;

(c) A violation of RCW 9A.56.300;

(d) A violation of RCW 9A.56.310;

(e) Any felony offense if the offender was armed with a firearm in the commission of the offense.

(11) "Firearm" means a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder. "Firearm" does not include a flare gun or other pyrotechnic visual distress signaling device, or a powder-actuated tool or other device designed solely to be used for construction purposes.

(12) "Gun" has the same meaning as firearm.

(13) "Law enforcement officer" includes a general authority Washington peace officer as defined in RCW 10.93.020, or a specially commissioned Washington peace officer as defined in RCW 10.93.020. "Law enforcement officer" also includes a limited authority Washington peace officer as defined in RCW 10.93.020 if such officer is duly authorized by his or her employer to carry a concealed pistol.

(14) "Lawful permanent resident" has the same meaning afforded a person "lawfully admitted for permanent residence" in 8 U.S.C. Sec. 1101(a)(20).

(15) "Licensed collector" means a person who is federally licensed under 18 U.S.C. Sec. 923(b).

(16) "Licensed dealer" means a person who is federally licensed under 18 U.S.C. Sec. 923(a).

(17) "Loaded" means:

(a) There is a cartridge in the chamber of the firearm;

(b) Cartridges are in a clip that is locked in place in the firearm;

(c) There is a cartridge in the cylinder of the firearm, if the firearm is a revolver;

(d) There is a cartridge in the tube or magazine that is inserted in the action; or

(e) There is a ball in the barrel and the firearm is capped or primed if the firearm is a muzzle loader.

(18) "Machine gun" means any firearm known as a machine gun, mechanical rifle, submachine gun, or any other mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into the firearm, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

(19) "Nonimmigrant alien" means a person defined as such in 8 U.S.C. Sec. 1101(a)(15).

(20) "Person" means any individual, corporation, company, association, firm, partnership, club, organization, society, joint stock company, or other legal entity.

(21) "Pistol" means any firearm with a barrel less than sixteen inches in length, or is designed to be held and fired by the use of a single hand.

(22) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned, made or remade, and intended to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(23) "Sale" and "sell" mean the actual approval of the delivery of a firearm in consideration of payment or promise of payment.

(24) "Secure gun storage" means:

(a) A locked box, gun safe, or other secure locked storage space that is designed to prevent unauthorized use or discharge of a firearm; and

(b) The act of keeping an unloaded firearm stored by such means.

(25) "Semiautomatic assault rifle" means any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

"Semiautomatic assault rifle" does not include antique firearms, any firearm that has been made permanently inoperable, or any firearm that is manually operated by bolt, pump, lever, or slide action.

(26) "Serious offense" means any of the following felonies or a felony attempt to commit any of the following felonies, as now existing or hereafter amended:

(a) Any crime of violence;

(b) Any felony violation of the uniform controlled substances act, chapter 69.50 RCW, that is classified as a class B felony or that has a maximum term of imprisonment of at least ten years;

(c) Child molestation in the second degree;

(d) Incest when committed against a child under age fourteen;

(e) Indecent liberties;

(f) Leading organized crime;

(g) Promoting prostitution in the first degree;

(h) Rape in the third degree;

(i) Drive-by shooting;

(j) Sexual exploitation;

(k) Vehicular assault, when caused by the operation or driving of a vehicle by a person while under the influence of intoxicating liquor or any drug or by the operation or driving of a vehicle in a reckless manner;

(l) Vehicular homicide, when proximately caused by the driv-

DOL00000128

ing of any vehicle by any person while under the influence of intoxicating liquor or any drug as defined by RCW 46.61.502, or by the operation of any vehicle in a reckless manner;

(m) Any other class B felony offense with a finding of sexual motivation, as "sexual motivation" is defined under RCW 9.94A.030;

(n) Any other felony with a deadly weapon verdict under RCW 9.94A.825;

(o) Any felony offense in effect at any time prior to June 6, 1996, that is comparable to a serious offense, or any federal or out-of-state conviction for an offense that under the laws of this state would be a felony classified as a serious offense; or

(p) Any felony conviction under RCW 9.41.115.

(((25))) (27) "Short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle by any means of modification if such modified weapon has an overall length of less than twenty-six inches.

(((26))) (28) "Short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun by any means of modification if such modified weapon has an overall length of less than twenty-six inches.

(((27))) (29) "Shotgun" means a weapon with one or more barrels, designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned, made or remade, and intended to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(((28))) (30) "Transfer" means the intended delivery of a firearm to another person without consideration of payment or promise of payment including, but not limited to, gifts and loans. "Transfer" does not include the delivery of a firearm owned or leased by an entity licensed or qualified to do business in the state of Washington to, or return of such a firearm by, any of that entity's employees or agents, defined to include volunteers participating in an honor guard, for lawful purposes in the ordinary course of business.

(((29))) (31) "Unlicensed person" means any person who is not a licensed dealer under this chapter.

NEW SECTION. **Sec. 17.** This act takes effect July 1, 2019, except for section 13 of this act which takes effect January 1, 2019.

NEW SECTION. **Sec. 18.** The director of the department of licensing may take the necessary steps to ensure that this act is implemented on its effective date.

NEW SECTION. **Sec. 19.** If any provision of this act or its application to any person or circumstance is held invalid or preempted by federal law, the remainder of the act or the application of the provision to other persons or circumstances is not affected.

**--- END ---**

# Complete Text
## Initiative Measure No. 940

AN ACT Relating to law enforcement; amending RCW 9A.16.040; adding new sections to chapter 43.101 RCW; adding new sections to chapter 36.28A RCW; and creating new sections.

BE IT ENACTED BY THE PEOPLE OF THE STATE OF WASHINGTON:

### PART I
### TITLE AND INTENT

NEW SECTION. **Sec. 1.** This act may be known and cited as the law enforcement training and community safety act.

NEW SECTION. **Sec. 2.** The intent of the people in enacting this act is to make our communities safer. This is accomplished by requiring law enforcement officers to obtain violence de-escalation and mental health training, so that officers will have greater skills to resolve conflicts without the use of physical or deadly force. Law enforcement officers will receive first aid training and be required to render first aid, which will save lives and be a positive point of contact between law enforcement officers and community members to increase trust and reduce conflicts. Finally, the initiative adopts a "good faith" standard for officer criminal liability in those exceptional circumstances where deadly force is used, so that officers using deadly force in carrying out their duties in good faith will not face prosecution.

### PART II
### REQUIRING LAW ENFORCEMENT OFFICERS TO RECEIVE VIOLENCE DE-ESCALATION TRAINING

NEW SECTION. **Sec. 3.** A new section is added to chapter 43.101 RCW to read as follows:

(1) Beginning one year after the effective date of this section, all law enforcement officers in the state of Washington must receive violence de-escalation training. Law enforcement officers beginning employment after the effective date of this section must successfully complete such training within the first fifteen months of employment. The commission shall set the date by which other law enforcement officers must successfully complete such training.

(2) All law enforcement officers shall periodically receive continuing violence de-escalation training to practice their skills, update their knowledge and training, and learn about new legal requirements and violence de-escalation strategies.

(3) The commission shall set training requirements through the procedures in section 5 of this act.

### PART III
### REQUIRING LAW ENFORCEMENT OFFICERS TO RECEIVE MENTAL HEALTH TRAINING

DOL00000129

NONPROFIT ORG.
U.S. POSTAGE
PAID
SEATTLE, WA
PERMIT NO. 1216
ECRWSS

OFFICIAL ELECTION MAIL™



SOS

Office of the Secretary of State

Elections Division
PO Box 40220
Olympia WA 98504-0220

Residential Customer

# EDITION 9

Pierce County

Para recibir un folleto en español,
comuníquese al (800) 448-4881
o visite vote.wa.gov.

# VOTERS' PAMPHLET

WASHINGTON STATE ELECTIONS

**GENERAL ELECTION
NOVEMBER 6**

THE SEAL OF THE STATE OF WASHINGTON 1889

YOUR BALLOT WILL BE MAILED BY **OCTOBER 19**

(800) 448-4881 | vote.wa.gov

**2018**

OFFICIAL PUBLICATION

Secretary of State

SER-318

DOL00000134

# Exhibit R

# Deposition of Daniel Mitchell

# Mitchell, et al. v. Atkins, et al.

# January 30, 2020



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

www.buellrealtime.com

Olympia  |  **360.534.9066**     Spokane  |  **509.624.3261**     National  |  **800.846.6989**

email:  info@buellrealtime.com



Daniel Mitchell                                                    1/30/2020

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON

 3                  AT TACOMA

 4   _____

 5   DANIEL MITCHELL, et al.       )
                                   )
 6            Plaintiffs,   )
                                   )
 7   v.                     ) No. 3:19-cv-5106
                                   )
 8   CHARLES ATKINS, et al.,       )
                                   )
 9            Defendants,    )
                                   )
10   and                    )
                                   )
11   SAFE SCHOOLS SAFE COMMUNITIES, )
                                   )
12      Intervenor-Defendant.    )

13            DEPOSITION UPON ORAL EXAMINATION

14                  OF

15            DANIEL MITCHELL

16

17

18      Taken at 1191 Second Avenue, Suite 2000

19            Seattle, Washington

20

21

22

23

24   DATE TAKEN:  JANUARY 30, 2020

25   REPORTED BY:  CRYSTAL R. McAULIFFE, RPR, CCR 2121
```

Daniel Mitchell                                                              1/30/2020

```
 1              A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:
                MATTHEW C. ALBRECHT
 4              ALBRECHT LAW, PLLC
                421 W. Riverside Avenue, Suite 614
 5              Spokane, Washington  99201
                matt@albrechtlawfirm.com
 6

 7    FOR DEFENDANT TERESA BERNTSEN:

 8              ZACHARY P. JONES
                ATTORNEY GENERAL OF WASHINGTON
 9              800 Fifth Avenue, Suite 2000
                Seattle, Washington 98104
10              206.464.7744
                Zach.jones@atg.wa.gov
11
                R. JULY SIMPSON
12              ATTORNEY GENERAL OF WASHINGTON
                800 Fifth Avenue, Suite 2000
13              Seattle, Washington 98104
                206.464.7744
14              July.Simpson@atg.wa.gov

15
                DIONNE PADILLA-HUDDLESTON
16              ATTORNEY GENERAL OF WASHINGTON
                800 Fifth Avenue, Suite 2000
17              Seattle, Washington 98104
                206.464.7744
18              dionnep@atg.wa.gov
                Via Telephone
19

20    FOR DEFENDANT ATKINS and CLARK COUNTY:

21              CURTIS BURNS
                CLARK COUNTY PROSECUTOR'S OFFICE
22              Civil Division
                P.O. Box 5000
23              Spokane, Washington 98666
                curtis.burns@clark.wa.gov
24

25
```

Daniel Mitchell                                                           1/30/2020

```
 1          A P P E A R A N C E S (Continued)

 2

 3   FOR DEFENDANT MEIDL, CITY OF SPOKANE:

 4              SALVATORE J. FRAGGIANO
                OFFICE OF THE CITY ATTORNEY
 5              808 W. Spokane Falls Blvd
                Spokane, Washington 99201
 6              Sfaggiano@spkanecity.org

 7

 8   FOR INTERVENOR DEFENDANT SAFE SCHOOLS SAFE COMMUNITIES:

 9              KAI A. SMITH
                PACIFICA LAW GROUP LLP
10              1191 Second Avenue, Suite 2000
                Seattle, Washington  98101
11              kai.smith@pacificalawgroup.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Daniel Mitchell                                                          1/30/2020

1          DEPOSITION OF DANIEL MITCHELL

2              EXAMINATION INDEX

3    EXAMINATION BY                        PAGE

4    Mr. Jones      . . . . . . . . . . . . . . .    6

5    Mr. Albrecht    . . . . . . . . . . . . . . .   227

6    Mr. Jones      . . . . . . . . . . . . . . .    233

7

8

9              EXHIBIT INDEX

10   EXHIBITS FOR IDENTIFICATION                 PAGE

11   3      RCW 9.41.010                  16

12   4      Washington DOL - Pistol and       46
            Semiautomatic Assault Rifle (SAR)
13          Transfer/Sales (2017-2019)

14   5      Screen Shot of Sporting Systems'      55
            Facebook homepage "Our Story"
15
     6      Sporting Systems' Facebook post from   57
16          October 8th, 2019

17   7      Inventory List                69

18   8      1639 Legal Defense Fund           135

19   10     You Tube screenshots            147

20   11     First Amended Complaint for Declaratory  155
            and Injunctive Relief
21
     12     Objections and Responses to Director   175
22          Berntsen's First Set of Interrogatories
            and Request for Production
23
     13     Federal Firearms License        183
24
     14     1639 training                186
25

**BUELL REALTIME REPORTING, LLC**                        **Page: 4**
**206.287.9066 | 800.846.6989**

**SER-324**

Daniel Mitchell                                                                          1/30/2020

1              EXHIBIT INDEX (Continued)

2    EXHIBITS FOR IDENTIFICATION                    PAGE

3    15       Facebook post                    192

4    16       Press release dated January 23, 2020     203

5    17       Sporting Systems' Facebook post from     208
             October 2, 2019
6
7    18       Violent Crime Control and Law        222
             Enforcement Act of 1994

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniel Mitchell                                                    1/30/2020

1    **Q.  NFA?**

2    A.   National Firearms Act, 1934, Class III items,

3    suppressors, short-barrel rifles, and a plethora of

4    other un -- not unusual but less typical accessories or

5    firearms.

6    **Q.   Would you say that Sporting Systems is known**

7    **more for pistol sales, more for rifle sales, or equal**

8    **for both?**

9    A.   Again, it -- that depends on the subset of

10   customers that we're working with, and -- and that has

11   changed.  It's -- it's -- it's -- it's fluid especially

12   with us being in a border region, because Washington

13   residents easily cross the border.

14        I'm three miles from the Oregon border.  I used

15   to be less than a mile from the Oregon border.

16        So Washington residents will go south of the

17   border to -- to avoid paying sales tax, to avoid paying

18   the SAR fees, to avoid having to go through the SAR

19   application to purchase a semiautomatic rifle.

20   So we've -- our inventory has shifted over the

21   years where we see where the demand lays.  High-end

22   rifles, we still do very well.

23        We have a large volume and a very broad

24   selection of handguns.  We also have a very large

25   selection of suppressors.  So those big selection in

**BUELL REALTIME REPORTING, LLC**                         **Page: 41**
**206.287.9066 | 800.846.6989**

Daniel Mitchell                                                          1/30/2020

1   Southwest Washington isn't very normal, especially with

2   a unique and high demand -- not necessarily high demand,

3   but higher cost items.  We stock a revolver called a

4   Korth.  It is made in Germany.

5       **Q.  Could you spell it?**

6       A.  K-o-r-t-h.

7       **Q.  Thanks.**

8       A.  It is a German revolver.  One gunsmith

9   manufactured the entire firearm.  We stock four

10  different models.  We're one of the only dealers in the

11  country that stocks the product on their shelf because

12  it's a very expensive revolver.

13      **Q.  What's the asking price for it?**

14      A.  You start at 3500 and you push through about 7-

15  to 8,000, depending on the configure.

16      **Q.  Okay.**

17      A.  And that's the kind of thing that we like to be

18  known for.  The customer comes in:  I've seen this on

19  the internet.  I've read stories.  I've never seen one

20  in person.

21      **Q.  I want to go back to, say, crossing the border.**

22          **Washington residents who go to Oregon to**

23  **circumvent Washington regulations to get around higher**

24  **fees or whatnot.**

25          **Do you have an understanding of whether 18- to**

Daniel Mitchell                                                    1/30/2020

1    **20-year-olds are currently able to purchase -- strike**

2    **that.  Let me rephrase it.**

3         **Do you have an understanding over whether 18- to**

4    **20-year-old Washingtonians are able to purchase**

5    **semiautomatic assault rifles in Oregon right now?**

6    A.   Excellent clarification.

7         Yes, Oregon State Police will approve any

8    semiautomatic rifle to any resident -- or any Washington

9    resident that meets Oregon laws for purchase and

10   possession.

11        **Q.   And in Oregon, 18, 19 and 20 year olds are**

12   **permitted to purchase SARs?**

13   A.   I believe that is correct.

14   **Q.   Going back to your inventory.**

15        **How familiar are you with the specifications of**

16   **the firearms of your inventory at any given time?**

17   A.   That's a very big question, because the

18   specifications can be very, very broad.

19   **Q.   Mm-hmm.**

20   A.   So I would say I have a good general acknowledge

21   of the specifications of each item that's in there.  But

22   not to the last mile, if that makes sense.

23   **Q.   Mm-hmm.**

24   A.   Caliber, barrels, lengths, finishes.

25        But if you ask me if it has a

Daniel Mitchell                                                1/30/2020

1    something different.

2       **Q.   Based on the information I've given you in that**

3    **scenario, would a handgun be a responsible choice of**

4    **firearm for the purposes that I described?**

5       A.   It would be one of them.  A compact shotgun

6    could be very effective in the same -- in the same

7    scenario as well as a compact rifle.  Something that's

8    easier to maneuver.

9         Rifles and shotguns are easier to get a sight

10   alignment and sight picture, so you're going to be more

11   accurate with them.

12      **Q.   Can you give me an example of a smaller -- a**

13   **smaller rifle?**

14      A.   A carbine --

15      **Q.   A compact rifle.**

16      A.   A carbine rifle or a rifle that's got a short

17   stock on it, a telescoping stock.  So that when it's not

18   telescoped out, it's significantly shorter.  So it's

19   much easier to maneuver inside of a confined space.

20      **Q.   Okay.  So let's say I decide to purchase a**

21   **weapon -- a firearm.**

22        **What happens next, in terms of making the sale?**

23   **How does the process work?**

24      A.   We'll ask for a copy of their ID.  And make sure

25   that I'm going through my procedures here.  I am not

Daniel Mitchell                                                    1/30/2020

1   went a little too quickly, and I didn't hear what you

2   said about -- something with a "W" that was an acronym.

3         MR. JONES:  WACIC, W-A-C-I-C.

4         MR. ALBRECHT:  W-A-C-I-C?

5         MR. JONES:  Yeah.

6         MR. ALBRECHT:  Okay.  Thanks.

7   BY MR. JONES:

8     **Q.  Overall, however, would you agree that the**

9   **enhanced background check is more comprehensive than a**

10  **regular NICS check?**

11    A.  I can't attest to the data or the efficiency of

12  whether that's -- that works.  We don't see a

13  differential from -- on our side of things --

14    **Q.  Sure.**

15    A.  -- of one versus the other.

16        Could there be an argument made by others?

17  That's completely subjective to -- to their experiences.

18    **Q.  But I think it was your testimony earlier that**

19  **you at least understood that the enhanced background**

20  **checks looks at mental health records; is that right?**

21    A.  It checks with the billing system to see if

22  there's been an involuntary commitment.

23    **Q.  And that's not included in a NICS check?**

24    A.  There is -- yes, I think this is a yes-and-no

25  answer.  Because it depends on if the State enters that

**BUELL REALTIME REPORTING, LLC**                        **Page: 119**
**206.287.9066 | 800.846.6989**

**SER-330**

Daniel Mitchell                                                        1/30/2020

1    information into the federal NICS system.  I believe

2    it's still voluntary for states to push mental health

3    records into the federal system.  And I believe a lot of

4    states still don't do that.

5         The U.S. Government didn't do that with military

6    records, with military health history and military

7    convictions.  Hence the young man that -- that committed

8    mass murder in Texas; he was a disqualified person.

9         But because the U.S. Air Force didn't enter that

10   data into the system, their lack of diligence of

11   following their own federal law result in a prohibited

12   person from obtaining a firearm.

13   **Q.  Sure.  But you do know that the enhanced**

14   **background check searches for information that is not**

15   **included in a NICS check; is that correct?**

16   A.  That -- I believe so, yes.

17   **Q.  Okay.  Would you agree that Washington's**

18   **system -- that requires contacting -- I think -- I**

19   **believe it's something like 250 agencies; is that**

20   **correct?**

21   A.  Correct.

22   **Q.  Would you agree that that is a cumbersome**

23   **process?**

24   A.  I would absolutely agree that that is a

25   cumbersome process.  Cumbersome and inefficient.

