NO. 20-35827

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DANIEL MITCHELL, et al.,

Appellants,

v.

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County,
Washington, et al.,

Defendants-Appellees

and

SAFE SCHOOLS SAFE COMMUNITIES,

Intervenor-Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
No. 3:20-cv-05106-JCC
The Honorable Judge John C. Coughenour, United States District Court

## APPELLEES' JOINT SUPPLEMENTAL EXCERPTS OF RECORD VOLUME 3 OF 4

ROBERT W. FERGUSON
 *Attorney General*
NOAH G. PURCELL
 *Solicitor General*
Zachary Pekelis Jones, WSBA 44557
R. July Simpson, WSBA 45869
 *Assistant Attorneys General*
Jeffrey T. Even, WSBA 20367
 *Deputy Solicitor General*
Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104
(206) 464-7744
*Counsel for Appellee Teresa Berntsen*

Salvatore J. Faggiano WSBA 15696
 *Assistant City Attorney*
Office of the City Attorney
808 W. Spokane Falls Blvd.
Spokane, WA 99201-3326
(509) 625-6818
*Counsel for Defendant Craig Meidl*

Paul J. Lawrence, WSBA 13557
Gregory J. Wong, WSBA 39329
Nicholas W. Brown, WSBA 33586
Kai A. Smith, WSBA 54749
PACIFICA LAW GROUP LLP
1191 Second Avenue, Suite 2000
Seattle, WA 98101-3404
Telephone: 206-240-1700
Facsimile: 206-240-1750800
*Counsel for Appellee Safe Schools Safe Communities*

Leslie A. Lopez, WSBA 46118
Deputy Prosecuting Attorney
Clark County Prosecutor's Office
PO Box 5000
Vancouver, WA 98666-5000
(564) 397-2478
*Counsel for Defendant Chuck Atkins*

# Exhibit EE



**U.S. Department of Justice**
Federal Bureau of Investigation

# A Study of Active Shooter Incidents in the United States Between 2000 and 2013

September 16, 2013
Washington Navy Yard,
Washington, D.C.

# A Study of Active Shooter Incidents in the United States between 2000 and 2013

Acknowledgments ............................................................................................ 2
Introduction ..................................................................................................... 4
Snapshot .......................................................................................................... 6
Findings ........................................................................................................... 8
Casualties ......................................................................................................... 9
Resolutions ...................................................................................................... 11
Law Enforcement/Security Personnel Casualties ............................................ 12
Shooter Outcomes .......................................................................................... 12
Locations ......................................................................................................... 12
Breakdown by location: .................................................................................. 14
    *Commerce Areas* ...................................................................................... 14
    *Education Environments* ........................................................................... 15
    *Open Spaces* ............................................................................................ 18
    *Military and Other Government Properties* .............................................. 18
    *Residences* ............................................................................................... 19
    *Houses of Worship* ................................................................................... 19
    *Health Care Facilities* ............................................................................... 19
Conclusion ...................................................................................................... 20
Appendix A: ..................................................................................................... 22
Appendix B: ..................................................................................................... 44
Appendix C: ..................................................................................................... 46



Click on a link above to jump to a page.

**On the cover:** An FBI evidence response team collects evidence at Building 197 at the Washington Navy Yard. A gunman killed 12 people at the base Sept. 16, 2013. (U.S. Navy photo by Mass Communication Specialist 2nd Class Pedro A. Rodriguez/Released)

3

# Introduction

In 2013, the president signed into law the Investigative Assistance for Violent Crimes Act of 2012, which granted the attorney general the authority to assist in the investigation of "violent acts and shootings occurring in a place of public use" and in the investigation of "mass killings and attempted mass killings at the request of an appropriate law enforcement official of a state or political subdivision."[1]

To provide further clarity on these threats, the Federal Bureau of Investigation (FBI) in 2014 initiated a study of "active shooter" incidents[2]. The goal of the FBI study is to provide federal, state, and local law enforcement with data so they can better understand how to prevent, prepare for, respond to, and recover from these incidents.



September 16, 2013
Washington Navy Yard,
Washington, D.C.

Photo: Shane T. McCoy/U.S. Marshals

Active shooter is a term used by law enforcement to describe a situation in which a shooting is in progress and an aspect of the crime may affect the protocols used in responding to and reacting at the scene of the incident. Unlike a defined crime, such as a murder or mass killing, the active aspect inherently implies that both law enforcement personnel and citizens have the potential to affect the outcome of the event based upon their responses.

---

1   Investigative Assistance for Violent Crimes Act of 2012, 28 USC 530C(b)(1)(M)(i).
2   The FBI's Uniform Crime Reporting system does not capture data specific to active shooters but rather is data derived from more than 18,000 city, university/college, country, state, tribal, and federal law enforcement agencies that voluntarily report monthly on criminal activity in their jurisdictions.

4

**SER-461**

The agreed-upon definition of an active shooter by U.S. government agencies—including the White House, U.S. Department of Justice/FBI, U.S. Department of Education, and U.S. Department of Homeland Security/Federal Emergency Management Agency—is "an individual actively engaged in killing or attempting to kill people in a confined and populated area."[3] Implicit in this definition is that the subject's criminal actions involve the use of firearms.[4]

For purposes of its study, the FBI extended this definition to include individuals, because some incidents involved two or more shooters. Though the federal definition includes the word "confined," the FBI excluded this word in its study, as the term confined could omit incidents that occurred outside a building.

Whether inside or out, these incidents still posed a threat to both law enforcement and the citizens they seek to protect.[5]

This is not a study of mass killings or mass shootings, but rather a study of a specific type of shooting situation law enforcement and the public may face. Incidents identified in this study do not encompass all gun-related situations; therefore caution should be taken when using this information without placing it in context. Specifically, shootings that resulted from gang or drug violence—pervasive, long-tracked, criminal acts that could also affect the public—were not included in this study. In addition, other gun-related shootings were not included when those incidents appeared generally not to have put others in peril (e.g., the accidental discharge of a firearm in a school building or a person who chose to publicly commit suicide in a parking lot). The study does not encompass all mass killings or shootings in public places and therefore is limited in its scope.[6] Nonetheless, it was undertaken to provide clarity and data of value to both law enforcement and citizens as they seek to stop these threats and save lives during active shooter incidents.[7]

As a result, the FBI identified 160 active shooter incidents that occurred in the United States between 2000 and 2013.[8] Though additional active shooter incidents may have occurred during this time period, the FBI is confident this research captured the vast majority of incidents falling within the search criteria. To gather information for this study, researchers relied on official police records (where available), FBI records, and open sources.[9] The time span researched was intended to provide substantive results to aid in preparedness and response efforts. This study is not intended to explore all facets of active shooter incidents, but rather is intended to provide a baseline to guide federal, state, tribal, and campus law enforcement along with other first responders, corporations, educators, and the general public to a better understanding of active shooter incidents.

---

3   White House, http://www.whitehouse.gov/sites/default/files/docs/developing_eops_for_houses_of_worship_final.pdf; Department of Justice/ FBI, http://www.fbi.gov/about/partnerships/office-of-partner-engagement/active-shooter-resources; Department of Homeland Security/Federal Emergency Management Agency, http://www.dhs.gov/active-shooter-preparedness and http://www.fema.gov/media-library/assets/documents/33597; Department of Education, http://www2.ed.gov/about/offices/list/oese/oshs/rems-k-12-guide.pdf.

4   Incidents involving only knives, vehicles, and other weapons are not part of this study.

5   See Appendix B for the full methodology used to select incidents.

6   Other private and public entities have studied mass casualty incidents, murder rates, and school or workplace violence. (e.g., Campus Attacks: Targeted Violence Affecting Institutions of Higher Education, a joint publication of U.S. Secret Service, U.S. Department of Education, and Federal Bureau of Investigation, 2010, http://rems.ed.gov/docs/CampusAttacks_201004.pdf).

7   Limited details on the shooters are included in this study. In 2015, the FBI Behavioral Threat Assessment Center will research shooter pre-attack behavioral indicators with a focus on findings that will enhance prevention methods.

8   See Appendix A for a summary of incidents examined in this study.

9   Researchers relied on 104 police department records, after action reports, shooting commission reports, open sources, and FBI resources.

5

**SER-462**

# Snapshot

The following characteristics of the 160 active shooter incidents identified between 2000 and 2013 are noted:



**160** incidents occurred between 2000 and 2013

An average of **11.4** incidents occurred annually; with an increasing trend from 2000 to 2013.

**486** were killed in 160 incidents

**1,043** Casualties, including killed and wounded (shooters were not included in this total)

**557** were wounded* in 160 incidents.

Source: Federal Bureau of Investigation, 2014

## INCIDENTS

- An average of 11.4 incidents occurred annually.
- An average of 6.4 incidents occurred in the first 7 years studied, and an average of 16.4 occurred in the last 7 years.
- 70.0% of the incidents occurred in either a commerce/business or educational environment.[10]
- Shootings occurred in 40 of 50 states and the District of Columbia.
- 60.0% of the incidents ended before police arrived.

*A handful of those identified as "wounded" were not injured by gunfire but rather suffered injuries incidental to the event, such as being hit by flying objects/shattered glass or falling while running. This does not account for all those wounded in this fashion or any mental or emotional trauma that resulted in potential medical treatment.

10    All percentages are rounded to the nearest tenth

## CASUALTIES
- Casualties (victims killed and wounded) totaled 1,043. The individual shooters are not included in this total.
- A total of 486 individuals were killed.
- A total of 557 individuals were wounded.[11]
- In 64 incidents (40.0%), the crime would have fallen within the federal definition of "mass killing"—defined as "three or more" killed—under the new federal statute.

## INCIDENTS WITH THE HIGHEST CASUALTY COUNTS:
- Cinemark Century 16 Theater in Aurora, Colorado:
  70 (12 killed, 58 wounded), July 20, 2012.
- Virginia Polytechnic Institute and State University in Blacksburg, Virginia:
  49 (32 killed, 17 wounded), April 16, 2007.[12]
- Ft. Hood Soldier Readiness Processing Center in Ft. Hood, Texas:
  45 (13 killed, 32 wounded), November 5, 2009.
- Sandy Hook Elementary School and a residence in Newtown, Connecticut:
  29 (27 killed, 2 wounded), December 14, 2012.

## SHOOTERS
- All but 2 incidents involved a single shooter.[13]
- In at least 9 incidents, the shooter first shot and killed a family member(s) in a residence before moving to a more public location to continue shooting.[14]
- In at least 6 incidents, the shooters were female.[15]
- In 64 incidents (40.0%), the shooters committed suicide; 54 shooters did so at the scene of the crime.
- At least 5 shooters from 4 incidents remain at large.[16]

11   A handful of those counted as wounded were not injured by gunfire but rather suffered injuries incidental to the event, such as being hit by flying objects/shattered glass, or falling while running. These were included in the casualty count when research may not have easily allowed for the type of injury to be discerned. This does not account for all those wounded in this fashion, to include those suffering any mental or emotional trauma that resulted in potential medical treatment.
12   Six additional students were injured after they climbed out of a second floor window in Norris Hall but are not included in the study's tally of those wounded because they could be easily discerned from those wounded by the shooter.
13   House Party in South Jamaica, New York, August 27, 2011; Streets of Tulsa, Oklahoma, April 6, 2012. (See Appendix A).
14   Amko Trading Store, January 9, 2001; Red Lake High School, March 21, 2005; Orange High School and Residence, August 30 2006; Residence, Latah County Courthouse, and First Presbyterian Church, May 19, 2007; Coffee and Geneva Counties, Alabama, March 10, 2009; Gainesville, Florida, October 4, 2010; Sandy Hook Elementary School and Residence, December 14, 2012; Jacksonville, North Carolina, and Brady, Texas, May 26, 2013; Santa Monica College and Residence, June 7, 2013.
15   Laidlaw Transit Services Maintenance Yard, April 23, 2001; Santa Barbara U.S. Postal Processing and Distribution Center, January 30, 2006; Louisiana Technical College, February 8, 2008; Shelby Center, University of Alabama, February 12, 2010; Publix Super Market, March 30, 2010; Kraft Foods Factory, September 9, 2010.
16   Burger King and Huddle House, November 22, 2005; Club LT Tranz, July 25, 2009; Washington, D.C. Department of Public Works, October 13, 2010; House Party in South Jamaica, New York, August 27, 2011.

**SER-464**

# Findings

In this study, the FBI identified 160 active shooter incidents, noting they occurred in small and large towns, in urban and rural areas, and in 40 of 50 states and the District of Columbia. Though incidents occurred primarily in commerce and educational environments (70.0%), they also occurred on city streets, on military and other government properties, and in private residences, health care facilities, and houses of worship. The shooters victimized young and old, male and female, family members, and people of all races, cultures, and religions.

The findings establish an increasing frequency of incidents annually. During the first 7 years included in the study, an average of 6.4 incidents occurred annually. In the last 7 years of the study, that average increased to 16.4 incidents annually. This trend reinforces the need to remain vigilant regarding prevention efforts and for law enforcement to aggressively train to better respond to—and help communities recover from—active shooter incidents.

The findings also reflect the damage that can occur in a matter of minutes. In 63 incidents where the duration of the incident could be ascertained, 44 (69.8%) of 63 incidents ended in 5 minutes or less, with 23 ending in 2 minutes or less.* Even when law enforcement was present or able to respond within minutes, civilians often had to make life and death decisions, and, therefore, should be engaged in training and discussions on decisions they may face.[17]



A Study of 160 Active Shooter Incidents in the United States Between 2000 - 2013: **Incidents Annually**

---

\* Initial publication of this study incorrectly identified by 1 the number of incidents where the duration of the incident could be ascertained. The actual number is 63. The percentage of incidents that ended in 5 minutes or less has been changed to reflect this revision. Other numbers cited in the sentence are still accurate.

17   In 6 incidents (and, in addition, at least 4 schools), officers were on the scene when the shooting began.

8

**SER-465**

# Exhibit FF



# K-12 School Shooting Database

**VIEW THE GRAPHS**

The K-12 school shooting database documents each and every instance a gun is brandished, is fired, or a bullet hits school property for any reason, regardless of the number of victims, time of day, or day of week.

**FOLLOW:**

**Tweets** by @K12ssdb



K-12 School Shooting Database
@K12ssdb

Large fights and shootings at closed schools are not good #socialdistancing practices. #schoolsout #schoolshooting #COVID19 Story by @MyArkLaMiss
myarklamiss.com/crime/monroe-p...



ACTIVE SHOOTER: SHOOTER'S AGE
Based on publicly available data on incidents from 1970-present



ACTIVE SHOOTER: INCIDENTS BY CALIBER OF FIREARM
Based on publicly available data on incidents from 1970-present

# Exhibit GG

**Analysis of the involvement of 18-20 year olds in**

**Firearm violence**

**And**

**The special problem of semi-automatic weapons**


**Prepared for the Alliance for Gun Responsibility**

**By**

**The Firearm Injury and Policy Research Program**

**The Harborview Injury Prevention and Research Center**

**University of Washington**


**June 2019**

1

**SER-471**

## INTRODUCTION

In response to an inquiry on potential effects of limiting access to semi-automatic rifles among adolescents 18-20, we investigated the specific burden of rifle injuries to this population and the differences in injury patterns between semi-automatic rifles and other types of firearms. Specifically, we examined the following questions:

1. What is the specific burden of firearm assaults and homicides in 18-20 year olds, compared to other age groups? Is the risk of being assaulted with a semi-automatic firearm higher for this age group?
2. What impact does this type of injury have on the health system?

To fully investigate these questions, we examined five data sources, alone and in combination, as outline in the table below:

| Data source | Purpose | Geographic level used | Injury definition used | Years of available data |
|---|---|---|---|---|
| Harborview trauma registry | Provide detailed data on the treatment and costs related to firearm injury | Local/Washington State (not population-based, but limited to WA residents) | Automatic firearm ICD-9 code E922.1 or ICD-10 code X94.9xxa | 1995 onward |
| Gun Violence Archive (GVA) | Identify the circumstances of injuries due to semi-automatic rifles reported in media sources | Washington State (not population-based) | Fatal and non-fatal shootings involving an "assault weapon" (AR-15, AK-47, and all variants as defined by law enforcement) and confirmed by law enforcement/media sources. | 2012 onward |
| National Violent Death Reporting System (NVDRS) | Estimate the number of violent deaths involving different types of firearms | Washington State (population-based) | Assault ICD-10 codes X93, X94, X95 (where X95 is for rifle, shotgun and other large firearms) | 2016 is the only year currently available for WA |
| National Trauma Data Bank (NTDB) | Estimate the burden of semi-automatic firearm injuries treated by | National (not population-based) | Automatic firearm assault: ICD-9 code E965.3; ICD-10 code X94.2 | 2007-2016 |

2

**SER-472**

| | | | | |
|---|---|---|---|---|
| | the healthcare system | | Other automatic firearm intents: ICD-9 codes E955.3, E985.3, E922.1, E922.3; ICD-10 codes W33.03, W33.13, X73.2, Y23.3, Y23.3 *See Table 1* | |
| CDC WONDER | Estimate the number of deaths involving firearms | National (all 50 states) | Assault ICD-10 codes X93, X94, X95 (where X95 is for rifle, shotgun and other large firearms) | 1999-2017 |

**How many firearm homicide deaths are there in Washington State among 18-20 year olds?**



In Washington State, in 2000-2017 (last year available), there have been 330 firearm homicides among 18-20 year olds. The numbers are small, so that there are large variations from year to year, with no specific apparent trend.

---

**What is the specific burden of assaults and homicides due to semi-automatic firearms among 18-20 year-olds?**

In Washington State in 2016 there were at least* three semi-automatic firearm homicides involving victims aged 18-20, out of 11 firearm homicides or 12 homicides by any means in this age group. This represents 27.3% of all firearm homicides in this age group and 25% of all homicides in this age group (NVDRS). Out of all homicides in Washington State that year known to involve a rifle, shotgun, or other long gun, 30% of the victims were 18-20. Less than 5% of the state's population is aged 18-20.

For comparison, out of all 32 states included in the NVDRS in 2016 there were 18 homicides among 18-20 year-olds involving a rifle, shotgun, or long gun. Those deaths represent 8.3% of all rifle-related

3

homicides and 2% of all homicides among 18-20 year-olds. Although the absolute numbers from Washington State are small, 16.7% of all the rifle-related homicides in this age group in 2016 occurred in Washington State, which has only 3.5% of the adolescent population of the United States. **Thus, Washington State had nearly 5 times as many rifle-related homicides among 18-20 year olds than would be expected based on size of the population.**

*Due to data coding practices it is not possible to identify deaths specifically involving a semi-automatic rifle using publicly-available government sources. However, Gun Violence Archive captures this level of detail based on law enforcement and media reports of gun violence incidents broadly defined. By crosschecking multiple sources we can conclusively identify a minimum number of incidents. Without access to additional years of state-specific data, it is difficult to know whether 2016 (in which a mass shooting occurred in Mukilteo) represents an outlier.

Using national death certificate data (CDC WONDER), between 1999 and 2017 there were an average of 60 firearm homicides per year nationally involving a victim aged 18-20 and a rifle, shotgun, or other long firearm. This represents 4% of all firearm homicides in this age group, and 9.7% of all rifle-related homicides across all ages. As 18-20 year olds represent only 4.2% of the United States population, adolescents have a higher-than-expected rate of rifle-related homicide.

**What impact do semi-automatic firearm assault injuries have on the health system? Is this impact larger among 18-20 year-olds than other age groups?**

Homicides represent only a fraction of the injury burden related to firearms, as the majority of assaults, even those involving a firearm, are not fatal. Conversely, a majority of firearm homicide victims die before arriving at a medical facility. **Between 2007 and 2016 only 39.1% of firearm homicide victims died at a medical facility (CDC WONDER).**

Using national trauma center data (NTDB), between 2007 and 2016 there were at least 564 semi-automatic firearm assaults treated at trauma centers across the United States. This certainly is an under-representation of the actual number, as 3,118 semi-automatic firearm injuries do not specify the injury intent, and nearly 150,000 firearm assaults do not specify the type of firearm. However, one would expect that few of the semi-automatic firearm injuries were self-inflicted or accidental. Among firearm assault injuries where a firearm type is specified, mortality is higher among victims of semi-automatic weapons than other firearm types, with 16.3% of semi-automatic firearm assault hospitalizations ending in death, compared to 12% of handgun and non semi-automatic rifles and shotgun assaults.

For firearm assault victims of all ages, those injured with a semi-automatic weapon are more likely to be admitted to the ICU than victims shot with other types of firearms (46.1% compared to 32.7%). Firearm assault victims shot with a semi-automatic weapon also needed more operations than victims shot with other types of firearms (mean of 9.6 operations compared to 5.6, $p < 0.0001$).

4

Among firearm assault victims who survived their injuries, the average length of stay in the hospital for victims shot with a semi-automatic weapon was 4.12 (95% CI: 3.06, 5.17) days longer than similarly-aged victims shot with another specified firearm (p<0.0001). Based on the average cost per day of inpatient hospitalization in Washington State government-run hospitals (Kaiser Family Foundation and American Hospital Association annual survey), an additional 4 days of care cost the hospital system an average of $13,248 more in care-related expenses per patient.

To estimate direct healthcare charges to the patient we relied on data from Harborview Medical Center, our regional Level 1 trauma center. Specifically, we examined all individuals treated for a firearm injury since 2012. Using facility-specific trauma registry data, median total charges for relevant semi-automatic injuries is $36,211 among 18-20 year olds, more than $10,000 higher than median charges for all types of firearm injuries in this age group and nearly identical to the median costs for semi-automatic firearm injuries across all age groups ($36, 845).

**LIMITATIONS OF THE DATA**

> Several notable limitations on available data are relevant. First, *the majority of firearm injury incidents captured in health data sources do not include details on either the type of firearm or characteristics of the perpetrator*. We were not able to describe firearm injuries in which individuals were shot by 18-20 year-olds. Estimates of the number of firearm injuries caused by a semi-automatic rifle are minimums, as many additional injuries are likely included in data sources as "unspecified firearm injuries." Lastly, there is no central data source at any geographic level that aggregates all fatal and non-fatal firearm injuries, and the number of non-fatal firearm injuries as reported by the CDC is believed to be unreliable.

**CONCLUSIONS**

The data on use of semi-automatic weapons in shootings is very limited both in Washington State and nationally because few databases specify the type of long-gun or handgun used, and of those databases which included this information, it is missing for the vast majority of incidents.  The data indicate that injuries involving semi-automatic weapons tend to be more severe, and have a higher fatality than other firearm injuries.

Among 18-20 year olds, Washington State had nearly 5 times as many rifle-related homicides among 18-20 year olds in 2016 than would be expected based on size of the population.  Nationally, the vast majority of firearm homicides in this age group involved handguns; only 4% involved rifles.

5

**APPENDIX**

**Table 1: NTDB Firearm Injury ICD-9 and ICD-10 codes**

| ICD-9 Codes | | | |
|---|---|---|---|
| Codes | Descriptions | Intent | Firearm Type |
| E965.0 | Assault by handgun | Assault | Handgun |
| E965.1 | Assault by shotgun | Assault | Shotgun |
| E965.2 | Assault by hunting rifle | Assault | Rifle |
| E965.3 | Assault by military firearms | Assault | Automatic or Semi-automatic |
| E965.4 | Assault by other and unspecified firearm | Assault | Unspecified |
| E922.0 | Accident caused by handgun | Unintentional | Handgun |
| E922.1 | Accident caused by shotgun (automatic) | Unintentional | Automatic or Semi-automatic |
| E922.2 | Accident caused by hunting rifle | Unintentional | Rifle |
| E922.3 | Accident caused by military firearms | Unintentional | Automatic or Semi-automatic |
| E922.8 | Accident caused by other specified firearm missile | Unintentional | Unspecified |
| E922.9 | Accident caused by unspecified firearm missile | Unintentional | Unspecified |
| E955.0 | Suicide and self-inflicted injury by handgun | Self-inflicted | Handgun |
| E955.1 | Suicide and self-inflicted injury by shotgun | Self-inflicted | Shotgun |
| E955.2 | Suicide and self-inflicted injury by hunting rifle | Self-inflicted | Rifle |
| E955.3 | Suicide and self-inflicted injury by military firearms | Self-inflicted | Automatic or Semi-automatic |
| E955.4 | Suicide and self-inflicted injury by other and unspecified firearm | Self-inflicted | Unspecified |
| E955.9 | Suicide and self-inflicted injury by firearms and explosives unspecified | Self-inflicted | Unspecified |
| E985.0 | Injury by handgun, undetermined whether accidentally or purposely inflicted | Undetermined intent | Handgun |
| E985.1 | Injury by shotgun, undetermined whether accidentally or purposely inflicted | Undetermined intent | Shotgun |
| E985.2 | Injury by hunting rifle, undetermined whether accidentally or purposely inflicted | Undetermined intent | Rifle |
| E985.3 | Injury by military firearms, undetermined whether accidentally or purposely inflicted | Undetermined intent | Automatic or Semi-automatic |
| E985.4 | Injury by other and unspecified firearm, undetermined whether accidentally or purposely inflicted | Undetermined intent | Unspecified |
| ICD-10 Codes | | | |
| Codes | Descriptions | | Unspecified |
| X93 | Assault by handgun discharge | Assault | Handgun |

6

**SER-476**

| X94.0 | Assault by shotgun | Assault | Shotgun |
|---|---|---|---|
| X94.1 | Assault by hunting rifle | Assault | Rifle |
| X94.2 | Assault by machine gun | Assault | Automatic or Semi-automatic |
| X94.8 | Assault by other larger firearm discharge | Assault | Unspecified |
| X94.9 | Assault by unspecified larger firearm discharge | Assault | Unspecified |
| X95.8 | Assault by other firearm discharge | Assault | Unspecified |
| X95.9 | Assault by unspecified firearm discharge | Assault | Unspecified |
| W32 | Accidental handgun discharge and malfunction | Unintentional | Handgun |
| W33.00 | Accidental discharge of unspecified larger firearm | Unintentional | Unspecified |
| W33.01 | Accidental discharge of shotgun | Unintentional | Shotgun |
| W33.02 | Accidental discharge of hunting rifle | Unintentional | Rifle |
| W33.03 | Accidental discharge of machine gun | Unintentional | Automatic or Semi-automatic |
| W33.09 | Accidental discharge of other larger firearm | Unintentional | Unspecified |
| W33.10 | Accidental malfunction of unspecified larger firearm | Unintentional | Unspecified |
| W33.11 | Accidental malfunction of shotgun | Unintentional | Shotgun |
| W33.12 | Accidental malfunction of hunting rifle | Unintentional | Rifle |
| W33.13 | Accidental malfunction of machine gun | Unintentional | Automatic or Semi-automatic |
| W33.19 | Accidental malfunction of other larger firearm | Unintentional | Unspecified |
| W34.00 | Accidental discharge from unspecified firearms or gun | Unintentional | Unspecified |
| W34.09 | Accidental discharge from other specified firearms | Unintentional | Unspecified |
| W34.10 | Accidental malfunction from unspecified firearms or gun | Unintentional | Unspecified |
| W34.19 | Accidental malfunction from other specified firearms | Unintentional | Unspecified |
| X72 | Intentional self-harm by handgun discharge | Self-inflicted | Handgun |
| X73.0 | Intentional self-harm by shotgun discharge | Self-inflicted | Shotgun |
| X73.1 | Intentional self-harm by hunting rifle discharge | Self-inflicted | Rifle |
| X73.2 | Intentional self-harm by machine gun discharge | Self-inflicted | Automatic or Semi-automatic |
| X73.8 | Intentional self-harm by other larger firearm discharge | Self-inflicted | Unspecified |
| X73.9 | Intentional self-harm by unspecified larger firearm discharge | Self-inflicted | Unspecified |
| X74.8 | Intentional self-harm by other firearm discharge | Self-inflicted | Unspecified |
| X74.9 | Intentional self-harm by unspecified firearm discharge | Self-inflicted | Unspecified |
| Y22 | Handgun discharge, undetermined intent | Undetermined intent | Handgun |
| Y23.0 | Shotgun discharge, undetermined intent | Undetermined intent | Shotgun |
| Y23.1 | Hunting rifle discharge, undetermined intent | Undetermined intent | Rifle |
| Y23.2 | Military firearm discharge, undetermined intent | Undetermined | Automatic or Semi- |

7

**SER-477**

| | | intent | automatic |
|---|---|---|---|
| Y23.3 | Machine gun discharge, undetermined intent | Undetermined intent | Automatic or Semi-automatic |
| Y23.8 | Other larger firearm discharge, undetermined intent | Undetermined intent | Unspecified |
| Y23.9 | Unspecified larger firearm discharge, undetermined intent | Undetermined intent | Unspecified |
| Y24.8 | Other firearm discharge, undetermined intent | Undetermined intent | Unspecified |
| Y24.9 | Unspecified firearm discharge, undetermined intent | Undetermined intent | Unspecified |

8

**SER-478**

# Exhibit HH

# Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States

WILLIAM DeJONG, PH.D.,[a,b,]* AND JASON BLANCHETTE, M.P.H.[c]

[a]Department of Community Health Sciences, Boston University School of Public Health, Boston, Massachusetts
[b]EverFi, Inc., Washington, DC
[c]Boston University School of Medicine, Boston, Massachusetts

**ABSTRACT. Objective:** In 2006, the nonprofit organization Choose Responsibility called for repealing the 1984 National Minimum Drinking Age Act, which had led all 50 states to establish a minimum legal drinking age (MLDA) of 21 years, and allowing the states to lower their MLDA to 18 years. Two years later, the organization assembled a small group of college and university presidents (the Amethyst Initiative) to call publicly for a critical reexamination of the law. Public health and traffic safety experts responded to these efforts by generating new research on the age 21 MLDA, thus warranting an updated review of the literature. **Method:** This review focuses primarily on research published since 2006, when Choose Responsibility began its public relations campaign to lower the MLDA. **Results:** Recent research on the age 21 MLDA has reinforced the position that the current law has served the nation well by reducing alcohol-related traffic crashes and alcohol consumption among youths, while also protecting drinkers from long-term negative outcomes they might experience in adulthood, including alcohol and other drug dependence, adverse birth outcomes, and suicide and homicide. **Conclusions:** The age 21 law saves lives and is unlikely to be overturned. College and university leaders need to put into effect workable policies, stricter enforcement, and other evidence-based prevention efforts that have been demonstrated to reduce underage drinking and alcohol-related problems on campus and are being applied successfully at prominent academic institutions (*J. Stud. Alcohol Drugs, Supplement 17*, 108–115, 2014)

IN 2005, MOTHERS AGAINST DRUNK DRIVING (MADD) and other traffic safety activists celebrated the 21st anniversary of the National Minimum Drinking Age Act (23 U.S.C. § 158), which President Reagan signed into law in 1984. MADD organized a 21-city tour to celebrate the law, which the organization reported had saved "nearly 21,000 lives" since its passage. MADD's support for the law is unwavering: "Hailed as one of the most effective anti–drunk driving laws ever passed, the law stands as one of MADD's most successful legislative achievements" (MADD, 2005, p.3).

With National Prohibition repealed in 1933, the states assumed responsibility for regulating the distribution and sale of alcohol, and most established a minimum legal drinking age (MLDA) of 21 years. During the Vietnam War era, when the national voting age was lowered to 18 years, 29 states lowered their MLDA to 18, 19, or 20 years, which led to a dramatic increase in alcohol-related traffic fatalities among young people ages 18–20 years (Wagenaar and Toomey, 2002). Faced with these statistics, many states reversed course, but the problem remained of young people traveling across state lines to drink legally in states with a lower MLDA (Toomey et al., 2009).

Received: July 17, 2013. Revision: August 18, 2013.
*Correspondence may be sent to William DeJong at the Department of Community Health Sciences, Boston University School of Public Health, 801 Massachusetts Avenue, 3rd Floor, Boston, MA 02118, or via email at: wdejong@bu.edu.

As a result, MADD, Remove Intoxicated Drivers, the National Parent Teacher Association, and other groups pressured Congress to pass legislation that would in effect prohibit the purchase and public possession of alcoholic beverages by any person younger than 21 years (Lerner, 2011). The 1984 law incentivized the states to adopt the higher MLDA by threatening to withhold a percentage of highway funds (authorized under the Federal Highway Aid Act) from noncompliant states.

By December 1987, all 50 states had an age 21 MLDA that met the federal requirement. Policy information assembled by the National Institute on Alcohol Abuse and Alcoholism (NIAAA) through its Alcohol Policy Information System reveals that many aspects of the MLDA laws vary from state to state (NIAAA, 2013). In several states, for example, the MLDA law does not explicitly prohibit consumption of alcohol by a person under age 21. Depending on the state, it can be legal for minors to possess alcohol with the consent or in the presence of a parent or guardian, for a parent or guardian to furnish alcohol to a minor, and for people under 21 to work as a clerk or server in an alcohol retail outlet.

The public continues to support the current age 21 law. According to a 2007 Gallup poll ($N = 1,001$), 77% of U.S. adults ages 18 and older would oppose a federal law to lower the drinking age to 18, whereas only 22% would support such a law (Carroll, 2007). In addition, 60% favored stricter penalties for underage drinking. A poll conducted in 2008 by the Opinion Research Corporation for Nationwide Mutual

SER-480

DEJONG AND BLANCHETTE                                                            109

Insurance (2008) found similar results ($N = 2,006$). Moreover, approximately three fourths of the respondents agreed that there should be increased enforcement of both underage drinking laws and laws that prohibit providing alcohol to minors, plus increased penalties for adults who provide alcohol to minors. Fully 52% said they would be less likely to vote for a state representative who supports lowering the legal drinking age.

### The Amethyst Initiative

In 2004, as he stepped down after 13 years as president of Middlebury College (Middlebury, VT), John M. McCardell published an op-ed in *The New York Times* to express his views on faculty tenure, faculty–student ratios, and the legal drinking age (McCardell, 2004). These were opinions, he explained, that he was not bold enough to state while president. What gained particular notice was McCardell's declaration that the age 21 law was "bad social policy and terrible law" that has "driven drinking behind closed doors and underground" and therefore contributes to "binge drinking" (i.e., heavy episodic drinking). McCardell's preferred solution, he said, is to lower the drinking age and teach college students how to drink responsibly: "Colleges should be given the chance to educate students, who in all other respects are adults, in the appropriate use of alcohol, within campus boundaries and out in the open."

Four years later, more than 100 college and university chancellors and presidents signed on to McCardell's "Amethyst Initiative," which he launched through the auspices of Choose Responsibility, a nonprofit organization he started with generous funding from the Robertson Foundation. (There are more than 2,800 degree-awarding institutions of higher education in the United States, including both 2- and 4-year colleges and universities; Knapp et al., 2012).

A public statement released to the press called for "an informed and dispassionate public debate" over the effects of the age 21 law (Amethyst Initiative, 2008) but stopped just short of calling for a lower drinking age. Even though only a very small percentage of chancellors and presidents had signed on, the news media's interest in McCardell, Choose Responsibility, and the Amethyst Initiative was intense, leading to extensive coverage in major national and regional newspapers, feature stories on cable news, a story on the highly regarded newsmagazine show *60 Minutes*, and even an appearance by McCardell on Comedy Central's *The Colbert Report*. Public health and traffic safety experts responded to this flurry of news reports by generating new research to investigate the impact of the current law.

### Method

This review focuses primarily on research published since 2006, when Choose Responsibility first began its public

relations campaign to lower the MLDA. We used the term *drinking age* in a PubMed search to identify articles in peer-reviewed journals, including but not limited to the *Journal of Studies on Alcohol and Drugs.* The selected articles had evaluated the age 21 MLDA in the United States or had investigated the potential effects of raising or lowering the MLDA. We examined several additional publications that were referenced in peer-reviewed articles or in various scholarly responses to the Amethyst Initiative.

### Impact of the age 21 minimum legal drinking age on alcohol-related traffic crashes

McCardell's public relations campaign took public health and traffic safety officials by surprise, given an extensive research literature showing that the age 21 MLDA reduces injuries and saves lives, even though the law is imperfectly enforced and widely disobeyed. Armed with this research, several public health and traffic safety experts wrote rebuttals to Choose Responsibility's position (e.g., Fell, 2008; Hingson, 2009; McCartt et al., 2010; Saylor, 2011; Toomey et al., 2009; Voas and Fell, 2012; Wechsler and Nelson, 2010).

According to estimates produced by the National Highway Transportation Safety Administration (NHTSA), the age 21 law has saved up to 900 lives annually as a result of reduced alcohol-related traffic fatalities among underage drivers (Kindelberger, 2005; NHTSA, 2009). McCartt and colleagues (2010) noted that the biggest relative declines in both the number and per capita rate of fatally injured drivers ages 16–20 were seen between 1982 and 1995. During that period, which included passage of the National Minimum Drinking Age Act of 1984 (23 U.S.C. § 158), the number of fatally injured drivers with a positive blood alcohol concentration (BAC) decreased by 57% among those ages 16–20, compared with 39% for those ages 21–24 and 9% for those ages 25 and older. Declines in per capita rates were 50%, 26%, and 25%, respectively.

Wagenaar and Toomey (2002) published a definitive review of the U.S. literature on the age 21 MLDA in a supplement issue to the *Journal of Studies on Alcohol* (now the *Journal of Studies on Alcohol and Drugs*), which was timed to coincide with publication of *A Call to Action: Changing the Culture of Drinking at U.S. Colleges,* a report prepared by the Task Force on College Drinking organized by NIAAA (2002). Their article highlighted research studies that examined the impact of decreasing and then increasing the MLDA in various states. When reviewing this research, the authors identified 79 higher quality studies that used probability sampling or census data; analyzed pre–post, longitudinal, or time-series data; and incorporated some type of comparison group. Of these, 46 found that a higher legal drinking age led to fewer traffic crashes, whereas none found the opposite.

A review published by researchers with the Centers for Disease Control and Prevention came to the same conclusion, estimating that fatal and nonfatal injury crashes combined increased 10% when the MLDA was lowered but decreased 16% when the MLDA was raised to age 21 (Shults et al., 2001). In a subsequent econometric analysis, Carpenter and Dobkin (2011) estimated that decreasing the MLDA to age 18 would result each year in 4.74 more nighttime fatal motor vehicle crashes per 100,000 person-years for youth ages 18–20, a statistically significant 17% increase. The magnitude of increase for daytime fatal crashes, the vast majority of which would not be alcohol-related, was far less and not statistically significant. Decreasing the MLDA was predicted to increase nighttime fatal crashes for persons ages 21–24 by only 11%, with no increase projected for those ages 15–17 or 25–29.

Ponicki and colleagues (2007) demonstrated that raising the MLDA from 18 to 21 was associated with a 5%–9% decrease in all traffic fatalities among drivers ages 18–20. Moreover, increasing the MLDA caused a larger proportional drop in fatalities when state beer taxes were relatively low, leading to greater alcohol availability. A more recent investigation reported that the age 21 MLDA reduced traffic fatalities among drivers ages 18–20 in states that adopted that measure before the 1984 federal law but not in states that adopted it after the law went into effect (Miron and Tetelbaum, 2009). A possible explanation is that the latter states devote fewer resources to enforcing the MLDA law, but there may also be cohort effects or other differences between the two sets of states that contribute to this pattern of results.

Especially convincing evidence on the impact of the age 21 MLDA comes from an analysis by Fell and colleagues (2009) that used Fatal Analysis Reporting System data for 1982–2004 to examine the effects of the age 21 MLDA on the ratio of drinking to nondrinking drivers younger than age 21 involved in fatal crashes. Importantly, this analysis statistically controlled for the presence of several additional state laws designed to deter alcohol-impaired driving (e.g., administrative license revocation, use/lose laws) or to otherwise reduce traffic-related fatalities (e.g., mandatory seat belt laws, graduated license restrictions), plus state-level data for per capita beer consumption, unemployment rates, number of licensed drivers, vehicle miles traveled, the ratio of drinking to nondrinking drivers (according to roadside surveys), the number of drivers age 26 and over involved in fatal crashes and, among that group, the ratio of drinking to nondrinking drivers. The age 21 MLDA was independently associated with a 16% decline in the ratio of drinking to nondrinking drivers under age 21 involved in fatal crashes. By comparison, two measures that target drivers under age 21—use/lose laws, which call for driving license suspension or revocation for violating the MLDA law, and zero tolerance laws, which impose far lower BAC per se limits for drivers under age 21 (e.g., ≤.02% BAC)—were associated with 5% declines.

A study by Lovenheim and Slemrod (2010) demonstrated the importance of having a national MLDA rather than a patchwork of varying state laws. Analyzing county-level data for 1977–2002, the authors found no reduction in youth involvement in fatal traffic crashes in counties with a higher MLDA but located within 25 miles of a state with a lower MLDA. In fact, among drivers ages 18–19, there was an increase in fatal crash involvement. In counties farther from the border, however, the results were consistent with other studies that have shown the age 21 MLDA to be protective.

Choose Responsibility has urged that individual states be allowed to experiment with lowering the MLDA while putting mandatory alcohol education programs in place (McCardell, 2006). Unfortunately, this proposal would reinstate the problem of young people traveling across state lines to drink legally in states with a lower MLDA and thus increasing their risk of being involved in a fatal traffic crash. Moreover, Choose Responsibility has not yet been specific about what content these education programs should include to ensure that they are consistent with evidence-based best practice.

*Impact of the age 21 minimum legal drinking age on youth alcohol consumption*

Choose Responsibility has also contended that the age 21 MLDA is contributing to heavy alcohol use on college campuses by forcing students to drink secretively and therefore more heavily (McCardell, 2006). In fact, there is no scientific evidence to support that argument.

According to the University of Michigan's Monitoring the Future study, heavy drinking rates for college students—defined as having five or more drinks in a row at least once during the past 2 weeks—have decreased from 43.2% in 1988, the first year when all 50 states had an age 21 MLDA, to 36.1% in 2011 (Johnston et al., 2012b). The corresponding rates for high school seniors (grade 12) decreased from 34.7% to 21.6% (Johnston et al., 2012a). An examination of 20 administrations of the National Survey on Drug Use and Health between 1979 and 2006 also showed decreases in heavy drinking rates among youth during this period (Grucza et al., 2009).

Choose Responsibility's argument has been that the age 21 MLDA is an unwarranted restriction that causes minors to drink more than they otherwise would (McCardell, 2006), consistent with what would be predicted by the theory of psychological reactance (Brehm and Brehm, 1981). Extensive research on drinking motivations has never identified reactance as an important motivator for youth drinking compared with social, enhancement, and coping motives (Baer, 2002; Kuntsche et al., 2005).

The commonsense counterargument is that raising the MLDA to age 21 has made alcohol less readily available and

thereby reduced youth consumption (Gruenewald, 2011), and that is what the research has shown, according to Wagenaar and Toomey (2002). For their review of the research literature, they identified 33 higher quality studies of MLDA and alcohol consumption: 11 found that a higher legal drinking age had led to less alcohol consumption, but only 1 found the opposite result.

The American public understands that reducing the legal drinking age would increase dangerous alcohol consumption among youth: When asked in the 2008 Nationwide Mutual Insurance poll if lowering the drinking age from 21 to 18 would reduce or increase "binge drinking" (i.e., heavy episodic drinking) among teens, 47% of the adults polled said there would be an increase, whereas only 14% said there would be a reduction, and 39% said there would be no impact (Nationwide Mutual Insurance, 2008).

Choose Responsibility has also stated that the minimum drinking age law is widely violated and cannot be consistently enforced, thus breeding cynicism and disrespect for the law (McCardell, 2006). Along these lines, a study of underage college students by Martinez and colleagues (2009) found a strong association between self-reported heavy and risky drinking and support for lowering the MLDA. It is important to emphasize, however, that defiance of the age 21 MLDA is not the majority view. A study conducted at 32 U.S. colleges and universities showed that 60% of undergraduate students supported tougher penalties for minors using a fake ID to make illegal alcohol purchases. Fully 46% supported undercover operations at bars, restaurants, and liquor stores to increase compliance with underage drinking laws (DeJong et al., 2007b).

*Comparing the United States with other countries*

Choose Responsibility also tapped into the popular misperception that, because European nations have lower legal drinking ages, they do a "better job" of introducing young people to alcohol and therefore have fewer alcohol-related problems (McCardell, 2006). In fact, the opposite is the case.

Data from the 2003 European School Survey Project on Alcohol and Other Drugs (EPAD) shows that the vast majority of the 35 participating countries have greater proportions of high school–aged youths who report heavy alcohol use and drinking to intoxication than does the United States (Grube, 2005). Subsequent EPAD surveys in the United States and Europe, plus similar surveys for the Health Behaviour in School-Aged Children project, have also shown that lifetime and annual prevalence rates are much higher in Europe than in the United States (Beccaria and White, 2012). Prevalence rates for drunkenness are also lower in the United States. In 2011, 36% of U.S. tenth-graders reported having been drunk in their lifetime, 29% in the past year, and 14% in the past month, compared with 47%, 37%, and 17%, respectively, of European youth ages 15–16 (Beccaria and White, 2012).

It should also be noted that, compared with other regions of the world, Europe has the highest per capita alcohol use, the highest percentage of deaths attributed to alcohol (about twice the worldwide percentage), the highest burden of disease (i.e., disability) related to alcohol, and the highest prevalence of alcohol dependence (Gilmore and Atkinson, 2010).

In contrast, a cross-national analysis by Keller and colleagues (2009) purportedly showed that the higher MLDA in the United States does not have a protective effect. The authors drew on survey data collected for the International Study of Heavy Drinking from students ages 17–30 enrolled in postsecondary institutions in the United States and 20 European countries (Dantzer et al., 2006). Heavy drinking was defined for men as having five or more drinks in one sitting at least once in the past 2 weeks, and for women as having four or more drinks. The authors calculated a simple Pearson product-moment correlation of .19 between the countries' MLDAs and their heavy drinking rates; the correlation between the minimum legal purchase ages and the heavy drinking rates was .34. The authors failed to control statistically for country-level factors—for example, the demographic profile for each country's students, the presence of additional laws designed to deter heavy alcohol consumption—and this greatly undermines the value of this study.

Broad national comparisons can be difficult to interpret, given the multiple factors other than the MLDA that affect youth drinking and its negative consequences, including restrictions on alcohol advertising and anti–impaired driving laws (Martinez et al., 2009). More directly on point is the impact of New Zealand's 1999 decision to lower its legal alcohol purchase age from 20 to 18 years. Researchers determined that this policy led to modest increases in drinking among youth ages 18–19 but more sizeable increases among those ages 16–17, who were still legally underage (Huckle et al., 2011). A 2006 study showed that there were significantly more alcohol-related crashes among 15- to 19-year-olds than would have occurred had the law not been changed (Huckle et al., 2006; Kypri et al., 2006), whereas another investigation showed greater numbers of emergency room admissions for severe intoxication (Everitt and Jones, 2002). Not surprisingly, several public opinions polls in New Zealand have shown strong majority public support for going back to a legal alcohol purchase age of 20 (e.g., Davison, 2012). A 2009 poll with 500 respondents showed that 74% agreed that the lower drinking age had a "negative effect on society" (Research New Zealand, 2009).

*Longer term effects of the minimum legal drinking age*

Recent years have seen a growing interest in examining how historical variations in the states' MLDA laws affected

longer term health-related outcomes. New research on this topic was stimulated by the recently initiated debate on the age 21 MLDA, plus extensive literature showing that early age at drinking onset is associated with a host of negative alcohol-related consequences: (a) alcohol dependence (Dawson et al., 2008; Hingson et al., 2006; Hingson and Zha, 2009; Pitkänen et al., 2005), (b) heavy episodic drinking (Hingson and Zha, 2009; LaBrie et al., 2008; Rothman et al., 2008), (c) committing alcohol-related violence (Hingson et al., 2001, 2009), (d) dating violence victimization (Ramisetty-Mikler, et al., 2006), (e) alcohol-related motor vehicle crashes (Hingson et al., 2002), (f) suicide (Birckmayer and Hemenway, 1999), (g) unintentional injury to oneself and others when under the influence of alcohol (Hingson et al., 2009; Hingson and Zha, 2009), (h) using drugs and drug dependence (Hermos et al., 2008; Hingson et al., 2008), (i) having unplanned and unprotected sex (Hingson et al., 2003), and (j) academic and employment problems (Ellickson et al., 2003).

Working with several years of data from the Monitoring the Future surveys, O'Malley and Wagenaar (1991) demonstrated that high school seniors and recent high school graduates drank less when the MLDA was 21 and then continued to do so through their early twenties, after they had reached the legal drinking age. A more recent analysis of Monitoring the Future data by Carpenter and colleagues (2007) found that exposure to an age 18 MLDA was associated with a higher prevalence of youth drinking (2.9 percentage points) and a higher prevalence of heavy drinking (1.7 percentage points). The authors estimated that national adoption of the age 21 MLDA was responsible for decreases in both outcomes of approximately 4%.

Plunk and colleagues (2013) examined data for past-year drinkers born between 1949 and 1972 from the 1991–1992 National Longitudinal Alcohol Epidemiologic Survey (NLAES) and the 2001–2002 National Epidemiologic Survey on Alcohol and Related Conditions (NESARC). They found that respondents who had been exposed to a lower MLDA as minors were more likely to report frequent heavy episodic drinking during the year before their survey interview, while also being less likely to report any past-year moderate drinking. At the same time, MLDA exposure did not affect overall drinking frequency or average alcohol consumption. The authors noted that the results were largely driven by men and those not attending college, perhaps because of alcohol being more readily available to underage college students.

Norberg and colleagues (2009), working with data from the same NLAES and NESARC surveys, showed that adults exposed to an MLDA less than 21 years during the 1970s and 1980s were more likely several decades later to meet criteria for an alcohol use disorder or other drug use disorder, as defined by the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (American Psychiatric

Association, 1994). Their analysis controlled statistically for state and birth-year fixed effects, age at assessment, alcohol tax rates, and other demographic and social background variables. This result did not appear to be mediated by age at drinking initiation, leading the authors to state that their findings are likely explained by the greater frequency and intensity of alcohol consumption among youths exposed to a lower MLDA.

Two studies examined the relationship between MLDA and birth outcomes for young mothers. Fertig and Watson (2009), using data from the National Vital Statistics for 1978–1988, found that an age 18 MLDA was associated with adverse outcomes for mothers ages 14–24, including low birth weight and premature birth, but not with congenital deformities. The effects were strongest for the children of Black women. Interestingly, in states with a lower MLDA, Black mothers were less likely to report paternal information on birth certificates, which the authors speculate may be due to there being more unplanned pregnancies in those states. They also reported that for women ages 18–20, there was a greater prevalence of drinking in the 12 months before childbirth and during the prenatal period when an age 18 MLDA was in effect.

In a similar investigation, Zhang and Caine (2011) looked at the effects of variable MLDAs on birth outcomes for 14-year-old mothers by combining two population-based data sets for the years 1985–2002: the Natality Detailed Files and the Behavioral Risk Factor Surveillance System. The authors reported that a lower MLDA was associated with a higher prevalence of low birth weight, low Apgar scores, and premature births. As also reported by Fertig and Watson (2009), these effects were stronger among children born to Black women compared with those born to White women. For Black women only, the authors reported, exposure to a lower MLDA was associated with a larger proportion of high school dropouts and a greater prevalence of heavy episodic drinking.

Using a similar analysis strategy, Grucza and colleagues (2012) examined data from the U.S. Multiple Cause of Death files for 1990–2004 to identify records for which either suicide or homicide was a contributing cause of death, based on International Classification of Diseases (ICD) codes. To conduct the analysis, the authors assumed that individuals who resided in their birth state at the time of death resided in their birth state when they were between ages 18 and 20. They found an increased risk of both homicide and suicide for adult women who were exposed to a lower MLDA and were legally permitted to drink when they were younger than ages 18–20. This effect only occurred for women born after 1960; the reasons for this finding require further investigation.

Collectively, these studies make clear that a commonly held view that the purpose of the age 21 MLDA is to prevent acute harm among young drinkers should be broadened to

include concerns about the serious long-term negative consequences that could be experienced by adults exposed to a lower MLDA when they are younger than 21 years old.

*Conclusions*

Recent research on the age 21 MLDA has reinforced the position that the current law has served the nation well by reducing alcohol-related traffic crashes and alcohol consumption among youths while also protecting drinkers from long-term negative outcomes they might experience in adulthood, including alcohol and other drug dependence, adverse birth outcomes, and suicide and homicide. The evidence is clear that, absent other policy changes and improved enforcement of the nation's alcohol laws, lowering the legal drinking age would lead to a substantial increase in injuries, deaths, and other negative health-related consequences.

Public interest in the Amethyst Initiative has waned, at least for now, and there is little likelihood of any state implementing a lower MLDA in the near future. A key reason for this outcome was the willingness of public health and traffic safety researchers to engage in the public debate by introducing the research evidence about the age 21 law's impact. Going forward, the role for public health researchers remains the same: to conduct research that evaluates the long-term impact of the age 21 law and addresses each of the arguments that were raised by proponents of a lower legal drinking age. The recent debate over the law should serve as a reminder that researchers should strive to communicate the results of their research to the general public through the news media and other accessible outlets, not just in scholarly journals.

It is important to remember that the age 21 MLDA has been effective even though it is indifferently enforced and widely disobeyed. For that reason, several agencies, including the Federal Trade Commission (2003), the Institute of Medicine (Bonnie and O'Connell, 2004), NIAAA's Task Force on College Drinking (NIAAA, 2002), and the Surgeon General's Office (U.S. Department of Health and Human Services, 2007), have all strongly recommended that there be stricter enforcement of the nation's underage drinking laws. Accordingly, future research should focus on developing and testing cost-efficient enforcement strategies and other programs to boost compliance with the age 21 MLDA, including measures directed at alcohol outlets and parents (Wagenaar et al., 2005).

For their part, college and university leaders need to accept the fact that the age 21 law saves lives and is unlikely to be overturned. With that, they should move on to put into effect workable policies, stricter enforcement, and other evidence-based prevention efforts that have been demonstrated to reduce underage drinking and alcohol-related problems on campus and are being applied successfully at prominent academic institutions (Cronce and Larimer, 2011; DeJong

et al., 2007a; Fairlie et al., 2012; Saltz, 2011; Toomey and Lenk, 2011).

**References**

American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (4th ed.). Washington, DC: Author.
Amethyst Initiative. (2008). *Statement: Rethinking the drinking age.* Washington, DC: Author. Retrieved from http://www.theamethystinitiative.org/statement/
Baer, J. S. (2002). Student factors: Understanding individual variation in college drinking. *Journal of Studies on Alcohol, Supplement 14,* 40–53.
Beccaria, F., & White, H. R. (2012). Underage drinking in Europe and North America. In P. De Witte & M. C. Mitchell, Jr.(Eds.), *Underage drinking: A report on drinking in the second decade of life in Europe and North America* (pp. 21–78). Louvain-la-Neuve, Belgium: Presses Universitaires de Louvain. Retrieved from http://www.abmrf.org/Files/Admin/Pages/Recent_News/Underage%20Drinking%20eBook.pdf
Birckmayer, J., & Hemenway, D. (1999). Minimum-age drinking laws and youth suicide, 1970-1990. *American Journal of Public Health, 89,* 1365–1368.
Bonnie, R. J., & O'Connell, M. E. (Eds.). (2004). *Reducing underage drinking: A collective responsibility.* Washington, DC: National Academies Press.
Brehm, S. S., & Brehm, J. W. (1981). *Psychological reactance: A theory of freedom and control.* San Diego, CA: Academic Press.
Carpenter, C., & Dobkin, C. (2011). The minimum legal drinking age and public health. *Journal of Economic Perspectives, 25,* 133–156.
Carpenter, C. S., Kloska, D. D., O'Malley, P., & Johnston, L. (2007). Alcohol control policies and youth alcohol consumption: Evidence from 28 years of Monitoring the Future. *The B.E. Journal of Economic Analysis & Policy, 7*(1), Article 25. Retrieved from doi:10.2202/1935-1682.1637
Carroll, J. (2007). *Most Americans oppose lowering legal drinking age to 18 nationwide.* Washington, DC: Gallup News Services. Retrieved from http://www.gallup.com/poll/28237/Most-Americans-Oppose-Lowering-Legal-Drinking-Age-Nationwide.aspx
Cronce, J. M., & Larimer, M. E. (2011). Individual-focused approaches to the prevention of college student drinking. *Alcohol Research & Health, 34,* 210–221.
Dantzer, C., Wardle, J., Fuller, R., Pampalone, S. Z., & Steptoe, A. (2006). International study of heavy drinking: Attitudes and sociodemographic factors in university students. *Journal of American College Health, 55,* 83–90.
Davison, I. (2012, July 2). Raise alcohol buying age: Poll. *The New Zealand Herald.* Retrieved from http://www.nzherald.co.nz/nz/news/article.cfm?c_id=1&objectid=10816780
Dawson, D. A., Goldstein, R. B., Chou, S. P., Ruan, W. J., & Grant, B. F. (2008). Age at first drink and the first incidence of adult-onset DSM-IV alcohol use disorders. *Alcoholism: Clinical and Experimental Research, 32,* 2149–2160.
DeJong, W., Anderson, J., Colthurst, T., Davidson, L., Langford, L. M., Mackay-Smith, V. L., . . . Stubbs, H. (2007a). *Experiences in effective prevention: The U.S. Department of Education's Alcohol and Other Drug Prevention Models on College Campuses Grants.* Washington, DC: U.S. Department of Education, Higher Education Center for Alcohol and Other Drug Abuse and Violence Prevention. Retrieved from http://safesupportivelearning.ed.gov/sites/default/files/sssta/20130315_ExperiencesinEffectivePreventionEDAlcoholandOtherDrugPrevention-CampusModels.pdf
DeJong, W., Towvim, L. G., & Schneider, S. K. (2007b). Support for alcohol-control policies and enforcement strategies among US college students at 4-year institutions. *Journal of American College Health, 56,* 231–236.

114          JOURNAL OF STUDIES ON ALCOHOL AND DRUGS / SUPPLEMENT NO. 17, 2014

Ellickson, P. L., Tucker, J. S., & Klein, D. J. (2003). Ten-year prospective study of public health problems associated with early drinking. *Pediatrics, 111,* 949–955.

Everitt, R., & Jones, P. (2002, January 25). Changing the minimum legal drinking age—its effect on a central city emergency department. *New Zealand Medical Journal, 115*(1146), 9–11.

Fairlie, A. M., Erickson, D. J., & Wood, M. D. (2012). Campus and community interventions to reduce alcohol use, abuse, and consequences. In C. J. Correia, J. G. Murphy, & N. P. Barnett (Eds.), *College student alcohol abuse: A guide to assessment, intervention, and prevention.* Hoboken, NJ: John Wiley and Sons.

Federal Trade Commission. (2003). *Alcohol marketing and advertising: A report to Congress.* Washington, DC: Authors.

Fell, J. C. (2008). *An examination of the criticisms of the minimum legal drinking age 21 laws in the United States from a traffic-safety perspective.* Washington, DC: U.S. Department of Transportation, National Highway Transportation Safety Administration.

Fell, J. C., Fisher, D. A., Voas, R. B., Blackman, K., & Tippetts, A. S. (2009). The impact of underage drinking laws on alcohol-related fatal crashes of young drivers. *Alcoholism: Clinical and Experimental Research, 33,* 1208–1219.

Fertig, A. R., & Watson, T. (2009). Minimum drinking age laws and infant health outcomes. *Journal of Health Economics, 28,* 737–747.

Gilmore, I. T., & Atkinson, S. (2010). Evidence to drive policy on alcohol pricing. *The Lancet, 375,* 1322–1324.

Grube, J. W. (2005). *Youth drinking rates and problems: A comparison of European countries and the United States.* Calverton, MD: Pacific Institute for Research and Evaluation, Office of Juvenile Justice Enforcing the Underage Drinking Laws Program.

Grucza, R. A., Hipp, P. R., Norberg, K. E., Rundell, L., Evanoff, A., Cavazos-Rehg, P., & Bierut, L. J. (2012). The legacy of minimum legal drinking age law changes: Long-term effects on suicide and homicide deaths among women. *Alcoholism: Clinical and Experimental Research, 36,* 377–384.

Grucza, R. A., Norberg, K. E., & Bierut, L. J. (2009). Binge drinking among youths and young adults in the United States: 1979-2006. *Journal of the American Academy of Child and Adolescent Psychiatry, 48,* 692–702.

Gruenewald, P. J. (2011). Regulating availability: How access to alcohol affects drinking and problems in youth and adults. *Alcohol Research & Health, 34,* 248–256.

Hermos, J. A., Winter, M. R., Heeren, T. C., & Hingson, R. W. (2008). Early age-of-onset drinking predicts prescription drug misuse among teenagers and young adults: Results from a national survey. *Journal of Addiction Medicine, 2,* 22–30.

Hingson, R., Heeren, T., Levenson, S., Jamanka, A., & Voas, R. (2002). Age of drinking onset, driving after drinking, and involvement in alcohol related motor-vehicle crashes. *Accident Analysis and Prevention, 34,* 85–92.

Hingson, R., Heeren, T., Winter, M. R., & Wechsler, H. (2003). Early age of first drunkenness as a factor in college students' unplanned and unprotected sex attributable to drinking. *Pediatrics, 111,* 34–41.

Hingson, R., Heeren, T., & Zakocs, R. (2001). Age of drinking onset and involvement in physical fights after drinking. *Pediatrics, 108,* 872–877.

Hingson, R. W. (2009). The legal drinking age and underage drinking in the United States. *Archives of Pediatrics & Adolescent Medicine, 163,* 598–600.

Hingson, R. W., Edwards, E. M., Heeren, T., & Rosenbloom, D. (2009). Age of drinking onset and injuries, motor vehicle crashes, and physical fights after drinking and when not drinking. *Alcoholism: Clinical and Experimental Research, 33,* 783–790.

Hingson, R. W., Heeren, T., & Edwards, E. M. (2008). Age at drinking onset, alcohol dependence, and their relation to drug use and dependence, driving under the influence of drugs, and motor-vehicle crash involve-

ment because of drugs. *Journal of Studies on Alcohol and Drugs, 69,* 192–201.

Hingson, R. W., Heeren, T., & Winter, M. R. (2006). Age of alcohol-dependence onset: Associations with severity of dependence and seeking treatment. *Pediatrics, 118,* e755–e763.

Hingson, R. W., & Zha, W. (2009). Age of drinking onset, alcohol use disorders, frequent heavy drinking, and unintentionally injuring oneself and others after drinking. *Pediatrics, 123,* 1477–1484.

Huckle, T., Pledger, M., & Casswell, S. (2006). Trends in alcohol-related harms and offences in a liberalized alcohol environment. *Addiction, 101,* 232–240.

Huckle, T., You, R. Q., & Casswell, S. (2011). Increases in quantities consumed in drinking occasions in New Zealand 1995-2004. *Drug and Alcohol Review, 30,* 366–371.

Johnston, L. D., O'Malley, P. M., Bachman, J. G., & Schulenberg, J. E. (2012a). *Monitoring the Future national survey results on drug use, 1975-2011 Volume I: Secondary school students.* Ann Arbor, MI: Institute for Social Research, The University of Michigan.

Johnston, L. D., O'Malley, P. M., Bachman, J. G., & Schulenberg, J. E. (2012b). *Monitoring the Future national survey results on drug use, 1975-2011. Volume II: College students and adults ages 19-50.* Ann Arbor, MI: Institute for Social Research, The University of Michigan.

Keller, A., Frye, L., Bauerle, J., & Turner, J. C. (2009). Legal ages for purchase and consumption of alcohol and heavy drinking among college students in Canada, Europe, and the United States. *Substance Abuse, 30,* 248–252.

Kindelberger, J. (2005). *Calculating lives saved due to minimum drinking age laws—Traffic Safety Facts Research Note* (DOT HS 809 860). Washington, DC: National Highway Transportation Safety Administration, National Center for Statistics and Analysis. Retrieved from http://www-nrd.nhtsa.dot.gov/Pubs/809860.pdf

Knapp, L. G., Kelly-Reid, J. E., & Ginder, S. A. (2012). *Enrollment in postsecondary institutions, fall 2010; financial statistics, fiscal year 2010; and graduation rates, selected Cohorts, 2002–07* (NCES 2012-280). Washington, DC: U.S. Department of Education, National Center for Education Statistics. Retrieved from http://nces.ed.gov/pubsearch

Kuntsche, E., Knibbe, R., Gmel, G., & Engels, R. (2005). Why do young people drink? A review of drinking motives. *Clinical Psychology Review, 25,* 841–861.

Kypri, K., Voas, R. B., Langley, J. D., Stephenson, S. C. R., Begg, D. J., Tippetts, A. S., & Davie, G. S. (2006). Minimum purchasing age for alcohol and traffic crash injuries among 15- to 19-year-olds in New Zealand. *American Journal of Public Health, 96,* 126–131.

LaBrie, J. W., Rodrigues, A., Schiffman, J., & Tawalbeh, S. (2008). Early alcohol initiation increases risk related to drinking among college students. *Journal of Child & Adolescent Substance Abuse, 17,* 125–141.

Lerner, B. H. (2011). *One for the road: Drunk driving since 1900.* Baltimore, MD: The Johns Hopkins University Press.

Lovenheim, M. F., & Slemrod, J. (2010). The fatal toll of driving to drink: The effect of minimum legal drinking age evasion on traffic fatalities. *Journal of Health Economics, 29,* 62–77.

Martinez, J. A., Muñoz García, M. A., & Sher, K. J. (2009). A new minimum legal drinking age (MLDA)? Some findings to inform the debate. *Addictive Behaviors, 34,* 407–410.

McCardell, J. M. (2004, September 13). What your college president didn't tell you. *The New York Times,* Section A, p. 23.

McCardell, J. M. (2006). *The effects of the 21 year old drinking age: A white paper.* Middlebury, VT: Choose Responsibility.

McCartt, A. T., Hellinga, L. A., & Kirley, B. B. (2010). The effects of minimum legal drinking age 21 laws on alcohol-related driving in the United States. *Journal of Safety Research, 41,* 173–181.

Miron, J. A., & Tetelbaum, E. (2009). Does the minimum legal drinking age save lives? *Economic Inquiry, 47,* 317–336.

Mothers Against Drunk Driving (2005). The 21 law comes of age. *Driven* (Spring), 3. Retrieved from www.matthewkatofoundation.org/ssl/DRIVEN-Spring-05.pdf

National Highway Traffic Safety Administration. (2009). *Lives saved in 2008 by restraint use and minimum drinking age laws* (DOT HS 811 153). Washington, DC: Author.

National Institute on Alcohol Abuse and Alcoholism, Task Force of the National Advisory Council on Alcohol Abuse and Alcoholism. (2002). *A call to action: Changing the culture of drinking at U.S. colleges.* Bethesda, MD: Author.

National Institute on Alcohol Abuse and Alcoholism. (2013). *Alcohol Policy Information System (APIS).* Bethesda, MD: Author. Retrieved from http://alcoholpolicy.niaaa.nih.gov/

National Minimum Drinking Age Act of 1984, 23 U.S.C. § 158 (1984).

Nationwide Mutual Insurance Company. (2008). *2008 Nationwide Insurance underage drinking survey results.* Columbus, OH: Author. Retrieved from http://static.nationwide.com/pdf/nw-bingedrinking-survey-results-final.pdf

Norberg, K. E., Bierut, L. J., & Grucza, R. A. (2009). Long-term effects of minimum drinking age laws on past-year alcohol and drug use disorders. *Alcoholism: Clinical and Experimental Research, 33,* 2180–2190.

O'Malley, P. M., & Wagenaar, A. C. (1991). Effects of minimum drinking age laws on alcohol use, related behaviors and traffic crash involvement among American youth: 1976-1987. *Journal of Studies on Alcohol, 52,* 478–491.

Pitkänen, T., Lyyra, A.-L., & Pulkkinen, L. (2005). Age of onset of drinking and the use of alcohol in adulthood: A follow-up study from age 8-42 for females and males. *Addiction, 100,* 652–661.

Plunk, A. D., Cavazaos-Rehg, P., Bierut, L. J., & Grucza, R. A. (2013). The persistent effects of minimum legal drinking age laws on drinking patterns later in life. *Alcoholism: Clinical and Experimental Research, 37,* 463–469.

Ponicki, W. R., Gruenewald, P. J., & LaScala, E. A. (2007). Joint impacts of minimum legal drinking age and beer taxes on US youth traffic fatalities, 1975 to 2001. *Alcoholism: Clinical and Experimental Research, 31,* 804–813.

Ramisetty-Mikler, S., Goebert, D., Nishimura, S., & Caetano, R. (2006). Dating violence victimization: Associated drinking and sexual risk behaviors of Asian, Native Hawaiian, and Caucasian high school students in Hawaii. *Journal of School Health, 76,* 423–429.

Research New Zealand. (2009, October 12). *Media release: Majority think lowering drinking age has been bad for New Zealand.* Wellington, NZ: Author. Retrieved from http://www.researchnz.com/pdf/Media%20Releases/RNZ%20Media%20Release%20-%2012-10-09%20Alcohol%20poll.pdf

Rothman, E. F., DeJong, W., Palfai, T., & Saitz, R. (2008). Relationship of age of first drink to alcohol-related consequences among college students with unhealthy alcohol use. *Substance Abuse, 29,* 33–41.

Saltz, R. F. (2011). Environmental approaches to prevention in college settings. *Alcohol Research & Health, 34,* 204–209.

Saylor, D. K. (2011). Heavy drinking on college campuses: No reason to change minimum legal drinking age of 21. *Journal of American College Health, 59,* 330–333.

Shults, R. A., Elder, R. W., Sleet, D. A., Nichols, J. L., Alao, M. O., Carande-Kulis, V. G., . . . Thompson, R. S., & the Task Force on Community Preventive Services. (2001). Reviews of evidence regarding interventions to reduce alcohol-impaired driving. *American Journal of Preventive Medicine, 21, Supplement 1,* 66–88.

Toomey, T. L., & Lenk, K. M. (2011). A review of environmental-based community interventions. *Alcohol Research & Health, 34,* 163–166.

Toomey, T. L., Nelson, T. F., & Lenk, K. M. (2009). The age-21 minimum legal drinking age: A case study linking past and current debates. *Addiction, 104,* 1958–1965.

U.S. Department of Health and Human Services. (2007). *The Surgeon General's call to action to prevent and reduce underage drinking.* Washington, DC: Author.

Voas, R. B., & Fell, J. C. (2012). Commentary on Fitzpatrick and colleagues (2012): Forecasting the effect of the amethyst initiative on college drinking. *Alcoholism: Clinical and Experimental Research, 36,* 1479–1482.

Wagenaar, A. C., & Toomey, T. L. (2002). Effects of minimum drinking age laws: Review and analyses of the literature from 1960 to 2000. *Journal of Studies on Alcohol, Supplement 14,* 206–225.

Wagenaar, A. C., Toomey, T. L., & Erickson, D. J. (2005). Preventing youth access to alcohol: Outcomes from a multi-community time-series trial. *Addiction, 100,* 335–345.

Wechsler, H., & Nelson, T. F. (2010). Will increasing alcohol availability by lowering the minimum legal drinking age decrease drinking and related consequences among youths? *American Journal of Public Health, 100,* 986–992.

Zhang, N., & Caine, E. (2011). Alcohol policy, social context, and infant health: The impact of minimum legal drinking age. *International Journal of Environmental Research and Public Health, 8,* 3796–3809.

View publication stats

# Exhibit II

Study Supports Raising Tobacco-Purchase Age to 21 - WSJ

Subscribe | Sign In

Home   World   U.S.   Politics   Economy   Business   Tech   Markets   Opinion   Life & Arts   Real Estate   WSJ. Magazine

DOW JONES, A NEWS CORP COMPANY

DJIA 19173.98  4.55% ▼   Nasdaq 6879.52  3.79% ▼   U.S. 10 Yr 0/32 Yield  1.123% ▼   Crude Oil 23.64  4.46% ▲   Euro 1.0716  0.18% ▲

SHARE

U.S.

# Study Supports Raising Tobacco-Purchase Age to 21

Congress-mandated report says raising age from 18 will cut number of 15- to 17-year-olds who start smoking

*By Tripp Mickle*

Updated March 12, 2015 7:41 pm ET

PRINT

A government-commissioned study supports increasing the tobacco purchase age to 21 from 18, saying it would decrease early deaths, cut low birth weights and "substantially" reduce the number of 15- to 17-year-olds who begin smoking.

Only Congress, which required that the U.S. Food and Drug Administration commission the report, has the power to increase the tobacco purchase age nationally. States and cities can raise the age in their jurisdictions.



A new study finds that raising the tobacco purchase age to 21 from 18 could impact the rate of teenagers who take up smoking. WSJ's Tripp Mickle reports. Photo: AP

The report by a panel at the independent Institute of Medicine examined the impact of increasing the age to 19 on teenagers. The committee also looked at how raising the age to 21 would affect 18- to

1 of 3

SER-489

20-year-olds, and how boosting it to 25 would affect 21- to 25-year-olds.

It concluded that increasing the age above 18 would most affect 15- to 17-year-olds, and found the impact of increasing the age to 21 "would be substantially higher than…19," but the impact of raising it beyond 21 would be "considerably smaller."

The report adds momentum to a state and local grass-roots movement to raise the legal age for buying cigarettes and other tobacco products to 21, a trend that poses a serious challenge for the $100 billion U.S. tobacco industry.

Raising the age would immediately deprive the industry of as much as 2% of sales, according to an estimate published last year in the American Journal of Public Health by Jonathan Winickoff, associate professor of pediatrics at Harvard Medical School.

Tobacco companies differed in their reactions to the report. Marlboro-maker Altria Group Inc. said Thursday that local governments should let the FDA and Congress weigh in before changing age limits. Newport-maker Lorillard said it supports current minimum age laws. Camel-maker Reynolds American Inc. said it would leave the minimum age up to city, state and federal authorities. In a statement, Reynolds American said, "We are opposed to youth use of tobacco and agree that the minimum age of purchase is an important issue for discussion."

Several cities recently raised the minimum purchase age to 21, including New York, Evanston, Ill., and Columbia, Mo., as did about 50 towns in Massachusetts. The majority of states have set the minimum age for tobacco purchases at 18. Four states have it at 19. The restrictions typically apply to all tobacco products, including cigars, moist snuff and electronic cigarettes.

The Institute of Medicine report estimates that increasing the tobacco purchase age to 21 would eventually reduce the number of Americans who smoke by 12% and result in 249,000 fewer premature deaths related to cigarette smoking for people born between 2000 and 2019. It also would result in about 286,000 fewer pre-term births and 438,000 fewer babies born with low birth weights.

"We hope and expect there will be substantial consideration at the state and local level of the findings of this report," said Richard Bonnie, the chairman of the Institute of Medicine committee and a University of Virginia School of Law professor.

An estimated 42 million Americans smoke. About 16% of high-school students reported smoking a cigarette in the 30 days prior to a 2013

## Most Popular Videos

1. More Than 195,000 People Have Been Tested for Coronavirus in the U.S.


2. Lockdowns and Spray-Downs: Do Measures Against Coronavirus Work?


3. How the New Coronavirus Became a Global Pandemic


4. Coronavirus Update: California Lockdown, $1,200 Checks, Walmart Hires


5. New York Drafting Hospital Guidelines on Possible Ventilator Rationing


## Most Popular Articles

1. A Guide to State Coronavirus Lockdowns


2. Opinion: Rethinking the Coronavirus Shutdown


3. Coronavirus Patient Recounts Coming 'One Inch From Death'


4. The Worst of the Selloff Isn't Here Yet, Banks and Investors Warn


5. Jails Release Prisoners, Fearing Coronavirus Outbreak


2 of 3

survey by the Centers for Disease Control and Prevention. The number
of high-school smokers is a record low, down from 19.5% in 2009 and
35% in 1999.

Increasing the legal age would help disrupt cigarette use before it
becomes ingrained as an adult habit. Nearly nine out of 10 smokers
first light up by age 18, and 99% start by 26, according to a 2012 report
by the U.S. Surgeon General. About two-thirds of smokers start lighting
up daily before 18, and it appears to take less nicotine for teenagers to
become addicted, compared with adults, the Surgeon General's report
added.

"Right now, with 18 as the age, a 16-year old could easily come into
contact with an 18-year old, but they're much less likely to come into
contact with a 21-year old," said Robin Mermelstein, a committee
member and psychology professor at the University of Illinois, Chicago.



A study found that raising the tobacco purchase age to 21 would
'substantially' reduce the number of 15- to 17-year-olds who start smoking.
PHOTO: ASSOCIATED PRESS

More than 70% of Americans and 58% of current smokers support
raising the purchase age to 21, according to a study published last
month in the peer-reviewed journal Tobacco Control. It was the first
study to examine Americans' appetite for changing the status quo. The
majority said it was important that teens never experiment with tobacco.

The Institute of Medicine report opened with a quote from Goethe:
"Knowing is not enough; we must apply. Willing is not enough; we must
do."

Write to Tripp Mickle at Tripp.Mickle@wsj.com

3 of 3

**SER-491**

# Exhibit JJ

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-4, Page 37 of 290

Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products
Case 3:19-cv-05106-RBL   Document 94-4   Filed 03/31/20   Page 76 of 165

# Public Health Implications of
# Raising the Minimum Age
## of Legal Access to
# Tobacco Products

Committee on the Public Health Implications of
Raising the Minimum Age for Purchasing Tobacco Products

Board on Population Health and Public Health Practice

Richard J. Bonnie, Kathleen Stratton, and Leslie Y. Kwan, *Editors*

INSTITUTE OF MEDICINE
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright © National Academy of Sciences. All rights reserved.

THE NATIONAL ACADEMIES PRESS  500 Fifth Street, NW  Washington, DC 20001

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This study was supported by Contract/Grant No. HHSF22301031T between the National Academy of Sciences and the Department of Health and Human Services: Food and Drug Administration. Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the authors and do not necessarily reflect the views of the organizations or agencies that provided support for the project.

International Standard Book Number 13:   978-0-309-31624-8
International Standard Book Number-10:   0-309-31624-3
Library of Congress Catalog Card Number:   2015942038

Additional copies of this report are available for sale from the National Academies Press, 500 Fifth Street, NW, Keck 360, Washington, DC 20001; (800) 624-6242 or (202) 334-3313; http://www.nap.edu.

For more information about the Institute of Medicine, visit the IOM home page at: **www.iom.edu.**

Copyright 2015 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

The serpent has been a symbol of long life, healing, and knowledge among almost all cultures and religions since the beginning of recorded history. The serpent adopted as a logotype by the Institute of Medicine is a relief carving from ancient Greece, now held by the Staatliche Museen in Berlin.

Suggested citation: IOM (Institute of Medicine). 2015. *Public health implications of raising the minimum age of legal access to tobacco products.* Washington, DC: The National Academies Press.

*"Knowing is not enough; we must apply.*
*Willing is not enough; we must do."*

—Goethe



# INSTITUTE OF MEDICINE
## *OF THE NATIONAL ACADEMIES*

## Advising the Nation. Improving Health.

Copyright © National Academy of Sciences. All rights reserved.

Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products

# THE NATIONAL ACADEMIES

*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. C. D. Mote, Jr., is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Victor J. Dzau is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. C. D. Mote, Jr., are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

Copyright © National Academy of Sciences. All rights reserved.

## COMMITTEE ON THE PUBLIC HEALTH
## IMPLICATIONS OF RAISING THE MINIMUM AGE
## FOR PURCHASING TOBACCO PRODUCTS

**RICHARD J. BONNIE** (*Chair*), Harrison Foundation Professor of Medicine and Law, Professor of Psychiatry and Neurobehavioral Sciences, Director of the Institute of Law, Psychiatry, and Public Policy, University of Virginia

**ANTHONY J. ALBERG,** Blatt Ness Distinguished Endowed Chair in Oncology, Professor, Public Health Sciences, Interim Director of Hollings Cancer Center, Medical University of South Carolina

**REGINA BENJAMIN,** NOLA.com/Times Picayune Endowed Chair in Public Health Sciences, Xavier University, New Orleans

**JONATHAN CAULKINS,** Professor, Operations Research and Public Health Policy, Heinz College of Public Policy and Management, Operations Research Department, Carnegie Mellon University

**BONNIE HALPERN-FELSHER,** Professor, Department of Pediatrics, Director of Research, Associate Director of Adolescent Medicine Fellowship Program, Division of Adolescent Medicine, Stanford University

**SWANNIE JETT,** Executive Director, Florida Department of Health in Seminole County

**HARLAN JUSTER,** Director, Bureau of Tobacco Control, New York State Department of Health

**JONATHAN D. KLEIN,** Associate Executive Director, Julius B. Richmond Center of Excellence for Children and Secondhand Smoke, American Academy of Pediatrics

**PAULA M. LANTZ,** Professor and Chair, Department of Health Policy and Management, Milken Institute School of Public Health, George Washington University

**ROBIN MERMELSTEIN,** Director of the Institute for Health Research and Policy, Professor of Psychology, Clinical Professor of Community Health Sciences, School of Public Health, University of Illinois, Chicago

**RAFAEL MEZA,** Assistant Professor, Department of Epidemiology, University of Michigan

**PATRICK O'MALLEY,** Research Professor, Institute for Social Research, University of Michigan

**KIMBERLY THOMPSON,** Professor of Preventive Medicine and Global Health, University of Central Florida College of Medicine, President, Kid Risk, Inc.

*v*

Copyright © National Academy of Sciences. All rights reserved.

*Consultants*

**THEODORE R. HOLFORD,** Susan Dwight Bliss Professor of Public Health (Biostatistics) and Professor of Statistics, Yale School of Medicine, Yale University

**DAVID T. LEVY,** Professor, Lombardi Comprehensive Cancer Center, Georgetown University Medical Center

**MARIA RODITIS,** Postdoctoral Research Fellow, Adolescent Medicine, Division of Adolescent Medicine, Department of Pediatrics, Stanford University

*IOM Staff*

**KATHLEEN STRATTON,** Study Director
**LESLIE Y. KWAN,** Research Associate
**BETTINA RITTER,** Research Assistant
**ANNA MARTIN,** Senior Program Assistant
**DORIS ROMERO,** Financial Associate
**ROSE MARIE MARTINEZ,** Senior Board Director, Board on Population Health and Public Health Practice

*vi*

Copyright © National Academy of Sciences. All rights reserved.

# Reviewers

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise, in accordance with procedures approved by the National Research Council's Report Review Committee. The purpose of this independent review is to provide candid and critical comments that will assist the institution in making its published report as sound as possible and to ensure that the report meets institutional standards for objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the deliberative process. We wish to thank the following individuals for their review of this report:

**ANNETTE M. BACHAND,** Colorado State University
**SANJAY BASU,** Stanford Prevention Research Center
**CHRISTINE DELNEVO,** Rutgers School of Public Health
**EDWARD EHLINGER,** Minnesota Department of Health
**MICHAEL P. ERIKSEN,** Georgia State University
**THOMAS J. GLYNN,** Stanford University and American Cancer Society
**STEVEN A. SCHROEDER,** University of California, San Francisco
**JOSHUA M. SHARFSTEIN,** Maryland Department of Health and Mental Hygiene
**LAURENCE STEINBERG,** Temple University
**JENNIFER IRVIN VIDRINE,** University of Texas MD Anderson Cancer Center

*vii*

Copyright © National Academy of Sciences. All rights reserved.

*viii*                                                                 REVIEWERS

**KENNETH W. WACHTER,** University of California, Berkeley
**ALEXANDER C. WAGENAAR,** University of Florida

Although the reviewers listed above have provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations, nor did they see the final draft of the report before its release. The review of this report was overseen by **SUSAN J. CURRY,** University of Iowa, and **RONALD S. BROOKMEYER,** University of California, Los Angeles. Appointed by the National Research Council and the Institute of Medicine, they were responsible for making certain that an independent examination of this report was carried out in accordance with institutional procedures and that all review comments were carefully considered. Responsibility for the final content of this report rests entirely with the authoring committee and the institution.

Copyright © National Academy of Sciences. All rights reserved.

# Preface

The Surgeon General's clarion call in 1964 for "appropriate remedial action" to address the hazards of smoking is often credited with having launched the nation's public health campaign against cigarettes. Effective federal action was impeded for more than three decades by a symbolic congressional action in 1965 mandating weak package warnings and then by the regressive decision by Congress in 1969 to preempt the states from regulating tobacco advertising "based on smoking and health." The 1969 legislation also banned tobacco advertising on television and thereby erased the country's first major tobacco control initiative—the hugely significant ruling by the Federal Communications Commission that broadcasters who aired tobacco advertisements were required by the agency's fairness doctrine to make time available for antismoking messages.

Attention then shifted to the states, largely driven by a grassroots movement for public smoking restrictions. The campaign was given major boosts by an important Surgeon General report emphasizing the addictive properties of nicotine (1988) and an Environmental Protection Agency report on the environmental hazards of tobacco smoke (1992). Another key building block of contemporary tobacco control was the initiative aiming to reduce youth smoking spearheaded by Congressman Mike Synar in 1992. The Synar Amendment requires states to enact and enforce youth access restrictions or else forfeit 40 percent of their block grants for substance abuse prevention and treatment. Within 2 years, the Synar Amendment was followed by two major reports by the Surgeon General and by the Institute of Medicine (IOM) on preventing the onset of nicotine addiction in adolescents and by a rhetorically and politically important initiative by Food and

*ix*

Copyright © National Academy of Sciences. All rights reserved.

*x*                                                              *PREFACE*

Drug Administration (FDA) Commissioner David Kessler characterizing nicotine addiction as a "pediatric disease." Despite some dissension within the ranks of tobacco control advocacy, preventing youth initiation took its place as one of the core strategic components of tobacco control.

The campaign against secondhand tobacco smoke and the new focus on child protection and the prevention of addiction played pivotal roles in the gradual evolution of public support for aggressive tobacco control in the 1990s. The cause of tobacco control was also fundamentally accelerated by the emerging evidence that cigarettes have been engineered to be addictive and by the public distaste for industry advertising campaigns that seemed so obviously targeted at children and adolescents. In 1995, as the policy context for tobacco control rapidly evolved, FDA announced its innovative initiative to declare jurisdiction over cigarettes as "nicotine delivery devices" and its intention to develop a new rule aiming to reduce youth smoking. FDA's proposed rule included limitations on advertising and promotion as well as federal restrictions on youth access. Although the age of access in FDA's regulation was 18, the agency considered setting the minimum age at 21. Whatever the reasoning within FDA may have been, the consensus within the IOM committee that authored the 1994 report on youth smoking was that setting the age at 21 was too large a leap for reform in a political and social context in which existing youth access restrictions were largely unenforced and cigarettes were easily available to children old enough to put coins in a vending machine.

FDA's Tobacco Rule was proposed in 1995, promulgated in 1996, and invalidated by the Supreme Court in 2000. However, momentum for aggressive tobacco control continued to build throughout this period. The state attorney generals' lawsuits against the tobacco companies to recover Medicaid costs attributable to smoking—and the accompanying disclosures of industry documents—led to the Master Settlement Agreement in 1998 and to aborted negotiations regarding federal tobacco regulation. Meanwhile, social norms toward smoking have been transformed, prevalence has gradually declined, more reports on tobacco have been issued by the IOM and by Surgeons General, and the Family Smoking Prevention and Tobacco Control Act was enacted in 2009. Tobacco advocates have begun to focus on the "end game" for cigarette smoking.

It is in this context that Congress directed FDA in the Tobacco Control Act to commission a report on the public health implications of raising the minimum age of legal access to tobacco products. Many states and localities are considering proposals to raise the age, and some have already done so. In light of the extraordinary momentum achieved by tobacco control advocacy over the past three decades, talking about raising the age of youth access may seem anticlimactic. However, cigarette smoking is a stubborn and costly public health problem, and the tobacco industry is resourceful

Copyright © National Academy of Sciences. All rights reserved.

Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products

*PREFACE*                                                                    *xi*

and creative. Adult prevalence remains about 18 percent, and smoking-related deaths approach 480,000 per year.

Although initiation rates have been dropping in recent years, history shows that they can reverse course just as easily. And investments in tobacco control tend to erode whenever the economy weakens. The development and marketing of new products is a wild card in the epidemiology of tobacco use. E-cigarettes and modified-risk tobacco products may eventually reduce the prevalence of cigarette smoking, but it is also possible that these products could serve as starter products for people who would not otherwise have begun smoking cigarettes and could also reduce incentives for cessation by addicted smokers who otherwise would have quit. Bringing these products within FDA's regulatory jurisdiction is imperative.

Vigilance is always advisable in tobacco control. It is prudent for federal policy makers and state and local authorities to strengthen all policies aimed at reducing the initiation of smoking, including the design and enforcement of youth access restrictions. The minimum age of legal access to tobacco products was set at 18 by the states more than two decades ago in response to federal incentives and is now required by federal law. However, states and localities remain free to raise the age. By assessing the public health implications of raising the minimum age, this report aims to provide the scientific guidance the states and localities need. In return, I urge states and localities that decide to raise the age to make sure that the necessary data are collected to evaluate the new policy in achieving its ultimate goal—the reduction and eventual elimination of tobacco use by children and youth.

Richard J. Bonnie, *Chair*
Committee on the Public Health
Implications of Raising the Minimum
Age for Purchasing Tobacco Products

Copyright © National Academy of Sciences. All rights reserved.

# Contents

**SUMMARY**                                                                    **1**

    Statement of Task, 1

      Interpreting the Statement of Task, 2

    Adolescent and Young Adult Developmental Trajectories and
        Patterns of Tobacco Use, 3

    Current Practices Regarding Youth Access Restrictions, 3

    Effects of Raising the MLA on Tobacco Use, 4

      Adolescents Less Than 18 Years of Age, 5

      Young Adults 18 to 20 Years of Age, 7

      Young Adults 21 to 24 Years of Age, 7

    Health Effects of Raising the MLA, 8

    Considerations for Policy Makers, 10

    References, 12

**1   INTRODUCTION**                                                          **15**

    Tobacco Use in Adolescents and Young Adults, 16

    High-Risk Populations, 17

    Brief History of Tobacco Control, 17

    Statement of Task, 19

      Interpreting the Statement of Task, 22

      Use of Models in This Report, 23

    Outline of the Report, 25

    References, 25

*xv*

Copyright © National Academy of Sciences. All rights reserved.

**2   PATTERNS OF TOBACCO USE BY ADOLESCENTS AND
    YOUNG ADULTS                                               31**
    Prevalence of Cigarette Smoking, 31
        Socioeconomic Status, 34
    Geographic Variation, 36
        Metropolitan Status, 40
    Other Individual Risk Factors for Tobacco Use, 41
        Mental Illness, 41
        Sexual Orientation, 41
    Initiation, 41
        A Note on the Definition of Initiation, 42
    Smoking Intensity, 46
        Emerging Patterns, 48
    Other Tobacco Products, 48
    Patterns of Use and Progression of Nicotine Dependence, 52
        Age of Initiation and Smoking Intensity, 55
        Age of Initiation and Continued Smoking, 55
    Tobacco Cessation Among Adolescents and Young Adults, 56
    References, 58

**3   THE DEVELOPMENTAL AND ENVIRONMENTAL CONTEXT
    OF ADOLESCENT AND YOUNG ADULT TOBACCO USE      63**
    Cognitive, Psychosocial, and Biological Development in
        Adolescents and Young Adults, 64
        Cognitive Development, 64
        Psychosocial Development, 66
        Biological Development of Adolescents and Young Adults, 72
    Tobacco-Related Decision Making by Adolescents and Young
        Adults, 79
    Tobacco Industry Targeting Adolescents and Young Adults, 80
    Implications, 82
    References, 83

**4   THE EFFECTS OF TOBACCO USE ON HEALTH            91**
    Time Horizon for the Health Effects of Cigarette Smoking, 92
    Spectrum of Health Effects, 92
    Morbidity, 96
        Immediate Health Effects, 96
        Intermediate-Term Effects on Morbidity, 102
        Long-Term Morbidity, 106
        Maternal/Fetal and Infancy Health Effects, 108
        Age of Initiation and Health Outcomes, 111
        Other Tobacco Products and Sources of Exposure, 113

Copyright © National Academy of Sciences. All rights reserved.

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-4, Page 50 of 290

Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products
Case 3:19-cv-05106-RBL   Document 94-4   Filed 03/31/20   Page 89 of 165

CONTENTS                                                                          *xvii*

Impact of Cigarette Smoking on Mortality, 121
    Cancer, 122
    Cardiovascular Disease, 122
    Diabetes, 122
    COPD, 122
    Increased Susceptibility to Infectious Lung Diseases, 123
Impact of Exposure to Secondhand Smoke on Mortality, 123
References, 123


**5   RESTRICTIONS ON YOUTH ACCESS TO TOBACCO
     PRODUCTS                                                              129**
Youth Tobacco Access Laws in the United States, 129
    Federal Youth Tobacco Access Laws, 129
    State and Local Youth Access Laws, 132
Enforcement of Youth Access Laws, 133
    Enforcing Restrictions Against Licensed Retailers, 134
    Enforcing Restrictions Against Internet Sellers, 138
    Enforcing Restrictions Against Non-Licensed Sellers and
        Social Distributors, 139
    Summary, 140
Sources of Cigarettes for Underage Individuals, 140
References, 151


**6   EVIDENCE ON THE EFFECTS OF YOUTH ACCESS
     RESTRICTIONS                                                          155**
The Impact of Enacting or Raising the Minimum Legal Age to
        Purchase Tobacco Products, 156
Lessons from Alcohol, 158
    Summary, 161
A Logic Model for Predicting the Effects of an MLA, 161
    Declarative Effects and Deterrent Effects of Legal Restrictions, 162
    Reducing Availability by Increasing Search-Time Costs, 163
    Penalties for Users, 165
    Measures of Availability, 165
    The Tobacco Control Context, 167
Effects of Retailer Interventions on Access to and Use of
        Tobacco, 167
    Effect of Retail Enforcement and Other Interventions on
        Retailer Compliance, 167
    Relationship Between Retail Interventions and Underage
        Tobacco Use, 170
    Relationship Between Retail Interventions and Perceived
        Availability, 173
    Summary, 175

Copyright © National Academy of Sciences. All rights reserved.

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-4, Page 51 of 290

Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products
Case 3:19-cv-05106-RBL   Document 94-4   Filed 03/31/20   Page 90 of 165

*xviii*                                                                                   CONTENTS

Underage Access Restrictions in the Context of Other
    Tobacco Control Policies, 176
   Multiple Statewide Retailer Interventions and Underage
      Tobacco Consumption, 177
   Comprehensive Tobacco Control Policies and Underage
      Tobacco Consumption, 178
   Summary, 179
Tobacco Purchase, Use, and Possession Laws, 180
Summary, 182
References, 183

7   **THE EFFECT ON TOBACCO USE OF RAISING THE
    MINIMUM AGE OF LEGAL ACCESS TO TOBACCO
    PRODUCTS**                                                          193
Methods, 193
Rationale for Expected Impact of Raising the Minimum Age of
    Legal Access on Initiation of Tobacco Use, 195
   Adolescents Less Than 15 Years of Age, 197
   Adolescents 15 to 17 Years of Age, 198
   Young Adults 18 to 20 Years of Age, 199
   Young Adults 21 to 24 Years of Age, 199
   Rebound, 200
   Intensity, 200
   Summary of Committee Estimates and Conclusions of the
      Likely Effects of Raising the MLA on Tobacco Use
      Initiation, 201
Estimated Initiation Effect Sizes, 204
Modeling, 205
   Effects of Raising the MLA on Smoking Initiation, 208
   Smoking Prevalence, 209
References, 216

8   **HEALTH BENEFITS OF RAISING THE MINIMUM AGE OF
    LEGAL ACCESS TO TOBACCO PRODUCTS**                                  219
Premature Deaths Prevented, 219
Lung Cancer Deaths, 227
Maternal and Child Health Outcomes, 229
Time to Accrue Benefits, 232
Other Health Effects, 232
   Immediate Health Effects, 233
   Intermediate Health Effects, 234
   Long-Term Health Effects, 235

Copyright © National Academy of Sciences. All rights reserved.

*CONTENTS* *xix*

Implications of Raising the Minimum Age of Legal Access to
Tobacco Products on Health, 237
References, 240

**9    OTHER CONSIDERATIONS FOR POLICY MAKERS    241**
National or State Enactment of MLA, 242
Effects of Other Tobacco Control Policies, 243
Scope and Enforcement of MLA Restrictions, 245
    Enforcement Against Retailers, 245
    Enforcement Against Social Sources, 248
    Black Market Supply to Adolescents and Young Adults, 249
    Enforcement of PUP Restrictions, 249
Adolescent Development and the MLA for Tobacco, 251
Possible Public Health Effects of New Tobacco Products, 254
Possible Effects of Raising the Tobacco MLA on Use of
    Alcohol and Other Drugs, 256
Concluding Remarks, 258
References, 259

**APPENDIXES**
A   State and Local Laws on the Minimum Age of Legal Access to
    Tobacco Products                                          265
B   State Laws—Tobacco Transfers to Minors                    287
C   State Laws—Tobacco Purchase–Use–Possession by Minors      315
D   Supplemental Information About the Models                 327
E   Open Meeting Agendas                                      369
F   Committee Biographical Sketches                           373

Copyright © National Academy of Sciences. All rights reserved.

# 6

# Evidence on the Effects of Youth Access Restrictions

Ultimately, the salient policy question concerning the minimum age of legal access to tobacco products (MLA) is whether and to what extent raising the MLA would reduce underage tobacco use. Although several U.S. localities have raised the MLA to 19 and 21 years, most of these actions have been done only very recently, and to date none has been systematically evaluated.[1] Furthermore, there have been only a handful of natural experiments in which the MLA for tobacco has been raised to 16 or 18, and they have taken place in other countries. Indeed, most of the relevant literature pertains not to raising the MLA but rather to enforcing an existing MLA more stringently. Therefore, conclusions about raising the MLA to ages higher than 18 must be extrapolated from review of other evidence on MLA laws and their enforcement as well as from analogous policy interventions.

To address the question whether and to what extent raising the MLA would reduce underage tobacco use, this chapter first reviews the limited international studies investigating the effect of raising the MLA for tobacco and then reviews evidence relating to the effects of raising the minimum legal drinking age for alcohol as an analogous policy intervention in a parallel domain. The remainder of the chapter reviews the body of literature

---

[1] Although Needham, Massachusetts, the first jurisdiction in the United States to raise the MLA to 21, has been cited as having seen significant declines in tobacco use and tobacco-related disease, there are no published data on these outcomes. In addition, the little available data that exist (EDC, 2010a,b; NPHD, 2008, 2012) have no baseline measurements and are confounded by the presence of other tobacco control measures that occurred in the town and throughout the state of Massachusetts at the same time the MLA was increased.

Copyright © National Academy of Sciences. All rights reserved.

182                 *MINIMUM AGE OF LEGAL ACCESS TO TOBACCO PRODUCTS*

adolescents smoked, while Tworek and colleagues (2010) found no association between PUP laws and any measure of adolescent smoking cessation.

In sum, there continues to be some controversy about the relative advantages and disadvantages of implementing PUP laws for tobacco. Although a small number of observational studies of PUP interventions suggest that they can contribute to the reduction of underage tobacco use if enforced, there is scant evidence of enforcement. Moreover, the few existing studies also suggest that, when enforced, the laws are selectively applied and that minority populations may carry a disproportionate burden of PUP violations.

> *Finding 6-5: Enforcement of purchase–use–possession laws is a controversial strategy for reducing underage tobacco use. Although a small number of studies suggest that enforcing these laws, in combination with strategies that limit retail tobacco sales, can reduce use, they also raise concerns about fair enforcement.*

## SUMMARY

This chapter reviewed the existing evidence on the effects of raising the minimum legal age to purchase tobacco products, in particular the effect on underage tobacco use. No published evidence is yet available on the effects of raising the MLA to 21 in any of the localities in the United States that have done so. Limited international evidence suggests that raising the MLA from 16 to 18 in countries that already had an actively enforced MLA can be implemented successfully to reduce the availability of retail tobacco to newly underage persons and thereby reduce underage tobacco use. Experience with raising the minimum legal drinking age for alcohol in the United States from 18 to 21 is instructive for tobacco control, in that it has led to reductions in the use of alcohol and concomitant harms, such as motor vehicle accidents in the underage population, although it also demonstrates that the prevalence of underage drinking remains high.

In light of the dearth of direct evidence on the effects of raising the MLA for tobacco, the committee focused its attention on the substantial body of literature on the effects of enforcing the MLA restrictions that have already existed in the United States for more than two decades. This literature suggests that the MLA policies that are actively enforced and supported by other retailer interventions will likely increase retailer compliance and thereby reduce retail tobacco availability to underage individuals. Furthermore, although increased retailer compliance is predictably accompanied by a corresponding increase in the use of social sources to obtain tobacco, this substitution of sources is likely to be incomplete, leading to decreased

Copyright © National Academy of Sciences. All rights reserved.

7

# The Effect on Tobacco Use of Raising the Minimum Age of Legal Access to Tobacco Products

The charge to the committee, as discussed in Chapter 1, was to assess the public health implications of raising the minimum age of legal access to tobacco products (MLA) through a review of the literature on tobacco initiation, modeling, and other approaches, as appropriate. This chapter provides the rationale for the committee's consensus conclusions about the likely effects of raising the MLA on tobacco initiation. The committee's conclusions serve as inputs to the two commissioned models, which provide quantification of the likely effects of increases in the MLA on smoking prevalence in the United States. The two simulation models used for the findings presented in this chapter and the next (the Cancer Intervention and Surveillance Modeling Network [CISNET] and SimSmoke models) are well established approaches for estimating the likely impact of changes in tobacco control policies on population-level smoking initiation and prevalence, and on population health outcomes. The next chapter (Chapter 8) uses the results presented in this chapter (i.e., the estimates of the effects of different MLA policies on smoking initiation) as inputs for modeling several important public health outcomes, smoking-related morbidity and mortality. Chapter 8 concludes with a discussion of the likely effect of a change in the MLA on the many tobacco-related health effects not modeled.

## METHODS

The committee followed a principled and evidence-based process to arrive at its estimates of the potential impact of a change in the MLA on

*193*

Copyright © National Academy of Sciences. All rights reserved.

*THE EFFECT ON TOBACCO USE OF RAISING THE MINIMUM AGE*          *201*

restrictions on tobacco use and increasing prices (HHS, 2014). Thus, it is difficult to estimate the independent gains in reducing intensity that will result from changes in the MLA, although the committee expects that these additional gains may be modest. Given this level of uncertainty and the lack of data about potential reductions in intensity, changes in intensity are not included in the modeling. For that reason the overall model estimates may ultimately underrepresent the potential health gains of changes in the MLA for tobacco.

### Summary of Committee Estimates and Conclusions of the Likely Effects of Raising the MLA on Tobacco Use Initiation

Table 7-1 summarizes the committee's ordered, categorical estimates of the effects that changes in the MLA will have in reducing initiation for the different age groups. The committee has more confidence in its estimates pertaining to the raising of the MLA to 19 or 21 than it does for raising the MLA to 25 because of the greater level of extrapolation needed for estimating change and other factors with increasing age. There are a variety of reasons for the uncertainty in these estimates. One is the lack of empirical evidence directly linking changes in the MLA and levels of MLA enforcement with changes in tobacco use. Another is the changing array of available tobacco products and uncertainty about how these new products may change patterns of tobacco use. The estimates being used as inputs for the simulation models include a range of potential values, with a broader range for the MLA of 25.

**Conclusion 7-1: Increasing the minimum age of legal access to tobacco products will likely prevent or delay initiation of tobacco use by adolescents and young adults.**

**Conclusion 7-2: Although changes in the minimum age of legal access to tobacco products will directly pertain to individuals who are age 18 or older, the largest proportionate reduction in the initiation of tobacco use will likely occur among adolescents 15 to 17 years old.**

**Conclusion 7-3: The impact on initiation of tobacco use of raising the minimum age of legal access to tobacco products (MLA) to 21 will likely be substantially higher than raising it to 19, but the added effect of raising the MLA beyond age 21 to age 25 will likely be considerably smaller.**

The previous section outlined, in qualitative terms, the expected effects of raising the MLA on initiation of tobacco use. The modeling exercise

Copyright © National Academy of Sciences. All rights reserved.

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-4, Page 57 of 290

Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products
Case 3:19-cv-05106-RBL   Document 94-4   Filed 03/31/20   Page 109 of 165

*214*                    MINIMUM AGE OF LEGAL ACCESS TO TOBACCO PRODUCTS

reduction represent the results from the lower and upper estimate scenarios (see Table 7-3) for effects on initiation for each MLA option. The results in Table 7-4 demonstrate that although the absolute prevalence predictions differ between the models, the two models predict similar percentage reductions in smoking for each MLA relative to the status quo. Specifically, both models estimate a roughly 3 percent decrease in the 2100 prevalence for the mid-MLA 19, an 11–12 percent decrease for the mid-MLA 21 scenario, and a 15.7 percent decrease for the mid-MLA 25 scenario.

*Summary of Smoking Prevalence Projections*

The modeling analysis suggests that raising the MLA for tobacco products could lead to considerable reductions in smoking prevalence. Both models suggest that it would take about a decade for the reductions in population-wide smoking prevalence to become meaningful; the delay can be attributed to the nature of the policy, which primarily affects children, adolescents, and young adults, so the effects become apparent only after those individuals affected by the policy have aged. Still, the projections show that with time the potential reductions and delays in smoking initiation would accumulate and lead to considerable decreases in prevalence.

Both models suggest that there is a considerable difference between the results of MLA 19 and MLA 21. Increasing the MLA from 21 to 25 leads to additional reductions, but they are smaller than the changes seen increasing the MLA from 19 to 21. This reflects the uncertainty in the assumed smoking initiation reductions for each MLA and the overlapping ranges for MLA 21 and MLA 25 (wider effect ranges for MLA 25).

> *Finding 7-1: Two policy simulation models project significant reductions in smoking prevalence from 2015 to 2100 in the United States in a status quo policy that captures the benefits from prior tobacco control policies.*

> *Finding 7-2: The models predict that raising the minimum age of legal access to tobacco products would lead to additional reductions beyond the status quo in smoking prevalence based on reasonably conservative assumptions about the potential reductions in smoking initiation rates.*

> *Finding 7-3: Raising the minimum age of legal access to tobacco products to 21 or 25 years would lead to larger reductions in smoking prevalence than the status quo or an increase of the MLA to 19.*

Copyright © National Academy of Sciences. All rights reserved.

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-4, Page 58 of 290

Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products
Case 3:19-cv-05106-RBL   Document 94-4   Filed 03/31/20   Page 110 of 165

THE EFFECT ON TOBACCO USE OF RAISING THE MINIMUM AGE                215

**Conclusion 7-4: Based on the modeling, raising the minimum age of legal access to tobacco products, particularly to age 21 or 25, will likely lead to substantial reductions in smoking prevalence.**

As discussed in Chapter 2, tobacco use is far from uniform among various subpopulations and varies, for example, by race and ethnicity, social and economic status, geography, incarceration status, and the presence of mental illness (Bachman et al., 2011; Cropsey et al., 2004, 2008; Goodman and Capitman, 2000; Green et al., 2007; HHS, 2012; Johnson et al., 2000; Johnston et al., 2014a; Kann et al., 2014; Melnick et al., 2001; Peek et al., in preparation; SAMHSA, 2012; Welte et al., 2011; Ziedonis et al., 2008). Tobacco control advocates interested in decreasing tobacco use are particularly concerned about closing the "equity gap" by reducing tobacco use among the highest-risk populations. An important consideration for the committee is whether a change in the MLA would differentially affect high-risk populations with initiation rates that vary significantly from the national averages considered in this report, including the rates contained in the modeling. One possibility is that groups with higher-than-average initiation rates would remain relatively resistant to tobacco control interventions and the effect would be smaller in those populations, widening the equity gap. The equity gap could be narrowed if groups with lower-than-average initiation rates respond less to an increase in the MLA. The third possibility is that the effects will not vary significantly between groups.

The literature provides little evidence to clarify this issue. Two recent systematic reviews of the effects of population-level tobacco control interventions on adolescents and young adults found no clear evidence of a differential impact by social factors. One review found "little evidence of policies that have the potential to increase inequalities" (Thomas et al., 2008, p. 235). The second review identified price as the only intervention with a consistent effect that would decrease the inequalities in smoking initiation (Brown et al., 2014). Given the extremely limited data available and the fact that the models are not equipped to analyze according to high-risk populations, the committee did not produce separate analyses of the effect of raising the MLA by subpopulation. The committee's conclusions also do not anticipate the changing landscape of tobacco products—in particular, the burgeoning popularity of electronic nicotine delivery systems (ENDS) (e.g., "e-cigarettes"). This new pattern of tobacco use creates various unknowns. The committee has no basis on which to conclude that the effect of a change in the MLA would have more or less effect on initiation with ENDS than with other tobacco products. Both of these limitations are discussed further in Chapter 9.

Copyright © National Academy of Sciences. All rights reserved.

# Exhibit KK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DANIEL MITCHELL, ROBIN BALL, LUKE RETTMER, ARMEN TOOLOEE, NATHANIEL CASEY, MATTHEW WALD, SECOND AMENDMENT FOUNDATION, and NATIONAL RIFLE ASSOCIATION, | The Honorable Ronald B. Leighton |
| *Plaintiffs,* | No. 3:19-cv-05106-RBL |
| v. | DIRECTOR BERNTSEN'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION TO PLAINTIFF DANIEL MITCHELL AND PLAINTIFF DANIEL MITCHELL'S OBJECTIONS AND RESPONSES |
| CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, CRAIG MEIDL, in his official capacity as the Chief of Police of Spokane, Washington, and TERESA BERNTSEN, in her official capacity as the Director of the Washington State Department of Licensing, | |
| *Defendants.* | |

Plaintiff Daniel Mitchell hereby makes these responses and objections (Responses) to Defendant Teresa Berntsen's First Set Of Interrogatories And Requests For Production, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure.

## I. GENERAL OBJECTIONS

1. Mitchell objects to the first numbered instruction to the extent that it calls for information not required by the Federal Rules of Civil Procedure. Mitchell's privilege log will comply with the requirements of the Rules.

MITCHELL'S OBJECTIONS AND RESPONSES TO BERNTSEN'S FIRST RFPs AND INTERROGATORIES - 1
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

2.  Mitchell objects to the second numbered instruction to the extent that it calls for information not required by the Federal Rules of Civil Procedure. Mitchell's responses will be limited to information required by the Rules.

3.  Mitchell objects to the fifth numbered instruction to the same extent that Defendant Bernsten maintains her objection to the virtually identical instruction in Mitchell's discovery. Mitchell will not assume any obligations that are not identical to those assumed by Defendant Berntsen.

4.  Mitchell objects to the instructions and definitions to the extent they impose burdens beyond those set forth in the Federal Rules of Civil Procedure.

5.  Mitchell objects to the definition of the term "Concerning" as vague, overbroad, unduly burdensome, and not proportional to the needs of the case.

6.  Mitchell objects to the definition of the term "Document" as vague, overbroad, and exceeding the requirements of the Federal Rules of Civil Procedure. Mitchell construes the definition as follows: "'Document' encompasses the broadest possible definition permitted under the Federal Rules of Civil Procedure."

7.  Mitchell objects to the definition of "Age Restrictions" as "applicable to persons between 18 and 20 years old." To the extent the definition could be interpreted to exclude a person who is 20 years of age, it is vague, overbroad, misleading, or irrelevant to this case. In these Responses, Mitchell understands the term "persons between 18 and 20 years old" to mean a person who is 18, 19, or 20 years of age.

8.  Mitchell objects to the three definitions of "Identify" to the extent that they impose burdens beyond those imposed by the Federal Rules of Civil Procedure. Mitchell will disregard these definitions and comply with the Rules.

9.  Mitchell objects to the definition of "National Rifle Association" and "NRA," and specifically to the phrase "as well as any of its officers, directors, employees, representatives, agents, or attorneys acting on behalf of or in the course of their duties to or employment with NRA," which is vague, overbroad, irrelevant, unduly burdensome, not proportional to the needs of the

Mitchell's Objections and Responses To Berntsen's First RFPs and Interrogatories - 2
No. 3:19-cv-05106-RBL

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

SER-517

case, and may call for information protected from disclosure by attorney-client privilege, the work product doctrine, or other applicable protection or immunity.

10. Mitchell objects to the definition of "Second Amendment Foundation" and "SAF," and specifically to the phrase "as well as any of its officers, directors, employees, representatives, agents, or attorneys acting on behalf of or in the course of their duties to or employment with SAF," which is vague, overbroad, irrelevant, unduly burdensome, not proportional to the needs of the case, and may call for information protected from disclosure by attorney-client privilege, the work product doctrine, or other applicable protection or immunity.

11. Mitchell objects to the definition of "You" and "Your" and specifically to the phrase "Robin Ball, Jeremy Ball, Anthony Ball, or Steve Ball; Sporting Systems Vancouver Inc., Sharp Shooting Indoor Range & Gun Shop, Inc., or any subsidiary, parent, affiliate, or other business owned (in whole or in part) or operated by Daniel Mitchell or Robin Ball; any person acting or purporting to act on behalf of any of the above, including (without limitation) any of their present or former employees, agents, representatives, personnel, attorneys, accountants, consultants, experts, investigators, or other persons; any officer, director, shareholder, or founder of the above business entities, including (without limitation) any person acting in concert or participation with any of them." This phrase is confusing, overbroad, unduly burdensome, and not proportional to the needs of the case. To the extent any interrogatory calls for information outside the knowledge of Mitchell, it is overbroad and improper. To the extent any RFP calls for documents outside the possession, custody, or control of Mitchell, it is overbroad and improper.

12. The foregoing General Objections are incorporated by reference into the response to each RFP and Interrogatory. Mitchell not having listed specifically any one of his generally stated objections in response to a particular RFP or Interrogatory does not constitute a waiver of any objection to that RFP or Interrogatory, even if the objection may be specifically stated in response to another RFP or Interrogatory.

Mitchell's Objections and Responses To Berntsen's First RFPs and Interrogatories - 3
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

SER-518

## II. MITCHELL'S RESPONSES AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Please identify all sales or transfers of semiautomatic assault rifles or self-loading rifles you made to Non-Residents between January 1, 2014 and July 1, 2019. For each sale or transfer identified, please state the following information:

1. The name of the seller or transferor;

2. The date of the sale or transfer;

3. The manufacturer and model of the firearm(s) sold or transferred;

4. The purchase price paid (or other consideration) for each firearm sold; and

5. The purchaser's or transferee's city and state of residence.

**ANSWER:**

Mitchell objects to this Interrogatory as seeking information that is not relevant to any party's claim or defense. None of the information sought by this Interrogatory is information reasonably calculated to lead to the discovery of admissible evidence. The Interrogatory seeks information that has no relevance to any issue in the case, nor will lead to the discovery of any admissible evidence.

Mitchell objects to this Interrogatory as seeking information that Mitchell is forbidden by 18 U.S.C. § 922(s)(6)(B) from providing to any person except for the purpose of that person carrying out the background checks required by that section.

Mitchell objects to this Interrogatory as unduly burdensome and not proportional to the needs of the case. Extracting this information from the records maintained by Mitchell would require visual review of hundreds of thousands of electronic records, individually identifying whether a particular record was a sale to a Non-Resident, then researching the model number to identify if that sale was of a firearm responsive to this Interrogatory. Mitchell estimates that the review would take several hundred hours of labor at a minimum.

MITCHELL'S OBJECTIONS AND RESPONSES TO BERNTSEN'S FIRST RFPs
AND INTERROGATORIES - 4
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**INTERROGATORY NO. 2:**

Of the sales or transfers identified in response to Interrogatory No. 1, how many for each seller or transferor identified were made to unique purchasers or unique transferees?  (For example, if one identified seller sold five semiautomatic assault rifles to one non-resident purchaser, three such rifles to another non-resident purchaser, and one such rifle each to ten other non-resident purchasers, the answer for that seller should be "12 unique purchasers.")

**ANSWER:**

Mitchell objects to this Interrogatory as seeking information that is not relevant to any party's claim or defense. None of the information sought by this Interrogatory is information reasonably calculated to lead to the discovery of admissible evidence. The Interrogatory seeks information that has no relevance to any issue in the case, nor will lead to the discovery of any admissible evidence.

Mitchell objects to this Interrogatory as unduly burdensome and not proportional to the needs of the case. After extracting the information required to respond to Interrogatory No. 1, compiling this further detailed information from the records maintained by Mitchell would require creating new records to tally which purchasers made multiple purchases. Mitchell estimates that the additional compilation would take one hundred hours of labor at a minimum.

**INTERROGATORY NO. 3:**

Please identify all sales or transfers of semiautomatic assault rifles or self-loading rifles you made to any person younger than 21 years of age at the time of the sale or transfer.  For each sale or transfer identified, please state the following information:

1. The name of the seller or transferor;

2. The date of the sale or transfer;

3. The make and model of the firearm(s) sold or transferred;

4. The purchase price paid (or other consideration) for each firearm sold; and

5. The purchaser's or transferee's city and state of residence.

MITCHELL'S OBJECTIONS AND RESPONSES TO BERNTSEN'S FIRST RFPs
   AND INTERROGATORIES - 5
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**SER-520**

**ANSWER:**

Mitchell objects to this Interrogatory as seeking information that is not relevant to any party's claim or defense. None of the information sought by this Interrogatory is information reasonably calculated to lead to the discovery of admissible evidence. The Interrogatory seeks information that has no relevance to any issue in the case, nor will lead to the discovery of any admissible evidence.

Mitchell objects to this Interrogatory as seeking information that Mitchell is forbidden by 18 U.S.C. § 922(s)(6)(B) from providing to any person except for the purpose of that person carrying out the background checks required by that section.

Mitchell objects to this Interrogatory as unduly burdensome and not proportional to the needs of the case. As described in response to Interrogatory No. 7, the records maintained by Mitchell do not contain the date of birth of any purchaser. It is therefore impossible to respond.

**INTERROGATORY NO. 4:**

Of the sales or transfers identified in response to Interrogatory No. 3, how many for each seller or transferor identified were made to unique purchasers or unique transferees? (For example, if one identified seller sold five semiautomatic assault rifles to one Young Adult purchaser, three such rifles to another Young Adult purchaser, and one such rifle each to ten other Young Adult purchasers, the answer for that seller should be "12 unique purchasers.")

**ANSWER:**

Mitchell objects to this Interrogatory as seeking information that is not relevant to any party's claim or defense. None of the information sought by this Interrogatory is information reasonably calculated to lead to the discovery of admissible evidence. The Interrogatory seeks information that has no relevance to any issue in the case, nor will lead to the discovery of any admissible evidence.

MITCHELL'S OBJECTIONS AND RESPONSES TO BERNTSEN'S FIRST RFPS AND INTERROGATORIES - 6
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    Mitchell objects to this Interrogatory as unduly burdensome and not proportional to the
2    needs of the case. As described in response to Interrogatory No. 7, the records maintained by
3    Mitchell do not contain the date of birth of any purchaser. It is therefore impossible to respond.
4    **INTERROGATORY NO. 5:**
5    What was the total gross revenue earned from firearms sales and transfers between January
6    1, 2014 and June 30, 2019 by each seller or transferor identified in response to Interrogatory Nos.
7    1 or 3?
8    **ANSWER:**
9    Mitchell objects to this compound Interrogatory as requesting responses to two separate
10   questions, and counts this Interrogatory as two for the purposes of the limits on Interrogatories set
11   by the Federal Rules of Civil Procedure.
12   Mitchell objects to this Interrogatory as seeking information that is not relevant to any
13   party's claim or defense. None of the information sought by this Interrogatory is information
14   reasonably calculated to lead to the discovery of admissible evidence. The Interrogatory seeks
15   information that has no relevance to any issue in the case, nor will lead to the discovery of any
16   admissible evidence.
17   Mitchell objects to this Interrogatory as unduly burdensome and not proportional to the
18   needs of the case. As described in response to Interrogatory No. 7, Mitchell's relevant records do
19   not include the sales price of firearms. It is therefore impossible to respond.
20   Mitchell objects to this Interrogatory as unduly burdensome and not proportional to the
21   needs of the case. As described in response to Interrogatory No. 7, the records maintained by
22   Mitchell do not contain the date of birth of any purchaser. It is therefore impossible to respond as
23   to Interrogatory No. 3.
24   **INTERROGATORY NO. 6:**
25   Please identify all facts, data, documents, or other information supporting, concerning, or
26   relating to the allegations in Paragraph No. 113 of the First Amended Complaint.
27

Mitchell's Objections and Responses To Berntsen's First RFPs    Ard Law Group PLLC
    and Interrogatories - 7
No. 3:19-cv-05106-RBL                                            P.O. Box 11633
                                                                Bainbridge Island, WA 98110
                                                                Phone: (206) 701-9243

1 ("Approximately 30% of Mitchell's business consists of sales of self-loading rifles to residents of

2 other states.").

3 **ANSWER:**

4

5     Mitchell bases this allegation on his personal experience of running his business for the past

6 4 years.

7 **INTERROGATORY NO. 7:**

8     Please describe your practices for making and retaining records of rifle sales and transfers

9 between January 1, 2014, and June 30, 2019.  Please include the following information:

10      1. A description of the record, receipt, or other document created at or near the time

11         of a firearm purchase or transfer reflecting the transaction (hereinafter, the

12         "record");

13      2. If the record is electronic, a description of the software, application, program,

14         system, or other means used to generate the record; or, if the record is not

15         electronic, a description of the method used to generate and preserve the record;

16      3. The specific location where such records are stored, including (for electronic

17         records) a description of the device, server (including any hosted or operated by a

18         third party), or any other means through which the records may be viewed or

19         accessed;

20      4. The length of time for which it is your regular practice to retain such records;

21      5. The method by which such records are destroyed, removed, or become otherwise

22         inaccessible.

23 **ANSWER:**

24

25     Mitchell creates a Federal Form 4473 for each sale. Mitchell also records each sale in an

26 electronic "Bound Book" using software specifically developed for use in tracking firearms sales,

27 namely, "Counterpoint." This is a proprietary software package, with secure data encryption as

28 required by BATFE regulations. The disposition record maintains the firearm manufacturer, the

Mitchell's Objections and Responses To Berntsen's First RFPs      Ard Law Group PLLC
and Interrogatories - 8
No. 3:19-cv-05106-RBL                                          P.O. Box 11633
                                                               Bainbridge Island, WA 98110
                                                               Phone: (206) 701-9243

SER-523

1   firearm importer (if applicable), model number, serial number, caliber, date of delivery, the NTN

2   number (National Tracing Number) issued by the FBI (more commonly referred to as the "NICS"

3   instant background check), the type of firearm, purchaser's name, and purchaser's address. This

4   Bound Book is only accessible within Mitchell's licensed location. A secure copy is also maintained

5   in real time by a subscription with Counterpoint Backup.

6      As required by federal law, Mitchell maintains 4473s for 25 years or until he closes his FFL.

7   The forms and records are maintained, as required by federal law, at the FFL licensee's location.

8   Mitchell maintains the hardcopy Form 4473's in time dated bankers boxes in a safe location, within

9   his licensed premises.

10     Upon closing his FFL, which he did as of June 30, 2019, Mitchell began the process of

11  complying with the federal requirement that he transfer his 4473 records to the ATF / Out of

12  Business Records Center in Martinsburg, West Virginia. Mitchell's 4473 records up to June 30,

13  2019 are therefore in the process of delivery to the possession of the Bureau of Alcohol, Tobacco,

14  and Firearms.

15  **INTERROGATORY NO. 8:**

16     Please identify each model of semiautomatic assault rifle currently in stock and available

17  for sale or transfer at Sporting Systems Vancouver Inc. Please include the following information

18  for each model of semiautomatic assault rifle:

19        1.   The manufacturer, model number, caliber, and capacity;

20        2.   The manufacturer's suggested retail price (MSRP);

21        3.   The number of each particular model currently in stock and available for sale as of

22             July 23, 2019.

23  **ANSWER:**

24     Mitchell objects to the term "capacity" as vague. Virtually all rifles, including many or all

25  of those defined as "semi-automatic assault rifles" in Washington state law, have the capacity for

26  one round in the chamber and detachable magazines. Virtually all rifles can accept magazines which

27

MITCHELL'S OBJECTIONS AND RESPONSES TO BERNTSEN'S FIRST RFPS
AND INTERROGATORIES - 9
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

SER-524

1  are capable of holding various numbers of rounds. In any sense in which the term is used in relation

2  to firearms, magazines have "capacity," not rifles. Thus, it is meaningless to attempt to identify

3  the "capacity" of a rifle. Mitchell will not include any information responsive to that portion of

4  this Interrogatory.

5          Mitchell objects to this Interrogatory as demanding a stock list as of July 23, 2019. A stock

6  list current as of August 9, 2019 will be produced with these responses.

7  **INTERROGATORY NO. 9:**

8          Please identify each model of semiautomatic assault rifle currently in stock and available

9  for sale or transfer at Sharp Shooting Indoor Range & Gun Shop, Inc.  Please include the following

10 information for each model of semiautomatic assault rifle:

11         1.   The manufacturer, model number, caliber, and capacity;

12         2.   The manufacturer's suggested retail price (MSRP);

13         3.   The number of each model currently in stock and available for sale as of July 23,

14              2019.

16 **ANSWER:**

17         Mitchell objects to this Interrogatory as seeking information not in his possession, custody,

18 or control.

19             **III.  Mitchell's Responses And Objections to**

20                    **Requests for Production**

21 **REQUEST FOR PRODUCTION NO. 1:**

22         Please produce all documents (1) concerning or relating to the information sought in the

23 above Interrogatories, or that (2) you relied on in responding to the above Interrogatories.

24 **RESPONSE:**

25         Mitchell objects to this RFP as seeking information that is not relevant to any party's claim

26 or defense. Documents "concerning or relating to the information" sought by improper

27

Mitchell's Objections and Responses To Berntsen's First RFPs          Ard Law Group PLLC
   and Interrogatories - 10
   No. 3:19-cv-05106-RBL                                             P.O. Box 11633
                                                                     Bainbridge Island, WA 98111
                                                                     Phone: (206) 701-9243

1   Interrogatories are equally irrelevant and beyond the scope of discovery, and Mitchell incorporates
2   in his objection to this RFP the objections to relevance and scope of each Interrogatory.

3       Mitchell objects to this RFP as overly broad, vague, and unduly burdensome to the extent
4   that it requests the production of documents "concerning or relating to the information sought in
5   the above Interrogatories." This request is not "reasonably targeted, clear, and as specific as
6   possible." LCR 26(f). As to Interrogatory No. 6, for example, this Request could be read as
7   requiring the production of all Mitchell's business records. As to Interrogatory No. 7, for example,
8   the Request could be read as calling for the production of every record described. As to
9   Interrogatory No. 8, for example, this request could be read as calling for the production of every
10  document related to the firearms identified in the stock list.

11      Mitchell objects to this RFP as seeking documents the production of which would violate
12  federal law, namely, 18 U.S.C. § 922(s)(6)(B).

13      Mitchell will produce the stock list identified in response to Interrogatory No. 9.

14  **REQUEST FOR PRODUCTION NO. 2:**

15      Please produce all communications between you and the National Rifle Association, the
16  Second Amendment Foundation, Luke Rettmer, Armen Tooloee, Nathaniel Casey, or Matthew
17  Wald, between January 1, 2017, and the present, concerning or related to I-1639, including the Age
18  Restrictions, the Residency Restrictions, or its definition of semiautomatic assault rifles.

19  **RESPONSE:**

20      Mitchell objects to this Request as seeking documents that are not relevant to any party's
21  claim or defense. No document sought by this Request has any relevance to any issue in the case,
22  nor will lead to the discovery of any admissible evidence.

23      Mitchell objects to this Request as overbroad, unduly burdensome, and not proportional to
24  the needs of the case.

25      Mitchell objects to this Request as calling for the production of documents protected by
26  the attorney-client privilege.

27

MITCHELL'S OBJECTIONS AND RESPONSES TO BERNTSEN'S FIRST RFPS    ARD LAW GROUP PLLC
AND INTERROGATORIES - 11
No. 3:19-cv-05106-RBL                                        P.O. Box 11633
                                                            Bainbridge Island, WA 98110
                                                            Phone: (206) 701-9243

**SER-526**

**REQUEST FOR PRODUCTION NO. 3:**

Please produce all documents supporting, concerning, or relating to your allegations in Paragraphs 110 through 115 of the First Amended Complaint.

**RESPONSE:**

Mitchell objects to this RFP as seeking documents the production of which would violate federal law, namely, 18 U.S.C. § 922(s)(6)(B).

As described in his Response to Interrogatory No. 7, all paper records of sales by Mitchell to any person made prior to July 1, 2019 are now in the possession of the United States, as required by federal law.

As described in Responses to Interrogatory Nos. 1, 2, 5, and 7, the extant records maintained by Mitchell do not contain any sales prices, precluding production of documents related to past profits for specific sales.

Mitchell does not possess any documents "supporting, concerning, or relating to" the allegations of ¶¶ 112, 114, and 115, due to the nature of those allegations.

August 22, 2019.

MITCHELL'S OBJECTIONS AND RESPONSES TO BERNTSEN'S FIRST RFPS
AND INTERROGATORIES - 12
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**SER-527**

**Verification**

I, Daniel Mitchell, on oath and under penalty of perjury, state that I have read the foregoing answers to Defendant Berntsen's Interrogatories, and the answers are true and correct to the best of my knowledge.

Dated this 22 day of August, 2019

Daniel Mitchell

**Attorney Certification**

I hereby certify that I have read the above answers and objections to Defendant Berntsen's First Interrogatories and that they comply with Fed. R. Civ. P. 26(g).

Dated this 22 day of August, 2019.

Ard Law Group PLLC

By:

Joel B. Ard, WSBA # 40104
Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Attorneys for Plaintiffs

Mitchell's Objections and Responses To Berntsen's First RFPs and Interrogatories - 13
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# Exhibit LL

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-4, Page 74 of 290

Gilroy Shooting: Two Children Among the Dead at California Festival - The New York T...   Page 1 of 5
Case 3:19-cv-05106-RBL   Document 94-4   Filed 03/31/20   Page 126 of 165

*The New York Times* | https://nyti.ms/2K2n5At

# Gilroy Shooting: Two Children Among the Dead at California Festival

**By Lauren Hepler, <u>Amy Harmon</u> and <u>Richard A. Oppel Jr.</u>**

July 29, 2019

GILROY, Calif. — The smell of barbecue was wafting through the air, a local rock band was playing its last song and parents were collecting their children at the end of the annual garlic festival in Gilroy, Calif., on Sunday when a gunman opened fire, killing three people.

Stephen Romero, a 6-year-old boy from San Jose who loved Legos and Batman, had been playing near a bounce house with his mother and grandmother before he was killed. A 13-year-old girl and a man in his 20s were the other victims, police said Monday.

The gunman also wounded 12 people before he was fatally shot in an exchange with three police officers, who had responded within one minute, the police chief said.

"As soon as he saw the officers he engaged the officers and fired," said Chief Scot Smithee of the Gilroy Police Department. "Then we had the aftermath of dealing with the victims.''



Noe Romero, 36, holds a photograph of his nephew Stephen Romero, who was killed in the shooting at the annual Gilroy Garlic Festival.  Sarahbeth Maney for The New York Times

Chief Smithee identified the gunman as Santino William Legan, 19, a resident of Gilroy, about 30 miles southeast of San Jose. The chief said the gunman's motive was not known.

"Motive is important," Chief Smithee said at a news conference on Monday afternoon. "Everybody wants to know why, the answer why."

The shooting "appeared as though it was random, but I think we're still too early in the investigation to be able to say that definitively," the chief said.

The suspect's car was found northeast of Christmas Hill Park, where the festival was held, the chief said. The authorities were in the process of executing a warrant to search the car.

Mr. Legan's home, on Gilroy's South Side, also was searched, the chief said, adding that he had no further details.

California, by some yardsticks, is among the states with the strictest gun laws in the country. The authorities did not specify the type of weapon used in the attack or whether it is banned in California. But they said the gunman carried out the shooting with a semiautomatic rifle that he had purchased legally this month in Nevada, a scenario that experts said may highlight how restrictions in some jurisdictions can be undermined by neighboring states whose gun laws are more lax.

"That's the problem with this patchwork of laws throughout the country," said Adam Skaggs, the chief counsel of the Giffords Law Center to Prevent Gun Violence, which lobbies for tighter gun laws. "Some places are trying to move the needle at the state level, but it is like combating air pollution. Your state can be the strongest on regulating emissions, but if neighboring states have no pollution controls, then air pollution is going to come downwind."

*[Here is what we know and what we don't know about the shooting.]*

Gilroy's garlic festival, founded in 1979, is an internationally known event, drawing roughly 100,000 visitors each year — and one that has special significance for locals. Thousands volunteer at the festival, which raises money for local organizations, including youth swim leagues, music groups and a mission trip to build houses in Mexico.





By The New York Times

Neighbors of the Legan family said Monday that their quiet, tree-lined community is home to a diverse mix of families and older residents. Two doors down from the family's home, Rosana Mendoza, who has lived on the street since 2008, said the Legans were always pleasant and quick to say hello.

"It's a quiet place," Ms. Mendoza said. "We are shocked, because they are very nice people."

At the end of the cul-de-sac where the family lives, Larry Scettrini said he and his wife, a former Spanish teacher at Gilroy High School, knew the Legans well enough to exchange pleasantries while doing yard work. The family set up a boxing gym in their garage to support another son's amateur boxing career, Mr. Scettrini said, but he had never seen political slogans, symbols or other indications near the home to make him worry about violence.

"I'm just stunned and heartbroken," said Mr. Scettrini, 69, a Gilroy native.

Craig Fair, a deputy special agent with the F.B.I. in San Francisco, confirmed that Mr. Legan had recently opened a Facebook account, but he said he couldn't confirm if he also owned an Instagram account that has been circulating online.

Chief Smithee said at the news conference that there was "a young man that thought it would be a good idea to post on social media that he just shot up the G fest." That man, a 20-year-old, was located and taken into custody, but the authorities determined he was not involved in the shooting, the chief said. The posts, he added, were a "fun way to get some attention, apparently."

Peter Leroe-Munoz, a city councilman, said he had volunteered at a booth at the garlic festival and was horrified to learn that the shooting had taken place at the city's prime event.

"That is our crown jewel in terms of our cultural identity," he said. "For this kind of tragedy to take place at something so core to our community, it is a tragedy beyond words."

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-4, Page 77 of 290

Gilroy Shooting: Two Children Among the Dead at California Festival - The New York T...   Page 4 of 5
Case 3:19-cv-05106-RBL   Document 94-4   Filed 03/31/20   Page 129 of 165

The 6-year-old victim, Stephen Romero, was shot in the back, said his father, Alberto. Among the dozen people wounded were Mr. Romero's wife, who was shot in the stomach, and his mother-in-law, who was shot in a leg.

"My son had his whole life to live," Mr. Romero told NBC Bay Area.

Stephen Romero's uncle, Noe Romero, 36, said that his nephew loved playing with his cousins on a tire swing outside his grandparents' house in San Jose.

"Let's put it this way, he's been the only boy" out of the grandchildren on his father's side of the family, Noe Romero said. "That's our boy."

To reach the festival, the suspect appeared to have crossed a nearby creek and cut a perimeter fence, the police chief said. The authorities said they were continuing to search for a possible accomplice, in response to some witness reports. "We don't have any confirmation that any second suspect did any shooting, but we are certainly investigating all leads to determine what that person's role was," Chief Smithee said.

Christmas Hill Park is just off a busy thoroughfare between two new subdivisions that are under construction on the southwestern edge of Gilroy. In recent years, Gilroy, an agricultural town at the end of the Bay Area commuter rail line, has grown into an extended Silicon Valley suburb.

Gov. Gavin Newsom said on Twitter that the shooting was "nothing short of horrific." Senator Kamala Harris of California wrote that "our country has a gun violence epidemic that we cannot tolerate."

Videos posted on social media showed attendees running past white tents in a grassy field, apparently fleeing. People looking to reunite with friends and family members had been told to gather at Gavilan College, a community college on the outskirts of the city.

Marie Blankley, the mayor pro tempore of Gilroy, spent Sunday afternoon making mimosas at a booth for the local Rotary Club. She finished her shift at 5:30 p.m., picked up some ribs to go and headed home, she said. She now believes she must have just missed the shooting, which broke out around 5:40 p.m.

"I am a lifelong Gilroy resident, 55 years — this is shocking," she said in an interview on Monday, describing a city where thousands volunteer for the annual garlic festival and people of all ages come out to enjoy signature food like garlic bread, shrimp scampi and pepper steaks.

"One of the last mimosas I made, the last mimosa I made before our shift ended," was for people who turned out to be victims, Ms. Blankley said, referring to two people who were injured. One needed stitches, she said, and the other had been shot in the arm.

Gilroy Shooting: Two Children Among the Dead at California Festival - The New York T...   Page 5 of 5

**SER-534**

# Exhibit MM

*The New York Times* | https://nyti.ms/1emJJhc

# State Law Prevented Sale of Assault Rifle to Suspect Last Week, Officials Say

**By** <u>Michael S. Schmidt</u>

Sept. 17, 2013

WASHINGTON — The suspect in the killing of 12 people at the Washington Navy Yard on Monday test-fired an AR-15 assault rifle at a Virginia gun store last week but was stopped from buying one because state law there limits the sale of such weapons to out-of-state buyers, according to two senior law enforcement officials.

Instead, the suspect, Aaron Alexis of Texas, bought a law-enforcement-style shotgun — an 870 Remington pump-action — and used it on Monday as he rampaged through the navy yard, said the officials, who requested anonymity because the investigation was continuing.

"The gun was broken in half, and he had it in a bag," one official said of the Remington. "He went inside the building and assembled it in a bathroom."

The gunman then perched himself above an atrium where he fired down on people who had been eating breakfast, officials said, adding that he used shotgun shells that had roughly a dozen large ball-bearing-like shots in them, increasing their lethal nature.

"When he discharged, the pieces of lead would spread the farther they went," the one official said. "It is similar to weapons used in bird shooting but on a more serious scale. These were not bullets but many small pieces of lead flying through the air."

After firing down on people, the gunman began to search for more people to shoot, and as he searched, he was confronted by a security guard near an exit, according to the officials. The gunman shot the guard and took his semiautomatic handgun, then headed back to the atrium.

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-4, Page 81 of 290

State Law Prevented Sale of Assault Rifle to Suspect Last Week, Officials Say - The New...    Page 2 of 3
Case 3:19-cv-05106-RBL    Document 94-4    Filed 03/31/20    Page 133 of 165

"He runs back upstairs and cranks off more rounds with the handgun and then heads to another stairwell, where he confronts a worker there and shoots him," the official said.

The gunman is believed to have shot the Navy employee, who worked in maintenance, with the pistol near another exit.

On Saturday, Mr. Alexis bought the Remington shotgun and ammunition at the gun store and range in Lorton, Va., Sharpshooters Small Arms Range, where he also rented a rifle and practiced with it, according to a lawyer for the store.

The lawyer, J. Michael Slocum, said in an e-mail that Mr. Alexis bought a Remington 870 Express 12-gauge shotgun and about two boxes of ammunition, or about 24 shells. The purchases were approved after the store owner conducted the required federal background check, Mr. Slocum said.

"After the terrible and tragic events at the navy yard, the Sharpshooters was visited by federal law enforcement authorities, who reviewed the Range's records, including video and other materials," Mr. Slocum wrote. "So far as is known, Mr. Alexis visited the Range only once, and he has had no other contact with the Range."

The Virginia State Police said Tuesday that Mr. Alexis had passed all state and local background checks to buy the shotgun.

Despite statements on Monday from senior law enforcement officials — which were widely reported in the news media, including in The New York Times — that an AR-15 had been found at the scene, no such gun has been found. The authorities say they do not believe the gunman used one.

Federal officials said that there was some initial confusion at the scene about which firearms had been used and that it was hours before investigators were able to analyze video from the scene.

It is unclear whether Mr. Alexis's psychiatric issues ever progressed to the point that he was involuntarily committed to a mental health institution, or legally determined to be mentally ill or incompetent, either of which would have barred him from buying a gun.

If neither applied — and most people who are treated for mental illness never get to that point — then his situation would be similar to other gunmen, like Jared L. Loughner, who killed 6 people and wounded 13, including former Representative Gabrielle Giffords, in Tucson in 2011, and James E. Holmes, who killed 12 people and wounded dozens in a Colorado movie theater last year.

Mental health experts point out that the vast majority of people with mental illness are never violent. On the other hand, studies have found an increased risk for violence among those with serious mental illness, including schizophrenia, major depression or bipolar disorder.

# Exhibit NN

**SEATTLE UNIVERSITY**
**FIREARMS AND WEAPONS POLICY**

Seattle University is committed to ensuring a safe and secure environment for the University community. This policy is a proactive step towards reducing the risk of injury or death associated with intentional or accidental use of firearms and weapons.

**Policy**

All members of the Seattle University community, including faculty, staff, students and visitors are prohibited from possessing, discharging, or otherwise using firearms, explosives or weapons ("weapons") on University premises without the expressed authorization of the Director of Campus Public Safety, whether or not the person has been issued a federal or state license to possess such weapons.

All members of the Seattle University community are also prohibited from possessing weapons while working or attending University or University-related events, whether or not the event is on University premises.

Any person violating this policy will be subject to disciplinary action including but not limited to suspension, expulsion, termination, removal from University premises or events and/or criminal prosecution.

Suspected violations of this policy should be reported immediately to the Department of Campus Public Safety at (206) 296-5911.

**Exceptions**

The following exceptions apply to this policy:

- Commissioned law enforcement officers in performance of their official duties.
- Military personnel in performance of their official duties.
- Armored vehicle guards.
- An individual using or possessing a weapon in connection with a scheduled educational, recreational or training program or activity authorized in writing by the Director of Campus Public Safety and under the supervision of a University employee.
- Additional exceptions to this policy may be requested in writing to the Director of Campus Public Safety. The Director will review requests on a case-by-case basis with University Counsel.

**Definitions**

- **Firearm** – Any device that shoots a bullet, pellet, flare, tranquilizer, dart, or other projectile, whether loaded or unloaded, including those powered by CO2. This includes but is not limited to guns, air guns, dart guns, pistols, revolvers, rifles, shot guns, cannons, and any ammunition for any such device.



Exhibit 85
Witness Ward
Date 2-13-2020
Buell Realtime Reporting
(206) 287-9066

SEADOCS:336004.2

- **Weapon** – Any device that is designed to or traditionally used to inflict serious bodily injury.  This includes but is not limited to:

    - Firearms, slingshots, switchblades, daggers, swords, blackjacks, brass knuckles, bows and arrows, tasers, hand grenades, knives with blades three (3) inches or longer, nunchucks, and throwing stars; or
    - Any object that could be reasonably construed as a weapon; or
    - Any object legally controlled as a weapon or treated as a weapon under the law.

- **Explosives** – Any dangerous chemicals, substances, mixtures or compounds capable of or intended to cause injury to another, or possessed in negligent disregard for the safety of self and others.  This includes but is not limited to firecrackers, gunpowder and dynamite.

SEADOCS:336004.2

# Exhibit OO



**BOISE STATE UNIVERSITY**

University Policy #12080

# Possession of Firearms/Weapons on University-Owned or Controlled Premises

**Effective Date**

June 2000

**Last Revision Date**

April 2019

**Responsible Party**

Department of Public Safety, (208) 426-6911
Office of the General Counsel, (208) 426-1203

**Scope and Audience**

This policy applies to all firearms and other Weapons on University-owned or controlled premises.

**Additional Authority**

- Idaho Code Title 18, Chapter 33
- 18 U.S.C. §§926B, 926C
- 18 U.S.C. §930
- Department of Army Regulation §145-1
- United States Army Cadet Command Regulation §145-3
- State Board of Education Policy, Section I. R.



Exh. No. 89
Date 2/20/2020
Name N. Casey

University Policy #12080                        Possession of Firearms/Weapons on University-Owned or
                                                Controlled Premises

## 1. Policy Purpose

To establish policy for the regulation of the possession of firearms and other Weapons on University-owned or controlled premises.

## 2. Policy Statement

A safe and secure environment is fundamental to fulfilling the University's mission of teaching, research, and public service. Boise State University is committed to maintaining an environment free of violence. This obligation includes restricting recognized hazards from the campus community that contribute to violence or serious harm.

## 3. Definitions

### 3.1 Weapon(s)

Any animate or inanimate device, instrument, material, or substance used for, or is readily capable of, causing death or serious bodily injury. Any device that is deadly or dangerous, as well as replicas or facsimiles that may be perceived as a Weapon. Includes firearms, knives of any length, conducted energy devices such as stun guns, incendiary devices and explosives.

## 4. Responsibilities and Procedures

### 4.1 Prohibition

The possession, wearing, carrying, transporting, or use of a Weapon is strictly forbidden on University-owned or controlled premises, including vehicles parked on such premises. This prohibition extends to any person with a government-issued permit or license. Violation of this policy may result in the following sanctions or disciplinary action:

- Exclusion or expulsion, in the case of students; or

- Exclusion or dismissal from employment, in the case of faculty and staff; or

- Exclusion from campus, in the case of the public.

### 4.2 Exceptions to the Prohibition

The following are exceptions to the general prohibition of Weapons on University-owned or controlled premises:

University Policy #12080                    Possession of Firearms/Weapons on University-Owned or
                                            Controlled Premises

a.  The lawful possession of Weapons by full-time sworn peace officers, Level I reserve officers,
    and qualified law enforcement officers, as such officers are defined in 18 U.S.C. § 926B
    (whether in uniform or off-duty/plain clothes with proper identification). Also included in
    the exception are on-duty armored transport personnel.

b.  The lawful carrying of concealed firearms by a qualified retired law enforcement officer, as
    such officers are defined in 18 U.S.C. §926C and Idaho Code §18-3302H.

c.  A Weapon in the possession of a person who has received prior written authorization from
    the Associate Vice President for Public Safety.

d.  The lawful possession of a Weapon by members of the Reserve Officer's Training Corps
    (ROTC) program, when directed by a provision of the program and with permission of the
    Associate Vice President for Public Safety.

e.  Personal protection pepper spray, e.g. Oleoresin Capsicum or OC, may be carried on
    campus, but not into campus entertainment facilities with a seating capacity of at least one
    thousand (1,000) persons as named in Section 4.2.g.(ii) of this policy.

f.  Household knives intended to be used for, and actually used for, the express purpose of
    cooking and eating.

g.  The lawful carrying of concealed firearms by a person who holds an enhanced license to
    carry concealed Weapons, as described in Idaho Code §18-3302K.. However, it is not lawful
    for a person issued a license under the provisions of Idaho Code §18-3302K to carry a
    firearm within a student dormitory or residence hall, or within any building of a public
    entertainment facility. Specifically, those licenses do not permit carrying of firearms:

    (i.)  Within any student dormitories or residence halls, including, but not limited to:

        • Aspen Townhouse

        • Barnes Towers Hall

        • Cedar Townhouse

        • Chaffee Hall

Page 3 of 6

University Policy #12080                          Possession of Firearms/Weapons on University-Owned or
                                                 Controlled Premises

- Clearwater Suites

- Driscoll Hall

- Keiser Hall

- Hawthorne Townhouse

- Honors College and Sawtooth Hall

- Juniper Townhouse

- Morrison Hall

- Payette Suites

- Spruce Townhouse

- Selway Suites

- Tamarack Townhouse

- University Heights Apartments

- University Manor Apartments

- University Park Apartments

- University Square Apartments

- University Village Apartments

- Leased facilities where students live and the University is the official tenant

(ii.) Within any building of a public entertainment facility with a seating capacity of at least
one thousand (1,000) persons, namely:

- Boas Tennis and Soccer Complex

- Bronco Gym

University Policy #12080                    Possession of Firearms/Weapons on University-Owned or Controlled Premises

- Albertsons Stadium, including all attached facilities with direct access such as the Allen Noble Hall of Fame Gallery, the Bleymaier Football Center, the Caven-Williams Sport Complex, the Fedrizzi Fitness Center Annex, the Idaho Sports Medicine Institute, the Keith and Catherine Stein Band Hall, the Nicolson-Yanke Athletic Center, the Simplot Center for Athletic Excellence, the Stueckle Sky Center, and the Varsity Center Annex.

- Dona Larsen Park

- Morrison Center

- Student Union Building, including all attached facilities with direct access such as the Special Events Center (SpEC)

- Taco Bell Arena, including all attached facilities

h.   It is not lawful for any person to carry a concealed Weapon when intoxicated under the influence of drugs or alcohol.

## 4.3 Weapons Screening

a.   The University may conduct Weapons screening to meet the requirements of this policy. The Department of Public Safety will determine the appropriate security screening procedures in consultation with venue security on a case-by-case basis for some, but not all events on campus.

b.   Screening procedures will be determined based on available security intelligence, threat indicators, attendance, crowd control needs, and specific event contract requirements. Screening procedures may include, but are not limited to, visual inspection, the use of magnetometer devices (including wands and walk-through metal detectors), bag size limitations, bag inspections, and limited pat down searches. Discovery of a Weapon at the screening checkpoint may require a law enforcement assessment of the situation.

## 4.4 Employment

Although this policy permits employees of the University to carry firearms if they hold certain licenses, it does not authorize employees to use a Weapon in any official capacity. Any use of a Weapon by a University employee is not authorized in the course and scope of employment, unless authorized by the Associate Vice President for Public Safety.

Page 5 of 6

**SER-547**

**University Policy #12080**                    Possession of Firearms/Weapons on University-Owned or
                                                Controlled Premises

Any employee who works primarily in one of the areas where firearms are not allowed, listed in Section 4.2.g.(i-ii) of this Policy, and any employee who is regularly expected to respond to one or more of those areas during a shift (e.g., security officers), is not permitted to carry a firearm while on shift.

## Revision History

October 2007; March 2013; June 2014; February 2017; October 2017; April 2019

SER-548

# Exhibit PP

restrains the person from harassing, stalking, or threatening an intimate partner, child of the person, or child of the intimate partner OR engaging in other conduct that would place the intimate partner in reasonable fear of bodily injury to the intimate partner or child. The court order must meet the specific requirements of 18 U.S.C. § 922(g)(8) to be prohibiting.

9. **Person Convicted of a Misdemeanor Crime of Domestic Violence:** This prohibited person category includes any person who has EVER been convicted in any court of a misdemeanor crime of domestic violence regardless of the title of the offense. The offense must meet the definition of "misdemeanor crime of domestic violence" in 18 U.S.C. § 921(a)(33). **Note:** Unlike other prohibited person categories, law enforcement officers purchasing firearms for official use are NOT exempt from this prohibited person category.

10. **Person who has Renounced U.S. Citizenship:** A person has renounced his or her United States citizenship if he or she takes formal steps to renounce her/his citizenship before a diplomatic or consular officer or before an officer designated by the Attorney General during a time of war.

11. **Aliens Illegally or Unlawfully in the United States:** This prohibited person category includes any person who unlawfully entered the United States or who illegally remains in the United States after his or her authorized period of stay has expired.

11a. **Nonimmigrant Aliens:** A nonimmigrant alien is an alien who is lawfully in the United States on a temporary basis for purposes of travel, business, study, etc. The term does NOT include a permanent resident alien (someone who possesses a "green card.") A nonimmigrant alien may only purchase or receive a firearm if he or she: (a) was admitted to the United States for lawful hunting or sporting purposes or presents a valid hunting license or permit issued by a State; (b) qualifies as a foreign diplomat, official, or law enforcement officer as defined at 18 U.S.C. § 922(y)(2); or (c) has received a waiver of the prohibition from the Attorney General.

12. **Sale of a Firearm or Ammunition to a Person Under Age 18:** You may not sell or deliver a firearm or ammunition to a person you know or have reasonable cause to believe is less than 18 years old.

13. **Sale of a Handgun or Handgun Ammunition to a Person Under Age 21:** You may not sell or deliver a firearm other than a rifle or a shotgun—or ammunition other than rifle or shotgun ammunition—to a person who you know or have reasonable cause to believe is less than 21 years old. A firearm frame or receiver is not a rifle or shotgun and may not be sold to a person under 21 years old.

14. **Sale in Violation of State Law or Published Ordinance:** You may not sell or deliver a firearm to any person in any State where the purchase or possession would be in violation of a State law or published ordinance.

    We recommend that you refer to the most recent edition of ATF's *State Laws and Published Ordinances–Firearms*.

## Age Restrictions

As noted above, under Federal law, the minimum age to purchase firearms and ammunition from an FFL is 18. If the firearm is other than a rifle or a shotgun—or ammunition for other than a rifle or a shotgun—the minimum age is 21 [18 U.S.C. 922(b)(1)]. However:

1. You may sell ammunition that is interchangeable between rifles and handguns to a buyer who is at least 18 years of age if you are satisfied that he or she will use the ammunition in a rifle.

2. Regardless of less restrictive State and local age requirements for firearms and ammunition purchases, you must adhere to the above Federal mininum age provisions.

## Transfers Between Licensees

Generally, FFLs may transfer firearms to other FFLs, including interstate transfers, without completing Form 4473 for these transactions. In these instances, the following procedures must be followed:

1. Transactions between licensees must be recorded in the bound book (Acquisition and Disposition or A&D) records of both licensees.

2. The FFL who is buying the firearm must furnish a certified copy of their license to the selling FFL prior to the transfer of any firearm. This certified copy may be emailed or faxed.

**SER-550**

## State Residency Requirements

Generally, you **MAY NOT** sell or transfer a firearm to a non-licensee who resides outside the State in which your licensed premises is located. A person's State of residence is the State in which the person resides and the person is present with the intent of making a home in that State.

**Military members on active duty and legal aliens have special residency considerations.**

A member of the Armed Forces on active duty is a resident of the State in which his or her permanent duty station is located. FFLs may accept electronic permanent change of station (PCS) orders, accompanied by a valid military identification card, to establish residency for an active duty military member of the Armed Forces.

A buyer who is not a citizen of the United States must provide additional documentation (beyond a valid Government-issued photo identification that contains the buyer's name, residence address, and date of birth) to establish that he or she has resided in a State continuously for at least 90 days immediately prior to the date of the sale or delivery of the firearm. Examples of acceptable documentation include, but are not limited to, utility bills, bank statements, rent receipts, and mortgage payments. This original documentation must contain the buyer's name (not the name of someone they are living with) and home address.

**Permitted Sales to Non-Residents of Your State**

You may sell a firearm to a person who does not reside in your State by shipping the firearm to a licensed dealer in the buyer's State of residence and having the buyer take possession of the firearm from that licensee. The licensed dealer in the buyer's State of residence is responsible for the Form 4473 and NICS background check. Your A&D records should reflect the transfer to the out-of-State FFL and not to the end purchaser.

You may make an over-the-counter sale of a rifle or shotgun to a non-resident if the transaction complies with all the laws of your State and the laws of the buyer's State.

We recommend that you refer to the most recent edition of ATF's *State Laws and Published Ordinances– Firearms*, prior to consummating an over-the-counter sale of a rifle or shotgun to an out-of-State resident.

## General Identification Requirements

You **MUST** verify the identity of each non-licensee buyer by examining the person's identification document(s) prior to transferring a firearm. A proper "identification document" is:

1. A document containing the name, residence address, date of birth, and photograph of the person;

2. A document that was made or issued by or under the authority of the U.S. Government, a State or local government, or a foreign government;

3. A document that is of a type commonly accepted for the purpose of identification of individuals.

Common examples of acceptable identification documents are a valid driver's license or a valid State identification card issued in lieu of a driver's license. Social security cards are not acceptable because they do not contain a residence address, date of birth, or photograph. However, a firearms buyer may be identified by any combination of documents which together contain all of the required information (as long as all the documents are Government issued): name, residence address, photograph, and date of birth.

**Military members and legal aliens may have special identification document considerations.**

No additional valid identification documentation is required of an active-duty member of the Armed Forces or a legal alien if he or she possesses a valid identification document (e.g., driver's license) that contains his or her name, residence address, date of birth, and photograph and is issued by the State in which your business premises is located. If a member of the Armed Forces or a legal alien does not possess a valid, State-issued identification document with the necessary information, you may accept a combination of valid Government-issued documents to satisfy the identification document requirement. A member of the Armed Forces on active duty may satisfy the identification document requirement by presenting his or her military identification card along with official orders showing his or her permanent duty station.

6

**SER-551**

1                                      Honorable Ronald B. Leighton

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON

8                          AT TACOMA

9

10 DANIEL MITCHELL, et al.,                    No. 3:19-cv-05106 RBL

11                       Plaintiffs,       

12      v.                           DECLARATION OF APRIL
                                 SCHENTRUP IN SUPPORT OF

13 CHARLES ATKINS, et al.,                DEFENDANTS' AND INTERVENOR-
                                 DEFENDANT'S CROSS-MOTION FOR

14                  Defendants,    SUMMARY JUDGMENT AND
                                 OPPOSITION TO PLAINTIFFS'

15      and                          MOTION FOR SUMMARY
                                 JUDGMENT

16 SAFE SCHOOLS SAFE COMMUNITIES,

17              Intervenor-Defendant.

18

19

20

21

22

23

24

25

26

27

DECLARATION OF APRIL SCHENTRUP –
SUMMARY JUDGMENT - 1
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

I, April Schentrup, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I currently reside in Bellevue, Washington. I am a Field Supervisor for the Seattle Pacific University College of Education, a job in which I oversee teacher internships.

3. Prior to living in Bellevue, I lived and worked in Florida, where I was an elementary school teacher, assistant principal, and principal for over 20 years. I also briefly served as the Director of School Safety and Security for Broward County Public Schools.

4. I am the mother of three children. I also have the unfortunate distinction of having to endure one of the most heart-wrenching and traumatic experiences a parent can go through: the entirely preventable loss of a child. My daughter, Carmen, was shot multiple times and killed by a 19-year old who used a legally purchased semiautomatic assault rifle to carry out a mass shooting at her school.

5. In February 2018, my two daughters Carmen and Evelyn were students at Marjory Stoneman Douglas High School in Parkland, Florida ("MSD"). At the time, Carmen was a senior and Evelyn was a freshman.

6. Carmen was an exceptionally bright, motivated and caring teenager. Although she was a senior in high school, she was only 16 years old. She completed two grade levels in one year in elementary school, allowing her to skip a grade. She was taking six or seven AP classes her senior year and was a National Merit Scholar.

7. Carmen could do anything she set her mind to and liked to challenge herself. She played violin, piano, and guitar and would learn songs on her own. At one point, she decided it would be interesting to live in Germany, so she created a PowerPoint presentation for our

DECLARATION OF APRIL SCHENTRUP –
SUMMARY JUDGMENT - 2
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

family to convince us to visit the country. She learned German on her own and then served as tour guide for our family during the trip. And after our family left, Carmen stayed longer with family friends to further her language skills. Carmen continued this passion by signing herself up for a German class at nearby Broward College, which she took on top of her full high school schedule her senior year.

8.  Carmen constantly looked for ways to be involved and improve the world. She served as President of our church's youth group. At MSD, she was President of the acapella club, a member of the Gay/Straight Alliance to support her LGBTQ friends, and active in the Health Occupation Students of America.

9.  Carmen's interest in health-related careers was based on her plan to become a medical researcher and find a cure for ALS. One of her aunts had died of ALS and Carmen wanted to make a difference for other families affected by the disease.

10. Carmen was planning to study pre-med in undergrad. She selected schools based on their medical research capabilities. She recently learned that she had been accepted into the University of Florida. Her acceptance to the University of Washington arrived shortly after she was killed.

11. Carmen also was, in many ways, a typical teenager. She loved being with her friends, riding horses, and the independence that comes with starting to drive.

12. Perhaps most importantly, Carmen was funny, helpful, and loving to her family and friends. She had incredible gifts to contribute and the motivation and excitement to do so.

13. On the morning of February 14, 2018, I got up as normal to get ready for work at my job as the Principal of Pembroke Pines Elementary School. I had made Valentine's Day goody bags for my girls. I put them on the counter and knocked on their doors to let them

DECLARATION OF APRIL SCHENTRUP –
SUMMARY JUDGMENT - 3
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

know I was going to work. I said to them through the doors: "Happy Valentine's Day. Love you. Have a great day at school." But I didn't see them before I left for work.

14. The day was proceeding as normal until about 2:30pm. Around that time, I received a text from my youngest daughter, Evelyn, which read: "I'm safe." I did not know what was going on, so I asked: "Where are you?"

15. Soon after, a friend of mine who also worked in the Parkland schools called my school and informed me that there was a lockdown at MSD. This was the first I heard of a lockdown, but I still did not know what was going on.

16. I then called a friend who let me know there were reports of a school shooting.

17. I texted Evelyn back and then texted Carmen to find out where she was and what was going on. Evelyn responded that she had been evacuated from the school and was at the Wal-Mart near the school. I called my husband to update him and he went to the Wal-Mart to pick up Evelyn.

18. I had not heard back from Carmen yet so I attempted to go to the school to try to find her. I could not reach the school due to the police activity. I went to a nearby park to wait.

19. At the park, I contacted people I knew at the school and texted Carmen's friends to see if they knew anything. Carmen's friends texted back and said they heard that Carmen was injured and maybe taken in an ambulance.

20. I then contacted the Sheriff's office and all of our local hospitals. Many would not share any information, so I drove to the hospitals to see if Carmen was there.

21. One of the hospitals said they did not have Carmen listed, but they did have some female students that may fit her description. I gave them a picture of Carmen and the hospital staff said they would look around.

DECLARATION OF APRIL SCHENTRUP –
SUMMARY JUDGMENT - 4
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

22. A chaplain and a police officer then came over to talk with me. In talking with them, the gravity of the situation dawned on me for the first time. Up until that point, I had not understood the scope of the tragedy; that this was a mass shooting with several people injured and killed.

23. The hospital staff then returned and let me know that Carmen was not there. I learned that all family members looking for their children were to go to the nearby Marriott hotel. Around 6:00pm, the chaplain drove me to the Marriott.

24. The scene at the Marriott was chaotic. There was a table of police officers asking for the names of people for whom families were searching. The police officers did not have Carmen's name on their list and did not know where she was. I saw one of Carmen's teachers and asked if she knew anything. She told me that Carmen was in Ms. Reoven's AP Psychology class at the time of the shooting and that Ms. Reoven was at the Marriott being interviewed by the police.

25. I asked the police if I could speak with Ms. Reoven, because I still was under the impression that Carmen was injured. But I did not know whether that meant she had been shot, had a fall, or something else. I was not able to speak with Ms. Reoven.

26. The police eventually separated us into different groups. I was put in a group of people where the police asked us for our loved ones' full names, birthdates, description of what they were wearing, and recent pictures. At that moment, I had a really bad gut feeling. I called my brother-in-law, who works in the Gainesville, Florida police department, and asked him what that meant. He said if that if I was being asked those questions then Carmen likely had been killed.

27. Our family had put out pleas for information on social media. Around 10:30pm, an older

DECLARATION OF APRIL SCHENTRUP –
SUMMARY JUDGMENT - 5
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

sister of one of Carmen's classmates called me. She said her sister could not speak, but that the gunman had shot into Carmen's classroom and that Carmen was one of the students who had been shot. She then told me that later, when the police evacuated the class, Carmen remained in the classroom. When I heard this I knew my worst nightmare had come true: Carmen was gone.

28. Around midnight, the FBI said they would start calling individual families. At about 2:00am, the FBI called me in and told me that Carmen was one of the deceased. She had been fatally shot in the classroom.

29. I then went home and had to tell my other children that our Carmen, with whom we so recently had been talking and laughing, had been killed.

30. Carmen was killed in a mass shooting carried out by Nikolas Cruz, a 19-year old former MSD student. He used a single firearm in the attack: a Smith and Wesson MP-15 with eight 30- and 40-round capacity magazines. Cruz legally purchased this AR-15 style semiautomatic assault rifle from a gun shop the year before, when he was 18.

31. Cruz used this single semiautomatic assault rifle to fire over a hundred rounds of ammunition in a short time. The state of Florida created the Marjory Stoneman Douglas High School Public Safety Commission to investigate and document the details and timeline of the shooting. The Commission reports and to-the-second timelines are publicly available at http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf and http://www.fdle.state.fl.us/MSDHS/MSD-Report-2-Public-Version.pdf.

32. Cruz did not enter a single classroom during the shooting. Instead, he used his semiautomatic assault rifle to gun down students and staff in the hallways and by shooting through windows in the classroom doors. Carmen's classroom was the third

DECLARATION OF APRIL SCHENTRUP –
SUMMARY JUDGMENT - 6
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

room Cruz shot into. Carmen's teacher had gathered the students in a "safe corner" in her classroom. But not all the students could fit in the corner. Carmen and three other students were left on the edge. Cruz shot these four students, injuring three of them and killing Carmen. Carmen was struck by four bullets, including a fatal shot to the back of her head. Her friend next to her was shot three times. The other two students were shot in the knee and the arm. Cruz was at Carmen's classroom door for no more than 9 seconds before he continued on his killing spree.

33. It took less than two minutes for Cruz to unpack his semiautomatic assault rifle, load his magazines, and open fire on the first floor at MSD before moving to the next floor. In around 120 seconds he shot 24 students and staff, killing 11, including Carmen, and injuring 13. In total, Cruz used his single semiautomatic assault rifle to kill 17 people and injure 17 others throughout MSD in a matter of minutes.

34. I cannot put into adequate words how the loss of Carmen has impacted my and my family's life. On the morning of February 14, 2018, I was happy and had what I considered a great life: three amazing children, a great husband, a job I loved. I felt complete.

35. Now, my life is defined as before and after Carmen's death. I feel broken and like I have a hole inside that cannot be filled. I cannot answer simple questions people, like: "Do you have children?" and "How old are your kids?"

36. I am sad every day thinking about how Carmen is no longer here. I miss her. I miss her silly jokes. Her playing the piano. Her little conversations about how she is thinking. Her thoughts about how to make the world a better place. My world is incomplete without her. I want to remember the happy memories. But every time I do, it comes with the

DECLARATION OF APRIL SCHENTRUP –
SUMMARY JUDGMENT - 7
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

sadness of knowing that there are no future memories to make with Carmen.

37. I also think about the dreams she had and how those will not be fulfilled now. Her dream of curing ALS. Her plan to adopt children when she was older. I think of what she would be doing now, who she would be dating, and how her life would be as we grow older. But those dreams and those thoughts have all been taken from me, and more importantly from Carmen.

38. At family get-togethers it is obvious that Carmen is not there. Her absence is clear. But as a family it is more painful to talk about it, so now we don't. As her siblings and extended family attempt to continue on with their lives it is obvious that they have been scarred. The trauma of losing our Carmen in such a violent, senseless, and sudden manner is something that will stay with us forever.

39. Words are not enough to express how my and my family's lives have been devastated by this act of gun violence. Our Carmen is gone. An obviously troubled teenager decided to use his legally purchased semiautomatic assault rifle to commit one of the worst, but sadly not the only, school shootings in our nation's history. As a result, Carmen is no longer a bright shining star in this world and my life will never be the same.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNED this 6 day of March, 2020, at Bellevue , Washington.

April Schentrup

DECLARATION OF APRIL SCHENTRUP –
SUMMARY JUDGMENT - 8
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1

2

**<u>CERTIFICATE OF SERVICE</u>**

3

    I hereby certify that on this 5th day of March, 2020, I electronically filed the foregoing

4

document with the Clerk of the United States District Court using the CM/ECF system which will

5

send notification of such filing to all parties who are registered with the CM/ECF system.

6

7

8

    DATED this _____ day of March, 2020.

9

10

_____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF APRIL SCHENTRUP –
SUMMARY JUDGMENT - 9
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1

2

3

4

5

6                                                      The Honorable Ronald B. Leighton

7                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
8                                    AT TACOMA

9    DANIEL MITCHELL, et al.,                    NO. 3:19-cv-5106

10                         Plaintiffs,           DECLARATION OF
                                                 FREDERICK P. RIVARA, MD,
11        v.                                     MPH

12   CHARLES ATKINS, et al.,

13                         Defendants,

14        and

15   SAFE SCHOOLS SAFE COMMUNITIES,

16                         Intervenor-Defendant.

17

18        I, Frederick P. Rivara, MD, MPH, declare as follows:

19        1.      I am over the age of 18, competent to testify as to the matters herein and make

20   this declaration based on my personal knowledge.

21        2.      I was retained by the Washington Attorney General's Office, counsel to

22   Defendant Teresa Berntsen, to serve as a testifying expert witness in this case. Attached as

23   Exhibit A is a true and correct copy of that report I prepared as part of my assignment. The report

24   contains the opinions I have reached in this case and the basis and reasons for them. If called to

25   testify as a witness, I could and would testify competently to the matters set forth therein.

26

DECLARATION OF FREDERICK P.            1          ATTORNEY GENERAL OF WASHINGTON
RIVARA, MD, MPH                                            800 Fifth Avenue, Suite 2000
NO. 3:19-cv-5106                                            Seattle, WA  98104-3188
                                                               (206) 464-7744

SER-561

1      I declare under penalty of perjury under the laws of the State of Washington and the

2    United States that the foregoing is true and correct.

3          DATED this _____ day of March, 2020, at _____.
            24                              Seattle,
                                            Washington

4

5

6                                   Frederick P. Rivara, MD, MPH

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF FREDERICK P.            2          ATTORNEY GENERAL OF WASHINGTON
RIVARA, MD, MPH                                              800 Fifth Avenue, Suite 2000
NO. 3:19-cv-5106                                                Seattle, WA  98104-3188
                                                                   (206) 464-7744

SER-562

# Exhibit A

Case: 20-35827, 02/26/2021, ID: 12018799, DktEntry: 17-4, Page 108 of 290

Expert Report: The Public Health and Medical

Care Implications of Semiautomatic Assault Rifles

**Prepared for Washington State Office of the Attorney General by**

Frederick P. Rivara, MD, MPH


**In the Matter of:**


DANIEL MITCHELL, *et al.*,

*Plaintiffs*,

v.


CHARLES ATKINS, *et al.*,

*Defendants*,

and


SAFE SCHOOLS SAFE COMMUNITIES,


*Intervenor-Defendant.*


Date: _10/16/19_                    Signed: _____

Frederick P. Rivara, MD, MPH

TABLE OF CONTENTS:

I.      INTRODUCTION............................................................................1

II.     QUALIFICATIONS.........................................................................1

III.    PUBLIC HEALTH IMPACT OF FIREARMS......................................2

IV.     THE SPECIAL PUBLIC HEALTH RISKS OF
        SEMIAUTOMATIC ASSAULT RIFLES.............................................3

V.      THE MENTAL HEALTH CONSEQUENCES OF MASS
        SHOOTINGS................................................................................7

VI.     THE DANGEROUS CLINICAL CONSEQUENCES OF
        SEMIAUTOMATIC RIFLES AND PISTOLS
        WEAPONS...................................................................................8

VII.    CONCLUSIONS............................................................................10

APPENDIX 1: CURRICULUM VITAE .......................................................11

APPENDIX 2: PUBLICATIONS AUTHORED IN THE PAST 10 YEARS.........76

APPENDIX 3: FACTS AND DATA CONSIDERED........................................98

## I.   INTRODUCTION

I was asked by the Washington Attorney General's Office, counsel for Defendant Teresa Berntsen, for my expert opinion on whether and to what extent (1) semiautomatic assault rifles present a danger to health and public health, and (2) semiautomatic assault rifles present challenges for medical providers in treating injuries caused by such weapons. I believe that semiautomatic assault rifles present an exceptional danger to public health and present increased challenges for medical providers, including the risk of death for those who are shot by such weapons.

## II.   QUALIFICATIONS

I am a Professor of Pediatrics and Adjunct Professor of Epidemiology at the University of Washington, where I have been a faculty member for the last 35 years. I practice clinically at Harborview Medical Center, Washington State's only Level I regional adult and pediatric trauma center. I have devoted my career to the study and prevention of injuries to individuals of all ages, and this has included injuries related to firearms. *See* Appendix 1 (curriculum vitae). I have published over 600 articles in the peer-reviewed scientific literature, mostly on injuries. *See* Appendix 2 (publications in last 10 years). I lead the University of Washington's Firearm Injury & Policy Research Program, which is funded by the state of Washington. I have been recognized for my work with a number of awards, including American Academy of Pediatrics, Section on Injury and Poison Prevention, Physician Achievement Award, 1994; the American Public Health Association, Injury Control and Emergency Health Services Section Distinguished Career Award, 1995; the Charles C. Shepard Science Award, Centers for Disease Control and Prevention, 1998; the Injury Free Coalition Prevention Pioneer Award, 2015; the Pediatric Trauma Society Lifetime Achievement Award, 2016; and election to the National Academy of Medicine

(formerly Institute of Medicine), 2005. I am providing my expert opinions pro bono and I am

not receiving compensation for my study or testimony in this case. I have not testified or

performed work as an expert witness in any case in the past four years.

## III.   PUBLIC HEALTH IMPACT OF FIREARMS

Firearm injuries and deaths are an enormous public health problem and have been

for decades. In 2017, more than 39,000 individuals in the U.S. died from firearm injuries.[1]

Over the last 100 years, there has been a 95% reduction in the number of deaths per mile

driven from motor vehicle crashes, due to a combination of laws and regulations on motor

vehicles, drivers, roads and highways, as well as improved medical and surgical care of

trauma patients. In contrast, the rate of deaths from firearms per 100,000 population has

not declined as rapidly, and has actually increased in the last five years. Firearm injuries

are a public health crisis that shows no sign of abating.[2] As with other public health

problems, the state has a duty to reduce the risk of injury and death to residents of the

state, using every appropriate means available. The health cost to the state is too great to

ignore firearm injuries.

In Washington State, there were 849 deaths from firearms in 2017 and the number

of deaths from firearms has exceeded those from motor vehicles every year since 2008.[3] In

King County, 51% of the shooting victims were under the age of 25.[4]

---

[1] Centers for Disease Control and Prevention. Injury Prevention & Control: Data and Statistics
(WISQARS). 2019.
[2] Bauchner H, Rivara FP, Bonow RO, Bressler NM, Disis MLN, Heckers S, et al. Death by Gun
Violence-A Public Health Crisis. JAMA Dermatol 2017;153(12):1223-1224.
[3] Centers for Disease Control and Prevention. Injury Prevention & Control: Data and Statistics
(WISQARS). 2019.
[4] King County Prosecuting Attorney's Office, December 2019.

It is also instructive to compare the number of people dying from firearms in the U.S. to those dying from other causes. In 2017, the last year data are available from the CDC, for those under the age of 45 years, 7,250 people died from cancer, and fewer than 1,000 from AIDS. In contrast, 22,467 people in this age group died from firearms.

It is very clear that firearms are an enormous public health problem that dwarfs many other problems in the U.S.

## IV. THE SPECIAL PUBLIC HEALTH RISKS OF SEMIAUTOMATIC ASSAULT RIFLES

Semiautomatic assault rifles[5] pose special risks to the public because of the number of bullets that can be shot in a very short period of time. A study[6] of 10 large cities, including Seattle, examined criminal activity involving all assault weapons (mostly semiautomatic assault rifles and some semiautomatic pistols) and large capacity magazine firearms (LCM). Assault weapons accounted for 2.4-8.5% of crime guns recovered in the time period studied, 2011-14. In Seattle, semiautomatic assault rifles accounted for 7.9% of crime guns in 2012-2014 and 36.2% of all crime guns were LCM compatible. Nationally, 15.5% of guns used to kill police officers in 2009-13 were semiautomatic assault rifles.

A recent study from Minneapolis[7] found that incidents involving more than 10 shots fired were about 3-fold more likely to result in multiple victims shot than incidents involving 10 or fewer shots fired. Semiautomatic assault rifles are designed specifically to provide that ability to fire many bullets in a very short period of time. For example, in the

---

[5] The state of Washington has defined a "semiautomatic assault rifle" as "any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge." RCW 9.41.010(26).
[6] Koper CS, Johnson WD, Nichols JL, Ayers A, Mullins N. Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources. J Urban Health 2018;95(3):313-321.
[7] Koper CS, Johnson WD, Stesin K, Egge J. Gunshot victimisations resulting from high-volume gunfire incidents in Minneapolis: findings and policy implications. Inj Prev 2019;25(Suppl 1):i9-i11.

Expert Report of Frederick P. Rivara, MD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL
Page 3 of 98

mass shooting in Dayton, Ohio, on August 4, 2019, the shooter used a semiautomatic assault weapon[8] AM-15 to kill 9 people and wound 27 others in *32 seconds*.[9] Other data also indicate that the number of victims wounded and killed is greater when a semiautomatic assault rifle is used. In 248 active shooter incidents identified by the FBI between 2000-2017, 61 (24%) involved a semiautomatic assault rifle.[10] Active shooter incidents involving semiautomatic assault rifles were associated with a higher incidence of persons wounded (mean, 5.48 vs 3.02; incidence rate ratio [IRR], killed (mean, 4.25 vs 2.49; IRR, 1.97), and wounded or killed (mean, 9.72 vs 5.47; IRR, 1.91).

Another recent study examined civilian public mass shootings from 2000 to 2016.[11] This study analyzed 27 mass shootings that occurred during this period of time. There were 247 victims, of whom 104 (44.8%) were shot with a semiautomatic assault rifle.[12]

In terrorist attacks captured in the Global Terrorism Database between 2002-16, the highest proportion of attacks involving firearms was in the US (20.4%). The number of fatalities per attack was also highest when firearms were used (4.75 fold higher than attacks with explosives).[13]

---

[8] Reports differ on the type of weapon. The New York Times reported it was an AR-15 style rifle. https://www.nytimes.com/2019/08/13/us/dayton-shooter-video-timeline.html. The Wall Street Journal reports it was a pistol based on an AR-15 style semiautomatic assault rifle. All reports agree it was a semiautomatic firearm with a 100 round magazine.
[9] https://abcnews.go.com/US/26-shot-32-seconds-details-videos-released-dayton/story?id=64953910
[10] de Jager E, Goralnick E, McCarty JC, Hashmi ZG, Jarman MP, Haider AH. Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States. JAMA 2018;320(10):1034-1035.
[11] Sarani B, Hendrix C, Matecki M, Estroff J, Amdur RL, Robinson BRH, et al. Wounding Patterns Based on Firearm Type in Civilian Public Mass Shootings in the United States. J Am Coll Surg 2019;228(3):228-234.
[12] This was determined from autopsy reports and media reports, per personal communication with Dr. Sarani, November 27, 2019.
[13] Tessler RA, Mooney SJ, Witt CE, O'Connell K, Jenness J, Vavilala MS, et al. Use of firearms in terrorist attacks: differences between the US, Canada, Europe, Australia, and New Zealand. JAMA Internal Medicine 2017;177.

One measure of the public health impact of semiautomatic assault rifles is the effect of bans of semiautomatic assault rifles and high capacity magazines. There is increasing data supporting the effect of the 1994-2004 federal assault weapons ban in decreasing firearm fatalities. Donohue and Boulouta[14] examined the effect of the federal assault weapons ban on mass shootings. While the violent crime rate has steadily decreased from 1994 to the present, the number of gun fatalities in mass shootings decreased from 81 total during the 11-year period of 1984-1994 to 49 total during the 10 years of the assault weapons ban, but increased dramatically to 219 total during the 10 years thereafter, and was 217 total from 2015 to September 2, 2019. The number of deaths per incident was 8.2 during the assault weapons ban, but is 18.1 from 2015 to the present.

In another study of the effects of the federal assault weapons ban, Dimaggio, Avraham, Berry et al[15] examined mass shooting events occurring between 1981-2017, using data from the Los Angeles Times, Mother Jones Magazine, and Stanford University; these sources have been used in a number of studies. They identified 44 mass shootings, using the FBI definition of 4 or more fatalities, not including the mass shooter. A total of 501 people were killed in these shootings. Incidents in which weapons were characterized as semiautomatic assault rifles accounted for 85.8% of the fatalities overall, and all mass-shooting fatalities in 15 of the 24 years in which a mass shooting was reported. The study authors calculated that mass shooting fatalities were 70% less likely to occur during the ban period.

---

[14] Donohue JJ, Boulouta T. The assault weapons ban saved lives. In: SLS Blog: Stanford Univesity; 2019.
[15] DiMaggio C, Avraham J, Berry C, Bukur M, Feldman J, Klein M, et al. Changes in US mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data. J Trauma Acute Care Surg 2019;86(1):11-19.

Another effort to reduce the number of semiautomatic assault rifles in the population is in Australia. On April 18, 1996, a gunman used 2 semiautomatic assault rifles to kill 35 people and wound 19 others. Within weeks, the government in Australia banned all semiautomatic assault, self-loading and pump action rifles. In addition, by January 1, 1997, all 8 provincial governments in Australia commenced a mandatory buyback, funded by a one-off levy on income tax, at market price of prohibited firearms. As of August 2001, 659,940 newly prohibited semiautomatic assault and pump-action rifles and shotguns had been purchased by the federal government from their civilian owners at market value and destroyed. While there had been 13 mass shootings (defined as 5 or more fatalities, not including the shooter) in Australia between 1979-1996, *none have occurred since* the action by the government of Australia to outlaw and remove all semiautomatic assault rifles.[16]

An important component of a semiautomatic assault rifle's ability to shoot a large number of bullets in a short period of time and thus increase its risk for harm is the use of large capacity magazines (LCMs). Therefore, examining bans on LCMs is useful to assess the potential effect of limiting the sale of semiautomatic assault rifles. A recent study of the effect of LCM bans on high fatality mass shootings is instructive.[17] Between 1990 and 2017, there were 69 high-fatality mass shootings. Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states and the annual number of deaths was more than 3 times higher. States without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents. LCM bans

---

[16] Chapman S, Alpers P, Jones M. Association Between Gun Law Reforms and Intentional Firearm Deaths in Australia, 1979-2013. JAMA 2016;316(3):291-9.
[17] Klaveras L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. Am J Public Health 2019;109:1754-1761.

appear to reduce both the incidence of, and number of people killed in, high-fatality mass shootings.

The available data on semiautomatic assault rifles indicates they have played an important and disproportionate role in mass shootings in the United States and appear to be the weapon of choice when an individual wants to shoot and kill as many people as possible in a short period of time. The available data also indicate that restrictions on purchase or possession of these rifles can result in a reduction of mass shooting deaths, as shown both in the US and in Australia, and thus have important positive impact of health and public health.

## V. THE MENTAL HEALTH CONSEQUENCES OF MASS SHOOTINGS

Since semiautomatic assault rifles are commonly used in mass shootings, it is important to also look at the mental health consequences of mass shootings.[18]

Children and adolescents exposed to mass shootings suffer from a variety of consequences.[19] This includes PTSD, decreased school performance, disruptive behavior at school, depression, and anxiety. Adults exposed to mass shootings also have a heightened risk of PTSD, depression, anxiety, subsequent substance abuse, sleep problems, panic disorder and social phobia, increased fear and decreased sense of safety. "In summary, the limited research suggests that mass shooting incidents can lead to an array of mental health problems in survivors and members of affected communities. Furthermore, they

---

[18] Rowhani-Rahbar A, Zatzick DF, Rivara FP. Long-lasting Consequences of Gun Violence and Mass Shootings. JAMA 2019;321(18):1765-1766.
[19] Travers A, McDonagh T, Elklit A. Youth Responses to School Shootings: a Review. Curr Psychiatry Rep 2018;20(6):47.

have been associated with increased fears and decreased perceptions of safety in indirectly exposed populations."[20]

It is clear that mass shootings, many of which are committed with semiautomatic assault rifles, have substantial effects on the mental health of survivors, as well as people in the community. We are now only beginning to study and understand these consequences.

## VI.   THE DANGEROUS CLINICAL CONSEQUENCES OF SEMIAUTOMATIC ASSAULT RIFLES AND PISTOLS WEAPONS

Injuries from firearms are a major burden on the health care system. If the firearm injury victim does not die at the scene of the injury, that person is brought to a hospital, often times trauma centers such as Harborview Medical Center. Trauma centers are very good at saving lives of injured patients, and the chances of survival is much better in such trauma centers than at community hospitals.[21]

Unfortunately, the difficulty treating victims of firearm injuries has increased in recent years. While deaths from other mechanisms of injury such as motor vehicle crashes has decreased over time due to the care provided in trauma centers, the case-fatality rate – the proportion of gunshot wound (GSW) victims who die – has been increasing over the last decade.[22] The reason for this is that the severity of GSW injuries has increased, likely due to more bullet wounds per person and the increased severity of those wounds. The improvements in trauma care that have led to reductions in deaths from other causes of trauma have not been able to keep pace with the severity of the GSW injuries now being treated in trauma centers. In Denver, for example, the case fatality rate of GSW victims

---

[20] Lowe Sr, Galea S. The mental health consequences of mass shootings. Trauma Violence Abuse 2017;18(1):62-82.
[21] MacKenzie EJ, Rivara  FP, Jurkovich G, Nathens AB, Frey KP, Eggelston BL, et al. A national evaluation of the effect of trauma center care on mortality. New Engl J Med 2006;354(4).
[22] Sauaia A, Gonzalez E, Moore HB, Bol K, Moore EE. Fatality and Severity of Firearm Injuries in a Denver Trauma Center, 2000-2013. JAMA 2016;315(22):2465-7.

Expert Report of Frederick P. Rivara, MD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL
Page 8 of 98

treated increased by 6% per year between 2000-2013.[23] In a study of national data from trauma centers between 2003-13, Tessler, colleagues, and I showed that the case fatality rate decreased during this period for motor vehicle crash victims but did not decrease for firearm injury victims.[24] Case-fatality percentages across nearly all injury severity categories were decreasing for motor vehicle crash victims yet stayed flat for firearm assault and unintentional firearm injury victims. Another national study from 1993-2014 showed an increase each year during this period in the severity of GSW patients admitted to hospitals in the US.[25]

Injuries from semiautomatic weapons pose increased clinical challenges. In some of our research at the University of Washington, we examined national data from trauma centers in the U.S. using the National Trauma Databank, 2007-2016 and identified 564 patients which were identified as suffering from gunshot wounds in which a semiautomatic weapon was involved. The injuries sustained by gunshot wounds from semiautomatic weapons were more severe than those sustained from other firearms. Those injured with a semiautomatic weapon were more likely to be admitted to the ICU than victims shot with other types of firearms (46.1% compared to 32.7%). Firearm assault victims shot with a semiautomatic weapon also needed more operations than victims shot with other types of firearms (mean of 9.6 operations compared to 5.6). I also found that among firearm assault injuries where a type of firearm was specified, mortality was higher among victims of semiautomatic weapons than other firearm injury types, 16.3% vs 12%. At Harborview

[23] Sauaia A, Gonzalez E, Moore HB, Bol K, Moore EE. Fatality and Severity of Firearm Injuries in a Denver Trauma Center, 2000-2013. JAMA 2016;315(22):2465-7.
[24] Tessler RA, Arbabi S, Bulger EM, Mills B, Rivara FP. Trends in Firearm Injury and Motor Vehicle Crash Case Fatality by Age Group, 2003-2013. JAMA Surg 2019;154(4):305-310.
[25] Kalesan B, Zuo Y, Xuan Z, Siegel MB, Fagan J, Branas C, et al. A multi-decade joinpoint analysis of firearm injury severity. Trauma Surg Acute Care Open 2018;3(1):e000139.

Medical Center the median charge (2012-2018) for young adult patients injured with semiautomatic weapons was $36,845, more than $10,000 higher than the median charges for firearm injuries, indicating a substantial burden on the health care system.

## VII.   CONCLUSIONS

For many years, firearms were viewed solely as a criminal justice issue. However, firearms are now recognized as an enormous public health and health problem in the United States. Semiautomatic assault rifles pose a special risk for the population in that they commonly are used in mass shootings and the injuries they cause are more severe than those commonly due to other firearms and more often result in death. In my opinion, as a matter of the public health, the state has a substantial basis for restricting the sale and possession of semiautomatic assault rifles.

**APPENDIX 1: CURRICULUM VITAE**

### Frederick P. Rivara, M.D., M.P.H.

| | |
|---|---|
| Date of Birth: | May 17, 1949 |
| Place of Birth: | Far Rockaway, New York |

| | |
|---|---|
| Current Appointments: | Professor of Pediatrics, University of Washington, School of Medicine |
| | Adjunct Professor, Epidemiology, University of Washington, School of Public Health |
| | Vice Chair for Academic Affairs, Department of Pediatrics, University of Washington, School of Medicine |
| | Seattle Children's Guild Endowed Chair in Pediatric Research |
| | Director, Firearm Injury and Policy Research Program, University of Washington |
| Contact information: | Harborview Injury Prevention and Research Center Box 359960, 325 Ninth Ave, Seattle, WA   98104 (206) 744-9449, fax (206) 744-9962, email: fpr@uw.edu |

EDUCATION:

| | |
|---|---|
| 1966 - 1970 | College of the Holy Cross Worcester, Massachusetts |
| 1970 - 1974 | University of Pennsylvania Philadelphia, Pennsylvania |
| 1978 - 1980 | University of Washington Seattle, Washington |

DEGREES OBTAINED:

| | |
|---|---|
| 1970 | B.A., Summa Cum Laude, College of the Holy Cross |
| 1974 | M.D., University of Pennsylvania |
| 1980 | M.P.H., University of Washington |

PROFESSIONAL TRAINING:

| | |
|---|---|
| 1974 - 1976 | Intern and Junior Assist. Resident, Pediatrics, Children's Hospital Medical Center, Boston, MA |
| 1978 - 1980 | Senior Assistant Resident in Pediatrics and Senior Fellow, Univ. of Washington, Seattle, Washington |

| | |
|---|---|
| 1978 - 1980 | Fellowship, Robert Wood Johnson Clinical Scholar, University of Washington, Seattle, Washington |
| 1993 | Visiting Scholar, Institute of Criminology, Cambridge University, Cambridge, United Kingdom |
| 1994 | Visiting Faculty, University of Malaysia, Kuala Lumpur, Malaysia |

ACADEMIC
APPOINTMENTS:

| | |
|---|---|
| 1978 - 1980 | Acting Instructor, Department of Pediatrics, University of Washington |
| 1981 - 1984 | Assistant Professor, Department of Pediatrics and Community Medicine, University of Tennessee Center for the Health Sciences |
| 1984 | Associate Professor of Pediatrics, University of Tennessee Center for the Health Sciences |
| 1984 - 1989 | Associate Professor of Pediatrics, Adjunct Associate Professor of Epidemiology, University of Washington |
| 1989 - | Professor of Pediatrics, Adjunct Professor of Epidemiology, Univ. of Washington |

PROFESSIONAL
POSITIONS:

| | |
|---|---|
| 1976 – 1978 | Medical Director, Outreach Services, Family Health Services, Hazard, Kentucky |
| 1976 - 1978 | National Health Service Corps, Family Health Services, Hazard, Kentucky |
| 1981 - 1984 | Director, Resident Continuity Clinic Program, Dept. of Pediatrics, University of Tennessee |
| 1983 - 1984 | Medical Director, Southern Poison Center |
| 1981 - 1984 | Associate Director, Ambulatory Care, LeBonheur Children's Medical Center |
| 1981 - 1984 | Pediatric Coordinator, Robert Wood Johnson Rural Infant Care Project |
| 1987 - 2000 | Director, Harborview Injury Prevention & Res. Ctr |
| 1990 – 1991 | President of Medical Staff, Harborview Med. Center |
| 2001 – 2002 | President of Medical Staff, Harborview Med. Center |

| 1994 - 2015 | Head, Division of General Pediatrics, University of Washington |
| 1997- | Vice Chair for Academic Affairs, Department of Pediatrics, University of Washington |
| 2001-2017 | Editor in Chief, *Archives of Pediatrics & Adolescent Medicine/ JAMA Pediatrics* |
| 2018- | Editor in Chief, *JAMA Network Open* |

## HONORS AND AWARDS:

Marie Leebron Prize in Pediatrics, University of Pennsylvania, 1974

United States Public Health Service Award for Outstanding Service, 1978

Ambulatory Pediatric Association, Excellence in Teaching and Research Award, 1984

Highline Council PTSA Community Service Award, 1988

Award of Excellence for Injury Prevention, Johns Hopkins University, 1991

George Adkins Endowed Professorship, 1991

Ambulatory Pediatric Association, Research Award, 1992

National SafeKids Research Award, 1992

American Academy of Pediatrics, Section on Injury and Poison Prevention, Physician Achievement Award, 1994

American Public Health Association, Injury Control and Emergency Health Services Section Distinguished Career Award, 1995

Charles C. Shepard Science Award, Centers for Disease Control and Prevention, 1998

Stanley Stamm Award for Best Role Model for Pediatric Housestaff, 1999

Honorary Fellow, Royal College of Paediatrics and Child Health 2004-

Elected Member, Institute of Medicine 2005-

University of Washington School of Public Health Distinguished Alumnus Award, 2009

Miller-Sarkin Mentoring Award, Academic Pediatric Association April 2012

University of Washington Minority Faculty Mentoring Award, 2015

Injury Free Coalition Prevention Pioneer Award, 2015

Pediatric Trauma Society Lifetime Achievement Award, 2016

CERTIFICATION:     American Board of Pediatrics, 1981


PROFESSIONAL ORGANIZATIONS:

Alpha Omega Alpha (AOA),
  Elected to membership, 1973;
  President, Beta Chapter University of Pennsylvania 1973-1974

Ambulatory Pediatric Association
  Board of Directors 1987-89

American Academy of Pediatrics (Fellow, 1981)

International Society for Child and Adolescent Injury
  Prevention (Founding Member, 1993, and Founding
  President, 1993-1999)

Society for Pediatric Research

American Association for the Surgery of Trauma
  (Contributing Scientist, 1997-)

American Pediatric Society, 2001-

Institute of Medicine/National Academy Of Medicine (elected),
  2005-

Society for the Advancement of Injury Research
  Member of the Board 2009-2012
  President Elect, 2012
  President 2013-2014

NATIONAL COMMITTEES AND CONSULTANTSHIPS:

Epidemiology Task Force, DSHS, State of Washington, 1987-1988

National Committee for Injury Prevention and Control, 1987-1989

Residency Training Committee, Department of Pediatrics,
  University of Washington, 1987-2000

Committee on Accident & Poison Prevention, American
  Academy of Pediatrics, 1987-1989

National Consortium on Violence Research, 1996-2000

Chair, Injuries Working Group, National Children's Study.
  2001-2004

Scientific Advisory Board (Chair), Hospital for Sick Kids
  Research Institute, 2006-2012

Committee on Adolescent Health Care Services and Models of
  Care, Institute of Medicine 2006-2008

Board of Children, Youth and Families, National Research
  Council  and Institute of Medicine, 2007—2010

Committee on Oral Health Access to Care (Chair), Institute of
  Medicine, 2009-2011

Scientific Advisory Board, The Urban Child Institute, Memphis,
  TN 2008-2015

Committee on Sports Related Concussions in Youth, Institute of
  Medicine (Vice Chair) 2012-2013

Nomination Committee, American Pediatric Society 2012

NICHD special study section for T32 applications 2013

Prevention of Bullying Workshop, Chair, Institute of Medicine
  April 2014

NICHD Advisory Council 2015-2018

Committee on the Biological and Psychosocial Effects of Peer
Victimization: Lessons for Bullying Prevention, Institute of
Medicine, Chair 2015-2016

National Academy of Medicine, Panel on Assessment and
Analysis of the Army Research Lab, 2017

EDITORIAL RESPONSIBILITIES:

Editorial Board, *Pediatrics in Review*, 1987-1990

Associate Editor, *Injury Prevention*, 1995-1999

Deputy Editor, *Injury Prevention*, 1999-2010

Associate Section Editor (Injury Epidemiology and Prevention), *Journal of Trauma*, 1996

Editorial Board, *Journal of Surgical Outcomes*, 1998

Editorial Board, *AAP Grand Rounds,* 1998-2001

Editorial Board, *Journal of the Ambulatory Pediatric Association*, 1998-2002

Guest Editor, Special Issue of *American Journal of Preventive Medicine on Systematic Reviews of Motor Vehicle Injury Prevention Programs*, 1999

Guest Editor, Special Issue of *American Journal of Preventive Medicine on Systematic Reviews of Occupational Injury Prevention Strategies*, February, 2000

Issue Editorial Advisor, Unintentional Injuries in Children, *Future of Children* Spring/Summer, 2000

Editor in chief, *Archives of Pediatrics & Adolescent Medicine/ JAMA Pediatrics*, 2001-17

Editorial Board, *JAMA* 2001-2017

Editor in chief, *JAMA Network Open*, 2018-

PUBLICATIONS

1.  **Rivara FP**.  Outreach in urban clinics:  A descriptive study.  *J Community Health* 1980; 6:43-53.

2.  **Rivara FP**.  Impact of the Rural Health Clinics Services Bill:  A projection.  *J Community Health* 1980; 6:103-112.

3.  **Rivara FP**.  Irritable bowel syndrome presenting in the first week of life.  *J Fam Pract* 1980; 10:731-732.

4.  Berger LR, **Rivara FP**.  Mini-bikes:  A case study in under-regulation.  *Business and Society Review* 1980; 41-43.

5.  Williams H, **Rivara FP**, Rothenberg MB.  The child is dying:  Who helps the family? *Am J Maternal Child Nursing* 1981; 6:261-265.

6.  **Rivara FP**.  Epidemiology of childhood injuries, pp. 13-18; Minibikes:  A case study in underregulation, pp. 61-64.  In:  Bergman AB (ed.) *Preventing Childhood Injuries.  Report of the Twelfth Ross Roundtable on Critical Approaches to Common Pediatric Problems*. Columbus, Ohio:  Ross Laboratories, January, 1982.

7.  **Rivara FP**.  Teenage pregnancy:  The forgotten father.  *J Dev Behav Pediatr* 1981; 2:142-145.

8.  **Rivara FP**.  Injury prevention:  The pediatrician as child advocate.  *J Dev Behav Pediatr* 1981; 2:160-162.

9.  **Rivara FP**, Stapleton FB.  Handguns and children:  A dangerous mix.  *J Dev Behav Pediatr* 1982; 3:35-38.

10.  **Rivara FP**, Berger LR.  Consumer product hazards:  Setting priorities for research and regulatory action.  *Am J Public Health* 1980; 70:701-704.

11.  **Rivara FP**.  Epidemiology of childhood injuries.  I.  Review of current research and presentation of conceptual framework.  *Am J Dis Child* 1982; 136:399-405.

12.  **Rivara FP**, Bergman AB, LoGerfo JP, Weiss NS.  Epidemiology of childhood injuries.  II. Sex differences in injury rates.  *Am J Dis Child* 1982; 136:502-506.

13.  **Rivara FP**, Culley GA, Steptoe MM.  The Hazard Infant Care Project:  Problems of innovation and continuity.  *J Ambulatory Care Manage* 1983; 6:44-57.

14.  **Rivara FP**.  Childhood injuries.  III:  Epidemiology of non-motor vehicle head trauma. *Dev Med Child Neurol* 1984; 26:81-87.

15.  **Rivara FP**, Wasserman AL.  Teaching psychosocial issues to pediatric house officers. *J Med Educ* 1984; 59:45-53.

16.  Muram D, **Rivara FP**, Buxton BH.  Management of sexual abuse in prepubertal girls. *Pediatr Adolesc Gynecol* 1984; 2:191-196.

APPENDIX 3: FACTS AND DATA CONSIDERED

1.      Centers for Disease Control and Prevention. Injury Prevention & Control: Data and Statistics (WISQARS). 2019.

2.      Bauchner H, Rivara FP, Bonow RO, Bressler NM, Disis MLN, Heckers S, et al. Death by Gun Violence-A Public Health Crisis. JAMA Dermatol 2017;153(12):1223-1224.

3.      RCW 9.41.010. In: Washington State Legislature., editor.; 2018.

4.      Koper CS, Johnson WD, Nichols JL, Ayers A, Mullins N. Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources. J Urban Health 2018;95(3):313-321.

5.      Koper CS, Johnson WD, Stesin K, Egge J. Gunshot victimisations resulting from high-volume gunfire incidents in Minneapolis: findings and policy implications. Inj Prev 2019;25(Suppl 1):i9-i11.

6.      de Jager E, Goralnick E, McCarty JC, Hashmi ZG, Jarman MP, Haider AH. Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States. JAMA 2018;320(10):1034-1035.

7.      Sarani B, Hendrix C, Matecki M, Estroff J, Amdur RL, Robinson BRH, et al. Wounding Patterns Based on Firearm Type in Civilian Public Mass Shootings in the United States. J Am Coll Surg 2019;228(3):228-234.

8.      Tessler RA, Mooney SJ, Witt CE, O'Connell K, Jenness J, Vavilala MS, et al. Use of firearms in terrorist attacks: differences between the US, Canada, Europe, Australia, and New Zealand. JAMA Internal Medicine 2017;177.

9.      Donohue JJ, Boulouta T. The assault weapons ban saved lives. In: SLS Blog: Stanford Univesity; 2019.

10.     DiMaggio C, Avraham J, Berry C, Bukur M, Feldman J, Klein M, et al. Changes in US mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data. J Trauma Acute Care Surg 2019;86(1):11-19.

11.     Chapman S, Alpers P, Jones M. Association Between Gun Law Reforms and Intentional Firearm Deaths in Australia, 1979-2013. JAMA 2016;316(3):291-9.

12.     Klaveras L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. Am J Public Health 2019;109:1754-1761.

13.     Rowhani-Rahbar A, Zatzick DF, Rivara FP. Long-lasting Consequences of Gun Violence and Mass Shootings. JAMA 2019;321(18):1765-1766.

14.     Travers A, McDonagh T, Elklit A. Youth Responses to School Shootings: a Review. Curr Psychiatry Rep 2018;20(6):47.

15.     Lowe Sr, Galea S. The mental health consequences of mass shootings. Trauma Violence Abuse 2017;18(1):62-82.

16.     MacKenzie EJ, Rivara  FP, Jurkovich G, Nathens AB, Frey KP, Eggelston BL, et al. A national evaluation of the effect of trauma center care on mortality. New Engl J Med 2006;354(4).

17.     Sauaia A, Gonzalez E, Moore HB, Bol K, Moore EE. Fatality and Severity of Firearm Injuries in a Denver Trauma Center, 2000-2013. JAMA 2016;315(22):2465-7.

18.     Tessler RA, Arbabi S, Bulger EM, Mills B, Rivara FP. Trends in Firearm Injury and Motor Vehicle Crash Case Fatality by Age Group, 2003-2013. JAMA Surg 2019;154(4):305-310.

19.     Kalesan B, Zuo Y, Xuan Z, Siegel MB, Fagan J, Branas C, et al. A multi-decade joinpoint analysis of firearm injury severity. Trauma Surg Acute Care Open 2018;3(1):e000139.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Honorable Ronald B. Leighton

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| DANIEL MITCHELL, *et al.*, | NO. 3:19-cv-5106 |
| Plaintiffs, | DECLARATION OF JENNIFER RICHARDS |
| v. | |
| CHARLES ATKINS, *et al.*, | |
| Defendants, | |
| and | |
| SAFE SCHOOLS SAFE COMMUNITIES, | |
| Intervenor-Defendant. | |

I, Jennifer (JR) Richards, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.      I am employed by the Washington State Department of Licensing (Department or DOL). I am currently the Administrator of Public Protection Services within DOL's Business and Professions Division. The Department's Firearms Program is within Public Protection Services.  I have been the Administrator for Public Protection Services since April

DECLARATION OF JENNIFER
RICHARDS
NO. 3:19-cv-5106

1

1   16, 2018. Prior to the Administrator position, was the Special Projects Program Manager with

2   DOL from June 1, 2017, to April 14, 2018. I report to the Deputy Assistant Director for the

3   Business and Professions Division.

4        3.     The Firearms Program, among other responsibilities, maintains records on

5   transfers and sales of pistols and, since July 1, 2019, transfers and sales of semi-automatic

6   assault rifles. Attached as Attachment A is a copy of the current Firearm Transfer Application.

7        4.     Firearms dealers are required to send DOL a copy of the completed Firearms

8   Transfer Application within seven days of the sale or transfer of a pistol or semi-automatic

9   assault rifle.

10        5.     DOL's current electronic record keeping system related to firearms is made up

11   of several software applications. The "Firearms System" is used by DOL staff to manage

12   records, create reports, and preform daily activities. "Firearms Online is used by law

13   enforcement agencies and firearms dealers to electronically input firearms related information.

14   Both applications make the up the "Firearms Database."

15        6.     For pistols, the Firearms Transfer Application can be submitted directly to DOL

16   by firearms dealers using Firearms Online. DOL also accepts paper copies of the Firearms

17   Transfer Application for pistols and semi-automatic assault rifles and DOL staff manually

18   enter the information. There is currently a backlog of paper copies of the Firearms Transfer

19   Application that have not yet been manually entered into the Firearms Database.

20        7.     DOL maintains information from the Firearms Transfer Application in the

21   course of its regularly conducted activities.

22        8.     Through the use of the DOL's Firearms Database and through reviewing paper

23   copies that have not yet been entered into the Firearms Database, DOL can generate reports on

24   the number of Firearms Transfer Applications DOL received each month. In January 2020, I

25   directed that such a report be generated from DOL's records to calculate the number of

26

DECLARATION OF JENNIFER
RICHARDS
NO. 3:19-cv-5106

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**SER-585**

1  Firearms Transfer Applications DOL received each month for the years 2017 through 2019. A

2  true and correct copy of that report is Attached as Exhibit B.

3         I declare under penalty of perjury under the laws of the State of Washington that the

4  foregoing is true and correct.

5         Dated this 26th day of March 2020.

6

7                                          JENNIFER (JR) RICHARDS

8                                          Department of Licensing

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF JENNIFER                3              ATTORNEY GENERAL OF WASHINGTON
RICHARDS                                                      Complex Litigation Division
NO. 3:19-cv-5106                                              800 Fifth Avenue, Suite 2000
                                                             Seattle, WA  98104-3188
                                                                (206) 464-7744

SER-586

# Exhibit A

**WASHINGTON STATE DEPARTMENT OF LICENSING**

## Firearm Transfer Application

*Adobe Reader XI or DC required to fill out this form Click to download*

**DEALER: This form must be completed in full and TYPED.**

1. **Send by the close of business day** to the appropriate Chief of Police or Sheriff for background check.
2. **Send within 7 days** after delivery of the firearm to the **applicable** address. Select the type of application you are sending:

☐ **Semiautomatic Assault Rifles (SAR) ONLY:**
Include check payable by dealer to Dept of Licensing for **$18** SAR fee. Mail to:
**Department of Licensing**
**Firearms Section**
**PO Box 9048**
**Olympia, WA 98507-9048**

☐ **Pistol Transfer Applications (PTA):**
**Department of Licensing**
**Firearms Section**
**PO Box 9649**
**Olympia, WA 98507-9649**

**For DOL validation only**

**DEALER: DO NOT STAPLE OR TAPE PAGES TOGETHER**

3. Retain a copy for your records for 6 years.

| Application initiated *(date and time)* | ☐ am ☐ pm |
|---|---|

| Private transfer | Approval code | Dealer transaction # | Appropriate LEA |
|---|---|---|---|
| ☐ Private transfer | | | ☐ City ☐ County |

## Section A – Firearm description (Type all information)

| Firearm serial number | Make Choose one | Other *(no abbreviations)* |
|---|---|---|

| Caliber | Barrel length in. | Condition ☐ New ☐ Used | Type Choose one | Model number or name |
|---|---|---|---|---|

## Section B – Dealer information

| Date weapon delivered | UBI number | Business ID | Location ID | Stamp area |
|---|---|---|---|---|

Federal firearms license number

Dealer/Store name

Address *(Number, Street, City, State, ZIP code)*

| (Area code) Dealer telephone number | Email |
|---|---|

Dealer signature
**X**  **Dealer sign here.**

## Section C – Buyer information

| Buyer name *(Last, First, Middle, Suffix)* | Gender ☐ Male ☐ Female | U.S. citizen ☐ Yes ☐ No |
|---|---|---|

Home address *(Number, Street, Apartment number)*

| City | State | ZIP code | County |
|---|---|---|---|

| Date of birth *(mm/dd/yy)* | Place of birth *(City, State or Province, and Country)* | Height | Weight lbs |
|---|---|---|---|

| Eye color Choose one | Driver license or state ID card number | State | (Area code) Telephone number |
|---|---|---|---|

Race *(choose all that apply)*
☐ American Indian/Alaska Native  ☐ Asian  ☐ Black  ☐ Native Hawaiian/Pacific Islander  ☐ White

| Permanent resident card number | Washington State alien firearms license Number _____ Expires_____ | Occupation |
|---|---|---|

| Concealed pistol license number | Expiration date | Issuing authority |
|---|---|---|

FIR-652-001 (R/2/20)WA Page 1 of 2

*Continued on next page*

**SER-588**

**Section C – Buyer information (continued)**

| Firearm serial number |
| --- |
| |

Answer the following

1. Have you been a resident of Washington at the address above for the previous consecutive 90 days? . . . . . . . . . ☐ Yes ☐ No
If "No", provide previous addresses:


2. Do you certify you are eligible to possess a pistol and/or semiautomatic assault rifle under
RCW 9.41.040 and 9.41.045? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .☐ Yes ☐ No

3. If purchasing a semiautomatic assault rifle, do you certify you have completed the required safety
training within the past 5 years. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .☐ Yes ☐ No

4. Do you understand by signing this application you are waiving confidentiality and requesting
the Department of Social and Health Services, mental health institutions, and other health care
facilities, to release information relevant to your eligibility to purchase a pistol and/or semiautomatic
assault rifle to a court or law enforcement agency? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .☐ Yes ☐ No

**Caution:** Although state and local laws do not differ, federal law and state law on the possession of firearms differ. If you are prohibited by federal law from possessing a firearm, you may be prosecuted in federal court. State permission to purchase a firearm is not a defense to a federal prosecution.

The presence of a firearm in the home has been associated with an increased risk of death to self and others, including an increased risk of suicide, death during domestic violence incidents, and unintentional deaths to children and others.

*I certify under penalty of perjury under the laws of the state of Washington that the information provided in this application are true and correct.*

_____   X _____
**Buyer - Print the completed form and sign your full legal name here**

Date and place *(city or county)* signed               Buyer signature *(Full legal name)*

Buyer printed name:

# Exhibit B

### Washington Department of Licensing –
### Pistol and Semiautomatic Assault Rifle (SAR) Transfers/Sales
### (2017–2019)

| 2019 | Pistol Transfers/Sales | SAR Transfer/Sales | | 2018 | Pistol Transfers/Sales | | 2017 | Pistol Transfers/Sales |
|---|---|---|---|---|---|---|---|---|
| Jan. | 13,447 | | | Jan. | 19,780 | | Jan. | 16,948 |
| Feb. | 11,291 | | | Feb. | 11,166 | | Feb. | 21,796 |
| Mar. | 13,260 | | | Mar. | 16,230 | | Mar. | 23,095 |
| Apr. | 12,343 | | | Apr. | 15,281 | | Apr. | 15,945 |
| May | 12,143 | | | May | 19,055 | | May | 17,117 |
| June | 16,460 | | | June | 11,978 | | June | 17,110 |
| July | 18,731 | 187 | | July | 10,904 | | July | 12,867 |
| Aug. | 16,325 | 1,156 | | Aug. | 9,917 | | Aug. | 13,659 |
| Sept. | 11,429 | 1,245 | | Sept. | 9,605 | | Sept. | 13,802 |
| Oct. | 19,644 | 1,740 | | Oct. | 9,965 | | Oct. | 15,020 |
| Nov. | 15,034 | 2,809 | | Nov. | 11,338 | | Nov. | 15,202 |
| Dec. | 14,397 | 2,201 | | Dec. | 13,329 | | Dec. | 19,374 |
| TOTAL | 174,504 | 9,338 | | TOTAL | 158,548 | | TOTAL | 201,935 |



Exhibit 4
Witness Mitchell
Date 1-30-2020
Buell Realtime Reporting
(206) 287-9066

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DANIEL MITCHELL, et al.,

Plaintiffs,

v.

CHARLES ATKINS, et al.,

Defendants,

and

SAFE SCHOOLS SAFE COMMUNITIES,

Intervenor-Defendant.

No. 3:19-cv-05106 RBL

DECLARATION OF PAUL KRAMER
IN SUPPORT OF DEFENDANTS' AND
INTERVENOR-DEFENDANT'S
CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

DECLARATION OF PAUL KRAMER – SUMMARY
JUDGMENT - 1
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

I, Paul Kramer, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I currently reside in Mukilteo, Washington. I have lived in Mukilteo since 1998.

3. I am the father of two biological children and three stepchildren. My biological children are my sons Ted and Will.

4. I, unfortunately, have had to live through the devastating impacts of gun violence. My son Will was shot in a mass shooting carried out by a 19-year old who sat in his car reading the instruction manual for his recently purchased semiautomatic assault rifle before proceeding into a party of teens and opening fire. Will was critically wounded, but luckily survived. Three of his friends were not so fortunate and were killed in the shooting.

5. Will always has been a great kid. He is intelligent, athletic, social, and has a good heart. In high school he played baseball and soccer, did well in school, and kept a wide network of friends.

6. In July 2016, Will was 18 years old and between his freshman and sophomore years at the University of Washington. He was staying at home with us in Mukilteo.

7. On Friday, July 29, 2016, Will went to a friend's house party in Mukilteo. The party was a get together of 19 recent Kamiak High School graduates, of which Will was one.

8. Around midnight, after I had gone to bed, my cell phone rang and it showed that a friend of Will's, a kid I had coached in Little League, was calling. I thought it was an accidental dial, so I did not answer and I put my phone on silent. As a result, and as I learned later much to my pain and regret, I missed several calls and text messages that followed.

DECLARATION OF PAUL KRAMER – SUMMARY
JUDGMENT - 2
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

9.  At about 2:30am, two police officers knocked on our door and woke me and my wife up. The police officers were vague in their statements to us, but told us that our son had been shot and we needed to go to Harborview Medical Center right away.

10. On the way to Harborview, I noticed all of the missed calls and texts. In those, I learned for the first time that some kids at the party had been shot and people thought they were dead. There was no news on Will, however, and while driving to Harborview we did not know if Will would be alive or dead when we got there.

11. At Harborview, we were brought back to see Will. He was on a gurney, bloody and with a chest tube in his side.

12. It was miraculous that Will did not die. He was shot in the back. The bullet narrowly missed his spine. It entered to the left of his spine and at the elevation of his heart. The bullet, however, hit his scapula. This caused both the bullet and his scapula to shatter. The bullet fragments deflected up away from his heart. The shooting fractured Will's rib and punctured and collapsed his left lung. Multiple bullet fragments lodged in Will's tissues and one came through his chest. He suffered heavy blood loss.

13. After treatment in the Emergency Room, Will was put in intensive care for at least three days.

14. Initially, the doctors did not perform surgery because removing bullet fragments can sometimes be more dangerous than leaving them in place. Instead, the doctors packed his bullet wound with material so the wound would heal from the inside out. Will's upper back, shoulder, and upper arm were entirely black and blue from the bullet's impact.

15. The doctors had chest tubes put in place to help keep Will's left lung inflated. The process of changing these tubes was very painful. Eventually, the doctors took out the

DECLARATION OF PAUL KRAMER – SUMMARY
JUDGMENT - 3
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

chest tubes to see if his lung would stay in place. An x-ray, however, showed a full collapse of his left lung, which can be fatal as it puts pressure on the heart. As a consequence, Will had to have surgery to attach his lung to the top of his chest cavity.

16. Ultimately, Will was at Harborview for 17 days total. My wife and I came every day to be with him. Will's mother, my ex-wife, stayed overnight at the hospital the full duration of Will's time there.

17. Will was shot by Allen Ivanov. Ivanov also was a recent graduate of Kamiak High School. Ivanov previously had dated Anna Bui, one of the guests at the party. Through the criminal investigation, it came out that Ivanov, 19 years old, legally had purchased a Ruger-556, which is an AR-15 style semiautomatic assault rifle, and a couple of 30-round magazines of ammunition a few days before the party. The night of the party he crept up to the house and saw Anna talking to another guy. He then returned to his car where he read the owner's manual for his semiautomatic assault rifle to learn how to load and shoot it, inserted a magazine, and headed towards the house.

18. Around this same time, Will was at the party with a tight-knit group of friends with whom he had grown up. Shortly after midnight (now July 30th), many of the teens were in the kitchen and dining area of the house. Will was sitting outside on the patio with his good friends Jake, Jordan, and Alex.

19. Jake told the group that perhaps he would head home. As he started to leave the patio area he saw Ivanov with his semiautomatic assault rifle. Jake turned back towards the house and ran shouting "No, no, no!" Ivanov started shooting. Jake was gunned down with three bullets in his back, killing him.

20. Will, Jordan, and Alex started running in three different directions. Will was hit by a

DECLARATION OF PAUL KRAMER – SUMMARY
JUDGMENT - 4
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

bullet as he ran, and then he dove into the darkness of the backyard. Alex was shot at, but got away by running past the hot tub to get behind the house. Jordan tried to run for the house. Ivanov shot him multiple times, including at close range. In all, Jordan was shot six times and killed.

21. Ivanov then entered the house. He found Anna under the dining table. He shot her five times at close range. He then went upstairs where others were hiding and went out onto the balcony. From there he fired more shots at the teens outside who were trying to flee. In almost no time at all, he had emptied his entire 30-round magazine, killing Jake, Jordan, and Anna and critically injuring Will.

22. Words cannot express what it means for a family to go through these devastating events. Three families lost their loved ones. We were lucky and Will lived. While his physical wounds eventually healed, the grief and trauma never will be gone.

23. I served as the citizen sponsor of Initiative 1639, which would have prohibited Ivanov from legally purchasing the semiautomatic assault rifle he used in his shooting spree, in order to help prevent other families from having to live the same nightmare as ours. It was too easy for Ivanov to walk in and purchase a gun that had the capacity to inflict mass casualties and injuries in a short amount of time. Its ease of use and deadliness were its attraction. As a result, three people are dead, one seriously injured, and countless other party guests, families, and community members are left to live with grief and fear. No family should have to go through the same type of tragedy that mine has.

DECLARATION OF PAUL KRAMER – SUMMARY
JUDGMENT - 5
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1

2      I declare under penalty of perjury that the foregoing is true and correct.

3

4      SIGNED this 15th day of March, 2020, at Mukilteo, Washington.

5

6      Paul Kramer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF PAUL KRAMER – SUMMARY
JUDGMENT - 6
Cause No. 3:19-cv-05106

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1
2
3
4
5
6                                              The Honorable Ronald B. Leighton

7                        UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
8                                    AT TACOMA

9    DANIEL MITCHELL, et al.,                    NO. 3:19-cv-5106

10                    Plaintiffs,                DECLARATION OF
                                                 MARK D. JONES
11         v.

12   CHARLES ATKINS, et al.,

13                    Defendants,

14         and

15   SAFE SCHOOLS SAFE COMMUNITIES,

16                    Intervenor-Defendant.

17

18         I, Mark D. Jones, declare as follows:

19         1.    I am over the age of 18, competent to testify as to the matters herein and make

20   this declaration based on my personal knowledge.

21         2.    I was retained by the Washington Attorney General's Office, counsel to

22   Defendant Teresa Berntsen, to serve as a testifying expert witness in this case. Attached as

23   Exhibit A is a true and correct copy of that report I prepared as part of my assignment. The report

24   contains the opinions I have reached in this case and the basis and reasons for them. If called to

25   testify as a witness, I could and would testify competently to the matters set forth therein.

26         3.    Attached as Exhibit B is a true and correct copy of the rebuttal report I prepared

DECLARATION OF MARK D. JONES            1          ATTORNEY GENERAL OF WASHINGTON
NO. 3:19-cv-5106                                              800 Fifth Avenue, Suite 2000
                                                             Seattle, WA  98104-3188
                                                               (206) 464-7744

SER-598

1   in response to the report of Plaintiffs' expert, Sheriff Ozzie Knezovich. The rebuttal report
2   contains my opinions regarding the subject matter identified in Sheriff Knezovich's report. If
3   called to testify as a witness, I could and would testify competently to the matters set forth
4   therein.

5         I declare under penalty of perjury under the laws of the State of Washington and the
6   United States that the foregoing is true and correct.

7         DATED this _____ day of March, 2020, at _____.

10         Mark D. Jones

DECLARATION OF MARK D. JONES
NO. 3:19-cv-5106

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

SER-599

# Exhibit A

Expert Report

Prepared for Washington State Office of the Attorney General by

Mark D. Jones

In the Matter of:

DANIEL MITCHELL, *et al.*,

*Plaintiffs*,

v.

CHARLES ATKINS, *et al.*,

*Defendants*,

and

SAFE SCHOOLS SAFE COMMUNITIES,

*Intervenor-Defendant.*

Date: 12/13/2019          Signed: _____

Mark D. Jones

## TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF OPINIONS..............................1

II. BACKGROUND AND QUALIFICATIONS..........................................1

III. ADDITIONAL QUALIFICATIONS....................................................3

IV. BACKGROUND..............................................................................10

V. ANALYSIS........................................................................................12

VI. CONCLUSION.................................................................................18

APPENDIX A: MATERIALS REVIEWED...............................................19

APPENDIX B: LIST OF PUBLICATIONS..............................................21

APPENDIX C: DECLARATION...............................................................22

## I. INTRODUCTION AND SUMMARY OF OPINIONS

I have been engaged by the Washington Attorney General's Office in this matter to provide my opinions on whether and to what extent Washington's regulation of semiautomatic assault rifles in I-1639, by prohibiting their sale to non-residents and to those under 21 years of age, serves the state's interest in public safety. In sum, I believe that I-1639's increased regulation of semiautomatic assault weapons in Washington State will result in fewer gunfire injuries and deaths. I believe that the several provisions of I-1639 will collectively enhance public safety by reducing the number of such firearms readily available to unauthorized or inappropriate possessors.

## II. BACKGROUND & QUALIFICATIONS

I am currently employed as the Senior Policy Advisor by Illinois Council Against Handgun Violence and have been so employed since December 2018. I assist in the development and promulgation of firearms violence reduction policies and programs state-wide.

I'm also employed as a policy consultant to the Illinois Gun Violence Prevention Education Center (GPEC) and have been so employed since January 2019. I assist in the development and promulgation of firearms violence reduction policies and programs state-wide.

I am also employed as a consulting subject matter expert by the Center for American Progress and have been so employed since May 2019. I provide technical and policy guidance to the Vice President of Gun Violence Reduction Programs.

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 1 of 46

**SER-603**

I was previously employed as the Project Director at the National Law Enforcement Partnership to Prevent Gun Violence, a National Police Foundation 501(c)(3) non-profit, and was so employed between November 2016 and December 2018. I served as the coordinator for policy support activities for nine national law enforcement executive organizations.

I was previously employed by SST, Inc (ShotSpotter) as Senior Director for Customer Success and was so employed between January 2015 and November 2016. I provided program implementation guidance and assistance to SST public sector customers, generally police agencies, when deploying the ShotSpotter Flex service.

I was previously employed as a Special Agent with the U.S. Departments of Justice and Treasury, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) between from September 1991 until November 2011. Throughout my career I focused on a broad range of issues involving firearms and explosives including both regulatory and enforcement matters.

I was previously employed as a Special Agent with the U.S. Department of State, Diplomatic Security Service and was so employed between November 1985 and September 1991. I conducted sensitive national security and personnel investigations; I supervised the personal security for the U.S. Ambassador to Lebanon and other U.S. and foreign dignitaries; I supervised a tactical and training team conducting operations in the U.S. and abroad.

I was previously employed by the Village of Glencoe, Illinois, as a Public Safety Officer and Detective and was so employed between June 1980 and November 1985. I was trained and certified as both a police officer and firefighter by the State

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 2 of 46

**SER-604**

of Illinois; my ultimate position was Detective wherein I conducted general crimes

investigations.

## III. ADDITIONAL QUALIFICATIONS

During my career I conducted, supervised, or participated in numerous

investigations in the District of Columbia, and the states of California, Florida,

Georgia, Illinois, Iowa, Kansas, Nebraska, North Carolina, Maryland, Missouri, New

Jersey, New York, Ohio, South Dakota, Texas, and Virginia in the U.S. as well as in

the countries of Barbados, Belize, Bolivia, Costa Rica, Egypt, El Salvador,

Guatemala, Honduras, Lebanon, Nicaragua, Nigeria, and Panama.

During my employment with ATF I managed a variety of national programs

and assisted in the development and implementation of ATF policies relating to

counter terrorism, explosives and arson. I worked with numerous domestic and

international law-enforcement and intelligence agencies to train their personnel to

conduct investigations of illicit small arms trafficking, investigations of explosives

related crimes, and investigation of violent gangs. In 2003, I was selected to serve as

one of the ATF representatives during national-level explosives policy meetings at

the White House. In 2000, working with the office of Chief Counsel, I negotiated the

first interagency agreement to bring the ATF's small-arms expertise to

FBI-sponsored Joint Terrorism Task Forces nationwide. In addition, I was the

principal author of ATF's national policy to implement that agreement.

My ultimate assignment with ATF was as Regional Firearms Advisor for

Central America. I was principally responsible for developing and implementing the

United States government's strategy to aid the governments of that region to reduce

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 3 of 46

SER-605

firearms violence. Based in El Salvador, I led teams of USDOJ experts who conducted detailed assessments of the regulatory and enforcement environments in six of the seven countries of Central America (Belize, Costa Rica, El Salvador, Guatemala, Honduras, and Panama). Through those assessments, I was able to formulate individualized training plans to help the public security agencies in each of those countries better focus and use their resources to deter illegal small arms trafficking.

As the Regional Firearms Advisor, I also helped identify and secure funding for equipment and training necessary to create new, or improve existing, firearms investigative units and explosive incident response squads in all seven Central America countries.

From 1985 through 1991, I worked for the U.S. Department of State, Diplomatic Security Service (DSS) where I conducted internal affairs investigations; served as the Supervisory Special Agent in charge of security for the U.S. Ambassador to Lebanon, and served as supervisor of a specially trained team of agents conducting security assessment, high-threat dignitary protection, and training missions both in the United States and abroad. During my DSS career I travelled extensively, both domestically and in foreign countries to conduct sensitive criminal and national security investigations, several involving criminal misuse of firearms or suicide.

Between 1980 and 1985, I was employed by the Village of Glencoe, Illinois Department of Public Safety, as a Public Safety Officer and detective. I was trained and state certified as a police officer and firefighter. The University of Illinois Police Training Institute required me to successfully complete 44 hours of firearms

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 4 of 46

SER-606

training including weapons familiarization, use of force, target discrimination/judgment shooting and required qualifications. As a certified law enforcement officer, I was required by my agency to qualify with my handgun monthly under the supervision of the senior range officer.

Throughout my federal career I provided training to law enforcement and public security officials and agencies throughout the United States, Europe, Central and South America, Africa, Asia, and the Middle East. That training included recognition and interdiction of illicit small arms trafficking and conducting explosives-related investigations. During my law enforcement career I received extensive training involving firearms, use of force, evidence collection, explosives investigations, and many additional, related topics.

In 1988, I was trained by DSS as a firearms instructor at the Diplomatic Security Training Center in Dunn Loring, Virginia. Following the 40-hour certification training, I subsequently trained more than 100 public security and law enforcement personnel, both in the United States and in foreign countries, in the safe use, care, and storage of firearms.

In 1989, I attended a 40-hour special weapons handling and familiarity course at the U.S. Army John F. Kennedy Special Warfare School, Ft. Bragg, North Carolina. Special Forces Operational Detachment-Delta conducted the training, and I learned how to operate, maintain, and properly employ a variety of military small arms and light weapons.

In 1991, I attended the 40-hour U.S. Marine Corps High Risk Personnel Pistol Course at Quantico, Virginia, where I was trained in advanced methods for

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 5 of 46

SER-607

carrying and use of concealed firearm in various permissive and non-permissive environments.

My appointment by ATF required me to successfully complete additional training as a firearms instructor through the Federal Law Enforcement Training Center (FLETC) 80-hour Firearms Instructor Training Program (FITP-1996). Upon my successful graduation from FITP, I subsequently trained more than 200 federal, state, and local law enforcement officers around the country in the proper use, handling, and maintenance of firearms and did so until I retired in 2011.

Between 1996 and 1999, I conducted and supervised all firearms training for the ATF Omaha Field Office agents and task force officers, as well as for other federal, state, and local agency personnel and ATF agents temporarily assigned from other posts of duty.

In 1998, I attended a 40-hour course conducted by the Omaha Police Department Firearms Training Unit related to proper handling, maintenance and employment of the police tactical rifle/carbine.

In 1998, I attended the International Association of Law Enforcement Firearms Instructors annual conference in Columbia, Missouri where I participated in several use-of-force and firearms instructor professional development seminars.

In 1999, I transferred to ATF headquarters and served as a firearms instructor for quarterly qualification and tactical training of HQ personnel until 2003 when I transferred to the Washington Field Division.

Between 2003 and 2005, I served as a firearms instructor during quarterly qualification and tactical training of Washington Group II, the firearms trafficking investigations group I supervised.

Between 2005 and 2007, I was assigned to ATF headquarters and served as a firearms instructor for quarterly qualification and tactical training of HQ personnel until 2007 when I transferred to the Chicago Field Division.

Between 2007 and 2009, I served as a firearms instructor for quarterly qualification and tactical training of Chicago Field Division personnel until 2009 when I transferred to the International Affairs Division, U.S. Embassy San Salvador, El Salvador.

While serving in El Salvador between 2009 and 2011, I assisted the DSS Regional Security Officer's staff in training U.S. federal law enforcement personnel assigned to the U.S. embassy in quarterly qualification; those personnel consisted of special agents from the Drug Enforcement Administration; the Federal Bureau of Investigation, the Naval Criminal Investigative Service, and Homeland Security Investigations.

During all of the previously listed assignments as a firearms instructor, I was responsible for maintaining a safe training environment, observing and correcting the physical performance of agents in training, scoring targets, and recording scores in the permanent training record of all participants.

In 1997, I was certified as a use-of-force instructor-trainer by Pressure Point Control Tactics, Inc. (PPCT) and conducted defensive tactics training for federal, state, and local law enforcement officers from numerous agencies until I retired.

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 7 of 46

**SER-609**

During that time I was required to recertify by PPCT, Inc. and ATF every three years, and to attend various annual use-of-force related continuing education courses to refresh and augment my knowledge of national trends in police defensive tactics, and use of force.

I was certified as an instructor in the PPCT disciplines of Spontaneous Knife Defense (SKD) and Defensive Tactics (DT); and I was certified as an Instructor-Trainer in the PPCT disciplines of Close Quarters Countermeasures (CQC), Ground Avoidance, Ground Escape (GAGE,) and Escape and Evasion (E&E) - a course developed by PPCT to train ATF unarmed regulatory Industry Operations Investigators.

On at least four occasions between 1991 and 1999, I served as assistant instructor for the Nebraska State Patrol training academy and in-service defensive tactics training program. In 1999, I conducted and supervised defensive tactics training for all special agents and Industry Operations Investigators in the ATF Kansas City Field Division (Missouri, Kansas, Nebraska, and Iowa) and was assisted in this effort by the instructors that I had previously trained; that year I also conducted and supervised initial defensive tactics training for the Seattle Field Division staff.

Between 1999 and 2005, I conducted and supervised defensive tactics training for the entire ATF headquarters and Washington Field Division special agent population in concert with the HQ defensive tactics training program manager.

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 8 of 46

**SER-610**

In 2003, I was trained by the U.S. Federal Air Marshal Service in a 24-hour Defensive Tactics and Firearms Use on Commercial Aircraft course. I subsequently trained the entire ATF headquarters special agent population in that discipline in support of the HQ Defensive Tactics training program.

In 2006, I served as class supervisor for six weeks of an ATF basic training class and assisted in both the firearms and defensive tactics training for the group of 24 special agent candidates.

In 2008, I was trained and certified by ATF in the use of the Taser conducted electrical weapon (CEW), which included a five-second personal exposure to the Taser to better understand the tool's strengths and limitations.

In 2008, I received 40 hours of training and was certified by Fit Force, Inc. as a Physical Readiness Coordinator, a discipline focused on providing physical fitness training and guidance to special agents to improve resilience to stress. I subsequently participated in assessing the physical readiness of the entire special agent populations (150 special agents) of the ATF Chicago, Baltimore, and Tampa Field Divisions.

I maintain an active Illinois Retired Officer Concealed Weapon Carry license, qualify pursuant to Illinois State Police Standards annually, and have done so since 2012.

I have read many studies, books, and publications on the technology, possession, lawful use, criminal, or negligent misuse of firearms. I also read to stay informed of trends in civilian use-of-force, physical fitness, law enforcement tactics, ballistic effects of various types of weapons and ammunition, and legal issues in

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 9 of 46

SER-611

police and civilian use-of-force. I make an effort to review new studies on those subjects as they are published.

I am or have been a member of the Federal Law Enforcement Officers Association (FLEOA), the Fraternal Order of Police, the American Society of Criminology, the International Association of Chiefs of Police, the Illinois Association of Chiefs of Police, the International Association of Law Enforcement Firearms Instructors, the International Society of Explosives Engineers (ISEE), the American Society of Industrial Security (ASIS), and the National Strength and Conditioning Association (NSCA).

Within the past four years, I testified as an expert in one case:

- *Matthew Wilson v. Cook County*, No. 17-cv-7002 (N.D. Ill. 2018).

I am not being compensated to render my opinion and testimony in this matter. I will be reimbursed by the state of Washington for any eligible expenses I may incur.

## IV. BACKGROUND

In November 2018, the citizens of Washington State approved ballot Initiative Measure No. 1639 to address the potential threat of mass shootings involving semiautomatic assault rifles. The initiative changed Washington State firearms laws to include increasing the age to purchase semiautomatic rifles from 18 to 21 years of age and prohibiting sales of semiautomatic rifles to out-of-state residents.

Mass shootings, whether they occur in public or private spaces, are demonstrably more lethal when the assailant uses a semiautomatic rifle than when

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 10 of 46

SER-612

other firearms are used[1]. A November 2019 study by Mayors Against Illegal Guns (MAIG) documents that use of semiautomatic weapons in mass shootings resulted in many more victims being killed and injured than when assailants used handguns or shotguns.[2] Between 2009 and 2018, in the five deadliest mass shootings in the U.S., the assailants all used semiautomatic rifles: Las Vegas, Orlando, Newtown, Sutherland Springs, and Parkland, leaving 176 dead and hundreds with life altering wounds.[3]

Rifles use ammunition that is generally 2-3 times more powerful than handguns. For example, the standard 9mm NATO pistol cartridge will typically achieve a velocity of 1,100 feet per second. By comparison, the standard 7.62x51 NATO rifle cartridge will achieve 2,600 feet per second and the standard 5.56x45 NATO rifle cartridge will achieve 3,200 feet per second.[4]

Semiautomatic rifles function by using the energy from an expended cartridge to load another cartridge into the weapon. By contrast, other types of firearms require the operator to perform a mechanical function such as pulling back a bolt or lever or breaking open the firearm in between shots to reload the weapon. The practical difference between firearms operating mechanisms is that a semiautomatic shooter may continue to rapidly fire his/her weapon uninterrupted until the ammunition in the magazine is depleted and reloading with another magazine is required.

---

[1] *Ten Years of Mass Shootings in the United States*, https://everytownresearch.org/mass shootingsreports/mass-shootings-in-america-2009-2019/ (last visited Nov. 24, 2019).
[2] *Id.*
[3] *Id.*
[4] The numbers I cite are approximate and virtually every caliber cited is manufactured to achieve a wide variety of velocities. *See* http://www.ballistics101.com/9mm.php (last visited Dec. 17, 2019).

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 11 of 46

**SER-613**

Conversely, a shooter using a break-open, bolt action, pump-action, or lever action rifle must shift focus from the target to reloading and back again between each shot. The difference is not insignificant from a tactical perspective and is the primary reason military forces worldwide adopted semi/fully automatic weapons as soon as the technology became reliable. It is virtually the exclusive operating system used by every military and police force worldwide.[5]

## V. ANALYSIS

Initiative Measure 1639 mandates several changes to state firearms law as it applies to semiautomatic assault rifles. I-1639 provides:

- An individual must be at least twenty-one years of age to purchase a semiautomatic assault rifle

- An individual must be a resident of Washington to purchase a semiautomatic assault rifle

- An individual must submit to an enhanced background check for semiautomatic assault rifles equivalent to that required to purchase a handgun

- Individuals must complete an approved firearms safety-training course

- Requires a waiting period for the purchase of a semiautomatic assault rifle

- Establishes standards for the safe storage of all firearms[6]

---

[5] The principal difference between an AR15 semi-automatic rifle and its military sibling, the M4/M16, is the latter's selective fire capability, that is the ability to use the weapon as a fully automatic machine gun (wherein a single trigger pull can empty the magazine) and for semi-automatic fire (wherein each trigger pull results in only one cartridge being fired). The federal government tightly regulates possession of machine guns, whereas the possession of semiautomatic firearms is not regulated very much at all. There have been very few crimes committed with legally registered machine guns and other firearms of the types under strict federal control and there have been many, many crimes including mass casualty shootings carried out with semi-automatic assault weapons, rifles and pistols. The mass shootings alone resulted in at least 519 deaths and scores of injuries between 2009 and 2013. *See* Appendix C, paragraph 36.

[6] Other changes not listed may be found at https://www.sos.wa.gov/_assets/elections/initiatives/finaltext_1531.pdf (last visited Dec. 17, 2019).

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 12 of 46

**SER-614**

My analysis focuses on the first two requirements listed above, which are the only provisions challenged in this case.

First, it should be noted that stringent regulations of dangerous weapons are an effective means of promoting public health and safety. I would like to use the example of fully automatic machine guns to illustrate this point.

There are approximately 200,000 legally owned and registered fully automatic machine guns in private hands in the United States. Since 1934 individual manufacture, transfer, and possession of such firearms has been carefully controlled under the National Firearms Act.[7] Fully automatic machine guns represent the most potentially lethal arsenal of weapons legally possessed outside of military and law enforcement entities due to the weapons' ability to produce large volumes of lethal firepower meant to quickly overwhelm an adversary. Despite the lethality of these weapons, fewer than 10 have been used in crimes since 1934. That statistic testifies to the efficacy and public health/safety benefits of the stringent regulation of dangerous articles available to the public.

By contrast, the federal 1994 assault weapons ban (AWB) that only incrementally regulated certain makes and models of semiautomatic firearms was less effective than it could have been due to loopholes the firearms industry exploited. The 1994, AWB attempted to simultaneously permit unregulated possession of previously possessed semiautomatic rifles and large capacity

---

[7] National Firearms Act, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Dec. 17, 2019).

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 13 of 46

SER-615

magazines while concurrently prohibiting the import, manufacture, possession and transfer of new models with "offending features."[8]

When the Gun Control Act of 1968 (GCA68) was enacted, the firearms industry was mainly producing sporting firearms, primarily for hunting and target shooting. GCA68 allowed individuals 18 years of age and older to purchase rifles and shotguns while handguns were restricted to those 21 years and older. Between 1968 and 2019, the population interested in hunting, target shooting, and other firearms based sporting activities have trended steadily downward, along with the sale of firearms, ammunition and accessories.[9] As demographics evolved so did the industry's need to find new products and markets.

The ten-year period from 1985-1994 saw violent crime rates spike to unprecedented levels driven largely by street gangs competing for lucrative inner city drug markets. Additionally, violent South American drug cartels, Jamaican "posses," and Eastern European organized crime groups emerged as well-armed new threats. In 1994, the U.S. Congress, concerned by the increasingly deadly drug war, passed the first federal assault weapons ban. The definition of what was an assault weapon was based largely on the ATF's determination of whether certain features were "military" in nature, e.g. various functional design additions that allow the

---

[8] H.R. 4296, 103d Cong. (1994), available at https://www.congress.gov/bill/103rd-congress/house-bill/4296/text.
[9] National Survey of Fishing, Hunting, & Wildlife-Associated Recreation (FHWAR): 2016, https://www.census.gov/library/publications/2018/demo/fhw-16-nat.html (last visited Dec. 17, 2019); Natalie Krebs, *Why We Suck at Recruiting New Hunters, Why It Matters, and How You Can Fix It*, Outdoorlife.com, October 2019, available at https://www.outdoorlife.com/why-we-are-losing-hunters-and-how-to-fix-it/.

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 14 of 46

**SER-616**

most efficient use in combat.[10] Manufacturers quickly adapted to the new law by creating "post-ban" models of pre-ban weapons; offending features removed but with overall functionality undiminished. Consequently, ATF initiated very few investigations during the ten years it was in place.[11]

The expiration of the federal assault weapons ban in 2004 provided the industry with an opportunity. Marketing trends in firearms began and continue to emphasize militarization of all kinds of firearms directed at the "home defense" market.[12] Using the fear of crime to motivate buyers, many manufacturers began creating what they branded as "modern sporting rifles," but which were the semiautomatic analogues of military weapons from around the world. The AR15 platform was marketed as "America's rifle" and innumerable Kalashnikov copies flooded the U.S. market, many of which were manufactured using imported foreign military surplus weapons.

Beginning in 2004 and continuing today, the industry marketing efforts prominently feature dozens of military analogues and militarized versions of traditional hunting rifles. The ads in magazines, television, and on-line describe the pinpoint accuracy and devastating killing power of their products, often comparing a user's needs and experience to that of a soldier in combat.[13]

---

[10] Bureau of Alcohol, Tobacco and Firearms, Report and Recommendation on the Importability of Certain Semiautomatic Rifles (July 6, 1989), available at https://www.atf.gov › file › download.
[11] Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy, available at https://www.justice.gov/archive/opd/Strategy.htm#Appendix%20C.
[12] In my declaration in *Friedman v. Highland Park*, attached as Appendix C, I spoke directly to the general unsuitability of the semiautomatic rifle, specifically the AR15, for the vast majority of self-defense in the home.
[13] RECOIL MAGAZINE, Issue 40, January/February 2019, available at https://www.recoilweb.com/magazine/issue-40; *The Most Wanted Gun in America*,

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 15 of 46

SER-617

The marketing emphasis put on these types of firearms, particularly the military analogues, highlights a gap in GCA68:[14] it permits teenagers to acquire military-grade rifles and ammunition, and mandates only a 24-hour waiting period to take possession. Conversely, it limits handgun purchases to those over 21 years of age and imposes a 72-hour waiting period.

Finally, GCA68 allows for certain cross-state purchasing of long guns, a codicil that has been shown to facilitate both interstate[15] and international firearms trafficking.[16]

In my experience, enhanced background checks, which are effective only for state resident purchases as they rely on local databases of information, will reduce firearms trafficking by providing an obstacle to easy access to guns, and creating documentary evidence for investigators and prosecutors to use when following up on recovered crime guns.

Research also demonstrates that firearms moving from states with less restrictive laws to states with more restrictions impact homicides in the more restrictive states.[17] It stands to reason that state oversight of interstate commerce of

---

https://www.nytimes.com/2013/02/03/business/the-ar-15-the-most-wanted-gun-in-america.html?smid=nytcore-ios-share.

[14] https://www.atf.gov/rules-and-regulations/gun-control-act

[15] Washington State was the chief source of crime guns traced by law enforcement in both Oregon and Idaho in 2018. https://www.atf.gov/resource-center/firearms-trace-data-2018

[16] Chelsea Parsons and Eugenio Weigend Vargas, *Beyond Our Borders: How Weak U.S. Gun Laws Contribute to Violence Crime Abroad*, Center for American Progress website. https://www.americanprogress.org/issues/guns-crime/reports/2018/02/02/445659/beyond-our-borders/

[17] Erik J. Olson, et al., "American Firearm Homicides: The Impact of Your Neighbors," *Journal of Trauma and Acute Care Surgery* 86, no. 5 (2019): 797–802.

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 16 of 46

**SER-618**

firearms will result in fewer firearms trafficked in both directions with a concomitant positive effect on homicides in the more restrictive state.

Washington State law now provides oversight for a significant part of the firearms sold in the state; all semiautomatic rifle transfers are subject to state regulation through enhanced background investigation along with age and residency restrictions on those who may purchase such firearms.

To add context for my opinions: from 1992 through 1999, I conducted many criminal investigations of various firearms trafficking schemes, including intra-state, interstate and international firearms trafficking. From 2003 through 2005, I supervised the Washington, D.C. Firearms Trafficking Task Force; from late 2008-2009, I supervised Chicago Group II investigating gang-related firearms trafficking.[18]

Since 2017, I have served on the Illinois Violent Death Reporting System advisory board (IVDRS), a CDC funded effort to understand violent death across the state.[19] Additionally, in my current work with the Illinois Council Against Handgun Violence and States United to Prevent Gun Violence, I collaborate closely with several domestic violence and suicide prevention organizations such as the Illinois Department of Public Heath, the American Foundation for Suicide Prevention, and the National Alliance on Mental Illness. While my work has not focused exclusively on suicide, it has required me to conduct research to better understand the

[18] U.S. Bureau of ATF, Kansas City Field Division, Omaha Field Office 1991-1999; Washington Field Division, Group II, 2003-2005; Chicago Field Division, Group II/Gangs West 2008-2009
[19] "Illinois Violent Death Reporting System" available at the website for Ann & Robert H. Lurie Children's Hospital of Chicago. https://www.luriechildrens.org/en/research/research-areas/health-services-policy-research/ivdrs/.

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 17 of 46

**SER-619**

phenomenon. My understanding of recent publications is that state laws restricting firearm sales to those 21 and older have been demonstrated to prevent youth suicide[20] and it has become axiomatic that active shooters, both in schools and other venues, nearly always seek to die by suicide.[21]

## VI. CONCLUSION

In my opinion, the increased regulation of semiautomatic assault weapons in Washington State will result in increased public safety: fewer firearms being diverted from lawful commerce; fewer gunfire homicides and injuries; and fewer unintentional firearm-related injuries and deaths. I also believe that Initiative Measure No. 1639 will collectively enhance public safety by reducing the number of semiautomatic rifles readily available to those who should not have them.

I submit my report subject to revision if so required by the provision of further information or additional documents.

---

[20] D. Mark Anderson, Joseph J. Sabia, Erdal Tekin, *Child Access Prevention Laws and Juvenile Firearm-Related Homicides*, IZA Institute of Labor Economics Discussion Paper Series available at: https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=7&ved=2ahUKEwiW9PQ9qHmAhUkhAKHWr8CKoQFjAGegQICBAC&url=http%3A%2F%2Fftp.iza.org%2Fdp11898.pdf&usg=AOvVaw2i8JWkhGakHRMwRFgCOT_N;
Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, The Social Science Journal, Vol. 52, Issue 2, June 2015, Pages 168-175 available at: https://www.sciencedirect.com/science/article/abs/pii/S036233191500221.
[21] "Enhancing School Safety Using a Threat Assessment Model: An Operational Guide for Preventing Targeted School Violence" available at the website for the Department of Homeland Security at https://www.dhs.gov/publication/enhancing-school-safety-using-threat-assessment-model

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 18 of 46

**SER-620**

## APPENDIX A: MATERIALS REVIEWED

I have reviewed the following documents related to this matter:

Washington State Initiative Measure 1639

*Mitchell v. Atkins*, Case No. 3:19-cv-05106-RBL, 387 F. Supp. 3d 1193 (2019)

2016 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation https://www.census.gov/library/publications/2018/demo/fhw-16-nat.html accessed 11/21/19

Abrams, Daniel, 1992. <u>Ending The Arms Race, An Argument for a Ban On Assault Weapons,</u> Yale Law & Policy Review: Vol. 10: Issue 2, Article 15. https://digitalcommons.law.yale.edu › cgi › viewcontent › article=1237

Bureau of Justice Statistics, 2018. <u>Victimization During Household Burglary,</u> National Crime Victimization Survey https://www.bjs.gov › content › pub › pdf

Bureau of Alcohol, Tobacco and Firearms, 1989 <u>Report and Recommendation on the Importability of Certain Semiautomatic Rifles</u> https://www.atf.gov › file › download

Bureau of Alcohol, Tobacco and Firearms, 1998. <u>A Study on the Sporting Suitability of Modified Semi-Automatic Assault Rifles</u> https://www.atf.gov › file › download

Chivers, C.J., 2011 <u>The Gun</u>. Simon and Schuster https://www.simonandschuster.com/books/The-Gun/C-J-Chivers/9780743271738

Hemenway, David, 2010. <u>Private Guns, Public Health.</u> University of Michigan Press https://www.press.umich.edu › pdf

Hemenway, David, 2011. <u>Risks and Benefits of a Gun in the Home:</u> American Journal of Lifestyle Medicine https://journals.sagepub.com › doi › pdf

Diaz, Tom, 2013. <u>The Last Gun</u>. New Press, New York https://thenewpress.com › books › last-gun

McDougal, Topher; David A. Shirk; Rogert Muggah and John H. Patterson, 2013. <u>The Way of the Gun: Estimating Firearms Traffic across the U.S.-Mexico Border.</u> https://www.researchgate.net/publication/265127678_The_Way_of_the_Gun_Estimating_Firearms_Trafficking_across_the_US-Mexico_Border

Richardson, Erin, Hemenway, David. 2011. <u>Homicide, Suicide, and Unintentional Firearm Fatality: comparing the United States with other high-income countries.</u> <u>The Journal of trauma.</u>

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 19 of 46

**SER-621**

Koper, Christopher, NIJ 2004: <u>An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003</u>

<u>Mass Shootings in America 2009-2019</u>
<u>https://everytownresearch.org/massshootingsreports/mass-shootings-in-america-2009-2019/</u>

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 20 of 46

SER-622

**APPENDIX B: LIST OF PUBLICATIONS**

Mark D. Jones, *Illinois Needs a Way to Ensure Gun Dealers Are Living Up to Their Responsibilities*, Chicago Tribune, May 19, 2017, http://www.chicagotribune.com/opinion/letters/ct-illinois-needs-a-wait-to-ensure-gun-dealers-are-living-up-to-their-responsibilities-20170519-story.html

**APPENDIX C: DECLARATION**

Declaration of Mark D. Jones, *Friedman v. Highland Park*, No. 13-cv-09073 (N.D. Ill.) (attached)

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 22 of 46

**SER-624**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARIE S. FRIEDMAN, M.D. and The Illinois State Rifle Association, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 13-cv-09073 ) |
| THE CITY OF HIGHLAND PARK, | ) ) |
| Defendant. | ) |

<u>**DECLARATION OF MARK D. JONES**</u>

Pursuant to 28 U.S.C. § 1746, I, Mark D. Jones, declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2. I was retained by the City of Highland Park to provide my opinions in this matter. The views I state herein are drawn from my professional experience and training.

3. I am currently employed by the University of Chicago Crime Lab in the capacity of Law Enforcement Advisor and have been so employed since August 2012. Prior to that I spent the majority of my career (from September 8, 1991 until November 30, 2011) with the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), where I worked on a range of issues involving firearms. My *curriculum vita* is attached hereto. I retired from ATF as the U.S. Department of Justice's Regional Firearms Advisor to the governments of Central America; prior to that position, I served as a program manager in ATF headquarters (HQ) assigned to

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 23 of 46

**SER-625**

the FBI Counter Terrorism and Criminal Investigations Divisions; supervisor of the Arson and Explosives Intelligence group in ATF HQ; supervisor of Washington Group II investigating firearms trafficking in the Washington, D.C. field division; Deputy Division Chief of the ATF HQ Arson and Explosives Division; the Division Operations Officer in the Chicago Field Division; supervisor of Chicago Group I investigating street gangs in the Chicago Field Division, and as a special agent in the Kansas City Field Division conducting criminal investigations. During my career with ATF, I was assigned to the District of Columbia for more than 7 years in several of the positions set forth above. I have participated in over 100 federal, state and/or local law enforcement arrests involving unlawful firearms possession, illegal firearms trafficking, misuse of firearms, and firearms-related violence. I conducted, supervised, or participated in investigations in the District of Columbia, and the states of California, Florida, Georgia, Illinois, Iowa, Kansas, Nebraska, North Carolina, Maryland, Missouri, New Jersey, New York, Ohio, South Dakota, Texas, and Virginia in the United States as well as in the countries of Barbados, Belize, Bolivia, Costa Rica, Egypt, EI Salvador, Guatemala, Honduras, Lebanon, Nigeria, and Panama.

4.   During my final assignment with ATF, I was responsible for developing and implementing the United States government's strategy to aid the governments of Central America in reducing firearms violence. While based in EI Salvador, I led a team of experts who conducted detailed assessments of the regulatory and enforcement environments in six of the seven countries of Central America (Belize,

2

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 24 of 46

SER-626

Costa Rica, EI Salvador, Guatemala, Honduras and Panama). Through those assessments I was able to formulate a training plan to help the public security agencies in each of those countries to better focus and use their resources to deter illegal small-arms trafficking.

5.   In my career at ATF I worked with numerous domestic and international law-enforcement and intelligence agencies to train their personnel to conduct investigations of illicit small-arms trafficking, investigations of explosives-related crimes, and investigation of violent gangs. I was selected as a ATF representative during national-level explosives policy meetings at the White House. I also negotiated the first interagency agreement to bring the ATF's small-arms expertise to FBI-sponsored Joint Terrorism Task Forces nationwide, and drafted ATF's national policy to implement that agreement.

6.   Prior to ATF, I worked for the U.S. Department of State, Diplomatic Security Service (DSS) where I conducted internal-affairs investigations and protective security operations.  I also served as the Supervisory Special Agent in charge of security for the U.S. Ambassador to Lebanon; and served as supervisor of a specially trained team of agents conducting high-risk dignitary protection operations and training missions, both within the United States and abroad. During my employment with DSS, I travelled extensively, both domestically and in foreign countries, to conduct sensitive criminal and national security investigations, several involving criminal misuse of firearms.

3
Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 25 of 46

SER-627

7.  I have provided training to law enforcement and public security officials and agencies throughout the United States, Europe, Central and South America, Africa, Asia and the Middle East, on how to recognize and interdict illicit small-arms trafficking and conduct explosives-related investigations. During my law-enforcement career, I received extensive training involving firearms, use of force, evidence collection, explosives, and many additional subjects. In 1988, I was trained as a firearms instructor by DSS and subsequently trained many public security and law enforcement personnel both in the United States and in foreign countries in the safe use, care and storage of firearms. Following my appointment by ATF, I received additional training as a firearms instructor, this time at the Federal Law Enforcement Training Center, and subsequently trained numerous federal, state and local law enforcement officers in the proper use, handling, and maintenance of firearms, and did so until I retired in 2011. I was certified as a use-of-force instructor-trainer, and conducted training for federal, state and local law enforcement officers from numerous agencies until I retired. I have read many studies on firearms possession, lawful use and criminal or negligent misuse of firearms. I make an effort to review new studies on those subjects as they are published. I have a Master of Science Degree in Management from Johns Hopkins University.

8.  In preparing to present my opinions here, I reviewed the following materials:

    a.  <u>Plaintiffs' Complaint</u>; Case Number 13-cv-9073
    b.  <u>Highland Park City Code of 1968</u>, as amended, Chapter 136: Assault
        Weapons (the "Highland Park Ordinance")

4

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 26 of 46

**SER-628**

c. Illinois Compiled Statutes, Chapter 430.  Public Safety Act,  Firearms Owners Identification Card Act

d. Abrams, Daniel, 1992. Ending The Arms Race, An Argument for a Ban On Assault Weapons, Yale Law Review

e. Ayoob, Massad, 1980. In the Gravest Extreme, Police Bookshelf

f. Bureau of Justice Statistics, 2010.  Victimization During Household Burglary, National Crime Victimization Survey

g. Bureau of Alcohol, Tobacco and Firearms, 1989 Report and Recommendation on the Importability of Certain Semiautomatic Rifles

h. Bureau of Alcohol, Tobacco and Firearms, 1998. A Study on the Sporting Suitability of Modified Semi-Automatic Assault Rifles

i. Chivers, C.J., 2011 The Gun. Simon and Schuster

j. Cooper, Jeff, 1989. Principals of Personal Defense.  Paladin Press

k. Firearm & Injury Center at University of Pennsylvania, 2011. Firearm Injury in the U.S.

l. Grossman, David A., 1996.  On Killing. Little, Brown & Co.

m. Hemenway, David, 2010.  Private Guns, Public Health.  University of Michigan Press

n. Hemenway, David, 2011. Risks and Benefits of a Gun in the Home; American Journal of Lifestyle Medicine

o. Krouse, William J., 2012. Gun Control Legislation, Congressional Research Service

p. Lizotte, Alan J; David J. Bordua and Carolyn S. White, 1981. Firearms Ownership for Sport and Protection: Two Not So Divergent Models. American Sociological Review, 46(4), 499-503.

q. Lott, John R. Jr., 1998.  More Guns, Less Crime, Understanding Crime and Gun Control Laws; University of Chicago Press

r. Lott, John R. Jr., 2003. The Bias Against Guns. Regnery Publishing, Inc.

s. Diaz, Tom, 2013. The Last Gun. New Press, New York

t. Ludwig, Jens; Philip J. Cook and Tom W. Smith, 1998. The Gender Gap in Reporting Household Gun Ownership. American Journal of Public Health, 88(11), 1715-18.

u. McDougal, Topher; David A. Shirk; Rogert Muggah and John H. Patterson, 2013. The Way of the Gun: Estimating Firearms Traffic across the U.S.-Mexico Border. University of San Diego Trans-Border Institute and the Igarape Institute

v. Planty, Michael and Jennifer L Truman, 2013. Firearm Violence, 1993-2011 Bureau of Justice Statistics, U.S. Department of Justice

w. Richardson, Erin, Hemenway, David. 2011. Homicide, Suicide, and Unintentional Firearm Fatality: comparing the United States with other high-income countries. Journal of Trauma and Acute Care Surgery.

5

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 27 of 46

SER-629

x.  Christopher Koper, AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT
        WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE (Jerry
        Lee Center of Criminology, University of Pennsylvania 2004).
y.  Shefey, Joseph F. and James D. Wright. 1995. <u>In the Line of Fire:
        Youth, Guns, and Violence in Urban America</u> Hawthorne, NY: Aldine
        de Gruyter
z.  Siddle, Bruce K. <u>Sharpening the Warrior's Edge</u>. 1995. PPCT Research
        Library
aa. Spitzer, Robert J. 2012. <u>The Politics of Gun Control</u>. Boulder, CO:
        Paradigm.
bb. Violence Policy Center, 2004. <u>Illinois, Land of Post-Ban Assault
        Weapons</u>
cc. Blair, Martaindale & Nichols, *Active Shooter Events from 2000 to 2012,*
        Jan. 2014 (available at http://leb.fbi.gov/2014/january/active-shooter-
        events-from-2000-to-2012?utm_campaign=email-
        Immediate&utm_content=286210)
dd. *Report of the State's Attorney for the Judicial District of Danbury,* Nov.
        25, 2013.
ee. Anything otherwise referenced in this declaration.

9.  In summary, based on my experience in law enforcement and my review of all
the materials cited herein, I believe that assault weapons, as defined by the
Highland Park Ordinance, are unusual and dangerous and are not appropriate for
self-defense.  Additionally, Highland Park's Ordinance serves the goals of enhancing
public safety and reducing firearm-related crime.

## I.  Topic Background

10.  The U.S. Supreme Court ruling in *Heller v District of Columbia* held that
the Second Amendment of the Constitution guarantees an individual's right to
possess a firearm unconnected with militia service, for traditionally lawful purposes
such as hunting and self-defense within the home. The court specifically stated that
the right to keep and bear arms is not unlimited, does not permit an individual to
possess any weapon whatsoever and specifically excludes unusually dangerous

6

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 28 of 46

**SER-630**

firearms.  Legislatures and bureaucracies have, respectively, the responsibility to pass laws and promulgate regulations that offer equal protection under the law to all parts of society, not just a vocal minority advocating for something that serves only their particular interests.

11.  The City of Highland Park enacted Ordinance to address the potential threat of mass shootings involving a semi-automatic assault weapon.  Such events are demonstrably more catastrophic when the assailant uses a semi-automatic assault weapon than when other firearms are used[i]. The recent study by Mayors Against Illegal Guns (MAIG) shows that of the 93 examples occurring between January 2009 and September 2013 at least 14 semi-automatic or fully automatic assault weapons were recovered from the suspects; in those incidents, 151% more casualties resulted and 63% more deaths occurred that in incidents involving other types of guns[ii]. The MAIG report cited does not include the September 20, 2013 mass shooting at Cornell Park in Chicago wherein a subject wielding a Kalashnikov style semi-automatic assault rifle wounded 13 victims in just a few seconds[iii].

12. According to the Federal Bureau of Investigation, the frequency of active shooter events has doubled between 2009 and 2013, as compared to the period 2000 to 2008[iv].  The FBI defines an "active shooter event" as "an individual actively engaged in killing or attempting to kill people in a confined and populated area, typically through use of a firearm."[v]  The events considered in the FBI's study were limited to those where the shooter attempted to kill multiple people in an area

7

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 29 of 46

SER-631

occupied by multiple unrelated individuals where at least one victim was unrelated to the shooter[vi].

13. Moreover, assault weapons are used in a disproportionately high number of shootings of law enforcement officers. For example, although assault weapons represented somewhere between 1 and 8% of guns used in crime in 1994, they accounted for 16% of gun murders of police officers[vii].

14. The AR15 family of rifles and the various civilian versions of Kalashnikov style firearms available on the U.S. gun market are based entirely on the original selective fire versions of the same guns[viii]. The functional differences are minimal, mainly in the lack of fully automatic fire capability missing on the semi-automatic civilian versions. Conversion of semi-automatic rifles to fully automatic machineguns is possible with machine tools available in any automotive repair shop and requires a certain amount of skill and knowledge to be reliable, but many of the U.S. sourced rifles recovered from Mexican drug cartels were found to have been converted from their original, semi-automatic configuration to allow fully automatic fire[ix]. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) recovers hundreds of illegal machine guns annually in the United States and many of those are either AR15 or Kalashnikov style firearms originally manufactured as semi-automatic firearms.

15. When comparing the rate of fire (cyclic rate) of a Federally regulated, fully automatic machine gun and an semi-automatic AR15-type rifle, the difference is minimal. The AR15 family of rifles may be fired at virtually the same cyclic rate of

8

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 30 of 46

SER-632

fire as a fully automatic machine gun, by installing a commercially manufactured so-called "bump fire" trigger activator or by merely firing from the hip holding the barrel shroud with one hand, and pressing the trigger with the other.  By using this after market device or adopting the described technique, the AR15's recoil will naturally fire the weapon at a cyclic rate equal to a fully automatic machine gun.

16.  Moreover, the parts and plans for conversion of a semi-automatic firearm into a machinegun are widely available on the internet, in classified advertisements in various trade publications or at gun shows and are, in and of themselves, legal to possess under federal law as long they are not stored in proximity to a firearm that could be converted by their installation[x].

17.  Semi-automatic assault weapons and civilian sporting firearms, e.g., hunting rifles and shotguns, make up a very small percentage of firearms used in armed assaults, homicides and suicides in Illinois and nationwide[xi].

18.  Many randomized, controlled case studies have demonstrated that merely bringing a firearm into the home significantly increases the residents' risk of death by gunshot,[xii] exactly the opposite result sought by many who acquire a firearm for self-defense. Alarmists cite an increase in residential burglary as the main reason to keep a firearm in the home for self-defense,[xiii] when in fact home invasion burglaries (and related murders) make up a tiny percentage of all residential burglaries in the United States[xiv].

19.  Two of the main rationales for acquiring a military style semi-automatic assault rifle cited in firearms industry articles and advertisements are defense of

9

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 31 of 46

SER-633

the home in the event of a natural disaster and ensuing civil insurrection and/or to fight the tyranny of an out-of-control federal government often supported by the words of the one of founding fathers of the republic, Thomas Jefferson; "The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants."[xv]

20.  Addressing these two concepts in reverse order: The ideation of armed resistance against a tyrannical government is part of the American legend and, while it is certainly true that colonial militia took up arms in revolt against the British during the 18th century, the concept of doing so in 2014, or for that matter of a dictatorial takeover of the United States government is laughable, as is the idea that a civilian militia armed with semi-automatic assault weapons could mount an effective campaign against the United States armed forces, even if the U.S. military were inclined to support an aspiring tyrant.

21.  Natural and man-made disasters can and do occur; floods, fires, earthquakes, tornados, failures of the power grid, riots and looting have all come to pass in the United States. Taken in context, however, the most serious incidents have lasted no longer than a few days before civilian authorities restored order. During such events civilians were required to shelter in place for short periods of time, some possibly resorting to the use of force. However the idea that untrained civilians should acquire assault weapons, as a hedge against a horde of suddenly feral neighbors is firearms industry fear mongering at its most vile[xvi] that results in more unnecessary firearms in general circulation, vulnerable to theft and misuse.

10
Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 32 of 46

**SER-634**

## II. Human Factors Considerations

22.  Firearms are clearly effective lethal tools for self-defense, both for law enforcement and civilian use. The paradox however is that many poorly or entirely untrained individuals would not be able to use a firearm to defend themselves. In his book On Killing, author David Grossman makes a compelling case that one person taking another's life is much more difficult in practice than is portrayed in popular culture, particularly for individuals who have not benefited from operant conditioning training methodologies employed by the military and civilian police agencies[xvii]. In my own experience as a law enforcement use-of-force instructor, countless civilians, relatives, and friends have sought my advice about acquiring a firearm for self-defense.  In most of those instances, when I inquired about their intentions I was told that they intended to deter would-be criminals by merely displaying a gun hoping that the demonstration would cause the criminal to flee. When questioned about their feelings about potentially killing another human being, I was invariably met with a statement to the effect that he or she had not really considered that possibility.

23.  It is axiomatic among firearms enthusiasts that "Guns don't kill people, people kill people," and it is also well known within the law enforcement training community that intention and combat mind set are critical to success in lethal force encounters.[xviii]  As a trainer I spent countless hours helping police officers and federal agents hone the physical skills required to manipulate their firearms and less-lethal weapons, e.g. handcuffs, pepper spray, batons, and conducted energy

11

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 33 of 46

**SER-635**

devices (Taser), trying to ingrain the skills so that little conscious thought would be necessary to employ them.  Civilians without training are clearly capable of killing one another with whatever is at hand as is borne out by the homicide statistics recorded annually by the FBI and other agencies. The question here is whether the average citizen, statistically unlikely to encounter violence in his or her lifetime, and with little or no training in self-defense disciplines, could become a killer by the mere possession of a firearm. Based on my training and experience, I believe the answer to be no.

24.  Setting aside the concept of combat mindset and the ability of one person to kill another, the idea of a use-of-force continuum must be considered. In discussions about use of force, lethal force is but one option and always the least desirable even when required.

25.  Police officers learn that their use of force begins with their mere presence -- their uniform, badge and other symbols of authority constitute a recognizable institution in American society and in general, citizens understand they are required to obey lawful commands from a police official or face arrest.[xix]  Police officers all over the United States receive empty-hand defensive tactics training, usually mandated by a state training council or a similar governing body.

26.  The amount of defensive tactics training for law enforcement officers varies from state to state, but is invariably focused on overcoming low to medium levels of resistance, e.g. verbal non-compliance to police commands, passive resistance characterized by letting one's body go limp, or active resistance like pulling or

12

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 34 of 46

**SER-636**

running away from an officer's attempts to restrain. That training begins in the police academy for recruits and continues throughout one's career. Police officers are issued handcuffs - the most ubiquitous use-of-force device - and other tools such as batons to ensure compliance or overcome resistance to their authority. They are trained in how to properly use these tools, and after just a few years most officers become quite adept at employing them.

27.  Research into human factors conducted by PPCT, Inc. has documented the physiological effects that come into play during a lethal force encounter and affect the outcome. The human nervous system, more specifically the sympathetic and parasympathetic nervous systems (SNS), have evolved to improve a human being's chances of surviving deadly threats.[xx]  The SNS offers tremendous support for gross motor skills like pushing, throwing and running, also known as fight or flight[xxi]. However, fine motor skills like manipulating the tiny selector lever (safety) or retracting the charging handle on a semi-automatic assault weapon often suffer during deadly force encounters.

28.  When a person experiences an SNS activation his or her heart rate soars almost immediately, sometimes to well over 200 beats per minute;[xxii] blood is shunted away from the extremities leading to loss of touch sensitivity; sensory input is largely restricted to vision, normally constituting about 70% of an individual's input under normal circumstances, during a SNS activation it becomes the dominant sense.  Importantly, a phenomenon known as "tunnel vision" also sets in,

13

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 35 of 46

SER-637

limiting peripheral and low light vision and thus further reducing information available to mitigate the lethal force threat perception.[xxiii]

29. One reason military and police trainers spend so much time on basic firearms drills is to instill so-called "muscle memory" in recruits whereby activities like deactivating a safety become automatic requiring no conscious thought. When suddenly confronted by a deadly force threat the automatic response ensues and the weapon may be brought into play using the gross motor skills that are complimented by the body's own evolutionary reaction. Police recruits typically fire thousands of rounds in basic training and manipulate all of their issued equipment, including their firearms, countless times.

30. ATF special agent candidates spend a full week drawing their firearms, developing a proper shooting stance, and "dry firing" with laser practice equipment before they ever actually discharge a live round.[xxiv] The fact that so many police involved shootings result in a documented nationwide hit-to-rounds fired ratio of less than 50% is evidence that even well trained law enforcement personnel subject to the forces of evolution and only able to overcome their natural programming with difficulty. How much less so will untrained, unskilled, and unresolved citizens be able to effectively employ a complex, notoriously finicky rifle like the AR15?

31. It is also widely understood that physical skills deteriorate without regular practice - hence the in-service training common to all law enforcement and military agencies and elements. Regular requalification is required and many agencies

14

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 36 of 46

**SER-638**

require monthly practice. Even the best trained police officers and soldiers skills will degrade over time if not deliberately and regularly honed.

32. Like pilots in training, much time in law enforcement recruit and in-service firearms training is given over to handling emergencies, specifically, fixing a (semi-automatic) gun that has malfunctioned during a deadly force encounter. This type of training is known as the "immediate action drill" and is designed to instill muscle memory in a shooter so that the physical actions become rote, requiring very little conscious thought. An individual is taught to perform a series of activities in a specific sequence that will rectify the most common semiautomatic firearm malfunctions.

33. In my own experience, these drills were performed at least twice annually for untold repetitions until my colleagues and I could perform them "in our sleep." Regrettably, most civilian firearms training ignores this topic altogether leaving the novice shooter with no knowledge, skills, or abilities to overcome a malfunction at a crucial moment. For that reason when I am asked to recommend a firearm for personal defense I usually suggest the revolver, a tried and true weapon design that is widely recognized by experts as the most reliable mechanism on the market. With no external safety or bolt carrier release to manipulate, if deadly force is necessary a home defender is only required to aim the gun and press the trigger. Jeff Cooper, the well-known firearms trainer, author of innumerable articles and books and founder of the original Gun Sight Ranch firearms training facility opined that a

15

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 37 of 46

SER-639

heavy-duty handgun is the "optimum defensive arm..."[xxv] and I am in complete agreement.

34.  The modern revolver will fire under virtually any circumstances, is ergonomically ideal for the human body under stress, and available in a variety of calibers, ammunition capacities, and price points to meet virtually any personal defense need.

### III. General Suitability

35.  The genre of firearm at the center of the instant case is the semi-automatic assault weapon defined under the Highland Park Ordinance[xxvi] - the essential characteristic of which is a magazine capacity well in excess of what would typically be used in for target shooting or hunting.  While there are many firearms available that are suitable for both sporting and defensive purposes, the semiautomatic assault weapon is typically a "civilianized" version of a firearm originally manufactured for military use.

36.  The principal difference between an AR15 semi-automatic rifle and its military sibling, the M4/M16, is the latter's selective fire capability, that is the ability to use the weapon as a fully automatic machine gun (wherein a single trigger pull can empty the magazine) and for semi-automatic fire (wherein each trigger pull results in only one cartridge being fired). The federal government tightly regulates possession of machine guns, whereas the possession of semiautomatic firearms is not regulated very much at all. There have been very few crimes committed with legally registered machine guns and other firearms of the types under strict federal

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 38 of 46

SER-640

control and there have been many, many crimes including mass casualty shootings carried out with semi-automatic assault weapons, rifles and pistols. The mass shootings alone resulted in at least 519 deaths and scores of injuries between 2009 and 2013.[xxvii]

37. Statistically, rifles and shotguns, known collectively in the vernacular as "long guns", are less likely to be used in homicides or be recovered by law enforcement authorities in other crimes.[xxviii] Yet when they <u>are</u> used the carnage that results is stunning, the two most recent examples being 29 casualties in Newtown, Connecticut (December 2012) and 70 in Aurora, Colorado (July 2012) for a total of 99 dead and wounded in just those two 2012 Incidents.[xxix]

38. Military assault weapons were developed to allow soldiers the ability to direct high volumes of "suppressive" fire at their enemies thus permitting their compatriots to more readily maneuver on the battlefield. The 20-30 round magazine capacity found in virtually every modern military long gun, coupled with the 7 magazine "basic load" carried by American military riflemen, gives an infantry squad the ability to maintain a sustained rate and volume of fire sufficient to dominate an enemy. Ultimately, the purpose of military assault rifles and submachine guns (the analog for a civilian assault pistol) is offensive - to facilitate the assault and capture of a military objective.  In terms of contemporary sporting purposes for a semi-automatic assault rifle, the only conceivable use for a high capacity magazine is during a 3-gun match.  In these events participants use a pistol, rifle, and shotgun to overcome fantasy challenges presented by the match

17

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 39 of 46

SER-641

organizers. Said another way, there are a variety of human silhouette "aggressor" targets arranged to challenge a shooter who's score is based on the number of accurate hits coupled with the time it takes him or her to complete the course of fire. Each of the three firearms is used during specific phases or segments of the match and then set aside, so in most cases a 30 round magazine is superfluous - the match stage requiring a rifle might only require 5 or 10 rounds to negotiate successfully.  A shooter using all 30 rounds would be considered by his or her peers as either very unskilled or profligate.

39.  In police involved shootings the number of shots fired is statistically very low - less than four rounds expended[xxx] so the ammunition capacity of a standard revolver (6 cartridges) would satisfy one's self defense needs most of the time and a semi-automatic pistol with a 10 round capacity magazine even more so.

40.  To offer a high capacity magazine as the answer to lack of training or familiarity with reloading the weapon when necessary is dangerous and irresponsible. A favorite old chestnut of police firearms trainers is, "You cannot miss fast enough," meaning that in time of need one should remain calm and rely on his or her training to make accurate, incapacitating shots against an assailant, not "spray and pray." To suggest that a novice gun owner without sufficient training and experience to reload a semi-automatic handgun under stress should equip themselves with more ammunition in high capacity magazines is ludicrous. That theory places everyone in a household, even a neighborhood, in jeopardy of being killed by stray rounds.

18

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 40 of 46

**SER-642**

41.  In my opinion, firearms owners should be required to attend professional training, conduct regular practice sessions, and become expert in manipulating his or her chosen weapon under a variety of circumstances and lighting conditions to gain and maintain proficiency.

42.  A would-be firearms owner who cannot, or will not, train and practice should consider other security options.  If that person ignores common sense and insists on buying a gun, then he or she would be best served by a revolver, for reasons previously articulated in this report.

43.  Assault weapons, rifles or pistols, fully or semi-automatic, are designed to be used in an offensive role. Law enforcement agencies deploy these firearms in an auxiliary function, generally subordinate to the primary duty weapon which is for the majority of police officers a handgun.  Generations of police agencies relied on revolvers as their primary duty weapon and shotguns as their auxiliary, the latter typically kept locked in patrol cars against the need for something more powerful than revolver.

44.  Following a specific high profile incident in California,[xxxi] police agencies around the country began issuing semi-automatic pistols - the Illinois State Police was the first large agency to adopt the technology - which soon became ubiquitous. A similar trend may be observed in the change from shotguns to patrol rifles, which began in earnest following a specific incident in Los Angeles in 1997[xxxii] and led to many agencies either issuing semi-automatic assault rifles or approving the private purchase of such by their personnel, to avoid being "out gunned." Nationally, law

19

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 41 of 46

**SER-643**

enforcement leaders perceived a need for their officers to be able to overcome deadly force assaults at a greater distance with increased accuracy, tasks that semi-automatic assault rifles may easily accomplish and a shotgun generally cannot. The design characteristics of semi-automatic assault rifles allow them to excel at long distance accuracy and penetrate common ballistic vests worn by criminals, advantages that most police were lacked in 1997. It should be noted that virtually all police agencies require their personnel to undergo additional training and qualification before being authorized to carry and use a patrol rifle. Such training is typically lengthy (on the order of 40 hours) and is supplemented by regularly scheduled in-service training and requalification.

## IV. Suitability for Home Defense

45. The design characteristics outlined above are not an advantage in home defense settings, however, since the typical self defense distances involved in scenarios envisioned by firearms industry pundits average twenty feet[xxxiii] in homes with interiors constructed from gypsum drywall/sheetrock that will not prevent over penetration by any modern firearms cartridge, rifle, pistol or shotgun. To tout the semi-automatic assault weapon as the best or even second best tool for home defense is specious and disingenuous. A widely known axiom amongst defensive tactics trainers is "the best self defense gun is the one at hand."

46. A responsible firearm owner will invariably keep his or her weapons under lock and key, most in a secure gun safe designed and sold for that purpose. Safes require time to unlock and open, obviating the rifle as the "...one at hand..." unless

20

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 42 of 46

SER-644

one anticipates an imminent home invasion, statistically very unlikely,[xxxiv] or irresponsibly stores his/her long gun in a closet or under the bed, easily accessible to all members of a household including children and uninvited visitors like burglars. It is well known to law enforcement authorities that firearms present an attractive target for burglars, and a gun owner who secretes his or her unsecured firearm somewhere in the home is virtually delivering the weapon to the underground gun market and criminal misuse.

47. Long guns are also not optimal for home defense because they are challenging to manipulate in the close confines found in homes; the overall length of many rifles, even those with folding or collapsible shoulder stocks, renders them unwieldy and hard to maneuver. Additionally, rifles are far more powerful than necessary or desirable for most home defense uses - the velocity of widely available standard military surplus ammunition for AR15 rifles is more than 3000 feet per second and the projectile contains a steel penetrator that greatly increases the possibility of innocents being injured or killed by missed shots or ricochets.[xxxv] Add to those factors the inevitable sympathetic nervous system activation coupled with a high capacity magazine and it becomes a recipe for disaster.

48. Many law enforcement and security experts consider the shotgun to be the acme of home defense tools, and I agree that a shotgun is more effective than most handguns and rifles but the shotgun suffers from the same disadvantages as any long gun - they are as a genre more complicated to store safely thus time consuming to obtain in an emergency, and are too long to be easily maneuverable indoors.

21

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 43 of 46

**SER-645**

49.  A far more likely scenario involves a handgun kept in a compact, secure yet easily accessible storage container - available in numerous configurations and locking mechanisms[xxxvi] - from which the weapon may be quickly obtained when needed but otherwise kept from unintended or unauthorized access.

50.  Finally, most homeowners are not trained in close quarters combat so attempting to "clear" their house of a possible intruder would be imprudent.  A safer, more conservative course would be to gather the family together in a pre-identified secure room, barricade the door and call the police. If an intruder cannot be warned off and forces entry into the safe haven before police arrive, the homeowner has the option to use deadly force if appropriate.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 7, 2014.


Executed on _____        _____

                                          MARK D. JONES

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 44 of 46

[i] Mayors Against Illegal Guns analysis of mass shootings in the United States 2009-2012, accessed September, 2013 www.mayorsagainstillegalguns.com

[ii] Ibid

[iii] Chicago Tribune, Shooting of 13 at Park Puts Chicago Back in the Spotlight. Accessed November 20, 2013

[iv] Blair, Martaindale & Nichols, *Active Shooter Events from 2000 to 2012*, Jan. 2014 (available at http://leb.fbi.gov/2014/january/active-shooter-events-from-2000-to-2012?utm_campaign=email-Immediate&utm_content=286210). [iv]

[v] *Id.*

[vi] *Id.*

[vii] Christopher Koper, AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE 11, 14-15, fn. 12 (Jerry Lee Center of Criminology, University of Pennsylvania 2004).

[viii] The Gun; C.J. Chivers; Simon and Schuster, 2011

[ix] Personal conversation between the author and (former) U.S. Assistant Country Attache to Monterrey, Mexico, Harry Penate, June 2011

[x] Title 26 US Code Section 5681(d)

[xi] Federal Bureau of Investigation, Uniform Crime Report, www.fbi.gov, accessed multiple times, September 2013.

[xii] Risks and Benefits of a Gun in the Home, David Hemenway, American Journal of Lifestyle Medicine, February 2011

[xiii] Home Defender magazine fall 2013

[xiv] Victimization During Household Burglary, Bureau of Justice Statistics, National Crime Victimization Survey 2010

[xv] Thomas Jefferson, letter to William Stephens Smith, November 13, 1787.  *The Papers of Thomas Jefferson*, ed. Julian P. Boyd, vol. 12, p. 356 (1955)

[xvi] The publications Shotgun News - Be Ready http://www.shotgunnews.com/2013/08/29/be-ready-hits-the-newstand, Combat Handguns http://www.tactical-life.com/subscribe/combat-handguns, Special Weapons for Military & Police http://www.tactical-life.com/subscribe/special-weapons-for-military-and-police Rifle Firepower http://www.tactical-life.com/subscribe/rifle-firepower Tactical Knives http://www.tactical-life.com/subscribe/tactical-knives, Tactical Weapons http://www.tactical-life.com/subscribe/tactical-weapons and Guns & Weapons for Law Enforcement http://www.tactical-life.com/subscribe/guns-weapons-for-law-enforcement have all run articles that describe or imply scenarios wherein control of the federal government must be forcibly wrested away from a tyrant or dictator who has at some point eliminated civilian firearms ownership.

[xvii] On Killing; David A. Grossman, Little, Brown & Co. 1996

[xviii] Sharpening the Warrior's Edge; Bruce K. Siddle, PPCT Research Library, 1995

[xix] Close Quarters Countermeasures, PPCT, Inc.

[xx] Ibid

[xxi] Ibid

[xxii] Ibid

[xxiii] Ibid

[xxiv] Personal experience and observation of ATF recruit training on various occasions between 1991 and 2011

[xxv] Principals of Personal Defense, p.30 Jeff Cooper, 1989

[xxvi] Highland Park, Illinois, City Code, Chapter 136: Assault Weapons

[xxvii] Mayors Against Illegal Guns - Analysis of Mass Shootings 2009-2013

[xxviii] Planty, Michael and Jennifer L. Truman, 2013. Firearm Violence, 1993-2011  Bureau of Justice Statistics, U.S. Department of Justice

[xxix] Mayors Against Illegal Guns - Analysis of Mass Shootings 2009-2013

[xxx] http://www.fbi.gov/stats-services/publications and http://guides.lib.jjay.cuny.edu/NYPDStatistics, accessed November 2, 2013

[xxxi] http://www.chp.ca.gov/memorial/newhall.html, accessed November 2, 2013

[xxxii] CNN report February 28, 1997, Accessed October 31, 2011

[xxxiii] Home Defender magazine fall 2013 and Personal Defense magazine fall/winter 2013 both contain multiple articles that demonstrate typical scenarios of defending the home at distances of between contact and 45 feet

[xxxiv] Bureau of Justice Statistics, U.S. Department of Justice, Victimization During Household Burglary, 2010

[xxxv] AR15.com: "The bullet shall completely penetrate a 10 gage (.135") thickness AISI 1010 to 1020 steel plate target with hardness between RB 55 minimum and RB 70 maximum, (NATO plate) positioned at 0 + 5 degrees

23

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 45 of 46

**SER-647**

obliquity and located 656 yards (600 meters) from the weapon.  In addition, an aluminum witness plate (2024-T3 or equivalent nominally 0.20" thick) shall be located 6" behind the target to determine penetration.  Testing shall be performed when the air is between 30 degrees F and 95 degrees F." accessed October 30, 2013
xxxvi Home Defender magazine fall 2013 and Personal Defense magazine fall/winter 2013

24

Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash.)
Page 46 of 46

**SER-648**

# Exhibit B

Rebuttal Expert Report

**Prepared for Washington State Office of the Attorney General by**

Mark D. Jones

## In the Matter of:

DANIEL MITCHELL, *et al.*,

*Plaintiffs*,

v.

CHARLES ATKINS, *et al.*,

*Defendants*,

and

SAFE SCHOOLS SAFE COMMUNITIES,

*Intervenor-Defendant.*

Date: January 16, 2020

Signed: _____

Mark D. Jones

<u>TABLE OF CONTENTS</u>

I. INTRODUCTION AND SUMMARY OF REBUTTAL OPINIONS...........1

II. REBUTTAL OF SHERIFF KNEZOVICH'S OPINIONS .......................2

III. CONCLUSION...............................................................…...…..…….6

## I.    INTRODUCTION AND SUMMARY OF REBUTTAL OPINIONS

I have been asked by the Washington Attorney General's Office to provide my expert opinions regarding the Report of Sheriff Ozzie Knezovich,[1] one of the expert witnesses disclosed by Plaintiffs in this matter. Specifically, I was asked to address Sheriff Knezovich's opinion that: (1) a "semi-automatic rifle may be preferable for self-defense";[2] (2) during a "major emergency" law enforcement would "welcome" the "availability of citizens who can defend themselves and (if necessary) provide interim community protection";[3] (3) I-1639's minimum age requirement may lead to "18- to 20-year-olds . . . seek[ing] to acquire a semi-automatic rifle" through "other means";[4] and (4) that "even if I-1639 resulted in fewer Washington citizens owning semi-automatic rifles, it is unlikely that the number or severity of mass shootings would be reduced."[5]

I respectfully disagree with Sheriff Knezovich's opinions for the following reasons. First, in my professional opinion, revolvers and shotguns are generally more appropriate, and even superior, for self-defense than a semi-automatic rifle. Second, in my experience, public safety officials prefer not to have poorly trained or untrained citizens insert themselves into the government's emergency response. Third, in my experience investigating firearms trafficking, the State's decision to raise the minimum age to purchase a particular type of firearm will not generally lead would-be purchasers to acquire it by unlawful means. Fourth, it is my opinion that limiting the availability of semi-automatic rifles to a higher risk group (namely,

---

[1] Report of Sheriff Ozzie Knezovich, Daniel Mitchell, *et al.* v. Chuck Atkins, *et al.*, No. 3:19-cv-05106-RBL (W.D. Wash.) (submitted Dec. 18, 2019) (hereinafter "Knezovich Rep.").
[2] Knezovich Rep. at 4.
[3] Knezovich Rep. at 5.
[4] Knezovich Rep. at 6.
[5] Knezovich Rep. at 6.

Rebuttal Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash)
Page 1 of 6

18- to 20-year-olds) in Washington State may prevent a mass shooting altogether, and reduce the severity of a mass shooting should one occur.

## II.    REBUTTAL OF SHERIFF KNEZOVICH'S OPINIONS

### A.    Use of Semiautomatic Assault Rifles for Self-Defense

In my professional opinion, revolvers and shotguns are generally more appropriate, and even superior, for self-defense than a semi-automatic rifle. In his report, Sheriff Knezovich opines that, while pistols are preferred for self-protection, a semi-automatic rifle might be preferable for self-defense against animal attack—bears, wolves, cougars, and moose. Sheriff Knezovich goes on to state that "[t]he same principle applies if the attacker is human rather than a wild animal."[6]

While it is true that a heavy caliber rifle, loaded with ammunition specifically designed for dangerous game is appropriate for defending oneself from an attack from a large, wild animal, the same weapon would pose significant hazards in a home defense scenario.

Certainly, a hunting rifle *could* be used to forestall an attack by a large wild animal, however, should the defender miss with the first shot, as Sheriff Knezovich discussed, even if the defender successfully hit the intended target with a second or third follow up shot, the initial unsuccessful shot(s) will easily travel through walls to kill or injure an innocent in another room or even a neighboring home.

Conversely, the type of semi-automatic rifles most useful in a home defensive situation are typically chambered in calibers completely unsuitable for hunting, particularly for the kind of animals present in Washington State as described by Sheriff Knezovich. One example, the 5.56 NATO standard, 62 grain SS109 projectile

---

[6] Knezovich Rep. at 4.

Rebuttal Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash)
Page 2 of 6

was developed from a caliber specifically designed to shoot *small* game, e.g. coyotes, rabbits, gophers and prairie dogs (.222 Remington[7]). Such an inappropriate caliber, generally best suited for warfare, would likely serve only to enrage the wounded animal, ensuring continued aggression.

Sheriff Knezovich's theory that extra ammunition makes up for the poor marksmanship that typically ensues in a life-threatening encounter is misguided.[8] There is an axiom in firearms training which speaks directly to the point: that "you cannot miss fast enough." [9] As I previously noted, missed shots <u>will</u> penetrate common construction materials, endangering anyone in the area.

In my 31-year law enforcement career, family and friends often asked my opinion related to the use of firearms and self-defense. In the instances when the person was determined to purchase a weapon but unlikely to seek training, I invariably recommended that they obtain a revolver.

Revolvers are non-semiautomatic handguns[10] whose design makes them particularly reliable, ergonomic, simple to operate, and require little maintenance to function—all features to recommend one to those who practice infrequently. Additionally, a revolver is easy to store in a way that is secure but accessible at a

---

[7] *The History of the AR-15 and 5.56x45 NATO Cartridge*, available at https://www.snipercountry.com/5-56x45-nato-and-ar-15-chronology/ (last accessed January 16, 2020).

[8] William Joseph Lewinsky, R. Avery, and Jacob M. Bushev, *The Real Risks During Deadly Police Shootouts: Accuracy of the Naïve Shooter*, https://www.semanticscholar.org/paper/The-real-risks-during-deadly-police-shootouts%3A-of-Lewinski-Avery/6af7197b64774f0e0858713bf5c2c0a8c477ffce (last accessed January 16, 2020).

[9] Wyatt Earp on Gunfighting Interview, available at http://abesguncave.com/wyatt-earp-on-gunfighting-interview/ (last accessed January 16, 2020).

[10] Revolvers are differentiated from (semi-automatic) pistols. See ATF Guidebook – Importation & Verification of Firearms, Ammunition, and Implements of War, available at http://www.atf.gov/resource-center/docs/firearms-imporation-verification-guidebook-terminology-nomenclaturepdf/download (last accessed January 16, 2020).

Rebuttal Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash)
Page 3 of 6

moment's notice. In a home defense scenario, a revolver would be far easier to maneuver in the confines of a typical house or apartment.

Sheriff Knezovich writes that "shotguns are preferred . . . for self-protection from animals and criminal threats,"[11] and I generally agree. During my long career in public safety, there was almost universal agreement amongst my colleagues that a shotgun was the most powerful weapon available. The 12 gauge shotgun using buckshot[12] fires eight to twelve .30 caliber projectiles with each pull of the trigger at a velocity that exceeds most handguns, but lower than the majority of rifle calibers. Additionally, the variety of ammunition configurations include low-recoiling buckshot designed specifically for home defense. This potent firearm would serve a hunter well, either for bringing down game or defending against an attack, human or animal.

### B.    Reliance on Armed Civilians During Major Emergency

In my experience, public safety officials prefer not to have citizens arbitrarily insert themselves into the government's response to an emergency, particularly armed citizens.[13] The primary focus and consideration of incident command staff is usually the coordination and safety of everyone involved in the response and recovery process. Random, unvetted volunteers including militias and other pseudo-paramilitary groups, present safety concerns on many levels. Are they well trained? Are they experienced? Do they have suitable equipment and supplies? Is their equipment compatible with each other and the official responders? Further,

---

[11] Knezovich Rep. at 3.
[12] Buckshot is a type of multi-projectile shotgun ammunition originally created for hunting deer.
[13] Department of Homeland Security, FEMA, Weapons and Emergency Kits, available at https://www.fema.gov/faq-details/Weapons-and-emergency-kits-1370032125846 (last accessed January 16, 2020).

Rebuttal Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash)
Page 4 of 6

such individuals and groups are unaccountable for their actions, cannot be relied upon to adhere to the rules of engagement imposed by the Incident Commander, and may decide to abandon their efforts at any moment.

The concerns of government officials at all levels regarding civilians acting in place of the government is so profound that all fifty states and the federal government have enacted laws restricting paramilitary training or related activities.[14] Additional validation of my opinion is found in the federal government's guidance and regulations surrounding disaster preparedness and response. FEMA recommends *against* including firearms in emergency disaster kits, and firearms are prohibited in FEMA short-term emergency shelters.[15]

### C.   Unintended Consequences of Minimum Age Requirement

In my experience investigating firearms trafficking, the State's increasing the age to possess any type of firearm will not lead to illegal behavior by underage, would-be possessors. Sheriff Knezovich's fear that increasing the age to purchase semi-automatic rifles will lead to increased illegal firearms diversion or trafficking is baseless. My research has failed to reveal any instance of a state enacting a more stringent gun law experiencing increased illegal firearm trafficking activity.

### D.   Effect of I-1639 on Mass Shootings

It is my opinion that an overall reduction in the number of firearms available in Washington—and specifically reducing access to semi-automatic assault rifles by

---

[14] Institute for Constitutional Advocacy and Protection, *Prohibiting Private Armies at Public Rallies* at 8–14 (Feb. 2018), available at https://www.law.georgetown.edu/icap/wp-content/uploads/sites/32/2018/04/Prohibiting-Private-Armies-at-Public-Rallies.pdf (last accessed January 16, 2020).

[15] Fed. Emergency Mgmt. Agency, *Are You Ready? An In-depth Guide to Citizen Preparedness* (Aug. 2004), available at https://www.fema.gov/pdf/areyouready/areyouready_full.pdf (last accessed January 16, 2020).

Rebuttal Expert Report of Mark D. Jones
Mitchell v. Atkins, No. C19-cv-5106-RBL (W.D. Wash)
Page 5 of 6

persons 18 to 20 years of age, who are more likely than other groups to commit gun violence—may reduce the likelihood of a mass shooting altogether, and reduce the severity of a mass shooting should one occur. The research to date has shown a positive relationship between more stringent gun laws and less gun violence, e.g., homicides, suicides, non-fatal firearm assaults, and unintentional firearm injuries and deaths.[16] One example is found in Missouri who, in 2007, repealed its permit to purchase firearms and subsequently saw a clear spike in the number of gun-related homicides.[17]

Sheriff Knezovich's stated belief that it is unlikely that even if fewer semi-automatic rifles were available in Washington State "the number or severity of mass shootings would be reduced"[18] stands virtually alone in opposition to a burgeoning body of research that comes to exactly the opposite conclusion.[19]

## III.   CONCLUSION

The ideas expressed by Sheriff Knezovich are based largely on his own experience, are not supported by data, and are both mistaken and misinformed.

---

[16] *See* Giffords Law Center, Annual Gun Law Scorecard: The evidence is clear—states with stronger gun laws have lower gun death rates, year after year, available at https://lawcenter.giffords.org/scorecard/ (last accessed January 16, 2020); Siegel, Solomon, Knopov, Rothman, Cronin, Xuan, Hemenway, *The Impact of State Firearm Laws on Homicide Rates in Suburban and Rural Areas Compared to Large Cities in the United States, 1991-2016*, J. Rural Health, 2019 July 30, available at https://www.ncbi.nlm.nih.gov/pubmed/31361355 (last accessed January 16, 2020); Elinors J. Kaufman, Christopher N. Morrison, Charles C. Branas, et al., *State Firearm Laws and Interstate Firearm Deaths from Homicide and Suicide in the United States: A Cross-sectional Analysis of Data by County*, JAMA Intern Med. 2018;178(5), available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2673375 (last accessed January 16, 2020).

[17] Daniel Webster, Cassandra Kercher Crifasi, and Jon S. Vernick, *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, J. Urban Health, 2014 Apr; 91(2): 293-302; published online 2014 Mar. 7, available at https://www.snipercountry.com/5-56x45-nato-and-ar-15-chronology/ (last accessed January 16, 2020).

[18] Knezovich Rep. at 6.

1
2
3
4
5
6                                                      The Honorable Ronald B. Leighton

7                        **UNITED STATES DISTRICT COURT**
                         **WESTERN DISTRICT OF WASHINGTON**
8                                    **AT TACOMA**

9    DANIEL MITCHELL, et al.,                    NO. 3:19-cv-5106

10                    Plaintiffs,                DECLARATION OF SARA B.
                                                 JOHNSON, PhD, MPH
11        v.

12   CHARLES ATKINS, et al.,

13                    Defendants,

14        and

15   SAFE SCHOOLS SAFE COMMUNITIES,

16                    Intervenor-Defendant.

17

18        I, Sara B. Johnson, PhD, MPH, declare as follows:

19        1.       I am over the age of 18, competent to testify as to the matters herein and make

20   this declaration based on my personal knowledge.

21        2.       I was retained by the Washington Attorney General's Office, counsel to

22   Defendant Teresa Berntsen, to serve as a testifying expert witness in this case. Attached as

23   Exhibit A is a true and correct copy of that report I prepared as part of my assignment. The report

24   contains the opinions I have reached in this case and the basis and reasons for them. If called to

25   testify as a witness, I could and would testify competently to the matters set forth therein.

26

DECLARATION OF                           1          ATTORNEY GENERAL OF WASHINGTON
SARA B. JOHNSON, PhD, MPH                                  800 Fifth Avenue, Suite 2000
NO. 3:19-cv-5106                                            Seattle, WA  98104-3188
                                                              (206) 464-7744

**SER-658**

1    I declare under penalty of perjury under the laws of the State of Washington and the

2    United States that the foregoing is true and correct.

3    DATED this __24__ day of March, 2020, at _____3:11p_____.

4

5

6    _____
     Sara B. Johnson, PhD, MPH

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF                                    2                  ATTORNEY GENERAL OF WASHINGTON
SARA B. JOHNSON, PhD, MPH                                               800 Fifth Avenue, Suite 2000
NO. 3:19-cv-5106                                                        Seattle, WA  98104-3188
                                                                        (206) 464-7744

SER-659

# Exhibit A

Expert Report: Developmental Science and Age Restrictions

for Purchase of Semiautomatic Assault Rifles

**Prepared for Washington State Office of the Attorney General by**

Sara B. Johnson, PhD, MPH


**In the Matter of:**


DANIEL MITCHELL, *et al.*,

*Plaintiffs*,

v.


CHARLES ATKINS, *et al.*,

*Defendants*,

and


SAFE SCHOOLS SAFE COMMUNITIES,


*Intervenor-Defendant.*


Date: _Dec. 12, 2019_

Signed: _____

Sara B. Johnson, PhD, MPH

<u>TABLE OF CONTENTS</u>

I. PROFESSIONAL QUALIFICATIONS & EXPERIENCE .....................................1

II. SUMMARY OF OPINIONS................................................................2

III. SCIENTIFIC OVERVIEW..............................................................3

    A. Older Adolescence as a Distinct Developmental Period.............................3

    B. Risk-Taking as a Developmental Imperitive .............................................6

    C. Two Sides of Adolescent Cognition ...........................................................7

    D. The Role of Brain Development in Older Adolescence................................10

IV. SUMMARY OF OPINIONS AND CONCLUSION ..............................................12

APPENDIX A: CURRICULUM VITAE....................................................................14

APPENDIX B: REFERENCES...............................................................................36

**Expert Report on Developmental Science and Age Restrictions for Purchase of Semiautomatic Assault Rifles**

**Dr. Sara B. Johnson**

This expert report was prepared and submitted by Dr. Sara B. Johnson, Associate Professor of Pediatrics at the Johns Hopkins School of Medicine, and Associate Professor of Public Health at the Johns Hopkins Bloomberg School of Public Health. This report was prepared for the Washington State Office of the Attorney General.

## I. PROFESSIONAL QUALIFICATIONS & EXPERIENCE

I have substantial formal training in developmental science, injury, and violence prevention, and adolescent health. I received my Master of Public Health degree from the Johns Hopkins Bloomberg School of Public Health in 2001, with a focus on adolescent injury and violence prevention. I went on to receive my PhD in public health from Johns Hopkins in 2005. My doctoral research focused on the science of adolescent brain development and its role in adolescent health risk behavior in this age group, particularly injuries and violence. During my doctoral training, I worked with the Johns Hopkins Center for Gun Policy and Research as part of a collaborative research team. After earning my PhD, I completed my post-doctoral fellowship as a Robert Wood Johnson Foundation Health and Society Scholar at the University of California, San Francisco (UCSF) and UC Berkeley. This training focused on strategies to advance population health, particularly the health of vulnerable and underserved individuals.

I joined the faculty of the Johns Hopkins School of Medicine in 2007 with a joint appointment in the Johns Hopkins Bloomberg School of Public Health. I was promoted to Associate Professor in 2014. At Johns Hopkins, I co-direct the Rales Center for the Integration of Health and Education, which is focused on evaluating innovative strategies

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 1 of 40

**SER-663**

to reduce disparities in child and adolescent health and educational outcomes. I have

taught courses on developmental neuroscience, adolescent health and development, and

adolescent behavior change to graduate students in public health and related fields. I have

lectured widely on the topic of adolescent brain development and maturity both nationally

and internationally. My curriculum vitae is attached as Appendix A.

I have published more than 50 papers and chapters on child and adolescent health

and development. One of my papers on the science of adolescent brain development for

policy decision-making, which appeared in the *Journal of Adolescent Health* in 2009, has

been cited more than 500 times in the peer-reviewed literature. I have received

approximately $5 million in federal funding from agencies including the National Institutes

of Health to study the development of behavioral regulation in the first three decades of life

as well as injury prevention in adolescence. A list of all publications I have authored in the

previous 10 years is included in my curriculum vitae, which is attached as Appendix A.

I have not previously testified or otherwise served as an expert witness. I am being

compensated at a rate of $250 per hour for my report and testimony.

## II. SUMMARY OF OPINIONS

I have been retained to provide my expert opinion on whether developmental science

supports Washington State's prohibition on the sale of semiautomatic assault rifles to those

under 21 years of age. Based on my experience and training, and the facts and data I relied

on (cited herein and listed in Appendix B), my opinion is that that the intersection of

developmental, psychological, and social changes occurring between 18 and 20 years of age

creates a period of vulnerability to firearm misuse (including intentional harm to self or

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 2 of 40

**SER-664**

others); reducing access to semiautomatic assault rifles, therefore, could have important benefits to older adolescents and their communities.

It is now well established that brain structures and coordination among them, change from childhood to early adulthood, and even across the life course (Giedd et al., 1999; Sowell, Thompson, Holmes, Jernigan, & Toga, 1999; Sowell, Thompson, Tessner, & Toga, 2001). Evidence from studies that examine the structure and function of the brain has prompted reconsideration of long-held ideas about when individuals can demonstrate maturity biologically and behaviorally. This body of scientific evidence has also led to greater appreciation for the complex biological and social processes that shape adolescent risk-taking, decision-making, and behavioral regulation.

This report summarizes what is known about behavioral development, risk-taking, and responses to threat in older adolescence, including the period between 18 and 20 years of age. Developmental processes in this period are associated with vulnerability to risky decision-making in emotionally charged, threatening, and social situations, as well as to other health risk behaviors that increase the risk of firearm misuse (including intentional harm to self or others).

## III. SCIENTIFIC OVERVIEW

### A. Older Adolescence as a Distinct Developmental Period

Adolescence is a period of tremendous change biologically, behaviorally, cognitively, and emotionally; as a result, it is widely recognized that adolescence is a life stage distinct from both childhood and adulthood (Spear, 2000). However, the broad umbrella of "adolescence" obscures substantial changes that occur within this period. As defined by the American Academy of Pediatrics (AAP), there are three periods within adolescence: early

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 3 of 40

SER-665

adolescence (ages 11-14 years), middle adolescence (15-17 years), and older adolescence (18-21 years) (American Academy of Pediatrics, 2017). The AAP's Bright Futures guidelines, which are the primary resource for pediatric well-child care in the United States, define older adolescence as a period distinct from both middle adolescence and adulthood, characterized by specific capacities, needs, and health risks (American Academy of Pediatrics, 2017).

The period from 18 years to the mid-20s (that is, slightly longer than "older adolescence") is often referred to by developmental scientists as "emerging adulthood" (Arnett, 2000). Dr. Jeffrey Arnett, who coined this term, argued, echoing the AAP, that emerging adulthood is discrete from adulthood (Arnett, 2000, p. 469). While emerging adults are often seen by society as fully mature by virtue of their legal permission to engage in some adult activities (e.g., voting, military service), developmental science suggests this is not the case (Johnson, Blum, & Giedd, 2009; Johnson & Giedd, 2015). Even young people themselves recognize some limits in their maturity. In Dr. Arnett's research, for example, in response to the question "Do you think that you have reached adulthood?" the most common response among emerging adults was "*in some respects yes, and in some respects no*" (Arnett, 2001, p. 136). Individuals in this complex transition know, intrinsically, what developmental science also bears out: individuals at the cusp of adulthood look physically mature, are able to reason and make decisions, and have honed their personal values and priorities, but there are some adult capacities and roles that remain immature or elusive (American Academy of Pediatrics, 2017).

The primary task of older adolescence is to transition into adulthood. A key principle of developmental science is that developmental transitions are important. As outlined by child development researcher Dr. Ann Masten, *"Periods of rapid or dramatic transformation*

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 4 of 40

**SER-666**

*in organism or context or both, which clearly is the situation both for the transition into and out of adolescence, are likely hot spots for observing onset or offset of psychopathology, and also periods when changes in vulnerabilities and opportunities may arise and redirect the course of development"* (Masten, 2004, p. 311). To understand risk in this age period, it is important to account for both developmental changes in the individual, and changes in their social context. **Importantly, older adolescents almost universally experience transitions in their relationships, living situations, lifestyles, education, occupation and/or daily activities during this period. At the same time, they have substantial autonomy from their parents and other adults in their lives.**

Older adolescence is a period of particular vulnerability to mental health disorders (e.g., anxiety disorders, major depressive disorder, alcohol use disorders); neural development during the transition to adulthood may facilitate the emergence of previously latent mental and behavioral health conditions (Benes, 2000; Kessler & Wang, 2008; Taber-Thomas & Pérez-Edgar, 2015). Psychopathology in this age group is common. An estimated 20% of 18 to 25 year-olds report a mental illness in the past year (Substance Abuse and Mental Health Services Administration, 2018). Moreover, epidemiological data show that rates of suicidal thoughts, plans, and attempts are higher in individuals ages 18 to 25 than any other age group (Piscopo, Lipari, Cooney, & Glasheen, 2016).

As a group, older adolescents experience more life stress than their younger peers, coinciding with their greater access to alcohol, drugs, and firearms (American Academy of Pediatrics, 2017). According to the Substance Use and Mental Health Services Administration, individuals 18 to 20 years have among the highest rates of alcohol and drug use. In 2018, 25% of 18 to 25 year-olds reported binge drinking in the past month, and 23% reported illicit drug use in the past year, a rate higher than any other age group

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 5 of 40

**SER-667**

(Substance Abuse and Mental Health Services Administration, 2018). Alcohol and drug use are related to increased risk of adolescent firearm injury, including homicide and suicide (Crumley, 1990; Hohl et al., 2017; Liu, Case, & Spirito, 2014).

In summary, high rates of mental and behavioral health disorders and life stress, alongside substantial instability in life circumstances with comparatively little supervision, provide the backdrop for many health risk behaviors during older adolescence. Access to alcohol and drugs, psychopathology, and suicidal feelings are independent risk factors for firearm injuries. How best to protect adolescents and those around them from serious, long-term risks to their health and wellbeing during this transition period is a crucial question. Reducing access to firearms in this interval, particularly firearms designed to kill humans quickly and efficiently, is one such strategy.

## B. Risk-Taking as a Developmental Imperative

Risk-taking, novelty-seeking, and the drive for social affiliation in adolescence and young adulthood are common across species of social mammals, from rodents to primates (Johnson & Jones, 2011; Spear, 2000). From an evolutionary perspective, these skills help set the stage for a successful transition to adulthood. Greater risk tolerance and novelty-seeking are needed to venture away from one's family of birth, and greater interest in social and peer affiliation are needed to create a new independent life and family of one's own (Spear, 2000).

In modern society, adolescence is longer than ever; the unintended consequence of extended adolescence is that this period of risk and opportunity is protracted (Moffitt, 1993). Dr. Terrie Moffit popularized the theory of adolescence-limited antisocial behavior (Moffitt, 1993). Contemporary society, she argues, pointing to a long history of sociological

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 6 of 40

SER-668

research on this topic, has created a period in which individuals are reproductively mature, but not yet socially mature; she writes, *"Contemporary adolescents are thus trapped in a 'maturity gap,' chronological hostages of a time warp between biological age and social age"* (Moffitt, 1993, p. 687). This "maturity gap" encourages adolescents and emerging adults to engage in antisocial behavior (Moffitt, 1993). Moffitt points out that antisocial behaviors (for example, fighting, bullying, theft, and truancy) increase nearly 10-fold in adolescence (Moffitt, 1993). For the large majority of young people, this increase is temporary and resolves as they age into adulthood but does create a particular period of risk to youth.

Delinquent risk behaviors in adolescence tend to co-occur, which substantially increases the likelihood of injury and other negative consequences. Gun carrying among high school students has been associated with highly aggressive delinquency (Webster, Gainer, & Champion, 1993). Other studies have found that adolescents who reported unsupervised firearm handling were also more likely to smoke, binge drink, and to have been threatened with a gun than their peers (Miller & Hemenway, 2004). Similarly, 18- to 21-year-old males who frequently engaged in risky driving behaviors were more likely to engage in substance abuse, criminal behavior, and association with deviant peers (Fergusson, Swain-Campbell, & Horwood, 2003). The consequences of co-occurring risk behaviors that involve firearms are particularly dire.

### C. Two Sides of Adolescent Cognition

Contrary to popular perceptions, the primary reason for adolescent risk-taking is not necessarily that young people lack the cognitive ability to identify less risky choices. By mid-adolescence, adolescents have the "cognitive machinery" in place to demonstrate decision-making capacities similar to adults (Keating, Feldman, & Elliot, 1990). By the age of 14 or 15, they can generate behavioral options and choose among them (Keating et al.,

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 7 of 40

**SER-669**

1990). Moreover, by age 14, adolescents have been observed to generally perceive the same amount of risk in various potentially dangerous activities as adults, challenging the idea that adolescents engage in risk-taking because they feel invulnerable to negative consequences (Steinberg, 2004).

It is critical to understand that adolescents' cognitive ability to make decisions and to appreciate risks may not translate to avoiding risky decision-making in real-world situations. This is due, in part, to the fact that, compared with adults and younger children, adolescent and emerging adult decision-makers are particularly sensitive to social and emotional cues in the environment and are more sensitive to stress, both psychologically and biologically (Crone & Dahl, 2012; Dreyfuss et al., 2014; Lupien, McEwen, Gunnar, & Heim, 2009). Maturity of judgment is evident earlier in adolescence for intellectually-driven decisions than for impulsive, peer-influenced decisions (Steinberg, Cauffman, Woolard, Graham, & Banich, 2009). Under "hot" conditions, adolescents are more likely to respond impulsively (Dreyfuss et al., 2014; Keating et al., 1990). Under emotionally neutral "cold" conditions, an adolescent's developing cognitive control system is sufficient to facilitate deliberation and impulse control; however, these developing capacities may be overwhelmed in the context of hot situations (Botdorf, Rosenbaum, Patrianakos, Steinberg, & Chein, 2017; Defoe, Dubas, Figner, & van Aken, 2015). In many experimental studies of decision-making, adolescents demonstrate more risk-taking than adults under hot conditions, particularly situations that involve potential rewards and losses (Defoe et al., 2015); however, it can be difficult to fully replicate hot conditions in the laboratory.

Laboratory studies, though limited, have generated important insight into the specific circumstances in which adolescents are likely to make risky decisions that could have tragic consequences in the context of firearms. Importantly, adolescents demonstrate

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 8 of 40

SER-670

poorer emotional regulation in response to threating stimuli compared to other age groups, even when they are explicitly told to try not to react (Dreyfuss et al., 2014). These findings are an important addition to previous laboratory-based studies that show that adolescents do not have the same challenges with impulse control in response to neutral stimuli (Grose-Fifer, Rodrigues, Hoover, & Zottoli, 2013; Somerville, Hare, & Casey, 2011). Dreyfuss and colleagues concluded, *"An elevated sensitivity or reaction to threat cues during adolescence may have important implications for understanding risky or criminal-related behaviors under a heightened sense of threat"* (2014, p. 226). Firearm access in the context of impulsive responding to a perceived threat could put older adolescents and those around them at elevated risk of injury; the potential consequences of this responding would be expected to be substantially magnified by access to semiautomatic weapons due to their lethality.

Adolescents' self-control is vulnerable not only in the context of perceived threats but also in the context of potential rewards (Breiner et al., 2017; Cohen-Gilbert et al., 2014; Geier, Terwilliger, Teslovich, Velanova, & Luna, 2009; Van Leijenhorst et al., 2010). This includes not just monetary rewards but also peer approval and acceptance (Chein, Albert, O'Brien, Uckert, & Steinberg, 2011; McCoy & Natsuaki, 2018; Sebastian, Viding, Williams, & Blakemore, 2010). Social pressures and peer influence are more salient for adolescents than they are for adults (Albert, Chein, & Steinberg). For example, in one study, a computer-simulated driving task, adolescents' risk-taking behavior was similar to adults when they were alone; however, in the presence of peers, risk-taking increased for adolescent participants through the college years but not for adults (Steinberg, 2004). Similarly, in the presence of peers, adolescents are more likely to have automobile crashes (Williams, 2003), to drink more alcohol, and to commit more crimes (Cooper, 1994; Zimring,

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 9 of 40

**SER-671**

1998). Some previous research also suggests that weapons play a part in gaining and maintaining peer approval for adolescents (Dijkstra et al., 2010). This is consistent with Moffitt's theory of adolescence-limited antisocial behavior, in which adolescent antisocial behavior results from imitation and mimicry of antisocial peers because antisocial behavior is temporarily seen as a sign of maturity (Moffitt, 1993).

Older adolescents' greater interest and participation in risk-taking behavior are evident in national data related to antisocial behavior. As a group, American adolescents commit more crimes per capita than adults or children (Snyder, 2012). An examination of arrest rates for a variety of crimes, including murder, robbery, aggregated assault, and weapon law violations demonstrates sharp peaks around the ages of 17-20 (Snyder, 2012). Arrest rates for weapons are nearly 50% higher among 18-20 year-olds (152 per 100,000) than among younger adolescents ages 15-17 (102 per 100,000) (US Department of Justice Office of Juvenile Justice and Delinquency Prevention, 2019). Moreover, firearms are disproportionately involved in some of these events. More than 85% of homicides among individuals 12-24 years of age are committed with a firearm (Development Services Group, 2016). These statistics suggest that evolving decision-making capacities and heightened responses to threat and reward in adolescence have lethal consequences for older adolescents and those around them and that reducing access to semiautomatic firearms could meaningfully reduce this public health and safety burden.

**D. The Role of Brain Development in Older Adolescence**

Adolescents' sensitivity to emotional arousal, perceived threat and potential rewards are related to a variety of biological changes during this period, including aspects of brain development. Complex supervisory and regulatory brain functions and social judgment continue to develop throughout adolescence and into emerging adulthood (Ernst, Pine, &

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 10 of 40

**SER-672**

Hardin, 2006; Steinberg, 2008; Taber-Thomas & Pérez-Edgar, 2015). "Fine-tuning" in the

brain during older adolescence plays a critical role in supporting prosocial behavior, health-

promoting choices, and injury and violence prevention (Taber-Thomas & Pérez-Edgar,

2015).

While the cognitive machinery that supports the ability to make adult-like decisions

is in place by mid-adolescence (Keating et al., 1990), there is fine-tuning in these brain

systems during late adolescence; this fine-tuning has important implications for decision-

making and risk-taking (Taber-Thomas & Pérez-Edgar, 2015). Neuroimaging studies

demonstrate that small structural changes are associated with meaningful changes in brain

connectivity during late adolescence. For example, using longitudinal diffusion magnetic

resonance imaging, Baker et al. (2015) studied a sample of 15 to 19 year-olds over 2 years;

they found that only 8% of the brain's connections increased and 6% decreased; these

connections, however, were responsible for linking more than 90% of brain regions.

Moreover, of particular relevance to firearm misuse, some of this fine-tuning occurs in the

neurocircuitry that governs "incentive processing"—that is, how we value and assess

different incentives (Balleine, Delgado, & Hikosaka, 2007). Maturation of this circuitry

helps to facilitate the transition to adulthood by reducing risky decision-making, supporting

social-emotional functioning, regulating anxiety and fear and promoting adaptive social

skills (Cunningham, Bhattacharyya, & Benes, 2002; Taber-Thomas & Pérez-Edgar, 2015).

One of the defining features of brain development during older adolescence and

emerging adulthood is fine-tuning of the "frontolimbic" network. It is proposed that the

capacity for mature, adaptive, and future-oriented social behavior that is expected between

adolescence and adulthood is enabled by increasing prefrontal function and

interconnections with the limbic system (Taber-Thomas & Pérez-Edgar, 2015). The balance

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 11 of 40

**SER-673**

between approach (i.e., "go!") and avoidance (i.e., "stop!") behaviors, behaviors that are supported by different regions of the prefrontal cortex, are being refined in older adolescence (Taber-Thomas & Pérez-Edgar, 2015). A balance that favors approach behavior can manifest as substance abuse, aggression, and antisocial behavior, whereas a balance that favors avoidance behavior can manifest as depression and anxiety, loneliness, or suicidal thoughts (Taber-Thomas & Pérez-Edgar, 2015). Developmental changes in frontolimbic balance can result in too much approach behavior or too much avoidance behavior, increasing vulnerability to risky decision-making and psychopathology during older adolescence, which could be expected to include firearm misuse that results in intentional or unintentional injury to the older adolescent and/or those around them.

## IV. SUMMARY OF OPINIONS AND CONCLUSION

Based on the existing scientific evidence, it is reasonable to limit purchases of semiautomatic assault rifles by individuals less than 21 years of age.

During older adolescence, individuals are maturing in important ways, psychologically, cognitive, and neurologically. These developmental processes have important implications for their decision-making, motivation and inhibition, as well as their risk for psychopathology, and substance use. This period of developmental vulnerability is particularly important from a public health and safety perspective because it coincides with growing independence, instability, life stress, and decreasing support and supervision from adults. During this period of flux, in order to protect young people and their communities, it is reasonable to limit purchases of semiautomatic firearms, whose misuse is particularly dangerous. A growing body of research demonstrates that there is continued refinement of the neural systems that support behavioral and emotional regulation and maturity of judgment in this period. In older adolescence, however, developmental changes are

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 12 of 40

**SER-674**

concentrated in areas of the brain that help individuals to suppress risky behavior, fear, and anxiety, manage social relationships, and consider the future consequences of their actions. While older adolescents may demonstrate adult-like levels of maturity under "cold" conditions, their developing capacities are particularly vulnerable under "hot" conditions, situations that require rapid, complex social information processing, those that involve peers, and conditions of perceived threat and reward. As a group, older adolescents are expected to gain additional maturity between 18 and 20 years, suggesting that restricting access to semiautomatic assault rifles in this period may be associated with both individual and community benefits.

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 13 of 40

**SER-675**

## APPENDIX A: CURRICULUM VITAE

The Johns Hopkins School of Medicine

_(signature)_                                                                December 2019

Sara Burr Johnson, PhD, MPH

### DEMOGRAPHIC AND PERSONAL INFORMATION

**Current Appointments**

University

| | |
|---|---|
| 2014-present | Associate Professor of Pediatrics, Division of General Pediatrics & Adolescent Medicine, Department of Pediatrics, Johns Hopkins University School of Medicine [Primary Appointment] |
| 2014-present | Associate Professor of Public Health, Department of Population, Family, & Reproductive Health, Johns Hopkins Bloomberg School of Public Health [Joint Appointment] |
| 2016-present | Associate Professor of Public Health, Department of Mental Health, Johns Hopkins Bloomberg School of Public Health [Joint Appointment] |

Other

| | |
|---|---|
| 2007-present | Core Faculty, Center for Injury Research & Policy, Johns Hopkins Bloomberg School of Public Health |
| 2013-present | Director, General Academic Pediatrics Fellowship Program, Johns Hopkins School of Medicine |
| 2014-present | Co-Director, Ruth and Norman Rales Center for the Integration of Health and Education, Johns Hopkins University |
| 2016-present | Faculty Associate, Johns Hopkins Population Center |
| 2018-present | Co-Director, Johns Hopkins Consortium for School-Based Health Solutions |
| 2019-present | Affiliate, Wendy Klag Center for Autism and Developmental Disabilities |

**Personal Data**

Johns Hopkins School of Medicine
Division of General Pediatrics and Adolescent Medicine
Department of Pediatrics
Room 2017 David M. Rubenstein Child Health Building
200 North Wolfe St.
Baltimore, MD 21287
Phone: (410) 614-8437
Fax: (410) 502-5440
Email: sjohnson@jhu.edu

**Education & Training**

Undergraduate:

| | |
|---|---|
| 1993-1997 | **BA**, _summa cum laude_, University of California, Los Angeles, Communication Studies |

Graduate:

| | |
|---|---|
| 2000 - 2001 | **MPH**, Johns Hopkins School of Hygiene & Public Health |
| 2001 | **Certificate in Injury Prevention**, Johns Hopkins School of Hygiene & Public Health |
| 2001 - 2005 | **PhD**, Johns Hopkins Bloomberg School of Public Health, Department of Health Policy & Management |

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 14 of 40

**SER-676**

*Thesis Title:* "The role of biobehavioral and psychosocial development in adolescent injury and violence prevention: Toward a developmental approach to intervention." *Advisor:* Prof. Stephen Teret

Post-Graduate:

| | |
|---|---|
| 2005 - 2007 | **Post-Doctoral Fellowship**, Robert Wood Johnson Foundation Health & Society Scholars Program, University of California, San Francisco & University of California, Berkeley, Population Health & Health Disparities |

**Professional Experience**

| | |
|---|---|
| 1997-1998 | Program Manager, Injury Prevention Program, Montgomery County (PA) Department of Health |
| 1998-2000 | Project Director, Labor Occupational Safety & Health Program, University of California, Los Angeles School of Public Policy & Social Research |
| 2003-2004 | Project Director, Outreach for Resilience-Building Involving Terrorism (ORBIT), Johns Hopkins Bloomberg School of Public Health & Johns Hopkins School of Medicine, Department of Psychiatry |
| 2007-2014 | Assistant Professor, Pediatrics, Johns Hopkins University School of Medicine |
| 2007–2014 | Assistant Professor, Population, Family & Reproductive Health, Johns Hopkins Bloomberg School of Public Health |
| 2007-present | Core Faculty, Center for Injury Research & Policy, Johns Hopkins Bloomberg School of Public Health |
| 2010-2014 | Co-Director, Developmental Neuroscience & Public Health Initiative, Johns Hopkins Bloomberg School of Public Health |
| 2011-2013 | Co-Director, General Academic Pediatrics Fellowship Program, Johns Hopkins School of Medicine |
| 2013-2016 | Adjunct Associate Professor, Institute for Interdisciplinary Salivary Bioscience Research, Arizona State University |
| 2013-present | Director, General Academic Pediatrics Fellowship Program, Johns Hopkins School of Medicine |
| 2014-present | Associate Professor of Pediatrics, Division of General Pediatrics & Adolescent Medicine, Department of Pediatrics, Johns Hopkins University School of Medicine |
| 2014-present | Associate Professor of Public Health, Department of Population, Family, & Reproductive Health, Johns Hopkins Bloomberg School of Public Health |
| 2014-present | Co-Director, Ruth and Norman Rales Center for the Integration of Health and Education, Johns Hopkins University |
| 2016-present | Faculty Associate, Johns Hopkins Population Center |
| 2016-present | Associate Professor of Public Health, Department of Mental Health, Johns Hopkins Bloomberg School of Public Health |
| 2018-present | Co-Director, Johns Hopkins Consortium for School-Based Health Solutions |
| 2019-present | Affiliate, Wendy Klag Center for Autism and Developmental Disabilities |

**PUBLICATIONS**

(Student/fellow/mentee author)

**Original Research [OR]**

1. Vernick JS, Pierce MW, Webster DW, **Johnson SB**, Frattaroli S. Technologies to detect concealed weapons: Fourth Amendment limits on a new public health and law enforcement tool. *J Law Med Ethics*, 2003; 31(4): 567-79. [PMCID: n/a]
2. Vernick JS, O'Brien M, Hepburn LM, **Johnson SB**, Webster W, Hargarten SW. Unintentional and undetermined firearm related deaths: A preventable death analysis for three safety devices. *Injury Prevention*, 2003; 9(4): 307-311.

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 15 of 40

**SER-677**

3.   **Johnson SB**, Frattaroli S, Wright JL, Pearson-Fields CB, Ricardo I, Cheng TL. Urban youths' perspectives on violence and the necessity of fighting. *Injury Prevention,* 2004; 10(5): 287-291. [PMCID: n/a].

4.   **Johnson SB**, Frattaroli S, Campbell, J, Wright JL, Pearson-Fields CB, Ricardo I, Cheng TL. "I know what love means": Gender-based violence among urban youth. *J Women's Health*, 2005; 14(2): 172-179. [PMCID: n/a]

5.   **Johnson SB**, Langlieb AL, Teret SP, Gross R, Schwab M, Massa J, Ashwell L, Geyh AS. Rethinking first response: Effects of the clean-up and recovery effort on workers at the World Trade Center disaster site. *J Occupational Environmental Med*, 2005; 47(4): 386-391. [PMCID: n/a]

6.   Vernick JS, **Johnson SB**, Webster DW. Firearm suicide in Maryland: Characteristics of older versus younger suicide victims. *Maryland Medicine,* 2005; 6(3) 24-27. [PMCID: n/a]

7.   Cheng TL, **Johnson SB**, Wright JL, Pearson-Fields AS, Brenner R, Schwarz D, O'Donnell R, Scheidt PC. Assault-injured adolescents presenting to the emergency department: Causes and circumstances. *Acad Emerg Med,* 2006;13(6) 601-606. [PMCID: n/a]

8.   **Johnson SB**, Bradshaw CP, Wright JL, Haynie DL, Simons-Morton B, Cheng TL. Characterizing the teachable moment: Is an emergency department visit a teachable moment for intervention among assault-injured youth and their parents? *Pediatric Emergency Care,* 2007; 23(8): 553-9. [PMCID: n/a]

9.   **Johnson SB**, Wang C. Why do adolescents say they are less healthy than their parents think they are? The importance of mental health varies by social class in a nationally representative sample. *Pediatrics*, 2008; 121(2): e307-313. [PMCID: n/a]

10.  **Johnson SB**, Blum RW, Giedd J. Adolescent maturity and the brain: The promise and pitfalls of neuroscience research in adolescent health policy. *J Adolescent Health*, 2009; 45(3): 216-221. [PMCID: 2892678]

11.  **Johnson SB**, Sudhinaraset M, Blum RW. Neuromaturation and adolescent risk taking: Why development is not determinism. *J Adolescent Research*, 2010; 25(1): 4-23. [PMCID: n/a]

12.  **Johnson SB**, Jones V. Adolescent development and risk of injury: Using developmental science to improve interventions. *Injury Prevention,* 2011;17(1):50-54. [PMCID:4405033]

13.  Copeland-Linder N, **Johnson SB**, Haynie D, Chung SE, Cheng TL.  Retaliatory attitudes and violent behaviors among assault-injured youth. *J Adolescent Health,* 2012; 50(3): 215-220. [PMCID: 3279700]

14.  **Johnson SB**, Dariotis JA, Wang C. Adolescent risk-taking under stressed and non-stressed conditions: Conservative, calculating and impulsive types. *J Adolescent Health*, 2012; 51(2 Suppl): S34-40. [PMCID: 3428028].

15.  Mistry KB, Minkovitz C, Riley AW, **Johnson SB**, Grayson H, Dubay L, Guyer B. A new framework for child health promotion – The role of policies and programs in building capacity and foundations of early child health. *Am J Public Health: 2012;* 102(9): 1688-1696. [PMCID: 3482035]

16.  Bair-Merritt ME, **Johnson SB**, Okelo S, Page G.  Intimate partner violence exposure, salivary cortisol and childhood asthma. *Child Abuse Neglect*. 2012; 36(7-8): 596-601. [PMCID: 3424283]

17.  **Johnson SB**, Riley AW, Granger DA, Riis JA.  The science of early life toxic stress for pediatric practice and advocacy. *Pediatrics,* 2013;131(2):319–327. [PMCID: 4074672]

18.  Sibinga EMS, Perry-Parrish C, Chung SE, **Johnson SB**, Smith M, Collado S, Webb L, Ellen JM. School-based mindfulness instruction for urban male youth: A small randomized controlled trial. *Preventive Medicine,* 2013; 57(6):799-801. [PMCID: n/a]

19.  **Johnson SB**, Gordon BJ, Jennings JM, Bair-Merritt MH, Adler NE, Okelo SO. Pediatric pulmonologists' perceptions of family socioeconomic status in asthma care. *Pediatric Allergy, Immunology & Pulmonology,* 2014; 27(3):120-125. [PMCID: 417138]

20.  Ouyang F, Longnecker MP, Venners S, **Johnson SB**, Korrick S, Zhang J, Xu, Christian P, Wang, MC, Cheng TL., Wang X. Preconception serum 1,1,1-trichloro-2,2,bis(p-chlorophenyl)ethane and B-vitamin status: independent and joint effects on women's reproductive outcomes. *American J Clinical Nutrition.* 2014; 100(6)1470-8. [PMCID: 4232015]

21.  Johnson M, Weaver S, Mix M, Mueller DM, Stewart R, Bair-Merritt M, **Johnson SB**, Rinke ML. Improvement in the administration of contraception for adolescents in a pediatric practice: Abstract 46. *American J Medical Quality.* 2014, 29:25S–26S. [PMCID: n/a] [QI]

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 16 of 40

**SER-678**

22. Riis JA, Granger D, DiPietro JA, **Johnson SB**. Salivary cytokines as a non-invasive measure of immune function in young children: Correlates and sensitivity to laboratory stress. *Developmental Psychology*. 2015; 57(2):153-67 [PMCID: 4538328]

23. Bair-Merritt MH, Voegtline K, Granger DA, Ghazarian SR, The Family Life Project Investigators, **Johnson SB**. Maternal intimate partner violence exposure, child cortisol reactivity and child asthma. *Child Abuse and Neglect*. 2015; 58:50-57 [PMCID: 4446253]

24. Gregory EF, Butz AM, Ghazarian SR, Gross SM, **Johnson SB**. Met expectations and satisfaction: A patient-centered evaluation of breastfeeding outcomes in the Infant Feeding Practices Study II. *J Human Lactation*. 2015; 31(3): 444-51. [PMCID: n/a]

25. Riis JA, Granger D, Minkovitz CS, Bandeen-Roche K, DiPietro JA, **Johnson SB**. Maternal distress and child neuroendocrine and immune regulation. *Social Science and Medicine*. 2016; 151:206-214. [PMCID: 4766032].

26. Gregory EF, Butz AM, Ghazarian SR, Gross SM, **Johnson SB**. Are unmet breastfeeding expectations associated with maternal depressive symptoms? *Academic Pediatrics*, 2015; 15(3): 319-25. [PMCID: n/a]

27. Guinosso SA, **Johnson, SB**, Schultheis, MT, Graefe, AC, and Bishai, DM. Neurocognitive correlates of young drivers' performance in a driving simulator. *J Adolescent Health*, 2016 Apr;58(4):467-73.

28. Gregory EF, Gross SM, Nguyen TQ, Butz AM, **Johnson SB**. WIC participation and breastfeeding at three months postpartum. *Maternal and Child Health Journal*, 2016; 20(8):1735-44. [PMCID: 4936931].

29. Michelson N, Riis JA, **Johnson SB**. Subjective social status and psychological distress in mothers of young children. *Maternal and Child Health Journal*. 2016; 20(10): 2019-29. [PMCID: 5025367]

30. Wang G, **Johnson SB**, Gong Y, Polk S, Divall S, Radovick S, Moon M, Paige D, Hong X, Caruso D, Chen Z, Mallow E, Walker SO, Mao G, Pearson C, Wang M, Zuckerman B, Cheng TC, Wang X. Weight gain in infancy and overweight or obesity across the gestational spectrum: A prospective Birth Cohort Study. *Scientific Reports*. 2016; 6: 29867. [PMCID: 4945912].

31. Li M, Riis JA, Ghazarian S, **Johnson SB.** Poverty, family context and self-regulation in 5-year-old children. *Developmental and Behavioral Pediatrics*. 2017; 38(2): 99-108. [PMCID: 5285269]

32. Kumra T, Antani S, **Johnson SB**, Weaver SJ. Improving adolescent preventive care in an urban pediatric clinic: Capturing missed opportunities. *Journal of Adolescent Health*. 2017; 60(6): 734-740. [PMID: 28259619]. [QI]

33. **Johnson SB**, Little T, Masyn K, Mehta P, Ghazarian S. Multidisciplinary design and analytic approaches to advance prospective research on the multilevel determinants of child health. *Annals of Epidemiology*. 2017; 27(6):361-70. [PMCID: n/a]

34. Caballero TM, **Johnson SB**, DeCamp L. Adverse childhood experiences among Hispanic children in immigrant families vs. US-native families. *Pediatrics*. 2017;*140(5): e20170297*. [PMCID: n/a]
    ▪ Mentored Dr. Caballero on this study with Dr. DeCamp.

35. Li M, **Johnson SB**, Musci R. Riley A. Perceived neighborhood quality, family context and trajectories of child externalizing behaviors in the United States. *Social Science & Medicine*. 2017; 192:152-161. [PMCID: n/a]
    ▪ Co-primary thesis advisor for Dr. Li with Dr. Riley.

36. Seltzer RR, **Johnson SB**, Minkovitz CS. Disability complexity and placement outcomes for children in foster care. *Social Services Review*. 2017; 83: 285-293. [PMCID: n/a]
    ▪ Co-primary mentor for Dr. Seltzer with Dr. Minkovitz.

37. Padula WV, Connor K, Mueller J, Calderon G, **Johnson SB**. Cost benefit of comprehensive primary and preventive school-based health care. *American Journal of Preventive Medicine*. 2018; 54 (1), 80-86. [PMCID: n/a]

38. Aqil A, Allport B, **Johnson SB**, Nelson T, Labrique A, Marcell A. Content to share with expectant fathers: Views of professionals focused on father involvement. *J Midwifery*. 2019; 70: 119-126. [PMCID: n/a]

39. Allport BS, Solomon B, **Johnson SB**. The other parent: Providers' engagement of fathers in pediatric primary care. *Clinical Pediatrics*. 2019; 58:555-563. [PMCID: n/a]

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 17 of 40

**SER-679**

40. <u>Li M</u>, **Johnson SB**, Newman SJ, Riley A. Residential mobility and long-term exposure to neighborhood poverty among children born in poor families: A US longitudinal cohort study. *Social Science & Medicine*. 2019; 226: 69-76. [PMCID: n/a]
   - ▪ Co-primary thesis advisor for Dr. Li with Dr. Riley.
41. Jones V, Spin JP, Connor K, The Rales Study Team, Cheng TL, **Johnson SB**. Are "no" and "no thanks" the same for school-based health center enrollment? *Health Behavior & Policy Review*. 2019; 6(1): 101-106. [PMCID: n/a].
42. <u>Wilson D</u>, Deater-Decker K, **Johnson SB**, Budhathoki C, Gross D. Executive function in the adolescent mother-grandmother dyad and development of the young child. *Journal of Child and Family Studies*. 2019; 28(10): 2842-53. [PMCID: n/a].
43. <u>Voegtline K</u>, **Johnson SB**, Huang R, DiPietro JA. The bloom is (slightly) off the rose: The motherhood effect on psychological functioning in successive pregnancies. *Journal of Psychosomatic Obstetrics and Gynecology*. 2019; 30:1-6. https://doi.org/10.1080/0167482X.2019.1657089. [PMCID: pending].
44. <u>Weiss-Laxer N</u>, **Johnson SB**, Ghazarian SR, Osbourne LM, Riley A. Maternal behavioral health symptom profiles in early family life: Complexity and context. *Archives of Women's Mental Health*. Epub ahead of print: https://doi.org/10.1007/s00737-019-00987-z. [PMCID: n/a].
   - ▪ Co-primary thesis advisor for Dr. Weiss-Laxer with Dr. Riley.
45. **Johnson SB**, Spin JP, Connolly F, Stein M, Cheng TL, Connor KA. Asthma and attendance in urban schools. In press: *Preventing Chronic Disease*. [PMCID: n/a].
46. <u>Rabner M</u>, Bissett K, **Johnson SB**, Connor KA. A risk stratification algorithm for asthma identification and prioritization in urban schools. In press, *Journal of School Health*. [PMCID: n/a].
47. <u>Riis JL</u>,Voegtline KM, Granger DA, DiPietro JA, Woo H, **Johnson SB**. Long-term associations between prenatal maternal cortisol and child neuroendocrine-immune regulation. In press, *International Journal of Behavioral Medicine*. [PMCID: pending].

**Review Articles [RA]**
1. <u>Moore EM</u>, **Johnson SB.** The use of case reports, anecdotal evidence, and descriptive epidemiological studies in pediatric practice. *Pediatrics in Review*, 2009; 31(8): 323-324. [PMCID: n/a]
2. <u>Smith TK</u>, **Johnson SB.**  Distribution, variability and statistical significance in pediatric research: An overview. *Pediatrics in Review*, 2010; 31(10): 431-432. [PMCID: n/a]
3. Granger DA, **Johnson SB**, Szanton SL, Out D, Schumann LL.  Incorporating salivary biomarkers into nursing research: An overview and review of best practices. *Biological Research for Nursing*, 2012; 14(4): 347-356. [PMICD: 3971903].
4. <u>Guinosso SA</u>, **Johnson SB**, Riley AE. Multiple adverse experiences and child cognitive development. *Pediatric Research*, 2016: 79:220-226. [PMCID: n/a]
   - ▪ Co-primary mentor for Dr. Guinosso with Dr. Riley.
5. **Johnson SB**, <u>Riis JA</u>, Noble K. State of the art review: Poverty and the developing brain. *Pediatrics,* 2016; 137(4): e20153075. [PMCID: 4811314].
6. Cheng TL, **Johnson SB**, Goodman E. Breaking the intergenerational cycle of disadvantage: The three-generation approach. *Pediatrics*. 2016;137(6):e20152467. [PMCID: 4894258].
7. <u>Caballero TM</u>, DeCamp LR, Platt RE, Shah H, **Johnson SB**, Sibinga EMS, Polk S. Addressing the mental health needs of Latino children in immigrant families. *Clinical Pediatrics*. 2017; 56(7): 648-58. [PMID: 27879297]
8. <u>Allport BS</u>, **Johnson SB,** Aqil A, Labrique AB, Nelson T, Carabas Y, Ang A, Marcell, A. Promoting father involvement for child and family health. *Academic Pediatrics;* 2018; 18(7): 746-753. [PMCID: n/a]

**Case Reports [CR]**  n/a

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 18 of 40

**SER-680**

**Book Chapters, Monographs [BC]**

1. **Johnson SB,** Langlieb AL. 2005. Mental health needs of special and vulnerable populations in a disaster: In Everly G, Parker CL (eds): *Mental Health Aspects of Disaster Public Health Preparedness and Response. Vol 1.* Atlanta, GA. Centers for Disease Control and Prevention.

2. Frattaroli S, **Johnson SB**, Teret SP. 2006. Firearm Injuries. In: Liller KD (ed): *Injury Prevention for Children and Adolescents: Integration of research, practice and advocacy.* Washington DC: American Public Health Association Press.

3. McNealy C, Blanchard J. *The Teen Years Explained: A Guide to Healthy Adolescent Development.* Baltimore, MD, Johns Hopkins Center for Adolescent Health. (Scientific Advisor, brain development content).

4. Frattaroli S, Vittes K, **Johnson SB,** Teret SP. 2012. Firearm Injuries. In: Liller KD (ed): *Injury Prevention for Children and Adolescents: Integration of research, practice and advocacy.* 2nd Ed. Washington DC: American Public Health Association Press.

5. Wilde C, Out D, **Johnson SB** Granger D. 2013. Sample collection, including participant preparation and sample handling. In: *The Immunoassay Handbook.* 4th Ed. Wild D (ed). London, UK: Elsevier.

6. Granger, DA. **Johnson SB**. 2013. Biomarkers and analytes in oral fluids: An overview and integration for behavioral medicine. *Encyclopedia of Behavioral Medicine.* Gellman M, Turner R (eds). New York: Springer.

7. Hammond WP, Matthews D, Cooper SM, **Johnson SB**, Caldwell CH. 2014. The role of paternal health socialization in preadolescent African American male health behavior, beliefs, and outcomes. In: *The Psychology of Black Boys and Adolescents.* Vaughans K, Spielberg W (eds). Santa Barbara, CA: Praeger.

8. **Johnson SB,** Giedd JN. 2015. Normal brain development and child/adolescent policy. In: *Springer Handbook of Neuroethics.* N. Levy, J Clausen, M Farah (Eds). New York: Springer.

9. **Johnson SB,** Voegtline KM. Salivary bioscience and pediatrics. In: *Foundations of Interdisciplinary Saliva Research and Applications.* Taylor M and DA Granger, Eds. New York: Springer. Forthcoming February 2020.

**Books, Textbooks [BK]**  n/a

**Other publications**

1. Center on the Developing Child at Harvard University. 2010. The foundations of lifelong health are built in early childhood. Available at: http://www.developingchild.harvard.edu. (Contributor)

2. **Johnson SB**, Blum RW. Stress and the brain: how experiences and exposures across the life span shape health, development, and learning in adolescence. J Adol Health. 2012; 51(2 Suppl):S1-2. [PMCID: 3508406] [Intro to Special Issue]

3. Webster DW, Donahue JJ, Klarevas L, Crisfasi CK, Vernick JS, Jernigan D, Wilcox H, **Johnson SB**, Greenberg S, McGinty E. Firearms on college campuses: research evidence and policy implications. July 2016. Prepared for the Association of American Universities.

**Media Releases or Interviews [MR]**

08/28/2001     Research profiled on BBC Horizon: The Nine Months that That Made You, Episode 3 (1–hour program).

**FUNDING**

**EXTRAMURAL Funding**

Research Extramural Funding: Current

2019-2021     HEALthy ORCHARD: Developing plans for a Baltimore site of the HEALthy BCD study
              1R34DA050292-01
              NIH/NIDA
              Total Direct Costs: $258,731
              PI: M. Danielle Fallin, PhD.

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 19 of 40

**SER-681**

Role: Co-I: 1%
This study creates a consortium to plan for a Baltimore-based site for the HEAL initiative (Healthy Brain and Child Development Study).

| | |
|---|---|
| 2019-2021 | Feasibility, acceptability, and preliminary efficacy of Text4Father for improving infant and family health |

2019-2021   Feasibility, acceptability, and preliminary efficacy of Text4Father for improving infant and family health
R21HD097453-A01
NICHD/NIH
Total Direct Costs: $275,000
PI: Arik Marcell, MD, MPH
Role: Co-I, 3%. This study evaluates a text messaging-based intervention to engage fathers in their children's lives, promote positive parenting, and support men's health.

2018-2023   Breaking the cycle: The intergenerational transmission of parenting and self-regulation following a universal preventive intervention in childhood.
1R01HD093643
NICHD/NIH
Total Direct Costs: $2,500,000
PIs: Sara Johnson, PhD, MPH (PI) & Rashelle Musci, PhD (MPI)
Role: PI, 30%. This study examines whether self-regulation in childhood predicts parenting behaviors in adulthood, and the intergenerational transmission of parenting and self-regulation across three generations in a cohort of low-income families in Baltimore City. In addition, it examines whether the effects of an effective school-based intervention delivered in childhood also improves self-regulation in the offspring of participants.

2017-2022   Social adversity, epigenetics and the obesity epidemic
1R01HD093643
NIMHHD/NIH
Total Direct Costs: $2,500,000
PIs: Cathrine Hoyo, PhD and Joan Kaufman, PhD (MPI)
Role: JHU Site PI, 15%. This project leverages the Johns Hopkins All Children's Hospital PREDICT study to evaluate epigenetic mediators of the relationship between maternal lifetime and pregnancy- specific adversity and the early development of obesity in her offspring.

2017-2020   Promoting Maternal Mental Health and Wellbeing in the Neonatal Intensive Care
1R34AT009615
NCCIH/NIH
Total Direct Costs: $245,313
PIs: Tamar Mendelson, PhD, Erica Sibinga, MD, MHS (MPI)
Role: Co-I; 4-10%. This study will further develop and pilot test a mindfulness intervention to improve mental health and wellbeing of mothers with infants in the neonatal intensive care unit (NICU).

2014-2020   The Ruth and Norman Rales Center for the Integration of Health and Education
Norman R. and Ruth Rales Foundation
Total Direct Costs: $5,967,008
Co-PIs: Tina Cheng, MD, MPH, Sara Johnson, PhD, MPH
Role: Co-PI; 35%. This funding creates a center to develop and test a fully integrated model of health services, health education, and family supports in high-poverty schools to reduce health and educational disparities.

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 20 of 40

SER-682

2019-2021    Examining early childhood teachers' and children's executive functioning
             201900221
             Spencer Foundation
             Total Direct Costs: $50,000
             PIs: Lieny Jeon, PhD and Sara Johnson, PhD, MPH
             Role: Co-PI, 4%. This study investigates the role of early childhood education teachers'
             cognitive self-regulation skills in shaping these skills in their students, including opportunities
             to scaffold teacher skills to improve child functioning and achievement.

Research Extramural Funding – Pending

Research Extramural Funding – Previous
2005-2007    Cognitive manifestations of social disparity: understanding the biology of risky decision-
             making in adolescence
             RWJ Health & Society Scholars Program
             Total Direct Costs: $20,700
             Role: PI; This experimental study used a stress manipulation to evaluate the impact of acute
             and chronic stress on decision-making in adolescence.

2007-2008    Biological stress reactivity, cognitive styles, and health related decision making
             UC Berkeley Center for Economics and Demography of Aging, UC Berkeley Social Science
             Experimental Laboratory & the Robert Wood Johnson Foundation/UC Berkeley Research
             Consortium on Population Health and Human Development
             Total Direct Costs: $22,000
             PI: Constance Wang, PhD
             Role: Co-Investigator
             This study investigated the impact of stress reactivity on decision making in young adults.

2010-2013    Using driving simulators to measure and improve teen driving behavior
             CDC/NCIPC to the Johns Hopkins Center for Injury Research and Policy
             Total Direct Costs: $103, 324
             Co-PIs: David Bishai, MD, MPH, Sara Johnson, PhD, MPH
             Role: Co-PI; This study examined the neuropsychological correlates of risky driving practices
             among novice drivers using driving simulators.

2013-2014    Understanding and promoting language development in young children in Baltimore City:
             Pathways to school readiness.
             The Thomas Wilson Sanitarium for Children of Baltimore City
             Total Direct Costs: $18,870
             Role: PI; 5%, in kind; This pilot evaluated the utility of state of the art language processing
             technology for documenting urban children's early home language environments. In
             addition, it sought to explore the role of maternal psychosocial stress in shaping early
             language development.

2014-2015    Promoting language development in young children in Baltimore City using Language
             ENvironment Analysis (LENA)
             Aaron and Lillie Straus Foundation and Lockhart Vaughan Foundation
             Total Direct Costs: $45,000
             Co-PIs: Sara Johnson, PhD, MPH, Tracy King, MD, MPH, Megan Bair-Merritt, MD, MSCE
             Role: Co-PI; 5%. This pilot study extended research funded by Thomas Wilson to include
             Spanish-speaking families in Baltimore.

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 21 of 40

SER-683

2010-2015    Environment, psychosocial stress and self-regulatory development
             KO1DA027229-01
             National Institute on Drug Abuse, NIH
             Total Direct Costs: $691,639
             Role: PI; 75%. This Mentored Research Career Development Award (K01) examined the
             foundations of self-regulatory development (fetal life to 5 years) and the role of social
             adversity in shaping self-regulatory functioning.

2014-2016    Do self-regulation and mindfulness instruction differ by gender of HIV+ youth?
             R01AT007888
             NIH/National Institute of Complementary and Alternative Medicine
             Total Direct Costs: $99,998
             PI: Erica Sibinga, MD
             Role: Co-Investigator; 5%. This study evaluated sex/gender differences in the effectiveness
             of mindfulness instruction in reducing physiological stress reactivity and viral load among
             youth with HIV.

2014-2017    Bridging the Word Gap Research Network
             Maternal and Child Health Bureau (MCHB) UA6
             Total Direct Costs: $300,000
             PI: Charles Greenwood, PhD
             Role: Co-I/Network member. This research network funded a research agenda to reduce
             socioeconomic disparities in early language development.

2014-2019    Johns Hopkins Medicine All Children's Hospital Institution-Wide Prospective, Inception
             Cohort Study of Healthy Children
             All Children's Hospital Foundation
             Total Direct Costs: $300,000
             Co-PIs: Sara Johnson, PhD, MPH, Neil Goldenberg, MD, PhD (MPI)
             Role: Co-PI; 25%. This funding supports the PREDICT longitudinal cohort of healthy
             children at JHM-ACH designed to investigate the etiology of obesity and developmental
             delay by describing the timing and nature of factors (molecular, genetic, clinical, behavioral
             and social) that are associated with divergent health trajectories beginning before birth.

**EDUCATIONAL Funding**
Educational Extramural Funding – Current
2015-2020    Primary Care Training Enhancement
             T0BHP28574
             HRSA
             Total Direct Costs: $1,750,000
             Program Director: Leonard Feldman, MD
             Role: Co-PI; 3%; This funding supports collaborative primary care training enhancements
             for residents in internal medicine, internal medicine/pediatrics, and pediatrics, and for
             fellows in general pediatrics.

2016-2021    Ruth L. Kirschstein National Research Service Award (T32)
             T32HP10025
             HRSA
             Program Director: Jodi Segal, MD
             Total Direct Costs: $1,989,693

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 22 of 40

**SER-684**

Role: General Pediatrics Fellowship Director. This training grant supports a joint General Internal Medicine/General Pediatrics postdoctoral training program in primary care research.

**INTRAMURAL Funding**

Research Intramural Funding – Current

2019-2020     The oral microbiome in early life and autism-related phenotypes
              Wendy Klag Center for Autism & Developmental Disabilities
              Total Direct Costs: $49,910
              Role: PI (With Heather Volk, PhD and Robert Yoken, PhD). This pilot grant is designed to evaluate the relationship of both the maternal prenatal oral microbiome and the child oral microbiome and autism-related phenotypes in the PREDICT cohort.

2018-2021     The Johns Hopkins Consortium for School-Based Health Solutions
              Johns Hopkins University President's Office
              Total Direct Costs: $1,200,000
              Role: Co-Director;  This funding creates a single entity at Johns Hopkins that brings together educators, researchers and clinicians to focus on developing successful, replicable and scalable school-based health solutions that address barriers to health and wellness access for underserved children and adolescents.

2018-2020     Identification of exosomal microRNA markers of maternal distress and offspring metabolic health using the PREDICT cohort
              Johns Hopkins Venture Discovery Fund
              Total Direct Costs: $50,000
              PIs: Kellie Tamashiro, PhD, Sara Johnson PhD, MPH, Neil Goldenberg, MD, PhD
              Role: Co-PI; This pilot grant seeks to understand whether exposure to maternal distress during pregnancy is reflected in changes in the circulating exosome miRNA profile and predicts risk for negative metabolic health conditions, such as diabetes and obesity, in offspring.

Research Intramural Funding – Previous

2007-2010     Social environment and childhood asthma severity
              Johns Hopkins Center for Mind-Body Research
              Total Direct Costs: $8,500
              PI:  Megan Bair-Merritt, MD, MSCE
              Role: Co-Investigator; This study examined the role of exposure to early stressors, including family violence, in asthma severity via dysregulation of the hypothalamic pituitary adrenal axis.

2009-2010     Does school-based mindfulness training reduce hostility among urban male youth?
              Johns Hopkins Center for Mind-Body Research
              Total Direct Costs: $39,438
              PI: Erica Sibinga, MD, MHS
              Role: Co-Investigator; This pilot study examined the role of mindfulness training to reduce hostility and facilitate the transition to high school in urban male middle school students.

2015-2016     Extreme poverty in Baltimore City: A pilot study to test the feasibility of enrolling parent-child dyads in extreme poverty and generate preliminary data regarding how extreme poverty affects children in distinctive ways.
              Johns Hopkins 21st Century Cities Award
              Total Direct Costs: $60,000

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 23 of 40

**SER-685**

PI: Jacky Jennings
Role: Co-I (in-kind). This one-year pilot study evaluated the impact of extreme poverty on families in Baltimore City, Maryland.

2016-2017    Development of an mHealth platform for fathers of young children
Johns Hopkins Provost's Discovery Award
Total Direct Costs: $100,000
PI: Arik Marcell
Role: Co-I; 5%. This catalyst grant brings together stakeholders from around the university to develop platform to engage fathers in their children's lives, promote positive parenting, and support men's health.

2016-2017    Development of the Johns Hopkins Baltimore Birth Cohort
Johns Hopkins Provost's Discovery Award
PI: Marsha Wills-Karp
Total Direct Costs: $125,000
Role: Co-I; 2.5%. This grant lays the foundation for a Baltimore-based birth cohort at Johns Hopkins that can be queried by investigators around the university to understand early environmental and social exposures and their impact of health and developmental outcomes.

2017-2018    The relationship between household food shortage and child cognitive performance among children whose families participate in the Supplemental Nutrition Assistance Program (SNAP)
The Johns Hopkins Population Center
PIs: Sara Johnson, PhD, MPH, Rachel Thornton, MD, PhD, Nicholas Papageorge, PhD
Total Direct Costs: $15,850
Role: Co-PI; This interdisciplinary pilot grant supports research to examine the impact of cyclical food availability among SNAP program recipients and potential impacts on child cognitive performance.

2016-2018    The relationship between early childhood teachers' and their students' executive functioning: elucidating contexts for early learning.
Johns Hopkins Science of Learning Institute
Total Direct Costs: $150,000
Role: Co-PI with Lieny Jeon, PhD; 10%; This pilot grant brings together colleagues from the JHU Schools of Education and Medicine to consider how teachers' distress is associated with children's executive function capacity and deployment in early childhood education settings that serve a large proportion of low-income students.

**CLINICAL ACTIVITIES:** Not applicable.

**EDUCATIONAL ACTIVITIES**

**Educational Focus**: My educational activities encompass classroom teaching, curriculum design, educational program leadership, and mentoring. From 2011-2014, I taught a course on social influences on adolescent health in the Bloomberg School of Public Health, for which I was recognized for teaching excellence four times. In 2015, I taught a course on the developmental neuroscience of behavior change in adolescence. I currently direct and teach in the General Academic Pediatrics fellowship seminar and provide guest lectures on the social determinants of child health and health equity across the institution. I mentor undergraduate students, master's and doctoral students in the Bloomberg School of Public Health, and mentor medical students and residents, and post-doctoral fellows in the School of Medicine. In 2013, I was awarded the Johns

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 24 of 40

SER-686

Hopkins School of Public Health Student Assembly Advising, Teaching & Mentoring Award (AMTRA), the School's highest award for mentorship.

**Teaching**
Classroom Instruction
*JHMI/Regional*

2011        Co-Instructor, Master's & Doctoral Students in Public Health, Seminar on Developmental Neuroimaging & Public Health (Special Studies), Johns Hopkins School of Public Health, Department of Population Family and Reproductive Health, Fourth term (March to May); Co-Instructor with Dr. Jay Giedd, MD.

2011-2014   Primary Instructor: Master's & Doctoral Students in Public Health, The Social Context of Adolescent Health and Development; Johns Hopkins Bloomberg School of Public Health, Department of Population Family and Reproductive Health Fourth term (March to May); Awarded *Excellence in Teaching* in 2011, 2012, 2013 & 2014 based on top course evaluations.

2014-2015   Primary Instructor: Master's & Doctoral Students in Public Health, Behavior Change in Adolescence: A framework for integrating developmental neuroscience and public health. (Special Studies); Johns Hopkins School of Public Health, Department of Population Family and Reproductive Health.

*National*     None

*International:*
2011        Primary Instructor: Master's Students in Public Health, The Social Context of Adolescent Health and Development, Johns Hopkins Bloomberg School of Public Health Fall Institute; Univeristat Pompeu Fabra, Barcelona, Spain.

Guest Lectures
*JHMI/Regional*
10/07       "The role of context and experiences in neuromaturation: The impact of childhood trauma on brain development." Course: Life Course Perspectives on Health, Johns Hopkins Bloomberg School of Public Health. Instructors: M.E. Hughes and W.R. Blum.
12/07       "Social influences on the development of decision-making and self-regulation: Implications for violence prevention." Course: Interdisciplinary training on violence seminar. Johns Hopkins School of Nursing. Instructor: J. Campbell.
10/08       "Social Influences on the biology of adolescence." Course: Life Course Perspectives on Health, Johns Hopkins Bloomberg School of Public Health. Instructors: M.E. Hughes and W.R. Blum.
10/10       "Measuring the social environment in studies of child health disparities." Course: Special topics in violence research. Johns Hopkins School of Nursing. Instructor: J. Campbell.
7/11        "Starting from the beginning: Understanding how early environments shape self-regulation." Course: Brain and Teaching, Johns Hopkins School of Education. Instructor: M. Hardiman.
10/12       "Family psychosocial environments and self-regulatory development form the fetal period to early childhood." Johns Hopkins School of Education. Course: Brain and Teaching, Instructor: M. Hardiman.
8/15        "The intersection of health and educational disparities: Moving from research to practice." Johns Hopkins Bloomberg School of Public Health. Course: Child Health, Instructor: R. Blum.
8/16,17     "A lifecourse perspective on health disparities." Course: Johns Hopkins Medical Student Curriculum on Healthcare Disparities, Instructor: R. Thornton.
4/17        "A neuroscience perspective on adolescent sexual and reproductive health." Course:

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 25 of 40

**SER-687**

|  | Adolescent Sexual and Reproductive Health. Johns Hopkins Bloomberg School of Public Health. Instructors: M. Trent, A. Burke. |
| 11/17, 18 | "A lifecourse perspective on understanding and preventing violence." Johns Hopkins Bloomberg School of Public Health. Course: Understanding and Preventing Violence." Instructor: D. Webster. |
| *National* | None |
| *International* | None |

Clinical instruction
Not applicable

CME instruction
Not applicable

Workshops/seminars
JHMI/Regional

| 3/08 | Johns Hopkins Division of General Pediatrics and Adolescent Medicine Fellow's Research Seminar. "An Introduction to Structural Equation Modeling for the Confused and/or Indifferent." |
| 4/10 | Johns Hopkins Division of General Pediatrics and Adolescent Medicine Fellow's Research Seminar. "An Introduction to Structural Equation Modeling for the Confused and/or Indifferent." |
| 3/11 | Clinical Epidemiology and Biostatistics for the Practitioner: Bayview Biostatistics, Epidemiology & Data Management (BEAD) Core: "Eliminating Bias and Confounders." |
| 9/11 | Clinical Epidemiology and Biostatistics for the Practitioner: Bayview Biostatistics, Epidemiology & Data Management (BEAD) Core: "Eliminating Bias and Confounders." |
| 10/11 | Clinical Epidemiology and Biostatistics for the Practitioner: Bayview Biostatistics, Epidemiology & Data Management (BEAD) Core: "Power and sample size considerations in clinical research." |
| 4/13 | Clinical Epidemiology and Biostatistics for the Practitioner: Bayview Biostatistics, Epidemiology & Data Management (BEAD) Core: "Eliminating Bias and Confounders." |
| 1/14 | Johns Hopkins Division of Child and Adolescent Psychiatry Divisional Conference. "Neurobiological and social factors predicting adolescent brain development." |
| *National* | |
| 12/13 | "Early Adversity/Intervention for Interpersonal Violence Exposure (IPV) Exposure and Child Health and Development: Understanding the Use of Biomarkers in Research." Workshop at: International Conference on Child and Family Maltreatment. San Diego, CA. Role: Workshop co-leader (with Dr. M. Bair-Merritt). |
| 5/16 | "Bridging the Word Gap: Implications for Pediatrics." Pediatric Academic Societies Meeting, Baltimore, MD, May 2016. Role: Workshop Participant. |
| 5/18 | "Innovative cross-sector approaches to promoting child health and wellbeing: The role of the pediatrician at the intersection of health, education, and social services." Pediatric Academic Societies Annual Meeting, Toronto, Canada, May 2018. Role: Workshop Leader. |

**Mentoring**
Pre-Doctoral Advisees/Mentees

| 2008-2010 | Jenna Riis, MHS Student, Johns Hopkins Bloomberg School of Public Health, Department of Population, Family & Reproductive Health. Primary advisor. (See below, doctoral advisees). |
| 2009-2010 | Laurel McCloskey, MPH Student, Johns Hopkins Bloomberg School of Public Health. Primary advisor. Currently Executive Director, Chronic Disease Prevention Council. |

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 26 of 40

**SER-688**

| | |
|---|---|
| 2009-2011 | Kay (Gonsalves) O'Neill, MHS Student, Johns Hopkins Bloomberg School of Public Health, Department of Population, Family & Reproductive Health. Primary advisor. Currently Senior Research Program Coordinator, Johns Hopkins Bloomberg School of Public Health. *Recognition:* HRSA Public Health Traineeship, 2009. |
| 2009-2011 | Elizabeth Fontaine, MSPH Student, Johns Hopkins Bloomberg School of Public Health, Department of Population, Family & Reproductive Health. Primary advisor. Currently at New River Health District, Christiansburg, VA. |
| 2009-2012 | Debra Parry, MD, MPH Student, Johns Hopkins Bloomberg School of Public Health. Primary advisor. Currently preventive medicine physician, Waterloo University, Ontario, Canada. |
| 2011-2013 | Van Kim Bui Lin, MSPH Student, Johns Hopkins Bloomberg School of Public Health, Department of Population, Family & Reproductive Health. Master's Essay Advisor. Currently: Senior Research Analyst, Child Trends, Bethesda, MD. |
| 2013-2014 | Meaghan Jones, MPH Student, Johns Hopkins Bloomberg School of Public Health. Capstone advisor. Currently Senior Executive, Hall and Partners, NYC, NY. |
| 2013-2017 | Nicole Michelson, undergraduate neuroscience student. Currently: Rhodes Scholar pursing D.Phil. in oncology at Oxford University, UK.  Primary Research Advisor. *Recognition:* Provost's Undergraduate Research Award, 2014-2015; Dean's Undergraduate Research Award, 2015-2016 and 2016-17, Goldwater Scholar. Honorable mention, Greg Alexander Outstanding Student Paper Session. Platform presentation, American Public Health Association Meeting 11/2015. Co-authored publication: OR #28. |
| 2018 | Caroline Plott, medical student, Johns Hopkins School of Medicine. Scholarly Concentration Advisor. Project Title: Elevated indoor school temperatures are associated with increased asthma-related school healthcare among urban schoolchildren. |
| 2018 | Dana Gopelrud, medical student, Johns Hopkins School of Medicine. Scholarly Concentration Advisor. Project Title: Maternal subjective social status and risk for low birth weight. |
| 2018 | Neha Anand, medical student, Johns Hopkins School of Medicine. Scholarly Concentration Advisor. Project Title: Cortisol reactivity and obesity in five-year-old children. Recognition: Dr. Small Award, Johns Hopkins School of Medicine. |
| 2017-2018 | Janasha Gaffigan-Holmes, Johns Hopkins Doctoral Diversity Scholar, Division of Neonatology, Johns Hopkins School of Medicine. Currently: MS in Integrative Biology program, Kennesaw State University. |
| 2018 | Matthew Hudson, Currently: Johns Hopkins Preventive Medicine Resident. MPH Capstone Advisor: Transit deserts in Baltimore: Assessing a possible association between transit supply deficit and student tardiness at a Baltimore charter School. |

Doctoral Advisees/Mentees

**Overview**: I serve as a doctoral advisor to students in the Bloomberg School of Public Health's Department of Population, Family and Reproductive Health.

| | |
|---|---|
| 2010-2015 | Jenna Riis, MHS, PhD Student, Department of Population, Family & Reproductive Health. Currently: Assistant Professor of Psychology, University of California, Irvine. Thesis title: "Health disparities and the biological embedding of early adversity." *Recognition:* Johns Hopkins Sommer Scholar, Bernard and Jane Guyer Scholarship, Donald Cornely Scholarship, Willian Endowment for Excellence in Science Award. Co-authored publications: see OR#17,21,24; RA#5. |
| 2010-2015 | Stephanie (Witt) Guinosso, MPH, PhD Student, Department of Population, Family & Reproductive Health. Co-Advisor. Currently Senior Researcher, ETR. Thesis Title: "Adverse experiences and cognitive function among school-aged children in the United States." *Recognition:* Johns Hopkins Delta Omega Research Award; Jack Cooke Kent Foundation Dissertation Award. Co-authored publications: see OR#: 25, RA #4. |

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 27 of 40

**SER-689**

2014-2017    Mengying Li. PhD Student. Currently: Department of Population, Family & Reproductive Health. Postdoctoral Fellow, National Institutes of Health: NICHD. Dissertation: "Effects of neighborhood disadvantage during childhood and adolescence on trajectories of externalizing behaviors." Co-authored publications: OR#31,35.

2017-present    Nomi Weiss-Laxer, PhD Student. Department of Population, Family & Reproductive Health. Dissertation: "Individual and family influences on maternal mental health trajectories, mental health care use, and life satisfaction." *Recognition:* Brown Scholars Program; Abstract of Distinction Award, Society for Prevention Research Annual Meeting 2019 for "Behavioral health symptom profiles among mothers of toddlers and risk of probable major depressive episode 2 years later: The role of social support." Co-authored publications: see OR#44.

Post-doctoral Advisees/Mentees

**Overview**: As Director of the General Academic Pediatrics fellowship program, I provide ongoing research and career mentoring to each of the General Academic Pediatrics fellows. I also mentor residents in pediatrics as a member of the mentorship board for the Johns Hopkins Pediatrics Residency Health Equity track. Here I summarize primary mentoring relationships, and/or instances where mentoring relationships have led to grants, publications, and/or presentations.

Post-doctoral Advisees /Mentees

2008-2012    Eva Moore, MD, MPH, Adolescent Medicine Fellow. Currently Clinical Assistant Professor, Division of Adolescent Health & Medicine, Department of Pediatrics, University of British Columbia, Vancouver, BC. Co-authored publications: see RA#1.

2008-2010    Tyler Smith, MD. General Academic Pediatrics Fellow. Currently Assistant Professor and Fellowship Director, General Academic Pediatrics, Kansas Mercy. Co-Authored publications: see RA #2.

2010-2012    Kamila Mistry, PhD, MPH, General Academic Pediatrics Fellow. Currently Senior Staff Fellow, AHRQ, Office of Extramural Research, Education, and Priority Populations. Co-authored publications: see OR #15.

2012-2015    Kathryn (King) Cristaldi, MD, MSPH, General Academic Pediatrics Fellow. Currently: Assistant Professor of Pediatrics, Medical College of South Carolina. Funding: Young Investigator Award, Academic Pediatrics Association, 2014, "Anticipatory Guidance for Healthy Schools" (Direct costs: $15,000).

2012-2015    Emily Gregory, MD, MSPH, General Academic Pediatrics Fellow. Currently Instructor in Pediatrics, University of Pennsylvania. Funding: Young Investigator Award, Academic Pediatrics Association, 2013, "Enhancing Breastfeeding Rates Using a Novel Indicator of Success: Use of the Infant Feeding Practices II Database" (Direct Costs: $8,129). "Beyond Nutrition in Pregnancy: Understanding the Experience of Nutrition in Pregnancy Program Graduates to Inform a Pathway to Support Postnatal Care" (Direct Costs: $18,150). Co-authored publications: see OR#23,25,27.

2012-2014    Martha Johnson, MD, MPH, General Academic Pediatrics Fellow. Currently at Franklin Square Hospital Department of Family Medicine. Co-authored publication: See OR# 21.

2013-2015    Shweta Antani, MD, General Academic Pediatrics Fellow. Currently: Assistant Professor of Pediatrics, Columbia University School of Medicine. Co-authored publications: See OR #32.

2014-2018    Tania Caballero, MD, MHS. General Pediatrics Fellow. Currently: Clinical Associate, Johns Hopkins Bayview Medical Center. AAP Presidential plenary at 2016 Pediatric Academic Societies Meeting, Baltimore MD: Latino Children in Immigrant Families Experience Fewer ACEs Than US Native Latinos. Caballero T, Johnson SB, DeCamp L. Co-authored publications: See RA#7 & OR#33.

2015-2018    Rebecca Seltzer, MD, MHS. General Pediatrics Fellow. Currently: Assistant Professor of Pediatrics, Johns Hopkins School of Medicine. Recognition: 2016 American Academy of Pediatrics Council on Foster Care, Adoption and Kinship Care Research Abstract

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 28 of 40

**SER-690**

|  | Competition Winner: "Foster Care for Children with Medical Complexity: Rarely a Short-Term Solution." Co-authored publication: See OR #36. |
|---|---|
| 2016-2018 | Brandon Allport, MD, MPH. General Pediatrics/General Internal Medicine joint fellow. Currently: Assistant Professor, Department of Population Health, University of Texas at Austin Dell Medical School. Presentations: "Parents' Perspectives on Supporting Father Involvement via Mobile Messaging" Co-authored publications: See OR #38, 41; RA #8. |
| 2017-2018 | Devika Bhushan D, resident in pediatrics, Johns Hopkins. Currently: General Academic Pediatrics Fellow, Stanford University School of Medicine. |
| 2018-2019 | Lauren Okano, PhD. General Pediatrics fellow. Currently: Director, Resource, Innovation, and Data, Puget Sound Educational Service District. |
| 2018-2019 | Jill Rabinowitz, PhD. Postdoctoral Fellow, Department of Mental Health, Bloomberg School of Public Health. Currently: Assistant Scientist, Johns Hopkins Bloomberg School of Public Health, Department of Mental Health. |
| 2017-present | Brandon Smith, MD. General Pediatrics fellow. Presentations: Child obesity and school-based health center utilization. Academic Pediatrics Association Region IV Annual Meeting, 2019. |
| 2018-present | Alejandra Ellison-Barnes, MD. Currently: General Internal Medicine Fellow, Johns Hopkins Bloomberg School of Medicine. |

Thesis committees

| 2008 | Sarika Rane, Ph.D., Johns Hopkins School of Public Health, Department of Health Policy & Management, School-Wide Committee for Preliminary Oral Examination. |
|---|---|
| 2013 | AliceAnn Crandall, Ph.D., Johns Hopkins School of Public Health, Department of Population, Family & Reproductive Health, School-Wide Committee for Preliminary Oral Examination. |
| 2013 | Alisa Padon, Ph.D. Johns Hopkins School of Public Health, Department of Health, Behavior & Society. School-Wide Committee for Preliminary Oral Examination & Thesis Defense committees. |
| 2014 | Samira Soleimanpour, MPH, Johns Hopkins Bloomberg School of Public Health, Department of Population, Family & Reproductive Health, School-Wide Committee for Preliminary Oral Examination. |
| 2015, 2018 | Damali Wilson, MSN, CPNP-PC, Johns Hopkins School of Nursing, Department of Acute and Chronic Care. School-wide Committee for Preliminary Oral Examination and Thesis Defense committee. |
| 2016, 2017 | Lauren Okano, MS, Johns Hopkins School of Public Health, Department of Population, Family & Reproductive Health, Departmental Committee for Preliminary Oral and School-Wide Examinations. |
| 2018 | Radhika Raghunathan, MSPH. Johns Hopkins School of Public Health, Department of Population, Family & Reproductive Health, Schoolwide Oral Examination. |

Educational Program Building / Leadership

| 2007-2009 | Core faculty, NIMH Pre & Post-Doctoral Fellowship, Interdisciplinary Research Training on Violence (T32 MH20014) |
|---|---|
| 2007-2011 | Core Faculty, HRSA Training Grant in Pediatric Primary Care (T32HP10004) |
| 2010-2014 | Core faculty, Pre & Post-Doctoral Fellowship, Interdisciplinary Training on Preventing and Addressing Violence in Families (T32064428) |
| 2015-2020 | Co-PI: Johns Hopkins Primary Care Training Enhancements (PCTE), Health Services and Resources Administration (HRSA). PI: L. Feldman. (T0BHP28574) |
| 2011-2013 | Co-Director, General Academic Pediatrics Fellowship, Johns Hopkins School of Medicine. |
| 2010 - 2014 | Co-Director, Developmental Neuroscience and Public Health Initiative, Johns Hopkins Bloomberg School of Public Health. The Developmental Neuroscience and Public Health Initiative was designed to build public health professionals' and neuroscientists' capacity to |

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 29 of 40

SER-691

|              | engage in critical transdisciplinary research.  In addition to national meetings and working groups that brought together the world's experts in the field, the primary activity of the NPHI focused on the development and implementation of a multi-institutional, collaborative training program for students in both fields that is offered at several universities simultaneously. I had primary responsibility for developing this training program. |
|--------------|---|
| 2013- present | Director, General Academic Pediatrics Fellowship, Johns Hopkins School of Medicine. I am responsible for training clinical and non-clinical fellows to become successful generalist academic researchers.  In addition to research-related mentoring, specific research program building/leadership activities that I have led or co-led, include: 1) Headed our successful 5-year accreditation by the Academic Pediatric Association in 2013; 2) Redesigned the fellowship mentoring and oversight process to ensure trainee success and productivity;  3) Designed a "Researcher's Workshop" curriculum that includes key topics for success in an academic research career, including: scientific writing, time management, peer review, CV preparation, mentoring, and grant writing. |
| 2018-present | Core faculty, NICHD Interdisciplinary Training on Trauma and Violence Fellowship, Interdisciplinary Research Training on Violence (T32 HD094687). |

**Educational Demonstration Activities to External Audiences**
Not applicable

## RESEARCH ACTIVITIES

**Research Focus** My research aims to integrate developmental biology and sociology to explain and interrupt population-level health disparities. My scholarship has been focused in two areas. First, brain development in adolescence and its relationship to risk behavior. I have shown how new understandings of adolescent brain development can be integrated into adolescent health programs and policies, particularly those related to injury/violence prevention. My second line of work focuses on the complex biological and social mechanisms through which early life experiences and environments shape health. I study how adverse experiences (e.g., poverty, trauma) influence child health, development, and learning across the lifecourse and across generations. This includes evaluating non-invasive biomarkers of stress and immune function, and, increasingly, epigenetics.

**Research Program Building / Leadership**

| 2014-present | Center Co-Director, Rales Center for the Integration of Health and Education. This center is focused on addressing the shared determinants of health and educational disparities. I worked to write the Center proposal, secured $5 million in funding.  I direct the evaluation of the Center's signature initiative, a fully integrated school-based health center and wellness program at KIPP Baltimore, a Baltimore City public charter school that serves more than 1,500 students in grades K-8. |
|--------------|---|
| 2018-present | Consortium Co-Director, Johns Hopkins Consortium for School-Based Health Solutions. This consortium creates a single entity at Johns Hopkins and brings together educators, researchers and clinicians to focus on developing successful school-based health solutions that address barriers to health and wellness for underserved children and adolescents. |

**Research Demonstration Activities**
None

**Inventions, Patents, Copyrights**
Not applicable

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C-19-cv-5106-RBL (W.D. Wash.)
Page 30 of 40

**SER-692**

**Technology Transfer Activities**
Not applicable

## SYSTEM INNOVATION AND QUALITY IMPROVEMENT ACTIVITIES

System Innovation and Quality Improvement efforts within JHMI

| | |
|---|---|
| 2013-15 | Team member, Johns Hopkins Community Physicians at Wyman Park; mentored Dr. S. Antani in implementation of a quality improvement intervention to increase adolescent well care by changing scheduled acute visits to well child visits. Successfully increased adolescent well care metrics and achieved HEDIS "neutral zone" status for first time. Results described in publication OR #31. |

## ORGANIZATIONAL ACTIVITIES

Institutional Administrative Appointments

| | |
|---|---|
| 2007-2012 | Child & Adolescent Health & Development Track Committee, Department of Population, Family, and Reproductive Health |
| 2007-2012 | Adolescent Health Curriculum Committee, Department of Population, Family, and Reproductive Health |
| 2008-2010 | Master of Health Science Committee, Department of Population, Family, and Reproductive Health. |
| 2011-2013 | Co-Director, General Academic Pediatrics Fellowship, Johns Hopkins School of Medicine. |
| 2013-present | Director, General Academic Pediatrics Fellowship, Johns Hopkins School of Medicine. |
| 2013-2014 | Member, Search Committee, Bloomberg Distinguished Professorship in Neurodevelopment and Neuroeducation |
| 2016-2018 | Member, School of Medicine committee on post-doctoral affairs |
| 2018-present | Ad hoc member, Johns Hopkins Bloomberg School of Public Health Promotion and Tenure Committee |
| 2019 | Member, Faculty Search Committee, Department of Population, Family & Reproductive Health, Bloomberg School of Public Health |
| 2019- | Permanent member, Johns Hopkins All Children's Hospital Department of Medicine Research Council |

Editorial Activities

| | |
|---|---|
| 2007-2010 | Evaluation Board, Faculty of 1000 Medicine, Public Health and Epidemiology, Social and Behavioral Determinants of Health Section |
| 2012 | Guest Editor (with RW Blum): *Journal of Adolescent Health* special issue: Stress and the adolescent brain: How experiences and exposures across the lifespan shape health, development and learning in adolescence. *Journal of Adolescent Health;* August 2012; 51(2 Suppl). |

Journal Peer Review Activities

| | |
|---|---|
| 2016-present | *Academic Pediatrics* |
| 2012-present | *Annals of Epidemiology* |
| 2006-present | *American Journal of Public Health* |
| 2010-present | *Developmental Psychology* |
| 2019-present | *Developmental Psychobiology* |
| 2010-present | *Developmental Science* |
| 2012-present | *Health Education Research* |
| 2005-present | *Injury Prevention* |
| 2007-present | *International Journal of Epidemiology* |
| 2005-present | *Journal of Adolescent Health* |

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 31 of 40

**SER-693**

| | |
|---|---|
| 2010-present | *Journal of Healthcare for the Poor and Underserved* |
| 2012-present | *Journal of Public Health Policy* |
| 2013-present | *NeuroImage* |
| 2013-present | *Neuroscience & Biobehavioral Reviews* |
| 2007-present | *Pediatrics* |
| 2011-present | *PLoS One* |
| 2016- present | *American Journal of Preventive Medicine* |
| 2017-present | *JAMA Pediatrics* |
| 2017-present | *Children and Youth Services Review* |
| 2018- present | *JAMA* |

Other Peer Review Activities
Not applicable

Advisory Committees, Review Groups/Study Sections

| | |
|---|---|
| 2010 | Member, NIH Special Emphasis Panel (NICHD): Experimental Research on the Effects of Teenage Passengers on Driving Performance among Teenagers. Bethesda, MD. |
| 2011-2013 | Advisory Board, Learn Now |
| 2016 | Member, Expert Working Group, Kirby Summit on Neuroscience on Adolescent and Reproductive Health, Palo Alto, CA |
| 2018 | Ad Hoc Member, NIH Psychosocial Development, Risk and Prevention (PDRP) Study Section (February, October 2018) |
| 2018 | Member, NIH/NHLBI Working Group: Social Determinants of Health: Early Life Adversity as a Contributor to Disparities in Cardiovascular Diseases. |
| 2019 | Member, NIH/CSR Behavioral/Social Science Methods and Measurement Special Emphasis Panel |
| 2019- | Standing member, NIH Psychosocial Development, Risk and Prevention (PDRP) Study Section |

Professional Societies

| | | |
|---|---|---|
| 2005-2009 | Member, American Public Health Association, Injury Prevention Special Interest Group | |
| 2007-2014 | Member, Society for Research in Child Development | |
| 2010-present | Member, Academic Pediatric Association | |
| | 2015-present | Member, Academic Pediatric Association, Fellowship Training Special Interest Group |
| | 2017-present | Co-Chair, Academic Pediatric Association, Fellowship Training Special Interest Group |
| | 2017-present | Member, Academic Pediatric Association, Interdisciplinary Pediatric Researcher Special Interest Group |
| | 2018-2019 | Co-Chair, Academic Pediatric Fellows' Meeting planning committee, Pediatric Academic Societies Annual Meeting 2019 |
| | 2018-present | Co-Director, Academic Pediatric Association Research Scholars Program |
| | 2019-2020 | Co-Chair, Academic Pediatric Fellows' Meeting planning committee, Pediatric Academic Societies Annual Meeting 2020 |

Conference Organizer
*JHMI/Regional*

| | |
|---|---|
| 7/05 | Adolescent Brain Development and Public Policy, Johns Hopkins Bloomberg School of Public Health. Sponsors: Department of Population & Family Health Sciences, Department of Health Policy and Management, Department of Pediatrics. Baltimore, MD. |
| 10/09 | Neuroscience and Public Health Initiative Working Group. Johns Hopkins Bloomberg School of Public Health. Sponsor: Ludwig Family Foundation. Baltimore, MD. |

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 32 of 40

**SER-694**

| 4/11 | Stress and the Brain: Implications for Health, Development, and Learning. The Johns Hopkins Neuroscience and Public Health Initiative and the Johns Hopkins Neuroeducation Initiative. Sponsor: Ludwig Family Foundation, Johns Hopkins Brain Science Institute, Johns Hopkins School of Education. Baltimore, MD. |
| *National* | |
| 6/15 | Institute of Medicine's Roundtable on Population Health Improvement Training in Interdisciplinary Population Health Science: A Vision for the Future. Planning committee. Washington, DC. |
| *International* | None |

## RECOGNITION

Awards/Honors

| 1997 | *Phi Beta Kappa* |
| 1997 | *Summa cum laude*, UCLA |
| 1997 | College of Letters and Science Honors, UCLA |
| 1997 | Highest Departmental Honors (awarded to one student), UCLA |
| 2000 | Merit Scholarship, Johns Hopkins School of Hygiene & Public Health |
| 2001 – 2003 | National Institute of Mental Health, Pre-Doctoral Fellowship, Interdisciplinary Research Training on Violence, T32 #MH20014 |
| 2005 | William Haddon, Jr. Fellowship in Injury Prevention, Johns Hopkins Bloomberg School of Public Health |
| 2006 | *Delta Omega*, Alpha Chapter, National Public Health Honorary Society |
| 2007 – 2011 | NIH L60 Pediatric Loan Repayment Program (and 2 renewals) |
| 2011 | Excellence in Teaching Award, Johns Hopkins Bloomberg School of Public Health |
| 2012 | Excellence in Teaching Award, Johns Hopkins Bloomberg School of Public Health |
| 2013 | Advising Teaching & Mentoring Award (AMTRA), Johns Hopkins Bloomberg School of Public Health (student assembly elected) |
| 2013 | Excellence in Teaching Award, Johns Hopkins Bloomberg School of Public Health |
| 2013 - 2014 | Johns Hopkins University School of Medicine Leadership Program for Women Faculty |
| 2014 | Excellence in Teaching Award, Johns Hopkins Bloomberg School of Public Health |
| 2015 | Robert Wood Johnson Foundation Leadership Development Program in Population Health Science |
| 2016 | "Pioneer in Children's Wellbeing" award for "Redesigning school health to address health and educational disparities in Baltimore City", Robert Wood Johnson Foundation and Ashoka Changemakers. |
| 2017-2018 | Johns Hopkins Leadership Development Program. |
| 2019 | Invited participant, National Academy of Medicine's Inaugural Emerging Leaders Forum |

Invited Talks
*JHMI/Regional*

| 4/11 | Social influences on the development of self-regulation. Invited lecture: Johns Hopkins Neuroeducation Initiative. Johns Hopkins School of Education. Baltimore, MD. |
| 9/11 | Adolescent brain development and decision-making. Grand Rounds: Adolescent Medicine Grand Rounds. Johns Hopkins School of Medicine. Baltimore, MD. |
| 5/12 | The adolescent brain and behavior. Invited plenary: Maryland Assembly on School-Based Health Care annual meeting. Owings Mills, MD. |
| 5/13 | The brain in context: environmental influences on socio-emotional development. Plenary address: Invited plenary: The 5th Annual Neuro-Education Initiative Summit, Executive Function: Approaches to Research and Intervention for School-Aged Children. Baltimore, MD. |
| 12/13 | The Opportunities of adolescence, a life course perspective. Invited plenary: Leadership in Adolescent Health (LEAH) Health Disparities Annual Meeting. Baltimore, MD. |

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 33 of 40

**SER-695**

| 11/14 | Council of State Governments' Forum on early childhood. Invited Keynote. Johns Hopkins School of Education and Council of State Governments. |
| 12/14 | Early life adversity and child health: A population health perspective. Grand Rounds, Department of Pediatrics, Johns Hopkins Department of Pediatrics. |
| 3/14 | Early life stress and child health: A population health perspective. Departmental Seminar, Department of Population, Family & Reproductive Health, Johns Hopkins Bloomberg School of Public Health. |
| 10/16 | A population health perspective of poverty and the developing brain. Johns Hopkins All Children's Hospital Research Day. |
| 11/17 | Extreme Poverty & the developing brain. In: Studying the experience of extreme poverty among families in Baltimore with Andrew Cherlin, Kathryn Edin, Jacky Jennings. Departmental Seminar, Department of Population, Family & Reproductive Health, Johns Hopkins Bloomberg School of Public Health. |
| 1/18 | Building healthy futures in Baltimore: Integrating health & education at KIPP Baltimore Grand Rounds, Department of Pediatrics, Johns Hopkins Department of Pediatrics. With Sonja Santelises, Roger Schulman. |
| 3/18 | Untreated trauma and the consequences for public safety and beyond. 2018 Eastern Regional Meeting of the National Association of Attorneys General. Washington, DC. |
| 9/18 | Sociology becomes biology: Understanding how stressful experiences get under the skin to shape health, development, and behavior. ThreadTalk Speaker Series, Baltimore City College, Baltimore, MD. |

*National*

| 11/07 | The promise and pitfalls of using neuroscience to inform adolescent health policy. Special Session: Adolescent and child health, is policy failing our youth? American Public Health Association Annual Meeting, Washington, DC. |
| 11/08 | Brains, biology, and behavior: How early life experiences shape adolescent decision-making about risk. Invited lecture: University of North Carolina Gillings School of Global Public Health. Department of Health Behavior and Health Education. Chapel Hill, NC. |
| 3/12 | Stress, neurodevelopment, and programs that promote the well-being of children and families. Invited expert: Office of Planning, Research and Evaluation, Administration for Children and Families, U.S. Department of Health and Human Services. Washington, DC. |
| 10/12 | Pathways to risk: Family psychosocial environments and self-regulatory development form the fetal period to early childhood. Invited lecture: National Institutes of Health, NIDA, Bethesda, MD. |
| 5/13 | Pathways to risk: Early social environments and the foundations of self-regulatory development. Invited lecture: Columbia Mailman School of Public Health, Environment, Molecules and Population Health Group. New York, NY. |
| 10/13 | The Science of Violence: Causation, migration and prevention. Invited speaker: Institute of Medicine of the National Academies, 43rd Annual Meeting. Washington, DC. |
| 12/13 | Toxic Stress: The science of why it matters. Invited plenary: Georgia Capital Defender's Annual Meeting. Young Harris, GA. |
| 6/14 | Understanding the Impact of Childhood Trauma, Adversity and Toxic Stress on the Body and Mind: The Role of Integrated Healthcare. National Child Traumatic Stress Network, Integrated Healthcare Collaborative (I-CARE). (National webinar with Dr. Lisa Amaya-Jackson). |
| 5/15 | How do adverse social environments very early in life drive social stratification and health disparities? Robert Wood Johnson Health & Society Scholars Program. Chapel Hill, NC. |
| 9/15 | The impact of poverty on child health and achievement. Invited Plenary: Mosaic Hunger Relief Forum, Bradenton, FL. |
| 9/15 | Early life adversity and child health: A population health perspective. Department of Pediatrics, Grand Rounds, Weill Cornell Medical College, New York, NY. |

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 34 of 40

**SER-696**

| 6/16 | What does poverty mean for children: Enacting public policy that lifts kids out of poverty. Congressional Briefing, Chair: R. DeLauro, Washington, DC. |
| 9/16 | Ecology becomes biology: A population health perspective on health disparities. University of California, Irvine. |
| 2/17 | Childhood experiences and health across the life course: Harnessing developmental biology for equity. Annual Diversity Day Plenary: St. Louis University. |
| 4/17 | Adversity in childhood and health across the life course: Harnessing developmental biology for equity. Grand Rounds, Department of Pediatrics, Texas Tech School of Medicine, El Paso, TX and University of Texas El Paso Child Advocacy Summit. |
| 3/19 | Gulf of Mexico Health Concerns: Studying the health of pregnant women and children. Invited presentation: Joint Institute for Gulf of Mexico Studies Oceans and Human Health Workshop. St. Petersburg, Florida. |

*International*

| 6/13 | Stress, the adolescent brain, and risk behavior. Invited Plenary: Health Behaviour in School-Aged Children, 30th Anniversary Conference, St. Andrews University, St. Andrews, Scotland. |

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 35 of 40

**SER-697**

## APPENDIX B: REFERENCES

Albert, D., Chein, J., & Steinberg, L. (2013). Peer Influences on Adolescent Decision Making. *Current Directions in Psychological Science, 22*(2), 114-120. doi:10.1177/0963721412471347

American Academy of Pediatrics. (2017). *Adolescence visits: ages 11 through 21 years.* Retrieved from https://brightfutures.aap.org/Bright%20Futures%20Documents/BF4_AdolescenceVisits.pdf

Arnett, J. (2001). Conceptions of the Transition to Adulthood: Perspectives From Adolescence Through Midlife. *Journal of Adult Development, 8*(2), 133-143. doi:10.1023/A:1026450103225

Arnett, J. J. (2000). Emerging adulthood: A theory of development from the late teens through the twenties. *American Psychologist, 55*(5), 469-480. doi:10.1037/0003-066X.55.5.469

Baker, S. T., Lubman, D. I., Yucel, M., Allen, N. B., Whittle, S., Fulcher, B. D., . . . Fornito, A. (2015). Developmental Changes in Brain Network Hub Connectivity in Late Adolescence. *Journal of Neuroscience, 35*(24), 9078-9087. doi:10.1523/JNEUROSCI.5043-14.2015

Balleine, B. W., Delgado, M. R., & Hikosaka, O. (2007). The role of the dorsal striatum in reward and decision-making. *Journal of Neuroscience, 27*(31), 8161-8165. doi:10.1523/JNEUROSCI.1554-07.2007

Benes, F. M. (2000). Emerging principles of altered neural circuitry in schizophrenia. *Brain Research: Brain Research Reviews, 31*(2-3), 251-269. doi:10.1016/s0165-0173(99)00041-7

Botdorf, M., Rosenbaum, G. M., Patrianakos, J., Steinberg, L., & Chein, J. M. (2017). Adolescent risk-taking is predicted by individual differences in cognitive control over emotional, but not non-emotional, response conflict. *Cognition & Emotion, 31*(5), 972-979. doi:10.1080/02699931.2016.1168285

Breiner, K., Li, A., Cohen, A. O., Steinberg, L., Bonnie, R. J., Scott, E. S., . . . Galvan, A. (2017). Combined effects of peer presence, social cues, and rewards on cognitive control in adolescents. *Developmental Psychobiology, 60*(3), 292-302. doi:10.1002/dev.21599

Chein, J., Albert, D., O'Brien, L., Uckert, K., & Steinberg, L. (2011). Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry. *Dev Sci, 14*(2), F1-10. doi:10.1111/j.1467-7687.2010.01035.x

Cohen-Gilbert, J. E., Killgore, W. D. S., White, C. N., Schwab, Z. J., Crowley, D. J., Covell, M. J., . . . Silveri, M. M. (2014). Differential influence of safe versus threatening facial expressions on decision-making during an inhibitory control task in

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 36 of 40

**SER-698**

adolescence and adulthood. *Developmental Science, 17*(2), 212-223. doi:10.1111/desc.12123

Cooper, M. (1994). Motivations for alcohol use among adolescents: Development and validation of a four-factor model. *Psychological Assessment, 6*(2), 117–128. doi:10.1037/1040-3590.6.2.117

Crone, E. A., & Dahl, R. E. (2012). Understanding adolescence as a period of social – affective engagement and goal flexibility. *Nature, 13*, 636-650. doi:10.1038/nrn3313

Crumley, F. E. (1990). Substance abuse and adolescent suicidal behavior. *JAMA, 263*(22), 3051-3056. doi:10.1001/jama.1990.03440220075033

Cunningham, M. G., Bhattacharyya, S., & Benes, F. M. (2002). Amygdalo-cortical sprouting continues into early adulthood: Implications for the development of normal and abnormal function during adolescence. *Journal of Comparative Neurology, 453*(2), 116-130. doi:10.1002/cne.10376

Defoe, I. N., Dubas, J. S., Figner, B., & van Aken, M. A. (2015). A meta-analysis on age differences in risky decision making: adolescents versus children and adults. *Psychological Bulletin, 141*(1), 48-84. doi:10.1037/a0038088

Development Services Group, I. (2016). *Gun Violence and Youth. Literature review.* Retrieved from Washington, D.C: https://www.ojjdp.gov/mpg/litreviews/gun-violence-and-youth.pdf

Dijkstra, J. K., Lindenberg, S., Veenstra, R., Steglich, C., Isaacs, J., Card, N. A., & Hodges, E. V. E. (2010). Influence and selection processes in weapon carrying during adolescence: The roles of status, aggression, and vulnerability. *Criminology, 48*(1), 187-220. doi:DOI 10.1111/j.1745-9125.2010.00183.x

Dreyfuss, M., Caudle, K., Drysdale, A. T., Johnston, N. E., Cohen, A. O., Somerville, L. H., . . . Casey, B. J. (2014). Teens impulsively react rather than retreat from threat. *Developmental Neuroscience, 36*(3-4), 220-227. doi:10.1159/000357755

Ernst, M., Pine, D. S., & Hardin, M. (2006). Triadic model of the neurobiology of motivated behavior in adolescence. *Psychological Medicine, 36*(3), 299-312. doi:10.1017/S0033291705005891

Fergusson, D., Swain-Campbell, N., & Horwood, J. (2003). Risky driving behavior in young people: Prevalence, personal characteristics and traffic accidents. *Australian and New Zealand Journal of Public Health, 27*, 337-342. doi:10.1111/j.1467-842X.2003.tb00404.x

Geier, C. F., Terwilliger, R., Teslovich, T., Velanova, K., & Luna, B. (2009). Immaturities in Reward Processing and Its Influence on Inhibitory Control in Adolescence. *Cerebral Cortex, 20*(7), 1613-1629. doi:10.1093/cercor/bhp225

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 37 of 40

**SER-699**

Giedd, J. N., Blumenthal, J., Jeffries, N. O., Castellanos, F. X., Liu, H., Zijdenbos, A., . . . Rapoport, J. L. (1999). Brain development during childhood and adolescence: A longitudinal MRI study. *Nature Neuroscience, 2*(10), 861-863. doi:10.1038/13158

Grose-Fifer, J., Rodrigues, A., Hoover, S., & Zottoli, T. (2013). Attentional capture by emotional faces in adolescence. *Advances in Cognitive Psychology, 9*(2), 81-91. doi:10.2478/v10053-008-0134-9

Hohl, B. C., Wiley, S., Wiebe, D. J., Culyba, A. J., Drake, R., & Branas, C. C. (2017). Association of drug and alcohol use with adolescent firearm homicide at individual, family, and neighborhood levels. *JAMA Intern Med, 177*(3), 317-324. doi:10.1001/jamainternmed.2016.8180

Johnson, S. B., Blum, R. W., & Giedd, J. N. (2009). Adolescent maturity and the brain: The promise and pitfalls of neuroscience research in adolescent health policy. *Journal of Adolescent Health, 45*(3), 216-221. doi:10.1016/j.jadohealth.2009.05.016

Johnson, S. B., & Giedd, J. (2015). Normal brain development and child/adolescent policy. In M. Farah (Ed.), *Handbook of Neuroethics* (pp. 1721-1736): Springer Netherlands.

Johnson, S. B., & Jones, V. C. (2011). Adolescent development and risk of injury: Using developmental science to improve interventions. *Injury Prevention, 17*(1), 50-54. doi:10.1136/ip.2010.028126

Keating, D. P., Feldman, S., & Elliot, G. R. (1990). Adolescent thinking. In S. Feldman (Ed.), *At the Threshold: The developing adolescent* (pp. 54-89). Cambridge: Harvard University Press.

Kessler, R. C., & Wang, P. S. (2008). The descriptive epidemiology of commonly occurring mental disorders in the United States. *Annual Review of Public Health, 29*, 115-129. doi:10.1146/annurev.publhealth.29.020907.090847

Liu, R. T., Case, B. G., & Spirito, A. (2014). Injection drug use is associated with suicide attempts but not ideation or plans in a sample of adolescents with depressive symptoms. *Journal of Psychiatric Research, 56*, 65-71. doi:10.1016/j.jpsychires.2014.05.001

Lupien, S. J., McEwen, B. S., Gunnar, M. R., & Heim, C. (2009). Effects of stress throughout the lifespan on the brain, behaviour and cognition. *Nature Reviews: Neuroscience, 10*(6), 434-445. doi:10.1038/nrn2639

Masten, A. S. (2004). Regulatory processes, risk, and resilience in adolescent development. *Annals of the New York Academy of Sciences, 1021*, 310-319. doi:10.1196/annals.1308.036

McCoy, S. S., & Natsuaki, M. N. (2018). For better or for worse: Social influences on risk-taking. *Journal of Social Psychology, 158*(2), 139-151. doi:10.1080/00224545.2017.1294139

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 38 of 40

**SER-700**

Miller, M., & Hemenway, D. (2004). Unsupervised firearm handling by California adolescents. *Injury Prevention, 10*(3), 163-168. doi: 10.1136/ip.2004.005447

Moffitt, T. E. (1993). Adolescence-limited and life-course-persistent antisocial behavior: A developmental taxonomy. *Psychological Review, 100*(4), 674-701. doi:10.1037/0033-295X.100.4.674

Piscopo, K., Lipari, R. N., Cooney, J., & Glasheen, C. (2016). *Suicidal thoughts and behavior among adults: Results from the 2015 National Survey on Drug Use and Health.* Retrieved from https://www.samhsa.gov/data/sites/default/files/NSDUH-DR-FFR3-2015/NSDUH-DR-FFR3-2015.htm

Sebastian, C., Viding, E., Williams, K. D., & Blakemore, S. J. (2010). Social brain development and the affective consequences of ostracism in adolescence. *Brain and Cognition, 72*(1), 134-145. doi:10.1016/j.bandc.2009.06.008

Snyder, H. (2012). *Arrest in the United States, 1990–2010.* Retrieved from Washington, DC:

Somerville, L. H., Hare, T., & Casey, B. J. (2011). Frontostriatal maturation predicts cognitive control failure to appetitive cues in adolescents. *Journal of Cognitive Neuroscience, 23*(9), 2123-2134. doi:10.1162/jocn.2010.21572

Sowell, E. R., Thompson, P. M., Holmes, C. J., Jernigan, T. L., & Toga, A. W. (1999). In vivo evidence for post-adolescent brain maturation in frontal and striatal regions. *Nature Neuroscience, 2*(10), 859-861.

Sowell, E. R., Thompson, P. M., Tessner, K. D., & Toga, A. W. (2001). Mapping continued brain growth and gray matter density reduction in dorsal frontal cortex: Inverse relationships during postadolescent brain maturation. *The Journal of Neuroscience, 21*(22), 8819-8829. doi:10.1523/JNEUROSCI.21-22-08819.2001

Spear, L. P. (2000). The adolescent brain and age-related behavioral manifestations. *Neuroscience and Biobehavioral Reviews, 24*(4), 417-463. doi:10.1016/s0149-7634(00)00014-2

Steinberg, L. (2004). Risk taking in adolescence: what changes, and why? *Annals of the New York Academy of Sciences, 1021*, 51-58. doi:10.1196/annals.1308.005

Steinberg, L. (2008). A social neuroscience perspective on adolescent risk-taking. *Developmental Review, 28*(1), 78-106. doi:10.1016/j.dr.2007.08.002

Steinberg, L., Cauffman, E., Woolard, J., Graham, S., & Banich, M. (2009). Are adolescents less mature than adults? Minors' access to abortion, the juvenile death penalty, and the alleged APA "flip-flop". *American Psychologist, 64*(7), 583-594. doi:10.1037/a0014763

Substance Abuse and Mental Health Services Administration. (2018). Reports and Detailed Tables From the 2018 National Survey on Drug Use and Health (NSDUH). Retrieved from https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHDetailedTabs2018R2/NSDUHDetTabsSect1pe2018.htm

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 39 of 40

**SER-701**

Taber-Thomas, B., & Pérez-Edgar, K. (2015). Emerging Adulthood Brain Development. In J. J. Arnett (Ed.), *The Oxford Handbook of Emerging Adulthood* (pp. 126-141). Oxford: Oxford University Press.

US Department of Justice Office of Juvenile Justice and Delinquency Prevention. (2019, October 31, 2019). OJJDP Statistical Briefing Book.Arrest rates by offense and age group, 2017 (rates are per 100,000 in age group). Retrieved from https://www.ojjdp.gov/ojstatbb/crime/ucr.asp?table_in=1

Van Leijenhorst, L., Moor, B. G., Op de Macks, Z. A., Rombouts, S. A. R. B., Westenberg, P. M., & Crone, E. A. (2010). Adolescent risky decision-making: neurocognitive development of reward and control regions. *Neuroimage, 51*(1), 345-355. doi:10.1016/j.neuroimage.2010.02.038

Webster, D. W., Gainer, P. S., & Champion, H. R. (1993). Weapon carrying among inner-city junior high school students: defensive behavior vs aggressive delinquency. *American Journal of Public Health, 83*(11), 1604-1608. doi:10.2105/ajph.83.11.1604

Williams, A. F. (2003). Teenage drivers: patterns of risk. *J Safety Res, 34*(1), 5-15. doi:10.1016/s0022-4375(02)00075-0

Zimring, F. E. (1998). *American Youth Violence* (1st ed.). New York, NY: Oxford University Press.

Expert Report of Sara B. Johnson, PhD, MPH
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 40 of 40

**SER-702**

1
2
3
4
                                     The Honorable Ronald B. Leighton

5
**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

6

7
DANIEL MITCHELL, et al.,                            NO. 3:19-cv-5106

8
                Plaintiffs,              DECLARATION BY
KATERI CANDEE IN
9
   v.                                          SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY
10
CHARLES ATKINS, et al.,                             JUDGMENT

11
                Defendants,

12
   and

13
SAFE SCHOOLS SAFE COMMUNITIES,

14
              Intervenor-Defendant.

15
    I, Kateri Candee, declare as follows:

16
    1.     I am over the age of 18, competent to testify as to the matters herein, and make

17
this declaration based on my personal knowledge.

18
    2.     I am employed by the Washington State Patrol (WSP). WSP is a criminal justice

19
agency dedicated to improving the quality of life for Washingtonians. WSP is made up of 2200

20
personnel, commissioned and civilian. The Criminal Records Division is comprised of four

21
Sections: Collision Records Section, ACCESS Section, Identification and Background

22
Section, and Criminal History Records Section. As required by RCW 43.89.010, in 1965, WSP

23
established ACCESS, an acronym for A Central Computerized Enforcement Service System.

24
ACCESS is a communications network which connects the law enforcement agencies of the

25
State of Washington to allow them to share criminal justice information. In 1971, WSP entered

26
into an agreement with the Federal Bureau of Investigation (FBI) to act as the Criminal Justice

DECLARATION BY KATERI CANDEE           1             ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF DEFENDANTS'                                      800 5th Avenue, Suite 2000
MOTION FOR SUMMARY JUDGMENT                                 Seattle, WA 98104-3188
CAUSE NO. 3:19-cv-5106                                            (206) 474-7744

1   Information Services Systems Agency (CSA). WSP acts as the point of contact in Washington

2   State for all agencies that use the ACCESS System. The WSP is ultimately responsible for all

3   state and local agencies' use of the ACCESS system in Washington, through auditing and

4   training.

5        3.     I have been employed by WSP for 20 years. I started my career as a 911

6   dispatcher in the Tacoma office in 1999. In 2005, I was promoted to the position of ACCESS

7   Trainer. In 2007, I was promoted to the Information Security Officer for the ACCESS Section.

8   I was promoted to my current position as the Assistant Division Administrator for the ACCESS

9   and Collision Records Section in 2016. In this position, I am the supervisor of the Division

10  Secretary Senior, ACCESS supervisor, and the Collision Records supervisor.

11       4.     ACCESS provides authorized criminal justice agencies with the ability to query

12  law enforcement data regarding individuals with criminal history and other related records.

13  ACCESS connects data repositories such as:

14       a.   Washington Crime Information Center (WACIC), which stores Washington

15          State's "hot files" (e.g., warrants, protections orders, and stolen vehicles);

16       b.   National Crime Information Center (NCIC), which stores "hot files" on a

17          national level;

18       c.   Washington State Identification Section (WASIS), which stores Washington

19          State criminal histories;

20       d.   Interstate Identification Index (III), which stores criminal history on a national

21          level;

22       e.   National Instant Criminal Background Check System (NICS), which is used to

23          conduct background checks prior to firearm transfers or firearms being released

24          from police evidence, prior to issuance of concealed pistol license applications

25          and renewals, and prior to issuance of alien firearm licenses.

26

DECLARATION BY KATERI CANDEE
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

2

ATTORNEY GENERAL OF WASHINGTON
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

f.   International Justice and Public Safety Information Sharing Network (Nlets), which links to Interpol, and the Canadian Police Information Centre (CPIC);

g.   Department of Licensing (DOL) records, which include, drivers' license records, vehicle registration and concealed pistol license records, and other information;

h.   Washington State Parks records, which include records of boater education cards; and

i.   Department of Corrections (DOC) records.

5.   In Washington, a background check is required to purchase or transfer a firearm, obtain a concealed pistol license, or obtain an alien firearm license. WSP does not perform any firearm background checks itself, as those checks are required to be performed either by the firearms dealer selling or transferring the firearm (for rifles and shotguns), or the local law enforcement agency in the jurisdiction (for pistols and semiautomatic assault rifles). WSP provides regional training to local law enforcement agencies on NICS on how to perform firearm background checks and on the "prohibitors" (i.e., disqualifying records) for which state and federal law provide. Attached hereto as Exhibit A is a true and correct copy of the Background Check Flow Chart disseminated to local law enforcement agencies by WSP during NICS trainings.

6.   The FBI NICS Section provides WSP employees with yearly "Train the Trainer" classes at the FBI to communicate new or changing processes to the Federal criteria for determining firearm prohibitors. The NICS system was mandated by the Brady Handgun Violence Prevention Act (Brady Act) of 1993, Public Law 103-159. NICS is a national system established as a means by which firearms dealers may make contact by telephone, or other electronic means, to receive information immediately on whether the transfer of a firearm would be in violation of federal or state law.

DECLARATION BY KATERI CANDEE
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

3

7.     NICS scans information from three federal databases: (1) NCIC, which contains information about fugitives from justice, terrorists, and those subject to domestic violence protection orders; (2) III, which contains state and national fingerprint records of people charged with felonies or misdemeanors; and (3) the NICS Index, to which federal, local, state, and agencies contribute other prohibitor information not in the NCIC or III databases. In addition, relevant databases of the U.S. Immigration and Customs Enforcement (ICE) may be queried through NICS for records on non-U.S. citizens attempting to receive firearms. NICS can only be used for the purposes listed.

8.     Although in 1998 Washington State signed an agreement with the FBI agreeing to submit records to the agency, participation by the states in NICS is voluntary. This means that the type and volume of records available in NICS databases varies widely from state to state. According to one report by the nonprofit National Consortium for Justice Information and Statistics, attached hereto as Exhibit B, "at least 25% of felony convictions . . . are not available" in NICS. Ex. B, App'x A at 19. One reason for this is that states typically have more arrests and more dispositions associated with those arrests than have either been reported or, due to rejection of fingerprints, maintained by the FBI.

9.     The Brady Act requires federal firearms licensees (FFLs) to conduct a NICS background check before transferring any firearm to a non-FFL. 18 U.S.C. § 922(t). In most states, FFLs rely on the FBI (through its NICS Section) to conduct required background checks. Attached hereto as Exhibit C of the FBI's NICS participation map dated July 2019, which shows that there are currently 36 such "Non Point-of-Contact States," including Idaho and Montana.

10.     States have the option of requiring firearms dealers to conduct background checks, rather than through the FBI, through state and local agencies called "Points of Contact" (POC). Such "POC states" can search state and local records and databases that are more comprehensive than those in NICS, yielding prohibitors that a NICS search alone may not

DECLARATION BY KATERI CANDEE
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

4

ATTORNEY GENERAL OF WASHINGTON
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

SER-706

1   locate, including outstanding felony warrants, mental health records, domestic violence

2   restraining orders, and final disposition records. Currently, there are 13 Full POC States. Ex. C.

3         11.    Washington is considered a "Partial POC State" because the process used for a

4   background check depends on the type of firearm being sold or transferred.

5         12.    For "long guns" (shotguns and rifles) other than semiautomatic assault rifles

6   (SARs), FFLs conduct NICS-only background checks through the FBI NICS section. This

7   NICS check is conducted through a system called E-check, which is a system available to the

8   firearms dealers only. The dealer may not sell or transfer the firearm unless the

9   purchaser/transferee has filled out an ATF form 4473. 27 C.F.R. § 478.124(a). A true and

10  correct copy of an ATF Form 4473 is attached hereto as Exhibit D.

11        13.    When using this system to process a background check for any long gun that is

12  *not* a semiautomatic assault rifle, the dealer may release the firearm to the purchaser/transferee

13  the same day if the dealer receives a "proceed" notification from the FBI NICS section. If the

14  dealer receives a NICS "delay" notification from the FBI NICS section, then they must "hold"

15  the firearm. A delay could be caused by, for example, an "open" disposition on a felony for

16  misdemeanor domestic violence charge. At this point the FBI NICS section will research

17  whether the person is disqualified from possessing a firearm and will follow up with the dealer

18  within 5 days to let them know whether to proceed or instead deny the transfer. If the delay

19  status remains in place past 10 days the dealer may release the long gun at its discretion. If the

20  dealer receives a NICS "denial" notification, then the dealer may not transfer the firearm to the

21  purchaser/transferee. FBI does not inform the dealer of the reason for the denial. The dealer is

22  required to report the denial to the Washington Association of Sheriffs and Police Chiefs

23  (WASPC) within five days of the denial and provide a copy of the WSP notice form informing

24  the applicant of their right to appeal the denial. RCW 9.41.114.

25        14.    For pistols and, since January 1, 2019, SARs, a Washington firearms dealer

26  does not conduct the background check. Instead, for a transfer of any pistol or SAR,

DECLARATION BY KATERI CANDEE
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

5

ATTORNEY GENERAL OF WASHINGTON
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

SER-707

1  Washington law requires an "enhanced background check" that is performed by local law

2  enforcement agencies acting as a POC. RCW 9.41.090, RCW 9.41.092. The dealer must have

3  the purchaser/transferee fill out an ATF Form 4473. 27 C.F.R. § 478.124(a). The

4  purchaser/transferee will also complete a Department of Licensing (DOL) Firearm Application

5  Form, RCW 9.41.090(6). The DOL form is sent to the local law enforcement agency where

6  the purchaser/transferee resides. RCW 9.41.090(6). A true and correct copy of the DOL

7  Firearm Application Form is attached hereto as Exhibit E.

8       15.    When conducting an enhanced background check to determine whether the

9  applicant is ineligible to possess a firearm under state or federal law, the local law enforcement

10  agency is required to run a NICS check, request the Washington Health Care Authority to run

11  a mental health background check, check the Washington state patrol electronic database, and

12  check with "other agencies or resources as appropriate." RCW 9.41.090.

13       16.    WSP trains local law enforcement agencies to check their local records

14  management systems. Those local management systems include records on current arrests or

15  contacts with law enforcement that will not show up in the NICS III database (generally

16  because fingerprinting was not required at the point of contact).

17       17.    WSP also trains local law enforcement agencies to search in each enhanced

18  background check they conduct:

19           a.  The Washington Crime Information Center (WACIC), which may disclose state

20               misdemeanor warrants not in the NICS databases. The WACIC does not contain

21               out-of-state records.

22           b.  The DOL Firearms System, which reflects whether the purchaser/transferee has

23               a concealed pistol license (CPL), including whether the license has been

24               revoked. DOL receives notifications from Washington state courts to revoke

25               CPLs for those who are prohibited from possession. The DOL Firearms System

26               thus serves as a backstop in case a court fails to notify the appropriate local law

DECLARATION BY KATERI CANDEE              6              ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF DEFENDANTS'                                    800 5th Avenue, Suite 2000
MOTION FOR SUMMARY JUDGMENT                                    Seattle, WA 98104-3188
CAUSE NO. 3:19-cv-5106                                            (206) 474-7744

1    enforcement agency to revoke a CPL (or that agency fails to process it). The

2    DOL Firearms System does not contain out-of-state concealed pistol license

3    revocation records.

4    c.    The Immigration Alien Query (IAQ), if the applicant is not a U.S. Citizen.

5          Performed by U.S. Immigration and Customs Enforcement (ICE) at the request

6          of local law enforcement agencies, an IAQ contains information on a

7          purchaser/transferee's lawful immigration status, which is a requirement to

8          purchase a firearm in the United States and Washington. RCW 9.41.171; 18

9          U.S.C. § 922(g)(5)(A).

10   d.    Washington court databases, which provide additional information to determine

11         whether a conviction is a prohibitor (such as the relationships between parties,

12         the judgment and sentencing information, and any plea agreements).

13         Washington court databases do not contain dispositions from out-of-state

14         courts.

15   e.    The DOC's database, which provides information on whether the

16         purchaser/transferee has an out-of-state conviction for which he or she served

17         time in Washington, but that did not show up on the criminal history check.

18         The DOC database also reflects probation status. For a purchaser/transferee

19         currently on probation, the agency performing the enhanced background check

20         should contact his or her Community Corrections Officer to determine whether

21         any recent drug test results would preclude the purchase. The DOC database

22         does not contain out-of-state conviction records, unless the subject served at

23         least part of his or her sentence for the conviction in Washington.

24   18.   For the reasons stated above, an enhanced background check is far more

25   thorough than a NICS check along. Furthermore, because the bulk of the state and local

26   databases queried in an enhanced background check contain exclusively Washington records,

DECLARATION BY KATERI CANDEE
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

7

ATTORNEY GENERAL OF WASHINGTON
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   conducting an effective enhanced background check on a resident of a state other than

2   Washington would be extremely difficult, if not impossible. Because many pertinent records

3   may not show up in a NICS check, for a local law enforcement agency to conduct a complete

4   enhanced background check on a non-resident would require contacting one or more

5   jurisdictions outside the state—which may or may not be cooperative and responsive to the

6   agency's request.

7         I declare under penalty of perjury under the laws of Washington and the United States

8   that the foregoing is true and correct.

9         SIGNED this 30 day of March 2020, at Tumwater, Washington.

10

11                              KATERI CANDEE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION BY KATERI CANDEE                    8          ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF DEFENDANTS'                                      800 5th Avenue, Suite 2000
MOTION FOR SUMMARY JUDGMENT                                      Seattle, WA 98104-3188
CAUSE NO. 3:19-cv-5106                                             (206) 474-7744

# Exhibit A

June 2019

# Background Check Flow Chart

<u>Must be used for:</u>
- Transfer and Redemptions
  - ✓ Pistols and Others
  - ✓ Semiautomatic Assault Rifles
- CPL new and/or renewal
- Disposition of Firearm (DOF)
- Alien Firearms License (AFL)

**What databases are checked with a QNP/QNR inquiry?**
- ✓ NCIC
- ✓ III/WASIS
- ✓ NICS Indices

Checks conducted by Law Enforcement Agency (LEA)
**Required by statute**
- ✓ NICS Check (QNP/QNR)
- ✓ Local records management
- ✓ State mental health
- ✓ DOL firearms
- ✓ IAQ for non-US citizen
- ✓ WACIC

**Recommended**
- ✓ Court databases
- ✓ Check WACIC/NCIC stolen on the firearm
- ✓ DOC/FORS

**No Findings**
Notify the FFL of the proceed including the NTN # within 10 business days (state office hours)

**Positive Responses**

**Local Check**

- ✓ Send NDN Message for denial
- ✓ Add denied person to the NICS Indices Enter Denied Person (EDP)

**NICS**
If you receive a positive hit from a QNP, run a QNR with the NTN, and FBI/SID/NRI # to determine if prohibited
- ✓ Send the delay (NLN) to NICS if more than 24 hours is needed for research
- ✓ Send the NPN if proceeded
- ✓ Send the NDN if denied

If a NICS Indices hit is received, the transfer is an immediate denial, no further research is required

Notify the FFL of the denial and provide the NTN # within 10 business days

**Keep all documentation and case files on denials and NICS Indices entries for appeals and audit purposed**

**SER-712**

# Exhibit B

# Improving the National Instant Background Screening System for Firearms Purchases

*Recommendations by SEARCH*

Version 2 / February 2013



**SEARCH**
The National Consortium for Justice Information and Statistics
www.search.org
**CHAIRMAN** FRANCIS X. AUMAND III
**EXECUTIVE DIRECTOR** SCOTT M. CAME

# Contents

Background and Executive Summary .................................................................................. 3

**A Few Facts…** ................................................................................................................... 5

The National Instant Criminal Background Check System (NICS) for Firearms Purchases .......... 5

Who Conducts the Checks – States or the FBI? ............................................................. 5

Which Federal Programs Fund Improvements to the NICS? ........................................... 5

What Disqualifies an Individual from Purchasing a Firearm? ........................................ 5

Which Databases Are Examined During a Background Check for a Firearm Purchase? ............ 6

What Percentage of the Criminal Records Do States Provide to NICS? ........................... 6

How Many Checks Have Been Conducted, and How Many Have Been Denied? ................ 6

**Summary of Recommendations** ........................................................................................ 7

Invest in Background Screening Improvements for Firearms Purchases .......................... 7

Improve the Availability of NICS Disqualifying Records .................................................. 7

Remove Roadblocks to Effective State Participation and Qualification .......................... 8

Prepare for Changes that May Expand Background Checks .............................................. 8

**Invest in Background Screening Improvements for Firearms Purchases** ........................... 9

Provide National Support for the Federal-State Partnership that is NICS .......................... 9

Channel Funding Efficiently and Effectively .................................................................... 10

Facilitate – Rather than Discourage – State Participation ................................................. 11

**Improve the Availability of NICS Disqualifying Records** .................................................... 12

Enhance the NICS Index ................................................................................................... 12

Enhance the Interstate Identification Index (III) ............................................................. 13

Improve Criminal Justice Information Sharing ................................................................. 13

**Remove Roadblocks to Effective State Participation and Qualification** ............................ 15

Facilitate the Sharing of Mental Health Records from Agencies Outside Criminal Justice ........ 15

Address Privacy Issues ..................................................................................................... 15

Maintain Incentives to Establish and Operate the Relief from Disabilities Process ............. 16

Revise or Remove the Requirement to Provide State Estimates ........................................ 16

**Prepare for Changes that May Expand Background Checks** ............................................... 18

**Appendix A: Improving the Availability of Records in the NICS Index** ............................... 19

**Appendix B: Suggested Resources and Reading** ............................................................... 20



As SEARCH continues to gather additional data and research, this report will be updated. Please visit www.search.org to access our most recent version.

# BACKGROUND AND EXECUTIVE SUMMARY

SEARCH, The National Consortium for Justice Information and Statistics (SEARCH), is a nonprofit membership organization created by and for the states.[1] For over 40 years, SEARCH has promoted the effective and appropriate use of justice information and identification technology.

SEARCH's Governor-appointed, dues-paying Members from each of the 50 states and territories have the responsibility, among other things, to oversee both the National Criminal History Improvement (NCHIP) and National Instant Criminal Background Check System (NICS) programs within their states.

Over the years, states have made great strides in meeting their criminal history record improvement goals under both programs. However, there is still much to be done to realize a truly complete and accurate national criminal history background check system. That system informs a variety of critical public safety decisions, as well as noncriminal justice decisions, such as those regarding applicants for employment and licensing, to volunteers who work with children and other vulnerable populations, to individuals purchasing firearms.

As Congress debates the issue of whether or not to expand background checks for firearms purchases, SEARCH can provide decision-makers a range of detailed and insightful information on the operational impacts, implications, and challenges of expanding and enhancing the national criminal history record background check system for firearms purchases.

This document responds to some of the most pressing issues that SEARCH has been asked about since the recent gun-related tragedies that have renewed the focus on the background check system for firearms purchases.

In short, SEARCH urges Congress to ensure all states receive or are eligible for grant funding to support improvements to the National Instant Criminal Background Check System — based on incentives, not penalties — and that new funding is authorized and appropriated for this work.

---

[1] For more information, visit www.search.org

As Congress considers additional funding to improve the national background check system for firearms purchases, SEARCH recommends that funding should be channeled in a way that meets the following core principles:

- *All states must qualify for the funding*. It is likely that many states will not meet the relief from disabilities requirement. To disqualify states from funding to improve their criminal history record system only weakens the potential for a national system that provides the most complete, accurate, and timely records to inform critical decision-making.

- *Grants should give states the discretion to address the specific challenges they face in making more records available to the national system.*

- *Funding should encourage adherence to performance metrics and accountability measures*. States should define specific and measurable goals for which they will use the funding to demonstrate progress and impact.

- *Consideration should be given to eliminate a funding match from the states.*

- *States should receive incentives, rather than penalties, to facilitate their compliance with grant requirements*. As currently structured, instituting penalties would only impact unrelated – yet critical – justice programs (such as the Byrne Justice Assistance Grant Program).

- *Congress should fund technical assistance and technology investments for states to improve automated information sharing systems in support of NICS*.

- *Expand the states' capacity to conduct background screening for firearms purchases*. SEARCH recognizes the potential role of other Federal funding programs and supports additional funding for these programs that provide significant technical assistance to the states with their information sharing initiatives (such as the Byrne Competitive Grant Program).

**For more information, contact**
Kelly J. Harbitter
Director of Government Affairs, SEARCH
kelly@search.org

SEARCH Analysis and Recommendations on Background Screening Improvements for Firearms Purchases  |  February 2013
Page 4

**SER-717**

# A FEW FACTS...

**The National Instant Criminal Background Check System (NICS) for Firearms Purchases**

- NICS was established in 1993 by the Brady Handgun Violence Prevention Act of 1993.

- The FBI maintains the NICS to conduct background checks on individuals seeking to purchase firearms from Federally Licensed Firearms Dealers (FFLs) or to obtain permits to possess, carry, or obtain firearms.

- The system relies on a comparison of an applicant's name with names in prohibitive category files. The system is not capable of positive identification through comparison of biometric information.

- The system does not include background checks for private firearm sales.

**Who Conducts the Checks – States or the FBI?**

- There are 13 full Point of Contact (POC) States that handle all NICS and state prohibitor checks: California, Colorado, Connecticut, Florida, Hawaii, Illinois, Nevada, New Jersey, Oregon, Pennsylvania, Tennessee, Utah, and Virginia.

- There are seven partial-POC States that handle their own handgun checks/handgun permit checks while the FBI handles the long gun checks: Iowa, Maryland, Nebraska, New Hampshire, North Carolina, Washington, and Wisconsin.

- Eighteen (18) are known as Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) "qualified alternate permit" States — meaning they have a process in place that serves as an alternative to the Brady law background check requirements.

- The FBI provides the NICS background checks for firearm transactions in the remainder of the states.

**Which Federal Programs Fund Improvements to the NICS?**

There are two Federal grant programs that have funded state improvements to their criminal history record repositories, generally, and the NICS specifically: the National Criminal History Improvement Program (NCHIP) and the NICS Act Record Improvement Program (NARIP). Both are administered by the Bureau of Justice Statistics (BJS), U.S. Department of Justice.

**What Disqualifies an Individual from Purchasing a Firearm?**

There are 10 categories established in Federal law that disqualify an individual from purchasing firearms. (Note: Some states have established their own, additional disqualifying categories.)

- Illegal/unlawful alien
- Dishonorable discharge
- Renounced U.S. citizenship
- Felony conviction
- Under indictment/information
- Fugitive from justice

- Unlawful use of/addiction to a controlled substance
- Involuntary commitment to mental health institution/mental adjudications
- Domestic violence protection/restraining order
- Misdemeanor conviction for crimes of domestic violence

**Which Databases Are Examined During a Background Check for a Firearm Purchase?**

During a NICS check, descriptive data such as name and date of birth are used to search three national databases that contain criminal history and other relevant records to determine whether a person is disqualified from purchasing a firearm. (Note: POC States may also search state databases.)

- **Interstate Identification Index (III)**. This FBI-maintained pointer system is the national system for exchanging criminal record information. It links state- and FBI-held information. The index contains information on persons arrested for fingerprintable felonies and misdemeanors under State or Federal law and can point to the states for additional information.

- **National Crime Information Center (NCIC)**. An automated, nationally accessible database of crime data, criminal justice and justice-related records, including information on wanted persons (fugitives) and persons subject to restraining orders.

- **NICS Index**. This database was created for presale background checks of firearms purchasers and contains information on persons prohibited from possessing or receiving a firearm. The NICS Index also contains information that may not be available in the NCIC or the III.

**What Percentage of the Criminal Records Do States Provide to NICS?**

Nearly all firearms purchase disqualification decisions are based on the information states provide. **Indeed, nearly 90% of the criminal records available to the NICS come from the states** (FBI Criminal Justice Information Services III Statistics, February 1, 2013). Similarly, relevant records in the NCIC and the NICS Index are overwhelmingly comprised of information entered by the states.

**How Many Checks Have Been Conducted, and How Many Have Been Denied?**

According to a BJS report released February 12, 2013, *Background Checks for Firearm Transfers, 2010 - Statistical Tables*:

- Since the inception of the Brady Act, over 118 million applications for firearm transfers or permits were subject to background checks. About 2.1 million applications, or 1.8%, were denied.

- In 2010, 1.5% of the 10.4 million applications for firearm transfers or permits were denied by the FBI or by state and local agencies.

- Among the 21 state agencies that reported reasons for denial, a felony conviction or indictment was the most common reason to deny an application in 2010 (31%). A state law prohibition was the second most common reason (16%).

# SUMMARY OF RECOMMENDATIONS

Since the recent tragedies in Aurora, Colorado, and Newtown, Connecticut — compounded by the nearly daily reports of gun-related violence — significant focus has been placed on the nation's background screening system for firearms purchases: the National Instant Criminal Background Check System (NICS). Some of that focus has been mistakenly critical of the States and their contributions — or lack thereof — to the databases used for such screening. Indeed, the vast majority of records in seven of the 10 categories used to make firearms transfer determinations are records maintained and made available by the States. Thus, the overwhelming majority of firearms transfer denials are based on state records. States have made their records available despite facing many extraordinary, and well-documented, obstacles to effectively sharing information at the national level and in support of this national system.

Those obstacles include lack of sufficient investment to help build the infrastructure for electronic information sharing, continuing challenges with making disqualifying records available to NICS, and significant policy challenges (particularly with sharing mental health records).

Despite these challenges, NICS has clearly demonstrated that it is an effective and robust tool for daily decision-making regarding firearms purchases. As Congress and other decision-makers consider introducing new programs, reauthorizing existing ones, expanding background checks for firearms purchases, and enhancing the states' role in the background screening system, SEARCH urges decision-makers to make a meaningful investment in enhancing the national system. For that investment to be successful, it should also remove the roadblocks to greater state participation and develop strategies to improve the availability of disqualifying records to the NICS Index. Following is a summary of the recommendations in the body of this report.

## INVEST IN BACKGROUND SCREENING IMPROVEMENTS FOR FIREARMS PURCHASES

- Provide National Support for the Federal-State Partnership that is NICS

- Channel Funding Efficiently and Effectively

- Facilitate – Rather than Discourage – State Participation

## IMPROVE THE AVAILABILITY OF NICS DISQUALIFYING RECORDS

- Enhance the NICS Index

- Enhance the Interstate Identification Index (III)

- Improve Criminal Justice Information Sharing

# REMOVE ROADBLOCKS TO EFFECTIVE STATE PARTICIPATION AND QUALIFICATION

- Facilitate the Sharing of Mental Health Records from Agencies Outside Criminal Justice

- Address Privacy Issues

- Maintain Incentives to Establish and Operate the State Relief from Disabilities Process

- Revise or Remove the Requirement for State Estimates

# PREPARE FOR CHANGES THAT MAY EXPAND BACKGROUND CHECKS

## INVEST IN BACKGROUND SCREENING IMPROVEMENTS FOR FIREARMS PURCHASES

### PROVIDE NATIONAL SUPPORT FOR THE FEDERAL-STATE PARTNERSHIP THAT IS NICS

A lack of sufficient funding to the states, exacerbated by impractical grant requirements, has been one of the most significant challenges to creating a more robust background check system for firearms purchases.

As a result of the Virginia Tech tragedy in 2007, Congress passed the NICS Improvement Amendments Act (NIAA) to help improve and enhance the NICS. NIAA established a grant program for states: the NICS Act Record Improvement Program (NARIP). For FY 2009–2013, Congress authorized $1.25 billion to the states and courts for NIAA. However, congressional appropriations have never reached anywhere near such authorization levels. In FY 2010, Congress appropriated $20 million. In FY 2011, the appropriation fell to $17 million, while the 2012 budget contained a $5 million appropriation.

During that same period, however, the U.S. Department of Justice's Bureau of Justice Statistics (BJS) — which administers the grant program under NIAA — received grant applications requesting funding far above the amounts appropriated. Ironically, however, due to the grant program's requirements,[2] most states could not qualify to receive funding. As a result, only three states received funding in FY 2009 for a total of $2.5 million — despite the fact that 22 states applied for $13.5 million in funding. In FY 2010, eight states received $16.9 million, although 15 states submitted applications totaling $28 million. In FY 2011, 15 states applied for more than $33 million in funding; however, 12 states received just over $20 million. FY 2012 grantees received just over $11 million in funding.

*SEARCH urges Congress to make a substantial investment in the Federal-State criminal background screening partnership as a necessary tool in the fight against gun violence, with a national scope that is inclusive of all the states.*

_____

[2] NARIP has two main requirements: States must 1) establish a process where those adjudicated as "mentally defective" can seek to reinstate their right to purchase a firearm, and 2) comply with a process to estimate the number of NICS disqualifying records they maintain. The challenges of implementing both of these requirements are discussed later in this document.

## CHANNEL FUNDING EFFICIENTLY AND EFFECTIVELY

Since 1995, the National Criminal History Improvement Program (NCHIP) has provided states the resources to improve their criminal history record systems to support a range of criminal justice and noncriminal justice decision-making activities. The program has demonstrated significant success across the country. NCHIP's strength, said one SEARCH state official, is its broad nature and flexibility that allows states to target their priorities and fund improvements to their criminal history records. All states and the District of Columbia have received NCHIP funding over the years.

The NICS grant funding stream — embodied in the NICS Act Record Improvement Program (NARIP) of 2007 — is targeted at further enhancing the NICS Index, as well as the number of disqualifying records in the system's other databases. To date, however, only 20 states have qualified for NARIP funding — and even fewer states have actually received NARIP funding since its inception. This is primarily due to the difficulty in establishing — both politically and logistically — a relief from disabilities process for those "adjudicated as a mental defective," as required under NARIP.

Due to NCHIP's broader focus, flexibility, and success over the years, it would be the most effective and appropriate channel for targeting additional funding toward improving NICS. Most importantly, <u>all states qualify for this funding stream</u>. NARIP requirements create a barrier that disqualifies more than half of the states from participating in the program and receiving funding to improve their records systems.

*SEARCH urges Congress to channel targeted funding to all states via the NCHIP grant program, with safeguards to ensure that NCHIP's basic program structure is not compromised.*

## FACILITATE – RATHER THAN DISCOURAGE – STATE PARTICIPATION

*SEARCH urges Congress to ensure all states receive or are eligible for grant funding to support improvements to the National Instant Criminal Background Check System — based on incentives, not penalties — and that new funding is authorized and appropriated for this work.*

As Congress considers additional funding to improve the national background check system for firearms purchases, SEARCH recommends funding should be channeled in a way that meets the following core principles:

- *All states must qualify for the funding*. It is likely that many states will not meet the relief from disabilities requirement. To disqualify states from funding to improve their criminal history record system only weakens the potential for a national system that provides the most complete, accurate, and timely records to inform critical decision-making.

- *Grants should give states the discretion to address the specific challenges they face in making more records available to the national system.*

- *Funding should encourage adherence to performance metrics and accountability measures*. States should define specific and measurable goals for which they will use the funding to demonstrate progress and impact.

- *Consideration should be given to eliminate a funding match from the states*.

- *States should receive incentives, rather than penalties, to facilitate their compliance with grant requirements*. As currently structured, instituting penalties would only impact unrelated – yet critical – justice programs (such as the Byrne Justice Assistance Grant Program).

- *Congress should fund technical assistance and technology investments for states to improve automated information sharing systems in support of NICS*.

- *Expand the states' capacity to conduct background screening for firearms purchases.* SEARCH recognizes the potential role of other Federal funding programs and supports additional funding for these programs that provide significant technical assistance to the states with their information sharing initiatives (such as the Byrne Competitive Grant Program).

# IMPROVE THE AVAILABILITY OF NICS DISQUALIFYING RECORDS

As noted, since its inception, NICS has been very successful in denying the sale and transfer of guns to those prohibited from having them. The States and FBI rely on NICS for robust decision-making on daily firearms transactions. There are, however, opportunities for improving the timeliness and availability of information to NICS that could be addressed through targeted funding.

## ENHANCE THE NICS INDEX

The NICS Index contains information not found in the Interstate Identification Index (III) or National Crime Information Center (NCIC), the other databases that are searched during a background check for firearms purchases. For example, a criminal case on a rap sheet (available in III) might show a disposition of "mental incompetency," while a NICS Index entry would record an involuntary commitment to a mental health facility unrelated to a criminal proceeding. Both are disqualifying events, but are recorded and available from different databases.

Meanwhile, of the 10 Federal prohibitive categories for firearms purchases, seven are predominantly derived from State information. Several million records in four of these categories (felony conviction, under indictment/information, fugitive from justice, and drug abuser) are not always available to the system. Information made available through the III is based on fingerprints, typically captured at the time of booking. However, not every person entering the criminal justice system is formally booked, creating a situation where a court may reach a decision, but there is no corresponding arrest information at the state record repository. Additionally, dispositions may be missing from the system, largely resulting from data-matching problems between the court and state record repository. In these cases, the felony arrest appears in the system and NICS and the POCs have three days to research the information needed for a firearm decision. Additional research is required in 8% of NICS transactions. An acquittal or dismissal is just as important as a conviction for making an informed decision on a firearm transfer. Rather than simply leaving this disposition information unavailable to the system because it is not available in III, an alternative would be to enable the States to address the workload and cost issues associated with placing it in the NICS Index.

Likewise – largely for policy and economic reasons associated with extradition and record validation – managing warrant transactions in NCIC is extremely labor-intensive. In some cases, there are also technical challenges associated with the NCIC system, primarily due to the system's age and original design. As a result, there are persons who are considered fugitives from justice (predominantly misdemeanor warrants) that are not available to NICS.

Meanwhile, many states have added their own prohibitive categories, and that information would greatly enhance the NICS Index and the decision-making process if made available to the system. See Appendix A, page 19, for more detail on the challenges to obtaining NICS disqualifying records.

*Fulfill the original intent of the NICS Index by making disqualifying records, across prohibitive categories, more readily available.*

## ENHANCE THE INTERSTATE IDENTIFICATION INDEX (III)

Felony convictions are the largest category of firearm transfer denials. Yet, as of December 31, 2010, a survey of the States conducted by SEARCH found that only seven states and Guam reported that 90% or more felony charges have a final disposition recorded in their criminal history databases. An additional five states had between 80% and 90% dispositions for felony charges.

*The quantity and quality of criminal history information available via III – and therefore for background screening purposes – must be improved. Investments should be made to vastly improve collection and reporting efficiencies by encouraging the adoption of the standardized criminal history record (rap sheet), increasing state participation in the FBI-administered National Fingerprint File (NFF) program, and for automation improvements at courts and repositories.*

## IMPROVE CRIMINAL JUSTICE INFORMATION SHARING

The ready availability of status information on the rap sheet would benefit and expedite NICS-related decision-making. For example, by capturing a prosecutor's charge reduction decision from a felony to a misdemeanor, NICS and POC States would not need to delay the transfer decision while attempting to find a disposition, as is now necessary when the rap sheet only shows an open felony case. Similarly, Indictments and the filing of Informations represent status information that is rarely available to those charged with making firearms transfer decisions.

*The general lack of status information on criminal history records diminishes the ability to make instant decisions when responding to gun dealers. Funding should be targeted to improving enterprise-wide information sharing within the criminal justice system and across the states.*

The integrity of the system is in part dependent upon FBI-administered decision and appeals processes that render conclusions without undue delay. In many instances this entails requesting overburdened and uncompensated courts to research information. Developing software and communications infrastructure that provides the FBI and the States with automated access to information maintained by other state and local agencies will generally

expedite the transaction decision process and appeals process for firearms sales denials. It would also greatly enhance the use of these records for all criminal justice and approved noncriminal justice purposes. Such investments should respect the historical and proper role of the States as interface points for the FBI to access local justice information.

Similarly, better interfaces between the FBI and the States, and between local courts and law enforcement agencies and the States, could enable NICS checks to include state and local warrant information currently unavailable to NICS.

*Expedite the resolution of the firearms purchase denial appeals process by providing automated means to inquire into local justice information systems.*

## REMOVE ROADBLOCKS TO EFFECTIVE STATE PARTICIPATION AND QUALIFICATION

### FACILITATE THE SHARING OF MENTAL HEALTH RECORDS FROM AGENCIES OUTSIDE CRIMINAL JUSTICE

Except for mental health-related criminal case dispositions, this Federal prohibition category relies on health information rather than traditional criminal justice information. Justice agencies often do not have access to this information due to patient privacy protections at both the state and Federal levels. While NICS does not collect diagnosis information, it does, however, need names and other descriptive information.

Mental health records not related to criminal case dispositions are maintained by agencies and organizations outside of criminal justice, such as private hospitals, state mental institutions, state health agencies, and civil courts. Since many of the records were not developed for criminal justice use, there are privacy and other challenges to sharing those records, including some records with missing required personal identifying data.

There are also significant technological challenges to electronically exchanging mental health data. Older paper-based records need to be automated before information can be available. Some mental health databases are not designed to allow sorting and retrieval of the key information necessary for firearms transfer decisions or appeals.

*State criminal justice agencies receiving funding to enhance their participation in NICS should not be penalized for their inability to obtain mental health records. Rather, mental health institutions, and other mental health records holders and states should be incentivized to share such information. Targeted funding could help overcome the technical and legal challenges to doing so.*

### ADDRESS PRIVACY ISSUES

If mental health records are truly to be regularly and routinely considered in firearms transfer decisions, then legislative policy must address the balance of protecting individual privacy and sharing information regarding involuntary commitment records.

Similarly, with drug abuse records, some jurisdictions experience challenges between drug court-related positive drug test information and the reporting of that information. While the drug court defendant information may not be confidential, the fact that someone appears on a drug court docket may be considered "client" information—and therefore confidential under Federal or state statutes that protect health information.

In many instances, the lack of access to disqualifying mental health information or drug abuser information is attributed to privacy laws that govern who can obtain health records on individuals. Yet, NICS does not require diagnosis information on those who have been or are currently in treatment—only names and basic identifiers. Some states have found effective workarounds, for example, by querying noncriminal justice databases for name matches. Fundamental to the development of privacy policies for information sharing within the justice community is an examination of local, state, and Federal privacy laws.

*Address citizens' legitimate concerns about protecting the privacy of mental health records by investing in the development of effective privacy policies to govern use of this information.*

## MAINTAIN INCENTIVES TO ESTABLISH AND OPERATE THE RELIEF FROM DISABILITIES PROCESS

The majority of states are ineligible for the very funding that would improve the number and quality of records available to NICS because those states have not implemented a relief from disabilities program. To qualify for NARIP funding, states must enact a program that allows individuals who have been prohibited from purchasing firearms due to a mental health adjudication or commitment to seek relief from the prohibition. There are many reasons states have not implemented a relief from disabilities program. These include public policy concerns, the expense of enacting such a program, and the time it takes to change state law (the program has to be established by state statute or administrative regulation), among others. To date, only 20 states have instituted a relief from disabilities process, meaning more than half of the states do not qualify for NARIP funding.

Further exacerbating this issue is the reality that the amount of funding available to the states via NARIP is insufficient to incentivize them to enact a relief from disabilities program.

*When NARIP provides a meaningful level of funding to states in support of their participation in and enhancement of NICS, states will be incented to implement a relief from disabilities process.*

## REVISE OR REMOVE THE REQUIREMENT TO PROVIDE STATE ESTIMATES

The U.S. Department of Justice, the Government Accounting Office, and the States have all determined that estimating the number of prohibitor records that exist in the states is problematic across all categories. For example, in many states, there are literally hundreds of courts and law enforcement agencies that maintain original source

records. There is no practical way to obtain estimates about these records from so many agencies, or to even ask them to take on the burden of counting records. Yet providing these estimates is a key requirement states must meet to qualify for NARIP grant funding.

Meanwhile, systems do not necessarily record data in a manner that supports the requirements of the estimates process. For example, most courts count the number of dockets, while the state repositories often count arrests or charges. From these inconsistencies, coming up with a meaningful calculation of the percentage of records available to the system is almost impossible. There are also relatively few state statutes that fully comport with the misdemeanor crime of domestic violence prohibitor, as defined in Federal law. States may impose much more stringent criteria on this prohibitor. Consequently, this category tends to be over-reported with the inclusion of assault charges, harassment charges, battery charges, and disorderly conduct charges that do not meet either the violence or the relationship tests of the Federal prohibitor.

Further, inaccurate conclusions can be drawn from the record estimates survey. For example, the apparent absence of conviction records available to the NICS (as reported in the survey data) may give a false impression about the direct relationship between missing records and missed gun transfer denials. Approximately two-thirds of criminal offenders are rearrested. As such, even if an offender has a conviction missing from the III, it is likely the offender would have one or more additional convictions available in III, thereby disqualifying a gun transfer. In addition, some persons have met the criteria for entry in other disqualifying categories searched in the NICS check. Consequently, despite the fact that the survey data suggest that there are a significant number of records not currently available to the NICS, this should not lead to a simple conclusion that the situation correlates to missed denials.

Finally, NARIP requires states to conduct a 20-year "look back" to come up with the estimates in select categories. In most cases, such information from that far back in time either does not exist due to record retention periods, or the survey workload exceeds any practical value.

*Nearly five years of experience with the NARIP requirement to collect estimates of the states' NICS disqualifying records has proven to be a difficult — if not impossible — task that yields less-than-meaningful results. New metrics for NARIP funding should be established that draw upon reliable data and other measures that demonstrate ongoing and effective efforts to improve both the quality and availability of information to NICS.*

## PREPARE FOR CHANGES THAT MAY EXPAND BACKGROUND CHECKS

If Congress expands the application of NICS checks to all firearms transactions, including private sales (often referred to as "gun show transactions"), state repository directors are concerned about the impact and funding for what promises to be a significant workload increase. Thirteen (13) states or territories are "full point of contact" (POC) States in that they perform background checks for all firearm transactions in connection with the issuance of permits. Seven are considered "partial POC" States in that they perform background checks in connection with handgun purchases and handgun permits, while the FBI handles checks for long gun sales. Eighteen (18) are known as Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) "qualified alternate permit" States — meaning they have a process in place that serves as an alternative to the Brady law background check requirements. In total, full and partial POC States and ATF-qualified Permit States conduct an average of 5,859,795 transactions per year.[3]

Given the deficiencies in the reporting of prohibitive information and that many of the prohibitors are name-based, the NICS Unit must frequently attempt to use the 72-hour window in the law to track down missing dispositions or other information. This involves contacting and seeking the assistance of state repositories and courts — this is disruptive to the operations of the repositories and courts that often must go through a laborious and time-consuming process of trying to locate information that may not be automated. An increase in NICS checks will inevitably place greater burdens on state repositories and courts. The existing infrastructure was not designed to respond to the urgent inquiries required for NICS decision-making, nor is there funding to do so. Proposals that include extending background screening for ammunition purchases will further exacerbate the workload issue.

In addition, the number of appeals of denial decisions is proportionate to the number of transactions processed by the NICS and the state POCs. As the number of transactions rise, so does the number of appeals. Researching the basis for a denial is an unfunded and increasingly unmanageable burden for courts and state and local agencies.

Imposition of a universal background check could fall especially hard on the 20 full or partial POC States if their state laws do not now cover every firearms transaction within the state. Alternatively, these states — as others have already chosen to do — could opt out of conducting the background checks by transferring the responsibility to the FBI, reducing their staffing and ability to handle appeals and research.

*The States' background check services are already operating at capacity (and in some cases, above capacity). Expansion of the demand for background checks for firearms purchases will require an investment in the states' capacity, in order to avoid degradation of service for other types of background checks, including law enforcement, public safety, and employment.*

*Funding could also be targeted to develop automated efficiencies linking the FBI and Point of Contact States with information sources.*

[3] Federal Register, Volume 77, Number 215, November 6, 2012, page 66637.

# Appendix A:
# Improving the Availability of Records in the NICS Index

**Felony Convictions**. III is a fingerprint-based system and the primary source for obtaining prohibition information for this category. The NICS Index is name-based. There are millions of conviction records that cannot be linked with arrests and consequently are not part of the computerized criminal history at the states and FBI. The most recent survey of the States for estimates of available records under the NIAA indicates that at least 25% of felony convictions, representing more than 7 million concluded judicial proceedings, are not available to NICS. Funding could enable the submission of these dispositions to the NICS Index.

**Person Under Indictment/Information**. A grand jury indictment or prosecuting attorney information is status information. It is generally available via the criminal history in only those states that collect this status information—a rarity. More than half the states have or are in the process of implementing a standardized rap sheet that makes provision for collecting this information. But it is an optional field. Funding would be needed to routinely collect this information from courts for either entry on the criminal history record (where it would be available through III) or directly reported to the NICS Index.

**Fugitive from Justice**. This refers to the misdemeanor and felony warrants entered on NCIC. There is a massive, but not well-documented, warrant under-reporting problem. The most recent survey of the States for estimates of available records under the NIAA indicates that at least 47% of active warrants/wants, representing more than 6 million active warrants, are not available to NICS. Funding could greatly enhance the issuance of electronic warrants at the courthouse and automation of the process between the courthouse and law enforcement, and between local law enforcement and the state/NCIC.

**Persons who are Unlawful Users of or Addicted to Any Controlled Substance**. This prohibition is generally based on criminal history record information that shows a conviction for use or possession of a controlled substance within the past year, or multiple arrests for use or possession within the past 5 years if the most recent arrest occurred within the past year. Alternatively, the prohibition applies when a person is found through a drug test to use a controlled substance unlawfully, provided the test was administered within the past year. There are now hundreds of drug court programs across the country helping drug abusers to overcome their dependencies. At the core of these programs are drug testing for admission and throughout the life of participation in the program. Yet this positive drug test data, associated with Drug Court programs, is rarely, if at all, provided to the NICS Index. Given that a defendant can be admitted to a drug court program for any offense and not merely one related to drug abuse, it is evident that these prohibiting drug abuser records are not reaching the NICS Index. Funding is needed to develop systems for the transmission of this information to state repositories/NICS.

**State Disqualifiers**. In addition to the Federal prohibitions, some states have enacted additional prohibitions. Recently, the NICS Index was opened up to accommodate recording of state firearm denials based on state prohibitions. Generally, states are not reporting this information. Funding is needed to put into place the programming to collect and transmit these data to NICS.

# Appendix B:
# Suggested Resources and Reading

## External Resources

- FBI NICS page:  http://www.fbi.gov/about-us/cjis/nics

- U.S. Government Accountability Office: *Gun Control: Sharing Promising Practices and Assessing Incentives Could Better Position Justice to Assist States in Providing Records for Background Checks*, GAO-12-684, July 16, 2012: http://www.gao.gov/products/GAO-12-684

- "Promising practices by states for improved record reporting," a Bureau of Justice Statistics web page with information responding to the NIAA and GAO-12-684 report: http://bjs.ojp.usdoj.gov/index.cfm?ty=tp&tid=491#promising

- U.S. Department of Justice, Bureau of Justice Statistics: *Background Checks for Firearm Transfers, 2010 – Statistical Tables,* NCJ 238226, February 12, 2013: http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=4596

- Bureau of Justice Statistics website: http://bjs.ojp.usdoj.gov/

## SEARCH Resources

- "NICS and Background Checks" resource page: http://www.search.org/products/criminal/nics/

- Law and Policy Information pages–
  - NICS: http://www.search.org/programs/policy/nics/
  - Criminal History Records: http://www.search.org/programs/policy/records/
  - Noncriminal Justice Background Checks: http://www.search.org/programs/policy/checks/
  - Interstate Identification Index: http://www.search.org/programs/policy/iii/

- Surveys on criminal history record checks, state repositories, and related issues: http://www.search.org/programs/policy/surveys/
  - *Survey of State Criminal History Information Systems, 2010*: https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=259283
  - State Repository Services Survey: http://www.search.org/files/pdf/Survey_of_State_Repository_Services.pdf

- Selected SEARCH Membership Group Resolutions on the NICS: http://www.search.org/files/pdf/SEARCH_RESOLUTIONS.pdf
  - 04-39: NICS Improvement Legislation (January 25, 2004)
  - 07-42: Enhancements to the Brady, National Instant Criminal Background Check System (February 14, 2007)
  - 07-46: Improvements to the Brady, National Instant Criminal Background Check System (July 20, 2007)
  - 10-57: NICS Improvement Amendments Act (NIAA) Funding (July 29, 2010)

- NICS NIAA Conference presentations: http://www.search.org/about/news/2009/niaa.asp

# Exhibit C

# NICS Participation Map



**36 Non Point-of-Contact (POC) States**

Federal Firearms Licensees (FFL) contact FBI for all firearm background checks

**13 Full POC States**

FFLs contact state for all firearm background checks

**4 Partial POC States**

FFLs contact state for handguns, and contact FBI for long gun background checks

**3 Partial POC States**

State-issued handgun permit is used for handguns, and FFLs contact FBI for long gun background checks

*25 Bureau of Alcohol, Tobacco, Firearms and Explosives Qualified Alternate Permits issued by state or local agencies

Please refer to the latest Permanent Brady Permit Chart for specific permit details.
www.atf.gov/rules-and-regulations/permanent-brady-permit-chart

7/2019

**SER-735**

Thirty-six Non Point-of-Contact (POC) states/territories do not have POC status. Federal Firearm Licensees (FFL) rely on the FBI for all firearm background checks by electronically accessing the NICS.

- *Non POC states/territories: Alabama, Alaska, American Samoa, Arizona, Arkansas, Delaware, District of Columbia, Georgia, Guam, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, New Mexico, New York, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Puerto Rico, Rhode Island, South Carolina, South Dakota, Texas, Vermont, Virgin Islands, West Virginia, and Wyoming.*

Thirteen Full POC states have agencies acting on behalf of the NICS in a Full POC capacity. These POC states have designated agencies to conduct firearm background checks for FFLs in their respective state by electronically accessing the NICS.

- *Full POC states: California, Colorado, Connecticut, Florida, Hawaii, Illinois, Nevada, New Jersey, Oregon, Pennsylvania, Tennessee, Utah, and Virginia.*

Seven states are currently sharing responsibility with the FBI by acting as partial POCs. Partial POC states have agencies designated to conduct checks for handguns and/or handgun permits, while the FBI handles the processing of the state transactions for long gun transfers.

- *Four Partial POC states conduct handgun background checks and the FFLs contact the FBI for long gun background checks: Maryland, New Hampshire, Washington, and Wisconsin.*

- *Three Partial POC states issue handgun permits used for handgun background checks, and the FFLs contact the FBI for long gun background checks: Iowa, Nebraska, and North Carolina.*

Twenty-five states have at least one Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)-qualified alternate permit, issued by a state or local agency.

- *ATF-qualified alternate permit states: Alaska, Arizona, Arkansas, California, Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Montana, Nebraska, Nevada, North Carolina, North Dakota, Ohio, South Carolina, South Dakota, Texas, Utah, West Virginia, and Wyoming.*

Please refer to the latest Permanent Brady Permit Chart for specific permit details at <www.atf.gov/rules-and-regulations/permanent-brady-permit-chart>.

**SER-736**

# Exhibit D

OMB No. 1140-0020

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Firearms Transaction Record

| | Transferor's/ Seller's Transaction Serial Number (If any) |
|---|---|
| **WARNING: You may not receive a firearm if prohibited by Federal or State law.  The information you provide will be used to determine whether you are prohibited from receiving a firearm.  Certain violations of the Gun Control Act, 18 U.S.C. 921 et. seq., are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.**<br><br>Read the Notices, Instructions, and Definitions on this form.  Prepare in original at the licensed premises *("licensed premises" includes business temporarily conducted from a qualifying gun show or event in the same State in which the licensed premises is located)* unless the transaction qualifies under 18 U.S.C. 922(c).  All entries must be handwritten in ink.  "PLEASE PRINT." | |

## Section A – Must Be Completed Personally By Transferee/Buyer

1. Transferee's/Buyer's Full Name *(If legal name contain an initial only, record "IO" after the initial.  If no middle initial or name, record "NMN".)*

| Last Name *(Including suffix (e.g., Jr, Sr, II, III))* | First Name | Middle Name |
|---|---|---|
| | | |

2. Current State of Residence and Address **(U.S. Postal abbreviations are acceptable.  Cannot be a post office box.)**

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| | | | | |

| 3. Place of Birth<br>U.S. City and State   **-OR-**   Foreign Country | 4. Height<br>Ft.<br>In. | 5. Weight *(LBs.)* | 6. Sex<br>☐ Male<br>☐ Female | 7. Birth Date<br>Month    Day    Year |
|---|---|---|---|---|
| | | | | |

| 8. Social Security Number *(**Optimal**, but will help prevent misidentification)* | 9. Unique Personal Identification Number (UPIN) if applicable *(See Instructions for Question 9.)* |
|---|---|
| | |

| 10.a. Ethnicity | 10.b. Race *(In addition to ethnicity, select one or more race in 10.b.  Both 10.a. and 10.b. must be answered.)* | | |
|---|---|---|---|
| ☐ Hispanic or Latino<br>☐ Not Hispanic or Latino | ☐ American Indian or Alaska Native<br>☐ Asian | ☐ Black or African American<br>☐ Native Hawaiian or Other Pacific Islander | ☐ White |

| 11.  Answer the following questions by checking or marking *"yes"* or *"no"* in the boxes to the right of the questions. | Yes | No |
|---|---|---|
| a.  Are you the actual transferee/buyer of the firearm(s) listed on this form?  **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person.  If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.**  *Exception:  **If you are picking up a repaired firearm(s)** for another person, you are **not** required to answer 11.a. and may proceed to question 11.b. (See Instructions for Question 11.a.)* | ☐ | ☐ |
| b.  Are you under indictment or information in any court for a **felony**, or any other crime for which the judge could imprison you for more than one year?  *(See Instructions for Question 11.b.)* | ☐ | ☐ |
| c.  Have you ever been convicted in any court of a **felony**, or any other crime for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation?  *(See Instructions for Question 11.c.)* | ☐ | ☐ |
| d.  Are you a fugitive from justice? *(See Instructions for Question 11.d.)* | ☐ | ☐ |
| e.  Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance?  **Warning:  The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.** | ☐ | ☐ |
| f.  Have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☐ |
| g.  Have you been discharged from the Armed Forces under **dishonorable** conditions? | ☐ | ☐ |
| h.  Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☐ |
| i.  Have you ever been **convicted** in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☐ |

12.a.  Country of Citizenship: *(Check/List more than one, if applicable.  Nationals of the United States may check U.S.A.)*
☐ United States of America *(U.S.A.)*     ☐ Other Country/Countries *(Specify)*

| | Yes | No |
|---|---|---|
| 12.b.  Have you ever renounced your United States citizenship? | ☐ | ☐ |
| 12.c.  Are you an alien **illegally** or **unlawfully** in the United States? | ☐ | ☐ |
| 12.d.1.  Are you an alien who has been admitted to the United States under a nonimmigrant visa? *(See Instructions for Question 12.d.)* | ☐ | ☐ |
| 12.d.2.  If "yes", do you fall within any of the exceptions stated in the instructions? ☐ N/A | ☐ | ☐ |

13.  If you are an alien, record your U.S.-Issued Alien or Admission number *(AR#, USCIS#, or I94#)*:

Previous Editions Are Obsolete

**Transferee/Buyer Continue to Next Page**
**STAPLE IF PAGES BECOME SEPARATED**

Page 1 of 6

ATF E-Form 4473 (5300.9)
Revised October 2016

I certify that my answers in Section A are true, correct, and complete.  I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473.  I understand that answering "yes" to question 11.a. if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law.  I understand that a person who answers "yes" to any of the questions 11.b. through 11.i and/or 12.b. through 12.c. is prohibited from purchasing or receiving a firearm.  I understand that a person who answers "yes" to question 12.d.1. is prohibited from receiving or possessing a firearm, unless the person answers "yes" to question 12.d.2. and provides the documentation required in 18.c.  I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law.  I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law.  *(See Instructions for Question 14.)*

| 14.  Transferee's/Buyer's Signature | 15.  Certification Date |
|---|---|
| | |

## Section B - Must Be Completed By Transferor/Seller

| 16.  Type of firearm(s) to be transferred *(check or mark all that apply)*: | 17.  If transfer is at a qualifying gun show or event: |
|---|---|
| ☐ Handgun   ☐ Long Gun *(rifles or shotguns)*   ☐ Other Firearm *(frame, receiver, etc, See Instructions for Question 16.)* | Name of Function: _____ <br> City, State: _____ |

18.a.  Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.)  (See Instructions for Question 18.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* |||
|---|---|---|---|---|
| | | Month | Day | Year |
| | | | | |

18.b.  Supplemental Government Issued Documentation *(if identification document does not show current residence address) (See Instructions for Question 18.b.)*

18.c.  Exception to the Nonimmigrant Alien Prohibition:  If the transferee/buyer answered "YES" to 12.d.2. the transferor/seller must record the type of documentation showing the exception to the prohibition and attach a copy to this ATF Form 4473. *(See Instructions for Question 18.c.)*

### Questions 19, 20, or 21 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 19, 20 and 21.)*

| 19.a.  Date the transferee's/buyer's identifying information in Section A was transmitted to NICS or the appropriate State agency: | 19.b.  The NICS or State transaction number *(if provided)* was: |
|---|---|
| Month    Day    Year | |

| 19.c.  The response initially (first) provided by NICS or the appropriate State agency was: | 19.d.  The following response(s) was/were later received from NICS or the appropriate State agency: |
|---|---|
| ☐ Proceed   ☐ Delayed <br> ☐ Denied   *[The firearm(s) may be transferred on* <br> ☐ Cancelled   _____ *if State law permits (optional)]* | ☐ Proceed _____ *(date)*   ☐ Overturned <br> ☐ Denied _____ *(date)* <br> ☐ Cancelled _____ *(date)* <br> ☐ No response was provided within 3 business days. |

19.e.  *(Complete if applicable.)*  After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).*   ☐ Proceed   ☐ Denied   ☐ Cancelled

| 19.f.  The name and Brady identification number of the NICS examiner. *(Optional)* | 19.g.  Name of FFL Employee Completing NICS check.  *(Optional)* |
|---|---|
| _____ *(name)*   _____ *(number)* | |

| 20. | ☐ No NICS check was required because a background check was completed during the NFA approval process on the individual who will receive the NFA firearm(s), as reflected on the approved NFA application. *(See Instructions for Question 20.)* |
|---|---|

| 21. | ☐ No NICS check was required because the transferee/buyer has a valid permit from the Sate where the transfer is to take place, which qualifies as an exemption to NICS. *(See Instructions for Question 21.)* |
|---|---|

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

## Section C - Must Be Completed Personally By Transferee/Buyer

If the transfer of the firearm(s) takes place on a different day from the date that the transferee/buyer signed Section A, the transferee/buyer must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 22 and 23.)*

**I certify that my answers to the questions in Section A of this form are still true, correct, and complete.**

| 22.  Transferee's/Buyer's Signature | 23.  Recertification Date |
|---|---|
| | |

**Transferor/Seller Continue to Next Page**
**STAPLE IF PAGES BECOME SEPARATED**

ATF E-Form 4473 (5300.9)
Revised October 2016

## SER-739

**Section D – Must Be Completed By Transferor/Seller Even If The Firearm(s) is Not Transferred**

| 24. Manufacturer and Importer *(If any) (If the manufacturer and importer are different, the FFL must include both.)* | 25. Model *(If Designated)* | 26. Serial Number | 27. Type *(See Instructions for Question 27.)* | 28. Caliber or Gauge |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

**REMINDER - By the Close of Business Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days**

| 29. Total Number of Firearms Transferred *(Please handwrite by printing e.g., zero, one, two, three, etc.  Do not use numerals.)* | 30. Check if any part of this transaction is a pawn redemption.  ☐ Line Number(s) From Question 24 Above: |
|---|---|
| 31. For Use by Licensee *(See Instructions for Question 31.)* | 32. Check if this transaction is to facilitate a private part transfer.  ☐ *(See Instructions for Question 32.)* |

33. Trade/corporate name and address of transferor/seller and Federal Firearm License Number ( *Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)*

**The Person Transferring The Firearm(s) Must Complete Questions 34-37.**
**For Denied/Cancelled Transactions, the Person Who Completed Section B Must Complete Questions 34-36.**

I certify that: (1) I have read and understand the Notices, Instructions, and Definitions on this ATF Form 4473; (2) the information recorded in Sections B and D is true, correct, and complete; and (3) this entire transaction record has been completed at my licensed business premises ("licensed premises" includes business temporarily conducted from a qualifying gun show or event in the same State in which the licensed premises is located) unless this transaction has met the requirements of 18 U.S.C. 922(c).  Unless this transaction has been denied or cancelled, I further certify on the basis of — (1) the transferee's/buyer's responses in Section A (and Section C, if applicable); (2) my verification of the identification recorded in question 18 (and my re-verification at the time of transfer, *if Section C was completed*); and (3) State or local law applicable to the firearms business — it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 34. Transferor's/Seller's Name *(Please print)* | 35. Transferor's/Seller's Signature | 36. Transferor's/Seller's Title | 37. Date Transferred |
|---|---|---|---|
| | | | |

## NOTICES, INSTRUCTIONS, AND DEFINITIONS

**Purpose of the Form:**  The information and certification on this form are designed so that a person licensed under 18 U.S.C. 923 may determine if he/she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the transferee/buyer of certain restrictions on the receipt and possession of firearms.  The transferor/seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction.  Consequently, the transferor/seller must be familiar with the provisions of 18 U.S.C. 921-931 and the regulations in 27 CFR Parts 478 and 479.  In determining the lawfulness of the sale or delivery of a rifle or shotgun to a resident of another State, the transferor/seller is presumed to know the applicable State laws and published ordinances in both the transferor's/seller's State and the transferee's/buyer's State. *(See ATF Publication 5300.5, State Laws and Published Ordinances.)*

Generally, ATF Form 4473 must be completed at the licensed business premises when a firearm is transferred over-the-counter.  Federal law, 18 U.S.C. 922(c), allows a licensed importer, manufacturer, or dealer to sell a firearm to a nonlicensee who does not appear in person at the licensee's business premises only if the transferee/buyer meets certain requirements.  These requirements are set forth in section 922(c), 27 CFR 478.96(b), and ATF Procedure 2013-2.

After the transferor/seller has completed the firearms transaction, he/she must make the completed, original ATF Form 4473 *(which includes the Notices, General Instructions, and Definitions)*, and any supporting documents, part of his/her permanent records.  Such Forms 4473 must be retained for at least 20 years and after that period may be submitted to ATF.  Filing may be chronological *(by date of disposition)*, alphabetical *(by name of purchaser)*, or numerical *(by transaction serial number)*, as long as all of the transferor's/seller's completed Forms 4473 are filed in the same manner.

FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not completed after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his/her records for at least 5 years.  Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical *(by name of transferee)* or chronological *(by date of transferee's certification)* order.

If the transferor/seller or the transferee/buyer discovers that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and the transferor/seller or the transferee/buyer wishes to correct the omission(s) or error(s), photocopy the inaccurate form and make any necessary additions or revisions to the photocopy.  The transferor/seller should only make changes to Sections B and D.  The transferee/buyer should only make changes to Section A and C.  Whoever made the changes should initial and date the changes.  The corrected photocopy should be attached to the original Form 4473 and retained as part of the transferor's/seller's permanent records.

**Exportation of Firearms:**  The State or Commerce Departments may require a firearms exporter to obtain a license prior to export.  **Warning:**  Any person who exports a firearm without proper authorization may be fined not more than $1,000,000 and/or imprisoned for not more than 20 years.  See 22 U.S.C. 2778(c).

### Section A

The transferee/buyer must personally complete Section A of this form and certify *(sign)* that the answers are true, correct, and complete.  However, if the transferee/buyer is unable to read and/or write, the answers *(other than the signature)* may be completed by another person, excluding the transferor/seller.  Two persons *(other than the transferor/seller)* must then sign as witnesses to the transferee's/buyer's answers and signature/certification in question 14.

ATF E-Form 4473 (5300.9)
Revised October 2016

**SER-740**

When the transferee/buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his/her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating:  (A) the firearm is being acquired for the use of and will be the property of that business entity; and (B) the name and address of that business entity.

**Question 1.**  If the transferee's/buyer's name in question 1 is illegible, the transferor/seller must print the transferee's/buyer's name above the name written by the transferee/buyer.

**Question 2.  Current Residence Address:**  A rural route (RR) may be accepted provided the transferee/buyer lives in a State or locality where it is considered a legal residence address.  County and Parish are one and the same.

If the transferee/buyer is a member of the Armed Forces on active duty, his/her State of residence is the State in which his/her permanent duty station is located. If the service member is acquiring a firearm in a State where his/her permanent duty station is located, but resides in a different State, the transferee/buyer must list both his/her permanent duty station address and his/her residence address in response to question 2.  If the transferee/buyer has two States of residence, the transferee/buyer should list his/her current residence address in response to question 2 *(e.g., if the transferee/buyer is purchasing a  firearm while staying at his/her weekend home in State X, he/she should list the address in State X in response to question 2).*

**Question 9.  Unique Personal Identification Number (UPIN):**  For transferees/buyers approved to have information maintained about them in the FBI NICS Voluntary Appeal File, NICS will provide them with a UPIN, which the transferee/buyer should record in question 9.  The licensee should provide the UPIN when conducting background checks through the NICS or the State POC.

**Question 10.a. and 10.b.**  Federal regulations (27 CFR 478.124(c)(1)) require licensees to obtain the race of the transferee/buyer.  This information helps the FBI and/or State POC make or rule out potential matches during the background check process and can assist with criminal investigations.  Pursuant to Office of Management and Budget (OMB), effective January 1, 2003, all Federal agencies requiring collection of race and ethnicity information on administrative forms and records, were required to collect this information in a standard format.  (See 62 FR 58782)  The standard OMB format consists of two categories for data on ethnicity: "Hispanic or Latino," and "Not Hispanic or Latino" and five categories for data on race:  American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and White.

Ethnicity refers to a person's heritage.  Persons of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race, are considered Hispanic or Latino.

Race - one or more of the following responses must be selected:  (1) American Indian or Alaska Native - A person having origins in any of the original peoples of North and South America (including Central America), and who maintains a tribal affiliation or community attachment; (2) Asian - A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam; (3) Black or African American - A person having origins in any of the Black racial groups of Africa; (4) Native Hawaiian or Other Pacific Islander - A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands; and (5) White - A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.  Any other race or ethnicity that does not fall within those indicated, please select the closest representation.

**Question 11.a.  Actual Transferee/Buyer:**  For purposes of this form, a person is the actual transferee/buyer if he/she is purchasing the firearm for him/herself or otherwise acquiring a firearm for him/herself. *(e.g., redeeming the firearm from pawn, retrieving it from consignment, firearm raffle winner).*  A person is also the actual transferee/buyer if he/she is legitimately purchasing the firearm as a bona fide gift for a third party.  A gift is not bona fide if another person offered or gave the person completing this form money, service(s), or item(s) of value to acquire the firearm for him/her, or if the other person is prohibited by law from receiving or possessing the firearm.

**Actual TRANSFEREE/buyer examples:**  Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith *(who may or may not be prohibited).*  Mr. Smith gives Mr. Jones the money for the firearm.  Mr. Jones is **NOT THE**
Page 4 of 6

**ACTUAL TRANSFEREE/BUYER** of the firearm and must answer **"NO"** to question 11.a.  The licensee may not transfer the firearm to Mr. Jones.  However, if Mr. Brown buys the firearm with his own money to give to Mr. Black as a gift *(with no service or tangible thing of value provided by Mr. Black)*, Mr. Brown is the actual transferee/buyer of the firearm and should answer **"YES"** to question 11.a.  However, the transferor/seller may not transfer a firearm to any person he/she knows or has reasonable cause to believe is prohibited under 18 U.S.C. 922(g), (n) or (x).
**EXCEPTION:** If a person is picking up a repaired firearm(s) for another person, he/she is not required to answer 11.a. and may proceed to question 11.b.

**Question 11.b. - 12.**  Generally, 18 U.S.C. 922(g) prohibits the shipment, transportation, receipt, or possession in or affecting interstate commerce of a firearm by one who:  has been convicted of a felony in any Federal, State or local court, or any other crime, punishable by imprisonment for a term exceeding one year *(this does not include State misdemeanors punishable by imprisonment of two years or less)*; is a fugitive from justice; is an unlawful user of, or addicted to, marijuana or any depressant, stimulant, or narcotic drug, or any other controlled substance; has been adjudicated as a mental defective or has been committed to a mental institution; has been discharged from the Armed Forces under dishonorable conditions; is subject to certain restraining orders; convicted of a misdemeanor crime of domestic violence under Federal, State or Tribal law; has renounced his/her U.S. citizenship; is an alien illegally in the United States or an alien admitted to the United States under a nonimmigrant visa.  Furthermore, section 922(n) prohibits the shipment, transportation, or receipt in or affecting interstate commerce of a firearm by one who is under indictment or information for a felony in any Federal, State or local court, or any other crime, punishable by imprisonment for a term exceeding one year.  An information is a formal accusation of a crime verified by a prosecutor.

A member of the Armed Forces must answer "yes" to 11.b. or 11.c. if charged with an offense that was either referred to a General Court Martial, or at which the member was convicted.  Discharged "under dishonorable conditions" means separation from the Armed Forces resulting from a dishonorable discharge or dismissal adjudged by a General Court-Martial.  That term does not include any other discharge or separation from the Armed Forces.

*EXCEPTION*:  A person who has been convicted of a felony, or any other crime, for which the judge could have imprisoned the person for more than one year, or who has been convicted of a misdemeanor crime of domestic violence, is not prohibited from purchasing, receiving, or possessing a firearm if:  (1) under the law of the jurisdiction where the conviction occurred, the person has been pardoned, the conviction has been expunged or set aside, or the person has had their civil rights *(the right to vote, sit on a jury, and hold public office)* taken away and later restored, AND (2) the person is not prohibited by the law of the jurisdiction where the conviction occurred from receiving or possessing firearms.  Persons subject to this exception, or who receive relief from disabilities under 18 U.S.C. 925(c), should answer "no" to the applicable question.

**Question 11.d.  Fugitive from Justice:**  Any person who has fled from any State to avoid prosecution for a felony or a misdemeanor; or any person who leaves the State to avoid giving testimony in any criminal proceeding.  The term also includes any person who knows that misdemeanor or felony charges are pending against such person  and who leaves the State of prosecution.

**Question 11.f.  Adjudicated as a Mental Defective:**  A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:  (1) is a danger to himself or to others; or (2) lacks the mental capacity to contract or manage his own affairs.  This term shall include: (1) a finding of insanity by a court in a criminal case; and (2) those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility.

**Committed to a Mental Institution:**  A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority.  The term includes a commitment to a mental institution involuntarily.  The term includes commitment for mental defectiveness or mental illness.  It also includes commitments for other reasons, such as for drug use.  The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

*EXCEPTION*:  Under the NICS Improvement Amendments Act of 2007, a person who has been adjudicated as a mental defective or committed to a mental institution in a State proceeding is not prohibited by the adjudication or commitment if

the person has been granted relief from the disabilities that prevent a qualifying mental health relief from disabilities program. Also, a person who has been adjudicated as a mental defective or committed to a mental institution by a department or agency of Federal Government is not prohibited by the adjudication or commitment if either: (a) the person's adjudication or commitment was set-aside or expunged by the adjudicating/committing agency; (b) the person has been fully released or discharged from all mandatory treatment, supervision, or monitoring by the agency; (c) the person was found by the agency to no longer suffer from the mental health condition that served as the basis of the initial adjudication/commitment; or (d) the adjudication or commitment, respectively, is based solely on a medical finding of disability, without an opportunity for a hearing by a court, board, commission, or other lawful authority, and the person has not been adjudicated as a mental defective consistent with section 922(g)(4) of title 18, United States Code; (e) the person was granted relief from the adjudicating/committing agency pursuant to a qualified mental health relief from disabilities program. **Persons who fall within one of the above exceptions should answer "no" to question 11.f.** This exception to an adjudication or commitment by a Federal department or agency does **not** apply to any person who was adjudicated to be not guilty by reason of insanity, or based on lack of mental responsibility, or found incompetent to stand trial, in any criminal case or under the Uniform Code of Military Justice.

**Question 11.h.  Qualifying Restraining Orders:**  Under 18 U.S.C. 922, firearms may not be sold to or received by persons subject to a court order that:  (A) was issued after a hearing which the person received actual notice of and had an opportunity to participate in; (B) restrains such person from harassing, stalking, or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.  An "intimate partner" of a person is: the spouse or former spouse of the person, the parent of a child of the person, or an individual who cohabitates or has cohabitated with the person.

**Question 11.i.  Misdemeanor Crime of Domestic Violence:**  A Federal, State, local, or tribal offense that is a misdemeanor under Federal, State, or tribal law and has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with, or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.  The term includes all misdemeanors that have as an element the use or attempted use of physical force or the threatened use of a deadly weapon *(e.g., assault and battery)*, if the offense is committed by one of the defined parties.  *(See Exception to 11.b. - 12.)*  A person who has been convicted of a misdemeanor crime of domestic violence also is not prohibited unless:  (1) the person was represented by a lawyer or gave up the right to a lawyer; or (2) if the person was entitled to a jury, was tried by a jury, or gave up the right to a jury trial.  Persons subject to this exception should answer **"no"** to 11.i.

**Question 12.d.  Immigration Status:**  An alien admitted to the United States under a nonimmigrant visa includes, among others, persons visiting the United States temporarily for business or pleasure, persons studying in the United States who maintain a residence abroad, and certain temporary foreign workers.  These aliens must answer "yes" to this question and provide the additional documentation required under question 18.c.  Permanent resident aliens and aliens legally admitted to the United States pursuant to either the Visa Waiver Program or to regulations otherwise exempting them from visa requirements may answer "no" to this question and are not required to submit the additional documentation under question 18.c.

**Question 13.  U.S.-issued Alien Number or Admission Number:**  U.S.-issued alien and admission numbers may be found on the following U.S. Department of Homeland Security documents:  Legal Resident Card or Employment Authorization Card (AR# or USCIS#); Arrival/Departure Record, Form I94, or Form 797A (I94#).  Additional information can be obtained from www.cbp.gov.  If you are a U.S. citizen or U.S. national then this question should be left blank.

**Question 14.**  Under 18 U.S.C. 922(a)(1), it is unlawful for a person to engage in the business of dealing in firearms without a license.  A person is engaged in the business of dealing in firearms if he/she devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms.  A license is not required of a person who only makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his/her personal collection of firearms.

**Section B**

**Question 16.  Type of Firearm(s):**  "Other" refers to frames, receivers and other firearms that are neither handguns nor long guns (rifles or shotguns), such as firearms having a pistol grip that expel a shotgun shell, or National Firearms Act (NFA) firearms, including silencers.

If a frame or receiver can only be made into a long gun *(rifle or shotgun)*, it is still a frame or receiver not a handgun or long gun.  However, frames and receivers are still "firearms" by definition, and subject to the same GCA limitations as any other firearms.  See Section 921(a)(3)(B).  Section 922(b)(1) makes it unlawful for a licensee to sell any firearm other than a shotgun or rifle to any person under the age of 21.  Since a frame or receiver for a firearm, to include one that can only be made into a long gun, is a "firearm other than a shotgun or rifle," it cannot be transferred to anyone under the age of 21, nor can these firearms be transferred to anyone who is not a resident of the State where the transfer is to take place.  Also, note that multiple sales forms are not required for frames or receivers of any firearms, or pistol grip shotguns, since they are not "pistols or revolvers" under Section 923(g)(3)(A).

**Question 17.  Qualifying Gun Show or Event:**  As defined in 27 CFR 478.100, a gun show or event is a function sponsored by any national, State, or local organization, devoted to the collection, competitive use, or other sporting use of firearms, or an organization or association that sponsors functions devoted to the collection, competitive use, or other sporting use of firearms in the community.

**Question 18.a.  Identification:**  Before a licensee may sell or deliver a firearm to a nonlicensee, the licensee must establish the identity, place of residence, and age of the transferee/buyer.  The transferee/buyer **must** provide a valid government-issued photo identification document to the transferor/seller that contains the transferee's/buyer's name, residence address, and date of birth.  A driver's license or an identification card issued by a State in place of a license is acceptable.  Social Security cards are not acceptable because no address, date of birth, or photograph is shown on the cards.  A combination of government-issued documents may be provided.  See instructions for question 18.b. Supplemental Documentation.
If the transferee/buyer is a member of the Armed Forces on active duty acquiring a firearm in the State where his/her permanent duty station is located, but he/she has a driver's license from another State, the transferor/seller should list the transferee's/buyer's military identification card and official orders showing where his/her permanent duty station is located in response to question 18.a.  Licensees may accept electronic PCS orders to establish residency.

**Question 18.b.  Supplemental Documentation:**  Licensees may accept a combination of valid government-issued documents to satisfy the identification document requirements of the law.  The required valid government-issued photo identification document bearing the name, photograph, and date of birth of transferee/buyer may be supplemented by another valid, government-issued document showing the transferee's/buyer's residence address.  This supplemental documentation should be recorded in question 18.b., with the issuing authority and type of identification presented.  For example, if the transferee/buyer has two States of residence and is trying to buy a handgun in State X, he may provide a driver's license *(showing his name, date of birth, and photograph)* issued by State Y and another government-issued document *(such as a tax document)* from State X showing his residence address.  A valid electronic document from a government website may be used as supplemental documentation provided it contains the transferee's/buyer's name and current residence address.

**Question 18.c. Exceptions to the Nonimmigrant Alien Prohibition and Acceptable Documentation:**  An alien admitted to the United States under a nonimmigrant visa is not prohibited from purchasing, receiving, or possessing a firearm if the alien:  (1) is in possession of a hunting license or permit lawfully issued by the Federal Government, a State or local government, or an Indian tribe federally recognized by the Bureau of Indian Affairs, which is valid and unexpired; (2) was admitted to the United States for lawful hunting or sporting purposes; (3) has received a waiver from the prohibition from the Attorney General of the United States; (4) is an official representative of a foreign government who is accredited to the United States Government or the Government's mission to an international organization having its

ATF E-Form 4473 (5300.9)
Revised October 2016

**SER-742**

headquarters in the United States; (5) is an official representative of a foreign government who is en route to or from another country to which that alien is accredited; (6) is an official of a foreign government or a distinguished foreign visitor who has been so designated by the Department of State; or (7) is a foreign law enforcement officer of a friendly foreign government entering the United States on official law enforcement business.

**Question 19.  NICS BACKGROUND CHECKS:** 18 U.S.C. 922(t) requires that prior to transferring any firearm to an unlicensed person, a licensed importer, manufacturer, or dealer must first contact the National Instant Criminal Background Check System (NICS).  NICS will advise the licensee whether the system finds any information that the purchaser is prohibited by law from possessing or receiving a firearm.  For purposes of this form, contacts to NICS include State agencies designated as points-of-contact ("or POCs") to conduct NICS checks for the Federal Government.

The licensee should NOT contact NICS and must stop the transaction if there is reasonable cause to believe that the transferee/buyer is prohibited from receiving or possessing a firearm, including if: the transferee/buyer answers "no" to question 11.a.; the transferee/buyer answers "yes" to any question in 11.b. - 11.i. or 12.b. - 12.c.; the transferee/buyer has answered "yes" to question 12.d.l., and answered "no" to question 12.d.2.; or the transferee/buyer cannot provide the documentation required by questions 18.a, b, or c.  **WARNING:**  Any person who transfers a firearm to any person he/she knows or has reasonable cause to believe is prohibited from receiving or possessing a firearm violates the law, even if the transferor/seller has complied with the Federal background check requirements.

At the time that NICS is contacted, the licensee must record in question 19.a. - 19.c.: the date of contact, the NICS *(or State)* transaction number, and the initial (first) response provided by NICS or the State.  The licensee may record the date the firearms may be transferred to the transferee/buyer (also known as the Missing Disposition Information (MDI) date) in 19.c. that NICS provides for delayed transactions *(States may not provide this date).*  If the licensee receives any subsequent response(s) before transferring the firearm, the licensee must record in question 19.d. any response later provided by NICS or the State, or that no response was provided within 3 business days.  If the transaction was denied and later overturned in addition to checking the "Proceed" and entering the date, the licensee must also check the "Overturned" box and, if provided,  attach the overturn certificate issued by NICS or the State POC to the ATF Form 4473.  If the licensee receives a response from NICS or the State after the firearm has been transferred, he/she must record this information in question 19.e.  **Note:**  States acting as points of contact for NICS checks may use terms other than "*proceed,*" "*delayed,*" "*cancelled,*" or "*denied.*"  In such cases, the licensee should check the box that corresponds to the State's response.  Some States may not provide a transaction number for denials.  However, if a firearm is transferred within the three business day period, a transaction number is required.

**NICS responses:**  If NICS provides a "*proceed*" response, the transaction may proceed.  If NICS provides a "*cancelled*" or "*denied*" response, the transferor/seller is prohibited from transferring the firearm to the transferee/buyer.  If NICS provides a "*delayed*" response, the transferor/seller is prohibited from transferring the firearm unless 3 business days have elapsed and, before the transfer, NICS or the State has not advised the transferor/seller that the transferee's/buyer's receipt or possession of the firearm would be in violation of law.  (See 27 CFR 478.102(a) for an example of how to calculate 3 business days.)  If NICS provides a "*delayed*" response, NICS also will provide a Missing Disposition Information (MDI) date that calculates the 3 business days and reflects when the firearm(s) can be transferred under Federal law.  States may not provide an MDI date.  *State law may impose a waiting period on transferring firearms.*

**Questions 20 and 21.  NICS Exceptions:**  A NICS check is not required if the transfer qualifies for any of the exceptions in 27 CFR  478.102(d).  Generally these include:  (a) transfers of National Firearms Act firearms to an individual who has undergone a background check during the NFA approval process; (b) transfers where the transferee/buyer has presented the licensee with a permit or license that allows the transferee/buyer to possess, acquire, or carry a firearm, and the permit has been recognized by ATF as a valid alternative to the NICS check requirement; or (c) transfers certified by ATF as exempt because compliance with the NICS check requirements is impracticable.  If the transfer qualifies for one of these exceptions, the licensee must obtain the documentation required by 27 CFR 478.131.  A firearm must **not** be transferred to any transferee/buyer who fails to provide such documentation.

A NICS check must be conducted if an NFA firearm has been approved for transfer to a trust, or to a legal entity such as a corporation, and no background check was conducted as part of the NFA approval process on the individual who will receive the firearm.  Individuals who have undergone a background check during the NFA application process are listed on the approved NFA transfer form.

**Section C**

**Questions 22 and 23.  Transfer on a Different Day and Recertification:**  If the transfer takes place on a different day from the date that the transferee/buyer signed Section A, the licensee must again check the photo identification of the transferee/buyer at the time of transfer.

**Section D**

**Question 24-28.  Firearm(s) Description:**  These blocks must be completed with the firearm(s) information.  Firearms manufactured after 1968 by Federal firearms licensees should all be marked with a serial number.  Should you acquire a firearm that is legally not marked with a serial number (i.e. pre-1968); you may answer
question 26 with "NSN" (No Serial Number), "N/A" or "None."

If more than four firearms are involved in a transaction, the information required by Section D, questions 24-28, must be provided for the additional firearms on a separate sheet of paper, which must be attached to this ATF Form 4473.

**Types of firearms include, but are not limited to:** pistol, revolver, rifle, shotgun, receiver, frame and other firearms that are neither handguns nor long guns (rifles or shotguns), such as firearms having a pistol grip that expel a shotgun shell (pistol grip firearm) or NFA firearms (machinegun, silencer, short-barreled shotgun, short-barreled rifle, destructive device or "any other weapon").

Additional firearms purchases by the same transferee/buyer may not be added to the form after the transferor/seller has signed and dated it.  A transferee/buyer who wishes to acquire additional firearms after the transferor/seller has signed and dated the form must complete a new ATF Form 4473 and undergo a new NICS check.

**Question 31.**  This item is for the licensee's use in recording any information he/she finds necessary to conduct business.

**Question 32.**  Check this box, or write "Private Party Transfer" in question 31, if the licensee is facilitating the sale or transfer of a firearm between private unlicensed individuals in accordance with ATF Procedure 2013-1. This will assist the licensee by documenting which transaction records correspond with private party transfers, and why there may be no corresponding A&D entries when the transfer did not proceed because it was denied, delayed, or cancelled.

**Privacy Act Information**

Solicitation of this information is authorized under 18 U.S.C. 923(g). Disclosure of this information by the transferee/buyer is mandatory for the transfer of a firearm.  Disclosure of the individual's Social Security number is voluntary.  The number may be used to verify the transferee's/buyer's identity.

For information about the routine uses of this form see System of Records Notice Justice/ATF-008, Regulatory Enforcement Records System (68 FR 163558, January 24, 2003).

**Paperwork Reduction Act Notice**

The information required on this form is in accordance with the Paperwork Reduction Act of 1995.  The purpose of the information is to determine the eligibility of the transferee to receive and possess firearms under Federal law.  The information is subject to inspection by ATF officers and is required by 18 U.S.C. 922 and 923.

The estimated average burden associated with this collection is 30 minutes per respondent or recordkeeper, depending on individual circumstances.  Comments about the accuracy of this burden estimate and suggestions for reducing it should be directed to Reports Management Officer, IT Coordination Staff, Bureau of Alcohol, Tobacco, Firearms and Explosives, Washington, DC 20226.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.  Confidentiality is not assured.

Page 6 of 6

ATF E-Form 4473 (5300.9)
Revised October 2016

# Exhibit E



**WASHINGTON STATE DEPARTMENT OF LICENSING**

## Firearm Transfer Application

**DEALER: This form must be completed in full and TYPED.**

**1. Send by the close of business day** to the appropriate Chief of Police or Sheriff for background check.

**2. Send within 7 days** after delivery of the firearm to the **applicable** address. Select the type of application you are sending:

☐ **Semiautomatic Assault Rifles (SAR) ONLY:**

Include check payable by dealer to Dept of Licensing for **$18 SAR fee.** Mail to:
**Department of Licensing**
**Firearms Section**
**PO Box 9048**
**Olympia, WA 98507-9048**

☐ **Pistol Transfer Applications (PTA):**
**Department of Licensing**
**Firearms Section**
**PO Box 9649**
**Olympia, WA 98507-9649**

**3.** Retain a copy for your records for 6 years.

For DOL validation only

| Application initiated *(date and time)* |
|---|
| ☐ am   ☐ pm |

| Private transfer | Approval code | Dealer transaction # | Appropriate LEA |
|---|---|---|---|
| ☐ Private transfer | | | ☐ City   ☐ County |

## Section A – Firearm description (Type all information)

| Firearm serial number | Make | Other *(no abbreviations)* |
|---|---|---|
| | Choose one | |

| Caliber | Barrel length | Condition | Type | Model number or name |
|---|---|---|---|---|
| | in. | ☐ New   ☐ Used | Choose one | |

## Section B – Dealer information

| Date weapon delivered | UBI number | Business ID | Location ID | Stamp area |
|---|---|---|---|---|
| Federal firearms license number | | | | |
| Dealer/Store name | | | | |
| Address *(Number, Street, City, State, ZIP code)* | | | | |
| (Area code) Dealer telephone number | Email | | | |
| Dealer signature  X | | | | |

## Section C – Buyer information

| Buyer name *(Last, First, Middle, Suffix)* | Gender | U.S. citizen |
|---|---|---|
| | ☐ Male ☐ Female | ☐ Yes ☐ No |

| Home address *(Number, Street, Apartment number)* |
|---|

| City | State | ZIP code | County |
|---|---|---|---|

| Date of birth *(mm/dd/yy)* | Place of birth *(City, State or Province, and Country)* | Height | Weight |
|---|---|---|---|
| | | | lbs |

| Eye color | Driver license or state ID card number | State | (Area code) Telephone number |
|---|---|---|---|
| Choose one | | | |

Race *(choose all that apply)*
☐ American Indian/Alaska Native   ☐ Asian   ☐ Black   ☐ Native Hawaiian/Pacific Islander   ☐ White

| Permanent resident card number | Washington State alien firearms license | Occupation |
|---|---|---|
| | Number _____ Expires _____ | |

| Concealed pistol license number | Expiration date | Issuing authority |
|---|---|---|

FIR-652-001 (R/2/20)WA Page 1 of 2                                      *Continued on next page*

**SER-745**

**Section C – Buyer information (continued)**

Firearm serial number

Answer the following

1. Have you been a resident of Washington at the address above for the previous consecutive 90 days? . . . . . . . . . . ☐ Yes ☐ No
   If "No", provide previous addresses:


2. Do you certify you are eligible to possess a pistol and/or semiautomatic assault rifle under
   RCW 9.41.040 and 9.41.045? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

3. If purchasing a semiautomatic assault rifle, do you certify you have completed the required safety
   training within the past 5 years. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

4. Do you understand by signing this application you are waiving confidentiality and requesting
   the Department of Social and Health Services, mental health institutions, and other health care
   facilities, to release information relevant to your eligibility to purchase a pistol and/or semiautomatic
   assault rifle to a court or law enforcement agency? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

**Caution:** Although state and local laws do not differ, federal law and state law on the possession of firearms differ. If you are prohibited by federal law from possessing a firearm, you may be prosecuted in federal court. State permission to purchase a firearm is not a defense to a federal prosecution.

The presence of a firearm in the home has been associated with an increased risk of death to self and others, including an increased risk of suicide, death during domestic violence incidents, and unintentional deaths to children and others.

*I certify under penalty of perjury under the laws of the state of Washington that the information provided in this application are true and correct.*

_____          **X**_____
Date and place *(city or county)* signed                    Buyer signature *(Full legal name)*

Buyer printed name:

**SER-746**