NO. 20-35827

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DANIEL MITCHELL, et al.,

Appellants,

v.

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, et al.,

Defendants-Appellees

and

SAFE SCHOOLS SAFE COMMUNITIES,

Intervenor-Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
No. 3:20-cv-05106-JCC
The Honorable Judge John C. Coughenour, United States District Court

## APPELLEES' JOINT SUPPLEMENTAL EXCERPTS OF RECORD VOLUME 4 OF 4

ROBERT W. FERGUSON
  *Attorney General*
NOAH G. PURCELL
  *Solicitor General*
Zachary Pekelis Jones, WSBA 44557
R. July Simpson, WSBA 45869
  *Assistant Attorneys General*
Jeffrey T. Even, WSBA 20367
  *Deputy Solicitor General*
Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104
(206) 464-7744
*Counsel for Appellee Teresa Berntsen*

Salvatore J. Faggiano WSBA 15696
  *Assistant City Attorney*
Office of the City Attorney
808 W. Spokane Falls Blvd.
Spokane, WA 99201-3326
(509) 625-6818
*Counsel for Defendant Craig Meidl*

Paul J. Lawrence, WSBA 13557
Gregory J. Wong, WSBA 39329
Nicholas W. Brown, WSBA 33586
Kai A. Smith, WSBA 54749
PACIFICA LAW GROUP LLP
1191 Second Avenue, Suite 2000
Seattle, WA 98101-3404
Telephone: 206-240-1700
Facsimile: 206-240-1750800
*Counsel for Appellee Safe Schools Safe Communities*

Leslie A. Lopez, WSBA 46118
Deputy Prosecuting Attorney
Clark County Prosecutor's Office
PO Box 5000
Vancouver, WA 98666-5000
(564) 397-2478
*Counsel for Defendant Chuck Atkins*

The Honorable Ronald B. Leighton

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

DANIEL MITCHELL, et al.,

          Plaintiffs,

    v.

CHARLES ATKINS, et al.,

          Defendants,

    and

SAFE SCHOOLS SAFE COMMUNITIES,

          Intervenor-Defendant.

NO. 3:19-cv-5106

DECLARATION BY
BRANDI BELCHER IN
SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

I, Brandi Belcher, declare as follows:

1.     I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.     I am employed by the Spokane Police Department (SPD) as a Records Specialist. I have been employed by the SPD for 22 years. I started my career in the Records Department in 1998. I have worked in almost every work group in the department including: Call In Reporting (report dictation by officers), Data Entry, Warrants, Court Orders, UCRS/NIBRS (crime statistics), Processing (report distribution), Concealed Pistol License Processing, and Firearms Transfers.

3.     As a local law enforcement agency, the SPD is statutorily required to run the background checks for pistol and semi-automatic assault rifles, concealed pistol license applications, firearm dealer license applications, and alien firearm license applications. SPD

DECLARATION BY BRANDI BELCHER
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

1

ATTORNEY GENERAL OF WASHINGTON
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

also runs background checks prior to returning a firearm to an owner who pawned the firearm or whose firearm was seized by SPD. Additionally, the FBI recently informed us that local law enforcement agencies will be required to run background checks for transfers of receivers and frames and certain firearm parts starting later this year. Local background checks are not run for sales and transfers of shotguns and non-semiautomatic rifles at this time.

4.       The SPD records office is comprised of 32 full-time employees, six of which are assigned to the work group that processes Firearms Transfers.  At any given time there are 1-3 people actively working on Firearm Transfers. The office handles approximately 200 background checks a day. The length of time to handle a check varies depending on whether there are any "flags" that require further investigation. A "flag" is any indication that a potential prohibiting record could exist. A check with no flags typically takes approximately 5-10 minutes to complete. However, a check with flags could take 2 to 3 weeks. By statute, the background check must be completed within 30 days or the firearm will be transferred unless there is a court order to extend the hold to 60 days. There have been times when the check has taken the full 30 days due to delays in receiving criminal records or other information from other jurisdictions. In other cases, we did not receive necessary information from other jurisdictions within the 30-day period.

5.       Each background check is unique, and I will follow different leads depending on what flags arise during my investigation. However, when running a check I will, at a minimum, take the following steps:

   a.   Send the name, date of birth, and sometimes the social security number, to the Washington State Health Care Authority which checks to see whether the individual is disqualified from possessing a firearm due to a mental health event in Washington.

   b.   Run a check through the FBI National Instant Criminal Background Check System (NICS), which is a computerized database designed to immediately

DECLARATION BY BRANDI BELCHER
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

2

ATTORNEY GENERAL OF WASHINGTON
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

**SER-749**

1   determine whether a person is disqualified from receiving or possessing a
2   firearm by conducting a search of available records. The NICS indices contains
3   information provided by local, state, tribal, and federal agencies on persons
4   prohibited from receiving firearms under state and federal law. The databases
5   searched in the NICS check include the National Crime Information Center
6   (NCIC), which stores "hot files" on wanted persons, protection orders, and the
7   like; the Interstate Identification Index (III), which access criminal history
8   records; and the NICS Indices, which includes records on individuals who have
9   been determined to be prohibited from possessing or receiving a firearm based
10  on information that may not be available through the other two NICS databases.

11  c.   Check the Washington Crime Information Center (WACIC), which stores
12       Washington State's "hot files" (e.g., warrants, protections orders, and stolen
13       vehicles);

14  d.   Check Washington State Identification Section (WASIS), which stores
15       Washington State criminal histories;

16  e.   Check the International Justice and Public Safety Information Sharing Network
17       (Nlets), which links to Interpol;

18  f.   The Canadian Police Information Centre (CPIC) has to be queried directly if
19       we have reason to suspect there may be a record (Place of Birth, Citizenship,
20       etc.);

21  g.   Check Department of Licensing (DOL) records, which include, for example,
22       drivers' license records, vehicle registration and concealed pistol license
23       records;

24  h.   Check Washington State Parks records, which include, for example Boater
25       Education Card; and

26  i.   Check Department of Corrections (DOC) records, which include:

DECLARATION BY BRANDI BELCHER          3          ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF DEFENDANTS'                              800 5th Avenue, Suite 2000
MOTION FOR SUMMARY JUDGMENT                             Seattle, WA 98104-3188
CAUSE NO. 3:19-cv-5106                                     (206) 474-7744

1         i.  WACIC/WASIS DOC File. This file provides DOC custody status
2        record information. This information is a copy of data contained in the
3        DOC database and is stored in the Washington State Identification
4        System (WASIS) database. It contains basic identity information,
5        location and supervision status as well as risk level classification on
6        clients of DOC.

7         ii.  Locator File. This file contains information on individuals under
8        supervision in the community, inmates in state institutions, persons on
9        work release, and persons at out-of-state facilities.

10       iii.  Felony Offender Reporting System (FORS) File. This file provides
11       felony offender information maintained by DOC.

12      These are possible indicators of a prohibiting conviction.

13     6.    Local background checks are important to public safety and keeping firearms

14 out of the hands of people who are prohibited from possessing them. Only running a NICS

15 check could easily miss a lot of disqualifiers that I would find during a local background check.

16 This is because NICS has a lot of shortcomings:

17     a.   NICS is only as good as the information submitted to it. Submission of

18        information into NICS by the states is voluntary and not all states input the same

19        information or the same quality of information.

20     b.  NICS is only as good as the technology that feeds information into the system.

21        For example, in theory there is a regular "data dump" of mental health

22        information into NICS. However, sometimes that data dump is not successful

23        due to issues with systems "talking" to one another and no one will know that

24        the data was not uploaded into NICS. As an example, I have encountered

25        situations where I ran a NICS check, had the person come back as clear, but

26        HCA returned a disqualifying mental health record.

DECLARATION BY BRANDI BELCHER
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 3:19-cv-5106

4

ATTORNEY GENERAL OF WASHINGTON
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

SER-751

    c.   Interstate Identification Index (III) only maintains fingerprint based records. This means that if no fingerprinting was done there will be no record. For example, if the person was only issued a summons and was not "booked" then the record of their conviction will not be in NICS.

    d.   Many juvenile records are not in III. At least half of Spokane County Juvenile arrests are not entered into the Washington State Criminal History database and are only in LERMS. I recently ran a check on an individual whose disqualifying juvenile record was not in III, but that record was found in LERMS. I subsequently submitted the record to NICS so that if a background check was run at a later date by someone who does not have access to the Spokane LERMS they would find the disqualifying record.

    e.   NICS only checks the national files, it will always miss any information that is only maintained in a state record, Washington or elsewhere, unless a local agency has made the effort to enter it into the NICS Indices.

7.    Additionally, only running NICS check does not allow for the kind of investigation that is necessary to uncover all disqualifiers. For example, a WACIC check may uncover a DOC number, meaning the person was recently incarcerated or under supervision. When this happens I will often look up their parole officer and inquire whether the person has failed a drug test in the last 12 months. NICS only returns information that is added to their database or that is associated with an FBI Number. An FBI Number is assigned to an individual by the FBI when the individual's fingerprints and/or criminal record has been submitted to their database.

8.    Further, because the types of records necessary to run a thorough background check are often local records, running checks on residents of states other than Washington is particularly challenging. Currently the only background checks run on non-residents are pawn returns. As an example, an individual from Idaho might pawn a gun in Spokane. When they

DECLARATION BY BRANDI BELCHER          5          ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF DEFENDANTS'                    800 5th Avenue, Suite 2000
MOTION FOR SUMMARY JUDGMENT                Seattle, WA 98104-3188
CAUSE NO. 3:19-cv-5106                         (206) 474-7744

SER-752

1   redeem that gun at the pawn shop we will run a background check before the gun can be

2   returned to them. In my experience it is virtually impossible to run a thorough and

3   comprehensive background check on a non-Washington resident. The kind of information I

4   can uncover in a local check is often not available to me for non-residents. There are some

5   convictions that I may never see because they are not in a database that I can access. I cannot

6   run a check in LERMS and find any juvenile convictions not in Interstate Identification Index

7   (III), access any mental health information that is not in NICS or the Washington State Health

8   Care Authority, and I will not be able to see if they have a non-Washington conviction for

9   which they were never finger printed. Although I can reach out to out of state agencies to

10  request more information, the other states' agencies are under no obligation to respond. For

11  example, I recently was running a background check on someone from the Midwest who was

12  arrested as a fugitive. This means the fugitive had likely been arrested for a felony charge and

13  was awaiting extradition. Because the underlying felony charge could have been a disqualifier,

14  I contacted the arresting agency to see what the charge was. Although some states in this

15  situation will respond to my inquiry, not all states do so in a timely manner (or respond at all).

16  Thus, when running a background check on an out-of-state resident I can only reliably check

17  that the person does not have a criminal history or mental health disqualifier in Washington

18  and that they have no FBI number. Any enhanced background check we would attempt to

19  conduct on a non-resident will inevitably be less complete and comprehensive than on a person

20  who lives in Washington.

21      9.      The shortcomings in doing background checks of non-residents is highlighted

22  by a tragic example of a woman who moved to Spokane from Hawaii. When her background

23  check was run, we were unable to find any disqualifiers. It turned out she had a known mental

24  health disqualifier from Hawaii. Because the Washington and Hawaii mental health agencies

25  do not exchange information, and Hawaii had not submitted the information to NICS, we were

26

DECLARATION BY BRANDI BELCHER                6        ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF DEFENDANTS'                              800 5th Avenue, Suite 2000
MOTION FOR SUMMARY JUDGMENT                             Seattle, WA 98104-3188
CAUSE NO. 3:19-cv-5106                                    (206) 474-7744

SER-753

1  unaware of the mental health disqualifier and issued the concealed pistol license. The woman

2  obtained a firearm and used it to shoot and kill another person.

3       I declare under penalty of perjury under the laws of the United States that the foregoing

4  is true and correct.

5       SIGNED this 30 day of March, 2020, at Spokane, Washington.

6

7  *Brandi Belcher*

    BRANDI BELCHER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION BY BRANDI BELCHER
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENTCAUSE NO. 3:19-CV-5106

       7

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

The Honorable Ronald B. Leighton

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

| | |
|---|---|
| DANIEL MITCHELL, et al., | NO. 3:19-cv-5106 |
| Plaintiffs, | DECLARATION OF ELIZABETH H. AYLWARD, Ph.D. |
| v. | |
| CHARLES ATKINS, et al., | |
| Defendants, | |
| and | |
| SAFE SCHOOLS SAFE COMMUNITIES, | |
| Intervenor-Defendant. | |

I, Elizabeth H. Aylward, Ph.D., declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein and make this declaration based on my personal knowledge.

2.      I was retained by the Washington Attorney General's Office, counsel to Defendant Teresa Berntsen, to serve as a testifying expert witness in this case. Attached as Exhibit A is a true and correct copy of that report I prepared as part of my assignment. The report contains the opinions I have reached in this case and the basis and reasons for them. If called to testify as a witness, I could and would testify competently to the matters set forth therein.

DECLARATION OF
ELIZABETH H. AYLWARD, Ph.D.
NO. 3:19-cv-5106

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

SER-755

1        I declare under penalty of perjury under the laws of the State of Washington and the

2    United States that the foregoing is true and correct.

3        DATED this _24th_ day of March, 2020, at _10:45am_____.

4

5

6                Elizabeth Aylward, Ph.D.
                 ELIZABETH H. AYLWARD, Ph.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF                                    2                    ATTORNEY GENERAL OF WASHINGTON
ELIZABETH H. AYLWARD, Ph.D.                                                   800 Fifth Avenue, Suite 2000
NO. 3:19-cv-5106                                                             Seattle, WA  98104-3188
                                                                                (206) 464-7744

# Exhibit A

Expert Report: Neurobiological Development during Late Adolescence

and its Relevance to Risk-Taking Behavior

**Prepared for Washington State Office of the Attorney General by**

Elizabeth H. Aylward, Ph.D.


**In the Matter of:**


DANIEL MITCHELL, *et al.*,

*Plaintiffs*,

v.


CHARLES ATKINS, *et al.*,

*Defendants*,

and

SAFE SCHOOLS SAFE COMMUNITIES,

*Intervenor-Defendant.*


Dec. 9, 2019                                Signed: *Elizabeth Aylward*

                                                      Elizabeth H. Aylward

### TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF OPINIONS............................................1

II. QUALIFICATIONS....................................................................................3

III. BRAIN DEVELOPMENT BACKGROUND.....................................................4

    A. Overall Brain Development from Childhood through Late Adolescence.......4

    B. Multiple Brain Regions associated with Risk-Taking Behaviors.................5

    C. Asynchronous Development of Networks may be Related to Risk-Taking
        Behaviors...........................................................................................9

    D. Role of Connectivity Between and Among Brain Regions.........................11

    E. Neurochemical Changes during Adolescence...........................................12

    F. Brain Function under Conditions that Increase Risk-Taking.....................13

    G. Individual differences in brain and behavioral maturity...........................14

IV. OPINIONS...........................................................................................15

APPENDIX A: CURRICULUM VITAE.............................................................18

APPENDIX B: REFERENCES.........................................................................36

## I. INTRODUCTION AND SUMMARY OF OPINIONS

I have been asked by the Washington Attorney General's Office to provide my expert opinion on how brain development affects judgment and the propensity to engage in risk-taking behavior in young adults—and specifically whether developmental science supports Washington's law prohibiting those under 21 from purchasing semiautomatic assault rifles. Based on my research, training, and experience in the field of neuroscience and neurodevelopment, my opinion is that individuals under age 21 should not be allowed to purchase a semiautomatic assault rifle.

This report will examine brain development during the late adolescent period (approximately 18 to 21 years of age), focusing particularly on regions of the brain that underpin risk-taking behaviors. As will be demonstrated, brains of individuals under 21 years of age are still under development, particularly in regions that are involved in sensation-seeking and poor impulse control, two factors responsible for risky (and sometimes violent) behavior. For this reason, my opinion is that restricting the access of those in that age range to firearms such as semiautomatic assault rifles is supported by scientific evidence and represents a reasonable approach to increasing public health and safety.

It is widely known that brain development begins prenatally and proceeds systematically, but in a nonlinear fashion, with some brain regions reaching full maturity in late childhood, and other regions continuing to mature at least into the early 30s. The regions that are the last to mature are associated with cognitive and emotional control, processes that are, consequently, not fully developed until adulthood. In addition, more "primitive" regions in the "reward pathway" are hyper-responsive during adolescence, making certain stimuli appear even more desirable for adolescents than for younger or

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 1 of 38

**SER-760**

older individuals. And regions of the brain associated with recognition and interpretation of emotional stimuli are also not fully functional until early adulthood. Furthermore, function of these brain regions is affected by both internal and external factors, such as drug and alcohol use, presence of peers, and emotionally-charged or threatening situational cues. The brain's ability to maintain cognitive and emotional control under these conditions is also not fully mature until much later in adulthood. Thus, late adolescence/early adulthood (approximately ages 18 to 21) is a developmental period during which the cognitive and emotional control needed for responsible possession of firearms is still under development.

Risk-taking, as characterized by Somerville, et al. (2010), involves the approach of pleasurable experiences without appropriate regard to their associated potentially negative consequences. There is abundant evidence that the peak of risk-taking behavior occurs in adolescence (Steinberg, 2008; Casey, et al. 2008). Steinberg (2008) concludes that "…as a general rule, adolescents and young adults are more likely than adults over 25 to binge drink, smoke cigarettes, have casual sex partners, engage in violent and other criminal behavior, and have fatal or serious automobile accidents…" (p. 79) Apparently this is not a new phenomenon, as Aristotle observed in 350 BC that youth "are hot-tempered and quick-tempered, and apt to give way to their anger (cited in Steinberg, et al, 2008, p.1776). While the age range for youth or adolescence can be debated, at least one group of investigators, (Dow-Edwards, et al., 2019) conclude that "High risk-taking behavior is especially common for 18- to 21-year-olds."

Increased risk-taking in late adolescence/early adulthood, which stems from brain development that is not fully mature, is, in my expert opinion, incompatible with responsible possession of firearms such as semiautomatic assault weapons.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 2 of 38

## II. QUALIFICATIONS

I hold a Ph.D. in Developmental Psychology from Cornell University (awarded 1982). In 1983 I completed a post-doctoral fellowship in Developmental Disabilities at the Johns Hopkins University School of Medicine, where I conducted evaluations of children and adolescents with a variety of cognitive and emotional disorders. I completed a second post-doctoral fellowship in 1990 in the Department of Psychiatry at the Johns Hopkins University School of Medicine that focused on learning and application of neuroimaging research tools to study neurodevelopment and neurodegeneration. Upon completion of this fellowship, I was admitted to the faculty of the Department of Psychiatry, where I continued to work until 1997 when I moved to Seattle and joined the faculty of the Department of Radiology (with joint appointments in Psychiatry and the Interdisciplinary Graduate Program in Neurobiology and Behavior) at the University of Washington. I was promoted to Full Professor of Radiology in 2000. In 2009 I was asked to take a leadership role in the creation of the Center for Integrative Brain Research at Seattle Children's Research Institute. As the Associate Director of this center, I continued my neuroimaging research in developmental and neurodegenerative disorders, resulting in 175+ peer-reviewed publications over a span of 35+ years. In 2014 I agreed to take an administrative role within Seattle Children's Research Institute, and have reduced the time I commit to research, although I continue to co-author scientific papers relating to neurodevelopment.

My curriculum vitae is attached as Appendix A, which lists all publications I have authored in the past 10 years. I am serving as a pro bono expert in this matter and am not receiving compensation for my study or testimony. I have not testified or served as an expert witness in any proceeding in the past four years. Appendix B contains a list of all materials I considered in forming the opinions expressed in this report.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 3 of 38

**SER-762**

## III. BRAIN DEVELOPMENT BACKGROUND

### A. Overall Brain Development from Childhood through Late Adolescence.

Brains develop rapidly from birth through early childhood, with total cerebral volume at 95% of its peak size by age 6 (Lenroot et al, 2006). Volume of gray matter (made up primarily of neuronal cell bodies and support structures called glial cells) increases with age until mid-to-late childhood and then decreases as synapses (the nodes at which one neuron communicates with another neuron) are "pruned," allowing for more efficient neural processing. Lenroot et al (2007) estimate that total gray matter volume peaks at age 8.5 years in girls and 10.5 years in boys. Another neurodevelopmental process that continues well beyond adolescence is myelination, whereby nerve fibers become sheathed in a fatty substance ("white matter") that acts as a type of insulation and allows for more efficient communication within and between neural regions. White matter volume increases linearly throughout childhood and into adulthood, not reaching peak volume until the early 20's (Sowell, et al., 1999). However, brain maturation is not simply a matter of growth, but involves both increases and later decreases in cortical volume, as well as increased and refined structural and functional connections among regions. These changes reflect increases and decreases in the number and size of neurons and other supporting cells, increases and decreases in dendritic arborization (the neural cell's "branches" that connect it to other neurons), number and specificity of synaptic connections, and extent of myelination, as well as changes in neurochemistry (e.g., availability of specific neurochemicals and proportion and responsivity of specific neuronal subtypes) (Bossong, & Niesink, 2010).

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 4 of 38

SER-763

**B. Multiple Brain Regions associated with Risk-Taking Behaviors.**

For understanding cognitive and emotional development, overall brain size or volumes of cortical or white matter are not particularly useful indices. Brain development is not linear or uniform across regions, meaning that specific regions of the brain grow (and shrink) at different rates and at different times across the age span (Giedd & Rapaport, 2010). Regional brain maturation clearly underpins specific motor, cognitive, and emotional skill developments. Neuroanatomical studies (post-mortem and neuroimaging) have convincingly demonstrated that brain areas associated with more basic functions (motor and sensory) mature earlier than areas associated with more complex functions (e.g., spatial orientation, speech and language, attention), followed even later by regions involved in "executive functions" (e.g., planning, impulse control, weighing risks and rewards, judgment, and the simultaneous consideration of multiple sources of information) (Gogtay, et al., 2004).

Over the past couple of decades there has been a growing body of neuroscience directed toward better understanding of the adolescent brain, with particular focus on the relationship between neurodevelopment and some of the problematic behaviors associated with this period of life, including excessive risk-taking, sensation-seeking, sensitivity to social evaluation, poor decision-making around sexual and drug related behaviors, aggression, and other forms of poor impulse control. This research suggests that development within a few specific regions--the prefrontal cortex, the ventral striatum, and the limbic system--and the connections between these regions, can help explain some of the specific challenges of adolescence and young adulthood.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 5 of 38

**SER-764**



**Figure 1:** *Brain anatomy showing locations of prefrontal cortex, amygdala, and nucleus accumbens. Reproduced from http://www.youthbingedrinking.org/facts/c_braindev.html*

**The prefrontal cortex**, the region most closely involved in cognitive and emotional control (e.g., control of impulsivity, rational decision making, delay of gratification, etc.), shows protracted structural and functional development up to at least 30 years of age (Petanjek, et al., 2011). Gray matter volume in the dorsolateral prefrontal cortex does not reach adult dimension until the early 20s (Giedd, 2004). In a comprehensive postmortem study of neuronal development specifically within prefrontal cortex (from 32 individuals from 1 week to age 91 years of age), Petanjek et al. discovered that more refined synaptic pruning and developmental remodeling continues to the third decade of life in this region of the brain. White matter volume increases associated with myelination are observed to continue even longer, with one study suggesting peak white matter volume in the frontal lobe occurring at age 44 (Bartzokis, et al. 2001). It is these subtle neurodevelopmental processes, continuing through late adolescence and into at least early adulthood, that are believed to underpin the improvements in planning and future orientation observed during

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 6 of 38

**SER-765**

this developmental period (Steinberg, 2008), as well as other higher-order functions, including response inhibition, weighing risks and rewards, and simultaneous consideration of multiple sources of information. These "psychosocial" skills, like the brain regions that support them, do not reach maturity until well into the adult years--much later than intellectual ability. For example, Figure 1 (reproduced from Steinberg, et al., 2009) shows results from a study of 935 individuals, age 10-30, who completed tests of cognitive and psychosocial maturity. Psychosocial skills reach adult levels (defined as the mean level of performance of the 26- to 30-year-old group) much slower than cognitive skills, with only 25% of 18- to 21-year-olds showing this level of maturity.



Figure 2. Proportion of Individuals in Each Age Group Scoring at or Above the Mean for 26- to 30-Year-Olds on Indices of Cognitive Capacity and Psychosocial Maturity (Reproduced from Steinberg et al., 2009).

Although immature prefrontal cortical structure and function contribute to the increased risk-taking observed in adolescence and early adulthood, neuroscientists agree that other neurodevelopmental processes are also involved. The ventral striatum is a subcortical region involved in reward detection and anticipation (and, as such, is highly involved in drug addiction). The **nucleus accumbens**, a part of the ventral striatum that is involved in reward processing (e.g., signaling the anticipation and achievement of rewards),

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C-19-cv-5106-RBL (W.D. Wash.)
Page 7 of 38

**SER-766**

grows rapidly in the prenatal period, and then begins to decrease in size starting in preadolescence (Wierenga, et al., 2018), with volume reduction continuing into young adulthood (i.e., between late teens and early twenties) (Urosevic et al., 2012), presumably related to synaptic pruning (as described previously). These volumetric *decreases* are, paradoxically, related to *greater* sensitivity to behavioral reward (Urosevic 2012). A large longitudinal functional MRI study of 275 individuals ranging from age 8 to 28 years, scanned three times over a 4-year period, demonstrated increased activation of the nucleus accumbens in response to stimuli viewed as rewarding in adolescents, in comparison to either children or adults (Schreuders et al., 2018). Results indicated an inverted U-shape function to describe age-related changes in responsivity of the nucleus accumbens to reward, with peak activation occurring around age 15, and a developmental trajectory continuing until at least into the late twenties. Furthermore, measures of nucleus accumbens activation were significantly correlated with both laboratory measures and self-report measures of sensitivity to reward.

Finally, **the amygdala**, a part of the phylogenetically primitive limbic system, is involved in processing emotional stimuli—decoding the affective features of both pleasurable and aversive stimuli. This type of processing clearly plays a role in how the adolescent views and reacts to situations. In a longitudinal study of 147 individuals, aged 7 to 23 years, Weirenga et al. (2014) found that the volume of the amygdala, like other gray matter structures, shows an inverted U-shape function, with peak volume at 19.7 years. In a functional MRI study exploring brain response to aversive stimuli in children, adolescents, and adults (ages 6 to 23 years), decreases in amygdala activation were observed with each year of age from 9 to 20; after 20, age no longer predicted significant

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 8 of 38

**SER-767**

changes in amygdala response (Silvers et al., 2017). Thus, it is not until late adolescence or early adulthood that the amygdala's response to emotional stimuli fully matures.

In summary, we can conclude that brain development, both structural and functional, lasts well into adulthood, and the regions that are the last to mature are those associated with executive control. Structural development of the prefrontal cortex, and especially the development of its white matter interconnections, continues at least into the third decade of life. Other brain regions that are involved in processing reward and emotional stimuli, the nucleus accumbens (part of the ventral striatum) is primed during mid-adolescence to be hyper-responsive (as compared to younger children and adults); the amygdala starts to show reductions in responsivity to emotional stimuli around age 15, with continued decreases observed until age 20.

### C. Asynchronous Development of Networks may be Related to Risk-Taking Behaviors.

In addition to relatively late maturation in structure and function within these brain regions, especially the prefrontal cortex, it is believed that asynchronies in maturation of the emotional/reward network (sometimes called the socioemotional network or the limbic network, and involving the nucleus accumbens, amygdala, as well as other related structures) and the cognitive control network (involving areas of the prefrontal cortex) during adolescence may contribute to risk-taking behavior commonly observed during this developmental phase. Steinberg, et al. (2008), among others, have proposed a model whereby the mismatch in development (both structural and functional) of the prefrontal cortex, amygdala, and nucleus accumbens helps to explain increased sensation seeking and risk-taking behavior in adolescence: The brain areas that respond to reward ("This will be fun!") or elicit strong emotions ("I feel like killing him") are at the peak of activity, while the

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 9 of 38

**SER-768**

brain regions that control impulsivity ("I shouldn't be doing this") are not fully online until years later.

This theory is supported by both structural and functional neuroimaging studies. Mills et al. (2014) found a developmental mismatch between longitudinal changes in regional volumes, with the amygdala and/or nucleus accumbens reaching mature size prior to the prefrontal cortex in almost all participants, spanning 7-30 years of age. Functional MRI studies have demonstrated increased nucleus accumbens activity in response to a risk-taking gambling task in adolescence, as compared with either children or adults; simultaneously, activation of the prefrontal cortex in adolescents was more similar to that of children than of adults (Galvan et al., 2006).

Further support for the theory that adolescent risk-taking behavior may result from a mismatch in development between the emotional/reward system and the cognitive control system comes from studies contrasting amygdala and prefrontal cortex. In adults, these two regions interact to process emotional stimuli, such as those associated with threat, fear, or stress. In a previously described functional MRI study exploring brain response to aversive stimuli in individuals 6 to 23 years of age, decreases in amygdala activation were observed with each year of age from 9 to 20, after which age no longer predicted significant changes in amygdala response (Silvers et al.,2017). Simultaneously, the dorsal-medial prefrontal cortex, a region that plays a role in executive control and higher-level representations of emotion, showed *increased* response to aversive stimuli, starting at age 15 years and persisting for each subsequent year of age. As was the case with the ventral striatum and its role in processing stimuli related to reward, adolescence is a time of immature brain reactivity in processing emotionally-laden stimuli. Because the prefrontal cortex is not fully functional until early adulthood, it is unable to exert neural control over the regions that

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 10 of 38

**SER-769**

are hyper-reactive to stimuli that elicit feelings of high reward or emotion. The temporal gap between the maturity of these two systems creates a period of heightened vulnerability for risk-taking behaviors. One author described the process as akin to starting the engines without a skilled driver behind the wheel (Dahl, 2001). Casey et al. (2011) further explain: "In appetitively charged situations, subcortical systems involved in detection of appetitive cues will win out (accelerator) over cortical control systems (brakes), given differential regional development. However, in situations in which appetitive or emotive cues are not present, cortical control systems are not compromised, leading to more optimal performance in adolescents." (page 9).

### D. Role of Connectivity Between and Among Brain Regions.

Adolescence through young adulthood is not only a period during which the reward/social-emotional network and the cognitive control network develop (albeit at different rates), but also a period marked by increasing connectivity among these and other brain regions. The proliferation of white matter tracts increases connections among regions within the frontal cortex, as well as between the frontal cortex and regions of the subcortical reward system. Casey, et al. (2016) argue that focusing on the developmental shifts in connectivity ("flow of information") among brain regions is even more important than focusing on development within the regions themselves, as it will help explain how the interactive effects of motivational signals on cognitive control reach maturity. Geidd and Rapoport (2010) note that myelin does not simply allow faster neural transmission, but also plays a role in the timing and synchrony of the neuronal firing patterns that create functional networks in the brain. Thus, the continuation of myelination in the brain into early adulthood means that specific regions of the brain (and especially the prefrontal cortex, which is the last area to fully myelinate) will not be communicating with one

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 11 of 38

SER-770

another as efficiently, but also that the mature within-structure networks will not be fully developed. This lack of regional connectivity and coordination likely underpins differences observed between adolescents and adults in the recruitment of different brain areas during neuropsychological tasks that assess impulse control. Steinberg and colleagues have found that performance on these tasks not only increases through adolescence, but continues to improve into the early twenties. (Steinberg, et al., 2009).

### E. Neurochemical Changes during Adolescence

In addition to structural and functional brain changes (assessed by structural and functional MRI, respectively), there is evidence that chemical changes also play a role in decreased risk-taking during adolescence. Much of our knowledge about developmental changes in neurochemistry comes from animal studies, so it is difficult to pinpoint when in human adolescence specific chemical changes are most pronounced. Based primarily on animal data, it is believed that a dramatic increase in dopaminergic activity within the reward system occurs around the time of puberty, due to a redistribution in dopamine receptor concentration, especially in projections from the limbic (reward) system to the prefrontal (cognitive control) area. This change in dopamine activity is thought to underpin the increase in reward seeking observed during this same period of adolescence (Steinberg, et al., 2008), and is consistent with functional imaging studies that indicate greater brain activation during tasks involving responsivity to reward. Chemical changes in the prefrontal (cognitive control) system are also occurring during adolescence, and include maturation of the neuronal system involving Gamma-amino butyric acid (GABA), the main inhibitory neurotransmitter system. Age-related increases in GABA levels are associated with better impulse control. Silveri et al. (2013) report that frontal lobe GABA receptors reach adult levels late in adolescence.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 12 of 38

**SER-771**

## F. Brain Function under Conditions that Increase Risk-Taking

In addition to the general immaturity of the cognitive control and reward networks in late adolescence/early adulthood, there are several external factors that can lead to even less optimal function of these networks. These factors include (but are not limited to) drug and alcohol use, presence of peers, and conditions of emotional stress. As would be expected, alcohol and drugs have acute effects on the brain, especially in regions involved in inhibitory control (Nikolaou et al., 2013; Anderson et al., 2011; Wrege et al., 2014). Studies have also demonstrated long-term neurobiological effects of even moderate levels of drinking or cannabis use. For example, Hatchard et al. (2017) found differences in neural activity between young adults who use alcohol on a regular basis and those who don't during the performance of a task involving response inhibition, and Wrege et al. (2014) report reduced prefrontal volumes and white matter integrity in regular cannabis users. There is some evidence, however, suggesting that abnormal neural functioning in those with substance abuse disorders may be a cause, as well as a result, of the increased substance use. (Wetherill et al., 2013).

Another factor that affects brain function during the performance of tasks requiring inhibitory control is the presence of peers. In a simulated driving study, Chein, et al. (2011) demonstrated that the presence of peers promoted adolescent risk taking by sensitizing brain regions associated with the anticipation of potential rewards. Increased activation of the ventral striatum was observed in adolescents in the condition where they were being observed by peers, in comparison to the condition where no peers were present. This difference in activation between the peer and no-peer conditions was not observed in adults.

Similarly, brain function can be altered in the presence of emotional stress. Using an emotional "go/no-go" paradigm to study impulse control under states of negative and

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 13 of 38

**SER-772**

positive arousal, Cohen et al. (2016) found that young adults (aged 18 to 21 years) demonstrated less neural activity than the older adults (aged 21 to 25 years) in the prefrontal cortex. The authors interpret the data as suggesting "that young adulthood is a time when cognitive control is still vulnerable to negative emotional influences, in part as a result of continued development of lateral and medial prefrontal circuitry."

Cohen & Casey (2014) summarize the neurodevelopmental research on external factors that affect brain function in adolescence: "In the presence of peers, potential threat, or rewards, emotional centers of the brain hijack less mature prefrontal control circuits during adolescence, leading to poor choice behaviors." By adulthood, the prefrontal networks have matured sufficiently to (most often) override the emotional-reward network, even under stressful or threatening situations or during times of extreme emotional arousal.

