No. 20-35827

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DANIEL MITCHELL, *et al.*,

*Plaintiffs/Appellants,*

vs.

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, *et al.*,

*Defendants/Appellees*

and

SAFE SCHOOLS SAFE COMMUNITIES,

*Intervenor-Defendant-Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

## BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AND BRADY

[Additional Counsel Listed
on Signature Page]

Hannah Shearer
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA 94104
(415) 433-2062

*Counsel for* Amici Curiae
*Giffords Law Center to Prevent
Gun Violence and Brady*

March 5, 2021

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Giffords Law Center to Prevent Gun Violence and Brady certify as follows:

Giffords Law Center to Prevent Gun Violence, an unincorporated non-profit policy organization, has no parents, subsidiaries and/or affiliates that have issued shares or debt securities to the public.

Brady, an unincorporated non-profit policy organization, has no parents, subsidiaries and/or affiliates that have issued shares or debt securities to the public.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 3

ARGUMENT ....................................................................................... 6

I.   THE DISTRICT COURT CORRECTLY DETERMINED THAT, AT MOST, THE INITIATIVE TRIGGERS INTERMEDIATE SCRUTINY. ................................................................................ 7

II.  THE DISTRICT COURT CORRECTLY DETERMINED THAT THE INITIATIVE SATISFIES INTERMEDIATE SCRUTINY. .... 8

    A.   Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates, and Access to Firearms, Especially Long Guns, Increases the Likelihood and Lethality of Those Suicide Attempts. ...................................... 9

        1.   Eighteen-to-Twenty-Year-Olds Account for a Disproportionate Share of Suicide Attempts. ................ 9

        2.   Firearm Access—and Especially Access to Long Guns—Increases the Suicide Risk for 18-to-20-Year-Olds. ..................................................................... 13

        3.   Age-Based Restrictions Lead to a Reduction in Firearm-Related Adolescent Suicides and Deaths. ...... 16

    B.   The Initiative Will Decrease Access to an Exceptionally Lethal Category of Firearms Amongst a Group that Is Disproportionately Likely to Carry Out Mass Shootings at Schools and Commit Homicides. ........................................ 18

        1.   Eighteen-to-Twenty-Year-Olds Commit Mass Shootings at Disproportionately High Rates. .............. 18

        2.   Eighteen-to-Twenty-Year-Olds Commit Violent Crimes and Homicides at Disproportionately High Rates. ................................................................. 22

        3.   Gun Violence Has Long-Lasting Effects on Young People. ......................................................................... 24

C.    The Initiative's Restriction on the Purchase of
      Semiautomatic Assault Rifles Extends Only to an
      Exceptionally Lethal Subset of Long Guns............................ 26

      1.    Semiautomatic Assault Rifles Are an
            Exceptionally Lethal Category of Firearms. ............... 26

      2.    Appellants' "Commonality" Argument Lacks
            Merit. ................................................................. 31

      3.    Appellants' "Scope" Argument Is Flawed and Has
            Dangerous Implications............................................ 33

CONCLUSION ......................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*,
   910 F.3d 106 (3d Cir. 2018) ..................................................... 2

*Caetano* v. *Massachusetts*,
   136 S. Ct. 1027 (2016) .......................................................... 32

*Coal. for Econ. Equity* v. *Wilson*,
   122 F.3d 692 (9th Cir. 1997) ................................................. 37

*District of Columbia* v. *Heller*,
   554 U.S. 570 (2008) ............................................... 1, 2, 8, 36

*Fyock* v. *City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) .................................................. 2

*Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms &*
   *Explosives*,
   417 F. Supp. 3d 747 (W.D. Va. 2019) ..................................... 2

*Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms, and*
   *Explosives*,
   No. 19-2250 (4th Cir. 2020) ................................................... 3

*Kasler* v. *Lockyer*,
   23 Cal. 4th 472 (2000) ......................................................... 27

*McDonald* v. *City of Chicago*,
   561 U.S. 742 (2010) .......................................................... 1, 2

*Md. Shall Issue* v. *Hogan*,
   353 F. Supp. 3d 400 (D. Md. 2018) ........................................ 2

*National Rifle Association of America, Inc.* v. *Bureau of*
   *Alcohol, Tobacco, Firearms, and Explosives*,
   700 F.3d 185 (5th Cir. 2012) .................................................. 2

*People* v. *Fields*,
24 N.E.3d 326 (Ill. App. Ct. 2014) ...................................................... 24

*Peruta* v. *County of San Diego*,
824 F.3d 919 (9th Cir. 2016) (en banc) (Graber, J.,
concurring) ............................................................................................ 2

*Stimmel* v. *Sessions*,
879 F.3d 198 (6th Cir. 2018) .................................................................. 2

*Teixeira* v. *County of Alameda*,
873 F.3d 670 (9th Cir. 2017) (en banc) .................................................. 1

*United States* v. *Chovan*,
735 F.3d 1127 (9th Cir. 2013) ................................................................ 7

*United States* v. *Hayes*,
555 U.S. 415 (2009) ................................................................................ 2

*United States* v. *Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ................................................................ 37

*United States* v. *Torres*,
911 F.3d 1253 (9th Cir. 2019) ................................................................ 7

**Statutes, Rules, and Regulations**

18 U.S.C. § 926(a) .................................................................................. 31

Fed. R. App. P. 29(a)(2) .......................................................................... 1

Fed. R. App. P. 29(a)(4)(E) ..................................................................... 1

Initiative Measure No. 1639, approved Nov. 6, 2018 ..................... *passim*

**Other Authorities**

Adam Winkler & Cara Natterson, *There's a Simple Way to
Reduce Gun Violence: Raise the Gun Age*, Wash. Post,
Jan. 6, 2016 .......................................................................................... 12

American Public Health Association, *Reducing Suicides by
Firearms* (2018) .................................................................................... 13

Andrew R. Morral et al., The Science of Gun Policy: A
    Critical Synthesis of Research Evidence on the Effects of
    Gun Policies in the United States 145 (2018)....................................24

Associated Press, *1996 Washington School Shooter
    Apologizes in His First Remarks*, FOX NEWS, Apr. 14, 2017 .............21

Associated Press, *The Latest: Family of School Shooting
    Suspect 'Devastated'*, AP NEWS, Sept. 14, 2017 ..................................21

Brad J. Bushman et al., *Youth Violence: What We Know and
    What We Need to Know*, 71 AM. PSYCH. 17 (2016) ..............................22

Centers for Disease Control and Prevention, Web-based
    Injury Statistics Query and Reporting System
    (WISQARS), Leading Cause of Death Reports...................................13

Centers for Disease Control and Prevention, Wide-ranging
    Online Data for Epidemiologic Research (WONDER). ......................15

Chelsea J. Carter, *Report: Suspect in Seattle College Attack
    Fascinated with School Shootings*, CNN, June 6, 2014 .....................21

Daniel W. Webster et al., *Association Between Youth-Focused
    Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004)...............17

