No. 20-35827

# In the United States Court of Appeals For The Ninth Circuit

DANIEL MITCHELL, ET AL.,

*Plaintiffs-Appellants,*

– v. –

CHUCK ATKINS, ET AL.,

*Defendants-Appellees,*

– and –

SAFE SCHOOLS SAFE COMMUNITIES,

*Defendant-Intervenor-Appellee.*

Appeal from the United States District Court for the Western District of Washington
Civil Case No. 3:19-cv-05106 (Honorable John C. Coughenour)

## BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF APPELLEES AND AFFIRMANCE

Janet Carter
William J. Taylor, Jr.
Lisa M. Ebersole
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, New York 10017
(646) 324-8215

David A. Perez
Mica D. Klein
Thomas J. Tobin
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-8000

March 5, 2021

*Counsel for Amicus Curiae Everytown for Gun Safety*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

STATEMENT OF INTEREST ................................................................. 1

STATEMENT OF ADDENDUM ................................................................ 2

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 3

ARGUMENT ............................................................................. 5

    I.     THE AGE PROVISION IS CONSTITUTIONAL ............................ 5

        A.    Restrictions on the Transfer of Firearms to Persons Under 21 Comport with Historical Understandings of the Second Amendment ................................................. 7

             1.    The most relevant time period for historical analysis purposes begins with the Fourteenth Amendment's ratification ................................. 7

             2.    Individuals under 21 were historically considered minors ........................................................ 9

             3.    Laws restricting the sale or transfer of firearms to minors have existed for more than 150 years ............... 10

        B.    Appellants' Historical Arguments Are Mistaken ................... 13

             1.    Appellants' militia-based argument is flawed and irrelevant ..................................................... 14

             2.    Appellants' attempt to distinguish the robust historical record is flawed ................................... 16

    II.    THE NONRESIDENT SALES PROVISION IS CONSTITUTIONAL ....................................................... 18

        A.    Inconsistencies in the Record-Reporting Processes of Several States Demonstrate the Importance of Washington's Enhanced Background Check System ............. 21

             1.    Criminal history records ............................... 23

             2.    Protective orders ......................................... 25

             3.    Mental health records .................................. 26

# TABLE OF CONTENTS

**Page(s)**

B.  The Nearby States of Oregon, Idaho, and Montana Share Many of the Same Record Reporting Flaws as Other States ........................................................................................... 27

CONCLUSION ........................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*,
   910 F.3d 106 (3d Cir. 2018) ..................................................................2

*Coleman v. State*,
   32 Ala. 581 (1858) ..............................................................................12

*Culp v. Raoul*,
   921 F.3d 646 (7th Cir. 2019). ............................................................20

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)......................................................................passim

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ...............................................................8

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ...............................................................8

*Fyock v. City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ...........................................................6, 9

*Gould v. Lipson*,
   141 S. Ct. 108 (June 15, 2020) .............................................................8

*Gould v. Morgan*,
   907 F.3d 659 (1st Cir. 2018)................................................................8

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011).........................................................18

*Horsley v. Trame*,
   808 F.3d 1126 (7th Cir. 2015) ..................................................9, 10, 13

*In re Jordan G.*,
   33 N.E.3d 162 (Ill. 2015)...................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

*Jones v. Becerra*,
  --- F. Supp. 3d ----, No. 19-cv-1226, 2020 WL 6449198 (S.D. Cal.
  Nov. 3, 2020) ...................................................................................... 13

*Kachalsky v. County of Westchester*,
  701 F.3d 81 (2d Cir. 2012) ................................................................... 17

*Lindenau v. Alexander*,
  663 F.2d 68 (10th Cir. 1981) ................................................................ 15

*Long v. SEPTA*,
  903 F.3d 312 (3d Cir. 2018) ................................................................. 17

*Mance v. Sessions*,
  896 F.3d 699 (5th Cir. 2018) ................................................................ 20

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,
  Firearms, & Explosives*,
  700 F.3d 185 (5th Cir. 2012) ............................................... 7, 9, 10, 14

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
  719 F.3d 338 (5th Cir. 2013) ................................................................ 13

*Peruta v. County of San Diego*,
  824 F.3d 919 (9th Cir. 2016) (en banc) ........................................... 7, 8

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) ........................................................................ 19, 21

*Powell v. Tompkins*,
  926 F. Supp. 2d 367 (D. Mass. 2013) .................................................. 13

*Powers v. Ohio*,
  499 U.S. 400 (1991) ............................................................................... 15

*Presser v. Illinois*,
  116 U.S. 252 (1886) ............................................................................... 15

*Rehaif v. United States*,
  139 S. Ct. 2191 n.7 (2019) ..................................................................... 2

# TABLE OF AUTHORITIES

**Page(s)**

*Rupp v. Becerra*,
401 F. Supp. 3d 978 (C.D. Cal. 2019) ............................................................... 2

*Silvester v. Harris*,
843 F.3d 816 (9th Cir. 2016) ................................................................... 6

*State in Interest of J.M.*,
144 So. 3d 853 (La. 2014) ................................................................... 13

*State v. Allen*,
94 Ind. 441 (1884) ................................................................... 12

*State v. Callicutt*,
69 Tenn. 714 (1878)................................................................... 11, 12

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013) ................................................................... 6

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019)................................................................... 17

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ................................................................... 8

*United States v. Rene E.*,
583 F.3d 8 (1st Cir. 2009)................................................................... 7

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) (en banc) ................................................................... 6

*United States v. Torres*,
911 F.3d 1253 (9th Cir. 2019) ................................................................... 6

*Whitt v. Whitt*,
490 S.W.2d 159 (Tenn. 1973) ................................................................... 11

**FEDERAL STATUTES**

18 U.S.C. § 922(g)(4)................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

Militia Act of 1792 ................................................................14

