**No. 20-35827**

# In the United States Court of Appeals For The Ninth Circuit

DANIEL MITCHELL, ET AL.,

*Plaintiffs-Appellants,*

– v. –

CHUCK ATKINS, ET AL.,

*Defendants-Appellees,*

– and –

SAFE SCHOOLS SAFE COMMUNITIES,

*Defendant-Intervenor-Appellee.*

Appeal from the United States District Court for the Western District of Washington
Civil Case No. 3:19-cv-05106 (Honorable John C. Coughenour)

## ADDENDUM TO BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF APPELLEES AND AFFIRMANCE

Janet Carter
William J. Taylor, Jr.
Lisa M. Ebersole
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, New York 10017
(646) 324-8215

David A. Perez
Mica D. Klein
Thomas J. Tobin
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-8000

March 5, 2021

*Counsel for Amicus Curiae Everytown for Gun Safety*

# TABLE OF CONTENTS

| DESCRIPTION | PAGE NO. |
|---|---|
| 2 *Annals of Cong., The Debates and Proceedings in the Cong. Of the U.S.* (1834) | ADD0001–0002 |
| Excerpt from Thomas M. Cooley, *A Treatise on the Constitutional Limitations* (5th ed. 1883) | ADD0003–0018 |
| Chart compiling the earliest known nineteenth century state laws restricting the purchase of firearms by, and transfer of firearms to, minors, as well as true and correct copies of the referenced laws | ADD0019–0079 |
| Chart compiling nineteenth century state analogues to the Second Amendment, as well as true and correct copies of the referenced laws | ADD0080–0136 |
| Chart compiling examples of state laws requiring parents to furnish or provide arms to minors in the militia, as well as true and correct copies of the referenced laws | ADD0137–0176 |
| Chart compiling examples of state laws providing for distribution of public arms to militia members, as well as true and correct copies of the referenced laws | ADD0177–0203 |
| Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. of Gender, Social Policy & the Law 613 (2007) | ADD0204–0278 |
| David Hemenway & Matthew Miller, *Association of rates of household handgun ownership, lifetime major depression, and serious suicidal thoughts with rates of suicide across US census regions*, 8 Injury Prevention 313 (2002) | ADD0279–0282 |

THE

# DEBATES AND PROCEEDINGS

IN THE

# CONGRESS OF THE UNITED STATES;

WITH

## AN APPENDIX,

CONTAINING

## IMPORTANT STATE PAPERS AND PUBLIC DOCUMENTS,

AND ALL

## THE LAWS OF A PUBLIC NATURE;

WITH A COPIOUS INDEX.

VOLUME II,

COMPRISING (WITH VOLUME I) THE PERIOD FROM MARCH 3, 1789, TO MARCH 3, 1791, INCLUSIVE.

---

COMPILED FROM AUTHENTIC MATERIALS,

BY JOSEPH GALES, SENIOR.

---

WASHINGTON:

PRINTED AND PUBLISHED BY GALES AND SEATON.

1834.



tion against the motion is, that it stops short in the regulation of the business. No provision, it is said, is made for the return of the arms to the public; and it gives a discretionary power to the officers to dispose of the property of the United States; but he conceived these difficulties were not beyond the reach of remedies; the wisdom of the House, he doubted not, would devise such as were adequate to the object. He asked by what means minors were to provide themselves with the requisite articles? Many of them are apprentices. If you put arms into their hands, they will make good soldiers; but how are they to procure them? It is said, if they are supplied by the United States the property will be lost; if this is provided against, every objection may be obviated. He then offered an addition to the motion, providing for the return of the arms to the commanding officer.

The Chairman then stated the motion with the amendment.

Mr. Tucker observed, that the motion in its present form differed from the original proposed by the gentleman from Virginia. He conceived the gentleman had no right to alter it, nor could it be done without a vote of the committee. He preferred the motion in its original state—for the United States may, without doubt, furnish the arms—but he very much questioned their right to call on the individual States to do it.

Mr. Williamson was in favor of the question's being taken with the amendment admitted by Mr. Parker. He wished to know whether Congress meant to tax the individual States in this unusual manner. Perhaps as they had assumed the State debts upon this principle, or rather without any principle, they might think they had a right to call upon them to furnish quotas in proportion, this would be getting something for something; and not like the other measure, losing something for nothing.

Mr. Vining said, he could not understand what was meant by saying that the amendment was dictating to the States. What is the whole bill but dictating; a law that affects every individual, touches the whole community. With respect to the constitutionality of the measure, there can be no doubt; every grant of power to Congress necessarily implies a conveyance of every incidental power requisite to carry the grant into effect.

Mr. Wadsworth apologized for detaining the attention of the committee a moment, while he asked the gentlemen who favored the motion what was the extent of their wishes? The motion at first appeared to be in favor of poor men, who are unable to purchase a firelock; but now it seems, minors and apprentices are to be provided for. Is there a man in this House who would wish to see so large a proportion of the community, perhaps one-third, armed by the United States, and liable to be disarmed by them? Nothing would tend more to excite suspicion, and rouse a jealousy dangerous to the

Union. With respect to apprentices, every man knew that they were liable to this tax, and they were taken under the idea of being provided for by their masters; as to minors, their parents or guardians would prefer furnishing them with arms themselves, to depending on the United States when they knew they were liable to having them reclaimed.

The question on Mr. Parker's motion was lost.

On motion of Mr. Heister, a proviso was added to the section in the following words:

"That every citizen so enrolled, and providing himself with the arms and accoutrements required as aforesaid, shall hold the same exempt from all executions, or suits for debt, or for the payment of taxes."

Mr. Fitzsimons moved to strike out the words "provide himself," and insert "shall be provided."

This motion was objected to by Messrs. Boudinot, Huntington, Jackson, Partridge, Vining, and Madison. It was said that it would be destructive of the bill, as it would leave it optional with the States, or individuals, whether the militia should be armed or not.

This motion was lost by a great majority. The second section comprises the characters that are to be exempted from enrolment or militia duty.

Mr. Madison moved to strike out that part which related to members of Congress, their officers and servants, attending either House—and to insert "members of the Senate and House of Representatives whilst travelling to, attending at, or returning from the sessions of Congress." He saw no reason for a total exemption from militia service; exceptions in favor of the framers of laws ought not to be extended beyond what is evidently necessary. The members of Congress, during the recess, are at liberty to pursue their ordinary avocations, and may participate in the duties and exercises of their fellow-citizens. They ought to bear a part in the burdens they lay on others, which may check an abuse of the powers with which they are vested.

Mr. Jackson observed, that this alteration might interfere with the public interest; in cases of alarm or invasion, the members might be called to a great distance in the militia at the moment when their presence was required to attend the session of the Legislature. It would be well therefore to consider whether their services in the militia would be of equal importance to the public interest, as their services in Congress.

Mr. Boudinot objected to the amendment; not that he would exempt members of Congress from burdens imposed on their fellow-citizens; but the motion he conceived was inconsistent with this very idea. The bill provides that exempts shall pay a certain equivalent; it would be unjust to impose this equivalent, and compel the members of Congress to turn out in the

Digitized by Google

A

# TREATISE

ON THE

# CONSTITUTIONAL LIMITATIONS

WHICH REST UPON

## THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION.

BY

THOMAS M. COOLEY, LL.D.,

ONE OF THE JUSTICES OF THE SUPREME COURT OF MICHIGAN, AND JAY PROFESSOR OF LAW IN THE UNIVERSITY OF MICHIGAN.

FIFTH EDITION,

WITH CONSIDERABLE ADDITIONS, GIVING THE RESULTS OF THE RECENT CASES.

BOSTON:
LITTLE, BROWN, AND COMPANY.
1883

Entered according to Act of Congress, in the year 1874, by
LITTLE, BROWN, AND COMPANY,
In the Office of the Librarian of Congress, at Washington.

Entered according to Act of Congress, in the year 1878, by
LITTLE, BROWN, AND COMPANY,
In the Office of the Librarian of Congress, at Washington.

Entered according to Act of Congress, in the year 1883, by
LITTLE, BROWN, AND COMPANY,
In the Office of the Librarian of Congress, at Washington.

UNIVERSITY PRESS:
JOHN WILSON AND SON, CAMBRIDGE.

# TABLE OF CONTENTS.

## CHAPTER I.

### DEFINITIONS.

Definition of a state, nation, people, sovereignty, and sovereign state . . . 1
What sovereignty consists in . . . . . . . . . . . . . 2
Apportionment of sovereignty in America . . . . . . . . . 2
Definition of constitution and constitutional government . . . . . 2, 3
Of unconstitutional law . . . . . . . . . . . . . . 4
The will of the people the final law . . . . . . . . . . . 5

## CHAPTER II.

### THE CONSTITUTION OF THE UNITED STATES.

What the United States government the successor of; Colonial confederacies . . . . . . . . . . . . . . . . . . 6
The States never in a strict sense sovereign . . . . . . . . 7
The Continental Congress . . . . . . . . . . . . . . . 6, 7
Limitations upon its power; the Articles of Confederation, and the supersession thereof by the Constitution . . . . . . . . 8
Adoption of the Constitution by North Carolina, Rhode Island, and the New States . . . . . . . . . . . . . . . . . 8, 9
United States government one of enumerated powers . . . . . . 10
General purpose of this government . . . . . . . . . . . 11
Powers conferred upon Congress . . . . . . . . . . . . 11, 12
Powers under the new amendments . . . . . . . . . . . 12–14
Executive and judicial power of the nation . . . . . . . . . 15
Constitution, laws, and treaties of United States to be supreme; final decision of questions under, to rest with national judiciary . . 15
Removal of causes from State courts; decisions of State courts to be followed on points of State law . . . . . . . . . . . 16–18
Protection to privileges and immunities of citizens . . . . . . 12, 21
Extradition of fugitives from justice . . . . . . . . . . . 22
Faith and credit secured to records, &c. . . . . . . . . . . 22, 23

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 8 of 284

Restrictions upon the States . . . . . . . . . . . . . . 20
Guaranty of republican government . . . . . . . . . . . . 24
Implied prohibitions on the States . . . . . . . . . . . . 25
Reservation of powers to States and people . . . . . . . . 26
Construction of national bills of rights . . . . . . . . . . 26
Statutes necessary to jurisdiction of national courts . . . . . . 26

## CHAPTER III.

### THE FORMATION AND AMENDMENT OF STATE CONSTITUTIONS.

State governments in existence when Constitution of United States adopted . . . . . . . . . . . . . . . . . . . . 29
Common law in force; what it consists in . . . . . . . . . 29–34
English and Colonial legislation . . . . . . . . . . . . . 34
Colonial charters and revolutionary constitutions . . . . . . 35, 36
Constitutions of new States . . . . . . . . . . . . . . . . 36
Sovereignty of the people . . . . . . . . . . . . . . . 36–39
Who are the people, in a political sense . . . . . . . . . . 37
Proceedings in the formation and amendment of constitutions . . 39–48
Restraints imposed thereon by Constitution of United States . . . 42
What generally to be looked for in State constitutions . . . . 44–46
Rights are protected by, but do not come from them . . . . . . 47

## CHAPTER IV.

### CONSTRUCTION OF STATE CONSTITUTIONS.

Interpretation and construction . . . . . . . . . . . . . 49
Who first to construe constitutions . . . . . . . . . . . 50–55
Final decision generally with the courts . . . . . . . . . . 55–57
The doctrine of *res adjudicata* and *stare decisis* . . . . . . . 58–66
Construction to be uniform . . . . . . . . . . . . . . . 67
The intent to govern . . . . . . . . . . . . . . . . . . 68
The whole instrument to be examined . . . . . . . . . . . 70
Effect to be given to the whole . . . . . . . . . . . . . 71
Words to be understood in their ordinary meaning . . . . . . 71
Common law to be kept in view . . . . . . . . . . . . . 73
Words sometimes employed in different senses . . . . . . . 74, 75
Operation of laws to be prospective . . . . . . . . . . . . 76
Implied powers . . . . . . . . . . . . . . . . . . . . 77, 78
Consideration of the mischief to be remedied . . . . . . . . 78
Proceedings of Constitutional Convention may be examined . . 79–81

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 9 of 284

Force of contemporaneous and practical construction . . . . 81–85
Unjust provisions not invalid . . . . . . . . . . . . . . . 86
Duty in case of doubt on constitutional questions . . . . . . . . 88
Directory and mandatory provisions . . . . . . . . . . . 88–98
Constitutional provisions are imperative . . . . . . . . . . 93–98
Self-executing provisions . . . . . . . . . . . . . . . 98–101
Danger of arbitrary rules of construction . . . . . . . . . . 101

## CHAPTER V.

### THE POWERS WHICH THE LEGISLATIVE DEPARTMENT MAY EXERCISE.

Power of American legislatures compared to that of British Parliament . . . . . . . . . . . . . . . . . . . 103–106
Grant of legislative power is grant of the complete power . . . . 106
But not of executive or judicial power . . . . . . . . . . . 106–109
Definition of legislative and judicial authority . . . . . . . 109–111
Declaratory statutes . . . . . . . . . . . . . . . . . 111–114
Statute setting aside judgments, granting new trials, &c. . . . . 115, 116
Recitals in statutes do not bind individuals . . . . . . . . . . 116
Statutes conferring power on guardians, &c., to sell lands . . 117–125
Statutes which assume to dispose of disputed rights . . . . . 125–129
Statutes validating irregular judicial proceedings . . . . . . . 128, 129
Legislative divorces . . . . . . . . . . . . . . . . . 130–135
Legislative encroachments upon executive power . . . . . . 135–138
Legislative power not to be delegated . . . . . . . . . . . . 139
Conditional legislation . . . . . . . . . . . . . . . . . 144–147
Local option laws . . . . . . . . . . . . . . . . . . 147, 148
Irrepealable laws not to be passed . . . . . . . . . . . . 149, 150
Territorial limitations upon State legislative authority . . . 151–153
Inter-State comity . . . . . . . . . . . . . . . . . . . 152
Other limitations by express provisions . . . . . . . . . . . 153
Limitations springing from nature of free government . . . 154, 155

## CHAPTER VI.

### THE ENACTMENT OF LAWS.

Importance of forms in parliamentary law . . . . . . . . . 156, 157
The two houses of the legislature . . . . . . . . . . . . . 157
Differences in powers of . . . . . . . . . . . . . . . . 158
Meetings and adjournments . . . . . . . . . . . . . . . 158
Contested elections, rules of proceeding, punishing disorderly behavior . . . . . . . . . . . . . . . . . . . . 159

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 10 of 284

Contents . . . . . . . . . . . . . . . . . . . . 160, 161
Privileges of members . . . . . . . . . . . . . . . . . 161
Legislative committees . . . . . . . . . . . . . . . . . 162
Journal of proceedings . . . . . . . . . . . . . . . . . 163
Corrupt contracts to influence legislation . . . . . . . . . . . 164
Counsel before legislature; lobby agents . . . . . . . . . . 165
The introduction and passage of bills . . . . . . . . . . . 166–169
Evasions of constitutional provisions . . . . . . . . . . . 167, *n.*
Three readings of bills . . . . . . . . . . . . . . . . . 168
Yeas and nays . . . . . . . . . . . . . . . . . . . 169
Vote required for the passage of a bill . . . . . . . . . . . 169
Title of statutes . . . . . . . . . . . . . . . . . . 170–181
Amendatory statutes . . . . . . . . . . . . . . . . . 181–184
Signing of bills by presiding officers . . . . . . . . . . . 184
Approval of bills by the governor . . . . . . . . . . . . 184–187
Other legislative powers of the governor . . . . . . . . . . 187
When acts to take effect . . . . . . . . . . . . . . . 188–191

## CHAPTER VII.

### THE CIRCUMSTANCES UNDER WHICH A LEGISLATIVE ACT MAY BE DECLARED UNCONSTITUTIONAL.

Authority to declare statutes unconstitutional a delicate one . 192–194
Early cases of such declaration . . . . . . . . . . . . 194, *n.*
Will not be done by bare quorum of court . . . . . . . . . 195
Nor unless a decision upon the point is necessary . . . . . . 196
Nor on objection by a party not interested . . . . . . . . 197
Nor solely because of unjust or oppressive provisions . . . . 197–202
Nor because conflicting with fundamental principles . . . . 202–204
Nor because opposed to spirit of the constitution . . . . . 205, 206
Extent of legislative power . . . . . . . . . . . . . . 206
Difference between State and national governments . . . . . 207
A statute in excess of legislative power void . . . . . . . . 208–211
Statutes invalid as encroaching on executive or judicial authority . 209
Or conflicting with the bill of rights . . . . . . . . . . . 210
Legislative forms are limitations of power . . . . . . . . . 211
Statutes unconstitutional in part . . . . . . . . . . . 211–216
Constitutional objection may be waived . . . . . . . . . 216, 217
Judicial doubts on constitutional questions . . . . . . . . 218–222
Inquiry into legislative motives not permitted . . . . . . . 222–224
Consequences if a statute is void . . . . . . . . . . . . 224

## CHAPTER VIII.

### THE SEVERAL GRADES OF MUNICIPAL GOVERNMENT.

The American system one of decentralization . . . . . . . 225–227
State constitutions framed in reference to it . . . . . . . . . 228
Local government may be delegated to citizens of the municipality 228
Legislative control of municipalities . . . . . . . . . . 230–232
Powers of public corporations . . . . . . . . . . . . . 233
Strict construction of charters . . . . . . . . . . . . . 234
Must act through corporate authorities . . . . . . . . . 236–238
Contracts *ultra vires* void . . . . . . . . . . . . . . . 235
Corporations by prescription and implication . . . . . . . . 238–240
Municipal by-laws . . . . . . . . . . . . . . . . 240–249
Delegation of powers by municipality not admissible . . . . 249, 250
Irrepealable municipal legislation cannot be adopted . . . . 251, 252
Presumption of correct action . . . . . . . . . . . . 254–258
Power to indemnify officers . . . . . . . . . . . . . 258–260
Powers to be construed with reference to purposes of their creation . . . . . . . . . . . . . . . . . . . . 260–263
Authority confined to corporate limits . . . . . . . . . . . 263
Municipal subscriptions to works of internal improvement . . . 263
Negotiable paper of corporations . . . . . . . . . . . 269–274
Municipal military bounties . . . . . . . . . . . . . 271–282
Legislative control of municipal taxation . . . . . . . . . 282–289
Legislative control of corporate property . . . . . . . . . 289–295
Towns and counties . . . . . . . . . . . . . . . . . 295–303
Not liable for neglect of official duty . . . . . . . . . . . 302
Different rules govern chartered corporations . . . . . . . . 303
In what respect the charter a contract . . . . . . . . . . 304–310
Validity of corporate organizations not to be questioned collaterally . . . . . . . . . . . . . . . . . . . . . 311
The State sometimes estopped from questioning . . . . . . . 311, *n.*

## CHAPTER IX.

### PROTECTION TO PERSON AND PROPERTY UNDER THE CONSTITUTION OF THE UNITED STATES.

Bill of Rights, importance of . . . . . . . . . . . . . 313–315
Addition of, by amendments to national Constitution . . . . . 316
Bills of attainder . . . . . . . . . . . . . . . . 316–321

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 12 of 284

*Ex post facto* laws . . . . . . . . . . . . . . . . . 321–331
Laws impairing the obligation of contracts . . . . . . . . 331–357
What charters are contracts . . . . . . . . . . . . . . 337, 338
Contracting away powers of sovereignty . . . . . . . . . 339–344
Grant of exclusive privileges . . . . . . . . . . . . . . 344
Changes in the general laws . . . . . . . . . . . . . . 345
Obligation of a contract, what it is . . . . . . . . . . . 346–348
Modification of remedies always admissible . . . . . . . . 349–357
Appraisal laws . . . . . . . . . . . . . . . . . . 353
Stay laws, when void . . . . . . . . . . . . . . . . 355
Laws taking away substantial rights . . . . . . . . . . 355, 356
Validating imperfect contracts . . . . . . . . . . . . . 357
State insolvent laws . . . . . . . . . . . . . . . . 357
The thirteenth and fourteenth amendments . . . . . . . . 358, 359

## CHAPTER X.

### THE CONSTITUTIONAL PROTECTIONS TO PERSONAL LIBERTY.

Villeinage in England . . . . . . . . . . . . . . . . 360–363
In Scotland . . . . . . . . . . . . . . . . . . . 363
In America . . . . . . . . . . . . . . . . . . . 363
Impressment of seamen . . . . . . . . . . . . . . . 365
Unreasonable searches and seizures . . . . . . . . . . . 365–369
Every man's house his castle . . . . . . . . . . . . . 365, 374
Search warrants . . . . . . . . . . . . . . . . . . 369–374
Inviolability of papers and correspondence . . . . . . . . 371–374
Quartering soldiers in private houses . . . . . . . . . . 375
Criminal accusations, how made . . . . . . . . . . . . 376
Bail to persons accused of crime . . . . . . . . . . . . 377–379
Prisoner standing mute . . . . . . . . . . . . . . . 379
Trial to be speedy . . . . . . . . . . . . . . . . . 379
To be public . . . . . . . . . . . . . . . . . . . 380
Not to be inquisitorial . . . . . . . . . . . . . . . 381
Prisoner's statement and confessions . . . . . . . . . . 381–388
Confronting prisoner with witnesses . . . . . . . . . . 388, 389
Prisoner to be present at trial . . . . . . . . . . . . 390
Trial to be by jury . . . . . . . . . . . . . . . . . 390
Number of jurors . . . . . . . . . . . . . . . . . 391
Right of challenge . . . . . . . . . . . . . . . . . 392
Jury to be of the vicinage . . . . . . . . . . . . . . 392
Verdict to be unanimous and free . . . . . . . . . . . 393
Instructions of the judge, how limited . . . . . . . . . . 393
Power of jury to judge of law . . . . . . . . . . . . 394–398

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 13 of 284

Accused not to be twice put in jeopardy . . . . . . . . . 399–402
Excessive fines and cruel and unusual punishments . . . . 402–404
Right to counsel . . . . . . . . . . . . . . . . . 405–412
Protection of professional confidence . . . . . . . . . . 408, 409
Duty of counsel . . . . . . . . . . . . . . . . . 409–412
Whether to address the jury on the law . . . . . . . . . . 411
Punishment of misconduct in attorneys . . . . . . . . . . 411
Writ of *habeas corpus* . . . . . . . . . . . . . . . 413–427
Legal restraints upon personal liberty . . . . . . . . . . 414–418
Necessity of *Habeas Corpus Act* . . . . . . . . . . . . 418–421
What courts issue the writ . . . . . . . . . . . . . . 421–425
General purpose of writ, and practice upon . . . . . . . . 425–427
Right to discussion and petition . . . . . . . . . . . . . 427
Right to bear arms . . . . . . . . . . . . . . . . . 428
Jealousy of standing armies . . . . . . . . . . . . . 428, 429

## CHAPTER XI.

### OF THE PROTECTION OF PROPERTY BY THE "LAW OF THE LAND."

Magna Charta, chap. 29 . . . . . . . . . . . . . . . 430
Constitutional provisions insuring protection "by the law of the land" . . . . . . . . . . . . . . . . . . . . 431, *n.*
Meaning of "due process of law" and "law of the land" . . 432–439
Vested rights not to be disturbed . . . . . . . . . . . . 439
What are vested rights . . . . . . . . . . . . . . . 440–447
Interests in expectancy are not . . . . . . . . . . . . 440
Legislative modification of estates . . . . . . . . . . . 441
Control of rights springing from marriage . . . . . . . . . 442
Legislative control of remedies . . . . . . . . . . . . 443, 444
Vested rights of action are protected . . . . . . . . . . . 445
Confiscation of rights and property . . . . . . . . . . 446, 447
Statutes of limitation . . . . . . . . . . . . . . . 448–451
Alteration in the rules of evidence . . . . . . . . . . . 452–455
Retrospective laws . . . . . . . . . . . . . . . . 455–473
Curing irregularities in legal proceedings . . . . . . . . 457–459
Validating imperfect contracts . . . . . . . . . . . . 459–471
Pendency of suit does not prevent healing act . . . . . . . . 470
What the healing statute must be confined to . . . . . . . 471–473
Statutory privilege not a vested right . . . . . . . . . . 473, 474
Consequential injuries from changes in the laws . . . . . . . 475
Betterment laws . . . . . . . . . . . . . . . . . 477–480
Sumptuary and other like laws . . . . . . . . . . . . . 476

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 14 of 284

Unequal and partial legislation . . . . . . . . . . . . . 481–492
Local laws may vary in different localities . . . . . . . . . 482
Suspension of general laws . . . . . . . . . . . . . . 484
Equality the aim of the law . . . . . . . . . . . . . . 486
Strict construction of special grants . . . . . . . . . . . 488–490
Privileges and immunities of citizens . . . . . . . . . . 491, 492
Judicial proceedings void if jurisdiction wanting . . . . . . 443
What constitutes jurisdiction . . . . . . . . . . . . . 493
Consent cannot confer it . . . . . . . . . . . . . . 493, 494
Jurisdiction in divorce cases . . . . . . . . . . . . . 493–499
Necessity for process . . . . . . . . . . . . . . . . 498–502
Process by publication . . . . . . . . . . . . . . . 499–502
Courts of general and special jurisdiction . . . . . . . . 502, 503
Effect of irregularities in judicial proceedings . . . . . . 504, 505
Judicial power not to be delegated . . . . . . . . . . . 506
Must be exercised under accustomed rules . . . . . . . . 506, 507
Judge not to sit in his own cause . . . . . . . . . . . 507–511

## CHAPTER XII.

### LIBERTY OF SPEECH AND OF THE PRESS.

Protection of, by the Constitution of the United States . . . . 512
State constitutional provisions . . . . . . . . . . . . . . . 512, *n.*
Not well protected nor defined at common law . . . . . . . . 515
Censorship of the press; publication of proceedings in Parliament not formerly suffered . . . . . . . . . . . . . . . . 515
Censorship of the press in America . . . . . . . . . . . . 516
Secret sessions of public bodies in United States . . . . . . 518
What liberty of the press consists in . . . . . . . . . . 518–521
Common-law rules of liability for injurious publications . . . 521–525
Cases of privileged communications . . . . . . . . 525–527, 563, *n.*
Libels on the government, whether punishable . . . . . . . 528–531
Sedition law . . . . . . . . . . . . . . . . . . . . . 529
Further cases of privilege; criticism of officers or candidates for office . . . . . . . . . . . . . . . . . . . . . . 532–544
Petitions and other publications in matters of public concern . . 534
Statements in course of judicial proceedings . . . . . . . . 545–547
by witnesses . . . . . . . . . . . . . . . 545
by complainant, &c. . . . . . . . . . . . . 546
by counsel . . . . . . . . . . . . . . . . 547–549
Privileges of legislators . . . . . . . . . . . . . . . 550–552
Publication of privileged communications through the press . . . 552

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 15 of 284

Accounts of judicial proceedings, how far protected . . . . 552–556
Privilege of publishers of news . . . . . . . . . . . . 556–566
Publication of legislative proceedings . . . . . . . . . . 567, 568
The jury as judges of the law in libel cases . . . . . . . . 569–573
Mr. Fox's Libel Act . . . . . . . . . . . . . . . . . 569
"Good motives and justifiable ends," burden of showing is on defendant . . . . . . . . . . . . . . . . . . 573–575
What is not sufficient to show . . . . . . . . . . . 575, *n.*

## CHAPTER XIII.

### RELIGIOUS LIBERTY.

Care taken by State constitutions to protect . . . . . . . . . 576
Distinguished from religious toleration . . . . . . . . . 570, 571
What it precludes . . . . . . . . . . . . . . . . . . 580–582
Does not preclude recognition of superintending Providence by public authorities . . . . . . . . . . . . . . . . . 582
Nor appointment of chaplains, fast-days, &c. . . . . . . . . . 583
Nor recognition of fact that the prevailing religion is Christian . . . . . . . . . . . . . . . . . . . . . . 583
The maxim that Christianity is part of the law of the land . . 584–588
Punishment of blasphemy . . . . . . . . . . . . . . . . 585
And of other profanity . . . . . . . . . . . . . . . . . 589
Sunday laws, how justified . . . . . . . . . . . . . . . . 589
Respect for religious scruples . . . . . . . . . . . . . 589–591
Religious belief as affecting the competency or credibility of witnesses . . . . . . . . . . . . . . . . . . . . . 591

## CHAPTER XIV.

### THE POWER OF TAXATION.

Unlimited nature of the power . . . . . . . . . . . . 593–600
Exemption of national agencies from State taxation . . . . 597–600
Exemption of State agencies from national taxation . . . . . 598
Limitations on State taxation by national Constitution . . . . 600
Power of States to tax subjects of commerce . . . . . . . . 601
Discriminations in taxation between citizens of different States . 602
Elements essential to valid taxation . . . . . . . . . . . 603
Purposes must be public . . . . . . . . . . . . . . . . 604
Legislature to judge of purposes . . . . . . . . . . . . 604–608
Unlawful exactions . . . . . . . . . . . . . . . . . . 608–612

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 16 of 284

Necessity of apportionment . . . . . . . . . . . . . . 612
Taxation with reference to benefits in local improvements . . 616–628
Local assessments distinguished from general taxation . . . . 618, 619
Apportionment of the burden in local assessments . . . . . . 620–636
Taxations must be uniform throughout the taxing districts . . 622–636
Road taxes in labor . . . . . . . . . . . . . . . . . 635
Inequalities in taxation inevitable . . . . . . . . . . . . 636
Legislature must select subjects of taxation . . . . . . . . 637
Exemptions admissible . . . . . . . . . . . . . . . . 637–641
Constitutional provisions forbidding exemptions . . . . . . . 640
Legislative authority requisite for every tax . . . . . . . . 641–644
Excessive taxation . . . . . . . . . . . . . . . . . . 644
The maxim *de minimis lex non curat* in tax proceedings . . . . 644
What errors and defects render tax sales void . . . . . . . 645, 646
Remedies for collection of taxes . . . . . . . . . . . . . 645

## CHAPTER XV.

### THE EMINENT DOMAIN.

Ordinary domain of State distinguished from eminent domain . . 647
Definition of eminent domain . . . . . . . . . . . . . 648
Not to be bargained away; general rights vested in the States . . 649
How far possessed by the general government . . . . . . . . 650
What property subject to the right . . . . . . . . . . . . 651
Legislative authority requisite to its exercise . . . . . . . . 653
Strict compliance with conditions precedent necessary . . . 654–656
Statutes for exercise of, not to be extended by intendment . . . 656
Purpose must be public . . . . . . . . . . . . . . . . 656
What is a public purpose . . . . . . . . . . . . . . . 657–665
Whether milldams are . . . . . . . . . . . . . . . . 662–665
Question of, is one of law . . . . . . . . . . . . . . . 666
How property to be taken . . . . . . . . . . . . . . 666–668
Determining the necessity for . . . . . . . . . . . . . 668, 669
How much may be taken . . . . . . . . . . . . . . . 670, 671
What constitutes a taking . . . . . . . . . . . . . . . 671
Consequential injuries do not . . . . . . . . . . . . 671–676
Appropriation of highway to plank road or railroad . . . . 676–691
Whether the fee in the land can be taken . . . . . . . . 691–693
Compensation to be made . . . . . . . . . . . . . . . 693
Time of making . . . . . . . . . . . . . . . . . . 694–697
Tribunal for assessing . . . . . . . . . . . . . . . . 697
Principle on which it is to be assessed . . . . . . . . . 698–705

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 17 of 284

Allowance of incidental injuries and benefits . . . . . . . . 703–705
What the assessment covers . . . . . . . . . . . . . . . 705
Action where work improperly constructed . . . . . . . . . 705

## CHAPTER XVI.

### THE POLICE POWER OF THE STATES.

Definition of police power . . . . . . . . . . . . . . . 706
Pervading nature of . . . . . . . . . . . . . . . . . 706–708
Power where vested . . . . . . . . . . . . . . . . . 708, 709
Exercise of, in respect to charter contracts . . . . . . . . 710–718
License or prohibition of sales of intoxicating drinks . . . . 718–722
Payment of license fee to United States gives no right in opposition to State law . . . . . . . . . . . . . . . . 721
Quarantine regulations and health laws . . . . . . . . . . 722
Inspection laws; harbor regulations . . . . . . . . . . . 723
Distinction between proper police regulation and an interference with commerce . . . . . . . . . . . . . . . . . 724
State taxes upon commerce . . . . . . . . . . . . . . 724–726
Sunday police regulations . . . . . . . . . . . . . . . 726
Regulation of highways by the States . . . . . . . . . . . 727
Control of navigable waters . . . . . . . . . . . . . . 728–733
What are navigable . . . . . . . . . . . . . . . . . 728
Congressional regulations of . . . . . . . . . . . . . . 731
Monopolies of, not to be granted by States . . . . . . . . . 730
Power in the States to improve and bridge . . . . . . . . . 731
And to establish ferries and permit dams . . . . . . . . . . 732
Regulation of speed of vessels . . . . . . . . . . . . . . 733
Destruction of buildings to prevent spread of fire . . . . . . 739, 740
Levees and drains . . . . . . . . . . . . . . . . . . 733
Regulation of civil rights and privileges . . . . . . . . . 734–739
Regulation of business charges . . . . . . . . . . . . . 734–739
Establishment of fire limits and wharf lines; abatement of nuisances, &c. . . . . . . . . . . . . . . . . . . . 740, 741
Other State regulations of police . . . . . . . . . . . . 740–746
Power of States to make breach thereof a crime . . . . . . . 745

## CHAPTER XVII.

### THE EXPRESSION OF THE POPULAR WILL.

People possessed of the sovereignty, but can only exercise it under legal forms . . . . . . . . . . . . . . . . . 647

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 18 of 284

Elections the mode . . . . . . . . . . . . . . . . . 748–750
Qualifications for office . . . . . . . . . . . . . . 748, *n*, 749, *n*
Officers *de facto* and *de jure* . . . . . . . . . . . . . 750, 751
Who to participate in elections; conditions of residence, presence at the polls, &c. . . . . . . . . . . . . . . . . . 752–754
Residence, domicile, and habitation defined . . . . . . . . 754–756
Registration of voters . . . . . . . . . . . . . . . . 756, 757
Other regulations . . . . . . . . . . . . . . . . . . 758
Preliminary action by authorities, notice, proclamation, &c. . . . 759
Mode of voting; the ballot . . . . . . . . . . . . . . 760
Importance of secrecy; secrecy a personal privilege . . . . 760–763
Ballot must be complete in itself . . . . . . . . . . . 763, 764
Parol explanations by voter inadmissible . . . . . . . . . 765
Names on ballot should be full . . . . . . . . . . . . 765
Abbreviations, initials, &c. . . . . . . . . . . . . . 766, 767
Erroneous additions do not affect . . . . . . . . . . . 767
Evidence of surrounding circumstances to explain ballot . . . 768, 769
Boxes for different votes; errors in depositing . . . . . . . 770
Plurality to elect . . . . . . . . . . . . . . 747, n, 770, 771
Freedom of elections; bribery . . . . . . . . . . . . . 771
Treating electors; service of process . . . . . . . . . . 772
Betting on elections, contracts to influence them, &c. . . . . . 772
Militia not to be called out on election days . . . . . . . . 773
Electors not to be deprived of votes . . . . . . . . . . 774
Liability of officers for refusing votes . . . . . . . . . . 775
Elector's oath when conclusive, . . . . . . . . . . . . 776
Conduct of election . . . . . . . . . . . . . . . . . 777
Effect of irregularities . . . . . . . . . . . . . . . 771–779
Effect if candidate is ineligible . . . . . . . . . . . . 779
Admission of illegal votes . . . . . . . . . . . . . . 780
Fraud, intimidation, &c. . . . . . . . . . . . . . . 780–782
Canvass and return of votes; canvassers act ministerially . . 782–784
Contesting elections; final decision upon, rests with the courts . 785–791
Canvasser's certificate conclusive in collateral proceedings; courts may go behind . . . . . . . . . . . . . . 787
What proofs admissible . . . . . . . . . . . . . . . 788–790
Whether qualification of voter may be inquired into by courts . . 790

INDEX . . . . . . . . . . . . . . . . . . . . . . 793

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 19 of 284

strument of oppression than a tyrannical monarch or any foreign power. So impatient did the English people become of the very army that liberated them from the tyranny of James II. that they demanded its reduction even before the liberation became complete; and to this day the British Parliament render a standing army practically impossible by only passing a mutiny act from session to session. The alternative to a standing army is "a well-regulated militia;" but this cannot exist unless the people are trained to bearing arms. The federal and State constitutions therefore provide that the right of the people to bear arms shall not be infringed; but how far it may be in the power of the legislature to regulate the right we shall not undertake to say.[1] Happily there neither has been, nor, we may hope, is likely to be, much occasion for an examination of that question by the courts.[2]

[1] See Wilson *v.* State, 33 Ark. 557.

[2] In Bliss *v.* Commonwealth, 2 Lit. 90, the statute "to prevent persons wearing concealed arms" was held unconstitutional, as infringing on the right of the people to bear arms in defence of themselves and of the State. But see Nunn *v.* State, 1 Kelly, 243; State *v.* Mitchell, 3 Blackf. 229; Aynette *v.* State, 2 Humph. 154; State *v.* Buzzard, 4 Ark. 18; Carroll *v.* State, 28 Ark. 99; s. c. 18 Am. Rep. 538; State *v.* Jumel, 13 La. Ann. 399; s. c. 1 Green, Cr. Rep. 481; Owen *v.* State, 31 Ala. 387; Cockrum *v.* State, 24 Tex. 394; Andrews *v.* State, 3 Heisk. 165; s. c. 8 Am. Rep. 8; State *v.* Wilburn, 7 Bax. 51; State *v.* Reid, 1 Ala. 612. A statute prohibiting the open wearing of arms upon the person was held unconstitutional in Stockdale *v.* State, 32 Ga. 225. And one forbidding carrying, either publicly or privately, a dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver, was sustained, except as to the last-mentioned weapon; and as to that it was held that, if the weapon was suitable for the equipment of a soldier, the right of carrying it could not be taken away. As bearing also upon the right of self-defence, see Ely *v.* Thompson, 3 A. K. Marsh. 73, where it was held that the statute subjecting free persons of color to corporal punishment for "lifting their hands in opposition" to a white person was unconstitutional. And see, in general, Bishop on Stat. Crimes, c. 36, and cases cited.

to take, use, or destroy the private property of individuals to prevent the spreading of a fire, the ravages of a pestilence, the advance of a hostile army, or any other great public [* 595] calamity.[1] Here the individual is in no degree in * fault, but his interest must yield to that "necessity" which "knows no law." The establishment of limits within the denser portions of cities and villages, within which buildings constructed of inflammable materials shall not be erected or repaired, may also, in some cases, be equivalent to a destruction of private property; but regulations for this purpose have been sustained notwithstanding this result.[2] Wharf lines may also be established for the general good, even though they prevent the owners of water-fronts from building out on soil which constitutes private property.[3] And, whenever the legislature deem it necessary to the protection of a harbor to forbid the removal of stones, gravel, or sand from the beach, they may establish regulations to that effect under penalties, and make them applicable to the owners of the soil equally with other persons. Such regulations are only "a just restraint of an injurious use of property, which the legislature have authority" to impose.[4]

So a particular use of property may sometimes be forbidden, where, by a change of circumstances, and without the fault of the owner, that which was once lawful, proper, and unobjectionable has now become a public nuisance, endangering the public health or the public safety. Mill-dams are sometimes destroyed upon

[1] Saltpetre Case, 12 Coke, 13; Mayor, &c. of New York v. Lord, 18 Wend. 126; Russell v. Mayor, &c. of New York, 2 Denio, 461; Sorocco v. Geary, 3 Cal. 69; Hale v. Lawrence, 21 N. J. 714; American Print Works v. Lawrence, 21 N. J. 248; Meeker v. Van Rensselaer, 15 Wend. 397; McDonald v. Redwing, 13 Minn. 38; Philadelphia v. Scott, 81 Penn. St. 80; Dillon, Mun. Corp. §§ 756–759. And see Jones v. Richmond, 18 Grat. 517, for a case where the municipal authorities purchased and took possession of the liquor of a city about to be occupied by a capturing military force, and destroyed it to prevent the disorders that might be anticipated from free access to intoxicating drinks under the circumstances. And as to appropriation by military authorities, see Harmony v. Mitchell, 1 Blatch. 549; s. c. in error, 13 How. 115.

[2] Respublica v. Duquet, 2 Yeates, 493; Wadleigh v. Gilman, 12 Me. 403; s. c. 28 Am. Dec. 188; Brady v. Northwestern Ins. Co., 11 Mich. 425; Monroe v. Hoffman, 29 La. An. 651; s. c. 29 Am. Rep. 345; King v. Davenport, 98 Ill. 305; s. c. 38 Am. Rep. 89.

[3] Commonwealth v. Alger, 7 Cush. 53. See Hart v. Mayor, &c. of Albany, 9 Wend. 571; s. c. 24 Am. Dec. 165.

[4] Commonwealth v. Tewksbury, 11 Met. 55. A statute which prohibited the having in possession of game birds after a certain time, though killed within the lawful time, was sustained in Phelps v. Racey, 60 N. Y. 10. That the State may prohibit the sale of arms to minors, see State v. Callicut, 1 Lea, 714.

**Earliest Known Nineteenth Century Restrictions on the Purchase and Transfer of Firearms by Minors**

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| Alabama | 1856 | "That any one who shall sell or give or lend, to any male minor, a . . . air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars." | An Act to Amend the Criminal Law, No. 26, § 1, 1856 Ala. Acts 17. |
| Delaware | 1881 | "That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined . . . ." | An Act providing for the punishment of persons carrying concealed deadly weapons, ch. 548, § 1, 16 Del. Laws 716 (1881). |
| District of Columbia | 1892 | "That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols . . . . That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor . . . ." | An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes, ch. 159, §5, 27 Stat. 116-17 (1892). |

[1] Year of enactment.

[2] Where the relevant law was published in a larger compendium source, the source date often postdates the year of enactment.

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| Georgia | 1876 | "[I]t shall not be lawful for any person or persons knowingly to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane. . . *Provided*, that nothing herein contained shall be construed as forbidding the furnishing of such weapons under circumstances justifying their use in defending life, limb or property." | An Act to punish any person or persons who shall sell, give, lend or furnish any minor or minors with deadly weapons herein mentioned and for other purposes, No. CXXVIIII (O. No. 63.), § 1, 1876 Ga. Acts And Resolutions 112. |
| Illinois | 1881 | "Whoever, not being the father, guardian or employer of the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor . . . ." | An Act to regulate the traffic in deadly weapons and to prevent the sale of them to minors, § 2, 1881 Ill. Laws 73. |
| Indiana | 1875 | "[I]t shall be unlawful for any person to sell, barter, or give to any other person under the age of twenty-one years any pistol . . . or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol." | An Act to prohibit the sale, gift, or bartering of deadly weapons or ammunition therfor, to minors, ch. XL, § 1, 1875 Ind. Laws 59. |
| Iowa | 1884 | "That it shall be unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor." | An Act to Prohibit the Selling or Giving of Fire Arms to Minors, ch. 78, § 1, 1884 Iowa Acts And Resolutions 86 |

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| Kansas | 1883 | "Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, . . . or other dangerous weapons to any minor . . . shall be deemed guilty of a misdemeanor . . . . Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, . . . or other dangerous weapon, shall be deemed guilty of a misdemeanor . . . ." | An Act to prevent selling, trading or giving of deadly weapons or toy pistols to minors, and to provide punishment therefor, ch. CV, §§ 1-2, 1883 Kan. Sess. Laws 159. |
| Kentucky | 1873 | "If any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon indictment and conviction, be fined . . . ." | Edward I. Bullock & William Johnson, Eds., The General Statutes Of The Commonwealth Of Kentucky, Ky. Gen. Stat. ch. 29, art. 29, § 1, at 359 (1873). |
| Louisiana | 1890 | "[I]t shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years." | An Act Making it a misdemeanor for any person to sell, give or lease, to any minor, any pistol, bowie-knife, dirk or any weapon, intended to be carried or used as a concealed weapon, No. 46, § 1, 1890 La. Acts 39, 39. |
| Maryland | 1882 | "[I]t shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shot guns, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years." | An Act to prohibit the sale of "Deadly Weapons to Minors," ch. 424, § 2, 1882 Md. Laws 656. |

| State | Year[1] | Statutory Text | Source[2] |
| --- | --- | --- | --- |
| Mississippi | 1878 | "[A]ny person not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a journey, or peace officers, or deputies in discharge of their duties, who carries concealed, in whole or in part, any bowie knife, pistol, . . . or other deadly weapon of like kind or description, shall be deemed guilty of a misdemeanor . . . . [I]t shall not be lawful for any person to sell to any minor . . . knowing him to be a minor . . . any weapon of the kind or description in the first section of this Act described, or any pistol cartridge . . . ." | An Act to prevent the carrying of concealed weapons, and for other purposes, ch. 66, §§ 1-2, 1878 Miss. Laws 175. |
| Missouri | 1879 | "If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, . . . having upon or about his person any kind of firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon . . . or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor . . . ." | Carrying deadly weapons, etc., Mo. Rev. Stat. § 1274 (1879). |

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| Nevada | 1885 | "Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous and deadly weapon concealed upon his person shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the County Jail not less than thirty days nor more than six months, or by both such fine and imprisonment." | An Act to amend an Act entitled "An Act to prohibit the carrying of concealed weapons by minors, ch. 51, § 1, 1885 Nev. Stat. 51; *see* An Act to Prohibit the Carrying of Concealed Weapons by Minors, ch. 104, § 1, 1881 Nev. Stat. 143-44 (statute that was amended in 1885 to increase the age from eighteen to twenty-one). |
| North Carolina | 1893 | "[I]t shall be unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot." | An act to prevent the sale of deadly weapons to minors, ch. 514, § 1, 1893 N.C. Pub. L. & Res. 468. |
| Tennessee | 1856 | "[I]t shall be unlawful for any person to sell, loan, or give, to any minor a pistol . . . *Provided*, that this act shall not be construed so as to prevent the sale, loan, or gift, to any minor of a gun for hunting." | An Act to amend the Criminal Laws of this State, ch. 81, § 2, 1856 Tenn. Acts 92. |
| Texas | 1897 | "[I]f any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol . . . without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof, he shall be punished by fine . . . ." | An Act to prevent the barter, sale and gift of any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance to any minor without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof, and providing a penalty for the violation, ch. 155, § 1, 1897 Tex. Gen. Laws 221-22. |

| State | Year[1] | Statutory Text | Source[2] |
| --- | --- | --- | --- |
| West Virginia | 1882 | "If a person carry about his person any revolver or other pistol . . . or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor . . . and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again." | An Act amending and re-enacting section seven of chapter one hundred and forty-eight of the code of West Virginia, and adding sections thereto for the punishment of unlawful combinations and conspiracies to injury persons or property, ch. 135, § 1, 1882 W. Va. Acts 421-22. |
| Wisconsin | 1883 | "It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor any pistol or revolver, found in his possession. . . . It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state." | An Act to prohibit the use and sale of pistols and revolvers, ch. 329, §§ 1-2, 1883 Wis. Laws 290. |

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| Wyoming | 1890 | "It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol . . . or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars." | Wyo. Rev. Stat. § 5052 (1899). |

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:23:30 2019

Citations:

Bluebook 20th ed.
1855 3 .

ALWD 6th ed.
1855 3 .

Chicago 7th ed.
, "," Alabama - General Assembly, 5th Biennial Session : 3-368

OSCOLA 4th ed.
, '' 1855 3

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 29 of 284

manner of apportioning the road hands in the county of St. Clair," be, and the same is hereby repealed. Repealed.

SEC. 2. *Be it further enacted*, That from and after the passage of this act, the Judge of Probate and Sheriff of St. Clair county, for services required of them in Article 1. Part 1. Title 13, Chapter 14, Code of Alabama, shall each receive annually fifty dollars, instead of ninety dollars as authorized by Section 1186, Code of Alabama.

APPROVED, Feb. 2, 1856.

---

[No. 26.] AN ACT

To amend the criminal law.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened*, That any one who shall sell or give or lend, to any male minor, a bowie knife, or knife or instument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars. Penalty.

APPROVED, Feb. 2, 1856.

---

[No. 27.] AN ACT

To declare Luxapalila Creek in Fayette county a public highway.

SECTION 1. *Be it enacted by the Senate and House of Representetives of the State of Alabama in General Assembly convened*, That from and after the passage of this act, Luxapalila Creek in Fayette county, from the State line up to Wood's Mill on said stream, be, and the same is hereby, declared a public highway.

APPROVED, February 15, 1856.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:47:57 2019

Citations:

Bluebook 20th ed.
1881 289 .

ALWD 6th ed.
1881 289 .

Chicago 7th ed.
, "," Delaware - General Assembly, Regular Session : 289-[iv]

OSCOLA 4th ed.
, '' 1881 289

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



be found the court shall impose a fine on the person so found guilty of the breaking and entering, not exceeding three hundred dollars, or shall imprison him for a term not exceeding three years, or both, at the discretion of the court.

Penalty.

*Passed at Dover, February 24, 1881.*

---

## CHAPTER 548.

### OF OFFENSES AGAINST PUBLIC JUSTICE.

Title.

AN ACT providing for the punishment of persons carrying concealed deadly weapons.

*Be it enacted by the Senate and House of Representatives of the State of Delaware, in General Assembly met:*

Unlawful to carry concealed deadly weapons.

Punishment.

SECTION 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: *Provided*, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.

Discharging fire-arms in any public road, a misdemeanor. Penalty.

SECTION 2. That if any person shall, except in lawful self-defence discharge any fire-arm in any public road in this State, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

Unlawful to point a gun or pistol at another.

SECTION 3. That it shall be unlawful for any person, either in jest or otherwise, intentionally to point a gun, pistol or other fire-arms at or towards any other person at any time or place. Any person violating any provision of this section shall, upon conviction thereof, pay a fine of not less than ten dollars nor more than one hundred dollars and the cost of prosecution, and should

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 32 of 284

death result to any person by the discharge of such gun, pistol or other fire-arm while so pointed, the person pointing the same shall be guilty of manslaughter when such killing shall not amount to murder, and shall be punished accordingly.

Penalty.

*Passed at Dover, April 8, 1881.*

---

## CHAPTER 549.

### GENERAL PROVISIONS CONCERNING CRIMES AND PUNISHMENTS.

AN ACT to amend Chapter 133 of the Revised Code, (General Provisions Concerning Crimes, &c.)

Title.

*Be it enacted by the Senate and House of Representatives of the State of Delaware, in General Assembly met:*

Section 10, Chap. 133, R. Code. amended.

SECTION 1. That Section 10 of Chapter 133 of the Revised Code, be amended by adding thereto as follows: If no order has been made by the court at the term when the sentence was made, or at a succeeding term, the resident judge of the county, shall have power to make such order upon petition and proof of inability; and the said order when made and filed with the Clerk of the Peace, shall be sufficient authority for the discharge of the prisoner. It shall be the duty of the Clerk of the Peace to furnish the sheriff at once with a certified copy of said order.

*Passed at Dover, January 26, 1881.*



Content downloaded/printed from HeinOnline

Thu Nov 7 15:07:40 2019

Citations:

Bluebook 20th ed.
To punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes., Chapter 159, 52 Congress, Public Law 52-159. 27 Stat. 116 (1892).

ALWD 6th ed.
To punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes., Chapter 159, 52 Congress, Public Law 52-159. 27 Stat. 116 (1892).

APA 6th ed.
To punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes., Chapter 159, 52 Congress, Public Law 52-159. 27 Stat. 116 (1892).

Chicago 7th ed.
, "Chapter 159, 52 Congress, Session 1, An Act: To punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.," U.S. Statutes at Large 27, no. Main Section (1892): 116-118

McGill Guide 9th ed.
To punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes., Chapter 159, 52 Congress, Public Law 52-159. 27 Stat. 116 (1892).

MLA 8th ed.
To punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes., Chapter 159, 52 Congress, Public Law 52-159. 27 Stat. 116 (1892). HeinOnline.

OSCOLA 4th ed.
To punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes., Chapter 159, 52 Congress, Public Law 52-159. 27 Stat. 116 (1892).

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



submitting plan and estimate for its improvement; and the Chief of Engineers shall submit to the Secretary of War the reports of the local and division engineers, with his views thereon and his opinion of the public necessity or convenience to be subserved by the proposed improvement; and all such reports of preliminary examinations with such recommendations as he may see proper to make, shall be transmitted by the Secretary of War to the House of Representatives, and are hereby ordered to be printed when so made.

Reports to be sent to House of Representatives and printed.

Appropriation for examinations, etc.

SEC. 8. For preliminary examinations, contingencies, expenses connected with inspection of bridges, the service of notice required in such cases, the examination of bridge sites and reports thereon, and for incidental repairs for which there is no special appropriation for rivers and harbors, one hundred and twenty-five thousand dollars: *Provided*, That no preliminary examination, survey, project, or estimate for new works other than those designated in this act shall be made: *And provided further*, That after the regular or formal report on any examination, survey, project, or work under way or proposed is submitted, no supplemental or additional report or estimate, for the same fiscal year, shall be made unless ordered by a resolution of Congress. The Government shall not be deemed to have entered upon any project for the improvement of any water way or harbor mentioned in this act until funds for the commencement of the proposed work shall have been actually appropriated by law.

*Provisos.*
No survey, etc., unless provided for.

No supplemental reports, etc., to be made.

No project authorized until appropriation made.

Approved, July 13, 1892.

---

July 13, 1892.

**CHAP. 159.**—An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

District of Columbia.

Carrying concealed weapons forbidden.

Openly carrying weapons with unlawful intent forbidden.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: *Provided*, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: *Provided, further*, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: *Provided further*, That nothing contained in the first or second sections of this act shall be so construed as to apply to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District

Punishment, first offense.

*Provisos.*
Exceptions.

Lawful use of weapons.

Permits.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 35 of 284

of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self-defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

Punishment, second offense.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

Disposition of weapons taken from offenders.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions of this act shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

Punishment for sale of weapons to minors.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major, and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars

Special license for dealers in weapons.

Penalty for dealing without license.

Register of sales, etc.

Half of fine to informer.

Penalty for failure to arrest by officers.

Repeal.

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

Approved, July 13, 1892.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:39:41 2019

Citations:

Bluebook 20th ed.
1876 112 .

ALWD 6th ed.
1876 112 .

Chicago 7th ed.
, "," Georgia - Regular Session : 112-113

OSCOLA 4th ed.
, '' 1876 112

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 37 of 284

No. CXXVII.—(O. No. 230.)

SECTION 1. Punishment for cruelty to animals.

*An Act to alter and amend an Act entitled an Act for the prevention of cruelty to animals, approved March 1, 1875.*

Punishment for cruelty to animals

SECTION I. *Be it enacted, etc.*, That from and after the passage of this Act, that the Act entitled an Act for the prevention of cruelty to animals be altered and amended by striking out the words, in the last line of said Act, "be fined in a sum not to exceed fifty dollars," and insert in lieu thereof the words "be punished as prescribed in section 4310 of the Code of 1873."

SEC. II. Repeals conflicting laws.

Approved February 23, 1876.

---

No. CXXVIII.—(O. No. 63.)

SECTION 1. Furnishing deadly weapons to minors prohibited.

*An Act to punish any person or persons who shall sell, give, lend or furnish any minor or minors with deadly weapons herein mentioned, and for other purposes.*

Furnishing deadly weapons to minors prohibited

Penalty for violation

Proviso

SECTION I. *Be it enacted, etc.*, That from and after the passage of this Act it shall not be lawful for any person or persons knowingly to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane. Any person found guilty of a violation of this Act shall be guilty of a misdemeanor, and punished as prescribed in section 4310 of the Code of 1873: *Provided*, that nothing herein contained shall be construed as forbidding the furnishing of such weapons under circumstances justifying their use in defending life, limb or property.

SEC. II. Repeals conflicting laws.

Approved February 17, 1876.

---

No. CXXIX.—(O. No. 184.)

SECTION.
1. Penalty for escapes.

SECTION.
2. *Particeps criminis.*

*An Act to provide a penalty for escapes from the "chain gang," and for other purposes.*

Penalty for escapes

SECTION I. *Be it enacted, etc.*, That from and after the passage of this Act, if any person or persons shall be convicted of any offense below the grade of felony, and such person or persons shall escape from the "chain gang," or from any other place of

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:49:35 2019

Citations:

Bluebook 20th ed.
1881 1 .

ALWD 6th ed.
1881 1 .

Chicago 7th ed.
, "," Illinois - 32nd General Assembly, 1st Session : 1-158

OSCOLA 4th ed.
, '' 1881 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CRIMINAL CODE.

## DEADLY WEAPONS.

### REGULATES TRAFFIC AND PREVENTS SALE TO MINORS.

§ 1. Forbids possession or sale of slung-shots or knuckles—penalty.
§ 2. Forbids sale, loan or gift to minors, of fire-arms or other deadly weapons—penalty.
§ 3. Provides for registry of sales by dealers in deadly weapons—Form of register—penalty for failure to keep same.
§ 4. Penalty for carrying deadly weapons or display of same.
§ 5. Fines and penalties—how recovered – Increased penalty for second offense.
§ 6. Exempts sheriffs, coroners, constables, policemen or peace officers from provisions of this act.
§ 7. Repealing clause for acts in conflict.

In force July 1, 1881.

AN ACT *to regulate the traffic in deadly weapons, and to prevent the sale of them to minors.*

SECTION 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That whoever shall have in his possession, or sell, give or loan, hire or barter, or whoever shall offer to sell, give, loan, hire or barter, to any person within this state, any slung-shot or metallic knuckles, or other deadly weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor, and upon conviction shall be fined in any sum not less than ten dollars ($10) nor more than two hundred dollars ($200).

§ 2. Whoever, not being the father, guardian or employer of the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

§ 3. All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this state shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form:

| No. of weapon. | To whom sold or given. | Age of purchaser. | Kind and description of weapon. | For what purpose purchased or obtained. | Price of weapon. |
|---|---|---|---|---|---|
| | | | | | |

Said register shall be kept open for the inspection of the public, and all persons who may wish to examine the same may do so at all reasonable times during business hours. A failure to keep such register, or to allow an examination of the same, or to record

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 40 of 284

therein any sale or gift of a deadly weapon, or the keeping of a false register, shall be a misdemeanor, and shall subject the offender to a fine of not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

§ 4. Whoever shall carry a concealed weapon upon or about his person of the character in this act specified, or razor as a weapon, or whoever, in a threatening or boisterous manner, shall display or flourish any deadly weapon, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

§ 5. All fines and penalties specified in this act may be recovered by information, complaint or indictment, or other appropriate remedy, in any court of competent jurisdiction; and, when recovered, shall be paid into the county treasury of the county where the conviction is had, and become a part of the current revenue of the county; or the said fines and penalties may be recovered by *qui tam* action, one-half to be paid to the informer, and the other half to be paid into the county treasury, as aforesaid. For a second violation of any of the provisions of this act the offender shall be fined in double the amount herein specified, or may be committed to the county jail for any term not exceeding twenty days, in the discretion of the court.

§ 6. Section four (4) of this act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, while engaged in the discharge of their official duties, or to any person summoned by any of such officers to assist in making arrest, or preserving the peace, while such person so summoned is engaged in assisting such officer.

§ 7. All acts and parts of acts in conflict with this act are hereby repealed.

APPROVED April 16, 1881.

---

## PENALTY FOR ADULTERATION OF BUTTER AND CHEESE.

§ 1. Manufacture of imitations or adulteration of butter and cheese prohibited—Penalty.

§ 2. Repealing clause.

In force July 1, 1881.

AN ACT *to prevent the adulteration of butter and cheese, or the sale or disposal of the same, or the manufacture or sale of any article as a substitute for butter or cheese, or any article to be used as butter and cheese.*

SECTION 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That whoever manufactures out of any oleaginous substances, or any compound of the same other than that produced from unadulterated milk, or cream from the same,

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:38:14 2019

Citations:

Bluebook 20th ed.
1875 59 .

ALWD 6th ed.
1875 59 .

Chicago 7th ed.
, "," Indiana - 49th Regular Session : 59-60

OSCOLA 4th ed.
, '' 1875 59

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 42 of 284

## CHAPTER XL.

AN ACT to prohibit the sale, gift, or bartering of deadly weapons or ammunition therefor, to minors.

[APPROVED FEBRUARY 27, 1875.]

Unlawful to sell, barter or give to minors deadly weapons or cartridges for pistol.

SECTION 1. *Be it enacted by the General Assembly of the State of Indiana,* That it shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol.

Penalty.

SEC. 2. *Be it further enacted,* That any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars.

---

## CHAPTER XLI.

AN ACT in relation to the settlement of claims against decedents' estates.

[APPROVED MARCH 11, 1875.]

Claims against decedent's estate, filing examination, allowance, and payment of same.

SEC. 1. *Be it enacted by the General Assembly of the State of Indiana,* That whenever a claim shall exist in favor of an executor or administrator against the estate he represents, which accrued before the death of such decedent, the same shall be filed against said estate, with the affidavit of the claimant attached, to the effect that the same is justly due and wholly unpaid, and placed upon the dockets of the court having jurisdiction of the estate against which said claim is filed, thirty days before the commencement of the term of said court, during which said claim is to be presented for allowance. And the Judge of said court shall represent said estate, and shall examine into the nature of

Judge shall represent estate.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:58:01 2019

Citations:

Bluebook 20th ed.
1884 1 .

ALWD 6th ed.
1884 1 .

Chicago 7th ed.
, "," Iowa - 20th General Assembly, Regular Session : 1-248

OSCOLA 4th ed.
, '' 1884 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



## CHAPTER 78.

RELATING TO SALE OF FIRE ARMS TO MINORS.

H. F. 104.

AN ACT to Prohibit the Selling or Giving of Fire Arms to Minors.

*Be it enacted by the General Assembly of the State of Iowa:*

Unlawful to sell or give to minors fire arms or toy pistols.

SECTION 1. That it shall be unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor.

Fine or imprisonment.

SEC. 2. Any violation of this act shall be punishable by a fine of not less than twenty-five nor more than one hundred dollars or by imprisonment in the county jail of not less than ten nor more than thirty days.

Publication.

SEC. 3. This act being deemed of immediate importance shall be in full force and take effect from and after its publication in the Iowa State Leader and Iowa State Register, newspapers published at Des Moines, Iowa.

Approved, March 29, 1884.

I hereby certify that the foregoing act was published in the *Iowa State Leader* April 2, and *Iowa State Register* April 3, 1884.

J. A. T. HULL, *Secretary of State.*

## CHAPTER 79.

CITIES AND TOWNS.

S. F. 380.

AN ACT to Amend Chapter ninety-five (95) of Laws of Sixteenth General Assembly.

*Be it enacted by the General Assembly of the State of Iowa:*

Chap. 95, 16th G. A., amended.

Loans.

SECTION 1. That chapter ninety-five (95) of the laws of the sixteenth general assembly be amended by striking out the number "4,500" in the fifth line of section one of said chapter and inserting the number "3,500" in lieu thereof.

Publication.

SEC. 2. This act being deemed of immediate importance the same shall take effect from and after its publication in the Iowa State Register and Iowa State Leader, newspapers published in Des Moines, Iowa.

Approved, March 29, 1884.

I hereby certify that the foregoing act was published in the *Iowa State Register* April 3, and in the *Iowa State Leader* April 2, 1884.

J. A. T. HULL, *Secretary of State.*



HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:55:45 2019

Citations:

Bluebook 20th ed.
1883 1 .

ALWD 6th ed.
1883 1 .

Chicago 7th ed.
, "," Kansas - 20th Legislature, Regular Session : 1-268

OSCOLA 4th ed.
, '' 1883 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 46 of 284

within thirty days after the said misdemeanor is alleged to have been committed.

SEC. 3. This act shall take effect and be in force from and after its publication in the official state paper.

Approved March 5, 1883.

I hereby certify that the foregoing is a true and correct copy of the original enrolled bill now on file in my office, and that the same was published in the official state paper, March 6, 1883. JAMES SMITH, *Secretary of State.*

## CHAPTER CV.

### CRIMES AND PUNISHMENTS—RELATING TO MINORS AND DEADLY WEAPONS OR TOY PISTOLS.

[House Bill No. 99.]

AN ACT to prevent selling, trading or giving deadly weapons or toy pistols to minors, and to provide punishment therefor.

*Be it enacted by the Legislature of the State of Kansas:*

SECTION 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.

SEC. 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nor more than ten dollars.

SEC. 3. This act to take effect and be in force from and after its publication in the official state paper.

Approved March 5, 1883.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:37:01 2019

Citations:

Bluebook 20th ed.
Edward I. Bullock, Editor; William Johnson, Editor. General Statutes of the Commonwealth of Kentucky (1873).

ALWD 6th ed.
Edward I. Bullock, Editor; William Johnson, Editor. General Statutes of the Commonwealth of Kentucky (1873).

APA 6th ed.
Bullock, E. (1873). General Statutes of the Commonwealth of Kentucky. Frankfort, KY, Printed at the Kentucky Yeoman Office.

Chicago 7th ed.
Bullock Edward I., Editor; William Johnson, Editor. General Statutes of the Commonwealth of Kentucky. Frankfort, KY, Printed at the Kentucky Yeoman Office.

McGill Guide 9th ed.
Edward I. Bullock, Editor; William Johnson, Editor, General Statutes of the Commonwealth of Kentucky (Frankfort, KY: Printed at the Kentucky Yeoman Office., 1873)

MLA 8th ed.
Bullock, Edward I., Editor, and Editor William Johnson. General Statutes of the Commonwealth of Kentucky. Frankfort, KY, Printed at the Kentucky Yeoman Office. HeinOnline.

OSCOLA 4th ed.
Bullock, Edward I., Editor; William Johnson, Editor. General Statutes of the Commonwealth of Kentucky. Frankfort, KY, Printed at the Kentucky Yeoman Office.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 48 of 284

§ 7. If any person unlawfully, but not with felonious intention, take, carry away, deface, destroy, or injure any property, real or personal, or other thing of value not his own, or willfully and knowingly, without a felonious intention, break down, destroy, injure, or remove any monument erected to designate the boundaries of this State, or any county, city, or town thereof, or the boundaries of any tract or lot of land, or any tree marked, or post or stone planted for that purpose, he shall be fined not less than ten nor more than two thousand dollars.

Carrying away or injuring property unlawfully, but not with felonious intent.

§ 8. If any person shall willfully and unlawfully cut down or destroy, by belting, topping, or otherwise, any fruit or shade tree of another, or quarry stone on the land, pull down or open the fence or gate, destroy or injure the vegetables, trees, or shrubbery of any other person, he shall be fined not less than five nor more than five hundred dollars.

Destroying or injuring fruit trees, quarrying stone, injuring gates, fences, vegetables, etc.

§ 9. If any person willfully and unlawfully pull down or injure a church, court-house, school-house, or other public building, he shall be fined not less than five nor more than five thousand dollars.

Injuring church, court-house, etc.

## ARTICLE XXIX.

### *Deadly Weapons.*

§ 1. If any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon indictment and conviction, be fined not less than twenty-five nor more than one hundred dollars, and imprisoned in the county jail for not less than ten nor more than thirty days, in the discretion of the court or jury trying the case.

Carrying concealed deadly weapons.

§ 2. That it shall be the duty of all ministerial officers in this State to apprehend such violator within their knowledge of this act, and to take such persons before a magistrate of the county in which said offense was committed; and if said magistrate shall, upon hearing the evidence, believe such accused person guilty of the offense charged, he shall require such accused person to give such bail as will insure his or her appearance at the next term of the circuit court for said county, to answer any indictment found against him or her in said court for said offense.

Duty of ministerial officers.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 49 of 284

Officer failing or refusing to discharge his duty.

§ 3. If any such officer shall knowingly and willfully fail or refuse to discharge the duties imposed and required of him under this act, he shall, upon indictment found by the grand jury of his county, and on conviction, be fined in a sum of not less than one hundred nor more than five hundred dollars.

If judgment confessed, shall be for highest amount.

§ 4. That if judgment shall be confessed under this article, the penalty shall be the highest punishment imposed herein.

Lawful in the following cases.

§ 5. Carrying concealed deadly weapons shall be lawful in the following cases: 1st. When the person has reasonable grounds to believe his person or the person of some of his family, or his property is in immediate danger from violence or crime; 2d. By sheriffs, constables, marshals, policemen, and other ministerial officers, when necessary for their protection in the discharge of their official duties.

## ARTICLE XXX.

### *Pardon Brokerage and Lobbying.*

Unlawful for certain persons for fee or reward to procure the passage or rejection of a bill.

§ 1. If any person other than an officer of this Commonwealth, for fee or reward, or the promise thereof, shall engage, or assist in procuring the passage of any bill or act, or the rejection thereof, by the General Assembly, not being a member thereof, or the granting or refusing of a pardon, or remission or respite of any punishment or fine, by the Governor, he shall be fined not less than twenty nor more than five hundred dollars; but this section shall not apply to an attorney at law, or other person who may orally, or in writing, appear before any committee of the General Assembly, or either House thereof, in advocacy of the passage of a bill or act, or the rejection thereof by the General Assembly or any such committee.

Unlawful for officer or member of the General Assembly to procure the allowance of a claim or the passage or rejection of a bill.

§ 2. If any officer of this State, or a member of the General Assembly, or officer thereof, shall, for fee, reward, or promise thereof, engage or assist in the prosecution, or in procuring the allowance or payment of any claim against this State, or in procuring the passage or rejection of a bill or act by the General Assembly, or in procuring a pardon or remission of a fine, or the refusal of either by the Governor, he shall be fined not less than twenty dollars, forfeit his office and right to hold office. The proper courts of Franklin county, or of the residence of the offender, shall have jurisdiction under this and the next preceding section.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:59:08 2019

Citations:

Bluebook 20th ed.
1890 39 .

ALWD 6th ed.
1890 39 .

Chicago 7th ed.
, "," Louisiana - General Assembly, Regular Session : 39-39

OSCOLA 4th ed.
, '' 1890 39

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



filed by the defendant, or by his counsel, the party cast in the suit, shall be considered duly notified of the judgment by the fact of its being signed by the judge;

*Provided*, that in the country parishes no execution shall issue in cases where an appeal lies, until ten days after the adjournment of the court by which the judgment was rendered, within which delay a party may take a suspensive appeal on filing petition and appeal bond as now provided by law.

Relative to appeals in the country parishes.

S. P. HENRY,
Speaker of the House of Representatives.
JAMES JEFFRIES.
Lieut.-Governor and President of the Senate.

Approved July 1st, 1890.

FRANCIS T. NICHOLLS,
Governor of the State of Louisiana.

A true copy from the original:
L. F. MASON
Secretary of State.

---

No. 46.] **AN ACT**

Making it a misdemeanor for any person to sell, give or lease, to any minor, any pistol, bowie-knife, dirk or any weapon, intended to be carried or used as a concealed weapon.

SECTION 1. *Be it enacted by the General Assembly of the State of Louisiana*, That, hereafter, it shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years.

Makigg it a misdemeanor to sell to any minor any pistol, bowie-knife, dirk or other weapon.

SECTION 2. *Be it further enacted, etc*, That any person violating the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction thereof, shall pay a fine of not less than twenty-five dollars nor more than one hundred dollars, and in default of the payment of said fine, by imprisonment not exceeding twenty days.

Penalty.

SEC. 3. *Be it further enacted, etc.*, That all laws or parts of laws in conflict with this act be and the same are hereby repealed, and that this act take effect from and after its passage.

Repealing clause.

S. P. HENRY,
Speaker of the House of Representatives.
JAMES JEFFRIES,
Lieut.-Governor and President of the Senate.

Approved July 1, 1890.

FRANCIS T. NICHOLLS,
Governor of the State of Louisiana.

A true copy from the original:
L. F. MASON,
Secretary of State.



HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:52:01 2019

Citations:

Bluebook 20th ed.
1882 656 .

ALWD 6th ed.
1882 656 .

Chicago 7th ed.
, "," Maryland - General Assembly, January Session : 656-657

OSCOLA 4th ed.
, '' 1882 656

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 53 of 284

## Chapter 424.

AN ACT to prohibit the sale of "Deadly Weapons to Minors."

Cartridge toy pistol.

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That it shall be unlawful for any person or persons within the State of Maryland to manufacture or to sell, barter or give away the cartridge toy pistol to any one whomsoever.

Prohibiting selling to minors.

SEC. 2. *Be it enacted*, That it shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shot gun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years. Any person or persons violating any of the provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and cost, be committed to jail and confined therein until such fine and costs are paid, or for the period of sixty days, whichever shall first occur.

Effective.

SEC. 3. *And be it enacted*, That this act shall take effect from the date of its passage.

Approved May 3, 1882.

---

## Chapter 425.

AN ACT to authorize the Commissioners of Talbot county to open water courses through private property in said county to secure the proper drainage of the public roads therein.

Open water course.

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That whenever any supervisor or contractor of the public roads in Talbot county shall find it necessary to open a water course through private property in said county, to secure the proper drainage of any public road therein, he shall forthwith so inform the County Commissioners of Talbot county, and if the owner or owners of said

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 54 of 284

property consent to the opening of such water course, or if such owner or owners and the said county commissioners shall agree upon the value and price to be paid for the same, then such consent and agreement shall be entered on the books of the said county commissioners, and such water course shall be opened; but if they cannot agree, and the said county commissioners decide that the opening of such water course is necessary to drain said road, they shall authorize the said supervisor or contractor to summon a jury of twelve men to value and condemn the said water course, deducting from their estimate the value, if any, that such water course will be to the owner or owners of said property through which it shall pass, and as soon as the money for such water course is tendered to the owner or owners of said private property, the said supervisor or contractor shall immediately cause such water course to be opened.

Disagreement—how settled.

SEC. 2. *And be it enacted*, That this act shall take effect from the date of its passage.

Effective.

Approved May 3, 1882.

---

## Chapter 427.

AN ACT to repeal and re-enact with amendments section one of chapter three hundred and eighteen of the acts of the General Assembly of eighteen hundred and eighty, entitled "An act to fix the compensation of the sheriff of Montgomery county for keeping and boarding prisoners committed to the jail of said county."

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That section one of chapter three hundred and eighteen of the acts of the General Assembly of eighteen hundred and eighty, entitled "An act to fix the compensation of the sheriff of Montgomery county for keeping and boarding prisoners committed to the jail of said county," be and the same is hereby repealed and re-enacted so as to read as follows:

Repealed and re-enacted.



HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:41:07 2019

Citations:

Bluebook 20th ed.
1878 175 .

ALWD 6th ed.
1878 175 .

Chicago 7th ed.
, "," Mississippi - Regular Session : 175-176

OSCOLA 4th ed.
, '' 1878 175

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device

## CHAPTER XLVI.

AN ACT to prevent the carrying of concealed weapons, and for other purposes.

SECTION 1. *Be it enacted by the Legislature of the State of Mississippi*, That any person, not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a journey, or peace officers, or deputies in discharge of their duties, who carries concealed, in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description, shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offence by a fine of not less than five dollars nor more than one hundred dollars, and in the event the fine and cost are not paid shall be required to work at hard labor under the direction of the board of supervisors or of the court, not exceeding two months, and for the second or any subsequent offence, shall, on conviction, be fined not less than fifty nor more than two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor not exceeding six months under the direction of the board of supervisors, or of the court. That in any proceeding under this section, it shall not be necessary for the State to allege or prove any of the exceptions herein contained, but the burden of proving such exception shall be on the accused.

When concealed weapons may be carried.

Penalty for carrying weapons.

Burden of proof on accused.

SEC. 2. *Be it further enacted*, That it shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described, or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months.

Minors, or persons intoxicated.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 57 of 284

SEC. 3. *Be it further enacted*, That any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this Act described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors or of the court.

Minor under 16 years.

SEC. 4. *Be it further enacted*, That any student of any university, college or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the first section of this Act described, or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars, and if the fine and costs are not paid, condemned to hard labor under the direction of the board of supervisors or of the court.

Students.

SEC. 5. *Be it further enacted*, That each justice of the peace before whom a conviction is had, shall, in addition to the costs now allowed by law, be entitled to a tax fee of two dollars and a half.

Tax fee of justice.

SEC. 6. *Be it further enacted*, That immediately after the passage of this Act, the Secretary of State shall transmit a copy to each circuit judge in the State, who shall cause the same to be read in open court on the day for the calling of the State docket of the court.

Act to be read in courts

SEC. 7. *Be it further enacted*, That this Act take effect from and after its passage.

APPROVED, February 28, 1878.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:45:42 2019

Citations:

Bluebook 20th ed.
John A.; et al. Hockaday, Compilers %26 Annotators. Revised Statutes of the State of Missouri 1879 (1879).

ALWD 6th ed.
John A.; et al. Hockaday, Compilers %26 Annotators. Revised Statutes of the State of Missouri 1879 (1879).

APA 6th ed.
Hockaday, J. (1879). Revised Statutes of the State of Missouri 1879. Jefferson City, Carter Regan, State printers and binders.

Chicago 7th ed.
Hockaday John A.; et al., Compilers %26 Annotators. Revised Statutes of the State of Missouri 1879. Jefferson City, Carter & Regan, State printers and binders.

McGill Guide 9th ed.
John A.; et al. Hockaday, Compilers %26 Annotators, Revised Statutes of the State of Missouri 1879 (Jefferson City: Carter & Regan, State printers and binders., 1879)

MLA 8th ed.
Hockaday, John A., and Compilers & Annotators et al. Revised Statutes of the State of Missouri 1879. Jefferson City, Carter & Regan, State printers and binders. HeinOnline.

OSCOLA 4th ed.
Hockaday, John A.; et al., Compilers & Annotators. Revised Statutes of the State of Missouri 1879. Jefferson City, Carter & Regan, State printers and binders.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



SEC. 1271. *Abandonment of children.*—If any father or mother of any child under the age of six years, or any other person to whom such child shall have been confided, shall expose such child in a street, field or other place, with intent wholly to abandon it, he or she shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding five years, or in the county jail not less than six months. (G. S. 781, § 39.)

SEC. 1272. *Mistreatment of apprentices.*—If any master or mistress of an apprentice or other person having the legal care and control of any infant, shall, without lawful excuse, refuse or neglect to provide for such apprentice or infant, necessary food, clothing or lodging, or shall unlawfully and purposely assault such apprentice or infant, whereby his life shall be endangered, or his health shall have been or shall be likely to be permanently injured, the person so offending shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or by imprisonment in the county jail not exceeding one year, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment. (New section.)

SEC. 1273. *Abandonment of wife or child.*—If any man shall, without good cause, abandon or desert his wife, or abandon his child or children under the age of twelve years born in lawful wedlock, and shall fail, neglect or refuse to maintain and provide for such wife, child or children, he shall, upon conviction, be punished by imprisonment in the county jail not more than one year, or by a fine of not less than fifty, nor more than one thousand dollars, or by both such fine and imprisonment. No other evidence shall be required to prove that such husband was married to such wife, or is the father of such child or children, than would be necessary to prove such fact or facts in a civil action. (Laws 1867, p. 112, amended—*m.*)

SEC. 1274. *Carrying deadly weapons, etc.*—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the county jail not exceeding three months, or by both such fine and imprisonment. (Laws 1874, p. 43; laws 1875, p. 50, and laws 1877, p. 240, amended.)

SEC. 1275. *Above section not to apply to certain officers.*—The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property. (New section.)

SEC. 1276. *Fire arms not to be discharged near court house.*—Hereafter it shall be unlawful for any person in this state, except he be a sheriff or other officer in the discharge of official duty, to discharge or fire off any

(*m*) Wife held to be a competent witness to prove fact of abandonment. 43 Mo. 429. The fact that the defendant has brought suit for divorce is no defense. 52 Mo. 172.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Jan 2 18:27:31 2020

Citations:

Bluebook 20th ed.
1881 9 .

ALWD 6th ed.
1881 9 .

Chicago 7th ed.
, "," Nevada - 10th Session : 9-2

OSCOLA 4th ed.
, '' 1881 9

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 61 of 284

SEC. 8. The Board of County Commissioners of said county are hereby authorized and empowered to grant to the said parties, named in Section One of this Act, their associates or assigns, such additional rights, privileges and grants as said parties, their associates and assigns, may desire or deem necessary for the full and complete enjoyment of the franchise and privileges created and granted by this Act.

Commissioners empowered to grant additional rights

SEC. 9. The Board of County Commissioners shall require of said railroad company the payment of a quarterly license for each and every car run on said railroad; also regulate the charge for fare and freights thereon; and do such other matters and things relating to said railroad as they may deem just and proper.

License required.

---

CHAP. CIII.—*An Act to Repeal an Act entitled "An Act to Authorize the Publication of the Laws Enacted in the Legislature of the State of Nevada," approved March 2, 1877.*

[Approved March 4, 1881.]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

SECTION 1. An Act entitled "An Act to Authorize the Publication of the Laws Enacted by the Legislature of the State of Nevada," approved the second day of March, A. D. one thousand eight hundred and seventy-seven, is hereby repealed.

Publication of Statutes, law repealed.

---

CHAP. CIV.—*An Act to Prohibit the Carrying of Concealed Weapons by Minors.*

[Approved March 4, 1881.]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

SECTION 1.—Every person under the age of eighteen (18) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous and deadly weapon concealed upon his person shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by

Minors prohibited from carrying concealed weapons, penalty, etc.

imprisonment in the County Jail not less than thirty days nor more than six months, or by both such fine and imprisonment.

SEC. 2. All Acts and parts of Acts in conflict with the provisions of this Act are hereby repealed.

SEC. 3. This Act shall take effect and be in force from and after its passage.

---

CHAP. CV.—*An Act Fixing the Salaries of the District Judges in the Several Judicial Districts and Matters Relating Thereto.*

[Approved March 4, 1881.]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

District Judges' salaries prescribed, to take effect in 1883.

SECTION 1. The annual salaries of the Judges of the several Judicial Districts shall be as follows:

Of the First District—Six thousand ($6,000) dollars.

Of the Second District—Four thousand ($4,000) dollars; of which sum the county of Ormsby shall pay twenty-eight hundred ($2,800) dollars and the county of Douglas shall pay twelve hundred ($1,200) dollars.

Of the Third District—Five thousand ($5,000) dollars; the county of Lyon shall pay twenty-five hundred ($2,500) dollars and the county of Esmeralda shall pay twenty-five hundred ($2,500) dollars.

Of the Fourth District—Forty-five hundred ($4,500) dollars; of which sum the county of Humboldt shall pay eighteen hundred ($1,800) dollars and the county of Elko shall pay twenty-seven hundred ($2,700) dollars.

Of the Fifth District—Five thousand ($5,000) dollars; of which sum the county of Lander shall pay twenty-two hundred and fifty ($2,250) dollars, the county of Nye shall pay nineteen hundred ($1,900) dollars, and the county of Churchill eight hundred and fifty ($850) dollars.

Of the Sixth District—Six thousand five hundred ($6,500) dollars; of which sum the county of Eureka shall pay thirty-five hundred ($3,500) dollars, the county of White Pine shall pay eighteen hundred ($1,800) dollars, and the county of Lincoln shall pay twelve hundred ($1,200) dollars.

Of the Seventh Judicial District—Thirty-six hundred ($3,600) dollars.

SEC. 2. This Act shall take effect and be in force on the first Monday in January, eighteen hundred and eighty-three, and all Acts heretofore passed and in conflict with this Act are hereby repealed.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Jan 2 10:56:52 2020

Citations:

Bluebook 20th ed.
1885 11 .

ALWD 6th ed.
1885 11 .

Chicago 7th ed.
, "," Nevada - 12th Session : 11-2

OSCOLA 4th ed.
, '' 1885 11

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



not, such person or persons, owner or owners, shall be subject to such damages as shall be equal to twice the value of the property broken into, eaten up or destroyed.

Damages.

SEC. 3. All actions for damages arising under the provisions of this Act shall be tried and determined in the court having jurisdiction thereof, as in other cases made and provided.

SEC. 4. All Acts and parts of Acts, in conflict with the provisions of this Act, are hereby repealed.

SEC. 5. This Act shall take effect and be in force from and after thirty days after its approval.

---

CHAP. LI.—*An Act to amend an Act entitled "An Act to prohibit the carrying of concealed weapons by minors," approved March 4, 1881.*

[Approved March 2, 1885.]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

SECTION 1. Section one of said Act is hereby amended so as to read as follows:

Minors not to carry concealed weapons.

Section one. Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.

Penalty.

---

CHAP. LII.—*An Act for the relief of William C. Ross.*

[Approved March 2, 1885.]

*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

State Land Register to contract.

SECTION 1. The State Land Register is hereby authorized to enter into contract with William C. Ross, on land applied for by said William C. Ross, February twenty-eighth, eighteen hundred and eighty-one, and described as follows: Lots one, two and three, and the southwest quarter of the northeast quarter of section five, in township number eleven, north of range number twenty-six east.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 15:09:18 2019

Citations:

Bluebook 20th ed.
1893 35 .

ALWD 6th ed.
1893 35 .

Chicago 7th ed.
, "," North Carolina - Public Laws and Resolutions, General Assembly : 35-500

OSCOLA 4th ed.
, '' 1893 35

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



CHAPTER 512.

**An act to amend section thirteen, chapter three hundred and twenty, acts eighteen hundred and ninety-one.**

*The General Assembly of North Carolina do enact:*

Chapter 320, laws 1891 (railroad commission act) amended. Telephone companies included.

SECTION 1. That chapter three hundred and twenty, section thirteen, laws eighteen hundred and ninety-one, be amended by adding after the word "telegraph" in line five, section thirteen, the words "and telephone."

To make rates for telephone lines.

SEC. 2. That section twenty-six be amended by inserting after the word "telegraph" in line seven the words "or telephone."

SEC. 3. That this act shall be in force from and after its ratification.

Ratified the 6th day of March, A. D. 1893.

---

CHAPTER 513.

**An act to amend chapter five hundred and thirty, laws of one thousand eight hundred and ninety-one.**

*The General Assembly of North Carolina do enact:*

Chapter 530, laws 1891, amended. Appropriation for colored orphan asylum at Oxford, N. C.

SECTION 1. That chapter five hundred and thirty of the laws of one thousand eight hundred and ninety-one be and the same is hereby amended by striking out all after the word "asylum" in line two section one of said chapter down to and including the word "orphanage" in line three of said section and inserting in lieu thereof the words "located at Oxford, North Carolina," and by striking out "one thousand dollars" and inserting the words "fifteen hundred dollars," the latter sum being the entire amount of the annual appropriation to said orphanage.

SEC. 2. That this act shall be in force from and after its ratification.

Ratified the 6th day of March, A. D. 1893.

---

CHAPTER 514.

**An act to prevent the sale of deadly weapons to minors.**

*The General Assembly of North Carolina do enact:*

Unlawful to knowingly sell, &c., to minor certain deadly weapons.

SECTION 1. That it shall be unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 67 of 284

SEC. 2. That any person, corporation or firm violating this act shall be guilty of a misdemeanor, and upon conviction for each and every offence shall be fined or imprisoned, one or both, in the discretion of the court.

Misdemeanor.

SEC. 3. That this act shall be in force from and after its ratification.

Ratified the 6th day of March, A. D. 1893.

---

## CHAPTER 515.

### An act to amend chapter sixty, section three, of the laws of eighteen hundred and eighty-nine.

*The General Assembly of North Carolina do enact:*

SECTION 1. That section three, chapter sixty of the laws of one thousand eight hundred and eighty-nine be and the same is hereby repealed.

Section 3, chapter 60, laws 1889, (reducing school age of Croatan Indians to ten years) repealed.

SEC. 2. That persons of the Croatan race of either sex who are not under thirteen years of age may attend the normal school for the Croatans: *Provided*, that children not under eleven years of age may be admitted who can stand an approved examination in spelling, reading, writing, primary geography and the fundamental rules of arithmetic.

School age for Croatan Indian children.

SEC. 3. That this act shall be in force from and after its ratification.

Ratified the 6th day of March, A. D. 1893.

---

## CHAPTER 516.

### An act to provide for the working of convicts on the public roads of Wayne county.

*The General Assembly of North Carolina do enact:*

SECTION 1. It shall be the duty of the county commissioners of Wayne county immediately after the passage of this act to provide means and make all necessary arrangements and rules for the working on the public roads of said county of the convicts which shall hereafter be sentenced to work thereon under the provisions of this act; and to that end it shall be lawful for the said county commis-

Commissioners of Wayne county to provide means, &c., for working convicts on roads.

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:30:50 2019

Citations:

Bluebook 20th ed.
1855-1856 92 .

ALWD 6th ed.
1855-1856 92 .

Chicago 7th ed.
, "," Tennessee - 31st General Assembly, 1st Session : 92-93

OSCOLA 4th ed.
, '' 1855-1856 92

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 69 of 284

## CHAPTER 81.

AN ACT to amend the Criminal Laws of this State.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee*, That when any person shall be indicted in the Circuit Courts, or any other court having criminal jurisdiction, for malicious shooting, and the jury trying the cause, after having all the evidence, shall be of the opinion that the defendant is not guilty of the malice, they shall have the power to find the defendant guilty of an assault, or an assault and battery, and judgment shall be given accordingly.

SEC. 2. *Be it enacted*, That, hereafter, it shall be unlawful for any person to sell, loan, or give, to any minor a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife; and whoever shall so sell, loan, or give, to any minor any such weapon, on conviction thereof, upon indictment or presentment, shall be fined not less than twenty-five dollars, and be liable to imprisonment, at the discretion of the Court: *Provided*, that this act shall not be construed so as to prevent the sale, loan, or gift, to any minor of a gun for hunting.

SEC. 3. *Be it enacted*, That it shall be the duty of the Circuit Judges and the Judges of the Criminal Courts to give this act in charge to the Grand Juries: *Provided*, said minor be travelling on a journey, he shall be exempted.

SEC. 3. *Be it enacted*, That this act shall be in force from and after its passage.

NEILL S. BROWN,
*Speaker of the House of Representatives.*
EDWARD S. CHEATHAM,
*Speaker of the Senate.*

Passed February 26, 1856.

---

## CHAPTER 82.

AN ACT to amend the Internal Improvement acts of 1852 and 1854.

*Be it enacted by the General Assembly of the State of Tennessee*, That, hereafter, it shall not be necessary for the Engineer in Chief to swear to the subscription list, solvency, and condition of any Railroad Company applying for State aid, but the oath required of the Engineer shall be taken by the President and Treasurer of the Com-

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 15:11:01 2019

Citations:

Bluebook 20th ed.
1897 221 .

ALWD 6th ed.
1897 221 .

Chicago 7th ed.
, "," Texas - 25th Legislature, Regular Session, General Laws : 221-222

OSCOLA 4th ed.
, '' 1897 221

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



yeas 86, nays 1; and passed the Senate by a two-thirds vote, yeas 21, nays 6.]

[NOTE.—The foregoing act was presented to the Governor of Texas for his approval, on Friday, the twenty-first day of May, A. D. 1897, but was not signed by him nor returned to the house in which it originated with his objections thereto within the time prescribed by the Constitution, and thereupon became a law without his signature.—JNO. H. CULLOM, Acting Secretary of State.]

---

H. B. No. 263.] CHAPTER 154.

An Act to prohibit persons, firms or corporations engaged in running pool or billiard tables in a public place, or for profit, knowingly permitting minors in their places of business without the written consent of their parents or guardians, and to provide a penalty therefor.

SECTION 1. *Be it enacted by the Legislature of the State of Texas:* That any person, firm, or corporation engaged in running any pool or billiard table or tables, in a public place, or for profit, or agent of such person, firm, or corporation, who shall knowingly permit any minor, without the written consent of such minor's parent or guardian, in such place of business, shall be fined not exceeding two hundred dollars.

[NOTE.—The foregoing act was presented to the Governor of Texas for his approval, on Friday, the fourteenth day of May, A. D. 1897, but was not signed by him nor returned to the house in which it originated with his objections thereto within the time prescribed by the Constitution, and thereupon became a law without his signature.—J. W. MADDEN, Secretary of State.]

Takes effect 90 days after adjournment.

---

H. B. No. 264.] CHAPTER 155.

An Act to prevent the barter, sale and gift of any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance to any minor without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof, and providing a penalty for the violation.

SECTION 1. *Be it enacted by the Legislature of the State of Texas:* That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof, he shall be punished by fine of not less than twenty-five dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment. And during the time of such imprisonment such offender may be put to

work upon any public work in the county in which such offense is committed.

[NOTE.—The foregoing act was presented to the Governor of Texas for his approval, on Friday, the fourteenth day of May, A. D. 1897, but was not signed by him nor returned to the house in which it originated with his objections thereto within the time prescribed by the Constitution, and thereupon became a law without his signature.—J. W. MADDEN, Secretary of State.]

Takes effect 90 days after adjournment.

---

H. B. No. 391.] CHAPTER 156.

**An Act to relinquish the title and confirm the patents to certain lands herein named.**

SECTION 1. *Be it enacted by the Legislature of the State of Texas:* That the land patents numbered three hundred and eighty-eight (388), five hundred and eighty-three (583) and five hundred and eighty-four (584), Vol. No. Four (4) (of the records of the general land office of the State of Texas), and issued to Thomas M. Joseph and Henry M. Truchart on the 20th day of December, A. D. 1859, and the 23rd day of August, A. D. 1860, covering certain lands in Galveston County, State of Texas, be, and the same are hereby confirmed, and that all right and title of the State of Texas to the lands therein named, be, and the same are hereby relinquished to the parties to whom the said patents were issued. and sale made in accordance with an act approved on the 20th day of February, A. D. 1858, and an act amendatory of the same, approved on the 1st day of February, A. D. 1860, as also by a special act of the legislature of the State of Texas, approved July 29th, A. D. 1870.

[NOTE.—The foregoing act was presented to the Governor of Texas for his approval, on Wednesday, the twelfth day of May, A. D. 1897, but was not signed by him nor returned to the house in which it originated with his objections thereto within the time prescribed by the Constitution, and thereupon became a law without his signature.—J. W. MADDEN, Secretary of State.]

Takes effect 90 days after adjournment.

---

S. S. B. No. 320.] CHAPTER 157.

**An Act to amend Title XXIII, Chapter 4, of the Revised Civil Statutes of the State of Texas, relating to county lines, by adding thereto Article 808a.**

SECTION 1. *Be it enacted by the Legislature of the State of Texas:* That Chapter 4, Title XXIII, of the Revised Civil Statutes of the State of Texas, be amended by adding thereto an Article to be known as 808a, which shall read as follows:

Article 808a. Notwithstanding the preceding articles of this chapter, any county in this State may bring suit against any adjoining coun-



HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:54:23 2019

Citations:

Bluebook 20th ed.
1882 3 .

ALWD 6th ed.
1882 3 .

Chicago 7th ed.
, "," West Virginia - 15th Legislature, Adjourned Session : 3-ii

OSCOLA 4th ed.
, '' 1882 3

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 74 of 284

of his duty as such, or by any means obstruct or impede, or attempt to obstruct or impede the administration of justice in any court, he shall be guilty of a misdemeanor, and unless otherwise provided by law he shall be fined not less than twenty-five nor more than two hundred dollars, and be imprisoned in the county jail not exceeding six months.

Punishment prescribed.

[Approved March 29, 1882.]

[NOTE BY THE CLERK OF THE HOUSE OF DELEGATES.]

The foregoing act takes effect at the expiration of ninety days after its passage.

---

## CHAPTER CXXXV.

AN ACT amending and re-enacting section seven of chapter one hundred and forty-eight of the code of West Virginia, and adding additional sections thereto for the punishment of unlawful combinations and conspiracies to injure persons or property.

[Passed March 24, 1882.]

Be it enacted by the Legislature of West Virginia:

1. That section seven of chapter one hundred and forty-eight of the code of West Virginia be, and the same is hereby, amended and re-enacted so as to read as follows:

Code amended; section 7 of chapter 148 of.

7. If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the

Deadly weapons; penalty for carrying.

Selling certain weapons to minors; penalty.

Acts of persons to which sections do not apply.

Upon trial of indictment for carrying deadly

Digitized from Best Copy Available

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 75 of 284

cealed weapons, when jury to find accused not guilty.

defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

Provisions of section not to apply to officers of the law.

2. That the said chapter be and the same is hereby amended by adding thereto the following additional sections, as parts thereof, to-wit:

Additional sections added.

9. If two or more persons under the name of "Red Men," "Regulators," "Vigilance Committee," or any other name or without a name, combine or conspire together for the purpose of inflicting any punishment, or bodily injury upon any other person, or persons, or for the purpose of destroying, injuring, or taking and carrying away any property, real or personal, not their own, every such person, whether he has done any act in pursuance of such combination or conspiracy or not, shall be guilty of a misdemeanor and fined not less than fifty, nor more than five hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months.

Combinations or conspiracies to injure etc., persons and property, deemed a misdemeanor.

Penalty.

10. If any person, in pursuance of such combination or conspiracy as is mentioned in the next preceding section, shall inflict any punishment or bodily injury upon another person, or shall destroy, injure, or take and carry away, any property, real or personal, not his own, he shall be guilty of a felony, and confined in the penitentiary not less than two nor more than ten years. And if, on the trial of an indictment under this section it be proved that two or more persons, the defendant being one, were present, aiding and abetting in the commission of the offense charged therein, it shall be presumed that such offense was committed in pursuance of such combination or conspiracy, in the absence of satisfactory proof to the contrary. And all persons who shall be present, aiding and abetting, at the commission of any offense mentioned in this section shall be deemed conspirators within the meaning of this, and the next preceding section.

Injury, etc., inflicted by such combination, etc., upon any persen or property, deemed a felony. Punishment. When such combination or conspiracy to be presumed.

Aiders and abettors deemed conspirators.

11. No person called as a witness for the state on the trial of any person for an offense mentioned in either of the two next preceding sections, shall be excused from answering any question which may be asked him as such

No witness excused from answering, because such answers would,

Digitized from Best Copy Available

witness, and which would be otherwise legal and proper, on the ground that the answer to such question would or might degrade him, or expose him to punishment; but no such witness, who shall fully and truly answer all such questions as may be asked him touching his connection with, or knowledge of such combination or conspiracy, or of the commission of the offense charged in the indictment, in pursuance of such combination or conspiracy, shall thereafter be prosecuted or punished for the same offense mentioned in the indictment upon which the accused is being tried.

etc., degrade him or expose him to punishment.

Such witness answering truly and fully exempted from prosecution, etc., for same offense, etc.

12. Persons offending against any of the provisions of the ninth and tenth sections of this chapter, may be indicted therefor, either jointly or separately.

May be indicted jointly or separately.

13. If the death of any person shall result from the commission of any offense mentioned in the tenth section of this chapter, every person engaged in the commission of such offense shall be guilty of murder of the first degree, and punished as in other cases of murder of the first degree.

If person die conspirators guilty of murder of first degree.

14. If any person by force, or other unlawful means, shall release or rescue, or attempt to release or rescue a person in prison or other custody, charged with, or convicted of an offense under the provisions of the ninth or tenth section of this chapter, he shall be guilty of felony and confined in the penitentiary as provided in said tenth section.

To release or rescue, or attempt to release, etc., person charged, etc., with an offense under sections 9 and 10 a felony. Punishment.

15. If any person shall, by threats, menaces, or otherwise, intimidate, or attempt to intimidate, a witness for the state in any prosecution under the ninth, or any succeeding section of this chapter, for the purpose of preventing the attendance of such witness at the trial of such case, or shall in any way or manner prevent, or attempt to prevent, the attendance of any such witness at such trial, he shall be guilty of felony and confined in the penitentiary not less than one, nor more than ten years, or he may, at the discretion of the court, be confined in the jail of the county not less than three, nor more than twelve months, and fined not less than one hundred, nor more than five thousand dollars.

Intimidating, etc., witness, a felony.

Punishment.

16. The governor is hereby authorized, whenever in his opinion it is proper to do so, to offer rewards, and employ special policemen and detectives, and to employ any and all means in his power, including the employment of any portion of the military forces of the state, to secure the apprehension of any and all persons belonging to any such unlawful combination, or who shall be charged with the commission of any offense mentioned in the tenth, or any succeeding section of this chapter.

Governor to employ any and all means, etc., to secure arrest of persons belonging to such unlawful combinations, etc.

[Approved March 29, 1882.]

Digitized from Best Copy Available

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 77 of 284

[NOTE BY THE CLERK OF THE HOUSE OF DELEGATES.]

The foregoing act takes effect from its passage, two-thirds of the members elected to each House, by a vote taken by yeas and nays, having so directed.

---

## CHAPTER CXXXVI.

AN ACT amending and re-enacting chapter one hundred and fifty-four of the code of West Virginia, concerning inquests on dead bodies.

[Passed March 24, 1882.]

Be it enacted by the Legislature of West Virginia:

Code amended; chapter 154 of.

1. That chapter one hundred and fifty-four of the code of West Virginia, be and the same is hereby amended and re-enacted so as to read as follows:

### CHAPTER CLIV.

*Of Inquest Upon Dead Bodies—Coroner; When and by Whom Appointed, &c.*

Coroner; when and how appointed. Term of office and oath. Duty of coroner or justice upon being notified of death by violence, etc.

Warrant to issue; to whom directed and what to command.

Witnesses to be summoned.

1. It shall be the duty of the county court of every county, from time to time, to appoint a coroner for such county, who shall hold his office during the pleasure of said court, and shall take the oath of office prescribed for other county officers. It shall be his duty, or if he be absent, or unable to act, or the office be vacant, the duty of any justice of the peace, upon being notified the dead body of a person, whose death is supposed to have been caused by violence or other unlawful act, and not by casualty, is within his county, to forthwith issue his warrant directed to a constable thereof who shall proceed to execute and make return of the same, commanding such constable to summon twelve suitable residents of the county to be in attendance on such coroner or justice, as jurors, at a place and on a day and hour to be designated in the warrant, to make inquisition, upon the view of the body of the person named therein, or of a person unknown, as the case may be, how such person came to his death; and may, by indorsement on such warrant, or by subpœna, command the officer to whom the same is delivered, to summon such witnesses as the coroner or justice may designate, or as the constable may be informed, or have reason to believe, have knowledge of the circumstances attending such death, to be in attendance upon the said inquest at such time as may be designated in such indorsement or subpœna. In case of the inability or failure of

Digitized from Best Copy Available



HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 14:57:01 2019

Citations:

Bluebook 20th ed.
1883 vol. I 3 .

ALWD 6th ed.
1883 vol. I 3 .

Chicago 7th ed.
, "," Wisconsin - Biennial Session, Index 1879-1883 : 3-342

OSCOLA 4th ed.
, '' 1883 vol I 3

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 79 of 284

[No. 5, S.] [Published April 7, 1883.]

## CHAPTER 329.

AN ACT to prohibit the use and sale of pistols and revolvers.

*The people of the state of Wisconsin, represented in senate and assembly, do enact as follows:*

Relating to the sale of pistols.

SECTION 1. It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession.

SECTION 2. It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state.

SECTION 3. It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver. Any person violating the provisions of this act, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars ($100).

SECTION 4. This act shall take effect and be in force from and after its passage and publication.

Approved April 3, 1883.

---

[No. 38, S.] [Published April 13, 1883.]

## CHAPTER 330.

AN ACT to provide for the punishment of attempts to commit felonies or other crimes, and amendatory of section 4385, revised statutes.

*The people of the state of Wisconsin, represented in senate and assembly, do enact as follows:*

Relating to punishment for attempt to commit felonies and other crimes.

SECTION 1. Section 4385 of the revised statutes, is hereby amended so as to read as follows; Section 4385. Any person who shall assault another with intent to commit any burglary, robbery, rape or mayhem, or who shall advise or attempt to commit any arson, or any other felony, that shall fail in being committed, the punishment for which such assault, advice or attempt is not herein prescribed, shall be punished by imprisonment in the state prison not more than three years nor less than one year, or by fine, not exceeding one

Digitized from Best Copy Available



Content downloaded/printed from HeinOnline

Thu Nov 7 15:00:46 2019

Citations:

Bluebook 20th ed.
J.A. Van Orsdel, Compiler and Editor; Chatterton, Fenimore, Compiler and Editor. Revised Statutes of Wyoming in Force December 1, 1899 (1899).

ALWD 6th ed.
J.A. Van Orsdel, Compiler and Editor; Chatterton, Fenimore, Compiler and Editor. Revised Statutes of Wyoming in Force December 1, 1899 (1899).

APA 6th ed.
Van Orsdel, J. (1899). Revised Statutes of Wyoming in Force December 1, 1899. Laramie, Wyo, Chaplin, Spafford Mathison.

Chicago 7th ed.
Van Orsdel J.A., Compiler and Editor; Chatterton, Fenimore, Compiler and Editor. Revised Statutes of Wyoming in Force December 1, 1899. Laramie, Wyo, Chaplin, Spafford & Mathison.

McGill Guide 9th ed.
J.A. Van Orsdel, Compiler and Editor; Chatterton, Fenimore, Compiler and Editor, Revised Statutes of Wyoming in Force December 1, 1899 (Laramie, Wyo: Chaplin, Spafford & Mathison., 1899)

MLA 8th ed.
Van Orsdel, J.A., Compiler and Editor, and Fenimore Chatterton, Compiler and Editor. Revised Statutes of Wyoming in Force December 1, 1899. Laramie, Wyo, Chaplin, Spafford & Mathison. HeinOnline.

OSCOLA 4th ed.
Van Orsdel, J.A., Compiler and Editor; Chatterton, Fenimore, Compiler and Editor. Revised Statutes of Wyoming in Force December 1, 1899. Laramie, Wyo, Chaplin, Spafford & Mathison.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



shall not apply to a person drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

[S. L. 1890, Ch. 73, Sec. 95; R. S. Ind., Sec. 1984.]

**CARRYING DANGEROUS WEAPONS.**

**Sec. 5051.** Every person, not being a traveler, who shall wear or carry any dirk, pistol, bowie knife, dagger, sword-in-cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent, or avowed purpose, of injuring his fellow-man, shall be fined not more than one hundred dollars.

[S. L. 1890, Ch. 73, Sec. 96; R. S. Ind., Sec. 1985.]

**FURNISHING DEADLY WEAPONS TO MINOR.**

**Sec. 5052.** It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars.

[S. L. 1890, Ch. 73, Sec. 97; R. S. Ind., Sec. 1986.]

**DISTURBING MEETINGS.**

**Sec. 5053.** Whoever, by any loud or unnecessary talking, hallooing, or by any threatening, abusive, profane or obscene language, or violent actions, or by any other rude behavior, interrupts, molests or disturbs any collection of any inhabitants of this state convened for the purpose of worship, or any agricultural fair or exhibition, or any person present thereat, or going to or returning therefrom; or who, in like manner interrupts, molests or disturbs any meeting of inhabitants of this state, met together for any lawful purpose, shall be fined in any sum not more than fifty dollars. Sextons of churches and officers of fairs or other meetings contemplated in this section are hereby authorized to arrest any person so disturbing such public meetings.

[S. L. 1890, Ch. 73, Sec. 98; R. S. Ind., Sec. 1988.]

## CHAPTER 4.

### CRIMES AGAINST PUBLIC MORALS.

Sec. 5054. Bigamy.
Sec. 5055. Incest.
Sec. 5056. Adultery and fornication.
Sec. 5057. Seduction.
Sec. 5058. Enticing females.
Sec. 5059. House of ill-fame.
Sec. 5060. Public indecency.
Sec. 5061. Selling obscene literature.
Sec. 5062. Mailing obscene literature.
Sec. 5063. Advertising private medicines.
Sec. 5064. Procurer assignation.
Sec. 5065. Pimp.
Sec. 5066. Prostitute.
Sec. 5067. Crime against nature.
Sec. 5068. Sale of liquor to minors and habitual drunkards.
Sec. 5069. Sale or gift of tobacco to minors prohibited.

**BIGAMY.**

**Sec. 5054.** Whoever, being married, marries again, the former husband or wife being alive, and the bond of matrimony being still undissolved, and no legal presumption of death having arisen, is guilty of bigamy, and shall be imprisoned in the penitentiary not more than five years.

[S. L. 1890, Ch. 73, Sec. 74; R. S. Ind., Sec. 1989.]

In re Murphy, 5 Wyo. 297.

**Nineteenth Century Second Amendment State Analogues**

| State | Year[1] | Statutory Text | Source |
|---|---|---|---|
| Alabama | 1819 | "Every citizen has a right to bear arms in defence of himself and the state." | Ala. Const. art. I, § 23 (1819). |
| Georgia | 1868 | "A well-regulated militia being necessary to the security of a free people, the right of the people to keep and bear arms shall not be infringed; but the general assembly shall have power to prescribe by law the manner in which arms may be borne." | Ga. Const. art. I, § 663, Sec. 14 (1868). |
| Indiana | 1851 | "The people shall have a right to bear arms, for the defense of themselves and the State." | Ind. Const. art. I, § 32 (1851). |
| Kansas | 1859 | "The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be tolerated, and the military shall be in strict subordination to the civil power." | Kan. Const. Bill of Rights, § 4 (1859). |
| Kentucky | 1850 | "That the rights of the citizens to bear arms in defence of themselves and the State shall not be questioned; but the general assembly may pass laws to prevent persons from carrying concealed arms." | Ky. Const. art. XIII, § 25 (1850). |

[1] Year of enactment.

| State | Year[1] | Statutory Text | Source |
|---|---|---|---|
| Louisiana | 1879 | "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed." | La. Const. art. 3 (1879). |
| Mississippi | 1868 | "All persons shall have a right to keep and bear arms for their defence." | Miss. Const. art. I, § 15 (1868). |
| Missouri | 1875 | "That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons." | Mo. Const. art. II, § 17 (1875). |
| North Carolina | 1875 | "A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power. Nothing herein contained shall justify the practice of carrying concealed weapons, or prevent the Legislature from enacting penal statutes against said practice." | N.C. Const. art. I, § 24 (1875). |
| Tennessee | 1834 | "That the free white men of this State have a right to keep and to bear arms for their common defence." | Tenn. Const. art. I, § 26 (1834). |

| State | Year[1] | Statutory Text | Source |
|---|---|---|---|
| Texas | 1876 | "Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime." | Texas Const. art. I, § 23 (1876). |
| Wyoming | 1889 | "The right of citizens to bear arms in defense of themselves and of the state shall not be denied." | Wyo. Const. art. I, § 24 (1889). |

HEINONLINE

Content downloaded/printed from HeinOnline

Fri Dec 13 15:41:30 2019

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1819. [1] (1819) Declaration of Rights

ALWD 6th ed.

Chicago 7th ed.
, "Declaration of Rights," Constitution of the State of Alabama. : [1]-[4]

McGill Guide 9th ed.
, "Declaration of Rights" [1].

MLA 8th ed.
"Declaration of Rights." Constitution of the State of Alabama., , , p. [1]-[4]. HeinOnline.

OSCOLA 4th ed.
, 'Declaration of Rights' [1]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CONSTITUTION OF THE STATE OF ALABAMA.

Preamble.

WE, the people of the Alabama Territory, having the right of admission into the general government, as a member of the union, consistent with the constitution and laws of the United States, by our representatives, assembled in convention at the town of Huntsville, on Monday, the fifth day of July, one thousand eight hundred and nineteen, in pursuance of an Act of congress, entitled "An Act to enable the people of the Alabama Territory to form a Constitution and State Government, and for the admission of such State into the Union, on an equal footing with the original States;" in order to establish justice, ensure tranquillity, provide for the common defence, promote the general welfare, and secure to ourselves and our posterity the rights of life, liberty, and property, do ordain and establish the following constitution, or form of government; and do mutually agree with each other to form ourselves into a free and independent state, by the name of "The State of Alabama." And we do hereby recognize, confirm, and establish the boundaries assigned to said state by the act of congress aforesaid, "to wit: beginning at the point where the thirty-first degree of north latitude intersects the Perdido river, thence, east, to the western boundary line of the state of Georgia; thence, along said line, to the southern boundary line of the state of Tennessee; thence, west, along said boundary line, to the Tennessee river; thence, up the same, to the mouth of Bear creek; thence, by a direct line, to the northwest corner of Washington county; thence, due south, to the Gulf of Mexico; thence, eastwardly, including all islands within six leagues of the shore, to the Perdido river; and thence, up the same, to the beginning"—subject to such alteration as is provided in the third section of said act of congress, and subject to such enlargement as may be made by law in consequence of any cession of territory by the United States, or either of them.

## ARTICLE I.

### *Declaration of Rights.*

That the general, great, and essential principles of liberty and free government may be recognized and established, we declare:

All freemen are equal.

SEC. 1. That all freemen, when they form a social compact, are equal in rights; and that no man or set of men are entitled to exclusive, separate public emoluments or privileges, but in consideration of public services.

Political power in the people.

SEC. 2. All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit: and, therefore, they have at all times an unalienable and indefeasible right to alter, reform, or abolish their form of government, in such manner as they may think expedient.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 87 of 284

Sec. 3. No person within this state shall, upon any pretence, be deprived of the inestimable privilege of worshipping God in the manner most agreeable to his own conscience; nor be compelled to attend any place of worship; nor shall any one ever be obliged to pay any tithes, taxes, or other rate, for the building or repairing any place of worship, or for the maintenance of any minister or ministry.

Rights of conscience

Sec. 4. No human authority ought, in any case whatever, to control or interfere with the rights of conscience.

not to be interfered with.

Sec. 5. No person shall be hurt, molested, or restrained, in his religious profession, sentiments, or persuasions, provided he does not disturb others in their religious worship.

No person molested.

Sec. 6. The civil rights, privileges, or capacities of any citizen, shall in no way be diminished, or enlarged, on account of his religious principles.

Civil rights not affected by religious belief.

Sec. 7. There shall be no establishment of religion by law; no preference shall ever be given by law to any religious sect, society, denomination, or mode of worship: and no religious test shall ever be required as a qualification to any office or public trust under this state.

No established religion or religious test.

Sec. 8. Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

Freedom of speech, &c.

Sec. 9. The people shall be secure in their persons, houses, papers, and possessions, from unreasonable seizures or searches; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation.

Searches.

Sec. 10. In all criminal prosecutions, the accused has a right to be heard by himself and counsel; to demand the nature and cause of the accusation, and have a copy thereof: to be confronted by the witnesses against him: to have compulsory process for obtaining witnesses in his favour; and, in all prosecutions, by indictment or information, a speedy public trial by an impartial jury of the county or district in which the offence shall have been committed: he shall not be compelled to give evidence against himself, nor shall he be deprived of his life, liberty, or property, but by due course of law.

Rights of accused in criminal cases.

Sec. 11. No person shall be accused, arrested, or detained, except in cases ascertained by law, and according to the forms which the same has prescribed; and no person shall be punished; but in virtue of a law, established and promulgated prior to the offence, and legally applied.

No person accused, &c. except by law.

Sec. 12. No person shall, for any indictable offence, be proceeded against criminally, by information; except in cases arising in the land and naval forces, or the militia when in actual service, or, by leave of the court, for oppression or misdemeanor in office.

Indictable offences, how proceeded against.

Sec. 13. No person shall, for the same offence be twice put in jeopardy of life or limb: nor shall any person's property be taken or applied to public use, unless just compensation be made therefor.

No person twice tried for same offence

Courts to be open, &c.

SEC. 14. All courts shall be open, and every person, for an injury done him, in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay.

Laws not suspended but by general assembly.

SEC. 15. No power of suspending laws shall be exercised, except by the general assembly, or its authority.

Of bail and fines.

SEC. 16. Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted.

Bailable offences.

SEC. 17. All persons shall, before conviction, be bailable by sufficient securities, except for capital offences, when the proof is evident, or the presumption great: and the privilege of the writ of "habeas corpus" shall not be suspended, unless when, in cases of rebellion, or invasion, the public safety may require it.

Debtors, when discharged.

SEC. 18. The person of a debtor, where there is not strong presumption of fraud, shall not be detained in prison, after delivering up his estate for the benefit of his creditors, in such manner as shall be prescribed by law.

No ex post facto laws.

SEC. 19. No ex post facto law, nor law impairing the obligation of contracts, shall be made.

No attaints.

SEC. 20. No person shall be attainted of treason or felony by the general assembly. No attainder shall work corruption of blood, nor forfeiture of estate.

No forfeiture from suicide.

SEC. 21. The estates of suicides shall descend or vest as in cases of natural death; if any person shall be killed by casualty, there shall be no forfeiture by reason thereof.

Assembly of citizens.

SEC. 22. The citizens have a right, in a peaceable manner, to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by petition, address, or remonstrance.

May bear arms.

SEC. 23. Every citizen has a right to bear arms in defence of himself and the state.

Standing army, &c.

SEC. 24. No standing army shall be kept up without the consent of the general assembly; and, in that case, no appropriation of money for its support shall be for a longer term than one year; and the military shall, in all cases, and at all times, be in strict subordination to the civil power.

Quartering troops.

SEC. 25. No soldier shall, in time of peace, be quartered in any house, without the consent of the owner; nor in time of war, but in a manner to be prescribed by law.

No titles of nobility.

SEC. 26. No title of nobility, or hereditary distinction, privilege, honour, or emolument, shall ever be granted or conferred in this state; nor shall any office be created, the appointment of which shall be for a longer term than during good behaviour.

Emigration.

SEC. 27. Emigration from this state shall not be prohibited, nor shall any citizen be exiled.

Trial by jury.

SEC. 28. The right of trial by jury shall remain inviolate.

Right of prosecuting, &c.

SEC. 29. No person shall be debarred from prosecuting or defending any civil cause, for or against him or herself, before any tribunal in this state, by him or herself or counsel.

SEC. 30. This enumeration of certain rights shall not be construed to deny or disparage others retained by the people: and to guard against any encroachments on the rights herein retained, or any transgression of any of the high powers herein delegated, we declare, that every thing in this article is excepted out of the general powers of government, and shall for ever remain inviolate; and that all laws contrary thereto, or to the following provisions, shall be void.

Enumeration of rights.

### ARTICLE II.

*Distribution of Powers.*

SEC. 1. The powers of the government of the state of Alabama shall be divided into three distinct departments; and each of them confided to a separate body of magistracy, to wit: those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

Three distinct departments.

SEC. 2. No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances herein after expressly directed or permitted.

Persons belonging to one not to interfere with the others.

### ARTICLE III.

*Legislative Department.*

SEC. 1. The legislative power of this state shall be vested in two distinct branches: the one to be styled the senate, the other the house of representatives, and both together "The General Assembly of the State of Alabama;" and the style of their laws shall be, "Be it enacted by the Senate and House of Representatives of the State of Alabama, in General Assembly convened."

Two branches. Style of laws.

SEC. 2. The members of the house of representatives shall be chosen by the qualified electors, and shall serve for the term of one year, from the day of the commencement of the general election, and no longer.

Members, how chosen.

SEC. 3. The representatives shall be chosen every year, on the first Monday and the day following in August, until otherwise directed by law.

Election, when held.

SEC. 4. No person shall be a representative unless he be a white man, a citizen of the United States, and shall have been an inhabitant of this state two years next preceding his election, and the last year thereof a resident of the county, city, or town, for which he shall be chosen, and shall have attained the age of twenty-one years.

Qualification of members.

SEC. 5. Every white male person of the age of twenty-one years, or upwards, who shall be a citizen of the United States, and shall have resided in this state one year next preceding an election, and the last three months within the county, city, or town, in which he offers to vote, shall be deemed a qualified elector; provided, that no soldier, seaman, or marine, in the regular army or navy of the United States, shall be entitled to

Of electors.

HEINONLINE

Content downloaded/printed from HeinOnline

Fri Dec 13 15:40:19 2019

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1868, with the amendments approved by Act of Congress on 25 June 1868, and those ratified 1 May 1877, appended. The Section nos. in bold are part of McElreath's numeration for his entire volume, and not part of the original document. 318 (1868) Declaration of Fundamental Principles

ALWD 6th ed.

Chicago 7th ed.
, "Declaration of Fundamental Principles," Constitution of the State of Georgia, As Adopted by the State Convention at Atlanta, on the 11th Day of March, 1868, and Ratified by the People at an Election held April 20th, 21st, 22nd, 23d, 1868. : 318-322

McGill Guide 9th ed.
, "Declaration of Fundamental Principles" 318.

MLA 8th ed.
"Declaration of Fundamental Principles." Constitution of the State of Georgia, As Adopted by the State Convention at Atlanta, on the 11th Day of March, 1868, and Ratified by the People at an Election held April 20th, 21st, 22nd, 23d, 1868., , , p. 318-322. HeinOnline.

OSCOLA 4th ed.
, 'Declaration of Fundamental Principles' 318

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



## CONSTITUTION OF 1868.

### Preamble.

We, the people of Georgia, in order to form a permanent government, establish justice, insure domestic tranquility, and secure the blessings of liberty to ourselves and our posterity, acknowledging and invoking the guidance of Almighty God, the author of all good government, do ordain and establish this constitution for the State of Georgia:

### ARTICLE I.

*Declaration of Fundamental Principles.*

**§ 650.** Section 1. Protection to person and property is the paramount duty of government, and shall be impartial and complete.

**§ 651.** Sec. 2. All persons born or naturalized in the United States, and resident in this State, are hereby declared citizens of this State, and no laws shall be made or enforced which shall abridge the privileges or immunities of citizens of the United States, or of this State, or deny to any person within its jurisdiction the equal protection of its laws. And it shall be the duty of the General Assembly, by appropriate legislation, to protect every person in the due enjoyment of the rights, privileges, and immunities guaranteed in this section.

**§ 652.** Sec. 3. No person shall be deprived of life, liberty, or property, except by due process of law.

**§ 653.** Sec. 4. There shall be within the State of Georgia neither slavery nor involuntary servitude, save as a punishment for crime after legal conviction thereof.

**§ 654.** Sec. 5. The right of the people to appeal to the courts, to petition government on all matters, and peaceably to assemble for the consideration of any matter, shall never be impaired.

**§ 655.** Sec. 6. Perfect freedom of religious sentiment shall be, and the same is hereby secured, and no inhabitant of this State shall ever be molested in person or property, or prohibited from holding any public office or trust, on account of his religious opinions; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the people.

**§ 656.** Sec. 7. Every person charged with an offense against the laws shall have the privilege and benefit of counsel, shall be furnished, on demand, with a copy of the accusation and a list of the witnesses on whose testimony the charge against him is founded, shall have compulsory process to obtain the attendance of his own witnesses, shall be confronted with the witnesses testifying against him, and shall have a public and speedy trial by an impartial jury.

**§ 657.** Sec. 8. No person shall be put in jeopardy of life or liberty more than once for the same offence, save on his or her own motion for a new trial after conviction, or in case of mistrial.

**§ 658.** Sec. 9. Freedom of speech and freedom of the press are inherent elements of political liberty. But while every citizen may freely speak, or write, or print on any subject, he shall be responsible for the abuse of the liberty.

**§ 659.** Sec. 10. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, particularly describing the place or places to be searched, and the person or things to be seized.

**§ 660.** Sec. 11. The social status of the citizen shall never be the subject of legislation.

**§ 661.** Sec. 12. No person shall be molested for his opinions, or be subject to any civil or political incapacity, or acquire any civil or political advantage in consequence of such opinions.

**§ 662.** Sec. 13. The writ of habeas corpus shall not be suspended unless, in case of rebellion or invasion, the public safety may require it.

**§ 663.** Sec. 14. A well-regulated militia being necessary to the security of a free people, the right of the people to keep and bear arms shall not be infringed; but the general assembly shall have power to prescribe by law the manner in which arms may be borne.

**§ 664.** Sec. 15. The punishment of all frauds shall be provided by law.

**§ 665.** Sec. 16. Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted, nor shall any person be abused in being arrested, whilst under arrest, or in prison.

**§ 666.** Sec. 17. The power of the courts to punish for contempt shall be limited by legislative acts.

**§ 667.** Sec. 18. There shall be no imprisonment for debt.

**§ 668.** Sec. 19. In all prosecutions or indictments for libel the truth may be given in evidence, and the jury shall have the right to determine the law and the facts.

**§ 669.** Sec. 20. Private ways may be granted upon just compensation being paid by the applicant.

**§ 670.** Sec. 21. All penalties shall be proportioned to the nature of the offense.

**§ 671.** Sec. 22. Whipping, as a punishment for crime, is prohibited.

**§ 672.** Sec. 23. No lottery shall be authorized, or sale of lottery-ticket allowed, in this State, and adequate penalties for such sale shall be provided by law.

**§ 673.** Sec. 24. No conviction shall work corruption of blood, and no conviction of treason shall work a general forfeiture of estate longer than during the life of the person attained.

**§ 674.** Sec. 25. Treason against the State of Georgia shall consist only in levying war against the State, or the United States, or adhering to the enemies thereof, giving them aid and comfort; and no person shall be convicted of treason except on the testimony of two witnesses to the same overt act, or his own confession in open court.

**§ 675.** Sec. 26. Laws shall have a general operation, and no general law, affecting private rights, shall be varied, in any particular case, by special legislation, except with the free consent, in writing, of all persons to be affected thereby; and no person under legal disability to contract is capable of such free consent.

**§ 676.** Sec. 27. The power of taxation over the whole State shall be exercised by the general assembly only to raise revenue for the support of government, to pay the public debt, to provide a general school-fund, for common defence and for public improvement; and taxation on property shall be ad valorem only, and uniform on all species of property taxed.

**§ 677.** Sec. 28. The general assembly may grant the power of taxation to county authorities and municipal corporations, to be exercised within their several territorial limits.

**§ 678.** Sec. 29. No poll-tax shall be levied except for educational purposes and such tax shall not exceed one dollar annually on each poll.

**§ 679.** Sec. 30. Mechanics and laborers shall have liens upon the property of their employers for labor performed or material furnished, and the legislature shall provide for the summary enforcement of the same.

**§ 680.** Sec. 31. The legislative, executive, and judicial departments shall be distinct; and each department shall be confided to a separate body of magistracy. No person, or collection of persons, being of one department, shall exercise any power properly attached to either of the others, except in cases herein expressly provided.

**§ 681.** Sec. 32. Legislative acts in violation of this constitu-

tion, or the Constitution of the United States, are void, and the judiciary shall so declare them.

**§ 682.** Sec. 33. The State of Georgia shall ever remain a member of the American Union; the people thereof are a part of the American nation; every citizen thereof owes paramount allegiance to the Constitution and Government of the United States, and no law or ordinance of this State, in contravention or subversion thereof, shall ever have any binding force.

## Article II.

### *Franchise and Elections.*

**§ 683.** Section 1. In all elections by the people the electors shall vote by ballot.

**§ 684.** Sec. 2. Every male person born in the United States, and every male person who has been naturalized, or who has legally declared his intention to become a citizen of the United States, twenty-one years old or upward, who shall have resided in this State six months next preceding the election, and shall have resided thirty days in the county in which he offers to vote, and shall have paid all taxes which may have been required of him, and which he may have had an opportunity of paying, agreeably to law, for the year next preceding the election (except as hereinafter provided), shall be deemed an elector; and every male citizen of the United States, of the age aforesaid (except as hereinafter provided), who may be a resident of the State at the time of the adoption of this constitution shall be deemed an elector, and shall have all the rights of an elector, as aforesaid: Provided, That no soldier, sailor, or marine in the military or naval service of the United States shall acquire the rights of an elector by reason of being stationed on duty in this State; and no person shall vote who, if challenged, shall refuse to take the following oath:

"I do swear that I have not given or received, nor do I expect to give or receive, any money, treat, or other thing of value, by which my vote, or any vote, is affected, or expected to be affected at this election, nor have I given or promised any reward, or made any threat, by which to prevent any person from voting at this election."

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Jan 2 11:12:29 2020

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1819. [1] (1819) Declaration of Rights

ALWD 6th ed.

Chicago 7th ed.
, "Declaration of Rights," Constitution of the State of Alabama. : [1]-[4]

McGill Guide 9th ed.
, "Declaration of Rights" [1].

MLA 8th ed.
"Declaration of Rights." Constitution of the State of Alabama., , , p. [1]-[4].
HeinOnline.

OSCOLA 4th ed.
, 'Declaration of Rights' [1]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CONSTITUTION OF THE STATE OF ALABAMA.

Preamble.

WE, the people of the Alabama Territory, having the right of admission into the general government, as a member of the union, consistent with the constitution and laws of the United States, by our representatives, assembled in convention at the town of Huntsville, on Monday, the fifth day of July, one thousand eight hundred and nineteen, in pursuance of an Act of congress, entitled "An Act to enable the people of the Alabama Territory to form a Constitution and State Government, and for the admission of such State into the Union, on an equal footing with the original States;" in order to establish justice, ensure tranquillity, provide for the common defence, promote the general welfare, and secure to ourselves and our posterity the rights of life, liberty, and property, do ordain and establish the following constitution, or form of government; and do mutually agree with each other to form ourselves into a free and independent state, by the name of "The State of Alabama." And we do hereby recognize, confirm, and establish the boundaries assigned to said state by the act of congress aforesaid, "to wit: beginning at the point where the thirty-first degree of north latitude intersects the Perdido river, thence, east, to the western boundary line of the state of Georgia; thence, along said line, to the southern boundary line of the state of Tennessee; thence, west, along said boundary line, to the Tennessee river; thence, up the same, to the mouth of Bear creek; thence, by a direct line, to the northwest corner of Washington county; thence, due south, to the Gulf of Mexico; thence, eastwardly, including all islands within six leagues of the shore, to the Perdido river; and thence, up the same, to the beginning"—subject to such alteration as is provided in the third section of said act of congress, and subject to such enlargement as may be made by law in consequence of any cession of territory by the United States, or either of them.

## ARTICLE I.

### *Declaration of Rights.*

That the general, great, and essential principles of liberty and free government may be recognized and established, we declare:

All freemen are equal.

SEC. 1. That all freemen, when they form a social compact, are equal in rights; and that no man or set of men are entitled to exclusive, separate public emoluments or privileges, but in consideration of public services.

Political power in the people.

SEC. 2. All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit: and, therefore, they have at all times an unalienable and indefeasible right to alter, reform, or abolish their form of government, in such manner as they may think expedient.

SEC. 3. No person within this state shall, upon any pretence, be deprived of the inestimable privilege of worshipping God in the manner most agreeable to his own conscience; nor be compelled to attend any place of worship; nor shall any one ever be obliged to pay any tithes, taxes, or other rate, for the building or repairing any place of worship, or for the maintenance of any minister or ministry.

Rights of conscience

SEC. 4. No human authority ought, in any case whatever, to control or interfere with the rights of conscience.

not to be interfered with.

SEC. 5. No person shall be hurt, molested, or restrained, in his religious profession, sentiments, or persuasions, provided he does not disturb others in their religious worship.

No person molested.

SEC. 6. The civil rights, privileges, or capacities of any citizen, shall in no way be diminished, or enlarged, on account of his religious principles.

Civil rights not affected by religious belief.

SEC. 7. There shall be no establishment of religion by law; no preference shall ever be given by law to any religious sect, society, denomination, or mode of worship: and no religious test shall ever be required as a qualification to any office or public trust under this state.

No established religion or religious test.

SEC. 8. Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

Freedom of speech, &c.

SEC. 9. The people shall be secure in their persons, houses, papers, and possessions, from unreasonable seizures or searches; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation.

Searches.

SEC. 10. In all criminal prosecutions, the accused has a right to be heard by himself and counsel; to demand the nature and cause of the accusation, and have a copy thereof: to be confronted by the witnesses against him: to have compulsory process for obtaining witnesses in his favour; and, in all prosecutions, by indictment or information, a speedy public trial by an impartial jury of the county or district in which the offence shall have been committed: he shall not be compelled to give evidence against himself, nor shall he be deprived of his life, liberty, or property, but by due course of law.

Rights of accused in criminal cases.

SEC. 11. No person shall be accused, arrested, or detained, except in cases ascertained by law, and according to the forms which the same has prescribed; and no person shall be punished; but in virtue of a law, established and promulgated prior to the offence, and legally applied.

No person accused, &c. except by law.

SEC. 12. No person shall, for any indictable offence, be proceeded against criminally, by information; except in cases arising in the land and naval forces, or the militia when in actual service, or, by leave of the court, for oppression or misdemeanor in office.

Indictable offences, how proceeded against.

SEC. 13. No person shall, for the same offence be twice put in jeopardy of life or limb: nor shall any person's property be taken or applied to public use, unless just compensation be made therefor.

No person twice tried for same offence

Courts to be open, &c.

SEC. 14. All courts shall be open, and every person, for an injury done him, in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay.

Laws not suspended but by general assembly.

SEC. 15. No power of suspending laws shall be exercised, except by the general assembly, or its authority.

Of bail and fines.

SEC. 16. Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted.

Bailable offences.

SEC. 17. All persons shall, before conviction, be bailable by sufficient securities, except for capital offences, when the proof is evident, or the presumption great: and the privilege of the writ of "habeas corpus" shall not be suspended, unless when, in cases of rebellion, or invasion, the public safety may require it.

Debtors, when discharged.

SEC. 18. The person of a debtor, where there is not strong presumption of fraud, shall not be detained in prison, after delivering up his estate for the benefit of his creditors, in such manner as shall be prescribed by law.

No ex post facto laws.

SEC. 19. No ex post facto law, nor law impairing the obligation of contracts, shall be made.

No attaints.

SEC. 20. No person shall be attainted of treason or felony by the general assembly. No attainder shall work corruption of blood, nor forfeiture of estate.

No forfeiture from suicide.

SEC. 21. The estates of suicides shall descend or vest as in cases of natural death; if any person shall be killed by casualty, there shall be no forfeiture by reason thereof.

Assembly of citizens.

SEC. 22. The citizens have a right, in a peaceable manner, to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by petition, address, or remonstrance.

May bear arms.

SEC. 23. Every citizen has a right to bear arms in defence of himself and the state.

Standing army, &c.

SEC. 24. No standing army shall be kept up without the consent of the general assembly; and, in that case, no appropriation of money for its support shall be for a longer term than one year; and the military shall, in all cases, and at all times, be in strict subordination to the civil power.

Quartering troops.

SEC. 25. No soldier shall, in time of peace, be quartered in any house, without the consent of the owner; nor in time of war, but in a manner to be prescribed by law.

No titles of nobility.

SEC. 26. No title of nobility, or hereditary distinction, privilege, honour, or emolument, shall ever be granted or conferred in this state; nor shall any office be created, the appointment of which shall be for a longer term than during good behaviour.

Emigration.

SEC. 27. Emigration from this state shall not be prohibited, nor shall any citizen be exiled.

Trial by jury.

SEC. 28. The right of trial by jury shall remain inviolate.

Right of prosecuting, &c.

SEC. 29. No person shall be debarred from prosecuting or defending any civil cause, for or against him or herself, before any tribunal in this state, by him or herself or counsel.

SEC. 30. This enumeration of certain rights shall not be construed to deny or disparage others retained by the people: and to guard against any encroachments on the rights herein retained, or any transgression of any of the high powers herein delegated, we declare, that every thing in this article is excepted out of the general powers of government, and shall for ever remain inviolate; and that all laws contrary thereto, or to the following provisions, shall be void. *Enumeration of rights.*

## ARTICLE II.

### *Distribution of Powers.*

SEC. 1. The powers of the government of the state of Alabama shall be divided into three distinct departments; and each of them confided to a separate body of magistracy, to wit: those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. *Three distinct departments.*

SEC. 2. No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances herein after expressly directed or permitted. *Persons belonging to one not to interfere with the others.*

## ARTICLE III.

### *Legislative Department.*

SEC. 1. The legislative power of this state shall be vested in two distinct branches: the one to be styled the senate, the other the house of representatives, and both together "The General Assembly of the State of Alabama;" and the style of their laws shall be, "Be it enacted by the Senate and House of Representatives of the State of Alabama, in General Assembly convened." *Two branches. Style of laws.*

SEC. 2. The members of the house of representatives shall be chosen by the qualified electors, and shall serve for the term of one year, from the day of the commencement of the general election, and no longer. *Members, how chosen.*

SEC. 3. The representatives shall be chosen every year, on the first Monday and the day following in August, until otherwise directed by law. *Election, when held.*

SEC. 4. No person shall be a representative unless he be a white man, a citizen of the United States, and shall have been an inhabitant of this state two years next preceding his election, and the last year thereof a resident of the county, city, or town, for which he shall be chosen, and shall have attained the age of twenty-one years. *Qualification of members.*

SEC. 5. Every white male person of the age of twenty-one years, or upwards, who shall be a citizen of the United States, and shall have resided in this state one year next preceding an election, and the last three months within the county, city, or town, in which he offers to vote, shall be deemed a qualified elector; provided, that no soldier, seaman, or marine, in the regular army or navy of the United States, shall be entitled to *Of electors.*



Content downloaded/printed from HeinOnline

Fri Dec 13 15:44:28 2019

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1859/1861. The texts of the seven Resolutions adopted at the Wyandotte Convention, ratified by the People and presented to Congress, concerning matters of finance on statehood, are appended to the principal text. [1] (1861) Ordinance

ALWD 6th ed.

Chicago 7th ed.
, "," Constitution of the State of Kansas; Adopted at Wyandotte, July 29, '59. : [1]-[2]

OSCOLA 4th ed.
, '' [1]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# *CONSTITUTION

OF THE

# STATE OF KANSAS;

## ADOPTED AT WYANDOT, JULY 29, '59.

---

### ORDINANCE.

WHEREAS, the Government of the United States is the proprietor of a large portion of the Lands included in the limits of the State of Kansas as defined by this Constitution; and whereas the State of Kansas will possess the right to tax said lands for purposes of government, and for other purposes; Now, therefore, be it ordained by the people of Kansas, that the right of the State of Kansas to tax such lands, is relinquished forever, and the State of Kansas will not interfere with the title of the United States to such lands, nor with any regulation of Congress in relation thereto, nor tax non-residents higher than residents; *Provided always,* That the following conditions be agreed to by Congress:

SECTION 1. Sections numbered sixteen and thirty-six in each township in the State, including Indian reservations and Trust lands, shall be granted to the State for the exclusive use of Common Schools; and when either of said sections, or any part thereof, has been disposed of, other lands of equal value, as nearly contiguous thereto as possible, shall be substituted therefor.

SEC. 2. That seventy-two sections of land shall be granted to the State for the erection and maintenance of a State University.

SEC. 3. That thirty-six sections shall be granted to the State for the erection of public buildings.

SEC. 4. That seventy-two sections shall be granted to the State for the erection and maintenance of charitable and benevolent institutions.

SEC. 5. That all salt springs, not exceeding twelve in number, with six sections of land adjacent to each, together with all mines, with the lands necessary for their full use, shall be granted to the State for works of public improvement.

SEC. 6. That five per centum of the proceeds of the public lands in Kansas, disposed of after the admission of the State into the Union, shall be paid to the State for a fund, the income of which shall be used for the support of Common Schools.

SEC. 7. That the Five Hundred Thousand acres of land to which the State is entitled under the Act of Congress entitled "An Act to appropriate the proceeds of the sales of public lands and grant pre-emption rights," approved September 4th, 1841, shall be granted to the State for the support of Common Schools.

---

* In the edition of 1859 the paging at this point reverts to number one.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 103 of 284

SEC. 8. That the lands hereinbefore mentioned shall be selected in such manner as may be prescribed by law; such selections to be subject to the approval of the Commissioner of the General Land Office of the United States.

## PREAMBLE.

We, the people of Kansas, grateful to Almighty God for our civil and religious privileges, in order to insure the full enjoyment of our rights as American citizens, do ordain and establish this constitution of the State of Kansas, with the following boundaries, to-wit: Beginning at a point on the western boundary of the State of Missouri, where the thirty-seventh parallel of north latitude crosses the same; thence running west on said parallel to the twenty-fifth meridian of longitude west from Washington; thence north on said meridian to the fortieth parallel of north latitude: thence east on said parallel to the western boundary of the State of Missouri; thence south with the western boundary of said State to the place of beginning.

[*2]

## *BILL OF RIGHTS.

SECTION 1. All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness.

SEC. 2. All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the Legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency.

SEC. 3. The people have the right to assemble, in a peaceable manner, to consult for their common good, to instruct their representatives, and to petition the government, or any department thereof, for the redress of grievances.

SEC. 4. The people have the right to bear arms for their defence and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be tolerated, and the military shall be in strict subordination to the civil power.

SEC. 5. The right of trial by jury shall be inviolate.

SEC. 6. There shall be no slavery in this State; and no involuntary servitude, except for the punishment of crime, whereof the party shall have been duly convicted.

SEC. 7. The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of, or interference with the rights of conscience be permitted, nor any preference be given by law, to any religious establishment or mode of worship. No religious test or property qualification shall be required for any office of public trust, nor for any vote at any election, nor shall any person be incompetent to testify on account of religious belief.

SEC. 8. The right to the writ of habeas corpus shall not be suspended, unless the public safety requires it in case of invasion or rebellion.

SEC. 9. All persons shall be bailable by sufficient sureties except for capital offences, where proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted.



Content downloaded/printed from HeinOnline

Fri Dec 13 17:55:53 2019

Citations:

Bluebook 20th ed.
C. A.; et al. Wickliffe. Revised Statutes of Kentucky: Approved and Adopted by the General Assembly, 1851 and 1852. In Force from July 1, 1852 (1852).

ALWD 6th ed.
C. A.; et al. Wickliffe. Revised Statutes of Kentucky: Approved & Adopted by the General Assembly, 1851 & 1852. In Force from July 1, 1852 (1852).

APA 6th ed.
Wickliffe, C. (1852). Revised Statutes of Kentucky: Approved and Adopted by the General Assembly, 1851 and 1852. In Force from July 1, 1852. Frankfort, KY, A.G. Hodges.

Chicago 7th ed.
Wickliffe C. A.; et al. Revised Statutes of Kentucky: Approved and Adopted by the General Assembly, 1851 and 1852. In Force from July 1, 1852. Frankfort, KY, A.G. Hodges.

McGill Guide 9th ed.
C. A.; et al. Wickliffe, Revised Statutes of Kentucky: Approved and Adopted by the General Assembly, 1851 and 1852. In Force from July 1, 1852 (Frankfort, KY: A.G. Hodges., 1852)

MLA 8th ed.
Wickliffe, C. A., et al. Revised Statutes of Kentucky: Approved and Adopted by the General Assembly, 1851 and 1852. In Force from July 1, 1852. Frankfort, KY, A.G. Hodges. HeinOnline.

OSCOLA 4th ed.
Wickliffe, C. A.; et al. Revised Statutes of Kentucky: Approved and Adopted by the General Assembly, 1851 and 1852. In Force from July 1, 1852. Frankfort, KY, A.G. Hodges.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



shall, at their next session, pass a law calling a convention, to consist of as many members as there shall be in the house of representatives, and no more; to be chosen on the first Monday in August thereafter, in the same manner and proportion, and at the same places, and possessed of the same qualifications of a qualified elector, by citizens entitled to vote for representatives; and to meet within three months after their election, for the purpose of re-adopting, amending, or changing this constitution; but if it shall appear by the vote of either year, as aforesaid, that a majority of all the citizens entitled to vote for representatives did not vote for calling a convention, a convention shall not then be called. And for the purpose of ascertaining whether a majority of the citizens, entitled to vote for representatives, did or did not vote for calling a convention, as above, the general assembly passing the law authorizing such vote shall provide for ascertaining the number of citizens entitled to vote for representatives within the state.

Number of members of the convention.

SECTION 2. The convention, when assembled, shall judge of the election of its members and decide contested elections, but the general assembly shall, in calling a convention, provide for taking testimony in such cases and for issuing a writ of election in case of a tie.

Convention to judge of the election of its members.

ARTICLE XIII.

*Bill of Rights.*

That the general, great, and essential principles of liberty and free government may be recognized and established: WE DECLARE,

Declaration of rights.

SECTION 1. That all freemen, when they form a social compact, are equal, and that no man, or set of men, are entitled to exclusive, separate public emoluments or privileges from the community, but in consideration of public services.

Equality of men.

SECTION 2. That absolute, arbitrary power over the lives, liberty, and property of freemen exists no where in a republic—not even in the largest majority.

Absolute power over life, liberty, & property exists nowhere in a republic, &c.

SECTION 3. The right of property is before and higher than any constitutional sanction; and the right of the owner of a slave to such slave, and its increase, is the same, and as inviolable as the right of the owner of any property whatever.

The right of property.

SECTION 4. That all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, happiness, security, and the protection of property. For the advancement of these ends, they have, at all times, an inalienable and indefeasible right to alter, reform, or abolish their government, in such manner as they may think proper.

All power in the people.

SECTION 5. That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no man shall be com-

Liberty of conscience.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 106 of 284

pelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; that no human authority ought, in any case whatever, to control or interfere with the rights of conscience; and that no preference shall ever be given by law to any religious societies or modes of worship.

Religion.

SECTION 6. That the civil rights, privileges, or capacities of any citizen shall in no wise be diminished or enlarged on account of his religion.

Elections.

SECTION 7. That all elections shall be free and equal.

Trial by jury.

SECTION 8. That the ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate, subject to such modifications as may be authorized by this constitution.

Freedom of the press and speech.

SECTION 9. That printing presses shall be free to every person who undertakes to examine the proceedings of the general assembly, or any branch of government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

To give truth in evidence.

SECTION 10. In prosecutions for the publication of papers investigating the official conduct of officers, or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

Jury to be judges of law and fact in libels.

People to be secure from unreasonable seizures and searches.

SECTION 11. That the people shall be secure in their persons, houses, papers, and possessions, from unreasonable seizures and searches, and that no warrant to search any place or to seize any person or thing, shall issue, without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation.

Rights of persons prosecuted criminally.

SECTION 12. That in all criminal prosecutions, the accused hath a right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process for obtaining witnesses in his favor; and in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; that he cannot be compelled to give evidence against himself; nor can he be deprived of his life, liberty, or property, unless by the judgment of his peers, or the law of the land.

Information.

SECTION 13. That no person shall, for any indictable offense, be proceeded against criminally by information, except in cases arising in the land or naval forces, or in the militia when in actual service, in time of war or public danger, or by leave of the court, for oppression or misdemeanor in office.

Twice in jeopardy, and property not to be taken.

SECTION 14. No person shall, for the same offense, be twice put in jeopardy of his life or limb; nor shall any

man's property be taken or applied to public use, without the consent of his representatives, and without just compensation being previously made to him.

All courts to be open.

SECTION 15. That all courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of law, and right and justice administered, without sale, denial, or delay.

Suspending laws.

SECTION 16. That no power of suspending laws shall be exercised, unless by the general assembly, or its authority.

Excessive bail.

SECTION 17. That excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted.

Prisoners, when bailable.

Habeas corpus.

SECTION 18. That all prisoners shall be bailable by sufficient securities, unless for capital offenses, when the proof is evident or presumption great; and the privilege of the writ of *habeas corpus* shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it.

Imprisonment of debtors.

SECTION 19. That the person of a debtor, where there is not strong presumption of fraud, shall not be continued in prison after delivering up his estate for the benefit of his creditors, in such manner as shall be prescribed by law.

Ex post facto laws

SECTION 20. That no *ex post facto* law, nor any law impairing contracts, shall be made.

Attainder.

SECTION 21. That no person shall be attainted of treason or felony by the general assembly.

SECTION 22. That no attainder shall work corruption of blood, nor, except during the life of the offender, forfeiture of estate to the commonwealth.

Felos de se and forfeiture.

SECTION 23. That the estates of such persons as shall destroy their own lives shall descend or vest as in case of natural death; and if any person shall be killed by casualty, there shall be no forfeiture by reason thereof.

Right of petition.

SECTION 24. That the citizens have a right, in a peaceable manner, to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by petition, address, or remonstrance.

Right to bear arms

SECTION 25. That the rights of the citizens to bear arms in defense of themselves and the state, shall not be questioned; but the general assembly may pass laws to prevent persons from carrying concealed arms.

Standing armies.

SECTION 26. That no standing army shall, in time of peace, be kept up, without the consent of the general assembly; and the military shall, in all cases and at all times, be in strict subordination to the civil power.

Soldiers not to be quartered.

SECTION 27. That no soldier shall, in time of peace, be quartered in any house, without the consent of the owner; nor in time of war, but in a manner to be prescribed by law.

SECTION 28. That the general assembly shall not grant any title of nobility, or hereditary distinction, nor create any office, the appointment to which shall be for a longer time than for a term of years.

Nobility, and limitation of office

SECTION 29. That emigration from the state shall not be prohibited.

Emigration.

SECTION 30. To guard against transgressions of the high powers which we have delegated, WE DECLARE, that every thing in this article is excepted out of the general powers of government, and shall forever remain inviolate; and that all laws contrary thereto, or contrary to this constitution, shall be void.

Exception out of the general powers.

SCHEDULE.

That no inconvenience may arise from the alterations and amendments made in the constitution of this commonwealth, and in order to carry the same into complete operation, it is hereby declared and ordained:

SECTION 1. That all the laws of this commonwealth, in force at the time of the adoption of this constitution, and not inconsistent therewith, and all rights, actions, prosecutions, claims, and contracts, as well of individuals as of bodies corporate, shall continue as if this constitution had not been adopted.

Laws and rights continued.

SECTION 2. The oaths of office herein directed to be taken may be administered by any judge or justice of the peace, until the general assembly shall otherwise direct.

Oaths, by whom administered.

SECTION 3. No office shall be superseded by the adoption of this constitution, but the laws of the state relative to the duties of the several officers, legislative, executive, judicial, and military, shall remain in full force, though the same be contrary to this constitution, and the several duties shall be performed by the respective officers of the state, according to the existing laws, until the organization of the government, as provided for under this constitution, and the entering into office of the officers to be elected or appointed under said government, and no longer.

No office shall be superseded by the adoption of this constitution.

SECTION 4. It shall be the duty of the general assembly which shall convene in the year 1850, to make an apportionment of the representation of this state, upon the principle set forth in this constitution; and until the first apportionment shall be made as herein directed, the apportionment of senators and representatives among the several districts and counties in this state, shall remain as at present fixed by law: *Provided*, that on the first Monday in August, 1850, all senators shall go out of office, and on that day an election for senators and representatives shall be held throughout the state, and those then elected shall hold their offices for one year, and no longer: *Provided further*, that at the elections to be held in the year 1850, that provision in this constitution which requires voters to vote in the precinct within which they reside, shall not apply.

Duty of general assembly that convenes in 1850.



Content downloaded/printed from HeinOnline

Fri Dec 13 15:48:34 2019

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1879. The "Miscellaneous Ordinances" are appended to the principal text. An index is provided. [1] (2015) Bill of Rights

ALWD 6th ed.

Chicago 7th ed.
, "," Appendix. Constitution of Louisiana. Adopted July 23, 1879. : [1]-[2]

OSCOLA 4th ed.
, '' [1]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# APPENDIX.

## CONSTITUTION OF LOUISIANA.

ADOPTED JULY 23, 1879.

### PREAMBLE.

We, the people of the State of Louisiana, in order to establish justice, insure domestic tranquility, promote the general welfare and secure the blessings of liberty to ourselves and our posterity, acknowledging and invoking guidance of Almighty God, the author of all good government, do ordain the and establish this constitution.

### BILL OF RIGHTS.

ART. 1. All government of right originates with the people, is founded on their will alone, and is instituted solely for the good of the whole, deriving its just powers from the consent of the governed. Its only legitimate end is to protect the citizen in the enjoyment of life, liberty and property. When it assumes other functions it is usurpation and oppression.

ART. 2. The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

ART. 3. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed. D. sec. 915, 2309.

ART. 4. No law shall be passed respecting an establishment of religion or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and petition the government for a redress of grievances.

ART. 5. There shall be neither slavery nor involuntary servitude in this State otherwise than for the punishment of crime, whereof the party shall have been duly convicted. Prosecutions shall be by indictment or information; *provided*, that no person shall be held to answer for a capital crime unless on a presentment or indictment by a grand jury, except in cases arising in the militia when in active service in time of war or public danger; nor shall any person be twice put in jeopardy of life or liberty for the same offence, except on his own application for a new trial, or where there is a mistrial, or a motion in arrest of judgment is sustained. D. 977.

ART. 6. No person shall be compelled to give evidence against himself in a criminal case or in any proceeding that may subject him to criminal prosecution, except where otherwise provided in this constitution; nor be deprived of life, liberty or property without due process of law.

ART. 7. In all criminal prosecutions the accused shall enjoy the right to a speedy public trial by an impartial jury, except that, in cases where the penalty is not necessarily imprisonment at hard labor or death the general assembly may provide for the trial thereof by a jury less than twelve in number; *provided*, that the accused in every instance shall be tried in the parish wherein the offence shall have been committed, except in cases of change of venue. Act 1880, p. 35, No. 35, sec. 4; D. sec. 1021, 1031.

(a)

ART. 8. In all criminal prosecutions the accused shall enjoy the right to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to defend himself and to have the assistance of counsel, and to have the right to challenge jurors peremptorily, the number of challenges to be fixed by statute. D. sec. 992.

ART. 9. Excessive bail shall not be required, nor excessive fines be imposed, nor cruel and unusual punishments inflicted All persons shall be bailable by sufficient sureties, unless for capital offences, where the proof is evident or the presumption great, or unless after conviction for any crime or offence punishable with death or imprisonment at hard labor. D. sec. 1010, 1011.

ART. 10. The privilege of the writ of *habeas corpus* shall not be suspended, unless when, in case of rebellion or invasion, the public safety may require it. C. P., art. 791.

ART, 11. All courts shall be open, and every person for injury done him in his rights, lands, goods, person or reputation, shall have adequate remedy by due process of law and justice, administered without denial or unreasonable delay.

ART. 12 The military shall be in subordination to the civil power.

ART. 13. This enumeration of rights shall not be construed to deny or impair other rights of the people not herein expressed.

## DISTRIBUTION OF POWERS.

ART. 14. The powers of the government of the State of Louisiana shall be divided into three distinct departments, and each of them be confided to a separate body of magistracy, to-wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another.

ART. 15. No one of these departments, nor any person or collection of persons holding office in one of them, shall exercise power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

## LEGISLATIVE DEPARTMENT.

### APPORTIONMENT.

ART. 16. Representation in the house of representatives shall be equal and uniform, and shall be regulated and ascertained by the total population. Each parish shall have at least one representative. The first enumeration to be made by the State authorities under this constitution shall be made in the year eighteen hundred and ninety; and subsequent enumerations shall be made every tenth year thereafter, in such manner as shall be prescribed by law, for the purpose of ascertaining the total population and the number of qualified electors in each parish and election district. At its first regular session after each enumeration the general assembly shall apportion the representation among the several parishes and election districts on the basis of the total population as aforesaid. A representative number shall be fixed; and each parish and election district shall have as many representatives as the aggregate number of its population will entitle it to, and an additional representative for any fraction exceeding one-half the representative number. The number of representatives shall not be more than ninety-eight nor less than seventy.

ART. 17. The general assembly, in every year in which they shall apportion representation in the house of representatives, shall divide the State into senatorial districts. No parish shall be divided in the formation of a senatorial district—the parish of Orleans excepted. Whenever a new parish shall be created it shall be attached to the senatorial district, from which most of its territory was taken, or to another contiguous district, at the discretion of the general assembly, but shall not be attached to more than one district. The number of senators shall not be more than thirty-six nor less than twenty-four, and they shall be apportioned among the senatorial districts according to the total population contained in the several districts.



Content downloaded/printed from HeinOnline

Fri Dec 13 15:49:47 2019

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1868/1869 as adopted at the election of 30 November/1 December 1869. [1] (2015) Bill of Rights

ALWD 6th ed.

Chicago 7th ed.
, "Bill of Rights," Constitution of the State of Mississippi. : [1]-[2]

McGill Guide 9th ed.
, "Bill of Rights" [1].

MLA 8th ed.
"Bill of Rights." Constitution of the State of Mississippi., , , p. [1]-[2]. HeinOnline.

OSCOLA 4th ed.
, 'Bill of Rights' [1]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CONSTITUTION OF THE STATE OF MISSISSIPPI.

**Adopted in Convention, Fifteenth Day of May, A. D. 1868, and Ratified by the People, First Day of December, A. D. 1869.**

To the end that justice be established, public order maintained, and liberty perpetuated, we, the people of the state of Mississippi, grateful to Almighty God for the free exercise of the right to choose our own form of government, do ordain this constitution:

## ARTICLE I.

### BILL OF RIGHTS.

SECTION 1. All persons resident in this state, citizens of the United States, are hereby declared citizens of the state of Mississippi.

SEC. 2. No person shall be deprived of life, liberty, or property, except by due process of law.

SEC. 3. The privilege of the writ of *habeas corpus* shall not be suspended, unless when, in case of rebellion or invasion, the public safety may require it.

SEC. 4. The freedom of speech and of the press shall be held sacred, and in all indictments for libel, the jury shall determine the law and the facts, under the direction of the court.

SEC. 5. No person's life or liberty shall be twice placed in jeopardy for the same offence.

SEC. 6. The right of the people peaceably to assemble and petition the government on any subject, shall never be impaired.

SEC. 7. In all criminal prosecutions, the accused shall have a right to be heard by himself, or counsel, or both; to demand the nature and cause of the accusation; to be confronted by the witnesses against him; to have a compulsory process for obtaining witnesses in his favor; and in all prosecutions by indictment or information, a speedy and public trial, by an impartial jury of the county where the offence was committed; and he shall not be compelled to give evidence against himself.

SEC. 8. Cruel or unusual punishment shall not be inflicted, nor shall excessive fines be imposed; excessive bail shall not be required; and all persons shall, before conviction, be bailable by sufficient sureties, except for capital offences, when the proof is evident, or presumption great.

SEC. 9. No *ex post facto* law, or laws impairing the obligation of contracts, shall ever be passed.

SEC. 10. Private property shall not be taken for public use, except upon due compensation first being made to the owner or owners thereof, in a manner to be provided for by law.

SEC. 11. There shall be no imprisonment for debt.

SEC. 12. The right of trial by jury shall remain inviolate.

SEC. 13. No property qualification shall ever be required of any person to become a juror.

SEC. 14. The people shall be secure in their persons, houses and possessions, from unreasonable seizure or search, and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched, and the person or thing to be seized.

SEC. 15. All persons shall have a right to keep and bear arms for their defense.

SEC. 16. The rights of married women shall be protected by law in property owned previous to marriage; and also in all property acquired in good faith by purchase, gift, devise or bequest after marriage: *provided*, that nothing herein contained shall be so construed as to protect said property from being applied to the payment of their lawful debts.

SEC. 17. No property qualification for eligibility to office shall ever be required.

SEC. 18. No property or educational qualification shall ever be required, for any person to become an elector.

SEC. 19. There shall be neither slavery nor involuntary servitude in this state, otherwise than in the punishment of crime, whereof the party shall have been duly convicted.

SEC. 20. The right to withdraw from the federal union, on account of any real or supposed grievance, shall never be assumed by this state; nor shall any law be passed in derogation of the paramount allegiance of the citizens of this state, to the government of the United States.

SEC. 21. No public money or moneys, shall be appropriated for any charitable or other public institution in this state, making any distinction among the citizens thereof; *provided*, that nothing herein contained shall be so construed as to prevent the legislature from appropriating the school fund, in accordance with the article in this constitution relating to public schools.

SEC. 22. No distinction shall ever be made by law, between citizens and alien friends, in reference to possession, enjoyment, or descent of property.

SEC. 23. No religious test, as a qualification for office, shall ever be required, and no preference shall ever be given, by law, to any religious sect or mode of worship, but the free enjoyment of all religious sentiments, and the different modes of worship shall ever be held sacred; *provided*, the rights hereby secured shall not be construed to justify acts of licentiousness, injurious to morals, or dangerous to the peace and safety of the state.

SEC. 24. The right of all citizens to travel upon all public conveyances, shall not be infringed upon, nor in any manner abridged in this state.

SEC. 25. The military shall be in strict subordination to the civil power.

SEC. 26. Treason against the state shall consist only in levying war against the same, or in adhering to its enemies, giving them aid and comfort. No person shall be convicted of treason, unless on the testimony of two witnesses to the same overt act, or on confession in open court.

SEC. 27. No person's life shall be periled by the practice of dueling; and any person who shall hereafter fight a duel, or assist in the same as second, or send, accept, or knowingly carry a challenge therefor, or go out of the state to fight a duel, shall be disqualified from holding any office under this constitution, and shall forever be disfranchised in this state.

SEC. 28. All courts shall be open, and every person, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

SEC. 29. No person shall ever be elected, or appointed to any office in this state, for life, or during good behavior, but the term of all offices shall be for some specified period.

SEC. 30. No person shall be debarred from prosecuting or defending any civil cause, for or against him or herself, before any tribunal in this state, by him or herself, or counsel, or both.

SEC. 31. No person shall, for any indictable offence, be proceeded against criminally, by information, except in cases arising in the land or naval forces, or the militia, when in actual service, or by leave of the court, for misdemeanor in office; *provided*, that the legislature, in cases of petit larceny, assaults, assault and battery, affray, riot, unlawful assembly, drunkenness, vagrancy, and other misdemeanors of like character, may dispense with an inquest of a grand jury, and may authorize prosecutions before justices of the peace, or such other inferior court or courts, as may be established by the legislature; and the proceedings in such cases shall be regulated by law.

SEC. 32. The enumeration of rights in this constitution shall not be construed to deny or impair others retained by, and inherent in the people.

## ARTICLE II.

### BOUNDARIES OF THE STATE.

The limits and boundaries of the state of Mississippi shall remain as now established by law.



Content downloaded/printed from HeinOnline

Thu Jan 2 17:39:32 2020

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1875. [1] (1875) Table of Contents

ALWD 6th ed.

Chicago 7th ed.
, "," Constitution of the State of Missouri, Adopted by a vote of the People, October 30, 1875. Went into Operation November 30, 1875. : [1]-[3]

OSCOLA 4th ed.
, '' [1]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CONSTITUTION

OF THE

# STATE OF MISSOURI,

ADOPTED BY A VOTE OF THE PEOPLE, OCTOBER 30, 1875. WENT INTO OPERATION NOVEMBER 30, 1875.

## CONTENTS.

PREAMBLE.

Constitution established.

ARTICLE I—BOUNDARIES.

SECTION
1. Boundaries of the state—jurisdiction.

ARTICLE II—BILL OF RIGHTS.

SECTION
1. Origin of political power.
2. Right to regulate internal affairs, and to abolish existing form of government.
3. Missouri a free and independent state—right of local self government.
4. The object of constitutional government.
5. Religious liberty and freedom of conscience guaranteed.
6. Religious worship.
7. No aid or preference given to churches.
8. Religious corporations established under a general law, may hold certain real estate.
9. Elections to be free and open.
10. Courts shall be open to every person.
11. Security from searches and seizures.
12. Criminal prosecutions to be by indictment or information.
13. Treason defined—corruption of blood.
14. Freedom of speech allowed—truth of publication may be given in evidence.
15. *Ex post facto* laws, and laws making irrevocable grants of special privileges, forbidden.
16. No imprisonment for debt, except, when.
17. Right to keep and bear arms.
18. Officers must devote their time to the duties of their offices.
19. Collectors and receivers, not eligible to office, when.
20. Private property taker for private use—for public use.
21. Private property taken for public use—compensation.
22. Criminal prosecutions, right of accused.
23. No self crimination, nor twice in jeopardy.
24. Bail allowed, when.
25. Excessive bail and fines, and cruel punishments, forbidden.
26. Writ of *habeas corpus* shall not be suspended.
27. Military subject to civil power.

SECTION
28. Trial by jury—grand jury to consist of twelve men.
29. Right of petition and remonstrance guaranteed.
30. Due process of law.
31. Slavery and involuntary servitude forbidden.
32. Reservation of rights.

ARTICLE III—THE DISTRIBUTION OF POWERS.

SECTION
1. Powers divided into three departments.

ARTICLE IV—LEGISLATIVE DEPARTMENT.

SECTION
1. Vested in general assembly.

REPRESENTAEION AND APPORTIONMENT.

2. Time of electing representatives—ratio of apportionment.
3. Division of counties into representative districts.
4. Qualifications of representatives.
5. Thirty-four senators—senatorial districts.
6. Qualifications of senators—division of counties into senatorial districts.
7. Rule of apportionment for senators and representatives—to be revised and adjusted on the basis of the United States census.
8. Number of representatives, how distributed.
9. Districts may be altered.
10. First election of senators and representatives.
11. The present senatorial districts.
12. Senators and representatives cannot hold another office—certain officers not eligible.
13. Removal of residence vacates office.
14. Writs of election to fill vacancies.
15. Oath of office, refusal to take, penalty for violation of.
16. Pay of members and expenses of committees.
17. Organization—punishment of disorderly members and other persons.
18. Quorum—compelling attendance of absent members.
19. Doors to be open.
20. Time of meeting.
21. Adjournment for more than three days.
22. Adjournment for three days or less.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 117 of 284

## PREAMBLE.

We, the people of Missouri, with profound reverence for the Supreme Ruler of the Universe, and grateful for his goodness, do, for the better government of the State, establish this Constitution.

## ARTICLE I.

### BOUNDARIES.

SECTION 1. The boundaries of the State as heretofore established by law, are hereby ratified and confirmed. The State shall have concurrent jurisdiction on the river Mississippi, and every other river bordering on the State, so far as the said rivers shall form a common boundary to this State and any other State or States; and the river Mississippi and the navigable rivers and waters leading to the same, shall be common highways, and forever free to the citizens of this State and of the United States, without any tax, duty, impost or toll therefor, imposed by this State.

## ARTICLE II.

### BILL OF RIGHTS.

In order to assert our rights, acknowledge our duties, and proclaim the principles on which our government is founded, we declare:

SECTION 1. That all political power is vested in, and derived from the people; that all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole.

SEC. 2. That the people of this State have the inherent, sole and exclusive right to regulate the internal government and police thereof, and to alter and abolish their Constitution and form of government whenever they may deem it necessary to their safety and happiness: *Provided*, Such change be not repugnant to the Constitution of the United States.

SEC. 3. That Missouri is a free and independent State, subject only to the Constitution of the United States; and as the preservation of the States and the maintenance of their governments, are necessary to an indestructible Union, and were intended to co-exist with it, the Legislature is not authorized to adopt, nor will the people of this State ever assent to any amendment or change of the Constitution of the United States which may in any wise impair the right of local self-government belonging to the people of this State.

SEC. 4. That all constitutional government is intended to promote the general welfare of the people; that all persons have a natural right to life, liberty and the enjoyment of the gains of their own industry; that to give security to these things is the principal office of government, and that when government does not confer this security, it fails of its chief design.

SEC. 5. That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no person can, on account of his religious opinions, be rendered ineligible to any office of trust or profit under this State, nor be disqualified from testifying, or from serving as a juror; that no human authority can control or interfere with the rights of conscience; that no person ought, by any law, to be molested in his person or estate, on account of his religious persuasion or profession; but the liberty of conscience hereby secured, shall not be so construed as to excuse acts of licentiousness, nor to justify practices inconsistent with the good order, peace or safety of this State, or with the rights of others.

SEC. 6. That no person can be compelled to erect, support or attend any place or system of worship, or to maintain or support any priest, minister, preacher or teacher of any sect, church, creed or denomination of re-

ligion; but if any person shall voluntarily make a contract for any such object, he shall be held to the performance of the same.

SEC. 7. That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to, nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.

SEC. 8. That no religious corporation can be established in this State, except such as may be created under a general law for the purpose only of holding the title to such real estate as may be prescribed by law for church edifices, parsonages and cemeteries.

SEC. 9. That all elections shall be free and open; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

SEC. 10. The courts of justice shall be open to every person, and certain remedy afforded for every injury to person, property or character, and that right and justice should be administered without sale, denial or delay.

SEC. 11. That the people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the person or thing to be seized, as nearly as may be; nor without probable cause, supported by oath or affirmation reduced to writing.

SEC. 12. That no person shall, for felony, be proceeded against criminally otherwise than by indictment, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger; in all other cases, offenses shall be prosecuted criminally by indictment or information as concurrent remedies.

SEC. 13. That treason against the State can consist only in levying war against it, or in adhering to its enemies, giving them aid and comfort; that no person can be convicted of treason, unless on the testimony of two witnesses to the same overt act, or on his confession in open court; that no person can be attainted of treason or felony by the General Assembly; that no conviction can work corruption of blood or forfeiture of estate; that the estates of such persons as may destroy their own lives shall descend or vest as in cases of natural death; and when any person shall be killed by casualty, there shall be no forfeiture by reason thereof.

SEC. 14. That no law shall be passed impairing the freedom of speech; that every person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact.

SEC. 15. That no *ex post facto* law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges or immunities, can be passed by the General Assembly.

SEC. 16. That imprisonment for debt shall not be allowed, except for the nonpayment of fines and penalties imposed for violation of law.

SEC. 17. That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons.

SEC. 18. That no person elected or appointed to any office or employment of trust or profit under the laws of this State, or any ordinance of any municipality in this State, shall hold such office without personally devoting his time to the performance of the duties to the same belonging.

SEC. 19. That no person who is now, or may hereafter become a collector or receiver of public money, or assistant or deputy of such collector or receiver, shall be eligible to any office of trust or profit in the State of



Content downloaded/printed from HeinOnline

Tue Dec 31 14:55:28 2019

Citations:

Bluebook 20th ed.
1876-1877 3 .

ALWD 6th ed.
1876-1877 3 .

Chicago 7th ed.
, "," North Carolina - Public and Private Laws : 3-50

OSCOLA 4th ed.
, '' 1876-1877 3

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CONSTITUTION

OF THE

# STATE OF NORTH CAROLINA,

AS AMENDED BY THE

## CONSTITUTIONAL CONVENTION OF 1875.

---

## PREAMBLE.

We, the people of the State of North Carolina, grateful to Almighty God, the Sovereign Ruler of nations, for the preservation of the American Union, and the existence of our civil, political and religious liberties, and acknowledging our dependence upon Him for the continuance of those blessings to us and our posterity, do, for the more certain security thereof, and for the better government of this State, ordain and establish this Constitution: **Preamble.**

## ARTICLE I.

### DECLARATION OF RIGHTS.

That the great, general and essential principles of liberty and free government may be recognized and established, and that the relations of this State to the Union and government of the United States, and those of the people of this State to the rest of the American people, may be defined and affirmed, we do declare:

**The equality and rights of men.** SECTION 1. That we hold it to be self-evident that all men are created equal; that they are endowed by their Creator

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 121 of 284

with certain unalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness.

Political power and government.

SEC. 2. That all political power is vested in, and derived from, the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole.

Internal government of the State.

SEC. 3. That the people of this State have the inherent, sole and exclusive right of regulating the internal government and police thereof, and of altering and abolishing their Constitution and form of government whenever it may be necessary to their safety and happiness; but every such right should be exercised in pursuance of law, and consistently with the Constitution of the United States.

That there is no right to secede.

SEC. 4. That this State shall ever remain a member of the American Union; that the people thereof are part of the American nation; that there is no right on the part of the State to secede, and that all attempts, from whatever source or upon whatever pretext, to dissolve said Union, or to sever said nation, ought to be resisted with the whole power of the State.

Of allegiance to the U. S. government.

SEC. 5. That every citizen of this State owes paramount allegiance to the Constitution and Government of the United States, and that no law or ordinance of the State in contravention or subversion thereof, can have any binding force.

Public debt.

SEC. 6. The State shall never assume or pay, or authorize the collection of any debt or obligation, express or implied, incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave.

Exclusive emoluments, &c.

SEC. 7. No man or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services.

The Legislative, Executive and

SEC. 8. The legislative, executive and supreme judicial

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 122 of 284

powers of the government ought to be forever separate and distinct from each other. Judicial powers distinct.

SEC. 9. All power of suspending laws, or the execution of laws, by any authority, without the consent of the representatives of the people, is injurious to their rights, and ought not to be exercised. Of the power of suspending laws.

SEC. 10. All elections ought to be free. Elections free.

SEC. 11. In all criminal prosecutions, every man has the right to be informed of the accusation against him and to confront the accusers and witnesses with other testimony, and to have counsel for his defence, and not be compelled to give evidence against himself or to pay costs, jail fees, or necessary witness fees of the defense, unless found guilty. In criminal prosecutions.

SEC. 12. No person shall be put to answer any criminal charge, except as hereinafter allowed, but by indictment, presentment or impeachment. Answers to criminal charges.

SEC. 13. No person shall be convicted of any crime but by the unanimous verdict of a jury of good and lawful men in open court. The Legislature may, however, provide other means of trial for petty misdemeanors, with the right of appeal. Right of jury.

SEC. 14. Excessive bail should not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted. Excessive bail.

SEC. 15. General warrants, whereby any officer or messenger may be commanded to search suspected places, without evidence of the act committed, or to seize any person or persons not named, whose offence is not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted. General warrants.

SEC. 16. There shall be no imprisonment for debt in this State, except in cases of fraud. Imprisonment for debt.

SEC. 17. No person ought to be taken, imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person to be taken, &c., but by law of the land.

Persons restrained of liberty.

SEC. 18. Every person restrained of his liberty is entitled to a remedy to enquire into the lawfulness thereof, and to remove the same, if unlawful; and such remedy ought not to be denied or delayed.

Controversies at law respecting property.

SEC. 19. In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and ought to remain sacred and inviolable.

Freedom of the press.

SEC. 20. The freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained, but every individual shall be held responsible for the abuse of the same.

Habeas corpus.

SEC. 21. The privileges of the writ of *habeas corpus* shall not be suspended.

Property qualification.

SEC. 22. As political rights and privileges are not dependent upon, or modified by property, therefore no property qualification ought to affect the right to vote or hold office.

Representation and taxation.

SEC. 23. The people of the State ought not to be taxed, or made subject to the payment of any impost or duty, without the consent of themselves, or their representatives in General Assembly, freely given.

Militia and the right to bear arms.

SEC. 24. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and, as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power. Nothing herein contained shall justify the practice of carrying concealed weapons, or prevent the Legislature from enacting penal statutes against said practice.

Right of the people to assemble together.

SEC. 25. The people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the Legislature for redress of grievances. But secret political societies are dangerous to the liberties of a free people, and should not be tolerated.

Religious liberty.

SEC. 26. All men have a natural and unalienable right to



Content downloaded/printed from HeinOnline

Fri Dec 13 16:57:45 2019

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1834/1835. [1] (2015) Constitution of the State of Tennessee

ALWD 6th ed.

Chicago 7th ed.
, "," Constitution of the State of Tennessee : [1]-[18]

OSCOLA 4th ed.
, '' [1]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CONSTITUTION

## OF THE STATE OF TENNESSEE.

Whereas, the People of the territory of the United States, south of the river Ohio, having the right of admission into the General Government as a Member State thereof, consistent with the Constitution of the United States, and the act of cession of the State of North Carolina, recognizing the ordinance for the government of the territory of the United States north-west of the river Ohio, by their delegates and representatives in Convention assembled, did, on the sixth day of February, in the year of our Lord one thousand seven hundred and ninety-six, ordain and establish a Constitution or form of government, and mutually agreed with each other to form themselves into a free and independent State, by the name of "The State of Tennessee;" and whereas, the General Assembly of said State of Tennessee, (pursuant to the third section of the tenth article of the Constitution) by an act passed on the twenty-seventh day of November, in the year of our Lord one thousand eight hundred and thirty-three, entitled "An act to provide for the calling of a Convention," did authorize and provide for the election, by the people, of Delegates, and Representatives, to meet at Nashville, in Davidson county, on the third Monday in May, in the year of our Lord one thousand eight hundred and thirty-four, "for the purpose of revising and amending (or changing) the Constitution:"

We, therefore, the Delegates and Representatives of the People of the State of Tennessee, elected and in Convention assembled, in pursuance of the said Act of Assembly, have ordained and established the following amended Constitution and form of Government for this State, which we recommend to the people of Tennessee for their ratification; that is to say:

## ARTICLE I.

### DECLARATION OF RIGHTS.

SECTION 1. That all power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness; for the advancement of those ends, they have, at all times, an unalienable and indefeasible right to alter, reform or abolish the government in such manner as they may think proper.

Digitized from Best Copy Available

SEC. 2. That government being instituted for the common benefit, the doctrine of non-resistance against arbitrary power and oppression, is absurd, slavish, and destructive of the good and happiness of mankind.

SEC. 3. That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no man can of right be compelled to attend, erect or support any place of worship, or to maintain any Minister against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or mode of worship.

SEC. 4. That no religious test shall ever be required as a qualification to any office or public trust under this State.

SEC. 5. That Elections shall be free and equal.

SEC. 6. That the right of trial by jury shall remain inviolate.

SEC. 7. That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

SEC 8. That no free man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land.

SEC. 9. That in all criminal prosecutions, the accused hath a right to be heard by himself and his counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face; to have compulsory process for obtaining witnesses in his favor; and in prosecutions by indictment or presentment, a speedy public trial, by an impartial jury of the county or district in which the crime shall have been committed; and shall not be compelled to give evidence against himself.

SEC. 10. That no person shall, for the same offence, be twice put in jeopardy of life or limb.

SEC. 11. That laws made for the punishment of facts committed previous to the existence of such laws, and by them only declared criminal, are contrary to the principles of a free government; wherefore no *ex post facto* law shall be made.

SEC. 12. That no conviction shall work corruption of blood or forfeiture of estate. The estate of such persons as shall destroy their own lives, shall descend or vest as in case of natural death. If any person be killed by casualty, there shall be no forfeiture in consequence thereof.

SEC. 13. That no person arrested or confined in jail, shall be treated with unnecessary rigor.

SEC. 14. That no free man shall be put to answer any criminal charge but by presentment, indictment or impeachment.

SEC. 15. That all prisoners shall be bailable by sufficient sureties unless for capital offences when the proof is evident or the presumption

Digitized from Best Copy Available

great. And the privilege of the writ of *habeas corpus* shall not be suspended, unless when in case of rebellion or invasion the public safety may require it.

SEC. 16. That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

SEC. 17. That all courts shall be open; and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the State in such manner and in such courts, as the Legislature may by law direct.

SEC. 18. That the person of a debtor, where there is not strong presumption of fraud, shall not be continued in prison after delivering up his estate for the benefit of his creditor or creditors, in such manner as shall be prescribed by law.

SEC. 19. That the printing presses shall be free to every person who undertakes to examine the proceedings of the Legislature, or of any branch or Officer of Government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. But in prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, the truth thereof may be given in evidence; and in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the Court, as in other criminal cases.

SEC. 20. That no retrospective law, or law impairing the obligation of contracts, shall be made.

SEC. 21. That no man's particular services shall be demanded, or property taken or applied to public use, without the consent of his representatives, or without just compensation being made therefor.

SEC. 22. That perpetuities and monopolies are contrary to the genius of a free State, and shall not be allowed.

SEC. 23. That the citizens have a right, in a peaceable manner, to assemble together, for their common good, to instruct their representatives, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by address or remonstrance.

SEC. 24. That the sure and certain defence of a free people, is a well regulated militia: and, as standing armies in time of peace are dangerous to freedom, they ought to be avoided, as far as the circumstances and safety of the community will admit; and that in all cases the military shall be kept in strict subordination to the civil authority.

SEC. 25. That no citizen of this State, except such as are employed in the army of the United States, or militia in actual service, shall be subjected to corporeal punishment under the martial law.

SEC. 26. That the free white men of this State have a right to keep and to bear arms for their common defence.

SEC. 27. That no soldier shall, in time of peace, be quartered in any house without the consent of the owner, nor in time of war, but in a manner prescribed by law.

Digitized from Best Copy Available

SEC. 28. That no citizen of this State shall be compelled to bear arms, provided he will pay an equivalent, to be ascertained by law.

SEC. 29. That an equal participation of the free navigation of the Mississippi, is one of the inherent rights of the citizens of this State: it cannot, therefore, be conceded to any prince, potentate, power, person or persons whatever.

SEC. 30. That no hereditary emoluments, privileges, or honors, shall ever be granted or conferred in this State.

SEC. 31. That the limits and boundaries of this State be ascertained, it is declared they are as hereafter mentioned, that is to say: Beginning on the extreme height of the Stone mountain, at the place where the line of Virginia intersects it, in latitude thirty-six degrees and thirty minutes north; running thence along the extreme height of the said mountain to the place where Watauga river breaks through it; thence a direct course to the top of the Yellow mountain, where Bright's road crosses the same; thence along the ridge of said mountain between the waters of Doe river and the waters of Rock creek, to the place where the road crosses the Iron mountain; from thence along the extreme height of said mountain, to the place where Nolichucky river runs through the same; thence to the top of the Bald mountain; thence along the extreme height of said mountain to the Painted Rock, on French Broad river; thence along the highest ridge of said mountain to the place where it is called the Great Iron or Smoky mountain; thence along the extreme height of said mountain to the place where it is called Unicoi or Unaka mountain, between the Indian towns of Cowee and Old Chota; thence along the main ridge of the said mountain to the southern boundary of this State, as described in the act of cession of North Carolina to the United States of America; and that all the territory, lands and waters, lying west of the said line, as before mentioned, and contained within the chartered limits of the State of North Carolina, are within the boundaries and limits of this State; over which the people have the right of exercising sovereignty and the right of soil, so far as is consistent with the constitution of the United States, recognizing the articles of confederation, the bill of rights, and constitution of North Carolina, the cession act of the said State, and the ordinance of Congress for the government of the territory northwest of the Ohio: *Provided*, nothing herein contained shall extend to affect the claim or claims of individuals, to any part of the soil which is recognized to them by the aforesaid cession act: *And provided, also*, that the limits and jurisdiction of this State shall extend to any other land and territory now acquired, or that may hereafter be acquired by compact or agreement with other States or otherwise, although such land and territory are not included within the boundaries herein before designated.

SEC. 32. The people residing south of French Broad and Holston, between the rivers Tennessee and Big Pigeon, are entitled to the right of pre-emption and occupancy in that tract.

## ARTICLE II.

SEC. 1. The powers of the Government shall be divided into three distinct departments; the Legislative, Executive and Judicial.

Digitized from Best Copy Available



Content downloaded/printed from HeinOnline

Fri Dec 13 17:09:11 2019

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1875/1876. [3] (1876) Bill of Rights

ALWD 6th ed.

Chicago 7th ed.
, "Bill of Rights," Constitution. : [3]-[6]

McGill Guide 9th ed.
, "Bill of Rights" [3].

MLA 8th ed.
"Bill of Rights." Constitution., , , p. [3]-[6]. HeinOnline.

OSCOLA 4th ed.
, 'Bill of Rights' [3]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CONSTITUTION.

## PREAMBLE.

Humbly invoking the blessing of Almighty God, the people of the State of Texas do ordain and establish this Constitution.

## ARTICLE I.

### Bill of Rights.

That the general, great and essential principles of liberty and free government may be recognized and established, we declare:

Section 1. Texas is a free and independent State, subject only to the Constitution of the United States; and the maintenance of our free institutions and the perpetuity of the Union depend upon the preservation of the right of local self-government unimpaired to all the States.

Sec. 2. All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government, and, subject to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient.

Sec. 3. All free men when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.

Sec. 4. No religious test shall ever be required as a qualification to any office, or public trust, in this State; nor shall any one be excluded from holding office on account of his religious sentiments, provided he acknowledge the existence of a Supreme Being.

Sec. 5. No person shall be disqualified to give evidence in any of the courts of this State on account of his religious opinions, or for the want of any religious belief, but all oaths or affirmations shall be administered in the mode most bind-

ing upon the conscience, and shall be taken subject to the pains and penalties of perjury.

Sec. 6. All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

Sec. 7. No money shall be appropriated or drawn from the treasury for the benefit of any sect, or religious society, theological or religious seminary; nor shall property belonging to the State be appropriated for any such purposes.

Sec. 8. Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers investigating the conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Sec. 9. The people shall be secure in their persons, houses, papers and possessions from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause supported by oath or affirmation.

Sec. 10. In all criminal prosecutions, the accused shall have a speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him, and have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself or counsel or both; shall be confronted with the witnesses against him, and shall have compulsory process for obtaining witnesses in his favor. And no person shall be held to answer for a criminal offense, unless on indictment of a grand jury, except in cases in which the punishment is by fine, or imprisonment otherwise than in the penitentiary, in cases of impeachment, and in cases

arising in the army or navy, or in the militia, when in actual service in time of war or public danger.

Sec. 11. All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident; but this provision shall not be so construed as to prevent bail after indictment found, upon examination of the evidence in such manner as may be prescribed by law.

Sec. 12. The writ of habeas corpus is a writ of right, and shall never be suspended. The Legislature shall enact laws to render the remedy speedy and effectual.

Sec. 13. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law.

Sec. 14. No person, for the same offense, shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction.

Sec. 15. The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency.

Sec. 16. No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.

Sec. 17. No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the state, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities shall be made; but all privileges and franchises granted by the Legislature or created under its authority shall be subject to the control thereof.

Sec. 18. No person shall ever be imprisoned for debt.

Sec. 19. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Sec. 20. No person shall be outlawed; nor shall any person be transported out of the State for any offense committed within the same.

Sec. 21. No conviction shall work corruption of blood, or forfeiture of estate; and the estates of those who destroy their own lives shall descend or vest as in case of natural death.

Sec. 22. Treason against the State shall consist only in

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 133 of 284

levying war against it, or adhering to its enemies, giving them aid and comfort; and no person shall be convicted of treason except on the testimony of two witnesses to the same overt act, or on confession in open court.

Sec. 23. Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime.

Sec. 24. The military shall at all times be subordinate to the civil authority.

Sec. 25. No soldier shall in time of peace be quartered in the house of any citizen without the consent of the owner, nor in time of war but in a manner prescribed by law.

Sec. 26. Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed; nor shall the law of primogeniture or entailments ever be in force in this State.

Sec. 27. The citizens shall have the right, in a peaceable manner, to assemble together for their common good, and apply to those invested with the power of government for redress of grievances or other purposes, by petition, address or remonstrance.

Sec. 28. No power of suspending laws in this State shall be exercised except by the Legislature.

Sec. 29. To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

## ARTICLE II.

### The Powers of Government.

Section 1. The powers of the government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to-wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.



Content downloaded/printed from HeinOnline

Fri Dec 13 17:48:53 2019

Citations:

Bluebook 20th ed.
Original text of the Constitution of 1889/1890. [1] (1890) Declaration of Rights

ALWD 6th ed.

Chicago 7th ed.
, "Declaration of Rights," Constitution of the State of Wyoming : [1]-[4]

McGill Guide 9th ed.
, "Declaration of Rights" [1].

MLA 8th ed.
"Declaration of Rights." Constitution of the State of Wyoming, , , p. [1]-[4].
HeinOnline.

OSCOLA 4th ed.
, 'Declaration of Rights' [1]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CONSTITUTION

—OF—

# THE STATE OF WYOMING.

## PREAMBLE.

We, the people of the State of Wyoming, grateful to God for our civil, political and religious liberties, and desiring to secure them to ourselves and perpetuate them to our posterity, do ordain and establish this Constitution.

## ARTICLE No. I.

### DECLARATION OF RIGHTS.

SECTION 1. All power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety and happiness; for the advancement of these ends they have at all times an inalienable and indefeasible right to alter, reform or abolish the government in such manner as they may think proper.

Power inherent in the people.

SEC. 2. In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal.

The equality of all.

SEC. 3. Since equality in the enjoyment of natural and civil rights is made sure only through political equality, the laws of this State affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever other than individual incompetency, or unworthiness duly ascertained by a court of competent jurisdiction.

Political rights without distinction of race, color or sex.

Security against searches.

SEC. 4. The right of the people to be secure in their persons, houses papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

Imprisonment for debt.

SEC. 5. No person shall be imprisoned for debt except in cases of fraud.

Definition of life, liberty, &c

SEC. 6. No person shall be deprived of life, liberty or property without due process of law.

Arbitrary power exists nowhere in republics.

SEC. 7. Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority.

Courts open to every person.

SEC. 8. All courts shall be open and every person for an injury done to person, reputation or property shall have justice administered without sale, denial or delay. Suits may be brought against the State in such manner and in such courts as the legislature may by law direct.

Trial by jury shall remain inviolate in criminal cases

SEC. 9. The right of trial by jury shall remain inviolate in criminal cases, but a jury in civil cases in all courts, or in criminal cases in courts not of record, may consist of less than twelve men, as may be prescribed by law. Hereafter a grand jury may consist of twelve men, any nine of whom concurring may find an indictment, but the legislature may change, regulate or abolish the grand jury system.

Accused in criminal cases, right to defend.

SEC. 10. In all criminal prosecutions the accused shall have the right to defend in person and by counsel, to demand the nature and cause of the accusation, to have a copy thereof, to be confronted with the witnesses against him, to have compulsory process served for obtaining witnesses, and to a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed.

In criminal cases no person compelled to testify against himself—jeopardy

SEC. 11. No person shall be compelled to testify against himself in any criminal case, nor shall any person be twice put in jeopardy for the same offense. If the jury disagree, or if the judgment be arrested after a verdict, or if the judgment be reversed for error in law, the accused shall not be deemed to have been in jeopardy.

Detaining witness in criminal case.

SEC. 12. No person shall be detained as a witness in any criminal prosecution longer than may be necessary to take his testimony or deposition, nor be confined in any room where criminals are imprisoned.

Criminal proceedings.

SEC. 13. Until otherwise provided by law, no person shall, for a felony, be proceeded against criminally, otherwise than by indictment, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger.

Bail.

SEC. 14. All persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishment be inflicted.

Penal code.

SEC. 15. The penal code shall be framed on the humane principles of reformation and prevention.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 137 of 284

SEC. 16. No person arrested and confined in jail shall be treated with unnecessary rigor. The erection of safe and comfortable prisons, and inspection of prisons, and the humane treatment of prisoners shall be provided for.

Jails—treatment of prisoners.

SEC. 17. The privilege of the writ of habeas corpus shall not be suspended unless, when in case of rebellion or invasion, the public safety may require it.

Habeas corpus.

SEC. 18. The free exercise and enjoyment of religious profession and worship without discrimination or preference shall be forever guaranteed in this State, and no person shall be rendered incompetent to hold any office of trust or profit, or to serve as a witness or juror, because of his opinion on any matter of religious belief whatever; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the State.

Religious liberty.

SEC. 19. No money of the State shall ever be given or appropriated to any sectarian or religious society or institution.

No money given to religious society.

SEC. 20. Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; and in all trials for libel, both civil and criminal, the truth, when published with good intent and for justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under direction of the court.

Freedom of speech.

SEC. 21. The right of petition, and of the people peaceably to assemble to consult for the common good, and to make known their opinions, shall never be denied or abridged.

Right of petition.

SEC. 22. The rights of labor shall have just protection through laws calculated to secure to the laborer proper rewards for his service and to promote the industrial welfare of the State.

Rights of labor to be protected.

SEC. 23. The right of citizens to opportunities for education should have practical recognition. The Legislature shall suitably encourage means and agencies calculated to advance the sciences and liberal arts.

Education.

SEC. 24. The right of citizens to bear arms in defense of themselves and of the State shall not be denied.

Self defense.

SEC. 25. The military shall ever be in strict subordination to the civil power. No soldier in time of peace shall be quartered in any house without consent of the owner, nor in time of war except in the manner prescribed by law.

Military subordinate to civil power.

SEC. 26. Treason against the State shall consist only in levying war against it, or in adhering to its enemies, or in giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court; nor shall any person be attainted of treason by the Legislature.

Treason.

SEC. 27. Elections shall be open, free and equal, and no power, civil or military, shall at any time interfere to prevent an untrammeled exercise of the right of suffrage.

Elections to be free and equal.

SEC. 28. No tax shall be imposed without the consent of the people or their authorized representatives. All taxation shall be equal and uniform.

No tax without consent—uniformity.

SEC. 29 No distinction shall ever be made by law between resident aliens and citizens as to the possession, taxation, enjoyment and descent of property.

Aliens.

Perpetuities and monopolies not allowed.

SEC. 30. Perpetuities and monopolies are contrary to the genius of a free state, and shall not be allowed. Corporations being creatures of the State, endowed for the public good with a portion of its sovereign powers, must be subject to its control.

Water control in state.

SEC. 31. Water being essential to industrial prosperity, of limited amount, and easy of diversion from its natural channels, its control must be in the State, which, in providing for its use, shall equally guard all the various interests involved.

When property taken for private use.

SEC. 32. Private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity, and for reservoirs, drains, flumes, or ditches on or across the lands of others for agricultural, mining, milling, domestic or sanitary purposes, nor in any case without due compensation.

Just compensation.

SEC. 33. Private property shall not be taken or damaged for public or private use without just compensation.

General laws—operation.

SEC. 34. All laws of a general nature shall have a uniform operation.

Ex post facto law, &c.

SEC. 35. No ex post facto law, nor any law impairing the obligation of contracts, shall ever be made.

Other rights not enumerated not impaired.

SEC. 36. The enumeration in this Constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people.

State, part of Union.

SEC. 37. The State of Wyoming is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land.

---

## ARTICLE No. II.

### DISTRIBUTION OF POWERS.

SECTION 1. The powers of the government of this State are divided into three distinct departments: the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted.

---

## ARTICLE No. III.

### LEGISLATIVE DEPARTMENT.

Name of legislature.

SECTION. 1. The legislative power shall be vested in a senate and house of representatives, which shall be designated "The Legislature of the State of Wyoming."

Senators, their term of office, qualifications.

SEC. 2. Senators shall be elected for the term of four (4) years and representatives for the term of two (2) years. The senators elected at the first election shall be divided by lot into two classes as nearly equal as may be. The seats of senators of the first class shall be vacated at the expiration of the first two years, and of the second class at the expiration of four years. No person shall be a senator who has not attained the age of twenty-five years, or a representative who has not attained the age of twenty-

**Examples of State Laws Requiring Parents to Furnish or Provide Arms to Children in the Militia**

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| Delaware | 1785 | "[E]very apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with a musket or firelock . . . ." | An Act for establishing a Militia, § 7, 2 Military Obligation: The American Tradition 13 (1947) |
| Maine | 1821 | "[A]ll parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms, and equipments, required by this Act . . . ." | An Act to organize, govern, and discipline the Militia of this State, ch. CLXIV, § 34, 1821 Me. Laws 548, 570. |
| Massachusetts | 1793 | "[A]ll parents, masters and guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipments aforementioned . . . ." | An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, Massachusetts Acts and Laws, May Session, ch. 1, § XIX (1793). |
| Massachusetts | 1810 | "[A]ll parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively with the arms and equipments, required by this act . . . ." | An Act for regulating, governing, and training the Militia of this Commonwealth, ch. CVII, § 28, in 1810 Mass. Laws 151, 176. |

[1] Year of enactment.

[2] Where the relevant law was published in a larger compendium source, the source date often postdates the year of enactment.

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| Missouri | 1825 | "[A]ll parents, masters and guardians, shall furnish all minors, enrolled in the militia, who shall be under their care, respectively, with the arms and equipments required by this act." | An Act to organize, govern and discipline the Militia, ch. I, § 24, in 1825 Mo. Laws 533, 554. |
| New Hampshire | 1776 | "And be it further Enacted by the Authority aforesaid, That each and every Officer and private Soldier of said Militia, not under the control of Parents, Masters, or Guardians, and being of sufficient Ability therefore, in the Judgment of the Select-men of the Town wherein he has his usual place of Abode, shall equip himself and be constantly provided with a good Fire Arm . . . ." | An Act For forming and regulating the Militia within the State of New Hampshire, in New-England, and for repealing all the Laws heretofore made for that Purpose, Acts & Laws of the Colony of N.H., 39 (1776). |
| New Hampshire | 1792 | "That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements." | An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose N.H., 447 (1792). |
| New Hampshire | 1820 | "[A]ll parents, masters, and guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms and equipments required by this act . . . ." | An Act for the forming, arranging and regulating the militia, § 46, 2 New Hampshire Laws Enacted Since June 1, 1815, 80 (1824). |
| North Carolina | 1806 | "And all parents and masters shall furnish those of the militia, who shall be under their care or command, with the arms and equipments above mentioned . . ." | 2 William T. Dortch, John Manning, John S. Henderson, The Code Of North Carolina § 3168, at 346-47 (1883). |

| **State** | **Year**[1] | **Statutory Text** | **Source**[2] |
|---|---|---|---|
| Vermont | 1797 | "And all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipments above mentioned . . . ." | An Act, for regulating and governing the militia of this State, ch. LXXXI, No. 1, § 15, 2 Laws Of The State Of Vermont Digested And Compiled 122, 131-32 (1808). |

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Jan 2 19:54:40 2020

Citations:

Bluebook 20th ed.
Backgrounds of Selective Service (1947).

ALWD 6th ed.
Backgrounds of Selective Service (1947).

APA 6th ed.
(1947). Backgrounds of Selective Service. Washington, U.S. Gvt. Printing Office.

Chicago 7th ed.
Backgrounds of Selective Service. Washington, U.S. Gvt. Printing Office.

McGill Guide 9th ed.
, Backgrounds of Selective Service (Washington: U.S. Gvt. Printing Office., 1947)

MLA 8th ed.
Backgrounds of Selective Service. Washington, U.S. Gvt. Printing Office. HeinOnline.

OSCOLA 4th ed.
Backgrounds of Selective Service. Washington, U.S. Gvt. Printing Office.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 143 of 284

BACKGROUNDS OF SELECTIVE SERVICE

# Military Obligation:

## THE AMERICAN TRADITION

*A Compilation of the Enactments of Compulsion*
*From the Earliest Settlements*
*of the Original Thirteen Colonies in 1607*
*Through the*
*Articles of Confederation 1789*

SPECIAL MONOGRAPH NO. 1
VOLUME II
PART 3. DELAWARE ENACTMENTS

THE SELECTIVE SERVICE SYSTEM

1947

## CLEARANCE COMMITTEE

BRIG. GEN. CARLTON S. DARGUSCH, *Chairman*

| | |
|---|---|
| COL. VICTOR J. O'KELLIHER | LT. COL. ARTHUR BOONE |
| COL. LEWIS F. KOSCH | LT. COL. IRVING HART |
| COL. WILLIAM HART | MR. KENNETH H. McGILL |

PREPARED AND COMPILED BY

LT. COL. ARTHUR VOLLMER

GOVERNMENT PRINTING OFFICE

WASHINGTON : 1947

FOR SALE BY THE SUPERINTENDENT OF DOCUMENTS, U. S. GOVERNMENT PRINTING OFFICE, WASHINGTON 25, D. C.

ments, (unlefs their remaining eftate be fufficient to anfwer what they are then in arrear) are hereby declared fraudulent, and fhall not prevent or avoid the feizing and felling the fame eftates, on any judgment that may be had on fuits to be brought for the recovery of the monies fo in arrear.

State treafurer to give bond.

Sect. 15. *And be it enacted*, That the faid ftate treafurer, before the firft day of November next, fhall become bound unto the Delaware ftate, with two or more fufficient fureties, to be approved of by the prefident or commander in chief for the time being, in an obligation of fifteen thoufand pounds, conditioned for the true obfervation of this act and the duty which to the faid office doth appertain; and in cafe of neglect or refufal of the faid ftate treafurer fo to do, or of his death in the recefs of the general affembly, it fhall and may be lawful for the prefident or commander in chief, with the approbation of the privy-council, to appoint fome other fit perfon to fupply his place, who fhall give fecurity as aforefaid.

His place how fupplied in cafe of delinquency, &c.

Sect. 16. *And be it enacted*, That if any of the days appointed by this act for the performance of any of the duties herein required, fhall happen to be on a Sunday, then fuch duties fhall be performed on the day following.

WHEREAS it appears, that fundry collectors of the ftate taxes directed to be raifed for the fervice of the years feventeen hundred and eighty-one, eighty-two, eighty-three and eighty-four, have through their indulgence, omitted to execute for thofe taxes within the times limited by law, and this general affembly being willing to give the fame fummary mode to the faid collectors to collect the arrearages of fuch taxes, as they could have had under the feveral acts of affembly paffed for thofe purpofes.

Summary mode for collecting the arrearages of taxes.

Sect. 17. *Be it enacted*, That the collectors refpectively of the faid feveral ftate-taxes, heretofore appointed, or hereafter to be appointed for that purpofe, be and they hereby are impowered to collect all arrearages and balances due of the faid taxes by execution, or otherwife, between the time of paffing this act and the firft day of November next, in as full and ample manner as heretofore could have been done had the fame been done within the time limited by law.

*Signed by Order of the Houfe of Affembly,*

THOMAS DUFF, *Speaker.*

*Signed by Order of the Council,*

THOMAS M'DONOUGH, *Speaker.*

*Paffed at* DOVER, *June* 4, 1785.

---

## An ACT for eftablifhing a Militia.

Preamble.

SECTION I. WHEREAS a well regulated Militia is the proper and natural defence of every free ftate; and as the laws heretofore made for the regulation thereof within this ftate are expired, and it is neceffary that a militia be eftablifhed;

Digitized from Best Copy Available

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 146 of 284

1785.

Returns to be made to the colonels of regiments, of all able-bodied male inhabitants within the districts of companies, &c.

the several counties of this state, shall, on or before the first day of August next, make an exact return to the late colonel or commanding officer of the regiment to which he did formerly belong, of the names and surnames of every able-bodied effective male white inhabitant between the ages of eighteen and fifty years, then residing in the district of which he was formerly captain or commanding officer; a copy of which return the said colonel or commanding officer of such regiment shall immediately transmit to the president or commander in chief of this state: And all male white persons between the ages aforesaid (clergymen and preachers of the gospel of every denomination, justices of the supreme court, keepers of the public gaols, school-masters teaching a Latin-school, or having at least twenty English scholars, and indented servants bona fide purchased, excepted) who on the said first day of August next, shall reside in any district or sub-division heretofore laid off in pursuance of the late militia laws of this state shall be considered as belonging to the militia company for such district or sub-division.

Officers in the military line, by whom appointed.

Sect. 3. *And be it enacted*, That the president or commander in chief shall, on or before the first day of October next, appoint and commission one colonel, one lieutenant-colonel and one major to command each of the regiments, and one captain, two lieutenants, and one ensign to command each of the companies within this state; and in case of the vacancy of a colonel, lieutenant colonel or major, captain, lieutenant or ensign, the president or commander in chief shall appoint and commission such person to fill the said vacancy as he shall judge most suitable for that purpose.

Quarter-masters, &c. by whom appointed.

Sect. 4. *And be it enacted*, That the field officers of each regiment shall appoint a quarter master and adjutant, a drum and a fife major for the regiment, and the commissioned officers of each company shall appoint four sergeants, four corporals, one drum and one fife for their respective companies.

Militia to be formed into classes.

Sect. 5. *And be it enacted*, That on the tenth day of April next ensuing, the captain or commanding officer of each company shall call the persons belonging to the same together, giving due notice, and shall divide them into eight classes, as nearly equal in number to each other, as conveniently may be, allotting a sergeant or a corporal to each class, and eight slips of paper numbered respectively from one to eight being prepared, every private shall determine, by drawing a ballot, what class he is to serve in; and in case any of the persons belonging to any company shall neglect to attend at the time and place appointed for classing the said company, or if present, shall refuse to draw as aforesaid, then the said captain or commanding officer thereof shall appoint one disinterested freeholder to draw for the absentees or persons so refusing; and when the classes shall be so settled, the captain or commanding officer of each company shall form a roll consisting of the eight classes, and the names and surnames of the men in each class, numbered according to the order of ballotting, which he shall keep for his own use and direction, transmitting forthwith a copy thereof, with a list of his commissioned and non-commissioned officers prefixed, to the colonel or commanding officer of the regiment, who shall enter the same in a book by him to be provided for that purpose: And the said captain or commanding officer shall in the month of April in the year of our Lord one thousand seven hundred and eighty-seven, and in the month of April in every succeeding year, add to the said roll the names and surnames of all such male white inhabitants between the ages aforesaid, who on the next preceding twelve months have removed to, and are then residing in, that

Rolls thereof to be formed, and transmitted to the colonel.

ADD0144

Digitized from Best Copy Available

1785.

Sect. 6. *And be it enacted*, That every company ſhall be duly exerciſed and inſtructed in the months of April and September annually, at ſuch time and place as the captain or commanding officer ſhall direct, he giving notice thereof by advertiſement at three of the moſt public places in his diſtrict, at leaſt five days before the day of muſter; and every regiment ſhall be reviewed on the firſt Wedneſday in June and the ſecond Wedneſday in October in every year, and be properly trained and diſciplined at ſuch place as the colonel or commanding officer ſhall direct, and at ſuch other times and places as the preſident or commander in chief ſhall think neceſſary, and ſhall order.

Militia how often to be exercised.

Sect. 7. *And be it enacted*, That every perſon between the ages of eighteen and fifty, or who may hereafter attain to the age of eighteen years, except as before excepted, whoſe public taxes may amount to twenty ſhillings a year, ſhall at his own expence, provide himſelf; and every apprentice, or other perſon of the age of eighteen and under twenty-one years, who hath an eſtate of the value of eighty pounds, or whoſe parent ſhall pay ſix pounds annually towards the public taxes, ſhall by his parent or guardian reſpectively be provided with a muſket or firelock, with a bayonet, a cartouch box to contain twenty three cartridges, a priming wire, a bruſh and ſix flints, all in good order, on or before the firſt day of April next, under the penalty of forty ſhillings, and ſhall keep the ſame by him at all times, ready and fit for ſervice, under the penalty of two ſhillings and ſix pence for each neglect or default thereof on every muſter day, to be paid by ſuch perſon if of full age, or by the parent or guardian of ſuch as are under twenty-one years, the ſame arms and accoutrements to be charged by the guardian to his ward, and allowed at ſettling the accounts of his guardianſhip.

What perſons ſhall provide arms, &c.

Penalty for neglecting to keep them in repair.

Sect. 8. *And be it enacted*, That every male white perſon within this ſtate, between the ages of eighteen and fifty, or who ſhall hereafter attain to the age of eighteen years, except as before excepted, ſhall attend at the times and places appointed in purſuance of this act for the appearance of the company or regiment to which he belongs, and if any non-commiſſioned officer or private, ſo as aforeſaid required to be armed and accoutred with his firelock and accoutrements aforeſaid in good order, or if any male white perſon between the ages aforeſaid although not required to be ſo armed and accoutred, ſhall neglect or refuſe to appear on the parade and anſwer to his name when the roll is called over, which the commanding officer is hereby directed to cauſe to be done at the diſtance of one hour after the time appointed for meeting, not having a reaſonable excuſe, to be adjudged of by a court-martial to be appointed by the commanding officer of the company, which ſhall conſiſt of a ſubaltern and four privates, the ſubaltern to be preſident thereof, every ſuch perſon ſhall forfeit and pay the ſum of four ſhillings for every ſuch neglect or refuſal; and if the ſaid court-martial ſhall adjudge, that ſuch perſon had not a reaſonable excuſe for ſuch neglect or refuſal, the juſtice to whom the captain or commanding officer of the company ſhall make return of the proceedings of ſuch court martial ſhall enter judgment and iſſue execution thereupon, unleſs it ſhall appear to him, that the defendant was ſick, or out of the county on ſome neceſſary buſineſs, and had not an opportunity of being heard before the court-martial.

Penalty on privates for non-attendance, &c.

How to be adjudged.

Sect. 9. *And be it enacted*, That every perſon required to attend as aforeſaid at the time and place of exerciſe in company, or in regiment, who ſhall then and there appear and [illegible]

For neglect of duty, the penalty.

Digitized from Best Copy Available



Content downloaded/printed from HeinOnline

Thu Nov 7 17:45:58 2019

Citations:

Bluebook 20th ed.
1821 50 .

ALWD 6th ed.
1821 50 .

Chicago 7th ed.
, "," Maine - Public Acts, Revision of 1821, Regular Session : 50-682

OSCOLA 4th ed.
, '' 1821 50

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



military parade on the day pointed out by the Constitution of this State for the election of Governor, and Senators, nor on any day which may be appointed for the choice of electors of President and Vice President of the United States, or Representatives to Congress. And it shall not be lawful for any officer to parade his men on either of said days, unless in case of invasion made or threatened, or in obedience to the orders of the Commander in Chief, except as is herein before excepted.

State colours, drums, fifes, &c. to be furnished by State.

SEC. 33. *Be it further enacted*, That each regiment of infantry and each battalion of cavalry or artillery shall be furnished with the State colours; and each company of infantry, artillery, light infantry, grenadiers and riflemen, shall be furnished with a drum and fife, or bugle horn, and each company of cavalry with a trumpet; and each Brigadier General after the first day of August next ensuing, is hereby authorized to draw orders upon the Quarter Master General in favor of the Commanding officers of regiments, battalions, and companies, for the above purposes, that the several regiments, battalions and companies may be supplied as aforesaid. And the Commanding officers of regiments and battalions shall be responsible for the safe keeping of their colours; and the Commanding officers of companies shall be responsible for the safe keeping of the drums, fifes, bugle horns, and trumpets, delivered to them for the use of their companies; and it shall be the duty of the Quarter Master General to furnish such colours and musical instruments, and to present his accounts therefor to the Legislature for allowance. And the Adjutant General shall furnish blank orders for the Commanding officers of companies to order their non-commissioned officers and privates to notify their men to attend all the inspections, trainings and reviews, and meetings for the choice of officers, which shall be ordered; also blank notifications or orders, to be left with the men by the non-commissioned officers or privates, ordered to notify as aforesaid; and Clerk's complaints to Justices of the Peace; and it shall not be necessary that seals be affixed to any orders whatever.

Commanding officers responsible for safe keeping of colours, &c.

Adjutant general to furnish blank orders, &c.

Parents, masters, &c. to furnish their minors with arms and equipments.

SEC. 34. *Be it further enacted*, That all parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms, and equipments, required by this Act; and if any parent, master or guardian, having any minor under his care, enrolled as aforesaid, shall neglect to provide such minor with the arms and equipments, required by this Act; or if said minor shall absent himself from any meeting of the company, to which he belongs, required by law, without sufficient excuse, the said parent, master or guardian is hereby subjected and made liable to the same forfeitures as such minor would be liable to, for a like deficiency, neglect or non-

appearance, if such minor were of age; and all persons liable by this Act to military duty, shall be allowed six months, immediately from and after their arrival at the age of eighteen years, and not afterwards, within which to furnish themselves with the arms and equipments required by law: *Provided however*, That such parents, masters, or guardians as shall produce, on or before the first Tuesday of May annually, certificates from the Overseers of the poor of the town or district in which they reside, of their inability to provide arms and equipments as aforesaid, to the Commanding officer of the company in which the minor under their care is enrolled, shall be exempted from the forfeitures aforesaid.

Six months allowed for providing arms and equipments.

Proviso respecting those unable to arm and equip.

SEC. 35. *Be it further enacted*, That no non-commissioned officer or private of any company shall be exempted from military duty on account of bodily infirmity, unless he shall obtain from the Surgeon or Surgeon's mate of the regiment to which he belongs, if either of those officers are commissioned in such regiments; if not, from some respectable physician, living within the bounds of the same, a certificate that he is unable to perform military duty on account of bodily infirmity, the nature of which infirmity is to be described in said certificate, and the Commanding officer of the company may, on the back of such certificate, discharge the non-commissioned officer or private, named therein, from performing military duty, for such a term of time, as he shall judge reasonable, not exceeding one year, which certificate, if approved and countersigned by the Commanding officer of the regiment, or battalion, to which the disabled non-commissioned officer or private belongs, shall entitle him to exemption from military duty for the time specified. And any non-commissioned officer or private, having obtained a certificate as aforesaid, and who may be refused a discharge, may apply to the Commanding officer of the regiment for further examination of his case, and if on such examination, the Commanding officer of the regiment shall be well satisfied that the bodily infirmity of such non-commissioned officer or private is such that he ought to be discharged, he is hereby authorized to discharge him from military duty for such time as he shall judge reasonable, not exceeding one year, which being certified by the Commanding officer of the regiment on the back of the certificate, shall discharge the non-commissioned officer, or private, from military duty for the time specified by the Commanding officer of the regiment.

No invalid exempts allowed without surgeon's certificate.

Certificates to be countersigned.

SEC. 36. *Be it further enacted*, That if any non-commissioned officer or private shall be killed, or die of wounds received when on any military duty required by this Act, his widow, child or children, shall receive from the Legislature such relief as shall be just and reasonable. And if any officer, non-commissioned officer or private, shall be wounded,

Pensions to be allowed in certain cases of death or wounds, when on duty.

72



Content downloaded/printed from HeinOnline

Thu Nov 7 17:31:52 2019

Citations:

Bluebook 20th ed.
1810 151 .

ALWD 6th ed.
1810 151 .

Chicago 7th ed.
, "," Massachusetts - Laws, January Session : 151-193

OSCOLA 4th ed.
, '' 1810 151

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 152 of 284

commiſſioned officers on privates, ordered to notify as aforeſaid, and it ſhall not be neceſſary that ſeals be affixed to any orders whatever.

Parents and maſters to equip minors.

SEC. 28. *Be it further enacted*, That all parents, maſters or guardians, ſhall furniſh all minors enrolled in the militia, who ſhall be under their care reſpectively with the arms and equipments, required by this act; and if any parent, maſter, or guardian, having any minor under his care, enrolled as aforeſaid, ſhall neglect to provide ſuch minor with the arms and equipments, required by this act, he is hereby ſubjected and made liable to the ſame forfeitures, as ſuch minor would be liable to, for a like deficiency or neglect, if ſuch minor were of age: *Provided however*, That ſuch parents, maſters, or guardians as ſhall produce, on or before the firſt Tueſday of May, annually, certificates from the overſeers of the poor of the town or diſtrict in which they reſide, of their inability to provide arms and equipments as aforeſaid, to the commanding officer of the company in which the minor under their care is enrolled, ſhall be exempted from the forfeitures aforeſaid.

No perſon exempted for infirmity, without a certificate.

SEC. 29. *Be it further enacted*, That no non-commiſſioned officer or private of any company ſhall be exempted from military duty on account of bodily infirmity, unleſs he ſhall obtain from the ſurgeon or ſurgeon's mate of the regiment to which he belongs, if either of thoſe officers are commiſſioned in ſuch regiments; if not, from ſome reſpectable phyſician living within the bounds of the ſame, that he is unable to perform military duty on account of bodily infirmity, the nature of which infirmity is to be deſcribed in ſaid certificate, and the commanding officer of the company may, on the back of ſuch certificate, diſcharge the non-commiſſioned officer or private, named therein, from performing military duty, for ſuch a term of time as he ſhall judge reaſonable, not exceeding one year, which certificate, if approved and counterſigned by the commanding officer of the regiment, or battalion, to which the diſabled non-commiſſioned officer or private belongs, ſhall entitle him to exemption from military duty for the time ſpecified. And any non-commiſſioned officer or private, having obtained a certificate as aforeſaid, and who may be refuſed a diſcharge, or an approval of a diſcharge, as aforeſaid, may apply to the commanding officer of the brigade for a further

ther



Content downloaded/printed from HeinOnline

Tue Dec 31 11:31:40 2019

Citations:

Bluebook 20th ed.
1793 289 .

ALWD 6th ed.
1793 289 .

Chicago 7th ed.
, "," Massachusetts - Acts & Laws, May Session : 289-308

OSCOLA 4th ed.
, '' 1793 289

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# Acts *and* Laws,

## Passed by the GENERAL COURT of *Massachusetts:*

Begun and held at BOSTON, in the County of SUFFOLK, on Wednesday the Twenty-ninth Day of MAY, ANNO DOMINI, 1793.

### CHAP. I.

An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, and for repealing all Laws heretofore made for that Purpose; excepting an Act, intitled "An Act for establishing Rules and Articles for governing the Troops stationed in Forts and Garrisons, within this Commonwealth, and also the Militia, when called into actual Service."

Preamble.

*WHEREAS the Laws for regulating and governing the Militia of this Commonwealth, have become too complicated for practical use, by reason of the several alterations which have from time to time been made therein:* Therefore,

Laws repealed.

I. *BE it enacted by the* SENATE *and* HOUSE *of* REPRESENTATIVES *in General Court assembled, and by the authority of the same,* That the several Laws heretofore made for governing and regulating

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 155 of 284

XVIII. *And be it further enacted by the authority aforesaid,* That every non-commiſſioned Officer and Private of the infantry ſhall conſtantly keep himſelf provided with a good muſket, with an iron or ſteel rod, a ſufficient bayonet and belt, two ſpare flints, a priming wire and bruſh, and a knapſack; a cartridge-box, or pouch with a box therein, to contain not leſs than twenty-four cartridges, ſuited to the bore of his muſket; each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapſack, ſhot-pouch, powder-horn, twenty balls ſuited to the bore of his rifle, and a quarter of a pound of powder: And ſhall appear ſo armed, accoutred and provided, whenever called out, except that when called out to exerciſe only, he may appear without a knapſack, and without cartridges loaded with ball. *Provided always,* that whenever a man appears armed with a muſket, all his equipments ſhall be ſuited to his muſket; and whenever a man appears armed with a rifle, all his equipments ſhall be ſuited to his rifle: And that from and after five years from the paſſing of this Act, all muſkets for arming the Militia, as herein required, ſhall be of bores ſufficient for balls of the eighteenth part of a pound: And every citizen enrolled and providing himſelf with arms ammunition and accoutrements, required as aforeſaid, ſhall hold the ſame exempted from all ſuits, diſtreſſes, executions or ſales for debt, or for payment of taxes.

Neceſſary articles of equipments.

Proviſo.

Arms &c. to be exempted from ſuits.

XIX. *And be it further enacted by the authority aforeſaid,* That every non-commiſſioned Officer or Private of the infantry, who ſhall neglect to keep himſelf armed and equipped as aforeſaid, or who ſhall on a muſter-day, or at any other time of examination, be deſtitute of, or appear unprovided with the arms and equipments herein directed (except as before excepted) ſhall pay a fine not exceeding *twenty ſhillings,* in proportion to the articles of which he ſhall be deficient, at the diſcretion of the Juſtice of the Peace, before whom trial ſhall be had: And all parents, maſters and guardians ſhall furniſh thoſe of the ſaid Militia who ſhall be under their care and command, with the arms and equipments aforementioned, under the like penalties for any neglect: And whenever the Selectmen of any town ſhall judge any inhabitant thereof, belonging to the Militia, unable to arm and equip himſelf in manner as aforeſaid, they ſhall at the expence of the town provide for and furniſh ſuch inhabitant with the aforeſaid arms and equipments, which ſhall remain the property of the town at the expence of which they ſhall be provided; and if any ſoldier ſhall embezzle or deſtroy the arms and equipments with which he ſhall be furniſhed, he ſhall, upon conviction before ſome Juſtice of the Peace, be adjudged to replace the article or articles, which ſhall by him be ſo embezzled or deſtroyed, and to pay the coſt ariſing from the proceſs againſt him: And if he ſhall not perform the ſame within fourteen days after ſuch adjudication, it ſhall be in the power of the

Fine for neglect.

Parents and maſters to equip their children & ſervants.

Perſons unable, to be furniſhed by the town.

Penalty, in caſe.

the Selectmen of the town to which he ſhall belong, to bind him out to ſervice or labour, for ſuch term of time as ſhall, at the diſcretion of the ſaid Juſtice, be ſufficient to procure a ſum of money equal to the value of the article or articles ſo embezzled or deſtroyed, and pay coſt ariſing as aforeſaid.

XX. *And be it further enacted by the authority aforeſaid,* That every perſon liable to do military duty, who being duly warned ſhall refuſe or neglect to appear at the time and place appointed, armed and equipped as by this act is directed, for any muſter, training, view of arms, or other military duty, ſhall pay as a fine for ſuch default, the ſum of *ten ſhillings:* And every perſon who ſhall appear at any muſter with his arms in an unfit condition, ſhall pay a fine of *three ſhillings* for each and every ſuch default: *Provided nevertheleſs,* It ſhall be lawful for the Commanding Officer of a company, at any time within eight days after any muſter, training, view of arms or other duty, to excuſe any perſon for non-appearance, on the delinquent's producing to him ſatisfactory evidence of his inability to appear as aforeſaid; and the Commanding Officer of the company ſhall certify the ſame to the Clerk within the time abovementioned, and the Clerk ſhall not thereafter commence any proſecution againſt ſuch delinquent for his fine for non-appearance, as aforeſaid.

Penalty for not appearing on muſter days.

Proviſo.

XXI. *And be it further enacted by the authority aforeſaid,* That whenever the Commanding Officer ſhall think proper to call his company together, or ſhall be ordered by his ſuperior Officer to do it, he ſhall iſſue his orders therefor, to one or more of the non-commiſſioned Officers, if there be any, if not to one or more of the privates belonging to his company, directing him or them to notify and warn the ſaid company to appear at ſuch time and place as ſhall be appointed; and every ſuch perſon or perſons, who ſhall receive ſuch orders, ſhall give notice of the time and place appointed for aſſembling ſaid company, to each and every perſon he or they ſhall be ſo ordered to warn, either by verbal information, or by leaving a written or printed notification thereof, at the uſual place of abode of the perſon thus to be notified and warned; and no notice ſhall be deemed legal for muſters for the purpoſe of common and ordinary trainings, unleſs it ſhall be given four days at leaſt, previous to the time appointed therefor; but in caſe of invaſion, inſurrection or other emergency, any time ſpecified in the orders ſhall be conſidered as legal; and every non-commiſſioned Officer, or other perſon, who ſhall neglect to give the ſaid notice and warning, when ordered thereto by the Commanding Officer of the company to which he belongs, ſhall for ſuch offence forfeit and pay as a fine, a ſum not exceeding *forty ſhillings,* nor leſs than *twelve ſhillings,* at the diſcretion of the Juſtice of the Peace before whom trial ſhall be had; and the teſtimony of any perſon under oath, who ſhall have received orders agreeable to law, for notifying

Clerk to notify.

Manner of notification.

Penalty.



Content downloaded/printed from HeinOnline

Thu Nov 7 17:52:58 2019

Citations:

Bluebook 20th ed.
Laws of the State of Missouri; Revised and Digested by Authority of the General Assembly: With an Appendix (1825).

ALWD 6th ed.
Ls of the State of Missouri; Revised & Digested by Authority of the General Assembly: With an Appendix (1825).

APA 6th ed.
(1825). Laws of the State of Missouri; Revised and Digested by Authority of the General Assembly: With an Appendix. St. Louis Mo., Printed by E. Charless, for the State.

Chicago 7th ed.
Laws of the State of Missouri; Revised and Digested by Authority of the General Assembly: With an Appendix. St. Louis Mo., Printed by E. Charless, for the State.

McGill Guide 9th ed.
, Laws of the State of Missouri; Revised and Digested by Authority of the General Assembly: With an Appendix (St. Louis Mo.: Printed by E. Charless, for the State., 1825)

MLA 8th ed.
Laws of the State of Missouri; Revised and Digested by Authority of the General Assembly: With an Appendix. St. Louis Mo., Printed by E. Charless, for the State. HeinOnline.

OSCOLA 4th ed.
Laws of the State of Missouri; Revised and Digested by Authority of the General Assembly: With an Appendix. St. Louis Mo., Printed by E. Charless, for the State.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 158 of 284

manner aforesaid; and such musicians, master and deputy master, shall be exempted from all military duty while he or they continue to belong to any band or company as musicians as aforesaid, excepting such as shall be required of them as musicians by the proper commanding officer.

Arms and equipments to be provided and kept.

SEC. 24. *Be it further enacted*, That every officer, non-commissioned officer and private, of infantry, light infantry, cavalry, artillery, grenadiers and riflemen, shall constantly keep himself furnished and provided with arms and equipments as required by the laws of the United States; and every officer, non-commissioned officer and private of light artillery shall be armed and equipped in the same manner as the officers, non-commissioned officers and privates of cavalry, respectively, and shall constantly keep himself furnished and provided with a horse, arms and equipments, as required by the laws of the United States of the officers, non-commissioned officers and privates of cavalry; and each company of light artillery shall do duty as cavalry until proper ordnance or field artillery is provided. And all parents, masters and guardians, shall furnish all minors, enrolled in the militia, who shall be under their care, respectively, with the arms and equipments required by this act.

Minors to be furnished with arms, &c by parents, guardians or masters.

Arms, public, may be loaned to volunteer companies.

SEC. 25. *Be it further enacted*, That the commander in chief shall be and is hereby authorized to loan to any volunteer corps, or company organized under the provisions of this act, the necessary arms required by the preceding section, and to each company of field artillery, or light artillery, in addition thereto, two field pieces of such calibre as the commander in chief shall direct, with carriages and apparatus complete, an ammunition cart, tumbrils, harness, implements, laboratory and ordnance stores, which may, from time to time, be necessary for their equipment for the field, to be furnished out of the arms which are or may be appointed to this state by the United States, or which may be purchased or provided by this state for arming the militia; and the commanding officers of companies shall be accountable for the careful preservation of arms, field pieces, and all the apparatus appertaining to their equipment, and for the disposition and management thereof according to the provisions of this act; and before any arms, field pieces or apparatus, shall be delivered to any officer, he shall enter into bond to the state, with security to be approved of by the governor, in such penalty and condition as shall be required by the governor, who shall so regulate the same as to secure the due accountability of the officer; which bond shall be deposited in the office of the quarter master general, who, in case of a vio-

Commandant of company accountable for arms, &c.

To give bond



Content downloaded/printed from HeinOnline

Wed Oct 23 17:16:03 2019

Citations:

Bluebook 20th ed.
1759-1776 1 .

ALWD 6th ed.
1759-1776 1 .

Chicago 7th ed.
, "," New Hampshire - Temporary Laws, Acts and Laws 1759-1776 : 1-113

OSCOLA 4th ed.
, '' 1759-1776 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 160 of 284

STATE OF NEW-HAMPSHIRE.

*In the Year of our LORD, One Thousand Seven Hundred and Seventy-six.*

# AN ACT

Passed Sept. 11, 1776.

To adopt and take the Name, Stile, and Title of STATE, in Lieu of COLONY, in New-Hampshire.

Preamble.

*WHEREAS by a late Declaration of the Honorable Continental CONGRESS, the United-Colonies of North-America are declared FREE and INDEPENDANT STATES* :

THEREFORE,

This Colony to take the Name and Stile of STATE.

BE IT ENACTED BY THE COUNCIL *and* ASSEMBLY, That henceforth this COLONY assume and take the Name and Stile of THE STATE OF NEW-HAMPSHIRE : And where any Law hath directed the Name and Stile of the Colony of New-Hampshire, or the Name and Stile of the Province of New-Hampshire, to be used in any Commissions, Processes, or Writings whatever ; in Lieu thereof, shall be now used the Name and Stile of THE STATE OF NEW-HAMPSHIRE, and not otherwise.

# AN ACT

Passed Sept. 19, 1776.

For forming and regulating the MILITIA within the State of *New-Hampshire*, in *New-England*, and for repealing all the LAWS heretofore made for that Purpose.

Preamble.

*WHEREAS it is not only the Interest, but the Duty of all Nations to defend their Lives, Liberties and Properties, in that Land, which the Supreme Ruler of the Universe has bestowed on them, against the unlawful Attacks and Depredations of all Enemies whatever ; especially those who are moved by a Spirit of Avarice or Despotism.* AND WHEREAS, *the Honorable* AMERICAN CONGRESS *have recommended to the United-Colonies, to put the Militia into a proper State for the Defence of* AMERICA :------- AND WHEREAS, *the Laws now in Force, respecting the Regulation of the* MILITIA, *have been found insufficient for the Purposes aforesaid* :

IT

*First,* IT IS THEREFORE ENACTED BY THE COUNCIL, AND HOUSE OF REPRESENTATIVES *in* GENERAL-COURT *assembled, and by the* Authority *of the same.* That the several Laws, and the several Paragraphs, and Clauses of all and every the Laws of this State, enforceing, or any ways relating to the Regulation of the MILITIA, be, and hereby are repealed, and declared null and void.

Repealing clause.

*And be it further Enacted by the* AUTHORITY *aforesaid,* That that part of the Militia of this State, commonly called the Training Band, shall be constituted of all the able-bodied Male-Persons therein, from sixteen Years old to fifty, excepting Members of the AMERICAN CONGRESS, Members of the COUNCIL, and of the Hou[illegible] of *Representatives* for the time being, the Secretary of the Colony, all Civil Officers that have been or shall be appointed by the General-Court, or either Branch of it, Officers and Students of Dartmouth-College, Ministers of the Gospel, Elders and Deacons of Churches, Church Wardens, Grammer-School-Masters, Masters of Arts, the Denomination of Christians called Quakers, Selectmen for the Time being, those who have by Commission under any Government or Congress, or by Election, in Pursuance of the Vote of any Congress of the Continent, or of this or any other Colony, held the Post of a Subaltern or higher Officer, Persons while actually employed as Masters of Vessels of more then Thirty Tons Burthen, other than Fishing Vessels, and Vessels coasting this Colony, and to and from this Colony, to the other New-England Governments, Constables, Sheriffs, and Deputy Sheriffs, Negroes, Indians and Mulattoes; and shall be under the Command of suchOfficers as shall be chosen, impowered, and commissionated over them, as is by this Act provided; and the Selectmen or the major part of them of each Town, shall be, and hereby are impowered, by writing under their Hands to excuse from Time to Time such Physicians, Surgeons, Ferrymen, and Millers, in their respective Towns, from common and ordinary Trainings as they shall judge it necessary to excuse: And the Council, and House of Representatives aforesaid, shall from Time to Time, as may appear to them necessary, divide the Militia of each County into Regiments, and alter and divide such Regiments from Time to Time, as they shall judge expedient, after having taken the Opinion, during any Session of the General Court, of such Members of the House as belong to the County, where the Division or Alteration is to be made, and as shall be present at the Time of such Consultation.

The training band.

Persons exempted.

Militia to be divided.

Second. *And be it further Enacted by the* AUTHORITY *aforesaid,* That there shall be chosen by Ballot of the Council, and House of Representatives for this State, from Time to Time as may be necessary, one Major-General over the whole Militia thereof, which Major-General when so chosen shall be commissionated to that Office by the Council and House aforesaid,

One Major General to be chosen by ballot of both Houses

L

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 162 of 284

ſaid, and ſaid General ſhall at all Times have Power to draw forth the ſaid Militia, or any part thereof, as the ſaid General may judge expedient and neceſſary for the immediate defence of this, or any of the United States of America. And the Officers and Soldiers of ſaid Militia, ſhall pay entire obedience to his Commands accordingly, under the Penalties hereafter provided in this Act.

His Power.

*Provided always*, That the ſaid General and all other Officers of ſaid Militia, ſhall at all Times be under the Command of the Council and Houſe of Repreſentatives, and ſhall in drawing forth or retaining in Service the ſaid Militia or any part thereof be ſubject to ſuch Orders and Inſtructions, as they may receive from Time to Time from the ſame COUNCIL and HOUSE of REPRESENTATIVES.

To be under the command of both HOUSES.

3d. *And be it further Enacted by the* AUTHORITY *aforeſaid*, That there ſhall be choſen, appointed, and commiſſionated, (as is provided and directed by this Act, for the Choice and Appointment of a General Officer) over each Regiment in this S ate, one Colonel, one Lieutenant-Colonel, and two Majors; and the ſaid Field Officers ſo appointed and commiſſionated, or the major part of them,, ſhall forthwith divide and ſet off the reſpective Regiments into Companies, as they ſhall judge expedient, to conſiſt as near as conveniently can be, of fixty-eight Privates, excluſive of thoſe of the Alarm Liſt, and to determine the Rank of each and every Company.

Field Officers to be choſen.

*Provided nevertheleſs*, That no Soldier ſhall be obliged without his conſent, to join a Company belonging to any Town, in which he has not his uſual Place of Abode, unleſs where there ſhall not be Privates enough to make a Company of Thirty Soldiers, including Officers; in which Caſe, as alſo where there are any Perſons belonging to a place not incorporated, they ſhall be joined to ſuch Company as the Field Officers of the Regiments within which they are ſhall ſee fit. And the Inhabitants of every Town now in, or that ſhall be in the Continental Army, ſhall be deemed to belong to, and be a part of the Companies in their reſpective Towns, and excuſed from Duty in the Militia, while they continue part of the Army aforeſaid; and each Company when ſo formed and ſet off, ſhall together with thoſe of the Alarm Liſt, within the Limits of the ſame, by Ballot, in the preſence of one of their Field Officers, who ſhall cauſe them to be duly notified for that purpoſe, and ſhall preſide as Moderator, chuſe one Captain, two Lieutenants, and one Enſign; which choice, ſhall be immediately certified to the Secretary by ſaid Field Officers; and the Preſident of the Council thereupon, unleſs ſome material Objection againſt ſuch choice for any corrupt Practice or Irregularity, ſhall be made at or before the Time of receiving ſaid Certificates, ſhall commiſſionate ſuch Perſons purſuant to their Election,

Perſons in the army to be conſidered as part of the Militia.

Choice of Subalterns.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 163 of 284

Election. And all the said Officers when so commissionated by the President of the Council, shall in the absence of their Superiors, have the same Power in ordering, directing and marching their Regiments and Companies, as the Major General has over the whole of the said Militia: And the Colonel, or commanding Officer of each Regiment, shall as soon as the Captains in his Regiment are commissionated, give them respectively under his Hand in Writing, the Limits of their respective Companies; their Alarm Posts, and the manner of mustering their Companies on all Occasions.

4th. *And be it further Enacted by the* AUTHORITY *aforesaid*, That the Field Officers of each and every Regiment, or the major part of them, shall recommend to the General-Court, a good able and skilful Person for Adjutant of their Regiment; and if either House shall by Ballot, elect such Person for that Office, then the President of the Council shall, when concurred, commissionate him thereto. And in all Cases determinable by Field-Officers of the several Regiments, where there shall be four Field Officers of any particular Regiment present, and they shall be equally divided in their Opinions respecting such Matter, the determination shall be according to the Opinion of the first Colonel.

Adjutant to be appointed.

5th. *And be it further Enacted*, That each Company, including the Alarm List, shall be called together by their Captain or commanding Officer, as soon as may be for the purpose of chusing one Clerk, four Serjeants, four Corporals, one Drummer, and one Fifer; and when it shall appear to the Commission Officers of any Company, that either of said non-commissioned Officers shall neglect his Duty, they may remove and dismiss him from his Office, and call upon their Company, including the Alarm List, to chuse another in the Room of such Delinquent; and if the said Company being called together for that Purpose, shall at any Time neglect or refuse immediately to proceed to the choice of one, or more non-commissioned Officer or Officers, so ordered to be chosen; the Commission Officers of such Company, or the major Part of them, shall by Warrant under their Hands in Writing, appoint such Non-commissioned Officer or Officers, which the said Company shall have refused to choose as aforesaid.

Non-commissioned Officers to be chose by the company.

6th. *And be it further Enacted by the* AUTHORITY *aforesaid*, That each and every Officer and private Soldier of said Militia, not under the controul of Parents, Masters, or Guardians, and being of sufficient Ability therefor, in the Judgment of the Selectmen of the Town wherein he has his usual place of Abode, shall equip himself, and be constantly provided with a good Fire Arm, good Ramrod, a Worm, Priming-Wire and Brush, and a Bayonet fitted to his Gun, a Scabbard and Belt therefor, and a cutting Sword or a Tomahawk, or Hatchet, a Pouch containing a Cartridge-Box that will hold fifteen Rounds of Cartridges at least, a hundred Buck

Equippage.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 164 of 284

Buck Shot, a Jack Knife and Tow for Wadding, fix Flints, one pound of Powder, forty leaden Balls, fitted to his Gun, a Knapfack and Blanket, a Canteen or Wooden Bottle, fufficient to hold one Quart. And all Parents, Mafters, and Guardians, fhall furnifh and equip thofe of the Militia, which are under their care and command, with the Arms, Equipments and Accoutrements aforefaid: And where the Selectmen of any Town fhall adjudge any Perfons belonging to the Militia of their Town unable to equip and arm himfelf as aforefaid, fuch Selectmen fhall in Writing, under their Hands certify the fame to the Captain, or commanding Officer in whofe Company fuch Perfon may be, and fhall at the Expence of fuch Town provide for, furnifh, arm and equip fuch Perfons with Arms and Equipments; which Arms fo provided by fuch Selectmen, fhall be the Property of the Town at whofe Expence they fhall be provided; and if any Non-commiffioned Officer or Soldier, fhall embezzle or deftroy the fame, he fhall be punifhed at the Difcretion of the Juftice, or Court before whom he may be convicted thereof, paying double the Value of the Arms, or Accoutrements fo wilfully deftroyed or embezzled, and on Default thereof, to be publickly whipped not exceeding twenty Stripes: And the Selectmen of each and every Town fhall provide at the Expence of the Colony and depofit and keep in fome fafe Place for the ufe of the Militia upon an Alarm, one fixteenth Part fo many Spades, or Iron Shovels with Handles and fitted for Service, as there are Rateable Polls in their Town; one half as many narrow Axes, as Spades and Iron Shovels, and as many Pick Axes, as narrow Axes, all fitted for Service; And at the coft and charge of their refpective Towns, one Drum and one Fife for each company therein. And the Freeholders and Inhabitants of each and every Town in this Colony, qualified by Law to vote in Town Meetings, are hereby impowered at a Meeting regularly warned for that Purpofe, to raife Money by Tax on the Polls and Eftates of the Inhabitants of their Towns to defray all charges arifing on faid Towns in confequence of this Act.

Poor perfons to be equip't at the expence of the Town.

Penalty for embezzlement.

7th. *And be it further enacted by the* AUTHORITY *aforefaid,* That each and every commiffion Officer of faid Militia, who fhall not within one Month next after receiving his Commiffion, provide for, arm and equip himfelf, with fuch Arms and Accoutrements, as is by this Act directed, fhall by order of a Court Martial appointed, as by this Act is provided, be removed from his Office. And every commiffioned Officer, who fhall be depofed from his Office in the Militia for neglect of Duty, or other Mifdemeanor, as by this Act is provided, fhall receive no Benefit from any Commiffion, which he fhall be thus incapacitated to execute to exempt him from Military Duty.

Penalty on commiffion officers neglecting to equip themfelves.

Eighth. *And be it further Enacted,* That the Clerk of each and every Company of faid Militia, fhall once every fix Months after the Time of his Choice or Appointment, take an exact Lift of

HEINONLINE

Content downloaded/printed from HeinOnline

Thu Nov 7 17:36:41 2019

Citations:

Bluebook 20th ed.
Laws of the State of New-Hampshire, Enacted since June 1, 1815 (1824).

ALWD 6th ed.
Ls of the State of New-Hampshire, Enacted since June 1, 1815 (1824).

APA 6th ed.
(1824). Laws of the State of New-Hampshire, Enacted since June 1, 1815. Concord, Printed by Isaac Hill.

Chicago 7th ed.
Laws of the State of New-Hampshire, Enacted since June 1, 1815. Concord, Printed by Isaac Hill.

McGill Guide 9th ed.
, Laws of the State of New-Hampshire, Enacted since June 1, 1815 (Concord: Printed by Isaac Hill., 1824)

MLA 8th ed.
Laws of the State of New-Hampshire, Enacted since June 1, 1815. Concord, Printed by Isaac Hill. HeinOnline.

OSCOLA 4th ed.
Laws of the State of New-Hampshire, Enacted since June 1, 1815. Concord, Printed by Isaac Hill.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 166 of 284

jutant general of this state with the rules and regulations for the field exercise and discipline of infantry, compiled and adopted for the army of the United States, agreeably to a resolve of congress, passed December, 1814, and the plates therewith connected.—And the adjutant-general is hereby required, under the direction of his excellency the Governor, to purchase or procure the printing of the books and engraved plates in such a manner as his excellency may deem most expedient.

And the said adjutant-general shall, at the expence of this state, deliver to the commanding officer of each regiment in this state, one book, with a plate annexed, for each and every commissioned officer belonging to his regiment, taking his receipt for the same; and whenever any such officer, having received of the commanding officer of the regiment a book and plate as aforesaid, shall resign his commission, he shall immediately deliver to the commanding officer of said regiment, for the time being, such book and plate to be by him furnished to the successor in said office. *Approved June* 28, 1816.

---

*AN ACT to constitute two companies of cavalry in the sixth regiment of militia in said state.* Passed Dec. 18, 1816.

---

*AN ACT for forming, arranging and regulating the militia.* Passed Dec. 22, 1820.

SECT. 1. BE *it enacted by the senate and house of representatives, in general court convened*, That the several laws heretofore made for arranging, forming and regulating the militia, be and hereby are repealed: *Provided*, that all officers actually in commission agreeably to the laws hereby repealed, shall be continued in their command; and the clerks of companies now in office shall be continued in office, and all actions or processes depending in any court, or before any magistrate, by force of said laws, and all arrests for offences committed under said laws, and all forfeitures incurred by virtue of said laws, shall and may be carried on, tried and prosecuted to final judgment, sentence and execution, in the same manner they would have been, had said laws not been repealed. Repealing clause. Proviso.

SECT. 2. *And be it further anacted*,

1. That the companies in the town of Portsmouth shall constitute the first regiment. 1st regiment.

2. That the companies in the towns of Dover, Somers- 2d regiment.

ments required as aforesaid, and they shall deposit the same in some safe and convenient place, and shall permit the commanding officer of the company to which such private unable to provide himself as aforesaid belongs, to deliver such arms and equipments to such private whenever his company shall be ordered out for any military duty; and the said commanding officer shall be responsible for the safe return of such arms and equipments to the place of deposit.

Parents, &c. to furnish arms, &c.

SECT. 46. *And be it further enacted*, That all parents, masters, and guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms and equipments required by this act; and if any parent, master or guardian, having any minor under his care enrolled as aforesaid, shall neglect to provide such minor with the arms and equipments required as aforesaid, he is hereby subjected and made liable to the same forfeitures as such minor would be liable to for a like deficiency or neglect, if such minor were of age: *Provided however*, that such parents, masters or guardians, as shall produce on or before the first Tuesday of May annually, certificates from the overseers of the poor of the town or district in which they reside, of their inability to provide arms and equipments as aforesaid to the commanding officer of the company in which the minor under their care is enrolled, shall be exempted from the forfeitures aforesaid.

Towns to provide.

Parents, &c. liable.

SECT. 47. *And be it further enacted*, That parents, masters and guardians shall be liable for the non-appearance and neglect of such persons as are under their care (and are liable by law to train) and are to be proceeded against for the penalty in the same manner as by this act is provided against other delinquents.

Fines for deficiency.

SECT. 48. *And be it further enacted*, That each non-commissioned officer or private who shall appear on parade not completely equipt according to law, shall for each article with which he shall neglect to appear, pay the following sums as fines for the equipments with which he shall not be provided, to wit: a gun, eighty cents; steel or iron ramrod, twenty cents; bayonet, scabbard and belt, twenty-five cents; for neglecting to have his musket and bayonet clean and in good order, fifty cents; pistol, forty cents; sword, forty cents; two spare flints, ten cents; priming wire and brush, ten cents; cartridge box capable of containing twenty-four rounds, twenty-five cents; knapsack, twenty cents; and canteen, ten cents; to be recovered as hereinafter pointed out.

Penalty for firing a gun without leave.

SECT. 49. *And be it further enacted*, That no non-commissioned officer or private soldier shall, upon any muster day, or evening of the same day, discharge or fire off a musket



Content downloaded/printed from HeinOnline

Tue Dec 31 11:04:20 2019

Citations:

Bluebook 20th ed.
1792 423 .

ALWD 6th ed.
1792 423 .

Chicago 7th ed.
, "," New Hampshire - General Court, November Session : 423-451

OSCOLA 4th ed.
, '' 1792 423

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device

Amherſt, in the county of Hillſborough, in ſaid State, on the ſecond Tueſday of May, ſhall forever hereafter be holden at Hopkinton in ſaid county, on the ſecond Tueſday of May annually. And the courts of common-pleas, which by law are to be holden at ſaid Amherſt, on the firſt Tueſday of September, and on the ſecond Tueſday of December, ſhall forever hereafter be holden at ſaid Hopkinton, on ſaid days annually. And the courts of general-ſeſſions of the peace, which by law are to be holden at ſaid Amherſt, on the Thurſday next following the firſt Tueſday of September, ſhall forever hereafter be holden at ſaid Hopkinton, on the Thurſdays next following the firſt Tueſday of September annually.

At Hopkinton.

*And be it further enacted*, That the act entitled, " An act for eſtabliſhing courts of law for the adminiſtration of Juſtice within this State, and deſignating their powers, and regulating their proceedings in certain caſes," ſo far as the ſaid act relates to holding ſuch of the aforeſaid courts at Amherſt, which by this act are directed in future to be holden at ſaid Hopkinton, be, and hereby is repealed.

Repealing clauſe.

*And be it further enacted*, That all writs, venires, recognizances, appeals, actions, indictments, warrants and proceſs of every kind, which by law were returnable to ſaid courts at Amherſt, which by this act are to be holden at ſaid Hopkinton, ſhall be returned to, and ſuſtained by ſaid courts at ſaid Hopkinton.

Writs, &c. to be ſuſtained by ſaid courts at Hopkinton.

*And be it further enacted*, That the ſeveral courts aforeſaid, which are to be holden at ſaid Hopkinton, ſhall be holden in, or as near the meeting-houſe in ſaid town as conveniently may be.

Courts where to be holden.

*And be it further enacted*, That this act, at the expiration of two years from the paſſing thereof, ſhall be null and void, unleſs a ſuitable houſe for holding ſaid courts, be erected at ſaid Hopkinton within that time, without being a county charge.

This act paſſed December 25, 1792.

---

Paſſed Dec. 27, 1792.

AN ACT for arranging the militia into diviſions.

BE *it enacted by the Senate and Houſe of Repreſentatives in General-Court convened*, That the militia of this State be arranged into diviſions, brigades and regiments,

Digitized from Best Copy Available

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 170 of 284

*And be it further enacted*, That each non-commiſſioned officer and ſoldier belonging to the regiments of foot, ſhall within one year from and after the paſſing this act, furniſh himſelf with a good fire-lock, bayonet and belt, a cartouch box that will contain twenty-four cartridges, two good flints, a knapſack and canteen-- and that the commiſſioned belonging to companies of foot, ſhall be ſeverally armed with a ſword or hanger, and an eſpontoon, and that the field officers be armed with a ſword or hanger.

How to be armed and accoutred.

*And be it further enacted*, That ſuch of the infantry as are under the care of parents, maſters or guardians, ſhall be furniſhed by them with ſuch arms and accoutrements. And ſuch as are unable to furniſh themſelves, ſhall make application to the ſelectmen of the town, who are to certify to their captain or commanding officer, that they are unable to equip themſelves, and the ſaid ſelectmen ſhall, at the expence of the town, provide for, and furniſh ſuch perſons with arms and equipments; which arms and equipments ſhall be the property of the town, at whoſe expence they were provided: And if any perſon ſo furniſhed, ſhall embezzle or wilfully deſtroy the ſame, he ſhall be puniſhed by any court proper to try the ſame, upon complaint made by the ſelectmen of ſaid town, by being publicly whipped not exceeding twenty ſtripes, or fined not exceeding forty ſhillings. And that all fines recovered for embezzling or deſtroying of arms and accoutrements as provided in this act, ſhall be paid into the hands of the ſelectmen to be appropriated in purchaſing arms and accoutrements for ſuch ſoldiers as are unable to purchaſe for themſelves.

Thoſe unable &c. to be equipped at the expence of the town.

Fines how to be appropriated.

*And be it further enacted*, That parents, maſters and guardians ſhall be liable for the neglect and non-appearance of ſuch perſons as are under their care (and are liable by law to train) and are to be proceeded againſt for the penalty in the ſame manner, as by this act is provided againſt other delinquents.

Parents, &c. liable to a penalty.

*And be it further enacted*, That the commander in chief, the officers commanding diviſions, brigades or regiments, may appoint military watches or guards when an invaſion of the State is apprehended, in ſuch place and under ſuch regulations as they may judge neceſſary; and all officers and ſoldiers under their com-

Military watches, by whom to be appointed.

mand

ADD0168

Digitized from Best Copy Available



Content downloaded/printed from HeinOnline

Thu Nov 7 17:29:00 2019

Citations:

Bluebook 20th ed.
William T.; et al. Dortch. Code of North Carolina, Enacted March 2, 1883 (1883).

ALWD 6th ed.
William T.; et al. Dortch. Code of North Carolina, Enacted March 2, 1883 (1883).

APA 6th ed.
Dortch, W. (1883). Code of North Carolina, Enacted March 2, 1883. New York, Banks.

Chicago 7th ed.
Dortch William T.; et al. Code of North Carolina, Enacted March 2, 1883. New York, Banks.

McGill Guide 9th ed.
William T.; et al. Dortch, Code of North Carolina, Enacted March 2, 1883 (New York: Banks., 1883)

MLA 8th ed.
Dortch, William T., et al. Code of North Carolina, Enacted March 2, 1883. New York, Banks. HeinOnline.

OSCOLA 4th ed.
Dortch, William T.; et al. Code of North Carolina, Enacted March 2, 1883. New York, Banks.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 172 of 284

## CHAPTER THIRTY-FIVE.

# MILITIA, STATE GUARD AND MILITARY SCHOOLS.

## MILITIA.

[See CONSTITUTION, ART. XII.]

SECTION.

3157. Of whom composed; exemption.
3158. How divided.
3159. How governed.
3160. Adjutant general to be appointed; term of office, and bond.
3161. Officers, by whom appointed and commissioned.
3162. Officers to take oath.
3163. White and colored militia in distinct companies.
3164. Who exempt from militia duty.
3165. Members of fire companies exempted; also persons of conscientious scruples.
3166. Further exemptions from militia duty.
3167. Officers to enroll and make return of exempts.
3168. Persons enrolled to equip themselves; forfeitures for neglect to do so.
3169. How infantry shall be divided.
3170. Regiments, brigades and divisions, how distinguished.
3171. Officers of infantry, their grade and how appointed.
3172. Governor may appoint four *aids-de-camp*.
3173. Uniform of officers.
3174. Officers to hold commissions three years and equip within twelve months; penalty.
3175. Officers to give notice of their absence.

SECTION.

3176. To deliver to their successors in office money and papers.
3177. Rules of discipline; adjutant general to distribute Upton's tactics, and how.
3178. Captain's district, how laid off; boundary lines in regiments in same county, how altered.
3179. Regulations as to company musters.
3180. Company courts-martial; how to proceed; appeal allowed; executions from courts-martial, how and to whom issued; penalty on sheriff or constable for neglect.
3181. Company musicians, how appointed; their privileges.
3182. Road hands not to be ordered out on muster day.
3183. Captains to make returns, when.
3184. Regimental or battalion musters, when held; duty of colonel; penalty for neglect of duty.
3185. Penalty on officers failing to attend reviews or musters.
3186. Commandants of regiments, &c., to give notice of reviews, &c.
3187. Commissioned officers of regiments, &c., to exercise day before review; penalty for failure.
3188. Penalties on officers and privates for misbehavior.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 173 of 284

which such service was rendered shall be sufficient to entitle the holder thereof to such exemption.

**Sec. 3167. Officers to enroll and make return of exempts. R. C., c. 70, s. 4. 1832, c. 7.**

The captain or commandants of companies shall enroll and keep enrolled all within the limits of their respective districts who are exempt from performing militia duty except in time of invasion or insurrection, and shall return the number of exempts in their annual returns to the commandants of regiments, who shall make a like return of all exempts in their respective regiments in their annual returns to the brigadier and adjutant-generals, regulations for which annual reports are hereinafter prescribed.

**Sec. 3168. Persons enrolled to equip themselves; forfeitures for neglect to do so. R. C., c. 70, s. 6. 1806, c. 708, ss. 1, 3, 9.**

Every citizen enrolled and notified, as is directed in this chapter, shall, within six months thereafter, provide himself with a good musket, smooth-bored gun or good rifle, shot-pouch and powder-horn, and shall appear so armed and accoutered when called out to exercise or in actual service; the commissioned officers shall severally be armed with a sword, or hanger, or an espontoon; and every citizen so enrolled and providing himself with arms and accouterments as herein directed, shall hold the same exempt from all suits, executions or sales for debts, or for the payment of taxes; and if he shall fail to provide himself with arms and accouterments, as herein directed, and if the commissioned officers of his company shall deem him in sufficient circumstances to equip himself he shall forfeit and pay for the want of a good, serviceable musket, gun or rifle fifty cents. And all parents and masters shall furnish those of the militia, who shall be under their care or command, with the arms and equipments above mentioned, under the like penalty for each neglect. If the company court-martial, after examination on oath, shall adjudge any person enrolled to be incapable of providing himself with arms and accouterments, as herein required, they shall make report thereof to the next regimental or battalion court-martial, as the case may be, who may, if it shall appear necessary, exempt such person from the fines here imposed until such arms and accouterments shall be provided and delivered to him by the court-martial. who shall take

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 174 of 284

security for the safe keeping of such arms and accouterments to be returned when required.

**Sec. 3169. How infantry shall be divided. R. C., c. 70, s. 7. 1806, c. 708, s. 3. 1848, c. 58, s. 12.**

The infantry shall be divided into divisions, brigades, regiments, battalions and companies; each division shall consist of at least two brigades; each brigade of at least four regiments, each county forming at least one regiment; each regiment, when convenient, shall consist of at least two battalions, each battalion of five companies, and each company of forty-five privates.

**Sec. 3170. Regiments, brigades and divisions, how distinguished. 1866, c. 23, s. 1.**

The following are declared to be the regiments, brigades and divisions of the infantry, to be known and distinguished as here designated, namely:

| Brigades. | Counties. | No. Regiment. | How Distinguished in Counties where more than one Regiment. |
|---|---|---|---|
| 1st | Currituck | 1 | |
| | Camden | 2 | |
| | Perquimans | 3 | |
| | Pasquotank | 4 | |
| 2nd | Chowan | 5 | |
| | Hertford | 6 | |
| | Gates | 7 | |
| | Bertie | 8 | |
| | " | 9 | |
| 3rd | Martin | 10 | |
| | Washington | 11 | |
| | Tyrrell | 12 | |
| | Hyde and Dare | 13 | |
| 4th | Beaufort | 14 | |
| | Craven | 15 | |
| | Pamlico | 16 | |
| | Pitt | 17 | |
| 5th | Carteret | 18 | |
| | Jones | 19 | |
| | Lenoir | 20 | |
| | Onslow | 21 | |
| 6th | New Hanover | 22 | |
| | Pender | 23 | |
| | Sampson | 24 | East of Big Coharrie. |
| | " | 25 | West of " " |
| 7th | Duplin | 26 | |
| | Wayne | 27 | Upper. |
| | " | 28 | Lower. |
| | Greene | 29 | |

Content downloaded/printed from HeinOnline

Thu Nov 7 17:27:29 2019

Citations:

Bluebook 20th ed.
Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State (1808).

ALWD 6th ed.
Ls of the State of Vermont, Digested & Compiled: Including the Declaration of Independence, the Constitution of the United States, & of this State (1808).

APA 6th ed.
(1808). Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State. Randolph Vt., Printed by Sereno Wright.

Chicago 7th ed.
Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State. Randolph Vt., Printed by Sereno Wright.

McGill Guide 9th ed.
, Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State (Randolph Vt.: Printed by Sereno Wright., 1808)

MLA 8th ed.
Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State. Randolph Vt., Printed by Sereno Wright. HeinOnline.

OSCOLA 4th ed.
Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State. Randolph Vt., Printed by Sereno Wright.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device

# CHAPTER LXXXI.

## OF THE MILITIA.

### Nº 1.

Paffed March 20, 1797.

*AN ACT, for regulating and governing the militia of this ftate.*

Militia, how and by whom to be enrolled.

SECT. 1. IT *is hereby enacted by the General Affembly of the State of Vermont*, That each and every free, able-bodied white male citizen of this ftate, or of any other of the United States refiding within this ftate, who is or fhall be of the age of eighteen years, and under the age of forty-five years (excepting as is herein after excepted) fhall feverally and refpectively be fubject to the requifitions of this act, and fhall be enrolled in the militia, by the captain or commanding officer of the company, within whofe bounds fuch citizen fhall refide, within three months from and after the paffing of this act. And it fhall be at all times hereafter the duty of the commanding officer of every fuch company, to enrol every fuch citizen as aforefaid, and alfo thofe who fhall from time to time arrive at the age of eighteen years, or being of the age of eighteen years and under the age of forty-five years, and not herein after excepted, fhall come to refide within his bounds; and fhall without delay notify fuch citizen of the enrolment, by a non-commiffioned officer or other perfon duly authorized for that purpofe, by whom fuch notice may be proved. And in all cafes of doubt refpecting the age of any perfon enrolled or intended to be enrolled; the party queftioned fhall prove his age, to the fatisfaction of the commanding officer of the company within whofe bounds he may refide.

act, shall be such as the brigadier generals, within their respective brigades, shall direct.

SECT. 14.——That every non-commissioned officer and private of the infantry, shall constantly keep himself provided with a good musket, with an iron or steel rod, a sufficient bayonet and belt, two spare flints, a priming wire and brush, and a knapsack, a cartridge box and pouch with a box therein sufficient to contain at least, twenty-four cartridges, suited to the bore of his musket; and shall appear so armed, accoutred and provided, whenever called out: *excepting*, that when called out to exercise only, he may appear without a knapsack.

Non-comm. and privates, how armed & accoutred.

*Provided always*, That every citizen enrolled, and providing himself with arms, ammunition and accoutrements, required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt, or for payment of taxes.

Arms and accoutrements exempt from execution.

SECT. 15.——That every non-commissioned officer or private of the infantry, who shall neglect to keep himself armed and equipped, as aforesaid, or who shall on a muster day, or at any other time of examination, be destitute of, or appear unprovided with, the arms and equipments herein directed (excepting as before excepted;) shall pay a fine, not exceeding *seventeen cents* for a gun, and *eight cents* for every other article, in which he shall be deficient: at the discretion of the court, before whom trial shall be had. And all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipments above mentioned, under the like penalties for any neglect. And when the selectmen of any town shall judge any inhabitant thereof belonging to the militia, unable to arm and equip himself, in manner aforesaid; they shall, at the expense of the town, provide for and furnish such inhabitant with the aforesaid arms, and equipments: which shall remain the property of the town, at the expense of which they shall be provided. And if any sol-

Non-commissioned officers and soldiers fined, for not being equip'd.

Parents and guardians to furnish arms.

Selectmen to furnish, for poor soldiers.

Penalty for embezzlement.

dier ſhall embezzle or deſtroy the arms, and equipments, with which he ſhall be furniſhed ; he ſhall, upon conviction as aforeſaid, be judged to replace the articles which ſhall be by him ſo embezzled or deſtroyed, and to pay the coſts ariſing from the proceſs againſt him. And if he ſhall not perform the ſame, within fourteen days after ſuch adjudication, it ſhall be in the power of the ſelectmen of the town, to which he ſhall belong; to bind him out to ſervice or labor, for ſuch term of time, as, in the diſcretion of the ſaid ſelectmen, ſhall be ſufficient to procure a ſum of money, equal to the value of the article or articles ſo embezzled or deſtroyed ; and pay coſts, ariſing as aforeſaid.

Fines for ſundry delinquencies.

SECT. 16.——That every perſon liable to do military duty, who being duly warned, ſhall refuſe or neglect to appear, at the time and place appointed, armed and equipped as by this act is directed, for any muſter, training, view of arms or other military duty ; ſhall pay as a fine for ſuch default, the ſum of *two dollars*. And every perſon who ſhall appear at any muſter, with his arms in an unfit condition, ſhall pay a fine of *twelve cents*, for each and every ſuch default.

Proviſo.

*Provided neverthelefs*, That it ſhall be lawful for the commanding officer of a company, at any time, within eight days after any muſter, training, view of arms, or other duty, to excuſe any perſon for non-appearance, or for any deficiency of equipments, on the delinquent's producing to him ſatisfactory evidence of his inability to appear, or equip, as aforeſaid.

2d proviſo.

*Provided*, That if ſuch delinquent had ſufficient cauſe of abſence, and ſhould neglect to make his excuſe within the eight days aforeſaid ; upon a proſecution, he ſhall be liable to pay coſts, at the diſcretion of the court before whom the cauſe is tried.

[☞ *The two proviſos of this ſection, repealed : See preſent chap.—Act* N°. 8.]

Companies how warned.

SECT. 17.——That when the commanding officer of a company ſhall think proper to call his

**Examples of State Laws Mandating the Distribution of Public Arms**

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| Connecticut | 1792 | "That if any soldier shall in the judgment of the select-men of the town to which he belongs, be unable to arm and accouter himself . . . it shall be the duty of such select-men to certify the same to the commissioned officers of the company . . . and also, at the expense of such town to provide such soldier with arms . . . and all arms and accoutrements thus provided, shall be the property of such town . . . ." | An Act for forming and conducting the military force of this state, conformable to the act of Congress, passed the eight day of May, A.D. 1792, § XI, 1792 Conn. Acts & Laws 428-29 (Oct. Sess. 1792). |
| Massachusetts | 1793 | "[A]nd whenever the Selectmen of any town shall judge any inhabitant thereof, belonging to the Militia, unable to arm and equip himself in manner as aforesaid, they shall at the expense of the town provide for and furnish such inhabitant with the aforesaid arms and equipments, which shall remain the property of the town at the expen[s]e of which they shall be provided . . . ." | An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, ch. 1 Mass. Acts & Laws, § XIX, at 297 (May Sess. 1793). |

[1] Year of enactment.

[2] Where the relevant law was published in a larger compendium source, the source date often postdates the year of enactment.

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| New Hampshire | 1776 | "And where the Selectmen of any Town shall adjudge any Persons belonging to the Militia of their Town unable to equip and arm himself as aforesaid, such Selectmen shall . . . at the Expen[s]e of such Town provide for, furnish, arm and equip such Persons with Arms and Equipments; which Arms so provided by such Selectmen, shall be the Property of the Town at whose Expense they shall be provided . . . ." | An Act for forming and regulating the Militia within the State of New Hampshire, in New-England, and for repealing all the Laws heretofore made for that Purpose, 1776 N.H. Acts & Laws 40 (1776). |
| New Hampshire | 1792 | "And such as are unable to furnish themselves shall make application to the selectmen of the town . . . and the said selectmen shall, at the expen[s]e of the town, provide for, and furnish such persons with arms and equipments; which arms and equipments shall be the property of the town, at whose expense they were provided . . . ." | An Act for forming and regulating the militia within this state, and for repealing all the laws heretofore made for that purpose, 1792 N.H. Acts & Laws 447. |
| Ohio | 1837 | "That when a part of the militia of this State shall be called into actual service, and arms shall be wanted for their use, the commander-in-chief of the division or brigade may call from any volunteer company . . . any or all the public arms in possession of such company, and place or cause the same to be placed in the hands of those who volunteer or are drafted for actual service." | An Act to organize and discipline the Militia, § 76, 1837 Ohio Gen. Laws 47. |

| State | Year[1] | Statutory Text | Source[2] |
|---|---|---|---|
| Vermont | 1797 | "And when the selectmen of any town shall judge any inhabitant thereof belonging to the militia, unable to arm and equip himself, in manner aforesaid; they shall, at the expense of the town, provide for and furnish such inhabitant with the aforesaid arms, and equipments: which shall remain the property of the town, at the expense of which they shall be provided." | An Act, for regulating and governing the militia of this state, ch. LXXXI, No. 1, § 15, 2 Laws Of The State Of Vermont Digested And Compiled 131-32 (1808). |



Content downloaded/printed from HeinOnline

Tue Dec 31 14:12:41 2019

Citations:

Bluebook 20th ed.
1792 423 .

ALWD 6th ed.
1792 423 .

Chicago 7th ed.
, "," Connecticut - October Session : 423-434

OSCOLA 4th ed.
, '' 1792 423

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# ACTS AND LAWS,

Made and paſſed by the General Court or Aſſembly of the State of Connecticut, in America, holden at New-Haven, (in ſaid State) on the ſecond Thurſday of October, Anno Dom. 1792.

An Act for forming and conducting the military force of this ſtate, conformable to the act of Congreſs, paſſed the eight day of May, A. D. 1792, which is as follows:—" An Act more effectually to provide for the national defence, by eſtabliſhing an uniform militia throughout the United States."

Militia how & by whom to be enrolled.

" SECTION I. BE *it enacted by the Senate, and houſe of Repreſentatives, of the United States of America, in Congreſs aſſembled*, That each and every free able bodied white male citizen, of the reſpective ſtates, reſident therein, who is, or ſhall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) ſhall ſeverally and reſpectively be enrolled in the militia, by the captain or commanding officer of the company, within whoſe bounds ſuch citizen ſhall reſide; and that within twelve months after the paſſing this act, it ſhall at all times hereafter be the duty of every ſuch captain, or commanding officer of a company, to enrol every ſuch citizen, as aforeſaid; and alſo thoſe who ſhall, from time to time, arrive at the age of eighteen years, and under the age of forty-five years (except as before excepted) ſhall come to reſide within his bounds; and ſhall without delay, notify each citizen of the ſaid enrolment, by a proper non-commiſſioned officer of the company, by whom ſuch notice may be proved. That every ſuch citizen ſo enrolled and notified, ſhall within ſix months thereafter, provide himſelf with a good muſket or firelock, a ſufficient bayonet and belt, two ſpare flints and knapſack, a pouch with a box therein to contain twenty-four cartridges, ſuited to the bore of his muſket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapſack, ſhot-pouch and powder-horn, twenty balls ſuited to the bore of his rifle, and a quarter of a pound of powder; and ſhall appear ſo armed, accoutred and provided, when called out to exerciſe, or into ſervice, except that when called out on company days to exerciſe only, he may appear without a knapſack. That the commiſſion officers ſhall ſeverally be armed with a ſword or hanger, and eſpontoon; and that from and after five years from the paſſing this act, all muſkets for arming the militia, as herein required, ſhall be of bores ſufficient for balls of the eighteenth part of a pound: And every citizen ſo enrolled, and providing himſelf with the arms, ammunition and accoutrements, required as aforeſaid, ſhall hold the ſame exempt from all ſuits, diſtreſſes, executions, or ſales for debt, or for the payment of taxes."

How to be armed and accoutred.

Executive officers, &c. exempted.

" SEC. II. *And be it further enacted*, That the vice-preſident of the United States, the officers, judicial and executive, of the United States, the members of both houſes of Congreſs, and the reſpective officers, all cuſtom-houſe officers, with their clerks, all poſt-officers, and ſtage drivers, who are employed in the care and conveyance of the mail of the poſt-office of the United States, all ferrymen employed at any ferry on the poſt-road, all inſpectors of exports, all pilots, all mariners actually employed in the ſea ſervice of any citizen or merchant within the United States, and all perſons who are, or may hereafter be exempted by the laws of the reſpective ſtates, ſhall be, and are hereby exempted from military duty, notwithſtanding their being above eighteen, and under the age of forty-five years."

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 184 of 284

tia of this ſtate, ſhall furniſh himſelf with the arms, ammunition and accoutrements, required by the act of congreſs, and by this act, upon the penalty of forfeiting and paying a fine of *twelve ſhillings* lawful money, and the like penalty for every four weeks he ſhall be unprovided; to be levied and collected by warrant of diſtreſs, as hereafter directed; and that a horſeman, or dragoon, who ſhall not furniſh and provide himſelf with a horſe and furniture, as required by the ſaid act, ſhall be returned to, enrolled, and do duty in the infantry company in the limits of which he reſides:—That the field and commiſſioned officers in each regiment, ſhall be uniformly cloathed in regimentals, at their own expence, and to be agreed upon by ſuch officers; that the field officers of each regiment ſhall furniſh ſtate and regimental colours for their regiment and battalions, at the ſtate expence, not exceeding the ſum of four pounds ten ſhillings lawful money, to each regiment.

*And be it further enacted*, That every commanding officer of a company of militia, ſhall order out his company or troop, three days in each year, and inſtruct them in the uſe of arms and diſcipline of war; and the days appointed, ſhall be in the month of March, April, May, September, October or November, and that on the firſt Monday of May and October annually, ſuch commanding officer ſhall cauſe the arms, ammunition and accoutrements, of all under his command, to be reviewed and inſpected:—That the commanding officer of each regiment, ſhall order out his regiment by battalion or regiment, once in each year for regimental exerciſe, inſpection and review. And if any of the privates belonging to any company of horſe, artillery or infantry, ſhall neglect to appear compleatly armed and equipped on the place of parade, appointed by the commanding officer of his company, being duly warned, he ſhall forfeit and pay a fine of *nine ſhillings* for each day: and if any non-commiſſioned officer, drummer, fifer, or trumpeter, ſhall neglect to appear as aforeſaid, he ſhall forfeit and pay the fine of *twelve ſhillings* for each day—unleſs any ſuch perſon ſhall appear before the commanding officer of ſuch company, within twelve days after ſuch day of exerciſe or review, and make ſatisfactory excuſe for his non appearance on ſaid day; and the commanding officer of each company, battalion or regiment, ſhall order the correcting and puniſhing diſorders and contempts, on days of company, battalion, or regimental exerciſe, inſpection or review; the puniſhment not being greater than riding a wooden horſe, for a time not exceeding one hour, or a fine not exceeding *forty ſhillings* lawful money:—That each commanding officer of a company, battalion, regiment, brigade or diviſion, ſhall have power and authority, and full power is hereby given to aſcertain and fix certain neceſſary limits and bounds to their reſpective parades, within which no ſpectator ſhall have right to enter, without liberty from ſaid commanding officer; and in caſe any perſon ſhall ſo intrude or offend, he ſhall be ſubjected to be confined in ſuch way and manner as the commanding officer ſhall direct, during the continuance of the exerciſe.

*And be it further enacted*, That all warrants granted by the commanding officer, of any company, battalion or regiment, for any time or times incurred by virtue of this act, or any breach thereof, ſhall be directed by the officer commanding a company, to the orderly ſergeant of his company; which orderly ſergeant he ſhall from time to time appoint, from the ſerjeants of his company; and the officer commanding a battalion or regiment, to the adjutant or ſergeant-major; and to be by them levied on the goods or chattles of the reſpective delinquents, if upwards of twenty-one years of age—And for the want of ſuch goods or chattles, againſt the body of ſuch delinquent, and againſt the goods and chattles of the parents, maſter or guardians, of ſuch delinquents as have not arrived to the age of twenty-one years; and for want of ſuch goods and chattles, againſt the body of parent, maſter or guardian, and them commit and hold in goal, until ſuch fine or fines ſhall be paid and ſatisfied, together with lawful fees for ſervice, as in caſes of execution for debt; which fines and forfeitures ſhall be appropriated for the uſe of the companies to which ſuch delinquents reſpectively belong, for purchaſing and maintaining colours, trumpets, drums and fifes; and ſhould there be any overplus of fines remaining in the hands of the commanding officers of companies, they ſhall pay it over to the commanding officer of their regiment to which they belong; which together with the fines collected by virtue of warrants iſſued by the field officers, ſhall be applied to keeping colours in repair, and for band-muſic for the regiment. That whenever any commanding officer of a company ſhall impoſe any fine in any of the caſes before mentioned in this act, he ſhall give notice to the perſon fined, who ſhall have liberty within ten days to apply to the commanding officer of the regiment, who on giving notice, and hearing the parties, may abate ſuch fines, or any part thereof; and if ſuch commanding officer of the regiment, thinks not proper to abate ſuch fine, the officer impoſing the ſame may proceed to a collection thereof.

*Provided neverthele*ſ*s*, That if any ſoldier ſhall in the judgment of the ſelect-men of the town to which he belongs, be unable to arm and accoutre himſelf agreeable to the directions of this act, it ſhall be the duty of ſuch ſelect-men to certify the ſame to the commiſſioned officers of the company to which ſuch ſoldier belongs, in order

[Margin notes: vates to furniſh themſelves with arms, &c. on penalty of 12s. — Officers to be uniformly clothed in regimentals. — Field officers to furniſh colours. — Companies to be out three days in each year, to be inſtructed, &c. — Arms to be inſpected. — Regiments to be reviwed once in each year. — Privates who do not appear equipt to pay 9s. — and drummers, &c. 12s. — Puniſhment inflicted. — Officers to fix limits & bounds to their parades. — Warrants by whom granted & to whom directed. — On whom & on what levied. — Fines how appropriated. — Officers impoſing fines, to give notice to the perſon fined, who ſhall have liberty within ten days to apply to, &c. for redreſs. — Soldiers unable to furniſh themſelves, &c.]

order that execution may not iſſue againſt him for deficiency in ſuch arms and accoutrements; and alſo, at the expence of ſuch town to provide ſuch ſoldier with arms, and the whole or any part of ſuch accoutrements as may be neceſſary, within forty days from the time of granting ſuch certificate, under penalty of the value of ſuch arms and accoutrements, to be recovered of any, or all of ſaid ſelect-men, by warrant from an aſſiſtant or juſtice of the peace, upon proper information, and proof of ſuch neglect, by ſaid commiſſioned officers; which warrant ſhall be directed to any ſheriff or conſtable proper to ſerve the ſame, returnable in ſixty days, and the fine payable into the treaſury of ſuch town; and all arms and accoutrements thus provided, ſhall be the property of ſuch town, and ſhall by the commanding officer of the company, be depoſited in ſuch places as he ſhall think proper, to be ready for ſuch ſoldier, as occaſion ſhall require; and ſuch officer ſhall ſtand accountable for ſuch arms and accoutrements, and ſhall be liable to pay for the ſame, if loſt through his neglect or default.

Warrant to whom directed.

Fines to be paid into the town treaſury.

Arms, &c. to be depoſited in, &c.

*Provided alſo*, That any of the people called *Quakers*, who ſhall produce to the commanding officer of the company in which he reſides, a certificate from the clerk of the ſociety of Quakers to which he belongs, certifying that ſuch perſon is a Quaker, he ſhall be exempt from equipping himſelf or doing military duty as required by this act, on his paying the ſum of twenty ſhillings to ſuch officer, at the expiration of each year during ſuch exemption; and in caſe ſuch Quaker refuſe to pay ſaid ſum of twenty ſhillings, the ſame ſhall be collected and diſpoſed of in the ſame manner as is heretofore provided for fines incurred by a breach of this act.

Quakers exempt on paying 20s.

*And be it further enacted*, That each rank and grade of officers, ſhall furniſh themſelves with the rules of diſcipline approved and eſtabliſhed by Congreſs, in their reſolution of the 29th of March, 1779, and ſhall ſubmit themſelves to the orders and directions of their ſuperior officers, or their ſenior officers, of the ſame grade; and all officers in the ſtaff and orderly departments, ſhall be vigilant and active in executing and diſpatching orders in their reſpective ſtations.

Officers to furniſh themſelves with the rules of diſcipline.

That general, field, commiſſioned, and ſtaff officers, of all grades and ranks, ſhall be amenable to, and ſubject to trial by courts martial, according to the uſage and practice of war, for all neglects of duty, for contempts or diſreſpects to a ſuperior officer, for diſobedience of orders, and for all un-officer-like conduct; which court martial ſhall conſiſt of not leſs than nine, or more than thirteen members—the ſenior officer of the higheſt grade to preſide—that another officer of the line or ſtaff, to do the duty of judge advocate to the court—that the members compoſing the court, ſhall take the following oath, before they proceed on the trial of an officer, viz.

Officers to be tried by courts martial.

Who to preſide.

Judge advocate to be of the ſtaff.

*You ſwear that you will well and truly try and determine according to evidence, the matter depending between the ſtate of Connecticut and the priſoner, or priſoners, now to be tried, that you will not divulge the ſentence of the court until the ſame ſhall be approved, or diſapproved, purſuant to law; neither will you upon any account at any time whatſoever, diſcloſe or diſcover, the vote or opinion of any particular member of the court martial, unleſs required by a due courſe of law.* So help you GOD.

Form of oath.

The preſident of the ſaid court martial, is hereby authorized and required to adminiſter an oath to the officer acting as judge advocate, who is hereby required to take the ſame before he proceeds further on buſineſs, viz.—*You do ſwear that you will not on any account, at any time whatſoever, diſcloſe or diſcover the vote or opinion of any particular member of the court martial, unleſs required in a due courſe of law; and that you will not divulge the ſentence of this court, till the ſame ſhall be approved or diſapproved according to law; and that you will well and truly do the duty of judge advocate, in this court, impartially and uprightly, according to the beſt of your abilities.*———So help you GOD.

Preſident of c. martial to adminiſter an oath to the judge advocate.
The form.

And no other perſon whatever, ſhall be admitted to ſolicit, proſecute or defend the officer arreſted; which officer arreſted, if under the grade or rank of a field officer, ſhall have twelve days notice of the articles of charge made againſt him, by leaving a true and atteſted copy of the original articles of arreſt, under the hand of a ſuperior officer arreſting him, and the names of the witneſſes to be uſed againſt him minuted thereon, lodged with him at his uſual place of abode by the officer arreſting, or the proper orderly officer; and of the grade and rank of a field officer twenty days notice; and of the rank of a general officer thirty days notice in like manner; which court martial, for the tryal of an officer under the rank and grade of a field officer, ſhall be appointed by the commanding officer of the brigade to which he belongs, and the ſentence approved or diſapproved by the captain-general of the ſtate—for the trial of an officer of the rank and grade of a field officer, by the commanding officer of the diviſion to which he belongs; and of a general officer by the captain-general of the ſtate, and their ſentence approved or diſapproved by the legiſlature of the ſtate. That no ſentence of a court martial ſhall inflict other puniſhment than a reprimand, ſuſpenſion from office for a certain term of time, caſhiering, and caſhiering with a diſability of holding any military office in this ſtate; two thirds of the members of any ſuch court agreeing in ſuch ſentence.

No perſon admitted to ſolicit &c.

Officers under the grade of field officers to have 12 days notice, &c.

Field officer to have 20, & gen. officer 30 days.

Court martials by whom appointed.

What puniſhment may be inflicted.

And



Content downloaded/printed from HeinOnline

Tue Dec 31 11:31:40 2019

Citations:

Bluebook 20th ed.
1793 289 .

ALWD 6th ed.
1793 289 .

Chicago 7th ed.
, "," Massachusetts - Acts & Laws, May Session : 289-308

OSCOLA 4th ed.
, '' 1793 289

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# Acts *and* Laws,

## Paſſed by the GENERAL COURT of *Maſſachuſetts :*

Begun and held at BOSTON, in the County of SUFFOLK, on Wedneſday the Twenty-ninth Day of MAY, ANNO DOMINI, 1793.

### CHAP. I.

An Act for regulating and governing the Militia of the Commonwealth of Maſſachuſetts, and for repealing all Laws heretofore made for that Purpoſe ; excepting an Act, intitled " An Act for eſtabliſhing Rules and Articles for governing the Troops ſtationed in Forts and Garriſons, within this Commonwealth, and alſo the Militia, when called into actual Service."

Preamble.

*WHEREAS the Laws for regulating and governing the Militia of this Commonwealth, have become too complicated for practical uſe, by reaſon of the ſeveral alterations which have from time to time been made therein :* Therefore,

Laws repealed.

I. *BE it enacted by the* SENATE *and* HOUSE *of* REPRESENTATIVES *in General Court aſſembled, and by the authority of the ſame,* That the ſeveral Laws heretofore made for governing and regulating

XVIII. *And be it further enacted by the authority aforesaid*, That every non-commiſſioned Officer and Private of the infantry ſhall conſtantly keep himſelf provided with a good muſket, with an iron or ſteel rod, a ſufficient bayonet and belt, two ſpare flints, a priming wire and bruſh, and a knapſack; a cartridge-box, or pouch with a box therein, to contain not leſs than twenty-four cartridges, ſuited to the bore of his muſket; each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapſack, ſhot-pouch, powder-horn, twenty balls ſuited to the bore of his rifle, and a quarter of a pound of powder: And ſhall appear ſo armed, accoutred and provided, whenever called out, except that when called out to exerciſe only, he may appear without a knapſack, and without cartridges loaded with ball. *Provided always*, that whenever a man appears armed with a muſket, all his equipments ſhall be ſuited to his muſket; and whenever a man appears armed with a rifle, all his equipments ſhall be ſuited to his rifle: And that from and after five years from the paſſing of this Act, all muſkets for arming the Militia, as herein required, ſhall be of bores ſufficient for balls of the eighteenth part of a pound: And every citizen enrolled and providing himſelf with arms ammunition and accoutrements, required as aforeſaid, ſhall hold the ſame exempted from all ſuits, diſtreſſes, executions or ſales for debt, or for payment of taxes.

Neceſſary articles of equipments.

Proviſo.

Arms &c. to be exempted from ſuits.

XIX. *And be it further enacted by the authority aforeſaid*, That every non-commiſſioned Officer or Private of the infantry, who ſhall neglect to keep himſelf armed and equipped as aforeſaid, or who ſhall on a muſter-day, or at any other time of examination, be deſtitute of, or appear unprovided with the arms and equipments herein directed (except as before excepted) ſhall pay a fine not exceeding *twenty ſhillings*, in proportion to the articles of which he ſhall be deficient, at the diſcretion of the Juſtice of the Peace, before whom trial ſhall be had: And all parents, maſters and guardians ſhall furniſh thoſe of the ſaid Militia who ſhall be under their care and command, with the arms and equipments aforementioned, under the like penalties for any neglect: And whenever the Selectmen of any town ſhall judge any inhabitant thereof, belonging to the Militia, unable to arm and equip himſelf in manner as aforeſaid, they ſhall at the expence of the town provide for and furniſh ſuch inhabitant with the aforeſaid arms and equipments, which ſhall remain the property of the town at the expence of which they ſhall be provided; and if any ſoldier ſhall embezzle or deſtroy the arms and equipments with which he ſhall be furniſhed, he ſhall, upon conviction before ſome Juſtice of the Peace, be adjudged to replace the article or articles, which ſhall by him be ſo embezzled or deſtroyed, and to pay the coſt ariſing from the proceſs againſt him: And if he ſhall not perform the ſame within fourteen days after ſuch adjudication, it ſhall be in the power of the

Fine for neglect.

Parents and maſters to equip their children & ſervants.

Perſons unable, to be furniſhed by the town.

Penalty, in caſe.

the Selectmen of the town to which he ſhall belong, to bind him out to ſervice or labour, for ſuch term of time as ſhall, at the diſcretion of the ſaid Juſtice, be ſufficient to procure a ſum of money equal to the value of the article or articles ſo embezzled or deſtroyed, and pay coſt ariſing as aforeſaid.

Penalty for not appearing on muſter days.

XX. *And be it further enacted by the authority aforeſaid*, That every perſon liable to do military duty, who being duly warned ſhall refuſe or neglect to appear at the time and place appointed, armed and equipped as by this act is directed, for any muſter, training, view of arms, or other military duty, ſhall pay as a fine for ſuch default, the ſum of *ten ſhillings :* And every perſon who ſhall appear at any muſter with his arms in an unfit condition, ſhall pay a fine of *three ſhillings* for each and every ſuch default : *Provided nevertheleſs*, It ſhall be lawful for the Commanding Officer of a company, at any time within eight days after any muſter, training, view of arms or other duty, to excuſe any perſon for non-appearance, on the delinquent's producing to him ſatisfactory evidence of his inability to appear as aforeſaid ; and the Commanding Officer of the company ſhall certify the ſame to the Clerk within the time abovementioned, and the Clerk ſhall not thereafter commence any proſecution againſt ſuch delinquent for his fine for non-appearance, as aforeſaid.

Proviſo.

Clerk to notify.

XXI. *And be it further enacted by the authority aforeſaid*, That whenever the Commanding Officer ſhall think proper to call his company together, or ſhall be ordered by his ſuperior Officer to do it, he ſhall iſſue his orders therefor, to one or more of the non-commiſſioned Officers, if there be any, if not to one or more of the privates belonging to his company, directing him or them to notify and warn the ſaid company to appear at ſuch time and place as ſhall be appointed ; and every ſuch perſon or perſons, who ſhall receive ſuch orders, ſhall give notice of the time and place appointed for aſſembling ſaid company, to each and every perſon he or they ſhall be ſo ordered to warn, either by verbal information, or by leaving a written or printed notification thereof, at the uſual place of abode of the perſon thus to be notified and warned ; and no notice ſhall be deemed legal for muſters for the purpoſe of common and ordinary trainings, unleſs it ſhall be given four days at leaſt, previous to the time appointed therefor ; but in caſe of invaſion, inſurrection or other emergency, any time ſpecified in the orders ſhall be conſidered as legal ; and every non-commiſſioned Officer, or other perſon, who ſhall neglect to give the ſaid notice and warning, when ordered thereto by the Commanding Officer of the company to which he belongs, ſhall for ſuch offence forfeit and pay as a fine, a ſum not exceeding *forty ſhillings*, nor leſs than *twelve ſhillings*, at the diſcretion of the Juſtice of the Peace before whom trial ſhall be had ; and the teſtimony of any perſon under oath, who ſhall have received orders agreeable to law, for notifying

Manner of notification.

Penalty.



Content downloaded/printed from HeinOnline

Wed Oct 23 17:16:03 2019

Citations:

Bluebook 20th ed.
1759-1776 1 .

ALWD 6th ed.
1759-1776 1 .

Chicago 7th ed.
, "," New Hampshire - Temporary Laws, Acts and Laws 1759-1776 : 1-113

OSCOLA 4th ed.
, '' 1759-1776 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 191 of 284

STATE OF NEW-HAMPSHIRE.

*In the Year of our LORD, One Thousand Seven Hundred and Seventy-six.*

# AN ACT

## To adopt and take the Name, Stile, and Title of STATE, in Lieu of COLONY, in New-Hampshire.

Passed Sept. 11, 1776.

Preamble. *WHEREAS by a late Declaration of the Honorable Continental CONGRESS, the United-Colonies of North-America are declared FREE and INDEPENDANT STATES :*

THEREFORE,

This Colony to take the Name and Stile of STATE.

BE IT ENACTED BY THE COUNCIL *and* ASSEMBLY, That henceforth this COLONY assume and take the Name and Stile of THE STATE OF NEW-HAMPSHIRE : And where any Law hath directed the Name and Stile of the Colony of New-Hampshire, or the Name and Stile of the Province of New-Hampshire, to be used in any Commissions, Processes, or Writings whatever ; in Lieu thereof, shall be now used the Name and Stile of THE STATE OF NEW-HAMPSHIRE, and not otherwise.

# AN ACT

## For forming and regulating the MILITIA within the State of *New-Hampshire*, in *New-England*, and for repealing all the LAWS heretofore made for that Purpose.

Passed Sept. 19, 1776.

Preamble. *WHEREAS it is not only the Interest, but the Duty of all Nations to defend their Lives, Liberties and Properties, in that Land, which the Supreme Ruler of the Universe has bestowed on them, against the unlawful Attacks and Depredations of all Enemies whatever ; especially those who are moved by a Spirit of Avarice or Despotism.* AND WHEREAS, *the Honorable* AMERICAN CONGRESS *have recommended to the United-Colonies, to put the Militia into a proper State for the Defence of* AMERICA :------- AND WHEREAS, *the Laws now in Force, respecting the Regulation of the* MILITIA, *have been found insufficient for the Purposes aforesaid :*

IT

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 192 of 284

*Firſt*, IT IS THEREFORE ENACTED BY THE COUNCIL, AND HOUSE OF REPRESENTATIVES *in* GENERAL-COURT *aſſembled, and by the* Authority *of the ſame.* That the ſeveral Laws, and the ſeveral Paragraphs, and Clauſes of all and every the Laws of this State, enforceing, or any ways relating to the Regulation of the MILITIA, be, and hereby are repealed, and declared null and void.

Repealing clauſe.

*And be it further Enacted by the* AUTHORITY *aforeſaid*, That that part of the Militia of this State, commonly called the Training Band, ſhall be conſtituted of all the able-bodied Male-Perſons therein, from ſixteen Years old to fifty, excepting Members of the AMERICAN CONGRESS, Members of the COUNCIL, and of the Ho[illegible] of *Repreſentatives* for the time being, the Secretary of the Colony, all Civil Officers that have been or ſhall be appointed by the General-Court, or either Branch of it, Officers and Students of Dartmouth-College, Miniſters of the Goſpel, Elders and Deacons of Churches, Church Wardens, Grammer-School-Maſters, Maſters of Arts, the Denomination of Chriſtians called Quakers, Selectmen for the Time being, thoſe who have by Commiſſion under any Government or Congreſs, or by Election, in Purſuance of the Vote of any Congreſs of the Continent, or of this or any other Colony, held the Poſt of a Subaltern or higher Officer, Perſons while actually employed as Maſters of Veſſels of more then Thirty Tons Burthen, other than Fiſhing Veſſels, and Veſſels coaſting this Colony, and to and from this Colony, to the other New-England Governments, Conſtables, Sheriffs, and Deputy Sheriffs, Negroes, Indians and Mulattoes; and ſhall be under the Command of ſuch Officers as ſhall be choſen, impowered, and commiſſionated over them, as is by this Act provided; and the Selectmen or the major part of them of each Town, ſhall be, and hereby are impowered, by writing under their Hands to excuſe from Time to Time ſuch Phyſicians, Surgeons, Ferrymen, and Millers, in their reſpective Towns, from common and ordinary Trainings as they ſhall judge it neceſſary to excuſe: And the Council, and Houſe of Repreſentatives aforeſaid, ſhall from Time to Time, as may appear to them neceſſary, divide the Militia of each County into Regiments, and alter and divide ſuch Regiments from Time to Time, as they ſhall judge expedient, after having taken the Opinion, during any Seſſion of the General Court, of ſuch Members of the Houſe as belong to the County, where the Diviſion or Alteration is to be made, and as ſhall be preſent at the Time of ſuch Conſultation.

The training band.

Perſons exempted.

*Militia to be divided.*

Second. *And be it further Enacted by the* AUTHORITY *aforeſaid*, That there ſhall be choſen by Ballot of the Council, and Houſe of Repreſentatives for this State, from Time to Time as may be neceſſary, one Major-General over the whole Militia thereof, which Major-General when ſo choſen ſhall be commiſſionated to that Office by the Council and Houſe afore-

One Major General to be choſen by ballot of both Houſes

L ſaid,

ſaid, and ſaid General ſhall at all Times have Power to draw forth the ſaid Militia, or any part thereof, as the ſaid General may judge expedient and neceſſary for the immediate defence of this, or any of the United States of America. And the Officers and Soldiers of ſaid Militia, ſhall pay entire obedience to his Commands accordingly, under the Penalties hereafter provided in this Act.

His Power.

*Provided always*, That the ſaid General and all other Officers of ſaid Militia, ſhall at all Times be under the Command of the Council and Houſe of Repreſentatives, and ſhall in drawing forth or retaining in Service the ſaid Militia or any part thereof be ſubject to ſuch Orders and Inſtructions, as they may receive from Time to Time from the ſame COUNCIL and HOUSE of REPRESENTATIVES.

To be under the command of both HOUSES.

3d. *And be it further Enacted by the* AUTHORITY *aforeſaid*, That there ſhall be choſen, appointed, and commiſſionated, (as is provided and directed by this Act, for the Choice and Appointment of a General Officer) over each Regiment in this S ate, one Colonel, one Lieutenant-Colonel, and two Majors; and the ſaid Field Officers ſo appointed and commiſſionated, or the major part of them,, ſhall forthwith divide and ſet off the reſpective Regiments into Companies, as they ſhall judge expedient, to conſiſt as near as conveniently can be, of fixty-eight Privates, excluſive of thoſe of the Alarm Liſt, and to determine the Rank of each and every Company.

Field Officers to be choſen.

*Provided nevertheleſs*, That no Soldier ſhall be obliged without his conſent, to join a Company belonging to any Town, in which he has not his uſual Place of Abode, unleſs where there ſhall not be Privates enough to make a Company of Thirty Soldiers, including Officers; in which Caſe, as alſo where there are any Perſons belonging to a place not incorporated, they ſhall be joined to ſuch Company as the Field Officers of the Regiments within which they are ſhall ſee fit. And the Inhabitants of every Town now in, or that ſhall be in the Continental Army, ſhall be deemed to belong to, and be a part of the Companies in their reſpective Towns, and excuſed from Duty in the Militia, while they continue part of the Army aforeſaid; and each Company when ſo formed and ſet off, ſhall together with thoſe of the Alarm Liſt, within the Limits of the ſame, by Ballot, in the preſence of one of their Field Officers, who ſhall cauſe them to be duly notified for that purpoſe, and ſhall preſide as Moderator, chuſe one Captain, two Lieutenants, and one Enſign; which choice, ſhall be immediately certified to the Secretary by ſaid Field Officers; and the Preſident of the Council thereupon, unleſs ſome material Objection againſt ſuch choice for any corrupt Practice or Irregularity, ſhall be made at or before the Time of receiving ſaid Certificates, ſhall commiſſionate ſuch Perſons purſuant to their

Perſons in the army to be conſidered a part of the Militia.

Choice of Subalterns.

Election,

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 194 of 284

Election. And all the said Officers when so commissionated by the President of the Council, shall in the absence of their Superiors, have the same Power in ordering, directing and marching their Regiments and Companies, as the Major General has over the whole of the said Militia: And the Colonel, or commanding Officer of each Regiment, shall as soon as the Captains in his Regiment are commissionated, give them respectively under his Hand in Writing, the Limits of their respective Companies; their Alarm Posts, and the manner of mustering their Companies on all Occasions.

4th. *And be it further Enacted by the* AUTHORITY *aforesaid*, That the Field Officers of each and every Regiment, or the major part of them, shall recommend to the General-Court, a good able and skilful Person for Adjutant of their Regiment; and if either House shall by Ballot, elect such Person for that Office, then the President of the Council shall, when concurred, commissionate him thereto. And in all Cases determinable by Field-Officers of the several Regiments, where there shall be four Field Officers of any particular Regiment present, and they shall be equally divided in their Opinions respecting such Matter, the determination shall be according to the Opinion of the first Colonel.

Adjutant to be appointed.

5th. *And be it further Enacted*, That each Company, including the Alarm List, shall be called together by their Captain or commanding Officer, as soon as may be for the purpose of chusing one Clerk, four Serjeants, four Corporals, one Drummer, and one Fifer; and when it shall appear to the Commission Officers of any Company, that either of said non-commissioned Officers shall neglect his Duty, they may remove and dismiss him from his Office, and call upon their Company, including the Alarm List, to chuse another in the Room of such Delinquent; and if the said Company being called together for that Purpose, shall at any Time neglect or refuse immediately to proceed to the choice of one, or more non-commissioned Officer or Officers, so ordered to be chosen; the Commission Officers of such Company, or the major Part of them, shall by Warrant under their Hands in Writing, appoint such Non-commissioned Officer or Officers, which the said Company shall have refused to choose as aforesaid.

Non-commissioned Officers to be chose by the company.

6th. *And be it further Enacted by the* AUTHORITY *aforesaid*, That each and every Officer and private Soldier of said Militia, not under the controul of Parents, Masters, or Guardians, and being of sufficient Ability therefor, in the Judgment of the Select-men of the Town wherein he has his usual place of Abode, shall equip himself, and be constantly provided with a good Fire Arm, good Ramrod, a Worm, Priming-Wire and Brush, and a Bayonet fitted to hisGun, a Scabbard and Belt therefor, and a cutting Sword or a Tomahawk, or Hatchet, a Pouch containing a Cartridge-Box that will hold fifteen Rounds of Cartridges at least, a hundred Buck

Equippage.

Buck Shot, a Jack Knife and Tow for Wadding, fix Flints, one pound of Powder, forty leaden Balls, fitted to his Gun, a Knapfack and Blanket, a Canteen or Wooden Bottle, fufficient to hold one Quart. And all Parents, Mafters, and Guardians, fhall furnifh and equip thofe of the Militia, which are under their care and command, with the Arms, Equipments and Accoutrements aforefaid: And where the Selectmen of any Town fhall adjudge any Perfons belonging to the Militia of their Town unable to equip and arm himfelf as aforefaid, fuch Selectmen fhall in Writing, under their Hands certify the fame to the Captain, or commanding Officer in whofe Company fuch Perfon may be, and fhall at the Expence of fuch Town provide for, furnifh, arm and equip fuch Perfons with Arms and Equipments; which Arms fo provided by fuch Selectmen, fhall be the Property of the Town at whofe Expence they fhall be provided; and if any Non-commiffioned Officer or Soldier, fhall embezzle or deftroy the fame, he fhall be punifhed at the Difcretion of the Juftice, or Court before whom he may be convicted thereof, paying double the Value of the Arms, or Accoutrements fo wilfully deftroyed or embezzled, and on Default thereof, to be publickly whipped not exceeding twenty Stripes: And the Selectmen of each and every Town fhall provide at the Expence of the Colony and depofit and keep in fome fafe Place for the ufe of the Militia upon an Alarm, one fixteenth Part fo many Spades, or Iron Shovels with Handles and fitted for Service, as there are Rateable Polls in their Town; one half as many narrow Axes, as Spades and Iron Shovels, and as many Pick Axes, as narrow Axes, all fitted for Service; And at the coft and charge of their refpective Towns, one Drum and one Fife for each company therein. And the Freeholders and Inhabitants of each and every Town in this Colony, qualified by Law to vote in Town Meetings, are hereby impowered at a Meeting regularly warned for that Purpofe, to raife Money by Tax on the Polls and Eftates of the Inhabitants of their Towns to defray all charges arifing on faid Towns in confequence of this Act.

Poor perfons to be equip't at the expence of the Town.

Penalty for embezzlement.

7th. *And be it further enacted by the* AUTHORITY *aforefaid,* That each and every commiffion Officer of faid Militia, who fhall not within one Month next after receiving his Commiffion, provide for, arm and equip himfelf, with fuch Arms and Accoutrements, as is by this Act directed, fhall by order of a Court Martial appointed, as by this Act is provided, be removed from his Office. And every commiffioned Officer, who fhall be depofed from his Office in the Militia for neglect of Duty, or other Mifdemeanor, as by this Act is provided, fhall receive no Benefit from any Commiffion, which he fhall be thus incapacitated to execute to exempt him from Military Duty.

Penalty on commiffion officers neglecting to equip themfelves.

Eighth. *And be it further Enacted,* That the Clerk of each and every Company of faid Militia, fhall once every fix Months after the Time of his Choice or Appointment, take an exact Lift of



Content downloaded/printed from HeinOnline

Tue Dec 31 11:04:20 2019

Citations:

Bluebook 20th ed.
1792 423 .

ALWD 6th ed.
1792 423 .

Chicago 7th ed.
, "," New Hampshire - General Court, November Session : 423-451

OSCOLA 4th ed.
, '' 1792 423

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Amherſt, in the county of Hillſborough, in ſaid State, on the ſecond Tueſday of May, ſhall forever hereafter be holden at Hopkinton in ſaid county, on the ſecond Tueſday of May annually. And the courts of common-pleas, which by law are to be holden at ſaid Amherſt, on the firſt Tueſday of September, and on the ſecond Tueſday of December, ſhall forever hereafter be holden at ſaid Hopkinton, on ſaid days annually. And the courts of general-ſeſſions of the peace, which by law are to be holden at ſaid Amherſt, on the Thurſday next following the firſt Tueſday of September, ſhall forever hereafter be holden at ſaid Hopkinton, on the Thurſdays next following the firſt Tueſday of September annually.

**At Hopkinton.**

*And be it further enacted*, That the act entitled, "An act for eſtabliſhing courts of law for the adminiſtration of Juſtice within this State, and deſignating their powers, and regulating their proceedings in certain caſes," ſo far as the ſaid act relates to holding ſuch of the aforeſaid courts at Amherſt, which by this act are directed in future to be holden at ſaid Hopkinton, be, and hereby is repealed.

**Repealing clauſe.**

*And be it further enacted*, That all writs, venires, recognizances, appeals, actions, indictments, warrants and proceſs of every kind, which by law were returnable to ſaid courts at Amherſt, which by this act are to be holden at ſaid Hopkinton, ſhall be returned to, and ſuſtained by ſaid courts at ſaid Hopkinton.

**Writs, &c. to be ſuſtained by ſaid courts at Hopkinton.**

*And be it further enacted*, That the ſeveral courts aforeſaid, which are to be holden at ſaid Hopkinton, ſhall be holden in, or as near the meeting-houſe in ſaid town as conveniently may be.

**Courts where to be holden.**

*And be it further enacted*, That this act, at the expiration of two years from the paſſing thereof, ſhall be null and void, unleſs a ſuitable houſe for holding ſaid courts, be erected at ſaid Hopkinton within that time, without being a county charge.

This act paſſed December 25, 1792.

---

**Paſſed Dec. 27, 1792.**

AN ACT for arranging the militia into diviſions.

BE *it enacted by the Senate and Houſe of Repreſentatives in General-Court convened*, That the militia of this State be arranged into diviſions, brigades and

regiments,

Digitized from Best Copy Available

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 198 of 284

*And be it further enacted*, That each non-commissioned officer and soldier belonging to the regiments of foot, shall within one year from and after the passing this act, furnish himself with a good fire-lock, bayonet and belt, a cartouch box that will contain twenty-four cartridges, two good flints, a knapsack and canteen—and that the commissioned belonging to companies of foot, shall be severally armed with a sword or hanger, and an espontoon, and that the field officers be armed with a sword or hanger.

How to be armed and accoutred.

*And be it further enacted*, That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements. And such as are unable to furnish themselves, shall make application to the selectmen of the town, who are to certify to their captain or commanding officer, that they are unable to equip themselves, and the said selectmen shall, at the expence of the town, provide for, and furnish such persons with arms and equipments; which arms and equipments shall be the property of the town, at whose expence they were provided: And if any person so furnished, shall embezzle or wilfully destroy the same, he shall be punished by any court proper to try the same, upon complaint made by the selectmen of said town, by being publicly whipped not exceeding twenty stripes, or fined not exceeding forty shillings. And that all fines recovered for embezzling or destroying of arms and accoutrements as provided in this act, shall be paid into the hands of the selectmen to be appropriated in purchasing arms and accoutrements for such soldiers as are unable to purchase for themselves.

Those unable &c. to be equipped at the expence of the town.

Fines how to be appropriated.

*And be it further enacted*, That parents, masters and guardians shall be liable for the neglect and non-appearance of such persons as are under their care (and are liable by law to train) and are to be proceeded against for the penalty in the same manner, as by this act is provided against other delinquents.

Parents, &c. liable to a penalty.

*And be it further enacted*, That the commander in chief, the officers commanding divisions, brigades or regiments, may appoint military watches or guards when an invasion of the State is apprehended, in such place and under such regulations as they may judge necessary; and all officers and soldiers under their com-

Military watches, by whom to be appointed.

mand

Digitized from Best Copy Available



Content downloaded/printed from HeinOnline

Tue Oct 29 17:02:05 2019

Citations:

Bluebook 20th ed.
1836 vol. 35 3 .

ALWD 6th ed.
1836 vol. 35 3 .

Chicago 7th ed.
, "," Ohio - 35th General Assembly, General Acts : 3-122

OSCOLA 4th ed.
, '' 1836 vol 35 3

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



## AN ACT.

To organize and discipline the Militia.

Every able bodied white male citizen to be enrolled in the militia, and equip themselves.

Sec. 1. *Be it enacted by the General Assembly of the* State *of Ohio*, That each and every able bodied white male citizen of the United States, who resides in this State; who now is or hereafter shall be, of the age of eighteen years and under forty-five years of age, except as hereinafter excepted, shall be enrolled in the militia of this State for the purpose of performing military duty, and be equiped as hereinafter provided.

Captain or commandant of company to enroll; to notify new members of the time and place of muster, unless herein exempted.

Sec. 2. That it is hereby made the duty of the captain or commandant of each company, within the bounds of whose company each person may reside, within ten days next after he shall be informed of such residence, and at all times hereafter, such commanding officers shall enroll each person aforesaid, and cause him to be notified of the same, and of the time and place of muster, and also of those who may from time to time, arrive at the age of eighteen years, and being under the age of forty-five years, excepting as hereinafter excepted, who shall come to reside within the bounds of said company.

The State organized into 23 Divisions.

What counties compose each Division.

Sec. 3. That the militia of this State shall be organized into divisions as follows, viz: The county of Hamilton shall form the first division; the counties of Pike, Jackson, Lawrence and Scioto, shall form the second division; the counties of Coshocton, Knox, Holmes and Tuscarawas, shall form the third division; the counties of Perry, Licking and Morgan, shall form the fourth division; the counties of Clark, Champaign and Greene, shall form the fifth division; the counties of Columbiana, Stark and Carroll, shall form the sixth division; the counties of Fairfield, Hocking, Franklin and Pickaway, shall form the seventh division; the counties of Adams, Brown and Clermont, shall form the eighth division; the counties of Cuyahoga, Lorain, Medina and Wayne, shall form the ninth division; the counties of Montgomery, Dark of Miami and Shelby, shall form tenth division; the counties of Richland, Huron and Crawford, shall form the eleventh division; the counties of Logan, Hardin, Allen, Mercer and Vanwert. shall form the twelfth division; the counties of Madison, Union, Delaware and Marion, shall form the thirteenth division; the counties of Jefferson and Harrison, shall form the fourteenth division; the counties of Muskingum and Guernsey, shall form the fifteenth division; the counties of Ross, Highland, Clinton and Fayette, shall form the sixteenth division; the counties of Sandusky, Seneca, Hancock and Putnam, shall form the seventeenth division; the counties of Lucas, Wood, Henry, Williams and Paulding, shall form the eighteenth division; the counties of Butler, Preble and Warren, shall form the nineteenth division; the counties of Portage and Trumbull, shall form the twentieth division; the counties of Ashtabula, and Geauga, shall form the twenty-

superceded by a regular contractor or purchasing commissary, shall deliver over to such contractor or commissary, all supplies he may have on hand, and the contractors and commissaries shall be bound to receive the same and receipt therefor to such special commissary at the prices given for such articles, with the additional expense incurred thereon at the time of delivery, which receipt shall be deposited with the Auditor of State, and the amount thereof charged to such regular contractor or commissary.

Suits bro't for any thing done in pursuance of this act, &c

Sec. 73. That if any suit or suits shall be brought or commenced against any person or persons for any thing done in pursuance of this act, the defendant may plead the general issue, and give this act and the special matter in evidence.

Quar. master of div. to take charge of and superintend all public ar's, ammunition, military stores and property of his division

His further duty.

Sec. 74. That all the public arms, ammunition, accoutrements, camp equippage and military stores belonging to any division of the militia of this State, shall be under the care and superintendence of the assistant quarter master general of such division, who shall have power to employ suitable persons to clean and repair any arms or articles which may require it, and certify any reasonable and just account which may be rendered for cleaning and repairing, and for transporting such arms and military stores to any place where they may be ordered by the commander-in-chief of divisions, which account thus certified shall be allowed by the Auditor of State, and paid as other accounts against the State are paid; and such assistant quarter master general shall receipt for all articles delivered to his charge, and account for the same at any time when called on so to do, by the commandant of division or quarter master general of this State.

Any person selling public arms or other property belonging to the State, shall forfeit, &c.

How collected

How fines are disposed of.

Sec. 75. That if any person shall sell or dispose of any of the public arms or any other camp equippage, or other property belonging to the State, every person so offending, shall forfeit and pay for every musket, sabre or pistol, or other article, double the value of the cost of such arms or other property, to be recovered by action of debt before any justice of the peace or other court having jurisdiction of the amount, in the name of the quarter masters of the proper regiment, squadron or battalion, on complaint of any person who may prosecute for the same; and all fines and forfeitures collected by virtue of the provisions of this section, shall be paid by the justice to the proper quarter master, and be by him transmitted to the paymaster general of the militia of this State.

When arms are wanted for service, they may be recalled from volunteer corps, who do not volunteer.

Sec. 76. That when a part of the militia of this State shall be called into actual service, and arms shall be wanted for their use, the commander-in-chief of division or brigade may call from any volunteer company which does not volunteer their services, any or all the public arms in possession of such company, and place or cause the same to be placed in the hands of those who volunteer or are drafted for actual service.

Sec. 77. That the militia of this State, when in actual ser-



Content downloaded/printed from HeinOnline

Thu Nov 7 17:27:29 2019

Citations:

Bluebook 20th ed.
Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State (1808).

ALWD 6th ed.
Ls of the State of Vermont, Digested & Compiled: Including the Declaration of Independence, the Constitution of the United States, & of this State (1808).

APA 6th ed.
(1808). Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State. Randolph Vt., Printed by Sereno Wright.

Chicago 7th ed.
Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State. Randolph Vt., Printed by Sereno Wright.

McGill Guide 9th ed.
, Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State (Randolph Vt.: Printed by Sereno Wright., 1808)

MLA 8th ed.
Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State. Randolph Vt., Printed by Sereno Wright. HeinOnline.

OSCOLA 4th ed.
Laws of the State of Vermont, Digested and Compiled: Including the Declaration of Independence, the Constitution of the United States, and of this State. Randolph Vt., Printed by Sereno Wright.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



# CHAPTER LXXXI.

## OF THE MILITIA.

### N° 1.

Paffed March 20, 1797.

*AN ACT, for regulating and governing the militia of this ftate.*

Militia, how and by whom to be enrolled.

SECT. 1. IT *is hereby enacted by the General Affembly of the State of Vermont*, That each and every free, able-bodied white male citizen of this ftate, or of any other of the United States refiding within this ftate, who is or fhall be of the age of eighteen years, and under the age of forty-five years (excepting as is herein after excepted) fhall feverally and refpectively be fubject to the requifitions of this act, and fhall be enrolled in the militia, by the captain or commanding officer of the company, within whofe bounds fuch citizen fhall refide, within three months from and after the paffing of this act. And it fhall be at all times hereafter the duty of the commanding officer of every fuch company, to enrol every fuch citizen as aforefaid, and alfo thofe who fhall from time to time arrive at the age of eighteen years, or being of the age of eighteen years and under the age of forty-five years, and not herein after excepted, fhall come to refide within his bounds; and fhall without delay notify fuch citizen of the enrolment, by a non-commiffioned officer or other perfon duly authorized for that purpofe, by whom fuch notice may be proved. And in all cafes of doubt refpecting the age of any perfon enrolled or intended to be enrolled; the party queftioned fhall prove his age, to the fatisfaction of the commanding officer of the company within whofe bounds he may refide.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 204 of 284

act, ſhall be ſuch as the brigadier generals, within their reſpective brigades, ſhall direct.

SECT. 14.——That every non-commiſſioned officer and private of the infantry, ſhall conſtantly keep himſelf provided with a good muſket, with an iron or ſteel rod, a ſufficient bayonet and belt, two ſpare flints, a priming wire and bruſh, and a knapſack, a cartridge box and pouch with a box therein ſufficient to contain at leaſt, twenty-four cartridges, ſuited to the bore of his muſket; and ſhall appear ſo armed, accoutred and provided, whenever called out: *excepting*, that when called out to exerciſe only, he may appear without a knapſack.

Non-comm. and privates, how armed & accoutred.

*Provided always*, That every citizen enrolled, and providing himſelf with arms, ammunition and accoutrements, required as aforeſaid, ſhall hold the ſame exempted from all ſuits, diſtreſſes, executions or ſales, for debt, or for payment of taxes.

Arms and accoutrements exempt from execution.

SECT. 15.——That every non-commiſſioned officer or private of the infantry, who ſhall neglect to keep himſelf armed and equipped, as aforeſaid, or who ſhall on a muſter day, or at any other time of examination, be deſtitute of, or appear unprovided with, the arms and equipments herein directed (excepting as before excepted;) ſhall pay a fine, not exceeding *ſeventeen cents* for a gun, and *eight cents* for every other article, in which he ſhall be deficient: at the diſcretion of the court, before whom trial ſhall be had. And all parents, maſters or guardians, ſhall furniſh thoſe of the ſaid militia who ſhall be under their care and command, with the arms and equipments above mentioned, under the like penalties for any neglect. And when the ſelectmen of any town ſhall judge any inhabitant thereof belonging to the militia, unable to arm and equip himſelf, in manner aforeſaid; they ſhall, at the expenſe of the town, provide for and furniſh ſuch inhabitant with the aforeſaid arms, and equipments: which ſhall remain the property of the town, at the expenſe of which they ſhall be provided. And if any ſol-

Non-commiſſioned officers and ſoldiers fined, for not being equip'd.

Parents and guardians to furniſh arms.

Selectmen to furniſh, for poor ſoldiers.

Penalty for embezzlement.

dier ſhall embezzle or deſtroy the arms, and equipments, with which he ſhall be furniſhed ; he ſhall, upon conviction as aforeſaid, be judged to replace the articles which ſhall be by him ſo embezzled or deſtroyed, and to pay the coſts ariſing from the proceſs againſt him. And if he ſhall not perform the ſame, within fourteen days after ſuch adjudication, it ſhall be in the power of the ſelectmen of the town, to which he ſhall belong, to bind him out to ſervice or labor, for ſuch term of time, as, in the diſcretion of the ſaid ſelectmen, ſhall be ſufficient to procure a ſum of money, equal to the value of the article or articles ſo embezzled or deſtroyed ; and pay coſts, ariſing as aforeſaid.

Fines for ſundry delinquencies.

SECT. 16.——That every perſon liable to do military duty, who being duly warned, ſhall refuſe or neglect to appear, at the time and place appointed, armed and equipped as by this act is directed, for any muſter, training, view of arms or other military duty ; ſhall pay as a fine for ſuch default, the ſum of *two dollars*. And every perſon who ſhall appear at any muſter, with his arms in an unfit condition, ſhall pay a fine of *twelve cents*, for each and every ſuch default.

Proviſo.

*Provided neverthele∫s*, That it ſhall be lawful for the commanding officer of a company, at any time, within eight days after any muſter, training, view of arms, or other duty, to excuſe any perſon for non-appearance, or for any deficiency of equipments, on the delinquent's producing to him ſatisfactory evidence of his inability to appear, or equip, as aforeſaid.

2d proviſo.

*Provided*, That if ſuch delinquent had ſufficient cauſe of abſence, and ſhould neglect to make his excuſe within the eight days aforeſaid ; upon a proſecution, he ſhall be liable to pay coſts, at the diſcretion of the court before whom the cauſe is tried.

[☞ *The two proviſos of this ſection, repealed : See preſent chap.—Act.* N°. 8.]

Companies how warned.

SECT. 17.——That when the commanding officer of a company ſhall think proper to call his

**Journal of Gender, Social Policy & the Law**

Volume 15 | Issue 4 Article 1

2007

# The Roots of Law

Larry D. Barnett

Follow this and additional works at: http://digitalcommons.wcl.american.edu/jgspl

 Part of the Constitutional Law Commons

Recommended Citation

Bennett, Larry D. "The Roots of Law." American University Journal of Gender, Social Policy & the Law. 15, no. 1 (2006): 613-686.

This Article is brought to you for free and open access by the Washington College of Law Journals & Law Reviews at Digital Commons @ American University Washington College of Law. It has been accepted for inclusion in Journal of Gender, Social Policy & the Law by an authorized administrator of Digital Commons @ American University Washington College of Law. For more information, please contact fbrown@wcl.american.edu.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 207 of 284

# THE ROOTS OF LAW

LARRY D. BARNETT

ABSTRACT

*This Article rests on the macrosociological thesis that (i) the concepts and doctrines used in law are determined by the properties of society and that (ii) these properties are produced by large-scale forces. The thesis thus maintains that the content of law is not shaped by the persons who serve as legislators, judges, and executive-branch policymakers; such individuals are merely the vehicles by which societal conditions mold law. To illustrate, the Article examines shifts in law in the United States on a number of subjects, including law setting the age of majority and law regulating access to abortion, and it links these shifts to changes in specific aspects of U.S. society. Data from the 1960 census on the forty-eight coterminous states are analyzed with logistic regression to identify system-level properties distinguishing states that liberalized their law on abortion between 1967 and 1972 (i.e., before Roe v. Wade) from states that did not. The regression analysis, in conjunction with time-series data for the nation as a whole, suggests that the liberalization by states and by Roe of law-imposed restrictions on abortion was associated mainly with increases in school enrollment and educational level among young women. This Article advances the premise that long-term growth in the quantity of knowledge broadly affected the American social system and its law, and ascribes the rising prevalence and longer duration of education among women—as antecedents of the liberalization of law on abortion—primarily to the expansion of knowledge.*

Published by Digital Commons @ American University Washington College of Law, 2007

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

# THE ROOTS OF LAW

LARRY D. BARNETT[*]

Abstract....613
I. Introduction....614
  A. Sex Roles....616
  B. The Investment Company Act and the Concept of "Person"....617
  C. Age of Majority....620
II. Knowledge as a Societal Property....627
III. Law and Abortion in the United States....636
  A. Change in Law Regulating Abortion, 1967-1973....637
  B. Factors Affecting Decisions by Women to Abort Pregnancies....639
  C. Time-Series Indicators of a National Need for Abortion....647
  D. System-level Properties and the Liberalization of State Abortion Law....651
IV. The Concept of Societal Need....672
  A. Functionalism....673
  B. Societal Need and Abortion....677

## I. INTRODUCTION

Distinct concepts and principles characterize every profession,[1] and the reality perceived by members of one profession therefore differs to some extent from the reality perceived by members of another profession.[2] Be-

---

[*] Professor, School of Law, Widener University, Wilmington, Delaware USA. Postal address: Post Office Box 7474, Wilmington, DE 19803-0474 USA. E-mail address: ldbarnett@widener.edu

The Widener University Legal Information Center provided invaluable assistance in the preparation of this article. I would particularly like to thank Enza Klotzbucher, Mary Jane Mallonee, and Kelly Pierce of the Center staff.

1. Larry D. Barnett, *When is a Mutual Fund Director Independent? The Unexplored Role of Professional Relationships under Section 2(a)(19) of the Investment Company Act*, 4 DEPAUL BUS. & COM. L.J. 155, 173-78 (2006) (summarizing the central elements of a profession).

2. According to research in linguistics, "the world is presented in a kaleidoscopic flux of impressions which has to be organized by our minds—and this means largely by the linguistic systems in our minds. We cut nature up, organize it into concepts, and ascribe significances as we do, largely because we are parties to an agreement to organize it in this way—an agreement that holds throughout our speech community and is codified in the patterns of our language." Benjamin Lee Whorf, *Science and Linquistics*, *in* LANGUAGE, THOUGHT, AND REALITY: SELECTED WRITINGS OF BENJAMIN LEE WHORF 207, 213 (John B. Carroll ed., 1956); see also Benjamin Lee Whorf, *Language, Mind, and Reality*, *in* LANGUAGE, THOUGHT, AND REALITY, *supra* at 246-47 (stating that "[e]very language . . . incorporates certain points of view and certain patterned resistances to widely divergent points of view"). Professions as well as societies differ in the concepts they use, and the concepts unique to a particular profession accordingly provide its members with perceptions that do not exist among the members of a differ-

cause an understanding of the world is never complete—perhaps because "[r]eality is nothing but a collective hunch"[3]—no single profession has a monopoly on truth, and research that brings together different professions has the potential to yield new insights. Accordingly, this Article brings together two professions—law and sociology—in an attempt to answer a pair of related questions. First, why does the law of a society contain certain concepts and doctrines at one point in history but not at another? Second, why at a given point in time does the law of one society contain certain concepts and doctrines while the law of another society does not? I believe that both questions have a common answer and that the answer stems from the discipline of macrosociology. Specifically, my thesis is that the properties of society form the roots of law and that these properties, and the forces behind them, shape the content of law in the social system in which the law develops and operates.

As a social science, macrosociology assumes that the doctrines of law are not random occurrences. Instead, macrosociology contends that identifiable system-level factors account for differences in law both across time in any particular jurisdiction and across jurisdictions at any particular point in time. The macrosociological approach employed in the instant Article (i) views law as an institution of a society and, hence, as a component of a system;[4] (ii) assumes that, as an institution, law aids society by promoting the equilibrium and cohesiveness of the system in the long run;[5] (iii) contends that, for law to benefit society, the content of law—i.e., the concepts and doctrines of law—must manifest the properties of society, not the personalities of individuals; and (iv) expects, therefore, that law will change as large-scale forces alter the properties of society. The preceding principles, although generally ignored in research on law,[6] form the foundation of this

---

ent profession.

3. Michael Moncur's (Cynical) Quotations, The Quotations Page, http://www.quotationspage.com (last visited Sept. 23, 2006) (quoting JANE WAGNER, THE SEARCH FOR SIGNS OF INTELLIGENT LIFE IN THE UNIVERSE (1986)).

4. Macrosociology assumes that, as a system, a society is characterized by cohesiveness and is comprised of interacting, interdependent components. *See* JOHN SCOTT, SOCIOLOGICAL THEORY: CONTEMPORARY DEBATES 138-39, 150, 153 (1995). The findings of quantitative research are consistent with this assumption. *See* Sung-Soon Clara Kim, Dimensions of Social Integration: Solidarity and Deviance in American Cities 9-28, 142-48 (1985) (unpublished Ph.D. dissertation, University of Virginia) (on file with Widener University School of Law Delaware Campus Library).

5. In my macrosociological framework, law furthers both social integration and system integration. Social integration involves the relationships between the individuals, and between the groups of individuals, in a society; system integration involves the relationships between the structural components of a society. David Lockwood, *Social Integration and System Integration*, *in* EXPLORATIONS IN SOCIAL CHANGE 244, 245 (George K. Zollschan & Walter Hirsch eds., 1964).

6. DANIEL J. ELAZAR, AMERICAN FEDERALISM: A VIEW FROM THE STATES 97, 135-36 (1966) (exemplifying an early use of principle (iv)). The statistical techniques available in the 1960s would not have allowed Professor Elazar to undertake the type of regression analysis reported in Part III(D) of the instant Article.

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

Article, and the fourth principle, which follows from the three that precede it, is the focus of the Article.

Several illustrations can be given in support of the fourth principle, i.e., the principle that law evolves in response to large-scale forces that alter the properties of society. These illustrations rely on studies (including, when available, quantitative data) that concern a long time interval prior to the change in law under consideration. Shifts that occur in the concepts and doctrines of law can be traced in most instances to change in societal properties that began much earlier and that occurred gradually.

### *A. Sex Roles*

The first illustration is the manner in which American law during the nineteenth and twentieth centuries treated the biological trait of sex. In 1872, the United States Supreme Court, with just one dissenting justice, ruled that a state could deny a woman a license to practice law even if she were eligible for a license in a state where she had formerly resided.[7] The Court deferred to the state's police power, under which states regulate occupations, and concluded that an inconsistency between states in the requirements for admission to the bar does not nullify the requirements of the more restrictive state, even though the restriction involves the sex of the applicant and the applicant had resided in a less-restrictive state. Notably, three justices, concurring in the decision, explained the ruling with their view that:

> The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood.[8]

A full century would pass before Supreme Court jurisprudence on sex-based differences in government policy underwent substantial change. Since the 1970s, the Court has required government to justify policies that treat women differently than men[9] and to do so with a rationale that is "ex-

---

7. Bradwell v. State, 83 U.S. 130, 139 (1872). *See generally* Caroline Goddard & Gwen Hoerr McNamee, *Myra Colby Bradwell*, *in* BAR NONE: 125 YEARS OF WOMEN LAWYERS IN ILLINOIS: EIGHT WOMEN LAWYERS IN ILLINOIS 3-7 (Gwen Hoerr McNamee ed., 1998).

8. *Bradwell*, 83 U.S. at 141 (Bradley, J., concurring). A similar view appears in a majority opinion of the Court rendered in 1908 on a state statute that limited the number of hours a woman, but not a man, could work during a twenty-four hour period. *See* Muller v. Oregon, 208 U.S. 412, 421-22 (1908).

9. United States v. Virginia, 518 U.S. 515, 532-34 (1996).

ceedingly persuasive."[10] However, social science research indicates that the shift in Supreme Court doctrine on gender just mirrored societal change in the state of sex roles[11] and that the Court accepted gender egalitarianism only after sex equality had markedly increased.[12]

Unfortunately, the scholarship of professionals in the field of law generally rests on the often implicit assumption that law molds society and that society has no more than a small effect on the content of law. As a result, the impact of societal conditions on law has been largely ignored, and not surprisingly, there is a dearth of quantitative research on the hypothesis that jurisprudence on the sex trait is tied closely to societal conditions. The macrosociological approach I advance challenges the prevailing assumption that law shapes social conditions. In my approach, law is a mechanism that facilitates the operation of society, and the concepts and doctrines used by the law of a society will necessarily be in harmony with the properties of the society. Often, if not typically, this harmony will require time to develop after societal conditions change, but eventually the concepts and doctrines of law must be congruent with societal conditions if law is to remain a viable institution of society. Thus, American law on gender evolved in response to change in sex roles and reflected the nature of these roles.

I turn now to two additional topics that illustrate the proposition that law is rooted in societal conditions.

### *B. The Investment Company Act and the Concept of "Person"*

The Investment Company Act ("Act"),[13] which Congress adopted in 1940,[14] governs vehicles in the United States that (i) issue and sell securities to investors and (ii) invest the assets obtained from the sale of their securities in securities issued by others, which are usually business entities, governments, and/or government agencies. Because the Act is the basis for the regulation of mutual funds by the Securities and Exchange Commission,[15] it is a prominent aspect of law pertinent to finance in the United

10. *Id.* at 533; *accord* Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 728-30, 740 (2003) (holding constitutional a federal statute that, in banning sex-based employment discrimination, removed the sovereign immunity of states that engaged in such discrimination).

11. LARRY D. BARNETT, LEGAL CONSTRUCT, SOCIAL CONCEPT 50-55 (1993).

12. *Id.* at 52-55. Between 1910 and 1990, the largest decadal decline in sex segregation in occupations occurred from 1930 to 1940. *See* Kim A. Weeden, *Revisiting Occupational Sex Segregation in the United States, 1910-1990: Results from a Log-Linear Approach*, 35 DEMOGRAPHY 475, 480 index A (1998). Notable decreases in such segregation took place in two subsequent decades (1940 to 1950 and 1960 to 1970), but these decreases were much smaller in magnitude than the decline between 1930 and 1940. *See id*.

13. 15 U.S.C. § 80a (2006).

14. Act of Aug. 22, 1940, ch. 686, title 1, 54 Stat. 789 (1940).

15. 15 U.S.C. § 80a-37 (2006). The Securities and Exchange Commission defines a mutual fund as an open-end management investment company, i.e., as an investment

States and significant to the welfare of the American public. An indicator of the societal importance of mutual funds is that in 2006 mutual funds managed net assets totaling $10.4 trillion, and their investors included almost half (48%) of all households in the country.[16]

As specified in Section 3 of the Act, an investment company must inter alia be an "issuer,"[17] and given the definition of issuer in Section 2 of the Act, an issuer must be a "person."[18] Therefore, the conceptualization of person is fundamental to an investment company: an investment vehicle cannot be an investment company unless it is a person. Of relevance here, the Act defines a person to include a "company,"[19] and by doing so, Congress placed entities—i.e., artificial persons—within the scope of the Act.

By encompassing an artificial being, is the Act's definition of person consistent with the way society at large employs the word? This question is important because my thesis contends that the meaning of concepts in law is compatible with their meaning in the general population. Research in etymology suggests that, in referring to artificial beings, the definition of person in law was preceded by a similar definition in society. The word *person* came into English from the Old French word *persone*, which in turn was derived from the Latin word *persona*.[20] Before the fourteenth century ended, the English concept of person referred not only to a human being but also to "[a] character sustained or assumed in a drama or the like, or in actual life; part played; hence function, office, capacity."[21] The latter meaning can include fictionalized characters, and by extending the word *person* to such characters, the English language abstracted artificial beings from interpersonal activities and recognized artificial beings as separate from the human beings who were involved in these activities.

Prior to the fifteenth century, therefore, English as a language possessed the ability to conceptualize an intangible dimension of human interaction

---

company that issues securities redeemable by the company. Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies, Investment Company Act Release No. IC-25922, 68 Fed. Reg. 6564, 6565 n. 6 (Feb. 7, 2003); *see* 15 U.S.C. §§ 80a-2(a)(32), 80a-4, 80a-5(a).

16. INVESTMENT COMPANY INSTITUTE, 2007 INVESTMENT COMPANY FACT BOOK 58, 95 (47th ed. 2007), *available at* http://www.icifactbook.org (including net assets of money market funds in total net assets of mutual funds).

17. 15 U.S.C. § 80a-3.

18. *Id.* § 80a-2(a)(22) (defining issuer as "every person who issues or proposes to issue any security, or has outstanding any security which it has issued").

19. 15 U.S.C. § 80a-2(a)(28) (2000) (defining person as "a natural person or a company"); 15 U.S.C. § 80a-2(a)(8) (2000) (defining company to include corporations and partnerships).

20. WEBSTER'S DICTIONARY OF WORD ORIGINS 353-55 (1995).

21. 11 OXFORD ENGLISH DICTIONARY 596-97 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1989) (using definition I.1); *see also* Oxford English Dictionary, www.oed.com (search "find word" for "person;" then select "person, n.;" then follow "Date Chart" hyperlink) (showing dates of meaning usage in English literature).

such as business arrangements and to treat this dimension as distinct from the human participants in the arrangement. Because the idea of an artificial person had become possible in the English language, a necessary condition existed for English law to recognize this type of person—including what we call a corporation and a partnership.[22] Notably, it was in the fifteenth century that corporations and partnerships were brought within the definition of person in the law of England.[23] Artificial beings thus appeared in the lexicon of English law only after they appeared in the English language, and the sequence is not simply coincidence. Business arrangements that today would be labeled partnerships, companies, and guilds had become an important element in the economy of England well before the fifteenth century began.[24] The experience of society is the impetus for the emergence and meaning of concepts,[25] and the nature of economic activity required artificial persons to be part of the language of England and of its law.[26]

When American law included artificial beings within the definition of person, therefore, it followed a long-established practice[27] and accepted a meaning for the word that had already been adopted outside the institution

22. Because they are accepted by law, corporations and partnerships are logically characterized as artificial persons that *result from* fictionalizing rather than as artificial persons that *are* a fiction. However, the judiciary does not necessarily take this approach. "If [a corporation] is a fiction it is a fiction created by law with intent that it should be acted on as if true. The corporation is a person." Klein v. Bd. of Tax Supervisors, 282 U.S. 19, 24 (1930).

23. WEBSTER'S DICTIONARY OF WORD ORIGINS, *supra* note 20, at 354; Beth Stephens, *The Amorality of Profit: Transnational Corporations and Human Rights*, 20 BERKELEY J. INT'L L. 45, 54 (2002).

24. SHEPARD BANCROFT CLOUGH & CHARLES WOOLSEY COLE, ECONOMIC HISTORY OF EUROPE 56, 75, 148 (1941); A. B. Hibbert, *The Economic Policies of Towns*, *in* 3 CAMBRIDGE ECONOMIC HISTORY OF EUROPE 157, 170, 190-95 (M.M. Postan & E.E. Rich eds., 1965); *see* Shael Herman, *Trusts Sacred and Profane: Clerical, Secular, and Commercial Uses of the Medieval Commendatio*, 71 TUL. L. REV. 869, 891-94 (1997); R. de Roover, *The Organization of Trade*, *in* 3 CAMBRIDGE ECONOMIC HISTORY OF EUROPE 42, 113 (M.M. Postan & E.E. Rich eds., 1965).

25. S. I. HAYAKAWA, LANGUAGE IN THOUGHT AND ACTION 11-14 (2d ed. 1964).

26. *Cf.* Sylvia L. Thrupp, *The Gilds*, *in* 3 CAMBRIDGE ECONOMIC HISTORY OF EUROPE 230, 231-32, 244 (M. M. Postan & E.E. Rich eds., 1965) (describing the development of occupational guilds in England during the late thirteenth century: "[t]heir organization was important . . . in bringing more formal deliberation to bear on the shaping of the law and custom and on the administrative procedures through which orderly relations were maintained among buyers and sellers").

27. Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 88 (1809) .

> As our ideas of a corporation, its privileges and its disabilities, are derived entirely from the English books, we resort to them for aid in ascertaining its character. It is defined as a mere creature of the law, invisible, intangible, and incorporeal. Yet, when we examine the subject further, we find that corporations have been included within terms of description appropriated to real persons.

*Id.* *See generally* Franklin A. Gevurtz, *The Historical and Political Origins of the Corporate Board of Directors*, 33 HOFSTRA L. REV. 89 (2004) (outlining the historical antecedents of boards of directors of corporations).

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

of law. However, if the theoretical framework employed in this Article accounts for the concepts used by law, the word person is only illustrative of a general principle, namely, that all concepts and rules of law develop within and are molded by the social system and culture in which the law is embedded. This principle accounts for abstractions from interpersonal relationships involving economic activity and the acceptance by law in the United States of artificial beings as persons: corporations and partnerships are, and long have been, central to the U.S. economy,[28] indicating that these forms of business organization have been an important, if not essential, aspect of U.S. society.

### *C. Age of Majority*

For a macrosociological theory of law, a compelling topic is the age of majority, i.e., the age at which society ceases to define an individual as a child and confers all of the rights, and imposes all of the duties, of adulthood. The topic is important sociologically for two related reasons. First, age, like gender, is a factor that organizes social life in every technologically advanced society, including the United States.[29] Second, the age of

---

28. Business receipts—data on which are available for corporations, partnerships, and nonfarm proprietorships—evidence the economic importance of corporations and partnerships in the United States. Of all receipts for the three types of business organization combined, corporations and partnerships have accounted for more than ninty percent in recent years. Calculated from U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES: 2006 (125th ed. 2005), at table 726, *available at* http://www.census.gov/prod/2005pubs/06statab/business.pdf

Unfortunately, data that use a consistent definition of proprietorship over a long period of time are unavailable. Corporations were not a customary form of conducting business in the United States before 1850. *See* William W. Bratton, Jr., *The New Economic Theory of the Firm Critical Perspectives from History*, 41 STAN. L. REV. 1471, 1485 (1989). Sole proprietorships, too, seem not to have been the norm prior to 1850. Rather, businesses at this time were predominantly partnerships. LAWRENCE M. FRIEDMAN, A HISTORY OF AMERICAN LAW 130 (3d ed. 2005). Nonetheless, corporations were being formed in the decades preceding 1850, usually by special acts of state legislatures. William C. Kessler, *Incorporation in New England: A Statistical Study, 1800-1875*, 8 J. ECON. HIST. 43, 45-47, 50 (1948). Notably, the business corporations in existence during this period "tended to function in vital, sensitive parts of the economy, such as banking and transportation. They tended to be the largest economic organizations and concentrations of economic power." Stephen A. Siegel, *Understanding the Nineteenth Century Contract Clause: The Role of the Property-Privilege Distinction and "Takings" Clause Jurisprudence*, 60 S. CAL. L. REV. 1, 68 (1986). The economy of the United States, therefore, is likely to have been dominated by corporations and/or partnerships almost since the nation began. *See* JAMES WILLARD HURST, THE LEGITIMACY OF THE BUSINESS CORPORATION IN THE LAW OF THE UNITED STATES, 1780-1970, at 14-18 (1970).

Law manifests the pivotal economic function of artificial beings both in legislation (e.g., state statutes on corporations and partnerships) and in judicial opinions. *See* Marshall v. Balt. & Ohio R.R. Co., 57 U.S. (16 How.) 314, 327 (1850) (explaining that corporations exist because "[t]he necessities and conveniences of trade and business require that [natural persons] . . . should act by representation, and have the faculty of contracting, suing, and being sued in a factitious or collective name").

29. Gunhild O. Hagestad & Peter Uhlenberg, *The Social Separation of Old and Young: A Root of Ageism*, 61 J. SOC. ISSUES 343, 344-47 (2005).

majority provides a salient line in the American social system. Specifically, for persons who do not suffer from a physical or psychological disability, the line separates individuals deemed dependent by society from individuals deemed independent.[30] Given its societal importance, the age of majority is designated by law, and "[y]oung people eagerly anticipate their legal 'adulthood.' At the age of majority, our society puts them on notice that they are assuming an array of rights and responsibilities which they never had before."[31]

In examining the age of majority designated by law, I will limit myself to the forty-eight states in the continental United States. I exclude Alaska and Hawaii because I consider a period that extends to the start of the twentieth century, and Alaska and Hawaii were not states until the end of the sixth decade of that century.[32] In addition, I omit all non-state jurisdictions. Thus, the District of Columbia is excluded along with non-state jurisdictions located outside the continental United States, such as Puerto Rico, Guam, and the Virgin Islands.[33]

The table in the Appendix to this Article summarizes state law on the age of majority. Column 3 of the table shows, by state, the age of majority that was in force in the 1990s. Column 4 specifies the year in which the legislature of each state approved the age in column 3, and column 2 gives the age of majority that preceded the age in column 3. In reviewing the table, the reader should keep two points in mind. First, the last column specifies the year in which the legislature approved the age of majority that applied in the state during the 1990s, but the year of legislative approval may not have been the first year that the age of majority was in effect. Some states did not implement the revised age of majority until the year following its approval by the legislature. Because my interest is whether law setting the age of majority responds to its social environment, the point at which a law-making body accepts a new age of majority seems more significant than the point at which government officially implements it. Second, the legislation altering the age of majority may have amended an existing statute or it may have altered the common law, i.e., doctrine in court decisions. Under the common law, the age of majority was twenty-one.[34]

---

30. Sy Moskowitz, *American Youth in the Workplace: Legal Aberration, Failed Social Policy*, 67 ALB. L. REV. 1071, 1081-82 (2004).

31. Schwan v. Riverside Methodist Hosp., 452 N.E.2d 1337, 1339 (Ohio 1983).

32. Proclamation No. 3269, 24 Fed. Reg. 81 (1959) (declaring Alaska a state); Proclamation No. 3309, 24 Fed. Reg. 6868 (1959) (declaring Hawaii a state).

33. From 1960 to 1980, these jurisdictions accounted for just 1.8% of all residents of areas that were under U.S. sovereignty. Calculated from U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES: 1985, 12 Table 12, 826 Table 1451 (105th ed. 1984), *available at* http://www. census.gov/prod/www/ abs/statab.html.

34. HOMER H. CLARKE, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES 309 (2d ed. 1988).

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

A review of the table in the Appendix yields a number of conclusions. Of greatest importance, states generally reduced the age of majority to eighteen, or in a few instances to nineteen, during a relatively short time span, viz., in the first half of the 1970s. Additionally, this period witnessed the elimination of different ages of majority for males and females by states that had such differences. However, states whose age of majority contained a gender distinction were few in number, and all but one of these states (Illinois) had small populations.[35] Gender differences in the age of majority had thus largely disappeared prior to the 1970s. Moreover, change in statutory law preceded rather than followed the emergence of constitutional law on the subject. In 1975, the U.S. Supreme Court concluded that, for purposes of child support, a gender-based distinction in the age of majority violates the equal protection guarantee of the Constitution,[36] but when the Court announced its decision in April 1975, the nine states with a different age of majority for women and men had eliminated the distinction.[37] The age of majority, therefore, was a product of the legislative process, not the judicial process.

Whether new law is developed by legislatures or by courts (or by executive-branch agencies), however, is not of central concern to my thesis. As an institution, law must aid the operation of its society in the long run, and through legislation, judicial action, or agencies of the executive branch, the doctrines of law will come to reflect the character of the social system and the forces shaping it. Let me accordingly attempt to identify the forces that contributed to reducing the age of majority in the early 1970s. Since the reduction occurred in most states during a short span of time, the forces that were involved evidently operated on a national scale and affected much of the population to roughly the same degree. But what social forces were at work? One of them, I believe, was the changing age structure of the United States that resulted from the baby boom after World War II and the historical context preceding the boom. Specifically, because of low levels of fertility before the war, especially during the Depression of the 1930s, the post-war baby boom created a large bulge in the demographic

35. U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES: 1998, 28 Table 26 (118th ed. 1998), *available at* http://www.census.gov/prod/ www/abs/statab.html.

36. Stanton v. Stanton, 421 U.S. 7, 17 (1975) (suggesting twice that its holding applied only in "the context of child support").

37. Stanton v. Stanton, 517 P.2d 1010 (Utah 1974) (upholding the different age of majority for men and women), *rev'd*, 421 U.S. 7 (1975) (decided April 15, 1975). The U.S. Supreme Court announced its ruling in *Stanton* on April 15, 1975. *Id*. Two of the nine states, Arkansas and Utah, eliminated the sex difference in their age of majority in 1975, but both states acted before April 15: a gender-neutral age of majority was approved by the Utah legislature on March 24, 1975 and by the Arkansas legislature on April 7, 1975. Act of Apr. 7, 1975, No. 892, 1975 Ark. Acts 2321; Act of Mar. 24, 1975, ch. 39, § 15-2-1, 1975 Utah Laws 121. In adopting a uniform age of majority, the Utah legislature thus was not responding to an adverse court decision.

structure of the population, and as the passage of time moved the bulge into successive age categories, these age categories seriatim perceptibly and rapidly increased in relative size. During the three decades after the war, therefore, the salience and significance of younger age groups rose dramatically. This demographic situation probably contributed to the collective decision during the early 1970s to reduce the age of majority. Research on other topics suggests that the age makeup of the U.S. population has had distinct effects,[38] and the changing age distribution of the country after World War II was likely to have been a key factor altering the age of majority in the 1970s.

The historical context and demographic dimensions of the baby boom may be understood with data on annual births. Estimates of fertility in the United States as a whole are available by individual year starting in 1909. From 1909 until the mid-1920s, the crude birth rate (the number of births per one-thousand members of the population) was consistently above twenty-five. Subsequently, the rate declined, reaching a low of 18.4 in the mid-1930s, and stayed in a relatively narrow range until World War II ended in 1945. Once World War II was over, births rose: from 1946 to 1959, the crude birth rate was between 24.1 and 26.6.[39] The comparatively low birth rate during the decade-and-a-half before the war, together with the materially higher birth rate after the war, had a dramatic effect on the age structure of the population.

If a society is to avoid upheaval, it must absorb its youth socially as well as economically. Since my goal is to ascertain whether the post-World War II baby boom helps to explain the reduction in the age for adult status during the first half of the 1970s, the ages directly affected by the change—viz., eighteen, nineteen, and twenty—necessarily are included in my analysis. In addition, persons close to their eighteenth birthday presumably contributed to lowering the age of majority, because in the 1960s they were relatively numerous and their share of the population was growing rapidly. The appreciable expansion of the segment of the population that was approaching age twenty-one—an expansion attributable to the baby boom fol-

---

38. *See* Guy N. Burkhardt, Population Determinants of Social Change: An Analysis of the Age Composition of the United States from 1920 to 1983 (1988) (unpublished Ph.D. dissertation, Portland State University) (on file with Widener University School of Law Delaware Campus library); *see also* Henry M. McMillan & Jerome B. Baesel, *The Macroeconomic Impact of the Baby Boom Generation*, 12 J. MACROECONOMICS 167 (1990) (finding that the age composition of the U.S. population affected real interest rates, income, inflation, and unemployment); Michael D. Mumford et al., *Age-Related Changes in the Likelihood of Major Contributions*, 29 INT'L J. AGING & HUM. DEV. 171, 175 (1989); Raymond K. Oldakowski, The Influence of Population Change on Municipal Fiscal Policy (Aug. 1987) (unpublished Ph.D. dissertation, University of Illinois at Urbana-Champaign) (on file with author) (finding that age structure and other population characteristics generate changes in municipal fiscal policy).

39. NATIONAL CENTER FOR HEALTH STATISTICS, VITAL STATISTICS OF THE UNITED STATES: 1993, VOL. I, NATALITY, at Table 1-1 (1999).

lowing World War II and occurring in the decade-and-a-half prior to 1970—confronted society with the necessity of assimilating a large group that would soon be adults and was probably a major source of pressure on the American social system.

Given these theoretical considerations, my focus is on the fraction of the population fifteen to twenty years of age and the manner in which this fraction changed over time. Striking shifts in this fraction may be infrequent in the history of a society, but when they occur, they have the ability to create conspicuous social and economic problems. Figure 1 shows the percentage of the U.S. population that was fifteen to twenty years old each year from 1900 to 1980.[40] Particularly important is the period from 1940 to 1970: the percentage declined by more than one-fourth between 1940 and 1954 (from 11.2% to 7.9%) and then rose by one-half between 1955 and 1976 (from 7.9% to 11.8%), with most of the rise occurring before 1970. Thus, during the three decades that preceded the reduction of the age of majority to eighteen, there was a sharp decline and rebound in the demographic presence of the age group most directly affected by whether majority was attained at age twenty-one or at age eighteen. The rapidity and magnitude of the rebound undoubtedly increased the salience of youth, and the prominence of young persons in the population is likely to have promoted law that reduced the age for adulthood.

40. The percentages were calculated for each year from 1900 through 1980. Percentages are based on the resident population of the forty-eight states for 1900-1939 and on the total population for 1940 and later years. Alaska and Hawaii are included by the Census Bureau in total population starting in 1950. U.S. BUREAU OF THE CENSUS, ESTIMATES OF THE POPULATION OF THE UNITED STATES, BY SINGLE YEARS OF AGE, COLOR, AND SEX: 1900 TO 1959, CURRENT POPULATION REP., Series P-25, No. 311 (1965); U.S. BUREAU OF THE CENSUS, ESTIMATES OF THE POPULATION OF THE UNITED STATES, BY AGE, SEX, AND RACE: APRIL 1, 1960 TO JULY 1, 1973, CURRENT POPULATION REP., Series P-25, No. 519 Table 1 (1974); U.S. BUREAU OF THE CENSUS, PRELIMINARY ESTIMATES OF THE POPULATION OF THE UNITED STATES, BY AGE, SEX, AND RACE: 1970 TO 1981, CURRENT POPULATION REP., Series P-25, No. 917 Table 1 (1982).



Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 219 of 284

Figure 1 also shows that the percentage of the population fifteen to twenty years of age was relatively high in the early decades of the twentieth century. Why was the age of majority not reduced to eighteen at this time? One possibility is that the substantial swing after 1940 in the proportion of persons fifteen to twenty years old by itself reduced the age of majority to eighteen. Under this hypothesis, the magnitude and speed of the change in the proportion was decisive. A second possibility is that the relatively large percentage of fifteen to twenty year olds in the population during the second half of the twentieth century (rather than the volatility of the percentage) acted in conjunction with one or more other factors that were present at the time—factors that did not exist or were not adequate in strength at the start of the twentieth century. According to the second hypothesis, the level of the percentage, and not its change, was critical, but the level of the percentage was unable by itself to alter the age of majority; the presence of some other factor(s) was required. A third possibility, of course, is that the reduction of the age of majority to eighteen in the 1970s was the product of both the large pre-reduction swing in the relative size of the age group fifteen to twenty years old and at least one additional factor. Under the last hypothesis, the change in, and not the level of, the relative size of the age group combined with one or more other factors to lower the age of majority. Since social phenomena are typically complex, the second and third alternatives are more plausible than the first. Thus, the age structure of the population probably did not act alone to reduce the age of majority in the 1970s.

What else may have been at work? One possible factor was the transformation that occurred during the twentieth century in the traits that American parents wanted to inculcate in their children. Specifically, inde-

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

pendence increased and obedience decreased as characteristics desired for children, and both changes were sizeable.[41] These changes may have stemmed from the large, complex, and expanding body of knowledge found in the United States, because individualism and personal autonomy become more prevalent when knowledge grows or reaches a certain threshold.[42] A lower age of majority is, of course, consistent with a societal emphasis on independence for youth, while a higher age of majority can be expected a priori in a social system that stresses obedience to authority.[43]

By way of conclusion, the reduction of the age of majority that occurred during the first half of the 1970s should be regarded as a means by which American society, through its law, adjusted to an important group. The assimilation of large, distinct groups—a process that probably happens in most social systems—has long been significant in the United States, even during the nineteenth century.[44] At the start of the twentieth century, immigration into the United States was appreciable, and a large part of the immigrant stream originated in central, eastern, and southern Europe.[45] Adaptation to and the assimilation of groups that did not share the culture of northwestern Europe—the dominant culture of the United States—were essential to the effective operation of the American social system. By the 1970s, on the other hand, cultural diversity was no longer a major problem for American society,[46] but the baby boom after World War II had created another substantial group, defined by age rather than culture, to which the social order needed to adjust if it was to avoid disruption. One means employed in the adjustment process was to lower the age of majority to eighteen. Law setting the age of majority was thus a societal device to facilitate a macrosociological process.

---

41. Duane F. Alwin, *From Obedience to Autonomy: Changes in Traits Desired in Children, 1924-1978*, 52 PUB. OPINION Q. 33, 43 (1988).

42. BARNETT, *supra* note 11, at 22-23.

43. It is probably not coincidence that, prior to the reduction during the 1970s in the age of majority established by law, loyalty to religion also became less important in the values that American parents had for their children. *See* Alwin, *supra* note 41, at 43.

44. *See* OSCAR HANDLIN, IMMIGRATION AS A FACTOR IN AMERICAN HISTORY 1-3 (1959).

45. U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES, 10 Table 5 (118th ed. 1998), *available at* http://www.census.gov/prod/www/abs/statab.html; U.S. BUREAU OF THE CENSUS, HISTORICAL STATISTICS OF THE UNITED STATES: COLONIAL TIMES TO 1970, PART I, 105-09 (Series C 89-119) (1975), *available at* http://www.census.gov/prod/www/abs/statab.html [hereinafter HISTORICAL STATISTICS].

46. *See* Campbell Gibson & Emily Lennon, *Historical Census Statistics on the Foreign-Born Population of the United States: 1850 to 1900*, Table 1 (U.S. Census Bureau, Population Division Working Paper No. 29, 1999), *available at* http://www.census.gov/population/www/documentation/twps0029/twps0029.html (showing that foreign-born persons comprised no less than 13.2% of the U.S. population between 1860 and 1920 but were just 4.7% of the population in 1970).

## II. KNOWLEDGE AS A SOCIETAL PROPERTY

If the sociology of law is to advance, change in law must be studied both when it happens quickly and when it happens slowly. Sudden transformations in doctrines of law may on the surface seem more important than gradual transformations because abrupt transformations are more salient. Sudden transformations are attractive topics additionally because their triggers may be easy to identify. However, inasmuch as prediction is a central goal of the scientific enterprise, abrupt shifts in law can complicate the task of social science. Two types of situations are pertinent in this regard. First, rapid shifts in law can stem from massive but aperiodic events such as natural disasters. These events are likely to prove difficult to anticipate far in advance, and the changes in law they generate, therefore, cannot readily be predicted. Second, doctrines of law can be modified suddenly by forces that develop gradually and that have their effects when thresholds are reached. The second route to abrupt change in law is probably much more common than the first, and the changes this route generates are especially hard to anticipate because there may be more than one point at which slowly building pressure will precipitate new doctrines in law. Multiple thresholds will exist when different combinations of societal properties and their interactions transform law, and multiple thresholds probably exist in every complex society.

Regardless of the speed with which novel doctrines of law arise, the properties of a social system and the forces that affect these properties must be the focus of attention if the doctrines are to be understood and their emergence is to be predicted. In a macrosociological framework, the individuals in the system—including those who participate in law-making bodies such as legislatures, agencies of the executive branch, and courts—do not account for the content of law. Rather, pervasive forces that mold the characteristics of the social system determine the decisions of these individuals with regard to the content of law,[47] and explanations of law that are based on personalities, even personalities of prominence and charisma, treat the institution of law superficially. The character of society and the substance of its law are not formed by individuals, but by large-scale forces that operate through the actions of individuals.

In this part of the Article, I will focus on one such force that I believe shaped the social order and doctrines of law in the United States during the twentieth century and that can be expected to remain a potent influence on

47. Larry D. Barnett, *Law as Symbol: Appearances in the Regulation of Investment Advisers and Attorneys*, CLEV. ST. L. REV. (forthcoming 2007) (contending that in the long run the properties of society and the forces that mold these properities control the doctrines of law). I am not implying that history is governed by a master plan and moves in a preordained direction; my contention is only that certain factors precede societal change and the new concepts and doctrines of law that are generated by such change. *Id.*

U.S. law for the foreseeable future. The role of this force, however, seems not to have been fully appreciated by either social scientists or law-trained scholars. The force is the expansion of knowledge. Undoubtedly, other forces (e.g., increases in population density)[48] influenced the character of American society and the content of its law, but I concentrate on knowledge because I believe that it had, and will continue to have, a major impact on the United States. Perhaps in part because accumulating knowledge shaped social life for so long, its role in the social system has not received the attention it deserves. We simply have become accustomed to improvements in knowledge.

In order to show the degree to which knowledge increased over time, I begin with a quantitative measure of it. Knowledge is difficult to study because it is an abstract concept and must be operationalized. The concept of knowledge is necessarily an abstraction because knowledge assumes different forms (e.g., a chemical compound or mechanical process in manufacturing, a statistical technique for data analysis in science), and in some forms (e.g., mathematics) it is composed entirely of written signs. Being an abstract concept, knowledge is not directly observable and must be measured by its manifestations.

What indicators can be used to determine the magnitude and growth of knowledge? The question does not have an easy answer, because no single indicator or set of indicators seems to be accepted by social scientists[49] even though the amount of knowledge available to Americans is believed to be expanding dramatically.[50] The absence of a generally accepted measure or set of measures is unfortunate. The availability of a relatively simple indicator that correctly gauges the quantity of knowledge, together with long-term data on the indicator, would benefit macrosociological analyses in general and a macrosociological framework for doctrines of law in particular.

Although at present no single indicator adequately depicts the volume and expansion of knowledge in the aggregate, figure 2 shows the annual number of patents that the U.S. Patent and Trademark Office has granted for inventions.[51] In the United States, patents are issued for inventions, for natural plants, and for designs, but of the three, patents for inventions are

---

48. BARNETT, *supra* note 11, at 23-24; Larry D. Barnett, *Population Growth, Population Organization Participants, and the Right of Privacy*, 12 FAM. L.Q. 37, 37 (1978).

49. *See* G. Nigel Gilbert, *Measuring the Growth of Science*, 1 SCIENTOMETRICS 9 (1978); Mumford et al., *supra* note 38, at 175.

50. Graham T.T. Molitor, *Trends and Forecasts for the New Millenium*, FUTURIST 53, 59 (Aug.-Sept. 1998).

51. The data in figure 2 are from U.S. PATENT & TRADEMARK OFFICE, U.S. PATENT ACTIVITY, CALENDAR YEARS 1790 TO THE PRESENT (2005), *available at* http://www.uspto.gov/web/offices /ac/ido/oeip/taf/reports.htm#by_hist.

the most accurate indicator of knowledge since they are awarded for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof," that was not obvious to a person of average skill in the field in which the invention originated.[52] An invention thus constitutes a technological innovation, and since technology employs knowledge, the number of patents granted for inventions over time can serve as an indicator of change in the quantity of accumulated knowledge.

In considering figure 2, the reader should keep in mind that patented inventions represent only one form of knowledge and are just a rough indicator of such knowledge. Patented inventions cannot serve as an accurate indicator of knowledge as a whole for at least two reasons: (1) an addition to knowledge may not be incorporated into a patentable invention; and (2) all patented inventions do not utilize the same amount of knowledge. The two problems are distinct. The first exists because many types of knowledge are not within the term "invention" as defined by law, and hence they cannot be patented. For example, a new measure of sex segregation in occupations[53] is a contribution to knowledge, but it is not patentable. Moreover, even when knowledge generates patented inventions, the quantum of knowledge used is not the same in every invention. To illustrate, less knowledge is probably required to create appliances for the home than to create drugs that treat serious diseases. Unfortunately, neither of the two problems can be corrected at the present time. The first problem could be mitigated by data on copyrights issued for scientific articles and books. However, while copyrights for scientific publications could be employed as an indicator (albeit imperfect) of advances in scientific knowledge,[54] long-term data on these copyrights do not exist. The second problem necessitates a technique to measure the amount of knowledge in an invention, but such a technique has yet to be devised. As a result, time-series data are unavailable on the total amount of knowledge in patented inventions.

---

52. 35 U.S.C. §§ 101, 103(a) (2006).

53. *See generally* Weeden, *supra* note 12 (using a margin-free method to measure sex segregation in occupations in the United States from 1910 to 1990).

54. Publications such as books and articles can be copyrighted only if they are original. MARSHALL LEAFFER, UNDERSTANDING COPYRIGHT LAW § 2.07 (4th ed. 2005). Copyrighted publications in science, therefore, represent contributions to scientific principles and/or concepts.

Figure 2 shows a secular rise in the number of patents granted for inventions. However, even during the periods when the number declined, knowledge continued to accumulate; the gains in knowledge simply were less in these periods than in the years that preceded them. Moreover, the intervals of decline in patent issuance are brief when viewed historically, and the discovery process is cumulative, i.e., the inventions in one year build on inventions (knowledge) from earlier years. For the last two centuries, then, knowledge expanded in the United States. Notably, the pace of the expansion accelerated starting in the mid-1980s, which may reflect developments in computer hardware and software.

A sustained increase in knowledge is likely to generate broad changes in the character of society,[55] and the changes resulting from this increase probably include two that are critical to understanding the content and evolution of law. The first is an increase in economic wealth. All else remaining constant, advances in knowledge add to the wealth of a society by augmenting economic productivity and permitting more efficient and/or more complete exploitation of natural resources. Wealth, in turn, allows individuals to pursue and fulfill their personal goals, i.e., wealth promotes secular individualism.[56] The second likely change is an increase in rationality. The progress of knowledge encourages rationality in part by producing a

55. *See* Patrick Nolan & Gerhard Lenski, *Technology, Ideology, and Societal Development*, 39 SOC. PERSP. 23, 33 (1996) (finding with cross-sectional data that, compared to ideology, improvements in subsistence technology had a larger effect on societies).

56. Ron Lesthaeghe, *A Century of Demographic and Cultural Change in Western Europe: An Exploration of Underlying Dimensions*, 9 POPULATION & DEV. REV. 411, 429-30 (1983).

greater understanding of events and experiences; comprehension, in turn, fosters reason. Additionally, the progress of knowledge increases rationality by enlarging the portion of the labor force that works with information[57] and that thus relies on intellectual rather than physical skills. Concomitantly, the progress of knowledge enlarges the number of jobs that are self-directed, i.e., that involve complex, non-methodical tasks and that are not subject to close supervision.[58] In short, occupations concerned with information and characterized by self-direction encompass more people as knowledge advances, and they enhance analytical abilities, i.e., reasoning, in every facet of life.[59] The U.S. commitment to scientific research has thus had widespread effects on American society.[60]

Assuming that the growth of knowledge reshapes society, in what ways did expanding knowledge alter doctrines of law in the United States during the twentieth century? The growth of knowledge undoubtedly had multiple effects, but this Article will suggest just one. Specifically, greater rationality, a consequence of knowledge growth, probably created and intensified expectations that expertise, rather than characteristics irrelevant to occupational skill and performance, would be the basis for employment-related

---

57. *See* Clifford I. Nass, Society as Computer: The Structure and Skill of Information Work in the United States, 1900-1980, 92, 94 (Oct. 1986) (unpublished Ph.D. dissertation, Princeton University) (on file with Widener University School of Law Delaware Campus Library) (finding that between 1900 and 1980 the proportion of the U.S. labor force in occupations dealing with information rose by 5.5% per decade, and that in 1980 two out of five workers were engaged in these occupations).

58. MELVIN L. KOHN & KAZIMIERZ M. SLOMCZYNSKI, SOCIAL STRUCTURE AND SELF-DIRECTION 108 (1990).

59. *See* Nass, *supra* note 57, at 204 (identifying information as the primary substance of nonmanual occupations, not of manual occupations); *see also* Melvin L. Kohn & Carrie Schoenbach, *Class, Stratification, and Psychological Functioning*, *in* WORK AND PERSONALITY 154, 185 (Melvin L. Kohn & Carmi Schooler eds., 1983) (finding that nonmanual occupations, including white-collar workers, have a higher level of self-direction than manual, i.e., blue-collar, occupations). Additions to knowledge thus seriatim enlarge the number of nonmanual positions in an economy, increase intellectual autonomy and flexibility, and heighten reasoning. *Cf.* Melvin L. Kohn & Carmi Schooler, *Job Conditions and Personality: A Longitudinal Assessment of Their Reciprocal Effects*, *in* WORK AND PERSONALITY 125, 147 (Melvin L. Kohn & Carmi Schooler eds., 1983) (finding that self-direction in an occupation is associated with reduced authoritarianism and ideational conformity); KOHN & SLOMCZYNSKI, *supra* note 58, at 235 (finding that self-direction in work produces more intellectual flexibility and a less-conformist orientation to society). *See generally* KOHN & SCHOENBACH, *supra*, at 154 (exploring the impact of occupational self-direction and social stratification on values, orientations, and cognitive functioning).

60. *See* Kenneth C. Land & Fred C. Pampel, *Indicators and Models of Changes in the American Occupational System, 1947-73*, 4 SOC. INDICATORS RES. 1, 18-19 (1977) (finding that expenditures on science raised the mean prestige of the occupational structure in the United States between 1950 and 1973). Because professional and other white-collar occupations are highest in prestige, advances in science and hence in knowledge, which presumably resulted in part from expenditures on science, increased the prevalence of these occupations. By definition, a profession possesses a substantial quantity of complex knowledge. *See* Barnett, *supra* note 1, at 177 (identifying a large body of abstract concepts and complex principles as one of five attributes presently fundamental to the existence of a profession in the United States).

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

decisions. Evidence that such change in expectations occurred with regard to gender is the declining sex differential in compensation since the early part of the twentieth century: the disparity between American women and men in skill levels due to work experience decreased with the passage of time, and the average pay of women rose more rapidly than the average pay of men.[61] Indeed, the gains of women in the United States seem to be a manifestation of an apparently universal phenomenon, for economic development—a process in which new knowledge is introduced and utilized in an economy[62]—has been found to augment the presence of women in information-based, self-directed occupations in numerous countries.[63] One of the attributes of these occupations is higher income.[64]

Advancing knowledge, in short, enlarges the number of jobs that require intellectual skill rather than physical strength, and it produces, or at least facilitates, pressure on employers to focus their personnel practices on job skills rather than on demographic attributes. In the United States, rationality seems to have become sufficiently pervasive and intense to generate statutes that authorized the imposition of penalties on employers that use demographic characteristics such as age, race, and sex in decisions regarding current employees and applicants for employment. Antidiscrimination statutes represent one of the striking innovations in law during the last half of the twentieth century, and because they illustrate—though by no means exhaust—the doctrines of law produced by advancing knowledge, I review below the antidiscrimination statutes at the federal level that dealt with employment.[65]

I begin with a statute enacted by Congress in 1870 that prohibits race discrimination in contracts and that has been applied to employment contracts.[66] The statute originally was aimed at slavery and associated conditions,[67] and it was extended to employment only in the 1970s.[68] Insofar as it is concerned with job discrimination, therefore, the statute is a creation of

---

61. *See* James P. Smith & Michael Ward, *Women in the Labor Market and in the Family*, 3 J. ECON. PERSP. 9, 10-11 (1989).

62. *Cf.* Eric A. Hanushek & Dongwook Kim, Schooling, Labor Force Quality, and Economic Growth 34 (Working Paper 5399, Nat'l Bureau of Economic Research 1995) (finding that national rates of economic growth rise with the level of student mastery of mathematics and science).

63. Roger Clark, *Contrasting Perspectives on Women's Access to Prestigious Occupations: A Cross-National Investigation*, 72 SOC. SCI. Q. 20, 28-29 (1991).

64. KOHN & SLOMCZYNSKI, *supra* note 58, at 133.

65. I confine myself to federal law, and exclude state law, because my focus is on the stock of knowledge of the nation as a whole. A macrosociological framework, however, is applicable at the state level. Thus, variations between states in knowledge growth and use can be expected to create differences in the content of state law.

66. Act of May 31, 1870, ch. 114, § 16, 16 Stat. 144 (codified at 42 U.S.C. § 1981 (2006)).

67. *See* Long v. Ford Motor Co., 496 F.2d 500, 504 (6th Cir. 1974).

68. *See* Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 459-60 & n.6 (1975).

the last part of the twentieth century.

The Equal Pay Act of 1963 was the first federal statute explicitly fashioned to combat employment discrimination.[69] The Act requires that, except when differential compensation is attributable to certain specified factors (e.g., a seniority program), women and men in the same establishment must receive identical compensation for work that is "equal," that demands "equal skill, effort, and responsibility," and that occurs under "similar working conditions."[70] Congress directed the Equal Pay Act at the "ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same."[71] It is notable, however, that this belief had already been abandoned by Americans: in a 1954 national survey, fully eighty-seven percent of respondents approved, and just thirteen percent disapproved, of equal compensation for male and female employees with the same occupational duties.[72]

While the Equal Pay Act of 1963 is confined to gender and covers only compensation, the Civil Rights Act of 1964 includes a provision (Title VII) that bans discrimination involving "race, color, religion, sex, or national origin" in all facets of employment.[73] The aim of Title VII is to require employers, labor organizations, and employment agencies to base employment decisions on job-related qualifications and to eliminate from these decisions groundless stereotypes that have been maintained by social inertia. In addition, Title VII renders reliance on statistical differences between groups impermissible in employment decisions without a compelling justification. For example, employment decisions cannot be based on the statistically demonstrable fact that women with minor children more often have primary responsibility for child care than men with minor children.[74] "Title VII prohibits the use of popular stereotypes or even statistical data to attribute general group characteristics to each individual member of the group."[75] Under Title VII, potential and current employees must be evalu-

---

69. 29 U.S.C. § 206(d) (2006).

70. *See* Equal Pay Act of 1963, Pub. L. No. 88-38, 77 Stat. 56 (1963) (covering employees who are, or whose employers are, "engaged in commerce or in the production of goods for commerce"). The Act was in force as of 1964. § 4, 77 Stat. 57.

71. S. REP. NO. 88-176, at 1 (1963).

72. 2 GEORGE H. GALLUP, THE GALLUP POLL: PUBLIC OPINION 1935-1971, at 1240 (William P. Hansen & Fred L. Israel eds., 1972).

73. Pub. L. No. 88-352, 78 Stat. 241, 253-66 (1964) (codified at 42 U.S.C. §§ 2000e to 2000e-15 (2006)). The Civil Rights Act was in force as of 1965. § 716, 78 Stat. 266. The Act applied to employers having an impact on interstate commerce and a minimum of twenty-five employees each working day during at least twenty calendar weeks in either the current or the preceding calendar year. § 701, 78 Stat. 253. The Act also prohibited labor organizations and employment agencies from discriminating. § 703, 78 Stat. 255.

74. *See* Phillips v. Martin Marietta Corp., 400 U.S. 542, 543 (1971) (per curiam).

75. Mitchell v. Mid-Continent Spring Co., 583 F.2d 275, 281 (6th Cir. 1978) (internal quotation marks omitted), *cert. denied*, 441 U.S. 922 (1979).

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

ated individually using criteria that are pertinent to job performance.

Because it encompassed the entire employment relationship and multiple demographic attributes and also established a governmental agency (the Equal Employment Opportunity Commission) to deal with discrimination covered by Title VII,[76] the Civil Rights Act of 1964 has been the most prominent federal legislation to date on employment discrimination. The Civil Rights Act of 1964 did not, however, include all demographic characteristics important to the structure of American society. In particular, it did not cover age, an omission that Congress eliminated three years after enactment of Title VII when it adopted legislation to prohibit discrimination in employment against persons forty to sixty-five years old. Like Title VII, the Age Discrimination in Employment Act of 1967 ("ADEA") extends to all aspects of employment, with exceptions for some types of employers,[77] and was designed to suppress "inaccurate and stigmatizing stereotypes" about age.[78] Under both statutes, decisions that affect employment must rely on factors relevant to job performance and on evaluations of individuals in terms of these factors.

The next, and last, major federal statute on employment discrimination was adopted more than two decades later. In 1990, Congress approved the Americans with Disabilities Act ("ADA") in order to prevent employers, labor organizations, and employment agencies from engaging in unwarranted discrimination against persons who have, or who are thought to have, physical or psychological disabilities.[79] Like other legislation dealing with employment discrimination, the ADA was designed to require that job-related decisions be based on the qualifications of current and potential employees, and it reflected the dissatisfaction of society with preconceptions that preclude evaluations of individuals in terms of these qualifications.[80] In enacting the ADA, "Congress acknowledged that society's ac-

---

76. *See* Pub. L. No. 88-352, §§ 705-709, 78 Stat. 241, 258 (1964).

77. *See* Pub. L. No. 90-202, 81 Stat. 602 (1967) (codified at 29 U.S.C. § 623 (2006)). The ADEA was in force as of 1968 and banned age discrimination by employers, employment agencies, and labor organizations. *Id.* The term "employer" has identical definitions in the ADEA and in Title VII but somewhat different exceptions. Although the ADEA originally did not cover persons who were older than sixty-four, a maximum age was subsequently removed for all but a few occupations. Pub. L. No. 95-256, § 3, 92 Stat. 189 (1978); Pub. L. No. 99-592, §§ 2-3, 100 Stat. 3342 (1986).

78. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610-11 (1993).

79. Pub. L. No. 101-336, 104 Stat. 327 (1990) (codified at 42 U.S.C. §§ 12101-17 (2006)). The ADA, which was in force as of 1992, covered the disabled individual, i.e., one who possesses "a physical or mental impairment that substantially limits one or more of the major life activities . . . or [who is] regarded as having such an impairment." *Id.* Employers were subject to the ADA, with some exceptions, if they had an impact on interstate commerce and a minimum of fifteen employees each working day during at least twenty calendar weeks in either the present or the prior calendar year. *Id.* §§ 3(2), 101(5), 108.

80. In 1977, i.e., thirteen years before the ADA, a national sample of adults in the United States was asked whether the government should enact legislation designed to

cumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment."[81]

The four statutes described above—the Equal Pay Act of 1963, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and the Americans with Disabilities Act of 1990—comprise the main innovations in federal public policy concerned with employment discrimination in the United States and serve as the central tools of the institution of law at the national level for promoting social and economic justice in employment. Indicative of the importance of these statutes to American society is that the number of employers subject to the statutes has generally been expanded over time.[82] Of particular relevance to a macrosociological framework is that the four statutes, as well as related federal legislation,[83] confer an identifiable character on the period from 1963 to 1990. By differentiating the period, the statutes form a unitary sociological phenomenon, and their enactment is presumptively not fortuitous.

In conclusion, novel doctrines are a core concern in a macrosociological approach to law, and an especially important macrosociological topic is any novel doctrine that several major pieces of legislation incorporate. Part II of this Article has focused on the impact of a growing stock of knowledge and has linked this factor to a salient development in recent law in the United States—federal antidiscrimination legislation. However, if the properties of a society have effects that are broad and fundamental, the substantial increase in knowledge is likely to have been responsible for new doctrines of law on a variety of subjects. In Part III below, I present evidence that additions to knowledge reshaped law on abortion by increasing the prevalence and lengthening the duration of schooling among young women.[84]

---

ensure equal job rights for individuals who are physically handicapped. Four out of five respondents endorsed the enactment of such legislation. CBS NEWS & NY TIMES, July 19-25, 1977, accession no. 20297, *available at* LEXIS, RPOLL File.

81. Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999).

82. *See, e.g.*, Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 2, 86 Stat. 103 (1972); Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 28, 88 Stat. 55, 74 (1974); Congressional Accountability Act of 1995, Pub. L. No. 104-1, 109 Stat. 3 (1995).

83. *See, e.g.*, Rehabilitation Act of 1973, Pub. L. No. 93-112, § 504, 87 Stat. 355, 394 (1973).

84. *See* Richard Rubinson & John Ralph, *Technical Change and the Expansion of Schooling in the United States, 1890-1970*, 57 SOC. EDUC. 134 (1984) (finding that advances in technology boosted enrollments in primary and secondary schools in the United States). However, Professors Rubinson and Ralph did not investigate whether advances in technology affected the likelihood of attending college. A study of four countries in Western Europe concluded that economic development between 1900 and 1985 increased the rate at which women enrolled in institutions of higher education. Joan Mary Hermsen, Gendering Higher Education Expansion: Explaining the Growth in Women's University Enrollment Rates in Britain, France, Germany, and Italy During the Twentieth Century 41, 49, 111-12 (1997) (unpublished Ph.D. dissertation, University of Maryland at College Park) (on file with author). Economic development requires the application of knowledge. Because economic development promoted

## III. LAW AND ABORTION IN THE UNITED STATES

Because law on abortion underwent a transformation during a relatively short period in the United States, the subject of abortion affords an opportunity not only to identify societal properties and forces shaping law but also to call attention to an important point in the macrosociological thesis that I am advancing. If the concepts and principles that dominate law are attributable to the society in which they are embedded, the distinction between branches of government—the legislature, the executive branch, and the judiciary—is not of major importance, and prevailing doctrines of law do not depend on whether they are in statutes enacted by legislatures, in regulations issued by administrative agencies, or in decisions rendered by judicial bodies. In a macrosociological perspective, broad forces that determine the properties of society shape the governing doctrines of law, and the doctrines respond in the long run to these forces/properties in a manner that protects the equilibrium of the society and maintains, or increases, commitment to the society on the part of its participants. One of the branches of government will supply a doctrine of law that a society needs, because a society is a system and because law is a component that contributes to the system. Thus, merely identifying the branch of government that produces a given doctrine is insufficient for understanding why the doctrine exists. An inquiry of greater depth is necessary. The branches of government form a dependent, not an independent, variable in my framework, and the branch that happens to originate a particular doctrine is a fact requiring an explanation, not a fact providing one.[85]

In asserting that the branch of government from which any particular doctrine emanates cannot explain the content and evolution of law, I am implicitly challenging at least one widely accepted belief, namely, that the political process is an important factor determining doctrines of law. I reject this assumption at the same time I concede that politics is a precursor of law. The role of politics differs across the branches of government—a difference that is particularly apparent between the judicial branch, where politics operates through the appointment and election of judges, and the legislative and executive branches, where politics operates not just through the election of officeholders but also through lobbying efforts directed at them. In my framework, however, political activity is merely the vehicle by which societal needs and values shape doctrines of law, and political analyses—despite their popularity—are not useful for understanding either

---

college attendance in four European nations, it also is likely to have done so in the United States.

85. Barnett, *supra* note 11, at 168 (suggesting that: (1) that the branches of government are mechanisms acting in response to their social environment; and (2) that, to be useful, a theory focusing on doctrines in law must explain why one branch reacts rather than another).

why certain concepts and principles of law are dominant in a society at a given point in time or why such concepts and principles change over time. The political process in a viable social system, I contend, primarily functions to communicate the requirements of society to the institution of law. Thus, social science research has found that the expenditure patterns and legislative subjects of government are not affected materially by whether the persons comprising the governing elite are replaced or retained.[86] Societal imperatives, not political considerations, drive the domestic policies of government.

The preceding points are pertinent to law governing the use of abortion, and I therefore turn to a review of the change that occurred in this law during the late 1960s and early 1970s.

### *A. Change in Law Regulating Abortion, 1967-1973*

*Roe v. Wade*,[87] the January 1973 decision of the U.S. Supreme Court that held unconstitutional government action intended to impose severe restrictions on access to abortion, has been regarded not just as a milestone in the rights that law accords women,[88] but more broadly as a landmark in the history of constitutional interpretation.[89] The salience of *Roe*, however, diverts attention from an important forerunner that occurred at the state level. Specifically, in the years immediately preceding *Roe*, many states, either through legislation or court decision, substantially liberalized their law on access to therapeutic abortion. The liberalization of state law began in 1967, and by 1972, sixteen states in the coterminous United States had appreciably relaxed the conditions under which women were allowed to terminate pregnancies lawfully.[90] While not all of the states that revised their

---

86. Gregory G. Brunk & Thomas G. Minehart, *How Important Is Elite Turnover to Policy Change?*, 28 AM. J. POL. SCI. 559, 568 (1984); David J. Falcone, *Legislative Change and Policy Change: A Deviant Case Analysis of the Canadian House of Commons*, 41 J. POL. 611, 632 (1979); Harold Wolman et al., *Does Changing Mayors Matter?*, 58 J. POL. 201, 219-21 (1996).

87. Roe v. Wade, 410 U.S. 113 (1973).

88. Amy S. Cleghorn, Comment, *Justice Harry A. Blackmun: A Retrospective Consideration of the Justice's Role in the Emancipation of Women*, 25 SETON HALL L. REV. 1176, 1189 (1995) (describing *Roe as* "the first victory cry for women in the fight to claim emotional and legal independence in a male-dominated world")

89. The U.S. Supreme Court regards *Roe v. Wade* as one of its most socially significant decisions during the last half of the twentieth century. In 1992, the Court described *Roe* as "a watershed decision" and added that *Roe*

> calls the contending sides of a national controversy to end their national division by accepting a common mandate rooted in the Constitution.
> The Court is not asked to do this very often, having thus addressed the Nation only twice in our lifetime, in the decisions of *Brown* [*v. Board of Education* holding unconstitutional purposeful racial segregation in public schools] and *Roe*.

Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 867 (1992).

90. Fifteen of the sixteen states appreciably eased their restrictions on the use of

therapeutic abortion through legislation. The fifteen states were Arkansas, California, Colorado, Delaware, Florida, Georgia, Kansas, Maryland, New Mexico, New York, North Carolina, Oregon, South Carolina, Virginia, and Washington. In Washington, the legislation was drafted by the legislature, but by its terms, the legislation could become law only after it was approved by the voters in a general election. Jon F. Merz et al., *A Review of Abortion Policy: Legality, Medicaid Funding, and Parental Involvement, 1967-1994*, 17 WOMEN'S RIGHTS L. REP. 1 (1995). The pertinent session laws were: Act of Feb. 17, 1969, § 2, 1969 Ark. Acts 177-78; Act of June 15, 1967, ch. 327, 1967 Cal. Stat. 1521; Act of Apr. 25, 1967, ch. 190, 1967 Colo. Sess. Laws 284; Act of June 17, 1969, ch. 145, 57 Del. Laws 409; Act of Apr. 12, 1972, ch. 72-196, 1972 Fla. Laws 608; Act of Apr. 10, 1968, ch. 26-12, 1968 Ga. Laws 1277; Act of Apr. 23, 1969, ch. 180, § 21-3407, 1969 Kan. Sess. Laws 452; Act of May 7, 1968, ch. 470, 1968 Md. Laws 870; Act of Mar. 21, 1969, ch. 67, 1969 N.M. Laws 225; Act of Apr. 11, 1970, ch. 127, 1970 N.Y. Laws 852; Act of May 9, 1967, ch. 367, 1967 N.C. Sess. Laws 394; Act of June 16, 1969, ch. 684, 1969 Or. Laws 1782; Act of Jan. 29, 1970, No. 821, 1970 S.C. Acts 1892; Act of Apr. 4, 1970, ch. 508, 1970 Va. Acts 1101; Act of Feb. 4, 1970, ch. 3, 1970 Wash. Sess. Laws 23. The Washington legislation was approved in an election held on November 3, 1970. Wash. Rev. Code §§ 9.02.060, 9.02.070 (1977).

The sixteenth state that expanded access to therapeutic abortion prior to *Roe* was Vermont, which did so through judicial decision. Specifically, in January 1972, the Supreme Court of Vermont held unconstitutional a state statute that subjected a person who performed an abortion to imprisonment unless the pregnancy threatened the life of the woman; the statute expressly exempted from punishment the woman whose pregnancy was aborted. Beecham v. Leahy, 287 A.2d 836, 840 (Vt. 1972). Following *Beecham*, a pregnancy could be terminated lawfully in Vermont for any reason before the fetus was capable of moving in the uterus, i.e., prior to quickening. *Id.* at 839.

Under Mississippi law prior to 1966, a woman could abort a pregnancy only when the pregnancy jeopardized her life. MISS. CODE ANN. § 2223(1) (1942, recompiled 1956). In 1966, Mississippi revised its abortion statute and added rape as a permissible ground for terminating a pregnancy. Act of May 8, 1966, ch. 358, § 1, 1966 Miss. Laws 661; Merz et al., *supra*, at 33. Because the statutory change did not substantially expand access to abortion, the instant study treats Mississippi as a state that did not alter its abortion law before *Roe*.

As the result of state court decisions rendered prior to *Roe*, Massachusetts allowed a pregnancy to be terminated "to preserve the woman's life or physical or mental health." Merz et al., *supra*, at 30. The court decisions conflicted with the state statute on abortion, which did not permit abortion for any reason. MASS. GEN. LAWS ANN. ch. 272, § 19 (1970). The highest court in Massachusetts established the exception for the life or health of the woman at least as early as 1944. Commonwealth v. Wheeler, 53 N.E.2d 4, 5 (Mass. 1944). Because my focus is on the states that eased restrictions on abortion starting in the 1960s, I classify Massachusetts as a jurisdiction that did not liberalize its law. An additional basis for doing so is that the case law of the highest court in Massachusetts during the 1960s is unclear as to whether a serious threat to the mental or physical health of the pregnant woman was necessary to abort a pregnancy lawfully or whether a health threat of any degree justified an abortion. *Compare* Commonwealth v. Brunelle, 171 N.E.2d 850, 852 (Mass. 1961) (requiring that an abortion be based on a reasonable belief that the health of the pregnant woman was placed in "great peril" by her pregnancy and that her health was in danger of "serious impairment" unless the pregnancy was terminated), *with* Kudish v. Bd. of Registration in Med., 248 N.E.2d 264, 266 (Mass. 1969) (citing *Brunelle* and earlier decisions without specifying the degree to which a pregnancy must endanger the health of the pregnant woman to justify an abortion). Massachusetts would have been categorized in the instant study as a state that liberalized its law on abortion prior to *Roe* if it had clearly changed its law to allow an abortion to be performed legally for health reasons without regard to the level of risk that the pregnancy posed. (For the same reasons, the instant study treats Alabama as a state that did not liberalize its law on abortion before *Roe*: its pre-*Roe* statute allowing an abortion for health reasons was enacted in 1951, as indicated in the text accompanying note 178 *infra*, and I could find no evidence that the statute permitted an abortion regardless of the severity of the health risk created by the pregnancy.)

law permitted women to terminate pregnancies as easily as *Roe*, the important point is that a substantial number of states expanded access to abortion before the Court announced *Roe* in 1973. *Roe*, therefore, must be understood to be a part of a movement that had already begun within law to reduce government barriers to therapeutic abortion.

*B. Factors Affecting Decisions by Women to Abort Pregnancies*

To identify the societal properties and forces that are pertinent to law on abortion, I will begin with a review of research conducted by social scientists on variables hypothesized to be possible influences on the decisions of pregnant women whether to abort their pregnancies. The review is based on the assumption that the variables having such an effect on individuals suggest the factors determining the strength of the societal need for access to medically approved methods of terminating pregnancy. Unfortunately, social science research dealing with the antecedents of induced abortion among women is scarce, and none of the existing research employs longitudinal, i.e., time series or panel, data. The absence of longitudinal data seriously limits the conclusions that can be drawn regarding causal relationships, because longitudinal data allow temporal sequences to be studied and are thus more likely than cross-sectional data to identify causes accurately.[91]

The studies I review involved multivariate analyses of data on samples of women in the United States and focused on whether induced abortions

---

In 1970, a three-judge federal district court issued a judgment declaring a Wisconsin statute to be unconstitutional in banning abortions during the first trimester of pregnancy and later issued an injunction against enforcement of the statute. The U.S. Supreme Court declined to rule on the declaratory judgment, but it vacated the injunction of the district court and directed the district court to reconsider the injunction. Babbitz v. McCann, 310 F. Supp. 293 (E.D. Wis. 1970), *appeal dismissed*, 400 U.S. 1 (1970); Babbitz v. McCann, 320 F. Supp. 219 (E.D. Wis. 1970), *vacated*, 402 U.S. 903 (1971). The remand of the case on the issue of the injunction has no subsequent judicial history, but since Wisconsin prosecutors and the Wisconsin judiciary were evidently continuing to enforce the state abortion statute during the appeal of the district court declaratory judgment, enforcement presumably continued until the Supreme Court decided *Roe* in January 1973. *See Babbitz*, 320 F. Supp. at 223 (justifying the injunction because "the state judiciary has failed to discourage the prosecutors from trespassing on the federal rights in question. The reaction of the state authorities to our judgment relegates our ruling to nothing more than a gratuitous, advisory opinion"). Accordingly, I do not consider Wisconsin to be a state that liberalized its abortion law prior to *Roe*.

In 1972, a three-judge federal district court, in a declaratory judgment, ruled unconstitutional the New Jersey statute that imposed criminal penalties on physicians who performed abortions, but the court did not enjoin enforcement of the statute. Young Women's Christian Ass'n v. Kugler, 342 F. Supp. 1048 (D. N.J. 1972), *aff'd*, 463 F.2d 203 (3d Cir. 1972), *cert. denied*, 415 U.S. 989 (1974). Because enforcement of the statute could continue while appellate courts considered the district court ruling, I do not deem New Jersey to be a state that liberalized its abortion law before *Roe*.

91. BARNETT, *supra* note 11, at 5-7; Joanna M. Shepherd, *Deterrence versus Brutalization: Capital Punishment's Differing Impacts Among States*, 104 MICH. L. REV. 203, 213 (2005).

among these women were associated with at least two of the following variables: (1) female employment; (2) female education (years of school completed or present school attendance); and/or (3) female marital status. The decisions made by women whether to end pregnancies by abortion are believed to be based on the costs of childbearing[92] and/or on the manner in which women define their role in society.[93] Because each of the three enumerated variables can affect these costs and reflect sex-role definitions, each variable has the potential to influence the proportion of pregnancies that women seek to avoid through contraception and to terminate through abortion. More precisely, insofar as any of the variables burdens childbearing and/or offers socially acceptable alternatives to childbearing, the variable(s) will enhance the need of the social system for ready access to abortion and for law that endorses such access. As a result, this Article examines social science research on the variables to ascertain if one or more of them influences the likelihood that women will end pregnancies through abortion.

Before turning to these studies, it is worth mentioning that the variables being considered—the employment, education, and marital status of women—possess three important attributes. First, the variables have been the subject of at least one well-designed study, and their effect, if any, on abortion can be ascertained tentatively. Quantitative research of reasonable quality will thus be the basis for decisions regarding which of the variables might create a societal need for a change in law on abortion. Second, reliable annual data on the rate or distribution of each variable in the female population of reproductive age are obtainable for years starting soon after World War II. Since the reform of abortion law in the United States commenced in the last half of the 1960s when some states began to ease their restrictions on abortion, a variable can produce a need for this reform only if its rate or distribution in the population increased during earlier years. Accordingly, the period covered by the data must commence well before the 1960s and, because World War II is a landmark in U.S. history, should ideally begin in the last half of the 1940s or in the early 1950s. Third, data on states from the 1960 census are available for each of the three variables, and these data can be used to identify system-level properties that differentiate the states that liberalized their law on abortion in the late 1960s and early 1970s from the states that did not.

In light of the attention that the abortion issue has attracted in the political arena, it is surprising that few well-designed social science studies with

92. Lawrence B. Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37 PERSP. ON SEXUAL AND REPROD. HEALTH 110, 117 (2005).

93. Steven L. Nock, *The Symbolic Meaning of Childbearing*, 8 J. FAM. ISSUES 373 (1987).

large data sets have been conducted on the factors affecting the likelihood that women who conceive will abort their pregnancies. Indeed, I was able to locate just two such studies. Like all research, the studies have methodological limitations that need to be understood in evaluating their findings. Therefore, I will discuss each study in some detail.

The first study was based on the 1976 cycle of the National Survey of Family Growth ("NSFG").[94] The NSFG sampled females fifteen to forty-four years old who resided in the coterminous United States. A female in this population was eligible for the sample if (i) she was currently or previously married, or (ii) even though she had never married, she had borne a child who was living with her.[95] In imposing these eligibility criteria, however, the sample excluded childless females who had never married. Since females in the latter category (i.e., childless never-married females) comprised most of the women who were undergoing abortions in the mid-1970s,[96] a serious question exists whether the findings of the study can be generalized to all women who experienced a pregnancy at this time.

Because the dependent variable in the study was whether a woman had ever aborted a pregnancy, the study was confined to women who reported they had been pregnant.[97] In examining the dependent variable, the study dichotomized the respondents—respondents who reported having had an abortion were placed in one category and respondents who did not report an abortion were placed in another category.[98] However, subsequent research indicates that many women in the survey did not admit that they had aborted pregnancies. Indeed, married interviewees in the 1976 NSFG are estimated to have revealed just forty-five percent of the abortions they actually obtained.[99] If the misreporting of abortions was not random but systematically associated with certain attributes of women, the findings of the study may misstate whether, how, and/or the degree to which the attributes are linked to the abortion decisions of women.

In terms of the independent variables that are of interest here, education was determined by the NSFG at the time of pregnancy and scaled with a dichotomy that separated (i) women who were still in school from (ii) women who had finished their education or whose educational status was uncertain.[100] Consequently, the study measured school attendance, not

94. Joanne M. Badagliacco, Who Has Abortions: Determinants of Abortion Choice among American Women (1987) (unpublished Ph.D. dissertation, Columbia University) (on file with Widener University School of Law Delaware Campus Library).

95. *Id.* at 33.

96. *Id.* at 38.

97. *Id*. at 54.

98. *Id.* at 56.

99. Elise F. Jones & Jacqueline Darroch Forrest, *Underreporting of Abortion in Surveys of U.S. Women: 1976 to 1988*, 29 DEMOGRAPHY 113, 115 (1992).

100. Badagliacco, *supra* note 94, at 64.

educational attainment. Employment status of respondents was generally unknown for the point in time when respondents became pregnant, but information existed on whether respondents were economically active outside the home when they were interviewed for the NSFG. The study used the latter information for employment, and hence the variable as measured refers to a point subsequent to the occurrence of pregnancy.[101] While the study assumed that the employment status of women was the same at the time of the pregnancy as at the time of the interview, the assumption may have often been inaccurate given the tendency of women in the 1970s to withdraw from the labor force when they carried pregnancies to term.[102] The findings of the study, accordingly, may be incorrect with regard to the relationship between employment and abortion.

The final independent variable of interest was marital status. For this variable, the study grouped women into two categories: (i) those who were married when they became pregnant or ended their pregnancy; and (ii) those who, when they became pregnant or aborted their pregnancy, had never been married, were married but separated or divorced from their husbands, or were widowed. The study deemed women in the first category to be married, and women in the second category to be unmarried.[103] However, the NSFG did not interview, and the second category therefore omits, never-married females who were childless. The exclusion of the latter females prevents the study from comparing women who were married at the time of their pregnancies to all other women and undermines the ability of the study to assess marital status as an explanatory variable.

What did the statistical analysis reveal? As the investigator recognized,[104] the problems characterizing the research design require that considerable caution be exercised in drawing conclusions from the findings. Nevertheless, the findings are plausible and hence noteworthy. With a range of other variables held constant,[105] a relationship emerged between school attendance and abortion use: the probability that a woman would end a pregnancy was higher among females who were attending school than among females who were not.[106] The relationship to abortion use of both employment status and marital status, however, differed between women who were not mothers when they became pregnant and women

---

101. *Id*.

102. GUS HAGGSTROM ET AL., CHANGES IN THE LIFESTYLES OF NEW PARENTS 146 (1984).

103. Badagliacco, *supra* note 94, at 61.

104. *Id*. at 76-77.

105. Among the variables controlled was whether the pregnancy occurred before or after the U.S. Supreme Court decided *Roe v. Wade*. *Id.* at 62, 160.

106. Unless otherwise noted, I base my summary of the findings on the logistic regression equations, not the ordinary least-squares equations, estimated by the investigator. Badagliacco, *supra* note 94, at 158-61.

who were.[107] In terms of employment status, non-mothers were more likely to abort a pregnancy when they were employed, full-time or part-time, than when they were not employed, but among mothers, employment status was unrelated to the probability of abortion. In terms of marital status, non-mothers were not characterized by a relationship between marital status and abortion probability, but mothers were less likely to terminate pregnancies when they were married than when they were not.

Two points emerge from the findings and merit some emphasis. First, school attendance was the sole independent variable that did not interact with another factor; the effects of the other two independent variables were contingent on whether the woman was already a mother when she became pregnant. Consequently, school attendance—and, by implication, educational level—offers particular promise as a factor generating a societal need for abortion. Second, standardized regression coefficients from ordinary least-squares regression indicated that school attendance had by far the strongest effect, as well as the most uniform effect, on the likelihood of aborting a pregnancy.[108]

A second study of the antecedents of abortion use was conducted on the pregnancy outcomes of females who resided in eight states or in New York City and whose pregnancies ended during 1980.[109] The data included information on more than a half-million pregnancies involving women twenty years of age and older, but while an impressively large number of cases could be used to assess the factors influencing pregnancy outcome, the data possessed three limitations that should be noted.

The first limitation of the study is that the dataset covered pregnancy outcomes of the residents of just a few geographic areas and therefore included only a portion of all pregnancies—specifically, only one out of nine pregnancies—that occurred in the United States among women age twenty and older and that had an outcome in 1980.[110] While this sampling fraction is much larger than that found in surveys of large populations, the women included in the data were not chosen randomly from a larger universe, rendering tests of statistical significance inappropriate. Accordingly, judgments are not possible whether relationships found between the independent variables and the dependent variable apply to all American women of reproductive age.

The second limitation of the study is that information was unavailable on

107. *Id.* at 67.

108. *Id.* at 143, 165.

109. Katherine Trent & Eve Powell-Griner, *Differences in Race, Marital Status, and Education Among Women Obtaining Abortions*, 69 SOC. FORCES 1121 (1991).

110. Computed from *id.* at 1126 and from Stephanie J. Ventura et al., *Trends in Pregnancies and Pregnancy Rates, United States, 1980-88*, 41 MONTHLY VITAL STAT. REP., at Table 1 (Nov. 16, 1992), *available* at http://www.cdc.gov/nchs/products/pubs/pubd/mvsr/supp/42-41/42-41.htm.

the employment status of women whose pregnancies were included in the study. Thus, one of the three variables of concern in this Article was omitted from the data analysis undertaken by the study.[111] To the extent that differences in employment are related to differences in the probability of aborting a pregnancy as well as to differences in education and/or marital status, the study may yield inaccurate conclusions. Notably, available research has identified relationships between employment, education, and marital status.[112]

The third limitation is that the data did not include information on spontaneous fetal deaths when gestation length was twenty weeks or less. The omission of data on early spontaneous fetal deaths, the investigators point out, causes the abortion rate to be overstated, but they contend that the omission does not bias their conclusions regarding the impact on abortion use of the explanatory variables that are of interest here. When the variables produce differences between groups in rates of abortion, the investigators argue, the magnitude of the differences will be correctly gauged because rates of early spontaneous fetal mortality are unlikely to differ between these groups.[113] However, if the investigators are mistaken in this regard, their estimates of the impact of the variables on the probability of abortion may be biased, because while fetal deaths were relatively uncommon in 1980,[114] the fetal deaths that were omitted from the data accounted for roughly three out of four such deaths that took place.[115]

In examining the findings of the study, I concentrate on women who were at least twenty years old, because the study combined younger females into a single category that included ages eighteen and nineteen and ages below eighteen.[116] Women who were at least twenty years old were thus the only group studied that had attained adulthood and had acquired

111. In addition to educational attainment and marital status, the following independent variables were included: age, metropolitan versus nonmetropolitan residence, prior number of live births, race, and state of residence. Trent & Powell-Griner, *supra* note 109, at 1126.

112. Among women, educational level and marital status are related to employment status under at least some conditions. Diane H. Felmlee, *A Dynamic Analysis of Women's Employment Exits*, 21 DEMOGRAPHY 171, 178, 180 (1984). In addition, the educational level and the employment status of wives affect the likelihood of marital disruption, suggesting that educational level and employment status of wives are linked to current marital status. Steven Ruggles, *The Rise of Divorce and Separation in the United States, 1880-1990*, 34 DEMOGRAPHY 455, 456, 463 (1997); Scott South & Glenna Spitze, *Determinants of Divorce Over the Marital Life Course*, 51 AM. SOC. REV. 583, 587-88 (1986).

113. Trent & Powell-Griner, *supra* note 109, at 1125.

114. Fetal deaths occurred in just one out of eight pregnancies that ended in 1980. Computed from Ventura et al., *supra* note 110, at Table 2.

115. Computed from U.S. DEP'T OF HEALTH & HUMAN SERVS., VITAL STATISTICS OF THE UNITED STATES: 1980, VOL. IIA, MORTALITY, at Table 3-3 (1985), *available at* http://www.cdc.gov/ nchs/products/pubs/pubd/vsus/1963/1963.htm.

116. Trent & Powell-Griner, *supra* note 109, at Table 2 (reporting the findings).

new rights from the reform of abortion law.[117] In this group, unmarried women had a much higher probability of aborting a pregnancy than currently married women, an effect that was net of differences on the remaining independent variables. The relationship between marital status and abortion was found even among women who were childless; indeed, childless unmarried women were ten times more likely than childless married women to abort a pregnancy. This is contrary to the Badagliacco study, which concluded that marital status did not affect the probability of abortion among childless women.

While marital status exhibited a simple relationship to abortion use, educational attainment did not. As the number of years of schooling increased, so did the likelihood that a pregnancy would end in an abortion, but when the study examined potential interactions, it found that the impact of education varied with the number of previous live births and with marital status. As to number of prior births, a clear difference existed between women who had not borne a child and women who had: the probability of an abortion generally rose with years of schooling for women who were childless, but for women having one or more births, the probability increased only to twelve years of completed schooling and then remained essentially constant. More important, however, is the finding that the effect of education depended on marital status. Among unmarried women, the proportion of pregnancies terminated by abortion rose consistently with education, but among married women, the relationship was ∩ in shape: the probability of abortion increased as the level of completed schooling went from eight or fewer years to twelve years and then fell back to its initial level as the level of completed schooling rose to sixteen or more years.

Let me now attempt to integrate the findings of the two studies. While their results are not conclusive, the studies indicate that abortion use rises with educational attainment and school enrollment and is more common among unmarried women than among married women,[118] but whether abortion is generally and substantially affected by employment is uncertain.[119]

117. Because the study focused on pregnancies having an outcome in 1980, all of the pregnancies in the study occurred after *Roe v. Wade*. *Roe* was applicable to adult women but not to females who were minors. 410 U.S. 113, 165 n.67. The constitutional right of minors to procure an abortion developed after *Roe* and was more circumscribed than the right of adults. Planned Parenthood Ass'n of Kansas City v. Ashcroft, 462 U.S. 476 (1983).

118. Another study that finds unmarried women are more likely to end pregnancies is Kanhaiya Lal Vaidya, Unintended Pregnancy and Abortion in the United States: Evidence from the National Survey of Family Growth, Cycle IV, 1988, at 79, 85 (1995) (unpublished Ph.D. dissertation, Bowling Green State University) (on file with author). However, the study did not include a control for the current educational level, schooling status, or employment status of women. *Id.* at 69-70, 94.

119. Among females who terminated pregnancies in 1987, the age-standardized use of abortion varied less with employment status than with school enrollment or marital status. Stanley K. Henshaw & Jane Silverman, *The Characteristics and Prior Contraceptive Use of U.S. Abortion Patients*, 20 FAM. PLAN. PERSP. 158, 162 (1988).

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

Educational achievement may not possess a linear relationship to the probability of abortion among married women, but it must be kept in mind that unmarried women were by far the chief source of abortions in the United States in the decade-and-a-half that followed *Roe v. Wade*, whether measured by the proportion of pregnancies ended by abortion or by the proportion of females of childbearing age who had an abortion.[120] Among women as a whole, then, a higher level of schooling is associated with a higher likelihood that a woman will terminate a pregnancy.

Before concluding this section, I would like to raise an important, but largely unrecognized and unexplored, methodological issue. The two studies reviewed above focused exclusively on the characteristics of individual women and used these characteristics to estimate the probability that a woman would abort a pregnancy. Neither study, however, examined whether the characteristics of geographic areas that form law-defined jurisdictions such as states are related to jurisdiction-level rates of abortion. For instance, the two studies defined marital status by the marital status of each woman in the sample, and the studies examined whether the marital status of a woman was related to whether she aborted a pregnancy. The studies did not consider whether a relationship existed between the proportion of women who were currently married or unmarried in each state and the percentage of all pregnancies in the state that were aborted. Individual-level attributes and jurisdiction-level attributes are distinctly different types of information, and when studied for their relationship to a state-level measure of abortion use, they may not yield the same conclusions. Unfortunately, while some investigators have attempted to estimate the incidence of abortion from the characteristics of jurisdictions, their research designs have serious limitations.

Future work, then, must address the question whether the antecedents of change in law on abortion are more readily and accurately identified using data on the characteristics of jurisdictions (e.g., states), data on the characteristics of individuals in these jurisdictions, or data on both. From a macrosociological perspective, law as an institution is a component of a social system, and the antecedents of the doctrines of law are expected to stem from the system. Two social science studies using a multivariate statistical technique support the assumption that characteristics of states shape doctrines of state law.[121] The research reported *infra* extends this type of study to the subject of abortion law.

---

120. STANLEY K. HENSHAW & JENNIFER VAN VORT, ABORTION FACTBOOK: READINGS, TRENDS, AND STATE AND LOCAL DATA TO 1988, at 176-77 (1992).

121. Barnett, *supra* note 47; Rich Geddes & Dean Lueck, *The Gains from Self-Ownership and the Expansion of Women's Rights*, 92 AM. ECON. REV. 1079, 1084-90 (2002). A state can be regarded as a system per se or as a subsystem in a larger system, namely, the United States as a society.

### *C. Time-Series Indicators of a National Need for Abortion*

While employment among women may or may not be generally related to the demand for abortion, according to the studies reviewed above, the education and marital status of women are evidently important factors affecting the likelihood that women in the United States will abort their pregnancies. These two variables, therefore, may shape the need for and lawfulness of abortion. Which variable—education or marital status—more accurately predicts abortion use cannot be ascertained from research conducted to date, but each variable seems to have a definite bearing on the probability an individual woman will choose to end a pregnancy, and each variable may thus be an indicator of a system-level determinant of law on abortion.

In light of the above findings with regard to marital status and school enrollment, I consider whether the distribution of marital status and the level of school enrollment among women in the United States changed over time in a manner suggesting that one or both of these variables produced a need for lawfully available abortion prior to the shift in abortion law that occurred from 1967 to 1973.[122] Figure 3 deals with marital status. Specifically, the figure shows, for each year in the time period covered, the percentage of women at age twenty to twenty-four and at age twenty-five to twenty-nine who had not been married; these women are designated "never married." The figure also shows the percentage of women in each of the two age ranges who had been married previously but who were no longer married due to divorce. I confine my attention to unmarried women because they accounted for the vast majority of abortions in the years following *Roe v. Wade*[123] and, presumably, in the years before as well.

For marital status to be a plausible factor creating and heightening a societal need for abortion, the percentage of reproductive-age women who are unmarried, whether from having never married or from divorce, would have had to rise *before* abortion law was reformed. As explained above,

---

122. The U.S. Census Bureau gathered the data on marital status and school enrollment in the Current Population Survey. Although the years before rather than after 1967-1973 determine the possible role of marital status and school enrollment in the need for lawful abortion, the time series I present extends to 1990.

The data on marital status start in 1949 for women twenty to twenty-four years old and in 1957 for women twenty-five to twenty-nine years old; the data are limited to the civilian population in some years but not others. Data on marital status for all years except 1990 are from U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES (71st ed. through the 111th ed.). Data for 1990 are from U.S. BUREAU OF THE CENSUS, MARITAL STATUS AND LIVING ARRANGEMENTS: MARCH 1990, CURRENT POPULATION REPORTS, Series P-20, No. 450 (May 1991), at Table 1. Yearly rates of school enrollment for the civilian noninstitutionalized population are in U.S. Census Bureau, Table A-2: Percentage of the Population 3 Years Old and Over Enrolled in School, by Age, Sex, Race, and Hispanic Origin: October 1947 to 2004, http://www.census.gov/population/www/socdemo/school.html [hereinafter Table A-2].

123. HENSHAW & VAN VORT, *supra* note 120.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 242 of 284

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

648 JOURNAL OF GENDER, SOCIAL POLICY & THE LAW [Vol. 15:4

the principal doctrinal changes in that reform occurred between 1967, when some states began to ease substantially the grounds for a lawful abortion, and 1973, when the Supreme Court decided *Roe v. Wade*.[124] (The two years are marked by vertical lines in figure 3 as well as in figures 4 and 5.) The years from 1967 to 1973 thus constitute the period of abortion law reform, and the years prior to this period are critical to deciding whether marital status produced a societal need to liberalize abortion law.

During the pre-reform period, as is evident from figure 3, the proportion never married and the proportion divorced are essentially stable among women twenty to twenty-four years old and women twenty-five to twenty-nine years old. Distinct movement in these proportions is found only during and/or after the period when reform occurred, and during the reform period (1967-1973), the movements are generally modest. As a consequence, there is no persuasive evidence that change in the prevalence of unmarried women in the population engendered a societal need for the liberalization of abortion law in the 1960s. If there was a need on the part of the social system to relax the grounds for abortion permitted by law, the source of the need evidently lies elsewhere.

Figure 3. Marital Status of Women by Age
Percentage
0
20
40
60
1950
1960
1970
1980
1990
Year
% women age 20-24 never married
% women age 25-29 never married
% women age 20-24 divorced
% women age 25-29 divorced

124. I regard the change in abortion law during this period as a national movement, and hence use data on marital status and school enrollment for the United States as a whole, because a decision of the highest federal court ended the period and because in 1972, thirty-nine percent of the population of the United States resided in the sixteen states whose law was changed from 1967 through 1972 to expand access to abortion. The percentage of the population was calculated from U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES: 1974, at Table 11 (95th ed. 1974), *available at* http://www.census.gov/prod/www/abs/statab1951-1994.htm.

http://digitalcommons.wcl.american.edu/jgspl/vol15/iss4/1 36

ADD0240

I turn now to the rate of school enrollment among women of childbearing age. Figure 4 shows the yearly percentage of adult women in each of four age groups who were enrolled in school (full-time or part-time). Schools of all levels are included in the figure; the data, therefore, cover enrollments in high schools, junior colleges, colleges granting baccalaureate and graduate degrees, and professional schools.

Substantial growth in school enrollment rates among women eighteen to nineteen years old and among women twenty to twenty-one years old characterize most of the time interval covered by figure 4. Notably, the trend commences prior to the period (1967-1973) when abortion doctrine underwent its main change. The trend was present well in advance of this period among women eighteen to nineteen years old, for whom enrollment rates begin in 1947. A rise in enrollment rates prior to the abortion-law liberalization period also is found among women twenty to twenty-one years old, for whom rates begin in 1959. Finally, an increase in enrollment rates among women twenty-two to twenty-four years old and among women twenty-five to twenty-nine years old is evident before this period, although the increase is small in absolute magnitude and does not commence until shortly before the liberalization of abortion law began. (Rates start in 1959 for women twenty-two to twenty-four years old[125] and in 1947 for women twenty-five to twenty-nine years old.) Thus, school enrollment in all of the age groups in the figure—but especially in the two youngest age groups—was changing in a manner that permitted schooling to create a societal need for abortion and promote legalization of the procedure. Indeed, school enrollment rates, by rising before as well as during the time that states significantly eased restrictions on access to abortion, behaved exactly as they would be expected to behave if they were creating and intensifying a need in American society for liberalized abortion doctrine.[126] Accordingly, macrosociological research on law regulating access to abortion must consider the variable.

---

125. TABLE A-2, *supra* note 122 (providing school enrollment rates from 1947 to 1958 for the age category twenty to twenty-four). From 1959 onward, the table separates this age range into two categories, namely, age twenty to twenty-one and age twenty-two to twenty-four. *Id*. The three-year mean percentage of women enrolled in school at age twenty to twenty-four doubled from 3.7% in 1947-1949 to 7.4% in 1956-1958. Calculated from *id*.

126. After the Supreme Court decided *Roe v. Wade*, women eighteen to twenty-nine years old were the source of approximately seven out of ten lawful abortions performed in the United States, and the proportion varied little over time. HENSHAW & VAN VORT, *supra* note 120, at Table 1. Given the consistency of this proportion in the years that followed *Roe*, the same proportion is likely to have prevailed in the years that preceded the ruling. If women eighteen to twenty-nine years old provided most of the pregnancies that were terminated in the period prior to 1967-1973, their rising rate of school enrollment before abortion law underwent liberalization had the ability to spawn and magnify a need for the liberalization.

Finally, I consider female employment. Although a relationship between the employment status of a woman and the probability she will abort a pregnancy has not been established, a relationship between these variables has not been disproved. Social science research to date does not allow a conclusion to be drawn regarding such a relationship, because studies of the relationship are too few in number and suffer from too many limitations. However, a link between female employment and abortion has been posited by theory, and thus such a link is a possibility that cannot be dismissed out of hand. For this reason, I examine the labor force participation rate, i.e., the percentage of individuals in a demographically defined group who currently are employed or are engaged in finding employment.

Figure 5 presents the seasonally adjusted rate of labor force participation among civilian women in each of three age groups, viz., eighteen to nineteen, twenty to twenty-four, and twenty-five to thirty-four.[127] The data in the figure are for the fourth quarter of each year from 1948 through 1990. Labor force participants are persons (i) who are presently working or (ii) who are not working but who are available for work and have sought work during the prior four weeks.[128] Labor force participants who are unemployed—the members of group (ii)—are thus persons who are motivated to work and have an attachment to work; women in this group presumably would view a pregnancy similarly to women who are employed.

---

127. The data in the figure are from the Current Population Survey and are published by the U.S. Bureau of Labor Statistics. U.S. Bureau of Labor Statistics, Current Population Survey, http://www.bls.gov/data/home.htm (last visited May 1, 2007); the data are accessible through the link "Historical Data for the 'A' Tables of the Employment Situation Release."

128. HANDBOOK OF U.S. LABOR STATISTICS 4, 5 (Eva E. Jacobs ed., 8th ed. 2005).

Notably, figure 5 reveals that the labor force participation rate of both women who were twenty to twenty-four years old and women who were twenty-five to thirty-four years old began to increase at least five years in advance of the period of abortion law reform. Among women eighteen to nineteen years old, the labor force participation rate remained relatively flat before 1967, but the absence of change is probably due to the growing school enrollment of women in this age group that is observable in figure 4.

*D. System-level Properties and the Liberalization of State Abortion Law*

Did change involving the role of women in the United States reshape law on abortion between 1967 and 1973 to expand access to the procedure? If law is a macrosociological phenomenon, the properties of society rather than the idiosyncrasies of individuals or the operation of chance determine the concepts and principles that dominate law at any particular point in history. In terms of sex roles, such properties include the level of educational attainment, extent of labor force participation, and distribution of marital status among women in the population. Because the three variables have been the focus of social science theory, their potential to account for the modification of law on abortion in the United States during the period from 1967 to 1973 was considered in figures 3, 4, and 5. In the instant part of this Article, the question whether the three variables contributed to liberalizing abortion law will be addressed with a different type of quantitative data and a different approach to analyzing the data.

The study that I report below involved the application of maximum-likelihood logistic regression—a statistical technique that is being used in-

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

creasingly in social science research[129]—to state-level data from the 1960 census on a number of "independent" variables, i.e., variables that are to be tested for their ability to account for the phenomenon that is to be explained. In the instant study, the phenomenon to be explained (i.e., the dependent variable) was whether states liberalized their law on abortion in the 1967-1972 period, and the independent variables were the income, educational attainment, labor force participation, and marital status of women who resided in each state in 1960. The age categories of women used for the independent variables were largely dictated by the age categories for which the Census Bureau reported data. All of the forty-eight states in the coterminous United States were included in the study.[130]

The independent variable measuring the income of women was used in the regression equation on the assumption that, as their personal income rises, women possess not only the economic resources required to abort pregnancies but, in addition, an economic incentive to do so because child-rearing will compete with other activities for at least some of their income.[131] A macrosociological perspective suggests that a social system will eventually permit and endorse the solutions wanted by its members for serious problems they are experiencing. With increases in the income of women, accordingly, a social system becomes more likely to accept a solution (e.g., abortion) sought by its female members to a problem (e.g., unwanted pregnancy) that solely or disproportionately affects them.

In terms of problems faced by women, pregnancy was evidently creating social and economic difficulties for many women when states began to liberalize their statutes on abortion, because during 1960-1965, women in the United States did not want a substantial proportion of their pregnancies.[132]

---

129. DAVID W. HOSMER & STANLEY LEMESHOW, APPLIED LOGISTIC REGRESSION ix (2d ed. 2000).

130. Alaska and Hawaii were omitted from the data in order to exclude the possibility that their law on abortion was influenced by factors different from and/or additional to the factors operating in the coterminous states. If such factors were present in Alaska and/or Hawaii, the inclusion of the two states could have affected the findings from the data analysis. The possibility exists that Alaska and Hawaii were subject to different and/or additional factors because both states are geographically distant from the coterminous states and had become states just the year before the 1960 census. *See supra* note 32.

131. *See generally* Marshall H. Medoff, *Constituencies, Ideology, and the Demand for Abortion Legislation*, 60 PUB. CHOICE 185, 186 (1989). The proportion of pregnancies aborted has been found to rise with the family income of women. Badagliacco, *supra* note 94, at 64, 165.

132. Women who bore children during 1960-1965 indicated that approximately one out of five of their births was unwanted and would not have been wanted under any circumstances. The pregnancies resulting in an additional two out of five births were regarded by the women involved as occurring earlier than they desired. Larry Bumpass & Charles F. Westoff, *The Perfect Contraceptive Population*, 169 SCI. 1177, 1178-80 (1970). Because the preceding proportions refer to *births* and because an unknown number of pregnancies in this time period did not end in births due to miscarriage or induced abortion, the proportion of births that were unwanted was lower than the proportion of pregnancies that were unwanted.

Notably, in the third quarter of the twentieth century, the birth and rearing of children reduced employment among women in the United States[133] and thus interfered with women's career goals. Moreover, much of the status difference between female and male sex roles, as indicated by the extent of sex segregation in occupations during the twentieth century, had been erased before the liberalization of state abortion law started.[134] In the context of reduced sex-role inequality, the likelihood that women would seek to eliminate unwanted pregnancies would rise with their personal income, because income supplies the financial resources and incentives to terminate pregnancies. The income of women, consequently, is a potentially important variable in the reform of abortion law.

As its measure of income, the instant study used the median number of dollars of income in 1959 received by women twenty-five to thirty-four years old who had income in that year.[135] While income at age twenty-five to twenty-nine might have been preferable to income at age twenty-five to thirty-four, income at age twenty-five to thirty-four was utilized because the U.S. Bureau of the Census did not report income by state for age twenty-five to twenty-nine separately. Instead, in publishing state data on income from the 1960 census, the Bureau combined age twenty-five to twenty-nine with age thirty to thirty-four and placed the two five-year age ranges into a single ten-year age range, i.e., twenty-five to thirty-four. State-level data on income were reported for the five-year age range twenty to twenty-four. However, age twenty-five to thirty-four was deemed more appropriate for the measure of income, because many women in the twenty to twenty-four age range, but few women in the twenty-five to thirty-four age range, were still in school in 1960.[136] School enrollment, of course, is not conducive to earning current income, and as a result, income at age twenty to twenty-four is an inappropriate gauge of the income of a cohort.

Even though the twenty-five to thirty-four age bracket includes numerous women who were older than women on whom the other independent

133. HAGGSTROM, *supra* note 102, at 146; Felmlee, *supra* note 112, at 180-81.

134. Weeden, *supra* note 12, at 480 index A.

135. Because every source of income was included, not all of the income received by a woman was necessarily from paid employment. However, in the United States as a whole, nine out of ten females age fourteen and over reported earned income in 1959. U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, U.S. CENSUS OF POPULATION: 1960. VOL. I, CHARACTERISTICS OF THE POPULATION. PART 1, UNITED STATES SUMMARY, at Table 98 (1964), *available at* http://www.census.gov/prod/www/abs/ decennial/1960cenpopv1.htm. Therefore, the assumption seems warranted that compensation from employment supplied most of the income received by a majority of women twenty-five to thirty-four years old.

136. In the United States as a whole, the percentage of women enrolled in school in 1960 was, for example, 19.3% among women who were twenty years old, 13.9% among women who were twenty-one years old, and 7.2% among women who were twenty-two years old. On the other hand, just 3.1% of all women twenty-five to twenty-nine years old, and 2.4% of all women thirty to thirty-four years old, were enrolled in school. *Id.* at Table 165.

variables were based (who were either age twenty to twenty-four or age twenty-five to twenty-nine), income at age twenty-five to thirty-four is important because women at this age generally have a high level of fecundity.[137] For them, unwanted pregnancy is a salient possibility, and law on abortion is a potentially important issue. Because in most situations a social system changes at a slow pace, the system is able to anticipate the approximate average income that a cohort of women, as well as a cohort of men, will earn after its members have gone through the education institution and acquired the knowledge that is available to the cohort. The experience of the cohort that is currently twenty-five to thirty-four years old is the basis for making a generally accurate prediction regarding what younger persons will collectively experience when they reach age twenty-five to thirty-four, because the cohort has been affected by the forces that have recently shaped the economy.

With regard to labor force participation and marital status, the study estimated odd ratios for both of these variables in each of two age ranges—age twenty to twenty-four and age twenty-five to twenty-nine. That is, the dependent variable (whether states revised their law to increase access to abortion during 1967-1972) was regressed on inter alia labor force participation among women twenty to twenty-four years old and among women twenty-five to twenty-nine years old. In addition, the study regressed the dependent variable on marital status among women twenty to twenty-four years old and among women twenty-five to twenty-nine years old. Both age groups are indisputably important in studying abortion: from 1973 to 1988, women in the two age categories produced approximately one-half of all lawful abortions performed annually, and because these yearly percentages were remarkably consistent over time,[138] the percentage probably characterizes 1967 to 1972, the period of interest here. The two age categories were thus included in the instant study.

Finally, the study measured the variable of education using the percentage of women twenty-five to twenty-nine years old who had finished four or more years of college. The variable involved the number of years of college completed, not the receipt of a degree (for which data are unavailable in the state reports on the 1960 census). The age range twenty-five to twenty-nine was preferable to the age range twenty to twenty-four, because college enrollment in 1960 was relatively infrequent among women

137. In 1960, the number of live births per 100 women in the United States was 19.7 among women who were twenty-five to twenty-nine years old and 11.3 among women who were thirty to thirty-four years old. NAT'L CENTER FOR HEALTH STATISTICS, U.S. DEP'T OF HEALTH, EDUCATION & WELFARE, VITAL STATISTICS OF THE UNITED STATES: 1960. VOL. I, NATALITY, at Table 1-E (1964), *available at* http://www.cdc.gov/nchs/products/pubs/pubd/vsus/1963/1963.htm. Women who were twenty-five to thirty-four years old accounted for a large proportion (42%) of all live births in the United States in 1960. Calculated from *id.* at Table 2-16.

138. HENSHAW & VAN VORT, *supra* note 120, at Table 1.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 249 of 284

twenty-five to twenty-nine years old compared to women twenty to twenty-four years old.[139] By age twenty-five to twenty-nine, that is, women who will ultimately finish at least four years of college will have generally done so.

Table 1 gives the mnemonic label and a description of each of the variables in the regression equation. For every independent variable, three categories—high, medium, and low—were created from the original data (median income or percentages) in order to avoid cells with zero cases, i.e., zero states. Cells having zero cases are problematic for maximum-likelihood logistic regression,[140] and thus I collapsed the original data for each indicator into three categories even though doing so reduced the precision with which the independent variables were measured.

---

139. In the coterminous United States in 1960, just 1.5% of women twenty-five to twenty-nine years old were enrolled in college. The percentages are much higher at younger ages; for example, 15.4% of women twenty years old, 11.0% of women twenty-one years old, and 5.2% of women twenty-two years old were enrolled in college. U.S. BUREAU OF THE CENSUS, *supra* note 135, at Table 167.

140. HOSMER & LEMESHOW, *supra* note 129, at 135-38.

In principle, the measure of each independent variable in the instant study is a ratio scale, and because such a scale is continuous, the data for the independent variables in the study can be used in logistic regression without being collapsed into categories. *Id*. at 136. In practice, however, the measure of each independent variable is more appropriately treated as an ordinal scale, because the states were not spread evenly across the range of values for the variable but tended to concentrate at certain numerical values. The kurtosis coefficient indicates the degree to which the distribution of a variable is spread out (i.e., flat) or concentrated (i.e., peaked); as the distribution of a variable becomes more peaked, the coefficient increases. In the instant study, the distributions of four of the six independent variables were not close to being flat but, rather, were almost as peaked as, or more peaked than, the normal distribution. The kurtosis coefficient for the individual (i.e., uncollapsed) values of these four independent variables was between 2.8 and 3.9, and the other two independent variables had kurtosis coefficients of 2.4 to 2.6. The kurtosis coefficient for the normal distribution is 3.0. STATA CORP., 4 STATA BASE REFERENCE MANUAL 150 (2003).

The concentration of states at particular numerical values on an independent variable is probably inherent in the nature of social systems and not attributable to the number of cases furnishing the data in a study: a social system is unlikely to operate effectively unless its important dimensions are present in certain amounts or at certain levels. In most social science research on states, therefore, a limited number of categories seems to be the most suitable way to measure the gradations of an independent variable.

Table 1. Variables in Regression Model[141]

| Variable (mnemonic label) | Description of variable |
|---|---|
| ABORTIONLAW | Whether the state liberalized its law on therapeutic abortion during the years 1967 through 1972, i.e., prior to the decision of the U.S. Supreme Court in *Roe v. Wade*. Each state was coded either 0 or 1. A state was coded 0 if it did *not* liberalize its law on abortion and was coded 1 if it did liberalize its law on abortion. |
| INCFEM2534CAT | The median income in 1959 of all women in each state who were twenty-five to thirty-four years old in 1960 and who received any income in 1959. In the regression, the variable was comprised of three categories of median income; the range of median income (and the number of states) in each category were: $967 to $1,495 (n = 16), $1,509 to $1,755 (n = 17), and $1,827 to $2,442 (n = 15). |
| LABOR2024CAT | The percentage of all women twenty to twenty-four years old in each state in 1960 who were in the labor force in 1960. In the regression, the variable consisted of three categories created from the percentages of women age twenty to twenty-four who were in the labor force; the range of percentages (and the number of states) |

141. The data used for abortion law, the dependent variable, are from *supra* note 90. The data for the independent variables were derived or calculated from data in the report from the 1960 census for each state: U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, CENSUS OF POPULATION: 1960, VOL. I, CHARACTERISTICS OF THE POPULATION (1963), *available at* http://www.census.gov/prod/www/abs/decennial/1960cenpopv1.htm. The state reports are numbered Part 2 (Alabama) through Part 52 (Wyoming). The following tables in each state report were used for the data for the independent variables:

INCFEM2534CAT- table 134

LABOR2024CAT - table 115

LABOR2529CAT - table 115

MARR2024CAT - table 105

MARR2529CAT - table 105

PCTCOLL2529CAT - tables 37 and 103

| | |
|---|---|
| | in each category were: 33.3% to 40.8% (n = 18), 41.3% to 44.4% (n = 16), and 45.1% to 52.7% (n = 14). |
| LABOR2529CAT | The percentage of all women twenty-five to twenty-nine years old in each state in 1960 who were in the labor force in 1960. In the regression, the variable consisted of three categories created from the percentages of women age twenty-five to twenty-nine who were in the labor force; the range of percentages (and the number of states) in each category were: 24.4% to 30.5% (n = 15), 30.9% to 34.9% (n = 16), and 35.7% to 45.0% (n = 17). |
| MARR2024CAT | The percentage of all women twenty to twenty-four years old in each state in 1960 who were currently married, i.e., who in 1960 were married. In the regression, the variable was comprised of three categories constructed from the percentages of women age twenty to twenty-four who were currently married; the range of percentages (and the number of states) in each category were: 56.9% to 70.8% (n = 17), 71.0% to 72.9% (n = 14), and 73.2% to 81.1% (n = 17). |
| MARR2529CAT | The percentage of all women twenty-five to twenty-nine years old in each state in 1960 who were currently married, i.e., who in 1960 were married. In the regression, the variable was comprised of three categories constructed from the percentages of women age twenty-five to twenty-nine who were currently married; the range of percentages (and the number of states) in each category were: 80.4% to 87.0% (n = 17), 87.2% to 88.6% (n = 16), and 88.9% to 92.7% (n = 15). |
| PCTCOLL2529CAT | The percentage of all women twenty-five to twenty-nine years old in each state in 1960 who had completed at least four years of college as of 1960. In the regression, the variable con- |

| | |
|---|---|
| | sisted of three categories created from the percentages of women age twenty-five to twenty-nine who had finished four or more years of college; the range of percentages (and the number of states) in each category were: 3.95% to 6.33% (n = 17), 6.46% to 7.72% (n = 15), and 7.83% to 11.2% (n = 16). |

Table 2 presents the regression results for the forty-eight coterminous states.[142] Although the table presents the level of statistical significance of each odds ratio, the discussion of the results will rely on the odds ratios alone. As explained elsewhere,[143] tests of statistical significance are inappropriate when, as here, maximum-likelihood logistic regression is applied to a small number of cases,[144] and they are unnecessary when, as here, the cases comprise the entire universe under study rather than a sample drawn from the universe.[145] Nonetheless, table 2 reports the two-tailed significance levels of the odds ratios for readers who want this information.

The regression results discussed below furnish estimates of the relationship of each independent variable to whether states changed their abortion law during 1967-1972. Whether a particular independent variable is related to the dependent variable depends on the odds ratio for the independent variable: the closer an odds ratio is to 1.000, the lower the odds are that the dependent variable is altered by increases in the independent variable, and when the odds ratio for the independent variable is exactly (or approximately) 1.000, the independent variable does not affect the dependent variable. Like other forms of multiple regression, logistic regression indicates the relationship that exists between a dependent variable and each independent variable, separately from the relationship to the dependent variable of every other independent variable in the same regression equation. In the instant analysis, logistic regression estimated, for every change in category

142. All statistical analyses were performed with Stata Release 8.2. The results in table 2 were generated by the LOGISTIC command in Stata. STATA CORP., 2 STATA REFERENCE MANUAL 296 (2003).

143. Barnett, *supra* note 47.

144. States are the cases in the instant regression analysis. As explained earlier, sixteen of the forty-eight states in the continental United States substantially revised their law during 1967-1972 to expand access to abortion. *See supra* note 90. Since the remaining thirty-two states did not liberalize their law on abortion, the number of states characterized by the least-frequent outcome on the dependent variable was sixteen. Given the latter number, the regression equation in table 2 has five too many independent variables for tests of statistical significance to be used. *See* HOSMER & LEMESHOW, *supra* note 129, at 346-47.

145. The universe for the present study is all states in the coterminous United States. *See supra* note 130.

of a given independent variable, the increase or decrease in the odds that a state eased its law on abortion.[146]

The odds ratios in table 2 indicate that just three of the independent variables had a relationship to the dependent variable (ABORTIONLAW) that was of practical importance. These three variables are the percentage of women twenty-five to twenty-nine years old who were in the labor force (LABOR2529CAT), the percentage of women twenty to twenty-four years old who were currently married (MARR2024CAT), and the percentage of women twenty-five to twenty-nine years old who had finished four or more years of college (PCTCOLL2529CAT). Since an odds ratio is converted into a percentage by subtracting 1.000 and multiplying the remainder by 100,[147] the odds that a state liberalized its abortion law rose by approximately thirty percent for each category increase in the labor force participation rate among women twenty-five to twenty-nine years old and by twenty-six percent for each category increase in the percentage of women twenty to twenty-four years old who were currently married. The odds ratio for PCTCOLL2529CAT, however, was by far the largest: the odds that a state eased its law-imposed restrictions on abortion jumped by approximately 101 percent—i.e., roughly doubled—for each category increase in the percentage of women twenty-five to twenty-nine years old who had finished four or more years of college.

---

146. *See* Barnett, *supra* note 47 for an explanation of the difference between probability, odds, and odds ratio.

147. *See* J. SCOTT LONG & JEREMY FREESE, REGRESSION MODELS FOR CATEGORICAL DEPENDENT VARIABLES USING STATA 146, 148 (rev. ed. 2003).

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

Table 2. Odds Ratios and Two-tailed Significance Levels for Regression of ABORTIONLAW on Independent Variables: 48 States

| Variable (mnemonic label) | Odds ratio | Standard error | z | p>\|z\| |
|---|---|---|---|---|
| INCFEM2534CAT | 0.996 | .002 | -2.28 | 0.023 |
| LABOR2024CAT | 1.116 | .138 | 0.89 | 0.375 |
| LABOR2529CAT | 1.295 | .150 | 2.24 | 0.025 |
| MARR2024CAT | 1.260 | .169 | 1.72 | 0.085 |
| MARR2529CAT | 1.051 | .343 | 0.15 | 0.878 |
| PCTCOLL2529CAT | 2.013 | .517 | 2.72 | 0.006 |

Regression model
Number of observations = 48
Log likelihood = -18.956
Likelihood ratio chi-squared (6) = 23.19
Probability > chi-square = 0.001
Pseudo $R^2$ = 0.380

The odds ratios in table 2 cannot be accepted, however, until several matters are considered. The first is the possibility that the results of the regression analysis were seriously affected by one or more outliers, i.e., states whose classification (0 or 1) on the dependent variable (ABORTIONLAW) was substantially different from the classification that the regression model predicted. An indication that an influential outlier may exist is the odds ratio in table 2 for MARR2024CAT: each category increase in the percentage of women twenty to twenty-four years old who were currently married raises the odds of abortion law liberalization by states by about twenty-six percent. (Because the odds ratio for MARR2529CAT is essentially 1.000, no relationship is evident between MARR2529CAT and ABORTIONLAW.) However, the odds ratio for MARR2024CAT, in substantially exceeding 1.000, is inconsistent with the data in figure 3, according to which the marital-status variables should be unrelated to change in state abortion law. The odds ratio for MARR2024CAT is also inconsistent with theory, which suggests that increases in the prevalence of marriage among women will reduce, not raise, the odds of abortion law liberalization.

One criterion that has been recommended to identify potentially influen-

tial outliers is a Cook's Statistic that is equal to or greater than the result obtained by dividing 2.0 by the square root of the number of cases.[148] In the instant study, the criterion is $2.0 \div \sqrt{48} = 0.29$. Cook's Statistic was of this size or higher for eighteen states. Consequently, I re-estimated the odds ratios for the six independent variables by eliminating each of these states one at a time, i.e., the odds ratios were re-estimated based on forty-seven states.

Three of the regression analyses that used forty-seven states produced notable changes in the odds ratio for one or both of the two independent variables dealing with the prevalence of marriage among women. The three states involved in these analyses were Arkansas, Vermont, and Texas. Table 3 reports the odds ratios just for MARR2024CAT and for MARR2529CAT from the resulting regression analyses. To simplify the table, the odds ratios for the other four independent variables estimated in these analyses are omitted. A comparison of table 3 with table 2 reveals that Texas was responsible for the largest and most notable alteration in an odds ratio for the marital status variable. Specifically, with Texas removed from the data, the odds ratio for MARR2529CAT was 0.792. The absence of Texas also moved the odds ratio for MARR2024CAT farther above unity—from 1.260 to 1.435. Without Texas, accordingly, each increase in category of marriage prevalence among women twenty to twenty-four years old *raised* the odds of abortion law liberalization, but each increase in category of marriage prevalence among women twenty-five to twenty-nine years old *reduced* the odds of liberalization. The inconsistency in the direction of the relationship for the two age groups is illogical.

148. DAVID A. BELSLEY ET AL., REGRESSION DIAGNOSTICS 28 (2004).

Table 3. Odds Ratios and Two-tailed Significance Levels for MARR2024CAT and MARR2529CAT from the Regression of ABORTIONLAW on All of the Independent Variables: 47 States

| Variable (mnemonic label) | Odds ratio | Standard error | z | p>\|z\| |
|---|---|---|---|---|
| | | Coterminous states without Arkansas | | |
| MARR2024CAT | 1.197 | .156 | 1.38 | 0.167 |
| MARR2529CAT | 1.341 | .496 | 0.79 | 0.428 |
| | | Coterminous states without Texas | | |
| MARR2024CAT | 1.435 | .250 | 2.07 | 0.039 |
| MARR2529CAT | 0.792 | .288 | -0.64 | 0.521 |
| | | Coterminous states without Vermont | | |
| MARR2024CAT | 1.448 | .258 | 2.07 | 0.038 |
| MARR2529CAT | 1.200 | .475 | 0.46 | 0.644 |

What accounts for the changes observed in the odds ratios for the two marital status variables when the three states are omitted? A number of explanations are possible. The most obvious, of course, is that one or more of the three states was indeed affecting the magnitude and direction of the relationship in the coterminous United States between the prevalence of marriage among women and the liberalization of state abortion law. Cook's Statistic is compatible with this explanation: Cook's Statistic exceeded 1.000 for each of the three states and only for these states. Since a case typically does not skew results unless its Cook's Statistic is at least 1.000,[149] one or more of the three states may have been an influential outlier. On the other hand, the striking inconsistency between the odds ratios for the marital-status variables when Texas is absent suggests that a factor other than, or in addition to, an influential outlier may have been responsi-

149. HOSMER & LEMESHOW, *supra* note 129, at 180.

ble for the changes in the odds ratios associated with the three states.

What other factor(s) might have contributed to the changes in the odds ratios for the marital-status variables produced by individual states? One possibility is that the data on marital status suffer from measurement error that is sufficiently widespread to affect the odds ratios for MARR2024CAT and MARR2529CAT. Under this view, marital status was inaccurately reported often enough to affect appreciably the proportion of women in the United States who were counted as married. Such an effect could have distorted the results of the regression analysis undertaken in the instant study for the marital-status variables. Different sources of data on the number of marriages in any particular year exhibit inconsistencies as well as suffer from errors,[150] and data on marital status in the census contain errors, too.[151]

Let me mention three reasons that marital status may have been misreported in the 1960 census with sufficient frequency to have a material effect on the odds ratios for MARR2024CAT and MARR2529CAT. First, the 1960 census gathered data using a questionnaire that respondents received by mail, and it was the first census to rely on a mailed, respondent-completed questionnaire for the country as a whole.[152] Thus, respondents in the 1960 census classified themselves as married or unmarried.[153] Second, an unknown but appreciable number of cohabiting persons in 1960 are likely to have incorrectly identified themselves as married.[154] Misidentification probably was facilitated because respondents, on their own, completed the census questionnaire. Third, the census considered individuals

---

150. Ellen Linna Jamison & Donald S. Akers, *An Analysis of the Differences Between Marriage Statistics from Registration and Those from Censuses and Surveys*, 5 DEMOGRAPHY 460, 461 (1968).

151. U.S. BUREAU OF THE CENSUS, *supra* note 135, at liv.

152. *Id*. at xiv. After the questionnaire was mailed, a Census Bureau enumerator conducted an interview, but the purpose of the interview was only to "correct omissions and obviously wrong entries" in the questionnaire as filled out. *Id*.

The yearly data on marital status that are the basis of figure 3 are from the Current Population Survey. *See supra* note 122. The design of the Survey has changed over time. However, since the Census Bureau assumed responsibility for the methodological aspects of the Survey in the early 1940s, each respondent in the Survey has remained in the sample for a period totaling several months, and at least the initial interview of respondents has been conducted at the home of the respondent by Census Bureau personnel unless the respondent requested a telephone interview. U.S. CENSUS BUREAU, U.S. DEP'T OF COMMERCE, TECHNICAL PAPER 63RV, CURRENT POPULATION SURVEY: DESIGN AND METHODOLOGY 2-1, 2-2, 7-1, 7-3, 7-4 (2002), *available at* http://www.census.gov/prod/www/workpaps.html. As a source of data on marital status, consequently, the Current Population Survey is probably more accurate than the 1960 census.

153. Jamison & Akers, *supra* note 150, at 462.

154. Catherine Fitch et al., *The Rise of Cohabitation in the United States: New Historical Estimates* 19 (Univ. of Minnesota Population Center, Working Paper No. 2005-03, 2005), *available at* http://www.pop.umn.edu/research/papers.shtml.

who were in common-law marriages to be married,[155] and respondents who did not know whether common-law marriage existed in their jurisdiction or whether a particular relationship satisfied the requirements of a common-law marriage could often have recorded marital status incorrectly. The potential extent of the misunderstanding among young adults is suggested by the relatively low educational attainment of persons who were twenty-five to twenty-nine years old in 1960: in the United States as a whole, two out of three individuals in this age range had no more than a high school education.[156]

Figure 3 and theory are consistent with the explanation that errors in marital status in the 1960 census distorted the odds ratio for at least MARR2024CAT. Figure 3 shows that, prior to 1967, change over time in the distribution of marital status among young women was minimal, and thus marital status was not a variable that could have altered state law on abortion during 1967-1972. Theory[157] suggests that an increase in the percentage of women who are married will reduce the odds of abortion law liberalization, but the odds ratio for MARR2024CAT in table 2 indicates that, in terms of marriage prevalence among women twenty to twenty-four years old, just the opposite happens. In short, the odds ratio for marriage prevalence among women twenty to twenty-four years old is suspect.

A second matter regarding the regression results—namely, collinearity[158]—will be considered just briefly. Was the correlation of any pair of independent variables sufficiently strong to keep multiple regression from estimating reliable odds ratios for the variables? The rank correlation coefficients for pairs of independent variables in table 2 were often substantial. However, the logistic regression program did not halt the computation of the odds ratio for any independent variable due to excessive collinearity with another independent variable. Because the program did not find the covariation of pairs of independent variables to be problematic, I concluded that collinearity did not exist.

Finally, I turn to the possibility that the relationship of an independent variable to the dependent variable may not be the same within all categories or at all levels of another independent variable. This is the question of interaction,[159] and the independent variables I consider here are those that theory identifies as related. Of the independent variables in the regression equations, two meet this criterion—namely, labor force participation and

155. U.S. BUREAU OF THE CENSUS, *supra* note 135, at liv; Jamison & Akers, *supra* note 150, at 462.

156. Calculated from U.S. BUREAU OF THE CENSUS, *supra* note 135, at Table 174.

157. *See supra* notes 92 & 93 and accompanying text.

158. William D. Berry, *Understanding Regression Assumptions*, 92 QUANTITATIVE APPLICATIONS IN THE SOC. SCIENCES 1, 24-27 (1993).

159. James Jaccard & Robert Turrisi, *Interaction Effects in Multiple Regression*, 72 QUANTITATIVE APPLICATIONS IN THE SOC. SCIENCES 1, 3-4 (2d ed. 2003).

marital status. Notably, a relationship between these two variables is posited by both theory in economics and theory in sociology. Economic theory has postulated that, *ceteris paribus*, the inclination of women to marry varies inversely with the appeal of their opportunities in the economy. Under this view, marriage in a society will be less beneficial to, and less popular among, women to the extent that women have enticements (e.g., high monetary compensation) to engage in paid employment outside the home. According to economic theory, then, marriage will become less common among women as the labor force provides incentives that draw women into non-household work.[160]

Sociological theory, which incorporates social values as a central concept,[161] expects marital status and employment status (of men as well as of women) to conform to the dominant values of society. In 1960, conventional values regarding marriage seem to have still been dominant in the United States,[162] and thus paid employment outside the home was envisioned for the husband but not the wife. Only later in the decade of the 1960s did traditional values concerning marriage start to come under attack and begin to erode.[163] Notably, patterns of employment in the United States in 1960 were consistent with the traditional view regarding marriage and employment among women: labor force participation at age twenty to twenty-four existed among fully seventy-three percent of never-married women in 1960 but among only thirty-one percent of currently married women whose husband was present; at age twenty-five to twenty-nine, labor force participation existed among seventy-nine percent of never-married women but among just twenty-seven percent of currently married women whose husband was present.[164]

---

160. Sara McLanahan & Lynne Casper, Growing Diversity and Inequality in the American Family, *in* 2 STATE OF THE UNION: AMERICA IN THE 1990S 1, 32-35 (Reynolds Farley ed., 1995); Francine D. Blau et al., *Understanding Young Women's Marriage Decisions: The Role of Labor and Marriage Market Conditions*, 53 INDUS. & LAB. REL. REV. 624, 626, 645 (2000).

161. *E.g.*, Francisco Parra-Luna, *An Axiological Systems Theory: Some Basic Hypotheses*, 18 SYS. RES. & BEHAV. SCI. 479, 481 (2001).

162. While this assertion cannot be documented with quantitative data from a sample survey of the U.S. population, the observation that the traditional conception of marriage prevailed at least as late as 1960 has been made by others. McLanahan & Casper, *supra* note 160, at 35. No national survey of attitudes conducted in the 1950s, or even in the early 1960s, assessed the extent to which Americans endorsed the conventional ideal of marriage. From 1969 to 1988, national sample surveys often asked interviewees to indicate whether they approved or disapproved of paid employment on the part of a married woman whose husband was "capable of supporting her" or "able to support her." During the years from 1946 through 1968, however, national surveys included no such measure. *See* RICHARD G. NIEMI ET AL., TRENDS IN PUBLIC OPINION: A COMPENDIUM OF SURVEY DATA 225 (1989).

163. *See* McLanahan & Casper, *supra* note 160, at 35; *accord*, Elizabeth S. Scott, *The Legal Construction of Norms: Social Norms and the Legal Regulation of Marriage*, 86 VA. L. REV. 1901, 1935-36 (2000).

164. Calculated from U.S. BUREAU OF THE CENSUS, *supra* note 135, at Table 196.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 260 of 284

To ascertain the possible existence of an interaction, I created two new variables—one by multiplying the values of LABOR2024CAT and MARR2024CAT and the other by multiplying the values of LABOR2529CAT and MARR2529CAT. Both of the new variables were added to the regression equation in table 2, but the odds ratios for the two variables deviated from 1.000 by less than ±0.02 when all forty-eight states were included in the regression analysis. When Arkansas, Texas, and Vermont were omitted from the data one at a time and forty-seven states were included in the regression analysis, the odds ratios for the two variables deviated from 1.000 by no more than ±0.04. Because the two variables created to test for interaction had no relationship to the dependent variable (ABORTIONLAW), interaction was assumed to be absent from the data.

What conclusions can be drawn from the data analysis? First, increasing educational attainment of young women had the strongest relationship to liberalization of state abortion law, and the magnitude of the relationship was substantial: for each category increase in the percentage of women twenty-five to twenty-nine years old who had finished at least four years of college, the odds roughly doubled that a state eased the restrictiveness of its law on access to abortion. Second, labor force participation among women twenty-five to twenty-nine years old was related to liberalization of state abortion law: each category increase in the percentage of women in this age range who were labor force participants raised the odds of liberalization by about thirty percent. By comparison to the relationship uncovered for schooling/education, however, the relationship found for labor force participation was just modest in magnitude.

Notably, educational attainment and labor force participation exhibited relationships to the dependent variable that are consistent both with the findings of research on the attributes of women that predict the probability of aborting a pregnancy and with the trends disclosed by the time-series data in figures 4 and 5. However, the odds ratios in table 2 for the marital status variables suggest that, among women twenty to twenty-four years old, category increases in the percentage who were currently married heightened the odds of liberalization of state law on abortion. Such a relationship is inconsistent with the implication from research that has found married women are less likely than unmarried women to abort pregnancies, and of particular importance, it does not comport with the trends observed in figure 3. I have suggested that the odds ratio for the marital status variable for women twenty to twenty-four years old may be due to misreporting by Americans in the 1960 census that they were married, but this is a hypothesis that could not be tested empirically.

Before ending, table 4 should be considered given the evidence that increases in the prevalence of schooling and the duration of education among young women were important in easing restrictions that state law imposed

ADD0258

on access to abortion. Table 4 is confined to women in the United States who were twenty-five to twenty-nine years old in each census year from 1940 to 2000. For the year specified in the first (i.e., left-hand) column of the table, the second column reports the percentage of women twenty-five to twenty-nine years old who held at least a bachelor's degree, and for each pair of sequential percentages in the second column, the third column reports the percentage change that occurred from the earlier to the later year. The third column thus shows the percentage change from one census year to the next in the prevalence of college graduation among women who were twenty-five to twenty-nine years old.

The trend that is apparent in the second column of table 4 is consistent with the trend that is seen in figure 4 for women younger than age twenty-five and with the data that footnote 126 presents on the mounting school enrollment rate between the last part of the 1940s and last part of the 1950s among women in the age range twenty to twenty-four. Table 4 shows that the percentage of women with a bachelor's degree or higher at age twenty-five to twenty-nine rose steadily from 1940 onward and that the decadal pace of the rise accelerated from 1940 to 1970. Figure 4 and footnote 126, which complement table 4, suggest that the proportion of women who received at least a bachelor's degree while twenty to twenty-four years old climbed rapidly during the 1950s and the first half of the 1960s. As these women grew older, the percentage of women with a college degree at age twenty-five to twenty-nine increased.[165] The increase from 1960 to 1970 is particularly notable; indeed, the largest percentage change found in the third column of table 4 is that occurring between 1960 and 1970. Therefore, prior to 1967 as well as during the period of abortion law liberalization that commenced in 1967, young women were increasingly entering college and earning bachelor's and graduate degrees. These trends are indicators of a fundamental shift in the role of women, and the shift that occurred before the modification of abortion law during 1967-1973 is unlikely to be mere coincidence.

165. Most women who hold a bachelor's degree at age twenty-five to twenty-nine evidently entered college when they were eighteen or nineteen years old. *See*, *e.g.*, U.S. BUREAU OF THE CENSUS, *supra* note 135, at Table 168; U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, CENSUS OF POPULATION: 1970, VOL. I, CHARACTERISTICS OF THE POPULATION. PART 1, UNITED STATES SUMMARY – SECTION 2, at Table 197 (1973), *available at* http://www.census.gov/prod/www/abs/decennial/1970cepopv1.htm. Therefore, an increase in the percentage of women with a bachelor's degree at age twenty-five to twenty-nine is an indicator of change in the female sex role that took place as much as a decade prior to the increase.

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

Table 4. Women 25-29 Years Old with a Bachelor's Degree or Higher, 1940-2000[166]

| Year | Percentage of women age 25-29 holding at least a Bachelor's degree | Percentage change from prior year |
|---|---|---|
| 1940 | 4.9% | — |
| 1950 | 5.9 | 20.4% |
| 1960 | 7.8 | 32.2 |
| 1970 | 13.3 | 70.5 |
| 1980 | 20.5 | 54.1 |
| 1990 | 22.4 | 9.3 |
| 2000 | 29.7 | 32.6 |

Finally, let me discuss another study of the relationship between the characteristics of jurisdictions and the law on abortion that existed in the jurisdictions prior to *Roe v. Wade*.[167] As I explain below, while this study (the Conway-Butler study) has the same subject matter as mine, there are critical differences in objectives, data, and procedures.

To begin, the Conway-Butler study, after an initial analysis, omitted women's educational attainment as a variable from its refined regression

166. The data in column 2 are from U.S. CENSUS BUREAU, U.S. DEP'T OF COMMERCE, *A Half-Century of Learning: Historical Statistics on Educational Attainment in the United States, 1940 to 2000*, at Table 2 (2006), *available at* http://www.census.gov/population/www/socdemo /education/phct41.html.

167. Karen Smith Conway & Michael R. Butler, *State Abortion Legislation as a Public Good—Before and After Roe v. Wade*, 30 ECON. INQUIRY 609 (1992).

In several social science studies that considered state differences on matters pertinent to law on abortion, the dependent variable was not differences in current law on abortion. Elizabeth Adell Cook et al., *State Political Cultures and Public Opinion about Abortion*, 46 POL. RES. Q. 771, 772 (1993); Leo H. Kahane, *Political, Ideological and Economic Determinants of Abortion Position: An Empirical Analysis of State Legislatures and Governors*, 53 AM. J. ECON. & SOC. 347, 348-50 (1994); Medoff, *supra* note 131.

models, in part because the investigators assumed that the main impact of educational attainment would be manifested through two other variables that they included in these models, namely, women's labor force participation rate and income.[168] Given the omission of education from the refined models, the study could not thoroughly evaluate the effect of the variable on abortion law or estimate the magnitude of any effect of the variable—an aspect of the study whose importance cannot be underrated in light of the trends in figure 4 *supra* and the odds ratio in table 2 *supra* for PCTCOLL2529CAT.

With regard to the variables that were included in the regression models of both the Conway-Butler study and my study, a difference in procedure between the studies markedly affected the interpretation of the regression results. Professors Conway and Butler relied on tests of significance; for reasons given earlier,[169] I did not. Using tests of statistical significance, the Conway-Butler study found that the restrictiveness of abortion law in a jurisdiction in 1970 was not associated either with the labor force participation rate among women in the jurisdiction or with the distribution of marital status among women in the jurisdiction.[170] This conclusion, however, takes into account only whether the probability of the regression coefficient for each variable was at or below .10 if no relationship with the dependent variable existed in the universe from which the investigators drew their sample.[171] If the regression coefficients themselves are considered[172] and their significance levels are disregarded, then the Conway-Butler study indicates that abortion law became more liberal with increases in the percentage of women in a jurisdiction who are married. This finding is consistent with the results of my regression analysis (at least for MARR2024CAT), but as in my study, the finding cannot be reconciled with figure 3 *supra* or with theory.[173] With regard to labor force participation, the regression results in the Conway-Butler study indicate that the odds of liberal abortion law decline with increases in the percentage of women in a jurisdiction who participate in the labor force. This finding is curious, because it is inconsistent with the odds ratios for women's labor force participation in table 2 *supra*, with figure 5 *supra*, and with theory.[174] The discrepant findings of the two

---

168. Conway & Butler, *supra* note 167, at 615, 618. The refined models are the models that Conway and Butler label the "'Best' Model" and the "Private Demand" model. Education, although included in the model that Conway and Butler label the "Broadest model," was not in the refined models, while labor force participation and income were in all of the preceding models. *Id.* at 618.

169. *See supra* notes 144 & 145 and accompanying text.

170. Conway & Butler, *supra* note 167, at 618.

171. The notes to Table III in Conway & Butler. *Id.* at 619.

172. *Id*. at 618 (reporting the regression coefficients).

173. *See supra* notes 92 & 93 and accompanying text.

174. *Id*.

studies as to labor force participation may be due to the omission of education as an independent variable in the Conway-Butler study and/or to one, or a combination, of the following differences between the studies.

The reader should note that the manner in which the dependent variable was measured was not the same in both studies. Professors Conway and Butler placed each state into one of three levels of restrictiveness in terms of its abortion law prior to *Roe*—viz., abortion unrestricted, significantly restricted, or prohibited[175]—while I measured the dependent variable with just two categories—viz., whether or not the state had eased its restrictions on abortion in the years preceding *Roe*. Undoubtedly of much greater potential importance to the regression results, however, is that the studies classified three states differently in terms of their abortion law before *Roe*. Professors Conway and Butler designated Florida as a state that banned abortion and designated Alabama and Massachusetts as states that significantly restricted access to abortion.[176] My study, on the other hand, classified Florida as a state that liberalized its abortion law, because the state had done so in 1972.[177] Furthermore, my study classified Alabama and Massachusetts as states that did not liberalize their abortion law, in part because the last pre-*Roe* change in abortion law that was made by these two states

175. Conway & Butler, *supra* note 167, at 616, 621-22. Another study classified states into three levels of restrictiveness in terms of their law on access to abortion before *Roe v. Wade*. Sharon Kay Parsons, Abortion Policy in the Fifty States: A Comparative Analysis 96, 166-67 (1991) (unpublished Ph.D. dissertation, Florida Atlantic University) (on file with Widener University School of Law Delaware Campus Library). However, the study by Parsons is not useful for two reasons. First, the Parsons study employed factor analysis to create clusters of independent variables, and it assessed the relationship of just the clusters to the restrictiveness of state abortion law prior to *Roe*. *Id.* at 114-19. Because a cluster is global in nature, reliance on clusters rather than on the independent variables that form the clusters precludes a direct comparison of the findings of the Parsons study with the findings of my study. The relationship of a cluster of independent variables to a dependent variable, moreover, supplies information that is much less precise than the relationships to the dependent variable of the independent variables comprising the cluster. The second reason the Parsons study is not helpful is that the study employed least-squares regression, but for analyzing relationships to a dependent variable that is measured in categories, least-squares regression is dubious and, accordingly, has been replaced by logistic regression. The results reported in the Conway-Butler study, which was carried out at almost the same time as the Parsons study, are based on logistic regression, and least-squares regression was not employed. Conway & Butler, *supra* note 167, at 615.

176. Conway & Butler, *supra* note 167, at 621-22.

To classify states in terms of the restrictiveness of their law on abortion prior to *Roe*, Professors Conway and Butler relied on information in a book authored by a social scientist. *Id*. at 613 n.6. The book explicitly discloses that its information on abortion law was current as of January 1971. NANETTE J. DAVIS, FROM CRIME TO CHOICE: THE TRANSFORMATION OF ABORTION IN AMERICA 254-57 (1985). Because the book was published fourteen years after January 1971, Professors Conway and Butler may have assumed that, from January 1971 until the Court announced *Roe* in January 1973, no other jurisdiction liberalized its law on abortion. However, such an assumption is mistaken as to Florida. *See infra* note 177 and accompanying text.

177. Act of Apr 12, 1972, ch. 72-196, 1972 Fla. Laws 608; Merz et al., *supra* note 90, at 19-20.

occurred, respectively, in 1951[178] and in 1944, not in the 1960s.[179]

An additional difference between the studies is that the Conway-Butler study included Alaska, Hawaii, and the District of Columbia,[180] but my study omitted them. I omitted Alaska and Hawaii for reasons explained earlier,[181] and I omitted the District of Columbia in order to confine the analysis to states. The difference in the jurisdictions covered by the two studies could have markedly affected the regression results of the studies, and the difference is not simply coincidence. Professors Conway and Butler included the three jurisdictions (Alaska, Hawaii, and the District of Columbia), and I excluded them, because our studies had different purposes. Professors Conway and Butler wanted to predict the content of law on abortion in each major jurisdiction of the United States if the U.S. Supreme Court overrules *Roe*, and their refined regression models thus evidently included the District of Columbia even though the investigators had identified this jurisdiction as "a very influential outlier."[182] My goal, on the other hand, was to help build a sociological theory of law, and to this end, my study examined a universe that was more circumscribed in order to reduce the likelihood of contamination by unmeasured factors.[183]

In sum, the regression results of the Conway-Butler study appear not to be helpful in isolating the causes of current law on abortion. Professors Conway and Butler focused on predicting the law on access to abortion that jurisdictions can expect to adopt if *Roe v. Wade* is overturned—an entirely

---

178. Act of Sept. 12, 1951, no. 956, 1951 Ala. Laws 1630 (amending ALA. CODE tit. 14, § 9 (1940)).

179. *See supra* note 90.

180. Conway & Butler, *supra* note 167, at 621-22.

181. *See supra* note 130.

182. Conway & Butler, *supra* note 167, at 623 n.17.

183. Two further differences between the studies should be mentioned. First, Professors Conway and Butler measured their independent variables as of 1970. *Id.* at 616. However, 1970 was either concurrent with or after the point at which action had been taken by most of the jurisdictions that eased restrictions on abortion. *See supra* note 90. In my study, on the other hand, the data on the independent variables were for 1960 (or 1959 in the case of income), a time point that *precedes* the changes in state law. Because causation involves temporal sequences, potential causes of a phenomenon should be measured at a time that is before the occurrence of the phenomenon, not at a time that is contemporaneous with the phenomenon or that is after it.

Second, Professors Conway and Butler measured their independent variables with data for women eighteen to forty-four years old. Conway & Butler, *supra* note 167, at 616-17. On the other hand, I used data for women in the age range twenty to twenty-nine to measure all of the independent variables except income, for which the data were for women twenty-five to thirty-four years old. *See supra* note 135 and accompanying text. In the decade-and-a-half from 1973 to 1988 (and presumably in the years before 1973), women twenty to twenty-nine years old were the source of approximately half of all abortions, while women thirty years of age and older accounted for fewer than one out of five abortions. HENSHAW & VAN VORT, *supra* note 120, at 172-73. Accordingly, the characteristics of females under thirty years old are probably the chief determinants of the existence and degree of pressure on a social system to allow ready access to abortion.

legitimate focus when the goal is to understand the political process. Their study, however, was not primarily concerned with a theory of law. My study, on the other hand, places a heavy emphasis on theory.

## IV. THE CONCEPT OF SOCIETAL NEED

All theories contain key concepts, and the macrosociological theory that frames the instant Article is no exception. Specifically, this Article employs the concept of need and contends that need is a principal determinant of law. My focus, however, has been on the needs of society, not on the needs of individuals, and although the two may influence one another and change concurrently in content and intensity, they possess distinctly different referents. To use abortion as an illustration, a woman who seeks to end a pregnancy does so for one or more reasons *she* considers important—because, for example, the fetus she is carrying is jeopardizing her physical health or financial goals—but *her* need to terminate a pregnancy is an individual-level attribute. I have focused instead on the degree to which society, in responding to the forces affecting it, requires the availability of abortion and the existence of supporting doctrine in law. Need in my lexicon accordingly emerges from the properties of society and from the forces that mold these properties, and it involves the propensity of every social system in the long run to (i) retain and/or strengthen the commitment of its participants to the system and (ii) operate smoothly. In accounting for the rules of social life—both those that are formal (e.g., law) and those that are informal—I believe that the concept of societal need can make a distinct and important contribution.

By considering need as an attribute of society, I do not mean to disparage the concept of need as an attribute of individuals or suggest that scientific inquiry should avoid the subject of the needs of individuals. Rather, I contend that individual need is unlikely to be a particularly helpful concept in accounting for the content and evolution of doctrine in law. Law is concerned with the ways in which individuals interact, but "relations among people have a material character which is largely independent of individual control or conscious action."[184] Doctrines in law must accordingly be understood by reference to conditions beyond the individual, i.e., by reference to the society in which the doctrines exist. In particular, I maintain that law, as a macrosociological phenomenon, is a response to societal needs and cultural values and that the need for law with a particular content on a given topic is the need of the social system.

Need, whether used in reference to social systems or to individuals, is an abstract concept, i.e., a concept that is not directly observable but that has

184. Bruce H. Mayhew, *Structuralism versus Individualism: Part 1, Shadowboxing in the Dark*, 59 SOC. FORCES 335, 345 (1980).

observable manifestations. Accordingly, need is a concept with potential uses in theory. Science employs such concepts because they have the ability to provide a coherent view of the world: with theoretical concepts, numerous and varied observations can be transformed into a manageable set of ideas and organized in ways that permit events not yet observed to be anticipated. The concept of gravity, for example, is found in physics for this reason.

A theoretical concept, however, does not exist for its own sake. Science is an inherently practical undertaking, and unless a concept is useful to the scientific enterprise—i.e., unless a concept furthers understanding and aids prediction—it must and will be abandoned. The history of science contains instances of theoretical concepts that did not advance the goals of science and were dropped. In the 1700s, for example, the concept of phlogiston was believed to be an invisible substance produced by combustion that accounted for certain observable changes associated with heat, but the concept was finally discarded because it could not be reconciled with the results of experiments in the emerging discipline of chemistry.[185]

If the concept of need in social science is not to suffer the same fate as the concept of phlogiston in physical science, it must be shown to aid the scientific enterprise, i.e., contribute to the explanation and prediction of phenomena. The present Article has considered several topics, and for each, the concept of need is useful. Specifically, a defensible argument can be made that, because of change in system-level conditions, society developed a need for new law on sex roles, on the age of majority, and on abortion. Societal need, in short, offers promise as an efficacious concept in a macrosociological theory of law.

### *A. Functionalism*

In order to understand the concept of societal need, the sociological theory from which it derives must be described, and the criticisms directed at the theory must be considered. The theory is functionalism. As an approach to the nature of social life, functionalism was the first theory propounded by sociologists, and revised versions of the theory remain influential.[186] The central premise of functionalism is that a society is composed of interrelated components that promote the operation and, in turn, the continuation of the society.[187] Specifically, functionalism considers society to be a system—i.e., an interrelated whole—and contends that the components of society facilitate the performance of the system. A component that

185. GERALD HOLTON & DUANE H. D. ROLLER, FOUNDATIONS OF MODERN PHYSICAL SCIENCE 269-73 (1958).

186. JONATHAN H. TURNER, THE STRUCTURE OF SOCIOLOGICAL THEORY 34, 37 n.31 (Wadsworth Thomson Learning 2003); SCOTT, *supra* note 4, at 139.

187. MARK ABRAHAMSON, FUNCTIONALISM 5 (1978).

becomes unable to assist the system, according to the functionalist perspective, either will change so that it once again serves the system, or it will cease to exist. A component thus does not emerge and/or persist unless it is functional for society. However, the emergence of, change in, or the disappearance of a component may not be immediate; on the contrary, these processes probably occur in the main over and/or after a substantial interval. Normally, then, the propositions of the functionalist school apply just in the long run.

What are the components of a society? In my macrosociological framework, the components are denominated "institutions,"[188] and one of them is law. Law, like every institution, possesses a distinct set of concepts and principles, i.e., doctrines, and the central doctrines of law reflect conditions in society, although usually with a time lag. Among the conditions shaping law are the values that govern the society.[189] The conformity of the content of law to social values should not be surprising, for without this conformity, the institution of law would not be accepted and could not contribute to the operation of society.

With this general outline, let me take up the principal criticisms that have been directed at the functionalist school insofar as the criticisms are relevant to doctrine in law and the theoretical framework employed in the instant Article.[190] The first criticism is that, because functionalism emphasizes stability and persistence in social systems, it cannot deal effectively with change, at least change that involves an important aspect of system structure and a major departure from established patterns. In terms of the approach I am employing to doctrines of law, the criticism is unfounded, for a theory of law based on functionalism demands that shifts in doctrine be studied. Indeed, the larger the magnitude of a doctrinal shift, the greater the importance of investigating the shift because major change is more likely than minor change to reveal (i) the societal properties and forces

---

188. An institution can be defined as "[a]n established law, custom, usage, practice, organization, or other element in the political or social life of a people; a regulative principle or convention subservient to the needs of an organized community or the general ends of civilization." OXFORD ENGLISH DICTIONARY 1047 (2d ed. 1989).

189. THOMAS R. MARSHALL, PUBLIC OPINION AND THE SUPREME COURT 192-93 (1989); Christopher Z. Mooney & Mei-Hsien Lee, *The Influence of Values on Consensus and Contentious Morality Policy: U.S. Death Penalty Reform, 1956-82*, 62 J. POL. 223, 234 (2000); Matthew E. Wetstein & Robert B. Albritton, *Effects of Public Opinion on Abortion Policies and Use in the American States*, 25 PUBLIUS 91, 102 (1995). Government policy generally manifests the attitudes of the public when crystallized attitudes exist. Paul Burstein, *Bringing the Public Back In: Should Sociologists Consider the Impact of Public Opinion on Public Policy?*, 77 SOC. FORCES 27, 41 (1998).

190. My review of these criticisms is based on ABRAHAMSON, *supra* note 187, at 37-49; JOHN REX, KEY PROBLEMS OF SOCIOLOGICAL THEORY 60-77 (1961); TURNER, *supra* note 186, at 23-37; Peter A. Munch, *The Concept of "Function" and Functional Analysis in Sociology*, 6 PHIL. SOC. SCI. 193 (1976); Jonathan H. Turner & Alexandra R. Maryanski, *"Is 'Neofunctionalism' Really Functional?"*, 6 SOC. THEORY 110, 115-17 (1988).

molding law and (ii) the effects of law—two issues with which any theory of law must be concerned. It is thus not happenstance that the focus of the instant Article includes abortion law. The subject was selected because of the striking change that abortion law underwent in the United States during the 1960s and 1970s, and because of the availability of considerable data to study the change.

A second criticism of functionalism has been that it is teleological, a criticism that implicates the concept of need. Functionalism relies heavily on the concept of need; indeed, the concept is "what is distinctive about functional analysis."[191] Traditionally, functionalism incorporated the concept of need by contending that every society requires a certain degree of internal integration and equilibrium in order to survive. In advancing this argument, functionalism becomes teleological if it assumes that the goal of satisfying the need produces the features of social life that accomplish the goal, and it becomes empirically untestable if at the same time it cannot generate hypotheses identifying these features in advance.[192] Specifically, to the extent functionalism argues that the needs of society call forth processes and structures that meet the needs, functionalism assumes the existence of an inherent design in society and relies on ends to explain means. Such reliance, though teleological, does not preclude empirical testing as long as functionalism also is able to predict the means that can reach the ends, and that therefore may emerge and be observed, in a given situation. Unfortunately, however, functionalist theory seems to be insufficiently developed at this point in time to permit such predictions to be consistently generated.

The preceding problem is associated with a third criticism of the functionalist school, namely, that the societal needs named by the school are so general that empirical research cannot disprove their existence. According to this criticism, functionalists have assumed that amorphous needs such as integration and equilibrium govern the social system, but the assumption cannot be rigorously tested because of the elusive nature of these needs. One prominent theorist in sociology has concluded that, because need is unverifiable as well as teleological, functionalism as an approach is of questionable scientific utility.[193]

The obscure quality and untestable character of needs in the functionalist perspective is closely linked to and largely responsible for a fourth problem that has plagued the perspective, namely, tautological reasoning. The problem arose because functionalists, having specified needs in highly abstract terms, rely upon the conditions believed to satisfy the needs as evidence

---

191. Turner & Maryanski, *supra* note 190, at 117.

192. *Cf. id*. at 116.

193. REX, *supra* note 190, at 76.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 270 of 284

that the needs are a reality. According to the functionalist argument, the existence of need X is shown by the presence of condition Y, and the fact that condition Y exists and can satisfy need X is proof that need X is real. This is reasoning that is circular and tautological; when need is employed in this fashion, it is intellectually empty.

To recapitulate, the concept of societal need has introduced problems of teleology, indefiniteness, and tautology into the macrosociological theory of functionalism. These problems, however, are not inherent in the concept of need, and they can be avoided. To do so in the present Article, I defined need in specific rather than general terms—e.g., as the need of the system for a particular type of law on abortion rather than as the need for integration and equilibrium—and I identified observable variables from which conclusions can be drawn regarding the degree to which a societal need exists for a specific doctrine in law, e.g., acceptance of access to abortion. The latter step—identifying a measure of need—is particularly important and warrants further comment.

Operationalizing a theoretical concept is essential if science is to use the concept and ascertain the contribution the concept can make to explanation and prediction.[194] In the instant Article, the criterion for determining the extent of a societal need for a particular doctrine of law, and the level of this need over time, was (i) change in the distribution in the population of the characteristic (e.g., age) that is the subject of the doctrine and/or (ii) change in the magnitude of a system-level factor that prior research on individuals suggests has an influence on the behavior that is the subject of the doctrine (e.g., the termination of a pregnancy by abortion). Thus, a societal need to legalize abortion was deemed to have existed when, before restrictions imposed by law on access to abortion were removed, an increase occurred in a system-level variable that has been found to affect the probability that individual women will terminate pregnancies.

Need, however, remains a concept that organizes and summarizes observations and that is itself unobserved. Need thus continues to be a theoretical construct, but as used here, it does not introduce the problems of teleology, indefiniteness, and tautology for which functionalism has been attacked. First, need was not regarded in this Article as controlling the variable being employed to measure need. Rather, my focus was on a variable that was believed responsible for producing a need, and quantitative data on the variable were employed to judge the intensity of the need. The variable, as reflected in data on its rate or distribution in the population, was accordingly viewed as creating a need rather than as satisfying a need that already exists. Used in this manner, the concept of need does not generate a teleological explanation. Second, need was empirically assessed in

194. HOLTON & ROLLER, *supra* note 185, at 218-22.

this Article with quantitative data on phenomena that were defined in a relatively unambiguous and precise manner. The referents of need, therefore, were definite, not obscure. Third, and finally, inferences regarding the intensity of need were based on the level of and trends in the quantitative variables employed—variables such as age that were themselves the subject of the doctrines of law under study or variables that research had found influence the frequency of behaviors such as abortion that were the focus of the doctrines of law under study. In this way, conclusions regarding the existence and intensity of a need do not arise from a presumption regarding the need but, instead, from change in one or more variables that are logically antecedents of the need and that are independently measured. Such an approach involves inferences in only one direction and precludes tautological reasoning.

### *B. Societal Need and Abortion*

Let me return to the subject of abortion. In Part III of this Article, evidence was adduced that increases in the prevalence and duration of schooling among women in their main reproductive years were key to the creation of a societal need for the nonrestrictive abortion law that materialized during the last half of the 1960s and the first half of the 1970s. The apparent impact on abortion law of schooling among females does not end the inquiry, however, for a macrosociological theory of law cannot be confined to the immediate antecedents of law doctrines if the theory is to maximize its ability to explain and predict doctrinal content and change. Rather, the theory must include the forces molding these antecedents, and an explanation, therefore, is required for the fact that, as seen in figure 4 and table 4, school enrollment and college graduation underwent an appreciable rise among young women during the 1950s and 1960s. Identification of the causes of the rise is also a prerequisite to understanding the full range of effects of the large-scale forces that altered the properties of society pertinent to the liberalization of abortion law. For example, the greater extent and length of schooling among young women seems to have been accompanied by a shift, albeit delayed, in the meaning that children have for women,[195] and all of these changes, as contributors to or concomitants of the liberalization of abortion law, may have stemmed from a common source. To obtain a complete picture of the societal setting in which abortion law evolved, an exploration of the reasons for higher rates of school enrollment and college graduation among young women is essential.

What forces expanded the pursuit of education by young women in the United States during the last half of the twentieth century? The research necessary for a definitive answer to this question remains to be done, but I

195. Nock, *supra* note 93, at 388-92.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 272 of 284

suspect two forces were important—viz., increases in the stock of knowledge and increases in the density of population. Elsewhere I have discussed why I believe these forces enlarged the number of court decisions during the 1960s and 1970s that dealt with the constitutional guarantee of equal protection.[196] Here, I would like to outline briefly the reasons I think the two forces made school enrollment and college graduation more common among young women and, in turn, helped to produce law that accepted the use of abortion.

I begin with growth in the stock of knowledge because I believe that, with respect to abortion, it is the more influential of the two forces. Increases in the quantity and quality of knowledge, and associated advances in technology, are presumably responsible for changes observed in the occupational structure of the United States—specifically, the noticeable enlargement during the 1950s and 1960s of the part of the occupational structure devoted to information.[197] These changes can also be seen during the twentieth century in the expanding size of the professional and technical workforce, an expansion that was especially rapid after World War II: during the fifty years from 1900 to 1950, the proportion of professional and technical workers in the economically active population rose by approximately four percentage points, but in the twenty years from 1950 to 1970, the magnitude of the rise was some five percentage points.[198] Decadal growth in professional and technical workers was thus considerably larger in the two decades that followed 1950 than in the five decades that preceded it.

The effect of knowledge and its increase are not confined to the occupational structure, however, but extend to the pursuit of education, for the greater size of the professional and technical workforce has, since the middle of the twentieth century, fostered school attendance after high school.[199] Change in the volume of knowledge, that is, altered the occupational system in a way that affected the incidence of tertiary education. Consequently, the post-World War II increase among young women in school enrollment and college completion (seen in figure 4 and table 4, respectively) was not happenstance, and it was undoubtedly a key factor in the movement of employed females into the professions after 1950.[200] Collectively,

---

196. BARNETT, *supra* note 11, at 22-24.

197. Nass, *supra* note 57, at 206.

198. Professional, technical, and kindred workers comprised 4.3% of the economically active population in 1900, 8.6% in 1950, and 13.7% in 1970. Computed from HISTORICAL STATISTICS, *supra* note 45, at 140 (Series D 233-682).

199. Pamela Barnhouse Walters, *Occupational and Labor Market Effects on Secondary and Postsecondary Educational Expansion in the United States: 1922 to 1979*, 49 AM. SOC. REV. 659, 668 (1984).

200. JAMES P. SMITH & MICHAEL P. WARD, RAND CORP., WOMEN'S WAGES AND WORK IN THE TWENTIETH CENTURY 40 (1984).

these changes—which stemmed from the enlarged store of knowledge—promoted the rationality of society and, hence, individual choice on a variety of matters.[201] In short, the volume and growth of knowledge had a major impact on the American social system at this time, an impact manifested in changes involving the role of women and, in turn, in law pertinent to women. Law banning gender-based discrimination in employment[202] and law regulating the grounds for abortion are illustrative.

With regard to population density, it is notable that the fraction of the U.S. population residing in a relatively populous area grew steadily during the twentieth century and that the fraction was appreciable in the period preceding and accompanying the reform of abortion law. To be exact, the percentage of the U.S. population residing in a metropolitan setting doubled between 1910 and 1950 (twenty-eight percent to fifty-six percent), and it continued to mount between 1950 and 1960 (fifty-six percent to sixty-three percent) and between 1960 and 1970 (sixty-three percent to sixty-nine percent).[203] How did exposure to an urban environment of a large and expanding share of the population contribute to the evolution of abortion law? Research indicates that, because its residents are more frequently college graduates,[204] such an environment is characterized by views, and presumably actions, that deviate from tradition.[205] Indeed, the impact of urbanism on civil liberties may be greatest in terms of the role of women.[206] Therefore, increases in metropolitan residence, by fostering or at least allowing the acceptance of nontraditional behavior, probably promoted the schooling and educational attainment of women.

In sum, I believe that, for the reasons I have outlined, growth in knowledge and increases in population density were instrumental in modifying abortion law in the United States. As forces reshaping the American social order, they changed the core of society in a number of ways that encouraged young women to enroll in school and complete college. Specifically, increases in the volume of knowledge and the density of population may have altered the social system in a manner that increased the ratio of burdens to benefits from childbearing and broadened the range of nonrepro-

---

201. *See supra* notes 55-64 and accompanying text; Barnett, *supra* note 47.

202. *See supra* notes 69-75 and accompanying text.

203. FRANK HOBBS & NICOLE STOOPS, U.S. CENSUS BUREAU, U.S. DEP'T OF COMMERCE, DEMOGRAPHIC TRENDS IN THE 20TH CENTURY: CENSUS 2000 SPECIAL REPORTS, at A-5 (2002). A geographic area that is labeled "metropolitan" contains "a large population nucleus, together with adjacent communities having a high degree of social and economic integration with that nucleus." *Id*. at B-4.

204. Laura M. Moore & Seth Ovadia, *Accounting for Spatial Variation in Tolerance: The Effects of Education and Religion*, 84 SOC. FORCES 2205, 2214 (2006).

205. Thomas C. Wilson, *Urbanism, Migration, and Tolerance: A Reassessment*, 56 AM. SOC. REV. 117, 119-21 (1991).

206. Thomas C. Wilson, *Urbanism and Nontraditional Opinion: Another Look at the Data*, 73 SOC. SCI. Q. 610, 612 (1992), at Table 1.

ductive activities that attract women. From a functionalist perspective, society-provided constraints and inducements mold the acts of individual human beings, and growth in the stock of knowledge and the density of population may have changed the constraints and inducements that affect women with respect to bearing and rearing children. In this new social environment, the education of women began to expand and affect fertility-related decisions. As the process unfolded, society removed conspicuous restrictions imposed by law on the termination of pregnancies by adult women: since participation in and progress through the education institution, and the nonreproductive activities that stem from this participation/progress, would not be fully available to young women unless abortion was accessible, the existence of appealing alternatives to childbearing would have required that the institution of law acknowledge the importance of abortion access and eliminate doctrines regarded as major obstacles to abortion use.[207]

207. While the growing demand for education among young women was critical to easing restrictions placed on abortion by law, the change in abortion policy did not appreciably further the schooling of these women: the liberalization of abortion law between 1967 and 1973 did not raise the educational level of white women, and it added just a quarter-year to the average educational achievement of black women. Maya H. Klein, The Effects of Abortion Legislation on Women's Educational Attainment in the United States 83-84, 106, 109, 113-14 (1997) (unpublished Ph.D. dissertation, University of California, Berkeley) (on file with Widener University School of Law Delaware Campus library). This is further evidence that, prior to 1967, women who wished to terminate pregnancies were in general doing so, even if the terminations violated existing law, and that the chief benefit to society from the liberalization of law on abortion was symbolic. Barnett, *supra* note 47.

Appendix
Age of Majority Specified by Law in Each State[208]

| State | Column 2: Age of majority before adoption of age of majority in column 3 | Column 3: Age of majority that replaced the age in column 2 | Column 4: Year of approval by legislature of age of majority in column 3 |
|---|---|---|---|
| Alabama | 21 | 19 | 1975 |
| Arizona | 21 | 18 | 1972 |
| Arkansas | 21 (males);<br>18 (females) | 18 | 1975 |
| California | 21;<br>18 if married | 18 | 1971 |
| Colorado | 21 | 18 | 1973 |
| Connecticut | 21 | 18 | 1972 |
| Delaware | 21 | 18 | 1972 |
| Florida | 21 | 18 | 1973 |
| Georgia | 21 | 18 | 1972 |
| Idaho | 21 (males);<br>18 (females) | 18 | 1972 |
| Illinois | 21 (males);<br>18 (females) | 18 | 1971 |
| Indiana | 21 | 18 | 1973 |
| Iowa | 21 or upon marriage<br>19 or upon marriage | 19 or upon marriage<br>18 or upon marriage | 1972<br>1973 |
| Kansas | 21;<br>18 if married | 18 | 1972 |
| Kentucky | 21 | 18 | 1964 |
| Louisiana | 21 | 18 | 1972 |
| Maine | 21<br>20 | 20<br>18 | 1969<br>1972 |
| Maryland | 21 | 18 | 1973 |
| Massachusetts | 21 | 18 | 1973 |
| Michigan | 21 | 18 | 1971 |
| Minnesota | 21 | 18 | 1973 |
| Mississippi | 21 | 21 | —— |

208. The age of majority that is given applies both to males and to females unless otherwise indicated.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 276 of 284

| | | | |
|---|---|---|---|
| Missouri | 21 | 18 | [See Missouri in Sources list for table.] |
| Montana | 21 (males);<br>18 (females)<br>19 | 19<br>18 | 1971<br>1973 |
| Nebraska | 21 or upon marriage<br>20 or upon marriage | 20 or upon marriage<br>19 or upon marriage | 1969<br>1972 |
| Nevada | 21 (males);<br>18 (females) | 18 | 1973 |
| New Hampshire | 21 | 18 | 1973 |
| New Jersey | 21 | 18 | 1972 |
| New Mexico | 21 | 18 | 1971 |
| New York | 21 | 18 | 1974 |
| North Carolina | 21 | 18 | 1971 |
| North Dakota | 21 (males);<br>18 (females) | 18 | 1971 |
| Ohio | 21 | 18 | 1973 |
| Oklahoma | 21 (males);<br>18 (females) | 18 | 1972 |
| Oregon | 21 or upon marriage | 18 or upon marriage | 1973 |
| Pennsylvania | | | [See Pennsylvania in Sources list for table |
| Rhode Island | 21 | 18 | 1972 |
| South Carolina | 21 | 18 | 1975 |
| South Dakota | 21 (males);<br>18 (females) | 18 | 1972 |
| Tennessee | 21 | 18 | 1972 |
| Texas | 21 | 18 | 1973 |
| Utah | 21 (males);<br>18 (females);<br>or upon marriage | 18 or upon marriage | 1975 |
| Vermont | 21 | 18 | 1971 |
| Virginia | 21 | 18 | 1972 |
| Washington | 21 | 18 | 1970, 1971 |
| West Virginia | 21 | 18 | 1972 |
| Wisconsin | 21 | 18 | 1972 |
| Wyoming | 21<br>19 | 19<br>18 | 1973<br>1993 |

ADD0274

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 277 of 284

Sources:

Alabama: Act of July 22, 1975, No. 77, 1975 Ala. Acts 554; *Ex parte* Bayliss, 550 So. 2d 986, 989 (Ala. 1989) ("From 1852 to 1975, the age of majority in Alabama was 21 years.").

Arizona: ARIZ. REV. STAT. § 1-215 (1956); Act of May 22, 1972, ch. 146, 1972 Ariz. Sess. Laws 1002.

Arkansas: ARK. CODE. § 57-103 (1947); Act of Apr. 4, 1975, No. 892, 1975 Ark. Acts 2321.

California: Act of Dec. 14, 1971, ch. 1748, 1971 Cal. Stat. 3736; Act of Sept. 7, 1955, ch. 183, 1955 Cal. Stat. 648.

Colorado: COLO. REV. STAT. § 2-4-211 (1989); Act of June 25, 1973, ch. 158, 1973 Colo. Sess. Laws 543.

Connecticut: Act of May 9, 1972, No. 127, 1972 Conn. Acts 129 (Reg. Sess.); Altieri v. Altieri, 155 A.2d 758, 760 (Conn. Super. Ct. 1959) ("Under the common law, which has been adopted in our jurisdiction, the age of majority is twenty-one years.").

Delaware: Act of June 16, 1972, ch. 439, 1972 Del. Laws 1351-52; Wife v. Husband, 412 A.2d 724, 725 (Del. Fam. Ct. 1980) (referring to the June 16, 1972 statutory reduction in the age of majority from twenty-one to eighteen years).

Florida: Act of May 9, 1973, ch. 73-21, 1973 Fla. Laws; Act of Nov. 6, 1829, § 1, 1829 Fla. Laws 8-9; Riley v. Holmer, 131 So. 330, 331 (Fla. 1930) ("Under our law, both males and females are minors till they reach the age of twenty-one years. This was the common law rule.").

Georgia: GA. CODE ANN. § 74-104 (1964); Act of Mar. 10, 1972, No. 862, 1972 Ga. Laws 193-99.

Idaho: IDAHO CODE ANN. § 32-101 (1932); Act of Mar. 10, 1972, ch. 117, 1972 Idaho Sess. Laws.

Illinois: Act of July 24, 1939, § 131, 1939 Ill. Laws 37; Act of Aug. 24, 1971, No. 77-1229, 1971 Ill. Laws 2201.

Indiana: IND. CODE ANN. § 34-1-67-1 (1973, repealed 1990); Act of Apr. 16, 1973, no. 313, 1973 Ind. Acts 1715-17; McClain v. Chavez, 383 N.E.2d 414, 415 (Ind. Ct. App. 1978) ("The Legislature changed the age of majority from 21 to 18 years effective as of July 26, 1973").

Iowa: IOWA CODE § 599.1 (1950); Act of April 19, 1972, ch. 1027, 1972 Iowa Acts 83; Act of Mar. 7, 1973, ch. 140, 1973 Iowa Acts 311.

Kansas: Act of Apr. 7, 1978, ch. 155, 1978 Kan. Sess. Laws 683 (reducing the age of majority to sixteen if married); Act of Mar. 26, 1972, ch.161, 1972 Kan. Sess. Laws 606; Act of Apr. 19, 1965, ch. 274, 1965 Kan. Sess. Laws 546.

Kentucky: Act of Mar. 10, 1964, ch. 21, 1964 Ky. Acts 96 (establishing eighteen as the age of majority; approved in 1964 and implemented on January 1, 1965); Showalter v. Showalter, 497 S.W.2d 420, 421 (Ky. 1973)

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 278 of 284

("In 1965 the age of majority was lowered from twenty-one to eighteen years by the General Assembly").

Louisiana: LA. CIV. CODE ANN. art. 37 (vacated by amendment 1987); Act of June 25, 1972, No. 98, 1972 La. Acts 336.

Maine: The age of majority was reduced from twenty-one to twenty in 1969 and from twenty to eighteen in 1971. Act of Oct. 1, 1969, ch. 433, 1969 Me. Laws 1150-68; Act of June 9, 1972, ch. 598, 1971 Me. Laws 164-180 (Spec. Sess.).

Maryland: Act of May 24, 1973, ch. 651, 1973 Md. Laws 1300; Monticello v. Monticello, 315 A.2d 520, 523 (Md. 1974) (quoting legislative history stating that, except for liquor, the 1973 Act "lower[s] the age of majority from twenty-one to eighteen years of age in all areas of the common law, in all sections and articles of the Annotated Code of Maryland, and in all counties of the State of Maryland").

Massachusetts: Act of Oct. 17, 1973, ch. 925, 1973 Mass. Acts 938-53; Orlandella v. Orlandella, 347 N.E.2d 665, 665 (Mass. 1976) ("Effective January 1, 1974, the age of majority was changed from twenty-one to eighteen years of age.").

Michigan: MICH. CONST. of 1963, art. III, § 7; Act of Aug. 4, 1971, no. 79, 1971 Mich. Pub. Acts 142.

Minnesota: MINN. STAT. § 645.45 (1947); Act of May 24, 1973, ch. 725, 1973 Minn. Laws 2082.

Mississippi: MISS. CODE ANN. § 1-3-27 (1999); MISS. CODE ANN. § 1-3-27 (1972).

Missouri: Owens v. Owens, 854 S.W.2d 52, 54 (Mo. Ct. App. 1993) ("In 1974 the Legislature attempted to change the age of majority from twenty-one to eighteen years of age for all purposes except for the purchase of alcoholic beverages. However, the Supreme Court held unconstitutional this blanket attempt to change the age of majority through an improper amendment. State *ex rel.* McNary v. Stussie, 518 S.W.2d 630, 634, 637 (Mo. 1974). Since then, the Legislature has piecemeal changed the age of majority to eighteen in certain instances."). *See also In re* Marriage of Orth, 637 S.W.2d 201, 205 (Mo. Ct. App. 1982) ("The age of majority is, for most purposes, eighteen in Missouri.").

Montana: The age of majority was reduced to nineteen for all persons in 1971 and to eighteen for all persons in 1973. MONT. CODE ANN. § 64-101 (1949); Act of Mar. 6, 1973, ch. 94, 1973 Mont. Laws 109; Act of Mar. 9, 1971, ch. 240, 1971 Mont. Laws 993.

Nebraska: Until 1965, majority was reached at twenty-one or, for females only, upon marriage. NEB. REV. STAT. § 38-101 (1944). From 1965 to 1969, majority was reached at twenty-one or upon marriage for both males and females. Act of May 12, 1965, ch. 207, 1965 Neb. Laws 613. The age of majority was reduced from twenty-one to twenty in 1969 and

from twenty to nineteen in 1972, with marriage conferring majority at younger ages. Act of Mar. 13, 1969, ch. 298, 1969 Neb. Laws 1072; Legis. 1086, 1972 Leg. (Neb. 1972).

Nevada: Act of May 3, 1973, ch. 753, 1973 Nev. Stat. 1577-83.

New Hampshire: N.H. CONST., pt. 2, art. 90; Act of Apr. 4, 1973, ch. 72, 1973 N.H. Laws 51.

New Jersey: Act of July 5, 1972, ch. 81, 1972 N.J. Laws 457; Act of Dec. 28, 1972, ch. 206, 1972 N.J. Laws 790; Green v. Auerbach Chevrolet Corp., 606 A.2d 1093, 1095 (N.J. 1992) ("Effective January 1, 1973, the Legislature lowered the age of majority in New Jersey from twenty-one to eighteen.").

New Mexico: Act of Apr. 2, 1971, ch. 213, 1971 N.M. Laws 727; Montoya de Antonio v. Miller, 34 P. 40, 41 (N.M. 1893) ("the common law fixes the beginning of [full legal age] on the day preceding the twenty-first anniversary of birth, and the same has not been changed by any statute of this territory.").

New York: N.Y. DOM. REL. LAW § 2 (Thompson 1964); Act of June 15, 1974, ch. 920, 1974 N.Y. Laws 2213.

North Carolina: N.C. GEN. STAT. § 4-1 (1986); Act of June 17, 1971, ch. 585, 1971 N.C. Sess. Laws 510.

North Dakota: N.D. CENT. CODE §§ 14-10-01, 14-10-02 (1960); Act of Feb. 26, 1971, ch. 145, 1971 N.D. Laws 230.

Ohio: OHIO REV. CODE ANN. § 3109.01 (1972); Act of Nov. 21, 1973, No. 1, 1973 Ohio Laws 7.

Oklahoma: OKLA. STAT. tit. 15, §§ 13, 14 (1966); Act of Apr. 7, 1972, ch. 221, 1972 Okla. Sess. Laws 332.

Oregon: OR. REV. STAT. §§ 109.510, 109.520 (1971); Act of July 20, 1973, ch. 827, 1973 Or. Laws 2417.

Pennsylvania: 23 PA. CONS. STAT. § 5101 (1991); Act of Dec. 6, 1972, No. 300, 1972 Pa. Laws 1404; 1 PA. CONS. STAT. § 1991 (1995); Act of May 28, 1937, No. 282, 1937 Pa. Laws 1019; Sutliff v. Sutliff, 528 A.2d 1318, 1322 n.4 (Pa. 1987) ("The age of majority for substantive purposes in civil matters remains twenty-one.").

Rhode Island: Act of Mar. 29, 1972, ch. 20, 1972 R.I. Pub. Laws 62, which "changed the age of majority in Rhode Island from twenty-one to eighteen." Vaillancourt v. Vaillancourt, 449 A.2d 885, 886 n.2 (R.I. 1982).

South Carolina: Act of July 2, 1976, no. 695, 1976 S.C. Acts 1886; Act of Feb. 6, 1975, No. 15, 1975 S.C. Acts 13.

South Dakota: S.D. CODIFIED LAWS § 26-1-1 (1967); Act of Feb. 17, 1972, ch. 154, 1972 S.D. Sess. Laws 185.

Tennessee: Act of Mar. 30, 1972, ch. 612, 1972 Tenn. Pub. Acts 494; Cardwell v. Bechtol, 724 S.W.2d 739, 745 (Tenn. 1987) ("That the Legislature has adopted [18 years] for attainment of majority indicates persua-

sively that conditions in society have changed to the extent that maturity is now reached at earlier stages of growth than at the time that the common law recognized the age of majority at 21 years.").

Texas: Act of June 16, 1973, ch. 626, 1973 Tex. Gen. Laws 1722; Dallas Joint Stock Land Bank of Dallas v. Dolan, 92 S.W.2d 1111, 1112 (Tex. Civ. App. 1936) ("By the common law and the law of this state, the status of minority of appellee continues up to the age of 21.").

Utah: UTAH CODE ANN. § 15-2-1 (1953); Act of Mar. 24, 1975, ch. 39, 1975 Utah Laws 121.

Vermont: VT. STAT. ANN. tit. 1, § 173 (1958); Act of Apr. 16, 1971, No. 90, 1971 Vt. Acts & Resolves 208.

Virginia: Act of Apr. 10, 1972, ch. 824-25, 1972 Va. Acts 1472-97; Hurdle v. Prinz, 235 S.E.2d 354, 355 (Va. 1977) ("On July 1, 1972, . . . [chapters 824 and 825] became effective lowering the age of majority from 21 years to 18.").

Washington: The age of majority was reduced from twenty-one to eighteen in 1970 for specified purposes (e.g., contractual obligations, civil litigation) and in 1971 for all purposes. Age Qualifications Act, ch. 292, 1971 Wash. Sess. Laws 1601; Act of Feb. 20, 1970, ch. 17, 1970 Wash. Sess. Laws 145; Act of Mar. 10, 1923, ch. 72, 1923 Wash. Sess. Laws 222.

West Virginia: W. VA. CODE § 2-1-1 (1999); Act of Mar. 11, 1972, ch. 61, 1972 W. Va. Acts 310; Dimitroff v. Dimitroff, 218 S.E.2d 743 (W. Va. 1975).

Wisconsin: WIS. STAT. § 990.01 (1958); Act of Mar. 22, 1972, ch. 213, 1971 Wis. Sess. Laws 509.

Wyoming: The age of majority was reduced from twenty-one to nineteen in 1973 and from nineteen to eighteen in 1993. WYO. STAT. ANN. § 8-1-101 (1999); Act of Feb. 16, 1993, ch. 1, 1993 Wyo. Laws 1; Act of Mar. 5, 1973, ch. 213, 1973 Wyo. Sess. Laws 312.

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 281 of 284

ORIGINAL ARTICLE

# Association of rates of household handgun ownership, lifetime major depression, and serious suicidal thoughts with rates of suicide across US census regions

**D Hemenway, M Miller**

*Injury Prevention* 2002;**8**:313–316

See end of article for authors' affiliations

Correspondence to: Dr David Hemenway, Harvard School of Public Health, 677 Huntington Avenue, Boston, MA 02115, USA; hemenway@hsph.harvard.edu

**Objective:** Cross sectional studies in the United States often find a significant positive association between levels of household firearm ownership and suicide rates. This study investigates whether the association can be explained by differences in levels of mental health.
**Methods:** The relationship between household handgun ownership and overall suicide rates across United States regions after accounting for two mental health variables—lifetime prevalence of major depression and serious suicidal thoughts—were examined. Analyses also add another control variable (urbanization, education, unemployment, or alcohol consumption). Data on mental health variables come from the National Comorbidity Study, conducted in the early 1990s. Data on household handgun ownership come from the General Social Surveys.
**Results:** Across the nine regions for the early 1990s (n = 9), household handgun ownership rates are positively correlated with the suicide rate ($r$ = 0.59) and are not correlated with either the lifetime prevalence of major depression or suicidal thoughts. After controlling for major depression and suicidal thoughts (and any of the four additional control variables), handgun ownership rates remain significantly associated with the overall suicide rate.
**Conclusions:** In United States regions with higher levels of household handgun ownership, there are higher suicide rates. This relationship cannot be explained by differences in the prevalence of two mental health indicators—lifetime rates of either major depression or suicidal thoughts.

Cross sectional studies in the United States, across regions,[1 2] states,[3–5] and urban counties or cities,[6 7] often find a significant association between rates of household firearm ownership and suicide rates.[8] Control variables have included urbanicity, education, unemployment and alcohol problems, but no ecological study we know of has controlled for possible mental health confounders.

In this article we use data from the National Comorbidity Survey (NCS) to investigate the regional relationship of handgun ownership levels and two psychological measures—lifetime prevalence of major depression and serious suicidal thoughts—with rates of suicide.

Our primary aim is to begin to investigate whether the association between firearm prevalence and suicide can be explained by differences in levels of mental health.

## METHODS

This study focuses on three related dependent variables: the total suicide rate, the firearm suicide rate, and the non-firearm suicide rate across the nine census regions. We begin with three explanatory variables, which are included in all analyses: rates of household handgun ownership, lifetime prevalence of major depression, and lifetime prevalence of serious suicidal thoughts. We also add a fourth explanatory variable—which is (1) the percent of the population living in metropolitan areas, or (2) the percent with at least some college, or (3) the percent unemployed, or (4) the per capita alcohol consumption. These four control variables are added, one at a time, to regressions that include (as independent variables) the prevalence of household handgun ownership, lifetime suicidal thoughts, and lifetime major depression (that is, these regressions have four rather than three independent variables).

For suicides, we use average regional rates for a 10 year period (1988–97). Data for the number of suicides, firearm suicides, and non-firearm suicides as well as yearly population figures come from the National Center for Health Statistics Mortality Files.[9] Deaths from firearm of undetermined intention constitute less than 3% of all firearm deaths and are excluded from the analysis. Region specific population and mortality data are derived by aggregating the corresponding state based data. The suicide rate within each region is very stable over the 10 year study period; the largest absolute (and percentage) variation in the rate of suicide within a region occurred in region 3, where the suicide rate averaged over the 10 year period was 10.9 per 100 000 (range 9.9–11.6 per 100 000). This within-region variation is far smaller than the twofold variation across regions. Using the rate for any year, or the average over the 10 years, yields similar results.

Data for the percentage of households with handguns in each region come from published survey based estimates from the General Social Surveys (GSS). The GSS, conducted by the National Opinion Research Center most years from 1972 to 1993, and biennially since 1994, is the gold standard for national surveys of gun ownership. In its current form, the GSS is conducted in person with a national area probability sample of 3000 non-institutionalized adults. The sample is chosen to be representative of each of the nine census regions. We use regional handgun ownership data averaged over the 1988–97 period.[10]

Because the stock of guns in the United States is so high (over 200 million guns in civilian hands) and because guns are highly durable goods, year-to-year variations in survey estimates of firearm ownership rates are as likely to reflect measurement error rather than actual fluctuations in firearm

**Abbreviations:** GSS, General Social Surveys; NCS, National Comorbidity Survey

ADD0279

**Table 1** Regional rates of suicide, mental illness, and handgun ownership

| | Region 1 (NE) | Region 2 (MA) | Region 3 (ENC) | Region 4 (WNC) | Region 5 (SA) | Region 6 (ESC) | Region 7 (WSC) | Region 8 (MT) | Region 9 (PAC) |
|---|---|---|---|---|---|---|---|---|---|
| Suicide rate (per 100 000) | 9.7 | 9.0 | 10.9 | 12.2 | 13.1 | 12.9 | 12.7 | 18.0 | 12.6 |
| Firearm suicide rate (per 100 000) | 4.2 | 4.0 | 6.1 | 7.2 | 8.6 | 9.8 | 9.0 | 11.6 | 6.8 |
| Non-firearm suicide rate (per 100 000) | 5.5 | 5.0 | 4.8 | 4.9 | 4.5 | 3.1 | 3.8 | 6.4 | 5.8 |
| Major depression (prevalence, %) | 18.5 | 15.3 | 17.1 | 16.4 | 16.5 | 16.8 | 15.2 | 16.7 | 20.9 |
| Suicidal thoughts (prevalence, %) | 14.5 | 11.9 | 14.2 | 12.7 | 13.0 | 12.7 | 11.0 | 19.9 | 15.2 |
| Household handgun (prevalence, %) | 14.1 | 11.9 | 19.5 | 19.2 | 27.3 | 38.3 | 30.7 | 26.4 | 22.5 |

ENC, East North Central; ESC, East South Central; MA, Mid-Atlantic; MT, Mountain; NE, Northeast; PAC, Pacific; SA, South Atlantic; WNC, West North Central; WSC, West South Central.

ownership levels. Handgun ownership data are, therefore, averaged over the 10 year study period to obtain more reliable estimates of regional handgun ownership rates.

Data on mental health variables come from the NCS, a nationally representative household survey of people aged 15–54 years old. The NCS was conducted between September 1990 and February 1992 to determine the prevalence, distribution, correlates, and consequences of psychiatric disorders in the United States. The final sample consisted of 8098 participants for a response rate of over 82%. The survey provides representative samples of the nine census regions. Verbal informed consent was obtained from all respondents and from the parents of minors before the interviews began. Detailed descriptions of the methods employed by the NCS have been published elsewhere.[11]

Mental health variables come from a survey of 15–54 year olds, whereas the suicide data pertain to all ages. Since rates of depression and suicide may be higher in more elderly groups, analyses might be biased if regional age distributions materially differ. However, across the nine regions, the percent of the population that is 15–54 years old varies little: from 70% to 73% with a mean of 72%. Moreover, the correlation coefficient across the nine regions between the suicide rate for all individuals and for individuals 15–54 years old is 0.99. Not surprisingly, results are virtually identical whether the dependent variable is the regional suicide rate for all individuals or the regional suicide rates for individuals aged 15–54 year olds.

The NCS provides information concerning the prevalence of a multitude of psychiatric disorders, including mood disorders (depression, dysthymia, mania), anxiety disorders (agoraphobia, generalized anxiety disorder, panic, social phobia, simple phobia, post-traumatic stress disorders), and substance use disorders (alcohol abuse, alcohol dependence, drug abuse, drug dependence).

All respondents who screened positive for a lifetime prevalence of any disorder and a random subsample of other respondents were administered a part II interview (5877 respondents). The data for these respondents were weighted to correct for differential probabilities of selection into part II as well as for differential probabilities of within-household selection and non-response. Questions on three aspects of suicidality were included in the part II interview (suicidal thoughts, plans, attempts).

Since the number of observations in our study is very small (n = 9 regions), we decided to investigate only a small number of disorders. The criteria for selection were a strong expected relationship between the disorder and suicide based on the psychological literature, and a large enough prevalence of the disorder in the population so the attributable risk would be sufficient to discover an effect and there would be an adequate cell size to ensure precision of the regional estimates. For the second criteria, we decided that the weighted national prevalence of the disorder had to be great enough to ensure that, if the least populous region had an average prevalence, there would be a minimum of 40 respondents from that region reporting the disorder. Two disorders met our criteria: lifetime prevalence of major depression and of serious suicidal thoughts.

The question on suicide thoughts asked: "Have you ever seriously thought about committing suicide?" The prevalence, distribution, and risk factors for lifetime prevalence of ever having serious suicidal thoughts is described in detail elsewhere.[12]

Major depression is the prevalence of people having a lifetime major depressive episode, based on responses to a modified version of the Composite International Diagnostic Interview. The approach to case ascertainment in the NCS, and particularly the comparison with the use of the Diagnostic Interview Schedule in the Epidemiologic Catchment Area study is described in detail elsewhere.[13]

Data for the percent of the population living in metropolitan areas, the percent with at least some college, and the percent unemployed are 10 year averages and come from the Statistical Abstract of the United States. Data for alcohol consumption pertains to gallons of beer, wine, or spirits divided by the population over age 14 and come from the National Institute on Alcohol Abuse and Alcoholism.

Bivariate associations are presented as simple correlation coefficients. Multivariate models use ordinary least squares, using two tailed $t$ tests for statistical significance.

## RESULTS

Across the nine regions, the suicide rate, averaged from 1988–97, varies from 9.0 per 100 000 in the Mid-Atlantic region to 18.0 in the Mountain region. Table 1 provides the regional rates of suicide, firearm suicide and non-firearm suicide, the lifetime prevalence of major depression and suicidal thoughts, and the average rates of household handgun ownership over the 10 year period. Seventeen percent (17%) of respondents on the NCS study reported ever having a major depression; residents of the Pacific region had the highest prevalence. Over 13% of respondents reported ever having serious suicidal thoughts; the Mountain region had the highest prevalence. Rates of household handgun ownership range from 12% in the Mid-Atlantic region to 38% in the East South Central region.

Across the nine regions, household handgun ownership rates are highly positively correlated with the suicide rate ($r$ = 0.59), and the firearm suicide rate ($r$ = 0.83), and negatively correlated with the non-firearm suicide rate ($r$ = –0.57) (table 2). Household handgun ownership rates are not correlated with either the prevalence of major depression ($r$ = –0.10) or suicidal thoughts ($r$ = –0.01).

The prevalence of major depression and prevalence of suicidal thoughts are positively correlated, but the prevalence of major depression is not correlated with the suicide rate ($r$ = 0.00), while the prevalence of suicidal thoughts is correlated with the suicide rate ($r$ = 0.68) (table 2). Figure 1 provides a graphical representation of regional suicide rates with household handgun ownership, prevalence of major depression, and suicidal thoughts across the nine regions.

**Table 2** Correlation coefficients: rates of suicide, firearm suicide, non-firearm suicide, lifetime major depression, lifetime suicidal thoughts and firearm ownership, US census regions

| | Suicide rate | Firearm suicide rate | Non-firearm suicide rate | Major depression | Suicidal thoughts |
|---|---|---|---|---|---|
| Firearm suicide rate | 0.93 | | | | |
| Non-firearm suicide rate | 0.27 | –0.12 | | | |
| Major depression | 0.00 | –0.18 | 0.43 | | |
| Suicidal thoughts | 0.68 | 0.39 | 0.77 | 0.39 | |
| Household handgun prevalence | 0.59 | 0.83 | –0.57 | –0.10 | –0.01 |

Rates of suicide, firearm suicide, and non-firearm suicide come from the National Center for Health Statistics. Psychiatric disorder prevalence estimates by census region, 1991–92, come from the National Co-morbidity Study. Lifetime major depression (n=8098) and suicidal thoughts (that is, ever seriously considered suicide) (n=5877) were reported by 17% and 13% of respondents nationally. Mean household firearm and handgun ownership rates come from the General Social Surveys (1988–97).

**Figure 1** Regional rates of suicide compared with regional prevalence of household handgun ownership (1988–97), lifetime major depression, and lifetime suicidal thoughts.

In multivariate regression (n = 9), with household handgun ownership, major depression and suicidal thoughts as the three independent variables, handgun ownership levels are positively associated with the firearm suicide rate ($p<0.01$), negatively associated with the non-firearm suicide rate ($p <0.01$), and positively associated with the overall suicide rate ($p <0.05$) (not shown). Suicidal thoughts are positively associated with all three suicide rates ($p <0.01$), while major depression is not associated with any of the three suicide rates.

The Mountain region has the lowest population, and the highest rate of suicide. As a sensitivity analysis we eliminated that region from the regression (n = 8). In multivariate analysis, the association of household handgun ownership levels with firearm, non-firearm and total suicide rates is unaffected, major depression remains non-significantly correlated with the suicide rates, but suicidal thoughts are no longer significantly correlated with any of the suicide rates (not shown). The simple correlation between suicidal thoughts and overall suicide falls dramatically ($r = -0.11$), while the correlation between major depression and suicidal thoughts rises to $r = 0.93$ (not shown).

When any one of the additional variables (the percent of the population living in metropolitan areas, the percent with at least some college, the percent unemployed, or the per capita alcohol consumption) are added as a fourth explanatory variable, the relationship between the regional prevalence of household handgun ownership and the regional suicide rate remains similar, statistically and in magnitude, as does the relationship between lifetime suicidal thoughts and the regional suicide rate (not shown).

## DISCUSSION

Across United States regions, where there are more handguns there are higher rates of firearm suicide, lower rates of non-firearm suicide, but higher levels of overall suicide. This article shows that regional levels of handgun ownership are not correlated with regional lifetime rates of major depression or suicidal thoughts. The association between rates of handgun ownership and suicide remains strong at the regional level even after accounting for the lifetime prevalence of major depression and suicidal thoughts.

The association between household handgun ownership rates and the total suicide rate is robust. The handgun-suicide connection holds when we use the 1992 rates of suicide rather than the 1988–97 average (not shown) and when rates of gun ownership rather than just handgun ownership are used as an independent variable (though the association between gun ownership levels and suicide is not quite so strong) (not shown). In addition, our results hold when any one of four additional control variables are added to the analyses (urbanization, education, unemployment, or alcohol consumption).

This study has various limitations. First, as in any ecological study, a concern is that the association found at the aggregate level does not exist at the individual level. For example, from our data, even if there is a regional level association between alcohol and suicide, we do not know if the individuals who are alcohol consumers are the ones more likely to commit suicide. However, from other studies we know that guns are the prime method of suicide in the United States, most people who use guns to commit suicide use family guns, and a gun in the home is a risk factor for firearm suicide.[8] We thus have somewhat less reason to be concerned about the “ecological fallacy” with respect to the gun prevalence-suicide connection.

Second, there is uncertainty associated with our measures—particularly our explanatory variables that come from self report surveys—that may bias the estimated relationships. Third, regional groupings undoubtedly mask considerable variation in the prevalence of both handgun ownership levels and mental health problems. Because we have representative mental health data only at the regional level, we have only nine observations. Fourth, we use only two measures of mental health—lifetime prevalence of major depression and of serious suicidal thoughts. Other mental health and socioeconomic factors undoubtedly influence the suicide rate.

We did not find any association between lifetime prevalence of major depression and suicide. Using data on current (30 day) prevalence of major depression might provide a better measure of susceptibility to suicide than lifetime prevalence. The NCS found a prevalence of current depression of less than 5%, putting into question the precision of estimates for the least populous of the nine census regions, if we use that measure. Dividing the country in four regions, the prevalence of current depression was highest in the South (where gun prevalence and suicide rates are highest) but second highest in the Northeast (where gun prevalence and suicide rates are lowest).[13]

Case: 20-35827, 03/05/2021, ID: 12026734, DktEntry: 26-2, Page 284 of 284

**Key points**

Across US regions:
- Handgun ownership rates are associated with suicide rates.
- Handgun ownership rates are not associated with rates of lifetime major depression.
- Handgun ownership rates are not associated with rates of lifetime serious suicidal thoughts.
- Rates of depression and suicidal thoughts cannot account for the handgun-suicide connection.

Compared with males, females have higher rates of both current and lifetime depression, higher rates of suicidal thoughts and suicidal attempts, but lower rates of suicide. Unfortunately, the NCS is not large enough to allow us to confidently disaggregate regional mental health measures by gender or age to get precise estimates to include in our analysis.

The strengths of our ecological study are that we use a good measure of handgun ownership levels, and we are the first to control for mental health risk factors. Our main results are consistent with case-control studies that find that a handgun or other firearm in the home is a risk factor for suicide, even after accounting for various measures of mental health.[14–18] We find that in regions with higher levels of household handgun ownership, there are higher rates of firearm suicide, lower rates of non-firearm suicide (suggesting substitution of methods), and higher rates of overall suicide. This positive association between handgun prevalence and overall suicide across regions cannot be explained by differences in levels of two indicators of mental health problems—lifetime prevalence of major depression or suicidal thoughts.

## ACKNOWLEDGEMENT

This research was supported in part by the Joyce Foundation, Robert Wood Johnson Foundation, and the Open Society Institute. Thanks to Beth Molnar and Ron Kessler.

### Authors' affiliations

**D Hemenway, M Miller,** Harvard School of Public Health, Boston

## REFERENCES

1 **Markush R**, Bartolucci A. Firearms and suicide in the United States. *Am J Public Health* 1984;**64**:123–7.
2 **Birckmayer J**, Hemenway D. Suicide and gun prevalence: are youth disproportionately affected? *Suicide Life Threat Behav* 2001;**31**:303–10.
3 **Lester D**. Gun ownership and suicide in the United States. *Psychol Med* 1989;**19**:519–21.
4 **Miller M**, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths, suicide and homicide among 5–14 year olds. *J Trauma* 2002;**52**:267–75.
5 **Miller M**, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths, suicide and homicide among women. *J Urban Health* 2002;**79**:26–38.
6 **Kleck G**, Patterson EB. The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology* 1993;**9**:249–87.
7 **Hellsten JJ**. Motivation and opportunity: an ecological investigation of US urban suicide, 1970–1990. PhD thesis in social ecology. Irvine: University of California, 1995.
8 **Miller M**, Hemenway D. The relationship between firearms and suicide: a review of the literature. *Aggression and Violent Behavior* 1999;**4**:59–75.
9 **National Center for Injury Prevention and Control**, Centers for Disease Control and Prevention. *Injury mortality statistics*. Available at: http://www.wonder.cdc.gov/mortsql.shtml.
10 **Davis J**, Smith T. *General social surveys, 1972–1998* [machine-readable data file]. Principal Investigator, James A Davis; Director and Co-Principal Investigator, Tom W Smith; Chicago: National Opinion Research Center. The Roper Center for Public Opinion Research, University of Connecticut, 1998.
11 **Kessler RC**, McGonagle KA, Zhao S, *et al.* Lifetime and 12 month prevalence of DSM-III-R psychiatric disorders in the United States. Results from the National Comorbidity Survey. *Arch Gen Psychiatry* 1994;**51**:8–19.
12 **Kessler RC**, Borges G, Walters EE. Prevalence of and risk factors for lifetime suicide attempts in the National Comorbidity Survey. *Arch Gen Psychiatry* 1999;**56**:617–26.
13 **Blazer DG**, Kessler RC, McGonagle KA, *et al.* The prevalence and distribution of major depression in a national community sample: the National Comorbidity Survey. *Am J Psychiatry* 1994;**151**:979–86.
14 **Brent DA**, Perper JA, Goldstein CE, *et al.* Risk factors for adolescent suicide. A comparison of adolescent suicide victims with suicidal inpatients. *Arch Gen Psychiatry* 1988;**45**:581–8.
15 **Brent DA**, Perper JA, Allman CJ, *et al.* The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. *JAMA* 1991;**266**:2989–95.
16 **Brent DA**, Perper JA, Moritz G, *et al.* Firearms and adolescent suicide: a community case-control study. *Am J Dis Child* 1993;**147**:1066–71.
17 **Bukstein OG**, Brent DA, Perper JA, *et al.* Risk factors for completed suicide among adolescents with a lifetime history of substance abuse: a case-control study. *Acta Psychiatr Scand* 1993;**88**:403–8.
18 **Kellermann AL**, Rivara FP, Somes G, *et al.* Suicide in the home in relation to gun ownership. *N Engl J Med* 1992;**327**:467–72.

View publication stats