No. 20-35827

In the United States Court of Appeals
for the Ninth Circuit

Daniel Mitchell, Robin Ball, Luke Rettmer, Nathaniel
Casey, Matthew Wald, Second Amendment Foundation, and
National Rifle Association,

Plaintiffs — Appellees,

v.

Chuck Atkins, in his official capacity as the Sheriff of Clark County,
Washington, Craig Meidl, in his official capacity as the Chief of Police of
Spokane, Washington, and Teresa Berntsen, in her official capacity as the
Director of the Washington State Department of Licensing,

Defendants — Appellants,

and

Safe Schools Safe Communities,

Defendant — Intervenor — Appellant.

Appeal from the United States District Court for the
Western District of Washington; No. 3:19-cv-05106-JCC

**Appellants' Reply Brief**

Ard Law Group PLLC

Joel Ard
joel@ard.law
P.O. Box 11633
Bainbridge Island, Washington 98110
(206) 701-9243

Albrecht Law PLLC

David K. DeWolf
david@albrechtlawfirm.com
5105 E. Third Avenue, Suite 101
Spokane Valley, WA 99212
(509) 495-1246

May 17, 2021

## TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ARGUMENT ...........................1

II. FACTS ............................................................................... 2

III. ARGUMENT...................................................................... 2

    A. Common use must be measured by all owners, nationwide. ................... 2

    B. The age provision violates the Second Amendment. ............................ 4

        1. The Second Amendment protects rights of 18-to-20 year old adults. ................................................................................. 4

        2. The State's "Second Amendment Framework" entirely misstates the meaning and protections of the Second Amendment recognized in *Heller*. ...................................11

        3. The ban is so sweeping it fails *Heller* or strict scrutiny. .................15

        4. The restriction fails even intermediate scrutiny ........................... 16

    C. The law unconstitutionally bans interstate FFL to FFL sales................. 19

        1. The law bans interstate FFL to FFL sales. ...................................20

        2. The ban is unconstitutional. .........................................................20

        3. There is no Congressional authorization for the ban. ................... 21

    D. All claims are justiciable........................................................................22

IV. CONCLUSION......................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016)............................................................. 3

*Carey v. Piphus*, 435 U.S. 247 (1978)...................................................................... 24

*City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978)................................................. 22

*District of Columbia v. Heller*, 552 U.S. 1035 (2007).................................................... 6

*District of Columbia v. Heller*, 552 U.S. 1035 (2008) ............................................. passim

*Edwards v. City of Coeur d'Alene*, 262 F.3d 856 (9th Cir. 2001) ................................... 12

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................................ 15

*Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015) ...................... 4

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).......................................................... 4

*General Motors v. Tracy*, 519 U.S. 278 (1997) .......................................................... 22

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) .......................................................... 18

*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)............................ 18

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) ........................................... 12, 16

*Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986) ................................ 24

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525 (2020) .......................................................................................................... 24

*Packingham v. North Carolina*, 137 S.Ct. 1730 (2017) ................................................ 18

*Renna v. Becerra*, 2021 WL 1597933 (S.D. Cal. April 23, 2021)...................................... 3

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) .................................................. 16, 17

*Teixeira v. Cty. of Alameda*, 873 F.3d 670 (9th Cir. 2017)...................................... 10, 13

*United States v. Miller*, 307 U.S. 174 (1939) ............................................................ 7

*United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) .............................................. 17

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) .................................................... 24

## STATUTES

18 U.S.C. § 922(b)(3)............................................................................................. 21, 22

## OTHER AUTHORITIES

James H. Price and Jagdish Khubchandani, *Firearm Suicides in the Elderly: A Narrative Review and Call for Action*, J COMMUNITY HEALTH. 2021 Feb 5 .....................11

## I. Introduction and Summary of Argument

Respondents (hereinafter "State") and their amici made several fundamental errors in their arguments. First, they evade the clear holding of *District of Columbia v. Heller*, 552 U.S. 1035 (2008), by substituting the exceptions to the right to keep and bear arms for the fundamental right that *Heller* acknowledges. *Heller* permitted *regulating* the manner of acquiring firearms and the circumstances in which they could be used, and also excluded from the protections of the Second Amendment persons such as convicted felons or the mentally ill who had historically been denied the right to possess firearms. Nonetheless, *Heller* held that the Second Amendment applies to the *people generally*, not just to those the State deemed sufficiently responsible.

The second fundamental error is to propose a level of scrutiny that would never be countenanced with respect to any other enumerated constitutional right. Imagine, for example, an argument that it was constitutional to forbid religious worship by congregations of more than 25 people on Sunday because other opportunities for religious worship were still available; or that 18-to-20 year old adults could be banned from posting on social media because they had other means of expressing themselves. Only the most compelling reasons could justify the State's wholesale ban on an otherwise lawful activity, and none have been presented here.