Daniel Mitchell                                                          1/30/2020

1     **Q.   Okay.**

2              (Exhibit 8 was marked.)

3     BY MR. JONES:

4        **Q.   The court reporter precisely is handing you now**

5     **what is marked as Exhibit 8.**

6         **What is Exhibit 8?**

7         **Mr. Mitchell, if I represent to you that this is**

8     **a web printout of a website called "1639 Legal Defense**

9     **Fund" on Go Fund Me, does that look correct to you?**

10       A.  Yes.

11       **Q.   Okay.  And what is the 1639 Legal Defense Fund,**

12    **Go Fund Me site?**

13       A.   It was a site that we set up for all the people

14    that wanted to find a way to donate and help on -- on

15    fighting 1639 to either repeal it, to challenge it in

16    the court, so on so forth.

17        But it really -- it was specifically focused

18    on -- as a fundraiser for the Second Amendment

19    Foundation to offset their legal costs on 1639 as well

20    as however they -- they chose to use those funds.

21        We don't -- we didn't earmark them or

22    specifically say these are for you to use on this.

23    That's their discretion.  We don't know how much their

24    legal fees cost.

25        So a hundred percent of the funds from this go

Daniel Mitchell                                                                    1/30/2020

1   directly to the Second Amendment Foundation.

2      **Q.   But nothing prevents the Second Amendment**

3   **Foundation from spending them on things unrelated to the**

4   **Mitchell defense, the Mitchell lawsuit?**

5          MR. ALBRECHT:  Objection.  That calls for

6   speculation and a legal conclusions about the

7   restrictions that may or may not exist.

8          THE WITNESS:  I didn't give them

9   stipulations.

10  BY MR. JONES:

11     **Q.   And who organized this Go Fund Me?**

12     A.  I did.

13     **Q.   Did you start it shortly after the first**

14  **complaint was filed in -- in Mitchell versus Atkins No.**

15  **1?**

16     A.   No.  I believe it -- we started it, end of

17  November.  I'm not a hundred percent sure.  It's end of

18  November or December; sometime in that time frame.

19     **Q.   Of 2018; correct?**

20     A.   I believe so, yes.

21     **Q.   If you'll look sort of in the middle of that**

22  **first page it says "created November 27, 2018."**

23     A.   There you go.

24     **Q.   Does that seem accurate to you?**

25     A.   Yes.

Daniel Mitchell                                                          1/30/2020

1    available from certain vendors.

2        **Q.   What would be the range of time that it could**

3    **take?**

4        A.   It could be a week.  It could be five months.

5    It could be ten months.

6        **Q.   Could it be expedited to be faster than a week?**

7        A.   Not necessarily.  I mean, if you expedited

8    freight, then certainly.  But it's a function of

9    availability, time of order, shipping cycles from

10   suppliers.  There's a lot of different variables that go

11   into the supply chain.

12           And sometimes a vendor may have it, but they

13   don't actually have it.  It's actually in Ruger's

14   inventory they just say they have it.  And then Ruger®

15   ships it to them as soon as they order it and then it

16   ships to us.

17       **Q.   Would a Ruger® bolt-action rifle be suitable for**

18   **hunting?**

19       A.   Yes.

20       **Q.   Would it be suitable for marksmanship practice?**

21       A.   Absolutely.

22       **Q.   Target practice?**

23       A.   Yes.

24       **Q.   Would it be suitable for self-defense?**

25       A.   Absolutely.  If the person chose to utilize that

Daniel Mitchell                                                    1/30/2020

1   item for self-defense.

2      **Q.   Turning to paragraphs 110 to 113 of Exhibit 11.**

3         **Would you just read those three paragraphs to**

4   **yourself and let me know when you've read them.  110,**

5   **111, 112, 113.**

6      A.   Okay.

7      **Q.   So in paragraph 113, the complaint reads:**

8   **"Approximately 30 percent of Mitchell's business**

9   **consists of sales of self-loading rifles to residents of**

10  **other states."**

11        **Do you see that?**

12     A.   Yes, sir.

13     **Q.   What is intended by "30 percent of Mitchell's**

14  **business"?**

15     A.   It's an approximation based off of where we --

16  where we were selling those rifles.

17        And, again, because we -- we stock a lot of

18  higher end product, things that are unique and

19  expensive, that would constitute an approximation of

20  business that was being done within that -- that

21  category.

22     Q.   I guess my question is what the word "business"

23  refers to.  Does it refer to revenue, profits, total

24  sales, number of customers?

25     A.   I -- I couldn't address that exact component

**BUELL REALTIME REPORTING, LLC**                    **Page: 169**
**206.287.9066 | 800.846.6989**

**SER-335**

Daniel Mitchell                                                          1/30/2020

1    without looking much further into -- into the sales

2    histories or things like that.  Which is exceptionally

3    difficult to do by -- by item or by -- without an awful

4    lot of other work.

5        **Q.   Well, what is that 30 percent number based on**

6    **then?**

7        A.   I expect that it was coming off of what we would

8    expect in revenue from our semiautomatic sales.  I don't

9    know if it was volume or revenue specific.  But it

10   was -- it would be in that realm.

11       **Q.   Did you use any data or financial records to**

12   **generate that 30 percent number?**

13       A.   It's mostly -- it started to become -- it got

14   developed -- a lot of it got developed by the number of

15   people that we were turning away.  That we were no

16   longer able to sell these items.  We turn people away

17   almost every day that are either from Oregon or from

18   another state that want to purchase a rifle that we have

19   in stock.

20       **Q.   So is not an estimate of past sales, it was an**

21   **estimate of forgone sales after the initiative went into**

22   **law?**

23       A.   Can you rephrase that one more time?

24       **Q.   Sure.  Is that 30 percent number an estimate of**

25   **past sales?**

Daniel Mitchell                                                    1/30/2020

1      A.   I believe it would be an approximation of what

2    we were doing and what we were now losing, because we

3    could no longer continue in that practice.

4      Q.   Did you derive this 30 percent number yourself?

5      A.   Yes.

6      Q.   And how did you derive it?  Take me through the

7    process that you went through to determine -- to

8    estimate that 30 percent of your business consists of

9    sales of self-loading rifles to residents of other

10   states.

11     A.   I would -- not knowing exactly what I did at

12   that time to -- to develop that number, it would have

13   been an approximation of where we were -- the State of

14   residency on the documents, because I'm signing the

15   documents at the end.

16        So an awareness of where those customers are

17   from, based off of their ID and what's on the 4473, as

18   well as knowing the customers themselves.  You know,

19   personally you get to know a lot of people in -- in this

20   business.  So you know they're from -- from Oregon and

21   you develop an idea of it from there.

22     Q.   So to derive that 30 percent number, did you

23   actually look at individual 4473 forms that had been

24   completed for past sales?

25     A.   I don't recall the specific method that I

Daniel Mitchell                                                    1/30/2020

1    determined that number from at that given time.

2        Q.   Is it safe to say that this was kind of a

3    ballpark estimate rather than an actual mathematical

4    calculation that you attempted?

5        A.   I believe the word "approximately" expresses

6    that quite accurately.  It was an approximation, not

7    a -- not a specific calculation.

8        Q.   Is that a "yes"?  It's a ballpark estimate?

9        A.   Yes.

10       Q.   Of the states that you sell -- okay.  Strike

11   that and start it over.

12           For the out-of-state residents to whom you in

13   the past sold semiautomatic assault rifles, what states

14   are they usually from?

15       A.   I'm just trying -- thinking of larger numbers or

16   repeat customers that we had, it was all over the place.

17   Texas, Florida, Oregon, Montana.  I know there's plenty

18   of other states in the Midwest.

19           Florida and Texas, we shipped a lot of stuff

20   down there.

21           We also had firearms that shipped into states

22   like New York where there were assault weapons bans.

23   And the firearms would be configured properly so that

24   they could be imported in the state and meet the

25   statutory requirements of a semiautomatic rifle in the

1          C E R T I F I C A T E

2

3

4    STATE OF WASHINGTON  )
                          ) ss.
5    COUNTY OF KITSAP      )

6

7       I, CRYSTAL R. McAULIFFE, a Certified Court

8    Reporter in and for the State of Washington, do hereby

9    certify that the foregoing transcript of the deposition

10   of DANIEL MITCHELL, having been duly sworn on

11   JANUARY 30, 2020, is true and accurate to the best of my

12   knowledge, skill and ability.

13      IN WITNESS WHEREOF, I have hereunto set my hand

14   and seal this 3rd day of February, 2020.

15

16

17      _____

18           CRYSTAL R. McAULIFFE, RPR, CCR #2121

19

20

21

22

23

24

25

# Exhibit S



# 9 Best Budget Home-Defense Shotguns

*by Brad Fitzpatrick - Friday, October 19, 2018*



Shotguns are an ideal home-defense tool for many reasons: For starters, they provide plenty of stopping power for close-range engagements, and yet most buckshot and birdshot loads won't penetrate through barriers like walls the way pistols and rifles can. Most shotguns are robust and easy to operate, and they function reliably under the worst conditions. They're also affordable. With so many new accessories available and a multitude of defensive loads available, there's never been a better time to buy a home-defense shotgun. If you've got $500 to spend, you can count on these scatterguns, which we have listed in no particular order, to serve you well.



Exh. No. 95
Date 2/20/2020
Name N. Casey

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-3, Page 109 of 223

Case 3:19-cv-05106-RBL    Document 94-2    Filed 03/31/20    Page 119 of 145
2/1/2020                              NRA Family | 9 Best Budget Home-Defense Shotguns



### 1. Benelli Nova Tactical

The Nova is a no-nonsense pump gun that comes equipped with your choice of rifle sights ($419) or a ghost ring rear sight ($449), both of which are ideally suited for home defense. The steel frame of this gun is covered with a high-tech, durable polymer that protects the Nova against damage and abuse. There's a shell-stop button on the forearm if you want to open the chamber without dropping another shell from the magazine, and dual action bars provide for smooth, reliable cycling. The Nova's 18.5-inch barrel has a fixed cylinder choke and the gun weighs just over 7 pounds, which is well-suited to handling heavy defensive loads. Capacity is 4+1. **www.benelliusa.com**



### 2. Winchester SXP Defender

The Defender may look pretty basic, but it comes with a number of great features that make it a real bargain at $349.99. The rotating bolt has four large lugs for years of reliable service and the 18-inch cylinder bore barrel is chrome lined. Winchester utilizes a black chrome finish that is more durable than traditional bluing, and the tactical forearm provides a secure grip on the gun even with wet hands. The Inflex recoil pad helps significantly reduce recoil impact and Defender is available in both 12 and 20 gauge with a 5+1 capacity. **www.winchesterguns.com**

**SER-342**

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-3, Page 110 of 223

Case 3:19-cv-05106-RBL   Document 94-2   Filed 03/31/20   Page 120 of 145
2/1/2020
NRA Family | 9 Best Budget Home-Defense Shotguns



### 3. Remington 870 TAC-14

Don't let the TAC-14's compact size fool you—this gun is a serious self-defense tool. Classified as a "non-NFA firearm," the TAC-14 doesn't require a stamp or extra paperwork from the ATF to own (although local laws may limit purchase). And while it may initially seem like a novelty firearm, the TAC-14 is easy to store in the home and offers 4+1 capacity in either 12 or 20 gauge. The Raptor glass-filled polymer pistol grip and Magpul forearm offer a stable platform for holding this gun when firing, and with a weight of 5.6 pounds it's manageable to shoot with most defensive rounds. At its heart this gun is a true Model 870, with dual action arms and a steel receiver with a black oxide finish. Prices start at $443.05. **www.remington.com**



### 4. Stoeger Double Defense

Available in either side-by-side or over/under configurations, the Double Defense is a modern take on the coach guns of the late nineteenth century. Both models offer a rapid one-two punch and their short (20-inch) barrels and compact size make these guns easy to store and maneuver for home-defense applications. Available in both 12 and 20 gauge, the Double Defense features a black-finished walnut stock and rails on the top and bottom of the guns for mounting optics, lights and lasers. Overall weights range from 6.4 to 7.1 pounds, which helps mitigate recoil with defensive loads, and the side-by-side version comes with ported barrels. All Double Defense shotguns come with high-visibility fiber optic front sights. MSRPs range from $449 to $489. **www.stoegerindustries.com**



### 5. Mossberg 500 Tactical HS410 Home Security

Consider the .410 shotgun: They combine light weight and minimal recoil with ample stopping power at home defense ranges. Mossberg's HS410 comes with a 18.5-inch barrel with a Spreader choke and a bead front sight. The forearm is equipped with a vertical pistol grip for rapid cycling and maximum stability and the tubular magazine holds 6 shells. Based on the time-tested Model 500 action, the HS410 has a three-inch chamber and a convenient tang-mounted safety. MSRP is $478. **www.mossberg.com**



### 6. Stoeger P3000 Defense

The Stoeger P3000 is a basic but functional pump shotgun that is a real bargain with an MSRP as low as $289. Each of these guns comes with a blade front sight, crossbolt safety, black synthetic stock (there's a pistol grip model available for $339) and a fixed cylinder choke. These guns come with absolutely no frills, but they function reliably and at just under 6.5 pounds, they're heavy enough to manage kick yet maneuverable. Standard capacity for the P3000 Defense is 4+1, but there's also a Freedom version that debuted this year with an increased capacity of 7+1. If you're looking for an affordable repeating shotgun for home defense the P3000 is a great option. **www.stoegerindustries.com**

2/1/2020

NRA Family | 9 Best Budget Home-Defense Shotguns



### 7. Mossberg Shockwave

The ultra-compact Shockwave is built on Mossberg's trusted 500 action, which features dual extractors and twin action bars for reliable cycling. Like the Remington TAC-14, this shotgun comes with a Raptor pistol grip and a short (14-14.375-inch) barrel. The "corn cob" forearm is equipped with a strap to keep the gun firmly planted, and the Shockwave is available in 12 and 20 gauge and .410 bore. All Shockwave models have a magazine capacity of 6 rounds, and they are available without special ATF paperwork in most jurisdictions. Compact, portable and extremely reliable, these guns make effective defensive guns in close quarters. MSRP is $455. **www.mossberg.com**



### 8. Remington 870 Hardwood Home Defense

When you purchase a home-defense shotgun you want to know that the gun is reliable, and Remington's 870 pump shotgun has a reputation for being fool-proof. More than 11 million of these guns have been sold, and they're a favorite of law enforcement professionals and civilians alike. The 870 Hardwood Home Defense is a personal-protection firearm with the look and feel of a classic walnut stock. Available in 12-gauge with a magazine capacity of either 4 or 6 rounds, the 870 comes equipped with am 18.5-inch barrel with a cylinder bore and a matte blue finish. At $420 it's very affordably priced as well. **www.remington.com**

**SER-345**

2/1/2020
NRA Family | 9 Best Budget Home-Defense Shotguns



### 9. Winchester SXP Shadow Marine Defender Kryptek Typhon

Squeaking just under the $500 limit (but no doubt available for less than the MSRP in some stores), is the Winchester SXP Shadow Marine Defender Kryptek, a pump shotgun with a long name and an equally long list of features that include a matte stainless finish on the barrel, a pistol grip stock with interchangeable comb inserts, a chrome-lined barrel and chamber and Kryptek Typhon camo on the stock and forearm. One additional upgrade you'll get with this gun—besides its ample bling—is a removable choke tube that allows you to change constrictions if desired (cylinder choke included). Other add-ons include an Inflex recoil pad, a TRUGLO fiber optic front sight and black chrome bolt. It's available in 12 gauge with a 18-inch barrel and has a capacity of 5 rounds in the tubular magazine. $499.99. **www.winchesterguns.com**

Privacy Policy  •  Contact Us  •  Warnings  •  FAQs  •  © 2020 National Rifle Association of America

# Exhibit T

# Deposition of Matthew Wald

# Mitchell, et al. v. Atkins, et al.

# February 18, 2020



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

www.buellrealtime.com

Olympia  l  **360.534.9066**    Spokane  l  **509.624.3261**    National  l  **800.846.6989**

email:  info@buellrealtime.com



Matthew Wald                                                    2/18/2020

1              UNITED STATES DISTRICT COURT
           WESTERN WASHINGTON OF WASHINGTON
2                     AT TACOMA

3    _____

     DANIEL MITCHELL, et al.,    )
4                                )
            Plaintiffs,      )
5                                )
      vs.                )   No. 3:19-CV-5106
6                                )
     CHARLES ATKINS, et al.,    )
7                                )
            Defendants.     )
8                                )
     And                )
9                                )
     SAFE SCHOOLS SAFE          )
10   COMMUNITIES,            )
                                 )
11     Intervenor-Defendant.    )

12   _____

         DEPOSITION UPON ORAL EXAMINATION
13                     OF
                 MATTHEW WALD
14   _____

15      Taken at 1191 Second Avenue, Suite 2000

16            Seattle, Washington

17

18

19

20

21

22

23

24   DATE TAKEN:  FEBRUARY 18, 2020

25   REPORTED BY: KIM DORE-HACKBARTH, RPR, CCR 2072

Matthew Wald                                                           2/18/2020

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF:   MATTHEW C. ALBRECHT
                    Albrecht Law PLLC
3                   421 W. Riverside Avenue
                    Suite 614
4                   Spokane, Washington 99201
                    (509) 495-1246
5                   Matt@albrechtlawfirm.com

6    FOR THE DEFENDANTS:
     COUNSEL FOR TERESA BERNTSEN:
7                   BRENDAN SELBY
                    ZACHARY PEKELIS JONES
8                   R. JULY SIMPSON (Telephonically)
                    Assistant Attorney General
9                   800 5th Avenue
                    Suite 2000
10                  Seattle, Washington 98104-3188
                    (360) 586-3151
11                  Brendan.selby@atg.wa.gov
                    Zack.jones@atg.wa.gov
12                  July.simpson@atg.wa.gov

13   COUNSEL FOR INTERVENOR DEFENDANT, SAFE SCHOOLS SAFE
     COMMUNITIES (CAMPAIGN):
14                  NICHOLAS W. BROWN
                    Pacifica Law Group LLP
15                  1191 Second Avenue
                    Suite 2000
16                  Seattle, Washington 98101-3404
                    (206) 245-1700
17                  Nicholas.brown@pacificalawgroup.com

18   COUNSEL FOR DEFENDANT MEIDLE,
     CITY OF SPOKANE:
19   (APPEARING TELEPHONICALLY)
                    SALVATORE J. FAGGIANO
20                  Assistant City Attorney
                    Office of the City Attorney
21                  808 W. Spokane Falls Blvd.
                    Spokane, Washington 99201-3326
22                  (509) 625-6818
                    Sfaggiano@spokanecity.org
23
                    * * * * *
24

25

BUELL REALTIME REPORTING, LLC                          Page: 2
206.287.9066 | 800.846.6989

SER-350

Matthew Wald                                                          2/18/2020

1                 DEPOSITION OF MATTHEW WALD

2                      EXAMINATION INDEX

3    EXAMINATION BY:                        PAGE NO.

4    MR. SELBY.....................................   4

5    MR. BROWN.....................................   105

6                       EXHIBIT INDEX

7    EXHIBITS FOR IDENTIFICATION               PAGE NO.

8       82     First Amended Complaint for
               Declaratory and Injunctive Relief..   55
9
        83     Complaint for Declaratory and
10             Injunctive Relief..................   64

11      84     The Spectator, 11/13/19............   78

12      85     Seattle University Firearms and
               Weapons Policy.....................   83
13
        86     Initiative Measure No. 1639........   90
14
        87     RCW 9.41.042 -- Children --
15             Permissible firearm possession.....   98

16

17

18

19

20

21

22

23

24

25

**BUELL REALTIME REPORTING, LLC**                    **Page: 3**
**206.287.9066 | 800.846.6989**

**SER-351**

Matthew Wald                                                    2/18/2020

1    or what kind of --

2       A.   It went pretty over my head.

3       Q.   Okay.

4            When you say over your head, you mean the --

5       A.   Lack of understanding.

6       Q.   What was the second -- remind me the second

7    thing you reviewed; you said your notes of your own?