### G. Individual differences in brain and behavioral maturity

In closing, it must be acknowledged, of course, that there is a high degree of individual variability among adolescents and adults in their ability to control impulsivity, control emotional responsivity to external stimuli, resist peer pressure, and avoid risky situations. These differences can include, among other factors, stable personality traits, differences in neurotransmitter profiles, biologically governed changes in hormones or other effects of puberty, and social context (e.g., status among peers), as well as familial influence (Somerville et al., 2010). And even within an individual, there can be a great deal of variation in behavior across time and situations, with even reasonable, intelligent young men and women engaging occasionally in behaviors they would normally view as outrageously unwise. Dahl states "For some adolescents this tendency to activate strong emotions and an affinity for excitement can be subtle and easily managed. In others, these inclinations toward high-intensity feelings can lead to emotionally charged and reckless

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 14 of 38

**SER-773**

adolescent behaviors, and at times to impulsive decisions by [seemingly] intelligent youth that are completely outrageous" (Dahl, 2004, p. 9). Among the many factors that modulate risky behavior among youth are the availability of access (e.g., to alcohol, willing sexual partners) and reduced monitoring by parents, teachers, and other responsible adults (Steinberg 2008).

## IV. OPINIONS

In summary, adolescence is a time of increased risk-taking behavior, with risk-taking being especially common between 18 and 21 years of age (Dow-Edwards, 2019). This review has aimed to outline the neurobiological processes that contribute to risky adolescent behavior. From a brain development perspective, the literature supports a theory that specific regions of the brain that are involved in processing reward and emotional stimuli are hyper-responsive during adolescence, while the cognitive control regions of the brain are not fully functional until early adulthood. This lack of synchrony in the development of regions whose interaction is required for sound judgment leaves the adolescent vulnerable to risk-taking until the cognitive control centers mature and the emotional/reward regions reach adult levels of reduced activation. Cognitive control during the late-adolescent/early adult period is especially likely to be compromised when peers are present or during stressful situations.

Because older adolescents (including those 18 to 21 years of age) have the logical reasoning and basic information processing skills to understand the dangers of risky behaviors, Steinberg (2008) argues that increasing the level of instruction on the perils of drinking, drugs, risky driving and sexual behavior is unlikely to make a substantial difference in controlling risky behavior for older teens and young adults. The same argument, in my opinion, can be applied to the potential perils of firearm use. The rate of

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 15 of 38

**SER-774**

development of the cognitive control systems that are required for self-regulation of behavior in the face of rewarding or emotional stimuli is fairly fixed by nature—there is not much we can do to speed it up, although certain environmental inputs (e.g., exposure to drugs and alcohol) can slow it down. Because of this, Steinberg argues, a more profitable strategy than additional educational attempts "might focus on limiting opportunities." As a society, this is exactly what we do when we restrict driving to those over 16, refuse sale of alcohol and cigarettes to minors under 21, and prohibit handgun purchases by minors under 21. Some communities have implemented further restrictions, based on our knowledge of factors that affect risk-taking. For example, several states in the US and Europe have implemented laws prohibiting adolescents from driving with peer passengers until 18 years of age. These laws have resulted in decreased accidents and risky driving behavior in adolescents by as much as 40% (Dow-Edwards 2019).

Society has created rules such as these to help children and adolescents develop safely into adults whose fully functional brains can take over the role of parental and legal proscriptions against risky and damaging behavior. Neuroscience has started to take a role in informing these rules. Our understanding of brain development has also contributed to laws that prohibit adult-appropriate criminal penalties for juvenile offenders, based on their diminished capacity for cognitive and emotional control, as well as their increased reactivity in emotionally charged and social situations (Cohen & Casey, 2014). It is totally valid to use our knowledge of neurobiological and behavioral development to inform laws that restrict adolescents from certain privileges afforded to adults, and there are many precedents for such legal restrictions. Steinberg (2008) sums up his argument that limitations on adolescent behavior are the most effective way to reduce risk-taking, saying

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 16 of 38

SER-775

"Some things just take time to develop, and mature judgment is probably one of them."
(page 100).

Based on the neuroscience of brain development during late adolescence/early
adulthood, and the high level of risk-taking behavior that occurs as a result of increased
sensation-seeking and decreased impulse control (as compared with adults over age 21), it
is my expert opinion is that it is reasonable and consistent with scientific consensus for the
state to restrict access to firearms such as semiautomatic assault rifles by individuals
under the age of 21, who are, on average, incapable of responsible use of such firearms.
Washington state law I-1639 wisely bars those under 21 from purchasing such weapons.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 17 of 38

**SER-776**

## APPENDIX A: CURRICULUM VITAE

### ELIZABETH H. AYLWARD, Ph.D.

Seattle Children's Research Institute, Seattle, WA

818 Stewart Street, Suite 603

 (206) 448-1065

elizabeth.aylward@seattlechildrens.org

### Current Positions

2014-Present:  Director, Office of Science-Industry Partnerships, Seattle Children's Research Institute, Seattle, WA

2009-Present:  Affiliate Professor, Department of Psychology, University of Washington, Seattle, WA

2007-Present:  Associate Director, Eunice Kennedy Shriver Intellectual and Developmental Disabilities Research Center, University of Washington, Seattle, WA.

1997-Present:  Adjunct Associate Professor, Department of Psychiatry and Behavioral Sciences, Johns Hopkins University School of Medicine, Baltimore, MD

### Education

B.S., Psychology, l973, Vanderbilt University, Nashville,  TN.

M.A., Psychology, l975, University of Connecticut, Storrs, CT.

Ph.D., Developmental Psychology, l982, Cornell University, Ithaca, N.Y.

Post-Doctoral Fellowship in Clinical Research, 1982-l983, Department of Pediatrics, Johns Hopkins University School of Medicine, Baltimore, MD.

Post-Doctoral Fellowship in the Dementias of Aging, l988-1990, Department of Psychiatry, Johns Hopkins University School of Medicine, Baltimore, MD.

### Previous Employment

2000-2008:  Professor, Department of Radiology, University of Washington, Seattle, WA

2006-2014:  Faculty Member, Interdisciplinary Graduate Program in Neurobiology and Behavior, University of Washington, Seattle, WA

1997-2000: Associate Professor, Department of Radiology, University of Washington, Seattle, WA

1993-1997: Associate Professor, Division of Psychiatric Neuroimaging and Division of Medical Psychology, Department of Psychiatry, Johns Hopkins University School of Medicine, Baltimore, MD

1990-1993: Assistant Professor, Division of Psychiatric Neuroimaging and Division of Medical Psychology, Department of Psychiatry, Johns Hopkins University School of Medicine, Baltimore, MD.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 18 of 38

**SER-777**

1988-1990:  Post-doctoral fellowship in the Dementias of Aging, Department of Psychiatry, Johns Hopkins University School of Medicine.

1985-1988:  Self-employed as licensed psychologist, and regular consultant to the Diagnostic and Evaluation Center at the Kennedy Institute for Handicapped Children.

l985-l988:  Part-time Instructor of Medical Psychology, Department of Psychiatry  and Behavioral Sciences, Johns Hopkins University School of Medicine, Baltimore, MD.

l983-l985:  Senior Psychologist, Diagnostic and Evaluation Center, John F. Kennedy Institute for Handicapped Children, Johns Hopkins University School of Medicine, Baltimore, MD.

l982-1983:  Post-Doctoral Fellow, Department of Clinical Research, John F. Kennedy Institute for Handicapped Children, Johns Hopkins University School of Medicine, Baltimore, MD.

## Current Outreach Activities

Women in Bioscience MAPS (Mentors, Advisors, Peers, and Sponsors) Group member

Washington Global Health Alliance "Pioneering Women" volunteer

Women in Global Health Seattle member

FareStart Volunteer:  Computer Lab

## Publications

(a)  Manuscripts in Refereed Journals:

1. Scahill RI, Andre R, Tabrizi SJ, Aylward EH. Structural imaging in premanifest and manifest Huntington disease. Handb Clin Neurol. 2017;144: 247-261. Review.

2. Frost C, Mulick A, Scahill RI, Owen G, Aylward E, Leavitt BR, Durr A, Roos RAC, Borowsky B, Stout JC, Reilmann R, Langbehn DR, Tabrizi SJ, Sampaio C; TRACK-HD Investigators. Design optimization for clinical trials in early-stage manifest Huntington's disease. Mov Disord. 2017; 32:1610-1619.

3. Velasquez F, Qin XA, Reilly MA, Neuhaus E, Estes A, Aylward E, Kleinhans NM. Neural correlates of emotional inhibitory control in autism spectrum disorders. Res Dev Disabil. 2017; 64:64-77.

4. Aldridge K, Collett BR, Wallace ER, Birgfeld C, Austin JR, Yeh R, Feil M, Kapp-Simon KA, Aylward EH, Cunningham ML, Speltz ML. Structural brain differences in school-age children with and without single-suture craniosynostosis. J Neurosurg Pediatr. 2017;19: 479-489.

5. Faja S, Dawson G, Aylward E, Wijsman EM, Webb SJ. Early event-related potentials to emotional faces differ for adults with autism spectrum disorder and by serotonin transporter genotype. Clin Neurophysiol. 2016; 127: 2436-47.

6. Kleinhans NM, Richards T, Greenson J, Dawson G, Aylward E. Altered dynamics of the fMRI response to faces in individuals with autism. J Autism Dev Disord. 2016; 46: 232-241

7. Weaver KE, Richards TL, Logsdon RG, McGough EL, Minoshima S, Aylward EH, Kleinhans NM, Grabowski TJ, McCurry SM, Teri L. Posterior cingulate lactate as a metabolic biomarker in amnestic mild cognitive impairment. Biomed Res Int. 2015; 2015: 610605.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 19 of 38

**SER-778**

8. Paulsen JS, Long JD, Ross CA, Harrington DL, Erwin CJ, Williams JK, Westervelt HJ, Johnson HJ, Aylward EH, Zhang Y, Bockholt HJ, Barker RA; PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Prediction of manifest Huntington's disease with clinical and imaging measures: a prospective observational study. Lancet Neurol. 2014; 13: 1193-201.

9. Aylward EH. Magnetic resonance imaging striatal volumes: A biomarker for clinical trials in Huntington's disease. Movement Disorders, 2014, 29:1429-1433.

10. Aylward EH, Harrington DL, Mills JA, Nopoulos PC, Ross CA, Long JD, Liu D, Westervelt HK, Paulsen JS, and the PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Regional atrophy associated with cognitive and motor function in prodromal Huntington disease. Journal of Huntington's Disease, 2014, 2: 477-489.

11. Ross CA, Aylward EH, Wild E, Langbehn D, Long J, Warner J, Scahill R, Leavitt B, Stout J, Paulsen J, Reilmann R, Unschuld P, Wexler A, Tabrizi S, Margolis R. Huntington disease: natural history, biomarkers and prospects for therapeutics. Nature Reviews Neurology, 2014; 10: 204-216.

12. Paulsen JS, Long JD, Johnson HJ, Aylward EH, Ross CA, Williams JK, Nance MA, Erwin CJ, Westervelt JH, Harrington DL, Bockholt JH, Zhang Y, McCusker EA, Chiu EM, Panegyres PK; PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Clinical and biomarker changes in premanifest Huntington disease show trial feasibility: A decade of the PREDICT-HD study. Front Aging Neurosci, 2014. Doi: 10.3389/fnagi.2014.00078.

13. Harrington DL, Liu D, Smith MM, Mills JA, Long JD, Aylward EH, Paulsen JS. Neuroanatomical correlates of cognitive functioning in prodromal Huntington disease. Brain Behav, 2014; 4: 29-40.

14. Borghesani PR, Madhyastha TM, Aylward EH, Reiter MA, Swarny BR, Schaie KW, Willis SL. The association between higher order abilities, processing speed, and age are variably mediated by white matter integrity during typical aging. Neuropsychologia. 2013;51: 1435-44

15. Padowski JM, Weaver KE, Richards TL, Laurino MY, Samii A, Aylward EH, Conley KE. Neurochemical correlates of caudate atrophy in Huntington's disease. Movement Disorders, 2014; 29: 327-335.

16. Younes L, Ratnanather JT, Brown T, Aylward E, Nopoulos P, Johnson H, Magnotta VA, Paulsen JS, Margolis RL, Albin RL, Miller MI, Ross CA; and the PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Regionally selective atrophy of subcortical structures in prodromal HD as revealed by statistical shape analysis. Hum Brain Mapp. 2014; 35: 792-809.

17. Bonner-Jackson A, Long JD, Westervelt H, Tremont G, Aylward E, Paulsen J. Protective effect of cognitive reserve in Huntington disease. Journal of the International Neuropsychological Society, 2013; 19: 739-750.

18. Georgiou-Karistianis N, Scahill R, Tabrizi SJ, Squitieri F, Aylward E. Structural MRI in Huntington's disease and recommendations for its potential use in clinical trials. Neurosci Biobehav Rev. 2013; 37: 480-490.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 20 of 38

**SER-779**

19. Magnotta VA, Matsui JT, Liu D, Johnson HJ, Long JD, Bolster BD, Mueller BA, Lim KO, Mori S, Helmer K, Turner JA, Lowe M, Aylward E, Flashman LA, Bonett G, Paulsen JS. Multi-Center reliability of diffusion tensor imaging. Brain Connect. 2012; 2: 345-355.

20. Zufferey F, Sherr EH, Beckmann ND, Hanson E, Maillard AM, Hippolyte L, Macé A, Ferrari C, Kutalik Z, Andrieux J, Aylward E, Barker M, Bernier R, Bouquillon S, Conus P, Delobel B, Faucett WA, Goin-Kochel RP, Grant E, Harewood L, Hunter JV, Lebon S, Ledbetter DH, Martin CL, Männik K, Martinet D, Mukherjee P, Ramocki MB, Spence SJ, Steinman KJ, Tjernagel J, Spiro JE, Reymond A, Beckmann JS, Chung WK, Jacquemont S; on behalf of the Simons VIP Consortium, on behalf of the 16p11.2 European Consortium. A 600 kb deletion syndrome at 16p11.2 leads to energy imbalance and neuropsychiatric disorders. J Med Genet; 2012;49: 660-668.

21. Roth CL, Aylward E, Liang O, Kleinhans NM, Pauley G, Schur EA. Functional neuroimaging in craniopharyngioma: A useful tool to better understand hypothalamic obesity? Obes Facts. 2012;5:243-253.

22. Webb SJ, Merkle K, Murias M, Richards T, Aylward E, Dawson G. ERP responses differentiate inverted but not upright face processing in adults with ASD. Soc Cogn Affect Neurosci. 2012;7:578-87

23. Sauder CL, Beauchaine TP, Gatzke-Kopp LM, Shannon KE, Aylward E. Neuroanatomical correlates of heterotypic comorbidity in externalizing male adolescents. J Clin Child Adolesc Psychol. 2012;41:346-352.

24. Aylward EH, Liu D, Nopoulos PC, Ross CA, Pierson RK, Mills JA, Long JD, Paulsen JS, & the PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Striatal volume contributes to the prediction of onset of Huntington Disease in incident cases. Biol Psychiatry. 2012; 71:822-8.

25. Collett BR, Aylward EH, Berg J, Davidoff C, Norden J, Cunningham ML, Speltz ML. Brain volume and shape in infants with deformational plagiocephaly. Child's Nervous System, J Neurol Neurosurg Psychiatry. 2012;83:612-9

26. Beauchaine TP, Sauder CL, Gatzke-Kopp LM, Shannon KE, Aylward E. Neuroanatomical correlates of heterotypic comorbidity in externalizing adolescent males. Journal of Clinical Child and Adolescent Psychology. 2012; 41:346-352.

27. Borghesani, PR, Weaver, K, Aylward, E, Richards AL, Madhyastha TM, Kahn A, Liang O, Ellenbogen R, Beg F, Schaie W, Willis S. Midlife memory improvement predicts preservation of hippocampal volume in old age. Neurobiology of Aging 2012;33:1148-55.

28. Faja S, Webb SJ, Jones E, Merkle K, Kamara D, Bavaro J, Aylward E, Dawson G. The effects of face expertise training on behavioral performance and brain activity of adults with high functioning autism spectrum disorders. J Autism Dev Disord. 2012; 42:278-93.

29. Aylward E, Mills J, Liu D, Nopoulos P, Ross CA, Pierson R, Paulsen JS. Association between age and striatal volume stratified by CAG repeat length in prodromal Huntington disease. PLoS Curr. 2011 May 11;3: RRN1235.

30. Carlozzi NE, Stout JC, Mills JA, Duff K, Beglinger LJ, Aylward EH, Whitlock KB, Solomon AC, Queller S, Langbehn DR, Johnson SA, Paulsen JS. Estimating premorbid IQ in

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 21 of 38

**SER-780**

the prodromal phase of a neurodegenerative disease.  Clin Neuropsychol. 2011; 25: 757-777.

31. Stout JC, Paulsen JS, Queller S, Solomon AC, Whitlock KB, Campbell JC, Carlozzi N, Duff K, Beglinger LJ, Langbehn DR, Johnson SA, Biglan KM, Aylward EH. Neurocognitive signs in prodromal Huntington disease. Neuropsychology. 2011; 25:1-14.

32. Aylward EH, Nopoulos PC, Ross CA, Langbehn DR, Pierson RK, Mills JA, Johnson HJ, Magnotta VA, Juhl AR, Paulsen JS; the PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Longitudinal change in regional brain volumes in prodromal Huntington disease. J Neurol Neurosurg Psychiatry. 2011; 82:405-10.

33. Duff K, Paulsen JS, Beglinger LJ, Langbehn DR, Wang C, Stout JC, Ross CA, Aylward E, Carlozzi NE, Queller S; Predict-HD Investigators of the Huntington Study Group. "Frontal" behaviors before the diagnosis of Huntington's disease and their relationship to markers of disease progression: evidence of early lack of awareness. J Neuropsychiatry Clin Neurosci. 2010; 22:196-207.

34. Nopoulos PC, Aylward EH, Ross CA, Johnson HJ, Magnotta VA, Juhl AR, Pierson RK, Mills J, Langbehn DR, Paulsen JS; the PREDICT-HD Investigators Coordinators of the Huntington Study Group (HSG). Cerebral cortex structure in prodromal Huntington disease. Neurobiol Dis. 2010; 40: 544-54.

35. Kleinhans NM, Richards T, Johnson LC, Weaver KE, Greenson J, Dawson G, Aylward E. fMRI evidence of neural abnormalities in the subcortical face processing system in ASD. Neuroimage. 2011; 54:697-704.

36. Kleinhans NM, Richards T, Weaver K, Johnson LC, Greenson J, Dawson G, Aylward E. Association between amygdala response to emotional faces and social anxiety in autism spectrum disorders. Neuropsychologia. 2010; 48: 3665-3670.

37. Webb SJ, Jones EJ, Merkle K, Murias M, Greenson J, Richards T, Aylward E, Dawson G. Response to familiar faces, newly familiar faces, and novel faces as assessed by ERPs is intact in adults with autism spectrum disorders.  Int J Psychophysiol. 2010; 77:106-117.

38. Nopoulos PC, Aylward EH, Ross CA, Mills J, Langbehn DR, Johnson HJ, Magnotta VA, Pierson RK, Beglinger LJ, Nance MA, Barker RA, Paulsen JS, and the PREDICT-HD Investigators and Coordinators of the Huntington Study Group (HSG).  Smaller intracranial volume in prodromal Huntington disease: evidence for abnormal neurodevelopment.  Brain. 2011; 134:137-142.

39. Paulsen JS, Nopoulos PC, Aylward E, Ross CA, Johnson H, Magnotta VA, Juhl A, Pierson RK, Mills J, Langbehn D, Nance M; the PREDICT-HD Investigators and Coordinators of the Huntington's Study Group (HSG). Striatal and white matter predictors of estimated diagnosis for Huntington disease. Brain Res Bull. 2010; 82:201-207.

40. Astley SJ, Aylward EH, Olson HC, Kerns K, Brooks A, Coggins TE, Davies J, Dorn S, Gendler B, Jirikowic T, Kraegel P, Maravilla K, Richards T. Magnetic resonance imaging outcomes from a comprehensive magnetic resonance study of children with fetal alcohol spectrum disorders. Alcohol Clin Exp Res. 2009; 33: 1671-1689.

41.  Biglan KM, Ross CA, Langbehn DR, Aylward EH, Stout JC, Queller S, Carlozzi NE, Duff K, Beglinger LJ, Paulsen JS; PREDICT-HD Investigators of the Huntington Study Group.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 22 of 38

**SER-781**

Motor abnormalities in premanifest persons with Huntington's disease: The PREDICT-HD study. Mov Disord. 2009; 24: 1763-1772.

42. Corrigan NM, Richards T, Webb SJ, Murias M, Merkle K, Kleinhans NM, Johnson LC, Poliakov A, Aylward E, Dawson G. An investigation of the relationship between fMRI and ERP source localized measurements of brain activity during face processing. Brain Topogr. 2009; 22: 83-96.

43. Gatzke-Kopp LM, Beauchaine TP, Shannon KE, Chipman J, Fleming AP, Crowell SE, Liang O, Johnson LC, Aylward E.  Neurological correlates of reward responding in adolescents with and without externalizing behavior disorders. J Abnorm Psychol 2009; 118: 203-213.

44. Astley SJ, Richards T, Aylward EH, Olson HC, Kerns K, Brooks A, Coggins TE, Davies J, Dorn S, Gendler B, Jirikowic T, Kraegel P, Maravilla K. Magnetic resonance spectroscopy outcomes from a comprehensive magnetic resonance study of children with fetal alcohol spectrum disorders. Magn Reson Imaging, 2009; 27: 760-78.

45.  AstleySJ, Aylward EH, Olson HC, Kerns K, Brooks A, Coggins TE, Davies J, Dorn S, Gendler B, Jirikowic T, Kraegel P, Maravilla K, Richards T. Functional magnetic resonance imaging outcomes from a comprehensive magnetic resonance study of children with fetal alcohol spectrum disorders.  Journal of Neurodevelopmental Disorders, 2009; 1: 61-80.

46. Kleinhans NM, Richards T, Weaver KE, Liang O, Dawson G, Aylward E.  Brief report: biochemical correlates of clinical impairment in high functioning autism and Asperger's disorder. J Autism Dev Disord. 2009; 39:1079-1086.

47. Astley SJ, Olson HC, Kerns K, Brooks A, Aylward EH, Coggins TE, Davies J, Dorn S, Gendler B, Jirikowic T, Kraegel P, Maravilla K, Richards T. Neuropsychological and behavioral outcomes from a comprehensive magnetic resonance study of children. Can J Clin Pharmacol. 2009;16: e178-201.

48. Kleinhans NM, Johnson LC, Richards T, Mahurin R, Greenson J, Dawson G, Aylward E. Reduced neural habituation in the amygdala and social impairments in autism spectrum disorders. Am J Psychiatry. 2009;166:467-475.

49. Drane DL, Ojemann GA, Ojemann JG, Aylward E, Silbergeld DL, Miller JW, Tranel D. Category-specific recognition and naming deficits following resection of a right anterior temporal lobe tumor in a patient with atypical language lateralization. Cortex. 2009;45:630-40.

50. Faja S, Webb SJ, Merkle K, Aylward E, Dawson G. Face configuration accuracy and processing speed among adults with high-functioning autism spectrum disorders.  J Autism Dev Disord 2009; 39:532-538.

51. Borson S, Scanlan J, Friedman S, Zuhr E, Fields J, Aylward E, Mahurin R, Richards T, Anzai Y, Yukawa M, Yeh S. Modeling the impact of COPD on the brain. Int J Chron Obstruct Pulmon Dis. 2008;3:429-434.

52. Beglinger LJ, Paulsen JS, Watson DB, Wang C, Duff K, Langbehn DR, Moser DJ, Paulson HL, Aylward EH, Carlozzi NE, Queller S, Stout JC. Obsessive and compulsive symptoms in prediagnosed Huntington's disease.J Clin Psychiatry 2008; 69: 1758-1765.

**SER-782**

53. Weaver KE, Richards TL, Liang O, Laurino MY, Samii A., Aylward, EH. Longitudinal diffusion tensor imaging in Huntington's Disease. Experimental Neurology. 2009; 216: 525-529.

54. Kleinhans NM, Johnson LC, Mahurin R, Richards T, Stegbauer KC, Greenson J, Dawson G, Aylward E. Abnormal functional connectivity in autism spectrum disorders during face processing. Brain. 2008; 131: 1000-1012.

55. Faja S, Aylward E, Bernier R, Dawson G. Becoming a face expert: a computerized face-training program for high-functioning individuals with autism spectrum disorders. Dev Neuropsychol. 2008; 33: 1-24.

56. Sterling L, Dawson G, Webb S, Murias M, Munson J, Panagiotides H, Aylward E. The role of face familiarity in eye tracking of faces by individuals with autism spectrum disorders. J Autism Dev Disord. 2008; 38: 1666-1675.

57. Drane DL, Ojemann GA, Aylward E, Ojemann JG, Johnson LC, Silbergeld DL, Miller JW, Tranel D. Category-specific naming and recognition deficits in temporal lobe epilepsy surgical patients. Neuropsychologia. 2008; 46: 1242-1255.

58. Paulsen JS, Langbehn DR, Stout JC, Aylward E, Ross CA, Nance M, Guttman M, Johnson S, McDonald M, Beglinger LJ, Duff K, Kayson E, Biglan K, Shoulson I, Oakes D, Hayden M. Detection of Huntington's disease decades before diagnosis: The Predict HD study. J Neurol Neurosurg Psychiatry. 2008, 79: 874-880.

59. Belmonte MK, Mazziotta JC, Minshew NJ, Evans AC, Courchesne E, Dager R, Bookheimer SY, Aylward EH, Amaral DG, Cantor RM, Chugani DC, Dale AM, Davatzikos C, Gerig G, Herbert MR, Lainhart JE, Murphy DG, Piven J, Reiss AL, Schultz RT, Zeffiro TA, Levi-Pearl S, Lajonchere C, Colamarino SA. Offering to Share: How to Put Heads Together in Autism Neuroimaging. J Autism Dev Disord. 2008; 38: 2-13.

60. Borghesani PR, Johnson LC, Shelton AL, Peskind ER, Aylward EH, Schellenberg GD, Cherrier MM. Altered medial temporal lobe responses during visuospatial encoding in healthy APOE*4 carriers. Neurobiol Aging. 2008; 29:981-991.

61. Aylward E. Change in MRI striatal volumes as a biomarker in presymptomatic Huntington's disease. Brain Research Bulletin. Brain Res Bull. 2007; 72:152-158.

62. Kleinhans NM, Johnson LC, Mahurin R, Richards T, Stegbauer KC, Greenson J, Dawson G, Aylward E. Increased amygdala activation to neutral faces is associated with better face memory performance. Neuroreport. 2007; 18:987-991.

63. Johnson SA, Stout JC, Solomon AC, Langbehn DR, Aylward EH, Cruce CB, Ross CA, Nance M, Kayson E, Julian-Baros E, Hayden MR, Kieburtz K, Guttman M, Oakes D, Shoulson I, Beglinger L, Duff K, Penziner E, Paulsen JS; Predict-HD Investigators of the Huntington Study Group. Beyond disgust: impaired recognition of negative emotions prior to diagnosis in Huntington's disease. Brain. 2007;130: 1732-1744.

64. Solomon AC, Stout JC, Johnson SA, Langbehn DR, Aylward EH, Brandt J, Ross CA, Beglinger L, Hayden MR, Kieburtz K, Kayson E, Julian-Baros E, Duff K, Guttman M, Nance M, Oakes D, Shoulson I, Penziner E, Paulsen JS; Predict-HD investigators of the Huntington Study Group.Verbal episodic memory declines prior to diagnosis in Huntington's disease. Neuropsychologia. 2007;45:1767-1776.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 24 of 38

**SER-783**

65. Juul, S.E., Aylward, E., Richards, T., McPherson, RJ.  Prenatal cord clamping in newborn macaca nemestrina:  a model of perinatal asphyxia.  Developmental Neuroscience. 2007;29:311-312.

66. Richards, T.L., Aylward, E.H., Field, K.M., Grimme, A.C., Raskind, W., Richards, A.L., Nagy, W., Eckert,  M., Leonard, C., Abbot, R.D., Berninger, V.S.  Converging evidence for triple word form theory in children with dyslexia.  Developmental Neuropsychology 2006; 30: 547-589.

67. Stanberry, L.I., Richards, T.L., Berninger, V.W., Nandy, R.R., Aylward, E.H., Maravilla, K.R., Stock, P.S., Cordes, D.  Low-frequency signal changes reflect differences in functional connectivity between good readers and dyslexics during continuous phoneme mapping.  Magn Reson Imaging 2006:  24:  217-229.

68. Paulsen, J.S., Hayden, M., Stout, J.C., Langbehn, D.R., Aylward, E., Ross, C.A., Gutman, M., Nance, M., Kiebrutz, K. Oakes, D., Shoulson, I., Kayson, E., Johnson, E., Penziner, E.  Predict-HD Investigators of the Hungtington Study Group.  Preparing for preventative clinical trials:  the Predict-HD study.  Arch Neurol 2006; 63:  883-890.

69. Reading, S., Yassa, M., Bakker, A., Dziorny, A., Gourley, L., Yallapragada, V., Rosenblatt, A., Margolis, R., Aylward, E., Brandt, J. Regional white matter change in pre-symptomatic Huntington's disease: a diffusion tensor imaging study.  Psychiatry Res. 2005;140:55-62.

70. Khan A., Aylward, E., Barta, P., Miller, M., Beg, M.F.  Semi-automated basal ganglia segmentation using large deformation diffeomrophic metric mapping.  Int Conf Med Image Comput 2005; 8:  238-245.

71. Aylward, E. H., Park, J.E., Field, K.M., Parsons, A.C., Richards, T.L., Cramer, S.C., Meltzoff, A.N.  Brain activation during face perception: Evidence of a developmental change J. Cogn. Neurosci. 2005; 17: 308-319.

72. Aylward EH, Sparks BF, Field KM, Yallapragada V, Shpritz BD, Rosenblatt A, Brandt J, Gourley LM, Liang K, Zhou H, Margolis RL, Ross CA.  Onset and rate of striatal atrophy in preclinical Huntington disease. Neurology 2004; 63:66-72.

73. Reading, S.A.J., Dziorny, A.C.,Peroutka, L.A.,Schreiber, M.,  Gourley, L.M., Yallapragada, V., Rosenblatt, A.,Margolis, R.L., Pekar, J.J., Pearlson, G.D., Aylward, E., Brandt, J., Bassett, S.S., Ross, C.A. Functional brain changes in presymptomatic Huntington's disease.  Annals of Neurology 2004; 55,879-883.

74. Scheibel, R.S., Pearson, D.A., Faria, L.P., Kotrla, K.J., Aylward, E., Bachevalier, J., Levin, H.S. An fMRI study of executive functioning after severe diffuse TBI.  Brain Injury 2004; 18: 1.

75. Aylward, E. H., Rosenblatt, A., Field, K., Yallapragada, V.,  Kieburtz, K., McDermott, M., Raymond, L. A., Almqvist, E. W., Hayden, M., and Ross C. A..  Caudate volume as an outcome measure in clinical trials for Huntington's disease: a pilot study. Brain Research Bulletin 2003; 62: 137-141.

76. Morrison, S.J., Demorest, S.M., Aylward, E.H., Cramer, S.C., and Maravilla, K.R.  FMRI investigation of cross-cultural music comprehension.  NeuroImage  2003; 20: 378-384.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 25 of 38

**SER-784**

77. Aylward, E. H., Richards, T. L., Berninger, V. W., Nagy, W. E., Field, K.M, Grimme, A.C., Richards, A. L., Thomson, J. B., Cramer, S.C. Instructional treatment associated with changes in brain activation in children with dyslexia.  Neurology 2003; 61:212-219.

78. Eckert, M.A., Leonard, C.M., Richards, T.L., Aylward, E.H., Thomson, J., Berninger, V.W. Anatomical correlates of dyslexia: frontal and cerebellar findings. Brain, 2003; 126:482-94.

79. Richards, T. L., Berninger, V. W., Aylward, E. H., Richards, A. L., Thomson, J. B., Nagy, W. E., Carlisle, J. F., Dager, S. R., Abbott, R. D. Reproducibility of proton MR spectroscopic imaging (PEPSI):comparison of dyslexic and normal-reading children and effects of treatment on brain lactate levels during language tasks. AJNR Am J Neuroradiol,2002; 23:1678-85.

80. Dawson, G., Webb, S., Schellenberg, G.D., Dager, S., Friedman, S., Aylward, E., Richards, T.  Defining the broader phenotype of autism:  Genetic, brain and behavioral perspectives.   Development and Psychopathology, 2002; 14:  581-611.

81. Aylward, E.H., Minshew, N.J., Field, K., Sparks, B.F., Singh, N. Effects of age on brain volume and head circumference in autism. Neurology, 2002;59:175-83.

82. Sparks, B.F., Friedman, S.D., Shaw, D.W., Aylward, E.H., Echelard, D., Artru, A.A., Maravilla, K.R., Giedd, J.N., Munson, J., Dawson, G., Dager, S.R. Brain structural abnormalities in young children with autism spectrum disorder. Neurology, 2002; 59:184-92.

83. Aylward, E.H, Codori, A.M., Rosenblatt, A., Sherr, M., Brandt, J., Stine, O.C., Barta, P.E., Pearlson, G.D., Ross, C.A. Rate of caudate atrophy in presymptomatic and symptomatic stages of Huntington's disease. Movement Disorders, 2000; 15:  552-560.

84. Rabins P.V., Aylward, E., Holroyd, S., Pearlson, G.  MRI findings differentiate between late-onset schizophrenia and late-life mood disorder.  International Journal of Geriatric Psychiatry, 2000;15:954-60

85. LaFrance WC Jr, Lauterbach EC, Coffey CE, Salloway SP, Kaufer DI, Reeve A, Royall DR, Aylward E, Rummans TA, Lovell MR.  The use of herbal alternative medicines in neuropsychiatry. A report of the ANPA Committee on Research.
Journal of Neuropsychiatry and Clinical  Neuroscience,  2000; 12:177-92.

86. Burt, D.B., Aylward, E.H.  Test battery for the diagnosis of dementia in individuals with intellectual disability. Journal of Intellectual Disabilities Research, 2000; 44: 175-180.

87. Annet, R., Aylward, E., Lapidus, J., Bender, B., DuHamel, T.  Neurocognitive functioning in children with mild and moderate asthma in the Childhood Asthma Management Program. Journal of Allergy and Clinical Immunology, 2000; 105:  717-724.