Daniel W. Webster et al., Johns Hopkins Ctr. for Gun Pol'y &
    Rsch., The Case for Gun Policy Reforms in America (2012) .............24

David Bahde, *Bolt Rifle vs. Semi-Auto Rifle: Which Option
    Is Better for Precision*, BALLISTIC MAG, May 25, 2018.......................28

Deborah Azrael et al., *The Stock and Flow of U.S. Firearms:
    Results from the 2015 National Firearms Survey*, 3
    RUSSELL SAGE FOUND. J. SOC. SCI. 38 (2017) .....................................33

Dictionary of Epidemiology (5th ed. 2008). ............................................14

E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and
    Public Policy*, 103 AM. J. PUB. HEALTH 27 (2013) ...............................11

Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLIN. PSYCHIATRY 19 (2009) ...................................... 11

Eboni Morris, Nat'l Urb. League Pol'y Inst., Youth Violence: Implications for Posttraumatic Stress Disorder in Urban Youth (2009) ......................................................................... 25

Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents with and Without Semiautomatic Rifles in the United States*, 320 JAMA 1034 (2018) .............................. 26, 29, 30, 34

Federal Bureau of Investigation, U.S. Department of Justice Uniform Crime Reporting Program Data: Supplementary Homicide Reports, 2015–2019, Ann Arbor Inter-university Consortium for Political and Social Research ................................... 23

Glenn D. Braunstein, *Violent Events Have Long-Term Effects on Children*, HUFFINGTON POST, Sept. 24, 2012 ................................. 25

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, THE ATLANTIC, Feb. 22, 2018.................................................. 27, 28

*Initiative Measure No. 1639*, November 6, 2018 General Election Results, Secretary of State (Nov. 27, 2018) ......................... 36

J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094 (2016) ............................................... 15, 16

Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES, Nov. 7, 2016.............................................. 16

Jared Keller, *The Psychological Aftermath of Surviving School Shootings*, PAC. STANDARD, Mar. 25, 2019 ............................. 25

Jillian K. Peterson et al., *Database of Mass Shootings in the United States*, THE VIOLENCE PROJECT (Nov. 2019) ........................... 20

Jillian Peterson et al., *School Shooters Usually Show These Signs of Distress Long Before They Open Fire, Our Database Shows*, THE CONVERSATION, Feb. 8, 2019 ...........................20

Jody Allard et al., *Washington Mall Shooting Suspect Confesses to Killings*, WASH. POST, Sept. 26, 2016 .............................18

Joseph O'Sullivan, *Washington State Voters Approved New Gun Regulations in I-1639. Here's What The Law Will Do*, SEATTLE TIMES, Nov. 8, 2018 .................................................................3

Joshua D. Brown et al., *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982–2018*, 108 AM. J. PUB. HEALTH 1385 (2018)...................22

Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124 (2010). ...........................................................................................10

Luis Melgar, *Are School Shootings Becoming More Frequent? We Ran the Numbers*, CTR. FOR HOMELAND DEF. & SEC. (May 21, 2019).........................................................................................20

Mariam Arain et al., Maturation of the Adolescent Brain, 9 NEUROSYCHIATRIC DISEASE & TREATMENT 449 (2013) .................10, 12

*Mass Shootings in the US Fast Facts*, CNN, May 3, 2020 ....................19

Matthew Miller & David Hemenway, *Firearm Prevalence and the Risk of Suicide: A Review*, 2 HARV. HEALTH POL'Y REV. 29 (2001). ...................................................................................14

Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 N. ENGL. J. MED. 989 (2008)...........................14

Matthew Miller et al., *Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 ANN. REV. PUB. HEALTH 393 (2012) .....................................................15

Melvin D. Livingston et al., *A Descriptive Analysis of School and School Shooter Characteristics and the Severity of School Shootings in the United States, 1999–2018*, 64 J. ADOLESCENT HEALTH 797 (2018) ........................................................ 22

*Mental Health Disorder Statistics*, JOHNS HOPKINS MEDICINE (2021) ................................................................................................ 9

Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058 (2011) ..................................................................... 10

Mike Carter et al., *Man Arrested in Tacoma Mall Shooting*, SEATTLE TIMES, Nov. 20, 2005 .............................................................. 18

Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS, Aug. 2019 .................... 17

*Percentage of the Population 3 to 34 Years Old Enrolled in School, by Age Group: Selected Years, 1940 Through 2018*, National Center for Education Statistics .......................................... 26

Richard A. Friedman, *Why Are Young Americans Killing Themselves? Suicide Is Now Their Second-Leading Cause of Death*, N.Y. TIMES, Jan. 6, 2020 ....................................................... 10

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED, June 17, 2016 ................................................................. 28, 29

Scott Pelley, *What Makes the AR-15 Style Rifle the Weapon of Choice for Mass Shooters?*, CBS, June 23, 2019 ............................ 27

Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150 (2019) ........................................ 18

Thomas J. Hanlon et al., *Type of Firearm Used in Suicides: Findings from 13 States in the National Violent Death Reporting System, 2005–2015*, 65 J. ADOLESCENT HEALTH 366 (2019) ............................................................................................. 15

Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (Suppl.) S<small>UICIDE</small> & L<small>IFE</small>-T<small>HREATENING</small> B<small>EHAVIOR</small> 49 (2001) ....................................................... 11

Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 N<small>ATURE</small> R<small>EVS</small>. N<small>EUROSCIENCE</small> 947 (2008) .................................................................... 9

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to effectively reduce gun violence. The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords. Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to improve the safety of their communities. Giffords Law Center has provided informed analysis as an *amicus* in many other firearm-related cases, including *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), *Teixeira* v. *County of Alameda*,

---

[1]  Appellants and Appellees have both consented to *amici curiae* filing this brief. *See* Fed. R. App. P. 29(a)(2). No counsel for a party authored this brief in whole or in part; no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amici curiae*, their members, or their counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E).

873 F.3d 670 (9th Cir. 2017) (en banc), and *Fyock* v. *City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).[2]

 *Amicus curiae* Brady (formerly the Brady Center to Prevent Gun Violence) is a non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution and state laws are properly interpreted to allow strong government action to prevent gun violence. Through its Legal Action Project, Brady has filed numerous briefs in support of government regulation of firearms, including in *McDonald*, 561 U.S. 742, *United States* v. *Hayes*, 555 U.S. 415 (2009), *Heller*, 554 U.S. 570, and *Fyock*, 779 F.3d 991. Further, Brady filed *amicus* briefs supporting federal minimum-age laws in *National Rifle Association of America, Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and*

---

[2]  Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *E.g.*, *Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*, 910 F.3d 106, 121–22 (3d Cir. 2018); *Md. Shall Issue* v. *Hogan*, 353 F. Supp. 3d 400, 403–05 (D. Md. 2018); *Stimmel* v. *Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta* v. *County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring). Giffords Law Center filed the last two briefs under its former name, the Law Center to Prevent Gun Violence.

*Explosives*, 700 F.3d 185 (5th Cir. 2012) and *Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives*, No. 19-2250 (4th Cir. 2020).