Consolidated Appropriations Act, 2018, Fix NICS Act of 2018, Pub.
L. No. 115-141, §§ 601–605, 132 Stat 1132–37 ................................28

**STATE STATUTES**

1895 Neb. Laws 237-38, Art. XXVI, §§ 2, 5 ........................................18

RCW § 9.41.010(26) ................................................................3

RCW § 9.41.040(2)(a)(iv) ...........................................................26

RCW § 9.41.047 ...................................................................26

RCW § 9.41.240 ....................................................................3

RCW § 71.05.182 ..................................................................26

**RULES**

Ninth Circuit R. 28-2.7 ............................................................2

Fed. R. App. P. 28(f) .............................................................2

**REGULATIONS**

28 C.F.R. § 20.3(m) ...............................................................24

**OTHER AUTHORITIES**

Active Records in the NICS Indices by State ........................................27

Br. in Opp. to Pet. for a Writ of Cert., *McGinnis v. United States*,
No. 20-6046 (Jan. 15, 2021) .................................................17

Bureau of Justice Statistics, *Survey of State Criminal History
Information Systems* 2018 (Nov. 2020) ..........................24, 25, 26, 28

## TABLE OF AUTHORITIES

**Page(s)**

David Hemenway & Matthew Miller, *Association of rates of household handgun ownership, lifetime major depression, and serious suicidal thoughts with rates of suicide across US census regions*, 8 Injury Prevention 313 (2002) ........................................................27

Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment* (2018) .............................................................17

Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender, Soc. Pol'y & L. 613 (2007) .............................................................10

Nat'l Consortium for Justice Info. & and Stat. (SEARCH), *Improving the National Instant Background Screening System for Firearm Purchases* (2013) ..............................................................23

SEARCH, State Progress in Record Reporting for Firearm-Related Background Checks: Misdemeanor Crimes of Domestic Violence (2016) ......................................................................................24

SEARCH, State Progress in Record Reporting for Firearm-Related Background Checks: Protection Order Submissions (2016) .............................26

Thomas M. Cooley, *A Treatise on the Constitutional Limitations* (5th ed. 1883) ......................................................................................12

Wash. State Office of the Att'y Gen., *Initiative 1639: Frequently Asked Questions* ..................................................................4

ix

## STATEMENT OF INTEREST

*Amicus curiae* Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly six million supporters across the country, including over 200,000 in Washington. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a 20-year-old gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut, using a Bushmaster XM-15 semiautomatic assault rifle. The mayors of nine cities in Washington are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws.

Everytown's mission includes defending common-sense gun safety laws by filing *amicus* briefs that provide historical context and doctrinal analysis that might otherwise be overlooked. Everytown has filed such briefs in numerous Second Amendment cases, including in the district court below, SER-2–28, and in other challenges to minimum-age and other restrictions on the purchase and sale of firearms and ammunition. *See, e.g.*, *Jones v. Becerra*, No. 20-56174 (9th Cir.); *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 19-2250 (4th Cir.); *Rhode v. Becerra*, No. 20-55437 (9th Cir.). Several courts have also cited and

expressly relied on Everytown's amicus briefs in deciding Second Amendment and other gun cases. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991–92, 992 n.11 (C.D. Cal. 2019), *appeal docketed*, No. 19-56004 (9th Cir. Aug. 28, 2019); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210, n.4, 2211 n.7 (2019) (Alito, J., dissenting).[1]

## STATEMENT OF ADDENDUM

Pursuant to Fed. R. App. P. 28(f) and Ninth Circuit R. 28-2.7, an addendum containing pertinent statutes, constitutional provisions, treatises, and other authorities has been filed concurrently with this brief.

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is about the right of the people of Washington to be free from gun violence and their power to pass laws to protect that freedom. By adopting Initiative Measure No. 1639 ("I-1639"), Washington voters chose to expand background checks, prohibit those under age 21 from purchasing a semiautomatic assault rifle (the "Age Provision"),[2] and bar in-person sales of such rifles to out-of-state purchasers (the "Nonresident Sales Provision"). Plaintiffs-Appellants ("Appellants") ask this Court to override these choices and reverse the district court's well-reasoned decision granting summary judgment by declaring the Age and Nonresident Sales Provisions unconstitutional.

Appellants challenge the Age Provision under the Second Amendment. They assert that I-1639 is "the most restrictive rifle ban ever imposed in the nation." Appellants' Br. 26. This is simply not so: I-1639 is comparable to numerous minimum-age laws on the purchase and sale of firearms that federal and state courts have upheld throughout the country. Regulating access to firearms for those under

---

[2] "Semiautomatic assault rifle" is defined to include "any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" and to exclude "antique firearms" and firearms that have been made permanently inoperable. RCW § 9.41.010(26). Washington law, like federal law, also prohibits the purchase of pistols by those under the age of 21, RCW § 9.41.240, but that provision is not challenged in this litigation.

age 21 has a clear historical pedigree extending back over a hundred and fifty years, from at least the mid-nineteenth century to modern times. Considering that long history, the district court correctly held that "[t]he Age Provision does not burden Second Amendment rights." ER-16. Appellants' effort to dismiss historical laws that imposed age restrictions on different kinds of firearms than those at issue fundamentally misunderstands the role of history in Second Amendment analysis.

Appellants also challenge the Nonresident Sales Provision under the Dormant Commerce Clause. Contrary to their contention, this restriction is not a "blanket ban on interstate commerce." Appellants' Br. 32. As Washington's Attorney General has explained, "nothing in the Initiative prohibits [a federal firearms licensee ("FFL") in Washington] from transferring a semiautomatic assault rifle to an FFL in a different state consistent with federal law," "a practice long utilized for interstate sales of pistols and other types of firearms."[3] And this provision does not otherwise violate the Constitution, as it neither discriminates against out-of-state commercial interests nor excessively burdens interstate commerce relative to Washington's substantial interest in promoting public safety and reducing gun violence through enhanced background checks. Accordingly, the district court correctly held that the Nonresident Sales Provision "is nondiscriminatory" and easily satisfies the

---

[3] Washington State Office of the Att'y Gen., *Initiative 1639: Frequently Asked Questions*, https://www.atg.wa.gov/initiative-1639 (last visited Mar. 2, 2021).

applicable balancing test because it "advances a bona fide state interest in public safety that far outweighs any perceived burden on interstate commerce." ER-23-25.