Finally, the State attempts to evade the statute's clear interdiction of interstate commerce by ignoring the plain language of the statute in favor of what the statute's drafters supposedly intended. In addition, the State proposes limiting the dormant interstate commerce clause to economic favoritism—a position sharply at odds with well established application of that clause.

Each of the State's arguments fails to overcome the showing in Appellants' Opening Brief that I-1639 is unconstitutional both because it abridges the right to keep and bear arms and because it prohibits otherwise lawful interstate commerce.

## II.  Facts

The State proffers a series of "undisputed or unrebutted facts" (Answer Brief, at 11-12) in an attempt to defend I-1639 under either intermediate or strict scrutiny. But these assertions of "fact" were either rebutted in previous briefing or are irrelevant to the determination of the constitutional rights of the plaintiffs. For example, the claim that shotguns or bolt-action rifles are suitable—even "ideal"—for self-defense was rebutted. Semi-automatic rifles, Plaintiffs showed, are the second most popular choice for in-home self defense, and best home defense firearm available to 18-to-20 year old adults. The fact that there are other means by which an individual can exercise a protected right—such as freedom of the press or the right to religious worship—does not justify depriving an individual of the chosen means. And the fact that 18-to-20 year old adults commit a disproportionate number of crimes does not justify the State taking away their constitutional rights any more than a factual claim that a particular ethnic group or gender is responsible for a disproportionate amount of crime would. Punishing an individual for wrongs committed by other members of a group to which the individual belongs is odious to the principle of individual liberty enshrined in our Constitution.

## III.  Argument

### A.  Common use must be measured by all owners, nationwide.

The State mistakenly suggests that the Plaintiffs' burden is to show that semiautomatic rifles are in common use ***by young adults***.[1] But *Heller*, *McDonald*, and *Caetano* all demonstrate that the test for whether a category of firearms is in "common use" must be measured by considering the United States as a whole, not

---

[1] Answer Brief, at 43. The State would have this Court demand that Plaintiffs prove the common use by young adults of these types of rifles, knowing full well that no one, anywhere, keeps such data. Indeed, the State itself acknowledged as much. *See* Answer Brief at 43-44, discussing difficulty of estimating whether SARs are in common use.

restricting the measurement to either a geographical region or a specific age or other subset of people. *Caetano*, for example, measured the common use of stun guns in the United States, not just among people in Massachusetts. *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, concurring). Following the correct approach, Plaintiffs demonstrated that semiautomatic rifles have been purchased by the millions across the United States. By any relevant measure, they are in common use. Appellants further demonstrated that, despite millions upon millions of semi-automatic rifles in private hands in the United States, they are used in crime so rarely that no one even keeps separate count.[2] Thus, the vast majority are used for only lawful purposes.

To follow the State's suggestion, and ask whether the affected group commonly and lawfully own these types of firearms, would permit evisceration of the Second Amendment by measuring a ban against itself. Once a certain firearm has been banned, all those who possess it cease to be law abiding and therefore the firearm is not in common use by law abiding citizens when the ban is tested in court. Indeed, under the State's approach, it could successfully ban ***all*** firearms ownership by ***all*** adults, simply by initially banning all those under 21 from firearms ownership, and then expanding by a year in successive legislation until no one was left.

The Southern District of California, in *Renna v. Becerra*, 2021 WL 1597933 (S.D. Cal. April 23, 2021), recently rejected just that strategy, and agreed that the state cannot slowly nibble away at Second Amendment rights by claiming that a restriction is only a minor imposition and that other ways to exercise the right remain. In *Renna*, plaintiffs challenged the provisions of California law that mandated removal of three handguns from the list of those approved for sale in the

---

[2] See, for example, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-20 (listing only "rifles" as a category).

state in exchange for every single handgun added to the list. The Court agreed that the plaintiffs stated a valid claim for violation of their Second Amendment rights by pointing to the state's gradual elimination of available handguns. *Id.* at *7. The Seventh Circuit also rejected this type of approach, holding that "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015). This Court has routinely followed the approach of *Heller* and *Caetano*, measuring common use based on nationwide sales data. *See, e.g.*, *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (noting millions of the subject magazines were sold "over the last two decades in the United States" and therefore concluding that they were in common use).

**B.    The age provision violates the Second Amendment.**

The State's claim that 18-to-20 year old adults have no Second Amendment rights directly contradicts the central holding in *Heller*. The Second Amendment codifies pre-existing rights of the people, a group that includes not only all members of the federally organized militia, but also a larger group that includes the federally organized militia, namely, all members of the unorganized militia. It also protects an even larger group that includes all members of the militia as well as others. That largest group is "the people," and comprises "all members of the political community, not an unspecified subset." *Heller*, 552 U.S. at 580. Because 18-to-20 year old adults were and are members of the federally organized militia, *Heller* has already resolved that those same adults are part of "the people," and have Second Amendment rights.