8       A.   No.

9       Q.   Can you remind me?

10      A.   I had a call with my attorney.

11      Q.   And did you discuss today's deposition with

12   anyone besides your attorney?

13      A.   Only as needed to make arrangements, as in, this

14   is happening, I have to be at this place at this time.

15      Q.   Can you state and spell your full name.

16      A.   Matthew Louis Wald.  M-A-T-T-H-E-W, space,

17   L-O-U-I-S, space, W-A-L-D.

18      Q.   What's your birthday?

19      A.   October 15th, 1999.

20      Q.   So that would make you how old right now?

21      A.   20.

22      Q.   And so you will turn 21 next October, right?

23      A.   This October.

24      Q.   This October.  This coming October, right?

25      A.   Uh-huh.

Matthew Wald                                                                2/18/2020

1    **Q.  Is that a yes?**

2    A.  Yes.

3    **Q.  What's your current home address?**

4    A.  My home address is 4213 Arbordale Avenue West,

5    University Place, Washington 98466.

6    **Q.  Is that a dorm or an apartment?**

7    A.  That is my actual house.  That's the home where

8    I live.

9    **Q.  And how long have you lived there?**

10   A.  The last 17 years.  The specific number is

11   escaping me, but that would be my best estimate,

12   17 years.

13   **Q.  Is that the house you grew up in?**

14   A.  For the most part, yes.

15   **Q.  Does anyone else live there?**

16   A.  Yes.

17   **Q.  Who else lives there?**

18   A.  My brother currently and my father and mother.

19   **Q.  So it would be accurate to say you live at home**

20   **right now?**

21   A.  I live at home when I return.  I am a college

22   student up here in Seattle, but I list my house as my

23   home address.  I spend a lot of time at home.

24   **Q.  So where do you live when you are in Seattle?**

25   A.  I live in a dorm facility in Seattle University.

**BUELL REALTIME REPORTING, LLC**                          **Page: 8**
**206.287.9066 | 800.846.6989**

**SER-353**

Matthew Wald                                                    2/18/2020

1        **First question is, do you currently own any**

2  **firearms?**

3       A.   I do currently own firearms.

4       **Q.   Which firearms do you own?**

5       A.   I currently own an AR-15 pattern rifle, a PTR 91

6  rifle, a Ruger 10/22 rifle, and a Ruger 20 gauge double

7  barrel shotgun.

8       **Q.   Okay.**

9        **And I just want to kind of walk through each of**

10  **those one by one.**

11       **Can you explain -- what kind of a gun is an**

12  **AR-15 pattern?**

13       A.   It is semi-automatic rifle, built on the general

14  AR-15 platform.  It is just a standard semi-automatic

15  rifle.

16       **Q.   What's your understanding of what a**

17  **semi-automatic rifle is?**

18       A.   A semi-automatic rifle will expend a portion of

19  the energy from the previously fired cartridge to

20  chamber the next round and reset the action, requiring a

21  separate trigger pull for each cartridge fire.

22       **Q.   Who makes the AR-15?**

23       A.   I actually do not know the manufacturer name off

24  the top of my head.

25       **Q.   How did you acquire your AR-15?**

Matthew Wald                                                    2/18/2020

1      A.  My AR-15 was a gift from my father when I turned

2  18.

3      Q.  **Did your father tell you why he was getting you**

4  **an AR-15?**

5      A.  My father told me it was a gift.

6      Q.  **Did you -- had you asked for a gun or anything**

7  **like that?**

8      A.  I had, I had not specifically asked for any

9  firearms, but my father and I, to my knowledge, one

10  understanding that I had an appreciation for firearms

11  and that a gift would not be unappreciated.

12     Q.  **Where do you keep your AR-15?**

13     A.  I keep it in a safe.

14     Q.  **Where is that safe?**

15     A.  Currently at the Arbordale Avenue residence.

16     Q.  **And who has access to that safe?**

17     A.  Myself and my father.

18     Q.  **So does your father know the code to the safe?**

19     A.  There is no code for the safe.

20     Q.  **How do you open the safe?**

21     A.  There is a key behind a separate code lock safe.

22     Q.  **Does your father have access to that key?**

23     A.  Yes.

24     Q.  **He knows the code to the separate code lock**

25  **safe?**

Matthew Wald                                                    2/18/2020

1    A.  Yes.

2    Q.  I assume you know the code to the separate code

3  lock safe?

4    A.  Yes.

5    Q.  Does anyone else know the code on that safe?

6    A.  Not to my knowledge.

7    Q.  Can you explain what kind of gun the PTR 91 is?

8    A.  The PTR 91 is also a semi-automatic rifle.  It

9  was -- it is not an AR-15 pattern, but a similarly

10  functioning semi-automatic rifle.

11    Q.  Are there any relevant differences from your

12  perspective between the PTR 91 and the AR-15?

13    A.  They are chambered for a different round.  They

14  are slightly different barrel lengths.  But for the most

15  part, they both function as a semi-automatic rifle.

16    Q.  Do you use them at all for different purposes or

17  in different settings?

18    A.  The predominant purpose that I have used them

19  for is mostly target practice.

20    Q.  And where is that PTR 91 kept?

21    A.  In the same safe.

22    Q.  Where is the ammunition for those two guns kept?

23    A.  To my knowledge, some in the same safe and some

24  held separate in a separate safe.

25    Q.  Okay.

Matthew Wald                                                    2/18/2020

1    **The Ruger 10/22, can you tell me what kind of**

2    **gun that is?**

3    A.   The Ruger 10/22 is also a semi-automatic rifle.

4    **Q.   I forgot to ask, how did you acquire the PTR 91?**

5    A.   The PTR 91 was also a gift from my father upon

6    turning 18.

7    **Q.   Was that -- were the two guns presented at the**

8    **same time?  Can you tell me -- let me just stop at that.**

9    **Were the two guns presented at the same time?**

10   A.   Yes.

11   **Q.   Can you tell me how they were presented?**

12   A.   It was a rather casual presentation of, these

13   two firearms are yours for your birthday for a gift.

14   **Q.   What about the Ruger 10/22, how did you acquire**

15   **that?**

16   A.   The Ruger 10/22 was handed to me upon turning 18

17   from my father.

18   **Q.   Okay.**

19   **That was at the same time generally that you**

20   **received the other two guns?**

21   A.   Related to my birthday, yes, for the most part,

22   upon turning 18.

23   **Q.   And what do you use the Ruger 10/22 for**

24   **specifically?**

25   A.   Predominantly target practice.

Matthew Wald                                                              2/18/2020

1    **Q.   Where is that gun kept?**

2    A.   The same safe as the AR-15 and the PTR.

3    **Q.   What about the Ruger 20 gauge, that's a shotgun,**

4    **right?**

5    A.   Correct.

6    **Q.   How did you acquire that?**

7    A.   That was a gift from my grandfather not related

8    to any specific circumstance, to my recollection.

9    **Q.   When did you receive that gift?**

10   A.   I believe it was two summers ago, to my

11   knowledge, but my direct recollection is not strong.

12   **Q.   Do you know how old you were?**

13   A.   I believe I was 19 at the time.

14   **Q.   And do you know what the circumstances of the**

15   **gift were?**

16   A.   To my recollection, it was a spur of the moment

17   gift.

18   **Q.   Do you use the 20 gauge shotgun for target**

19   **practice or anything else?**

20   A.   I do frequently, and skeet and trap shooting.

21   **Q.   Where is that gun kept?**

22   A.   In the same safe as previously mentioned.

23   **Q.   Is there any kind of -- are you in the**

24   possession of any kind of paperwork or documentation

25   regarding the ownership of these four guns?

Matthew Wald                                                    2/18/2020

```
 1          MR. SELBY:  I will probably turn to

 2   exhibits, so now might be a good time to take a break.

 3          MR. ALBRECHT:  Sure.

 4          (Break taken from 10:08 a.m. to

 5          10:20 a.m.)

 6             EXAMINATION (CONTINUED)

 7   BY MR. SELBY:

 8     Q.  Back on the record.

 9          Mr. Wald, you understand you are still under

10   oath?

11     A.  Yes.

12     Q.  You mentioned that you haven't kept any firearms

13   at your apartment in Seattle, why not?

14     A.  As it currently stands, the university policy is

15   that no firearms are allowed on any campus or any

16   campus-related facilities, period.

17     Q.  When you say, as it currently stands, do you

18   anticipate the policy might change?

19     A.  I don't -- that should be an important note to

20   make -- I don't anticipate that changing.

21     Q.  When did you become aware of that policy?

22     A.  It was one of the first things that I looked up

23   when I was accepted to Seattle University.  I looked up

24   the on-campus safety and weapons policy, I believe was

25   how they filed it.
```

Matthew Wald                                                           2/18/2020

1   don't know if that's necessarily a given statement, that

2   a semi-automatic would shoot faster than a bolt action.

3      **Q.   Do you have a preference for -- is there a**

4   **particular reason that you want to own a semi-automatic**

5   **rifle as opposed to a bolt action rifle?**

6      A.   There are a number of reasons.  For the most

7   part, a semi-automatic rifle makes cycling the action

8   far simpler, a trigger pull compared to physically

9   manipulating bolt-on-bolt action.  For me that's just

10  simpler, simpler between round shots.

11       If it was in a situation of home defense, it

12  would be far easier to manipulate in my opinion on a

13  bolt action just as rapidly.  I also think that

14  internally it's, for the most part, slightly more

15  complicated mechanism.  And if someone who is interested

16  in firearms and firearm operations from a mechanical

17  standpoint, that to me is of greater interest.

18       Those are, what I would argue, probably the two

19  that spring to mind first, but I am sure there are other

20  reasons that are not coming to me.

21     **Q.   Is the shotgun a useful weapon for home defense?**

22     A.   I would argue that home defense could be solved

23  by a number of different firearms.  I think it depends

24  on what situation the home defense is.  I think that in

25  some situations the shotgun might be adequate and some

Matthew Wald                                                          2/18/2020

1    others a rifle might be adequate, and others it may be a

2    handgun.  I think it depends highly on the

3    circumstances.

4        **Q.   Can you think of any situations where a**

5    **semi-automatic rifle would be more adequate than a**

6    **shotgun in a home defense?**

7        A.   I am sure if it was potentially a greater

8    distance between the target and firearms operator, that

9    a rifle of any type would be more effective than a

10   shotgun or handgun.  That is the first that springs to

11   mind is simplicity.

12        It may be -- the need for accuracy, a shotgun is

13   not necessarily accurate.  There's a greater risk of the

14   potentially buckshot spread or whatever, the shotgun

15   spreading beyond the intended target.  Semi-automatic

16   rifle for the most part or bolt action rifle for the

17   most part produce a more specific point of contact when

18   the bullet reaches the target.

19        Those are the two ideas that would most likely

20   spring to mind for why that is important, but I am sure

21   there are others.

22        **Q.   So the distance, how -- to the extent you know,**

23   **what would be the distance where a shotgun, up to what**

24   **distance would a shotgun remain effective for home**

25   **defense?**

Matthew Wald                                                              2/18/2020

1      **Q.   Anything else regarding sales?**

2      A.   I don't believe, to my knowledge, other than the

3  fact that it was limiting those sales of -- to 18 to

4  21-years-olds, that was the language of the initiative.

5      **Q.   And did -- do you remember anything specifically**

6  **about what Mr. Mitchell said about 18 to 21-year-olds**

7  **and their ability to use firearms safely or effectively?**

8      A.   I don't recall any statement towards Mitchell to

9  that effect, no.

10     **Q.   What about Mr. Ard?**

11     A.   I do not recall a statement from Mr. Ard to that

12  effect either.

13     **Q.   Did you speak at this event?**

14     A.   I did a minor introduction.  I, myself, asked

15  some questions.  I remember chatting unofficially with

16  Mitchell and Ard after the event, but for the most part

17  no, I didn't speak.

18     **Q.   And how long was the event, how long did it go**

19  **on?**

20     A.   The official event, to my recollection, ran from

21  6:30 to 8:00 p.m.  I do remember students staying after

22  for some volume of time chatting amongst themselves and

23  with the guest speakers as they got a chance to speak

24  unofficially after the event.

25     **Q.   I am going to show you Exhibit 85.**

Matthew Wald                                                          2/18/2020

1    A.   Correct.

2         To clarify, I was in Bellarmine Hall when that

3    call was made, but it was the same for this apartment.

4    **Q.   So it's your understanding you are not able to**

5    **possess firearms at Bellarmine Hall and your current**

6    **apartment house?**

7    A.   Correct.

8    **Q.   And if you were to stay in Seattle University**

9    **housing next year, you would not be able to possess a**

10   **firearm there as well?**

11   A.   Correct.

12   **Q.   But if you left, if you left off campus, then**

13   **you potentially could?**

14   A.   Correct.

15   **Q.   Do you intend to take up hunting any time in the**

16   **next year?**

17   A.   That is something I am uncertain on.  If it

18   happened, it would not be me going out and getting a

19   hunting license.  It would most likely be accompanying a

20   friend who does hunt regularly, which I have several.

21   **Q.   Do you intend to engage in any competitive**

22   **shooting activities in the next year?**

23   A.   I don't anticipate the opportunity, but if given

24   the opportunity, I would.

25   **Q.   You were talking a little bit before about home**

Matthew Wald                                                    2/18/2020

1          THE WITNESS:  You are saying just any child?

2          MR. SELBY:  Yeah.

3          THE WITNESS:  Yes, I am aware that's the

4     exception.

5     BY MR. SELBY:

6        Q.   Are you aware that a person under the age of 21

7     in Washington is permitted to possess a firearm as part

8     of a hunter's safety course or firearm safety course?

9          MR. ALBRECHT:  Counsel, I will offer the

10    same objection as a standing objection to this line, if

11    it's acceptable.

12         MR. SELBY:  It's acceptable, thank you.

13         THE WITNESS:  Yes.

14    BY MR. SELBY:

15       Q.   Is it your understanding that someone under the

16    age of 21 is able to possess a firearm, possess and use

17    a firearm at a target range?

18       A.   Yes.

19       Q.   And as someone who engages in target shooting,

20    is it your understanding that you continue to be able to

21    lawfully possess and use a firearm, including a

22    semi-automatic rifle, at target ranges in Washington?

23       A.   Yes.

24       Q.   Do you understand that individuals under the age

25    of 21 in Washington can continue to engage in organized

Matthew Wald                                                    2/18/2020

1    competition involving the use of a firearm, including a

2    semi-automatic rifle in Washington?

3        A.  Yes.

4        Q.   Is it your understanding that an individual

5    under 21 can engage in hunting or trapping with a

6    license using a firearm, including a semi-automatic

7    rifle in Washington, today?

8        A.  Yes.

9        Q.   And it's your understanding that an individual

10   under the age of 21 can travel with a firearm, including

11   a semi-automatic rifle, to and from any of the

12   activities I just mentioned?

13       A.  Yes.

14       Q.   And I think we already discussed this, but

15   you -- it's your understanding that you continue to

16   possess any of the semi-automatic rifles you already own

17   at your, at the property of which you reside at, at

18   University Place?

19       A.  Correct.

20       Q.   And that you are able to keep those weapons at

21   home for possible home defense purposes?

22       A.  Yes, and other purposes.

23       Q.   And other purposes.

24          Is your ability to -- to what extent is your

25   ability to use your semi-automatic rifles impaired by

Matthew Wald                                                          2/18/2020

1              C E R T I F I C A T E

2

     STATE OF WASHINGTON  )
3                         ) ss.
     COUNTY OF KING       )
4

5        I, KIM M. DORE-HACKBARTH, a Certified Shorthand

6    Reporter in and for the State of Washington, do hereby

7    certify that the foregoing transcript is true and

8    accurate to the best of my knowledge, skill and ability.

9        IN WITNESS WHEREOF, I have hereunto set my hand

10   and seal this 28th day of February, 2020.

11

12

13              _____

14              KIM M. DORE-HACKBARTH, RPR, CCR
                Certified Court Reporter No. 2072
15              (Certification expires 5/27/20.)

16

17

18

19

20

21

22

23

24

25



# E R R A T A

**CASE NAME:** Mitchell, et al. v. Atkins, et al.

**DATE TAKEN:** 02/18/2020

**WITNESS:** Matthew Wald

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| 78 | 19 | Walton | Waldman |
| 78 | 23 | Walton | Waldman |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com



# D E C L A R A T I O N

**CASE NAME:**  Mitchell, et al. v. Atkins, et al.

**DATE TAKEN:** 02/18/2020

**WITNESS:**    Matthew Wald


I declare under penalty of perjury under the laws of the State of

Washington that I have read my within deposition, and the same is true and

accurate, save and except for changes and/or corrections, if any, as indicated by

me on the ERRATA flyleaf page hereof.


_Matthew Wald_
Matthew Wald


Signed on the __12th__ day of _____March_____, 2020.


1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com

**SER-368**

# Exhibit U

# About NICS



# General Information
## Brady Act Requirements

Mandated by the Brady Handgun Violence Prevention Act (Brady Act) of 1993, Public Law 103-159, the National Instant Criminal Background Check System (NICS) was established for Federal Firearms Licensees (FFLs) to contact by telephone, or other electronic means, for information to be supplied immediately on whether the transfer of a firearm would be in violation of Section 922 (g) or (n) of Title 18, United States Code, or state law. The Brady Act is a public record and is available from many sources, including the Internet at www.atf.gov.

The NICS is a national system that checks available records on persons who may be disqualified from receiving firearms. The FBI developed the system through a cooperative effort with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and local and state law enforcement agencies. The NICS is a computerized background check system designed to respond instantly on most background check inquiries so the FFLs receive an almost immediate response.  In calendar year 2015, the NICS Contracted Call Centers (NCCC) handled calls an average of 141 seconds.  After transferring the calls to the NICS Section, the wait and processing time averaged 446.3 seconds.  When firearm background checks were conducted via the NICS E-Check, the wait and processing time averaged 107.5 seconds. Depending on the willingness of state governments to act as a liaison for the NICS, the FFLs contact either the FBI or a designated state point of contact (POC) to initiate background checks on individuals possessing or receiving firearms. The background check process, as performed by the FBI and by state POCs, is described below.

# The NICS Section

Located at the FBI's Criminal Justice Information Services Division in Clarksburg, West Virginia, the NICS Section processes background checks for the FFLs in those states that have declined to serve as POCs for the NICS. The FFLs conducting business in these states will contact the NICS either by telephone via the NCCC, or electronically by the NICS E-Check via the Internet. The FFLs will provide the descriptive information requested on the ATF Form 4473, which is required by law to be completed and signed by every prospective firearm transferee. The FFL will receive a response that the transfer may proceed or is delayed.

After initiating a firearm background check via the NCCC, if no matching records are returned by any of the databases, the transaction is automatically proceeded. If the NICS returns a match of the prospective firearm transferee's descriptive information to that of record information located in any of the databases, the FFL is advised that the transaction is delayed. While the FFL is still on the telephone, the call is placed on hold and transferred to the NICS Section in Clarksburg, West Virginia, for a quick review and evaluation by a NICS legal instruments examiner (NICS examiner). If the record information returned by the NICS presents a valid match to the descriptive information of the prospective firearm transferee, the NICS examiners, who have access to protected information (as opposed to NCCC personnel who do not have such access) review the information to determine if state and/or federal firearm prohibitive criteria exists. If the information matched by the NICS is not a valid match or no prohibitive criteria exists, the NICS examiner will advise the FFL they may PROCEED with the firearm transaction. The FFL must record the NICS Transaction Number (NTN) on line 21b of the ATF Form 4473 and retain the form for auditing purposes.

If it is determined that prohibitive criteria exists, the NICS examiner will advise the FFL to DENY the firearm transaction. If potentially prohibitive criteria exists and more information is required in order to make the determination, the NICS examiner will advise the FFL to DELAY the firearm transaction and the FFL will receive the following instructions:

". . .NTN ___ will be delayed while the NICS continues its research. If you do not receive a final response from us, the Brady Law does not prohibit the transfer of the firearm on day/date."