88. Schretlen, D., Pearlson, G.D., Anthony, J., Aylward, E.H., Augustine, A.M., Davis, A., Barta, P. Elucidating the contributions of processing speed, executive ability, and frontal lobe volume to normal age-related differences in fluid intelligence. Journal of the International Neuropsychological Society, 2000; 6: 52-61.

89. Frederikse, M., Lu, A., Aylward, E., Barta, P., Sharma, T., Pearlson, G.  Sex differences in inferior parietal lobule volume in schizophrenia.  American Journal of Psychiatry, 2000; 3:  422-427.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 26 of 38

**SER-785**

90. Aylward, E.H., Minshew, N.J., Goldstein, G., Honeycutt, N.A., Augustine, A.M., Yates, K.O., Barta, P.E., Pearlson, G.D.  MRI volumes of amygdala and hippocampus in non-mentally retarded autistic adolescents and adults.  Neurology, 1999; 53:  2145-2150.

91. Frederikse, M., Lu, A., Aylward, E., Barta, P., Pearlson, G.D  Gender differences in the inferior parietal lobule. Cerebral Cortex, 1999; 9: 896-901.

92. Aylward, E.H., Li, Q., Honeycutt, N.A., Warren, A.C., Pulsifer, M.B., Barta, P.E., Chan, M.D., Smith, P.D., Jerram, M., Pearlson, G.D  MRI volumes of the hippocampus and amygdala in adults with Down's syndrome with and without dementia.  American Journal of Psychiatry, 1999; 156:  564-568.

93. Rosenblatt, A., Margolis, M.D., Becher, M.W., Aylward, E., Franz, M.L., Sherr, M., Abbott, M.H., Liang, K.Y., Ross, C.A.  Does CAG repeat number predict the rate of pathological changes in Huntington's disease?  Annals of Neurology, 1998; 44: 708-709.

94. Honeycutt, N.A., Smith, P.D., Aylward, E., Li, Q., Chan, M., Barta, P.E., Pearlson, G.D  Mesial temporal lobe measurements on magnetic resonance imaging scans.  Psychiatry Research: Neuroimaging, 1998; 83:  85-94.

95. Campodonico J.R., Aylward, E., Codori, A.M., Young C., Krafft, L., Magdalinski, M., Ranen, N., Slavney, P.R., Brandt, J.  When does Huntington's disease begin?  Journal of the International Neuropsychological Society, 1998; 4: 467-473.

96. Pearlson G.D., Breiter, S.N., Aylward, E.H., Warren, A.C., Grygorcewicz, M., Frangou, S., Barta, P.E., Pulsifer, M.  MRI brain changes in Down syndrome patients with and without dementia.  Developmental Medicine and Child Neurology, 1998, 40: 326-34.

97. Aylward, E.H., Anderson, N.B., Bylsma, F.W., Wagster, M.V., Barta, P.E., Sherr, M., Feeney, J., Davis, A., Rosenblatt, A., Pearlson, G.D., Ross, C.A.  Frontal lobe volume in patients with Huntington's disease.  Neurology, 1998; 50:  252-258

98. Aylward, E.H., Augustine, A., Li, Q., Barta, P.E., Pearlson, G.D. Measurement of frontal lobe volume on magnetic resonance imaging scans.  Psychiatry Research, 1997; 75: 23-30.

99. Aylward, E., Li, Q., Habbak, R., Warren, A., Pulsifer, M., Barta, P., Jerram, M., Pearlson, G.  Basal ganglia volume in adults with Down syndrome.  Psychiatry Research, 1997; 74: 73-82.

100. Aylward, E.H., Burt, D. B., Thorpe, L.U., Lai, F., Dalton, A.J.  Diagnosis of dementia in individuals with intellectual disability. Journal of Intellectual Disabilities Research, 1997; 41:  152-164.

101. Ross C.A., Margolis, R., Rosenblatt, A., Ranen, N.G., Becher, M.W., Aylward, E.H.  Reviews in molecular medicine:  Huntington disease and a related disorder, dentatorubral-pallidoluysian atrophy (DRPLA), Medicine, 1997; 76:305-33.

102. Frangou, S., Aylward, E., Warren, A., Sharma, T., Barta, P., Pearlson, G.  Small planum temporale volume In Down syndrome: a volumetric MRI study.  American Journal of Psychiatry, 1997; 154:  1424-1429.

103. Barta, P.E., Powers, R.E., Aylward, E.H., Chase, G.A., Harris, G.J., Rabins, P.V., Tune, L.E., Pearlson, G.D. Quantitative MRI volume changes in late onset schizophrenia

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 27 of 38

**SER-786**

and Alzheimer's disease compared to normal controls.  Psychiatry Research-Neuroimaging, 1997;68, 65-75.

104. Pearlson, G.D., Barta, P.E., Menon, R., Richards, S., Aylward, E.H., Han, W., Federman, E., Chase, G.J., Tien, A.Y., Petty, R.G., Medial and superior temporal gyral volumes and cerebral asymmetry in schizophrenia and bipolar disorder.  Biological Psychiatry, 1997; 41:  1-14.

105. Aylward, E.H., Li, Q., Stine, O.C., Ranen, N., Sherr, M., Barta, P.E., Bylsma, F.W., Pearlson, G.D., Ross, C.A. Longitudinal change in basal ganglia volume in  patients with Huntington's disease.  Neurology,1997; 48:  394-399.

106. Aylward, E.H., Habbak, R., Warren, A.C., Pulsifer, M.B., Barta, P.E., Jerram, M., Pearlson, G.D.  Cerebellar volume in adults with Down syndrome.  Archives of Neurology, 1997, 54:  209-212.

107. Holder, J.L., Habbak, R.A., Pearlson, G.D., Aylward, E.A., Pulsifer, M, Warren, A.C.  Reduced survival of Apolipoprotein E4 homozygotes in Down's syndrome.  NeuroReport, 1996; 7:2455-2456.

108. Aylward, E.H., Codori, A.M., Barta, P.E., Pearlson, G.P., Harris, G.J., Brandt, J.  Basal ganglia volume and proximity to onset in presymptomatic Huntington's disease.  Archives of Neurology, 1996; 53: 1293-1296.

109. Davison, S.E., Aylward, E.H., McArthur, J.C., Selnes, O., Lyketsos, C., Barta, P.E., Pearlson, G.  A quantitative MRI study of the basal ganglia in depression associated with HIV infection. Journal of Neuro-AIDS, 1996; 1: 29-41.

110. Aylward, E.H., Harris, G.J., Hoehn-Saric, R., Barta, P.E., Machlin, S.R., Pearlson, G.D.  Normal caudate nucleus in obsessive-compulsive disorder assessed by quantitative neuroimaging.  Archives of Neurology,1996; 53:  577-584.

111. Aylward, E., Rasmusson, X., Brandt, J., Raimundo, L., Folstein, M., Pearlson, G.  CT measurement of suprasellar cistern predicts rate of cognitive decline in Alzheimer's disease.  Journal of International Neuropsychological Society, 1996, 2:  89-95.

112. Aylward, E., Reiss, A., Reader, M., Singer, H., Brown, J., & Denckla, M. Basal ganglia volumes in children with attention deficit-hyperactivity disorder.  Journal of Child Neurology, 1996, 11, 112-115.

113. Harris, G., Aylward, E., Peyser, C., Pearlson, G., Brandt, J., Roberts-Twillie, J., Barta, P., Folstein, S.  Single photon emission computed tomographic blood flow and magnetic resonance volume imaging of basal ganglia in Huntington's disease.  Archives of Neurology 1996; 53:  316-324.

114. Tien, A.Y., Eaton, W.W., Schlaepfer, T.E., McGilchrist, I.K., Menon, R., Powers, R.E., Aylward, E., Barta, P., Strauss, M.E., & Pearlson, G.D.  Exploratory factor analysis of MRI brain structure measures in schizophrenia.  Schizophrenia Research, 1996; 19: 93-101.

115. Freund, L.S., Peebles, C.D., Aylward, E.H., & Reiss, A.L.  Preliminary report on cognitive and adaptive behaviors of preschool aged males with fragile X.  Developmental Brain Dysfunction 1995; 8: 242-251.

116. Noga, T., Aylward, E.H., & Pearlson, G.D.  Cingulate gyrus in schizophrenia and controls.  Psychiatry Research Neuro-Imaging, 1995, 61, 201-208.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 28 of 38

**SER-787**

117. Brandt, J., Bylsma, F.W., Aylward, E., Rothlind, J., & Gow, C.  Impaired source memory in Huntington's disease and its relation to basal ganglia atrophy.  Journal of Clinical and Experimental Neuropsychology, 1995, 17, 868-877.

118. Menon, R., Aylward, E., Barta, P., Richards, S., Vaughn, D., Tien, A., Harris, G., & Pearlson, G..  Superior temporal gyrus in schizophrenia:  Grey matter changes and clinical correlates.  Schizophrenia Research, 1995, 16, 127-135.

119. Aylward, E., Brettschneider, P.D., McArthur, J.C., Harris, G.J., Schlaepfer, T.E., Henderer, J.D., Barta, P.E., Tien, A.Y., & Pearlson, G.D.  Magnetic resonance imaging measurement of gray matter volume reductions in HIV-1 dementia.  American Journal of Psychiatry, 1995, 152, 987-994.

120. Aylward, E., Reiss, A., Barta, P., Tien, A., Han, W., Lee, J., & Pearlson, G.  Magnetic resonance imaging measurement of posterior fossa structures in schizophrenia.  American Journal of Psychiatry, 1994, 151, 1448-1452.

121. Habbak, R., Warren, A., Aylward, E., Jerram, M., & Pearlson, G.  Brief Report: Synkinesias are common in Down Syndrome.  Journal of Nervous and Mental Disease, 1994, 182, 667.

122. Aylward, E., Brandt, J., Codori, A., Mangus, R., Barta, P., & Harris, G. Reduced basal ganglia volume associated with the gene for Huntington's disease in asymptomatic at-risk persons.  Neurology, 1994, 44, 823-828.

123. Aylward, E., Roberts-Twillie, J., Barta, P., Kumar, A., Harris, G., Geer, M., Peyser, C., & Pearlson, G. Basal ganglia volumes and white matter hyperintensities in bipolar disorder.  American Journal of Psychiatry, 1994, 151, 687-693.

124. Aylward, E., Henderer, J., McArthur, J., Brettschneider, P., Harris, G., Barta, P., & Pearlson, G.  Basal ganglia atrophy in HIV-1 associated dementia complex:  Results from quantitative neuroimaging.  Neurology, 1993, 43, 2099-2104.

125. Singer, H., Reiss, A., Brown, J., Aylward, E., Shih, B., Harris, E., Reader, M., Chase, G., Bryan, N., & Denckla, M.  Volumetric MRI changes in basal ganglia of children with Tourette's syndrome.  Neurology, 1993, 43, 950-956.

126. Hestad, K., McArthur, J., Dal Pan, G., Selnes, O., Nance-Sproson, T., Aylward, E., Mathews, V., & McArthur, J.  Regional brain atrophy in HIV-1 infection:  Association with specific neuropsychological test performance.  Acta Neurologica Scandinavica, 1993, 88, 112-118.

127. Pearlson, G., Tune, L., Wong, D., Aylward, E., Barta, P., Powers, R., Tien A., Chase, G., Harris, G., & Rabins, P.  Quantitative D2 dopamine receptor PET and structural MRI changes in late onset schizophrenia.  Schizophrenia Bulletin, 1993, 19, 783-795.

128. Dal Pan, G. J., McArthur, J.H., Aylward, E.A., Selnes, O.A., Nance-Sproson, T.E., Kumar, A.J., Mellits, E.D., & McArthur, J.C. Patterns of cerebral atrophy in HIV-1 infected individuals:  Results of a quantitative MRI analysis.  Neurology, 1992, 42, 2125-2130.

129. Schwartz, J., Aylward, E., Barta, P., & Pearlson, G.  Increased sylvian fissure size in schizophrenia using the CERAD MRI rating protocol.  American Journal of Psychiatry, 1992, 149, 1195-1198.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 29 of 38

**SER-788**

130. Aylward, E., Butz, A., Hutton, N., Joyner, M., & Vogelhut, J.  Cognitive and motor development in HIV-risk infants.  American Journal of Diseases of Children, 1992, 146, 218-223.

131. Harris, G., Pearlson, G., Peyser, C., Aylward, E., Roberts, J., Barta, P., Chase, G., & Folstein, S.  Putamen volume reduction on magnetic resonance imaging exceeds caudate changes in mild Huntington's disease. Annals of Neurology, 1992, 31, 69-75.

132. Aylward, E., Karagiozis, H., Pearlson, G., & Folstein, M.  Suprasellar cistern as a reflection of dementia in Alzheimer's Disease but not Huntington's Disease.  Journal of Psychiatric Research, 1991, 25, 31-47.

133. Aylward, E., Schwartz, J., Machlin, S., & Pearlson, G.  Bicaudate ratio as a measure of caudate volume on MR Images.  AJNR, 1991, 12, 1217-1222.

134. Aylward, E., & Reiss, A.  Area and volume measurement of posterior fossa structures in MRI.  Journal of Psychiatric Research, 1991, 25, 159-168.

135. Reiss, A., Aylward, E., Freund, L., Joshi, P., & Bryan, N. Neuroanatomy of Fragile X syndrome I:  The posterior fossa.  Annals of Neurology, 1991, 29, 26-32.

136. Rabins, P., Pearlson, G., Aylward, E., Kumar, A., & Dowell, K.  Cortical MRI changes in elderly inpatients with major depression.  American Journal of Psychiatry, 1991, 148, 617-620.

137. Pearlson, G., Warren, A., Starkstein, S., Aylward, E., Kumar, A., Chase, G., & Folstein, M.  CT measures in Down Syndrome with and without dementia.  American Journal of Neuroradiology. 1990; 11: 811-816.

138. Brown, F.R., Greer, M.K., Aylward, E.H., & Hunt, H.H.  Intellectual and adaptive functioning in Down syndrome in relation to age and environmental placement.  Pediatrics. 1990; 85: 450-452.

139. Aylward, E., and Schmidt, S.  A comparison of three tests of visual-motor integration.  Journal of Learning Disabilities, 1986: 328-330.

140. Aylward, E.  Lateral asymmetry in subgroups of dyslexic children.  Brain and Language. 1984; 22: 221-231.

141. Aylward, E., Walker, E., & Bettes, B.  Intelligence and schizophrenia: An overview and meta-analysis of the research. Schizophrenia Bulletin. 1984; 10: 430-459.

142. Walker, E., Hoppes, E., & Emory, E.  A reinterpretation of findings on hemispheric dysfunction in schizophrenia.  Journal of Nervous and Mental Disease, 1981, 169, 378-380.

143. Walker, E., Emory, E., Hoppes, E., & Mednick, S. Environmental factors related to schizophrenia in psycho physiologically labile high-risk males.  Journal of Abnormal Psychology, 1981, 49, 313-320.

Refereed Manuscripts Published as a Member of the Huntington Study Group,    PREDICT-HD and I-RESPOND-HD investigators:

1. Carvalho JO, Long JD, Westervelt HJ, Smith MM, Bruce JM, Kim JI, Mills JA, Paulsen JS; PREDICT-HD Investigators and Coordinators Of The Huntington Study Group. The

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 30 of 38

SER-789

impact of oculomotor functioning on neuropsychological performance in Huntington disease. J Clin Exp Neuropsychol. 2016; 38:217-26.

2. Liu D, Long JD, Zhang Y, Raymond LA, Marder K, Rosser A, McCusker EA, Mills JA, Paulsen JS; PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Motor onset and diagnosis in Huntington disease using the diagnostic confidence level. J Neurol. 2015; 262: 2691-8.

3. Kim JI, Long JD, Mills JA, McCusker E, Paulsen JS; PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Multivariate clustering of progression profiles reveals different depression patterns in prodromal Huntington disease. Neuropsychology. 2015; 29: 949-60.

4. Kim JI, Long JD, Mills JA, Downing N, Williams JK, Paulsen JS; PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Performance of the 12-item WHODAS 2.0 in prodromal Huntington disease. Eur J Hum Genet. 2015; 23: 1584-7.

5. Downing NR, Kim JI, Williams JK, Long JD, Mills JA, Paulsen JS; PREDICT-HD Investigators and Coordinators of the Huntington Study Group. WHODAS 2.0 in prodromal Huntington disease: measures of functioning in neuropsychiatric disease. Eur J Hum Genet. 2014; 22: 958-63.

6. Long JD, Paulsen JS, Marder K, Zhang Y, Kim JI, Mills JA; Researchers of the PREDICT-HD Huntington's Study Group. Tracking motor impairments in the progression of Huntington's disease. Mov Disord. 2014; 29: 311-9.

7. Epping EA, Mills JA, Beglinger LJ, Fiedorowicz JG, Craufurd D, Smith MM, Groves M, Bijanki KR, Downing N, Williams JK, Long JD, Paulsen JS; PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Characterization of depression in prodromal Huntington disease in the neurobiological predictors of HD (PREDICT-HD) study. J Psychiatr Res. 2013;47:1423-31.

8. Brossman B, Williams JK, Downing N, Mills JA, Paulsen JS; PREDICT-HD Investigators and Coordinators of the Huntington Study Group. Development of the huntington disease work function scale. J Occup Environ Med. 2012; 54:1300-1308.

9. Smith MM, Mills JA, Epping EA, Westervelt HJ, Paulsen JS; PREDICT-HD Investigators of the Huntington Study Group. Depressive symptom severity is related to poorer cognitive performance in prodromal Huntington disease. Neuropsychology. 2012; 26:664-9.

10. Harrington DL, Smith MM, Zhang Y, Carlozzi NE, Paulsen JS; PREDICT-HD Investigators of the Huntington Study Group. Cognitive domains that predict time to diagnosis in prodromal Huntington disease. J Neurol Neurosurg Psychiatry. 2012; 83:612-9.

11. Long JD, Matson WR, Juhl AR, Leavitt BR, Paulsen JS; PREDICT-HD Investigators and Coordinators of the Huntington Study Group. 8OHdG as a marker for Huntington disease progression. Neurobiol Dis. 2012; 46:625-34.

12. Downing N, Smith MM, Beglinger LJ, Mills J, Duff K, Rowe KC, Epping E, Paulsen JS, & the PREDICT-HD Investigators of the Huntington Study Group (2011). Perceived Stress in Prodromal Huntington Disease. Psychology & Health. 2012; 27:196-209.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 31 of 38

**SER-790**

13. Lee JM, Ramos EM, Lee JH, Gillis T, Mysore JS, Hayden MR, Warby SC, Morrison P, Nance M, Ross CA, Margolis RL, Squitieri F, Orobello S, Di Donato S, Gomez-Tortosa E, Ayuso C, Suchowersky O, Trent RJ, McCusker E, Novelletto A, Frontali M, Jones R, Ashizawa T, Frank S, Saint-Hilaire MH, Hersch SM, Rosas HD, Lucente D, Harrison MB, Zanko A, Abramson RK, Marder K, Sequeiros J, Paulsen JS; PREDICT-HD study of the Huntington Study Group (HSG), Landwehrmeyer GB; REGISTRY study of the European Huntington's Disease Network, Myers RH; HD-MAPS Study Group, Macdonald ME, Gusella JF; COHORT study of the HSG. CAG repeat expansion in Huntington disease determines age at onset in a fully dominant fashion. Neurology. 2012; 78: 690-695.

14. Fiedorowicz JG, Mills JA, Ruggle A, Langbehn D, Paulsen JS, & the PREDICT-HD Investigators of the Huntington Study Group (2011). Suicidal Behavior in Prodromal Huntington Disease. Neurodegenerative Diseases. Neurodegener Dis. 2011; 8:483-90

15. Soneson C, Fontes M, Zhou Y, Denisov V, Paulsen JS, Kirik D, Petersén A; Huntington Study Group PREDICT-HD investigators. Early changes in the hypothalamic region in prodromal Huntington disease revealed by MRI analysis. Neurobiol Dis. 2010; 40: 531-43.

16. Paulsen JS, Wang C, Duff K, Barker R, Nance M, Beglinger L, Moser D, Williams JK, Simpson S, Langbehn D, van Kammen DP; PREDICT-HD Investigators of the Huntington Study Group. Challenges assessing clinical endpoints in early Huntington disease. Mov Disord. 2010;25: 2595-603.

17. Williams JK, Erwin C, Juhl AR, Mengeling M, Bombard Y, Hayden MR, Quaid K, Shoulson I, Taylor S, Paulsen JS; I-RESPOND-HD Investigators of the Huntington Study Group. In their own words: reports of stigma and genetic discrimination by people at risk for Huntington disease in the International RESPOND-HD study. Am J Med Genet B Neuropsychiatr Genet. 2010; 153B:1150-9.

18. Erwin C, Williams JK, Juhl AR, Mengeling M, Mills JA, Bombard Y, Hayden MR, Quaid K, Shoulson I, Taylor S, Paulsen JS; I-RESPOND-HD Investigators of the Huntington Study Group Perception, experience, and response to genetic discrimination in Huntington disease: the international RESPOND-HD study. Am J Med Genet B Neuropsychiatr Genet. 2010; 153B:1081-93.

19. Langbehn DR, Hayden MR, Paulsen JS; PREDICT-HD Investigators of the Huntington Study Group. CAG-repeat length and the age of onset in Huntington disease (HD): a review and validation study of statistical approaches. Am J Med Genet B Neuropsychiatr Genet. 2010; 153B:397-408.

Refereed Manuscripts Published as a Member of the Childhood Asthma Management Program Research Group

1. McGeachie MJ, Yates KP, Zhou X, Guo F, Sternberg AL, Van Natta ML, Wise RA, Szefler SJ, Sharma S, Kho AT, Cho MH, Croteau-Chonka DC, Castaldi PJ, Jain G, Sanyal A, Zhan Y, Lajoie BR, Dekker J, Stamatoyannopoulos J, Covar RA, Zeiger RS, Adkinson NF, Williams PV, Kelly HW, Grasemann H, Vonk JM, Koppelman GH, Postma DS, Raby BA, Houston I, Lu Q, Fuhlbrigge AL, Tantisira KG, Silverman EK, Tonascia J, Weiss ST, Strunk RC. Patterns of growth and decline in lung function in persistent childhood asthma. N Engl J Med. 2016; 374:1842-1852.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 32 of 38

**SER-791**

2. Strunk RC, Colvin R, Bacharier LB, Fuhlbrigge A, Forno E, Arbelaez AM, Tantisira KG; Childhood Asthma Management Program Research Group. Airway obstruction worsens in young adults with asthma who become obese. J Allergy Clin Immunol Pract. 2015; 3:765-71.

3. Howrylak JA, Fuhlbrigge AL, Strunk RC, Zeiger RS, Weiss ST, Raby BA; Childhood Asthma Management Program Research Group. Classification of childhood asthma phenotypes and long-term clinical responses to inhaled anti-inflammatory medications. J Allergy Clin Immunol. 2014; 133: 1289-300, 1300.

4. Spicher M, Bollers N, Chinn T, Hall A, Plunkett A, Rodgers D, Sundström DA, Wilson L; Childhood Asthma Management Program (CAMP) Research Group. Adherence in single-parent households in a long-term asthma clinical trial. Pediatr Nurs. 2012; 8: 207-13, 238.

5. Kelly HW, Sternberg AL, Lescher R, Fuhlbrigge AL, Williams P, Zeiger RS, Raissy HH, Van Natta ML, Tonascia J, Strunk RC; CAMP Research Group. Effect of inhaled glucocorticoids in childhood on adult height. N Engl J Med. 2012; 367: 904-12.

6. Wu AC, Tantisira K, Li L, Fuhlbrigge AL, Weiss ST, Litonjua A; Childhood Asthma Management Program Research Group. Effect of vitamin D and inhaled corticosteroid treatment on lung function in children. Am J Respir Crit Care Med. 2012;186: 508-13.

7. Tse SM, Kelly HW, Litonjua AA, Van Natta ML, Weiss ST, Tantisira KG; Childhood Asthma Management Program Research Group. Corticosteroid use and bone mineral accretion in children with asthma: effect modification by vitamin D. J Allergy Clin Immunol. 2012; 130: 53-60.

8. Wu AC, Tantisira K, Li L, Schuemann B, Weiss ST, Fuhlbrigge AL; Childhood Asthma Management Program Research Group. Predictors of symptoms are different from predictors of severe exacerbations from asthma in children. Chest. 2011; 140: 100-107.

9. Cohen RT, Raby BA, Van Steen K, Fuhlbrigge AL, Celedón JC, Rosner BA, Strunk RC, Zeiger RS, Weiss ST; Childhood Asthma Management Program Research Group. In utero smoke exposure and impaired response to inhaled corticosteroids in children with asthma. J Allergy Clin Immunol. 2010; 126: 491-7.

10. Brehm JM, Schuemann B, Fuhlbrigge AL, Hollis BW, Strunk RC, Zeiger RS, Weiss ST, Litonjua AA; Childhood Asthma Management Program Research Group. Serum vitamin D levels and severe asthma exacerbations in the Childhood Asthma Management Program study.J Allergy Clin Immunol. 2010; 126: 52-8.e5.

11. Strunk RC, Sternberg AL, Szefler SJ, Zeiger RS, Bender B, Tonascia J; Childhood Asthma Management Program (CAMP) Research Group. Long-term budesonide or nedocromil treatment, once discontinued, does not alter the course of mild to moderate asthma in children and adolescents. J Pediatr. 2009;154: 682-7.

12. Sharma S, Litonjua AA, Tantisira KG, Fuhlbrigge AL, Szefler SJ, Strunk RC, Zeiger RS, Murphy AJ, Weiss ST; Childhood Asthma Management Program Research Group. Clinical predictors and outcomes of consistent bronchodilator response in the childhood asthma management program. J Allergy Clin Immunol. 2008;122: 921-928.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 33 of 38

**SER-792**

13. Kelly HW, Van Natta ML, Covar RA, Tonascia J, Green RP, Strunk RC; CAMP Research Group.  Effect of long-term corticosteroid use on bone mineral density in children: a prospective longitudinal assessment in the childhood Asthma Management Program (CAMP) study.  Pediatrics. 2008;122: e53-61.

Refereed Manuscript Published as a Member of the Simons VIP Consortium:

1. D'Angelo D, Lebon S, Chen Q, Martin-Brevet S, Snyder LG, Hippolyte L, Hanson E, Maillard AM, Faucett WA, Macé A, Pain A, Bernier R, Chawner SJ, David A, Andrieux J, Aylward E, Baujat G, Caldeira I, Conus P, Ferrari C, Forzano F, Gérard M, Goin-Kochel RP, Grant E, Hunter JV, Isidor B, Jacquette A, Jønch AE, Keren B, Lacombe D, Le Caignec C, Martin CL, Männik K, Metspalu A, Mignot C, Mukherjee P, Owen MJ, Passeggeri M, Rooryck-Thambo C, Rosenfeld JA, Spence SJ, Steinman KJ, Tjernagel J, Van Haelst M, Shen Y, Draganski B, Sherr EH, Ledbetter DH, van den Bree MB, Beckmann JS, Spiro JE, Reymond A, Jacquemont S, Chung WK; Cardiff University Experiences of Children With Copy Number Variants (ECHO) Study; 16p11.2 European Consortium; Simons Variation in Individuals Project (VIP) Consortium. Defining the effect of the 16p11.2 duplication on cognition, behavior, and medical comorbidities. JAMA Psychiatry. 2016; 73: 20-30.

2. Bernier R, Steinman KJ, Reilly B, Wallace AS, Sherr EH, Pojman N, Mefford HC, Gerdts J, Earl R, Hanson E, Goin-Kochel RP, Berry L, Kanne S, Snyder LG, Spence S, Ramocki MB, Evans DW, Spiro JE, Martin CL, Ledbetter DH, Chung WK; Simons VIP consortium. Clinical phenotype of the recurrent 1q21.1 copy-number variant. Genet Med. 2016; 18: 341-9.

3. Hanson E, Bernier R, Porche K, Jackson FI, Goin-Kochel RP, Snyder LG, Snow AV, Wallace AS, Campe KL, Zhang Y, Chen Q, D'Angelo D, Moreno-De-Luca A, Orr PT, Boomer KB, Evans DW, Kanne S, Berry L, Miller FK, Olson J, Sherr E, Martin CL, Ledbetter DH, Spiro JE, Chung WK; Simons Variation in Individuals Project Consortium. The cognitive and behavioral phenotype of the 16p11.2 deletion in a clinically ascertained population. Biol Psychiatry. 2015; 77:785-93.

4. Simons VIP Consortium. Simons Variation in Individuals Project (Simons VIP): a genetics-first approach to studying autism spectrum and related neurodevelopmental disorders. Neuron. 2012; 73:1063-1067.

(b) *Book Chapters*

1. Weaver K, Williams A, Konopa P, Aylward E.  Neuroimaging in Huntington's disease.  In Huntington's dementia (Leavitt, B., Ed.), Lake Worth FL:  Carma, 2008.

2. Berninger, V., Nagy, W., Carlisle, J., Thomson, J., Hoffer, D., Abbott, S., Abbott, R., Richards, T., & Aylward, E.  (2002).  Effective treatment for dyslexics in grades 4 to 6.  In B. Foorman (Ed.), *Preventing and Remediating Reading Difficulties:  Bringing Science to Scale.*  Timonium, MD:  York Press.

3. Dawson, G., Webb, S., Schellenberg, G., Aylward, E., Richards, T., Dager, S., Friedman, S.  Defining the phenotype of autism:  Genetic, brain and behavioral perspectives.   Special Issue of Development and Psychopathology on "Multiple Levels of Analysis."  Cicchetti, D., and Dawson, G. (Eds.), 2002, 14, 581-611.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 34 of 38

SER-793

4. Pulsifer, M., Aylward, E.  Neuropsychology of pediatric HIV. In K.O. Yeates, M.D. Ris, H.G. Taylor (eds.), <u>Pediatric Neuropsychology:  Research, theory, and practice</u>.  N.Y.: Guilford Publications, 1999.

5. Burt, D.B.& Aylward, E. Procedures for diagnosis of dementia.  In M. Janicki & A. Dalton (eds.), <u>Dementia and Aging Adults with Intellectual Disabilities: A Handbook</u>.  Bristol: Taylor & Francis, 1999.

6. Aylward, E. & Whitehouse, D.  Learning disability with and without attention        deficit disorder.  In S. Ceci (ed.), <u>Handbook of Cognitive, Social and Neuropsychological Aspects of Learning Disabilities</u>.  Lawrence Erlbaum Associates, l986.

7. Walker, E. & <u>Hoppes, E.,</u>  Longitudinal research in schizophrenia:  The high-risk method.  In S. Mednick & M. Harway (Eds.), <u>Longitudinal Research:  Methods and Uses in Behavioral Services</u>.  Boston:  M. Najhoff, l984.

<u>(c) Books</u>

1. Brown, F.B., Aylward, E.H., Keogh, B.K.  <u>Diagnosis and management of learning disabilities: A multidisciplinary/lifespan approach</u> (3rd edition).  San Diego:  Singular Publishing,1996.

2. Aylward, E.  <u>Understanding Children's Testing, Vol. 1: Psychological Testing</u>.  Austin:  Pro-Ed, l991.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 35 of 38

**SER-794**

## APPENDIX B: REFERENCES

Anderson BM, Stevens MC, Meda SA, et al. Functional imaging of cognitive control during acute alcohol intoxication. Alcohol Clin Exp Res. 2011; 35(1):156-165.

Bartzokis G, Beckson M, Lu PH, Nuechterlein KH, Edwards N, Mintz J. Age-related changes in frontal and temporal lobe volumes in men: a magnetic resonance imaging study. Arch Gen Psychiatry. 2001;58(5):461-5.

Bossong MG, Niesink RJ. Adolescent brain maturation, the endogenous cannabinoid system and the neurobiology of cannabis-induced schizophrenia. Prog Neurobiol. 2010;92(3):370-85.

Casey B, Jones RM, Somerville LH. Braking and accelerating of the adolescent brain. J Res Adolesc. 2011;21(1):21–33.

Casey BJ, Galván A, Somerville LH. Beyond simple models of adolescence to an integrated circuit-based account: A commentary. Dev Cogn Neurosci. 2016; 17:128-30.

Casey BJ, Getz S, Galvan A. The adolescent brain. Dev Rev. 2008;28(1):62-77.

Chein J, Albert D, O'Brien L, Uckert K, Steinberg L. Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry. Dev Sci. 2011; 14(2):F1-10.

Cohen AO, Breiner K, Steinberg L, et al. When is an adolescent an adult? Assessing cognitive control in emotional and nonemotional contexts. Psychol Sci. 2016;27(4):549-62.

Cohen, A. O., & Casey, B. J. (2014). Rewiring juvenile justice: The intersection of developmental neuroscience and legal policy. Trends in Cognitive Sciences 2014;18,63–65.

Dahl R. 2004.  Adolescent brain development:  A period of vulnerabilities and opportunitites.  Ann NY Acad Sci. 2004; 1021:1-22.

Dahl RE. Affect regulation, brain development, and behavioral/emotional health in adolescence. CNS Spectr. 2001;6(1):60-72.

Dow-Edwards D, MacMaster FP, Peterson BS, Niesink R, Andersen S, Braams BR. Experience during adolescence shapes brain development: From synapses and networks to normal and pathological behavior. Neurotoxicol Teratol. 2019; 76.

Galvan A, Hare TA, Parra CE, et al. Earlier development of the accumbens relative to orbitofrontal cortex might underlie risk-taking behavior in adolescents. J Neurosci. 2006; 26(25):6885-92.

Giedd JN, Rapoport JL. Structural MRI of pediatric brain development: what have we learned and where are we going? Neuron. 2010; 67(5):728–734.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 36 of 38

**SER-795**

Giedd JN. Structural magnetic resonance imaging of the adolescent brain. Ann NY Acad Sci. 2004; 1021:77-85.

Gogtay N, Giedd JN, Lusk L, et al. Dynamic mapping of human cortical development during childhood through early adulthood. Proc Natl Acad Sci U S A. 2004;101(21):8174-9.

Hatchard T, Mioduszewski O, Fall C, Byron-Alhassan A, Fried P, Smith AM. Neural impact of low-level alcohol use on response inhibition: An fMRI investigation in young adults. Behav Brain Res. 2017; 329:12-19.

Lenroot RK, Giedd JN. Brain development in children and adolescents: insights from anatomical magnetic resonance imaging. Neurosci Biobehav Rev. 2006;30(6):718-29.

Lenroot RK, Gogtay N, Greenstein DK, et al. Sexual dimorphism of brain developmental trajectories during childhood and adolescence. Neuroimage. 2007;36(4):1065-73.