## INTRODUCTION AND SUMMARY OF ARGUMENT

On November 6, 2018, the people of Washington went to the polls and voted to reduce gun violence in their communities, and among young people in particular. They did so by passing a ballot measure—Initiative 1639 (the "Initiative")[3]—to prohibit 18-to-20-year-olds from purchasing semiautomatic assault rifles. The Initiative passed by a strong majority, garnering more than 60% of the vote.[4]

The grassroots movement to pass the Initiative began two years earlier, after three teenagers were murdered at a house party in Mukilteo, Washington, by a former high school classmate. The 19-year-old attacker used an AR-15 semiautomatic assault rifle that he

---

[3]     Initiative Measure No. 1639, approved Nov. 6, 2018, *available at* https://www.sos.wa.gov/_assets/elections/initiatives/finaltext_1531.pdf.

[4]     Joseph O'Sullivan, *Washington State Voters Approved New Gun Regulations in I-1639. Here's What the Law Will Do*, SEATTLE TIMES, Nov. 8, 2018, https://www.seattletimes.com/seattle-news/politics/washington-state-voters-approved-new-gun-regulations-in-i-1639-heres-what-the-law-will-do/.

purchased *legally* the previous week.[5]  The massacre caused Washington voters to devise measures to reduce the gun violence that was all too prevalent in their state, particularly shootings involving semiautomatic assault rifles, which they recognized "heavily" "impact . . . children and teenagers."[6]

Seeking to reverse the voters' will and well-established Second Amendment law, Appellants filed suit alleging that the Initiative prevents them from exercising rights conferred by the Second Amendment.  (4 S.E.R. 871–72, at ¶ 3.)  In response to cross-motions for summary judgment, the district court applied the long-standing "two-part test for Second Amendment claims" adopted by "nearly every circuit (including the Ninth)."  (E.R. 12.)  Pursuant to that test, the court first determined that "[t]he Age Provision does not burden Second Amendment rights[, and] Plaintiffs' challenge to it thus fails at the first step of the inquiry."  (E.R. 16.)  Although it could have ended its analysis

---

[5]    *Washington Party Shooting Suspect Read AR-15 Gun Manual Right Before Attack*, THE GUARDIAN, Aug. 1, 2016, https://www.theguardian.com/us-news/2016/aug/01/washington-shooting-suspect-allen-ivanov-ar-15-gun-manual.

[6]    Initiative 1639, *supra* note 3, at § 1.

there, out of an "abundance of caution," the court proceeded to step two and applied intermediate scrutiny to the Initiative. (E.R. 16–17.) Finding "indisputably substantial" the Initiative's objectives of "promoting public safety and preventing violent crime," the court held that, based on crime data, legislative findings, and scientific research, "[t]he Age Provision reasonably fits with Washington's interest[s]." (E.R. 18–19.) After losing at both steps of the constitutional inquiry, Plaintiffs appealed.

Amici write to provide this Court with additional social science research and data that confirm the district court's well-reasoned decision was correct. In particular, this evidence demonstrates that: (i) 18-to-20-year-olds are at higher risk of using long guns to attempt suicide, (ii) this age group is disproportionately likely to carry out mass shootings at schools using semiautomatic assault rifles, and (iii) the Initiative's definition of semiautomatic assault rifles is carefully tailored to restrict the purchase of exceptionally lethal weapons. For these reasons and those advanced by Appellees, the Initiative easily passes constitutional muster. The district court's decision should be affirmed.

# ARGUMENT

As the district court recognized, courts in "nearly every circuit (including the Ninth)" apply a "two-part test for Second Amendment claims." (E.R. 12.) This test asks, first, "whether the challenged law burdens conduct protected by the Second Amendment" and, if so, directs courts to apply an appropriate level of scrutiny. (E.R. 12.) A law may be upheld as constitutional at either step of the two-step inquiry. Here, the district court correctly upheld the Initiative at both steps.

The Initiative easily passes this test. *First*, as Appellees explained, history and tradition show that state and federal governments have regulated 18-to-20-year-olds' access to firearms for most of the nation's history. (Appellees' Br. at 19–25.) The Initiative is therefore constitutional at the threshold inquiry. *Second*, as explained below, social science research demonstrates that the Initiative easily survives intermediate scrutiny. Washington's interests in public health and safety are significant, substantial, and important, and there is a more than reasonable fit between the Initiative's restrictions and Washington's public safety objectives.

-6-

## I.   THE DISTRICT COURT CORRECTLY DETERMINED THAT, AT MOST, THE INITIATIVE TRIGGERS INTERMEDIATE SCRUTINY.

The second step of the Ninth Circuit's Second Amendment inquiry "directs courts to apply an appropriate level of scrutiny." *United States* v. *Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). "[I]ntermediate scrutiny is appropriate if a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right." *United States* v. *Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) (quotation omitted). There is "near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *Id.* (quotation omitted).

This case is no exception: the Initiative is a common-sense measure that does not substantially burden Second Amendment rights, and thus, the district court was correct to apply intermediate scrutiny. As the court correctly reasoned:  (i) the Initiative does not restrict 18-to-20-year-olds' ability to purchase shotguns and non-semiautomatic rifles for home defense (E.R. 9, 17), (ii) the Initiative allows 18-to-20-year-olds to possess semiautomatic assault rifles in many places, including the

home for self-defense (E.R. 9, 17), and (iii) "18- to 20-year-olds have historically not been considered 'responsible' and thus have not had the same panoply of constitutional or other legal rights as adults." (E.R. 17); *see Heller*, 554 U.S. at 635 (defining the core Second Amendment right as "the right of law-abiding, *responsible* citizens to use arms in defense of hearth and home" (emphasis added)).

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE INITIATIVE SATISFIES INTERMEDIATE SCRUTINY.

Applying intermediate scrutiny, the district court held that the Initiative's objectives—"promoting public safety and preventing violent crime—are indisputably substantial government interests." (E.R. 18.) Based on crime data, legislative findings, and scientific research, the court held that "[t]he Age Provision reasonably fits with Washington's interest in promoting public safety and reducing gun violence." (E.R. 19.)

*Amici* write to highlight three reasons, rooted in social science evidence, why the Initiative satisfies intermediate scrutiny. First, the Initiative will save the lives of many 18-to-20-year-olds, a demographic that is uniquely vulnerable to suicide by long gun. Second, the Initiative will decrease the occurrences and lethality of mass shootings and

homicides, including at schools, which are disproportionately committed by 18-to-20-year-olds. And finally, far from an extensive blanket ban, the Initiative is a targeted commercial regulation that conditions the purchase of just one subset of extremely lethal firearms by one narrow subset of the population, and for only a limited duration.

### A. Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates, and Access to Firearms, Especially Long Guns, Increases the Likelihood and Lethality of Those Suicide Attempts.