Everytown files this amicus brief in support of Defendants-Appellees and Intervenor (collectively, for brevity, the "State") and of affirmance of the district court's sound opinion, to provide additional background for the Court on two issues. *First*, restrictions on the transfer of firearms to persons under age 21 are consistent with historical understandings of the Second Amendment—and thus regulate conduct outside its scope. *Second*, the government's interest in enhanced background checks, which it cannot conduct adequately on nonresidents of Washington, is substantial—indeed, compelling—for purposes of the Dormant Commerce Clause analysis.

## **ARGUMENT**

## I. **THE AGE PROVISION IS CONSTITUTIONAL**

The Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment protects an individual right to bear arms. It emphasized, however, that this right "is not unlimited," and that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or … laws imposing conditions and qualifications on the commercial sale of arms," which it identified as "presumptively lawful regulatory measures." *Id.* at 626–27, 627 n.26. In the years since *Heller*,

5

federal courts have confirmed that "exclusions" from the Second Amendment right "need not mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc); *see also Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).

Under Ninth Circuit precedent, courts apply a two-step framework to assess whether a law violates the Second Amendment. *First*, they ask "whether the challenged law burdens conduct protected by the Second Amendment," *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013), including by examining "whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood," *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). If the law does not impinge on the right, it is constitutional, and the inquiry ends. *Second*, if the law does impinge on the right, courts apply a "means-end" test, to evaluate whether the law satisfies the appropriate level of scrutiny. *See Chovan*, 735 F.3d at 1136–38; *see also* ER-17–19 (explaining that intermediate scrutiny applies and that I-1639 survives such scrutiny, because the law "reasonably fits" the important government interest it serves).

The Age Provision does not implicate the Second Amendment as traditionally understood. Restricting the sale or transfer of firearms to individuals under age 21 is a "longstanding" form of firearms regulation that "historically has fallen outside the scope of the Second Amendment." *United States v. Torres*, 911 F.3d 1253, 1258 (9th

Cir. 2019). The district court thus correctly concluded that Appellants' claim fails on the merits at step one of the constitutional analysis. *See* ER-16. Therefore, this Court need not reach the second step of its inquiry. *See* Appellees' Br. at 9; *see also, e.g.*, *Peruta v. County of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) (en banc) (holding, based on historical analysis alone, that law prohibiting persons from carrying loaded or unloaded concealed weapons, subject to a license-based exception, did not violate the Second Amendment); *United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) ("We have evaluated evidence that the founding generation would have regarded such laws as consistent with the right to keep and bear arms. Therefore, we have concluded that this law, with its narrow scope and its exceptions, does not offend the Second Amendment.") *cf. Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 204 (5th Cir. 2012) ("*NRA*") ("Although we are inclined to uphold the challenged federal laws at step one of our analytical framework, in an abundance of caution, we proceed to step two.").[4]

---

[4] In the alternative, for the reasons set out in the State's brief, the Age Provision is constitutional under the applicable (intermediate) standard of scrutiny. *See* Appellees' Br. at 28–39.

A.    **Restrictions on the Transfer of Firearms to Persons Under 21 Comport with Historical Understandings of the Second Amendment.**

1.    **The most relevant time period for historical analysis purposes begins with the Fourteenth Amendment's ratification.**

Because Appellants are challenging a state law, the most relevant time period for purposes of historical analysis begins around 1868, when the Fourteenth Amendment was ratified and made the Second Amendment fully applicable to the States. *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."), *cert. denied*, 141 S. Ct. 108 (2020); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *cf. Peruta*, 824 F.3d at 933 (evaluating historical materials bearing on adoption of both Second and Fourteenth Amendments in considering Second Amendment challenge to interpretation of the statutory good cause requirement under California law).

The historical inquiry continues after 1868. *Heller* instructs that "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605 (second emphasis added); *see also, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015)

8

(noting that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" despite fact that "states didn't begin to regulate private use of machine guns until 1927" and that "regulating machine guns at the federal level" did not begin until 1934); *NRA*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."). Indeed, the Ninth Circuit has found that regulations as recent as the "early twentieth century … might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record." *Fyock*, 779 F.3d at 997.

A survey of laws from before 1868 through modern day reveals a longstanding history of state regulation of the sale and transfer of firearms to 18-to-20-year-olds. These laws establish a clear historical understanding that the Constitution allows a state government to prevent people under age 21 from possessing firearms.

### 2. Individuals under 21 were historically considered minors.

For most of U.S. history, including when the Second and Fourteenth Amendments were ratified, persons younger than 21 were considered minors. At the time of founding, the age of majority was 21, and the term "minor" applied to persons under 21. *See NRA*, 700 F. 3d at 201; *Horsley v. Trame*, 808 F.3d 1126, 1130 (7th Cir. 2015) ("During the founding era, persons under 21 were considered minors or 'infants.'"); ER-13 (quoting Blackstone's *Commentaries* and *Black's Law*

9

*Dictionary*, among others); *see also* Appellees' Br. at 19. And until 1969—more than a century after the Fourteenth Amendment's ratification—the age of majority for unmarried men was 21 in every state. *See* Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender, Soc. Pol'y & L. 613, 681–86 (2007); *NRA*, 700 F.3d at 201 ("[I]t was not until the 1970s that States enacted legislation to lower the age of majority to 18."); *Horsley*, 808 F.3d at 1130 ("The age of majority was 21 until the 1970s."); ER-13–14. Thus, historically, laws restricting the rights of minors applied to persons under the age of 21.