**1.    The Second Amendment protects rights of 18-to-20 year old adults.**

The State ignores the methodology for analyzing Second Amendment rights adopted in *Heller*, which looked to the historical understanding of what was meant

by the Second Amendment's text. *Heller* held that the Second Amendment codified what was understood at the time as a preexisting right *of the people* to keep and bear arms; this right applied not just when they were part of an organized militia, but was more fundamental, insuring that when the need for a militia arose, the people would be ready. To be sure, *Heller* acknowledged exceptions to this right:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27. But this language does not obscure the more fundamental holding that the Second Amendment should be given a broad, rather than narrow, reading. Nevertheless, the State does pretends that *Heller* authorized broad restrictions on Second Amendment rights so long as the State could justify them with a plausible rationale.

      a)      ***Heller* establishes that 18-to-20 year old adults have rights protected by the Second Amendment.**

The State looks everywhere other than the Supreme Court's decision in *Heller* to find support for its astonishing claim that 18-to-20 year old adults simply have no rights protected by the Second Amendment. *Heller* leads to the opposite conclusion and settles the question against the State.

The Supreme Court granted *certiorari* in *Heller* to address a question it wrote: did the challenged District of Columbia laws "violate the Second Amendment rights of individuals who are not affiliated with any state-regulated militia, but who wish to keep handguns and other firearms for private use in their homes?" *District of Columbia v. Heller*, 552 U.S. 1035 (2007). This presented two subsidiary questions: first, who has Second Amendment rights? Second, did those rights extend to "keep[ing] handguns and other firearms for private use in their homes?"

*Heller* resolved both questions with legal conclusions that, taken together, are utterly fatal to the State's position that young adults between ages 18 and 20 have no he Second Amendment rights. *Heller* held that the Second Amendment protects the pre-existing rights of "the people." It also held that "the militia" is a subset of "the people." Logically, then, *Heller* compels the conclusion that ***all*** members of "the militia" have protected rights under the Second Amendment, and that others do as well, constituting the larger group of "the people" of which "the militia" is a subset. Because 18, 19, and 20 year old adults were and are members of "the militia," *Heller* confirms that they have Second Amendment rights.

*Heller* begins by confirming, unequivocally, that "[t]he first salient feature of the operative clause is that it codifies a 'right of the people.'" *Heller*, 554 U.S. at 579. Further, "the term unambiguously refers to ***all members of the political community***, not an unspecified subset." *Id.* at 580 (emphasis added). The use of the phrase "the people" "contrasts markedly with the phrase 'the militia' in the prefatory clause. . . [T]he 'militia' in colonial America consisted of a ***subset*** of 'the people'—those who were male, able bodied, and within a certain age range." *Id.* (emphasis added).

Thus, the Second Amendment, in its prefatory and operative clauses, refers to two groups: first, "the people," all of whom have rights codified in the Amendment, and second, "the militia," a subset of the larger group. Because "the militia" is a subset of "the people," all members of the militia are also members of the larger set, "the people." *Heller* went into even greater detail in reaching and clarifying its conclusion that "the people," not merely members of organized state militias, have Second Amendment rights. The Court reiterated its statement from *United States v. Miller*, 307 U.S. 174 (1939) that "'the Militia comprised all males physically capable of acting in concert for the common defense.'" *Heller*, 554 U.S. at 595 (quoting *Miller*, 307 U.S. at 179). Then the Court clarified that an organized militia is a subset of the larger group "the militia." The Court recognized that "the

militia is assumed by Article I already to be in existence." Article I gave Congress the power to organize that pre-existing group, which the Court held "is fully consistent with the ordinary definition of the militia as all able-bodied men." *Heller*, 554 U.S. at 596. Therefore, "[a]lthough the militia consists of all able-bodied men, the federally organized militia may consist of a subset of them." *Id.*

Thus, in determining who has rights protected by the Second Amendment, the Court found that (1) all members of the federally organized militia are members of "the militia," which also has more members than only the federally organized militia, and (2) all members of the militia are members of "the people" who have Second Amendment rights, and which is a larger group than the militia. Any person who was (or is) a member of the federal organized militia is necessarily a member of the larger group "the militia," and therefore also necessarily a member of the yet larger group "the people." The Court cited the first Militia Act as defining the smallest of these groups, the federally organized militia:

> [T]he first Militia Act . . . specified that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia."

*Heller*, 554 U.S. at 596 (internal citations omitted).

As the Appellants' opening brief demonstrated, young adults between 18 and 20 are now, and since the founding era have been, members of "the militia." Numerous colonies defined them as members of the militia prior to the adoption of the Constitution and Second Amendment. App. Brief. at 17 (citing statutes). Because 18-to-20 year old adults are now members of the militia, and were members of the militia in the founding era, *Heller*'s holding as to the meaning and scope of "the people" in whom the protected rights inhere means that the Supreme Court has already decided, in *Heller*, that 18-to-20 year old adults have rights.

### b) Founding-era militia laws are the best historical evidence.

Just as the State ignores the central holding of *Heller*, it ignores founding and colonial era militia laws in order to justify denying 18-to-20 year old adults rights protected by the Second Amendment. This Court, and every court which has analyzed the scope of Second Amendment rights since *Heller*, has looked to laws of the colonial and founding era and earlier English law as the best evidence of the scope of the rights codified in the Second Amendment.