The NICS examiner will provide the FFL with the date of the third business day after the firearm check was initiated. Business days do not include the day the check was initiated, Saturdays, Sundays, and any day state offices in the state of purchase are closed. If the FFL has not received from the NICS a final determination after three business days have elapsed since the delay response, it is within the FFL's discretion whether or not to transfer the firearm (if state law permits the transfer). If the FFL transfers the firearm, the FFL must mark "No resolution was provided within three business days" on line 21d of the ATF Form 4473. It is recommended the FFL record the date provided in the delay response on which the firearm may be lawfully transferred under federal law if a final determination of proceed or denied is not received from the NICS.

When a transaction is DELAYED, the NICS examiner begins extensive research on the potential prohibitor. Upon completion of the research when a definitive status is determined, the FFL is contacted and given a PROCEED or DENY decision on the firearm transaction.

In states that agree to serve as POCs for the NICS, the functions performed by the NICS Section are performed by a local or state law enforcement agency which services the FFLs. The FFLs call these local or state agencies, which perform the check, make the decision whether the check indicates an individual is disqualified or not from possessing a firearm, and notify the FFL of the results of the check.

## NICS Background Checks

The FFLs have the following three methods of performing background checks depending upon the state in which the FFL is conducting business:

1. In states where the state government has agreed to serve as the POC for the system, the FFLs contact the NICS through the state POC for all firearm transfers. The state POC conducts the NICS check and determines whether or not the transfer would violate state or federal law.

2. In states where the state government has declined to serve as a POC, the FFLs initiate a NICS background check by contacting the NCCC for all firearm transfers. The FBI conducts the NICS check and determines whether or not the transfer would violate state or federal law.

3. Finally, in states where the state government has agreed to serve as a POC for handgun purchases but not for long gun purchases, the FFLs contact the NICS through the designated state POC for handgun transfers and the NICS Section for long gun transfers.

Each state decides whether the FFLs in its state call a state POC or the FBI to initiate firearm background checks.

## NICS E-Check

This function enables FFLs to initiate an unassisted NICS background check for firearm transfers via the Internet. The NICS Section ensured that security was a priority during the development and implementation of the NICS E-Check. The NICS E-Check is monitored 24 hours a day, 7 days per week, for misuse and unauthorized access. In addition, the NICS E-Check denies access to any individual whose identification is not known to the system.

When a firearm background check is initiated via the NICS E-Check if no matching records are returned by any of the databases, the transaction is automatically proceeded. If it is determined that prohibitive criteria exists, the NICS examiner will deny the firearm transaction. If the NICS returns a match of the prospective firearm transferee's descriptive information to that of record information located in any of the databases that is potentially disqualifying, the NICS examiner delays the transaction. When the initial processing of the NICS E-Check transactions is completed, the NICS E-Check generates the status to be relayed electronically to the requestor. If the transaction is determined to be a delay, the pre-calculated date the requestor may transfer the firearm if no resolution is provided within three business days is also relayed. The NICS Examiner begins extensive research on the potential prohibitors located on firearm background checks delayed via the NICS E-Check. Upon completion of the research when a definitive status is determined, an electronic message is generated to the requestor for a PROCEED or DENY decision. When transactions are denied after the third business day, the requestor is contacted via telephone with the final status.

# Privacy and Security of NICS Information

The privacy and security of the information in the NICS is of great importance. In October 1998, the Attorney General published regulations on the privacy and security of NICS information, including the proper and official use of this information. These regulations are available on the NICS website. Data stored in the NICS is documented federal data and access to that information is restricted to agencies authorized by the FBI. Extensive measures are taken to ensure the security and integrity of the system information and agency use. The NICS is not to be used to establish a federal firearm registry; information about an inquiry resulting in an allowed transfer is destroyed in accordance with NICS regulations. Current destruction of NICS records became effective when a final rule was published by the Department of Justice in The Federal Register, outlining the following changes. Per Title 28, Code of Federal Regulations, Part 25.9(b)(1), (2), and (3), the NICS Section must destroy all identifying information on allowed transactions prior to the start of the next NICS operational day. If a potential purchaser is delayed or denied a firearm and successfully appeals the decision, the NICS Section cannot retain a record of the overturned appeal. If the record is not able to be updated, the purchaser continues to be denied or delayed, and if that individual appeals the decision, the documentation must be resubmitted on every subsequent purchase. For this reason, the Voluntary Appeal File (VAF) has been established. This process permits applicants to request that the NICS maintain information about themselves in the VAF to prevent future denials or extended delays of a firearm transfer. (See VAF Section below.)

# Appeals

Individuals who attempt to purchase a firearm and are denied the transfer may request that the FBI or the state which processed their transaction provide the reason for the denial. Federal regulations address the process for challenging the final status received. Individuals must include the NTN or State Transaction Number assigned to their transaction. To ensure all necessary information is received, individuals are encouraged to request the reason for their at https://www.edo.cjis.gov. (https://www.edo.cjis.gov.)

For customers **without** Internet access, you may mail a request to the following address:

FBI CJIS Division
ATTN:  CRIMINAL HISTORY ANALYSIS TEAM
1BTC 3
1000 Custer Hollow Road
Clarksburg, WV 26306

## Voluntary Appeal File (VAF)

Individuals attempting to purchase firearms who experience extended delays or erroneous denials may apply to be considered for entry into the VAF by signing an applicant statement that authorizes the NICS Section to retain information that would otherwise be destroyed upon the approval of the firearm transaction. A fingerprint card is also required when applying for VAF.

A complete NICS check is still required for future purchases and will result in a denial if additional prohibitive information is discovered. The NICS Section is required to destroy any records submitted to the VAF upon written request of the individual.

A VAF application can be obtained online (https://www.fbi.gov/file-repository/vaf-form-25.pdf/view) or by mailing a request to the FBI, Criminal Justice Information Services Division, NICS Section, NICS Functional Support Team, Module D-1, Post Office Box 4278, Clarksburg, WV 26302-4278. More information can be found on the Appeals and VAF (https://www.fbi.gov/services/cjis/nics/national-instant-criminal-background-check-system-nics-appeals-vaf) webpage.

## Federal Categories of Persons Prohibited from Receiving

A delay response from the NICS Section indicates the subject of the background check has been matched with either a state or federal potentially prohibiting record containing a similar name and/or similar descriptive features (name, sex, race, date of birth, state of residence, social security number, height, weight, or place of birth). The federally prohibiting criteria are as follows:

- A person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year or any state offense classified by the state as a misdemeanor and is punishable by a term of imprisonment of more than two years.
- Persons who are fugitives from justice.
- An unlawful user and/or an addict of any controlled substance; for example, a person convicted for the use or possession of a controlled substance within the past year; or a person with multiple arrests for the use or possession of a controlled substance within the past five years with the most recent arrest occurring within the past year; or a person found through a drug test to use a controlled substance unlawfully, provided the test was administered within the past year.
- A person adjudicated mental defective or involuntarily committed to a mental institution or incompetent to handle own affairs, including dispositions to criminal charges of found not guilty by reason of insanity or found incompetent to stand trial.
- A person who, being an alien, is illegally or unlawfully in the United States.
- A person who, being an alien except as provided in subsection (y) (2), has been admitted to the United States under a non-immigrant visa.
- A person dishonorably discharged from the United States Armed Forces.
- A person who has renounced his/her United States citizenship.
- The subject of a protective order issued after a hearing in which the respondent had notice that restrains them from harassing, stalking, or threatening an intimate partner or child of such partner. This does not include ex parte orders.
- A person convicted in any court of a misdemeanor crime which includes the use or attempted use of physical force or threatened use of a deadly weapon and the defendant was the spouse, former spouse, parent, guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited in the past with the victim as a spouse, parent, guardian or similar situation to a spouse, parent or guardian of the victim.
- A person who is under indictment or information for a crime punishable by imprisonment for a term exceeding one year.

A delay response indicates that information you supplied on the ATF Form 4473 has been matched with information contained in the National Crime Information Center, the Interstate Identification Index, and/or the NICS Indices. Complete disposition information is not always available and a further review of these records is necessary. The NICS Section exhausts all efforts to retrieve current record information by contacting all applicable law enforcement agencies, i.e., local, state, and federal courts, etc. The Brady Act allows three business days to obtain this information before an FFL can transfer a firearm. The FFL is not prohibited from transferring the firearm after three business days have passed; however, the FFL is not required to transfer the firearm.

The Privacy Act of 1974 restricts the dissemination of specific information to you via the telephone. Under the provisions of Title 28, United States Code, Sections 16.30 through 16.34, you can obtain a copy (for a fee) of any identification record the FBI may maintain on you by contacting the following unit at the address and telephone number provided:

Federal Bureau of Investigation
Criminal Justice Information Services Division
Attention: Summary Request

1000 Custer Hollow Road
Clarksburg, WV 26306
Telephone Number: (304) 625-5590

## Additional Information

- For the FFL to initiate background checks with the NICS Section, the FFL MUST BE ENROLLED WITH THE FBI. Enrollment information may be obtained by accessing Resources for Federal Firearms Licensees website; via e-mail at NICS@fbi.gov; or via telephone at 1-877-FBI-NICS (324-6427).
- Persons holding firearm permits which qualify as alternatives, per the ATF, under the permanent provision of the Brady Act may not be required to undergo a NICS check.
- The former pawnshop exemption for background checks on individuals who are redeeming firearms ceased to exist on November 30, 1998. NICS background checks are required for the transfer of redeemed firearms, including both handguns and long guns.
- The NICS Section attends FFL and ATF regional firearms seminars in selected states around the country to provide a NICS overview, answer questions, and provide updates on new developments in NICS operations.
- More information may be obtained by accessing the Resources for Federal Firearms Licensees website.
- As of January 20, 2015, Title 28, Code of Federal Regulations, Part 25, allows local, state, tribal, and federal law enforcement agencies to access the NICS to conduct background checks for the purpose of returning firearms in their possession to an individual (e.g., at the conclusion of a case). Law enforcement agencies are not required by law to access the NICS for this purpose. However, if they desire to do so, authorized law enforcement agencies should conduct disposition (return) of firearm background checks in the same manner as the firearm and firearm-related permit and purchase checks are currently conducted through their state-designated agency (if applicable), or directly through the FBI. More information may be obtained by submitting an e-mail to NICSLiaison@fbi.gov (mailto:NICSLiaison@fbi.gov).

# Resources

Download nics-participation-map-july-2019.pdf (https://www.fbi.gov/file-repository/nics-participation-map.pdf) — 1153 KB

## NICS Overview Brochure (https://www.fbi.gov/file-repository/nics-overview-brochure.pdf/view)

NICS brochure discussing the Brady Handgun Violence Prevention Act of 1993, how to access the NICS, how the NICS works, privacy and security, and points of contact.

## NICS Indices Brochure (https://www.fbi.gov/file-repository/nics-indices-brochure.pdf/view)

The NICS Indices contains information provided by local, state, tribal, and federal agencies of persons prohibited from receiving firearms under federal or state law that may not be found in the National Crime Information Center of the Interstate Identification Index.

## NICS Misdemeanor Crimes of Domestic Violence (MCDV) Brochure (https://www.fbi.gov/file-repository/nics-misdemeanor-crimes-of-domestic-violence-brochure.pdf/view)

National Instant Criminal Background Check System (NICS) brochure intended for those involved with the investigation and prosecution of domestic violence offenses.

# Exhibit V

# Deposition of Ozzie Knezovich

# Mitchell, et al. v. Atkins, et al.

# February 4, 2020



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

www.buellrealtime.com

Olympia | **360.534.9066**    Spokane | **509.624.3261**    National | **800.846.6989**

email: info@buellrealtime.com



Ozzie Knezovich                                                    2/4/2020

1              UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF WASHINGTON

3                    AT TACOMA

4    _____

5    DANIEL MITCHELL, et al.,        )
                                     )
6         Plaintiffs,                )
                                     ) NO. 3:19-cv-5106
7    vs.                             )
                                     )
8    CHARLES ATKINS, et al.,         )
                                     )
9         Defendants,                )
                                     )
10   and                            )
                                     )
11   SAFE SCHOOLS SAFE COMMUNITIES,  )
                                     )
12        Intervenor-Defendant.      )

13

14

15    VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

16                  OZZIE KNEZOVICH

17

18                 February 4, 2020
                     11:09 a.m.
19              1116 W. Riverside Avenue
                 Spokane, Washington
20

21

22     TAKEN AT THE INSTANCE OF THE DEFENDANTS

23

24
     REPORTED BY:
25   AMY J. BROWN, RMR, CRR, WA CCR NO. 2133, ID CCR NO. 700

Ozzie Knezovich                                                                    2/4/2020

1                         APPEARANCES:

2

   FOR THE PLAINTIFFS:
3
           MATTHEW C. ALBRECHT
4          Albrecht Law PLLC
           421 W. Riverside Avenue
5           Suite 614
           Spokane, WA  99201
6          (509) 992-1012
           matt@albrechtlawfirm.com
7
   FOR THE DEFENDANT TERESA BERNTSEN:
8
           ZACHARY P. JONES
9          JULY SIMPSON (APPEARING VIA TELEPHONE)
           Assistant Attorney General
10         800 5th Avenue
            Suite 2000
11         Seattle, WA 98104
           (206) 332-7089
12         zachj@atg.wa.gov

13 FOR THE DEFENDANTS ATKINS AND CLARK COUNTY:

14         CURTIS BURNS (APPEARING VIA TELEPHONE)
           Clark County Prosecutor's Office
15         1300 Franklin Street
            P.O. Box 5000
16         Vancouver, WA  98666
           (360) 397-2478
17
   FOR THE DEFENDANTS MEIDL AND CITY OF SPOKANE:
18
           SALVATORE J. FAGGIANO
19         Office of the City Attorney
           808 W. Spokane Falls Blvd.
20         Spokane, WA  99201
           (509) 625-6818
21         sfaggiano@spokanecity.org

22

23

24

25

Ozzie Knezovich                                                          2/4/2020

1    FOR THE INTERVENOR DEFENDANT SAFE SCHOOLS SAFE
     COMMUNITIES:
2

3          NICHOLAS W. BROWN
           Pacifica Law Group LLP
           1191 Second Avenue
4           Suite 2000
           Seattle,WA 98101
5          (206) 245-1700
           nicholas.brown@pacificalawgroup.com
6

     ALSO PRESENT:
7

8          VICTOR BEZMEN, VIDEOGRAPHER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ozzie Knezovich                                                          2/4/2020

```
 1            I N D E X
 2   MITCHELL vs. ATKINS, et al.
     NO. 3:19-cv-5106
 3   February 4, 2020
 4
 5            T E S T I M O N Y
 6   OZZIE KNEZOVICH                 PAGE NO.
```

```
 7   EXAMINATION BY MR. JONES              6
 8   EXAMINATION BY MR. BROWN            177
 9   EXAMINATION BY MR. ALBRECHT           187
10
11            E X H I B I T S
12   NO.          DESCRIPTION        PAGE NO.
13   44    Deposition notice         10
14   45    Rule 45 subpoena            11
15   46    Revised Code of Washington 9.41.010    15
16   47    Table of contents to Exhibit 48      52
17   48    Documents brought to deposition by      54
           Mr. Albrecht
18
19   49    Sheriff Knezovich's expert report      55
20   50    9/14/17 AP article          65
21   51    WA DOL data re transfer forms for      71
           pistols, semiautomatic assault rifles
22   52    NRA Family article Nine Best Budget     77
           Home-Defense Shotguns
23
     53    WASPC annual report on crime data       90
24
     54    1/31/19 article from khq.com     122
25
```

1   55    3/12/19 Inlander article          125

2   56    1/31/19 article from The          131
          Spokesman-Review
3
    57    Video clip C from 2/21/19, Part 2,    135
4         Sheriff's Report

5   58    Excerpts of the Heller decision      142

6   59    Video clip D from 2/21/19, first half   147
          of part 3, Sheriff's Report
7
    60    Video clip E from 2/21/19, second half    152
8         of part 3, Sheriff's Report

9   61    3/14/17 article from The          157
          Spokesman-Review
10
    62    Video clip B from 2/14/19 Sheriff's    161
11        Report

12  63    Video clip A from 2/7/19 Sheriff's    168
          Report
13
    64    Binder of documents brought by Sheriff   206
14        Knezovich

15  65    Binder of documents brought by Sheriff   206
          Knezovich
16

17

18

19

20

21

22

23

24

25

Ozzie Knezovich                                                    2/4/2020

1    never seen this before -- I haven't -- could he have

2    time to read the whole thing and see -- introduce

3    himself?

4            MR. JONES:  Absolutely.  Yeah.  Would you like

5    to read the first paragraph there?

6            I'm not going to ask about the specific

7    shotguns that are recommended later on, but I am going

8    to ask you about just the first paragraph on the first

9    page.  So take a moment to read it to yourself and let

10   me know when you've finished.

11           THE WITNESS:  Okay.

12   BY MR. JONES:

13      Q.  So you see it says, "Shotguns are an ideal

14   home-defense tool for many reasons."

15           Do you agree with that sentence?

16      A.  I do.

17      Q.  Continuing to read, "For starters, they provide

18   plenty of stopping power for close-range engagements,

19   and yet most buckshot and birdshot loads won't penetrate

20   through barriers like walls the way pistols and rifles

21   can."

22           Do you agree with that second sentence at all?

23      A.  I do not.

24      Q.  Why not?

25      A.  Buckshot will go through metal.  I personally

Ozzie Knezovich                                                              2/4/2020

1        **Do you understand what the NICS system is?**

2    A.  I do.

3        **Q.   Okay.  Do you understand that the background**

4    **check conducted by local law enforcement, the enhanced**

5    **background check, includes the NICS check?**

6    A.  Yes.  However -- sorry.

7        **Q.  Go ahead.**

8    A.  However, if you remember that in October of the

9    year that 1639 was passed, the FBI told us we would be

10   dealing with the NICS issues.  They really didn't want

11   to do it anymore.

12       **Q.   Okay.  But -- and the enhanced background check**

13   **does include a NICS check?**

14   A.  Yes.

15       **Q.   And it also includes checks of other records**

16   **that are not conducted as a normal part of a NICS check;**

17   **correct?**

18   A.  Mental health and things like that, yes.

19       **Q.   And local court records?**

20   A.  And local court records, which are woefully

21   behind in their updating and -- again, it -- it causes

22   problems within the entire system because, both you and

23   I understand, that there are severe backlogs that exist

24   in those different categories.

25       **Q.  But it's fair to say that the enhanced**

**BUELL REALTIME REPORTING, LLC**                        **Page: 107**
**206.287.9066 | 800.846.6989**

**SER-384**

Ozzie Knezovich                                                    2/4/2020

1    background check is more comprehensive than a NICS check

2    alone?

3        A.   Yes, I would -- I would agree.

4        Q.   Turning to page 6 of your report, Exhibit 49,

5    take a look at lines 12 to 14.  And you write, "Now that

6    purchase in Washington has been forbidden, 18- to

7    20-year-olds may seek to acquire a semiautomatic rifle

8    through other means which may not involve a background

9    check."

10       What do you mean by "other means" in that

11   sentence?

12       A.   Well, "other means" can skirt the system.  That

13   would be illegal means.

14       Q.   A black market purchase, you mean?

15       A.   Yes.  Which I believe it was the CDC report

16   that stated it tends to be the scarcity or inability to

17   get weapons tends to lead to the black market purchase

18   of weapons, and I believe that's in the CDC report.  If

19   it's not, it's in the 2004 report.

20       Q.   Any other facts or data besides that CDC report

21   to support your view that the minimum age requirement in

22   1639 may lead kids under the age of 21 to resort to the

23   black market?

24       A.   Those were intend -- using the weapons for

25   illegal purposes, yes.  I mean, there's FBI statistics

SER-385

Ozzie Knezovich                                                    2/4/2020

1       **Q.   By orders of magnitude?**

2          A.   We have a higher rate of gun violence,

3    Counselor, but you forget there's other forms of

4    violence.