Mills KL, Goddings AL, Clasen LS, Giedd JN, Blakemore SJ. The developmental mismatch in structural brain maturation during adolescence. Dev Neurosci.2014;36(3-4):147-60.

Nikolaou K, Critchley H, Duka T. Alcohol affects neuronal substrates of response inhibition but not of perceptual processing of stimuli signalling a stop response. PLoS One. 2013;8(9):e76649.

Petanjek Z, Judaš M, Šimic G, et al. Extraordinary neoteny of synaptic spines in the human prefrontal cortex. Proc Natl Acad Sci U S A. 2011;108(32):13281-6.

Schreuders E, Braams BR, Blankenstein NE, Peper JS, Güroğlu B, Crone EA. Contributions of reward sensitivity to ventral striatum activity across adolescence and early adulthood. Child Dev. 2018;89(3):797-810.

Silveri MM, Sneider JT, Crowley DJ, et al. Frontal lobe γ-aminobutyric acid levels during adolescence: associations with impulsivity and response inhibition. Biol Psychiatry. 2013; 74(4):296–304.

Silvers JA, Insel C, Powers A, et al. vlPFC-vmPFC-amygdala interactions underlie age-related differences in cognitive regulation of emotion. Cereb Cortex. 2017; 27(7):3502–3514.

Somerville LH, Jones RM, Casey BJ. A time of change: behavioral and neural correlates of adolescent sensitivity to appetitive and aversive environmental cues. Brain Cogn. 2010;72(1):124-33.

Sowell ER, Thompson PM, Holmes CJ, Batth R, Jernigan TL, Toga AW. Localizing age-related changes in brain structure between childhood and adolescence using statistical parametric mapping. Neuroimage. 1999;(6 Pt 1):587-97.

Steinberg L, Albert D, Cauffman E, Banich M, Graham S, Woolard J. Age differences in sensation seeking and impulsivity as indexed by behavior and self-report: evidence for a dual systems model.  Dev Psychol. 2008;44(6):1764-78.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 37 of 38

SER-796

Steinberg L, Cauffman E, Woolard J, Graham S, Banich M. Are adolescents less mature than adults?:  Minors' access to abortion, the juvenile death penalty, and the alleged APA "flip-flop." Psychol. 2009;64(7):583-94.

Steinberg L. A social neuroscience perspective on adolescent risk-taking. Dev Rev. 2008;28(1):78-106.

Urošević S, Collins P, Muetzel R, Lim K, Luciana M. Longitudinal changes in behavioral approach system sensitivity and brain structures involved in reward processing during adolescence. Dev Psychol. 2012;48(5):1488-500.

Wetherill RR, Squeglia LM, Yang TT, Tapert SF. A longitudinal examination of adolescent response inhibition: neural differences before and after the initiation of heavy drinking. Psychopharmacology (Berl). 2013;230(4):663–671.

Wierenga L,  Langen M, Ambrosino S, et al. Typical development of basal  ganglia, hippocampus, amygdala and cerebellum from age 7 to24. Neuroimage. 2014;96,67-72.

Wrege J, Schmidt A, Walter A, et al. Effects of cannabis on impulsivity: a systematic review of neuroimaging findings. Curr Pharm Des. 2014; 20(13):2126–2137.

Expert Report of Elizabeth H. Aylward, Ph.D
Mitchell v. Atkins, No. C:19-cv-5106-RBL (W.D. Wash.)
Page 38 of 38

**SER-797**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable Ronald B. Leighton

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

DANIEL MITCHELL, *et al.*,

Plaintiffs,

v.

CHARLES ATKINS, *et al.*,

Defendants,

and

SAFE SCHOOLS SAFE COMMUNITIES,

Intervenor-Defendant.

NO. 3:19-cv-5106

DEFENDANTS AND INTERVENOR-DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**NOTED ON MOTION CALENDAR:  APRIL 24, 2020**

**ORAL ARGUMENT REQUESTED**

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................ 1

II.   FACTS IN SUPPORT OF MOTION ............................................................ 3

      A.   Gun Violence, Including Mass Shootings, Significantly Impacts Public Safety
           in Washington and the United States ................................................................ 3

      B.   I-1639 is Designed to Reduce Gun Violence and Increase Public Safety by
           Extending Federal and State Laws that Apply to Handguns to SARs .................... 6

           1.   The Age Provision ................................................................................ 6

           2.   The Background Check Provision ......................................................... 7

           3.   The Nonresident Sales Provision ........................................................ 9

      C.   Plaintiffs Challenge Only the Age Provision and the Nonresident Sales
           Provision ............................................................................................ 10

III.  ARGUMENT ................................................................................................ 10

      A.   Standard of Review ................................................................................ 10

      B.   The Age Provision Does Not Violate the Second Amendment ............................ 10

           1.   The Second Amendment framework .................................................... 10

           2.   The Age Provision does not burden Second Amendment rights ................ 11

                a.   "Longstanding" firearm laws fall outside the Second Amendment ......... 11

                b.   Minimum age laws for firearms are historically longstanding ............... 12

                     i.    The age of majority was 21 until the 1970s ............................ 12

                     ii.   Laws have restricted under-21 firearm sales since the 1800s ......... 13

                     iii.  An emerging consensus among the courts is that firearm
                           minimum age restrictions fall outside the Second Amendment ..... 14

           3.   The Age Provision withstands intermediate scrutiny ............................ 16

                a.   Intermediate scrutiny applies because the Age Provision does not
                     severely burden a core Second Amendment right ................................ 16

                     i.    The Age Provision does not burden the "core right" of
                           "responsible individuals" to defend themselves in the home ......... 16

                     ii.   Any burden imposed by the Age Provision is not "severe" .......... 17

DEFS.' CROSS-MSJ AND OPP. TO                    i                    ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                                      800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                                          Seattle, WA 98104-3188
                                                                                     (206) 464-7744

|  |  |  |  |
|---|---|---|---|
|  | b. | The Age Provision satisfies intermediate scrutiny | 20 |
|  | i. | I-1639 addresses significant government interests | 20 |
|  | ii. | Restricting SAR sales to 18- to 20-year olds has a "reasonable fit" with reducing gun violence and increasing public safety | 21 |
|  | (a) | The regions of the brain that govern impulsivity and judgment do not fully mature until the twenties | 21 |
|  | (b) | Individuals 18 to 20 disproportionately commit violent crimes | 22 |
|  | (c) | Minimum age laws have proven effective in addressing health and safety concerns | 23 |
|  | (d) | SARs are more dangerous and used more frequently in mass shootings than other firearms | 24 |

C. The Nonresident Sales Provision Does Not Violate the Dormant Commerce Clause .................................................................................26

   1. Dormant Commerce Clause framework .........................................27

   2. The Nonresident Sales Provision is non-discriminatory because it does not involve economic protectionism .............................................27

   3. The Nonresident Sales Provision meets the *Pike* balancing test ......................31

   4. The Nonresident Sales Provision would meet strict scrutiny if it applied ........32

   5. Congress has authorized states to restrict sales of rifles to nonresidents .........35

D. Plaintiffs' Claims Are Not Justiciable .................................................37

   1. Plaintiffs Casey's and Rettmer's Second Amendment claims are moot .........38

   2. Plaintiff Wald lacks standing .....................................................38

   3. The Organizational Plaintiffs lack standing to challenge the Age Provision ....................................................................................38

   4. Plaintiff Mitchell lacks standing to challenge the Nonresident Sales Provision ...................................................................................39

E. Plaintiffs' Request for Attorney Fees Should Be Denied ......................40

IV. CONCLUSION ..........................................................................................40

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

ii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-800

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Am. Civil Liberties Union of Nev. v. Lomax*,
    471 F.3d 1010 (9th Cir. 2006) ........................................................................37

*Bayer v. Neiman Marcus Grp., Inc.*,
    861 F.3d 853 (9th Cir. 2017) .........................................................................38

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*,
    476 U.S. 573 (1986) ...............................................................................30, 31

*C & A Carbone, Inc. v. Town of Clarkstown*,
    511 U.S. 383 (1994) .......................................................................28, 32, 34

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
    520 U.S. 564 (1997) ......................................................................................29

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ......................................................................................11

*City of New York v. U.S. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) ...........................................................................8

*City of Phila. v. New Jersey*,
    437 U.S. 617 (1978) ......................................................................................28

*Cohen v. R.I. Tpk. & Bridge Auth.*,
    775 F. Supp. 2d 439 (D.R.I. 2011) ................................................................29

*Colacurcio v. City of Kent*,
    163 F.3d 545 (9th Cir. 1998) .........................................................................20

*Coleman v. State*,
    32 Ala. 581 (1858) .........................................................................................13

*Conservation Force, Inc. v. Manning*,
    301 F.3d 985 (9th Cir. 2002) .........................................................................27

*Craig v. Boren*,
    429 U.S. 190 (1976) ......................................................................................38

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ...............................................................................passim

*Doe v. Virginia Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013) .........................................................................38

*Ecumenical Ministries v. Oregon State Lottery Comm'n*,
    871 P.2d 106 (Or. 1994) ..................................................................................3

DEFS.' CROSS-MSJ AND OPP. TO                    iii            ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                              800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                                 Seattle, WA 98104-3188
                                                                            (206) 464-7744

SER-801

*Farrar v. Hobby*,
   506 U.S. 103 (1992) ............................................................................40

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) .............................................................25

*Friend v. Kolodzieczak*,
   72 F.3d 1386 (9th Cir. 1995) .............................................................40

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ...........................................................................39

*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ........................................... 11, 15, 16, 20

*Gen. Motors Corp. v. Tracy*,
   519 U.S. 278 (1997) ...........................................................................29

*Graham v. Florida*,
   560 U.S. 48 (2010) .............................................................................22

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ........................................................25

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   417 F. Supp. 3d 747 (W.D. Va. 2019) .........................................12, 15

*Hirst v. Skywest*, 910 F.3d 961 (7th Cir. 2018) ......................................37

*Horsley v. Trame*,
   61 F. Supp. 3d 788 (S.D. Ill. 2014), *aff'd*, 808 F.3d 1126 (7th Cir. 2015) ...........................22

*Horsley v. Trame*,
   808 F.3d 1126 (7th Cir. 2015) .......................................................3, 21

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
   803 F.3d 389 (9th Cir. 2015) .......................................................26, 28

*Jackson v. City & Cty. of S.F.*,
   746 F.3d 953 (9th Cir. 2014) ...................................................16, 18, 20

*Kachalsky v. Cty. of Westchester*,
   701 F.3d 81 (2d Cir. 2012) ................................................................33

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) .......................................................15, 21, 25

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...........................................................................38

*Mahoney v. Sessions*,
   871 F.3d 873 (9th Cir. 2017) .............................................................20

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

iv

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-802**

*Maine v. Taylor*,
     477 U.S. 131 (1986) ................................................................ 27, 33, 35

*Mance v. Sessions*,
     896 F.3d 699 (5th Cir. 2018) (per curiam) .................... 9, 32, 33, 34

*McDonald v. City of Chicago*,
     561 U.S. 742 (2010) .................................................................... 12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*,
     883 F.3d 45 (2d Cir. 2018), *cert. granted sub nom.* 139 S. Ct. 939 (2019) ......................... 33

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
     804 F.3d 242 (2d Cir. 2015) ............................................ 11, 21, 25

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
     567 F.3d 521 (9th Cir. 2009) ........................................................ 31

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
     682 F.3d 1144 (9th Cir. 2012) ................................................ 27, 31

*Nat'l Rifle Ass'n v. Bur. of Alcohol, Tobacco, Firearms & Explosives*,
     700 F.3d 185 (5th Cir. 2012) ................................................. passim

*Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
     472 U.S. 159 (1985) .................................................................... 35

*New England Power Co. v. New Hampshire*,
     455 U.S. 331 (1982) .................................................................... 30

*Norfolk S. Corp. v. Oberly*,
     632 F. Supp. 1225 (D. Del. 1986), *aff'd*, 822 F.2d 388 (3d Cir. 1987) ................................ 37

*NRA v. McCraw*,
     719 F.3d 338 (5th Cir. 2013) .......................................... 14, 18, 21, 38

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*,
     511 U.S. 93 (1994) ...................................................................... 28

*Oregon v. Mitchell*,
     400 U.S. 112 (1970) .................................................................... 13

*Pena v. Lindley*,
     898 F.3d 969 (9th Cir. 2018) ............................................ 16, 18, 20

*Penn Advert. of Baltimore, Inc. v. Mayor & City Council of Baltimore*,
     63 F.3d 1318 (4th Cir. 1995), *cert. granted, judgment vacated on other grounds sub
     nom. Penn Advert. of Baltimore, Inc. v. Schmoke*, 518 U.S. 1030 (1996), *and adopted
     as modified,* 101 F.3d 332 (4th Cir. 1996) ........................................ 3

*People v. Mosley*,
     33 N.E.3d 137 (Ill. 2015) ............................................................. 15

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

v

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-803

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ................................................................................27, 31

*Powell v. Tompkins*,
    926 F. Supp. 2d 367 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015) ..................15, 26

*Prete v. Bradbury*,
    438 F.3d 949 (9th Cir. 2006) ..........................................................................3

*Raymond Motor Transp., Inc. v. Rice*,
    434 U.S. 429 (1978) ....................................................................................27

*Rocky Mtn. Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) .........................................................28, 31, 33

*Rosenblatt v. City of Santa Monica*,
    940 F.3d 439 (9th Cir. 2019) .........................................................................31

*S.-Cent. Timber Dev. v. Wunnicke*,
    467 U.S. 82 (1984) .....................................................................................27

*Schrader v. Holder*,
    704 F.3d 980 (D.C. Cir. 2013) .......................................................................18

*Silvester v. Harris*,
    843 F.3d 816 (9th Cir. 2016) ..................................................................16, 21

*State v. Callicutt*,
    69 Tenn. 714 (1878)....................................................................................14

*Stiles v. Blunt*,
    912 F.2d 260 (8th Cir. 1990) ........................................................................19

*Sullivan v. Oracle Corp.*,
    662 F.3d 1265 (9th Cir. 2011) ......................................................................27

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...................................................................................39

*Swanson Grp. Mfg. LLC v. Jewell*,
    790 F.3d 235 (D.C. Cir. 2015)........................................................................39

*Teixeira v. Cty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc) ...........................................................11

*Tenn. Wine & Spirit Retailers Ass'n v. Thomas*,
    139 S. Ct. 2449 (2019) ................................................................................26

*Town of Southold v. Town of E. Hampton*,
    477 F.3d 38 (2d Cir. 2007) ...........................................................................29

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

vi

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-804**

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,*
  550 U.S. 330 (2007) ............................................................................27

*United States v. Booker,*
  644 F.3d 12 (1st Cir. 2011) ...............................................................18

*United States v. Chovan,*
  735 F.3d 1127 (9th Cir. 2013) ..............................................11, 16, 26

*United States v. Decastro,*
  682 F.3d 160 (2d Cir. 2012) ..............................................................18

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) ................................................................12

*United States v. Redus,*
  469 F.2d 185 (9th Cir. 1972) ...............................................................9

*United States v. Rene E.,*
  583 F.3d 8 (1st Cir. 2009) ..................................................................15

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010) ...........................................................18

*United States v. Torres,*
  911 F.3d 1253 (9th Cir. 2019) ...........................................................16

*W. Lynn Creamery, Inc. v. Healy,*
  512 U.S. 186 (1994) .....................................................................29, 33

*White v. Mass. Council of Const. Employers, Inc.,*
  460 U.S. 204 (1983) ...........................................................................37

*Wilson v. Cook Cty.,*
  937 F.3d 1028 (7th Cir. 2019) (per curiam) ......................................25

### Constitutional Provisions

U.S. Const. amend. II ...........................................................................passim

U.S. Const. Art. 1, § 8, cl. 3...................................................................26

### Statutes

18 U.S.C. § 921 .....................................................................................1, 7

18 U.S.C. § 922 ................................................................................passim

18 U.S.C. § 927 .......................................................................................37

42 U.S.C. § 1988 .....................................................................................40

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

vii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-805

RCW 9.41.010 ................................................................................. 1, 6, 7, 17

RCW 9.41.042 ..................................................................................... 7, 17, 19

RCW 9.41.060 ................................................................................................. 7

RCW 9.41.090 ............................................................................................. 8, 9

RCW 9.41.092 .................................................................................................. 6

RCW 9.41.124 ............................................................................................. 9, 37

RCW 9.41.240 .......................................................................... 7, 14, 17, 19

RCW 9.41.360 .................................................................................................. 6

RCW 19.70.020 .......................................................................................... 9, 36

RCW 26.28.080 .............................................................................................. 24

1970 Wash. Sess. Laws, ch. 74, § 2 .......................................................... 9, 36

1994 Wash. 1st Spec. Sess. Laws, ch. 7, § 423 ............................................. 7

Initiative Measure No. 1639 ............................................................... passim

43.430 Ill. Comp. Stat. 65/2 ......................................................................... 14

43.430 Ill. Comp. Stat. 65/4 ......................................................................... 14

430 Ill. Comp. Stat. 65/3 .............................................................................. 14

430 Ill. Comp. Stat. 65/4 .............................................................................. 14

Firearm Owners Protection Act ("FOPA"),
    Pub. L. No. 99-308, § 102(4)(B), 100 Stat. 449, 451 (1986) ................. 36

Gun Control Act of 1968, Pub. L. 90-618,
    82 Stat. at 1213 ......................................................................................... 7

Act of April 7, 1921, § 2, 1921 Mo. Laws 692 ........................................... 36

Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134 .................................. 36

Act of Feb. 16, 1909, ch. 51, 1909 W. Va. Acts 394 ................................. 36

Act of Feb. 20, 1918, ch. 2, §§ 1-3, 8, 1918 Mont. Laws 6 ...................... 36

Act of Feb. 21, 1935, ch. 63, §§ 1, 3, 5, 1935 Ind. Laws 159 .................. 36

Act of Feb. 25, 1939, ch. 14, 1939 Me. Acts 53 ........................................ 36

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

viii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Act of Feb. 26, 1913, ch. 256, § 1, 1913 Or. Laws 497 ..........................................36

Act of July 11, 1919, § 4, 1919 Ill. Laws 431 .........................................................36

Act of June 2, 1927, ch. 372, §§ 2, 6, 1927 Mich. Acts 887 ...................................36

Act of Mar. 2, 1937, No. 190, § 1, 1937 Ala. Laws 223, 223 ..................................36

Act of March 10, 1919, ch. 197, §§ 1-2, 1919 N.C. Laws 397 ................................36

Act of March 11, 1924, ch. 137, §§ 1-2, 1924 N.J. Acts 305...................................36

Act of March 19, 1923 §§ 1, 3, 1923 Ark. Acts 379.................................................36

Act of March 3, 1919, ch. 74, § 5, 1919 Mont. Acts 147.........................................36

Act of May 2, 1910, ch. 591, § 1, 1910 R.I. Acts 156 .............................................36

Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627 ......................................36

Act of May 29, 1922, ch. 485, § 9, 1922 Mass. Acts 560 ........................................36

Cal. Penal Code § 27505(a).......................................................................................14

Cal. Penal Code § 27510(a).......................................................................................14

Conn. Gen. Stat. § 29-34(b).......................................................................................14

D.C. Code Ann. § 22-4507 ........................................................................................14

Del. Code Ann. tit. 24, § 903 .....................................................................................14

Fla. Stat. § 790.065(13).............................................................................................14

Haw. Rev. Stat. Ann. § 134-2(a)...............................................................................14

Iowa Code § 724.22(2)...............................................................................................14

Mass. Gen. Laws ch. 140, § 130 ...............................................................................14

Md. Code Ann., Crim. Law § 4-301(c)......................................................................25

Md. Code Ann., Pub. Safety § 5-134(d).....................................................................14

N.J. Stat. Ann. § 2C:58..............................................................................................14

N.Y. Penal Law § 265.00 ...........................................................................................26

N.Y. Penal Law § 400.00 ...........................................................................................14

Neb. Rev. Stat. § 69-2403 ..........................................................................................14

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

ix

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-807

Neb. Rev. Stat. § 69-2404 ................................................................................14

Ohio Rev. Code Ann. § 2923.21 ........................................................................14

R.I. Gen. Laws § 11-47-35 ................................................................................14

R.I. Gen. Laws § 11-47-37 ................................................................................14

Vt. Stat. Ann. tit. 13, § 4020 ............................................................................14

Wyo. Stat. Ann. § 6-8-404 ................................................................................14

**Legislative History**

131 Cong. Rec. S9149
    (daily ed. July 9, 1985) ................................................................................36

145 Cong. Rec. 18119 (1999) ............................................................................22

99th Cong. (1st and 2d Sess.) Pt. 1, Serial No. 131 ........................................36

H.R. Rep. No. 90-1577 (1968),
    *reprinted in* 1968 U.S.C.C.A.N. 4410 ...................................................35, 36

S. Rep. No. 90-1097,
    *reprinted in* 1968 U.S.C.C.A.N. 2112 (1968) ..............................................36

S. Rep. No. 90-1501 (1968) ..............................................................................35

S. Rep. No. 98-583 (1984) ................................................................................36

**Regulations**

27 C.F.R. § 478.99 ...............................................................................9, 35, 37

28 C.F.R. § 25.1 ................................................................................................8

**Rules**

Fed. R. Civ. P. 56(c) .........................................................................................10

**Other Authorities**

"Initiative 1639: Frequently Asked Questions,"
    Wash. Office of the Att'y Gen. .................................................................9, 35

1 William Blackstone,
    *Commentaries* *463 .....................................................................................13

2017 Crime in the United States,
    FBI, Table 38 ...............................................................................................22

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

x

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-808**

2018 General Election Voters' Pamphlet,
  Wash. Sec'y of State ...........................................................................................6

A Study of Active Shooter Incidents in the United States Between 2000 and 2013 ...............23

*Analysis of the Involvement of 18-20 Year Olds in Firearm Violence and the Special
  Problem of Semi-Automatic Weapons,*
  Firearm Injury and Policy Research Program, et al. (June 2019)..................................23, 25

Anderson, Rick
  *Stroke of luck and gun laws kept Washington state mall shooting from being much
  worse, police say*, Dec. 15, 2016 ...........................................................................3

Barnett, Larry D.,
  *The Roots of Law,* 15 Am. U.J. Gender Soc. Pol'y & L. 613 (2007) ..................................13

Cooley, Thomas M.,
  *Treatise on Constitutional Limitations* 740 (5th ed. 1883) .................................13

DeJong, William, et al.,
  *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21
  Minimum Legal Drinking Age in the United States,*
  75 J. Stud. on Alcohol & Drugs 108 (2014)...............................................................24

Dep't of Treasury,
  *Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles* 34
  (1998) ...............................................................................................................25

*Federal Firearms Regulations Reference Guide,*
  U.S. Dep't of Justice (2014) ...........................................................................9, 35

*Federal Firearms Licensee Quick Reference and Best Practices Guide,*
  U.S. Dep't of Justice (2010) ...............................................................................9

Green, Sara Jean,
  *Shooting suspect jealous over ex, bought rifle a week ago, police say,*
  Seattle Times, Aug. 2, 2016 ...............................................................................3

Hepler, Lauren, Amy Harmon, and Richard A. Oppel Jr.,
  *Gilroy Shooting: Two Children Among the Dead at California Festival,*
  N.Y. Times, July 29, 2019 ...............................................................................33

Indermaur, John,
  *Principles of the Common Law* 195
  (Edmund H. Bennett ed., 1st Am. ed. 1878) .................................................13

*Infant, Black's Law Dictionary* 847
  (9th ed. 2009)...................................................................................................13

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

xi

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-809**

Koper, Christopher S. et al.,
  *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms:*
  *An Updated Examination of Local and National Sources,*
  95 J. Urb. Health 313 (Oct. 2017)) ........................................................4

Koper, Christopher S. et al.,
  U. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the*
  *Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–*
  *2003* (2004).............................................................................................25

Lopez, German and Kavya Sukumar,
  *After Sandy Hook, we said never again. And then we let 2,408 mass shootings*
  *happen,* Vox, Mar. 27, 2020 .................................................................3

Marjory Stoneman Douglas High Sch. Public Safety Comm'n, Initial Report,
  Jan. 2, 2019 .............................................................................................4

Mickle, Tripp,
  *Study Supports Raising Tobacco-Purchase Age to 21,*
  Wall St. J., Mar. 12, 2015......................................................................24

NICS Participation Map, Fed. Bur. of Investigation,
  https://www.fbi.gov/file-repository/nics-participation-map.pdf/view (last updated
  July 2019) ................................................................................................8

Nov. 6, 2018 General Election Results:
  Initiative Measure No. 1639 ..................................................................6

Ortiz, Adam,
  *Adolescence, Brain Development, and Legal Culpability*, Am. Bar. Ass'n, Juvenile
  Justice Ctr. (Jan. 2004)..........................................................................4

*Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco*
  *Products*, Inst. of Medicine of the Nat'l Academies
  (Richard J. Bonnie, et al., eds. 2015)...................................................24

Rhee, Peter M. et al.,
  *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths,*
  80 J. Trauma & Acute Care Surgery 853 (2016)......................................3, 4, 24

Schmidt, Michael S.,
  *State Law Prevented Sale of Assault Rifle to Suspect Last Week, Officials Say,*
  N.Y. Times, Sept. 13, 2013 ..................................................................34

Spitzer, Robert J.,
  *Gun Law History in the United States and Second Amendment Rights,*
  80 Law & Contemp. Probs. 55 (2017) .................................................15

State's Att'y Rep. on the Shootings at Sandy Hook Elem. Sch.,
  Nov. 25, 2013..........................................................................................4

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

xii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-810

U.S. Census Bur.,
  2010–2018 Annual Estimates of U.S. Population by Age,
  https://www2.census.gov/programs-surveys/popest/tables/2010-
  2018/national/asrh/PEPALL6N.pdf ...................................................................4

U.S. Dep't of the Treasury & U.S. Dep't of Justice,
  *Gun Crime in the Age Group 18–20* (June 1999) ..............................................22

U.S. Department of Justice,
  2018 Crime in the United States, Arrests, by Age, Tbl. 38,
  https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-
  pages/tables/table-38 ....................................................................................4, 22

Violent Crime Control and Law Enforcement Act of 1994,
  Pub L. No.103 § 110102(b), 108 Stat 1796, 1997–98 ......................................25

White, J.,
  *When Lawmakers Try to Ban Assault Weapons, Gunmakers Adapt,*
  N.Y. Times, July 31, 2019 .................................................................................6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

xiii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## I.   INTRODUCTION

Gun violence devastates individual lives, families, and communities across our country. Mass shootings alone have killed more than 2,700 Americans and injured over 10,000 others since 2012. Newtown, Connecticut: 20 schoolchildren and 6 adults killed at Sandy Hook Elementary School. Parkland, Florida: 17 killed and 17 injured at Marjory Stoneman Douglas High School. And locally, Burlington, Washington: five killed while shopping in the Cascade Mall. Those tragedies, among others, share a common feature: each of the gunmen was between 18 and 20 years old and used a semiautomatic assault rifle ("SAR") to carry out his attack.

The people of Washington took action to reduce gun violence and increase public safety by adopting Initiative Measure No. 1639 ("I-1639" or the "Initiative").[1] I-1639 takes a simple and commonsense approach: extend three longstanding statutory restrictions on handguns to the weapon often favored by mass shooters: SARs.[2] I-1639 mirrors existing federal and state restrictions on handguns by (1) prohibiting individuals under 21 from purchasing SARs (the "Age Provision"); (2) requiring an enhanced background check—a comprehensive records search conducted by local law enforcement—for SAR purchases (the "Background Check Provision"); and (3) prohibiting in-person sales of SARs to non-Washington residents (the "Nonresident Sales Provision").

Plaintiffs challenge the Age Provision under the Second Amendment and the Nonresident Sales Provision under the dormant Commerce Clause. Plaintiffs' claims fail as a matter of law.

First, the Age Provision falls outside the scope of the Second Amendment because laws regulating access to firearms by those under 21 are longstanding and historical. But even if the Age Provision were within the Second Amendment's scope, it would pass intermediate scrutiny. Far from the "firearms ban" that Plaintiffs mischaracterize it as, the Age Provision is a narrow

---

[1] Declaration of R. July Simpson ("Simpson Decl."), Ex. A at 2 (I-1639 § 1, approved Nov. 6, 2018).

[2] The terms "handgun" and "pistol" are often used interchangeably. Pistols are commonly understood to be a subset of handguns, but Washington law defines "pistol" more broadly as "any firearm with a barrel less than sixteen inches in length, or is designed to be held and fired by the use of a single hand." RCW 9.41.010(23). *Cf.* 18 U.S.C. § 921(a) (defining "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled"). Defendants use the term "handgun" herein unless in reference to Washington law.

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

1

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-812

1   restriction that applies only to sales to 18- to 20-year-olds and only to one type of firearm.

2   Eighteen- to twenty-year-olds may still possess multiple firearms, including SARs, for self-

3   defense in their homes, property, and places of business, as well as for hunting, target shooting,

4   and various other lawful purposes. The law does not burden core Second Amendment rights.

5       Second, the Age Provision reasonably fits with Washington's substantial interest in

6   reducing gun violence and promoting public safety. The structures of the human brain that

7   govern impulsivity and judgment do not fully mature until well after age 20. And older

8   adolescents (*i.e.*, those 18 to 20 years of age) disproportionately commit violent crimes. Like the

9   corresponding federal age restriction on handguns, I-1639's Age Provision is constitutional.

10      Third, the Nonresident Sales Provision does not violate the dormant Commerce Clause

11  because it does not advance economic protectionism. Rather, the provision promotes public

12  safety by ensuring that sales of SARs comply with Washington's enhanced background check

13  requirements, which cannot adequately be conducted on nonresidents. Alternative channels for

14  nonresident purchases of SARs, such as through licensed dealers, remain open. The law therefore

15  does not discriminate under the Commerce Clause and satisfies the *Pike* balancing test. Further,

16  Congress has authorized states to prohibit sales of firearms to nonresidents, precluding any claim

17  against the Nonresident Sales Provision under the dormant Commerce Clause.

18      Finally, several of Plaintiffs' claims are not justiciable, either because Plaintiffs lack

19  standing or their claims are moot.

20      Gun violence is a scourge in our society. The people of Washington acted within

21  constitutional bounds when they decided to regulate sales of SARs in the same ways that long

22  have been in place for handguns. The voters' action is constitutional under the U.S. Supreme

23  Court's and this Circuit's clear precedents. Defendants and Intervenor-Defendant (collectively,

24  "Defendants") are therefore entitled to summary judgment as a matter of law.

25

26

DEFS.' CROSS-MSJ AND OPP. TO          2          ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                  800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                      Seattle, WA 98104-3188
                                                           (206) 464-7744

SER-813

## II.    FACTS IN SUPPORT OF MOTION

**A.    Gun Violence, Including Mass Shootings, Significantly Impacts Public Safety in Washington and the United States**

Every year, "approximately 111,000 Americans are shot and 33,800 die as a result of [firearm] injuries, which equates to 93 deaths caused by firearms every day."[3] Since December 2012, when a gunman shot and killed 20 young children at Sandy Hook Elementary School, more than 2,700 Americans have been killed and over 10,000 injured in mass shootings alone.[4]

Mass shootings in particular—many committed by older adolescents using SARs— wreak havoc on communities.[5] In 2016, a 19-year-old sat in his car in Mukilteo, Washington, to study the owner's manual for a newly purchased AR-15-style SAR before entering a party, opening fire, and killing multiple people.[6] Likewise, the 2016 shooter in Burlington, Washington, was 20 years old and used a Ruger 10/22 SAR to kill five people at a Macy's.[7] The same is true for some of our nation's most horrific mass shootings, such as Sandy Hook (shooter age 20 used a SAR)[8] and Parkland (shooter age 19 used a SAR).[9]

---

[3] Simpson Decl., Ex. B at 853 (Peter M. Rhee et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma & Acute Care Surgery 853 (2016)). The articles, government reports, scholarly literature and related materials cited herein constitute "legislative facts" supporting Washington voters' decision to adopt I-1639. *See, e.g., Prete v. Bradbury*, 438 F.3d 949, 969 (9th Cir. 2006) (citing *Ecumenical Ministries v. State Lottery Comm'n*, 871 P.2d 106, 111 n.8 (Or. 1994) for the proposition that "[i]n considering the history of a constitutional provision adopted through the initiative process, [courts] examine[ ], as legislative facts, other sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure . . . .); *see also Nat'l Rifle Ass'n v. Bur. of Alcohol, Tobacco, Firearms & Explosives* (*NRA*), 700 F.3d 185, 207–11 (5th Cir. 2012) (relying on legislative facts in upholding firearm restriction); *Horsley v. Trame*, 808 F.3d 1126, 1133–34 (7th Cir. 2015) (same); *see generally Penn Advert. of Baltimore, Inc. v. Mayor & City Council of Baltimore*, 63 F.3d 1318, 1323 (4th Cir. 1995), *cert. granted, judgment vacated on other grounds sub nom. Penn Advert. of Baltimore, Inc. v. Schmoke*, 518 U.S. 1030 (1996), and *adopted as modified*, 101 F.3d 332 (4th Cir. 1996) (government may defend law "by pointing to legislative facts, studies, history, or common sense").

[4] Simpson Decl., Ex. C (German Lopez and Kavya Sukumar, *After Sandy Hook, we said never again. And then we let 2,408 mass shootings happen*, Vox, Mar. 27, 2020).

[5] Simpson Decl., Ex. A at 1 (I-1639 § 1), Ex. D (Mass Killings Table).

[6] Declaration of Paul Kramer ("Kramer Decl.") ¶¶ 4, 17; Simpson Decl., Ex. E (Sara Jean Green, *Shooting suspect jealous over ex, bought rifle a week ago, police say*, Seattle Times, Aug. 2, 2016).

[7] Simpson Decl., Ex. D at 2 (Mass Killings Table), Ex. F at YY (Rick Anderson, *Stroke of luck and gun laws kept Washington state mall shooting from being much worse, police say*, Dec. 15, 2016).

[8] Simpson Decl., Ex. G (State's Att'y Rep. on the Shootings at Sandy Hook Elem. Sch., Nov. 25, 2013).

[9] Declaration of April Schentrup ("Schentrup Decl.") ¶ 4; Simpson Decl., Ex. H (Marjory Stoneman Douglas High Sch. Public Safety Comm'n, Initial Report at 231, 262–63, Jan. 2, 2019).