#### 1. *Eighteen-to-Twenty-Year-Olds Account for a Disproportionate Share of Suicide Attempts.*

Eighteen-to-twenty-year-olds are disproportionately at risk of attempting suicide. Many major psychiatric conditions first develop in adolescence,[7] and suicide risk "increase[s] steeply during the first few

---

[7] Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947, 952 (2008) ("Anxiety disorders, bipolar disorder, depression, eating disorder[s], psychosis (including schizophrenia) and substance abuse all most commonly emerge during adolescence."); *Mental Health Disorder Statistics*, JOHNS HOPKINS MEDICINE (2021), https://www.hopkins medicine.org/health/wellness-and-prevention/mental-health-disorder-statistics (explaining that schizophrenia typically "first appears in men during their late teens or early twenties").

years after" an individual's first contact with psychiatric services.[8]

      Additionally, minors are uniquely prone to negative emotional states, and their responses to these "frequent" negative states "tend to be more intense, variable and subject to extremes relative to adults."[9] Minors are also more likely to act on these negative emotions like stress or rage, because their limbic systems (i.e., emotional response centers) have matured while their cerebral cortexes (i.e., impulse control centers) are still developing.[10]  Scientists have reasoned that "[f]eeling sad, depressed, or hopeless may be associated with the heightened rates of affective disorders, attempted and completed suicide, and addiction also observed during adolescence."[11]

---

[8]    Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058, 1061 (2011).

[9]    Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124, 125 (2010).

[10]    Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROSYCHIATRIC DISEASE & TREATMENT 449, 458 (2013) ("[T]he adolescent brain is structurally and functionally vulnerable to environmental stress . . . .").

[11]    Somerville, *supra* note 9, at 125; *see also* Richard A. Friedman, *Why Are Young Americans Killing Themselves? Suicide Is Now Their Second-Leading Cause of Death*, N.Y. TIMES, Jan. 6, 2020,

Furthermore, suicide "is commonly an impulsive act by a vulnerable individual."[12] One study asked 153 survivors of nearly lethal suicide attempts aged between 13 and 34 how much time passed between the decision to commit suicide and their attempt.[13] *Less than five minutes*, was the response of nearly a quarter of survey respondents.[14] Another study asked people who were referred to a psychiatric hospital following a suicide attempt how much time passed between when they first began contemplating the act and their attempt; 47.6% stated that ten minutes or less had passed.[15]

As the district court recognized, after "[c]anvassing the leading research in neuroscience and developmental psychology,

---

https://www.nytimes.com/2020/01/06/opinion/suicide-young-people.html?action=click&module=Opinion&pgtype=Homepage.

[12] E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27, 27 (2013).

[13] Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (Supp.) SUICIDE & LIFE-THREATENING BEHAV. 49, 50–51 (2001).

[14] *Id.* at 52.

[15] Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLIN. PSYCHIATRY 19, 20 (2009).

Defendants' two *unrebutted* scientific experts have found clear consensus that various regions of the human brain that govern impulsivity and sensation-seeking do not fully mature until the twenties," noting also that other "[c]ourts have reached the same conclusion." (E.R. 19 (emphasis added).)[16] The *last* part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and planning.[17] As a result, people in their late teens and early twenties tend to have lower self-control and make more impulsive decisions.[18]

---

[16]    *See also* Adam Winkler & Cara Natterson, *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST, Jan. 6, 2016, https://www.washingtonpost.com/posteverything/wp/2016/01/06/there-a-simple-way-to-fight-mass-shootings-raise-the-gun-age/?utm_term=.e8adc7e6c1da ("The scientific literature over the past two decades has demonstrated repeatedly that the brain does not fully mature until the mid-to-late 20s.").

[17]    *Id.*; *see also* Arain, *supra* note 10, at 456 ("Behavioral control requires a great involvement of cognitive and executive functions. These functions are localized in the prefrontal cortex, which matures independent of puberty and continues to evolve up until 24 years of age.").

[18]    Arain, *supra* note 10, at 453 ("[S]tudies involv[ing] comparing a teen brain to an adult brain determined that adolescents' prefrontal cortices are used less often during interpersonal interactions and decision making than their adult counterparts . . . provid[ing] a partial explanation for certain characteristics of adolescents and adolescent behaviors, such as quickness to anger, intense mood swings, and making decisions on the basis of 'gut' feelings.").

Given 18-to-20-year-olds' propensity toward negative emotional states and impulsivity, and the tie between these characteristics and suicide risk, it is perhaps unsurprising, but nonetheless troubling, that suicide accounts for a higher percentage of deaths for 15-to-24-year-olds than for any other age group.[19] Indeed, from 2010 to 2019, suicide was the second-most-common cause of death among 18-to-20-year-olds.[20]

### 2. *Firearm Access—and Especially Access to Long Guns— Increases the Suicide Risk for 18-to-20-Year-Olds.*

Given the rapidity with which suicidal ideation gives way to action, "[a]ccess to firearms is a key risk factor for suicide."[21] In fact, "at least a dozen U.S. case-control studies in the peer-reviewed literature . . . have found that a gun in the home is associated with an increased risk of

---

[19] Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), Leading Cause of Death Reports, https://webappa.cdc.gov/sasweb/ncipc/leadcause.html.

[20] *Id.* Centers for Disease Control and Prevention has not reported cause of death statistics post-dating 2019.

[21] American Public Health Association, *Reducing Suicides by Firearms* (2018), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2019/01/28/reducing-suicides-by-firearms.

suicide. The increase in risk is large, typically 2 to 10 times that in homes without guns."[22] Those prone to "act impulsively . . . are more likely to be affected by availability of the means at hand," which explains why "the preponderance of current evidence indicates that gun availability is a risk factor for suicide, especially among youth."[23]

Unfortunately, given the increased risk of suicide posed by firearm access, firearm suicide is also the suicide method with the highest fatality rate—the odds of completing a suicide attempt are 140 times greater when a gun is used than for any other commonly used

---

[22] Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 N. ENGL. J. MED. 989, 990 (2008). "Case-control studies provide strong evidence that suicide risk is heightened where guns are more readily available." Matthew Miller & David Hemenway, *Firearm Prevalence and the Risk of Suicide: A Review*, 2 HARV. HEALTH POL'Y REV. 29, 34 (2001).

The Dictionary of Epidemiology defines a case-control study as the "study of persons with [a] disease (or another outcome variable) of interest and a suitable control group of persons without the disease (comparison group, reference group)." Case-control study, DICTIONARY EPIDEMIOLOGY 31 (5th ed. 2008), http://www.academia.dk/BiologiskAntro pologi/Epidemiologi/PDF/Dictionary_of_Epidemiology__5th_Ed.pdf.

[23] Miller & Hemenway, *Firearm Prevalence and the Risk of Suicide*, *supra* note 22, at 34.

method.[24]  Framed differently, while 4% of non-firearm suicide attempts are fatal,[25] 85% of suicide attempts involving a firearm are fatal.[26]

Furthermore, 18-to-20-year-olds are particularly at risk for suicides involving long guns, a category of firearm that includes semiautomatic assault rifles.  While adults, generally, are more than twice as likely to die by handgun suicide as they are by long gun suicide,[27] 18-to-20-year-olds are much more likely to die by long gun suicides than other groups.  In fact, 18-to-20-year-olds are the *only group* more likely to die by long gun suicide than handgun suicide.[28]  Long guns therefore pose a unique risk to the 18-to-20-year-old age group.