### 3. Laws restricting the sale or transfer of firearms to minors have existed for more than 150 years.

Statutes restricting individuals under the age of 21 from purchasing or acquiring firearms have existed for over 150 years. Nineteenth-century state laws restricted the purchase of firearms by, and transfer of firearms to, minors—including laws for the states of Alabama, Delaware, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, North Carolina, Tennessee, Texas, West Virginia, Wisconsin, Wyoming, and the District of Columbia. *See, e.g.*, ADD0019–79, Chart compiling the earliest known nineteenth-century state laws restricting the purchase of firearms by, and transfer of firearms to, minors; *see also NRA*, 700 F.3d at 202 n.14. At the time these restrictions on minors were enacted, constitutional provisions analogous to the Second Amendment existed in twelve of these states, showing that legislators and citizens at that time viewed

10

them as consistent with the individual right to keep and bear arms. *See* ADD0080–136, Chart compiling nineteenth century state analogues to the Second Amendment.

Not only did the people's elected representatives demonstrate, by enacting these laws, that they considered them to be within the government's constitutional power, but judges and leading scholars of the era also considered them to be constitutional. For example, in 1878, the Supreme Court of Tennessee rejected a challenge to a law prohibiting the sale of pistols to minors (individuals under age 21)[5] and held that "we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *State v. Callicutt*, 69 Tenn. 714, 716–17 (1878). The court rejected the defendant's argument that "every citizen who is subject to military duty has the right 'to keep and bear arms,' and that this right necessarily implies the right to buy or otherwise acquire, and the right in others to give, sell, or loan to him." *Id.* at 716. The court explained that the challenged laws were "passed with a view to 'prevent crime'" and do not "affect" or "abridge" the

---

[5] *See Whitt v. Whitt*, 490 S.W.2d 159, 160 (Tenn. 1973) (noting that Chapter 162 of the Public Acts of 1971 reduced the age of majority from 21 to 18 years of age).

constitutional right of the "'citizens of the State to keep and bear arms for their common defense.'" *Id.*[6]

The work of a leading scholar supports the same conclusion. Thomas Cooley, the "most famous" nineteenth century constitutional law scholar and author of "a massively popular" constitutional law treatise, *Heller*, 554 U.S. at 616, acknowledged that "the State may prohibit the sale of arms to minors." ADD0018, Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 740 n.4 (5th ed. 1883). In the same volume, Cooley noted that the "federal and State constitutions … provide that the right of the people to bear arms shall not be infringed." ADD0017, *Id.* at 429. Nothing indicates that he perceived any conflict between these principles.

This robust historical record supports the district court's conclusion that the Age Provision is part of a longstanding regulatory tradition and, therefore, constitutional. *See* ER-14–16 (endorsing conclusions of other federal courts that age-based firearms restrictions are longstanding and "fall outside the scope of the Second Amendment"). In so holding, the district court joined a clear consensus among state

---

[6] There are numerous examples of prosecutions under similar laws. *See, e.g.*, *Coleman v. State*, 32 Ala. 581, 582 (1858) (upholding conviction under law forbidding "sell[ing], or giv[ing], or lend[ing]" a pistol "to any male minor"); *State v. Allen*, 94 Ind. 441, 442 (1884) (defendant was charged with "'unlawfully barter[ing] and trad[ing] to … a minor under the age of twenty-one years, a certain deadly and dangerous weapon, to wit: a pistol'").

and federal courts that age-based restrictions on firearm purchases, including restrictions on those under age 21, fall outside the Second Amendment's protection.[7]

### B. Appellants' Historical Arguments Are Mistaken.

Despite purporting to base their case on history, Appellants barely engage with this robust record. Instead, they assert that the existence of colonial-era militia laws, which applied to certain males under 21, entails a right for people under 21 to acquire firearms. *See* Appellants' Br. 17–18. They then claim that historical laws limited the ability of individuals under 21 to acquire only handguns and have no

---

[7] *See, e.g.*, *Jones v. Becerra*, --- F. Supp. 3d ----, No. 19-cv-1226, 2020 WL 6449198, at *6 (S.D. Cal. Nov. 3, 2020) (denying preliminary injunction in challenge to California law restricting individuals under 21 from acquiring firearms because such age-based restrictions "are longstanding, do not burden the Second Amendment, and are therefore presumptively Constitutional"), *appeal docketed*, No. 20-56174 (9th Cir. Nov. 9, 2020); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387 (D. Mass. 2013) (holding that Massachusetts's limiting public carry licenses to those 21 and older "comports with the Second Amendment and imposes no burden on the rights of eighteen- to twenty-year-olds to keep and bear arms"), *aff'd on other grounds*, 783 F.3d 332 (1st Cir. 2015); *State in Interest of J.M.*, 144 So. 3d 853, 862 (La. 2014) (upholding prohibition on handgun possession by individuals under age 17 in light of 1890 law that criminalized selling pistols to individuals under age 21); *In re Jordan G.*, 33 N.E.3d 162, 168 (Ill. 2015) (holding that age-based restrictions on the right to keep and bear arms are historically rooted and apply "equally to those persons under 21 years of age"); *see also Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (upholding state law requirement that applicants for concealed-carry permits be at least 21, noting that "the conduct burdened by the Texas scheme likely 'falls outside the Second Amendment's protection'"); *cf. Horsley*, 808 F.3d at 1134 (upholding under intermediate scrutiny a state law restricting the ability of persons under the age of 21 from acquiring a firearm license without parental consent or a heightened showing of responsibility, challenged by individual seeking a shotgun).

bearing on the constitutionality of restricting their access to other kinds of firearms. *See id.* at 19–21. Neither argument has merit.