In order to determine what the words of the Second Amendment meant to those who drafted and adopted it, *Heller* relied extensively on colonial- and founding-era militia acts, among other sources. *Id.* at 584 (reviewing "nine state constitutional provisions written in the 18th century or the first two decades of the 19th"); *id.* at 590 (evaluating the Pennsylvania Militia Act of 1757); *id.* at 591 (comparing the language used in a debate in the House of Lords in 1780). When it came to the key question presented here—*whose* pre-existing rights were codified in the Second Amendment?—the *Heller* court engaged in an extensive review of various founding era militia laws. Because the militia is a subset of those who possess the protected right, any person who is a member of the militia referred to in the prefatory clause, necessarily possesses the rights codified in the Second Amendment.

*Heller* focused on the meaning of "militia" in the prefatory clause to demonstrate that it referred to the unorganized militia—all able-bodied men—not merely the organized military or National Guard. The Court engaged in a careful review of founding and colonial militia laws to demonstrate that the word, at the time of adoption of the Second Amendment, identified a body that "consists of all able-bodied men . . ." *Heller*, 554 U.S. at 596. *Heller* demonstrates that the very laws cited in Appellants' opening brief are the best source of evidence for the rights recognized by those of the founding era and which they codified in the Second Amendment. The State asks this Court to ignore both the holding in Heller and the best evidence of

the meaning of the Second Amendment to reach the conclusion that 18-to-20 year old adults do not have Second Amendment rights.

### c) The "age of majority" applied in other contexts has no bearing on whether 18-to-20 year old adults have Second Amendment rights.

*Heller* did not, as the State proposes, cabin the meaning and scope of the Second Amendment by limitations historically imposed on activities other than keeping and bearing arms. It did not look, for example, at voting rights in 1786 to decide which persons or groups were protected by the Amendment. Instead, *Heller* held that the Amendment codified a right understood to belong to "the people." Nor did *Heller* consider limitations on, for example, rights to property ownership, formation of contracts, or the rights of women to make legal decisions separate from fathers or husbands. None of these limitations were considered relevant to determining who are "the people" whose firearms rights are protected by the Second Amendment. There is simply no support in *Heller* for the proposition put forward by the State that limitations placed on other activities during the founding era could be transposed to place limitations on the Second Amendment. *Heller* calls for examining the historical record with respect to the right in question. Asking whether a group faced other, unrelated restrictions is not the same inquiry, and entirely irrelevant. Instead, by citing restrictions more recent than the founding era, the State rejects *Heller*'s historical analysis in favor of a mode of judicial review that would allow gradual erosion of constitutional rights. As *Heller* made clear, the proper method of judicial review is first to determine what was understood to be the scope of that right when it was adopted, and then to apply it.

This Court has adopted *Heller*'s approach to determine the scope of the rights protected by the Second Amendment. *See, e.g.*, *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 684-686 (9th Cir. 2017) (Second Amendment protects commercial firearm

sales, reviewing, *i.a.*, the English Bill of Rights, Blackstone, histories of arms in colonial America, a Virginia law of 1657, a Connecticut law of 1665, and a Maryland law of 1638). The colonial and founding era militia laws cited by Appellants are the most compelling evidence, in addition to the holding of *Heller* itself, that the Second Amendment protects the pre-existing right of 18-to-20 year old adults to purchase and possess long guns.

> ### d) *Heller*, not an "emerging judicial consensus," governs the outcome here.

As shown above, *Heller* confirms that 18-to-20 year old adults are part of the body of "the people" whose right to keep and bear arms was codified in the Second Amendment. The State asks this Court to disregard *Heller* in favor of an "emerging judicial consensus" that adults age 18 to 20 simply do not have any Second Amendment rights. This approach not only flouts the central holding of *Heller*, but also ignores its explicit caution against substituting a "judicial consensus" for rights guaranteed by the Constitution: "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35.

Amici contend that I-1639's ban on purchase of semi-automatic rifles is merely an "age provision" that is a permissible exercise of the state's police power (States' brief at 10), or a measure justified by the "disproportionate share of suicide attempts" on the part of young adults (Giffords brief at 9). But precisely the same rationale could be applied to a restriction on access to firearms by persons over the

age of 65. In light of the disproportionate risk of suicide in that age group,[3] would the state's police power allow it to adopt what is merely an "age provision"? Plainly not.

### 2. The State's "Second Amendment Framework" entirely misstates the meaning and protections of the Second Amendment recognized in *Heller*.

As *Heller* held, "the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right," namely, the "individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. That right is incorporated by the Fourteenth Amendment against the states. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010). *Heller* repeated this holding emphatically throughout the majority opinion: "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. Instead of recognizing that *Heller* established a fundamental, personal right to keep and bear arms, the State believes that any limitation it chooses to place on that right is "presumptively valid."