5       **Q.   And my question was about gun violence.**

6          A.   Exactly.  But I would caution that there are

7    more types of violence.  London is in a crisis over

8    knives right now.

9       **Q.   Do you believe that the proliferation of**

10   **semiautomatic weapons in the United States is at least**

11   **in part responsible for our high rate of gun violence?**

12         A.   Counsel, you would find it very difficult to

13   find a research study, a valid research study, that

14   would say that.  The research study that was

15   commissioned by President Obama in 2013, by the CDC,

16   definitively said that that was -- you know, there's

17   no -- we can't find that nexus.

18         Then, if you take a look at the fact that even

19   though America wants to claim and the politicians want

20   to claim that we banned SARs from 1994 to 2004, we

21   didn't.  We still had the same functioning weapons,

22   hence the photographs that you mentioned in reading the

23   material.  They didn't -- all you did was cosmetically

24   remove a bayonet lug, shroud the flash suppresser.

25         Those guns were in existence, have been in

Ozzie Knezovich                                                    2/4/2020

1    existence, even during the ban.

2         Q.   You're speaking of the Federal Assault Weapons

3    Ban; correct?

4         A.   I am.  And if you take a look at the trendline

5    of violent crime, in totality it has gone down since

6    that time of pre -- about 1993 it peaks, and down.  And

7    gun violence has also gone down pretty much in the same

8    ratio, but it has maintained the ratio it has with -- as

9    far as crime rate per capita with the -- with the

10   violence, overall violence.

11        So these guns have been out on the street all

12   this time, and crime's gone down.

13        Q.   I have a question with the Federal Assault

14   Weapons Ban.  Are you familiar with that legislation?

15        A.   I know that they banned -- the legislation.  I

16   read the report in 2004 when they were talking about

17   bringing it back.

18        Q.   And do you understand that the Federal Assault

19   Weapons Ban consisted of a list of specific firearms

20   that qualified as an assault weapon, plus a features

21   test?

22        A.   Yes.  And most of the ones that were banned

23   because of -- on that list had those features.

24        Q.   And isn't it true that firearms manufacturers,

25   after the assault weapons ban, skirted the ban by

Ozzie Knezovich                                                    2/4/2020

1    slightly modifying weapons that were not under the

2    letter of the law violating the ban, but that

3    functionally were the same?

4        A.  I believe I just covered that.  Yes, they did,

5    and therefore you never banned those weapons and crime

6    went down.

7        Q.  My question was just whether you agree that the

8    high rate of semiautomatic weapon ownership in the US is

9    in some part responsible for our high firearm fatality

10   rate.  Do you agree, yes or no?

11       A.  No.  I disagree, because the data does not show

12   that.  They're actually used the least amount of times

13   in causing overall crime trends.  So, no, they're not.

14       Q.  Do you believe that rap music is more

15   responsible for firearm violence in America than

16   semiautomatic assault rifles?

17       A.  I do, and so did many African American pastors

18   here in the 1990s.

19          MR. JONES:  That's exactly what I wanted to

20   discuss.  So this will be another Sheriff's Report video

21   clip.  It will be Exhibit 60.  And this clip is also

22   from February 21st, 2019.  This is the second half of

23   part 3, the last half.

24          And for the aid of the court reporter and Mr.

25   Albrecht, if you're viewing these clips later, this is

Ozzie Knezovich - 2/4/2020

207

                    C E R T I F I C A T E

1
2    STATE OF WASHINGTON          )
                                  )
3    COUNTY OF SPOKANE            )

4          This is to certify that I, Amy J. Brown,

5    Registered Merit Reporter, Certified Realtime Reporter

6    and Certified Court Reporter in and for the States of

7    Washington and Idaho, residing at Spokane Valley,

8    reported the within and foregoing deposition; said

9    deposition being taken before me on the date herein set

10   forth; that pursuant to RCW 5.28.010 the witness was

11   first by me duly sworn; that said examination was taken

12   by me in shorthand and thereafter under my supervision

13   transcribed, and that same is a full, true and correct

14   record of the testimony of said witness, including all

15   questions, answers and objections, if any, of counsel.

16         I further certify that I am not a relative or

17   employee or attorney or counsel of any of the parties,

18   nor am I financially interested in the outcome of the

19   cause.

20         IN WITNESS WHEREOF I have set my hand this 25th

21   day of February, 2020.

22

23

24   _____

25   AMY J. BROWN, RMR, CRR
     WA CCR NO. 2133, ID CCR NO. 700



**buell**
REALTIME REPORTING   COURT REPORTING AND LEGAL VIDEO

206.287.9066
buellrealtime.com
1325 Fourth Avenue, Suite 1840
Seattle, Washington 98101

# Exhibit W

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives
*Enforcement Programs and Services*

# ATF
# Federal Firearms Regulations
# Reference Guide

## 2014



ATF Publication 5300.4
Revised September 2014



# U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

Washington, DC 20226

Dear Federal Firearms Licensees:

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), a component of the United States Department of Justice, is a law enforcement agency charged with protecting our communities from violent criminals, criminal organizations, the illegal possession, use and trafficking of firearms, the illegal possession, use and storage of explosives, acts of arson and bombings, and the illegal diversion of alcohol and tobacco products. We are proud to partner with industries, law enforcement, and the community to protect the public we serve.

Federal firearms licensees play a key role in safeguarding the public from violent crime by maintaining accurate records, instituting internal controls, and performing background checks on potential firearms purchasers. These practices have saved lives, prohibited violent criminals from obtaining firearms, and prevented firearms-related crimes.

The 2014 edition of the Federal Firearms Regulations Reference Guide contains information that will help you comply with Federal laws and regulations governing the manufacture, importation and distribution of firearms and ammunition. This edition contains new and amended statutes enacted since publication of the 2005 edition, as well as updated regulations and rulings issued by ATF. In addition to these updated materials, in response to inquiries received from industry members, the public, and partner agencies, the 2014 edition contains additional and amended Questions and Answers to assist with compliance.

Laws may change over time, as will information in this guide. The ATF website at www.ATF.gov is a good source of updated information and is one method ATF uses to communicate with licensees about changes to laws and regulations. Additionally, as always, you are welcome to contact your local ATF office for information or assistance.

Thank you for working with us to make our communities safer.

Sincerely,

B. Todd Jones
Director

1

**SER-392**

NOTICE OF CORRECTIONS
March 7, 2015

On January 15, 2015, ATF posted the 2014 Federal Firearms Regulations Reference Guide (the "2014 Guide") to the ATF website (www.atf.gov).  ATF last published this guide in 2005; the 2014 Guide incorporates almost a decade of updates to the federal firearms regulations.

Since posting the 2014 Guide, ATF became aware that it contained some inadvertent omissions and editing errors.  ATF has corrected these omissions and errors in an update to 2014 Guide posted on March 7, 2014.

The corrected omissions and editing errors are:

(1) At page 90, within Section III, Laws and Regulations, Sub-Part B., National Firearms Act, the citation and title for one of the regulations was not included with the text of the regulation.  That citation and title, "§ 479.105 Transfer and possession of machine guns," is now included.

(2) At page 190, within the General Information section, the last two subparts of Item 10, Armor Piercing Ammunition, were not included. These subparts consist of:  (a) the text of the 1994 amendment Congress made to the Gun Control Act's (GCA) definition of armor piercing ammunition and, (b) a listing of the projectiles that have been granted exemptions to the GCA's prohibition on armor piercing ammunition.  These subparts are now included.

(3) At page 102, within Section III, Laws and Regulations, Sub-part C, U.S. Munitions Import List, Category XIV, Toxicological Agents and Equipment and Radiological Equipment, the text of 27 CFR 447.21(c) did not reflect recent regulatory changes.  Those language changes are now included.

(4) At page 198, Question & Answer Item B8, grammatical errors have been corrected.

(5) At page 206, Question & Answer Item I3, grammatical errors have been corrected.

The 2014 Guide functions as a convenient reference source for the public and industry. The omissions and errors in the original posting in no way altered the legal force and effect of these provisions.

ATF continues to review the 2014 Guide to ensure no other typographical or editing errors occurred in the publishing process.  The public is welcome to provide input regarding the identification of any potential error in the 2014 Guide, or any other suggestions on improving the 2014 Guide.  Please submit to: ORA@atf.gov.

Any future corrections, additions or modifications to the 2014 Guide will be identified on this page. ATF apologizes for any confusion or inconvenience caused by publishing errors, and looks forward to continued dialogue with our regulated community and the general public.

# FEDERAL FIREARMS REGULATIONS
# REFERENCE GUIDE
# 2014

## TABLE OF CONTENTS

I.   Message from the Director ................................................................................................................... 1

II.  Editor's Note .................................................................................................................................... 6

III. Laws and Regulations

    A.  Gun Control Act

        1.  18 U.S.C. Chapter 44 ................................................................................................... 7

| | | |
|---|---|---|
| § 921 | Definitions. | 7 |
| § 922 | Unlawful acts. | 10 |
| § 923 | Licensing. | 20 |
| § 924 | Penalties. | 23 |
| § 925 | Exceptions: Relief from disabilities. | 26 |
| § 925A | Remedy for erroneous denial of firearms. | 27 |
| § 926 | Rules and regulations. | 28 |
| § 926A | Interstate transportation of firearms. | 28 |
| § 926B | Carrying of concealed firearms by qualified law enforcement officers. | 28 |
| § 926C | Carrying of concealed firearms by qualified retired law enforcement officers. | 29 |
| § 927 | Effect on State law. | 30 |
| § 928 | Separability. | 30 |
| § 929 | Use of restricted ammunition. | 30 |
| § 930 | Possession of firearms and dangerous weapons in Federal facilities. | 30 |
| § 931 | Prohibition on purchase, ownership, or possession of body armor by violent felons. | 31 |

        2.  27 CFR Part 478 ....................................................................................................... 32

        Subpart A Introduction. ................................................................................................... 34

        Subpart B Definitions ...................................................................................................... 34

        Subpart C Administrative and Miscellaneous Provisions .................................................. 39

        Subpart D Licenses. ....................................................................................................... 45

        Subpart E License Proceedings. ...................................................................................... 48

        Subpart F Conduct of Business ....................................................................................... 50

        Subpart G Importation. .................................................................................................... 56

        Subpart H Records ......................................................................................................... 62

        Subpart I Exemptions, Seizures, and Forfeitures ............................................................. 69

        Subpart J [Reserved] ...................................................................................................... 72

        Subpart K Exportation. .................................................................................................... 72

    B.  National Firearms Act

        1.  26 U.S.C. Chapter 53 ................................................................................................. 73

        Subchapter A Taxes ........................................................................................................ 73

        Subchapter B General Provisions and Exemptions .......................................................... 74

        Subchapter C Prohibited Acts .......................................................................................... 76

        Subchapter D Penalties and Forfeitures ........................................................................... 77

3

    2.  27 CFR Part 479 .................................................................................................................... 78

        Subpart A Scope of Regulations ............................................................................................ 79

        Subpart B Definitions ............................................................................................................. 79

        Subpart C Administrative and Miscellaneous Provisions ...................................................... 81

        Subpart D Special (Occupational) Taxes .............................................................................. 82

        Subpart E Tax on Making Firearms........................................................................................ 86

        Subpart F Transfer Tax .......................................................................................................... 87

        Subpart G Registration and Identification of Firearms .......................................................... 89

        Subpart H Importation and Exportation.................................................................................. 91

        Subpart I Records and Returns .............................................................................................. 93

        Subpart J Stolen or Lost Firearms or Documents.................................................................. 93

        Subpart K Examination of Books and Records....................................................................... 93

        Subpart L Distribution and Sale of Stamps ........................................................................... 94

        Subpart M Redemption of or Allowance for Stamps or Refunds .......................................... 94

        Subpart N Penalties and Forfeitures...................................................................................... 94

        Subpart O Other Laws Applicable.......................................................................................... 94

  C.  Arms Export Control Act

      1.  22 U.S.C. Chapter 2778........................................................................................................ 95

        2778 Control of arms exports and imports............................................................................. 95

      2.  27 CFR Part 447 .................................................................................................................... 98

        Subpart A  Scope .................................................................................................................... 98

        Subpart B  Definitions ............................................................................................................. 99

        Subpart C  The U.S. Munitions Import List ............................................................................ 99

        Subpart D  Registration ........................................................................................................ 102

        Subpart E  Permits................................................................................................................ 103

        Subpart F  Miscellaneous Provisions.................................................................................... 104

        Subpart G  Penalties, Seizures and Forfeitures.................................................................... 106

  D.  28 CFR Part 25 (National Instant Criminal Background Check System Regulations)

      1. 28 Code of Federal Regulations Part 25 ............................................................................ 108

        Subpart A  The National Instant Criminal Background Check System............................... 108

  E.  Postal Service

      1. 18 U.S.C. Section 1715....................................................................................................115

        Firearms As Nonmailable; Regulations............................................................................115

IV.  Additional Information

  A.  Ruling, Procedures, and Industry Circulars ......................................................................116

  B.  General Information .............................................................................................................. 181

  C.  Question and Answers.......................................................................................................... 191

  D.  Key Information

      1.  ATF Points of Contact ...................................................................................................... 218

      2.  ATF Criminal Enforcement Filed Divisions ...................................................................... 219

      3  ATF Industry Operations Field Offices ............................................................................. 220

      4.  Non-ATF Points of Contact............................................................................................... 223

      5.  State Attorneys General .................................................................................................... 224

**SER-395**

E.  NICS Forms, Flyers, and Brochures

1.  Letter to Federal Firearms Licensees ............................................................................................................... 226
2.  Reference Guide ................................................................................................................................................ 230
3.  What is a "business day" for NICS Purposes? .................................................................................................. 231
4.  What Do I Give My Delayed/Denied Customers? ............................................................................................. 232
5.  Deny/Delay NICS Resolution Card .................................................................................................................. 233

**(G5) May a licensee sell a firearm to a nonlicensee who is a resident of another State?**

Generally, a firearm may not lawfully be sold by a licensee to a nonlicensee who resides in a State other than the State in which the seller's licensed premises is located. However, the sale may be made if the firearm is shipped to a licensee whose business is in the purchaser's State of residence and the purchaser takes delivery of the firearm from the licensee in his or her State of residence. In addition, a licensee may sell a rifle or shotgun to a person who is not a resident of the State where the licensee's business premises is located in an over–the–counter transaction, provided the transaction complies with State law in the State where the licensee is located and in the State where the purchaser resides.

[18 U.S.C. 922(b)(3); 27 CFR 478.99(a)]

**(G6) May a licensee sell firearms to law enforcement agencies and individual officers?**

Yes. Law enforcement officers purchasing firearms for official use who provide a licensee with a certification on agency letterhead that the officer will use the firearm in official duties and that a records check reveals the purchasing officer has no convictions for misdemeanor crimes of domestic violence are not required to complete a ATF Form 4473 or undergo a background check. An officer purchasing a firearm for official duties may purchase the firearm from a licensee in any State, regardless of where the officer resides or the agency is located. Disposition of a firearm to an officer must be entered into the licensee's acquisition and disposition record, and the certification letter used to purchase the firearm must be retained in the licensee's files. Contact your State's Attorney General's Office to ensure there is no State prohibition on such sales.

[18 U.S.C. 925(a)(1); 27 CFR 478.134 and 478.141]

**(G7) May a licensee employ an individual who is less than 21 years of age if the licensee sells handguns and ammunition suitable for use in handguns?**

Yes. An individual less than 21 years of age may sell handguns and ammunition suitable for use in handguns. How-

ever, a person less than 18 years of age must have the prior written consent of a parent or guardian and the written consent must be in the person's possession at all times. Also, the parent or guardian giving the written consent may not be prohibited by law from possessing a firearm. Moreover, State law must not prohibit a person less than 18 years of age from possessing the handguns or ammunition.

[18 U.S.C. 922(x)]

**(G8) May a licensee employ an individual who is prohibited from receiving or possessing firearms and ammunition?**

A licensee may not allow an individual who is a prohibited person to receive or possess firearms or ammunition, including persons employed by the licensee.

[18 U.S.C. 922(g) or (n), and 2]

**(G9) Must a licensee advise ATF if two or more pistols or revolvers are sold or otherwise disposed of to an unlicensed person?**

The disposition of two or more pistols or revolvers to any nonlicensee during a period of 5 consecutive business days must be reported on ATF Form 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers, not later than the close of the business day on the day of disposition of the second pistol or revolver. The licensee must forward a copy of the Form 3310.4 to the ATF office specified thereon, and another copy must be forwarded to the State police or local law enforcement agency where the sale occurred. A copy of the Form 3310.4 must also be attached to the ATF Form 4473 executed upon delivery of the pistols or revolvers.

A business day for purposes of reporting multiple sales of pistols or revolvers is a day that a licensee conducts business pursuant to the license, regardless of whether State offices are open. The application of the term "business day" is, therefore, distinguishable from the term "business day" as used in the NICS context.

**Example:** A licensee conducts business only on Saturdays and Sundays, days on which State offices are not open. The licensee sells a pistol to an unlicensed person on a Saturday. If that same unlicensed

person acquires another handgun the next day (Sunday), the following Saturday or Sunday, or the Saturday after that, the reporting requirement would be triggered, the subsequent acquisition of a pistol or revolver would have to be reported on a Form 3310.4 by the close of the day upon which the second or subsequent pistol or revolver was sold.

[18 U.S.C. 923(g)(3); 27 CFR 478.126a]

**(G10) Does a licensee have to prepare a multiple sale report for the return of two or more pistols or revolvers to the same person from whom they were received?**

No. A multiple sale report is not required for the return of firearms to the same individual such as a pawn redemption, consignment or repair.

[27 CFR 478.126a]

**(G11) Where does a licensee submit the ATF Form 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers?**

ATF Form 3310.4 must be completed in triplicate (3 copies). The original is sent to ATF's National Tracing Center by FAX at 1–877–283–0288, by email at MultipleHandgunSalesForms@atf.gov, or by mail to U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, National Tracing Center, P.O. Box 0279, Kearneysville, WV 25430–0279. A copy is to be sent to the designated State police or the local law enforcement agency in the jurisdiction where the sale took place. The remaining copy is to be attached to the corresponding ATF Form 4473 and retained in the licensee's records for a period of not less than 5 years.

[27 CFR 478.126a and 478.129]

**(G12) How long may Chief Law Enforcement Officers (CLEOs) retains multiple sale reports?**

Federal law, 18 U.S.C. 923(g)(3)(B), provides that Chief Law Enforcement Officers (CLEOs) receiving copies of ATF Form 3310.4 from FFLs for sales to nonprohibited persons may not disclose the contents of the forms and must destroy the forms and any record of the content of the forms within 20 days of receipt.

203

# Exhibit X



Published on *Washington State* (https://www.atg.wa.gov)

Home > Initiative 1639 FAQ

# Initiative 1639

# <u>Initiative 1639: Frequently Asked Questions</u>

In November 2018, Washingtonians overwhelmingly adopted Initiative 1639, which made a number of changes to Washington's firearms laws. The FAQs provided here answer questions that have come to our attention regarding this important public safety measure.

For more specific answers and clarification about how the provisions of Initiative 1639 might apply to you and your specific situation, you are encouraged to consult the law itself and/or legal counsel. The text of Initiative 1639 can be found <u>here</u>. The language of the initiative has been codified in Washington law in several sections of <u>Chapter 9.41 RCW</u>. If you do not know an attorney in your area, you may be able to find help through the Washington State Bar Association <u>here</u>.