---

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

3

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-814**

Mass shooters often favor SARs and other high-capacity firearms.[10] As explained by Defendants' law enforcement expert Mark Jones—a former special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives—"mass shootings . . . are demonstrably more lethal when the assailant uses a [SAR] than when other firearms are used."[11] In each of the five deadliest mass shootings in the United States between 2009 and 2018, the assailant used a SAR.[12] It is no mystery why: in general, SARs are easy to use and fire more rapidly than handguns and non-semiautomatic firearms (and often at approximately four times the muzzle velocity).[13] Anyone can quickly shoot a fusillade of bullets, maximizing lethality.[14]

The young age of these mass shooters matches statistical evidence showing disproportionate participation in criminal activity by older adolescents. Arrests for violent crimes peak from ages 17 to 20.[15] While people age 18 to 20 make up only 4.4% of the population, they account for 20% of homicide and manslaughter arrests.[16] One reason older adolescents disproportionately commit gun violence is because they often lack the adult ability to "govern impulsivity, judgment, planning for the future, [and] foresight of consequences."[17] As Defendants' unrebutted neuroscience expert Dr. Elizabeth Aylward explains, "brain development, both structural and functional, lasts well into adulthood, and the regions that are the last to mature are those associated with executive control."[18] Dr. Sara Johnson, Defendants'

---

[10] *See* Declaration of Fred Rivara ("Rivara Decl."), Ex. A at 3–4 (Rivara Rep.); Simpson Decl., Ex. I at 319 (Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. Urb. Health 313 (Oct. 2017)).

[11] Jones Decl., Ex. A (Jones Rep. at 10–11).

[12] *Id.*

[13] *Id.*; Simpson Decl., Ex. J (Casey Dep. 77:15–18), Ex. K (Ball Dep. 59:17–25; 132:14–25; 133:23–134:15, Ex. B at 859 (Rhee et al., *Gunshot Wounds*, 80 J. Trauma & Acute Care Surgery 853 (2016)).

[14] Declaration of Mark Jones ("Jones Decl."), Ex. A at 11 (Jones Rep.).

[15] Declaration of Sara Johnson ("S. Johnson Decl."), Ex. A at 10 (Johnson Rep.); Simpson Decl., Ex. L (U.S. Department of Justice, 2018 Crime in the United States, Arrests, by Age, Tbl. 38, https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/tables/table-38).

[16] *Id.*; Simpson Decl., Ex. M at 1 (U.S. Census Bur., 2010–2018 Annual Estimates of U.S. Population by Age, https://www2.census.gov/programs-surveys/popest/tables/2010-2018/national/asrh/PEPALL6N.pdf).

[17] Simpson Decl., Ex. N (Adam Ortiz, *Adolescence, Brain Development, and Legal Culpability*, Am. Bar. Ass'n, Juvenile Justice Ctr., at 2 (Jan. 2004)); *see also id.*, Ex. A at 2 (I-1639 § 1) ("[S]tudies show that eighteen to twenty year olds commit a disproportionate number of firearms homicides in the United States and research indicates that the brain does not fully mature until a later age.").

[18] Declaration of Elizabeth Aylward ("Aylward Decl."), Ex. A at 9 (Aylward Rep.).

---

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

4

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-815

1   unrebutted developmental psychology expert, agrees, describing older adolescence as a period
2   of "developmental vulnerability" when individuals are still "maturing in important ways,
3   psychologically, cognitive, and neurologically."[19]

4        Mass shootings are a significant public safety concern in and of themselves. But they
5   represent only a fraction of the gun violence in our society. In general, gun violence presents an
6   extraordinary public health problem.[20] This is true not only because of the direct fatalities and
7   physical injuries suffered, but also because of the mental health problems and trauma that
8   survivors and the community experience after the shooting is over.[21] April Schentrup, whose 16-
9   year-old daughter Carmen was shot four times with a SAR—including a fatal shot to the back
10  of the head as she tried to hide in a "safe corner" of her classroom during the Parkland, Florida,
11  mass shooting—describes defining her life as "before and after Carmen's death."[22]
12  Understandably, she notes that "[w]ords are not enough to express how my and my family's
13  lives have been devastated by this act of gun violence."[23] It took the Parkland shooter only about
14  two minutes to kill or injure 24 students and staff on the level of Carmen's school where she was
15  shot before the shooter moved on to other areas of the building.[24] Similarly, Paul Kramer, whose
16  son Will was shot in the Mukilteo shooting, describes the experience as a "nightmare" that left
17  the community to "live with grief and fear."[25] Kramer sponsored I-1639 so that no other family
18  has "to go through the same type of tragedy that mine has."[26]

---

[19] S. Johnson Decl., Ex. A at 12 (Johnson Rep.).
[20] Rivara Decl., Ex. A at 2–3 (Rivara Rep.).
[21] *Id.* at 7–8.
[22] Schentrup Decl. ¶ 35.
[23] *Id.* ¶ 39.
[24] *Id.* ¶ 33.
[25] Kramer Decl. ¶ 23.
[26] *Id.* ¶ 23.

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

5

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-816

**B.**   **I-1639 is Designed to Reduce Gun Violence and Increase Public Safety by Extending Federal and State Laws that Apply to Handguns to SARs**

In 2018, Washington voters decided "[e]nough is enough" when it comes to the problem of gun violence.[27] The people of Washington adopted I-1639, with over 59% of voters supporting the measure, to "increase public safety and reduce gun violence."[28] Given the prominent use of SARs in mass shootings, I-1639 is primarily directed at regulating that type of firearm. The Initiative defines a SAR as "any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."[29] I-1639's "common sense" approach was to "require[] the same standards for purchasing semi-automatic assault rifles that are already required for handguns."[30] The Initiative does so in three respects.

**1.**   **The Age Provision**

First, I-1639's Age Provision extends longstanding federal and state restrictions on the sale and possession of handguns to persons under 21 to SARs. The Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (codified as amended at 18 U.S.C. §§ 921 *et seq.*) (the "GCA"), comprehensively regulates interstate and foreign commerce in firearms, imposing strict licensing

---

[27] Simpson Decl., Ex. A at 2 (I-1639 § 1).

[28] *Id.*; Simpson Decl., Ex. O (Nov. 6, 2018 General Election Results: Initiative Measure No. 1639).

[29] Simpson Decl., Ex. A at 27 (I-1639 § 16(25), codified at RCW 9.41.010(27)); *id.* (I-1639 § 1) (SARs "are specifically designed to kill quickly and efficiently and have been used in some of the country's deadliest mass shootings"). A SAR "does not include antique firearms, any firearm that has been made permanently inoperable, or any firearm that is manually operated by bolt, pump, lever, or slide action." *Id.* at 27–28 (codified at RCW 9.41.010(27)). The definition focuses on the semiautomatic action of the rifle rather than a military features test or a list of firearm models. Gun manufacturers regularly and routinely work to design new firearms that "comply with the law [regulating features] while still offering consumers a similar product with all the same accessories." Simpson Decl., Ex. P (J. White, *When Lawmakers Try to Ban Assault Weapons, Gunmakers Adapt*, N.Y. Times, July 31, 2019). Plaintiffs' objections to the use of the word "assault" in the term is an irrelevant aside. *See* Plaintiffs' Motion for Summary Judgment, Dkt. 76, at 9–10. The word "assault" is not part of this legal challenge. Further, Plaintiffs' extensive quotation of the opinion of the Violence Policy Center in an attempt to (without citation) suggest the state acted improperly in adopting I-1639 is misleading. *Id.* The Violence Policy Center had nothing to do with I-1639's creation or passage, nor is it a party to this lawsuit.

[30] Simpson Decl., Ex. Q at 26 (2018 General Election Voters' Pamphlet, Wash. Sec'y of State). Although not challenged here, I-1639 also requires firearms safety training and a waiting period prior to purchasing a SAR, *id.* Ex. A at 9 (I-1639 § 4, codified at RCW 9.41.092), and provides criminal penalties if a firearm is stored unsafely and is obtained by a person who cannot legally possess it, *id.* at 10 (I-1639 § 5, codified at RCW 9.41.360).

---

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

6

1   requirements.[31] The GCA prohibits a federal firearms licensee ("FFL") from selling a handgun

2   to anyone under the age of 21. *Id.* § 102, 82 Stat. at 1218 (codified as amended at 18 U.S.C.

3   § 922(b)(1)). Since 1994, Washington State law has prohibited 18- to 20-year-olds from

4   possessing pistols, except in their home or in a variety of other enumerated situations.

5   1994 Wash. 1st Spec. Sess. Laws, ch. 7, § 423 (codified as amended at RCW 9.41.240).

6           Under I-1639's Age Provision, the minimum age requirements for purchase of SARs and

7   pistols are identical: a person under 21 "may not purchase a pistol or semiautomatic assault rifle."

8   RCW 9.41.240(1). Likewise, I-1639 limits possession of SARs by 18- to 20-year-olds in parallel

9   circumstances to those long in place for pistols. RCW 9.41.240(3). Despite Plaintiffs' false

10  characterization of I-1639 as a "blanket ban," Dkt. 76 at 14, the Age Provision does not preclude

11  18- to 20-year-olds from accessing SARs. Its exceptions permit 18- to 20-year-olds to possess SARs

12  in a variety of situations, including: (1) in their home or business; (2) on real property they control;

13  (3) at competitions or shooting ranges; (4) hunting; (5) anywhere shooting is legal; (6) while on

14  duty in the armed forces; or (7) traveling to or from a place they may legally possess such weapons.

15  RCW 9.41.240(2), 9.41.042, 9.41.060. Further, 18- to 20-year-olds may still legally buy shotguns

16  and non-semiautomatic rifles for any and all legal purposes. *See* RCW 9.41.010(27); 18 U.S.C.

17  § 922(b)(1). Plaintiffs concede that those firearms are suitable for self-defense.[32]

18          **2.      The Background Check Provision**

19          Second, I-1639's Background Check Provision requires local law enforcement agencies to

20  conduct the same enhanced background checks on prospective purchasers of SARs that they long

21  have performed for pistols. RCW 9.41.090(2)(b).

22          Basic background check requirements apply to most firearm sales. Federal law requires

23  FFLs to conduct background checks on potential firearm purchasers. 18 U.S.C. § 922(s). It also

24  requires the FBI to maintain the National Instant Criminal Background Check System ("NICS"),

25  _____

26  [31] The GCA is today used to refer to the statutes codified at 18 U.S.C. §§ 921–27, app. §§ 1201–03 (1985), originally two separate 1968 enactments.

[32] Simpson Decl., Ex. R (Mitchell Dep. 110:5–6, 168:17–25); Ex. S (Casey Dep. Ex. 95); Ex. T (Wald Dep. 71:22–72:2).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

7

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-818

1   a centralized catalog of records comprising three separate national databases. 18 U.S.C.

2   § 922 note. States' participation in NICS is voluntary, and the quantity and quality of records

3   shared with NICS varies widely across states.[33] By one count, "at least 25% of felony

4   convictions" in the United States "are not available" in NICS.[34]

5       By default, an FFL will contact the FBI's NICS Section when performing a potential

6   firearm transaction. 18 U.S.C. § 922(t). States may also designate a law enforcement agency

7   "point of contact" to initiate the NICS check and to search any other state and local databases

8   required under state law. *See* 28 C.F.R. §§ 25.1–.2, 25.6(d).[35]

9       Washington is a "partial" point-of-contact state.[36] Before I-1639, FFLs contacted the FBI

10  for NICS checks on sales of all firearms except pistols.[37] For pistols, Washington law

11  enforcement agencies conduct "enhanced background checks." In such a check, law enforcement

12  queries not only the NICS databases to determine a purchaser's eligibility, but also various state

13  and local databases, including: (1) the Washington Crime Information Center (which may

14  disclose state arrest warrants not in the NICS databases); (2) the DOL Firearms System (which

15  reflects whether the purchaser has a concealed pistol license and whether it has been revoked);

16  (3) Washington court databases; (4) the Department of Corrections database; (5) local records

17  management systems; and (6) the Washington Health Care Authority's mental health records.[38]

18  It is undisputed that the enhanced background check is more comprehensive than a NICS check

19  alone.[39] This helps prevent ineligible purchasers from falling through the cracks. I-1639 now

20  requires local law enforcement to conduct enhanced background checks for SARs as well.[40]

21

22  [33] Declaration of Kateri Candee ("Candee Decl.") ¶ 8; Declaration of Brandi Belcher ("Belcher Decl.") ¶ 6;
    Declaration of Terri Johnson ("T. Johnson Decl.") ¶ 6; *see also City of New York v. U.S. Dep't of Def.*, 913 F.3d

23  423, 427 (4th Cir. 2019) ("states are not required to perform any functions associated with the Brady Act").
    [34] Candee Decl. ¶ 8, Ex. B.

24  [35] *See* Simpson Decl., Ex. U at 1 (FBI, *About NICS*); Candee Decl. ¶ 10.
    [36] Candee Decl. ¶ 11.

25  [37] *See* RCW 9.41.090(1); Candee Decl. Ex. C at 1 (FBI, NICS Participation Map).
    [38] Candee Decl. ¶¶ 14–17.

26  [39] *See, e.g.*, Simpson Decl., Ex. R (Mitchell Dep. 119:18-120:16), Ex. V (Knezovich Dep. 107:25–108:3);
    Belcher Decl. ¶¶ 6–7; Candee Decl. ¶¶ 15–18; T. Johnson Decl. ¶¶ 6–7.
    [40] Simpson Decl., Ex. A at 4 (I-1639 § 3) (codified at RCW 9.41.090(2)).

DEFS.' CROSS-MSJ AND OPP. TO           8           ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                      800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                          Seattle, WA 98104-3188
                                                                     (206) 464-7744

### 3.     The Nonresident Sales Provision

Third, federal law has long prohibited in-person handgun sales to nonresidents of a state. I-1639 mirrors that requirement for SARs. Under the GCA, it is unlawful for anyone to sell a handgun in person to a nonresident. 18 U.S.C. § 922(a)(5)(A), (b)(3). All interstate transfers of firearms must take place through an FFL, *id.* § 922(a)(1)–(5), and only FFLs may "engage in the business of . . . dealing in firearms" (interstate or otherwise), *id.* § 922(a)(1)(A); *see United States v. Redus*, 469 F.2d 185, 187 (9th Cir. 1972). To buy a handgun from an out-of-state FFL, a nonresident may arrange for its delivery to an in-state FFL, from whom the buyer may retrieve the gun. 18 U.S.C. § 922(b).[41] This process is known as "FFL-to-FFL transfer." To purchase a rifle or shotgun from an out-of-state FFL, the buyer may do so in person—provided that the sale "compl[ies] with the legal conditions of sale in both such States." *Id.* § 922(b)(3).

Shortly after the GCA's enactment, Washington legalized the in-person sale of rifles and shotguns to nonresidents. 1970 Wash. Sess. Laws, ch. 74, § 2 (originally codified at RCW 19.70.020, codified as amended at RCW 9.41.124). In I-1639, Washington narrowed the scope of that permission by removing SARs from the category of "rifles and shotguns" that legally may be purchased in person by nonresidents. RCW 9.41.124. The effect of this provision is that SARs are treated the same as handguns: they may not be purchased by nonresidents in person. But just as for handguns, a nonresident may still purchase a SAR through an FFL-to-FFL transfer.[42]

The Nonresident Sales Provision is a logical corollary to the Background Check Provision. Because enhanced background checks query an array of state and local databases, it is difficult if not impossible for law enforcement agencies to effectively conduct such checks on nonresidents.[43]

---

[41] *See also* 27 C.F.R. § 478.99(a); *Mance v. Sessions*, 896 F.3d 699, 709 (5th Cir. 2018) (per curiam); Simpson Decl., Exs. W at 203 (*Federal Firearms Regulations Reference Guide*, U.S. Dep't of Justice (2014)), PP at 6 (*Federal Firearms Licensee Quick Reference and Best Practices Guide*, U.S. Dep't of Justice (2010)).

[42] Simpson Decl., Ex. X at 8 ("Initiative 1639: Frequently Asked Questions," Wash. Office of the Att'y Gen.)

[43] Candee Decl. ¶¶ 17–18; Belcher Decl. ¶¶ 8–9; T. Johnson Decl. ¶ 9.

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

9

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-820**

**C.     Plaintiffs Challenge Only the Age Provision and the Nonresident Sales Provision**

Plaintiffs were political opponents of I-1639. Dkt. 22 at 4–6. Plaintiffs Daniel Mitchell and Robin Ball are FFLs in Washington. Plaintiffs Nathaniel Casey, Luke Rettmer, and Matthew Wald were between 18 and 20 years old when I-1639 was enacted. Casey and Rettmer have since turned 21.[44] Each older adolescent plaintiff already owns at least one SAR.[45] Plaintiffs also include two gun rights organizations, the Second Amendment Foundation ("SAF") and the National Rifle Association ("NRA") (together, "the Organizational Plaintiffs"), which organized and are directly funding this lawsuit.[46]

Plaintiffs challenge two specific provisions of I-1639. First, all Plaintiffs allege that the Age Provision violates the Second Amendment. Dkt. 17 ¶¶ 117–19. Second, Mitchell alleges that the Nonresident Sales Provision violates the dormant Commerce Clause. *Id.* ¶ 120.

### III.     ARGUMENT

**A.     Standard of Review**

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the opposing party must then set forth specific facts showing a genuine issue for trial in order to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the nonmoving party fails to make this showing, "Rule 56(c) mandates the entry of summary judgment." *Id.* at 322.

**B.     The Age Provision's Restriction on Sales Does Not Violate the Second Amendment**

**1.     The Second Amendment framework**

In *District of Columbia v. Heller*, 554 U.S. 570, 573–74 (2008), the Supreme Court struck down under the Second Amendment a city's "total ban" on the "possession of usable handguns

---

[44] Simpson Decl., Ex. J (Casey Dep. 64:12–18), Ex. Y (Rettmer Dep. 9:18–19). Armen Tooloee, originally a plaintiff in this lawsuit, was voluntarily dismissed as a party last month. Dkt. 75.

[45] Simpson Decl., Ex. Z at ¶¶ 24, 33 (*Mitchell I* Compl.), Ex. Y (Rettmer Dep. 13: 5–19), Ex. T (Wald Dep. 21:1–15), Ex. J (Casey Dep. 28:11–29:5).

[46] *Id.*, Ex. R (Mitchell Dep. 135:4–136:1), Ex. AA (Mitchell Dep. Ex. 8), Ex. Y (Rettmer Dep. at 16:25–17:6).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

10

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-821**

in the home." In the wake of *Heller*, nearly every circuit (including the Ninth) has adopted a two-part test for Second Amendment claims. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo* (*Cuomo*), 804 F.3d 242, 254 (2d Cir. 2015); *see, e.g.*, *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th. Cir. 2015). The court first "'asks whether the challenged law burdens conduct protected by the Second Amendment.'" *Fyock*, 779 F.3d at 996 (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)). If the law does not burden protected conduct, "the inquiry is complete" and the law "passes constitutional muster" without further analysis. *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc) (internal quotation marks and citations omitted). If there is a burden, the court proceeds to step two, asking "what level of scrutiny should be applied" and evaluating the law in question. *Fyock*, 779 F.3d at 996. Plaintiffs fail to engage in substantive analysis of this inquiry in their Motion. But a straightforward application of the test demonstrates that the Age Provision does not violate the Second Amendment.

### 2.     The Age Provision does not burden Second Amendment rights

The first step of the Second Amendment test requires the court to consider whether the challenged law burdens protected conduct, because not every firearm regulation does.

### a.     "Longstanding" firearm laws fall outside the Second Amendment

The Supreme Court has set forth a non-"exhaustive" list of "presumptively lawful [firearm] regulatory measures," *Heller*, 554 U.S. at 627 & n.26, that "are outside the ambit of the [Second] [A]mendment," *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010). Those exceptions include "laws imposing conditions and qualifications on the commercial sale of arms" and certain "longstanding prohibitions on the possession of firearms." *Heller*, 554 U.S. at 626–27 & n.26. The Supreme Court later "repeat[ed] those assurances" and reiterated that *Heller* had invalidated a broad ban on handgun possession in the home while simultaneously "recogniz[ing] that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626). To determine whether a

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

11

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-822

law is so historically rooted as to fall outside the scope of the Second Amendment, courts assess "a variety of legal and other sources to determine the public understanding of [the] legal text in the period after its enactment or ratification." *Heller*, 554 U.S. at 600. Under this analysis, the Age Provision does not burden Second Amendment conduct and must be upheld.

**b.    Minimum age laws for firearms are historically longstanding**

Plaintiffs' repetitive denunciation of the Age Provision as a "ban" ignores its fundamental feature: it applies only to 18- to 20-year-olds. Thus, the question is not whether a type of firearm falls within the Second Amendment's protection. Rather, it is whether sales of such firearms to 18- to 20-year-olds fall within the Second Amendment's protection. They do not. Laws restricting sales to this age group have been widespread since the 19th century. Plaintiffs' singular focus on the alleged "overwhelmingly common and popular" use of SARs, Dkt. 76 at 15—which they fail to support with any actual evidence—is irrelevant to the inquiry.[47]

**i.    The age of majority was 21 until the 1970s**

For most of our country's history, 18- to 20-year-olds were considered minors or "infants" without the full legal rights of adulthood. At common law and at the time of the adoption of the Constitution, the age of majority was 21 years. *See*, *e.g.*, 1 William Blackstone, *Commentaries* *463 ("So that full age in male or female, is twenty one years . . . , who till that time is an infant, and so styled in law.");[48] *Infant*, *Black's Law Dictionary* 847 (9th ed. 2009) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority . . . .") (quoting John Indermaur, *Principles of the*

---

[47] The only direct evidence in the record probative of SARs' popularity indicates that Washingtonians purchase just one-tenth as many SARs as pistols. *See* Declaration of Jennifer Richards ("Richards Decl."), Ex. B (DOL data comparing SAR sales to pistol sales). And Plaintiffs cite no evidence whatsoever as to the popularity of SARs among 18- to 20-year olds. Regardless, even if it were true that SARs are "the second most popular choice" of firearm, Dkt. 76 at 18, Plaintiffs never explain how prohibiting sales of SARs to 18- to 20-year-olds could be unconstitutional when the parallel federal age prohibition on sales of handguns—the *most* common and popular firearm and "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629—has uniformly withstood Second Amendment challenges. *See NRA*, 700 F.3d at 188; *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 755–56 (W.D. Va. 2019). A fortiori, I-1639's Age Provision is constitutional, too.

[48] Blackstone "constituted the preeminent authority on English law for the founding generation." *Heller*, 554 U.S. at 593–94 (citation and quotation marks omitted).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

12

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-823

1   *Common Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878)). In fact, before ratification of the

2   26th Amendment in 1971, states rarely permitted individuals under 21 to vote. *See, e.g.*, *Oregon*

3   *v. Mitchell*, 400 U.S. 112, 130–31 (1970) (lead opinion of Black, J.) (upholding provision of

4   Voting Rights Act Amendments of 1970 lowering voting age to 18 in federal elections but

5   invalidating provision doing same for state and local elections); *id.* at 213 n.90 (Harlan, J.,

6   concurring in part and dissenting in part) (noting that at the time only four states set the voting

7   age below 21). It was not until the 1970s that states lowered the age of majority to 18. *NRA*, 700

8   F.3d at 201; Larry D. Barnett, *The Roots of Law,* 15 Am. U.J. Gender Soc. Pol'y & L. 613, 681–

9   86 app. (2007).

10           **ii.**       **Laws have restricted under-21 firearm sales since the 1800s**

11         Against this historical backdrop, it is unsurprising that laws prohibiting those under 21

12   from purchasing firearms are longstanding. In the 19th century, 19 states and the District of

13   Columbia enacted laws expressly restricting the ability of individuals under 21 to purchase or

14   use particular firearms in jurisdictions where the age of majority was set at 21. *See, e.g.*, *NRA*,

15   700 F.3d at 202.[49] By the early twentieth century, three more states had restricted the purchase

16   or use of particular firearms by persons under 21. *Id.* Thus by 1923, over half the states then in

17   the union had set 21 as the minimum age for purchase or use of particular firearms. *Id.*[50]

18         This long-held tradition of restricting certain firearm rights of 18- to 20-year-olds

19   continues today. Since 1968, federal law has prohibited FFLs from selling handguns to persons

20   under 21. 18 U.S.C. § 922(b)(1). Currently, 17 states and the District of Columbia have parallel

21

22

---

[49] *See also* Simpson Decl., Ex. BB (Table of 19th Cent. Firearms Statutes).

23   [50] Such age restrictions were regarded as constitutional by "19th-century cases" and "legal scholar[s]." *Heller*,
554 U.S. at 610, 616. *See, e.g.*, *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878) ("[W]e regard the acts to prevent the

24   sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions."); *Coleman v. State*, 32 Ala. 581, 582 (1858) (upholding conviction

25   under statute making it a misdemeanor to "sell, or give, or lend, to any male minor" a handgun). Those decisions cohere with the views of Judge Thomas Cooley, whose authority *Heller* recognized, *see* 554 U.S. at 616–17, and

26   who wrote "that 'the State may prohibit the sale of arms to minors' pursuant to the State's police power." *NRA*, 700
F.3d at 203 (quoting Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883)).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

13

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-824**

1   or more exacting laws prohibiting those under 21 from purchasing or possessing handguns.[51]

2   And five states also prohibit the sale of *all* long guns—not just SARs—to individuals under 21.

3   *Id.*[52] Contrary to Plaintiffs' erroneous assertion that the Age Provision is the "most expansive

4   firearms ban anywhere in the nation," Dkt. 76 at 1, prohibiting SAR sales to 18- to 20-year-olds

5   comports with these longstanding laws.

6                **iii.**       **An emerging consensus among the courts is that firearm**

7   **minimum age restrictions fall outside the Second Amendment**

8        Based on this historical evidence, several courts have concluded that firearms age

9   restrictions, particularly those for people under 21, fall outside the Second Amendment's ambit.

10   In *NRA*, 700 F.3d at 211, the Fifth Circuit rejected a Second Amendment challenge to the federal

11   prohibition on the sale of handguns by FFLs to those under 21, 18 U.S.C. § 922(b)(1). The Fifth

12   Circuit concluded that the federal age restriction was "consistent with a longstanding, historical

13   tradition, which suggests that the conduct at issue falls outside the Second Amendment's

14   protection." *Id.* at 203. A year later the same court upheld a Texas law prohibiting persons under

15   21 from receiving a license to carry concealed pistols, concluding that the age restriction "likely

16   'falls outside the Second Amendment's protection.'" *NRA v. McCraw*, 719 F.3d 338, 347 (5th

17   Cir. 2013) (quoting *NRA*, 700 F.3d at 203). In both cases, although the Fifth Circuit was "inclined

18   to uphold the challenged federal laws at step one of our analytical framework, in an abundance

19   of caution" it "proceed[ed] to step two" and upheld the minimum age restriction under

20   intermediate scrutiny. *NRA*, 700 F.3d at 204; *McCraw*, 719 F.3d at 347.

---

[51] Cal. Penal Code § 27505(a); Conn. Gen. Stat. § 29-34(b); Del. Code Ann. tit. 24, § 903; D.C. Code Ann. § 22-4507; Fla. Stat. § 790.065(13); Haw. Rev. Stat. Ann. § 134-2(a), (d); 430 Ill. Comp. Stat. 65/3a, 65/4(a)(2)(i-5); Iowa Code § 724.22(2); Md. Code Ann., Pub. Safety § 5-134(d); Mass. Gen. Laws ch. 140, §§ 130, 131E(a); Neb. Rev. Stat. §§ 69-2403, 69-2404; N.J. Stat. Ann. §§ 2C:58-3.3c, 2C:58-6.1(a), 2C:58-3c(4); N.Y. Penal Law § 400.00(1)(a), N.Y. Penal Law § 400.00(12); Ohio Rev. Code Ann. § 2923.21(B); R.I. Gen. Laws §§ 11-47-35(a)(1), R.I. Gen. Laws § 11-47-37; Vt. Stat. Ann. tit. 13, § 4020; RCW 9.41.240; Wyo. Stat. Ann. § 6-8-404(d)(i)(A). All those states, with the exception of Maryland, extend the federal minimum age requirement for handguns sold by FFLs to private sales as well.

[52] *See* Cal. Penal Code § 27510(a) (21 to purchase a long gun with some exceptions); Fla. Stat. § 790.065(13) (21 to purchase any firearm); Haw. Rev. Stat. Ann. § 134-2(a), (d) (21 to purchase long guns); 430 Ill. Comp. Stat. 65/3a, 65/4 (21 to purchase long guns) and 43.430 Ill. Comp. Stat. 65/2(a)(1), 65/4 (21 to possess a long gun); Vt. Stat. Ann. tit. 13, § 4020 (21 to purchase a long gun unless in possession of a hunter safety certificate).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

14

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    At least three other courts have held that firearms restrictions applicable to persons under
2    21 fall outside the scope of the Second Amendment. *See, e.g.*, *Hirschfeld*, 417 F. Supp. 3d at
3    755–56 (rejecting challenge to federal prohibition on sale by FFLs of handguns and ammunition
4    to those under 21 because law "reflect[s] 'longstanding' prohibitions on the use or possession of
5    handguns by those under a given age" that "have been in place and upheld by courts since the
6    nineteenth century" and thus "do not implicate Second Amendment rights"); *Powell v.*
7    *Tompkins*, 926 F. Supp. 2d 367, 387–88 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015)
8    (state law prohibiting those under 21 from receiving concealed carry licenses "comports with the
9    Second Amendment" because such "[a]ge-based restrictions . . . are among those lawful,"
10   "access-limiting conditions" and "impose[] no burden on the rights of eighteen- to twenty-year-
11   olds to keep and bear arms"); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (state convictions
12   for aggravated unlawful use of a weapon by defendant under 21 did not regulate conduct within
13   scope of Second Amendment); *see also United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009)
14   (upholding the federal age restriction on possession of handguns because "the right to keep arms
15   in the founding period did not extend to juveniles"). Defendants are aware of no case—and
16   Plaintiffs provide no authority—holding that an age-based restriction on firearm sales falls
17   within the Second Amendment's scope.[53]

18       The Age Provision does not burden Second Amendment rights. Plaintiffs' challenge to
19   it thus fails at the first step of the inquiry. This Court should grant Defendants summary judgment
20   on the Second Amendment claims on this basis alone.[54]

21

22       [53] As with restrictions on age, restrictions on assault weapons are also longstanding and historical. *See Fyock*,
23   779 F.3d at 996 ("longstanding prohibitions" on the possession of certain types of weapons are "traditionally
     understood to be outside the scope of the Second Amendment"); *Kolbe*, 849 F.3d at 137-38 (holding that law
24   banning assault rifles and high capacity magazines was "outside the ambit of the Second Amendment" because it
     concerned weapons "most useful in military service"); Robert J. Spitzer, *Gun Law History in the United States and*
     *Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 56, 70 tbl. 2 (2017) ("[A]t least seven, and as many as
25   ten, state laws specifically restricted semi-automatic weapons" from the early 1900s to the present).
       [54] The Age Provision falls outside the Second Amendment because it simply "impos[es] conditions and
26   qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27; *see also Hirschfeld*, 417 F. Supp. 3d at
     756 (federal age restriction for handguns is "among the . . . conditions and qualifications on the commercial sale of
     arms," which the Supreme Court in *Heller* did not 'cast doubt' on") (quoting *Heller*, 554 U.S. at 626–27).

DEFS.' CROSS-MSJ AND OPP. TO        15        ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                             800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                 Seattle, WA 98104-3188
                                                         (206) 464-7744

### 3. Regardless, the Age Provision withstands constitutional scrutiny

Even if Plaintiffs' challenge implicated the Second Amendment (which it does not), their claim would still fail because I-1639's Age Provision withstands intermediate scrutiny.

#### a. Intermediate scrutiny applies because the Age Provision does not severely burden a core Second Amendment right

If a law burdens protected conduct, the court next determines whether to apply intermediate or strict scrutiny. The level of scrutiny depends on two factors: "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Chovan*, 735 F.3d at 1138 (internal quotation marks omitted). Strict scrutiny applies only to a law that (1) "implicates the core of the Second Amendment right" (namely, the right to defend one's home), and (2) "severely burdens that right." *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). Intermediate scrutiny applies if the law either does not implicate the core Second Amendment right *or* does not place a severe burden on that right. *Id.* (quoting *Fyock*, 779 F.3d at 998–99). Where a law carves out exceptions to its regulation of the core Second Amendment right, it may alleviate the impact so as to render any burden insubstantial. *Chovan*, 735 F.3d at 1138.

There "has been 'near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate.'" *United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) (quoting *Silvester*, 843 F.3d at 823).

##### i. The Age Provision does not burden the "core right" of "responsible individuals" to defend themselves in the home

The "core right" of the Second Amendment is that of "responsible" individuals to possess firearms for self-defense in the home. *Heller*, 554 U.S. at 630; *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 961 (9th Cir. 2014). The Age Provision does not burden this right.

First, the Age Provision places no limits on the ability of 18- to 20-year-olds to purchase long guns that are not semiautomatic—including shotguns, any non-semiautomatic rifles (*e.g.*,

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

16

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-827

bolt-action rifles, lever-action rifles, pump-action rifles, break-action rifles), or any antique long gun. RCW 9.41.010(26). Plaintiffs acknowledge that such firearms are good—even "ideal"—self-defense options.[55] In fact, in Plaintiff Ball's gun store there are dozens of firearms available for purchase by 18- to 20-year-olds that Ball concedes are appropriate for self-defense.[56]

Second, the Age Provision contains multiple exceptions, allowing 18- to 20-year-olds to possess SARs in several places and situations, including in their homes for self-defense. *See* RCW 9.41.240(3)(a), 9.41.042(8); Knezovich Rep. at 6 (noting that I-1639 contains "broad exceptions under RCW 9.41.240, permitting the possession of the same firearms by 18- to 20-year-olds in a wide variety of circumstances").

Third, strict scrutiny does not apply because 18- to 20-year-olds have historically not been considered "responsible." This group has not had the same panoply of constitutional or other legal rights as adults, such as to vote, serve on juries, consume alcohol, gamble, or own firearms. *See supra* at 12–14; *see, e.g.*, *NRA*, 700 F.3d at 206 ("restricting the presumptive Second Amendment rights of 18-to-20-year-olds does not violate the central concern of the Second Amendment" which protects "responsible" citizens because "Congress found that persons under 21 tend to be relatively irresponsible and can be prone to violent crime").