---

[24]  J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094, 1097 (2016).

[25]  Matthew Miller et al., *Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 ANN. REV. PUB. HEALTH 393, 397 (2012) (establishing that in 2001, there were 333,765 non-firearm suicide attempts and 13,753 fatalities).

[26]  *Id.*

[27]  Thomas J. Hanlon et al., *Type of Firearm Used in Suicides: Findings from 13 States in the National Violent Death Reporting System, 2005–2015*, 65 J. ADOLESCENT HEALTH 366, 367 (2019).

[28]  Centers for Disease Control and Prevention, Wide-ranging Online Data for Epidemiologic Research (WONDER), https://wonder.cdc.gov/

3. *Age-Based Restrictions Lead to a Reduction in Firearm-Related Adolescent Suicides and Deaths.*

Research shows that fewer than 3% of people who survive one suicide attempt later die by suicide.[29]  As scholars have noted, "[s]uicide attempters often have second thoughts, but when a method like a gun works so effectively, there's no opportunity to reconsider."[30]  A young adult's access to firearms when contemplating a suicide attempt, therefore, often determines whether they die or recover.

Fortunately, studies have repeatedly found a connection between age restrictions, such as the Initiative, and a decline in firearm-related adolescent deaths, especially suicides.  For instance, an August 2004 study found that state laws raising the minimum legal age to

---

controller/datarequest?stage=search&action=current. Query of Detailed Mortality files for years 1999–2019, with results grouped by single-year ages. ICD-10 codes of X72 and X73 were used to identify handgun and long-gun suicide deaths, respectively.

[29]    Bostwick, *supra* note 24, at 1098.

[30]    Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES, Nov. 7, 2016, https://www.nytimes.com/2016/11/08/well/live/after-a-suicide-attempt-the-risk-of-another-try.html.

purchase a handgun to 21 were associated with a 9% reduction in firearm suicide rates among 18-to-20-year-olds.[31]

Relatedly, state gun-safety laws have proven effective in reducing the overall number of gun deaths among young people, including in the 18-to-20-year-old range. A 2019 study examined the 21,241 firearm-related deaths among U.S. children (up to age 21) from 2011 to 2015.[32] Eighteen-to-twenty-one-year-olds made up more than two-thirds of these deaths (68.7%).[33] But state laws make a difference: the study found that stronger gun safety laws linearly decrease the firearm-related mortality rate among children.[34] Another 2019 study found that the quartile of states with the strongest gun safety laws "have an annual pediatric firearm mortality rate of 2.563 per 100,000 [children

---

[31] Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

[32] Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS, Aug. 2019, at 1–2.

[33] *Id.* at 3 & tbl. 1.

[34] Specifically, every 10-point increase in the quantitative measure of the strictness of a state's gun safety laws "decreases the firearm-related mortality rate in children by 4%" in the study's fully adjusted model. *Id.* at 3.

aged 0-to-19-years-old] compared with states in the lowest quartile [with the weakest laws], where the mortality rate is almost twice as high at 5.005 per 100,000."[35]  These studies show that minimum-age laws save lives, confirming the "reasonable fit" between Washington's public safety objective and the Initiative's restrictions.

**B.   The Initiative Will Decrease Access to an Exceptionally Lethal Category of Firearms Amongst a Group that Is Disproportionately Likely to Carry Out Mass Shootings at Schools and Commit Homicides.**

   1.   *Eighteen-to-Twenty-Year-Olds Commit Mass Shootings at Disproportionately High Rates.*

For Washington voters, the risk posed by 18-to-20-year-olds armed with semiautomatic assault rifles is not hypothetical: there have been multiple mass shootings in Washington perpetrated by individuals in this age demographic, wielding semiautomatic assault rifles, in recent years.[36]  As the district court held, "the prevalence of 18- to 20-year-olds

---

[35]    Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150, 152 (2019).

[36]    Jody Allard et al., *Washington Mall Shooting Suspect Confesses to Killings*, WASH. POST, Sept. 26, 2016, https://www.washingtonpost.com/ news/post-nation/wp/2016/09/25/after-day-long-manhunt-police-arrest-20-year-old-in-washington-state-mall-killings/ (20-year-old shooter used Ruger semiautomatic rifle to kill 5 in mall); Mike Carter et al., *Man Arrested in Tacoma Mall Shooting*, SEATTLE TIMES, Nov. 20, 2005,

as mass shooters is sufficient justification itself [for the Initiative.]" (E.R. 19.)

Many of the deadliest mass shootings in our nation's history took place at schools and were committed by individuals in the age range targeted by the Initiative. The Court surely recalls the December 14, 2012 Newtown, Connecticut, shooting at Sandy Hook Elementary School, in which a 20-year-old shooter killed 20 schoolchildren, six adult school staff and faculty, and his mother, before turning the gun on himself; the February 14, 2018 Parkland, Florida, shooting at Marjory Stoneman Douglas High School, in which a 19-year-old shooter killed 17 victims; and the April 20, 1999 Littleton, Colorado, shooting at Columbine High School, in which an 18-year-old and a 17-year-old killed 12 students and one teacher, before taking their own lives.[37]

In the 20 years since the Columbine High School massacre, there have been at least 486 incidents involving firearms at schools and

---

https://www.seattletimes.com/seattle-news/man-arrested-in-tacoma-mall-shooting/ (20-year-old man shot six people and took others hostage, using "assault-style rifle").

[37] *Mass Shootings in the US Fast Facts*, CNN, https://www.cnn.com/2019/08/19/us/mass-shootings-fast-facts/index.html (last updated May 3, 2020).

68 incidents of an active shooter on school property during the school day.[38] And school shootings have become more frequent in recent years: "From 1999 to 2014, the average number of days between [active school] shootings was 124 days. From 2015 to 2018, the average was 77 days."[39] Mass shooters tend to target people or institutions against which they have a grievance,[40] which is why most school shooters—as high as 91% in one recent study—were current or former students of the school at which the attack occurred.[41] As a result, the median age of school shooters is high-school-aged or only slightly older.

---

[38]    Luis Melgar, *Are School Shootings Becoming More Frequent? We Ran the Numbers*, CTR. FOR HOMELAND DEF. & SEC. (May 21, 2019), https://www.chds.us/ssdb/are-school-shootings-becoming-more-frequent-we-ran-the-numbers/.

[39]    *Id.*

[40]    A comprehensive analysis of mass shootings shows that 70% of mass shooters knew at least some of their victims, and school shooters "in particular were 'insiders.'" Jillian K. Peterson et al., *Database of Mass Shootings in the United States*, THE VIOLENCE PROJECT, at 19 (Nov. 2019), https://www.theviolenceproject.org/wp-content/uploads/2019/11/TVP-Mass-Shooter-Database-Report-Final-compressed.pdf.