### 1. Appellants' militia-based argument is flawed and irrelevant.

Appellants' militia-based argument rests on a series of unwarranted inferences from colonial and founding-era militia laws. They observe that several state laws and the Militia Act of 1792 required males in an age range encompassing 18-to-20-year-olds to enroll in the militia and extrapolate that anyone aged 18 to 20 necessarily had "rights protected by the Second Amendment," including a right to purchase a long gun. *See* Appellants' Br. 18. As the Fifth Circuit has held, *see NRA*, 700 F.3d at 204 n.17, this argument fails on multiple grounds.

*First*, Appellants' argument is undercut by *Heller*, which decoupled the right to bear arms from the duty to serve in the militia. *See Heller*, 554 U.S. at 589–94. As the Fifth Circuit observed in *NRA*, *Heller* held that "the right to arms is not co-extensive with the duty to serve in the militia." 700 F.3d at 204 n.17.

*Second*, Appellants' argument ignores the fact that the lower age for militia service differed between states and frequently changed over time. In the Fifth Circuit's words, these differing ages and fluctuations "undermine[] Appellants' militia-based claim that the right to purchase arms must fully vest precisely at age 18—not earlier or later." *Id*. Indeed, it is unclear whether even Appellants would accept the imprudent consequences of their argument—that those as young as 16

14

should have unrestricted Second Amendment rights. *See* Appellants' Br. 17 (relying on militia law that encompassed 16-year-olds); *NRA*, 700 F.3d at 204 n.17 (argument "proves too much" by implying rights for 16-year-olds); *see also* Appellees' Br. at 26 (argument would improperly exclude women, people of color, and others).

*Third*, historical sources undermine the notion that 18-to-20-year-olds in the militia were required to supply their own firearms, and hence must have had a right to purchase them. In the debate regarding the Militia Act, Representative Jeremiah Wadsworth of Connecticut noted that "as to minors, their parents or guardians would prefer furnishing them with arms themselves." ADD0001–02, 2 *Annals of Cong., The Debates and Proceedings in the Cong. Of the U.S.* 1856 (1834). Several states even *required* the parents of militia members who were minors to provide firearms to their children. *See, e.g.*, ADD0137–76, Chart compiling examples of state laws requiring parents to furnish or provide arms to minors in the militia. And some militia laws required states to equip certain militia members with public arms (*i.e.*, arms that were the property of the state or town); ADD0177–203, Chart compiling examples of state laws providing for distribution of public arms to militia members. Thus, even laws that did mandate militia enrollment by minors frequently provided other means by which they would receive arms, negating the purported implication that minors had *a right* to arm themselves, much less to acquire firearms from a dealer.

15

*Fourth*, Appellants' argument fails to recognize that a government mandate to engage in certain conduct does not create an individual right to do so.[8] The Supreme Court made that clear in the militia context almost 150 years ago. *See Presser v. Illinois*, 116 U.S. 252, 263 (1886) (holding that participation in a non-government-organized militia "cannot be claimed as a right independent of law"). And it reaffirmed that principle in *Heller*, explaining that "weapons … most useful in military service," which are not typically possessed by law-abiding citizens for lawful purposes, fall outside of the Second Amendment's scope, *see* 554 U.S. at 627–28, even though the government may mandate their use in the military or militia.

### 2. Appellants' attempt to distinguish the robust historical record is flawed.

Appellants next argue that "there are no historical examples of blanket bans on young adults purchasing long guns in common use," and thus no historical precedent for Washington's law. Appellants' Br. 16; *see also id.* at 12-13. This claim is inaccurate. *See, e.g.*, 1895 Neb. Laws 237-38, Art. XXVI, §§ 2, 5 ("No person shall sell, loan, or furnish, to any minor, any gun, fowling-piece, or other fire-arm,

---

[8] For example, even though citizens have a duty to serve on a jury, "[a]n individual juror does not have a right to sit on any particular petit jury," *Powers v. Ohio*, 499 U.S. 400, 409 (1991); and even though there is a duty to serve in the military if drafted, "[i]t is well established that there is no right to enlist in this country's armed services," *Lindenau v. Alexander*, 663 F.2d 68, 72 (10th Cir. 1981).

within the limits of the city, under penalty of a fine of fifty dollars for each offense."). But more fundamentally, this claim misunderstands the role of history in Second Amendment analysis.

A regulatory tradition does not have to match precisely the modern, challenged law for that law to fall outside the Second Amendment's protection. In a case challenging a federal law (and thus implicating only the Second Amendment, not its incorporation), the Solicitor General recently explained that the Supreme Court "has never held … that modern firearms regulations can be constitutional only if they mirror colonial regulations. … It is enough if the modern law is 'fairly supported' by tradition." Br. in Opp. to Pet. for a Writ of Cert. at 9–10, *McGinnis v. United States*, No. 20-6046 (Jan. 15, 2021) (citations omitted), *cert. denied* (Feb. 22, 2021). Similarly, in *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019), the D.C. Circuit rejected the plaintiff's argument that the precise prohibition challenged lacked a historical legacy because it had existed only since 1980. Instead, the court explained, "[t]he relevant inquiry is whether a particular *type* of regulation has been a 'longstanding' exception to the right to bear arms." *Id.* More generally, courts use analogy to identify a historical basis for a modern gun law. *See, e.g.*, *Kachalsky v. County of Westchester*, 701 F.3d 81, 91 (2d Cir. 2012) (upholding law regulating public carry of firearms, which has "a number of close and longstanding cousins"); Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment* 136 (2018)

("[L]ower courts have used analogy to extend *Heller*'s exclusions beyond those specifically identified in the case."); *cf. Long v. SEPTA*, 903 F.3d 312, 321, 324 (3d Cir. 2018) (in Article III standing context, where Supreme Court test requires that an intangible harm have "'a close relationship' to one that historically has provided a basis for a lawsuit," emphasizing that "[a] perfect common-law analog is not required" (citation omitted)).[9]