The State first makes the breathtaking claim that "the law does not burden conduct protected by the Second Amendment." Answer Brief, at 16. The only way to make sense of this astonishing claim is to smuggle the conclusion (that the law does not violate the Second Amendment) into the proposition. If it were true that 18-to-20 year old adults possess *no* Second Amendment rights, then the State could bar 18-to-20 year old adults from possessing *any* type of firearm—not just the semi-automatic rifles at issue here. In no other context would it be said that an outright ban on the form of an activity "does not burden" the right sought to be exercised. For example, a ban on "the attachment of any wooden, plastic or other type of

---

[3] James H. Price and Jagdish Khubchandani, *Firearm Suicides in the Elderly: A Narrative Review and Call for Action*, J COMMUNITY HEALTH. 2021 Feb 5 : 1–9 (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7864138).

support to signs carried during parades and public assemblies" plainly implicates—and violates—the First Amendment. *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 861 (9th Cir. 2001). This ban creates an even greater imposition on Second Amendment rights than forbidding sign handles does for First Amendment rights.

To forbid an entire class of people—in this case, 18-to-20 year old adults—from acquiring through normal commercial channels the firearm they judge best suited to the various lawful purposes to which that firearm can be put plainly burdens the activity. If the question is whether the plaintiffs have a protected right to purchase, keep, and bear a semi-automatic rifle, the answer is clear; an absolute ban on the normal means of acquiring the firearm in question indisputably burdens the right to keep and bear it. "'[t]he right to keep arms, necessarily involves the right to purchase them . . .'" *Teixeira*, 873 F.3d at 678 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)).

The State argues that *Heller*'s acceptance of "lawful regulatory measures." (Answer Brief, at 17) applies to the prohibition on purchase. But a prohibition on purchasing firearms is not a mere regulation or procedural hurdle that imposes inconvenience or delay, like requiring a background check. Instead, it is an outright ban. This Court has firmly rejected the State's claim that banning purchases of firearms is a presumptively lawful regulation. Instead, it has firmly held that the right to keep and bear arms includes the right to purchase them. "[T]he core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." *Teixeira*, 873 F.3d at 677.

The State further attempts to deny that laws including 18-to-20 year old adults in the militia provide any historical basis for excluding them from the class of persons entitled to exercise Second Amendment rights. Again, in an effort to avoid *Heller*'s clear application, the State claims that "*Heller* specifically described the Second Amendment as a 'right unconnected with militia service.'" Answer Brief, at 25. Just

as it strains credulity to suggest that I-1639 does not burden the rights of 18-to-20 year old adults, it would turn *Heller* on its head to characterize the majority opinion as finding the history of militia service as irrelevant to the analysis of how 18-to-20 year old adults have been treated historically. Rather than narrowing the Second Amendment right, as the State suggests, the quoted language from *Heller* was meant to demonstrate that it was not *militia service alone* that was understood as a preexisting right that the Second Amendment codified. Further, and as detailed above, contrary to the District of Columbia's argument (and that of the *Heller* dissent), the militia identified in the prefatory clause was not "the state- and congressionally-regulated military forces described in the Militia Clauses . . ." but comprised "all able bodied men." *Heller*, 554 U.S. at 596. The "militia" comprised far more than those called by the government into actual service because "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Id.* at 598. The Court explained:

> It was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down. It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution.

*Heller*, 554 U.S. at 599. Thus, in addition to Mr. Heller's right to purchase and possess a firearm in common use by law-abiding citizens for the purpose of defending himself and his family in his own home, the Second Amendment codified the preexisting right of all people—the unorganized militia—to keep and bear arms for self-defense, for hunting, and to preserve the existence of a "citizens' militia as a safeguard against tyranny." *Id.* at 600.

13

After this lengthy exposition, the Court struck down the law because it "totally bans handgun possession in the home. It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id*. at 628. "The handgun ban amounts to a prohibition of ***an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose***. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute." *Id*. at 628–29 (internal quotations and citations omitted) (emphasis added).

Thus, a state ban on purchasing and using a class of firearms in common use in the United States is unconstitutional. Moreover, the majority explicitly left open—to the dismay of the dissent—the outcome of future cases asserting the protection of other activities by the Second Amendment: *Id*. at 635. Neither *Heller* nor the Second Amendment support the State's contention that the right consists exclusively of an individual right to self-defense in the home, on terms and conditions as the State sees fit to allow, subject to whatever limitations and exceptions it might implement. Because *Heller* was a challenge to a law that effectively prevented defense of the home, the Court was at pains to explain how that interest related to the stated purpose of the Second Amendment—to insure the availability of a well-regulated militia. But it would stand *Heller* on its head to suggest that defense of the home was the *only* right it protected. Instead, it also protects other activities, such as target shooting, which more directly serve the interest of forming a well-regulated militia. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 690 (7th Cir. 2011) (because target practice was not outside the scope of Second Amendment protections, remanding to enjoin a law which banned gun ranges but "conditions [gun] possession on range training").