---

1. <u>When do the provisions of Initiative 1639 take effect?</u>
2. <u>Do I still need to comply with the requirements of Initiative 1639 even though there's a lawsuit challenging the law?</u>
3. <u>Can my police chief or county sheriff refuse to administer enhanced background checks under Initiative 1639?</u>
4. <u>Do sheriffs and police chiefs have discretion on how to prioritize their resources?</u>
5. <u>What are the new requirements for background checks for the purchase or transfer of semiautomatic assault rifles?</u>
6. <u>Does Initiative 1639 require that I keep my firearm in secure storage?</u>
7. <u>Does Initiative 1639 require law enforcement to come to my house to make sure I'm storing my firearm properly?</u>
8. <u>Does Initiative 1639 make me liable if my firearm is stolen and used in a crime?</u>
9. <u>What is secure storage?</u>
10. <u>Does Initiative 1639 require firearms safety training?</u>
11. <u>How can a purchaser of a semiautomatic assault rifle demonstrate that he or she has received the firearm safety training required by Initiative 1639?</u>

12. **Is there a requirement for independent verification that an individual has completed the training required by Initiative 1639?**
13. **Does Initiative 1639 require firearms dealers to offer patrons secure gun storage?**
14. **What safe storage warnings does Initiative 1639 require firearms dealers give to patrons?**
15. **What are the new requirements for purchasing, selling or transferring a semiautomatic assault rifle?**
16. **Does Initiative 1639 prohibit a federal firearms licensee (FFL) in Washington from transferring a semiautomatic assault rifle to an FFL in another state for its sale to a non-Washington resident?**
17. **What information must be provided to the dealer by a potential purchaser in the application for purchasing or transferring a semiautomatic assault rifle?**
18. **Will I be charged a fee when I purchase or transfer a semiautomatic assault rifle?**
19. **Do Washington's background check requirements violate privacy protections for firearms purchasers' medical information such as HIPAA?**
20. **What are the new requirements for ensuring the owner of a pistol or semiautomatic assault rifle remains eligible to possess a firearm under state and federal law?**
21. **What is the role of the Attorney General's Office with regard to Initiative 1639**

**When do the provisions of Initiative 1639 take effect?**

Effective January 1, 2019 the new law

- Makes it illegal for a person under 21 years of age to buy a semiautomatic assault rifle.
- Makes it illegal for any person to sell or transfer a semiautomatic assault rifle to a person under age 21.
- Allows a person between the ages of 18 and 21 to possess a semiautomatic assault rifle:

1. In the person's residence or fixed place of business;
2. On real property under his or her control;
3. When engaging in, or travel to or from, a lawful outdoor recreational activity;
4. When engaging in target shooting at an established, authorized range; or
5. If the semiautomatic assault rifle is unloaded and either in secure gun storage or secured with a trigger lock for the specific purpose of (i) moving to a new residence; (ii) traveling between the person's residence and real property under his or her control; or (iii) legally selling or transferring the firearm.

All of the other provisions in the law take effect on July 1, 2019 including:

- Enhanced background check and waiting period requirements for the purchase or transfer of semiautomatic assault rifles. Click here for more information on background checks.

- Training requirements to purchase a semiautomatic assault rifle. <u>Click here</u> for more information on training requirements.
- Criminal liability for failure to safely secure a firearm under certain conditions. <u>Click here</u> for more information on storage requirements.
- Safety warning and safe storage requirements for dealers. <u>Click here</u> for more information on storage requirements for dealers.

### <u>Do I still need to comply with the requirements of Initiative 1639 even though there's a lawsuit challenging the law?</u>

Yes. Initiative 1639 was adopted by nearly 60% of Washington voters in November 2018. This law, like any other, is presumed constitutional and in force unless a court rules otherwise. No court has held any part of Initiative 1639 unconstitutional. Although there is a lawsuit challenging certain provisions of the law, the court has not yet ruled on any issues in the case. A ruling is not expected for some time. Consequently, a failure to comply with the law could result in criminal and/or civil liability.

### <u>Can my police chief or county sheriff refuse to administer enhanced background checks under Initiative 1639?</u>

Effective July 1, 2019, when a person is attempting to purchase a semiautomatic assault rifle the chief of police or sheriff where the purchaser lives is required by <u>law</u> to perform an enhanced background check. The purpose of the enhanced background check is to determine whether the person is legally eligible to possess a firearm.

State <u>law</u> provides immunity to local law enforcement officers who run these checks in good faith. In the event a police chief or sheriff refuses to perform the enhanced background check required by Initiative 1639, they could be held liable if there is a sale or transfer of a firearm to a dangerous individual prohibited from possessing a firearm and that individual uses that firearm to do harm. In that case, the taxpayers of the city or county would assume the financial risk from the official's decision.

### <u>Do sheriffs and police chiefs have discretion on how to prioritize their resources?</u>

Generally speaking, law enforcement officials have broad discretion to set their own priorities and target their staff and resources where investigation and enforcement is most needed. Often those decisions are based on common sense and the specific circumstances of a given case. The background checks required by Initiative 1639 are not discretionary -- the law requires that law enforcement agencies perform these checks. It is their duty.

### <u>What are the new requirements for background checks for the purchase or transfer of semiautomatic assault rifles?</u>

Firearm sales by federally licensed firearm dealers have long been subject to background checks. In 2014, the people of the state of Washington overwhelmingly voted to extend this background check requirement to private gun sales and transfers. The legal challenge to that initiative failed.

In addition, enhanced background checks of state records have long been required for pistol sales or transfers. Local law enforcement officials perform these enhanced background checks. These enhanced background checks include searches for outstanding warrants in the Washington State Patrol electronic database. They also include mental health checks with the Washington State Health Care Authority, such as records of individuals found Not Guilty by Reason of Insanity. According to the Health Care Authority, these mental health checks result in approximately 400 denials per year.

Beginning July 1, 2019, Initiative 1639 requires enhanced background checks for sales or transfers of semiautomatic assault rifles as well. The chief of police or sheriff must provide written notice to the dealer whether the purchaser is eligible to possess a semiautomatic assault rifle and whether the application to purchase is approved.

**Does Initiative 1639 require that I keep my firearm in secure storage?**

No. The new law doesn't directly require that a firearm be stored in a particular place or in a particular way.

But if your firearm is not in secure storage, and you knew or reasonably should have known that the firearm could be accessed by someone who is prohibited from possessing a firearm, such as a child, under some circumstances you may be charged with a crime.

Effective July 1, 2019, a person who fails to securely store a firearm could be charged with a felony if a person who is legally ineligible to possess a firearm uses it to injure or kill themselves or someone else.

Effective July 1, 2019, a person who fails to securely store a firearm could be charged with a gross misdemeanor if a prohibited person discharges it and uses the firearm:

1. In a way that shows intent to intimidate someone or that warrants alarm for the safety of others, or
2. In the commission of a crime.

The new safe storage requirements are not violated:

1. If the firearm was in secure gun storage or was secured with a trigger lock or similar device; or
2. If the person is ineligible to possess because of age but the access is with parental permission and under adult supervision; or
3. In cases of self-defense; or
4. If the person who is ineligible to possess the firearm:
   ◦ Obtains it through unlawful entry, and

**SER-402**

◦ The unauthorized access or theft is reported to law enforcement within five days of the time the owner knew or should have known that the firearm had been taken.

### Does Initiative 1639 require law enforcement to come to my house to make sure I'm storing my firearm properly?

No. The new law doesn't require that a firearm be stored in a particular place or in a particular way.

There are strict constitutional limits on when law enforcement can enter your home.

### Does Initiative 1639 make me liable if my firearm is stolen and used in a crime?

No, not if you report it as stolen. The new law specifically provides an exemption from the storage requirement for a firearms owner if their firearm is taken from them:

1. Through unlawful entry, and
2. The unauthorized access or theft is reported to law enforcement within five days of the time the owner knew or should have known that the firearm had been taken.

### What is secure storage?

Effective July 1, 2019, Washington law defines "secure gun storage" as

1. A locked box, gun safe, or other secure locked storage space that is designed to prevent unauthorized use or discharge of a firearm; and
2. The act of keeping an unloaded firearm stored by such means.

### Does Initiative 1639 require firearms safety training?

Yes, but the training requirement only applies to purchases of semiautomatic assault rifles after July 1, 2019.

Owners of semiautomatic assault rifles who obtained their firearm before July 1, 2019 are not required to have training.

The training requirement does not apply to other types of firearms.

After June 30, 2019, before delivering a semiautomatic assault rifle to a purchaser, a dealer must be provided proof that the purchaser has completed a recognized firearm safety training program within the past five years.

The training must be sponsored by a federal, state, county or municipal law enforcement agency, a college or university, a nationally recognized organization that customarily offers firearms training, or a firearms training school with certified instructors.

The training must include instruction on:

1. Basic firearms safety rules;
2. Firearms and children, including secure gun storage and talking to children about gun safety;
3. Firearms and suicide prevention;
4. Secure gun storage to prevent unauthorized access and use;
5. Safe handling of firearms; and
6. State and federal firearms laws, including prohibited firearms transfers.

Initiative 1639 does not require any state agency to further define the information that must be taught in a required firearm safety training program.

### How can a purchaser of a semiautomatic assault rifle demonstrate that he or she has received the firearm safety training required by Initiative 1639?

The purchaser must provide the dealer with a certification stating, under the penalty of perjury that the purchaser has completed the training within the last five years and that the training included instruction on basic firearms safety rules; firearms and children, including secure gun storage and talking to children about gun safety; firearms and suicide prevention; secure gun storage to prevent unauthorized access and use; safe handling of firearms; and state and federal firearms laws, including prohibited firearms transfers.

Initiative 1639 does not require that any state agency produce a standardized form for this certification. Other state law specifies the wording and format to be used in a document signed under penalty of perjury. RCW 9A.72.085. A false certification, made under penalty of perjury, is subject to potential criminal enforcement under RCW Chapter 9A.72. Under RCW 9.41.090(8), "[a] person who knowingly makes a false statement regarding identity or eligibility requirements on the application to purchase a firearm is guilty of false swearing under RCW 9A.72.040."

### Is there a requirement for independent verification that an individual has completed the training required by Initiative 1639?

Beginning on July 1, 2019, before delivering a semiautomatic assault rifle to a purchaser, a dealer must receive proof that the purchaser has completed a recognized firearm safety training program within the past five years. The language of Initiative 1639 does not require a dealer or law enforcement agency to independently confirm the authenticity of a facially complete training certification submitted by a potential purchaser prior to delivery of a semiautomatic assault rifle.

**Does Initiative 1639 require firearms dealers to offer patrons secure gun storage?**

Effective July 1, 2019, every registered firearms dealer is required to offer to sell or give the purchaser or transferee of any firearm a secure gun storage device or trigger lock or similar device that is designed to prevent the unauthorized use or discharge of the firearm. A failure to do so could result in the dealer being subject to a civil infraction.

**What safe storage warnings does Initiative 1639 require firearms dealers give to patrons?**

Effective July 1, 2019, every registered firearms dealer is required to:

1. Post a warning sign in block letters at least one inch in height; and
2. Deliver a written warning to any firearms purchaser or transferee in block letters no less than ¼ inch in height.

The warning sign and written warning must say:

> WARNING: YOU MAY FACE CRIMINAL PROSECUTION IF YOU STORE OR LEAVE AN UNSECURED FIREARM WHERE A PERSON WHO IS PROHIBITED FROM POSSESSING FIREARMS CAN AND DOES OBTAIN POSSESSION

A failure to give the warnings could result in the dealer being subject to a civil infraction.

**What are the new requirements for purchasing, selling or transferring a semiautomatic assault rifle?**

Certain existing laws that applied only to pistols were expanded by Initiative 1639 to also apply to semiautomatic assault rifles. This includes the enhanced background check requirement. Click here for more information on enhanced background checks.

After July 1, 2019, before delivering a semiautomatic assault rifle to a purchaser:

1. The dealer must receive a complete application from the potential purchaser. (Click here for more information on application requirements); and
2. The dealer must be provided proof that the purchaser has completed a recognized firearms safety training program within the past five years. (Click here for more information on training requirements); and
3. The dealer must initiate an enhanced background check with the police chief or sheriff where the purchaser resides. (Click here for more information on enhanced background checks); and
4. Ten days must have elapsed from the date of the purchase application or, in the case of a transfer, ten business days from the date a background check is initiated.

Unless an exception applies, a firearms dealer can be criminally charged for selling or transferring a firearm to a purchaser without first complying with the law regarding

background checks, or for delivering a firearm to a person whom he or she has reasonable cause to believe is ineligible to possess a firearm.  RCW 9.41.080.

After July 1, 2019, state law prohibits anyone who is not a resident of Washington from buying a semiautomatic assault rifle in Washington.

**Does Initiative 1639 prohibit a federal firearms licensee (FFL) in Washington from transferring a semiautomatic assault rifle to an FFL in another state for its sale to a non-Washington resident?**

No. Initiative 1639's amendment to RCW 9.41.124 prevents Washington FFLs from selling semiautomatic assault rifles directly to residents of another state. But nothing in the Initiative prohibits an FFL from transferring a semiautomatic assault rifle to an FFL in a different state, consistent with federal law—a practice long utilized for interstate sales of pistols and other types of firearms. For guidance on the rules and procedures governing interstate FFL-to-FFL firearm transfers, licensed firearm dealers should contact the Seattle Field Division of the U.S. Bureau of Alcohol, Tobacco and Firearms at (206) 204-3205 or SeattleDiv@atf.gov.

**What information must be provided to the dealer by a potential purchaser in the application for purchasing or transferring a semiautomatic assault rifle?**

Initiative 1639 changed certain existing laws that applied only to pistols and expanded those requirements to semiautomatic assault rifles. Effective July 1, 2019, at the time of applying for the purchase of a pistol or semiautomatic assault rifle, the purchaser must fill out and sign an application containing:

1. The applicant's name, residential address, date and place of birth, race, gender, and driver's license or state identification card number;
2. The date and hour of the application;
3. A description of the firearm including the make, model, caliber and manufacturer's number;
4. A statement that the purchaser is eligible to purchase and possess a firearm under state and federal law; and
5. If a semiautomatic assault rifle is being purchased, a certified statement that the applicant has completed an eligible training program within the last five years. Click here for more information on training requirements.

If a manufacturer's number is not available at the time of the application, the application can still be processed but delivery of the pistol or semiautomatic assault rifle cannot occur until a number is recorded and transmitted to the chief of police or sheriff in the jurisdiction where the purchaser resides.

The application must contain certain required warnings about ineligibility to possess firearms and risks associated with firearms in the home.

The Washington State Department of Licensing has developed a new Firearm Transfer Application to be used for both semiautomatic assault rifle transfers and pistol transfers. Written and video tutorial information can be found on the agency's website here.

### Will I be charged a fee when I purchase or transfer a semiautomatic assault rifle?

RCW 9.41.090(7), as adopted under Initiative 1639, allows the Washington State Department of Licensing to establish a fee of up to $25 on the sale or transfer of a semiautomatic assault rifle. The Department of Licensing has proposed a rule to set the fee at $18 for each sale or transfer. Once that rule becomes final, purchasers will be charged a fee at the time of a sale or transfer. Fees remitted to the Department of Licensing by the dealer will be deposited into the state general fund. The purpose of the fee is to help offset costs incurred by the state, certain health care facilities and local law enforcement agencies in implementing designated provisions of Washington's firearms laws.

### Do Washington's background check requirements violate privacy protections for firearms purchasers' medical information such as HIPAA?

No. Under Washington law, a signed application to purchase a pistol constitutes a waiver of confidentiality and written request that the Health Care Authority, mental health institutions, and other health care facilities release, to an inquiring court or law enforcement agency, information relevant to the applicant's eligibility to purchase a pistol. Effective July 1, 2019, that waiver of confidentiality provision is expanded to include applications to purchase a semiautomatic assault rifle.

### What are the new requirements for ensuring the owner of a pistol or semiautomatic assault rifle remains eligible to possess a firearm under state and federal law?

RCW 9.41.139, as adopted under Initiative 1639, requires that the Washington State Department of Licensing work with the Washington State Patrol and other state and local law enforcement agencies to develop a process to verify—at least once a year—that the owner of a pistol or semiautomatic assault rifle remains eligible to possess a firearm under state and federal law. If the owner is determined to be ineligible for any reason, notification and the relevant information will be provided to the chief of police or the sheriff of the jurisdiction in which the owner resides. Steps are then required to be taken to ensure the owner is not illegally in possession of firearms. The new law requires the verification process to be developed no later than July 1, 2020.

### What is the role of the Attorney General's Office with regard to Initiative 1639?

It is our practice to provide members of the public with information of a general nature whenever possible, but we cannot provide legal advice to private individuals or business owners.

**When an initiative is placed on the ballot,** the Attorney General is required by law to prepare an Explanatory Statement. The Attorney General's Statement that was included in the Voter's Pamphlet with Initiative 1639 may provide you with some useful information.

**Once voters pass an initiative**, the Attorney General's Office has three primary roles:

1. Provide legal advice to our state agency clients that have a new or expanded role under the initiative or whose operations are affected by the initiative;
2. Uphold the will of the voters and defend the initiative against lawsuits; and
3. Provide answers in response to a request for an Attorney General opinion. An opinion represents the Attorney General's official interpretation on a point of law. **Opinions are not issued at the request of private individuals**. Only the following people can request an opinion:

 • Members of the Washington State Legislature;
 • Statewide elected officials;
 • Appointed heads of state agencies, boards, or commissions; or
 • County prosecuting attorneys.

The Washington Attorney General's Office issues official opinions on questions of law when requested to do so by these designated public officials on issues that arise in the course of their duties. The opinions are not binding but can be given "great weight" by courts. Opinions are not issued on every topic, but the office has issued opinions related to firearms.

# Exhibit Y

# Deposition of Luke Rettmer

# Mitchell, et al. v. Atkins, et al.

# February 15, 2020



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

www.buellrealtime.com

Olympia l **360.534.9066**   Spokane l **509.624.3261**   National l **800.846.6989**

email: info@buellrealtime.com



Luke Rettmer                                                    2/15/2020

1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
2                   AT TACOMA

3    _____

     DANIEL MITCHELL, et al.,    )
4                                )
            Plaintiff,           )
5                                )
      vs.                        )   No. 3:19-CV-5106
6                                )
     CHARLES ATKINS, et al.,     )
7                                )
            Defendants,          )
8      and                       )
                                 )
9    SAFE SCHOOLS SAFE           )
     COMMUNITIES,                )
10                               )
      Intervenor-Defendant.      )
11   _____

12          DEPOSITION UPON ORAL EXAMINATION
                        OF
13        LUKE RETTMER (APPEARING VIA ZOOM)
     _____
14
         Taken at 1191 Second Avenue, Suite 2000
15
              Seattle, Washington
16

17

18

19

20

21

22

23

24   DATE TAKEN:  FEBRUARY 15, 2020

25   REPORTED BY: KIM DORE-HACKBARTH, RPR, CCR 2072

Luke Rettmer                                                          2/15/2020

1                        A P P E A R A N C E S

2   FOR THE PLAINTIFF:
    (APPEARING VIA ZOOM)
3                    MATTHEW C. ALBRECHT
                     Albrecht Law PLLC
4                    421 W. Riverside Avenue
                     Suite 614
5                    Spokane, Washington 99201
                     (509) 495-1246
6                    Matt@albrechtlawfirm.com

7   FOR THE DEFENDANTS:
    COUNSEL FOR TERESA BERNTSEN:
8                    R. JULY SIMPSON
                     ZACHARY PEKELIS JONES
9                    Assistant Attorney General
                     Complex Litigation Division
10                   7141 Clearwater Drive SW
                     PO Box 40111
11                   Olympia, Washington 98504-0111
                     (360) 586-3151
12                   July.simpson@atg.wa.gov
                     Zack.jones@atg.wa.gov
13
    COUNSEL FOR INTERVENOR DEFENDANT, SAFE SCHOOLS SAFE
14  COMMUNITIES (CAMPAIGN):
                     KAI SMITH
15                   Pacifica Law Group LLP
                     1191 Second Avenue
16                   Suite 2000
                     Seattle, Washington 98101-3404
17                   (206) 245-1700
                     Kai.smith@pacificalawgroup.com
18
    COUNSEL FOR DEFENDANT MEIDLE,
19  CITY OF SPOKANE:
    (APPEARING TELEPHONICALLY)
20                   SALVATORE J. FAGGIANO
                     Assistant City Attorney
21                   Office of the City Attorney
                     808 W. Spokane Falls Blvd.
22                   Spokane, Washington 99201-3326
                     (509) 625-6818
23                   Sfaggiano@spokanecity.org

24           * * * * *

25

1      DEPOSITION OF LUKE RETTMER (APPEARING VIA ZOOM)

2                    EXAMINATION INDEX

3    EXAMINATION BY:                    PAGE NO.

4    MS. SIMPSON....................................    4

5    MR. FAGGIANO..................................    51

6    MR. ALBRECHT..................................    52

7                     EXHIBIT INDEX

8    EXHIBITS FOR IDENTIFICATION               PAGE NO.

9     77     Third Amended Notice of Deposition
            Upon Oral Examination of Luke
10           Rettmer...........................      7

11    78     First Amended Complaint for
            Declaratory and Injunctive Relief..    16
12
      79     Initiative Measure No. 1639
13           DOL00000001.......................    25

14    80     RCW 9.41.042......................    26

15    81     RCW 9.41.060......................    29

16

17

18

19

20

21

22

23

24

25

Luke Rettmer                                                      2/15/2020

1    Q.  Excellent.

2        And in preparation for today's deposition, and,

3    again, I don't want you to go into anything that's

4    privileged or anything specifically that you discussed

5    with your counsel, but did you review any -- did you do

6    any preparation other than what you previously

7    discussed?  And, again, setting aside anything that

8    might be privileged, did you do anything to prepare for

9    today's deposition?