        **ii.     Any burden imposed by the Age Provision is not "severe"**

Even if the Age Provision did implicate Plaintiffs' core Second Amendment rights, intermediate scrutiny would still apply because any such burden is not "severe." A severe burden

---

[55] Simpson Decl., Ex. S (Casey Dep. Ex. 95) (NRA article describing shotguns as "an ideal home-defense tool"); Ex. CC (Foskey Dep. 56:9–25) ("Q. Are shotguns a good option for self-defense? A. Yes."); Ex. V (Knezovich Dep. 78:13–16) (agreeing that "shotguns are an ideal home-defense tool for many reasons"); Ex. R (Mitchell Dep. 110:2–11) ("A compact shotgun could be very effective in the same . . . scenario [for self-defense in the home]"); Ex. T (Wald Dep. 71:21–72:2) ("[H]ome defense could be solved by a number of different firearms . . . . I think that in some situations the shotgun might be adequate and some others a rifle might be adequate, and others it may be a handgun."); *see also id.* Dkt. 78-1 at 4 of 300 (Knezovich Rep.) ("shotguns are preferred for . . . self-protection from animals and criminal threats"). Defendants have moved to exclude the testimony of Plaintiffs' expert, Sheriff Ozzie Knezovich. Dkt. 77. Although Defendants urge the Court to disregard Sheriff Knezovich's Report and deposition testimony in their entirety, they include herein relevant citations to each in the event the Court declines to exclude him as an expert.

[56] Simpson Decl., Ex. K (Ball. Dep. 45:21–46:5, 119:18–120:13).

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

17

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-828**

1    is one that "substantially prevent[s] law-abiding citizens from using firearms to defend

2    themselves in the home." *Jackson*, 746 F.3d at 964.

3         First, the courts of appeals consistently have applied and upheld under intermediate

4    scrutiny laws that restrict access to firearms by discrete groups of individuals, including 18- to

5    20-year-olds. *See, e.g.*, *NRA*, 700 F.3d at 211 (upholding federal prohibition on sale of handguns

6    by FFLs to those under 21); *McCraw*, 719 F.3d at 349 (upholding Texas law restricting ability

7    of 18- to 20-year-olds to carry handguns in public).[57]

8         Second, courts also have applied intermediate scrutiny to laws that leave alternatives for

9    using firearms in self-defense at home are left open. For example, in *Pena*, 898 F.3d at 977, the

10   Ninth Circuit recently applied intermediate scrutiny to a California law requiring new safety

11   technology on all new models of semiautomatic handguns. The *Pena* court rejected the plaintiffs'

12   arguments that they faced a substantial burden because they would be unable to purchase "the

13   majority of Smith & Wesson's handguns, two of Ruger's most popular models, and the fourth

14   generation of Glocks." *Id*. at 978. The *Pena* court explained that "being unable to purchase a

15   subset of semiautomatic weapons, without more, does not significantly burden the right to self-

16   defense in the home." *Id*. Plaintiffs could still purchase those firearms through exceptions in the

17   law and "[t]here [was] no evidence in the record that the hundreds of firearms available for

18   purchase are inadequate for self-defense." *Id*. at 979 (citing *United States v. Decastro*, 682 F.3d

19   160, 168 (2d Cir. 2012) (firearm regulation that preserved alternatives not a substantial burden)).

20        Plaintiffs' argument for strict scrutiny fails for similar reasons. While I-1639 prohibits

21   18- to 20-year-olds from purchasing one specific category of firearm, the law has no impact on

22   their ability to purchase other firearms for self-defense. As in *Pena*, 898 F.3d at 978, Plaintiffs

23   here may purchase firearms "suitable for self-defense—just not the exact gun they want."

24   _____

25   [57] *See also Schrader v. Holder*, 704 F.3d 980, 991 (D.C. Cir. 2013) (upholding federal prohibition on possession of firearms by individuals convicted of common law misdemeanor offenses); *United States v. Booker*, 644 F.3d 12, 24–26 (1st Cir. 2011) (upholding federal prohibition on possession of firearms by domestic violence

26   misdemeanants); *United States v. Reese*, 627 F.3d 792, 804–05 (10th Cir. 2010) (upholding federal prohibition on possession of firearms by individuals subject to domestic protective orders).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

18

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-829

1    Moreover, "[a]ny burden on the right is lessened by [a law's] exceptions." *Id.* at 979. I-

2    1639 contains several exceptions, including specifically for possession of SARs in the home.

3    Indeed, each of the three older adolescent Plaintiffs already owns one or more SARs.[58] Under I-

4    1639, they are free to keep these firearms in their homes and use them in self-defense—as well

5    as in many other circumstances, which they all acknowledge.[59]

6    Finally, any perceived burden is alleviated by the Age Provision's inherently temporary

7    nature. In *NRA*, the Fifth Circuit held that intermediate scrutiny was appropriate in a challenge

8    to a federal law which prohibited FFLs from selling handguns to individuals under 21. *NRA*, 700

9    F.3d at 209 ("[T]hese laws demand only an 'intermediate' level of scrutiny because they regulate

10   commercial sales through an age qualification with temporary effect. Any 18-to-20-year-old

11   subject to the ban will soon grow up and out of its reach."); *see also Stiles v. Blunt*, 912 F.2d

12   260, 265 (8th Cir. 1990) ("[I]t is particularly appropriate to apply a deferential standard of review

13   to age requirements affecting young people because such requirements do not result in an

14   absolute prohibition but merely postpone the opportunity to engage in the conduct at issue.").

15   That is exactly the case here. The "temporary nature" of I-1639's Age Provision "reduces

16   its severity" such that, at most, intermediate scrutiny applies. Since this lawsuit was filed,

17   Plaintiffs Casey and Rettmer turned 21 and are now legally entitled to purchase SARs.[60] So too

18   will Plaintiff Wald, who already owns three SARs (including an AR-15 rifle), when he turns 21

19   in October of this year.[61]

20   The Age Provision is not a categorical ban on SARs that triggers strict scrutiny. If any

21   scrutiny applies, it is intermediate scrutiny.

22

23

24   _____

25   [58] Simpson Decl., Ex. T (Wald Dep. 21:1–15, 23:7–15); Ex. J (Casey Dep. 28:11–29:7); Ex. Y (Rettmer Dep. 13:5–8).

26   [59] Simpson Decl., Ex. J (Casey Dep. 86:15–91:5), Ex. T (Wald Dep. 100:6–101:22), Ex. Y (Rettmer Dep. 26:3–29:17); *see also* RCW 9.41.240, 9.41.042(1)–(9).
     [60] Simpson Decl., Ex. Y (Rettmer Dep. 9:18–19), Ex. J (Casey Dep. 64:12–18).
     [61] Simpson Decl., Ex. T (Wald Dep. 7:18–25, 21:4–7).

DEFS.' CROSS-MSJ AND OPP. TO                    19                 ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                                         800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                                             Seattle, WA 98104-3188
                                                                                  (206) 464-7744

SER-830

#### b.      The Age Provision satisfies intermediate scrutiny

A law meets intermediate scrutiny if (1) the state's objective is significant, substantial, or important; and (2) there is a reasonable fit between the challenged regulation and the objective. *Jackson*, 746 F.3d at 965. The regulation must "promote[] a 'substantial government interest that would be achieved less effectively absent the regulation,'" but need not be the "least restrictive means" of achieving the government's interest. *Fyock*, 779 F.3d at 1000 (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998) (internal quotation marks omitted)).

Courts considering a state's interest "do not impose an 'unnecessarily rigid burden of proof,'" and the state is allowed to "rely on any material 'reasonably believed to be relevant' to substantiate its interests in gun safety and crime prevention." *Pena*, 898 F.3d at 979 (quoting *Mahoney v. Sessions*, 871 F.3d 873, 881 (9th Cir. 2017)). When analyzing whether there is a "reasonable fit between the government's stated objective and the regulation," courts consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." *Id.* (quoting *Fyock*, 779 F.3d at 1000) (internal citations omitted).

Plaintiffs make no meaningful attempt to apply the correct standard for intermediate scrutiny. Their omission demonstrates the law's constitutionality.

#### i.      I-1639 addresses significant government interests

The people of Washington passed I-1639 to "increase public safety and reduce gun violence."[62] Specifically, the intent of the Initiative was "to increase public safety for all Washingtonians, in particular our children," by "requir[ing] that individuals . . . be at least twenty-one years of age to purchase" SARs.[63] Promoting public safety and preventing violent crime are indisputably substantial government interests. *See e.g.*, *Pena*, 898 F.3d at 981–82 (noting that "countless cases support" the principle that "public safety and crime prevention are substantial government interests"); *NRA*, 700 F.3d at 209 ("[C]urbing violent crime perpetrated by young persons under 21—by preventing such persons from acquiring handguns from FFLs—

---

[62] Simpson Decl., Ex. A at 2 (I-1639 § 1).
[63] *Id.*

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

20

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-831

constitutes an important government objective."); *Cuomo*, 804 F.3d at 261 ("[S]tates have substantial, indeed compelling, governmental interests in public safety and crime prevention.") (internal citation omitted).[64] Given the epidemic of gun violence, and in particular the use of SARs by mass shooters age 18 to 20, Washington unquestionably has a significant interest in enhancing public safety by reducing the risk and severity of gun violence—an interest that Plaintiffs entirely ignore.

ii.      **Restricting SAR sales to 18- to 20-year olds has a "reasonable fit" with reducing gun violence and increasing public safety**

The Age Provision reasonably fits with Washington's interest in promoting public safety and reducing gun violence. Scientific research, crime data, and legislative findings all support "the commonsense notion that 18–to–20–year–olds tend to be more impulsive" and likelier to resort to violent crime than older adults. *NRA*, 700 F.3d at 210 n.21. Indeed, the prevalence of 18- to 20-year-olds as mass shooters is sufficient justification itself. Age-based access to SARs is "reasonably suited to achieve" the state's interests. *Silvester*, 843 F.3d at 827.

(a)      **The regions of the brain that govern impulsivity and judgment do not fully mature until the twenties**

Research shows that 18- to 20-year-olds are developmentally immature compared with older adults, increasing their risk to the community. Canvassing the leading research in neuroscience and developmental psychology, Defendants' two unrebutted scientific experts have found clear "consensus" that various regions of the human brain that govern impulsivity and sensation-seeking do not fully mature until the twenties.[65] Courts have reached the same conclusion. *See e.g.*, *Horsley*, 808 F.3d at 1133 ("The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment,

---

[64] *See also McCraw*, 719 F.3d at 348 (age limit to carry handguns in public served an important public safety interest); *Kolbe*, 849 F.3d at 139 (public safety interest is "not only substantial, but compelling").

[65] Aylward Decl., Ex. A at 17 (Aylward Rep.); *see also id.* at 1 ("[B]rains of individuals under 21 years of age are still under development, particularly in regions that are involved in sensation-seeking and poor impulse control, two factors responsible for risky (and sometimes violent) behavior."); S. Johnson Decl., Ex. A at 10 (Johnson Rep.) ("Complex supervisory and regulatory brain functions and social judgment continue to develop . . . into emerging adulthood.").

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

21

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  planning for the future, foresight of consequences, and other characteristics that make people
2  morally culpable.") (quoting scientific expert declaration); *Graham v. Florida*, 560 U.S. 48, 68
3  (2010) ("[D]evelopments in psychology and brain science continue to show fundamental
4  differences between juvenile and adult minds. For example, parts of the brain involved in
5  behavior control continue to mature through late adolescence.").[66] These well-established
6  neuroscientific findings logically support the decision of Washington voters to limit sales of
7  SARs, a firearm with the potential to inflict significant harm, to those 21 and older.[67]

8               **(b)     Individuals 18 to 20 disproportionately commit violent
9                          crimes**

10             Given their higher degree of impulsiveness and emotional immaturity, it is unsurprising
11  that 18- to 20-year-olds commit a disproportionately large share of crimes, including violent
12  crimes involving firearms. Though this group comprises only 4.4% of the population, it accounts
13  for approximately one-quarter of firearm homicides committed where an offender was
14  identified.[68] *See, e.g.*, 145 Cong. Rec. 18119 (1999) ("Studies show that one in four gun murders
15  are committed by people aged 18 to 20.") (statement of Rep. Grace Napolitano).
16  In addition, 18- to 20-year-olds account for 8.7% of all violent crime arrests, including: 15.5%
17  of murder and non-negligent manslaughter, 17.1% of robbery, 11.1% of rape, and 11.5% of
18  weapons offense arrests.[69] Overall, older adolescents aged 19, 18, and 20 accounted for the first,
19  second, and third highest percentages of arrests, respectively, for any age up to age 24.[70] Arrest

---

20  [66] *See also NRA*, 700 F.3d at 210 n.21 ("Modern scientific research supports the commonsense notion that 18-
21  to-20-year-olds tend to be more impulsive than young adults aged 21 and over."); *Horsley v.* Trame, 61 F. Supp. 3d
    788, 793 (S.D. Ill. 2014), *aff'd*, 808 F.3d 1126 (7th Cir. 2015) ("Many courts have noted that the risk of
    irresponsibility is higher in minors, and consequently, the danger of damage is greater.").
22  [67] *See, e.g.*, Aylward Decl., Ex. A at 2 (Aylward Rep.) ("[L]ate adolescence/early adulthood (approximately
23  ages 18 to 21) is a developmental period during which the cognitive and emotional control needed for responsible
    possession of firearms is still under development."); S. Johnson Decl. Ex. A at 12 (Johnson Rep.) ("During older
24  adolescence, individuals are maturing in important ways, psychologically, cognitive, and neurologically . . . . During
    this period of [developmental vulnerability], in order to protect young people and their communities, it is reasonable
    to limit purchases of semiautomatic firearms, whose misuse is particularly dangerous.").
25  [68] Simpson Decl., Ex. DD at 2, 6 fig. 1 (U.S. Dep't of the Treasury & U.S. Dep't of Justice, *Gun Crime in the
    Age Group 18–20* (June 1999)).
26  [69] Simpson Decl., Ex. L (U.S. Dep't of Justice, 2018 Crime in the United States, tbl. 38).
    [70] *Id.*

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106                          22                    ATTORNEY GENERAL OF WASHINGTON
                                                                          800 5th Ave. Suite 2000
                                                                          Seattle, WA 98104-3188
                                                                             (206) 464-7744

SER-833

1  rates for murder, robbery, and other violent crimes peak around ages 17 to 20, and arrest rates
2  for weapons crimes are nearly 50% higher among 18- to 20-year-olds than among younger
3  adolescents.[71]

4       The statistics are even starker when analyzing school shootings in particular. "[M]ore
5  than two hundred eight thousand students attending at least two hundred twelve schools have
6  experienced a shooting on campus since the Columbine mass shooting in 1999."[72] At the time I-
7  1639 was enacted, five of the previous six school shooters used a SAR.[73] And of "active shooter"
8  incidents[74] since 1970, more than 80% of the assailants were under age 21.[75] One need look no
9  further than Columbine, Sandy Hook, and Parkland to understand the scope of the problem.

10      Such violence is a problem here, too. In Washington, there were 330 firearm homicides
11  among 18- to 20-year-olds from 2000 to 2017.[76] The Mukilteo shooter and the Burlington Mall
12  shooter are among those 18- to 20-year-olds who used SARs in their crimes.[77] Moreover, at
13  Seattle's Harborview Medical Center, semiautomatic firearm injuries to young adult patients
14  cost approximately $10,000 more than other firearm injury types.[78]

15              **(c)    Minimum age laws have proven effective in addressing**
16                       **health and safety concerns**

17      Laws raising the minimum legal age to engage in certain behaviors to 21 have effectively
18  addressed other public health and safety concerns. For example, raising the minimum age to
19  drink alcohol to 21 reduced alcohol-related traffic crashes.[79] Raising the age to purchase tobacco

---

20  [71] S. Johnson Decl., Ex. A at 10 (Johnson Rep.).
      [72] Simpson Decl., Ex. A at 2 (I-1639 § 1).
21      [73] Simpson Decl., Exs. Q at 26 (I-1639 Voter Pamphlet, Proponent's Statement), D (mass shootings chart).
      [74] The FBI defines an "active shooter" incident as "[one or more] individual[s] actively engaged in killing or
22  attempting to kill people in a . . . populated area." Simpson Decl., Ex. EE at 5 (A Study of Active Shooter Incidents
   in the United States Between 2000 and 2013).
23      [75] *Id.*, Ex. FF (K-12 School Shooting Database).
      [76] Simpson Decl., Ex. GG at 3 (*Analysis of the Involvement of 18-20 Year Olds in Firearm Violence and the
24  Special Problem of Semi-Automatic Weapons*, Firearm Injury and Policy Research Program (June 2019)).
      [77] Simpson Decl., Ex. D at 2, 4 (Mass Killings table).
25      [78] Rivara Decl., Ex. A at 9–10 (Rivara Rep.).
      [79] Simpson Decl., Ex. HH at 113 (William DeJong et al., *Case Closed: Research Evidence on the Positive
26  Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, 75 J. Stud. on Alcohol &
   Drugs 108, 113 (2014)).

---

DEFS.' CROSS-MSJ AND OPP. TO                    23                ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                                        800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                                            Seattle, WA 98104-3188
                                                                                 (206) 464-7744

SER-834

1    to 21 is expected by the Institute of Medicine to "eventually . . . result in 249,000 fewer

2    premature deaths . . . for people born between 2000 and 2019. It also would result in about

3    286,000 fewer pre-term births and 438,000 fewer babies born with low birth weights" by

4    reducing smoking among older adolescents.[80] Washington recently enacted exactly such a

5    measure. *See* RCW 26.28.080. It is reasonable for Washingtonians to anticipate that

6    corresponding minimum age requirements for firearms would also yield public health benefits.

7                     **(d)      SARs are more dangerous and used more frequently in
                                 mass shootings than other firearms**
8

9    Data on mass shootings reinforces the reasonableness of prohibiting sales of SARs to

10   those under 21. As Defendants' experts explain, SARs "pose special risks to the public because

11   the number of bullets that can be shot in a very short period of time."[81] And many SARs shoot

12   those bullets at higher speeds and have more lethal impacts.[82]

13   Further, SARs are easier to operate for inexperienced shooters.[83] This aspect of SARs is

14   particularly relevant in Washington: in 2016, a 19-year-old in Mukilteo studied the owner's

15   manual for his newly purchased AR-15-style SAR before walking into a party and opening fire,

16   killing three people and injuring another.[84]

17   Not only are SARs the weapon of choice for mass shooters, but mass shootings are

18   "demonstrably more lethal when the assailant uses a semiautomatic rifle than when other

19

20   _____

21   [80] Simpson Decl., Ex. II at 2. (Tripp Mickle, *Study Supports Raising Tobacco-Purchase Age to 21*, Wall St. J., Mar. 12, 2015), Ex. JJ at 182, 201, 214–15 (*Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products*, Inst. of Medicine of the Nat'l Academies (Richard J. Bonnie, et al., eds. 2015).

22   [81] Rivara Decl., Ex. A at 3 (footnote omitted); *see also* Jones Decl., Ex. A at 11 ("The practical difference between operating mechanisms is that a semiautomatic shooter may continue to rapidly fire his/her weapon

23   uninterrupted until the ammunition is depleted and reloading with another magazine is required."); *see also* Simpson Decl., Ex. J (Casey Dep. 37:8–38:10; 77:15–18) (SARs permit shooter to fire more shots in same amount of time).

24   [82] Simpson Decl., Ex. B at 859 (Rhee et al., *Gunshot Wounds*, 80 J. Trauma & Acute Care Surgery 853 (2016)).

     [83] Simpson Decl., Ex. K (Ball Dep. 59:17–25 (bigger firearms are "easier to shoot"), 132:14–25 (shooter-
25   induced malfunctions more likely with handgun or shotgun than SAR), 133:23–134:15 (SARs "are easier to grab ahold of").

26   [84] Kramer Decl. ¶¶ 4, 17; Simpson Decl., Ex. E at 2 (Sara Jean Green, *Shooting suspect jealous over ex, bought rifle a week ago, police say*, Seattle Times, Aug. 2, 2016).

DEFS.' CROSS-MSJ AND OPP. TO          24          ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                              800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                  Seattle, WA 98104-3188
                                                           (206) 464-7744

**SER-835**

firearms are used."[85] Semiautomatic weapons result in higher mortality rates (16.3%) than other types of firearms (12%) and require on average 4.12 more days of hospitalization compared with other types of firearms.[86] Plaintiff Casey concedes that if he were a victim of a mass shooting, he would prefer the shooter to have a bolt action rifle over a SAR.[87] Nor would exempting .22 caliber rifles from the age restriction satisfy the public interest; such rifles are the most common known type of firearm used in school shootings.[88]

Given mass shooters' preference for SARs and their lethality, it is not surprising that other states have enacted total bans on assault weapons (even to individuals over 21)—and federal courts have upheld them. *Wilson v. Cook Cty.*, 937 F.3d 1028, 1036–37 (7th Cir. 2019) (per curiam) (upholding Illinois county's ban on assault rifles); *Kolbe v. Hogan*, 849 F.3d 114, 137–38 (4th Cir. 2017) (upholding Maryland's ban on assault rifles); *Cuomo*, 804 F.3d at 242 (upholding New York's and Connecticut's bans on assault weapons); *Heller II*, 670 F.3d at 1264 (upholding District of Columbia's ban on assault rifles).[89]

---

[85] Jones Decl., Ex. A at 10–11 (Jones Rep.); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015) ("But assault weapons with large-capacity magazines can fire more shots, faster, and thus can be more dangerous in aggregate. Why else are they the weapons of choice in mass shootings?"); *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1262–63 (D.C. Cir. 2011) ("assault weapons are preferred by criminals") (citing, inter alia, Dep't of Treasury, *Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles* 34–35, 38 (1998); Christopher S. Koper et al., U. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, at 51, 87 (2004)).

[86] Simpson Decl., Ex. GG at 5 (*Analysis of the Involvement of 18-20 Year Olds in Firearm Violence and the Special Problem of Semi-Automatic Weapons*, Firearm Injury and Policy Research Program (June 2019)).

[87] Simpson Decl., Ex. J (Casey Dep. 73:18-74:1, 77:15-78:2).

[88] Simpson Decl., Ex. FF at 3 (K-12 School Shooting Database).

[89] I-1639 differs in some respects from the assault weapon bans in Connecticut, D.C., Illinois, Maryland, and New York, as well as the federal assault weapons ban that expired in 2004. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub L. No. 103–322, § 110102(b), 108 Stat 1796, 1997–98. First, I-1639 does not "ban" any weapons, but merely imposes a minimum age qualification to purchase a SAR. Second, the federal ban and more recent state analogues all define "assault weapons" by reference to both a list of specific firearm models such as the AR-15 (including "copies" or "duplicates," *e.g.*, *id.* § 110102(b)(A)), and by certain technical "features" such as a "pistol grip" or a "flash suppressor" (the so-called "features test"). Those definitions encompass not only assault rifles but semiautomatic handguns as well. *See, e.g.*, *id.*; Md. Code Ann., Crim. Law § 4-301(c), (d)(2); N.Y. Penal Law § 265.00(22)(c). It is widely acknowledged—including by Plaintiffs' own expert—that the federal restriction was easily circumvented by firearms manufacturers and criminals through minor modifications designed to avoid triggering the technical "features test" but with "overall functionality undiminished." Jones Decl., Ex. A at 15 (Jones Rep.); *see also* Simpson Decl., Ex. V (Knezovich Dep. 149:18–151:6). I-1639 avoids that shortcoming by defining a SAR to include all rifles with semiautomatic firing action.

---

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

25

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-836

1    In sum, the people's decision to limit the often deadly mix of older adolescents and SARs

2    reasonably fits with the substantial interests in increasing public safety and reducing gun

3    violence. *See Powell*, 926 F. Supp. 2d at 392–93 ("[Y]oung adults' access to firearms is an issue

4    of significant governmental concern and . . . there is a close fit between this concern and the

5    prohibition on the grant of licenses to carry to adults under the age of twenty-one."). Defendants

6    need not prove that the Age Provision is the only strategy that would achieve that public interest,

7    only that there is a reasonable fit. For that reason, too, Defendants are entitled to summary

8    judgment on Plaintiffs' Second Amendment claim.[90]

9    **C.      The Nonresident Sales Provision Does Not Violate the Dormant Commerce Clause**

10   The Commerce Clause provides that Congress shall have the power "[t]o regulate

11   Commerce with foreign Nations, and among several states, and with the Indian Tribes." U.S.

12   Const. Art. 1, § 8, cl. 3. In addition to this express grant of power to Congress, the Commerce

13   Clause has an implicit negative aspect—known as the dormant Commerce Clause—that

14   "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirit Retailers*

15   *Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). The dormant Commerce Clause serves as a

16   bulwark against state programs of "economic protectionism—that is, regulatory measures

17   designed to benefit in-state economic interests by burdening out-of-state competitors." *Int'l*

18   *Franchise Ass'n, Inc. v. City of Seattle* (*Int'l Franchise Ass'n*), 803 F.3d 389, 399 (9th Cir. 2015)

19   (internal citations and quotations omitted).

20   If a law affects interstate commerce, then a court applies one of two levels of scrutiny

21   depending on whether the law is "discriminatory" as that term is used in dormant Commerce

22

23   _____

24   [90] Even if the Court were to apply heightened or strict scrutiny, the Age Provision still passes constitutional muster: Washington's interests in reducing gun violence and promoting public safety are "compelling"; its prohibition on the sale to a discrete, high-risk group of older adolescents of one specific type of weapon used

25   disproportionately in mass shootings is "narrowly tailored" to advancing those interests; and the law—including the wide range of exceptions allowing possession of SARs by older adolescents—leaves ample alternative channels for

26   exercise of Second Amendment rights. *See, e.g.*, *Chovan*, 735 F.3d at 1152 (Bea, J., concurring) (agreeing with majority that federal law prohibiting convicted domestic violence misdemeanants from possessing firearms does not violate Second Amendment, but reaching conclusion after applying strict scrutiny).

DEFS.' CROSS-MSJ AND OPP. TO                    26                    ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                                          800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                                              Seattle, WA 98104-3188
                                                                                   (206) 464-7744

**SER-837**

1  Clause jurisprudence. *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 995 (9th Cir. 2002).

2  Here, the Nonresident Sales Provision is valid regardless what level of scrutiny applies.

3  **1.   Dormant Commerce Clause framework**

4  In fewer than two pages of argument, Plaintiffs' Motion cherry-picks quotes from

5  dormant Commerce Clause cases, rather than articulating or applying the governing legal

6  framework. To determine whether a law violates the dormant Commerce Clause, courts "first

7  ask whether it discriminates on its face against interstate commerce." *United Haulers Ass'n v.*

8  *Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007). If so, the law is

9  invalid unless the state "has no other means to advance a legitimate local purpose." *Id.*

10  (citing *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). If the law is non-discriminatory, however, it

11  violates the dormant Commerce Clause only if the burden on interstate commerce is "clearly

12  excessive in relation to the putative local benefits." *Sullivan v. Oracle Corp.*, 662 F.3d 1265,

13  1271 (9th Cir. 2011) (quotation marks omitted) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S.

14  137, 142 (1970)). This *Pike* balancing test requires "sensitive consideration of the weight and

15  nature of the state regulatory concern in light of the extent of the burden imposed on the course

16  of interstate commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 441 (1978). That

17  there "be a *substantial burden* on *interstate commerce*" is a "critical requirement" of a dormant

18  Commerce Clause violation. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144,

19  1148 (9th Cir. 2012) (citing *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)).

20
21  **2.   The Nonresident Sales Provision is non-discriminatory because it does not involve economic protectionism**

22  The threshold question under the dormant Commerce Clause is whether the law is

23  discriminatory. The term "discrimination" has a specific meaning in the dormant Commerce

24  Clause context: "economic protectionism, or discrimination, 'simply means differential

25  treatment of in-state and out-of-state economic interests that benefits the former and burdens the

26

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

27

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-838**

1   latter.'" *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Or.*

2   *Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)).

3          Mere differential treatment of in-state and out-of-state interests is not sufficient to

4   establish discrimination. Rather, there must be some economic benefit to in-state interests or

5   some economic burden on out-of-state interests. *See, e.g.*, *City of Phila. v. New Jersey*, 437 U.S.

6   617, 624 (1978) ("The crucial inquiry . . . [is] whether [the law] is basically a protectionist

7   measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with

8   effects upon interstate commerce that are only incidental."). This makes sense, as "[t]he central

9   rationale for the rule against discrimination is to prohibit state or municipal laws *whose object is*

10  *local economic protectionism*, laws that would excite those jealousies and retaliatory measures

11  the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S.

12  383, 390 (1994) (emphasis added).

13         The Nonresident Sales Provision does not trigger this protectionism concern because it

14  neither benefits in-state economic interests nor burdens out-of-state economic interests. Plaintiff

15  Mitchell—the only Plaintiff who now asserts a Commerce Clause claim, Dkt. No. 76 at 16—

16  bears the burden of establishing that the provision discriminates. *Int'l Franchise Ass'n*, 803 F.3d

17  at 400. (Plaintiff Ball had originally alleged a dormant Commerce Clause claim too, but

18  Plaintiffs' abandoned her claim after Ball revealed in discovery that, after I-1639 went into

19  effect, her firearm sales revenue increased.[91]) But Mitchell fails to adduce facts creating a

20  genuine dispute on this threshold issue. Mitchell alleges that the provision has diminished his

21  sales of SARs to potential out-of-state purchasers.[92] But Mitchell concedes that no actual

22  evidence supports his bare allegation of diminished sales because he did not consult any financial

23  records or sales data in arriving at his "ballpark" estimate.[93]

24

25

---

26   [91] Dkt. 17 ¶ 120; Simpson Decl., Ex. K (Ball Dep. 125:25–126:5).
     [92] *See, e.g.*, Dkt. 76-4, ¶ 17.
     [93] Simpson Decl., Ex. R (Mitchell Dep. 169:7–172:9).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106                    28          ATTORNEY GENERAL OF WASHINGTON
                                                           800 5th Ave. Suite 2000
                                                          Seattle, WA 98104-3188
                                                             (206) 464-7744

SER-839

1    Even if Mitchell's allegations were true, they would not establish discrimination under

2    the dormant Commerce Clause because they connote a *burden* to Washington economic

3    interests—the very opposite of economic protectionism. Conversely, the likely economic

4    beneficiaries of the Nonresident Sales Provision are out-of-state gun dealers who would, if

5    anything, see a corresponding *increase* in sales at the expense of Washington gun dealers. *See*

6    *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1997) ("[A]ny notion of discrimination

7    assumes comparison of substantially similar entities.") (footnote omitted). Thus, the central

8    concern of the dormant Commerce Clause is not triggered and the Nonresident Sales Provision

9    is nondiscriminatory. *See, e.g.*, *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d

10   Cir. 2007) (law nondiscriminatory where "it does not confer a competitive advantage upon local

11   business vis-a-vis out-of-state competitors" and  "even local businesses operating within the

12   Town itself challenge [its] validity"); *Cohen v. R.I. Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439,

13   447 (D.R.I. 2011) ("[W]hen a law does not implicate the kind of 'local economic protectionism'

14   that the Commerce Clause aims to eradicate, the rationale for equating differentiation and

15   discrimination disappears . . . . Plaintiff has failed to identify a specific in-state commercial

16   interest that is favored by the [law] at the expense of particular out-of-state competitors, so it

17   cannot demonstrate that the discount discriminates against interstate commerce.").

18   Mitchell's attempt to rebut this "cardinal" principle of dormant Commerce Clause

19   jurisprudence—that "a State may not benefit in-state economic interests by burdening out-of-

20   state competitors"—falls flat. *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 199 (1994)

21   (internal quotation marks omitted). First, Mitchell relies on decisions that concern state attempts

22   to hoard natural resources or other unique state products for the purpose of benefitting in-state

23   interests. In *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 576–77, 580–

24   81 (1997), the Court struck down a state tax exemption for summer camps serving mostly

25   Mainers but not those serving primarily out-of-state campers because it effectively blocked "out-

26   of-state access to" a "natural resource"—namely, "the natural beauty of Maine itself." Similarly,

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

29

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-840

1    in *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339 (1982), the prohibition on

2    selling hydroelectric energy outside the state was "simple economic protectionism" designed to

3    gain an "economic advantage for New Hampshire citizens at the expense of New England

4    Power's customers." In contrast, Mitchell does not allege that I-1639's purpose or effect is to

5    reserve scarce Washington products for in-state consumers. Nor could he. I-1639 indisputably

6    restricts in-person SAR sales to "increase public safety and reduce gun violence"—a goal wholly

7    unrelated to seeking in-state economic advantage or creating a functional export tariff.[94]

8         Further, I-1639 does not result in hoarding or discriminatory protection of in-state

9    resources and is not a law that would incite retaliatory measures from other states. Indeed, the

10   flow of commerce is not shut off at all. Contrary to Mitchell's unsupported assertion otherwise,

11   Dkt. 76 at 16, nonresidents may continue to purchase SARs from Mitchell and other Washington

12   dealers using the FFL-to-FFL transfer process. *See supra* at 9. Moreover, Mitchell does not

13   contend that nonresidents are constrained in their ability to purchase SARs in their home states.

14   Nor is there a nonresident plaintiff who asserts any injury from I-1639. According to Mitchell,

15   it is the other way around: Washington residents prefer to purchase firearms in Oregon to avoid

16   paying sales tax or transfer fees.[95] And, of course, nonresidents may continue to purchase SARs

17   in their home states or in other states. Thus, SARs remain widely available to nonresidents.

18         Second, Mitchell's reliance on *Brown-Forman Distillers Corp. v. New York State Liquor

19   Authority*, 476 U.S. 573 (1986), for the proposition that a regulation that disadvantages in-state

20   interests may constitute economic protectionism, is misplaced. Dkt. 77 at 16. In *Brown-Forman

21   Distillers*, the Supreme Court struck down a state law that, to give low prices to New Yorkers,

22   required liquor distillers to sell their products to in-state wholesalers for no more than the lowest

23   price offered in any other state. *Id.* at 576. The Court held that the law violated the dormant

24   Commerce Clause because it, in effect, "regulate[d] out-of-state transactions": "Once a distiller

25   ha[d] posted prices in New York, it [wa]s not free to change its prices elsewhere in the United

26

---

[94] Simpson Decl., Ex. A at 2 (I-1639 § 1).
[95] Simpson Decl., Ex. R (Mitchell Dep. 42:21–43:13).

DEFS.' CROSS-MSJ AND OPP. TO          30          ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                    800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                        Seattle, WA 98104-3188
                                                             (206) 464-7744

SER-841

1   States during the relevant month." *Brown-Forman Distillers*, 476 U.S at 582. The Court noted

2   that "[w]hile New York may regulate the sale of liquor within its borders, and may seek low

3   prices for its residents, it may not project its legislation into [other States] by regulating the price

4   to be paid for liquor in those States." *Id.* at 582–83 (quotation marks and citation omitted). I-

5   1639 does not regulate or limit sales of SARs in other states.[96] Instead, it permissibly "regulate[s]

6   the sale of [firearms] within its borders." *Id.* at 582. Doing so does not discriminate under the

7   dormant Commerce Clause.