[41]    Jillian Peterson et al., *School Shooters Usually Show These Signs of Distress Long Before They Open Fire, Our Database Shows*, THE CONVERSATION, Feb. 8, 2019, https://theconversation.com/school-shooters-usually-show-these-signs-of-distress-long-before-they-open-fire-our-database-shows-111242.

Washington is no exception to this nation's school shooting epidemic, and these tragic incidents often involve long guns:

- On September 13, 2017, at Freeman High School, one high school student was killed and three others were injured after a teenage student opened fire with a semiautomatic rifle and a handgun.[42]

- On June 5, 2014, three students were shot and one was killed by a young, shotgun-wielding man with "a fascination with school shootings."[43]

- On February 2, 1996, a teenager with a semiautomatic hunting rifle and two handguns walked into an Algebra class and killed his math teacher and two classmates, wounding another student before his spree was stopped.[44]

---

[42] Associated Press, *The Latest: Family of School Shooting Suspect 'Devastated'*, AP NEWS, Sept. 14, 2017, https://apnews.com/article/43dde78fe33c4db5b34e35347063f4a0.

[43] Chelsea J. Carter, *Report: Suspect in Seattle College Attack Fascinated with School Shootings*, CNN, June 6, 2014, https://www.cnn.com/2014/06/06/justice/seattle-campus-shooting/index.html.

[44] Associated Press, *1996 Washington School Shooter Apologizes in His First Remarks*, FOX NEWS, Apr. 14, 2017, https://www.foxnews.com/us/1996-washington-school-shooter-apologizes-in-his-1st-remarks.

Further, school shootings in the United States involving rifles have a 9.73 times higher casualty rate and a 14.74 times higher fatality rate compared to shootings involving handguns.[45]

A recent study estimated that one-fourth of school shooting deaths nationwide could have been prevented if 18-to-20-year-olds were barred from buying long guns.[46] This makes sense: shooters between the ages of 18 and 21 typically commit crimes with firearms they purchased legally.[47]

> 2. *Eighteen-to-Twenty-Year-Olds Commit Violent Crimes and Homicides at Disproportionately High Rates.*

In addition to mass shootings, 18-to-20-year-olds account for a disproportionate share of violent crimes and homicides in Washington:

- In Washington, 18-to-20-year-olds make up nearly 4% of the state population. From 2015 to 2019, there were 915 homicide offenders for whom the

---

[45] Melvin D. Livingston et al., *A Descriptive Analysis of School and School Shooter Characteristics and the Severity of School Shootings in the United States, 1999–2018*, 64 J. ADOLESCENT HEALTH 797, 798 (2018).

[46] Joshua D. Brown et al., *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982–2018*, 108 AM. J. PUB. HEALTH 1385, 1386 (2018).

[47] Brad J. Bushman et al., *Youth Violence: What We Know and What We Need to Know*, 71 AM. PSYCH. 17, 19, 28 (2016).

age of the offender was known,[48] and 136 of these homicide offenders were between 18 and 20, amounting to approximately 15%. This means that, where the offender's age is known, **while 18-to-20-year-olds make up less than 4% of Washington's population, they are responsible for almost 15% of homicides**.[49]

• Eighteen-to-twenty-year-old homicide offenders in Washington are also more likely to use firearms than any other means. Roughly **80%** of Washington homicide offenders in this age range used firearms to kill.[50]

These Washington statistics are consistent with nationwide research demonstrating the specific and significant danger posed by 18-to-20-year-olds with firearms. As the district court found, although 18-to-20-year-olds "comprise[] only 4.4% of the [nation's] population, [they] account[] for approximately one-quarter of firearm homicides committed where an offender was identified." (E.R. 20 (citing 145 Cong. Rec. 18119 (1999)).) The court further recognized that "adolescents aged 18, 19, and 20

---

[48]    This count excludes negligent homicides.

[49]    *See* Federal Bureau of Investigation, U.S. Department of Justice Uniform Crime Reporting Program Data: Supplementary Homicide Reports, 2015–2019, Ann Arbor Inter-university Consortium for Political and Social Research. This count includes all offenders, including co-offenders.

[50]    *Id.*

accounted for the first, second, and third highest percentages of arrests, respectively, for any age up to age 24," and that "[a]rrest rates for murder, robbery, and other violent crimes peak around ages 17 to 20." (E.R. 20.) Data confirm the district court's findings.[51] Indeed, "[g]iven [their] higher degree of impulsiveness and emotional immaturity, it is unsurprising that 18- to 20-year-olds . . . commit a disproportionate share of crimes, including violent crimes." (E.R. 20.)[52]

### 3. Gun Violence Has Long-Lasting Effects on Young People.

Compounding these tragic statistics is the fact that, even after the shooting stops, gun violence disproportionately harms young people. Young people exposed to gun violence are at a greater risk of developing

---

[51] See, e.g., Daniel W. Webster et al., Johns Hopkins Ctr. for Gun Pol'y & Rsch., The Case for Gun Policy Reforms in America 5 (2012).

[52] The victims of homicides perpetrated by 18-to-20-year-olds are also disproportionately likely to be under the age of 21 themselves. See Andrew R. Morral et al., The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States 145 (2018), https://www.rand.org/pubs/research_reports/RR2088.html; see also People v. Fields, 24 N.E.3d 326, 344 (Ill. App. Ct. 2014) ("We also note that the 18-to-20-year-old age group is more likely to be directly interacting with and, thus, endangering juveniles under 18 years of age.").

-24-

PTSD[53] and harming themselves.[54]  For instance, after the Columbine massacre, one student survivor suffering from PTSD died by suicide after losing two friends and watching his basketball coach die in the mass shooting.[55]  Similarly, two teenage survivors of the 2018 mass shooting in Parkland, Florida, later died by suicide.[56]  By seeking to prevent mass school shootings and other gun violence, the Initiative's age restrictions squarely fit the State's objective of protecting the mental health and safety of young adults.

As the Initiative recognized in its statement of intent, "[t]he impacts of gun violence by assault weapons fall heavily on children and teenagers.  According to one analysis, more than 208,000 students

---

[53]    One study found that nearly 40% of children exposed to a shooting will develop PTSD.  *See* Eboni Morris, Nat'l Urb. League Pol'y Inst., Youth Violence: Implications for Posttraumatic Stress Disorder in Urban Youth 7 (2009).

[54]    Glenn D. Braunstein, *Violent Events Have Long-Term Effects on Children*, Huffington Post, Sept. 24, 2012, https://www.huffingtonpost.com/glenn-d-braunstein-md/childrenptsd_b_1901651.html.