In this case, the relevant question is thus simply whether there is a historical tradition of restricting the ability of individuals under 21 to purchase and acquire firearms. The answer, indisputably, is yes. Appellants acknowledge a history of such regulation with respect to handguns. *See* Appellants' Br. 20. Given that states may prohibit those under age 21 from acquiring handguns—the "quintessential self-defense" weapon that *Heller* placed at the heart of the Second Amendment right, *see* 554 U.S. at 629, 634–35—it necessarily follows that states may prohibit those same individuals from acquiring other weapons, such as semiautomatic assault rifles, that are less connected to the Second Amendment's core protection. Accordingly, the

---

[9] Even the small number of dissenting jurists who would prefer to interpret the Second Amendment to bar any firearm regulation not grounded in "text, history, and tradition"—a view contrary to the two-part Second Amendment framework that is the law of this Circuit and every other Circuit that has weighed in—acknowledge that "the proper interpretive approach" to the historical inquiry involves "reason[ing] *by analogy* from history and tradition." *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) (emphasis added).

district court was correct that Appellants' effort to dismiss this nation's robust history of age-based firearms restrictions rests on "a distinction without a difference." ER-15–16.

## II. THE NONRESIDENT SALES PROVISION IS CONSTITUTIONAL

Appellants also challenge I-1639 under the Dormant Commerce Clause. I-1639's Nonresidential Sales Provision excludes semiautomatic assault rifles from the categories of firearms that Washington dealers may sell directly, in person, to non-state purchasers—placing them in the same category as handguns. As the State explains, this exclusion does not violate the Dormant Commerce Clause because it does not discriminate against interstate commerce and, even if it indirectly burdens interstate commerce, it easily passes muster under the balancing test set out in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *See* Appellees' Br. 56–65. This section confirms the State's argument under the balancing test by detailing Washington's compelling reasons for requiring enhanced background checks, which the Nonresidential Sales Provision acts to protect.

Under *Pike*, a non-discriminatory measure that indirectly burdens interstate commerce is constitutional unless the burden is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. As the State explains, the "local benefits" of limiting in-person sales of semiautomatic assault rifles to Washington residents arise from its substantial interest in ensuring the proper processing of

enhanced background checks, which cannot adequately be run on nonresidents.

Compelling public-policy considerations support that interest. The federal background check system performs an indispensable function in reducing the chances that individuals not permitted to possess firearms will nevertheless be able to acquire them.[10] Nevertheless, the system is not perfect: "states voluntarily provide records for use in the databases accessed by NICS. … [F]or various reasons, some records are not timely provided, or are not provided at all." *Mance v. Sessions*, 896 F.3d 699, 707 (5th Cir. 2018), *cert. denied*, 141 S. Ct. 123 (2020); *see also Culp v. Raoul*, 921 F.3d 646, 648 (7th Cir. 2019) (rejecting constitutional challenges to Illinois law limiting concealed carry permits to residents of Illinois and states with substantially-similar standards, in light of "Illinois's inability to obtain complete and timely information about nonresidents—for example, about a recent arrest for domestic violence or a voluntary commitment for inpatient mental health treatment[—given that] Illinois cannot compel this information from other states, nor at this time do national databases otherwise contain the information"),

---

[10] Queries to the National Instant Criminal Background Check System ("NICS") yield information from three databases, containing (1) information about fugitives from justice, terrorists, and those subject to domestic violence protection orders; (2) state and national fingerprint records of people charged with felonies or misdemeanors; and (3) other prohibitor information not contained in (1) or (2). *See* SER-706, Candee Decl. ¶ 7. In addition, ICE databases may be queried through NICS for records on non-U.S. citizens attempting to receive firearms. *See id.*

*cert. denied*, 141 S. Ct. 109 (2020).

Washington's enhanced background checks are critical to supplement the federal system for those firearms that Washington voters have determined merit additional safeguards—*i.e.*, handguns and semiautomatic assault rifles. It therefore has a compelling interest in permitting in-person sales of semiautomatic assault rifles only to those for whom an enhanced background check is feasible—*i.e.*, Washington residents. That policy has substantial "local benefits" and any purported burden on interstate commerce does not outweigh—let alone "clearly exce[ed]"—those benefits.[11]

### A. Inconsistencies in the Record-Reporting Processes of Several States Demonstrate the Importance of Washington's Enhanced Background Check System.

As the State explains, I-1639's background check provision provides for an "enhanced" background check for semiautomatic assault rifles, the same process Washington currently has in place for handguns. Local law enforcement performs these checks, which involve querying not only NICS but also multiple additional databases and agency sources. *See* Appellees' Br. 7.

Kateri Candee, Washington State Patrol's Assistant Division Administrator

---

[11] *See Pike*, 397 U.S. at 142. Although strict scrutiny is not the applicable standard, these compelling state interests would also guide the analysis even if it did apply. For the reasons set out in the State's brief, the Nonresident Sales Provision would satisfy strict scrutiny. *See* Appellees' Br. 41–42.

for ACCESS, the system that enables state agencies to query law enforcement data, explained in a declaration that Washington's enhanced background checks are "far more thorough than a NICS check alon[e]." SER-709–10, Candee Decl. ¶ 18. As Candee explained, "participation by the states in NICS is voluntary. This means that the type and volume of records available in NICS databases varies widely from state to state." *Id.*, SER-706, ¶ 8. In addition, Washington's enhanced checks can identify several categories of information not available via NICS. *See id.*, SER-708–10, ¶¶ 15–17. Furthermore, "because the bulk of state and local databases queried in an enhanced background check contain exclusively Washington records, conducting an effective enhanced background check on a resident of a state other than Washington would be extremely difficult, if not impossible." *Id.*, SER-709–10, ¶ 18. Such a check would "require contacting … jurisdictions outside the state—which may or may not be cooperative and responsive to the agency's request." *Id.*