Nor can the State limit Second Amendment protection to members of groups that the State elects to deem "responsible." *Heller* summarizes its analysis by stating

that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 552 U.S. at 635. It uses the word "responsible" as a shorthand for the long-standing historical exclusion of identifiable persons who had forfeited their rights or had been legally subjected to state control because they posed a danger to themselves or others. This status was determined on an individual basis, resulting from individual, adjudicated conduct. Neither the Second Amendment, nor *Heller*, nor any other constitutional doctrine, gives any support to the State's proposal that a majority of the state's voters can decide that a minority group can be excluded from constitutional protections because the majority deems that group not "responsible."

### 3. The ban is so sweeping it fails *Heller* or strict scrutiny.

The State's ban on purchase of an entire category of firearms in common use in the United States cannot be reconciled with *Heller*, *McDonald*, and *Caetano*. The State attempts to minimize the impact of the law by characterizing the ban on *purchase* (but not possession) as so minor an inconvenience that it should face only intermediate scrutiny. Of course, *Teixeira* precludes any finding that a purchase ban is anything other than a major imposition on core Second Amendment rights. But worse, the State claims that the effect of that supposedly minor inconvenience will be a dramatic reduction in the very rare case of young adult violent crime committed with semiautomatic rifles. Both *Heller* and *McDonald* reject a role for "judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 561 U.S. at 790–91. This law "imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right [and] is unconstitutional under any level of scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). Like the blanket handgun ban in *Heller* that failed any degree

of scrutiny in the Supreme Court, this law bars 18, 19, and 20 year old adults from purchasing any model of semi-automatic rifle.

I-1639 is not merely among the category of "laws which regulate only the manner in which persons may exercise their Second Amendment rights [and which] are less burdensome than those which bar firearm possession completely." *Silvester*, 843 F.3d at 827. As this Court has held, the purchase of arms is the way a person exercises her fundamental right to keep and bear arms. The State bans that protected conduct. Conditioning a fundamental, enumerated right on the receipt of permission or a gift from a parent goes far beyond regulation of the manner of exercise. No other enumerated Constitutional right would survive such "regulation." As such, the ban is far more of an imposition on the exercise of the Second Amendment rights than any ban to which the Ninth Circuit has given strict scrutiny.

### 4. The restriction fails even intermediate scrutiny

*Heller* reiterates that the core of the Second Amendment right is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) (quoting *Heller*, 554 U.S. at 635). This law is not, as the State would have it, among the category of "laws which regulate only the manner in which persons may exercise their Second Amendment rights [and which] are less burdensome than those which bar firearm possession completely." *Silvester*, 843 F.3d at 827. The State argues that whenever it can offer evidence of a group's immaturity or emotional deficits, it can deny that group otherwise guaranteed by the Constitution. Understandably, the State must insist that intermediate scrutiny applies, but it cannot even survive that test. This law directly implicates the core of the Second Amendment right for responsible, law abiding adults who happen to be 18, 19, and 20 years old. It effectively strips them of their constitutionally protected right to purchase arms.

### a) There is no discernable "fit" between the restriction and public safety.

The State mischaracterizes intermediate scrutiny by omitting the requirement that the legislature's chosen means be narrowly tailored to achieve its ends, or that the law be the least restrictive means of achieving its ends. *See* Answer Brief at 35, citing *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 966 (9th Cir. 2014); *Gould v. Morgan*, 907 F.3d 659, 674 (1st Cir. 2018). In fact, I-1639 fails intermediate scrutiny unless the State can affirmatively demonstrate that the law is "narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017) (internal quotation marks omitted).

The government bears the burden of proving that the chosen imposition on a constitutional right serves the identified governmental interest. Even crediting the interest, I-1639 does not prevent adults from accessing semiautomatic rifles. The State freely admits that I-1639 does not prevent 18-to-20 year old adults from actually accessing and possessing semi-automatic rifles" *See* Answer Brief at 29. Not only does I-1639 permit supposedly "irresponsible" adults to acquire semiautomatic rifles legally, but the State additionally ignores the substantial possibility that a person intent on committing a crime with a firearm would pursue illegal means to obtain one. But far worse than simply being ineffectual, I-1639 actually subverts the identified governmental interest, which is to prevent the use of semiautomatic rifles in mass shootings. Absent the purchase ban of I-1639, an adult under age 21 who wished to purchase a semiautomatic rifle would undergo the same background check that is applied to any other purchaser; with the ban, he cannot. For all of the reasons identified in State's brief, a background check serves a legitimate governmental interest in preventing felons, the mentally ill, and other legally adjudicated "irresponsible" persons from obtaining firearms. But as a result of I-1639, the only way that a young adult can access to a semiautomatic rifle—access which I-1639 not

only contemplates but specifically permits—is to obtain a semiautomatic rifle *without* a background check. Not only can a background be avoided when giving or loaning a semiautomatic rifle to a young adult; **a background check is legally forbidden**. A sympathetic adult who is persuaded that a young adult should have access to a semi-automatic rifle, might also believe that it should be purchased, so that a background check could be performed. I-1639 now makes such a background check impossible.