10   A.  I reviewed the complaint and my deposition

11   notice.

12   Q.  And did you review any other documents?

13   A.  Just the complaint.

14   Q.  And other than with counsel, did you discuss

15   today's deposition with anyone?

16   A.  No.

17   Q.  Just getting into some background information.

18   What is your date of birth?

19   A.  December 29, 1998.

20   Q.  What city and state do you live in?

21   A.  I currently live in Fort Benning, Georgia.

22   Q.  And how long have you lived there?

23   A.  I officially moved here November 1st of 2019.

24   Q.  Where are you registered to vote?

25   A.  Washington State.

Luke Rettmer                                                          2/15/2020

1   semi-automatic rifle or SAR.  And when I use any of

2   those terms, I am going to be referring to the

3   definition that we just covered; do you understand that?

4      A.  I do.

5      Q.  Mr. Rettmer, what firearms do you currently own?

6      A.  I currently own an AR-15, and a bolt action 308,

7   both of which are designed for competitive target rifle

8   shooting.

9      Q.  Have you owned any other firearms in the past?

10     A.  No.

11     Q.  And when did you acquire these firearms?

12     A.  The AR-15 was -- I don't have the exact dates.

13  Would you like me to approximate?

14     Q.  Yes, please.

15     A.  The AR-15 was purchased somewhere around 2017.

16  And the 308 bolt action rifle was purchased somewhere

17  around 2018.

18     Q.  And who bought those?

19     A.  I did.

20     Q.  Other than the firearms that you have owned,

21  what other firearms have you used?

22     A.  I have used my father's AR-15 prior to me being

23  16 -- or 18, I am sorry -- and being able to go out and

24  buy my own.  I used my father's AR-15 for the target

25  rifle competing.

Luke Rettmer                                                                    2/15/2020

1    A.  No.

2       **Q.  Have you ever known anyone who has done that?**

3    A.  Outside of the -- no, I haven't.

4       **Q.  All right.  I am hoping this is going to go a**

5    **little bit more smoothly, but if you could open the**

6    **document that's entitled Tab 15.  And we will mark that**

7    **as Exhibit 78.**

8             (Exhibit No. 78 was marked.)

9    A.  Did you say Tab 16?

10      **Q.  15, one five, it's the First Amended Complaint.**

11   A.  Okay.  I have it pulled up.

12      **Q.  Thank you.**

13          **In that document, if you can turn or scroll to**

14   **page 7, and I would like to direct your attention**

15   **specifically to paragraphs 58 to 70.**

16   A.  Page 7, paragraph 58.

17      **Q.  Through 70.**

18   A.  Okay, I am currently on 58.

19      **Q.  Excellent.**

20          **So if you can review paragraphs 58 to 70 to**

21   **yourself, and let me know when you are ready.**

22   A.  Okay.

23       (Witness reviews document.)

24       Okay.

25      **Q.  How did you become a plaintiff in this lawsuit?**

**BUELL REALTIME REPORTING, LLC**                               **Page: 16**
**206.287.9066 | 800.846.6989**

Luke Rettmer                                                                    2/15/2020

1      A.   I was working at a gun range called Custom

2   Sportsman Club, where a coworker told me about the

3   Second Amendment Foundation was going to seek this or

4   pursue this lawsuit, and I got -- from there I got in

5   contact with Mr. Joel Ard from the Second Amendment

6   Foundation where he got me directly involved.

7      Q.   It states in the complaint that you wished to

8   purchase a Ruger 10/22.  Why did you specifically wish

9   to purchase a Ruger 10/22?

10      A.   For its ability both in caliber, which is

11   22 caliber, provides readily available and relatively

12   inexpensive ammunition for practice, to lower costs, and

13   its semi-automatic feature allows me to practice aspects

14   of competition that are seen in my competitions.

15      Q.   Any other reasons?

16      A.   The training purposes are my -- were my primary

17   reason for wanting to pursue that, but the rifle also

18   would have been used for recreation shooting, and if

19   needed, self-defense.

20      Q.   Would a 10/22 and your 308 competition rifle --

21   strike that.

22          Is your 308 competition rifle, is that a bolt

23   action rifle?

24      A.   Yes, it is.

25      Q.   So that would have a different action than a

Luke Rettmer                                                        2/15/2020

1          **Do you understand that language?**

2     A.   Yes.

3          **Q.   Then, do you understand that Initiative 1639**

4     **permits individuals under 21 from possessing a**

5     **semi-automatic assault rifle in their homes?**

6          A.   In their homes, yes, I understand that.

7          **Q.   And also while transporting that, the**

8     **semi-automatic assault rifle from the home and to other**

9     **certain locations?**

10         A.   Could you clarify what other certain locations.

11         **Q.   Absolutely.**

12         **If you could open Tab 4, which is RCW 941.042.**

13    A.   Okay, it is open.

14         MR. ALBRECHT:  Is this being given an

15    exhibit number?

16         MS. SIMPSON:  Yes, being marked as

17    Exhibit 80.

18             (Exhibit No. 80 was marked.)

19    BY MS. SIMPSON:

20         **Q.   In Initiative 1639 specifically allowed, as we**

21    **just covered, an exception for the places and situations**

22    **identified in RCW 941.042, which we are now looking at.**

23         **And if I could direct your attention to**

24    **Exhibit 80.  Do you understand that under the**

25    **initiative, an individual under 21 could possess a**

**BUELL REALTIME REPORTING, LLC**                      **Page: 26**
**206.287.9066 | 800.846.6989**

**SER-418**

Luke Rettmer                                                      2/15/2020

1    semi-automatic assault rifle while attending a hunter

2    safety course or firearm safety course?

3           MR. ALBRECHT:  Objection.  Calls for a legal

4    conclusion.  Luke, we discussed this a little bit, but

5    when you hear my objections, that doesn't mean you

6    shouldn't answer.

7           THE WITNESS:  Understood.

8           I do see that, that is what this says, yes.

9    BY MS. SIMPSON:

10     Q.   And under Subsection 2, it allows for use while

11   engaging in practice in the use of a firearm or target

12   shooting at an established range.

13        Do you understand that under the initiative,

14   individuals under the age of 21 allows possession of a

15   semi-automatic assault rifle while target shooting at a

16   recognized range?

17    A.   Yes.

18           MR. ALBRECHT:  I am going to make a same

19   objection to all questions requesting him to interpret

20   and make legal conclusions to statutes as falling under

21   the same objection.  Every one of them asks for a legal

22   analysis and conclusions.

23           Luke, I probably stepped over your answer,

24   so go ahead.

25           THE WITNESS:  Okay.

Luke Rettmer                                                              2/15/2020

1        I do see that that is what this is, yes.

2    BY MS. SIMPSON:

3        Q.   And do you see that under Subsection 3 that

4    Initiative 1639 would permit an individual under 21 to

5    possess a semi-automatic assault rifle in an organized

6    competition?

7            MR. ALBRECHT:  Same objection.

8            THE WITNESS:  Yes.

9            MS. SIMPSON:  And Matt, I recognize your

10   standing objection, thank you.

11           MR. ALBRECHT:  All right.

12   BY MS. SIMPSON:

13       Q.   And looking at Subsection 4, do you understand

14   that under the Initiative 1639, that individuals under

15   21 may possess a semi-automatic assault rifle while

16   hunting or trapping with a valid license?

17       A.   Yes.

18       Q.   And that under Subsection 5, individuals under

19   the age of 21 may under the initiative have a

20   semi-automatic assault rifle in an area where it is

21   legal to shoot as long as you aren't trespassing, and

22   has either been issued a hunter safety certificate or is

23   under the supervision of a parent, guardian or other

24   adult approved for such purpose?  Do you understand

25   that?

Luke Rettmer                                                                    2/15/2020

1      A.  Yes.

2      Q.   And do you also see that under Subsection 6, the

3   initiative allows individuals under the age of 26 to

4   possess a semi-automatic assault rifle while traveling

5   to or from those activities?

6      A.  Yes.

7      Q.   Do you also see the individual under the age of

8   21 can possess a semi-automatic assault rifle on their

9   parents' property?

10      A.  Yes.

11      Q.   And do you also understand that under

12   Subsection 9 of this law, that under Initiative 1639, an

13   individual under the age of 21 may also possess a

14   semi-automatic assault rifle while on active duty in the

15   military?

16      A.  Yes.

17      Q.   If you could turn to Tab 5, which is

18   RCW 941.060.  Please let me know when you are there.

19   And we will be marking that as Exhibit 81.

20         (Exhibit No. 81 was marked.)

21         THE WITNESS:  I am on Tab 5.  Is there a

22   specific location you want?  Okay.

23         MR. ALBRECHT:  Are we in agreement the same

24   standard objections are being recognized?

25         MS. SIMPSON:  We are in agreement, Matt.

Luke Rettmer                                                    2/15/2020

1              C E R T I F I C A T E

2

   STATE OF WASHINGTON  )
3                        ) ss.
   COUNTY OF KING        )
4

5        I, KIM M. DORE-HACKBARTH, a Certified Shorthand

6   Reporter in and for the State of Washington, do hereby

7   certify that the foregoing transcript is true and

8   accurate to the best of my knowledge, skill and ability.

9        IN WITNESS WHEREOF, I have hereunto set my hand

10  and seal this 25th day of February, 2020.

11

12

13        _____

14        KIM M. DORE-HACKBARTH, RPR, CCR
          Certified Court Reporter No. 2072
15        (Certification expires 5/27/20.)

16

17

18

19

20

21

22

23

24

25



# E R R A T A

**CASE NAME:**   Mitchell, et al. v. Atkins, et al.

**DATE TAKEN:** 02/15/2020

**WITNESS:**   Luke Rettmer

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| 17 | 1 | Custom | Custer |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com



# D E C L A R A T I O N

**CASE NAME:**  Mitchell, et al. v. Atkins, et al.

**DATE TAKEN:** 02/15/2020

**WITNESS:**   Luke Rettmer

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

_____
Luke Rettmer

Signed on the _____9_____ day of ____March____, 2020.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com

# Exhibit Z

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-3, Page 193 of 223

Case 3:19-cv-05106-RBL   Document 94-3   Filed 03/31/20   Page 58 of 102
Case 3:18-cv-05931-RBL   Document 1   Filed 11/15/18   Page 1 of 41

Washington State
Office of the Attorney General
Acknowledged Receipt, this 11th day
of December, 2018, Time: 12:40 pm
in Olympia, Washington.
Signature: William C. Frymire
Print Name: William C. Frymire
Assistant Attorney General

RECEIVED

18 DEC 11 P12:35

CENTRAL OFFICE
ATTORNEY GENERAL
STATE OF WASHINGTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

No. 3:18-cv-5931

DANIEL MITCHELL, ROBIN BALL, LUKE
RETTMER, ARMEN TOOLOEE,
NATHANIEL CASEY, MATTHEW WALD,
SECOND AMENDMENT FOUNDATION,
AND NATIONAL RIFLE ASSOCIATION,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

Plaintiff,

vs.

STATE OF WASHINGTON, AND ROBERT
FERGUSON, IN HIS OFFICIAL CAPACITY
AS THE ATTORNEY GENERAL OF THE
STATE OF WASHINGTON,

Defendant.

## I.    INTRODUCTION

1.    This case is a federal civil rights action brought pursuant to 42 U.S.C. § 1983

seeking declaratory judgment and injunctive relief.

2.    This suit challenges the constitutionality of certain bans enacted through

Washington State Initiative No. 1639 ("I-1639"), enacted by voters on November 6, 2018.

A copy of I-1639 is attached hereto as Exhibit A.

Complaint (No. 3:18-cv-5931)
Page 1 of 11



421 W. Riverside Ave, Suite 614
Spokane, WA 99201 (509) 495-1246

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-3, Page 194 of 223

Case 3:19-cv-05106-RBL   Document 94-3   Filed 03/31/20   Page 59 of 102
Case 3:18-cv-05931-RBL   Document 1   Filed 11/15/18   Page 4 of 41

23.   Casey is in the army reserves where he has received training and is qualified by the U.S. Army on his fully automatic duty rifle as well as several other firearms.  The training he has already received exceeds anything required by I-1639.

24.   Casey owns a semi-automatic .223 caliber Colt M4 and intends to purchase a similar rifle in .22 long rifle caliber for less expensive target practice to help remain proficient with rifle target practice when not on duty.

25.   Casey also intends to purchase a higher caliber semi-automatic rifle suitable for lawful big game hunting in the future.

26.   Plaintiff Armen Toolooe is a resident of the state of Washington.

27.   Toolooe is 20 years old.

28.   Toolooe is a recreational shooter.

29.   Toolooe shoots at a rifle range with friends approximately once a month.

30.   Matthew Louis Wald is a resident of Washington State, age 19.

31.   Wald is a student at Seattle University, currently studying Nursing for his BSN. His permanent residence is in University Place, Washington.

32.   Wald is a recreational shooter and shoots at rifle ranges several times a year.

33.   Wald is the legal owner of a Ruger .22 semi-automatic rifle, and has hopes of purchasing a semi-automatic .223 rifle for recreational target practice in the future.

34.   Wald has extensive experience with semi-automatic rifles and is lawfully qualified to purchase and own such rifles but for the restrictions of I-1639.

35.   Plaintiffs Rettmer, Casey, Toolooe, and Wald are hereafter identified together as the "Young Adult Plaintiffs."

Complaint (No. 3:18-cv-5931)
Page 4 of 11



421 W. Riverside Ave, Suite 614
Spokane, WA 99201  (509) 495-1246

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-3, Page 195 of 223

Case 3:19-cv-05106-RBL   Document 94-3   Filed 03/31/20   Page 60 of 102
Case 3:18-cv-05931-RBL   Document 1   Filed 11/15/18   Page 10 of 41

77.   Unless enjoined by this Court, the enforcement of I-1639 will deprive plaintiffs of civil rights guaranteed by the Second Amendment to the United States Constitution, as applied by the Fourteenth Amendment to the United States Constitution.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

78.   A declaration that the challenged portions of I-1639 are unconstitutional;

79.   An order enjoining the defendants, and anyone acting on their behalf or in concert with them, from enforcing I-1639 in its entirety unless the law is ruled severable, and in that case, as to those sections determined to be unconstitutional;

80.   Plaintiffs' costs and attorneys' fees; and

81.   Such other and further relief as the court shall deem just and appropriate.

DATED November 14, 2018.


By: s/ _____

Matthew C. Albrecht WSBA No. 36801
ALBRECHT LAW PLLC
421 W. Riverside Ave, Suite 614
Spokane, WA 99201
Telephone: (509) 495-1246
Facsimile: (509) 757-8255
Email: malbrecht@albrectlawfirm.com
Attorneys for Plaintiff

Complaint (No. 3:18-cv-5931)
Page 10 of 11



421 W. Riverside Ave, Suite 614
Spokane, WA 99201  (509) 495-1246

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-3, Page 196 of 223

Case 3:19-cv-05106-RBL  Document 94-3  Filed 03/31/20  Page 61 of 102
Case 3:18-cv-05931-RBL  Document 1  Filed 11/15/18  Page 11 of 41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to parties of record through counsel (when applicable) as follows:

By email as per the stipulation for electronic service to:

DATED November 14, 2018.

By: s/_____
      Melanie Evans, Paralegal

Complaint (No. 3:18-cv-5931)
Page 11 of 11



421 W. Riverside Ave, Suite 614
Spokane, WA 99201  (509) 495-1246

# Exhibit AA

🔍 Search  |  How it works ▾  |  Start a GoFundMe  |  **gofundme**  |  Sign in  |  **Share**  |  **Donate**

# 1639 Legal Defense Fund

**$115,817** raised of
$100,000 goal

| 2.4K | 4.6K | 2.5K |
|------|------|------|
| donors | shares | followers |

**Donate now**

**Share**

Daniel Mitchell is organizing this fundraiser.

Created November 27, 2018
🏷️ Non-Profits & Charities

We've set up this fund to support the lawsuit against Initiative 1639.  Myself, another gun shop and 4 young adults are the plaintiffs in the suit.  ==The Second Amendment Foundation and National Rifle Association's federal lawsuit to overturn Initiative 1639.==  While SAF and the NRA are covering the direct legal costs, we are using the power of social media and the firearms community to help bundle funds to cover the costs of THIS case.  100% of the funds from this account are going directly to the Second Amendment Foundation.   This account has its own IRS EIN number and bank account, watch updates to this page for transparency reports, bank statements and photos of checks being delivered to SAF.   You can also donate directly to the Second

**Tim Kooistra**
$50 • 20 hrs

**Logan Boydell**
$30 • 4 d

**Anonymous**
$25 • 4 d

**Rodney Fosback**
$10 • 4 d

**Pat Martinez**
$25 • 4 d

See all



Exhibit 4
Witness Mitchell
Date 1-30-2021
Buell Realtime Reporting
(206) 287-9066

**SER-431**

Amendment Foundation or The National Rifle Association, just ask that donations be sent directly to the 1639 legal challenge. Watch our page and Facebook and Instagram Feed (Sporting Systems) for updates.

If you want to learn more about what 1639 did to law abiding, Washington citizens, and non-residents too, watch the 6 minute parody video we put together.

https://www.youtube.com/watch?v=9rA99GegBzA&t=121s

Thank you for your consideration, and shares of this event.

## Updates (1)

**JULY 6, 2019**  by Daniel Mitchell, Organizer

Good afternoon everyone. Just wanted update everyone on the progress of the #F1639 campaign. We're excited that these resources will provide the Second Amendment Foundation with a substantial boost in their ability to challenge other details of I-1639. We will be presenting SAF with a check in excess of $100,000 at TriggrCon July 27th. Please keep the donations coming, so we can continue to fight 1639 on every level. Thank you - Dan & Hiedi @ Sporting Systems.

**Donate**          **Share**

## Organizer



**Daniel Mitchell**
Organizer
Vancouver, WA

Contact

## Community Photos (39)

See all

## Comments (889)



Lyle Sample donated **$25**

Right thing to do for my freedom.

4 d



Anthony Machado donated **$20**

This is such an infringement on our constitutional rights. If we give them a inch they will take a mile! Our government is making us soft and the powers at hand are turning us against each other to maintain power. We need to stand together!

1 mo



Jill LeDoux donated **$30**

I took the course and it was great and also to support education of proper firearm

**SER-433**

handling for any reason, because of a law
that was passed or not.

1 mo

---



JR Pardo donated **$30**

Freedom of the free!!! USA!!

1 mo

---



Logan Rash donated **$10**

Legislation should not infringe on rights,
That's why the constitution is written as it

is. 2A strong brothers, thanks for the free
"training" to support bs laws.

1 mo

---



Support 2A Everywhere donated **$5**

Tyranny anywhere is tyranny everywhere!

2 mos

---



Adam Aranda donated **$20**

I want to be able to own my firearms. This
illegal BS has to be stopped.