### 3.  The Nonresident Sales Provision meets the *Pike* balancing test

9   Without discrimination, a law need only meet the lenient *Pike* balancing test, under which

10   courts "will uphold the law 'unless the burden imposed on [interstate] commerce is clearly

11   excessive in relation to the putative local benefits.'" *Corey*, 730 F.3d at 1087–88 (quoting *Pike*,

12   397 U.S. at 142). Mitchell "bears the burden of proof in establishing the excessive burden in

13   relation to the local benefits." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v.*

14   *Brown*, 567 F.3d 521, 528 (9th Cir. 2009). Courts will not look beyond a law's putative benefits

15   absent proof of an excessive burden. *Harris*, 682 F.3d at 1155.

16   Mitchell put forth no evidence to establish an excessive burden on interstate commerce.

17   When asked to identify details of his out-of-state SAR sales, including the number and value of

18   such sales, Mitchell did not answer. He objected that, among other bases, the inquiry was "not

19   relevant to any party's claims or defense" and that the "information . . . has no relevance to any

20   issue in this case."[97] This response indicates that Mitchell cannot meet his burden of showing

21   there is an excessive burden on interstate commerce. And notably, no out-of-state competitors

22   to Mitchell or nonresident consumers have asserted that their interests are in any way harmed.

---

[96] A "per se" dormant Commerce Clause violation may also occur when a law "directly regulates interstate commerce," that is, when it "directly affects transactions that take place across state lines or entirely outside of the state's borders." *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 445 (9th Cir. 2019) (quotation marks and citations omitted). As explained above, the Nonresident Sales Provision does not regulate sales outside Washington's borders or across state lines because it bars only SAR sales in person. An interstate transaction through FFL-to-FFL transfer remains lawful. *Supra* at 9.

[97] Simpson Decl., Ex. KK (Interrogatory Answers 1, 2, 5; Request for Production Responses 1, 3); *see also id.*, Ex. R (Mitchell Dep. 169:22–170:4) (examination of sales records would be "exceptionally difficult to do").

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

31

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-842

1  Because Mitchell fails to show an excessive burden, the Nonresident Sales Provision is

2  presumptively valid even without evidence of any local benefits.

3       I-1639's benefits, however, are substantial. Thus, even if Mitchell had shown that the

4  law substantially burdens interstate commerce, it would still pass constitutional muster because

5  it advances a bona fide state interest in public safety that far outweighs any perceived burden on

6  interstate commerce. I-1639 was adopted to "increase public safety and reduce gun violence,"

7  an unquestionably legitimate government interest.[98] To advance this interest, the people of

8  Washington extended an existing safeguard on handgun sales to SAR sales: the requirement to

9  undergo an enhanced background check, in which law enforcement searches additional state and

10  local databases to ensure that the buyer is not prohibited by law from buying the firearm. *Supra*

11  at 8–9. It is undisputed that enhanced background checks are more comprehensive than a NICS

12  check alone.[99] As the Fifth Circuit has noted, "The states voluntarily provide records for use in

13  the databases accessed by NICS," and, "for various reasons, some records are not timely

14  provided, or are not provided at all." *Mance*, 896 F.3d at 707. This enhanced background check

15  cannot be conducted on nonresidents because Washington State cannot request—much less

16  require—out-of-state law enforcement agencies to assist with running Washington's background

17  checks.[100] Thus, the Nonresident Sales Provision is necessary to ensure an enhanced background

18  check is conducted before a SAR is sold in Washington. This local benefit far outweighs any

19  alleged burden. The Nonresident Sales Provision is constitutional under *Pike* balancing.

20       **4.    The Nonresident Sales Provision would meet strict scrutiny if it applied**

21       While the Nonresident Sales Provision is not discriminatory, if this Court were to

22  conclude otherwise, the provision would survive strict scrutiny. To pass strict scrutiny, a law

23  must be "demonstrably justified by a valid factor unrelated to economic protectionism."

24  *Carbone*, 511 U.S. at 402; *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y.* (*N.Y. State Rifle*),

25

26  [98] Simpson Decl., Ex. A at 2 (I-1639 § 1).
   [99] *See, e.g.*, Belcher Decl. ¶¶ 6–7; Candee Decl. ¶¶ 15–18; T. Johnson Decl. ¶¶ 6–7; Simpson Decl., Ex. R
   (Mitchell Dep. 119:18–120:16), Ex. V (Knezovich Dep. 107:25–108:3), Ex. K (Ball Dep. 71:22–72:3; 132:1–11).
   [100] Candee Decl. ¶¶ 17–18; Belcher Decl. ¶¶ 6–9.

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

32

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-843**

1   883 F.3d 45, 64 (2d Cir. 2018), *cert. granted*, 139 S. Ct. 939 (2019). Articulated in a different

2   way, the law must "serve[] a legitimate local purpose, and this purpose could not be served as

3   well by available nondiscriminatory means." *Corey*, 730 F.3d at 1087 (quoting *Maine*, 477 U.S.

4   at 138 (internal quotation marks omitted)).

5        *New York State Rifle* is instructive. In that case, the Second Circuit recently rejected a

6   dormant Commerce Clause challenge to a city's significant restrictions on the transportation of

7   certain firearms outside of the home. The ordinance, like I-1639, was enacted "to protect the

8   health and safety" of residents. *N.Y. State Rifle*, 883 F.3d at 65. Even if strict scrutiny applied,

9   the court would have upheld the ordinance because it was "demonstrably justified by a valid

10  factor unrelated to economic protectionism." *Id.* (internal quotations and citation omitted).

11  Specifically, restricting access to firearms to curb gun violence is a valid part of a "'longstanding

12  tradition of . . . regulating firearm possession and use in public because of the dangers posed to

13  public safety.'" *Id.* (quoting *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 94–95 (2d Cir.

14  2012)). And the Supreme Court has recognized a "'deeply rooted' distinction 'between the

15  power of the State to shelter its people from menaces to their health or safety . . . when those

16  dangers emanate from interstate commerce, and its lack of power to . . . constrict the flow of

17  such commerce for their economic advantage.'" *Id.* at 66 (quoting *W. Lynn Creamery, Inc.*, 512

18  U.S. at 206 n.21).

19       The same logic applies here. The Nonresident Sales Provision serves the legitimate local

20  purpose of ensuring that Washington's enhanced background check procedures apply to all sales

21  of SARs in this state. This concern is more than valid—it is compelling. *See, e.g.*, *Mance*, 896

22  F.3d at 706 (federal prohibition on in-person sales of handguns to nonresidents, 18 U.S.C.

23  § 922(a)(3), was "justified by a compelling interest and is narrowly tailored to serve that

24  interest"). Indeed, in the 2019 Gilroy Garlic Festival mass shooting, which killed or injured 20

25  people, the shooter purchased his SAR in Nevada before carrying out his attack in California.[101]

26

---

[101] Simpson Decl., Ex. D (Mass Killings Table), Ex. LL at 2 (Lauren Hepler, Amy Harmon, and Richard A. Oppel Jr., *Gilroy Shooting: Two Children Among the Dead at California Festival*, N.Y. Times, July 29, 2019).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

33

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   And the 2013 D.C. Navy Yard shooter had attempted to purchase an AR-15 in a Virginia gun

2   store "but was stopped from buying one because state law there limits the sale of such weapons

3   to out-of-state buyers" by requiring additional forms of identification.[102] Forced to use a shotgun

4   and a handgun instead, the killer could well have harmed many more victims had his arsenal

5   included a SAR. The Nonresident Sales Provision is directed at only promoting public health

6   and safety and has no connection to economic protectionism.

7          Further, I-1639 is narrowly tailored. An interest is narrowly tailored if the state can

8   "demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local

9   interest." *Carbone*, 511 U.S. at 392. The Nonresident Sales Provision is necessary in light of the

10  mechanics of the enhanced background check process. *See supra* at 7–9. Washington cannot

11  compel thousands of local law enforcement agencies across the country to conduct detailed

12  background checks on prospective nonresident SAR purchasers.[103] And it would also be

13  "unrealistic" to require Washington FFLs to "become, and remain, knowledgeable about the

14  handgun laws of the 50 states and the District of Columbia, and the local laws within the 50

15  states and the District." *Mance*, 896 F.3d at 708 (federal in-state sales requirement for handguns

16  "is narrowly tailored to assure that an FFL . . . can . . . know and comply with the laws of the

17  state in which the delivery occurs").

18         No alternative means are available to advance this interest. *See generally Mance*,

19  896 F.3d at 709 (holding that federal law prohibiting sales of handguns to nonresidents is the

20  "least restrictive means of insuring that the handgun laws of states are not circumvented"). And

21  nonresidents have adequate alternative channels to purchase SARs through the FFL-to-FFL

22  transfer process, in their own states, and in other states. *Supra* at 9; *see also Mance*, 896 F.3d at

23  709 ("a qualified person in any state may purchase a firearm] from an FFL in his or her state of

24

25         ─────────────────

26         [102] Simpson Decl., Ex. MM (Michael S. Schmidt, *State Law Prevented Sale of Assault Rifle to Suspect Last Week, Officials Say*, N.Y. Times, Sept. 13, 2013).
         [103] Candee Decl. ¶ 18; Belcher Decl. ¶¶ 8–9.

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

34

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-845

1   residence, or may purchase the firearm from an out-of-state FFL as long as the weapon is

2   lawfully transferred to an in-state FFL").[104]

3       Even if strict scrutiny applied, I-1639 does not violate the dormant Commerce Clause.

4       **5.     Congress has authorized states to restrict sales of rifles to nonresidents**

5       Mitchell's dormant Commerce Clause claim also fails because Congress has authorized

6   states to prohibit the sale of rifles to nonresidents. "It is well established that Congress may

7   authorize the States to engage in regulation that the Commerce Clause would otherwise forbid."

8   *Maine*, 477 U.S. at 138. Federal law permits sales of rifles to nonresidents only if they "fully

9   comply with the legal conditions of sale in both such States." 18 U.S.C. § 922(b)(3); 27 C.F.R.

10  § 478.99. Because § 922(b)(3) "plainly authorizes" states to restrict rifle sales to nonresidents,

11  the Nonresident Sales Provision is "invulnerable to constitutional attack under the Commerce

12  Clause." *Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985).

13      Congress first enacted § 922(b)(3) as part of the GCA "to strengthen Federal controls

14  over interstate and foreign commerce in firearms and to assist the States effectively to regulate

15  firearms traffic within their borders." H.R. Rep. No. 90-1577, at 6 (1968), *reprinted

16  in* 1968 U.S.C.C.A.N. 4410, 4411. Having found that "the sale . . . of firearms" (including

17  "[r]ifles") "to nonresidents . . . has tended to make ineffective the laws, regulations, and

18  ordinances in the several States," S. Rep. No. 90-1501, at 28 (1968), Congress made it unlawful

19  for FFLs to sell or deliver "any firearm" (including a rifle) to a nonresident, 18 U.S.C.

20  § 922(b)(3) (1970). That general prohibition contained an exception for sales of rifles or

21  shotguns to residents of "contiguous" states. *Id.* But the exception applied only if allowed by law

22

23

24      [104] Simpson Decl., Ex. W at 203 (*Federal Firearms Regulations Reference Guide* 3, U.S. Dep't of Justice
        (2014)) ("[T]he sale may be made if the firearm is shipped to a licensee whose business is in the purchaser's State

25  of residence and the purchaser takes delivery of the firearm from the licensee in his or her State of residence."); *id.*
    Ex. X at 8 ("Initiative 1639: Frequently Asked Questions," Wash. Office of the Att'y Gen.) ("[N]othing in the

26  Initiative prohibits an FFL from transferring a semiautomatic assault rifle to an FFL in a different state, consistent
    with federal law—a practice long utilized for interstate sales of pistols and other types of firearms.").

DEFS.' CROSS-MSJ AND OPP. TO                    35              ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                              800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                                  Seattle, WA 98104-3188
                                                                          (206) 464-7744

1  in both states. *Id.* At the time of the GCA's enactment, at least 16 states had laws restricting

2  acquisition or possession of one or more types of firearms by nonresidents.[105]

3      In enacting § 922(b)(3), Congress did not intend to displace state residency restrictions.

4  Quite the opposite: its goal was to "[a]ssist and encourage States and local communities to adopt

5  and enforce *stricter* gun control laws." H.R. Rep. No. 90-1577, at 8, 1968 U.S.C.C.A.N. at 4413

6  (emphasis added). By making the default rule that nonresidents may not purchase firearms—

7  subject to an exception if and only if the laws of both states permit it—Congress sought to

8  strengthen state restrictions on out-of-state purchasers. *See* S. Rep. No. 90-1097, at 50

9  (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2166 (residency provisions "will enable the States

10  to more effectively control this traffic within their own jurisdictions under the police power").

11  When Congress amended the GCA, it reaffirmed its original purpose to "prevent the use of

12  interstate sales to defeat state and local gun restrictions," S. Rep. No. 98-583, at 10 (1984), and

13  to "[l]et the States make those decisions," Hearings of Subcomm. on Crime, Comm. of Judiciary,

14  99th Cong. (1st and 2d Sess.) Pt. 1, Serial No. 131, at 785.[106] In sum, § 922(b)(3) vests in each

15  state the authority to determine whether to permit FFLs to sell rifles to nonresidents.

16      In 1970, Washington allowed qualified nonresidents to purchase rifles and shotguns in

17  person. 1970 Wash. Sess. Laws at 668, ch. 74, § 2 (originally codified at RCW 19.70.020,

18

19  [105] *See, e.g.*, Act of Mar. 2, 1937, No. 190, § 1, 1937 Ala. Laws 223, 223; Act of March 19, 1923 §§ 1, 3, 1923 Ark. Acts 379, 379-80; Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134; Act of July 11, 1919, § 4, 1919 Ill.

20  Laws 431, 432; Act of Feb. 21, 1935, ch. 63, §§ 1, 3, 5, 1935 Ind. Laws 159, 159-61; Act of Feb. 25, 1939, ch. 14, 1939 Me. Acts 53; Act of May 29, 1922, ch. 485, § 9, 1922 Mass. Acts 560, 563; Act of June 2, 1927, ch. 372, §§

21  2, 6, 1927 Mich. Acts 887, 887-89; Act of April 7, 1921, § 2, 1921 Mo. Laws 692; Act of Feb. 20, 1918, ch. 2, §§ 1-3, 8, 1918 Mont. Laws 6, 6-9; Act of March 3, 1919, ch. 74, § 5, 1919 Mont. Acts 147, 148; Act of March 11,

22  1924, ch. 137, §§ 1-2, 1924 N.J. Acts 305, 305-06; Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627, 1628-29; Act of March 10, 1919, ch. 197, §§ 1-2, 1919 N.C. Laws 397, 397-98; Act of Feb. 26, 1913, ch. 256, § 1,

23  1913 Or. Laws 497; Act of May 2, 1910, ch. 591, § 1, 1910 R.I. Acts 156, 156-57; Act of Feb. 16, 1909, ch. 51, 1909 W. Va. Acts 394, 395-96.

24  [106] In the Firearm Owners Protection Act ("FOPA"), Pub. L. No. 99-308, § 102(4)(B), 100 Stat. 449, 451 (1986), Congress expanded the exception for rifles and shotguns to permit their sale to residents of noncontiguous

25  states—provided, again, that the "sale, delivery, and receipt fully comply with the legal conditions of sale in both such States." *Id.* (codified at 18 U.S.C. § 922(b)(3)). As FOPA's chief sponsor explained, Congress "never intended

26  in the interstate sales [exception] to make any change in any local or State law." Hearings of Subcomm. on Crime on Comm. of Judiciary, 99th Cong. (1st and 2d Sess.) Pt. 1, Serial No. 131, at 785; *see also* 131 Cong. Rec. S9149–
50 (daily ed. July 9, 1985) (Statement of Sen. Hatch) (FOPA "permits out[]of State purchases but it also ensures that the laws of the buyer's as well as the seller's State shall be scrupulously obeyed.").

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

36

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

SER-847

1    codified as amended at RCW 9.41.124). But in I-1639, Washington's voters amended the law to

2    remove SARs from the class of rifles that may be sold in person to nonresidents. Washington's

3    decision to limit its own law squarely is within the state's congressionally delegated authority.

4           That statutory authorization defeats Mitchell's dormant Commerce Clause claim at its

5    threshold. "Where state or local government action is specifically authorized by Congress, it is

6    not subject to the Commerce Clause even if it interferes with interstate commerce." *White v.*

7    *Mass. Council of Const. Employers, Inc.*, 460 U.S. 204, 213 (1983). Here, Congress

8    unambiguously authorized states to regulate firearms sales to nonresidents. Section 922(b)(3)

9    permits sales of rifles to nonresidents, but only if they "fully comply with the legal conditions of

10   sale in both such States." *Id.*; *see also* 27 C.F.R. § 478.99 (same). By allowing nonresident rifle

11   purchases only if they "fully comply" with state laws, Congress allowed states to impose

12   additional limits on such sales. *See, e.g.*, *Hirst v. Skywest*, 910 F.3d 961, 967 (7th Cir. 2018)

13   (holding state minimum wage laws were authorized by federal law providing that "[n]o provision

14   of this chapter or of any order thereunder *shall excuse noncompliance with any Federal or State*

15   *law* . . . establishing a minimum wage higher than the minimum wage established under this

16   chapter.") (emphasis added). Indeed, the "entire thrust" of § 922(b)(3) "is for each state to resolve

17   for its own" how to regulate sales of rifles and shotguns to nonresidents. *Norfolk S. Corp. v.*

18   *Oberly*, 632 F. Supp. 1225, 1247 (D. Del. 1986), *aff'd*, 822 F.2d 388 (3d Cir. 1987).[107]

19          Defendants are entitled to summary judgment on Mitchell's Commerce Clause claim.

20   **D.    Plaintiffs' Claims Are Not Justiciable**

21          Finally, this Court lacks jurisdiction over some of Plaintiffs' claims due to lack of

22   standing or mootness. *Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1015 (9th Cir.

23   2006). To demonstrate standing, a plaintiff must show "(1) injury in fact; (2) causation; and (3)

24   likelihood that the injury will be redressed by a favorable decision." *Id.* To avoid mootness, a

25

26       [107] That Congress sought to authorize state restrictions on the sale of firearms to out-of-state residents is
     reinforced by its specification that "[n]o provision of this chapter shall be construed as indicating an intent on the
     part of the Congress to occupy the field in which such provision operates *to the exclusion of the law of any State on
     the same subject matter*, unless there is a direct and positive conflict . . . ." 18 U.S.C. § 927 (emphasis added).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

37

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-848**

1  plaintiff must show that "an actual, ongoing controversy exist at all stages of federal court

2  proceedings." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017).

3  **1.    Plaintiffs Casey's and Rettmer's Second Amendment claims are moot**

4  The claims of Casey and Rettmer are moot because they are now 21, so they have "aged

5  out of the demographic group affected by" the Age Provision. *McCraw*, 719 F.3d at 344 (quoting

6  *NRA,* 700 F.3d at 188); *see, e.g.*, *Craig v. Boren*, 429 U.S. 190, 192 (1976) (turning 21 mooted

7  a challenge to laws barring minors from buying beer). Their claims should be dismissed.

8  **2.    Plaintiff Wald lacks standing**

9  Although Plaintiff Wald is 20 years old, he can show neither that any injury suffered is

10  "fairly traceable" to I-1639 nor that a "favorable decision" would "redress[]" it. *Lujan v.*

11  *Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Wald is a sophomore at Seattle University

12  and "live[s] in a dorm," but stores his three SARs at his parents' home outside Tacoma.[108] Seattle

13  University prohibits firearms on campus.[109] Thus, even if Plaintiffs were to prevail, Wald would

14  be in the same position he is in today—the owner of multiple SARs but unable, by dint of a

15  private college's policy, to keep them at home. Any injury of his is neither traceable to I-1639

16  nor redressable by a favorable decision. Wald lacks standing. *See, e.g.*, *Doe v. Va. Dep't of State*

17  *Police*, 713 F.3d 745, 756 (4th Cir. 2013) ("A plaintiff faces a related obstacle to establishing

18  traceability and redressability when there exists an unchallenged, independent rule, policy, or

19  decision that would prevent relief even if the court were to render a favorable decision.").

20  **3.    The Organizational Plaintiffs lack standing to challenge the Age Provision**

21  The Organizational Plaintiffs lack Article III standing. An association may sue on behalf

22  of its members when "[1] its members would otherwise have standing to sue in their own right,

23  [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim

24  asserted nor the relief requested requires the participation of individual members in the lawsuit."

25

26  [108] Simpson Decl., Ex. T (Wald Dep. 8:25; 21:1–25:22).
   [109] *Id.* at Ex. T (Wald Dep. 53:12–20, 82:25, 85:11), Ex. NN (Wald Dep. Ex. 85); *see also id.*, Ex. J (Casey Dep. 29:8–30:11), *id.* Ex. OO (Casey Dep. Ex. 89).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

38

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**SER-849**

1  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000). Associations must
2  make "specific allegations establishing that at least one identified member had suffered or would
3  suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

4      The Organizational Plaintiffs merely restate in a conclusory fashion the requirements of
5  associational standing. *Compare* Dkt. 76 at 7, *with Laidlaw*, 528 U.S. at 181. But they offer no
6  evidence that any of the individual plaintiffs are members of their organizations, nor that any of
7  their members have suffered specific harm. While the First Amended Complaint broadly asserts
8  that both organizations have members who are Washington residents, Dkt. 17, ¶¶ 23, 31, that is
9  not sufficient. *See Summers*, 555 U.S. at 497–98 (requiring "plaintiff-organizations to make
10  specific allegations establishing that at least one identified member had suffered or would suffer
11  harm"). The Organizational Plaintiffs offered no evidence that they meet standing requirements
12  in their pleadings and Motion.

13      **4.      Plaintiff Mitchell lacks standing to challenge the Nonresident Sales Provision**

14      Mitchell lacks Article III standing to challenge the Nonresident Sales Provision because
15  he has not identified a single lost sale due to I-1639. When asked during his deposition about the
16  basis of his claimed diminished sales, Mitchell conceded that he had not consulted any financial
17  records or sales data.[110] When asked to provide evidence of lost sales in written discovery,
18  Mitchell objected on multiple grounds, including that the request did not seek relevant
19  information, and did not answer.[111] Mitchell's contrary statements in his declaration, untethered
20  from documentation, are insufficient as mere "general averments." *Swanson Grp. Mfg. LLC v.*
21  *Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015) (quoting *Laidlaw*, 528 U.S. at 184).

22      Mitchell also lacks standing because he can sell SARs to nonresidents through the FFL-
23  to-FFL transfer process, *supra* at 9, which is evidently the sales method his prospective out-of-
24  state customers request. Dkt. 76-5, ¶ 19. His claim should be dismissed for lack of standing.[112]

25  _____
   [110] Simpson Decl., Ex. R (Mitchell Dep. 169:7–172:9) (claimed diminished sales was "a ballpark estimate").
26  [111] Simpson Decl., Ex. KK (Mitchell discovery responses).
   [112] Mitchell argues that this Court already held he has standing, Dkt. 76 at 7, but to the extent the Court did so,
   it was before Mitchell revealed that no evidence supports his claimed injury specific to the Commerce Clause claim.

DEFS.' CROSS-MSJ AND OPP. TO          39          ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                        800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                            Seattle, WA 98104-3188
                                                                 (206) 464-7744

**SER-850**

**E.    Plaintiffs' Request for Attorney Fees Should Be Denied**

Plaintiffs' request for attorney fees should be denied because they are unlikely to be able to establish their status as a prevailing party, a requirement of a fee award under 42 U.S.C. § 1988. *Friend v. Kolodzieczak*, 72 F.3d 1386, 1388 (9th Cir. 1995). As explained above, Plaintiffs should not succeed "on any significant issue in litigation." *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (quotation marks and citation omitted).[113]

## IV.    CONCLUSION

Gun violence results in tragic deaths, grievous injuries, and lifelong trauma in our communities. To combat this threat to public health and safety, the people of Washington took the reasonable step of applying to SARs the same restrictions that have long applied to handguns under state and federal law. The temporary age restriction on 18- to 20-year-olds' ability to purchase SARs does not trigger, nor offend, the Second Amendment. Likewise, the Nonresident Sales Provision does not violate the Commerce Clause, as it enables effective implementation of Washington's enhanced background check requirements to ensure only eligible persons purchase SARs in the state. Plaintiffs raise no genuine issue of material fact in this case. Defendants respectfully request that the Court enter summary judgment in their favor.

RESPECTFULLY SUBMITTED this 31st day of March 2020.

ROBERT W. FERGUSON
*Attorney General*
NOAH G. PURCELL, WSBA No. 43492
*Solicitor General*

*s/ Zachary Pekelis Jones*
JEFFERY T. EVEN, WSBA No. 20367
Deputy Solicitor General
ZACHARY PEKELIS JONES, WSBA No. 44557
R. JULY SIMPSON, WSBA No. 45869
BRENDAN SELBY, WSBA No. 55325
Assistant Attorneys General,
Complex Litigation Division
DIONNE PADILLA-HUDDLESTON, WSBA No. 38356

---

[113] If this Court were to invalidate any provision of I-1639, it should sever it from the remainder, consistent with the text and expressed will of the voters. Simpson Decl., Ex. A at 30 (I-1639 § 19) (severability clause).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

40

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1
Assistant Attorney General,
Licensing and Administrative Law Division
2
Attorney General's Office
800 Fifth Ave., Ste. 2000, Seattle, WA 98104
3
(206) 464-7676 Fax: (206) 464-2800
4
dionnep@atg.wa.gov; lalseaef@atg.wa.gov

5
*Attorneys for Defendant Teresa Berntsen*

6

7
PACIFICA LAW GROUP LLP

8
By *s/ Gregory J. Wong*
Paul J. Lawrence, WSBA No. 3557
9
Gregory J. Wong, WSBA No. 39329
Nicholas W. Brown, WSBA No. 33586
10
Kai A. Smith, WSBA No. 54749

11
*Attorneys for Intervenor-Defendant*
12
*Safe Schools Safe Communities*

13
*s/ Leslie A. Lopez*
Leslie A. Lopez, WSBA No. 46118
14
Deputy Prosecuting Attorney
Clark County Prosecutor's Office – Civil Division
15
PO Box 5000
16
Vancouver WA 98666-5000
Tele: (564) 397-2478
17
Email: leslie.lopez@clark.wa.gov

18
*Attorney for Defendant Chuck Atkins*
19
*s/ Salvatore J. Faggiano*
20
Salvatore J. Faggiano, WSBA No. 15696
Assistant City Attorney
21
Office of the City Attorney
808 W. Spokane Falls Blvd.
22
Spokane, WA 99201-3326
Telephone: (509) 625-6818
23
Fax: (509) 625-6277
24
Email: sfaggiano@spokanecity.org

25
*Attorney for Defendant Craig Meidl*

26

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

41

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

The Honorable Ronald B. Leighton

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| DANIEL MITCHELL, et al., | NO.  3:19-cv-5106 |
|          Plaintiffs, | DECLARATION OF ZACHARY PEKELIS JONES IN SUPPORT OF DEFENDANT BERNTSEN'S MOTION TO EXCLUDE EXPERT TESTIMONY OF SHERIFF OZZIE KNEZOVICH |
|     v. | |
| CHARLES ATKINS, in his official capacity as the Sheriff of Clark County, et al., | |
|          Defendants. | |

1.     I am an Assistant Attorney General in the Complex Litigation Division of the Office of the Attorney General. In that capacity, I am one of the attorneys representing the Department of Licensing in the above-captioned case. I am at least 18 years of age, competent to testify as a witness, and have personal knowledge of the facts related in this declaration.

2.     Attached as Exhibit A is a true and correct copy of the Report of Sheriff Ozzie Knezovich, which Plaintiffs produced as part of their expert disclosures pursuant to Federal Rule 26(a)(2)(B) on December 18, 2019. The Report was marked and referenced in Sheriff Knezovich's February 4, 2020 deposition as Deposition Exhibit No. 49.

3.     Attached as Exhibit B is a true and correct copy of the excerpted transcript of the Sheriff Knezovich's deposition, which was taken on February 4, 2020.

DECL. OF ZACHARY PEKELIS JONES
IN SUPPORT OF DEF. MOT. TO
EXCLUDE TESTIMONY OF
SHERIFF OZZIE KNEZOVICH
CAUSE NO.  3:19-CV-5106

1

ATTORNEY GENERAL OF WASHINGTON
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

**SER-853**

4.      Attached as Exhibit C is a true and correct copy of an article dated January 31, 2019 published online by KHQ News, entitled "Spokane County Sheriff Ozzie Knezovich: '1639 is unconstitutional at the State and Federal level.'" This article was marked and referenced in Sheriff Knezovich's deposition as Deposition Exhibit No. 54.

5.      Attached as Exhibit D is a true and correct copy of a set of documents Plaintiffs' counsel Matthew Albrecht presented to me upon arriving at Sheriff Knezovich's deposition. The complete set documents totaled 396 pages and was marked and referenced in Sheriff Knezovich's deposition as Deposition Exhibit No. 48.

6.      Attached as Exhibit E is a true and correct copy of the table of contents to the set of documents attached as Exhibit D. The table of contents was marked and referenced in Sheriff Knezovich's deposition as Deposition Exhibit No. 47.

7.      Attached as Exhibit F are excerpts of a true and correct copy of a set of documents that Sheriff Knezovich brought with him in a binder to his deposition. The complete set of documents totaled 115 pages and was marked and referenced in Sheriff Knezovich's deposition as Deposition Exhibit No. 64.

8.      Attached as Exhibit G are excerpts of a true and correct copy of an additional set of documents that Sheriff Knezovich brought with him to his deposition in a separate binder. The complete set of documents totaled 437 pages and was marked and referenced in Sheriff Knezovich's deposition as Deposition Exhibit No. 65.

9.      On March 6, 2020, I emailed Plaintiffs' counsel regarding deficiencies in their expert disclosures and Sheriff Knezovich's qualifications and opinions. Specifically, I objected to Plaintiffs' reliance on Sheriff Knezovich as an expert witness on five grounds: First, Plaintiffs had not timely disclosed all "facts or data considered" by Sheriff Knezovich, Fed. R. Civ. P. 26(a)(2)(B)(ii). Second, Plaintiffs had not produced any communications between the Sheriff and Plaintiffs' counsel, which are discoverable, *see* Fed. R. Civ. P. 26(b)(4)(C), and which the Director had specifically requested in discovery. Third, I objected to the Sheriff's

DECL. OF ZACHARY PEKELIS JONES
IN SUPPORT OF DEF. MOT. TO
EXCLUDE TESTIMONY OF
SHERIFF OZZIE KNEZOVICH
CAUSE NO.  3:19-CV-5106

2

ATTORNEY GENERAL OF WASHINGTON
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   qualifications because he lacks expertise in the subject matter on which he opines in his report.

2   Fourth, I objected that the Sheriff's opinions are not based on sufficient "facts or data," as

3   required by Federal Rule of Evidence 702(b). Fifth, I objected that the Sheriff's opinions are

4   not based on "reliable principles and methods . . . reliably applied . . . to the facts of the case."

5   Fed. R. Evid. 702(c)–(d). I sought to meet and confer telephonically with Plaintiffs' counsel

6   regarding my objections. Plaintiffs' counsel disputed some of my objections by letter but

7   declined to conduct a telephone conference, taking the position that there is no meet-and-confer

8   requirement for *Daubert* motions. Attached as Exhibit H is a true and correct copy of my email

9   correspondence with Plaintiffs' counsel.

10       10.    Attached as Exhibit I is a true and correct copy of the Director's Second Set of

11   Interrogatories and Requests for Production to Plaintiffs Daniel Mitchell and Robin Ball.

12       11.    Attached as Exhibit J is a true and correct copy of an email correspondence

13   between me and Plaintiffs' counsel Joel Ard on Monday, January 27, 2020.

14       12.    I declare under penalty of perjury under the laws of the State of Washington

15   that the foregoing is true and correct.

16       DATED this 10th day of March 2020.

17

18                                */s/ Zachary Pekelis Jones*
                                  ZACHARY PEKELIS JONES
19

20

21

22

23

24

25

26

DECL. OF ZACHARY PEKELIS JONES              3          ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF DEF. MOT. TO                                      800 5th Avenue, Suite 2000
EXCLUDE TESTIMONY OF                                             Seattle, WA 98104-3188
SHERIFF OZZIE KNEZOVICH                                             (206) 474-7744
CAUSE NO.  3:19-CV-5106

**SER-855**

# Exhibit A

United States District Court
For The Western District Of Washington
At Tacoma

| | |
|---|---|
| Daniel Mitchell, Robin Ball, Luke Rettmer, Armen Tooloee, Nathaniel Casey, Matthew Wald, Second Amendment Foundation, and National Rifle Association, | The Honorable Ronald B. Leighton |
| *Plaintiffs,* | No. 3:19-cv-05106-RBL |
| v. | Report of Sheriff Ozzie Knezovich |
| Chuck Atkins, in his official capacity as the Sheriff of Clark County, Washington, Craig Meidl, in his official capacity as the Chief of Police of Spokane, Washington, and Teresa Berntsen, in her official capacity as the Director of the Washington State Department of Licensing, | |
| *Defendants.* | |

## I.   Introduction

Sheriff Ozzie Knezovich submits the following report pursuant to Fed.R.Civ.P. 26.

### A.  Bio/ CV

I have attached as Exhibit A my Professional Resume.

### B.  Definitions

Before addressing the questions put to me by Plaintiffs' counsel, I need to define the term "semi-automatic rifle," which I use throughout this report.

Exhibit 49
Witness Knezovich
Date 2-4-2020
Buell Realtime Reporting (206) 287-9066

Expert Report of Sheriff Ozzie Knezovich- 1
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1      1.    "I-1639" refers to the statutory amendments to Chapter 9.41 RCW that resulted

2  from the passage of Initiative 1639 in November 2018.

3      2.    I-1639 includes the following definition, now found in Washington statute at RCW

4  9.41.010(26):

> "Semiautomatic assault rifle" means any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge. "Semiautomatic assault rifle" does not include antique firearms, any firearm that has been made permanently inoperable, or any firearm that is manually operated by bolt, pump, lever, or slide action.

9      3.    Rifles that utilize a portion of the energy of a firing cartridge to extract the fired

10  cartridge case and chamber the next round, and which require a separate pull of the trigger to fire

11  each cartridge, are usually referred to by law enforcement as "semi-automatic rifles."

12      4.    To the best of my knowledge, the phrase "semiautomatic assault rifle" is uniquely

13  found in Washington law as modified by I-1639. It is not a term commonly used by law

14  enforcement to describe any class or category of weapon.

15      5.    Thus, the category of weapons that fit the definition of RCW 9.41.101(26) are best

16  and most commonly known as "semi-automatic rifles." I will therefore use that term throughout

17  this report, with the intent of referring to the same type of firearm as is described in Chapter 9.41

18  RCW as a "semiautomatic assault rifle."

19    **C. Terms of Retention and Instructions**

20    I am not being compensated for appearing as an expert in this case.

21    I have been asked to provide an opinion regarding the following questions:

22    1. Are semi-automatic rifles owned by law-abiding citizens?