[55]    *Id.*

[56]    Jared Keller, *The Psychological Aftermath of Surviving School Shootings*, Pac. Standard, Mar. 25, 2019, https://psmag.com/education/the-psychological-aftermath-of-surviving-school-shootings.

attending at least 212 schools have experienced a shooting on campus since the Columbine mass shooting in 1999."[57]  Further, 18.6% of 18- and 19-year-olds in the United States are enrolled in secondary education.[58] Extrapolating that percentage to Washington state, there are likely almost 50,000 18- and 19-year-olds in Washington state enrolled in secondary schools.  The Initiative's sensible age restrictions are designed to protect precisely these students, who are the same age as the victims of the Mukilteo house party shooting.

### C.   The Initiative's Restriction on the Purchase of Semiautomatic Assault Rifles Extends Only to an Exceptionally Lethal Subset of Long Guns.

#### 1.   *Semiautomatic Assault Rifles Are an Exceptionally Lethal Category of Firearms.*

Semiautomatic assault rifles are exceptionally lethal.[59]   (*See* Appellees' Br. at 38–39.)  These weapons fire bullets at a higher velocity

---

[57]   Initiative 1639, *supra* note 3, at § 1.

[58]   *Percentage of the Population 3 to 34 Years Old Enrolled in School, by Age Group: Selected Years, 1940 Through 2018*, National Center for Education Statistics, https://nces.ed.gov/programs/digest/d19/tables/dt19_103.20.asp?current=yes (last visited Mar. 3, 2021).

[59]   *See* Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents with and Without Semiautomatic Rifles in the United States*, 320 JAMA 1034, 1034 (2018).

than other types of firearms (such as semiautomatic handguns), which medical evidence shows results in more grievous injuries.[60]  Bullets from a 9mm handgun travel around 800 miles per hour, but bullets from semiautomatic rifles can travel three times faster and strike with twice the force.[61]

When travelling through the body, bullets fired from semiautomatic rifles cause "cavitation," whereby a swath of tissue several inches from the bullet's path ripples away from the bullet and then settles back.[62]  This is rather "like a cigarette boat traveling at

---

[60]  *See, e.g.*, Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, THE ATLANTIC, Feb. 22, 2018, https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victimsfrom-parkland-should-change-the-debate-on-guns/553937/ (explaining the difference between injuries inflicted by semiautomatic rifles versus handguns); *Kasler* v. *Lockyer*, 23 Cal. 4th 472, 484 (2000) (citing medical evidence on "special wounding characteristics" of the high-velocity ammunition like that used in semiautomatic rifles).

[61]  Scott Pelley, *What Makes the AR-15 Style Rifle the Weapon of Choice for Mass Shooters?*, CBS, June 23, 2019, https://www.cbsnews.com/news/ar-15-used-mass-shootings-weapon-of-choice-60-minutes-2019-06-23/.

[62]  Sher, *supra* note 60.

-27-

maximum speed through a tiny canal" of flesh.[63]  As University of Texas Health Science Center trauma surgeon Donald Jenkins explained, a direct hit from semiautomatic rifle fire is capable of turning three inches of leg bone "to dust" or rendering the liver "like a jello mold that's been dropped on the floor."[64]  In describing the difference between gun-shot wounds inflicted by a semiautomatic rifle and those inflicted by a 9mm handgun, Peter Rhee, a trauma surgeon at the University of Arizona, stated:  "One looks like a grenade went off in there," while "[t]he other looks like a bad knife cut."[65]

The devastating effects of semiautomatic rifle fire are multiplied by the facts that semiautomatic rifles are capable of firing more shots per minute than other commercially available rifles and that they cause less recoil in doing so.[66]  Trauma Surgeon Ernest Moore

---

[63]    *Id.*

[64]    Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED, June 17, 2016, https://www.wired.com/2016/06/ar-15-can-human-body/.

[65]    *Id.*

[66]    *See* David Bahde, *Bolt Rifle vs. Semi-Auto Rifle:  Which Option Is Better for Precision*, BALLISTIC MAG, May 25, 2018, https://www.ballistic mag.com/2018/05/25/bolt-rifle-vs-semi-auto-rifle/.

explained that when firing a low-recoil semiautomatic assault rifle: "The gun barely moves. You can sit there boom boom boom and reel off shots as fast as you can move your finger."[67]

In a study of "active shooter incidents," defined by the FBI as "situation[s] in which an individual is actively engaged in killing or attempting to kill people in a confined or populated area," "[a]ctive shooter incidents with vs without the presence of a semiautomatic rifle were associated with a higher incidence of persons . . . wounded or killed."[68] The following chart is illustrative:[69]

---

[67]    Zhang, *supra* note 64.

[68]    Jager, *supra* note 59, at 1034.

[69]    *Id.*



That semiautomatic rifles attacks result in more and worse injuries is unsurprising when one considers that "[s]emiautomatic rifles are designed for easy use, can accept large magazines, and fire high-velocity bullets."[70] By delaying, temporarily, an 18-to-20-year-old's ability to purchase a semiautomatic assault rifle, Washington's citizens made the sensible decision to limit one means of access to these tools of destruction for one small subset of its population.

---

[70] *Id.*

2. *Appellants' "Commonality" Argument Lacks Merit.*

Appellants argue that, despite semiautomatic assault rifles' lethality, the fact they are in common use renders any regulation of them *per se* unconstitutional. (*See* Appellants' Br. at 24.)  As explained by Appellees and elaborated upon below, this argument is unfounded. (*See* Appellees' Br. at 42–44.)

This argument is belied by the fact that the commonality of semiautomatic rifles is "difficult to calculate" (Appellants' Br. at 5), which is by design: gun-rights organizations like Appellants have for decades orchestrated efforts to bar the collection of reliable data about private gun sales and ownership in the United States.  *See, e.g.*, 18 U.S.C. § 926(a); Firearms Owners' Protection Act, Pub. L. No. 308, 99 Cong., 2 sess. (May 19, 1986) (prohibiting the creation of a centralized federal database containing records of "firearms, firearms owners, or firearms transactions or dispositions"); Compl. at 16, *Second Amendment Foundation* v. *Bureau of Alcohol, Tobacco & Firearms*, No. 3:21-cv-00116-B, Dkt. 1 (N.D. Tex. Jan. 15, 2021) (lawsuit by Appellant Second Amendment Foundation arguing that "new application and registration requirements" for firearm accessories violate both sellers' and

Case: 20-35827, 03/05/2021, ID: 12026640, DktEntry: 25, Page 43 of 52

purchasers' Second Amendment rights).  The inequitable result is that organizations like Appellants argue for a strict "common-use test" based on national ownership data (a test supported by only two justices in the case Appellants cite, *Caetano* v. *Massachusetts*, 136 S. Ct. 1027 (2016)), while simultaneously obstructing access to reliable national ownership data.

Even if the "common-use test" were a colorable legal theory (it is not),  Appellants' industry-supplied estimates are inadequate to prove that semiautomatic assault rifles are commonly owned, let alone owned by 18-to-20-year-olds in significant numbers.  (Appellees' Br. at 43–44.) First, the data does not differentiate between semiautomatic and non-semiautomatic rifles and thereby includes many rifles that may be legally owned by 18-to-20-year-olds in Washington.  (E.R. 56–61.)  Second, the data includes rifles manufactured for law enforcement (E.R. 56) and rifles imported for the military (E.R. 60, 62).  Thus, the data overestimates the number of semiautomatic rifles in circulation and provides no basis to infer the number of semiautomatic rifles in the hands of civilians rather than police forces or the military.