Brandi Belcher, a Records Specialist at the Spokane Police Department, likewise explains that "it is virtually impossible to run a thorough and comprehensive background check on a non-Washington resident. The kind of information I can uncover in a local check is often not available to me for non-residents." SER-752–53, Belcher Decl. ¶ 8. For example, in Belcher's experience, some disqualifying mental-health records in Washington's state records do not appear in NICS-accessible databases, and NICS searches would likewise not reveal

22

"a non-Washington conviction for which [an applicant was] never finger printed." *Id.*, SER-752–53, ¶¶ 6–8. Belcher illustrates these issues with a tragic example of an individual who, despite a mental health disqualifier known to Hawaii (but not submitted to NICS or shared with Washington), received a Washington concealed pistol license, obtained a firearm, and used it to kill someone. *Id.*, SER-753–54, ¶ 9.

These observations are consistent with information collected from federal and state entities that examine and report on the NICS system, which likewise show that Washington has a robust interest in permitting sales of semiautomatic assault rifles only to those for whom an enhanced background check is feasible—namely, Washington residents.

### 1. Criminal history records.

Significant state-level disparities exist in reporting criminal records to the national system. A 2013 report (cited in and attached to Candee's declaration) found that, nationwide, states fail to make available to NICS the records of at least twenty-five percent of felony convictions, totaling more than seven million missing records. Nat'l Consortium for Justice Info. & and Stat. (SEARCH), *Improving the National Instant Background Screening System for Firearm Purchases* 19 (2013), http://bit.ly/2oat4Ha ("SEARCH Report"); *see also* SER-706, Candee Decl. ¶ 8 & SER713–33, Exh. B. The most recently-available statistics show that the criminal records of over 15.8 million individuals contained in state repositories may not be

available through the Interstate Index. Bureau of Justice Statistics, *Survey of State Criminal History Information Systems* 2018 ("BJS Report"), Tables 1, 19 (Nov. 2020), https://www.ojp.gov/pdffiles1/bjs/grants/255651.pdf.[12] Relatedly, twenty-four states have significant backlogs of records—as high as 700,000 for a single state—that have not been entered into the state databases that populate the Interstate Index. BJS Report at Table 12.[13]

Moreover, certain states make criminal records available through the Interstate Index only after significant delays. This flaw has two elements: (1) delays in submitting felony convictions to the state repository and (2) delays in entering those submissions into a state database, which feeds into the national database.[14] In

---

[12] Most states hold criminal records in their state criminal record databases, which are also made available through an entry in the Interstate Identification Index ("Interstate Index"), the national database for records of arrests, indictments, and dispositions, (which in turn is one of the three databases that compose NICS). *See* SEARCH Report at p. 6; SER-706, Candee Decl. ¶ 7. Among other reasons, some state-level records are unavailable in a national check because some law enforcement agencies do not collect offenders' fingerprints—and the Interstate Index will not accept records that do not contain fingerprints. SEARCH, State Progress in Record Reporting for Firearm-Related Background Checks: Misdemeanor Crimes of Domestic Violence, 6 (2016), https://bit.ly/2pMnDQd. One result is that many records of misdemeanor crimes of domestic violence are not available through the Interstate Index. *Id*.

[13] These include: Colorado (702,898 records); Utah (237,114); Hawaii (172,502); Nevada (154,664); Pennsylvania (159,012); Virginia (133,963); Oregon (132,349); Idaho (125,221); and California (67,458).

[14] Thus, states' failure to enter records in their own databases also deprives

ten states it takes at least thirty days for the state repository to receive felony records and in an additional eleven states it takes between eight and thirty days. BJS Report at Table 7b.[15] Once records are received, six states take at least thirty days to then enter that felony adjudication into the state database, and nine states take between eight and thirty days to do so. *Id*.[16] Together, in low-performing states, these reporting delays can lead to long gaps between a felony conviction and the entry of records into a database accessible through the federal system—for example, this gap is over a year in Arizona, Indiana and Wyoming. *Id*.[17] Considered together, these backlogs and delays compromise Washington's ability to conduct reliable background checks on nonresidents.

_____

the federal system of the records. *See* 28 C.F.R. § 20.3(m); BJS Report at Table 7b.

[15] Indiana (more than one year); North Dakota (91-180 days); Arizona, Florida, Nevada, New Mexico, North Carolina, Ohio, West Virginia and Wyoming (31-90 days); Alaska, California, Georgia, Hawaii, Louisiana, Massachusetts, Missouri, Montana, South Dakota, Texas and Virginia (8-30 days). BJS Report at Table 7b.

[16] Arizona and Wyoming (more than one year); New Mexico (91-180 days); California, Louisiana and Nevada (31-90 days); Alaska, Georgia, Iowa, Missouri, Montana, North Dakota, South Dakota, Vermont and West Virginia (8-30 days). BJS Report at Table 7b.

[17] *See also* New Mexico (122-270 days); North Dakota (99-210); Nevada (62-180); California, Louisiana and West Virginia (39-120); Ohio (33-97); Florida and North Carolina (31-90); Alaska, Georgia, Missouri, Montana and South Dakota (16-60); Hawaii, Massachusetts and Virginia (10-37); Iowa, Texas and Vermont (8-30 days). BJS Report at Table 7b.

### 2. Protective orders.

Certain states fail—significantly—to report protective orders into the national database. Nationally, there is a disparity of nearly 400,000 protective orders between state databases and the federal background-check system. BJS Report at Tables 3, 3a.[18] Some of this disparity may be due to the regular entry and expiration of short-term orders, but the size of the disparity is concerning,[19] and indicates that Washington cannot access a substantial amount of important information about out-of-state purchasers.