If "intermediate scrutiny" is to mean anything, it requires not only consideration of the strength of the governmental interest asserted, but also whether it is "narrowly tailored"—so that it does not inflict substantial damage to other legitimate interests, especially enumerated constitutional rights. I-1639 undeniably prevents more than 300,000 Washington citizens from exercising their constitutional right to keep and bear arms—for self-defense, for marksmanship, for hunting, and for other lawful purposes. But it does little to achieve the goal of preventing mass shootings, and may very well have a negative impact by evading the background check requirement that would otherwise apply. [4]

> **b)    I-1639 is not effective in meeting the State's asserted public safety interest in preventing school shootings.**

The State asserts that the specific harm sought to be avoided by I-1639 is the prevention of mass shootings by young adults, yet it characterizes this interest as a generic concern about "gun violence" because it cannot show that a reasonable fit exists between the statutory scheme of I-1639 and the interest of preventing young adults from using semiautomatic rifle in school shootings. Thankfully these horrific

---

[4] The State characterizes Appellants' objection as a "speculative theory" (Answer Brief, at 40). Yet the State makes the far more speculative claim that by preventing lawful purchase (but not access) by 18-to-20 year old adults, the law will effectively reduce the number of deaths caused by mass murderers. Against demonstrable harm, the State can only offer a speculative offsetting benefit.

events are extremely rare.[5] In fact, semi-automatic rifles are so rarely used in any crime that databases on gun crimes do not even list semi-automatic rifles as a separate category. Thus, the State's premise that 18-to-20 year old adults disproportionately commit violent crimes does not support banning them from purchasing a type of firearm lawfully possessed by millions of Americans but rarely used in crime. There is no "fit" between the State's asserted interest in advancing public health and safety and a complete ban on purchasing firearms. This is especially true where the State contends that the law will prevent mass school shootings, which are also extremely rare.

Because the State fails to demonstrate that a reasonable fit exists between its interests and the statutory scheme of I-1639, the statute fails even intermediate scrutiny.

## C. The law unconstitutionally bans interstate FFL to FFL sales.

I-1639 unmistakably prevents—has prevented, and continues to prevent—Dan Mitchell from making profitable sales of semi-automatic rifles in interstate commerce. The record below made clear that, prior to the law's enactment, Mitchell regularly profited from such sales, and the law prevents him from continuing to do so, harming him in a manner that would be remedied by striking it down. ER 115. Mitchell clearly has standing to challenge the ban on interstate sales. The State's primary defense is that the law means what the citizen drafters wanted, not what they said. This fails.

---

[5] Plaintiffs have challenged two aspects of I-1639: the prohibition of sales of semiautomatic rifles to certain adults, and the prohibition against purchase of semiautomatic rifles by residents of other states. The State has proposed intermediate scrutiny for the prohibition on sales of semiautomatic rifles to resident adults, basing their defense of the statute on the supposedly "irresponsible" character of adults between ages 18 and 20. Consequently, to pass constitutional muster this aspect of the statute must be narrowly tailored to serve the specific governmental interest of preventing mass shootings by those adults.

### 1.   The law bans interstate FFL to FFL sales.

The State effectively concedes that a ban on interstate FFL to FFL sales would be unconstitutional. Instead, the State attempts to make the law mean something other than what the words actually say. As shown in Appellants' opening brief, *purchase* and *sale* have unique meanings in firearms law, and no assurance to this Court that the drafters of the law meant something else will change its legal effect.

### 2.   The ban is unconstitutional.

The State truncates the well-established dormant Interstate Commerce Clause jurisprudence as though it only banned discrimination in the form of economic protectionism; further, it argues that because I-1639 only negatively affects Mitchell and other in-state licensed firearms dealers, it is not "economic protectionism" favoring in-state economic interests. But the State's efforts to limit the scope of the dormant Interstate Commerce Clause are unpersuasive. First, every economic transaction, and every economic effect, has two sides. Any financial harm Washington imposes on in-state dealers has a price-reducing effect on in-state buyers. The State cannot avoid the Interstate Commerce Clause by claiming that a restriction on interstate commerce has only negative effects on its own citizens.

The cases cited by the State also fail to support their position. For example, the State relies on *General Motors v. Tracy*, 519 U.S. 278 (1997), for its "economic protectionism" argument. There, the Court upheld the challenged regulation because the statute was facially non-discriminatory: "The State of Ohio imposes its general sales and use taxes on natural gas purchases from all sellers, whether in-state or out-of-state, except regulated public utilities that meet Ohio's statutory definition of a 'natural gas company.'" *GM v. Tracy*, 519 U.S. at 281-282. Similarly, the State relies on *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), to suggest that without economic favoritism benefiting the state's own residents, there is no discrimination. But there, the Supreme Court struck down a New Jersey law

forbidding the importation of solid or liquid waste originating outside the state. The asserted justification for the law was protection of the environment. Thus, it is *protectionism of any kind* that is *per se* unconstitutional, not just economic protectionism. Just as the desire to protect New Jersey residents from environmental degradation could not save a statute that discriminated against out-of-state sales, I-1639 cannot be saved by claiming that it is protecting the health and safety of Washington residents (without favoring them economically).