2 mos

---

David Charles Doyle donated **$10**

I donated because it is necessary to help
everyone with this cause.

2 mos

Nathan Staunton commented

2 mos

Hobo Widashotgun Yankee NEA donated **$20**

Shall not be infringed!!!!

2 mos

Show more

Report fundraiser

**#1 FUNDRAISING PLATFORM**

People have raised more money on GoFundMe than anywhere else.
Learn more

**GOFUNDME GUARANTEE**

In the rare case that something isn't right, we will refund your donation.
Learn more

**EXPERT ADVICE, 24/7**

Contact us with your questions and we'll answer, day or night.
Learn more

FUNDRAISE FOR LEARN MORE RESOURCES

**gofundme**

Choose your
language

English (| ∨)

| | | |
|---|---|---|
| Medical | How GoFundMe works | Help center |
| Emergency | Why GoFundMe | Blog |
| Memorial | Common questions | GoFundMe Stories |
| Education | Success stories | Press center |
| Charity | Supported countries | Careers |
| Nonprofit organization | | About |

---

© 2010-2020
GoFundMe

Terms    Privacy    Legal

**SER-436**

# Exhibit BB

Nineteenth Century Statutes Restricting Minors' Access to Firearms

| Citation | Text |
|---|---|
| 1856 Ala. Acts 17, § 1 | "That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars." |
| 16 Del. Laws 716, § 1 (1881) | "That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten days nor more than six months, or both at the discretion of the court . . . ." |
| 27 Stat. 116–17, § 5 (D.C. 1892) | "That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described [deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles] shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months." |
| 1876 Ga. Laws 112, § 1 | "That from an after the passage of this Act it shall not be lawful for any person or persons knowingly to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane." |
| 1881 Ill. Laws 73, § 2 | "Whoever, not being the father, guardian, or employer of the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200)." |
| 1875 Ind. Acts 86, § 1 | "That it shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol." |
| 1884 Iowa Acts 86, § 1 | "That it shall be unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor." |
| 1883 Kan. Sess. Laws 159, ch. 106 | "§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars. § 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nor more than ten dollars." |

1 of 3

Nineteenth Century Statutes Restricting Minors' Access to Firearms

| Citation | Text |
| --- | --- |
| 1859 Ky. Acts 245, § 23 | "If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie-knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor . . . he shall be fined fifty dollars." |
| 1890 La. Acts 39, § 1 | "[I]t shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon which may be carried concealed to any person under the age of twenty-one years." |
| 1882 Md. Laws 656, § 2 | "That it shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years." |
| 1878 Miss. Laws 175–76, ch. 46, § 2 | "It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives, etc.], or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months." |
| 1883 Mo. Acts 76, § 1274 | "If any person shall . . . directly or indirectly sell or deliver, loan or barter to any minor any [kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon], without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment." |
| 1895 Neb. Laws 237–38, Art. XXVI, §§ 2, 5 | "No person shall sell, loan, or furnish, to any minor, any gun, fowling-piece, or other fire-arm, within the limits of the city, under penalty of a fine of fifty dollars for each offense. . . . It shall be unlawful for any parent, guardian, or other person having the care and custody of any minor, to purchase for or give to any such minor or knowingly to permit any minor to have any toy pistol, toy gun, or other toy arm or arms, or sling shot, out of which any leaden or other dangerous missiles may be discharged. Any such person so offending shall, upon conviction thereof, be fined in any amount not exceeding twenty dollars, and stand committed until such fine and costs are paid and secured." |
| 1885 Nev. Stat. 51, ch. LI, § 1 | "Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment." |
| 1893 N.C. Sess. Laws 468–69, § 1 | "That it shall be unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling shot." |
| 1890 Okla. Sess. Laws 495–96, § 3 | "It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in section one and two of this article [a pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword, cane, spear, billy, metal knuckles, or any other kind of knife, instrument manufactured or sold for the purpose of defense, offensive or defensive weapon, except as in this article provided]." |

2 of 3

Nineteenth Century Statutes Restricting Minors' Access to Firearms

| Citation | Text |
|---|---|
| 1856 Tenn. Pub. Acts 92, ch. 81, § 2 | Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court. |
| 1897 Tex. Gen. Laws 221–22 | "That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then [sic] twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment." |
| 1882 W. Va. Acts 421–22, § 7 | "If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided . . . ." |
| 1883 Wis. Sess. Laws 290, ch. 329 | "Section 1. It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor any pistol or revolver, found in his possession. Section 2. It shall be unlawful for any dealer in pistols or revolvers, or any other person to sell, loan or give any pistol or revolver to any minor in this state." |
| 1890 Wyo. Sess. Laws 1253, § 5052 | "It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars." |

Case 3:19-cv-05106-RBL   Document 94-3   Filed 03/31/20   Page 73 of 102

# Exhibit CC

# Deposition of Hugh Foskey

# Mitchell, et al. v. Atkins, et al.

# February 3, 2020



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

www.buellrealtime.com

Olympia | **360.534.9066**    Spokane | **509.624.3261**    National | **800.846.6989**

email: info@buellrealtime.com



Hugh Foskey                                                          2/3/2020

1            UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON

3                    AT TACOMA

4    _____

     DANIEL MITCHELL, et al.,      )
5                                  )
             Plaintiffs,      )
6                                  )
      vs.                 )  No. 3:19-cv-5106
7                                  )
     CHARLES ATKINS, et al.,      )
8                                  )
             Defendants.      )
9                                  )
      and                 )
10                                 )
     SAFE SCHOOLS SAFE COMMUNITIES, )
11                                 )
      Intervenor-Defendant.      )
12

13

14   _____

15          Deposition Upon Oral Examination

16                    of

17               HUGH FOSKEY

18   _____

19               9:06 a.m.

20             February 3, 2020

21        1191 Second Avenue, Suite 2000

22           Seattle, Washington

23

24

25   REPORTED BY:  Karmen Knudson, RPR, CRR No. 1935

Hugh Foskey                                                                    2/3/2020

```
 1              APPEARANCES

 2
     FOR THE PLAINTIFFS:
 3
         MATTHEW C. ALBRECHT
 4       ALBRECHT LAW
         421 W. Riverside Avenue
 5       Suite 614
         Spokane, WA 99201
 6       matt@albrechtlawfirm.com

 7
     FOR THE INTERVENOR DEFENDANT, SAFE SCHOOLS SAFE
 8     COMMUNITIES:

 9       NICHOLAS W. BROWN
         PACIFICA LAW GROUP
10       1191 Second Avenue
         Suite 2000
11       Seattle, WA 98101
         nicholas.brown@pacificalawgroup.com
12

13   FOR DEFENDANT BERNTSEN:

14       R. JULY SIMPSON
         ZACHARY P. JONES
15       ASSISTANT ATTORNEY GENERAL
         800 Fifth Avenue
16       Suite 2000, TB-14
         Seattle, WA 98104
17       july.simpson@atg.wa.gov
         zach.jones@atg.wa.gov
18

19   FOR DEFENDANT ATKINS AND CLARK COUNTY
       (ATTENDING BY PHONE):
20
         LESLIE LOPEZ
21       DEPUTY PROSECUTING ATTORNEY
         CLARK COUNTY PROSECUTOR'S OFFICE
22       CIVIL DIVISION
         PO Box 5000
23       Vancouver, WA 98666
         leslie.lopez@clark.wa.gov
24

25
```

Hugh Foskey                                                              2/3/2020

1                 APPEARANCES (Continuing)

2

     FOR DEFENDANT MEIDL, CITY OF SPOKANE
3       (ATTENDING BY PHONE):

4          SALVATORE J. FAGGIANO
           ASSISTANT CITY ATTORNEY
5          OFFICE OF THE CITY ATTORNEY
           808 W. Spokane Falls Boulevard
6          Spokane, WA 99201-3326
           sfaggiano@spokanecity.org
7

8    COURT REPORTER:

9          KARMEN KNUDSON, RPR, CCR
           BUELL REALTIME REPORTING
10         1325 Fourth Avenue
           Suite 1840
11         Seattle, Washington 98101

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X

2    EXAMINATION BY:                    PAGE

3    Mr. Brown                    6

4    Mr. Albrecht               168

5    Mr. Brown                  179

6

7

8                 EXHIBIT INDEX

9    EXHIBIT MARKED                     PAGE

10

11   24    Notice of Deposition Upon Oral      9
           Examination of Hugh Foskey
12
     25    Email to Foskey from Ard dated      11
13         11/21/2019

14   26    Email string re: Introduction -     19
           Military procurement
15         expert/Washington FFL expert
           MITCHELL0001 to 0006
16
     27    Emails between Mitchell and Foskey  22
17         re: Suppressor process
           MITCHELL0007
18
     28    List of firearms              24
19
     29    RCW 9.41.010                  29
20
     30    LinkedIn printout for Hugh Foskey   59
21
     31    Expert Declaration of Hugh Foskey   62
22
     32    Pictures of guns              70
23
     33    Detail Specification for 5.56       71
24         millimeter rifle, 5 August 2009

25
```

Hugh Foskey                                                                          2/3/2020

| | | |
|---|---|---|
| 1 | EXHIBIT INDEX (Continuing) | |
| 2 | EXHIBIT MARKED | PAGE |
| 3 | 34    Exhibit inadvertently not marked | |
| 4 | 35    Pictures of guns | 75 |
| 5 | 36    Detail Specification for Carbine,<br>5.56 millimeter: M4 | 77 |
| 6 | | |
| 7 | 37    Barrett Firearms Technical Data for<br>M107A1 | 85 |
| 8 | 38    Picture of gun | 96 |
| 9 | 39    Performance Specification for Rifle,<br>7.62MM:  Semi-Automatic Sniper System<br>(SASS) - M110 | 101 |
| 10 | | |
| 11 | 40    Webpage printout from Sharp Shooting<br>Indoor Range & Gunshop | 138 |
| 12 | | |
| 13 | 41    Webpage printout for FN 15 MM<br>Military Collector M4 | 138 |
| 14 | 42    Memorandum to Director from Associate<br>Director dated July 6, 1989, Report | 142 |
| 15 | and Recommendation on the<br>Importability of Certain | |
| 16 | Semiautomatic Rifles | |
| 17 | 43    Picture of gun parts | 161 |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Hugh Foskey                                                      2/3/2020

1    any sort of weapons until you've had training?

2        A.   Some sort of training, yes.

3        Q.   Are there a variety of type of handguns that

4    might be useful for self-defense?

5        A.   Yes.

6        Q.   What would those include, in your view?

7        A.   A Glock, Smith & Wessons.  Pretty much

8    anything on the market you could defend yourself with.

9        Q.   You mentioned that your courses also included

10   teaching the use of shotguns.  Is that right?

11       A.   Yes.

12       Q.   Are shotguns a good option for self-defense?

13       A.   Yes.

14       Q.   What makes them particularly useful?

15       A.   I would say they're useful because they're

16   pretty easy to teach, which, most weapons are easy to

17   teach, but -- I don't know.  I think they would all be

18   useful, according to how you use it and according to how

19   your training is and how confident you are on your

20   abilities to manage that weapon, which you should be

21   trained in it if you're going to use it for self-

22   defense.

23            And that training could be going to the range

24   and learning yourself or having someone help you.  And

25   that's what I did, is try to help people.

Hugh Foskey                                                                    2/3/2020

1              REPORTER'S CERTIFICATE

2        I, KARMEN M. KNUDSON, the undersigned Certified

3    Court Reporter, pursuant to RCW 5.28.010 authorized to

4    administer oaths and affirmations in and for the State

5    of Washington, do hereby certify that the sworn

6    testimony and/or proceedings, a transcript of which is

7    attached, was given before me at the time and place

8    stated therein; that any and/or all witness(es) were

9    duly sworn to testify to the truth; that the sworn

10   testimony and/or proceedings were by me stenographically

11   recorded and transcribed under my supervision, to the

12   best of my ability; that the foregoing transcript

13   contains a full, true, and accurate record of all the

14   sworn testimony and/or proceedings given and occurring

15   at the time and place stated in the transcript; that a

16   review of which was reserved; that I am in no way

17   related to any party to the matter, nor to any counsel,

18   nor do I have any financial interest in the event of the

19   cause.

20        WITNESS MY HAND and DIGITAL SIGNATURE this 12th

21   day of February, 2020.

22

23   _____

24        Karmen M. Knudson, CCR, RPR, CRR

25        Certified Court Reporter No. 1935.



# D E C L A R A T I O N

**CASE NAME:**   Mitchell, et al. v. Atkins, et al.

**DATE TAKEN:**  02/03/2020

**WITNESS:**    Hugh Foskey

          I declare under penalty of perjury under the laws of the State of

Washington that I have read my within deposition, and the same is true and

accurate, save and except for changes and/or corrections, if any, as indicated by

me on the ERRATA flyleaf page hereof.

_____
Hugh Foskey

Signed on the __13__ day of __Feb_____, 2020.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com

**SER-450**



# ERRATA

**CASE NAME:** Mitchell, et al. v. Atkins, et al.

**DATE TAKEN:** 02/03/2020

**WITNESS:** Hugh Foskey

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| 47 | 25 | Novles | Nobles |
| 48 | 12 | Nowle's | Nobles |
| 49 | 7 | Novles | Nobles |
| 60 | 7 | Novles | Nobles |
| 07 | 23 | NO | YES thats Right |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com

**SER-451**

# Exhibit DD



# Gun Crime in the Age Group 18-20

A Report by:

## The Department of the Treasury
### and
## The Department of Justice



June 1999

*Department of Justice*                                                               *Department of the Treasury*

# Gun Crime in the Age Group 18 to 20

In 1996, 34,040 people in the United States were killed with guns.  Of those deaths, 18,166 were suicides, 14,037 were homicides, 1,134 were unintentional shootings, and 413 deaths were of unknown intent. (National Center for Health Statistics, Centers for Disease Control, U.S. Department of Health and Human Services.)  This report focuses primarily on firearms homicides and other gun crime in the age group 18 to 20.

## Current Law on Firearms Possession by Young People

Current federal minimum age regulations relating to firearms vary by type of gun and means of access.  The Gun Control Act of 1968 made it unlawful for federal firearms dealers to sell handguns to persons under 21.  The Youth Handgun Safety Act of 1994 generally prohibited transfers of handguns to and possession of handguns by anyone under 18.  Exceptions include official military use, and the following activities with the written consent of the parent or guardian: employment, ranching, farming, target practice, hunting and handgun safety instruction.  Persons between the ages of 18 and 21 may still acquire handguns from non-licensed sellers.

There is no federal age restriction on possession of long guns (including rifles and shotguns).  While licensed dealers may only sell rifles and shotguns to persons aged 18 and older, there is no age restriction on the transfer of shotguns and rifles by non-licensed sellers.

The Violent Crime Control and Law Enforcement Act of 1994 banned the possession of semiautomatic assault weapons manufactured after passage of the law.  Under the law, assault weapons are defined either by specific make and model or by specific features.  Assault weapons can be pistols, rifles, or shotguns.  A person of any age may acquire an assault rifle or assault shotgun manufactured before 1994 from a non-licensed seller, and as of age 18, a person may buy assault rifles and assault shotguns manufactured before 1994 from licensed dealers.  Pistols classified as semiautomatic assault weapons that are grandfathered are subject to the same restrictions as other handguns.  There are no age restrictions on transfer or possession of large capacity ammunition feeding devices (more than 10 rounds); thus a person of any age may purchase such devices manufactured before 1994.

## Age Restrictions in The Youth Gun Crime Enforcement Act of 1999

The Youth Gun Crime Enforcement Act of 1999 would raise the minimum age for possession of a handgun from 18 to 21 and bar all handgun transfers to anyone in that age group, with exceptions for employment, hunting, farming, target practice, and for safety instruction.  The legislation would also raise the minimum age to possess an assault rifle from 18 to 21, and bar assault rifle transfers by anyone to anyone in that age group, without exception.  The same is true for large capacity magazine feeding devices.

## Murder and  Violent Crime Arrests in the 18 to 20 Age Range

In 1997, the most frequent age for arrest for murder was 18, accounting for 8 percent of all arrests for murder.  The second most frequent age for murder was 19, accounting for 8 percent of those arrests, and the third most frequent age for arrest for murder was 20, accounting for 7 percent.  Eighteen to 20 year olds comprised 22 percent of all those arrested for murder.  Similarly, the most frequent age for arrest for violent crime was 18, accounting for 5 percent of all violent crime

**SER-454**

*Department of the Treasury*                                                      *Department of Justice*

arrests.  Eighteen to 20 year olds comprised 14 percent, or one in seven, of all of those arrested for violent crime.  (FBI Uniform Crime Reports, Table 38, 1997).

## Criminal Use of Firearms in the 18 to 20 Age Range

In 1997, 18, 19 and 20 year olds ranked first, second, and third in the number of gun homicides committed.  Of all gun homicides where an offender was identified, 24 percent were committed by 18 to 20 year olds.  (Figure 1).  This is consistent with the historical pattern of gun homicides over the past 10 years.

Among murderers, 18 to 20 year olds were more likely to use a firearm than adults 21 and over.  More specifically, in 1997, 74 percent of the homicides committed by 18 to 20 year old offenders involved firearms.  In contrast, only 61 percent of homicides committed by offenders 21 or over involved firearms. (Table 1).  The under-21 offender age groups showed a significant shift toward the use of firearms in committing homicides by the mid-1980's.  By the 1990's, these offender groups were using firearms to commit homicides more than 70 percent of the time.  Although the proportion of 18 to 20 year olds who use firearms to commit homicides has declined since the 1994 peak, it remains higher than levels recorded before 1990.  (Figure 2).  Similarly, in non-lethal crimes, including assault, rape, and robbery, 18 to 20 year old offenders were more likely to use guns than both younger and older offender age groups.  For non-lethal crimes of violence from 1992 to 1997, in cases where the weapon and age of offender were identified, 15 percent of 18 to 20 year old offenders used a firearm, in contrast to 10 percent of adult offenders, and 5 percent of offenders 17 and under.  (Table 2).

## Youth Gun Acquisition Through the Illegal Market

Young offenders can and do obtain firearms illegally.  The complexity of the firearms market poses a challenge for law enforcement officials seeking to develop strategies to attack the illegal market that supplies criminals and juveniles.  The firearms market includes federal firearms licensees (FFLs); unregulated sellers and private transferors in what is known as the secondary market; and the illegal market.  The illegal market involves transfers both from FFLs and from unregulated transferors.  Gun violence is also facilitated when firearms are inadequately secured by FFLs, common carriers, and gun owners, especially parents with children at home.

### *Recent Law Enforcement Information on the Illegal Market in Firearms*

During the past six years, the Bureau of Alcohol, Tobacco and Firearms (ATF), working with law enforcement agencies around the country, academic researchers, and the Department of Justice, has significantly increased efforts to determine how felons and other prohibited persons, including juveniles and youth offenders, obtain firearms.  Better information enables ATF and State and local law enforcement officials to deploy regulatory and criminal investigative resources more effectively against illegal traffickers.

ATF has encouraged all law enforcement agencies to submit crime guns for tracing by the National Tracing Center (NTC).  An NTC trace can identify the FFL that sold the crime gun as a new gun, and the purchaser of the crime gun. This information can assist law enforcement officials in identifying illegal traffickers.  ATF has worked with law enforcement officials in an increasing number of jurisdictions to trace *all* recovered crime guns as part of an effort to obtain better investigative and strategic information about how the illegal market in firearms operates locally.

*Department of the Treasury*          *Department of Justice*

# Gun Homicide Offenders by Age Group

### Figure 1



Source: Federal Bureau of Investigation (FBI), Uniform Crime Reports, Supplemental Homicide Reports, 1997, special tabulation prepared by Northeastern University, Boston, Massachusetts.

In 1997, 18, 19, and 20 year olds ranked first, second, and third in the number of gun homicides committed.  For each of these ages, the number of homicides exceeded the number for any ages older or younger than 18 to 20.  Of all gun homicides where an offender was identified, 24 percent were committed by 18 to 20 years olds.  This is consistent with the historical pattern of gun homicides over the past 10 years.