23    2. Are semi-automatic rifles used for law-abiding purposes?

24    3. Are the restrictions imposed by I-1639 on acquisition and possession of semi-automatic

25  rifles likely to reduce misuse of firearms?

26

27

Expert Report of Sheriff Ozzie Knezovich- 2
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

6
**SER-858**

### D.  Familiarity with the Issues Presented in this Case

As Spokane County Sheriff I am responsible for anticipating threats to the safety of the citizens of Spokane County and preparing plans and counter-measures for addressing those potential threats.  In addition to criminal activity by individuals and criminal organizations, I am responsible for making plans to address natural disasters, terrorist attacks, mass shootings, and other mass casualty events.  In order to protect the citizens of Spokane County from the wide range of potential threats, I read a wide variety of publications in order stay informed of research and relevant statistics to assist in risk assessment and formulating pro-active measures to minimize threats.

I was in charge of the response to the school shooting at Freeman High School on September 13, 2017, in which one student was killed and three others were wounded.

Significant public attention has been directed toward the question of whether restrictions on the acquisition or ownership of firearms, particularly the ones restricted by I-1639,  would result in fewer deaths and injuries.  Because of my public duties I pay particular attention to research bearing on this subject.  In addition, because of my elective office and the responsibilities it places upon me, the public expects me to make recommendations for public policy that will improve public safety.  As a result, I have studied the policy recommendations made by others addressing this issue.

### II.    Question #1:  Are Semi-Automatic Rifles Owned by Law-
### Abiding Citizens?

Answer:  Yes.

A substantial number of residents in Spokane County own firearms.  The types of firearms include shotguns, rifles, and pistols. Each type of firearm has its advantages depending upon the purpose for which it is being used.  For example, shotguns are preferred for bird hunting and for self-protection from animals and criminal threats.  Rifles are used for other types of hunting.

Expert Report of Sheriff Ozzie Knezovich- 3
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

7
**SER-859**

1  Pistols are preferred for self-protection, particularly where weight or accessibility are a factor. All
2  types of firearms are useful for target practice. Because of the different uses to which a firearm
3  may be put, it is common for the owner of one type of firearm to acquire another type of firearm
4  in order to be able to participate in a wider range of activities.

5  There is no difference, in terms of their law-abiding characteristics, between citizens who
6  own semi-automatic rifles and those who do not. Rifles are rarely chosen as a means to commit
7  crime. For example, according to Department of Justice crime data,[1] in Washington in 2017 there
8  were 228 murders, of which 134 were committed by the use of firearms. Of 134 murders
9  committed with firearms, 75 were committed with handguns, while only one murder was
10 committed with a rifle.

11      III.    **Question #2:  Are Semi-Automatic Rifles Used for Law-**
12                            **Abiding Purposes?**

13      Answer:  Yes.

14      **A.  Self-Defense**

15      As stated above, many Washington citizens own firearms, including rifles. Rifles are the
16 preferred firearm for many types of hunting and target practice. In addition, rifles are acquired for
17 self-defense. In many rural areas of Spokane County, citizens face threats from wild animals,
18 including cougars, bears, wolves, and moose. Many rifles are not semi-automatic, and require
19 opening and closing the breech in order to reload a cartridge. If an animal is charging, the time
20 necessary to reload and take new aim after a missed (or ineffective) shot may prevent effective
21 self-defense. Therefore, a semi-automatic rifle may be preferable for self-defense.

22      The same principle applies if the attacker is human rather than a wild animal.

23      **B.  Hunting**

24      For reasons similar to those just identified, a hunter may prefer a semi-automatic weapon
25 to a bolt-action or single-shot rifle. If an animal is merely wounded by a first shot, the hunter will

26

27  [1] https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/tables/table-20

Expert Report of Sheriff Ozzie Knezovich- 4
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1  not want to take the time to chamber a new round and re-aim.  Instead, humane treatment of the
2  animal will be more easily accomplished if the rifle is semi-automatic and can be fired by another
3  squeeze of the trigger.  Semi-automatic rifles are as common, if not more common, than bolt action
4  rifles.

5  **C.  Emergency Preparedness**

6      As stated earlier, part of my responsibility as Sheriff is to coordinate preparedness for a
7  wide variety of emergencies, including natural disasters, terrorist attacks, etc.  In the event of a
8  major emergency, ordinary law enforcement resources may be inadequate or unavailable.  To
9  supplement the type of emergency preparedness that my office can provide, I welcome the
10  availability of citizens who can defend themselves and (if necessary) provide interim community
11  protection from those who might seek to exploit the emergency.

12  **D.  Target Practice**

13      As preparation for each of the activities described above, but also as a law-abiding activity
14  in its own right, many Washington residents engage in target practice with semi-automatic rifles.
15  Being able to fire additional rounds without separate action to chamber the next round permits the
16  shooter to concentrate on the target and accuracy,

17      IV.    **Question #3:  Are the Restrictions Imposed by I-1639 on**
18             **Acquisition and Possession of Semiautomatic Rifles Likely**
19             **to Reduce Misuse of Firearms?**

20      Answer:  No.

21  **A.  The Benefits of Background Checks**

22      As Sheriff of Spokane County I have a role in the enforcement of background checks.
23  Requiring a gun purchaser to pass a background check has numerous benefits.  One is that the
24  decision to purchase a firearm and the ability to possess the firearm are separated by the time it
25  takes to perform a background check.  That delay reduces the likelihood that an impulsive decision
26  to harm oneself or others will be acted upon.

27

Expert Report of Sheriff Ozzie Knezovich- 5
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    In addition, the background check requirement prevents unqualified individuals from
2  acquiring firearms, for example if the prospective purchaser has a criminal record or other
3  disqualifying reason.  Of course, the background check requirement is not foolproof, but it is a
4  valuable component of a law enforcement strategy to reduce the improper use of firearms.

5    **B. The Impact of I-1639 on Background Checks**

6    A major reason I am skeptical of the policy benefits from I-1639 is that it is preferable for
7  18- to 20-year-olds to purchase a semi-automatic rifle (with the accompanying background check)
8  compared to other means by which such a rifle may be obtained.  The law is subject to broad
9  exceptions under RCW 9.41.240, permitting the possession of the same firearms by 18- to 20-
10  year-olds in a wide variety of circumstances. Prior to the passage of I-1639, 18- to 20-year-olds
11  who wanted to acquire a semi-automatic rifle could be expected to purchase one—with an
12  accompanying background check.  Now that purchase in Washington has been forbidden, 18- to
13  20-year-olds may seek to acquire a semi-automatic rifle through other means, which may not
14  involve a background check.

15    I should add that even if I-1639 resulted in fewer Washington citizens owning semi-
16  automatic rifles, it is unlikely that the number or severity of mass shootings would be reduced.  In
17  most of the incidents with which I am familiar, such as the school shooting at Freeman High
18  School, the weapons were not acquired lawfully.  Consequently, restricting the ability of
19  individuals to acquire firearms lawfully, with an accompanying background check, is not likely to
20  promote the public safety.

21    Submitted on this 18th day of December 2019

22
23                                      _____
24                                      Ozzie Knezovich
25
26
27

Expert Report of Sheriff Ozzie Knezovich- 6
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# Exhibit A

Ozzie Knezovich, Professional Resume
PO Box 48185 Spokane, Washington 99228
509-951-3437
ozzieknezovich@gmail.com

---

PROFESSIONAL EXPERIENCE

2006 – Present    Spokane County Sheriff
- Responsible for the law enforcement activities in the unincorporated areas of Spokane County and several contract cities and towns with an annual budget of $39 million and 750 personnel, including office staff, patrol operations, investigations, training, Department of Emergency Management, Search and Rescue, and Sheriff's Community Oriented Policing Effort volunteers

2006-Present:    Washington Association of Sheriffs and Police Chiefs
- Past President Washington Association of Sheriffs and Police Chiefs
- Homeland Security Intelligence Committee Co-Chair
- Washington State Fusion Center Board Member
- Former Law Enforcement Education, Training, and Standards Committee Co-Chair
- Former Public Trust Committee Co-Chair
- Former Accreditation Committee Co-Chair
- Former Legislative Committee Co-Chair

2012-2013:    President of the FBI-Law Enforcement Executive Development Association

2006 – 2013    Responsible for all operations of the Spokane County Jail & Geiger Correctional Facility with an annual $30 million budget and 350 employees to include detention services housing and programing.

1996 – 2006    Spokane County Sheriff's Department
- Training Unit Supervisor responsible for hiring, training and accreditation, as well as policy and procedure development
- Patrol Sergeant, Patrol Deputy, Patrol Field Training officer, Detective: Sex Crimes and Property Crimes, and SWAT Team Supervisor
- President of the Spokane County Deputy Sheriff's Association

1995 – 1996    City of Olympia Police Department, Olympia, WA
- Patrol Officer
- Vice President of the Olympia Police Guild

1991 – 1995    City of Rock Springs Police Department, Rock Springs, WY
- Relief Shift Supervisor
- Patrol Officer

12

**SER-864**

- Developed the department's School Resource Officer Program
- Served on Mayor's Youth & Violence Committee
- President of the Rock Springs Police Protection Association

1990 – 1991    Town of Superior, Superior, Wyoming
- Town Marshal and Water Plant Operations Manager

1987 – 1990    United States Army
- Airborne Combat Medical Specialist, Sr. Combat Medic, Squad Leader, Section Sergeant, and Platoon Sergeant
- While serving in Korea, developed a combat deployment plan for medical assets. Decorated for this achievement.
- Earned the 'Leadership Award' while attending the U.S. Army Noncommissioned Officer's Primary Leadership Development Course

EDUCATION

1985    Weber State College, Ogden, UT
- Bachelor of Integrated Studies in Management, Law Enforcement & Marketing
- Dean's Honor Roll

Law Enforcement & Leadership Training

2017    FBI LEEDA:  Received Trilogy Award for completing LEEDA's three core leadership courses

2015    Southern Police Institute – Intelligence Analysis of the Beat

2013    Ethics
Leadership rraining – Law Enforcement Executive Development Seminar

2012    Leadership Training – FBI-LEEDA 6th Executive Survival: Policing in the 21st Century
Leadership Training – FBI-LEEDA Supervisor Leadership Institute

2010    Conferences and Seminars- Leadership & Communication Excellence
Incident Command – Managing the Incident

2009    Leadership Training – The Executive Academy
Leadership Training – Crisis Leadership & Decision Making for Elected Officials
Senior Officials Workshop for All-Hazards Preparedness

2008    FBI National Law Enforcement Academy Quantico VA.- Received 9 hours of graduate level college credits.
Dept. Of Emergency Management – Integrated Emergency Management Course
Domestic Violence Unit – Investigating Sexual Assault, Domestic Violence and Stalking

| 2007 | Incident Command- G400: Incident Command System: Advanced |
|------|-----|
|      | Terrorism – IS-00800 A National Response Plan, Introduction |
|      | Incident Command – G300: Incident Command System: Intermediate |

| 2005 | Incident Command NIMS IS-00700, Federal Government |
|------|-----|
|      | Domestic Violence, Law & Order, State of Washington |
|      | Anti-Terrorism SLATT, IRR |
|      | Incident Command Management for Tactical Operations, NTOA |

| 2004 | First Level Supervisor Course, State of Washington |
|------|-----|

| 2003 | Blood Spatter Analysis School, State of Washington |
|------|-----|
|      | Incident Command Course, State of Washington |
|      | Terrorism Seminar, State of Washington |
|      | Conduct of Operations at Hostage/Barricaded/Terrorist Incidents, POST |
|      | Child Abuse Investigation and Interviewing, State of Washington |
|      | Internet Crimes Against Children Training Conference, State of Washington |
|      | Infant Death Investigation Training Session, State of Washington |

| 2002 | Methamphetamine Lab Detection and Processing Course, State of Washington |
|------|-----|
|      | Methamphetamine Lab Entry Team Training, State of Washington |
|      | Hostage Rescue Training Course, National Tactical Officers Association |
|      | Homicide Investigation School, State of Washington |
|      | Instructor Development Training Course, State of Washington |

| 2001 | Planning and Execution of Raids and Search Warrants, State of Washington |
|------|-----|
|      | Weapons of Mass Destruction Incident Command Course (COBRA), United States Department of Justice |

| 1999 | Ballistic Shield Operator, State of Washington |
|------|-----|
|      | Field Training Officer Training Course, State of Washington |

| 1998 | SWAT Basic, State of Washington |
|------|-----|

| 1995 | Basic Law Enforcement Certification Course, State of Washington |
|------|-----|

| 1993 | Drug Detection and Apprehension, State of Wyoming |
|------|-----|
|      | Emergency Disaster First Responder Training, State of Wyoming |
|      | Advanced SWAT, State of Wyoming |

| 1992 | SWAT Training, State of Wyoming |
|------|-----|
|      | Sniper/Counter Sniper Training, State of Wyoming |
|      | Professional Certification, State of Wyoming |

1991       Wyoming Law Enforcement Academy
               Advanced Certification, State of Wyoming
               Reed School of Interview and Interrogation, State of Wyoming

All original graphics and text are copyrighted © 2006 by
Ozzie Knezovich and may not be used without permission.

Last Updated – March, 2019

1

**Certificate Of Service**

2          I certify under penalty of perjury under the laws of the United States of America that on

3   DATE, 2019, I filed the foregoing with the Court's CM/ECF system, which will give notice to all

4   parties and counsel of record.

5                                                           Ard Law Group PLLC

6

7                                              By

8                                                   Joel B. Ard, WSBA # 40104

9                                                   P.O. Box 11633
                                                    Bainbridge Island, WA 98110
10                                                  (206) 701-9243
                                                    Joel@Ard.law
11

12                                                  Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Certificate Of Service
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

16

1

2

3

4

5

6

United States District Court
For The Western District Of Washington
At Tacoma

7

8

9

Daniel Mitchell, Robin Ball, Luke Rettmer,
Armen Tooloee, Nathaniel Casey, Matthew
Wald, Second Amendment Foundation, and
National Rifle Association,

The Honorable Ronald B. Leighton

10

        *Plaintiffs*,

No. 3:19-cv-05106-RBL

11

v.

[~~PROPOSED~~]
Order Dismissing Plaintiff
Armen Tooloee

12

13

14

15

Chuck Atkins, in his official capacity as the
Sheriff of Clark County, Washington, Craig
Meidl, in his official capacity as the Chief of
Police of Spokane, Washington, and Teresa
Berntsen, in her official capacity as the
Director of the Washington State Department
of Licensing,

16

        *Defendants*.

17

18

19

20

    This matter having come before the Court on Plaintiff Armen Tooloee's Motion to Dismiss
and Withdraw Pursuant to Fed. R. Civ. P. 41, and the court having considered the Motion, it is

    ORDERED, ADJUDGED, and DECREED that:

21

22

    1.    Plaintiff Armen Tooloee's claims are dismissed without prejudice and Mr. Tooloee
is hereby withdrawn as a plaintiff in this matter.

23

///

24

///

25

///

26

///

27

[~~Proposed~~] Order on Tooloee Motion to Dismiss - 1
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    Dated this ⎧4ᵗʰ day of _February_____, 2020.

2

3

4                             _____

5                             Honorable Ronald B. Leighton
                             United States District Judge

6

7      Presented by:

8  Ard Law Group PLLC

9  Joel B. Ard, WSBA # 40104

10 P.O. Box 11633
   Bainbridge Island, WA 98110

11 (206) 701-9243

12 Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

[Proposed] Order on Tooloee Motion to Dismiss - 2
No. 3:19-cv-05106-RBL

                                    Ard Law Group PLLC

                                     P.O. Box 11633
                                     Bainbridge Island, WA 98110
                                     Phone: (206) 701-9243

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DANIEL MITCHELL, ROBIN BALL, LUKE RETTMER, ARMEN TOOLOEE, NATHANIEL CASEY, MATTHEW WALD, SECOND AMENDMENT FOUNDATION, and NATIONAL RIFLE ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, CRAIG MEIDL, in his official capacity as the Chief of Police of Spokane, Washington, and TERESA BERNTSEN, in her official capacity as the Director of the Washington State Department of Licensing,<br><br>Defendants. | No. 3:19-cv-05106<br><br>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## I. INTRODUCTION

1.      This case is a federal civil rights action brought pursuant to 42 U.S.C. § 1983 seeking declaratory judgment and injunctive relief.

2.      This suit challenges the constitutionality of certain bans enacted through Washington State Initiative No. 1639 ("I-1639"), enacted by voters on November 6, 2018. A copy of I-1639 is attached hereto as Exhibit A.

3.      I-1639 drastically rewrites statutes governing purchase, sale, and ownership of firearms in common use in the state of Washington. It thereby infringes the Plaintiffs' right

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 1
3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

SER-871

1  under the Commerce Clause, U.S. Const. Art. I § 8 Cl. 3, and the Second and Fourteenth

2  Amendments to the United States Constitution.

3      4.    Section 13 of I-1639 became effective on January 1, 2019; the balance of I-1639

4  becomes effective on July 1, 2019.

5  ## II. JURISDICTION AND VENUE

6      5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

7  the suit arises under Art. I § 8 Cl. 3 and the Second and Fourteenth Amendments to the United

8  States Constitution.

9      6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 because

10  the suit arises under the Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress the deprivation,

11  under color of state law, of rights, privileges, and immunities secured to Plaintiffs by U.S.

12  Const. Art. I § 8 Cl. 3 and the Second and Fourteenth Amendments to the U.S. Constitution.

13      7.    Under 28 U.S.C. § 1367 this Court has supplemental jurisdiction over claims

14  stated in this Complaint that arise under state law but are so related to the federal claims as to

15  form part of the same case or controversy.

16      8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and LCR 3(e), and

17  intra-district assignment to the Tacoma Division is proper because a substantial part of the

18  events and omissions that give rise to Plaintiffs' claims arose in this judicial district and

19  division, and Defendants Atkins and Berntsen do business and operate in this judicial district

20  and division.

21  ## III. PARTIES

22      9.    Plaintiff Daniel Mitchell is a federally licensed firearms dealer.

23      10.    Mitchell operates a business in Vancouver, Washington, which sells firearms to

24  the public.

25      11.    Plaintiff Robin Ball is a federally licensed firearms dealer.

26

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 2
3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1      12.    Ball operates a business in Spokane, Washington, which sells firearms to the

2  public.

3      13.    Plaintiff Luke Rettmer is a resident of the state of Washington.

4      14.    Rettmer is 20 years old.

5      15.    Plaintiff Nathaniel Casey is a resident of the state of Washington.

6      16.    Casey is 19 years old.

7      17.    Plaintiff Armen Tooloee is a resident of the state of Washington.

8      18.    Tooloee is 20 years old.

9      19.    Plaintiff Matthew Wald is a resident of the state of Washington.

10      20.    Wald is 19 years old.

11      21.    Plaintiffs Rettmer, Casey, Tooloee, and Wald are hereafter identified together

12  as the "Young Adult Plaintiffs."

13      22.    Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit

14  membership organization incorporated under the laws of Washington with its principal place

15  of business in Bellevue, Washington.

16      23.    SAF has over 600,000 members and supporters nationwide, including

17  thousands in the State of Washington.

18      24.    SAF's members include Plaintiffs Mitchell, Ball, Rettmer, Casey, Tooloee, and

19  Wald.

20      25.    SAF offers education, research, publishing, and support for the constitutional

21  right to own and possess firearms.

22      26.    SAF brings this action on behalf of itself and its members.

23      27.    Plaintiff National Rifle Association of America, Inc. ("NRA") is a nonprofit

24  association incorporated under the laws of New York. Its principal place of business is 11250

25  Waples Mill Road, Fairfax, VA 22030.

26

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -
3
   3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

28. The NRA is the oldest civil rights organization in America and the Nation's foremost defender of Second Amendment rights.

29. The NRA promotes the safe and responsible purchase, possession, and use of firearms by law-abiding adults for lawful purposes, such as self-defense, target practice, marksmanship competition, and hunting.

30. The NRA is the leading provider of firearms marksmanship and safety training for civilians and law-enforcement officers.

31. The NRA has a membership of approximately five million persons, many thousands of whom reside throughout the state of Washington.

32. NRA's members include Plaintiffs Mitchell, Ball, and Rettmer.

33. NRA brings this action on behalf of itself and its members.

34. Plaintiffs Second Amendment Foundation and National Rifle Association are hereafter identified together as the "Organizational Plaintiffs."

35. Defendant Chuck Atkins is sued in his official capacity as the Sheriff of Clark County, Washington. In that capacity, he issues Plaintiff Mitchell's license to sell firearms in the State of Washington, and has the authority to revoke that license for violations of Washington laws governing sales of firearms.

36. Defendant Craig Meidl is sued in his official capacity as the Chief of Police of Spokane, Washington. In that capacity, he issues Plaintiff Ball's license to sell firearms in the State of Washington, and has the authority to revoke that license for violations of Washington laws governing sales of firearms.

37. Defendant Teresa Berntsen is sued in her official capacity as the Director of the Washington State Department of Licensing. In that capacity, she has the authority to revoke both Ball and Mitchell's licenses to sell firearms for violations of Washington laws governing sales of firearms.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 4
3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## IV.  FACT ALLEGATIONS

**A.     I-1639 Bans Certain Sales Of Self Loading Rifles.**

38.     I-1639 includes the following definition:

"Semiautomatic assault rifle" means any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

39.     Rifles that utilize a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which require a separate pull of the trigger to fire each cartridge (hereinafter "self loading rifles") are in common use in Washington and in the United States.

40.     Self loading rifles are used for lawful purposes in Washington and in the United States.

41.     I-1639 amends RCW 9.41.240 to add the following ban:

A person under twenty-one years of age may not purchase a pistol or semiautomatic assault rifle, and except as otherwise provided in this chapter, no person may sell or transfer a semiautomatic assault rifle to a person under twenty-one years of age. . .

42.     I-1639 amends RCW 9.41.124, which reads in part:

Residents of a state other than Washington may purchase rifles and shotguns, <u>except those firearms defined as semiautomatic</u> assault rifles, in Washington …

43.     The words "except those firearms defined as semiautomatic assault rifles" were added to the existing statute by I-1639.

**B.     Defendants Intend To Enforce I-1639.**

44.     Defendant Atkins, in his official capacity as Sheriff of Clark County, Washington, issues a license to Plaintiff Mitchell to sell firearms.

45.     Without the license issued by Atkins, Mitchell may not sell firearms.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 5

3:19-cv-05106

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

46.     In conducting his business of selling firearms, Mitchell is required to comply with all relevant state laws, including I-1639's ban on certain self loading rifle sales.

47.     If Mitchell does not comply with state law in the conduct of his business selling firearms, Washington law requires Atkins to revoke Mitchell's license.

48.     On February 1, 2019, Atkins stated "Initiative 1639, which was passed by a vote of the people, makes significant changes to the firearm laws of the State of Washington. The initiative is being challenged in court. The Clark County Sheriff's Office will evaluate the statutory requirements of initiative 1639 and will adopt policy consistent with state law and any subsequent judicial rulings. The Clark County Sheriff's Office will adhere to the law as passed by a vote of the people unless a court rules that it is unconstitutional."

49.     Defendant Meidl, in his official capacity as Chief of Police of Spokane, Washington, issues a license to Plaintiff Ball to sell firearms.

50.     Without the license issued by Meidl, Ball may not sell firearms.

51.     In conducting her business of selling firearms, Ball is required to comply with all relevant state laws, including I-1639's ban on certain self loading rifle sales.

52.     If Ball does not comply with state law in the conduct of her business selling firearms, Washington law requires Meidl to revoke Ball's license.

53.     On information and belief, plaintiffs allege that Meidl intends to enforce relevant state laws governing the sale of firearms, including revoking the licenses of dealers, including Ball, who sell self loading rifles in violation of I-1639.

54.     Plaintiffs allege that a reasonable opportunity for discovery will show that Meidl intends to enforce relevant state laws governing the sale of firearms, including revoking the licenses of dealers, including Ball, who sell self loading rifles in violation of I-1639.

55.     Defendant Berntsen, in her official capacity as Director of the Washington State Department of Licensing, is authorized by state law to revoke the licenses of dealers who do not comply with state law in the conduct of the business of selling firearms.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 6
3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

56.     On information and belief, plaintiffs allege that Berntsen intends to enforce relevant state laws governing the sale of firearms, including revoking the licenses of dealers, including Michell and Ball, who sell self loading rifles in violation of I-1639.

57.     Plaintiffs allege that a reasonable opportunity for discovery will show that Berntsen intends to enforce relevant state laws governing the sale of firearms, including revoking the licenses of dealers, including Mitchell and Ball, who sell self loading rifles in violation of I-1639.

**C.     Harm From The Ban On Selling Self Loading Rifles To Young Adults.**

58.     Rettmer is not prohibited by any law from purchasing or owning a firearm except by virtue of his age.

59.     Rettmer desires to purchase a self loading rifle.

60.     On February 4, 2019, Rettmer contacted Mitchell and inquired about the purchase of a Ruger 10/22 self-loading rifle.

61.     Mitchell routinely stocks the Ruger 10/22, and offers it for sale for $299.

62.     Rettmer informed Mitchell that he was age 19.

63.     Mitchell informed Rettmer that, due to Rettmer's age, Mitchell would not sell him the Ruger 10/22.

64.     Mitchell will not sell Rettmer a Ruger 10/22 because the sale would violate Washington state law governing firearms sales as amended by I-1639, effective January 1, 2019.

65.     In light of Atkin's stated intent to enforce I-1639, Mitchell reasonably fears that selling a Ruger 10/22 to Rettmer will result in the loss of his license to sell firearms in Washington, and thus the loss of his business.

66.     Rettmer was thereby harmed by Washington's ban on sales of self-loading rifles to young adults enacted by I-1639.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 7

3:19-cv-05106

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    67.    Rettmer is unable to exercise his right under the Second Amendment of the
2    United States Constitution to purchase a firearm that is in common use for lawful purposes in
3    Washington and the United States.

4    68.    Mitchell was thereby harmed by Washington's ban on sales of self-loading rifles
5    to young adults enacted by I-1639.

6    69.    Mitchell was unable to sell Rettmer a firearm that is in common use for lawful
7    purposes in Washington and the United States.

8    70.    Mitchell lost the profits that would accrue to him from the sale to Rettmer of a
9    firearm that is in common use for lawful purposes in Washington and the United States.

10    71.    Tooloee is not prohibited by any law from purchasing or owning a firearm except
11    by virtue of his age.

12    72.    Tooloee desires to purchase a self loading rifle.

13    73.    On February 6, 2019, Tooloee contacted Mitchell and inquired about the
14    purchase of a Ruger 10/22 self-loading rifle.

15    74.    Mitchell routinely stocks the Ruger 10/22, and offers it for sale for $299.

16    75.    Tooloee informed Mitchell that he was age 20.

17    76.    Mitchell informed Tooloee that, due to Tooloee's age, Mitchell would not sell
18    him the Ruger 10/22.

19    77.    Mitchell will not sell Tooloee a Ruger 10/22 because the sale would violate
20    Washington state law governing firearms sales as amended by I-1639, effective January 1, 2019.

21    78.    In light of Atkin's stated intent to enforce I-1639, Mitchell reasonably fears that
22    selling a Ruger 10/22 to Tooloee will result in the loss of his license to sell firearms in
23    Washington, and thus the loss of his business.

24    79.    Tooloee was thereby harmed by Washington's ban on sales of self-loading rifles
25    to young adults enacted by I-1639.

26

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 8

3:19-cv-05106

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

80.    Tooloee is unable to exercise his right under the Second Amendment of the United States Constitution to purchase a firearm that is in common use for lawful purposes in Washington and the United States.

81.    Mitchell was thereby harmed by Washington's ban on sales of self-loading rifles to young adults enacted by I-1639.

82.    Mitchell was unable to sell Tooloee a firearm that is in common use for lawful purposes in Washington and the United States.

83.    Mitchell lost the profits that would accrue to him from the sale to Tooloee of a firearm that is in common use for lawful purposes in Washington and the United States.

84.    Wald is not prohibited by any law from purchasing or owning a firearm except by virtue of his age.

85.    Wald desires to purchase a self loading rifle.

86.    On February 4, 2019, Wald contacted Mitchell and inquired about the purchase of a Ruger 10/22 self-loading rifle.

87.    Mitchell routinely stocks the Ruger 10/22, and offers it for sale for $299.

88.    Wald informed Mitchell that he was age 19.

89.    Mitchell informed Wald that, due to Wald's age, Mitchell would not sell him the Ruger 10/22.

90.    Mitchell will not sell Wald a Ruger 10/22 because the sale would violate Washington state law governing firearms sales as amended by I-1639, effective January 1, 2019.

91.    In light of Atkin's stated intent to enforce I-1639, Mitchell reasonably fears that selling a Ruger 10/22 to Wald will result in the loss of his license to sell firearms in Washington, and thus the loss of his business.

92.    Wald was thereby harmed by Washington's ban on sales of self-loading rifles to young adults enacted by I-1639.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 9
3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

93.     Wald is unable to exercise his right under the Second Amendment of the United States Constitution to purchase a firearm that is in common use for lawful purposes in Washington and the United States.

94.     Mitchell was thereby harmed by Washington's ban on sales of self-loading rifles to young adults enacted by I-1639.

95.     Mitchell was unable to sell Wald a firearm that is in common use for lawful purposes in Washington and the United States.

96.     Mitchell lost the profits that would accrue to him from the sale to Wald of a firearm that is in common use for lawful purposes in Washington and the United States.

97.     Casey is not prohibited by any law from purchasing or owning a firearm except by virtue of his age.

98.     Casey desires to purchase a self loading rifle.

99.     On February 6, 2019, Casey contacted Ball and inquired about the purchase of a Ruger 10/22 self-loading rifle.

100.    Ball routinely stocks the Ruger 10/22, and offers it for sale for $299.

101.    Casey informed Ball that he was age 19.

102.    Ball informed Casey that, due to Casey's age, Ball would not sell him the Ruger 10/22.

103.    Ball will not sell Casey a Ruger 10/22 because the sale would violate Washington state law governing firearms sales as amended by I-1639, effective January 1, 2019.

104.    Ball reasonably fears that selling a Ruger 10/22 to Casey will result in the loss of her license to sell firearms in Washington, and thus the loss of her business.

105.    Casey was thereby harmed by Washington's ban on sales of self-loading rifles to young adults enacted by I-1639.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 10
3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

106.    Casey is unable to exercise his right under the Second Amendment of the United States Constitution to purchase a firearm that is in common use for lawful purposes in Washington and the United States.

107.    Ball was thereby harmed by Washington's ban on sales of self-loading rifles to young adults enacted by I-1639.

108.    Ball was unable to sell Casey a firearm that is in common use for lawful purposes in Washington and the United States.

109.    Ball lost the profits that would accrue to him from the sale to Casey of a firearm that is in common use for lawful purposes in Washington and the United States.

**D.    Harm From The Ban On Sales Of Self-Loading Rifles To Non-Residents**

110.    Mitchell has previously sold self loading rifles to residents of other states.

111.    Mitchell profits from such sales.

112.    Mitchell intends in the future, absent a statutory ban, to continue selling self-loading rifles to residents of other states.

113.    Approximately 30% of Mitchell's business consists of sales of self-loading rifles to residents of other states.

114.    Because the statutory ban on sales of self-loading rifles to residents of other states will come into force on July 1, 2019, Mitchell has already taken steps to reduce inventory and to refuse requests for special orders of self-loading rifles with longer delivery times, knowing that such sales will be forbidden in under five months.

115.    Mitchell has been harmed by the loss of profit that would result from sales of self-loading rifles to residents of other states, because he will never be able to make sales of self-loading rifles that he has not ordered for stocking and selling in the latter half of 2019.

**V.  CAUSES OF ACTION**

116.    The allegations of the previous paragraphs are incorporated as if fully set forth.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 11
3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**A.      Count I: Declaratory Relief That The Ban On Sales Of Self Loading Rifles To Young Adults Impermissibly Impairs Rights Guaranteed By The Second Amendment**

117.     The Young Adult Plaintiffs seek a declaration from this Court that the ban enacted by I-1639 which forbids a young adult from purchasing, and forbids a dealer from selling to a young adult, a self loading rifle, impermissibly burdens their exercise of rights guaranteed by the Second Amendment to the United States Constitution.

118.     The Dealer Plaintiffs seek a declaration from this Court that the ban enacted by I-1639 which forbids a young adult from purchasing, and forbids a dealer from selling to a young adult, a self-loading rifle, impermissibly burdens their exercise of rights guaranteed by the Second Amendment to the United States Constitution.

119.     The Organizational Plaintiffs, on their own behalf and on behalf of their members, seek a declaration from this Court that the ban enacted by I-1639 which forbids a young adult from purchasing, and forbids a dealer from selling to a young adult, a self-loading rifle, impermissibly burdens the exercise of rights guaranteed by the Second Amendment to the United States Constitution.

**B.      Count II: Declaratory Relief That The Ban On Sales Of Self Loading Rifles To Nonresident Purchasers Violates The Commerce Clause.**

120.     The Dealer Plaintiffs seek a declaration from this Court that the ban enacted by I-1639 which forbids a licensed dealer from selling self loading rifles to non-residents of the state impermissibly burdens interstate commerce in violation of the Commerce Clause of the United States Constitution, Art. I § 8 cl. 3.

**C.      Count III: Violation of Civil Rights (42 U.S.C. § 1983).**

121.     Defendants have stated their intention to enforce I-1639 including the bans on sales of self loading rifles to young adults and to nonresidents.

122.     In doing so, defendant will act under color of state law.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 12
3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

123.    The enforcement of I-1639 will deprive Plaintiffs of civil rights guaranteed by the Second Amendment to the United States Constitution, as applied by the Fourteenth Amendment to the United States Constitution, as well as rights guaranteed by the Commerce Clause, Art. I § 8 cl. 3.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

124.    A declaration that the challenged portions of I-1639 are unconstitutional;

125.    An order enjoining the defendants, and anyone acting on their behalf or in concert with them, from enforcing I-1639 in its entirety unless the law is ruled severable, and in that case, as to those sections determined to be unconstitutional;

126.    Plaintiffs' costs and attorneys' fees; and

127.    Such other and further relief as the court shall deem just and appropriate.

February 8, 2019.

ARD LAW GROUP PLLC

By: _____
Joel B. Ard, WSBA # 40104
Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

ALBRECHT LAW PLLC

By: _____
Matthew C. Albrecht, WSBA #36801
David K. DeWolf, WSBA #10875
421 W. Riverside Ave., Ste. 614
Spokane, WA 99201
(509) 495-1246
Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 13
3:19-cv-05106

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**SER-883**