-32-

It is even less plausible to assume semiautomatic rifles are commonly possessed by 18-to-20-year-olds. Gun ownership is extremely concentrated with super-owners (those with 10 or more firearms) accounting for 39% of guns in America,[71] and rifle ownership is likely even more concentrated than handgun ownership because it is more common for owners to possess only one handgun (as their sole gun) than only one long gun.[72] It is unlikely many adolescents, who have just become eligible to own guns, would be among those who possess expensive arsenals, and much more likely they account for an exceedingly small fraction of the rifles reflected in Appellants' data (which is already an overestimate since it includes rifles manufactured for law enforcement).

### 3. Appellants' "Scope" Argument Is Flawed and Has Dangerous Implications.

Further, Appellants contend the Initiative's "scope" is too broad because the Initiative defines semiautomatic assault rifles in terms

---

[71] *See* Deborah Azrael et al., *The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey*, 3 RUSSELL SAGE FOUND. J. SOC. SCI. 38, 43 (2017).

[72] *Id.* at 44 (17% of owners report only owning one handgun as their sole firearm while 9% report only owning one long gun).

of their fundamental mechanics rather than by particular features. (Appellants' Br. at 2–3.) Specifically, the Initiative defines semiautomatic assault rifles as "any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."[73] This definition differs from that used in other states' assault weapon laws, which restrict guns based on the presence of specific features, "such as pistol grips and removable magazines." (Appellants' Br. at 6.)

The Initiative's approach is entirely reasonable, especially given that its goal is much narrower than other states' prohibitions on assault weapons. The Initiative does not ban any weapons, but rather restricts access to otherwise-available firearms capable of causing exceptionally serious harm if misused. Research on the enhanced lethality of semiautomatic rifles, as defined in the Initiative, amply justifies the Initiative's holistic, physics-based definition.[74] Moreover, gun manufacturers have a well-documented history of attempting to

---

[73]    Initiative 1639, *supra* note 3, at § 16.

[74]    Jager, *supra* note 59, at 1034.

circumvent regulations that prohibit specific features on semiautomatic rifles by engineering slight modifications so that a rifle complies with the regulation but remains similarly lethal in operation or can be easily modified by the retail purchaser to be as lethal. And gun-rights organizations, including Appellants, have brought repeated constitutional challenges to feature-based tests, arguing that the tests are arbitrary and conceding that semiautomatic rifles are equally lethal with or without the prohibited features. *See, e.g.*, Plaintiffs' Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction at 25, *Miller* v. *Becerra*, No. 19-cv-01537, Dkt. 22-1 (S.D. Cal. Dec. 6, 2019) ("[S]emiautomatic firearms with the regulated [features] are not more deadly in the hands of a criminal than a firearm without those characteristics. Indeed, many notable crimes have been committed by criminals with semiautomatic firearms that did not have the regulated [features]." (citation omitted)). Appellants cannot have it both ways; their apparent position that there are constitutional flaws with all possible definitions addressing the lethal subset of rifles that dramatically increase mass shooting casualties cannot be squared with *Heller*, which makes clear the Second Amendment is "not a right to

keep and carry any weapon whatsoever," *Heller*, 554 U.S. at 626, and that the Second Amendment "leaves [state legislatures] a variety of tools for combating" gun violence, *id.* at 636.

Washington sought to avoid this pitfall in the Initiative by defining semiautomatic assault rifles by the fundamental mechanical traits that enable and enhance their lethality. In doing so, the Initiative ensures that the limited restrictions it places on 18-to-20-year-olds' ability to purchase the most lethal type of rifles promote public safety (by, among other things, reducing fatalities from mass shootings and suicide attempts) rather than incentivizing gun manufacturers to design around the law.

## CONCLUSION

The Initiative's minimum-age restrictions reflect the judgment of nearly two million Washington voters[75] who voted to address the grave danger of gun violence.[76] Nothing in the Second Amendment

---

[75]  *Initiative Measure No. 1639*, November 6, 2018 General Election Results, Secretary of State (Nov. 27, 2018), *available at* https://results. vote.wa.gov/results/20181106/State-Measures-Initiative-Measure-No-1639-Initiative-Measure-No-1639-concerns-firearms_ByCounty.html.

[76]  Initiative 1639, *supra* note 3, at § 1.

-36-

requires this Court to strip the people of their power to protect their children and communities. Indeed, "[a] system which permits one judge to block with the stroke of a pen what [nearly two million] state residents voted to enact as law tests the integrity of our constitutional democracy." *Coal. for Econ. Equity* v. *Wilson*, 122 F.3d 692, 699 (9th Cir. 1997). As Judge Wilkinson, speaking for the Fourth Circuit, said: "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *United States* v. *Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

\*     \*     \*

The Initiative is a common-sense, calibrated, and data-driven solution to reduce certain forms of gun violence that does not substantially burden Second Amendment rights and carries an enormous potential to save lives.

Dated:      March 5, 2021          Respectfully submitted,

*Of Counsel for* Amicus Curiae          /s/ *Hannah Shearer*
*Giffords Law Center to Prevent*         Hannah Shearer
*Gun Violence:*                          GIFFORDS LAW CENTER TO
                                         PREVENT GUN VIOLENCE
J. Adam Skaggs                           268 Bush St. # 555
GIFFORDS LAW CENTER TO                    San Francisco, CA 94104
PREVENT GUN VIOLENCE                      (415) 433-2062
223 West 38th St. # 90                    hshearer@giffords.org
New York, NY 10018
(917) 680-3473
askaggs@giffords.org                     *Counsel for* Amici Curiae
                                         *Giffords Law Center to Prevent*
                                         *Gun Violence and Brady*
Robert A. Sacks
Leonid Traps
D. Wil Gould
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000
sacksr@sullcrom.com

Angela N. Ellis
Jackson Froliklong
Rachel H. VanGelder
Madeline B. Jenks
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Suite 700
Washington, DC 20006
(202) 956-7500
ellisan@sullcrom.com

*Of Counsel for* Amicus Curiae
*Brady*:

Jonathan Lowy
Christa Nicols
BRADY
840 First Street N.E., Suite 400
Washington, D.C.  20002
Tel:  (202) 289-7319
jlowy@brayunited.org
cnicols@bradyunited.org

## CERTIFICATE OF SERVICE

I certify that on March 5, 2021, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Hannah Shearer*
Hannah Shearer
*Counsel for* Amici Curiae
*Giffords Law Center to Prevent*
*Gun Violence and Brady*

March 5, 2021

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6,814 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Hannah Shearer*

Hannah Shearer
*Counsel for* Amici Curiae
*Giffords Law Center to Prevent Gun Violence and Brady*

March 5, 2021