### 3. Mental health records.

Certain states also fail to report prohibiting mental health records.[20] Two states

---

[18] Alabama (6,046 active records in the federal background check system, of 13,257 active records in state database); Alaska (1,169 of 1,504); Arizona (17,984 of 25,978); California (280,959 of 579,212); Colorado (140,367 of 254,922); Hawaii (6,656 of 7,681); Illinois (32,944 of 87,822); Indiana (112,754 of 115,626); Iowa (30,094 of 31,431); Louisiana (17,336 of 20,399); Maryland (9,702 of 10,839); Massachusetts (19,115 of 37,104); Nebraska (3,654 of 5,985); Nevada (143 of 2,035); Rhode Island (14,477 of 46,718); South Dakota (3,077 of 4,127); Texas (20,198 of 49,373); Utah (12,124 of 40,130); Virginia (35,170 of 95,788). BJS Report at Tables 3, 3a.

[19] *See* SEARCH, State Progress in Record Reporting for Firearm-Related Background Checks: Protection Order Submissions, 5 (2016), https://bit.ly/2GklRwa. Additionally, some states cannot reliably report protective orders to the National Crime Information Center ("NCIC") file (which is one of the databases that NICS comprises). *See id.*

[20] Federal law prohibits the possession of firearms by anyone "who has been adjudicated as a mental defective or who has been committed to a mental

near Washington—Wyoming and Montana—functionally fail to report any prohibiting mental health records. Active Records in the NICS Indices by State, https://bit.ly/2JISsPk (showing 16 records for Wyoming and 36 for Montana). In states that do report records, a number do so at a per-capita rate that is aberrantly low compared to other states, indicating either underreporting or differences in state law leading to the failure to include seriously ill individuals.[21] The median state, Massachusetts, reports prohibiting mental health records at a rate of 818 per 100,000 (a total of 56,406 records for a state of 6,892,503 people). Sixteen states report prohibiting records at less than half the median rate, and nine states report a rate at or below one-fourth of the median. [22] Some of these disparities may be explained by policy differences, rather than reporting failures; but this does not mitigate Washington's need to identify people prohibited by mental illness when selling

---

institution." 18 U.S.C. § 922(g)(4); *see also* RCW §§ 9.41.040(2)(a)(iv), 9.41.047, 71.05.182 (Washington analogue).

[21] States do not meaningfully differ in their underlying rates of mental illness. *See* David Hemenway & Matthew Miller, *Association of rates of household handgun ownership, lifetime major depression, and serious suicidal thoughts with rates of suicide across US census regions*, 8 Injury Prevention 313, 314 (2002), https://bit.ly/2V9Pxoe.

[22] Wyoming (3 per 100,000); Montana (3); New Hampshire (47); Alaska (112); Georgia (151); Arkansas (167); Rhode Island (175); Oklahoma (181); South Dakota (201); Indiana (212); Louisiana (215); Alabama (243); Kansas (271); Maryland (300); Nevada (334); Vermont (390). Washington's own reporting rate is more than twice the median rate, at 2,030 per 100,000.

semiautomatic assault rifles.

**B.    The Nearby States of Oregon, Idaho, and Montana Share Many of the Same Record Reporting Flaws as Other States.**

The nonresidents that Washington gun stores are most likely to serve are those from nearby states: Oregon, Idaho, and Montana. *See, e.g*, ER-113, 115 (reporting that majority of Appellant Mitchell's sales from store in southern Washington are to Washington and Oregon residents). Many of the state-level reporting problems just discussed are present in these three states. As noted above, Montana functionally fails to report any prohibiting mental-health records. *See supra* Part II.A.3. And, as of 2018, Oregon and Idaho each had enormous backlogs of unprocessed and partially processed dispositions not yet entered into their respective state criminal record repositories: 132,000 and 125,000 records, respectively. *See* BJS Report at Table 12.

Each of these shortcomings would undermine Washington's ability to ensure that purchasers of semiautomatic assault rifles are qualified and responsible, if the state were limited to NICS checks.[23] And given that enhanced background checks are virtually impossible to run on nonresidents, *see* SER-752–53, Belcher Decl. ¶ 8; SER-706, Candee Decl. ¶ 18, these shortcomings further establish the close fit

---

[23] Recently-enacted federal legislation will (1) require states to form a plan to improve their record reporting, (2) incentivize states to comply with their improvement plans, and (3) provide funding to states to improve their record reporting systems. *See* Consolidated Appropriations Act, 2018, Fix NICS Act of 2018, Pub. L. No. 115-141, §§ 601–-605, 132 Stat 1132–37. But the results of this increased funding and attention are yet to be realized.

between Washington's compelling interest in public safety and limiting such sales to Washington residents. Accordingly, and for the further reasons set out in the State's brief, the Nonresident Sales Provision is constitutional. *See* Appellees' Br. at 45–71.

## <u>CONCLUSION</u>

The Court should affirm the grant of summary judgment.

Respectfully submitted,

Dated: March 5, 2021

By: *s/ Thomas J. Tobin*
David A. Perez
Mica D. Klein
Thomas J. Tobin
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-8000

Janet Carter
William J. Taylor, Jr.
Lisa M. Ebersole
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8215

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, that I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<em>s/ Thomas J. Tobin</em><br>
Thomas J. Tobin<br>
PERKINS COIE LLP<br>
1201 Third Avenue, Suite 4900<br>
Seattle, WA  98101-3099<br>
<br>
<em>Counsel for Amicus Curiae<br>
Everytown for Gun Safety</em>

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____20-35827_____

I am the attorney or self-represented party.

**This brief contains** ____6,974_____ **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** ____*s/ Thomas J. Tobin*_____ **Date** __3/5/2021_____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                                           *Rev. 12/01/18*