   **3.     There is no Congressional authorization for the ban.**

   The State also asserts that Congress allows the interstate commerce restriction by imposing criminal penalties on dealers who do not comply with relevant state laws when making sales or deliveries. This argument also fails. Phrased in double and triple negatives, 18 U.S.C. § 922(b)(3) requires federally licensed dealers who ***sell*** or ***deliver*** long guns to residents of other states to know, understand, and comply with the laws of both the state in which they operate as well as the state of the purchaser's residence. It imposes criminal penalties on any dealer who fails to do so. It further imposes a presumption of knowledge: "any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States . . . ." 18 U.S.C. § 922(b)(3). The State argues that because Mitchell must comply with Washington law as well as another state's law in making ***sales*** or ***deliveries*** to non-residents, it can therefore ban ***purchases*** by those non-residents for sale or delivery by a different dealer in a different state.

   The argument fails because Congress specifically did not authorize a state ban on interstate commerce. It regulated (and subjected to state regulation) sale and delivery by dealers, but it did not thereby authorize discriminatory regulation of ***purchase***—again, because, as discussed above, sale, delivery, and purchase are

different and uniquely understood in firearms law. Here, none of the State's cases or discussions of legislative history offer any support for the law's effect of banning out-of-state residents from purchasing semiautomatic rifles from Washington dealers for eventual *delivery* to those purchasers in their home states. As discussed above, when a dealer such as Mitchell does so, it is not, as a matter of Washington law, a sale or delivery. The State's extensive discussion of legislative history shows, in fact, that the ban is too broad—again, because it regulates *purchase*, not *sale* or *delivery*. The federal statute, 18 U.S.C. § 922(b)(3), requires Mitchell to comply with both states' laws when he sells or delivers. According to the State's mistaken reading of state law, the State may prohibit Mitchell from selling or delivering to a non-resident purchaser, because that prohibition reaches only conduct within the state's borders. But the law reaches further: because I-1639 instead banned *purchase* by non-residents, it reaches conduct which the state plainly cannot regulate, regardless of 18 U.S.C. § 922(b)(3). Thus, none of the cases cited by the State are apposite. Irrespective of whether Congress *could* authorize limitations on *purchase* in a way that affects interstate commerce, Congress has chosen not to do so. It allows state regulation of sale and delivery by licensed dealers, actions which by definition occur within the state. This law goes far beyond that.

**D.    All claims are justiciable.**

The District Court assumed that plaintiffs' claims were justiciable. On appeal, the Respondents concede justiciability. Answer Brief, at 2. The only issue that might require explanation is whether the young adult plaintiffs still have standing. Because of the passage of time inherent to litigating this case, Casey and Rettmer are now able to purchase semiautomatic rifles on the same terms as other Washington citizens. However, as the Supreme Court has recognized, once a plaintiff establishes a constitutional violation, nominal damages are recoverable by the plaintiffs, and preclude mootness. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798 (2021); *Carey v.*

*Piphus*, 435 U.S. 247 (1978); *Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986); In *New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525 (2020), the Supreme Court recognized that even though the City had withdrawn the ordinance that was being challenged, the case would not be moot if the plaintiffs added a claim for damages: "On remand, the Court of Appeals and the District Court may consider whether petitioners may still add a claim for damages in this lawsuit with respect to New York City's old rule." *Id.* at 1526.

## IV. Conclusion.

The State has failed to overcome the arguments presented in Appellants' opening brief. *Heller* unambiguously found that 18-to-20 year old adults were among the *people* whose right to keep and bear arms shall not be infringed. The State and amici have presented no evidence or argument that would withstand the type of scrutiny that such a broad ban requires. In addition, the State's misreading of the dormant interstate commerce clause cannot save an unconstitutional restriction on sales to nonresidents. The judgment of the court below should be reversed, and the case remanded for entry of judgment in Appellants' favor.

///

May 17, 2021.

Ard Law Group PLLC

By: _____

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Attorneys for Plaintiffs

Albrecht Law PLLC

By: _____

David K. DeWolf, WSBA #10875
421 W. Riverside Ave., Ste. 614
Spokane, WA 99201
(509) 495-1246
Attorneys for Plaintiffs

## Certificates

This filing complies with the length requirements of Federal Rule of Appellate Procedure 35 because it contains fewer than **7700** words.

This filing complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32 because it uses a proportionally spaced typeface, Equity 14 point.

This filing was served on all parties' counsel at the time of filing by delivering it through the Court's electronic docketing system.

Ard Law Group PLLC

By _____

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Joel@Ard.law

Attorneys for Plaintiffs—Appellants